UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| EMHART INDUSTRIES, INC.<br><br>Plaintiff,<br><br>v.<br><br>HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICAN, LIBERTY MUTUAL INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICAN INSURANCE COMPANY and United States FIRE INSURANCE COMPANY<br><br>Defendants | Civil Action No.: 02-053-S |

**DEFENDANT THE NORTH RIVER INSURANCE COMPANY'S MOTION *IN LIMINE* TO EXCLUDE EXPERT TESTIMONY OF MICHAEL P. BONCHONSKY**

Pursuant to Fed.R.Evid. 702, defendant The North River Insurance Company ("North River") moves that the Court enter an order precluding plaintiff's expert witness, Michael P. Bonchonsky ("Bonchonsky"), from offering any opinions at trial. As grounds for this motion, North River states that such "opinions" do not meet the standard for admissibility under Fed.R.Evid. 702 and are irrelevant to the issues in the case. In further support of this motion, North River relies upon its Memorandum of Law submitted herewith.

**THE NORTH RIVER INSURANCE COMPANY,**

By its attorneys,

Mark T. Nugent, RI Bar# 2637
MORRISON MAHONEY LLP
121 South Main Street, Suite 600
Providence, RI 02903-7141
(401) 331-1660

John T. Harding, *pro hac vice*
MORRISON MAHONEY LLP
250 Summer Street
Boston, MA 02210-1181
(617) 439-7500

Dated: May 16, 2006

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| EMHART INDUSTRIES, INC.<br><br>Plaintiff,<br><br>v.<br><br>HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, LIBERTY MUTUAL INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICA INSURANCE COMPANY and United States FIRE INSURANCE COMPANY,<br><br>Defendants | Civil Action No.: 02-053-S |

**DEFENDANT THE NORTH RIVER INSURANCE COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION *IN LIMINE* TO EXCLUDE EXPERT TESTIMONY OF MICHAEL P. BONCHONSKY**

## I. INTRODUCTION

The Court should preclude Michael P. Bonchonsky ("Bonchonsky"), an expert designated on behalf of plaintiff Emhart Industries, Inc. ("Emhart"), from offering what amount to "generic" opinions untethered to the facts of this case. Indeed, Bonchonsky's report [Ex. 1 hereto] is so devoid of specific information or analysis concerning the chemical manufacturing and waste handling operations that took place at the Centredale Manor Site (the "Site") that it could apply to virtually any chemical manufacturing plant from a similar era. Bonchonsky asserts that information concerning waste disposal practices at the Site is "sketchy" and "limited," yet makes sweeping pronouncements that the employees at the Site did not expect or intend that their conduct would cause damage. In rendering such opinions, Bonchonsky ignores available testimony and information concerning the operations at the Site and their effect on the environment. Bonchonsky improperly seeks to use the absence of federal statutes and

regulations to demonstrate that the employees did not expect or intend the harm. Bonchonsky offers a similarly "canned" opinion that certain waste disposal practices were allegedly "common" and, therefore, that no harm was expected. Ultimately, because Bonchonsky does not offer any opinions that are sufficiently reliable to be admitted under Fed.R.Evid. 702, and because the proposed opinions would not assist the trier of fact in resolving any issue in the case, the opinions should be excluded.

## II. THE TESTIMONY AT ISSUE

Bonchonsky is a lawyer, environmental consultant, and former employee of the Environmental Projection Agency. [Ex. 1 at 2]. Bonchonsky has testified on behalf of policyholders in numerous other environmental coverage cases, including on behalf of Emhart's parent corporation, Black & Decker. [See Ex. 1 at Expert Testimony Assignments]. Bonchonsky's report does not establish that he has any expertise in the waste handling practices of chemical manufacturing operations during any era. Bonchonsky states that he was retained in this case to offer an opinion on whether the employees "of the chemical production operations would have expected or intended that damage was occurring to the environment as a result of their manufacturing and handling practices." [Ex. 1 at 3].

