UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

EMHART INDUSTRIES, INC.,

Plaintiff,

v.

HOME INSURANCE COMPANY,
INSURANCE COMPANY OF NORTH AMERICA,
LIBERTY MUTUAL INSURANCE COMPANY,
NORTH RIVER INSURANCE COMPANY,
ONEBEACON AMERICA INSURANCE COMPANY
and UNITED STATES FIRE INSURANCE COMPANY,

Defendants.

Civil Action No. 02-053 S

MOTION IN LIMINE OF EMHART INDUSTRIES, INC.
TO PRECLUDE EXPERT OPINIONS OF FRANKLIN E. WOODARD

Plaintiff, Emhart Industries, Inc. ("Emhart"), moves for an order in limine to preclude defendants from offering at trial any opinions of Franklin E. Woodard. Dr. Woodard has submitted an expert report in support of the defendants' contention that environmental damage at the Centredale Superfund Site ("Site") was expected or intended from the standpoint of the insured. The expert report submitted by Dr. Woodard and his deposition testimony indicate that his opinions are inadmissible under the standards regarding expert opinions set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993); General Electric Co. v. Joiner, 522 U.S. 136 (1997); and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999).

Dr. Woodard has based his opinions on criteria that differ greatly from the proper criteria for determining whether damage was expected or intended from the standpoint of the insured. Accordingly, the Woodard opinions are unconnected to the applicable issues and legal

standards and should be excluded. Dr. Woodard's opinions are further marred by his reliance on irrelevant matter and speculative assumptions that have no basis in fact. Dr. Woodard should therefore not be permitted to testify as to those opinions.

In support of its motion, Emhart relies upon the Memorandum of Law and Appendix of Exhibits filed herewith.

By its attorneys,

Gerald J. Petros (#2931)
Hinckley, Allen & Snyder LLP
1500 Fleet Center
Providence, Rhode Island 02903
(401) 274-2000

Jack R. Pirozzolo
Richard L. Binder
Willcox, Pirozzolo & McCarthy
50 Federal Street
Boston, Massachusetts 02110
(617) 482-5470

Dated: May 16, 2006

Counsel for Emhart Industries, Inc.

**CERTIFICATION**

To:

James T. Murphy, Esq.
Kelly N. Michels, Esq.
Hanson Curran LLP
146 Westminster Street
Providence, RI 02903

Kevin J. O'Connor, Esq.
Hermes, Netburn, O'Connor & Spearing, P.C.
265 Franklin Street, 7th Floor
Boston, MA 02110

Mark T. Nugent, Esq.
Michael Marcello, Esq.
Michael T. Farley, Esq.
Morrison Mahoney LLP
121 South Main Street, Suite 600
Providence, RI 02903-7141

John T. Harding, Esq.
Morrison Mahoney LLP
250 Summer Street
Boston, MA 02210

James T. McCormick, Esq.
McKenna & McCormick
128 Dorrance Street, Suite 330
Providence, RI 02903

Lawrence A. Nathanson, Esq.
Siegal, Napierkowski & Park
533 Fellowship Road, Suite 120
Mt. Laurel, NJ 08054

I hereby certify that on the 16th day of May, 2006, a copy of the within document was served by first class mail, postage prepaid, upon the counsel of record listed above.

Cynthia Torres

715029v1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| EMHART INDUSTRIES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>HOME INSURANCE COMPANY,<br>INSURANCE COMPANY OF NORTH AMERICA,<br>LIBERTY MUTUAL INSURANCE COMPANY,<br>NORTH RIVER INSURANCE COMPANY,<br>ONEBEACON AMERICA INSURANCE COMPANY<br>and UNITED STATES FIRE INSURANCE COMPANY,<br><br>Defendants. | Civil Action No. 02-053 S |

MEMORANDUM OF LAW OF EMHART INDUSTRIES, INC. IN SUPPORT OF ITS MOTION IN LIMINE TO PRECLUDE EXPERT OPINIONS OF FRANKLIN E. WOODARD

## INTRODUCTION

Plaintiff, Emhart Industries, Inc. ("Emhart"), has filed a motion in limine to preclude defendants from offering any opinions of Franklin E. Woodard, a witness who has provided an expert report in this action on behalf of defendants. It appears that defendants seek to introduce opinion testimony of Dr. Woodard in support of a contention that environmental damage at the Centredale Superfund Site ("Site") was expected or intended from the standpoint of the insured. The expert report submitted by Dr. Woodard and his deposition testimony indicate that his opinions are inadmissible under the standards regarding expert opinions set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993); General Electric Co. v. Joiner, 522 U.S. 136 (1997); and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999). The Woodard opinions are not based on a reliable foundation and are not relevant to the issues.

