UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| EMHART INDUSTRIES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>HOME INSURANCE COMPANY,<br>INSURANCE COMPANY OF NORTH AMERICA,<br>LIBERTY MUTUAL INSURANCE COMPANY,<br>NORTH RIVER INSURANCE COMPANY,<br>ONEBEACON AMERICA INSURANCE COMPANY<br>and UNITED STATES FIRE INSURANCE COMPANY,<br><br>Defendants. | ) | Civil Action No. 02-053 S |

MOTION IN LIMINE OF EMHART INDUSTRIES, INC.
TO PRECLUDE EXPERT OPINIONS OF EDWARD CALABRESE

Plaintiff ("Emhart") seeks to preclude defendants from offering opinion evidence by Edward L. Calabrese. Defendants seek to introduce opinion testimony by Dr. Calabrese to support the contention that environmental damage at the Centredale Superfund Site ("Site") was expected or intended from the standpoint of the insured. The report and deposition testimony of Dr. Calabrese show that his opinions are inadmissible under the standards articulated in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993); General Electric Co. v. Joiner, 522 U.S. 136 (1997); and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999). The opinions of Dr. Calabrese do not have a reliable foundation. They are not relevant to the issues.

Dr. Calabrese based his opinions on criteria that differ greatly from the proper criteria for determining whether damage was expected or intended from the standpoint of the insured. Accordingly, his opinions are unconnected to the applicable issues and legal standards

and should be excluded. The opinions of Dr. Calabrese further are marred by his reliance on assumptions that have no basis in fact, including unwarranted assumptions regarding when hexachlorophene was manufactured at the Site and the amount of hexachlorophene manufactured. In addition, Dr. Calabrese also purports impermissibly to provide opinions concerning the credibility of witnesses based on his subjective determinations of their credibility. Dr. Calabrese should not be permitted to testify.

In support of its motion, Emhart relies upon the Memorandum of Law and Appendix of Exhibits filed herewith.

By its attorneys,

Gerald J. Petros (#2931)
Hinckley, Allen & Snyder LLP
1500 Fleet Center
Providence, Rhode Island 02903
(401) 274-2000

Jack R. Pirozzolo
Richard L. Binder
Willcox, Pirozzolo & McCarthy
50 Federal Street
Boston, Massachusetts 02110
(617) 482-5470

Dated: May 16, 2006

Counsel for Plaintiff, Emhart Industries, Inc.

## CERTIFICATION

To:

James T. Murphy, Esquire
Kelly N. Michels, Esquire
Hanson Curran LLP
146 Westminster Street
Providence, Rhode Island 02903

Kevin J. O'Connor, Esquire
Hermes, Netburn, O'Connor & Spearing, P.C.
265 Franklin Street, 7th Floor
Boston, Massachusetts 02110

Mark T. Nugent, Esquire
Michael Marcello, Esquire
Michael T. Farley, Esquire
Morrison Mahoney LLP
121 South Main Street, Suite 600
Providence, Rhode Island 02903-7141

John T. Harding, Esquire
Morrison Mahoney LLP
250 Summer Street
Boston, Massachusetts 02210

James T. McCormick, Esquire
McKenna & McCormick
128 Dorrance Street, Suite 330
Providence, Rhode Island 02903

Lawrence A. Nathanson, Esquire
Siegal & Napierkowski
533 Fellowship Road
Mount Laurel, New Jersey 08054

I hereby certify that on the 16th day of May, 2006, a copy of the within document was served by first class mail, postage prepaid, upon the counsel of record listed above.

Cynthia Lomas

715024v1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

EMHART INDUSTRIES, INC.,

Plaintiff,

v.

HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, LIBERTY MUTUAL INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICA INSURANCE COMPANY and UNITED STATES FIRE INSURANCE COMPANY,

Defendants.

