UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| EMHART INDUSTRIES, INC., Plaintiff, | ) | |
| v. | ) | Civil Action No. 02-053 S |
| HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, LIBERTY MUTUAL INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICA INSURANCE COMPANY and UNITED STATES FIRE INSURANCE COMPANY, Defendants. | ) | |

MOTION IN LIMINE OF EMHART INDUSTRIES, INC.
TO PRECLUDE EXPERT OPINIONS OF RICHARD J. HUGHTO

Plaintiff, Emhart Industries, Inc. ("Emhart"), moves for an order in limine to preclude defendants from offering at trial any opinions of Richard J. Hughto. It appears that defendants seek to introduce opinion testimony of Dr. Hughto in support of a contention that the property damage at the Centredale Superfund Site ("Site") was not discoverable in the 1969 time frame, when certain of the policies at issue were in effect. The Hughto report and the deposition testimony of Dr. Hughto demonstrate that his opinions are inadmissible under the standards regarding expert opinions set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993); General Electric Co. v. Joiner, 522 U.S. 136 (1997); and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999).

Dr. Hughto has based his opinions on criteria that differ greatly from the criteria for determining whether property damage was discoverable. In addition, while Dr. Hughto has

certain general expertise, he does not have expertise that bears on the specific issues upon which he purports to opine. His testimony should therefore be excluded.

In support of its motion, Emhart relies upon the Memorandum of Law and Appendix of Exhibits filed herewith.

By its attorneys,

Gerald J. Petros (#2931)
Hinckley, Allen & Snyder LLP
1500 Fleet Center
Providence, Rhode Island 02903
(401) 274-2000

Jack R. Pirozzolo
Richard L. Binder
Willcox, Pirozzolo & McCarthy
50 Federal Street
Boston, Massachusetts 02110
(617) 482-5470

Dated: May 16, 2006

Counsel for Emhart Industries, Inc.

**CERTIFICATION**

To:

James T. Murphy, Esq.
Kelly N. Michels, Esq.
Hanson Curran LLP
146 Westminster Street
Providence, RI 02903

Kevin J. O'Connor, Esq.
Hermes, Netburn, O'Connor & Spearing, P.C.
265 Franklin Street, 7th Floor
Boston, MA 02110

Mark T. Nugent, Esq.
Michael Marcello, Esq.
Michael T. Farley, Esq.
Morrison Mahoney LLP
121 South Main Street, Suite 600
Providence, RI 02903-7141

John T. Harding, Esq.
Morrison Mahoney LLP
250 Summer Street
Boston, MA 02210

James T. McCormick, Esq.
McKenna & McCormick
128 Dorrance Street, Suite 330
Providence, RI 02903

Lawrence A. Nathanson, Esq.
Siegal, Napierkowski & Park
533 Fellowship Road, Suite 120
Mt. Laurel, NJ 08054

I hereby certify that on the 11th day of May, 2006, a copy of the within document was served by first class mail, postage prepaid, upon the counsel of record listed above.

Cynthia Torres
_________________________

715028v1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| EMHART INDUSTRIES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>HOME INSURANCE COMPANY,<br>INSURANCE COMPANY OF NORTH AMERICA,<br>LIBERTY MUTUAL INSURANCE COMPANY,<br>NORTH RIVER INSURANCE COMPANY,<br>ONEBEACON AMERICA INSURANCE COMPANY<br>and UNITED STATES FIRE INSURANCE COMPANY,<br><br>Defendants. | Civil Action No. 02-053 S |

MEMORANDUM OF LAW OF EMHART INDUSTRIES, INC. IN SUPPORT OF ITS MOTION IN LIMINE TO PRECLUDE EXPERT OPINIONS OF RICHARD J. HUGHTO

## INTRODUCTION

Plaintiff, Emhart Industries, Inc. ("Emhart"), has filed a motion in limine to preclude defendants from offering any opinions of Richard J. Hughto, a retained witness who has provided an expert report in this action. It appears that defendants seek to introduce opinion testimony of Dr. Hughto in support of a contention that the insured did not have "some reason to test" for dioxin contamination at the Centredale Superfund Site ("Site") in the 1969 time frame, when certain of the policies at issue were in effect. It also appears that defendants seek to introduce Dr. Hughto's testimony to support a contention that in the 1969 time frame, Emhart would have not "been able to discover" dioxin contamination at the Site "in the exercise of reasonable diligence." Both of these issues relate to the "discoverability trigger" articulated by the Rhode Island Supreme Court in Textron, Inc. v. Aetna Casualty and Surety Co., 723 A.2d

