UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| EMHART INDUSTRIES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>HOME INSURANCE COMPANY,<br>INSURANCE COMPANY OF NORTH AMERICA,<br>LIBERTY MUTUAL INSURANCE COMPANY,<br>NORTH RIVER INSURANCE COMPANY,<br>ONEBEACON AMERICA INSURANCE COMPANY<br>and UNITED STATES FIRE INSURANCE COMPANY,<br><br>Defendants. | Civil Action No. 02-053 S |

MOTION IN LIMINE OF EMHART INDUSTRIES, INC.
TO PRECLUDE EXPERT OPINIONS OF NICHOLAS CHEREMISINOFF

Plaintiff, Emhart Industries, Inc. ("Emhart"), moves for an order in limine to preclude defendants from offering at trial any opinions of Nicholas Cheremisinoff. It appears that defendants seek to introduce opinion testimony of Dr. Cheremisinoff in support of a contention that environmental damage at the Centredale Superfund Site ("Site") was expected or intended from the standpoint of the insured. The Cheremisinoff report and the deposition testimony of Dr. Cheremisinoff indicate that his opinions are inadmissible under the standards regarding expert opinions set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993); General Electric Co. v. Joiner, 522 U.S. 136 (1997); and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999). The Cheremisinoff opinions are not based on a reliable foundation and are not relevant to the issues.

Dr. Cheremisinoff based his opinions on criteria that differ greatly from the proper criteria for determining whether damage was expected or intended from the standpoint of

the insured. Accordingly, the Cheremisinoff opinions are unconnected to the applicable issues and legal standards and should be excluded. Dr. Cheremisinoff's opinions are further marred by his reliance on assumptions that have no basis in fact, including unwarranted assumptions regarding the time period in which hexachlorophene was manufactured at the Site and the amount of hexachlorophene manufactured. In addition, Dr. Cheremisinoff also purports impermissibly to provide opinions concerning the credibility of witnesses based on his subjective determinations of their credibility. Dr. Cheremisinoff should therefore not be permitted to testify.

In support of its motion, Emhart relies upon the Memorandum of Law and Appendix of Exhibits filed herewith.

By its attorneys,

Gerald J. Petros (#2931)
Hinckley, Allen & Snyder LLP
1500 Fleet Center
Providence, Rhode Island 02903
(401) 274-2000

Jack R. Pirozzolo
Richard L. Binder
Willcox, Pirozzolo & McCarthy
50 Federal Street
Boston, Massachusetts 02110
(617) 482-5470

Dated: May 16, 2006

Counsel for Emhart Industries, Inc.

**CERTIFICATION**

To:

James T. Murphy, Esq.
Kelly N. Michels, Esq.
Hanson Curran LLP
146 Westminster Street
Providence, RI 02903

Kevin J. O'Connor, Esq.
Hermes, Netburn, O'Connor & Spearing, P.C.
265 Franklin Street, 7th Floor
Boston, MA 02110

Mark T. Nugent, Esq.
Michael Marcello, Esq.
Michael T. Farley, Esq.
Morrison Mahoney LLP
121 South Main Street, Suite 600
Providence, RI 02903-7141

John T. Harding, Esq.
Morrison Mahoney LLP
250 Summer Street
Boston, MA 02210

James T. McCormick, Esq.
McKenna & McCormick
128 Dorrance Street, Suite 330
Providence, RI 02903

Lawrence A. Nathanson, Esq.
Siegal, Napierkowski & Park
533 Fellowship Road, Suite 120
Mt. Laurel, NJ 08054

I hereby certify that on the 16th day of May, 2006, a copy of the within document was served by first class mail, postage prepaid, upon the counsel of record listed above.

Cynthia Tomas

715026v1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| EMHART INDUSTRIES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, LIBERTY MUTUAL INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICA INSURANCE COMPANY and UNITED STATES FIRE INSURANCE COMPANY,<br><br>Defendants. | Civil Action No. 02-053 S |

MEMORANDUM OF LAW OF EMHART INDUSTRIES, INC.
IN SUPPORT OF ITS MOTION IN LIMINE TO PRECLUDE
EXPERT OPINIONS OF NICHOLAS CHEREMISINOFF

INTRODUCTION

Plaintiff, Emhart Industries, Inc. ("Emhart"), has filed a motion in limine to preclude defendants from offering any opinions of Nicholas Cheremisinoff, a retained witness who has provided an expert report in this action. It appears that defendants seek to introduce opinion testimony of Dr. Cheremisinoff in support of a contention that environmental damage at the Centredale Superfund Site ("Site") was expected or intended from the standpoint of the insured. The Cheremisinoff report and the deposition testimony of Dr. Cheremisinoff indicate that his opinions are inadmissible under the standards regarding expert opinions set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993); General Electric Co. v. Joiner, 522 U.S. 136 (1997); and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999). The Cheremisinoff opinions are not based on a reliable foundation and are not relevant to the issues.

