UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| EMHART INDUSTRIES, INC.,<br><br>Plaintiff,<br>v.<br><br>HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, LIBERTY MUTUAL INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICA INSURANCE COMPANY, and UNITED STATES FIRE INSURANCE COMPANY,<br><br>Defendants. | CIVIL ACTION<br>NO. CA 02-053S |

**OPPOSITION OF ONEBEACON AMERICA INSURANCE COMPANY AND CENTURY INDEMNITY COMPANY TO MOTION IN LIMINE TO EXCLUDE THE EXPERT OPINION TESTIMONY OF RICHARD J. HUGHTO**

The defendants OneBeacon America Insurance Company ("OneBeacon") and Century Indemnity Company ("Century")[1] hereby oppose the Motion in Limine of Emhart Industries, Inc. to Preclude Expert Opinions of Richard J. Hughto. To prevail on its claim against OneBeacon and Century, one of the many elements Emhart must prove is that the contamination at issue in this case – the dioxin contamination at the Centredale Manor Restoration Project Superfund Site – was discoverable by Emhart or its alleged predecessor, Crown-Metro, Inc., in the exercise of reasonable diligence, during the 1969 time period the insurance policies issued by OneBeacon and Century were in effect. The Court should deny Emhart's motion because Dr. Hughto's opinions are directly relevant to this discoverability issue, are within the area of his professional expertise, and satisfy the standards for admission in evidence of expert opinion testimony under Fed. R. Evid. 702, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and

[1] As successor to CCI Insurance Company, as successor to Insurance Company of North America.

*Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

Dr. Hughto's opinions fit precisely with the criteria under Rhode Island law for determining when, in the exercise of reasonable diligence, the dioxin contamination at issue in this case was discoverable. Further, those opinions are well within the area of Dr. Hughto's professional expertise.

OneBeacon and Century submit to the Court that Emhart's motion may be rendered unnecessary through action by the Court on issues identified in the parties' Joint Statement of issues for potential pretrial disposition. Therefore, consideration of the issues raised therein should be deferred by the Court until a later point in this case, after the issues remaining for trial have been determined.

In support of this opposition, OneBeacon and Century rely upon the Memorandum of Law filed herewith.

James T. McCormick by Kelly N. Michel with assent

James T. McCormick
McKenna & McCormick
128 Dorrance Street, Suite 330
Providence, RI 02903
(401) 831-2970
-and-
Lawrence A. Nathanson
Scott E. Levens
Siegal, Napierkowski & Park
533 Fellowship Road, Suite 120
Mt. Laurel, NJ 08054
(856) 380-8900

Attorneys for Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America

Kelly N. Michels

James T. Murphy #1698
Kelly N. Michels #6478
Hanson Curran LLP
146 Westminster Street
Providence, RI 02903
(401) 421-2154
- and -
Kevin J. O'Connor
Peter C. Netburn
Hermes, Netburn, O'Connor
& Spearing, P.C.
265 Franklin Street, Seventh Floor
Boston, MA 02110-3113
(617) 728-0050
Attorneys for OneBeacon America
Insurance Company

Dated: June 2, 2006

G:\DOCS\KJO\CGU\Emhart\Pleadings\Hughto MIL.opp.mot.doc

**PROOF OF SERVICE**

I hereby certify that on this 2nd day of June, 2006, I served the within by mailing or hand delivering copies of same to the following counsel of record: **Gerald J. Petros, Esq.**, Hinckley, Allen & Snyder, LLP, 1500 Fleet Center, Providence, RI 02903; **James T. McCormick, Esq.**, McKenna & McCormick, 128 Dorrance Street, Suite 330, Providence, RI 02903; **Mark T. Nugent, Esq., Michael T. Farley, Esq.**, Morrison, Mahoney & Miller, LLP, One Providence Washington Plaza, Providence, RI 02903; **Lawrence A. Nathanson, Esq.**, Siegal & Napierkowski, 220 Lake Drive East, Suite 304, Cherry Hill, NJ 08002; **John T. Harding, Esquire**, Morrison Mahoney LLP, 250 Summer Street, Boston, MA 02210-1181; **Jack R. Pirozzolo, Esq., Richard L. Binder, Esq.**, Willcox, Pirozzolo & McCarthy, 50 Federal Street, Boston, MA 02110; and **Kevin J. O'Connor, Esq., Peter Netburn, Esq.**, Hermes, Netburn, O'Connor & Spearing, PC, 265 Franklin Street, 7th Floor, Boston, MA 02110-3113;

