UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| EMHART INDUSTRIES, INC., Plaintiff, v. HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, LIBERTY MUTUAL INSURANCE COMPANY, THE NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICA INSURANCE COMPANY and United States FIRE INSURANCE COMPANY, Defendants | Civil Action No.: 02-053-S |

**DEFENDANTS' OPPOSITION TO**
**EMHART'S MOTIONS IN *LIMINE* TO PRECLUDE EXPERT OPINIONS OF**
**DRS. WOODARD, CHEREMISINOFF AND CALABRESE**

Now comes the defendants and file this consolidated opposition to Plaintiff's Motions in *Limine* to Preclude the Expert Opinions of Drs. Franklin E. Woodard ("Woodard"), Nicholas P. Cheremisinoff ("Cheremisinoff") and Edward J. Calabrese ("Calabrese") filed by Plaintiff Emhart Industries, Inc. ("Emhart")[collectively, "Emhart's Motions"].[1]

In support of this motion, the defendants offer the attached memorandum of law.

[1] Although Emhart has filed separate motions with respect to each expert, Emhart's Motions are largely duplicative, raise similar issues as to each expert, and copy verbatim sections of argument from one motion to the next. For the convenience of the Court, Defendants have consolidated their opposition into a single memorandum.

Respectfully submitted,

**THE NORTH RIVER INSURANCE COMPANY,**
By its attorneys,

Mark T. Nugent, RI Bar# 2637
Michael T. Farley, RI Bar #6196
**MORRISON MAHONEY LLP**
121 South Main Street, Suite 600
Providence, RI 02903-7141
(401) 331-1660

John T. Harding, Mass. BBO#221270, *pro hac vice*
**MORRISON MAHONEY LLP**
250 Summer Street
Boston, MA 02210-1181
(617) 439-7500

**AND ON BEHALF OF DEFENDANTS CENTURY INDEMNITY COMPANY AND ONEBEACON AMERICA INSURANCE COMPANY**

Dated: June 2, 2006

**I hereby certify that a true copy of the above document was served upon (each party appearing pro se and) the attorney of record for each (other) party by mail (by hand) on 6/2/06**



1006057v1

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| EMHART INDUSTRIES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, LIBERTY MUTUAL INSURANCE COMPANY, THE NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICA INSURANCE COMPANY and United States FIRE INSURANCE COMPANY,<br><br>Defendants | Civil Action No.: 02-053-S |

# DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO EMHART'S MOTIONS IN *LIMINE* TO PRECLUDE EXPERT OPINIONS OF DRS. WOODARD, CHEREMISINOFF AND CALABRESE

## INTRODUCTION

The Court should deny or, at the very least, defer until the time of trial, the Motions in *Limine* to Preclude the Expert Opinions of Drs. Franklin E. Woodard ("Woodard"), Nicholas P. Cheremisinoff ("Cheremisinoff") and Edward J. Calabrese ("Calabrese") filed by Plaintiff Emhart Industries, Inc. ("Emhart")[collectively, "Emhart's Motions"].[1] All three experts are eminently qualified to render opinions in this matter; have provided detailed reports grounded in the facts of this case and supplemented by extensive literature and other research; address the relevant issues to be decided; and meet the standards for admissibility under the tests established by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993);

[1] Although Emhart has filed separate motions with respect to each expert, Emhart's Motions are largely duplicative, raise similar issues as to each expert, and copy verbatim sections of argument from one motion to the next. For the convenience of the Court, Defendants have consolidated their opposition into a single memorandum.

*General Electric Co. v. Joiner*, 522 U.S. 136 (1997) and *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137 (1999). Emhart's challenges to the proposed expert testimony should be rejected or deferred until the Court has decided the legal standards that govern the issue of whether the contamination was "expected or intended"; resolved other legal issues identified by the parties that may impact the proposed testimony; and the expert testimony can be placed in the context of the complete factual record to be presented at trial. As discussed below:

- The Court has not determined that a "subjective" standard applies to the issue of whether the property damage caused by pollution was "expected or intended." Indeed, this is one of the issues that the parties have agreed should be briefed and decided at a time to be set by the Court at the June 8, 2006 conference. [*See* Joint Statement Pursuant to Pretrial Conference, 5/16/06 at 5-6 ("Joint Statement")]. Emhart's attempt to short-circuit the process should be rejected. To the extent that Emhart's arguments are almost exclusively based upon this issue, the motions should be deferred.

- Other issues that the parties have identified for briefing in the Joint Statement could make it entirely unnecessary for the Court to enter the factually and legally intense thicket relating to the "expected or intended" issue. Moreover, any challenge to the relevance and admissibility of the proposed expert opinions on this issue should only be determined based upon a complete factual record at trial, not the selective facts and characterizations thereof put forward by Emhart.

- Emhart's Motions ignore the fact that the opinions being offered are relevant to issues other than the question of whether the property damage was "expected or intended." For example, these opinions are also relevant to demonstrate that Emhart's "routine operations" caused the contamination at issue and Emhart's claims are therefore barred by the "pollution exclusion" contained in the policy issued by defendant The North River Insurance Company ("North River").

- Even if the Court ultimately determines that a "subjective" standard applies to the "expected or intended" issue, the requisite intent or expectation can be inferred from circumstantial evidence, including the nature of the inherently injurious conduct engaged in by Emhart's predecessors when they dumped, burned and buried hazardous wastes at the Site. The experts' opinions will be helpful in understanding this evidence.

- Emhart's objections go to issues of the weight and credibility to be accorded to the expert opinions, rather than the threshold admissibility of the opinions. Excluding testimony based upon weight or credibility is not a proper function of a *Daubert* inquiry; rather, these are matters for the trier of fact.

In short, there is no reason for the Court to determine at this time that none of the proposed opinions could ever meet the applicable standard of admissibility and should be precluded. Emhart's Motions should either be rejected outright or deferred for further consideration at the time of trial.

