UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| EMHART INDUSTRIES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>HOME INSURANCE COMPANY,<br>INSURANCE COMPANY OF NORTH AMERICA,<br>LIBERTY MUTUAL INSURANCE COMPANY,<br>NORTH RIVER INSURANCE COMPANY,<br>ONEBEACON AMERICA INSURANCE COMPANY<br>and UNITED STATES FIRE INSURANCE COMPANY,<br><br>Defendants. | Civil Action No. 02-053 S |

OPPOSITION OF EMHART INDUSTRIES, INC. TO
MOTION IN LIMINE OF THE NORTH RIVER INSURANCE COMPANY
TO EXCLUDE EXPERT TESTIMONY OF MICHAEL P. BONCHONSKY

Defendant The North River Insurance Company ("North River") has moved to preclude Emhart from offering at trial the expert testimony of Michael Bonchonsky, a former EPA regulator who has consulted to industry regarding environmental issues. Mr. Bonchonsky has provided expert opinions regarding the state of knowledge in the 1960s concerning environmental risks associated with waste handling practices at Metro-Atlantic, Inc. ("Metro-Atlantic"), the predecessor to the insured, and whether Metro-Atlantic employees would have "expected or intended" damage to the environment due to these practices. None of North River's arguments provide a sufficient basis for the exclusion of Mr. Bonchonsky's testimony, and the motion should be denied.

While North River asserts that Mr. Bonchonsky's opinions ignore the available evidence regarding the Site, the report written by Mr. Bonchonsky and his deposition testimony

show that he has considered all of the available evidence in forming his opinions. In any event, an objection that an expert failed to consider certain evidence is a matter for cross-examination and not a basis for exclusion of his testimony. McMillan v. Massachusetts Society for the Prevention of Cruelty to Animals, 140 F.3d 288, 303 (1st Cir. 1998).

North River also contends that Mr. Bonchonsky's opinions will not assist the trier of fact because his testimony regarding historic waste disposal practices and the limited historical awareness of environmental issues is too "generic" to be of use. However, "such evidence may generally be helpful to the jury in determining what a party should have known at some time in the past" and has been accepted as evidence relevant to the issue of whether damage was "expected or intended" by the insured. CPC International, Inc. v. Northbrook Excess & Surplus Ins. Co., 144 F.3d 35, 43 (1st Cir. 1998). Mr. Bonchonsky's testimony will provide circumstantial evidence of the expectation and intent of the Metro-Atlantic personnel during the relevant time period and therefore is admissible. Finally, North River provides no basis for excluding Mr. Bonchonsky's opinion regarding potential sources for contamination other than the Metro-Atlantic operations. Those opinions are based on the knowledge and experience with dioxin Mr. Bonchonsky obtained through his work at the EPA.

In its motion, North River has only established that it disagrees with Mr. Bonchonsky's opinions, not that those opinions are unreliable or unsupported. The opinions rest "upon 'good grounds, based on what is known'" and therefore should be admitted and "tested by the adversary process … rather than excluded from jurors' scrutiny…." Ruiz-Troche v. Pepsi Cola of Puerto Rico, Inc., 161 F.3d 77, 85 (1st Cir. 1998) (citing Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 590 (1993)). North River's motion should therefore be denied.

In support of its opposition, Emhart relies upon the Memorandum of Law and Appendix of Exhibits filed herewith.

Respectfully submitted,

Gerald J. Petros (#2931)
Hinckley, Allen & Snyder LLP
1500 Fleet Center
Providence, Rhode Island 02903
(401) 274-2000

Jack R. Pirozzolo
Richard L. Binder
Willcox, Pirozzolo & McCarthy
50 Federal Street
Boston, Massachusetts 02110
(617) 482-5470

Dated: June 2, 2006

Counsel for Emhart Industries, Inc.