Under New York law applicable to the policy issued by defendant The North River Insurance Company ("North River"), Emhart bears the burden of proof as to whether there is a covered "occurrence" at the Site, including proof that the property damage was neither expected nor intended. *Consolidated Edison Co. of New York v. Allstate Ins. Co.*, 98 N.Y.2d 208, 220, 774 N.E.2d 687 (N.Y. 2002). An "objective" standard is used to determine whether the property damage was neither expected nor intended. *Borg-Warner Corp. v. Ins. Co. of N. Am.*, 577

N.Y.S.2d 953, 959 (3d Dept. 1992); *County of Broome v. Aetna Cas. & Sur. Co.*, 540 N.Y.S.2d 620, 622 (3d Dept. 1989).

Based upon only the briefest overview of selected facts [Ex. 1 at 6-7], Bonchonsky offers a series of generic opinions that are not linked in any meaningful way to the operations at the Site. [Ex. 1 at 4-5]. Bonchonsky never analyzes the actual chemical processing operations, waste streams and waste disposal practices at the Site. Nevertheless, he sweepingly concludes that (1) before the advent of federal environmental laws and the creation of the Environmental Protection Agency in the 1970's no one understood the concept of environmental harm; (2) "everyday leaks and spills"[1] at the Site would not have been expected to cause damage; (3) the use of land for disposal was "common"; (4) similarly, the disposal of chemical wastes into unlined earthen disposal forms was a "common" practice; and (5) discharge of wastes to surface waters was an equally "common" and accepted practice. [Ex. 1 at 4-5]. Essentially, Bonchonsky's testimony boils down to generic opinions regarding the claimed significance of the absence of federal regulations and his conclusions as to what were "common" practices of the time. However, Bonchonsky never links up any of these "opinions" to the actual facts at the Site. Such opinions ignore the extant factual record regarding the Site and make leaps of logic that are without any factual support.

---

[1] Of course, Bonchonsky's opinion that there were routine leaks and spills at the Site simply shows why Emhart's claim is barred by the pollution exclusion contained in the North River policy. *Northville Industries Corp. v. National Union Fire Ins. Co.*, 89 N.Y.2d 621, 679 N.E.2d 1044 (N.Y. 1997).

## ARGUMENT

### I. APPLICABLE LEGAL STANDARD

Federal Rule of Evidence 702 controls the admissibility of opinion or "expert" testimony. The rule provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

District Courts are guided in their determination of the admissibility of evidence under Rule 702 by the Supreme Court's decisions in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) and *Kumho Tire v. Carmichael*, 526 U.S. 137 (1999). "Under the holding of *Daubert*, a district court must act as a 'gatekeeper' by determining 'whether the reasoning or methodology underlying the testimony is ... valid and whether that reasoning properly can be applied to the facts in issue.'" *Zachar v. Lee*, 363 F.3d 70, 76 (1st Cir. 2004) (quoting *Daubert*, 509 U.S. at 592-93). "In *Kumho Tire*, the Court extended the reach of *Daubert's* gatekeeping function to cover all types of expert testimony involving technical or otherwise specialized knowledge." *Id.*

As "gatekeeper," the trial judge must determine if the "expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. In determining the reliability of the proffered testimony -- whether the expert's opinion is based upon "good science" and not reliant upon flawed methodology -- the court should consider whether the technique or methodology utilized by the expert has been tested and peer reviewed, as well as whether it is generally accepted by the scientific community. *Id.* at 593-595.

Relevancy is determined not only under the general principles of Federal Rule of Evidence 402, "but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue." *Ruiz- Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998) (noting that *Daubert* "imposed a special relevancy requirement"); *Hall v. Eklof Marine Corp.*, 339 F. Supp. 2d 369, 381 (D.R.I. 2004); *The Beacon Mutual Ins. Co. v. One Beacon Ins. Group*, 253 F. Supp. 2d 221, 222 (D.R.I. 2003). The Supreme Court has provided useful guidance on this point:

> [C]onclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also Ruiz-Troche*, 161 F.3d at 81 stating that *Joiner* "[also] placed a gloss on *Daubert's* insistence that trial courts focus on an expert's methodology, rather than his conclusions, in order to determine the reliability of his testimony"); *Smith v. General Elec. Co.*, 2004 WL 870832, at *3 (D. Mass. Apr. 23, 2004) (explaining that *Joiner* provides "[t]he most authoritative guidance as to the meaning of this 'special relevancy requirement'").