Dr. Woodard has based his opinions on criteria that differ greatly from the proper criteria for determining whether damage was expected or intended from the standpoint of the insured. Damage is not expected or intended from the standpoint of the insured unless the insured subjectively intended the environmental damage that occurred. By contrast, Dr. Woodard gives the opinion that contamination at the Site resulted from the "sloppy storage/transfer procedures" or from "routine operations" of the insured's predecessor, Metro-Atlantic, Inc. ("Metro-Atlantic"), and a separate entity, New England Container Company ("NECC"), which included "improper storage, handling, and disposal of chemicals and waste." Whether Metro-Atlantic or another company on the Site handled waste in a manner that Dr. Woodard considers "improper" is unrelated to whether it subjectively expected or intended environmental damage. Moreover, the Woodard opinions are irrelevant as there is no evidence that the documents he asserts set forth the "standard of practice" for waste disposal were known to the insured when it conducted the manufacturing operations at issue. Moreover, none of the references that he has cited could possibly support an opinion under the correct legal standard in view of his admission, on deposition, that he "can't think of any reference before 1970 that says anything would cause environmental harm." Accordingly, the Woodard opinions are unconnected to the applicable issues and legal standards. See, e.g., Aetna Casualty & Surety Co. v. Dow Chemical Co., 28 F. Supp. 2d 421, 427-29 (E.D. Mich. 1998) ("Aetna/Dow I"). As the Woodard opinions are unrelated to the applicable issues, they should be excluded. E.g., Daubert, 509 U.S. at 591 (expert opinion which does not "fit" the facts and issues is inadmissible even if scientifically valid); Hochen v. Bobst Group, Inc., 290 F.3d 446, 452-53 (1st Cir. 2002) (opinion does not meet the "fit" requirement of Daubert as it did not address appropriate issue); Cipollone v. Yale Industrial Products, Inc., 202 F.3d 376, 380 (1st Cir. 2000) (expert's opinion

inadmissible due to references to standards that were not on point). What Dr. Woodard has provided "is not 'expert' opinion, but rather a personal opinion about what standards [Dr. Woodard] believes should apply...." In re Diet Drugs Product Liability Litigation, 2001 WL 454586, at *18 (E.D. Pa. Feb. 1, 2001).

Dr. Woodard's opinions are further marred by his reliance on irrelevant matter and speculative assumptions that have no basis in fact. Dr. Woodard relies heavily on evidence regarding the operations of NECC, a separate entity from the insured's predecessor, Metro-Atlantic. The operations of NECC have no bearing on whether Metro-Atlantic expected or intended environmental damage. Dr. Woodard likewise relies heavily on the testimony of one witness, Raymond Nadeau, who was not employed by Metro-Atlantic and lacks reliable knowledge regarding the contents of drums that Mr. Nadeau asserts were "dumped" by Metro-Atlantic. Dr. Woodard further uses a trade publication's laudatory statement regarding a Metro-Atlantic chemist as a basis for concluding that, a decade later, Metro-Atlantic employed "world class chemists," which in turn is his only support for the assumption that Metro-Atlantic read and understood obscure references regarding waste handling practices.

## BACKGROUND

### A. The Site

Crown Metro, Inc. ("Crown Metro"), the insured on the policies issued by OneBeacon America ("OneBeacon") and Century Indemnity Corporation ("CIC"), was formed in December 1968 when Metro-Atlantic entered into an agreement of consolidation with Crown Chemical Corporation ("Crown Chemical"). Prior to the consolidation, Metro-Atlantic had operated on a portion of the Site. Those operations ceased at the time of the consolidation and

the operations of Metro-Atlantic in Rhode Island were moved to the location in Providence where Crown Chemical conducted its business operations.[1]

Dioxin is a major contaminant at the Site. It is asserted that some of the dioxin on the Site was associated with Metro-Atlantic having manufactured hexachlorophene, an ingredient in pHisoHex, an anti-bacterial soap (Cleary Dep. (Ex. A) at 17, 40).[2] One of the ingredients in hexachlorophene is trichlorophenol, a chemical that is now known to contain dioxin. The testimony of Thomas Cleary, who invented the process used to manufacture hexachlorophene at Metro-Atlantic, shows that Metro-Atlantic manufactured hexachlorophene for less than twelve months in 1964 and 1965 (id. at 49, 53).

B. The Woodard Report And Deposition

Dr. Woodard is attempting to give opinions well outside his area of expertise. Dr. Woodard is a professional witness who spends approximately 40% of his time testifying, almost exclusively on behalf of insurance companies (Woodard Dep. (Ex. B) at 171; see also id. at 169-71).[3] Nothing in Dr. Woodard's background qualifies him to provide opinions concerning whether the insured, by allegedly engaging in certain practices in the 1960s, expected or intended environmental injury. During the relevant pre-1970 time period, Dr. Woodard had no experience working in industry and had no experience consulting to industry other than occasional part-time

---

1 See. e.g., paragraph 91 of the statement of material facts filed in support of the CIC summary judgment motion and paragraph 21 of the statement of material facts filed in support of the OneBeacon summary judgment motion.