Civil Action No. 02-053 S

EMHART'S MEMORANDUM IN SUPPORT OF ITS MOTION IN LIMINE TO PRECLUDE EXPERT OPINIONS OF EDWARD CALABRESE

INTRODUCTION

Plaintiff ("Emhart") seeks to preclude defendants from offering opinion evidence by Edward L. Calabrese. Defendants seek to introduce opinion testimony by Dr. Calabrese to support the contention that environmental damage at the Centredale Superfund Site ("Site") was expected or intended from the standpoint of the insured. The report and deposition testimony of Dr. Calabrese show that his opinions are inadmissible under the standards articulated in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993); General Electric Co. v. Joiner, 522 U.S. 136 (1997); and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999).

The opinions of Dr. Calabrese do not have a reliable foundation. They are not relevant to the issues. Dr. Calabrese based his opinions on criteria that differ greatly from the proper criteria for determining whether damage was expected or intended from the standpoint of the insured. Damage is not expected or intended from the standpoint of the insured unless the

insured subjectively intended the environmental damage that occurred. In contrast to the applicable standard, Dr. Calabrese bases his opinions on the purported knowledge of major chemical companies that supplied companies, such as the predecessor of Emhart, Metro-Atlantic, Inc. ("Metro-Atlantic"), with the materials used in their operations, without regard to the actual knowledge of such information by Metro-Atlantic. Such speculation is unrelated to whether Metro-Atlantic subjectively expected or intended environmental damage. The opinions of Dr. Calabrese, unconnected to the applicable issues and legal standards (see, e.g., Aetna Casualty & Surety Co. v. Dow Chemical Co., 28 F. Supp. 2d 421, 427-29 (E.D. Mich. 1998) ("Aetna/Dow I")) should be excluded. E.g., Daubert, 509 U.S. at 591 (expert opinion which does not "fit" the facts and issues is inadmissible even if scientifically valid); Hochen v. Bobst Group, Inc., 290 F.3d 446, 452-53 (1st Cir. 2002) (opinion does not meet the "fit" requirement of Daubert as it did not address appropriate issue); Cipollone v. Yale Industrial Products, Inc., 202 F.3d 376, 380 (1st Cir. 2000) (opinion of expert inadmissible due to references to standards that were not on point). What Dr. Calabrese has provided "is not 'expert' opinion, but rather a personal opinion about what standards [Dr. Calabrese] believes should apply...." In re Diet Drugs Product Liability Litigation, 2001 WL 454586, at *18 (E.D. Pa. Feb. 1, 2001).

Dr. Calabrese relies upon assumptions that have no basis in fact. This mars his opinions further. He disregards undisputed facts regarding the limited period (1964-1965) of hexachlorophene manufacture at the Site. Instead, Dr. Calabrese relies upon an unsupported assertion by another expert retained by defendants, Dr. Cheremisinoff, that hexachlorophene was manufactured at the site from 1965-1970 (Calabrese Report (Ex. A) at 12-13).[1] As addressed in

---

1 A copy of the Calabrese report is Exhibit A to the Appendix to this memorandum. Documents in the Appendix will be cited by exhibit number and page number.

the contemporaneous motion by Emhart regarding Dr. Cheremisinoff, the basis for this assertion is speculative projections from information in one 1965 newspaper article, with an assumption of continued operations for five years, all without a scintilla of supporting evidence. Similarly speculative opinions frequently have been excluded in the damages context when based on unsupportable projections regarding anticipated sales. Irvine v. Murad Skin Research Laboratories, Inc., 194 F.3d 313, 321 (1st Cir. 1999); Williams v. Rene, 72 F.3d 1096, 1101-03 (3d Cir. 1995); Joy v. Bell Helicopter Textron, Inc., 999 F.2d 549, 569-70 (D.C. Cir. 1993).

Dr. Calabrese also purports impermissibly to provide opinions concerning the credibility of witnesses, most specifically Thomas Cleary, a former consultant for Metro-Atlantic, a function uniquely for the jury. E.g., Goodwin v. MTD Products, Inc., 232 F.3d 600, 609 (7th Cir. 2000); SEC v. Lipson, 46 F. Supp. 2d 758, 763 (N.D. Ill. 1999).