1138 (R.I. 1999) ("Textron-Gastonia") and Textron, Inc. v. Aetna Casualty and Surety Co., 754 A.2d 742 (R.I. 2000) ("Textron-Wheatfield").[1]

The Hughto report and the deposition testimony of Dr. Hughto demonstrate that his opinions are inadmissible under the standards regarding expert opinions set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993); General Electric Co. v. Joiner, 522 U.S. 136 (1997); and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999). The Hughto opinions are not relevant to the issues to be tried. Further, while Dr. Hughto has certain general expertise, he does not have expertise that bears on the two very specific issues upon which he purports to opine.

Dr. Hughto opines that it was not "common to test" for dioxin during the policy period (Hughto Report (Ex. A) at 5).[2] That opinion is not relevant. As discussed below, one issue raised by the "discoverability trigger" is whether a person would have had "some reason to test," not whether such testing was "common." Textron-Gastonia, 723 A.2d at 1144. The Hughto testimony is inconsistent with the holding in the two Textron cases that spills and leaks sufficed to satisfy the requirement of "some reason to test." Moreover, even if an analysis of what was "common" were relevant to whether there was "some reason to test," Dr. Hughto's opinion is flawed as relating to sites different from the site at issue. As Dr. Hughto himself admits, the "reason to test" for a specific contaminant is dependent upon the site history (Hughto

---

1 In Textron-Gastonia, the Rhode Island Supreme Court left open the possibility that the continuous trigger of coverage might also be appropriate. 723 A.2d at 1141.

2 A copy of the Hughto report is contained in Exhibit A to the Appendix to this memorandum. Documents cited in the Appendix will be cited by exhibit number and page number.

Dep. (Ex. B) at 61-64).[3] It may well be true that it was not "common" to test for dioxin at sites where the site history did not suggest the presence of dioxin. However, testimony about whether it was "common" to test for dioxin at other sites will not aid the jury in deciding whether a person would have had "some reason to test" for dioxin at a site where, as here, the site history might indicate the presence of dioxin.

Dr. Hughto's other opinion is also based upon the wrong standard and, in addition, ignores the facts of record. As discussed, infra, a second issue raised by the "discoverability trigger" is whether the dioxin contamination was "capable of being detected" during the relevant period. Dr. Hughto's report indicates that he is expected to testify that the analytical methods in existence at "commercial analytical laboratories" during the relevant time period were not capable of detecting dioxin in the range of 1 to 9 parts per billion (see Ex. A at 5; Ex. B at 101-02). First, the "capable of being detected" requirement says nothing about testing in "commercial analytical laboratories." Second, Dr. Hughto concedes that dioxin levels at the Site were in excess of 100 parts per billion, not the less than 10 parts per billion level discussed in his report (Ex. B at 103). Thus, tests capable of detecting low concentrations would have been unnecessary to detect dioxin at the Site. Dr. Hughto's opinion has no relevance to whether dioxin, at the levels present at the Site, was "capable of being detected" at a commercial or other laboratory when the policies at issue were in effect.

The question of whether testing was "common" does not "fit" the legal standard of whether there would have been "reason to test" at this particular site. Similarly, testimony regarding the ability to detect low concentrations at commercial laboratories does not "fit" either

---

3 Excerpts from the deposition of Dr. Hughto cited in this memorandum are contained in Exhibit B to the Appendix to this memorandum.

the legal standard or the facts of record. It is well-settled that, where there is no connection or "fit" between an expert opinion and the applicable legal standards and/or factual issues, the opinions should be excluded. E.g., Daubert, 509 U.S. at 591 (expert opinion which does not "fit" the facts and issues is inadmissible even if scientifically valid); Hochen v. Bobst Group, Inc., 290 F.3d 446, 452-53 (1st Cir. 2002) (opinion does not meet the "fit" requirement of Daubert as it did not address the appropriate issue); Cipollone v. Yale Industrial Products, Inc., 202 F.3d 376, 380 (1st Cir. 2000) (expert's opinion inadmissible due to references to standards that were not on point).