Dr. Cheremisinoff based his opinions on criteria that differ greatly from the proper criteria for determining whether damage was expected or intended from the standpoint of the insured. Damage is not expected or intended from the standpoint of the insured unless the insured subjectively intended the environmental damage that occurred. In contrast to the applicable standard, Dr. Cheremisinoff bases his opinions on whether the insured's predecessor, Metro-Atlantic, Inc. ("Metro-Atlantic"), followed the "best practices" for waste management. Whether Metro-Atlantic followed the "best practices" is unrelated to whether it subjectively expected or intended environmental damage. The Cheremisinoff opinions are also irrelevant as the documents that he asserts set forth the "best practices" were not known to Metro-Atlantic when it conducted the manufacturing operations at issue. Accordingly, the Cheremisinoff opinions are unconnected to the applicable issues and legal standards. See, e.g., Aetna Casualty & Surety Co. v. Dow Chemical Co., 28 F. Supp. 2d 421, 427-429 (E.D. Mich. 1998) ("Aetna/Dow I"). As the Cheremisinoff opinions are unrelated to the applicable issues, they should be excluded. E.g., Daubert, 509 U.S. at 591 (expert opinion which does not "fit" the facts and issues is inadmissible even if scientifically valid); Hochen v. Bobst Group, Inc., 290 F.3d 446, 452-453 (1st Cir. 2002) (opinion does not meet the "fit" requirement of Daubert as it did not address appropriate issue); Cipollone v. Yale Industrial Products, Inc., 202 F.3d 376, 380 (1st Cir. 2000) (expert's opinion inadmissible due to references to standards that were not on point). What Dr. Cheremisinoff has provided "is not 'expert' opinion, but rather a personal opinion about what standards [Dr. Cheremisinoff] believes should apply…." In re Diet Drugs Product Liability Litigation, 2001 WL 454586, at *18 (E.D. Pa. Feb. 1, 2001).

Dr. Cheremisinoff's opinions are further marred by his reliance on assumptions that have no basis in fact. He disregards the undisputed facts regarding the limited period in

which hexachlorophene was manufactured at the Site. Instead, he concludes that hexachlorophene was manufactured at the site from 1965-1970 on the basis of a 1965 newspaper article. The article states the production capacity of the building used to manufacture hexachlorophene, the amount of money Metro-Atlantic invested in that building and that Metro-Atlantic hoped the investment would be profitable. Not satisfied with relying on the article to determine that the operation continued for an additional five years, he also used the article as the basis for an assumption about the amount of hexachlorophene that was manufactured during this hypothetical five year period. That reasoning is akin to determining the financial performance of a company on the basis of projections made in considering a new investment, while blindly disregarding the actual performance after the investment was made. Expert opinions regarding damages have frequently been excluded as they were based on unsupportable projections regarding anticipated sales. Irvine v. Murad Skin Research Laboratories, Inc., 194 F.3d 313, 321 (1st Cir. 1999); Williams v. Rene, 72 F.3d 1096, 1101-03 (3d Cir. 1995); Joy v. Bell Helicopter Textron, Inc., 999 F.2d 549, 569-70 (D.C. Cir. 1993).

Dr. Cheremisinoff also purports impermissibly to provide opinions concerning the credibility of witnesses, a function uniquely for the jury. E.g., Goodwin v. MTD Products, Inc., 232 F.3d 600, 609 (7th Cir. 2000); SEC v. Lipson, 46 F. Supp. 2d 758, 763 (N.D. Ill. 1999). Dr. Cheremisinoff admits that those opinions are based on his subjective determinations of credibility.

## BACKGROUND

### A. The Site

Crown Metro, Inc. ("Crown Metro"), the insured on the policies issued by OneBeacon America ("OneBeacon") and Century Indemnity Corporation ("CIC"), was formed in December 1968 when Metro-Atlantic entered into an agreement of consolidation with Crown

Chemical Corporation ("Crown Chemical"). Prior to the consolidation, Metro-Atlantic had operated on a portion of the Site. Those operations ceased at the time of the consolidation and the operations of Metro-Atlantic in Rhode Island were moved to the location in Providence where Crown Chemical conducted its business operations.[1]

Dioxin is a major contaminant at the Site. It is asserted that some of the dioxin on the Site was associated with Metro-Atlantic having manufactured hexachlorophene, an ingredient in pHisoHex, an anti-bacterial soap (Cleary Dep. (Ex. A) at 17, 40).[2] One of the ingredients in hexachlorophene is trichlorophenol, a chemical that is now known to contain dioxin. The testimony of Thomas Cleary, who invented the process used to manufacture hexachlorophene at Metro-Atlantic, shows that Metro-Atlantic manufactured hexachlorophene for less than twelve months in 1964 and 1965 (id. at 49, 53).