Kellyn N. Michel
of Hanson Curran LLP

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| EMHART INDUSTRIES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, LIBERTY MUTUAL INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICA INSURANCE COMPANY, and UNITED STATES FIRE INSURANCE COMPANY,<br><br>Defendants. | CIVIL ACTION<br>NO. CA 02-053S |

**MEMORANDUM OF LAW OF ONEBEACON AMERICA INSURANCE COMPANY AND CENTURY INDEMNITY COMPANY IN OPPOSITION TO MOTION IN LIMINE TO EXCLUDE THE EXPERT OPINION TESTIMONY OF RICHARD J. HUGHTO**

**INTRODUCTION**

The defendants OneBeacon America Insurance Company ("OneBeacon") and Century Indemnity Company ("Century")[1] expect to offer expert opinion testimony from Dr. Richard J. Hughto in support of their position that no coverage is afforded to Emhart Industries, Inc. ("Emhart") under insurance policies issued to Crown-Metro, Inc., an alleged predecessor of Emhart, because the contamination at issue in this case – the dioxin contamination at the Centredale Manor Restoration Project Superfund Site – was neither discovered nor discoverable in the exercise of reasonable diligence during the 1969 time period those policies were in effect. As explained below, the Century and OneBeacon policies are triggered for coverage *only if* the

[1] As successor to CCI Insurance Company, as successor to Insurance Company of North America.

contamination at issue was discovered or was discoverable in the exercise of reasonable diligence in 1969.

The Court should deny or, at the very least, defer until the time of trial, Emhart's Motion in Limine to Preclude the Expert Opinions of Dr. Richard J. Hughto. Dr. Hughto is highly qualified to offer opinion testimony in this case and he and his testimony meet the standards for admissibility established by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *General Electric Co. v. Joiner*, 522 U.S. 136 (1997) and *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137 (1999). In fact, Emhart's objections to Dr. Hughto's expected expert opinions go to the issues of the weight and credibility to be accorded to those opinions, not to the admissibility of the opinions. Excluding expert testimony based upon issues relating to its weight or credibility is not a proper function of a Daubert inquiry.

For the reasons set forth herein, there is no basis for the Court to rule that Dr. Hughto's expected opinions fail to meet the applicable standard of admissibility or should be excluded from evidence. Emhart's motion in limine should be denied outright or deferred for further consideration at the time of trial.

The opinions challenged by Emhart's motion fall into two categories. The first category relates to when dioxin contamination of the environment became an area of concern. Dr. Hughto's opinions in this area include the opinions that: (1) concern with dioxin contamination of the environment arose only after 1969 as a result of incidents such as occurred in Times Beach, Missouri in the 1970's and (2) dioxin contamination of the environment did not become a matter of significant concern in the environmental engineering and remediation industry or to government regulators of the environment until after 1980. The second category of opinions subjected to attack in Emhart's motion in limine relate to when it became reasonably possible to

test for dioxin contamination of the environment such as that found at the site. His opinion in that regard is that commercial analytical laboratories did not have the capacity to test environmental samples for dioxin contamination at the low part per billion levels found at the site until after 1980. Based in part on this opinion testimony, OneBeacon and Century contend that the dioxin contamination at issue was not discoverable in the exercise of reasonable diligence by Emhart or its predecessors in 1969.

Emhart seeks to exclude this expert opinion testimony from admission in evidence on two grounds, arguing that (1) the opinions are not relevant to the application of the discovery/discoverability trigger of coverage standard under Rhode Island law and (2) Dr. Hughto is not qualified to offer these opinions. As more fully set forth below, Emhart's motion in limine should be denied because Dr. Hughto's opinions are (1) relevant to the facts in dispute in this case and (2) well within the area of Dr. Hughto's professional expertise.