## THE EXPERT OPINIONS AT ISSUE[2]

### A. Dr. Franklin E. Woodard

Dr. Woodard holds a Ph.D. in Civil and Sanitary Engineering and has more than thirty years of experience in the environmental field, including extensive ***practical*** experience in actually designing industrial wastewater and solid waste treatment and disposal systems. Dr. Woodard has authored numerous articles on issues relating to waste treatment. He has served as an expert witness in a number of cases where he has provided reports, deposition and trial testimony on issues relating to historical standards of practice and technologies for waste handling, treatment and disposal. He has been in charge of teams retained to analyze the waste handling practices of various manufacturing facilities, including to determine the sources and

---

[2] Defendants have provided the Court with a brief overview of the experts' opinions and the methodology that they employed to arrive at their opinions. The full text of each expert's report is attached as an exhibit to Emhart's Motions and Defendants respectfully suggest that the reports should be reviewed by the Court in their entirety to understand the methodology employed, the facts and research that were relied upon, and the conclusions that were reached. In addition to their original reports, Drs. Woodard and Cheremisinoff each provided a rebuttal report that responds to the opinions of Emhart's experts. [Exs. 1, 2 hereto]. The substance of the rebuttal reports is not addressed in Emhart's Motions. Each expert also provided extensive deposition testimony which is available for the Court's review if it would be helpful. The complexity of the opinions and rebuttal opinions involved and the fact that ultimately the opinions can only be properly understood when presented in the context of the trial, supports deferring any further consideration of Emhart's Motions at this time. This is simply not the typical *Daubert* case where an expert is proposing to testify on a novel scientific theory and the admissibility of the theory can be resolved in advance without a complete factual record.

extent of contamination. Dr. Woodard has also served as a Professor of Civil Engineering at the University of Maine. [Ex. A to Woodard Report].[3]

Dr. Woodard's report and rebuttal report in this case reflect that he thoroughly reviewed all of the available factual information concerning the operations of Metro Atlantic and its affiliate, New England Container Company ("NECC"),[4] at the Centredale Manor Superfund Site (the "Site"), including the testimony of former employees who worked at the Site concerning the waste disposal practices that took place. [Woodard Report at 2-22 and References]. Thus, all of his opinions are firmly anchored to the facts known about the operations that occurred at the Site before it closed. Dr. Woodard reviewed the relevant historical information concerning the major chemicals used in the operations at the Site, including the descriptions of toxicity and hazards associated with these chemicals contained in Chemical Safety Data Sheets and other publications. [Id.]. Dr. Woodard considered the testimony of former employees who described the hazardous nature of the substances that were used, generated and/or disposed of at the Site. [Id. at 9-19]. Moreover, Dr. Woodard collected and analyzed literature and other "information concerning the historical state of knowledge of pollutants, of public hazards, of the exposure to releases associated with waste disposal methods" and the resulting pollution and hazardous conditions available before and during the period of operations at the Site. [Id. at 4]. Dr.

---

[3] A copy of Dr. Woodard's Report is attached as Exhibit C to Emhart's Motion. While Emhart refers to Dr. Woodard as a "professional witness," Emhart simply disregards the host of practical field work in which Dr. Woodard has been involved unrelated to litigation. Emhart also fails to note that its parent company, Black & Decker, was unsuccessful in its efforts to prevent Dr. Woodard from testifying in the Massachusetts District Court action that it brought against Liberty Mutual Insurance Company seeking coverage for contamination at a number of sites.

[4]As discussed below, Emhart's attempt to portray NECC as a separate company that was not intimately connected to the manufacturing operations of Metro Atlantic is contrary to the record. Apart from the witness testimony detailing the relationship between Metro Atlantic and NECC, contemporaneous historical articles referred to NECC as an "affiliate" of Metro Atlantic and described its close connection to the operations of Metro Atlantic. [Ex. D to Woodard Motion].

Woodard evaluated information concerning waste treatment technologies that were available during the time when Metro Atlantic was manufacturing products at the Site. [Id. at 6-8].[5]

Based upon his analysis of this factual information (including testimony of former employees concerning their routine dumping of chemicals, sludges and other substances onto the ground and into adjacent waterways at the Site), coupled with his assessment of relevant literature establishing historical industry practices and knowledge, Dr. Woodard presented a series of opinions that Metro-Atlantic and NECC caused environmental harm through their improper and reckless waste management practices; the environmental harm at the Site took place over an extended period of time; the contamination resulted from "routine operations," including the improper storage, handling, and disposal of chemicals and wastes; the contamination was obvious and on-going; and both industry in general and Metro-Atlantic and NECC in particular knew that many of the chemicals used at the Site were toxic and therefore would result in contamination if not properly handled. [Id. at 9-26]. In his rebuttal report, Dr. Woodard refutes many of the assertions made by one of Emhart's designated experts (Bonchonsky) concerning the alleged lack of knowledge of the harm that would be caused by discharging hazardous chemicals directly onto the ground or into waterways. [Ex. 1 at 1-7].[6] Dr. Woodard also responds to the assertion put forward by Dr. Hass that the dioxin contamination at the Site did not originate from the hexachlorophene manufacturing process. Based upon the testimony of the person most directly involved in (and who held patents relating to) the purification process (Cleary) the record shows that the hexachlorophene manufacturing

---

[5] Emhart suggests that Dr. Woodard's opinions are unreliable because the sources he consulted did not use the magic words "environmental harm" [Woodard Mem. at 7], ignoring the fact that the relevant publications addressed the concept without using the particular phrase.

[6] North River has filed a motion in *limine* seeking to exclude Bonchonsky's testimony.

process generated sludges containing dioxin in the initial purification step. [Ex. 1 at 2-3]. There is no documentation that these sludges containing dioxin were ever removed from the Site.[7]

**B. Dr. Nicholas P. Cheremisinoff**

Dr. Nicholas P. Cheremisinoff has a Ph.D. in Chemical Engineering and has served as a consultant and expert witness on issues relating to environmental management throughout the world. He has testified as an expert witness in cases involving issues of due care in the handling and disposal of chemicals. Dr. Cheremisinoff has specific experience in reconstructing standard operating and waste management practices based upon historical records from chemical manufacturing sites, including the development of estimates of the volume of wastes generated at those sites. Dr. Cheremisinoff has investigated contamination issues at plants in the United States and abroad. Dr. Cheremisinoff has authored numerous articles on issues relating to pollution and waste management. [*See* Cheremisinoff Report, Key Qualifications and Publications List; Ex. C to Emhart's Motion].

Dr. Cheremisinoff's Report reflects that he engaged in a thorough and complete review and analysis of all of the available reports, analyses, historical information, corporate documents and other sources of information available regarding the Site. [Id., Declaration and Disclaimer]. In addition, Dr. Cheremisinoff consulted scientific and trade journals, engineering textbooks and other literature sources with respect to issues concerning historical knowledge of pollution and technologies that were available to manage hazardous wastes. [Id., References]. The central purpose of the report prepared by Dr. Cheremisinoff was to "assess the environmental aspects of

---

[7] While Emhart's witness, Dr. Hass, contends that the absence of activated charcoal in samples taken from the Site shows that the dioxin did not originate from the manufacturing process, this is a hotly contested issue. The Defendants have submitted an expert report from Dr. Michael J. Wade directly refuting Dr. Hass' assertions that the dioxin did not result from Metro Atlantic's operations.

the two industrial operations; define the waste management practices used by the facilities to manage their environmental aspects; and to provide an assessment of whether practices were within the standard of care for the time period." [Id., Executive Summary].