**CERTIFICATION**

To:

James T. Murphy, Esq.
Kelly N. Michels, Esq.
Hanson Curran LLP
146 Westminster Street
Providence, RI 02903

Kevin J. O'Connor, Esq.
Hermes, Netburn, O'Connor & Spearing, P.C.
265 Franklin Street, 7th Floor
Boston, MA 02110

Mark T. Nugent, Esq.
Michael Marcello, Esq.
Michael T. Farley, Esq.
Morrison Mahoney LLP
121 South Main Street, Suite 600
Providence, RI 02903-7141

John T. Harding, Esq.
Morrison Mahoney LLP
250 Summer Street
Boston, MA 02210

James T. McCormick, Esq.
McKenna & McCormick
128 Dorrance Street, Suite 330
Providence, RI 02903

Lawrence A. Nathanson, Esq.
Siegal, Napierkowski & Park
533 Fellowship Road, Suite 120
Mt. Laurel, NJ 08054

I hereby certify that on the 2nd day of June, 2006, a copy of the within document was served by first class mail, postage prepaid, upon the counsel of record listed above.

Cynthia Lomas

718763v1 (55451/115705)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| EMHART INDUSTRIES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, LIBERTY MUTUAL INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICA INSURANCE COMPANY and UNITED STATES FIRE INSURANCE COMPANY,<br><br>Defendants. | Civil Action No. 02-053 S |

MEMORANDUM OF LAW OF EMHART INDUSTRIES, INC. IN OPPOSITION TO MOTION IN LIMINE OF THE NORTH RIVER INSURANCE COMPANY TO EXCLUDE EXPERT TESTIMONY OF MICHAEL P. BONCHONSKY

## INTRODUCTION

Michael Bonchonsky is a former EPA regulator who has consulted to industry regarding environmental issues. In this action, he has provided expert opinions regarding the state of knowledge in the 1960s concerning environmental risks associated with waste handling practices at Metro-Atlantic, Inc. ("Metro-Atlantic"), the predecessor to the insured, and whether Metro-Atlantic employees would have "expected or intended" damage to the environment due to these practices. One of the defendants, The North River Insurance Company ("North River"),[1] has moved to exclude Mr. Bonchonsky's opinions at trial. North River asserts that Mr. Bonchonsky's opinions ignore the available evidence regarding the Site. In fact, Mr.

---

1 The other remaining defendants, Century Indemnity Company ("Century") and OneBeacon America Insurance Company ("OneBeacon"), have not joined in this motion.

Bonchonsky has considered all of the available evidence in forming his opinions, as is shown by his report and deposition testimony. In any event, this assertion, even if true, would not suffice to exclude Mr. Bonchonsky's testimony, as a complaint that an expert failed to consider certain evidence is a matter for cross-examination. McMillan v. Massachusetts Society for the Prevention of Cruelty to Animals, 140 F.3d 288, 303 (1st Cir. 1998).

North River also contends that Mr. Bonchonsky's opinions will not assist the trier of fact because his testimony regarding historic waste disposal practices and the limited historical awareness of environmental issues is too "generic" to be of use. To the contrary, as the First Circuit has noted, "state-of-the-art and state-of-knowledge evidence is used by both sides in many contexts in civil and criminal environmental and toxic tort litigation," and specifically has been "used by insurers and insureds in insurance coverage cases" because "such evidence may generally be helpful to the jury" in determining whether damage was "expected or intended" by the insured. CPC International, Inc. v. Northbrook Excess & Surplus Ins. Co., 144 F.3d 35, 43 (1st Cir. 1998). Mr. Bonchonsky's testimony will provide circumstantial evidence of the expectation and intent of the Metro-Atlantic personnel during the relevant time period and therefore is admissible.[2]

Despite its objections, North River has only established that it disagrees with Mr. Bonchonsky's opinions, not that those opinions are unreliable. The opinions rest "upon 'good

---

[2] North River also contends, in a footnote, that Mr. Bonchonsky's "opinion that there were routine leaks and spills at the Site simply shows why Emhart's claim is barred by the pollution exclusion contained in the North River policy." North River Memorandum ("NR Mem.") at 3 n.1. Mr. Bonchonsky's opinion was limited to whether manufacturing and waste handling operations at Metro-Atlantic would have been expected or intended to cause damage to the environment, not whether non-routine events such as explosions and fires led to contamination. Mr. Bonchonsky's opinions have no bearing on the applicability of the pollution exclusion, and Emhart has provided evidence that events other than leaks and spills caused environmental contamination at the Site.

grounds, based on what is known'" and therefore should be admitted and "tested by the adversary process ... rather than excluded from jurors' scrutiny...." Ruiz-Troche v. Pepsi Cola of Puerto Rico, Inc., 161 F.3d 77, 85 (1st Cir. 1998) (citing Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 590 (1993)). North River's motion should therefore be denied.