## II. BONCHONSKY'S "GENERIC" OPINIONS ARE UNRELIABLE, IRRELEVANT AND SPECULATIVE

### A. Bonchonsky Fails to Apply a Reliable Method to the Facts

At the most fundamental level, Bonchonsky's proffered expert testimony should be rejected because there is nothing to indicate that the testimony is based upon sufficient facts or data; that the testimony is the product of reliable principles and methods; or that Bonchonsky has applied any principles and methods reliably to the specific facts concerning the Site.

Bonchonsky's report does not even reflect a discernable methodology other than to offer conclusory opinions coupled with the contention that the employees at Metro Atlantic did not act in a manner that is "inconsistent" with an alleged industry standard that he never defines. Bonchonsky never links his opinions to the history of operations at the Site in any meaningful way. As such, Bonchonsky's opinions fail to meet the threshold criteria for admissibility. *See Ed Peters Jewelry Co. v. C&J Jewelry Co.*, 124 F. 3d 252, 259 (1st Cir. 1997) (court must ensure that the proposed testimony "rests upon a reliable foundation and is relevant to the facts of the case") (internal citations omitted).

Although the Metro Atlantic facility operated for a period of nearly twenty-five years, Bonchonsky's report contains virtually no information or analysis of what actually transpired at the plant during this period. In particular, Bonchonsky has not provided any substantive analysis of what chemicals and chemical processes were used at the plant; what specific waste streams were generated as a result of the manufacturing operations; or how those waste streams were actually handled and disposed of. Indeed, the most repeated refrain in Bonchonsky's report and deposition is that there is limited information concerning the actual waste handling practices at the Site. [*See* Ex. 1 at 14-15, 19; Bonchonsky Dep. 9/10/03 at 76-77, 138, 192; Ex. 2]. When asked if he knew how MetroAtlantic handled its various waste streams, Bonchonsky replied: "Well, as I mentioned all along, the information regarding waste streams is fairly sketchy...***A clear picture is not really obtainable from the information available.***" [Bonchonsky Dep. at 192 (emphasis added)]. Nevertheless, Bonchonsky goes on to opine that the employees are "unlikely" to have expected or intended any harm from the practices as to which there is insufficient information to develop a "clear picture." This inherently contradictory approach simply underscores that Bonchonsky's opinions are not properly anchored to the facts at the Site.

The unreliable nature of Bonchonsky's approach is further emphasized by the fact that he utterly ignores the available evidence concerning the historic operations at the Site and their impact on the environment. For example, Bonchonsky did not even consider the analysis of historical aerial photographs of the Site that was prepared by EPA in 2000 which documented the history of waste disposal at the Site over the course of decades. As summarized in the Interim Final Remedial Investigation Report:

> Evidence of improper waste disposal activities at the source area is documented in an analysis of historical aerial photographs conducted by the U.S. EPA Office of Research and Development (U.S. EPA, 2000). U.S. EPA analyzed thirteen sets of black-and-white historical aerial photographs taken from 1939 to 2000 to assess landscape morphology, patterns of hazardous waste disposal, and other discernable activities and conditions of environmental significance at the source area. Results from the study showed evidence of waste disposal activities dating back to 1951, including presence of drums, stained soils, grading scars, evidence of solid and liquid waste materials, mixtures of solid waste and drums, and surface impoundments. These features were concentrated in the central and southern parts of the site. The historical aerial photographs show evidence of drainage leading away from waste disposal areas to the west into the Woonasquatucket River, and to the east towards the tailrace along the eastern boundary of the site. [Ex. 3].

Bonchonsky fails to take into consideration this extensive data concerning the history of operations at the Site.