2 Excerpts from the deposition of Thomas Cleary cited in this memorandum are contained in Exhibit A to the Appendix to this memorandum. Documents in the Appendix will be cited by exhibit number and page number.

3 Excerpts from the Woodard deposition cited in this memorandum are contained in Exhibit B to the Appendix to this memorandum.

work, usually on behalf of a college professor, while he was a student (id. at 247-51). Dr. Woodard claims expertise in the design of waste treatment facilities (id. at 135), a field unrelated to knowledge about dioxin and trichlorophenol during the 1960's. Dr. Woodard is an environmental engineer, not an environmental scientist, and as such has expertise in "designing facilities," not "investigating sites and situations" (id. at 172). He is not a licensed site professional (id. at 173).

In his report, Dr. Woodard does not even attempt to provide a review of the industrial standard of practice with respect to the handling or disposal of trichlorophenol or dioxin in the mid 1960's when, for less than one year, Metro-Atlantic used trichlorophenol as an ingredient in hexachlorophene (Ex. B at 164). Instead, Dr. Woodard's report addresses whether Metro-Atlantic engaged in "improper" waste handling and disposal, and he opines that contamination "more often than not" resulted from either "sloppy storage/transfer procedures or from an obvious lack of proper preventative maintenance, repair, or upgrade of equipment" (Ex. C (Woodard Report) at 3, 17).[4] This has no bearing on the standard relevant to insurance coverage litigation, whether the insured subjectively intended environmental injury.

Even while admitting that standards "don't become standards without action by the government" (Ex. B at 154), Dr. Woodard contends that the source of standards for waste handling, treatment and disposal in the 1960s was "the textbooks and the handbooks that were in circulation at that time" (id. at 155, 159-60; see also id. at 244 (Dr. Woodard uses the terms "improper" storage, handling and disposal to mean practices not in keeping with the recommendations of the Manufacturing Chemists Association); id. at 245 (Dr. Woodard relies on "several publications, including the Manufacturing Chemists Association publications,

---

4 A copy of the Woodard Report is Exhibit C to the Appendix.

textbooks, [and] certain publications in magazines")). However, Dr. Woodard can point to no evidence that any employees of Metro-Atlantic ever saw or were aware of those textbooks, handbooks or recommendations. Indeed, there is no evidence that the chemists employed by Metro-Atlantic (Messrs. Sprenger, Huse and Grimmel) even knew that there was dioxin in the trichlorophenol used to make the hexachlorophene. Instead, it is Dr. Woodard's "professional opinion" that these men "would have known" that there was dioxin in the trichlorophenol, and that the dioxin would have been contained in waste generated by the hexachlorophene production process, because two of the chemists (Messrs. Sprenger and Grimmel) "were described as world-class chemists" (id. at 103-04). This characterization is apparently based on a single reference in an article in a trade publication (Apparel Manufacturer) published in 1956 (eight years before hexachlorophene was produced at the Site), in which one of the chemists (Mr. Grimmel) was described as "one of the outstanding dye chemists in the world" (Ex. D (Article from Apparel Manufacturer) at 3, emphasis added).[5] Similarly, Dr. Woodard believes that Messrs. Sprenger, Huse and Grimmel would have known about problems that Diamond Alkali had with dioxin-induced chloracne because "manufacturers know the characteristics of the materials they work with" (Ex. B at 105), an opinion based on Dr. Woodard's experience beginning in the 1970s, a period of increased awareness of environmental concerned due to new statutes and regulation which were not in effect in the period in which Metro-Atlantic operated. Dr. Woodard provides no actual evidence that any of these men in fact knew of any chloracne incidents at Diamond Alkali.

Dr. Woodard likewise considers that it was "obvious" that contamination of the soil was "immediate and self-evident" when chemicals were "placed on the ground" (Ex. C at 3;

---

[5] A copy of the 1956 article from Apparel Manufacturer is Exhibit D to the Appendix.

see Ex. B at 226-28, 230-32). He even states that the chemists had a "moral obligation" to inform the employees of Metro-Atlantic that there was dioxin in the waste generated by the hexachlorophene production process (Ex. B at 228-29), even though he has no direct knowledge that these chemists knew there was dioxin in that waste. The use of emotionally charged labels, such as "moral obligation" or "professional opinion," is not a substitute for the factual basis on which to form a reliable opinion.