## BACKGROUND

### A. The Site

Crown Metro, Inc., the insured on the policies issued by OneBeacon America and Century Indemnity Corporation, was formed in December 1968 when Metro-Atlantic entered into an agreement of consolidation with Crown Chemical Corporation. Before the consolidation, Metro-Atlantic operated on a portion of the Site. Those operations ceased at the time of the consolidation. The Rhode Island operations of Metro-Atlantic moved to Providence.[2]

Dioxin is a major contaminant at the Site. It is asserted that some of the dioxin on the Site was associated with the manufacture by Metro-Atlantic of hexachlorophene, an

2 See, e.g., paragraph 91 of the statement of material facts filed with the CIC summary judgment motion and paragraph 21 of the statement of material facts filed with the OneBeacon summary judgment motion.

ingredient in pHisoHex, an anti-bacterial soap (Cleary Dep. (Ex. B) at 17, 40).[3] One ingredient in hexachlorophene is trichlorophenol, a chemical now known to contain dioxin. The testimony of Mr. Cleary, who invented the process used to purify hexachlorophene used at Metro-Atlantic, shows that Metro-Atlantic manufactured hexachlorophene for less than twelve months in 1964 and 1965 (id. at 49, 53-54).

B. The Deposition And Report Of Dr. Calabrese

The opinions of Dr. Calabrese seek to address the purported knowledge of Metro-Atlantic regarding dioxin, even though Dr. Calabrese has no evidence of actual knowledge. In these opinions, Dr. Calabrese speculates concerning what knowledge Metro-Atlantic allegedly had concerning the existence of dioxin, the hazards presented by dioxin and the potential for water and soil contamination.

Dr. Calabrese never visited or inspected the Site (Calabrese Dep. (Ex. C) at II:29).[4] He had no knowledge of the size, shape and configuration of the building where Metro-Atlantic manufactured hexachlorophene (id. at II:22-23). Dr. Calabrese had no knowledge as to how Metro-Atlantic disposed of any waste or still bottom material from its hexachlorophene production (id. at II:26-28). Dr. Calabrese acknowledged that he never has observed the handling and disposal of waste by a manufacturing operation (id. at I:47).

As Dr. Calabrese admitted: "I don't have any documentation by the people, Emhart or MetroAtlantic that, that provides clear assurances that my inferences are correct" (Ex.

---

3 Excerpts from the Cleary deposition cited in this memorandum are contained in Exhibit B to the Appendix to this memorandum.

4 Excerpts from the Calabrese deposition cited in this memorandum are contained in Exhibit C to the Appendix to this memorandum. Volume numbers of the deposition are indicated in Roman numerals.

C at I:84). He agreed that there were no records that showed what information Metro-Atlantic possessed regarding risks associated with dioxin or with trichlorophenol (id. at III:29-30). Dr. Calabrese had no information that Diamond Alkali, the company that supplied Metro-Atlantic with trichlorophenol, ever disclosed any information about the presence of dioxin in the trichlorophenol or of any danger posed by trichlorophenol, other than to the extent that such information could be gleaned from a patent that was not issued until January 1966 (id. at I:102), after hexachlorophene manufacture at Metro-Atlantic ended.[5] Other comments and testimony by Dr. Calabrese that, because Diamond Alkali had industrial accidents in its production of trichlorophenol, its customers knew of the dangers associated with production of trichlorophenol (see id. at III:18), simply are unsupported speculation. Dr. Calabrese acknowledged that he has not located and cannot cite any reference expressly stating not to dispose of dioxins in soil or groundwater (id. at III:55-56).