In addition, Dr. Hughto's general training and expertise as an environmental engineer does not "fit" the two very specific issues upon which he apparently intends to opine. As Dr. Hughto has testified, he has no expertise, from an historical standpoint, regarding laboratory testing for contaminants during the relevant period. Moreover, he does not hold himself out as an expert on dioxin (Ex. B at 53, 72-73, 122-24). Just as "possessing a medical degree is not sufficient to permit a physician to testify concerning any medical-related issue," such as "the advantage of a spinal fixation device" (Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965, 970 (10th Cir. 2001)), Dr. Hughto's training and experience do not qualify him to opine upon two very focused questions which go beyond the general knowledge of an environmental engineer.

SITE BACKGROUND

Crown Metro, Inc. ("Crown Metro"), the insured on the policies issued by OneBeacon America ("OneBeacon") and Century Indemnity Corporation ("CIC"), was formed in December 1968 when Metro-Atlantic, Inc. ("Metro-Atlantic") entered into an agreement of consolidation with Crown Chemical Corporation ("Crown Chemical"). Prior to the

consolidation, Metro-Atlantic had operated on a portion of the Site. Those operations ceased at the time of the consolidation and the operations of Metro-Atlantic in Rhode Island were moved to the location in Providence where Crown Chemical conducted its business operations.[4]

Dioxin is a major contaminant at the Site. It is asserted that some of the dioxin on the Site was associated with Metro-Atlantic having manufactured hexachlorophene, an ingredient in pHisoHex, an anti-bacterial soap (Cleary Dep. (Ex. C) at 17, 40).[5] One of the ingredients in hexachlorophene is trichlorophenol, a chemical that is now known to contain dioxin.

## ARGUMENT

### A. Under Daubert, The Expert Testimony Must "Fit" The Issues

The Supreme Court has explained the scope of permissible expert testimony in Daubert, Joiner and Kumho, 526 U.S. 137 (1999). In Daubert, the Supreme Court held that the rules of evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597. The Court explained the requirement that there be a "fit" between the proffered expert testimony and an issue in the case as a condition for admissibility. Id. at 591. Absent a "fit", the evidence does not meet the requirement of Rule 702 of the Federal Rules of Evidence that the testimony "will assist the trier of fact to understand or determine an issue." Id. at 592.

The Supreme Court illustrated the "fit" requirement in Daubert:

---

4 See, e.g., paragraph 91 of the statement of material facts filed with the CIC summary judgment motion and paragraph 21 of the statement of material facts filed in support of the OneBeacon summary judgment motion.

5 Excerpts from the Cleary deposition cited in this memorandum are contained in Exhibit C to the Appendix to this memorandum.

> The study of the phases of the moon, for example, may provide valid scientific 'knowledge' about whether a certain night was dark, and if darkness was a fact in issue, the knowledge will assist the trier of fact. However (absent creditable grounds supporting such a link), evidence that the moon was full on a certain night will not assist the trier of fact in determining whether an individual was unusually likely to have behaved irrationally on that night. Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.

Id. at 591-92. Here, testimony regarding whether certain testing was "common" would assist a jury if it had to decide an issue that would be illuminated by knowledge of the frequency of testing. That same testimony would not assist the jury in determining whether there was a "reason to test" for a certain contaminant at a certain site at a certain time.

It is settled that when an expert bases his opinions on an incorrect legal standard, the opinion must be excluded in view of the Daubert requirement that expert opinion be "relevant to the task at hand," Daubert, 509 U.S. at 597, and "fit" the issues in the case. Hochen, 290 F.3d at 452-53 (trial court properly excluded testimony regarding meaning of scope of work to engineer where relevant issue was meaning to electrician, thus meaning to engineer was of "questionable 'relevan[ce] to the task at hand'"); Cipollone, 202 F.3d at 379-80 (expert's opinion inadmissible due to references to standards that were not on point). See also Loeffel Steel Products, Inc. v. Delta Brands, Inc., 387 F. Supp. 2d 794, 805, 817-18 (N.D. Ill. 2005) (stating that "[e]xpert opinions that are contrary to law are inadmissible" and "cannot be said to be scientific, to be reliable or to be helpful to the trier of fact," and excluding opinion based on measure of damage contrary to the correct legal standard of damages). Here, Dr. Hughto's opinions do not "fit" either the legal standard or the factual record. In addition, Dr. Hughto's expertise does not "fit" the issues upon which he purports to opine.