B. The Cheremisinoff Deposition And Report

Dr. Cheremisinoff claims expertise in areas unrelated to his opinions. He is a chemical engineer who asserts that he is an expert in plant economics and mathematically oriented process engineering (Cheremisinoff Dep. (Ex. B) at 47).[3] He admits that he is not an expert in chemistry (id. at 63), is not an environmental historian (id. at 198) and is not aware of any techniques that are regarded by others as being appropriate for evaluating environmental

---

1 See, e.g., paragraph 91 of the statement of material facts filed with the CIC summary judgment motion and paragraph 21 of the statement of material facts filed in support of the OneBeacon summary judgment motion.

2 Excerpts from the Cleary deposition cited in this memorandum are contained in Exhibit A to the Appendix to this memorandum. Documents in the Appendix will be cited by exhibit number and page number.

3 Excerpts from the Cheremisinoff deposition cited in this memorandum are contained in Exhibit B to the Appendix to this memorandum.

practices that were in effect prior to 1971 (id. at 173). Dr. Cheremisinoff worked as a process engineer and as a consultant, who compared existing practices to the environmental regulations that were promulgated after the formation of the EPA in the 1970's (id. at 29, 30, 33-34). The bulk of his professional consulting activities involve determining whether existing practices meet the so-called International Organization for Standardization ("ISO") guidelines for "best practices" that were created in 1995 (id. at 77-78, 84). He admits that no comparable regulations existed in the 1960's (id. at 426), when Metro-Atlantic manufactured chemicals at a portion of the Site.

Nothing in Dr. Cheremisinoff's background qualifies him to provide opinions concerning whether the insured, by engaging in certain practices in the 1960's, expected or intended environmental injury. He asserts that he has expertise based on investigating contaminated sites since the 1980's (Ex. B at 328-30). Such activities relate to the identification and remediation of contamination, not to whether particular practices in the 1960's were expected or intended to cause environmental contamination. The information that Dr. Cheremisinoff provided about other matters in which he has been engaged as an expert witness demonstrated that the only opinions he has provided about historic practices at sites, prior to the formation of the EPA in 1970[4], were in tort litigation, where negligence was at issue (id. at 84-87; see also id. at 104-07).

Dr. Cheremisinoff's report in this action consists primarily of a lengthy attempt to summarize documents concerning activities at the Site. He then provides opinions concerning whether Metro-Atlantic was negligent in its alleged waste handling practices. The discussion of

---

[4] In other cases, he testified concerning alleged negligence in connection with regulations promulgated after the formation of the EPA.

negligence has no bearing on the standard relevant to insurance coverage litigation, whether the insured subjectively intended environmental injury. Dr. Cheremisinoff's reliance on the inapplicable standard permeates his report and deposition. Dr. Cheremisinoff consistently states that his opinions are based on the use of a "due care" standard. He asserts that the "purpose of [his] report is to... provide an assessment as to whether practices were within the standard of due care" (Ex. C, Executive Summary)[5] and explains that in his report "a comparison was made between the waste management practices over the life of the two facilities to voluntary industry due care practices" (id. at 42).

While the Cheremisinoff report purports to use a negligence standard, the Cheremisinoff deposition demonstrates that in analyzing negligence, he compared conduct to the "best" practices, rather than due care. Dr. Cheremisinoff testified that his opinions are based on whether Metro-Atlantic followed what he believes to be "the industry best practices for that time era" (Ex. B at 288-89). He admits that his analysis is based on determining whether Metro-Atlantic met a level of "due care," which he interprets as meaning "whether or not this facility was using best practices to manage their waste operations or their waste" (id. at 408-09). He further explained that he "made a comparison of the waste-related practices of this site to best available practices" (id. at 421-22; see also id. at 417). His opinions are based on the assumption that Metro-Atlantic had a "responsibility to keep abreast with the technical literature of the day" (id. at 312), but he admits that he did not know whether Metro-Atlantic read the literature upon which he based his opinions (id. at 313, 314) and that he could only "speculate" that it had (id. at 315). Dr. Cheremisinoff faults Metro-Atlantic for not following "best practices," although he recognizes that Metro-Atlantic followed practices that were "widespread activity among

5 A copy of the Cheremisinoff report is Exhibit C to the Appendix.

industry" (id. at 242). He recognizes that the activities he criticizes were not in violation of any statutes or regulations that were in effect at the time of the conduct at issue (id. at 245, 287).

Dr. Cheremisinoff's report is further marred by relying on assumptions that were unsupportable, including assumptions that he admitted were unjustifiable. Although he recognizes that "[t]here is no data to base reliable calculations on the quantities of waste water flows from the [Metro-Atlantic] chemical plant" (Ex. C at 36, 39), he then proceeds to make such an estimate (id. at 39). He asserts that Metro-Atlantic manufactured hexachlorophene for a five year period beginning in 1965 on the basis of a 1965 newspaper article stating that Metro-Atlantic had invested in manufacturing hexachlorophene and hoped to be successful (Ex. C at 13-14; Ex. B at 334-36). He found the newspaper article more probative than the unrebutted testimony of a witness involved in the manufacture of hexachlorophene, who testified that the process lasted for less than one year. In an apparent attempt to give an aura of reliability to his assertions, he refers to his use of "subjective probability analysis" (Ex. B at 195). He subjectively determines the weight to be given testimony or documents and then makes "calculations" based on the weight he assigned to a piece of information (id. at 333-37). Any "subjective probability" process that relies on a newspaper account of a business' future plans being more reliable than the testimony of an individual who was knowledgeable about actual performance (and was compensated based on the quantity of material sold) is unreliable and epitomizes the evidence that the Supreme Court held is inadmissible as "not aris[ing] above 'subjective belief or unsupported speculation'" and being "connected to existing data only by the ipse dixit of the expert." Joiner, 522 U.S. at 140.