## CONTAMINATION AT THE SITE

Dioxin contamination of the soil and river sediments at the Site is the cause of the cleanup work conducted to date at the Site and any future cleanup work that will be conducted or required by EPA. The specific cause of that contamination is a matter in dispute between Emhart and the Defendants. EPA has concluded that the cause of that contamination was the operations of Metro Atlantic, Inc., in 1964 or 1965, in manufacturing a product known as hexachlorophene. The manufacturing process for this product is alleged to have included the use of a chemical called trichlorophenol, a substance which in turn is alleged to have included trace quantities of dioxin.

In 1968, Metro Atlantic and Crown Chemical Company, an unrelated chemical company also operating in Providence Rhode Island, merged to form Crown-Metro, Inc. At the time of the merger, operations at the Site were discontinued and moved to the former Crown Chemical facility. In late 1968 and 1969, OneBeacon and Century issued the insurance policies at issue to Crown-Metro.

At the time that it used trichlorophenol, Metro Atlantic did not know that it contained dioxin. In fact, there is no evidence that anyone at Metro-Atlantic or its alleged successors ever knew about such dioxin until after the dioxin contamination was discovered at the Site in the late 1990's.

Dioxin contamination was discovered in fish from the Woonasquatucket River, and in river sediments, in the late 1990's. Subsequent investigations lead EPA to believe that the Site was a cause of that contamination. Emhart first became aware of the Site and the dioxin contamination at it in June, 1999 when it received a request for information regarding the Site from EPA.

## ARGUMENT

## I. THE COURT SHOULD DEFER CONSIDERATION OF EMHART'S MOTION

At the April 11, 2006 pretrial conference, in response to the parties' extensive pretrial memoranda, the Court put in place a pretrial process designed to assess and narrow the issues presented for trial. As a first step in that process, the parties have submitted a Joint Statement of Issues to the Court. The resolution of certain issues identified in the Joint Statement could make it unnecessary for the Court to address Emhart's motion in limine. For example, both Century and OneBeacon have asked the Court to consider whether a trial even is necessary on the trigger of coverage issue, on the grounds that the undisputed material facts show that the dioxin

contamination at issue was not discoverable in the exercise of reasonable diligence in 1969. The discoverability trigger also will be an issue presented in connection with the issue of whether Century has a duty to defend Emhart. This process should be allowed to go forward before the Court dedicates time and resources to the issues presented by Emhart's motion. Depending upon the outcome of the briefing process contemplated by the Joint Statement, there simply may be no need for the Court to address that motion.

## II. DR. HUGHTO'S OPINIONS ARE ADMISSIBLE AND EMHART'S MOTION SHOULD BE DENIED.

### A. Trigger of Coverage Standard Under Rhode Island Law

Century issued two policies to Crown-Metro, a primary policy and an excess policy. The primary policy was in effect between February 15, 1969 and January 1, 1970. The excess policy was in effect between December 1, 1968 and January 1, 1970. OneBeacon issued one policy to Crown-Metro, an excess policy in effect between April 24, 1969 and January 1, 1970. Each of these policies provides[2] that the insurer:

> … will indemnify the Insured for ultimate net loss in excess of the retained limit hereinafter stated which the Insured shall become legally obligated to pay as damages because of
>
> A. personal injury or
> B. property damage or
> C. advertising injury
>
> to which the insurance applies, caused by an occurrence…

The term "occurrence" is defined in these policies as "an injurious exposure to conditions which results, during the policy period, in personal injury, property damage or advertising injury neither expected nor intended from the standpoint of the Insured."

[2] This quotation is from the Century excess policy. It is agreed by the parties that the Century primary policy and the OneBeacon excess policy contain language either identical to or having the same effect for trigger of coverage purposes as the quoted language.