Based upon his review of the relevant information and applying the standard of due care, Dr. Cheremisinoff reached several core opinions, including that (1) management of Metro Atlantic and NECC understood that their waste management practices were harmful to the environment; (2) there was no significant change in the nature of the waste management practices over the course of the operations at the Site; (3) waste disposal facilities at the Site included "common waste burial sections on the property, direct discharge of liquid wastes into the river through common drainage ways, and disposal of wastes to bare ground in common areas"; (4) some of the practices showed a high disregard for the environment; (5) the process used for hexachlorophene production generated large quantities of solid and liquid wastes which contained dioxin from the feedstock TCP; (6) TCP was known at the time to be a hazardous and toxic chemical, but there is no information suggesting that the wastes from the process were handled responsibly; (7) large volumes of wastewaters were generated by Metro Atlantic and NECC and were directly discharged into the Woonasquatucket River; (8) the chemical plant produced as much as 20 million pounds of product annually, generating significant waste streams; and (9) the facility owners conducted mass burials of drums containing hazardous wastes below the water table and also performed mass burning of chemical wastes on bare ground. [Id., Executive Summary].[8]

---

[8] While Emhart spends a great deal of its motion focusing on Dr. Cheremisinoff's opinion regarding the length of time that hexachlorophene was manufactured by Metro Atlantic [Cheremisinoff Mem. at 15-17], this opinion is in no way integral to Dr. Cheremisinoff's conclusions regarding the waste management practices at the Site.

Dr. Cheremisinoff supports his opinions with a detailed description of the pollutants found and the most likely sources of those pollutants arising from within the process operations that were employed at the Site. [Id. at 6-27]. Dr. Cheremisinoff details the historical evolution of the operations at this very sophisticated facility. [Id.] Dr. Cheremisinoff identifies the sources of dioxin from the chemical manufacturing operations, primarily the hexachlorophene production process. In particular, Dr. Cheremisinoff provides a process diagram derived from Cleary's testimony and other available information to support his conclusion that the purification of TCP as part of the hexachlorophene manufacturing process resulted in sludges that contain dioxin. Further, there is no indication that these sludges were disposed of other than by being landfilled or incinerated on bare ground at the Site. [Id. at 15-16]. Dr. Cheremisinoff discusses the widespread knowledge of the hazards associated with TCP from a series of industrial accidents resulting in occupational exposure diseases, including chloracne. [Id. at 17-20].

Dr. Cheremisinoff offers a very detailed discussion of the waste management practices at the Site over the life of the operations. In particular, Dr. Cheremisinoff relies upon an analysis of historical aerial photographs prepared by EPA which document the nature and extent of disposal practices at the Site during the period from 1951 to 1970. The EPA analysis confirms the widespread contamination at the Site that resulted from the waste disposal practices. As Dr. Cheremisinoff summarizes these practices based upon the historical data:

> The chemical plant operations clearly had major waste problems that management chose not to address responsibly, but rather focused their attention on the industrial expansions aimed at growing their business. With increased production came increasing amounts of waste by-products that required disposal. Conditions at the site appeared to have been fluid with considerable drainageways, standing pools of liquids, landfarming and mass waste burials taking place in order to cope with the significant production activity increases. Over relatively short periods of time (2 to 4 years) large sections of the property were

> landfilled with waste products and new waste disposal sections created. New drainageways, pits and impoundments appear and disappear at various points in time, leaving strong evidence of grading scars and cover vegetation to conceal toxic deposits. Waste disposal sections appear not to have been carefully planned, but rather done in a manner that was reactionary in order to cope with the increased production activities. The use of pits and surface impoundments clearly appear to have been reactionary contrivances hastily constructed to manage wastes, with the largest ones appearing around 1970. Their appearance and disappearance at various stages of development of the site support that they were not dedicated waste management tools designed to contain hazards and minimize the environmental impacts of operations, but rather served only to address immediate waste problems that would have interfered with production activities.

[Id. at 30]. As Dr. Cheremisinoff further notes, "concepts of pollution prevention appear to have been totally devoid in the plant operations given the intensity of waste-related activities identified from the aerial photographic analysis. Spills, excessive staining, leaking tanks and overflowing pits observed from aerial photographs suggest little or no preventative measures were taken." [Id. at 32]. Essentially, there is no evidence of any actual on-site treatment facilities for any of the wastes that were generated. [Id.].

Dr. Cheremisinoff assesses whether the owners/operators of the Site met the standard of "due care" or "responsible care." The standard used by Dr. Cheremisinoff was "applied as a benchmark comparison to voluntary standards and codes of practice of the day." [Id. at 42]. Dr. Cheremisinoff notes that at the time of the operations "there were unquestionably industry guidelines and standard practices that focused on managing environmental aspects of operations for the purpose of both public safety and environmental protection." [Id. at 42]. Dr. Cheremisinoff specifically identifies the historical technical literature relevant to operations at the Site which describe available methods of waste treatment. [Id. at 43-48]. Metro Atlantic and NECC failed to follow these practices, including by burying wastes below the water table and

engaging in mass burnings. [Id. at 49-50]. As Dr. Cheremisinoff concludes, none of the contemporaneously available procedures for handling toxic waste streams were used at the Site:

> The fact remains that there were voluntary codes of practice and highly technical guidelines for environmental protection. At the very least, both operations could have followed the recognized best practices of the day for highly toxic waste streams, which consisted of waste management in evaporation ponds, the use of lined surface impoundments and on-site wastewater treatment. Wastewater treatment options that could have been applied included neutralization, precipitation, filtration, aeration, biological treatment, and solvent recovery. Some of these on-site treatment technologies represented low to moderate cost investments for facilities, and while they had certain limitations for that time period, they would have significantly reduced toxic discharges and environmental impacts. It appears that not even the simple low-cost options were exercised by Crown-Metro or New England Container Co. Instead, practices aimed at quickly removing liquid waste streams from the site were chosen, most likely so that wastes would not interfere with production.

[Id. at 48-49].

**C. Dr. Edward J. Calabrese**

Dr. Edward J. Calabrese is a Board Certified Toxicologist employed as a Professor of Toxicology at the University of Massachusetts. [Calabrese Report at 2; Ex. A to Emhart's Motion]. Dr. Calabrese has authored more than 500 articles, including a substantial number that directly relate to issues pertaining to contamination and hazardous waste. [Id. at 2]. Dr. Calabrese has been in charge of numerous studies and investigations relating to the toxicological effects of various chemicals in the environment. [Id. at Appendix 2].