MR. BONCHONSKY'S EXPERT OPINIONS

Michael Bonchonsky's credentials and experience are set forth in the curriculum vitae attached to his expert report (Bonchonsky Report (Ex. A), c.v.).[3] He worked at the United States Environmental Protection Agency ("EPA") for a decade, beginning in 1971 (Ex. A, c.v.; Bonchonsky Deposition (Ex. B) at 27-45).[4] For part of that time, he served as deputy director and as acting director of the EPA enforcement division with responsibility for enforcing all federal environmental statutes, including air, water and hazardous waste control programs. (Ex. A, c.v.; Ex. B at 24-25). After leaving the EPA, Mr. Bonchonsky has consulted with business and industry regarding environmental issues (Ex. A, c.v.; Ex. B at 45-46, 56-58). Mr. Bonchonsky has been an adjunct professor in environmental health sciences and regulation at New Jersey Institute of Technology and City University of New York, Hunter College (Ex. A, c.v.; Ex. B at 59-60). Mr. Bonchonsky has taught courses which include instruction concerning historic waste disposal practices (Ex. B at 61-62).

---

3 A copy of Mr. Bonchonsky's report dated June 30, 2003 is Exhibit A to the Appendix to this memorandum. Documents in the Appendix will be cited by exhibit number and page number. Mr. Bonchonsky's curriculum vitae ("c.v.") is included in the expert report after the numbered pages.

4 Cited pages from the deposition of Mr. Bonchonsky are Exhibit B to the Appendix to this memorandum.

During the 1960s, Mr. Bonchonsky worked in industrial facilities, including the Eastern Airlines maintenance department at LaGuardia Airport, an incinerator in Northport, Long Island, and an automotive assembly plant in Long Island (Ex. B at 88). He was aware of the waste disposal practices at those operations (Ex. B at 89-91). Mr. Bonchonsky earned a bachelor's degree in biology in 1970, a master's degree in environmental health sciences in 1971 and a law degree in 1977 (Ex. A, c.v.; Ex. B at 25-26). The environmental sanitary engineering courses Mr. Bonchonsky took in 1970 included reviews of historic waste disposal practices (Ex. B at 93).

In preparing his report, Mr. Bonchonsky reviewed the available evidence, including documents, deposition transcripts and other material relating to the Metro-Atlantic manufacturing operations, and literature and references relating to historic waste disposal practices (Ex. A at 3; id., References and Site Specific References). Based on these materials and his professional experience as an environmental consultant, academic and EPA administrator, he provided opinions regarding the operations of Metro-Atlantic in the 1960s and the state of knowledge regarding environmental hazards at that time. First, Mr. Bonchonsky explained that there was significantly less knowledge and understanding of environmental issues during the period of Metro-Atlantic's operations than is the case today (Ex. A at 7-11). He similarly explained that accidental releases of raw materials were common and ordinary at industrial facilities at the time and were not generally thought to be a cause for concern unless the releases impacted a well or water supply (id. at 11-13). Mr. Bonchonsky next provided his opinion that if wastes from the Metro-Atlantic operations were disposed of on the land, either in a landfill or in a surface impoundment, those practices were common and acceptable (and even recommended) at the time and did not show an expectation that harm would result (id. at 13-18).

Mr. Bonchonsky likewise explained that discharging waste water into the neighboring river was a common and acceptable practice at the time and not expected to lead to damage to the environment (id. at 18-20). Finally, Mr. Bonchonsky concluded that knowledge of dioxin and PCBs was very limited at the time of Metro-Atlantic's operations and that those substances were not known to cause damage to the environment at the time (id. at 20-27).