Bonchonsky similarly ignores specific testimony from former employees at the Site in which they described both the nature of discharges to the environment and their awareness of the harmful nature of the chemicals that they were using. For the convenience of the Court, this testimony is summarized in detail in the Expert Report of Franklin E. Woodard dated June 27, 2003 [Ex. 4]. By way of example only, the employees describe:

- Waste waters, sludges and other substances were discharged to floor drains and into the tailrace

- Direct discharges of acid wastes were made into the river through a pipe that would have to be replaced every couple of weeks because the waste would eat through the pipe
- Routine pipe leaks
- Routine dumping of waste materials and sludges, including onto the ground
- Discoloration of the surrounding waterways
- Strong chemical odor emanating from the Site
- Employees had to routinely dispose of their clothing because of the chemicals that would adhere to them
- An employee was warned by a chemist at the plant that the chemicals were dangerous and to avoid breathing them if he wanted to have children
- Awareness of the hazardous nature of chemicals that were being used at the Site
- As one employee put it succinctly, "something was always dripping on you."

[Ex. 4 at 9-19]. The knowledge that there were constant discharges into the environment was not limited to the employees. As early as 1956, Metro Atlantic had been ordered to stop dumping chemicals into the river raceway by state officials. [Ex. 4 at 25-26].

This evidence overwhelmingly demonstrates that the employees at the Site understood that they were using hazardous chemicals; that there were frequent releases of these chemicals at the Site; and that the employees knew or should have known that the releases would cause environmental harm. The fact that Bonchonsky apparently made a conscious decision to ignore this body of evidence concerning the actual conditions while contending that the employees at the Site never expected that there would be any harm from their activities renders his "opinions" inherently unreliable.

### B. Bonchonsky's Proposed Testimony Will Not Assist the Trier of Fact

Under the holding of *Consolidated Edison, supra,* Emhart is required to affirmatively establish that the property damage at the Site was neither expected nor intended. The focus is therefore on the conduct that actually took place at the Site and whether the employees should have reasonably known that harm would result. However, Bonchonsky's failure to provide any substantive analysis of what actually happened at the Site renders his generic "opinions" irrelevant because they ultimately do not help to resolve that inquiry. As such, they will not assist the trier of fact to understand the evidence or to determine a fact in issue. Instead, Bonchonsky attempts to ignore the evidence and substitute his "generic" opinions concerning the absence of federal statutes and alleged "common" practices for actual information concerning the Site. This approach is entirely inconsistent with the requirements of Fed.R.Evid. 702 as interpreted in *Daubert* and *Kuhmo Tire.*

One of Bonchonsky's central premises is that because there was not an EPA and certain environmental statutes and regulations before the 1970's, no one could have known that environmental harm would result from routine discharges of toxic chemicals onto the ground and surface waters. [Ex. 1 at 7-11]. Other than Bonchonsky's assertion that this is the case, he offers no connection between his opinion and the actual facts at the Site. Bonchonsky seeks to make the untenable "leap in logic" that because the federal government did not have specific laws in place, the employees at the Site had no understanding that discharging chemicals into the environment could lead to damage. Bonchonsky offers no particular support for this opinion and, as demonstrated above, ignores the factual record that employees understood that they were dealing with hazardous substances that were being directly discharged into the environment. Even Bonchonsky cannot muster more than an opinion that it is "unlikely" that the employees

would have expected or intended damage to the environment. [Ex. 1 at 7].[2] *See Thomas Hall v. Eklof Marine Corp*, 339 F. Supp. 2d 369, 377 (D.R.I. 2004) (expert testimony cannot be based upon mere "possibilities").

Equally unhelpful are Bonchonsky's "opinions" concerning so-called "common" practices with respect to disposal of industrial wastes and contaminants onto land, into unlined earthen disposal forms and into surface waters [Ex. 1 at 13-20]. Bonchonsky's report does not contain any information concerning the actual waste handling practices of any allegedly similar chemical manufacturing plant. Bonchonsky does not attempt to compare the practices of such other facilities (or the chemical industry) to the disposal practices at the Site. Bonchonsky's report fails to define any allegedly relevant "industry standard" and instead just cites to "surveys" of what was occurring at landfills. Bonchonsky then makes the further leap in logic by suggesting that the employees at the Site had no objective expectation of harm because the practice was allegedly "common." Making a conclusory assertion that a practice is "common," however, does not answer the question of what the employees at the Site actually knew about the potential harm from the waste disposal practices being used.