While Dr. Woodard cites to various warning labels on products and chemical data safety sheets (e.g., Ex. C at 22-25), none of them warn of environmental damage. Dr. Woodard admits that the product safety data sheets for trichlorophenol say nothing about trichlorophenol containing dioxin or causing environmental harm (Ex. B at 120-21) and that no warning label on trichlorophenol before 1970 said that trichlorophenol would cause environmental harm (id. at 121). Similarly, Dr. Woodard acknowledges that no references prior to 1970 "specifically" said that dioxin would cause environmental harm (id. at 122-23) and that he "can't think of any reference before 1970 that says anything would cause environmental harm" (id. at 122, emphasis added).[6]

Dr. Woodard's report is further marred by relying on irrelevant matters and unreliable testimony to make unwarranted assumptions. In particular, Dr. Woodard relies on the operations and waste handling practices of NECC in coming to his conclusions regarding Metro-Atlantic (Ex. C at 13-16). With respect to the alleged "dumping" by Metro-Atlantic, Dr. Woodard states that "[i]t was common knowledge that Metro-Atlantic dumped waste materials on-site," but actually relies solely on the testimony of an NECC employee, Raymond Nadeau,

---

6 Dr. Woodard agrees, however, that there are references published after 1970 that state that dioxin is harmful to the environment (Ex. B at 124).

who testified that Metro-Atlantic dumped "[s]ludge they got out of their presses" behind the plant (Ex. C at 12). However, Mr. Nadeau is in fact the only witness to claims to have seen such dumping by Metro-Atlantic. In addition, Mr. Nadeau testified that he "doesn't know what" was in the trucks that were allegedly used to dump waste for Metro-Atlantic (Nadeau Dep. (Ex. E) at 16),[7] that the dumping took place at a distance such that he could not recognize the faces of anyone doing the dumping (id. at 45) and that he himself never went to the area where dumping allegedly occurred (id. at 44), making his knowledge about what was allegedly dumped by Metro-Atlantic suspect. Dr. Woodard compounds the questionable value of this testimony by assuming that the "sludge" allegedly dumped by Metro-Atlantic was waste from the hexachlorophene manufacturing process; while he admits that the sludge to which Mr. Nadeau refers "could have been from several different processes," Dr. Woodard believes that "it's certainly more probable than not that ... one of the sludges that Raymond Nadeau was talking about" was waste from the hexachlorophene manufacturing process (Ex. B at 111-12). Indeed, if Mr. Nadeau saw any dumping by Metro-Atlantic, that dumping would not have occurred during the brief period in 1964 and 1965 in which Metro-Atlantic manufactured hexachlorophene, as Mr. Nadeau's duties during that period resulted in his spending little time at the NECC facility (Ex. E at 9, 42-44). In contrast, during the years 1956 through 1962, Mr. Nadeau spent considerable time at the NECC facility (id.).

Dr. Woodard likewise states that contamination was "obvious" to Dr. Sprenger, a chemist at Metro-Atlantic, "who saw the stuff all over the dump" (Ex. B at 231) and that "[w]e know that Dr. Sprenger knew that it was [toxic or dangerous]. He knew that that material was

---

7 Excerpts from the deposition of Raymond Nadeau cited in this memorandum are contained in Exhibit E to the Appendix.

being placed on the ground" (Ex. B at 233). However, Dr. Woodard provides no support for his assertion; indeed, the only source to which Dr. Woodard cites for the proposition that any Metro-Atlantic material was "all over the dump" or "being placed on the ground" is Mr. Nadeau, an NECC employee (compare Ex. C at 12 with Ex. E at 7), who provided no testimony concerning the knowledge of Dr. Sprenger or any Metro-Atlantic employees and only testified to what he allegedly saw himself.

### C. Legal Principles Regarding Whether Property Damage Was Expected Or Intended

The insurance policies at issue provide coverage for "property damage neither expected nor intended from the standpoint of the insured." Whether damage was expected or intended, within the meaning of the insurance policies, is determined on the basis of whether the insured intended the damage itself not whether the insured intended to take the action which caused the damage. Damage arising from the unintentional consequences of intentional acts is not expected or intended. That is clear both from the policy language and from cases construing this policy language. See, e.g., Aetna/Dow I, 28 F. Supp. 2d at 427-29 (rejecting the argument that intentional disposal of waste meant damage was expected or intended as insurance coverage is available for "unintended and unexpected harm, even if the acts that caused the harm were intentional"); State v. CNA Ins. Companies, 779 A.2d 662, 670 (Vt. 2001) ("Thus the relevant inquiry in this case is not whether the spilling of chemicals at the prison site was intentional, but rather whether the harm that resulted from the spilling was expected or intended") (emphasis in original); James Graham Brown Foundation, Inc. v. St. Paul Fire & Marine Ins. Co., 814 S.W.2d 273, 278 (Ky. 1991) ("The 'expected or intended' exception is inapplicable unless the insured specifically and subjectively intends the injury giving rise to the claim"); Queen City Farms, Inc. v. Central Nat'l Ins. Co. of Omaha, 882 P.2d 703, 714 (Wash. 1994) (determining that the

relevant inquiry is "whether an insured subjectively expected or intended the damage" resulting from the occurrence), modified, 891 P.2d 718 (Wash. 1994).