In his attempt to attribute some form of knowledge to Metro-Atlantic, Dr. Calabrese sought to rely upon speculation as to knowledge by Mr. Cleary, who briefly was a Metro-Atlantic consultant. Mr. Cleary was not an officer, director or managing employee of Metro-Atlantic; any purported knowledge by him cannot be attributed to Metro-Atlantic. See Aetna/Dow I, 28 F. Supp. 2d at 438-40 (citing Hoechst Celanese Corp. v. National Union Fire Insurance Co., 1994 WL 721786, at *4 (Del. Super. Ct. April 22, 1994)); Aetna Casualty & Surety Co. v. Dow Chemical Co., 44 F. Supp. 2d 865, 866-67 (E.D. Mich. 1998) ("Aetna/Dow II"). The knowledge that Dr. Calabrese sought to attribute to Mr. Cleary was based upon his

---

5 Dr. Calabrese also was unaware that patent applications are kept confidential; the information in them is unavailable until they are issued (Ex. B at I:100). See 35 U.S.C. § 122.

work in improving the purity of hexachlorophene manufactured by Metro-Atlantic (see Ex. C at III:15-16). However, Dr. Calabrese cannot point to evidence of Mr. Cleary having any actual knowledge of the danger of dioxin contamination of the environment in 1964 and 1965. Dr. Calabrese conceded that he had no information to support the assertion that Mr. Cleary would have seen the Diamond Alkali patent discussed above (id. at I:98), which, in any event, was not issued or published until after Metro-Atlantic had ended the manufacture of hexachlorophene. Similarly, the citation by Dr. Calabrese to a patent invented by Mr. Cleary also is unavailing. The application for that patent was not filed until October 20, 1966, again after Metro-Atlantic ceased hexachlorophene production (id. at II:81). Dr. Calabrese conceded that Mr. Cleary "would not have been a consultant that should have been retained to evaluate the health effects of dioxin" and that the expertise of Mr. Cleary "wouldn't have been an expertise that would have permitted adequate guidance to the company concerning hazard assessment and potential risks associated with dioxin" (id. at III:30). The speculation that Mr. Cleary had such knowledge is contrary to the testimony of Mr. Cleary that in the 1960s he was not aware of dioxin. (Ex. B at 28).

Metro-Atlantic did not manufacture trichlorophenol, but instead purchased it from Diamond Alkali. The manufacturers of trichlorophenol were large chemical companies, such as Diamond Alkali, Dow, Monsanto, Hercules and Hooker (Ex. C at I:67). Dr. Calabrese cited incidents involving trichlorophenol manufacture by Dow and others to support his opinions that Metro-Atlantic would have known of the dangers of trichlorophenol (e.g., id. at II:51-53, III:33-35), but presented no evidence that Metro-Atlantic either knew or would have known of such incidents. Thus, while Dr. Calabrese referred to a meeting of trichlorophenol manufacturers in 1965, near the time that Metro-Atlantic was ceasing hexachlorophene production (id. at III:21),

he also conceded: "I don't believe that purchasers [of trichlorophenol] were invited to the meeting" (id. at III:22). Reliance upon a 1960 meeting of trichlorophenol manufacturers is similarly flawed (id. at III:31-32).

Dr. Calabrese places reliance upon purported actions by Dow Chemical in notifying users regarding quality control (Ex. C at I:67-68), while also acknowledging that Dow was a far larger entity with more resources than Metro-Atlantic (id. at III:49-50). While Dr. Calabrese can address in detail information about knowledge by Dow of dioxin in connection with the manufacture of trichlorophenol (see id. at II:31-33), he was unable to recall any instance of Dow directly informing its customers about this (id. at II:33-34).

Finally, Dr. Calabrese obtained much of the information upon which he relied in forming his opinions, including foreign publications, when he was an expert retained by an insurer in other litigation involving Hercules Corp (Ex. C at I:108-12), a major trichlorophenol producer (id. at I:67). Dr. Calabrese first saw those references in the course of his prior provision of expert services in other cases (id. at I:114, 126, 131-32) or during recent literature searches (id. at I:123-24). He did not know if translations of the articles ever had been published (id. at I:115, 126) and did not know whether translations that he did have were complete (id. at I:133). Dr. Calabrese admitted that, without these private translations, the articles would not have been available in English, and did not know if even abstracts of those articles had been published in English (id. at I:142-44). In addition, many of the references bore confidentiality legends from the prior litigation involving Hercules (id. at I:108-09, 126), thus indicating that these materials were not publicly available.