B. The Rhode Island Discoverability Trigger

The requirements of Rhode Island's discoverability trigger were set forth in Textron-Gastonia. As pertinent here, the insured is required to prove that, during the policy period, the contamination was "discoverable with the exercise of reasonable diligence." 723 A.2d at 1144.[6] The court explained the scope of this requirement, stating that "in order to trigger coverage in the absence of actual discovery, [the insured] must have had some reason to test for the contamination, and must actually have been able to discover it in the exercise of reasonable diligence." Id.[7] Subsequently, when the court applied the discoverability trigger in Textron-Wheatfield, and considered "whether Textron had reason to test for environmental damage during the policy period," it answered the question affirmatively, relying upon affidavits that there were "small leaks and spills," including spills on cement ramps which were cracked. 754 A.2d at 747. As to whether the contamination was capable of being detected, the Textron-Gastonia court relied upon evidence that testing simply required "collecting and analyzing a ground water sample." 723 A.2d at 1144.

In Textron-Wheatfield, 754 A.2d at 746, the court described the "discoverability" trigger as "descend[ing] from a long and venerable line of insurance cases" and referred specifically to American Home Assurance Co. v. Libbey-Owens-Ford Co., 786 F.2d 22, 30 (1st Cir. 1986). There, the First Circuit held that coverage of damage from the falling windows in the John Hancock building was triggered by the date the architect advised the owner that the

---

6 The insured also must show that the contamination was present during the policy period. Dr. Hughto has not opined on that subject.

7 In Textron-Wheatfield, the court articulated the requirement that the insured must have been able to discover the contamination as a requirement that the contamination "was capable of being detected." 754 A.2d at 745.

windows "presented a 'clear and present danger' to the public." Under American Home, "the test for determining the date of the occurrence should be the time at which a reasonable person would be aware that a defect exists that may give rise to a cause of action." 786 F.2d at 30.

The testimony that Dr. Hughto is expected to present does not address the issues that underlie a discoverability determination. Specifically, he does not consider whether tests were available that would have detected dioxin at the levels present at the Site during the 1969 time frame nor does he consider whether a reasonable person with knowledge of the manufacturing history at the Site, including spills and leaks that occurred, would have had reason to test for dioxin during that period. Moreover, Dr. Hughto has conceded that he has no expertise regarding either dioxin or the history of environmental laboratory testing.

1. "Common To Test" Is Different From "Reason To Test"

According to his expert report, Dr. Hughto intends to testify that "prior to 1980 it was not common for soil, sediment, surface water, or groundwater samples to be analyzed for dioxin at a site being assessed for potential contamination or at a site known to be contaminated" (Ex. A at 5). Along the same lines, he is expected to testify that testing during that time period "was generally limited to a much more restricted list" of contaminants than during subsequent decades (id.). Although he stated in his expert report that "there was no awareness in the environmental engineering field or at EPA" that dioxin "presented a risk to human health or the environment" until "the mid 1970's," he retracted that statement during his deposition, opining instead that such awareness was "limited" at the time (compare id. at 5 with Ex. B at 87).[8]

---

[8] Dr. Hughto's opinions are set forth in three paragraphs. The content of the first paragraph is summarized above. The second paragraph is apparently intended to support Dr. Hughto's statement in the first paragraph that there was "no" knowledge of the dangers of dioxin during the relevant period. That paragraph is of limited importance in view of Dr. Hughto's concession during his deposition (Ex. B at 87) that there was at

These amorphous opinions about what testing was "common," what contaminants were "generally" on a list, and that knowledge of health problems was "limited" do not address the issue of whether a reasonable person would have had "some reason to test" a site for dioxin in view of spills and leaks at the site. It also does not address whether there would have been "some reason to test" if trichlorophenol had been used in a manufacturing process at that site or if hexachlorophene had been manufactured there. The issue is what a reasonable person, having knowledge of the site history, such as the "drips" relied upon by the court in Textron-Wheatfield, would have had reason to do.