C. Legal Principles Regarding Whether Property Damage Was Expected Or Intended

The insurance policies at issue provide coverage for "property damage neither expected nor intended from the standpoint of the insured." Whether damage was expected or intended, within the meaning of the insurance policies, is determined on the basis of whether the insured intended the damage itself not whether the insured intended to take the action which caused the damage. Damage arising from the unintentional consequences of intentional acts is not expected or intended. That is clear both from the policy language and from cases construing this policy language. See, e.g., Aetna/Dow I, 28 F. Supp. 2d at 427-29 (rejecting the argument that intentional disposal of waste meant damage was expected or intended as insurance coverage is available for "unintended and unexpected harm, even if the acts that caused the harm were intentional"); State v. CNA Ins. Companies, 779 A.2d 662, 670 (Vt. 2001) ("Thus the relevant inquiry in this case is not whether the spilling of chemicals at the prison site was intentional, but rather whether the harm that resulted from the spilling was expected or intended") (emphasis in original); James Graham Brown Foundation, Inc. v. St. Paul Fire & Marine Ins. Co., 814 S.W.2d 273, 278 (Ky. 1991) ("The 'expected or intended' exception is inapplicable unless the insured specifically and subjectively intends the injury giving rise to the claim"); Queen City Farms, Inc. v. Central Nat'l Ins. Co. of Omaha, 882 P.2d 703, 714 (Wash. 1994) (determining that the relevant inquiry is "whether an insured subjectively expected or intended the damage" resulting from the occurrence), modified, 891 P.2d 718 (Wash. 1994).

This principle was recognized, in a context other than environmental coverage litigation, by the Supreme Court of Rhode Island in Grenga v. National Surety Co., 317 A.2d 433, 436 (R.I. 1974):

> We agree with plaintiffs' assertion that the policy's exclusionary language should not apply where an insured's intentional act

> results in unintentional harm. It is the harm itself that must be intended, i.e., "intentionally" caused before the exclusion will apply. There is substantial support for the proposition that coverage exists under insuring and exclusion clauses identical or similar to the case presently before us for the unintentional results of an intentional act but not for damages incurred because of an injury which was intended to be inflicted.

See Liberty Mut. Ins. Co. v. Black & Decker Corp., C.A. No. 96-10804-DPW, slip op. at 40 (D. Mass. Dec. 5, 2003) ("Liberty/Black & Decker I")[6] ("For an event to be covered as either an 'accident' or 'occurrence,' the damage (as distinguished from the acts that caused the damage) must have been unintended and unexpected by the insured."); Liberty Mutual Insurance Co. v. Black & Decker Corp., 2004 WL 187387, at *5 (D. Mass. Jan. 27, 2004) ("Liberty/Black & Decker II").

The issue of whether the environmental harm at Centredale "was expected or intended from the standpoint of the insured" is determined using a subjective standard. Courts overwhelmingly recognize that "the 'expected or intended' exception is inapplicable unless the insured specifically and subjectively intends the injury giving rise to the claim." James Graham Brown Foundation, 814 S.W.2d at 278. See also Village of Morrisville Water & Light Dept. v. U.S. Fid. & Guar. Ins. Co., 775 F. Supp. 718, 729-30 (D. Vt. 1991); St. Paul Fire & Marine Ins. v. McCormick & Baxter Creosoting Co., 923 P.2d 1200, 1218 (Or. 1996); Shell Oil Co. v. Winterthur Swiss Ins. Co., 12 Cal. App. 4th 715, 747-48 (1993); Liberty/Black & Decker I, slip op. at 47-48 (objective test is the "minority view among states"). Accord State ex rel. Davidson v. Hoke, 532 S.E.2d 50, 57 & n.2 (W. Va. 2000) (concurring opinion) (collecting cases and noting that "[i]t appears that a majority of jurisdictions have adopted the subjective approach to the 'expected/intended' exclusion").