The Rhode Island Supreme Court has determined that this policy language means that a particular policy is "triggered" for coverage only if the underlying property damage is discovered or manifested during the policy period or is reasonably discoverable during the policy period. In CPC International, Inc. v. Northbrook Excess & Surplus Ins. Co., 668 A. 2d 647 (R.I. 1995), responding to a certified question from the United States Court of Appeals for the First Circuit, the Rhode Island Supreme Court held:

> The question certified by the First Circuit asks us to determine, under Rhode Island law, when there has been an "occurrence" sufficient to trigger coverage under a general liability policy. … We answer that an "occurrence" under a general liability policy takes place when property damages, which includes property loss, manifests itself or is discovered or in the exercise of reasonable diligence, is discoverable.

Id., at 649. See also, Truk Away of Rhode Island, Inc. v. Aetna Cas. & Sur. Co., 723 A. 2d 309, 313 (R.I. 1999).

The question of when property damage is discoverable in the exercise of reasonable diligence was addressed and answered in Textron, Inc. v. Aetna Cas. & Sur. Co., 723 A. 2d 1138 (R.I. 1999)("Textron-Gastonia"). There, the Rhode Island Supreme Court held:

> Textron's burden, however, is not met by merely establishing that the contamination was present during the policy period. Rather, CPC requires that the contamination not only exist during the period of coverage, but also be discoverable in the exercise of reasonable diligence. [citation omitted]. In other words, in order to trigger coverage in the absence of actual discovery, Textron must have some reason to test for the contamination, and must actually have been able to discover it in the exercise of reasonable diligence.

Id., at 1144 (emphasis added).

Application of this law to Emhart's claims for insurance coverage under the OneBeacon and Century policies imposes a clear burden of proof on Emhart. There is no dispute that actual discovery of the dioxin contamination at issue happened in the late 1990's, thirty years after the

expiration of the OneBeacon and Century policies. Therefore, to trigger those policies for coverage, Emhart must establish that the dioxin contamination at issue was discoverable in 1969, in the exercise of reasonable diligence. Dr. Hughto's opinions speak directly to this issue and provide a basis upon which the trier of fact in this case can conclude that the dioxin contamination at issue was not discoverable in the exercise of reasonable diligence during the OneBeacon and Century policy periods.[3]

### B. <u>Standard for Admission of Expert Opinion Testimony</u>

The admissibility of Dr. Hughto's expert opinion testimony is governed by Fed. R. Evid. 702. It provides:

> If scientific technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill experience, training, or education may testify thereto in the form if an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) and *Kumho Tire v. Carmichael*, 526 U.S. 137 (1999), a district court acts as a "gatekeeper" by determining "whether the reasoning or methodology underlying the testimony is ... valid and whether that reasoning properly can be applied to the facts in issue." *Zachar v. Lee*, 363 F.3d 70, 76 (1st Cir. 2004) (quoting *Daubert*, 509 U.S. at 592-93). This function applies to all types of expert testimony involving technical or otherwise specialized knowledge. *Id.* In discharging this function, the district court must determine if the "expert's testimony both rests on a reliable foundation and is

---

[3] Emhart's contentions regarding application of this "discoverability" trigger of coverage standard ignore the central concept of reasonable diligence. Its proof on this issue – testimony from Dr. Hass that in 1969 some level of knowledge among a distinct group existed connecting trichlorophenol with dioxin created a reason to test and that cutting edge testing methods could then have been applied to detect the dioxin later found at the Site – would succeed to establish discoverability only if the relevant standard were any possibility of discovery, not discoverable in the exercise of reasonable diligence.

relevant to the task at hand." *Daubert*, 509 U.S. at 597. The relevancy requirement is met if the expected testimony "likely would assist the trier of fact to understand or determine a fact in issue." *Ruiz- Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998); *Hall v. Eklof Marine Corp.*, 339 F. Supp. 2d 369, 381 (D.R.I. 2004); *The Beacon Mutual Ins. Co. v. One Beacon Ins. Group*, 253 F. Supp. 2d 221, 222 (D.R.I. 2003). However, the gatekeeper function is not a replacement for the adversary system. Use of that function to exclude offered expert testimony is to be the exception rather than the rule. *U.S. v. 14.38 Acres of Land Situated in Leflore, Mississippi*, 80 F.3d 1074, 1078 (5th Cir. 1996).