In this case, Dr. Calabrese was asked to provide an opinion regarding the time by which employees at the Site would have understood that damage was occurring to the environment as a result of their manufacturing and waste handling practices. [Id. at 2]. Based upon his review of information and applicable literature sources concerning the nature of the chemicals that were used at the Site and the availability of disposal methods, Dr. Calabrese offers a series of opinions



1006057v1

including that (1) disposal of industrial waste was a recognized problem; (2) since at least the 1940's the scientific and industrial communities had knowledge concerning acceptable waste disposal methods; and (3) industry was aware of the hazardous nature of the chemicals such as TCP that were used at the Metro Atlantic facility, including as the result of industrial accidents in which dioxin exposure caused serious injuries. [Id. at 3-4].

## ARGUMENT

### I. THE COURT SHOULD DEFER ACTION ON EMHART'S MOTIONS

As a threshold matter, Defendants respectfully suggest that the Court should defer ruling upon Emhart's Motions at this time. Emhart's Motions all proceed from the erroneous premise that the Court has already determined that a "subjective" intent to cause injury standard applies and that such a standard necessarily requires the Defendants to establish that Emhart's predecessors actually and specifically intended to cause dioxin contamination at the Site. [*See e.g.,* Woodard Mem. at 9-11; Cheremisinoff Mem. at 8-10]. But the Court has not done so. The parties have agreed that the issue of what standard applies to the "expected or intended" provision of the policies will be resolved based upon further briefing at a time to be set by the Court at the conference on June 8, 2006. [Joint Statement at 5-6]. Emhart should not be allowed to use its *Daubert* motions to circumvent this process. Accordingly, the proper course of action is for the Court to defer any ruling upon Emhart's Motions until after this issue is decided.

Similarly, there is no need for the Court to address Emhart's Motions now as the parties have identified any number of additional matters to be resolved before trial that could render the complex issues surrounding the "expected or intended" defense moot or change the landscape of this case in a way that significantly affects the evidence to be presented at trial. While the parties are not in agreement on whether all issues should be briefed and decided now, in the Joint

Statement the parties have identified some ***sixteen (16) separate issues*** that may be considered by the Court before trial. As indicated at the conference held on April 11, 2006, the purpose of the Joint Statement is to identify issues that may be disposed of before trial in order to streamline the proceedings. That process should be allowed to go forward before the Court decides to involve itself in the intense thicket of legal issues presented by Emhart's Motions. Depending upon the outcome of the briefing process contemplated by the Joint Statement and the rulings made by the Court, there simply may be no need for one or more of the Defendants to present an "expected or intended" defense or the nature of that defense may change.

Emhart's Motions should also be deferred in light of the inherently complex factual nature of the evidence to be considered in connection with the "expected or intended" issue. Emhart's Motions are based upon a selective reading of the record of this case. The purpose of a *Daubert* motion is not to try the case on a paper record. The testimony of the experts identified by the Defendants would only be presented ***after*** there has been a full and complete development of the factual record at trial, including the testimony of former employees who worked at Metro Atlantic and NECC. The Court needs to hear all of that factual evidence in order to fully understand the proffered opinions and decide whether they are admissible. The decision should not be made based upon the truncated and incomplete "record" set forth in Emhart's Motions.

## II. THE OPINIONS OF DEFENDANTS' EXPERTS ARE ADMISSIBLE AND RELEVANT TO THE ISSUES IN THE CASE

### A. The Applicable Legal Standard

In the event that the Court decides to consider Emhart's Motions at this time, Federal Rule of Evidence 702 controls the admissibility of opinion or "expert" testimony. The rule provides:



1006057v1

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

District Courts are guided in their determination of the admissibility of evidence under Rule 702 by the Supreme Court's decisions in cases including *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) and *Kumho Tire v. Carmichael*, 526 U.S. 137 (1999). "Under the holding of *Daubert*, a district court must act as a 'gatekeeper' by determining 'whether the reasoning or methodology underlying the testimony is ... valid and whether that reasoning properly can be applied to the facts in issue.'" *Zachar v. Lee*, 363 F.3d 70, 76 (1st Cir. 2004) (quoting *Daubert*, 509 U.S. at 592-93). "In *Kumho Tire*, the Court extended the reach of *Daubert's* gatekeeping function to cover all types of expert testimony involving technical or otherwise specialized knowledge." *Id.*

As "gatekeeper," the trial judge must determine if the "expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. Relevancy is determined not only under the general principles of Federal Rule of Evidence 402, "but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue." *Ruiz- Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998) (noting that *Daubert* "imposed a special relevancy requirement"); *Hall v. Eklof Marine Corp.*, 339 F. Supp. 2d 369, 381 (D.R.I. 2004); *The Beacon Mutual Ins. Co. v. One Beacon Ins. Group*, 253 F. Supp. 2d 221, 222 (D.R.I. 2003). The Supreme Court has provided useful guidance on this point:

> [C]onclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also Ruiz-Troche*, 161 F.3d at 81, stating that *Joiner* "[also] placed a gloss on *Daubert's* insistence that trial courts focus on an expert's methodology, rather than his conclusions, in order to determine the reliability of his testimony"). Here, the proffered testimony of the Defendants' experts clearly satisfies these standards for admissibility.

**B. Defendants' Experts are Qualified and Followed Reliable Methods**

There is no basis for Emhart to challenge the qualifications of Defendants' experts or the methodology that they employed to arrive at their opinions. Each of Defendants' experts has decades of experience in the environmental field. As discussed above and as set forth in detail in each expert's report, the opinions are based upon the available information concerning the operations at the Site; the testimony of former employees who have personal knowledge of the hazardous nature of the chemicals that were employed and the methods that were used to handle and dispose of wastes; and a review and analysis of relevant industry and technical literature that demonstrates what was known about pollution and how to control it during the period when Metro Atlantic and NECC were operating at the Site. The reports are more than sufficient for the Court to find that the opinions are admissible at trial. *See e.g., Ferrara & DiMercurio v. St. Paul Mercury Ins. Co.*, 240 F.3d 1, 8 (1st Cir. 2001) (discussing extensive professional experience in sustaining expert's qualifications); *Falconer v. Penn Maritime, Inc.*, 380 F.Supp.2d 2, 4-8 (D. Me. 2005)(permitting expert testimony based on professional experience, review of literature and report which set forth facts and information relied upon); *The Beacon Mutual Ins. Co. v.*

*OneBeacon Ins. Group*, 253 F. Supp. 2d 221, 222 (D.R.I. 2003) (Daubert/Rule 702 inquiry is "flexible"; district court has "considerable leeway" in "how to determine reliability" and "its ultimate conclusion").