## ARGUMENT

### A. Mr. Bonchonsky's Opinion Is Based On The Available Information And His Own Experience And Expertise

North River's first attack on Mr. Bonchonsky's testimony is that his opinions are not based on sufficient facts or data. To the contrary, Mr. Bonchonsky reviewed all of the available documentary and testimonial evidence in the record and relied upon that information in forming his opinions. However, unlike the defendants' proposed expert, Dr. Franklin Woodard,[5] Mr. Bonchonsky recognized that the evidence was often contradictory and sometimes incomplete. Mr. Bonchonsky's opinions are based on an adequate foundation and are admissible.

North River complains that Mr. Bonchonsky has provided "virtually no information or analysis of what actually transpired at the plant" while it was operating and "ignores specific testimony" and documentation about waste handling practices. See North River Memorandum ("NR Mem.") at 6-7. In fact, as Mr. Bonchonsky stated in his report and deposition, he took all of the relevant evidence into consideration. He reviewed the available documents and testimony in preparing his report (Ex. A at 3; id., References and Site Specific References) and noted in his report testimony upon which he relied (e.g., Ex. A at 13 (noting that the testimony of the witnesses "does not indicate extraordinary or unusual waste or raw material

[5] Emhart has moved to exclude the testimony of Dr. Woodard.

handling measures" and that the "activities at the plant were reasonable as described in the testimony and waste handling was consistent with the practices of the time"); id. at 14 (describing testimony that wastes were trucked off-site); id. at 19 (describing testimony concerning washwaters and other waste)). However, in preparing the report, he acknowledged that the testimony was not detailed and was contradictory at times. With respect to wastes specifically from the hexachlorophene manufacturing process, Mr. Bonchonsky noted that various witnesses had testified about waste removal practices at Metro-Atlantic, but none had specified what happened to the hexachlorophene production wastes:

> [T]here are very few deponents that speak knowledgeably of much of the waste products. I do recall this one fellow who spoke of it going into barrels and going off site. There's another fellow that spoke of it as going into a waste container of some sort. There's another one that speaks of a truck going down with trash in it. I don't know of anyone that speaks specifically of wastes from the hexachlorophene. There are others that refer to wash waters from cleaning out some of the vats. I can't recall anyone that speaks specifically of the waste products from the hexachlorophene.

(Ex. B at 135). With respect to the actual nature of the wastes generated by the Metro-Atlantic operations, Mr. Bonchonsky again noted that while there was some testimony about wastes being disposed of, the actual content of the wastes was not clear:

> We don't know that much about the nature of the waste materials generated at this facility, the information seems to be rather sketchy amongst the various deponents. There are some indications that wash waters, for example, are created from the facility. We don't know exactly what facts, what operations, or what stages of these processes created these wash waters. We don't know the concentrations. We're not sure of the constituents."

(Ex. B at 76-77, emphasis added).

Similarly, with respect to wash waters used to clean out vats in which the Metro-Atlantic products were created, Mr. Bonchonsky noted that while waste water was generated,

witnesses had failed to specify what was originally in the vats and were divided as to where the waste water went:

> [T]here is no permit information, there are no deponents that describe quantities, flows and constituents of the waste waters. There are these references to washed down waters. There is some confusion as to whether or not the lines carrying waste waters go to the Town municipal system, which one or two people describe, with some uncertainty, I might add, go to the municipal system, others say some of the waters go to the river. There are some observations of waters that come through a pipe that go into the rivers, but there is no description of the nature of those waters and what processes specifically they come from.

(Ex. B at 140). Mr. Bonchonsky did not ignore the testimony of these witnesses; instead, he acknowledged that it was at times contradictory and lacking in specific information showing that these wastes even contained substances which would cause damage to the environment, let alone that the Metro-Atlantic employees expected or intended damage to result.