Once again, the utter irrelevance of Bonchonsky's opinions is demonstrated by his inability to link any of these alleged "common" practices to the actual practices at the Site. As noted above, Bonchonsky basically conceded at his deposition that he does not have a "clear picture" of what waste streams were generated at the plant and how they were handled.

---

[2] While Bonchonsky asserts throughout his report that the employees would not have specifically understood that dioxin contamination resulted from their actions, there is no requirement in the North River policy that the employees have known of the specific contents of the materials that were being disposed of. In other words, the employees do not need to have understood the specific environmental harm that would result from specific types of chemicals or wastes as long as the evidence shows that they should have appreciated that some harm would result from their conduct.

[Bonchonsky Dep. at 192]. Given this admission, there is no basis for Bonchonsky to opine on whether MetroAtlantic followed these allegedly "common" practices or not. Indeed, throughout his report, Bonchonsky qualifies his opinions by indicating that in the "limited" record available he has not seen information that the employees at MetroAtlantic acted in a manner that was "inconsistent" with these "common" practices. [*See, e.g.*, Ex. 1 at 15]. Such "qualified" opinions will not help resolve the issue of whether Emhart can prove that the property damage at the Site was not reasonably expected based upon what actually happened at the Site and should not be allowed.

### C. Bonchonsky Should be Precluded from Offering any Speculative "Opinions" Regarding Sources of the Contamination

Although Bonchonsky was only designated to offer an opinion on whether the contamination at the Site was "expected or intended," Bonchonsky's report contains gratuitous references to the effect that fires could have contributed to the contamination at the Site. [*See e.g.*, Ex. 1 at 25].[3] There is nothing in Bonchonsky's expert report or background which suggests that he is qualified to render a scientific "opinion" on the subject of the sources of dioxin contamination at the Site. Bonchonsky was never designated to offer opinions as to the sources of dioxin contamination. Bonchonsky's report does not reflect that he actually conducted any analysis of information pertaining to such events even if he was qualified to provide such an "opinion" and had been designated to do so. Bonchonsky cannot be permitted to offer purely speculative testimony on this issue. Any statements that Bonchonsky might attempt to offer concerning such "possibilities" do not meet the test of Rule 702 because they are not based upon sufficient facts or data and do not employ a scientifically reliable method. *See*

[3] In his later rebuttal report, Bonchonsky similarly notes that fires offer a "plausible scenario" for the contamination.

*Thomas Hall v. Eklof Marine Corp.*, 339 F.Supp.2d 369, 377 (D.R.I. 2004)(noting that expert testimony based upon "possibilities" is not sufficient; "[e]xpert testimony, if it is to have any evidentiary value, must state with some degree of positiveness that a given state of affairs is the result of a given cause"). Equally, such speculative statements are irrelevant because they would not assist the trier of fact to understand or determine a fact in issue. *Ruiz-Troche v. Pepsi-Cola of Puerto Rico Bottling Co.*, 161 F. 3d 77, 81 (1st Cir. 1998). Bonchonsky should be precluded from suggesting such "possibilities" at trial.

## CONCLUSION

Bonchonsky's proposed generic opinions are not specifically tied to the actual facts and historic operations at the Site. The "analytical gap" between the opinions and the data is a chasm. This fundamental error requires that the opinions be precluded from being offered at trial.

Respectfully submitted,

**THE NORTH RIVER INSURANCE COMPANY,**
By its attorneys,

Mark T. Nugent, RI Bar# 2637
MORRISON MAHONEY LLP
121 South Main Street, Suite 600
Providence, RI 02903-7141
(401) 331-1660

John T. Harding, *pro hac vice*
MORRISON MAHONEY LLP
250 Summer Street
Boston, MA 02210-1181
(617) 439-7500

Dated: May 16, 2006