This principle was recognized, in a context other than environmental coverage litigation, by the Supreme Court of Rhode Island in Grenga v. National Surety Co., 317 A.2d 433, 436 (R.I. 1974):

> We agree with plaintiffs' assertion that the policy's exclusionary language should not apply where an insured's intentional act results in unintentional harm. It is the harm itself that must be intended, i.e., "intentionally" caused before the exclusion will apply. There is substantial support for the proposition that coverage exists under insuring and exclusion clauses identical or similar to the case presently before us for the unintentional results of an intentional act but not for damages incurred because of an injury which was intended to be inflicted.

See Liberty Mut. Ins. Co. v. Black & Decker Corp., C.A. No. 96-10804-DPW, slip op. at 40 (D. Mass. Dec. 5, 2003) ("Liberty/Black & Decker I")[8] ("For an event to be covered as either an 'accident' or 'occurrence,' the damage (as distinguished from the acts that caused the damage) must have been unintended and unexpected by the insured."); Liberty Mutual Insurance Co. v. Black & Decker Corp., 2004 WL 187387, at *5 (D. Mass. Jan. 27, 2004) ("Liberty/Black & Decker II").

The issue of whether the environmental harm at Centredale "was expected or intended from the standpoint of the insured" is determined using a subjective standard. Courts overwhelmingly recognize that "the 'expected or intended' exception is inapplicable unless the insured specifically and subjectively intends the injury giving rise to the claim." James Graham Brown Foundation, 814 S.W.2d at 278. See also Village of Morrisville Water & Light Dept. v. U.S. Fid. & Guar. Ins. Co., 775 F. Supp. 718, 729-30 (D. Vt. 1991); St. Paul Fire & Marine Ins.

---

8 A copy of the opinion has been filed herewith.

v. McCormick & Baxter Creosoting Co., 923 P.2d 1200, 1218 (Or. 1996); Shell Oil Co. v. Winterthur Swiss Ins. Co., 12 Cal. App. 4th 715, 747-48 (1993); Liberty/Black & Decker I, slip op. at 47-48 (objective test is the "minority view among states"). Accord State ex rel. Davidson v. Hoke, 532 S.E.2d 50, 57 & n.2 (W. Va. 2000) (concurring opinion) (collecting cases and noting that "[i]t appears that a majority of jurisdictions have adopted the subjective approach to the 'expected/intended' exclusion").

As the definition specifically refers to "the standpoint of the insured," a subjective test is mandated. Grenga applied the subjective test for determining whether an event was an accident and, as explained in Liberty/Black & Decker II, 2004 WL 187387, at *5, "the SJC and other courts have held that the 'occurrence' definition simply codified how courts had already construed 'accident.'" The intent is analyzed "at the time the insured performed the acts which caused the environmental contamination," not during the term a particular insurance policy was in effect. Aetna/Dow I, 28 F. Supp. 2d at 433 n.13. In addition, the pertinent inquiry is the intent of Metro-Atlantic, the insured's predecessor, not the intent of NECC, a barrel reconditioning facility that conducted operations on a portion of the Site abutting the Metro-Atlantic facility. See State Mut. Life Assurance Co. of America v. Lumbermens Mut. Cas. Co., 874 F. Supp. 451, 456 (D. Mass. 1995) (intent of third party not imputed to insured); Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co., 868 F. Supp. 1278, 1298 (D. Utah 1994) (same), aff'd, 52 F.3d 1522 (10th Cir. 1995). See also Upjohn Co. v. Aetna Casualty & Surety Co., 1994 WL 1029337, at *30 n.18 (W.D. Mich. July 22, 1994) (rejecting contention "that because [insured] was located across the street and could observe [third party's] activities on the site during the years the coal gasification plant was in operation, it should have known that contamination would result").

## ARGUMENT

### A. The Daubert Standard

The Supreme Court has explained the scope of permissible expert testimony in Daubert, Joiner and Kumho. In Daubert, the Supreme Court held that the rules of evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597. The Court explained the requirement that there be a "fit" between the proffered expert testimony and an issue in the case as a condition for admissibility. Id. at 591. Absent a "fit", the evidence does not meet the requirement of Rule 702 of the Federal Rules of Evidence that the testimony "will assist the trier of fact to understand or determine an issue." Id. at 592. The Court explained the requirement, in a manner that demonstrates that even if the Woodard opinions were based on scientific knowledge, they would fail to meet the "fit" requirement, stating as follows

> The study of the phases of the moon, for example, may provide valid scientific 'knowledge' about whether a certain night was dark, and if darkness was a fact in issue, the knowledge will assist the trier of fact. However (absent creditable grounds supporting such a link), evidence that the moon was full on a certain night will not assist the trier of fact in determining whether an individual was unusually likely to have behaved irrationally on that night. Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.