C. Legal Principles Regarding "Expected Or Intended" Property Damage

The insurance policies at issue provide coverage for "property damage neither expected nor intended from the standpoint of the insured." Whether damage was expected or

intended, within the meaning of the insurance policies, is determined based on whether the insured intended the damage itself not whether the insured intended to take the action that caused the damage. Damage arising from the unintentional consequences of intentional acts is not expected or intended. That is clear both from the policy language and from cases construing this policy language. See, e.g., Aetna/Dow I, 28 F. Supp. 2d at 427-29 (rejecting the argument that intentional disposal of waste meant damage was expected or intended as insurance coverage is available for "unintended and unexpected harm, even if the acts that caused the harm were intentional"); State v. CNA Insurance Companies, 779 A.2d 662, 670 (Vt. 2001) ("Thus the relevant inquiry in this case is not whether the spilling of chemicals at the prison site was intentional, but rather whether the harm that resulted from the spilling was expected or intended") (emphasis in original); James Graham Brown Foundation, Inc. v. St. Paul Fire & Marine Insurance Co., 814 S.W.2d 273, 278 (Ky. 1991) ("The 'expected or intended' exception is inapplicable unless the insured specifically and subjectively intends the injury giving rise to the claim"); Queen City Farms, Inc. v. Central National Insurance Co. of Omaha, 882 P.2d 703, 714 (Wash. 1994) (determining that the relevant inquiry is "whether an insured subjectively expected or intended the damage" resulting from the occurrence), modified, 891 P.2d 718 (Wash. 1994).

This principle was recognized, in a context other than environmental coverage litigation, by the Supreme Court of Rhode Island in Grenga v. National Surety Co., 317 A.2d 433, 436 (R.I. 1974):

> We agree with plaintiffs' assertion that the policy's exclusionary language should not apply where an insured's intentional act results in unintentional harm. It is the harm itself that must be intended, i.e., "intentionally" caused before the exclusion will apply. There is substantial support for the proposition that coverage exists under insuring and exclusion clauses identical or

> similar to the case presently before us for the unintentional results of an intentional act but not for damages incurred because of an injury which was intended to be inflicted.

See Liberty Mutual Insurance Co. v. Black & Decker Corp., C.A. No. 96-10804-DPW, slip op. at 40 (D.Mass. Dec. 5, 2003) ("Liberty/Black & Decker I")[6] ("For an event to be covered as either an 'accident' or 'occurrence,' the damage (as distinguished from the acts that caused the damage) must have been unintended and unexpected by the insured"); Liberty Mutual Insurance Co. v. Black & Decker Corp., 2004 WL 187387, at *5 (D.Mass. Jan. 27, 2004) ("Liberty/Black & Decker II").

The issue of whether the environmental harm at Centredale "was expected or intended from the standpoint of the insured" is determined using a subjective standard. Courts overwhelmingly recognize that "the 'expected or intended' exception is inapplicable unless the insured specifically and subjectively intends the injury giving rise to the claim." James Graham Brown Foundation, 814 S.W.2d at 278. See also Village of Morrisville Water & Light Dept. v. U.S. Fid. & Guar. Ins. Co., 775 F. Supp. 718, 729-30 (D.Vt. 1991); St. Paul Fire & Marine Insurance Co. v. McCormick & Baxter Creosoting Co., 923 P.2d 1200, 1218 (Or. 1996); Shell Oil Co. v. Winterthur Swiss Insurance Co., 12 Cal.App. 4th 715, 747-48 (1993); Liberty/Black & Decker I, slip op. at 47-48 (objective test is the "minority view among states"). Accord State ex rel. Davidson v. Hoke, 532 S.E.2d 50, 57 & n.2 (W.Va. 2000) (concurring opinion) (collecting cases and noting that "[i]t appears that a majority of jurisdictions have adopted the subjective approach to the 'expected/intended' exclusion").