At his deposition, Dr. Hughto testified that the history of a site is considered when determining whether to test for certain contaminants (e.g., Ex. B at 61). As he explained, "you have a specific set of facts and circumstances related to a location and you look at the history and you look at the natural environment and you look at what was done there and how wastes were disposed and … what products are made, what by-products there were, etc." to determine what tests are appropriate (id.). Indeed, Dr. Hughto testified that, in deciding whether to test for dioxin, "the most important [consideration] is the history of what was done there" (id. at 61-62). He also stated that "the manufacture of products such as … hexachlorophene, such as at the Rhode Island site," would be an indicator that dioxin testing was appropriate (id. at 63-64).

In reaching his opinion regarding whether there was a "reason to test" for dioxin, Dr. Hughto completely disregarded the primary factor which he and other experts in the field would have considered in deciding what tests were appropriate for a particular site, i.e., the site

---

least "limited" knowledge during prior years. The third paragraph of Dr. Hughto's opinion, concerning whether levels of dioxin an order of magnitude less than those present at the Site could have been detected by "commercial laboratories," is discussed in the following section of this memorandum.

history. Instead, he focused on a completely different question, i.e., what tests were "common" at environmental sites. In doing so, he ignored the legal standard and opined upon the wrong issue. There was a "reason to test" for dioxin at the Site, due to the site history, even if such tests were not "common." Whether, as an abstract matter, a test was "common," is beside the point. The "fit" between Dr. Hughto's opinion and the relevant legal standard is absent. Since Dr. Hughto's opinion, as set out in his expert report and as discussed above, does not shed light on the "reason to test" issue, his opinion would not be helpful to the jury and should be excluded at trial.

2. Dr. Hughto's Opinion On Whether Dioxin Was "Capable Of Being Detected" Does Not "Fit" The Facts Or Law

Dr. Hughto is expected to testify that "the analytical methods employed at commercial analytical laboratories prior to the late 1970s were not capable of quantifying dioxin to the low part per billion level in environmental samples" (Ex. A at 5). Again, this opinion fails to address the real issue.

The question is whether the dioxin contamination at the Site was "capable of being detected" during the relevant period. There is no requirement that the detection be accomplished by testing in a "commercial analytical laboratory." Dr. Hughto does not discuss whether testing could have taken place in other facilities, such as university or governmental laboratories.

Second, Dr. Hughto limits his opinion to the ability to test to certain low concentrations, i.e., "low part per billion," that are considerably lower than the concentrations found at the Site. He testified, at his deposition, that, by "low part per billion," he meant a range of "1 to 9" (Ex. B at 101-02). He selected that level because the EPA expects the Centredale site to be remediated so that dioxin levels do not exceed 1 part per billion (id. at 102). However,

Dr. Hughto is confusing apples with oranges. To detect whether a site has to be remediated – as opposed to whether it has been remediated – it is not necessary to test to such low concentrations. Dr. Hughto acknowledged during his deposition that tests at the Centredale showed dioxin levels as high as 140 parts per billion (id. at 103). Dr. Hughto's opinion does not address whether, during the relevant period, dioxin levels as high as 140 parts per billion could have been detected at commercial facilities or elsewhere. However, other experts retained by the parties have agreed that dioxin in the concentrations found at the Site could have been discovered using testing methods that existed at the time, regardless of whether those methods were used in a "commercial analytical laboratory" (see Ex. D (Cheremisinoff Dep.) at 388-91; Ex. E (Calabrese Dep.) at 35-37; Ex. F (Hass Report) at 6-7).[9]

Since Dr. Hughto's opinion is limited to the availability of testing at "commercial analytical laboratories" and then does not address the ability to detect dioxin at the levels actually existing at the Site, his opinion regarding testing methods will not assist the jury in determining whether a reasonable person would have been able to discover dioxin contamination during the relevant period. There are no constraints in the "discoverability trigger" regarding the type of facility where the testing would have taken place. The facts do not justify the limitations Dr. Hughto has placed on the concentrations to be detected. Since his opinion "fits" neither the legal standard nor the facts of record, he should not be permitted to testify at trial as to the alleged unavailability of testing methods in commercial laboratories.

---

9 Excerpts from the depositions of Nicholas Cheremisinoff and Edward Calabrese, experts retained by the defendants in this action, are included in the Appendix as Exhibits D and E, respectively. The text of the June 2003 expert report of Dr. J. Ronald Hass, an expert witness retained by Emhart, is contained in Exhibit F to the Appendix.