---

6 A copy of the opinion has been filed herewith.

As the definition specifically refers to "the standpoint of the insured," a subjective test is mandated. Grenga applied the subjective test for determining whether an event was an accident and, as explained in Liberty/Black & Decker II, 2004 WL 187387, at *5, "the SJC and other courts have held that the 'occurrence' definition simply codified how courts had already construed 'accident.'" The intent is analyzed "at the time the insured performed the acts which caused the environmental contamination," not during the term a particular insurance policy was in effect. Aetna/Dow I, 28 F. Supp. 2d at 433 n.13. In addition, the pertinent inquiry is the intent of Metro-Atlantic, the insured's predecessor, not New England Container Company, a barrel reconditioner that conducted operations on a portion of the Site abutting the Metro-Atlantic facility. See State Mut. Life Assurance Co. of America v. Lumbermens Mut. Cas. Co., 874 F. Supp. 451, 456 (D. Mass. 1995) (intent of third party not imputed to insured); Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co., 868 F. Supp. 1278, 1298 (D. Utah 1994) (same), aff'd, 52 F.3d 1522 (10th Cir. 1995). See also Upjohn Co. v. Aetna Casualty & Surety Co., 1994 WL 1029337, at *30 n.18 (W.D. Mich. July 22, 1994) (rejecting contention "that because [insured] was located across the street and could observe [third party's] activities on the site during the years the coal gasification plant was in operation, it should have known that contamination would result").

## ARGUMENT

### A. The Daubert Standard

The Supreme Court has explained the scope of permissible expert testimony in Daubert, Joiner and Kumho. In Daubert, the Supreme Court held that the rules of evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597. The Court explained the requirement that there be a "fit" between the proffered expert testimony and an issue in the case

as a condition for admissibility. Id. at 591. Absent a "fit", the evidence does not meet the requirement of Rule 702 of the Federal Rules of Evidence that the testimony "will assist the trier of fact to understand or determine an issue." Id. at 592. The Court explained the requirement, in a manner that demonstrates that even if the Cheremisinoff opinions were based on scientific knowledge, they would fail to meet the "fit" requirement, stating as follows

> The study of the phases of the moon, for example, may provide valid scientific 'knowledge' about whether a certain night was dark, and if darkness was a fact in issue, the knowledge will assist the trier of fact. However (absent creditable grounds supporting such a link), evidence that the moon was full on a certain night will not assist the trier of fact in determining whether an individual was unusually likely to have behaved irrationally on that night. Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.

Id. at 591-92.

In Joiner, the Court explained another requirement that is not satisfied by the Cheremisinoff report, that there must be a reliable factual basis for the opinions. 522 U.S. at 140. There the Court affirmed the exclusion of an expert report that "did not rise above 'subjective belief or unsupported speculation.'" It stated that "'[n]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." See also Daubert, 509 U.S. at 590 ("requirement that an expert must have "'knowledge' connotes more than subjective belief or unsupported speculation").

B. The Cheremisinoff Opinions Are Not Relevant To The "Expected Or Intended" Issue

1. The Opinions Are Inadmissible As There Is No Evidence That Metro-Atlantic Received The Documents That Are Asserted To Constitute "Best Practices"

At pages 43-48 of his report, Dr. Cheremisinoff identifies and summarizes the references that he asserts set forth the best practices upon which his opinions are based. If it were assumed that the various references he cites are sufficient to create a standard of "due care" or "best practices"[7] and that whether the insured's practices met "best practices" or constituted "due care", the Cheremisinoff references would still be irrelevant. There is no nexus between Metro-Atlantic and any of the cited references. Dr. Cheremisinoff admitted, as he must, that there was no evidence that Metro-Atlantic read the literature that he asserted created industry standards of best practices (Ex. B at 313, 314) and that he could "only speculate as to whether they read the literature" (id. at 315). That suffices to exclude his opinions.

A similar issue was presented in Aetna/Dow I. There, the court, in granting summary judgment to the insured on the expected or intended issue, found that the evidence of industry standards upon which the insurers relied was inadmissible. It ruled that evidence of so-called industry standards is not evidence of subjective intent in the absence "of a showing that the insured actually received and understood the information." 28 F. Supp. 2d at 433. In the absence of such a nexus, purported expert witness testimony "invades the jury's function to weigh evidence and determine credibility." Id. In confirming its decision, after the insurers moved for reconsideration, the court stated that "[e]vidence of [the insured's] intentional acts, [the insured's] general knowledge of the risks posed by chemicals, [the insured's] knowledge at other sites, and industry knowledge, without evidence [the insured] received and understood the information, is simply not relevant to a determination of whether [the insured] subjectively expected or intended property damage at the [Site]." Aetna Casualty & Surety Co. v. Dow

---

7 While there is no basis for concluding that the references create any type of standard, the sufficiency of the material to create any relevant standard is not addressed in this motion.

Chemical Co., 44 F. Supp. 2d 865, 868 (E.D. Mich. 1999) ("Aetna/Dow II"). See also Upjohn, 1994 WL 1029337, at *24 ("argument that [insured] 'should have known' about the potential for damage ... is irrelevant" to "whether [insured] subjectively expected or intended property damage") (emphasis in original). As the references cited by Dr. Cheremisinoff are "simply not relevant to a determination of whether [the insured] subjectively expected or intended property damage at the [Site]," his opinions based on those references must be excluded as there is no "fit" between the opinion and the issues in this action.