Applying this standard, Emhart argues that Dr. Hughto's expected opinion testimony is not admissible in evidence for two reasons. First, Emhart argues that Dr. Hughto's opinions are not relevant to the issue of discoverability of dioxin contamination. Second, Emhart argues that Dr. Hughto is not qualified to offer opinions on the subject matter at hand. Neither contention provides a basis for the exclusion of Dr. Hughto's testimony. Quite to the contrary, Dr. Hughto is qualified and his testimony is admissible. Emhart's motion should be denied.

### C. Dr. Hughto's Testimony is Relevant to Whether the Contamination at the Site was Discoverable in the Exercise of Reasonable Diligence.

#### 1. Reason to Test Opinions

Dr. Hughto's testimony in this area has a number of elements. All of them relate and are relevant to whether at time periods at issue in this case the dioxin contamination at the Site was discoverable in the exercise of reasonable diligence. The first element of his expected testimony is that it was not common for a site being tested for contamination to be tested for dioxin contamination until after 1980, long after the expiration of the 1969 Century and OneBeacon

policies. Dr. Hughto's report provides:

> [P]rior to 1980 it was not common for soil, sediment, surface water or groundwater samples to be analyzed for dioxin at a site being assessed for potential contamination or at a site known to be contaminated. [T]he constituents analyzed for during such investigations in that time period was generally limited to a much more restricted list than during subsequent decades.[4]

On the most basic level, this opinion tends to prove that reasonable diligence on the part of Emhart or its alleged predecessors did not require them to look for such contamination. The second element of Dr. Hughto's expected testimony relates to *why* it was not common for such testing to be conducted prior to 1980. A number of reasons are given by Dr. Hughto. The first is that awareness of dioxin contamination of the environment as a health risk grew out of a number of specific instances of such contamination that occurred in the 1970's, such as a soil contamination issue that arose in Times Beach, Missouri. His expert report states:

> At least one reason for this is that until the mid 1970's there was no awareness in the environmental engineering field or at EPA that the presence of dioxin in soil, sediment, surface water or groundwater presented a risk to human health or the environment.

During his deposition, Dr. Hughto elaborated on this part of his report:

> Q: Is there any particular incident or incidents that created awareness in the mid 1970's?
>
> A: In the seventies there were incidents. Probably the most significant being, for creating awareness, anyway, was Times Beach, which we already discussed. I think the awareness from Times Beach was later than – It was more in the latter part of the seventies and very clearly in the early 1980's when it became, it created a great deal of awareness.[5]

A second reason given by Dr. Hughto as to why it was not usual to test for dioxin contamination is that the studies performed by regulating agencies such as the Environmental

---

[4] A copy of Dr. Hughto's report is included in the Appendix submitted by Emhart in support of its motion in limine.
[5] Hughto deposition, p. 88; a copy of this page is attached in Exhibit A to this memorandum.

Protection Agency of the toxicity and risks posed by dioxin contamination were not conducted until the late 1970's and 1980's. His report provides:

> The ATSDR, the US EPA and some State organizations have researched the impacts to humans and animals of dioxin and established standards for environmental exposures. Most of the research that has been utilized to establish the standards was published in the late 1970's and in the 1980's. US EPA advisories and health effects levels were published beginning in the 1980's. Fate and transport characteristics of dioxin were established in the literature in the late 1970's and into the 1980's.

One of the factors in the Rhode Island "discoverability" analysis under the Textron-Gastonia case is whether Emhart or Crown-Metro had a reason to look for the dioxin contamination.[6] If it did not, then the contamination was not discoverable in the exercise of reasonable diligence. Dr. Hughto's opinions set forth above are directly relevant to whether Crown-Metro had a reason to test for dioxin contamination. Because the environmental risks associated with that contamination were not yet known in 1969 and the studies establishing such environmental contamination as presenting such a risk had not yet been performed or concluded, no reason to test was presented to Crown-Metro. Certainly, given this general lack of knowledge of dioxin-related environmental risk and Dr. Hughto's opinion that testing for such contamination therefore was not common, Dr. Hughto's expected testimony forms a basis upon which a jury or the Court could find that reasonable diligence did not require Crown-Metro to look for dioxin contamination.