The courts have emphasized that *Daubert* does not permit the District Court to substitute its view of the persuasiveness of the evidence for the adversary process:

> *Daubert* does not require that a party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct. As long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' *Daubert, 509 U.S. at 590* (internal quotation marks omitted), it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies, *see id. at 596*. In short, *Daubert* neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance. It demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion.

*Ruiz-Troche,* 161 F.3d at 85. In light of the nature of the claims presented and their inherently historical dimension, the Defendants' experts applied their experience, skill, knowledge and training to the relevant issues in the most logical way possible. There is no basis for the Court to conclude that the methods employed by Defendants' experts are unreliable or that the opinions are not relevant to the issues in the case.

### C. The Testimony is Relevant to Issues Other than "Expected or Intended"

The focus of Emhart's challenge to the proposed expert testimony is that it is not relevant to the issue of whether Emhart's predecessors "expected or intended" the environmental damage at the Site. Emhart contends that the testimony does not "fit" the correct legal standards. [*See e.g.,* Woodard Mem. at 12-16]. Emhart simply ignores the fact that the testimony is relevant to other issues in the case. As Emhart notes, Dr. Woodard's opinions include that the



1006057v1

contamination at the Site resulted from the "sloppy storage/transfer procedures," "improper storage, handling, and disposal of chemicals and waste" and "routine operations" that took place at the Site. [Woodard Mem. at 2]. Dr. Cheremisinoff offers similar opinions regarding the operations that occurred at the Site. [Cheremisinoff Report at 27-49]. The experts' opinions are clearly relevant to the question of whether Emhart's claims for indemnity are barred by the "pollution exclusion" contained in the subject North River policy as the cause of the pollution was not a "sudden and accidental" discharge of dioxin. The opinions address the fact that the pollution resulted from the "routine operations" that took place at the Site. *See Northville Industries Corp. v. National Union Fire Ins. Co. of Pittsburgh, PA.*, 89 N.Y.2d 621, 634, 679 N.E. 2d 1044, 1048 (1997) (policyholder must prove that the release of the contaminants was both "sudden and accidental"); *Technicon Elecs. Corp. v. American Home Assur. Co.*, 74 N.Y.2d 66, 542 N.E. 2d 1048 (1989) (pollution exclusion held to bar coverage for intentional, long-term discharge of toxic waste materials from manufacturing plant into nearby waterway); *Merchants Mutual Ins. Co. v. Allcity Insur. Co.*, 664 N.Y.S.2d 690 (3d Dept. 1997)(pollution exclusion barred claims arising from operations of company that was in business of purchasing 55 gallon steel drums from industrial firms and then cleaning, repainting and reselling the drums).

Dr. Woodard has offered specific opinions in response to Emhart's contentions regarding the "pollution exclusion" issue. For example, in his rebuttal report [Ex. 1], Dr. Woodard responded to the contention that an unknown quantity of water being poured on the Site to extinguish the August 1972 fire caused a release of dioxin. As Dr. Woodard notes, "[t]he incremental effect of water used to fight the fire several years after hexachlorophene was no longer being produced and remaining chemical operations had been moved off-site to another facility is insignificant compared to expected routine releases that would have occurred during

the production of hexachlorophene, and subsequent normal rainfall and high water events, and would not have made a noticeable impact on what has to be cleaned up." [Ex. 1 at 3].[9] In short, since the opinions of Defendants' experts relate to issues other than the question of whether the property damage at the Site was "expected or intended," there is no basis for the Court to bar the testimony.[10]

### D. Testimony Concerning the Connection Between NECC and Metro Atlantic is Relevant to the Issues in the Case

Throughout its motions, Emhart contends that the facts concerning the operations of NECC at the Site are irrelevant to this case and that Defendants' experts should not be permitted to offer opinions that rely upon those facts. [*See, e.g.* Woodard Mem. at 2-3]. Emhart would have the Court believe that NECC was a "stranger" who had no connection to Metro Atlantic and just happened to be operating a facility where it received and reconditioned some 50,000 barrels per year on a portion of the Site, including by the open dumping and burning of chemical residues that were contained in the drums. (NECC was a "barrel reconditioning facility that conducted operations on a portion of the Site abutting the Metro-Atlantic facility"; Woodard Mem. at 11).

---

[9] It is not clear whether Emhart is still pursuing the theory that Dr. Woodard addresses. Instead, Emhart's strategy appears to be to constantly change the supposed "events" upon which it relies to try to avoid the bar of the pollution exclusion. [*See* Emhart's Pretrial Mem. of Law at 41-45]. As previously noted by North River, the only relevant inquiry under the pollution exclusion is whether the ***initial discharge*** of contaminants into the environment was "sudden and accidental." *See Employers Insurance of Wausau v. The Duplan Corp.*, 1999 U.S. Dist. LEXIS 15368, *38 (S.D.N.Y. 1999) (event that merely redistributes existing pollution does not satisfy exception to the "pollution exclusion"). Accordingly, there is no legal basis for Emhart to contend that pouring water on soil that was already contaminated with dioxin constitutes a "sudden and accidental" discharge.

[10] As discussed in Section III, below, the testimony of Defendants' experts is relevant to the issue of whether the property damage was "expected or intended" under either an "objective" or "subjective" standard.

Emhart's position ignores the factual record in this case and the intimate connection between Metro Atlantic and NECC. Witnesses have testified that from its formation until approximately 1967, NECC was a corporate affiliate of Metro Atlantic. [V. Buonanno Dep., 3/25/03 at 12-14, 36-38 (Ex. 3)]. NECC's financial records were kept in Metro Atlantic's offices. [G. Sarracino Dep., 2/27/03 at 59 (Ex. 4)]. Bernard Buonanno was a 50% stockholder of NECC and also served as the President of NECC and as a Supervisor and General Manager at Metro Atlantic. [V. Buonanno Dep., 3/25/03 at 10, 14, 31 (Ex. 3); J. Cifelli Dep., 2/13/03 at 58 (Ex. 5)]. Although he was the President of NECC, Bernard Buonanno's office was located at the Metro Atlantic facility. [V. Buonanno Dep., 3/25/03 at 31 (Ex. 3)]. Emhart's corporate designee admitted that Metro Atlantic and NECC were both under the operation of the same people. [Biagioni Dep., 3/10/03 at 95 (Ex. 6)].

Indeed, as Vincent Buonanno testified, NECC was actually formed to support the operations of Metro Atlantic:

> So there came a time when it seemed logical for Metro Atlantic to have some sort of a recycling operation, where containers were received in empty of raw materials could be cleaned up and put back in service to be shipped back out again. So the genesis of New England Container was kind of a captive operation where they could take containers which they were emptying everyday, have them cleaned, and break down the-- at the end of the property in a barn and then to return them to be filled again for their own products going out.