North River specifically objects to Mr. Bonchonsky's purported failure to consider an analysis of aerial photographs prepared by the EPA in 2000. See NR Mem. at 7. In fact, Mr. Bonchonsky did review aerial photographs of the site (Ex. B at 185). North River then quotes an EPA contractor's interpretation of these photographs as evidence which Mr. Bonchonsky "ignored." However, an analysis by an EPA contractor of historic photographs is not evidence that Metro-Atlantic employees expected or intended to cause damage to the environment. According to the author of this analysis, the photographs show "evidence of waste disposal activities," such as the presence of drums, stained soils, and evidence of liquid and solid waste materials. The photographs do not show, however, what was contained in those drums, what the cause of the stained soils was, or the components of the wastes. Moreover, the author of this analysis does not assert that this "evidence of waste disposal activities" was due to Metro-Atlantic's operations; instead, he or she merely states that those features were present, leaving

open the possibility that it was New England Container Company ("NECC"), a barrel reclamation facility also located on the Site, and not Metro-Atlantic, who was responsible for the waste disposal. The aerial photographs do not change the fact that specific information is lacking about who disposed of wastes at the site, what was contained in those wastes, and most importantly, the knowledge or intent of those responsible for disposing of the wastes.

North River also asserts that Mr. Bonchonsky has ignored the testimony "summarized in detail" by Dr. Woodard. See NR Mem. at 7-8. In fact, Mr. Bonchonsky was aware of and considered all of this testimony. However, rather than cherry-picking the evidence, as Dr. Woodard has done, he acknowledged that the testimony was sometimes contradictory. For example, while Dr. Woodard claims the evidence shows that "[w]aste waters, sludges and other substances were discharged to floor drains and into the tailrace" (which was located next to the NECC operations), Mr. Bonchonsky noted that the testimony differed as to whether waste waters were put into the sewer system or into the river (Ex. B at 140). As to another of the examples listed by Dr. Woodard, Mr. Bonchonsky was aware of one witness's testimony regarding "acid wastes" being discharged into the river through a pipe (id. at 112-14). However, Mr. Bonchonsky disagreed with Dr. Woodard's unwarranted conclusion that such actions must have been done with an expectation or intent to cause damage. As Mr. Bonchonsky explained, these actions would not necessarily damage the water quality of the river "[d]epending on the concentration, depending on the flow, depending on the flow of the river at the times, depending on whether the testimony accurately represents what was causing" the pipe in question to erode (id. at 114-15). Significantly, none of the testimony "summarized in detail" by Dr. Woodard gives any indication that those engaged in waste disposal believed that they were causing any damage to the environment through their actions.

In any event, whatever complaints North River has regarding the foundation of Mr. Bonchonsky's opinions go at best to the weight his testimony should be accorded, not the admissibility of the testimony pursuant to Daubert. Daubert expressly recognized that cross-examination, not exclusion, is the method for resolving disputes about the persuasiveness of expert opinion, noting that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means" for challenging testimony of this nature. 509 U.S. at 596. See also Seahorse Marine Supplies, Inc. v. Puerto Rico Sun Oil Co., 295 F.3d 68, 81 (1st Cir. 2002) (quoting the above statement in Daubert and noting that the "proper course of action [was] rebutting that testimony with its own expert"); Cummings v. Standard Register Co., 265 F.3d 56, 65 (1st Cir. 2001) ("whatever shortcomings [defendant asserts] existed in [the expert's opinion] went to the weight, not the admissibility"); McMillan, 140 F.3d at 303 (1st Cir. 1998) ("if [the expert's] analysis omitted what defendants argue are important variables, or was deficient in other respects, …it was up to defendants to exploit and discredit the analysis during cross examination").

B. Mr. Bonchonsky's Testimony Is Relevant To The "Expected Or Intended" Issue And Would Tend To Assist The Jury

1. A Subjective, Not Objective, Standard Applies In Determining Whether Damage Was Expected Or Intended

North River asserts that the question is whether Metro-Atlantic employees "should have reasonably known that harm would result" from the alleged waste disposal practices which North River asserts took place at Metro-Atlantic. See NR Mem. at 9. North River likewise asserts, incorrectly, that expectation or intent is to be decided on an "objective" basis under New York law. See id. at 9-10. Emhart believes that under New York law, expectation or intent is properly determined on a subjective basis, and that the exclusionary language will apply only when the insured subjectively intended the resulting damage. See Olin

Corp. v. Ins. Co. of North America, 221 F.3d 307, 317 (2d Cir. 2000) ("regardless of the initial intent or lack thereof as it relates to causation, or the period of time involved, if the resulting damage could be viewed as unintended by the fact finder the total situation could be found to constitute an accident") (quoting McGroarty v. Great American Ins. Co., 36 N.Y.2d 358, 364-65).