Id. at 591-92.

In Joiner, the Court explained another requirement that is not satisfied by the Woodard report, that there must be a reliable factual basis for the opinions. 522 U.S. at 140. There the Court affirmed the exclusion of an expert report that "did not rise above 'subjective belief or unsupported speculation.'" It stated that "'[n]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." See also Daubert, 509 U.S. at 590 ("requirement that

an expert must have 'knowledge' connotes more than subjective belief or unsupported speculation").

B. The Woodard Opinions Are Not Relevant To The"Expected Or Intended" Issue

1. The Opinions Are Inadmissible As There Is No Evidence That Metro-Atlantic Received The Documents That Are Asserted To Constitute The "Standard Of Practice"

At his deposition, Dr. Woodard stated that the standards by which he is judging whether Metro-Atlantic engaged in "improper" waste handling practices are contained in "several publications, including the Manufacturing Chemists Association publications, textbooks, [and] certain publications in magazines" from the time (Ex. B at 155, 245). Even if it were assumed that the various references he cites are sufficient to create a standard of practice to which the insured must be held,[9] there is no nexus between Metro-Atlantic and any of the cited references. There is simply no evidence that anyone at Metro-Atlantic read the literature to which Dr. Woodard refers. That suffices to exclude his opinions.

A similar issue was presented in Aetna/Dow I. There, the court, in granting summary judgment to the insured on the expected or intended issue, found that the evidence of industry standards upon which the insurers relied was inadmissible. It ruled that evidence of so-called industry standards is not evidence of subjective intent in the absence "of a showing that the insured actually received and understood the information." 28 F. Supp. 2d at 433. In the absence of such a nexus, purported expert witness testimony "invades the jury's function to weigh evidence and determine credibility." Id. In confirming its decision, after the insurers moved for reconsideration, the court stated that "[e]vidence of [the insured's] intentional acts,

---

9 While there is no basis for concluding that the references create any type of standard, the sufficiency of the material to create any relevant standard is not addressed in this motion.

[the insured's] general knowledge of the risks posed by chemicals, [the insured's] knowledge at other sites, and industry knowledge, without evidence [the insured] received and understood the information, is simply not relevant to a determination of whether [the insured] subjectively expected or intended property damage at the [Site]." Aetna Casualty & Surety Co. v. Dow Chemical Co., 44 F. Supp. 2d 865, 868 (E.D. Mich. 1999) ("Aetna/Dow II"). See also Upjohn, 1994 WL 1029337, at *24 ("argument that [insured] 'should have known' about the potential for damage ... is irrelevant" to "whether [insured] subjectively expected or intended property damage") (emphasis in original). As the references cited by Dr. Woodard are "simply not relevant to a determination of whether [the insured] subjectively expected or intended property damage at the [Site]," his opinions based on those references must be excluded as there is no "fit" between the opinion and the issues in this action.

Dr. Woodard's own testimony precludes him from asserting that Metro-Atlantic expected or intended environmental harm. Dr. Woodard has admitted that he "can't think of any reference before 1970 that says anything would cause environmental harm" (Ex. B at 122). Dr. Woodard's opinions regarding the waste handling practices of Metro-Atlantic are further flawed by his admission that the references he asserts create a standard of practice do not address the dioxin, the contaminant of concern (Ex. B at 122-23, 246), or trichlorophenol, the chemical now known to contain dioxin that was used by Metro-Atlantic to manufacture hexachlorophene (id. at 120-21).[10] Rather, Dr. Woodard cites abstract references concerning waste in general (e.g., Ex. C at 7). General knowledge of problems associated with chemicals is not subjective knowledge of environmental risks associated with specific chemicals. Aetna/Dow II, 44 F. Supp. 2d at 868.

---

10 While Dr. Woodard asserts that one publication of the Manufacturing Chemists Association pertains to tricholrophenol, he did not cite to that publication in his report (Ex. B at 246).

See also Smith v. Hughes Aircraft Co., 22 F.3d 1432, 1439-40 (9th Cir. 1993) (district court "improperly based its conclusion that Hughes expected or intended the ... injuries, in large part, on Hughes' disposal of chromium" and, on remand, "should not rely on evidence of Hughes' chromium disposal practices to establish the conclusion that Hughes expected or intended injury from TCE"); Upjohn, 1994 WL 1029337, at *27-28 (insured entitled to summary judgment that damage was neither expected nor intended as statements in industry literature about potential contamination associated with handling products for the pharmaceutical industry were insufficient to permit verdict in favor of insurer).