As the definition specifically refers to "the standpoint of the insured," a subjective test is mandated. Grenga applied the subjective test for determining whether an event was an

---

6 A copy of the opinion has been filed herewith.

accident and, as explained in Liberty/Black & Decker II, 2004 WL 187387, at *5, "the SJC and other courts have held that the 'occurrence' definition simply codified how courts had already construed 'accident.'" The intent is analyzed "at the time the insured performed the acts which caused the environmental contamination," not during the term a particular insurance policy was in effect. Aetna/Dow I, 28 F. Supp. 2d at 433 n.13. In addition, the pertinent inquiry is the intent solely of Metro-Atlantic, the predecessor of the insured, not New England Container Company, a barrel reconditioner that conducted operations on a portion of the Site abutting the Metro-Atlantic facility. See State Mutual Life Assurance Co. of America v. Lumbermens Mutual Casualty Co., 874 F. Supp. 451, 456 (D. Mass. 1995) (intent of third party not imputed to insured); Quaker State Minit-Lube, Inc. v. Fireman's Fund Insurance Co., 868 F. Supp. 1278, 1298 (D. Utah 1994) (same), aff'd, 52 F.3d 1522 (10th Cir. 1995). See also Upjohn Co. v. Aetna Casualty & Surety Co., 1994 WL 1029337, at *30 n.18 (W.D. Mich. July 22, 1994) (rejecting contention "that because [insured] was located across the street and could observe [third party's] activities on the site during the years the coal gasification plant was in operation, it should have known that contamination would result").

## ARGUMENT

### A. The Daubert Standard

The Supreme Court has explained the scope of permissible expert testimony in Daubert, Joiner and Kumho. Daubert held that the rules of evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597. The Court explained the requirement that there be a "fit" between the proffered expert testimony and an issue in the case as a condition for admissibility. Id. at 591. Absent a "fit," the evidence does not meet the requirement of Fed. R. Evid. 702 that the testimony "will assist the trier of fact to understand or determine an issue." Id. at 592.

Daubert makes it clear that, even if the opinions of Dr. Calabrese were based on scientific knowledge, they would fail to meet the "fit" requirement:

> The study of the phases of the moon, for example, may provide valid scientific 'knowledge' about whether a certain night was dark, and if darkness was a fact in issue, the knowledge will assist the trier of fact. However (absent creditable grounds supporting such a link), evidence that the moon was full on a certain night will not assist the trier of fact in determining whether an individual was unusually likely to have behaved irrationally on that night. Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.

Id. at 591-92.

Joiner explained another requirement not satisfied by the report of Dr. Calabrese, that there must be a reliable factual basis for the opinions. 522 U.S. at 140. There the Court affirmed the exclusion of an expert report that "did not rise above 'subjective belief or unsupported speculation.'" It stated that "'[n]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." See also Daubert, 509 U.S. at 590 ("requirement that an expert must have "'knowledge' connotes more than subjective belief or unsupported speculation").

B. The Opinions Of Dr. Calabrese Are Not Relevant To The "Expected Or Intended" Issue

1. The Opinions Are Inadmissible As There Is No Evidence That Metro-Atlantic, A Trichlorophenol Consumer, Had The Knowledge Purportedly Possessed By Trichlorophenol Manufacturers

At pages 14-15 of his report (Ex. A at 14-15) and in his deposition, Dr. Calabrese relied upon the knowledge of manufacturers of trichlorophenol as a basis for his opinions that Metro-Atlantic knew or should have known that disposal of by-products of hexachlorophene presented a hazard. There is no nexus between Metro-Atlantic and any of the cited references.

Dr. Calabrese admitted, as he must, that there was no evidence that Metro-Atlantic had the same information as was possessed by trichlorophenol manufacturers and that his assumption of such knowledge was only speculation (Ex. C at III:21-22, 29-34). That suffices to exclude his opinions.