C. Dr. Hughto Conceded That He Did Not Have The Relevant Expertise

Dr. Hughto relies upon "his experience and education, his knowledge of the pertinent literature and references ..., and his review of the documents he received specific to this case" as a basis for his opinions (Ex. A at 5). While his training, employment by the Environmental Protection Agency ("EPA"), and consulting experience demonstrate general expertise regarding the remediation of contaminated sites, his background is devoid of any specific expertise on dioxins and on the ability to test for dioxin or, indeed, any other contaminant during the late 1960s. Where the issues before the jury are precisely defined, expertise precisely targeted to those issues is required. See Ralston, 275 F.3d at 970 (limiting testimony of physician where his expertise did not encompass the narrow issues to be tried).

Dr. Hughto's personal experience is an insufficient basis for his opinions. He testified that, among the test reports he came across in his work at the EPA in the 1973-76 time period and as a consultant subsequent to 1979, he rarely saw dioxin test reports, extrapolating from that personal experience that such tests were not done (Ex. B at 77-81).[10] Even assuming, contrary to the applicable standard, that whether testing for dioxin was "common" were relevant, Dr. Hughto's limited personal experience does not provide a basis for determining whether testing for dioxin was in fact common, much less whether such testing was common when investigating a facility that had used trichlorophenol in its manufacturing activities. As for the issue of testing methods available in the 1969 time frame, Dr. Hughto does not attempt to rely upon even anecdotal experience.

---

[10] Dr. Hughto's testimony shows that the frequency of testing for dioxin may have been skewed during some periods due to non-technical considerations. For example, he explained that in the early 1980's the EPA "didn't always want to spend the money to analyze for dioxin" and that the agency "shied away from it" (Ex. B at 66-67).

Dr. Hughto has acknowledged that neither dioxin nor the availability of testing equipment has ever been a focus of his career. Dr. Hughto testified that he is not an expert regarding the history of test equipment (id. at 53). He does not hold himself out as an expert in the chemistry of dioxin (id. at 72-73). At deposition, he had to correct his opinion regarding the awareness of health risks from dioxin (id. at 87). Although Dr. Hughto has testified extensively as an expert witness, he has never previously testified on the subject of dioxin or the methods of testing for dioxin (id. at 122-24). While he has numerous publications and presentations to his credit, none have dioxin or dioxin testing as a primary topic (id. at 120-22).

In short, Dr. Hughto is not an appropriate expert on the two very specialized issues, i.e., whether in the 1969 time frame a reasonable person would have had some reason to test for dioxin at the Site and whether such a test would have detected dioxin at the higher concentrations present at the Site. Those are the two questions that will be before the jury. Since Dr. Hughto cannot help the jury resolve them, his testimony should be excluded.

## CONCLUSION

For the foregoing reasons, the Court should exclude the testimony of Richard J. Hughto.

By its attorneys,

Gerald J. Petros (#2931)
Hinckley, Allen & Snyder LLP
1500 Fleet Center
Providence, Rhode Island 02903
(401) 274-2000

Jack R. Pirozzolo
Richard L. Binder
Willcox, Pirozzolo & McCarthy
50 Federal Street
Boston, Massachusetts 02110
(617) 482-5470

Dated: May 16, 2006

Counsel for Emhart Industries, Inc.

**CERTIFICATION**

To:

James T. Murphy, Esq.
Kelly N. Michels, Esq.
Hanson Curran LLP
146 Westminster Street
Providence, RI 02903

Kevin J. O'Connor, Esq.
Hermes, Netburn, O'Connor & Spearing, P.C.
265 Franklin Street, 7th Floor
Boston, MA 02110

Mark T. Nugent, Esq.
Michael Marcello, Esq.
Michael T. Farley, Esq.
Morrison Mahoney LLP
121 South Main Street, Suite 600
Providence, RI 02903-7141

John T. Harding, Esq.
Morrison Mahoney LLP
250 Summer Street
Boston, MA 02210

James T. McCormick, Esq.
McKenna & McCormick
128 Dorrance Street, Suite 330
Providence, RI 02903

Lawrence A. Nathanson, Esq.
Siegal, Napierkowski & Park
533 Fellowship Road, Suite 120
Mt. Laurel, NJ 08054

I hereby certify that on the 16th day of May, 2006, a copy of the within document was served by first class mail, postage prepaid, upon the counsel of record listed above.

Cynthia Torres

715023v1 (55451/115705)