The Cheremisinoff opinions regarding the waste handling practices of Metro-Atlantic are further flawed by his admission that the references upon which he relies do not address dioxin, the contaminant of concern (Ex. B at 312), or trichlorophenol, the chemical, now known to contain dioxin, that was used by Metro-Atlantic to manufacture hexachlorophene (id. at 361, 364). Rather, Dr. Cheremisinoff cites references containing abstract statements concerning waste in general (id.). Neither general knowledge of problems associated with chemicals nor references concerning contaminants other than dioxin are relevant to whether practices concerning dioxin were expected or intended to cause environmental damage. Aetna/Dow II, 44 F. Supp. 2d at 868. See also Smith v. Hughes Aircraft Co., 22 F.3d 1432, 1439-40 (9th Cir. 1993) (district court "improperly based its conclusion that Hughes expected or intended the ... injuries, in large part, on Hughes' disposal of chromium" and, on remand, "should not rely on evidence of Hughes' chromium disposal practices to establish the conclusion that Hughes expected or intended injury from TCE"); Upjohn, 1994 WL 1029337, at *27-28 (insured entitled to summary judgment that damage was neither expected nor intended as statements in industry literature about potential contamination associated with handling products for the pharmaceutical industry were insufficient to permit verdict in favor of insurer).

2. The Cheremisinoff Opinions Would Be Inadmissible Even Under An Objective Standard

If the expected or intended issue were analyzed on the basis of an objective standard, rather than the applicable subjective standard, the Cheremisinoff opinions would be inadmissible. As demonstrated, supra, Dr. Cheremisinoff's opinions are based on comparing Metro-Atlantic's alleged waste processing activities to the "best practices" of the times (Ex. B at 288-89, 408-09, 417-21). Failure to follow best practices does not equate to expecting or intending environmental harm. A standard based on best practices is more rigorous than even an objective standard for determining reasonable care. E.g., Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994) (in context of qualified immunity recognizing that reasonable care does not correlate with best practices); Smith v. Menet, 530 N.E.2d 277, 280 (Ill. App. Ct. 1988) (in a medical malpractice action where issue was whether defendant exercised "reasonable skill", the court noted that "'highest degree of skill' and 'best possible' care are phrases which have been rejected as setting a standard which is too high" and then ruled that a jury instruction that the defendant was required to provide "good" treatment also set too high a standard). As another court noted, "[t]hat only a reasonable standard, and not a best or perfect, method of doing something is required is an accurate statement of Louisiana law." Underwriters at Lloyd's London v. OSCA, Inc., 2006 WL 941794, at *9 (5th Cir. Apr. 12, 2006). Indeed, that statement of law is in accordance with the plain meaning of due care. E.g., Boeing Co. v. State, 572 P.2d 8, 12 (Wash. 1978) (even when a dangerous instrumentality is involved, "'the law does not require that one employ the safest of all procedures,'" quoting 65 C.J.S. Negligence). Dr. Cheremisinoff, by basing his opinions on best practices, is utilizing an unduly rigorous standard, contrary to the applicable standard.

It is settled that when an expert bases his opinion on an incorrect legal standard, the opinion must be excluded in view of the Daubert requirement that expert opinion be "relevant to the task at hand," Daubert, 509 U.S. at 597, and "fit" the issues in the case. Hochen, 290 F.3d at 452-53 (trial court properly excluded testimony regarding meaning of scope of work to engineer where relevant issue was meaning to electrician, thus meaning to engineer was of "questionable 'relevan[ce] to the task at hand'"); Cipollone, 202 F.3d at 379-80 (expert's opinion inadmissible due to references to standards that were not on point). See also Loeffel Steel Products, Inc. v. Delta Brands, Inc., 387 F. Supp. 2d 794, 805, 817-18 (N.D. Ill. 2005) (stating that "[e]xpert opinions that are contrary to law are inadmissible" and "cannot be said to be scientific, to be reliable or to be helpful to the trier of fact," and excluding opinion based on measure of damage contrary to the correct legal standard of damages). The reason for this rule is that such an opinion "is not 'expert' opinion, but rather a personal opinion about what standards [Dr. Cheremisinoff] believes should apply…." In re Diet Drugs, 2001 WL 454856, at *18, quoted with approval in Loeffel, 387 F. Supp. 2d at 806. In the words of Joiner, such an opinion "did not arise above 'subjective belief or unsupported speculation.'" 522 U.S. at 140.

C. The Opinions Are Based On Unsupported Assumptions

1. The Cheremisinoff Statements About The Length Of The Manufacturing Activities Should Be Excluded

The Cheremisinoff opinions are further marred by being based on unsupportable assumptions. A particularly egregious example is opinion 5 (Ex. C at unnumbered page in "Executive Summary") in which Dr. Cheremisinoff concludes that "[a] body of evidence suggests that hexachlorophene production continued for several years at [Metro-Atlantic]." The

"body of evidence" supporting this assertion consists of a newspaper article (Ex. D)[8] stating that Metro-Atlantic had made a $250,000 investment in a building and hoped to successfully expand its activities to enter a new field, the pharmaceutical industry (Ex. C at 14-15; Ex. B at 341-44). Dr. Cheremisinoff relies on the newspaper article concerning Metro-Atlantic's aspirations, although he had to admit that "sometimes things don't work out as planned" (id. at 343) and that "its entirely possible that after making a substantial investment in a production line, circumstances may occur that require abandonment of production of that particular product" (id. at 343-44).