Emhart's relevance argument, couched in terms of a lack of "fit" between that testimony

---

[6] Emhart appears to contend that the Rhode Island "discoverability" trigger looks not to whether Emhart or its predecessors had a reason to look for dioxin contamination, but to whether some fictional reasonable person would have had a reason to look for it. Emhart is incorrect in this regard. The Textron-Gastonia case states specifically that the insured must have a reason to test for the contamination at issue. Textron-Gastonia, 773 A.2d at 1144 ("In other words, . . . to trigger coverage in the absence of actual discovery, Textron must have some reason to test for the contamination, and must actually have been able to discover it in the exercise of reasonable diligence"). Accordingly, the relevant question is whether Crown-Metro in 1969 had a reason to look for dioxin contamination in the exercise of reasonable diligence.

and the facts and law under Daubert, is based upon the false premise that Crown-Metro's manufacture of hexachlorophene, using trichlorophenol, placed Crown-Metro in a special category with respect to having a reason to test for dioxin contamination. Emhart is wrong, for at least two reasons. First, the undisputed evidence is that Crown-Metro was utterly unaware of the fact that its hexachlorophene manufacturing process had anything to do with dioxin or dioxin contamination. Second, by the time that the Century and OneBeacon policies were issued, the hexachlorophene manufacturing operations of Metro Atlantic has stopped and the merged company, Crown-Metro, had moved its operations to a new location.[7]

**2. Ability to Test Opinions**

Dr. Hughto's expected opinion testimony with respect to the availability of procedures and methods capable of testing for dioxin at levels material to the contamination at the Site also is relevant to and tailored to the Rhode Island discoverability trigger. His report states:

> [T]he analytical methods employed at commercial analytical laboratories prior to the late 1970's were not capable of quantifying dioxin to the low part per billion level in environmental samples. It was in the late 1970's and early 1980's that such laboratories began to have gas chromatograph/mass spectrometer (GC/MS) technology available to them. The GC/MS made it possible to quantify dioxin in the environmental samples to the low part per billion level.

As set forth above, part of the discoverability analysis is whether Emhart or its predecessors could have detected the dioxin contamination at issue in the exercise of reasonable diligence. Obviously, the fact that technology was not available in 1969 at commercial

---

[7] Viewed in light of these facts, it is Emhart's discoverability expert testimony – that of Dr. Ronald Hass – that is not relevant to and does not "fit" with the facts of the case. Dr. Hass' opinion is based upon research showing a history in the 1960's of firms that manufactured TCP investigating the cause of certain occupational diseases among plant workers and determining that dioxin might be its cause. This opinion, not that of Dr. Hughto, does not "fit" with the facts of the case because: (1) Crown-Metro did not manufacture TCP; (2) Crown-Metro did not even occupy the site in 1969 and therefore had no occupational health exposures there; and (3) the matter at issue in this case is dioxin contamination of soil, sediments and other environmental media, not occupational disease.

analytical laboratories is relevant to whether the contamination was discoverable in the exercise of reasonable diligence at that time.

Emhart's argument against admission of this evidence has two prongs. First, Emhart argues that because: (1) Dr. Hughto testified at deposition that his report reference to "low parts per billion level" meant less than ten parts per billion; and (2) sampling at that site during the past decade has shown levels as high as 140 parts per billion, Dr. Hughto's testimony is not relevant and does not "fit" the facts of this case. If anything, Emhart's argument goes to the weight of the testimony, not its admission in evidence. The contamination at issue in this case - - the contamination that has caused Emhart to incur damages for which it seeks recovery - - has been defined by EPA by the one part per billion level of dioxin contamination. That is the critical level by which EPA has defined the property damage at issue and that has caused Emhart to incur the damages and liability underlying its claim for insurance coverage. Further, the vast majority of the samples analyzed at the Site show dioxin contamination limited to the low part per billion level identified by Dr. Hughto. Because the contamination at the site is defined by the "low part per billion level" identified by Dr. Hughto, his opinion is relevant to and "fits" the issue of whether that contamination was discoverable in the exercise of reasonable diligence.