[V. Buonanno Dep., 3/25/03 at 15-16 (Ex. 3)]. With respect to its drums, except in special circumstances, Metro-Atlantic only did business with NECC. [J. Buonanno Dep., 1/17/03 at 20-21 (Ex. 7)]. Further, a number of employees worked at both Metro Atlantic and NECC, including John Turcone, Joseph Nadeau, Walter Murphy, Buster Murphy and John Priest. Certain of these employees have testified that barrels containing a black sludge were sent from

Metro Atlantic to NECC, where the sludge was dumped directly onto the ground. [*See e.g.*, Woodard Report at 11].

Given the intimate connection between the operations of Metro Atlantic and NECC demonstrated by the available record, it was entirely appropriate for Defendants' experts to take these facts into account in forming their opinions. It is certainly logical for the Defendants' experts to infer from the testimony that Metro Atlantic was well aware of the nature of the operations at NECC, including the routine dumping of chemicals onto the ground and the mass burnings that occurred in connection with the reconditioning operations. NECC was not an entirely separate company with no connection to Metro Atlantic. [*See* Woodard Report at 13-16]. The direct connection between the two companies supports an inference that Metro Atlantic was well aware of NECC's practices and could be found to have "expected" any property damage that resulted from those operations.

Moreover, this information is independently relevant to the applicability of the "pollution exclusion" contained in the North River policy. Under New York law, whether the contamination resulted from the operations of Metro Atlantic or the operations of NECC does not matter. The policyholder does not have to be the "actual polluter" in order for the pollution exclusion to bar the claim for indemnity. *Powers Chemco, Inc. v. Federal Ins. Co.*, 74 N.Y.2d 910, 911, 548 N.E.2d 1301 (1989). Emhart's suggestion that the operations at NECC are somehow divorced from the conduct of Metro Atlantic is disingenuous, at best.

## III. THE EXPERTS' TESTIMONY IS RELEVANT TO THE ISSUE OF "EXPECTED OR INTENDED" DAMAGE

### A. An "Objective" Standard Should be Applied

Emhart's Motions proceed from the erroneous assumption that only a "subjective" test can be applied to the question of whether Emhart's predecessors "expected or intended" property

damage at the Site. Emhart compounds its error by contending that a "subjective" test somehow requires proof of specific intent to cause particular property damage, rather than simply that the policyholder had "actual" knowledge from which it can be inferred that the damage caused by its intentional acts was expected. Emhart even goes so far as to suggest that unless there is proof that employees specifically intended to cause dioxin contamination, the Court or a jury could not find that the damage was "expected or intended." There is no reason for the Court to accept Emhart's contentions or to rule that its view of the law requires the exclusion of the testimony to be offered by Defendants' experts.

As noted above, the parties have agreed that the issue of what legal standard applies to the question of whether the property damage was "neither expected nor intended" is a matter for further briefing and decision by the Court following the June 8, 2006 status conference. [Joint Statement at 5-6]. However, even the briefest of overviews of cases from other jurisdictions demonstrates that the standard which Emhart seeks to have the Court adopt here is far from universally accepted.

While Emhart cites cases from Washington, Kentucky and elsewhere, Emhart's Motions totally ignore the law of New York, which the Court has already ruled applies to the coverage issues under the North River policy. Under New York law, Emhart bears the burden of proving that there was an "occurrence" at the Site, including that the property damage for which it seeks coverage under the North River policy was "neither expected nor intended." *Consolidated Edison Co. of New York v. Allstate Ins. Co.*, 98 N.Y. 2d 208, 218, 774 N.E.2d 687, 691 (2002). As the Court of Appeals noted, placing the burden of proof on the policyholder is simply consistent with the basic requirement of the policy that there be proof of an "accident" or a "fortuitous" event in order for the coverage to potentially apply. 98 N.Y. 2d at 220, 774 N.E.2d

at 692. In the context of claims for environmental coverage, New York courts have applied an "objective" standard to the question of whether the insured expected the property damage. *County of Broome v. Aetna Cas. & Sur. Co.*, 540 N.Y.S.2d 620, 622 (3d Dept. 1989)("personal injuries or property damage are expected if the actor knew or should have known there was a substantial probability that a certain result would take place"; no "occurrence" as a matter of law based upon routine dumping of hazardous wastes); *Borg-Warner Corp. v. Insurance Co. of North America*, 577 N.Y.S.2d 953, 959 (3d Dept. 1992)(court applies an objective standard to the definition of "occurrence"; damages are "expected if the insured knew or should have known that they were substantially probable" to occur).

Similarly, the courts of New Hampshire have held that an "objective" standard applies, with the relevant inquiry being whether the conduct at issue was "inherently injurious." For example, in *New Hampshire Ball Bearings v. Aetna Cas. & Sur. Co.*, 43 F.3d 749 (1st Cir. 1995), the First Circuit Court of Appeals reversed the District Court's ruling that there was an "occurrence" arising from the policyholder's routine discharge of hazardous wastes. The District Court had based its ruling upon the conclusion that the policyholder did not understand the effect that its discharges of solvents would have on the groundwater at the time the discharges took place. In reversing this decision, the First Circuit summarized the "objective" test (based upon the concept of "inherently injurious" conduct) that applies to the issue of whether the property damage was expected or intended:

> The test of "inherently injurious" conduct . . .is that "an insured's intentional act cannot be an 'accident' when it is so inherently injurious that 'it is certain to result in some injury, although not necessarily the particular injury alleged. In determining whether an insured's actions were certain to result in some injury, New Hampshire law instructs that the reviewing court look at "the character of the act viewed, with reference to the insured, as a cause of injury. This has been interpreted as an objective standard.



1006057v1

> The Court does not look to the actor's subjective intent that the result in question occur, but rather, the Court may infer that the actor's state of mind was the same as a reasonable person's state of mind would have been.. . As we interpret it, the test that emerges from *Vermont Mutual* and its progeny is the following: would a reasonable company in NHBB's position know that its intentional dumping and contamination of the soil and wetlands with hazardous waste was certain to result in some injury to property, although not necessarily the particular injury to the groundwater.