In addition, New York law is not the only relevant consideration here. The Court has previously concluded that Rhode Island law applies to the policies issued by Century and OneBeacon. Rhode Island applies a subjective standard for determining whether damage was expected or intended. Grenga v. National Surety Co., 317 A.2d 433, 436 (R.I. 1974). Other courts overwhelmingly recognize that "the 'expected or intended' exception is inapplicable unless the insured specifically and subjectively intends the injury giving rise to the claim." James Graham Brown Foundation, Inc. v. St. Paul Fire & Marine Ins. Co., 814 S.W.2d 273, 278 (Ky. 1991). See also Village of Morrisville Water & Light Dept. v. U.S. Fid. & Guar., 775 F. Supp. 718, 729-730 (D. Vt. 1991); St. Paul Fire & Marine Ins. v. McCormick & Baxter Creosoting Co., 923 P.2d 1200, 1218 (Or. 1996); Shell Oil Co. v. Winterthur Swiss Ins. Co., 12 Cal. App. 4th 715, 747-48 (1993); Queen City Farms, Inc. v. Central Nat'l Ins. Co. of Omaha, 882 P.2d 703, 714 (Wash. 1994) (determining that the relevant inquiry is "whether an insured subjectively expected or intended the damage" resulting from the occurrence), modified, 891 P.2d 718 (Wash. 1994); Liberty Mut. Ins. Co. v. Black & Decker Corp., C.A. No. 96-10804-DPW, slip op. at 47-48 (D. Mass. Dec. 5, 2003)[6] (objective test is the "minority view among states"). Accord State ex rel. Davidson v. Hoke, 532 S.E.2d 50, 57 & n.2 (W. Va. 2000)

---

6 A copy of this opinion was previously filed in connection with the motions filed by Emhart concerning the exclusion of the testimony of defendants' experts.

(concurring opinion) (collecting cases and noting that "[i]t appears that a majority of jurisdictions have adopted the subjective approach to the 'expected/intended' exclusion").

2. Under Either A Subjective Standard Or An Objective Standard, Mr. Bonchonsky's Testimony Is Relevant And Will Assist The Jury In Determining Whether Damage Was Expected Or Intended

North River asserts that Mr. Bonchonsky's opinions do not resolve the question of whether Metro-Atlantic employees "should have reasonably known that harm would result" from the waste handling practices which took place. North River also faults Mr. Bonchonsky for stating that it was "unlikely" that Metro-Atlantic employees expected or intended damage to the environment. See NR Mem. at 9-10. Mr. Bonchonsky has provided opinions regarding the state of knowledge of environmental issues relating to waste handling and waste disposal practices prior to 1970. This state of awareness is evidenced by the regulatory framework imposed by the government and the common practices of industry at the time, and even Dr. Woodard stated that he "can't think of any reference before 1970 that says anything would cause environmental harm."[7] In the absence of any direct evidence that the employees of Metro-Atlantic knew that operations of the Metro-Atlantic facility were causing harm to the environment, this state-of-knowledge evidence provides circumstantial evidence of the lack of expectation or intent to cause damage to the environment.