2. The Woodard Opinions Are Based On Application Of An Incorrect Legal Standard

Even if the expected or intended issue were analyzed on the basis of an objective standard, rather than the applicable subjective standard, the Woodard opinions would be inadmissible. As already discussed, Dr. Woodard's opinions are based on comparing Metro-Atlantic's alleged waste processing activities to various handbooks, textbooks or publications of non-governmental organizations to determine whether those activities were "improper" (Ex. B at 155, 159-60, 244-45). Engaging in "sloppy" practices or failing to comply with "handbooks and textbooks," which may or may not have been generally accepted by the industry, does not equate to expecting or intending environmental harm. Moreover, Dr. Woodard injects his own personal beliefs into the standard he purportedly applies by stating that the chemists at Metro-Atlantic had a "moral obligation" to inform the employees of Metro-Atlantic that waste from the hexachlorophene manufacturing process contained dioxin (Ex. B at 228-29). The personal belief underlying Dr. Woodard's opinions is his conspiratorial view that "[w]e all know that American industry was allowed to pollute through the '20s and '30s and '40s and '50s and '60s and into the '70s in order to not be shut down. That was the old jobs-over-fish argument" (Ex. B at 140).

During his deposition, he also admitted that his opinion about the Metro-Atlantic waste handling practices is based on Metro-Atlantic's failure to make "a heroic search for a lined landfill" although during that period 90% of the landfills were unlined (id. at 145). The failure to take "heroic" actions is not evidence of a subjective intent to cause environmental damage or even a failure to exercise due care.

It is settled that when an expert bases his opinion on an incorrect legal standard, the opinion must be excluded in view of the Daubert requirement that expert opinion be "relevant to the task at hand," Daubert, 509 U.S. at 597, and "fit" the issues in the case. Hochen, 290 F.3d at 452-53 (trial court properly excluded testimony regarding meaning of scope of work to engineer where relevant issue was meaning to electrician, thus meaning to engineer was of "questionable 'relevan[ce] to the task at hand'"); Cipollone, 202 F.3d at 379-80 (expert's opinion inadmissible due to references to standards that were not on point). See also Loeffel Steel Products, Inc. v. Delta Brands, Inc., 387 F. Supp. 2d 794, 805, 817-18 (N.D. Ill. 2005) (stating that "[e]xpert opinions that are contrary to law are inadmissible" and "cannot be said to be scientific, to be reliable or to be helpful to the trier of fact," and excluding opinion based on measure of damage contrary to the correct legal standard of damages). The reason for this rule is that such an opinion "is not 'expert' opinion, but rather a personal opinion about what standards [Dr. Woodard] believes should apply...." In re Diet Drugs, 2001 WL 454856, at *18, quoted with approval in Loeffel, 387 F. Supp. 2d at 907. See also Joiner, 522 U.S. at 140 (affirming exclusion of expert report that "did not arise above 'subjective belief or unsupported speculation'"). Indeed, an opinion based on the "old jobs-over-fish argument" is the epitome of a personal opinion that is inadmissible.

C. The Woodard Opinions Are Based On Unsupported Assumptions And Unreliable Sources

The Woodard opinions are further marred by being based on unwarranted assumptions. For example, as discussed above, Dr. Woodard opines that the waste disposal practices were deficient at Metro-Atlantic in part because of an assumption that sludge known to contain dioxin was dumped by Metro-Atlantic at the Site. This conclusion is based on thin evidence and unsupportable assumptions and is contradicted by the analytical data concerning the dioxin at the Site. First, Dr. Woodard assumes that waste from the hexachlorophene manufacturing process was known by Metro-Atlantic personnel to contain dioxin, with the basis for this assumption being that chemists at Metro-Atlantic "would have known" about the dioxin because one of them was described in a trade publication as "world-class" (compare Ex. B at 103-04 with Ex. D at 3). Dr. Woodard then assumes that "sludge" which Mr. Nadeau asserts was dumped by Metro-Atlantic was waste from the hexachlorophene manufacturing process, even though he admits that the sludge to which Mr. Nadeau refers "could have been from several different processes" (id. at 111-12) and even though Mr. Nadeau would not have been in a position to make such an observation during the period when Metro-Atlantic manufactured hexachlorophene at the Site (Ex. E at 9, 44-45).[11] From there, Dr. Woodard leaps to the conclusion that "[i]t was common knowledge that Metro-Atlantic dumped waste materials on-site" (Ex. C at 12), but Dr. Woodard's only source for this "common knowledge" is Mr. Nadeau, an NECC employee who testified that he "doesn't know what" was in the trucks that allegedly dumped waste for Metro-Atlantic, that the dumping took place at a distance such that he could

---

11 Dr. Woodard asserts that "it's certainly more probable than not that … one of the sludges that Raymond Nadeau was talking about" was waste from the hexachlorophene manufacturing process (Ex. B at 111-12), but he provides no basis for this conclusion.