A similar issue was presented in Aetna/Dow I. There, the court, in granting summary judgment to the insured on the expected or intended issue, found that the evidence of industry standards upon which the insurers relied was inadmissible. It ruled that evidence of so-called industry standards is not evidence of subjective intent absent "a showing that the insured actually received and understood the information." 28 F. Supp. 2d at 433. In the absence of such a nexus, purported expert witness testimony "invades the jury's function to weigh evidence and determine credibility." Id. In confirming its decision, after the insurers moved for reconsideration, the court stated that "[e]vidence of [the insured's] intentional acts, [the insured's] general knowledge of the risks posed by chemicals, [the insured's] knowledge at other sites, and industry knowledge, without evidence [the insured] received and understood the information, is simply not relevant to a determination of whether [the insured] subjectively expected or intended property damage at the [Site]." Aetna/Dow II, 44 F. Supp. 2d at 868. See also Upjohn, 1994 WL 1029337, at *24 ("argument that [insured] 'should have known' about the potential for damage ... is irrelevant" to "whether [insured] subjectively expected or intended property damage") (emphasis in original). The references cited by Dr. Calabrese are "simply not relevant to a determination of whether [the insured] subjectively expected or intended property damage at the [Site]." Accordingly, the opinions of Dr. Calabrese that are based on those references must be excluded as there is no "fit" between the opinion and the issues in this action.

Like opinions by other experts proffered by defendant, the opinions of Dr. Calabrese regarding the waste handling practices of Metro-Atlantic are further flawed by his reliance upon references that either do not address dioxin, the contaminant of concern, or trichlorophenol, the chemical, now known to contain dioxin, that was used by Metro-Atlantic to manufacture hexachlorophene, or, if they do reference it, are dated from long after Metro-Atlantic ceased hexachlorophene production in 1965 (see Ex. A at 4-9). Rather, Dr. Calabrese cites references containing abstract statements concerning waste in general (id.). Neither general knowledge of problems associated with chemicals nor references concerning contaminants other than dioxin are relevant to whether practices concerning dioxin were expected or intended to cause environmental damage. Aetna/Dow II, 44 F. Supp. 2d at 868. See also Smith v. Hughes Aircraft Co., 22 F.3d 1432, 1439-40 (9th Cir. 1993) (district court "improperly based its conclusion that Hughes expected or intended the … injuries, in large part, on Hughes' disposal of chromium" and, on remand, "should not rely on evidence of Hughes' chromium disposal practices to establish the conclusion that Hughes expected or intended injury from TCE"); Upjohn, 1994 WL 1029337, at *27-28 (insured entitled to summary judgment that damage was neither expected nor intended as statements in industry literature about potential contamination associated with handling products for the pharmaceutical industry were insufficient to permit verdict in favor of insurer).

2. The Opinions Of Dr. Calabrese Would Be Inadmissible Even Under An Objective Standard

If the expected or intended issue were analyzed using an objective standard, rather than the applicable subjective standard, the opinions of Dr. Calabrese would be inadmissible. As demonstrated, supra, those opinions do not even address the waste processing activities of Metro-Atlantic. Instead, the opinions of Dr. Calabrese either address general standards that do

not address dioxin, are based on knowledge not held by other consumers of trichlorophenol or are from later and thus irrelevant periods. There is no basis for attributing to trichlorophenol consumers information possessed by trichlorophenol manufacturers.