The opinion regarding the duration of the hexachlorophene manufacture should be excluded in accordance with the settled ruled that an expert opinion based on assumptions not supported by the record must be excluded. Murad Skin Research, 194 F.3d at 321 (applying the principle that "absent adequate factual data to support the expert's conclusion his testimony was unreliable" in affirming exclusion of the opinion of an expert who relied on the assumption that sales of a product constituted 100% of net income although that assumption was not supported by the record). See also Target Market Publications, Inc. v. ADVO, Inc., 136 F.3d 1139, 1145 (7th Cir. 1998) (affirming exclusion of expert report concerning lost profits as expert was relying on a "plan [that] sought to demonstrate what Select Auto's profits might have been given certain assumptions that had not yet, and might never, come to pass"); Bell Helicopter, 999 F.2d at 569-70 (D.C. Cir. 1993) (reversible error in allowing expert testimony of future earnings, including that plaintiff would have engaged in new lucrative business activities because he had considered change of career and that home built on unimproved land would appreciate substantially);

---

8 A copy of the May 30, 1965 newspaper article upon which Dr. Cheremisinoff relies is Exhibit D to the Appendix.

Lithuanian Commerce Corp. v. Sara Lee Hosiery, 179 F.R.D. 450, 459-61 (D.N.J. 1998) (excluding damage calculation based on unsupported assumptions about prospective new business). Indeed, Dr. Cheremisinoff's opinions contain the vice recounted in Joiner, as they are "connected to existing data only by the ipse dixit of the expert." 522 U.S. at 146.

The Cheremisinoff speculation is even more egregious than the speculative assumptions excluded in Target Market, Bell Helicopter and Lithuanian Commerce. Dr. Cheremisinoff chose to disregard the testimony about the duration of the hexachlorophene operation provided by the consultant who was compensated on a commission basis for those sales and was present at the Site during the period in which hexachlorophene was manufactured (Ex. A at 53-54, 59). A newspaper article reporting a company's hopes for profits five years in the future is not a rational basis for determining actual performance. Moreover, even that article is not a basis for the further speculative step in Dr. Cheremisinoff's thought process, assuming that during the hypothetical five year period, sales would equal 50% of manufacturing capacity (Ex. C at 15). As noted in the rebuttal report of an Emhart expert, Dr. Cheremisinoff's line of reasoning is analogous to using the fiber optic capacity of WorldCom as the measure of its annual sales. Such an approach is far removed from the requirement that expert opinions be the product of "intellectual rigor." Kumho Tire, 526 U.S. at 152.

2. The Opinions About Quantities Of Waste Must Be Excluded

Dr. Cheremisinoff also resorts to unsupported speculation in purporting to quantify waste waters generated during the manufacturing activities at Metro-Atlantic. He first notes that "[t]here is no data to base reliable calculations on the quantities of waste water flows from the [Metro-Atlantic] chemical plant" (Ex. C at 36). Yet the absence of reliable data did not prevent Dr. Cheremisinoff from forming an opinion. Using the unsupported assumption that production equals capacity that marred his assertion regarding the amount of hexachlorophene

produced, he generated "[a]n order of magnitude estimate" based, inter alia, on "high production capacity capability" and concluded that "wastewater flows could have been in the league of several million gallons per annum" (id.). His "order of magnitude estimate" was unreliably based in part on "the size of surface impoundments appearing in 1970" (id.), although there is no correlation between the capacity of impoundments and the actual amount of waste water discharged by a manufacturer. The reliance on impoundments as a measure of production of Metro-Atlantic is further flawed as the impoundment areas were available to both Metro-Atlantic and New England Container Company and the size of impoundments in 1970 is unrelated to their size in earlier years when Metro-Atlantic was operating at the Site. Such an approach is devoid of the requisite intellectual rigor, or, indeed, any logical analysis. Even if founded on a reliable factual basis, an estimate as to what "could have been" is inadmissible. Pipitone v. Biomatrix, Inc., 288 F.3d 239, 245 (5th Cir. 2002) (excluding opinion that "it was as likely as not" that event occurred, as an "equivocal opinion does not make any fact more or less probable" as is required for admissibility under Fed. R. Evid. 401).

D. Dr. Cheremisinoff Would Invade The Province Of The Jury By Impermissibly Providing Opinions Concerning Credibility Of Witnesses

It is impermissible for an expert witness, or any witness, to provide "opinions" about the credibility of other witnesses or evidence. E.g., MTD Products, 232 F.3d at 609 ("Any argument by MTD that Plamper was entitled to give expert opinion as to whether he believed Goodwin's testimony ... is without merit as an expert cannot testify as to credibility issues. Rather, credibility questions are within the province of the finder of fact, in this case a jury"); Lipson, 46 F. Supp. 2d at 763 ("The jury needs no assistance in determining the credibility of Defendant's anticipated testimony…."; permitting such testimony "would invade, and perhaps usurp, the jury's fact-finding function," particularly when the witness "necessarily made

credibility determinations ...[which] are precisely the credibility determination that the jury will be required to make").