Emhart's second attack on Dr. Hughto's testimony on this issue is that it is not relevant because the testimony addresses the availability of testing at commercial analytical laboratories and not at the other facilities. Once again, while perhaps this could be a subject of cross-examination with Dr. Hughto, the point being raised by Emhart does not alter the relevance of Dr. Hughto's testimony to the issue to be decided by the trier of fact - - whether Emhart or its predecessors could have discovered the contamination in 1969 in the exercise of reasonable diligence. Apparently, Emhart's position is that sufficient testing capabilities existed at other

facilities, such as university or governmental laboratories. However, Dr. Hughto's testimony remains relevant because it demonstrates the lengths to which Emhart or its predecessors would have had to go to detect the contamination at issue. They would have had to search out special facilities to perform the testing. Whether this constitutes or is beyond what reasonable diligence required is an issue to be determined by the trier of fact and to which Dr. Hughto's opinion relates directly.

### D. <u>Dr. Hughto is Qualified to Render His Opinions</u>

Emhart's final attack on Dr. Hughto's testimony, mentioned almost in passing, is that he is not qualified to offer the opinions that he has expressed in his report. Emhart's argument is that Dr. Hughto is not qualified because his career has not focused on dioxin contamination and the means and methods by which it could be detected. Emhart's argument fundamentally misconstrues the Rhode Island discoverability trigger. That trigger rule revolves around the concept of reasonable diligence - - whether Crown-Metro, in the exercise of reasonable diligence, had a reason to test for dioxin contamination in 1969; whether Crown-Metro, in the exercise of reasonable diligence, could have detected the dioxin contamination at the site. Emhart seeks to prove such discoverability through testimony about cutting edge knowledge regarding dioxin hazards and cutting edge technology in the detection of dioxin. This argument ignores the fundamental concept included in and underlying the discoverability trigger - - reasonable diligence.

Dr. Hughto's expected testimony revolves around the reasonable diligence concept. On the issue of whether Emhart or its predecessor had a reason to test, Dr. Hughto's testimony addresses the issue of when risk associated with dioxin contamination of the environment became known. On the issue of ability to detect the dioxin contamination at issue, his testimony

addresses when testing capability for that work readily was available to Emhart. These areas of testimony are well within the scope of Dr. Hughto's professional expertise. He has worked and studied in the environmental engineering field for over thirty years. During that time, he has worked at the United States Environmental Protection Agency in the assessment of pollution in the environment. He has worked in private environmental consulting in assessing and directing response actions at contaminated sites. Over the course of that career, Dr. Hughto has become and is familiar with the evolution of awareness of environmental contamination, including dioxin contamination, awareness and the development of environmental protection issues and concerns in general. His testimony about when the hazard or risk associated with dioxin contamination of the environment first arose and when testing methods to detect dioxin at the levels at issue became available is based upon this experience. Such experience based expertise is a proper basis for qualification of an expert witness. However, the basis for Dr. Hughto's testimony goes beyond his own personal experience. It includes research conducted by him, as reflected in his report, into the development of and evolution of the matters in issue.

## CONCLUSION

Dr. Hughto's testimony is relevant to and "fits" the facts of this case and the law of Rhode Island regarding whether the dioxin contamination at the Site was discoverable in the exercise of reasonable diligence. Accordingly, Emhart's motion in limine to exclude his testimony should be denied.

James T. McCormick by Kelly N. Michels w/consent

James T. McCormick
McKenna & McCormick
128 Dorrance Street, Suite 330
Providence, RI 02903
(401) 831-2970
-and-
Lawrence A. Nathanson
Scott E. Levens
Siegal, Napierkowski & Park
533 Fellowship Road, Suite 120
Mt. Laurel, NJ 08054
(856) 380-8900

Attorneys for Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America

Kelly N. Michels

James T. Murphy #1698
Kelly N. Michels #6478
Hanson Curran LLP
146 Westminster Street
Providence, RI 02903
(401) 421-2154
- and -
Kevin J. O'Connor
Peter C. Netburn
Hermes, Netburn, O'Connor
& Spearing, P.C.
265 Franklin Street, Seventh Floor
Boston, MA 02110-3113
(617) 728-0050