43 F.3d at 753-54 (internal citations omitted). *Accord Mottolo v. Fireman's Fund Ins. Co.*, 43 F.3d 723, 727 (1st Cir. 1995) (No genuine issue of fact and insurer entitled to judgment as a matter of law on the "occurrence" issue; routine dumping of waste was "inherently injurious" notwithstanding insured's affidavit that he did not intend to cause the injury); *Energy North Natural Gas, Inc. v. Continental Ins. Co.*, 146 N.H. 156, 162, 781 A. 2d 969, 974 (2001) (trial court did not err in applying the test of "[w]ould a reasonable company in ENGI's position know that its intentional dumping of tar and other byproducts contained in its waste stream was certain to result in some injury to property, although not necessarily the particular injury to the groundwater, surface water or sediment").

These cases and others demonstrate that there are competing views among the courts as to what standard applies to the issue of whether property damage was "neither expected nor intended." The opinions of Defendants' expert witnesses are directly relevant to illuminating the point that a "reasonable" operator at the Site would have expected its routine dumping onto land, discharges into waterways, mass burials and open burning of toxic chemicals to have caused property damage, even if the operator did not expect the precise property damage that is present at the Site today.

**B. Circumstantial Evidence of Intent or Expectation is Relevant Even If a "Subjective" Standard Applies**

Even if the Court was to conclude that a "subjective" standard should be applied to the issue of whether property damage was "expected or intended," such a ruling does not require a finding that the testimony of Defendants' experts is irrelevant. Emhart's Motions proceed from the erroneous premise that in the absence of a "confession" from a former employee that he specifically intended to cause dioxin contamination at the Site, there can be no finding that coverage is barred because property damage was "expected or intended." In cases such as this one involving intentional conduct that occurred decades ago, where business records apparently were not preserved, and where many of the witnesses with the most direct knowledge of the issues are dead, Emhart's position amounts to a contention that it could never be found to have expected or intended property damage based upon the conduct of its predecessors, including the routine dumping, burning and other intentional activities that are the alleged source of the contamination at the Site.

In circumstances where there is an issue of a party's "intent," courts routinely rely upon circumstantial evidence to establish the requisite "intent" since direct proof may rarely be available. *See Boston Mutual Life Ins. Co. v. Fireman's Fund Ins. Co.*, 613 F.Supp. 1090, 1099 (D. Mass. 1985) ("A state of mind, like any other fact, may be proved by circumstantial evidence. Indeed, in litigated cases direct evidence of a disputed state of mind is seldom available"). Moreover, Emhart's analysis is fundamentally flawed to the extent that it equates "subjective" intent or expectation with "specific" intent or expectation. Instead, the focus is simply upon what "actual" knowledge the policyholder had, rather than what an objectively "reasonable" policyholder knew or should have known. *See Utica Mutual Ins. Co. v. Printed Circuit Design, Inc.*, 1997 Mass. Super. LEXIS 588 (Mass. Super.), *aff'd*, 708 N.E.2d 145 (Mass.

App. 1999). The cases do not require that the policyholder have intended the specific harm (*e.g.*, dioxin contamination) that ultimately resulted from its intentional acts.

For example, in *Printed Circuit Design*, the court granted the insurer's motion for summary judgment, holding as a matter of law that the policyholder "expected or intended" the resulting damage from its routine chemical operations:

> Given the continuous and extensive nature of the spills and leaks, the inevitability of harm, at least to some degree of harm was plain. . .Moreover, although [the insured] may not have been able to gauge the precise extent of the damage, it is substantially certain, as a matter of law, that some harm would occur. As such, the damage to [the] building falls outside of the meaning of an "occurrence" and is therefore excluded from coverage.

1997 Mass. Super. LEXIS 588, *5 [Ex. 8]. The Appeals Court affirmed, noting that coverage was unavailable where the insured knew "to a substantial certainty" that its conduct would cause "some damage"; the insured need not have known the precise harm or degree of harm that would result. 708 N.E.2d at 625.

Here, the testimony to be offered by Defendants' experts is clearly relevant to the issue of what "actual knowledge" Emhart's predecessors had that their conduct would cause at least "some damage" at the Site. The testimony compiles and illustrates the circumstantial evidence that:

- Metro Atlantic engaged in the routine dumping and discharge of wastes at the Site, including onto the ground and into the adjacent river
- The effects of the dumping and discharges were immediate and obvious
- Metro Atlantic's operations were closely tied to those of NECC and Metro Atlantic was well aware of the routine burning and burial of wastes by NECC at the Site
- Metro Atlantic was aware of the hazardous nature of the chemicals that were used in its processes

From these and the other specific facts discussed in their reports, the Defendants' experts properly concluded that Emhart's predecessors "expected" that their conduct would cause property damage at the Site. The opinions will be helpful in assisting the trier of fact and are therefore admissible under the *Daubert* standard.

### C. Information Concerning Industry Knowledge and Standards is Relevant

An essential component of the opinions to be offered by Defendants' experts is their testimony that the waste handling and management practices at Metro Atlantic and NECC did not comply with industry standards and practices, including technologies that were available at the time of the operations. The reports reflect that Defendants' experts conducted extensive research into these issues to determine such matters as (1) industry knowledge of the hazards associated with the chemicals that were used at the Site, including TCP; (2) awareness of pollution and environmental issues prior to the time that the operations at the Site ended; and (3) available technologies for handling and disposing of the waste streams generated by the manufacturing and drum reconditioning operations other than the indiscriminate dumping, discharges to waterways, mass burials and open burning that occurred at the Site. [*See* Woodard Report at 2-26; Cheremisinoff Report at 27-49]. Defendants' experts then used this information to develop and support their opinions on whether the conduct of Emhart's predecessors met the relevant industry standards. [Id.].

There is no valid basis for Emhart to challenge the admissibility of these opinions. Courts have routinely considered evidence regarding the state of knowledge within a particular industry at the relevant time as bearing on the issue of whether the policyholder "expected or intended" the property damage at a site. This is particularly so in a case such as this one where the operations ceased decades before the coverage issues arose. *See e.g., CPC International, Inc.*

*v. Northbrook Excess and Surplus Ins. Co.*, 144 F.3d 35, 43-45 (1st Cir. 1998)(citing numerous decisions acknowledging the relevance of information concerning industry knowledge); *Energy North Natural Gas, Inc. v. The Continental Ins. Co.*, 146 N.H. 156, 162-165, 781 A.2d 969, 974-76 (2001)(citing gas industry literature in support of conclusion that policyholder expected or intended damage at manufactured gas plant site); *PSI Energy, Inc. v. The Home Ins. Co.*, 801 N.E. 2d 705, 730 (Ind. App. 2004) ("we acknowledge that it will be difficult to establish PSI's subjective intent because PSI has not operated the MGP's for over sixty years; however, evidence of industry standards and testimony from former employees, where available, will be useful in resolving this issue"), *appeal after remand*, No. 32A01-0503-CV-130 (Ind. App. April 28, 2006) (no abuse of discretion in admitting various gas industry publications as evidence of industry's knowledge of problems associated with gas plants) [Ex. 9].