Mr. Bonchonsky has provided opinions regarding the general state of environmental awareness in the 1950s and 1960s, the time frame in which Metro-Atlantic was operating, and the awareness of the impact that certain types of waste disposal practices had on the environment. He states that "[h]istorically pollution was an interference with a use; if you were putting [substances] into a water body and thereby interfering with the use of that

7 Deposition of Franklin Woodard at 122. The cited page is in Exhibit B to the Appendix to Emhart's motion in limine to exclude the testimony of Dr. Woodard.

waterway, it was regarded as pollution.... In fact, streams were classified by their uses." (Ex. B at 93). He also notes that the character of the area around the Metro-Atlantic facility was industrial (Ex. A at 19) and that waterways were often used to dilute wastewaters and attenuate any harmful effects (id. at 12). Mr. Bonchonsky describes the regulatory concerns that emerged in the 1970s and 1980s which led to a greater awareness of environmental harm resulting from industrial operations (id. at 8-11). Mr. Bonchonsky describes the use of landfills and surface impoundments during this time period, practices which are no longer considered to be acceptable (id. at 13-18). He also notes that "[t]here are no indications that the staff at [the Metro-Atlantic] facility had knowledge of environmental issues that was beyond what was commonly understood at the time..." (id. at 13) and gives his opinion as to the probable lack of knowledge and/or intent of the Metro-Atlantic employees:

> I can't with 100 percent certainty get into the minds of the people that are involved in the Metro[-]Atlantic plant. I can never say with certainty that they 100 percent knew, understood, I can only say it was probable, it was likely, what I believe was likely to have happened consistent with the backdrop of understanding of that day; that's why I phrased it that way.

(Ex. B at 127). From this circumstantial evidence, and based on his own experience as a regulator, Mr. Bonchonsky concluded that it was "highly improbable" that Metro-Atlantic personnel would have understood that harm would result from the contaminants produced from the Metro-Atlantic operations (Ex. B at 123).

The state-of-knowledge evidence provided by Mr. Bonchonsky is admissible circumstantial evidence of the expectation and intent of the Metro-Atlantic employees. The First Circuit has repeatedly held that, in discerning a state of mind, a jury may rely upon circumstantial evidence and draw inferences based on such evidence. Zimmerman v. Direct Federal Credit Union, 262 F.3d 70, 77-78 (1st Cir. 2001) (jury properly relied on inferences to

find actual malice); Acevedo-Diaz v. Aponte, 1 F.3d 62, 69, 72 (1st Cir. 1993) (jury properly relied on circumstantial evidence to infer motivation). See also United States v. Hernandez, 218 F.3d 58, 64-66 (1st Cir. 2000) (in criminal case, jury properly relied on inferences from evidence, including circumstantial evidence, to prove intent), cert. denied, 531 U.S. 1103 (2001); Katz v. City Metal Co., 87 F.3d 26, 33 (1st Cir. 1996) (reversing grant of JMOL as "timing of Katz's firing, one month after his heart attack, was circumstantial evidence from which the jury could find that Katz's disability triggered, in whole or in part, his firing by City Metal"). "[N]o premium is placed upon direct as opposed to circumstantial evidence," and "[i]ntent can be proven 'wholly on the basis of circumstantial evidence.'" Hernandez, 218 F.3d at 64, 66.

Courts in other jurisdictions recognize that circumstantial evidence is available and that inferences may be drawn by a jury in determining whether damage from releases of substances was expected or intended to cause environmental damage. Washington's highest court has noted that, "in deciding whether an insured subjectively expected or intended the damage, circumstantial evidence is, of course, admissible." Queen City Farms, Inc. v. Central National Ins. Co. of Omaha, 882 P.2d 703, 714 (Wash. 1994) (en banc). It went on to quote a commentator, who pointed out that, "[s]ince proof of state of mind normally is indirect or circumstantial, even a subjective test must rely on facts from which an inference about the insured's state of mind must be drawn ..." Id. See also PSI Energy, Inc. v. Home Insurance Co., 801 N.E.2d 705, 730 (Ind. Ct. App. 2004) ("We acknowledge that it will be difficult to establish [the insured's] subjective intent because [the insured] has not operated the [manufactured gas plants] for over sixty years; however, evidence of industry standards and testimony from former employees, where available, will be useful in resolving this issue").