not recognize the faces of anyone doing the dumping and that he himself never went to the dumping area (Ex. E at 16, 44-45). Dr. Woodard likewise assumes that Dr. Sprenger, a Metro-Atlantic chemist, "saw the stuff all over the dump" (Ex. B at 231) and "knew that that material was being placed on the ground" (id. at 233), even though there is no factual basis for these statements. These assumptions based on questionable sources are not the proper basis for expert opinion. Moreover, Dr. Woodard ignores the analytical data concerning dioxin at the Site, as this data precludes the possibility that waste from the hexachlorophene production process was disposed of at the Site. As explained in the expert report of Dr. J. Ronald Hass (Ex. F (Hass Report) at 3-4),[12] the hexachlorophene manufactured at the Site was bound to activated carbon during the manufacturing process, while the analytical results demonstrate that the dioxin found at the Site was not bound to activated carbon and therefore could not be waste from the hexachlorophene production process.

Dr. Woodard's opinions should therefore be excluded in accordance with the settled ruled that where the expert opinion is based on assumptions not supported by the record, it must be excluded. Irvine v. Murad Skin Research Laboratories, Inc., 194 F.3d 313, 321 (1st Cir. 1999) (applying the principle that "absent adequate factual data to support the expert's conclusion his testimony was unreliable" in affirming exclusion of the opinion of an expert who relied on the assumption that sales of a product constituted 100% of net income although that assumption was not supported by the record). See also Target Market Publications, Inc. v. ADVO, Inc., 136 F.3d 1139, 1145 (7th Cir. 1998) (affirming exclusion of expert report concerning lost profits as expert was relying on a "plan [that] sought to demonstrate what Select

---

12 A copy of the November 2003 expert report of Dr. Hass (entitled Rebuttal of Opinions Regarding Dioxin Source) is Exhibit F to the Appendix.

Auto's profits might have been given certain assumptions that had not yet, and might never, come to pass"); Bell Helicopter, 999 F.2d at 569-70 (D.C. Cir. 1993) (reversible error in allowing expert testimony of future earnings, including that plaintiff would have engaged in new lucrative business activities because he had considered change of career and that home built on unimproved land would appreciate substantially); Lithuanian Commerce Corp. v. Sara Lee Hosiery, 179 F.R.D. 450, 459-61 (D.N.J. 1998) (excluding damage calculation based on unsupported assumptions about prospective new business). Indeed, Dr. Woodard's opinions contain the vice recounted in Joiner, 522 U.S. at 140, in which the Court affirmed the exclusion of an expert report that "did not arise above 'subjective belief or unsupported speculation'" and stated that "[n]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." Indeed, Dr. Woodard, when confronted with the lack of factual support for his conjectures, resorted to asserting that, nonetheless, it was his "professional opinion" (Ex. B at 104). He is therefore no different from the expert whose conclusion, supported solely by his assertion that "that is my opinion," was excluded in Sultis v. General Motors Corp., 690 F. Supp. 100, 103-04 (D. Mass. 1988), as "an argument without reasoned support in evidence, masquerading as expert opinion."

## CONCLUSION

For the foregoing reasons, the Court should exclude the testimony of Dr. Franklin E. Woodard.

By its attorneys,

________________________________

Gerald J. Petros (#2931)
Hinckley, Allen & Snyder LLP
1500 Fleet Center
Providence, Rhode Island 02903
(401) 274-2000

Jack R. Pirozzolo
Richard L. Binder
Willcox, Pirozzolo & McCarthy
50 Federal Street
Boston, Massachusetts 02110
(617) 482-5470

Dated: May 16, 2006

Counsel for Emhart Industries, Inc.

**CERTIFICATION**

To:

James T. Murphy, Esq.
Kelly N. Michels, Esq.
Hanson Curran LLP
146 Westminster Street
Providence, RI 02903

Kevin J. O'Connor, Esq.
Hermes, Netburn, O'Connor & Spearing, P.C.
265 Franklin Street, 7th Floor
Boston, MA 02110

Mark T. Nugent, Esq.
Michael Marcello, Esq.
Michael T. Farley, Esq.
Morrison Mahoney LLP
121 South Main Street, Suite 600
Providence, RI 02903-7141

John T. Harding, Esq.
Morrison Mahoney LLP
250 Summer Street
Boston, MA 02210

James T. McCormick, Esq.
McKenna & McCormick
128 Dorrance Street, Suite 330
Providence, RI 02903

Lawrence A. Nathanson, Esq.
Siegal, Napierkowski & Park
533 Fellowship Road, Suite 120
Mt. Laurel, NJ 08054

I hereby certify that on the 16th day of May, 2006, a copy of the within document was served by first class mail, postage prepaid, upon the counsel of record listed above.

Cynthia Torres