It is settled that when an expert bases his opinions on an incorrect legal standard, the opinion must be excluded in view of the Daubert requirement that expert opinion be "relevant to the task at hand," Daubert, 509 U.S. at 597, and "fit" the issues in the case. Hochen, 290 F.3d at 452-53 (trial court properly excluded testimony regarding meaning of scope of work to engineer where relevant issue was meaning to electrician, thus meaning to engineer was of "questionable 'relevan[ce] to the task at hand'"); Cipollone, 202 F.3d at 379-80 (opinion of expert inadmissible due to references to standards that were not on point). See also Loeffel Steel Products, Inc. v. Delta Brands, Inc., 387 F. Supp. 2d 794, 805, 817-18 (N.D. Ill. 2005) (stating that "[e]xpert opinions that are contrary to law are inadmissible" and "cannot be said to be scientific, to be reliable or to be helpful to the trier of fact," and excluding opinion based on measure of damage contrary to the correct legal standard of damages). The reason for this rule is that such an opinion "is not 'expert' opinion, but rather a personal opinion about what standards [Dr. Calabrese] believes should apply...." In re Diet Drugs Product Liability Litigation, 2001 WL 454856, at *18, quoted with approval in Loeffel, 387 F. Supp. 2d at 806. In the words of Joiner, such an opinion "did not arise above 'subjective belief or unsupported speculation.'" 522 U.S. at 140.

### C. Statements By Dr. Calabrese About The Length Of Hexachlorophene Manufacture Are Based On Unsupported Assumptions And Should Be Excluded

The opinions of Dr. Calabrese are further marred by being based on unsupportable assumptions. A particularly egregious example is his adoption of the opinion of Dr. Cheremisinoff (Ex. A at 12-13) that Metro-Atlantic produced hexachlorophene from 1965

through 1970. As his deposition testimony (Ex. C at II:19-22) also makes clear, Dr. Calabrese is making improper credibility determinations in this regard. As noted, supra, Emhart is filing contemporaneously with this motion a motion to exclude, inter alia, this "opinion" of Dr. Cheremisinoff. As Emhart has shown, the unrebutted fact evidence is that in the deposition of Mr. Cleary, that Metro-Atlantic manufactured hexachlorophene for less than one year in 1964-1965. In contrast, the "opinion" of Dr. Cheremisinoff was based upon taking one 1965 newspaper article and speculating that manufacturing operations would have continued for five years at the levels that Metro-Atlantic hoped to obtain.

Emhart incorporates and adopts its arguments regarding the "opinion" of Dr. Cheremisinoff in support of striking any opinion by Dr. Calabrese that relies upon that alleged "opinion." If Emhart prevails on its motion to strike that "opinion" by Dr. Cheremisinoff, then the opinions of Dr. Calabrese that are based on that inadmissible assumption also must be excluded.

## CONCLUSION

For the foregoing reasons, the Court should exclude the testimony of Edward Calabrese.

By its attorneys,

Gerald J. Petros (#2931)
Hinckley, Allen & Snyder LLP
1500 Fleet Center
Providence, Rhode Island 02903
(401) 274-2000

Jack R. Pirozzolo
Richard L. Binder
Willcox, Pirozzolo & McCarthy
50 Federal Street
Boston, Massachusetts 02110
(617) 482-5470

Dated: May 16, 2006

Counsel for Emhart Industries, Inc.

**CERTIFICATION**

To:

James T. Murphy, Esquire
Kelly N. Michels, Esquire
Hanson Curran LLP
146 Westminster Street
Providence, Rhode Island 02903

Kevin J. O'Connor, Esquire
Hermes, Netburn, O'Connor & Spearing, P.C.
265 Franklin Street, 7th Floor
Boston, Massachusetts 02110

Mark T. Nugent, Esquire
Michael Marcello, Esquire
Michael T. Farley, Esquire
Morrison Mahoney LLP
121 South Main Street, Suite 600
Providence, Rhode Island 02903-7141

John T. Harding, Esquire
Morrison Mahoney LLP
250 Summer Street
Boston, Massachusetts 02210

James T. McCormick, Esquire
McKenna & McCormick
128 Dorrance Street, Suite 330
Providence, Rhode Island 02903

Lawrence A. Nathanson, Esquire
Siegal & Napierkowski
533 Fellowship Road
Mount Laurel, New Jersey 08054

I hereby certify that on the 16th day of May, 2006, a copy of the within document was served by first class mail, postage prepaid, upon the counsel of record listed above.

Cynthia Lomas

715025v1