Notwithstanding this well-settled rule, Dr. Cheremisinoff, employing "subjective probability analysis," purports to provide such opinions on credibility of evidence. In an apparent attempt to provide a gloss of reliability on his reliance on unsupported assumptions, Dr. Cheremisinoff refers to his approach as "Bayesian probability theory." Dr. Cheremisinoff admitted that "Bayesian probability theory " is a subjective analysis, consisting of subjectively determining the reliability of evidence. After subjectively assigning values to sources of evidence, Dr. Cheremisinoff reaches conclusions based on the value he assigned to each source (Ex. B at 195). Using this subjective approach, he chose to disregard Mr. Cleary's unrebutted testimony about the limited duration of manufacturing activities because Mr. Cleary did not know the amount of money Metro-Atlantic invested in the facility[9] (Ex. B at 342; see generally id. at 340-50) and assigned 100% likelihood to statements in a newspaper article concerning Metro-Atlantic's hope for performance five years in the future. This subjective approach is subject to manipulation. If it is desired that a conclusion be reached, one subjectively assigns a 100% probability to the purported evidence supporting the desired result. This abuse is demonstrated by the unsound rationale Cheremisinoff employed for his subjective determination. Even if there were any logic to Dr. Cheremisinoff's subjective determinations, they would be inadmissible. The jury, empowered to find the facts, needs no help from a witness using a pseudo-mathematical formula to make the determination which is uniquely within its province.

---

9 Dr. Cheremisinoff's other criticism is that Mr. Cleary testified that there was only one purchaser of the product, although, in fact Mr. Cleary testified that there were two purchasers, Sterling Winthrop, who received the highest quality hexachlorophene and Kalo Laboratories, who received the "second crop" that did not meet the stringent requirements of Sterling Winthrop (Ex. A at 42-44).

Dr. Cheremisinoff uses the same improper analysis in his assertion that Metro-Atlantic was not tied into the sewer system (Ex. C at 34-36). Attempting to employ a formula, he assigns high value to the witnesses who testify that they saw occasional disposal into the river and assigns no weight to the witnesses who testified that Metro-Atlantic was tied into the sewer system. He ignores the municipal records demonstrating that Metro-Atlantic was tied into the sewer system. Presumably, the reason for his speculation on this factual issue, and the factual issue of the amount of hexachlorophene manufactured, is that the insurers believe it helps their position to assert that large quantities of waste were discharged into the river. The issue should be addressed by presenting fact evidence to the jury. Thereafter, closing argument should be made by counsel, not from the witness box. In re Air Crash Disaster, 795 F.2d 1230, 1233 (5th Cir. 1986) ("a proffered expert [must] bring to the table more than the lawyers can offer in argument"). Dr. Cheremisinoff may not "merely tell the jury what result to reach" somewhat in the manner of the oath-helpers of an earlier day. Montgomery v. Aetna Casualty & Surety Co., 898 F.2d 1537, 1541 (11th Cir. 1990) (citing Advisory Committee Notes to Fed. R. Evid. 704).

CONCLUSION

For the foregoing reasons, the Court should exclude the testimony of Nicholas Cheremisinoff.

By its attorneys,

Gerald J. Petros (#2931)
Hinckley, Allen & Snyder LLP
1500 Fleet Center
Providence, Rhode Island 02903
(401) 274-2000

Jack R. Pirozzolo
Richard L. Binder
Willcox, Pirozzolo & McCarthy
50 Federal Street
Boston, Massachusetts 02110
(617) 482-5470

Dated: May 16, 2006

Counsel for Emhart Industries, Inc.

**CERTIFICATION**

To:

James T. Murphy, Esq.
Kelly N. Michels, Esq.
Hanson Curran LLP
146 Westminster Street
Providence, RI 02903

Kevin J. O'Connor, Esq.
Hermes, Netburn, O'Connor & Spearing, P.C.
265 Franklin Street, 7th Floor
Boston, MA 02110

Mark T. Nugent, Esq.
Michael Marcello, Esq.
Michael T. Farley, Esq.
Morrison Mahoney LLP
121 South Main Street, Suite 600
Providence, RI 02903-7141

John T. Harding, Esq.
Morrison Mahoney LLP
250 Summer Street
Boston, MA 02210

James T. McCormick, Esq.
McKenna & McCormick
128 Dorrance Street, Suite 330
Providence, RI 02903

Lawrence A. Nathanson, Esq.
Siegal, Napierkowski & Park
533 Fellowship Road, Suite 120
Mt. Laurel, NJ 08054

I hereby certify that on the 16th day of May, 2006, a copy of the within document was served by first class mail, postage prepaid, upon the counsel of record listed above.

Cynthia Lomas

715027v1