Attorneys for OneBeacon America Insurance Company

Dated: June 2, 2006

G:\DOCS\KJO\CGU\Emhart\Pleadings\Hughto MIL.opp.memo.doc

**PROOF OF SERVICE**

I hereby certify that on this 2nd day of June, 2006, I served the within by mailing or hand delivering copies of same to the following counsel of record: **Gerald J. Petros, Esq.**, Hinckley, Allen & Snyder, LLP, 1500 Fleet Center, Providence, RI 02903; **James T. McCormick, Esq.**, McKenna & McCormick, 128 Dorrance Street, Suite 330, Providence, RI 02903; **Mark T. Nugent, Esq., Michael T. Farley, Esq.**, Morrison, Mahoney & Miller, LLP, One Providence Washington Plaza, Providence, RI 02903; **Lawrence A. Nathanson, Esq.**, Siegal & Napierkowski, 220 Lake Drive East, Suite 304, Cherry Hill, NJ 08002; **John T. Harding, Esquire**, Morrison Mahoney LLP, 250 Summer Street, Boston, MA 02210-1181; **Jack R. Pirozzolo, Esq., Richard L. Binder, Esq.**, Willcox, Pirozzolo & McCarthy, 50 Federal Street, Boston, MA 02110; and **Kevin J. O'Connor, Esq., Peter Netburn, Esq.**, Hermes, Netburn, O'Connor & Spearing, PC, 265 Franklin Street, 7th Floor, Boston, MA 02110-3113;

Kerry N. Michel

of Hanson Curran LLP

Volume: I
Pages: 141
Exhibits: 2

UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

EMHART INDUSTRIES, INC.,
Plaintiff

Docket No. 02-053-S

vs.

HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, LIBERTY MUTUAL INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICA INSURANCE COMPANY and UNITED STATES FIRE INSURANCE COMPANY,
Defendants

DEPOSITION of RICHARD J. HUGHTO, a witness called by and on behalf of the Defendant, taken pursuant to the Federal Rules of Civil Procedure, before Cynthia F. Stutz, Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the offices of Willcox, Pirozzolo & McCarthy, 50 Federal Street, Boston, Massachusetts, on Monday, March 1, 2004, commencing at 10:06 a.m.

Hennessey Corp., d/b/a
Robert H. Lange Company
50 Congress Street
Boston, Massachusetts 02109
617-523-1874 *** 800-645-6807 *** Fax 617-523-7343

in which I have had to consider many, many reports generated during that period of time and deal with regulators that were creating scopes of work and drawing conclusions and doing analyses based on work done during that time, I believe that during the 1970's time period, that with the change I made, there was limited awareness, as it states here.

Q. Is there any particular incident or incidents that created awareness in the mid 1970's?

A. In the seventies there were incidents. Probably the most significant being, for creating awareness, anyway, was Times Beach, which we discussed already. I think the awareness from Times Beach was later than -- It was more the latter part of the seventies and very clearly in the early 1980's when it became, it created a great deal of awareness.

There were some incidents outside the country that created some awareness in some locations, but again, even as I was in working at EPA and working for EPA, there were the, you know, we would know now from reading back that some of these incidents took place, but they weren't

forming people's thoughts in the 1970's or in this period I was talking about here until the mid 1970's. I worked on a lot of permits and a lot of analyses in the environment in the EPA at that time. It was not a topic of discussion.

Q. Can we go to the next paragraph of your opinion? You refer to the ATSDR. What is that?

A. I believe this is, I got the acronym right here. It's the Agency for Toxic Substances Disease Registry, I think it is.

Q. What is that?

A. That is a, I believe it's a quasi-public organization -- It could be a fully public. I'm not 100% sure -- that does a number of things and I'm sure I'm not aware of all of them. One thing that they do, that I'm aware of is they produce compilations of research on different chemicals or incidents of exposures to chemicals and they also will do analyses and risk assessments of specific situations, where you'd give, for example, at this site, the Centredale Manor site, that sites like that often are given by EPA or some other body to the ATSDR and they will do a risk assessment or an analysis of the potential risks from the exposures