Emhart challenges Dr. Cheremisinoff's opinions on industry standards by contending that he used an unduly rigorous test of whether "best practices" were employed at the facility. A fair reading of Dr. Cheremisinoff's report and related deposition testimony [*See* Cheremisinoff Dep., 10/23/03, 246-256, 288-304, 356-364, 408-422 (Ex. 10)] reveals that no improper test was employed. Dr. Cheremisinoff is not offering a "personal" opinion. Instead, Dr. Cheremisinoff carefully collected and analyzed the standards and technologies for waste handling and disposal that were available at the time of Metro Atlantic's operations and then compared that information to the actual practices at the Site. [Id.]. Dr. Cheremisinoff used the applicable industry standards as a "benchmark":

> The benchmark I chose were the recommended practices, best available practices of the day. That's what I mean by a standard of due care, where were they acting, was this facility acting in a responsible manner with best technologies, the best recommended procedures for waste management or management of their industrial wastes.



1006057v1

[Id. at 422]. The analysis demonstrated that Metro Atlantic failed to act responsibly and in accordance with standards of care that were known within industry at the time. This was an entirely appropriate standard to employ.[11]

Emhart further claims that unless the Defendants' experts can establish that Emhart's' predecessors actually received the industry literature and were specifically aware of the industry standards and technologies cited by the experts, the opinions should not be admitted. [*See* Cheremisinoff Mem. at 2, 11-13]. Emhart's only support for this position is a lone decision from Michigan which held that industry knowledge can constitute evidence of subjective intent provided that there is a showing that the insured actually received and understood the information. *Aetna Casualty and Surety Co. v. Dow Chemical Co.,* 28 F.Supp.2d 421, 433 (E.D. Mich. 1998), *later decision*, 44 F.Supp.2d 865 (E.D. Mich. 1999).

The Court should not follow the reasoning of *Dow Chemical* here. There is no question that Metro Atlantic was a very sophisticated operation employing knowledgeable chemists and managers who built the business into a major operation. [*See* Woodard Report at 25; Cheremisinoff Report at 8-9; Ex. D to Woodard Motion]. However, it appears that the business records that would establish the extent to which Metro Atlantic actually received particular publications or participated in industry organizations no longer exist. The management of Metro Atlantic who could have been expected to participate in industry associations and be aware of the standards identified by Defendants' experts are long since dead. Emhart should not be able to

[11] Emhart's position with respect to Defendants' experts is particularly difficult to square with its contention that the jury should be permitted to hear the opinions of its own expert, Bonchonsky, who seeks to offer the mirror image of the Defendants' position as to the state of industry knowledge. Further, any challenge to the qualifications of Defendants' experts on the grounds that they were not working in the relevant industry during the 1960's simply ignores the fact that, given the time that has elapsed since the operations occurred, the historical method employed by Defendants' experts is the only one that is capable of recreating what was known at the time.

benefit from this absence of direct proof of its knowledge of industry standards simply because the insurance claim comes so long after the operations at the Site ceased.

Moreover, Emhart's position really amounts to a contention that a policyholder operating a facility that regularly uses and discharges large quantities of toxic chemicals should be permitted to bury its head in the sand about the state of industry knowledge and then use its alleged lack of knowledge to create coverage for claims arising from its deliberate disregard of the environmental consequences of its practices. Under Emhart's skewed rationale, a company such as Metro Atlantic could completely ignore the available information and then contend that it should not be held to applicable industry standards. The extensive information and literature identified and relied upon by Defendants' experts provides substantial evidence that Emhart's predecessors likely were aware that their practices would cause property damage at the Site and that there were available methods to avoid or minimize that harm. The jury should be allowed to hear this evidence and draw its own conclusions as to whether Emhart's "ostrich"-like position should be accepted.

### D. Emhart's Disagreement with the Opinions is Not a Basis for Exclusion

Although this Court clearly has the power to exclude testimony by an expert in appropriate circumstances, this is not such a case. *Ford v. Nationwide Mutl. Fire Ins. Co.*, 2003 U.S. App. LEXIS 6837, *9 (1st Cir. April 8, 2003)(weight of expert testimony to be decided by jury); *Blake v. Pellegrino*, 329 F.3d 43, 47-48 (1st Cir. 2003) (district court reversed for excluding relevant evidence on grounds it was not persuasive; weight of evidence is jury's province). The fact that Emhart (and Emhart's experts) disagree with the opinions is certainly not a basis at this stage of the case to exclude the testimony in its entirety.

Most of the "complaints" that Emhart levels at the Defendants' experts relate to specific documents and testimony that were considered by the experts and Emhart's view of how those documents or testimony should be interpreted. For example, Emhart suggests that Dr. Woodard's opinions should be excluded because he relied on testimony from Mr. Nadeau which Emhart considers to be "suspect." [Woodard Mem. at 17-18]. However, whether Dr. Woodard placed some form of "undue" reliance upon the testimony of a particular witness (whom the jury will have a chance to hear in person at trial before Dr. Woodard testifies), is an issue that Emhart's counsel should explore on cross-examination. Wholesale exclusion of the testimony is improper. *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling, Inc.*, 161 F.3d 77, 85 (1st Cir. 1998)("As long as an expert's scientific testimony rests upon good grounds based on what is known. . .it should be tested by the adversary process of competing expert testimony and active cross-examination, rather than excluded from jurors' scrutiny"). In arguing for the exclusion of the testimony, Emhart ignores the admonition of *Daubert* that "the focus, of course, must be solely on principles and methodology, not on the conclusions they generate." 509 U.S. at 595.

**CONCLUSION**

For the reasons stated, the Court should deny Emhart's Motions or defer further consideration of the issues raised by Emhart's Motions until the time of trial.

Respectfully submitted,

**THE NORTH RIVER INSURANCE COMPANY,**
By its attorneys,

[signature]

Mark T. Nugent, RI Bar# 2637
**MORRISON MAHONEY LLP**
121 South Main Street, Suite 600
Providence, RI 02903-7141
(401) 331-1660

John T. Harding, Mass. BBO#221270, *pro hac vice*
**MORRISON MAHONEY LLP**
250 Summer Street
Boston, MA 02210-1181
(617) 439-7500

**AND ON BEHALF OF DEFENDANTS CENTURY INDEMNITY COMPANY AND ONEBEACON AMERICA INSURANCE COMPANY**

Dated: June 2, 2006

I hereby certify that a true copy of the above document was served upon (each party appearing pro se and) the attorney of record for each (other) party by mail (by hand) on 6/2/06.



1006057v1