In Smith v. Hughes Aircraft Co., 22 F.3d 1432, 1440 (9th Cir. 1994), where the "expected or intended" issue was to be determined using "a subjective standard," the trial court's grant of summary judgment to the insurer was reversed on appeal, based solely on historical, expert evidence that, during the relevant period, trichloroethylene ("TCE") was not considered harmful. Similarly, in Universal-Rundle Corp. v. Commercial Union Ins. Co., 725 A.2d 76, 80-81, 83 (N.J. Super. Ct. App. Div. 1999), certification denied, 735 A.2d 574 (table), where the insured's "subjective knowledge of the pollutant qualities of its waste material" was considered, the court, as fact-finder, relied upon expert testimony regarding "the standard of practice" and declined to equate awareness of occupational dangers with awareness of environmental harm. Courts have likewise recognized that the absence of regulatory concern is probative that damage was not expected or intended. See Hatco Corp. v. W.R. Grace & Co., 801 F. Supp. 1334, 1376 (D.N.J. 1992) (evidence that policyholder was not in violation of law or regulation and evidence of lack of knowledge of subsurface groundwater contamination relevant to expected or intended issue); New Castle County v. Continental Cas. Co., 725 F. Supp. 800, 804-05, 814 (D. Del. 1989) (lack of regulations and standards regarding environmental consequences of disposal of industrial wastes indicated that disposal practices were not expected or intended to cause environmental harm), aff'd in part, rev'd in part on other grounds, 933 F.2d 1162 (3d Cir. 1991).

Mr. Bonchonsky's opinions are of the same type considered in environmental insurance coverage cases on the issue of whether damage was expected or intended. These opinions will assist the jury in determining whether Metro-Atlantic employees expected or intended harm to the environment. North River's motion to exclude this testimony should therefore be denied.

C. North River Has Not Articulated A Basis For Excluding Mr. Bonchonsky's Testimony Regarding Possible Dioxin Sources

Finally, North River seeks to exclude Mr. Bonchonsky's opinions regarding fires or burning of barrels at the Site as a possible source of dioxin contamination. See NR Mem. at 11-12. While North River complains that this testimony is "purely speculative," Mr. Bonchonsky is generally familiar with dioxin and its characteristics through his experience at the EPA (Ex. A at 18-25; Ex. B at 159-161, 167). Mr. Bonchonsky noted that "[d]ioxin is ... known to be formed through the burning of precursor materials" (Ex. A at 24). His statement that "[t]he various fires identified at the Centredale site, the burning of barrels in the reconditioning process [at NECC] or even in the final plant fire provided conditions that would have allowed for the formation of dioxin" (id. at 24-25) is simply based on that experience. North River provides no real basis for excluding this testimony, and its request to exclude these statements should be denied.

## CONCLUSION

For the foregoing reasons, the Court should deny the motion in limine to exclude the opinion evidence of Michael Bonchonsky.

Respectfully submitted,

Gerald J. Petros (#2931)
Hinckley, Allen & Snyder LLP
1500 Fleet Center
Providence, Rhode Island 02903
(401) 274-2000

Jack R. Pirozzolo
Richard L. Binder
Willcox, Pirozzolo & McCarthy
50 Federal Street
Boston, Massachusetts 02110
(617) 482-5470

Dated: June 2, 2006

Counsel for Emhart Industries, Inc.

## CERTIFICATION

To:

James T. Murphy, Esq.
Kelly N. Michels, Esq.
Hanson Curran LLP
146 Westminster Street
Providence, RI 02903

Kevin J. O'Connor, Esq.
Hermes, Netburn, O'Connor & Spearing, P.C.
265 Franklin Street, 7th Floor
Boston, MA 02110

Mark T. Nugent, Esq.
Michael Marcello, Esq.
Michael T. Farley, Esq.
Morrison Mahoney LLP
121 South Main Street, Suite 600
Providence, RI 02903-7141

John T. Harding, Esq.
Morrison Mahoney LLP
250 Summer Street
Boston, MA 02210

James T. McCormick, Esq.
McKenna & McCormick
128 Dorrance Street, Suite 330
Providence, RI 02903

Lawrence A. Nathanson, Esq.
Siegal, Napierkowski & Park
533 Fellowship Road, Suite 120
Mt. Laurel, NJ 08054

I hereby certify that on the 1 day of June, 2006, a copy of the within document was served by first class mail, postage prepaid, upon the counsel of record listed above.

Cynthia Gomes

718764v1 (55451/115705)