UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| EMHART INDUSTRIES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>HOME INSURANCE COMPANY,<br>INSURANCE COMPANY OF NORTH AMERICA,<br>LIBERTY MUTUAL INSURANCE COMPANY,<br>NORTH RIVER INSURANCE COMPANY,<br>ONEBEACON AMERICA INSURANCE COMPANY<br>and UNITED STATES FIRE INSURANCE COMPANY,<br><br>Defendants. | Civil Action No. 02-053 S |

REPLY MEMORANDUM OF EMHART INDUSTRIES, INC.
IN SUPPORT OF ITS MOTIONS TO PRECLUDE EXPERT OPINIONS OF
NICHOLAS CHEREMISINOFF, FRANKLIN WOODARD AND EDWARD CALABRESE

## INTRODUCTION

Emhart has shown that the Cheremisinoff, Woodard and Calabrese opinions do not meet the Daubert requirement that expert testimony "fit" the issues and be based on a factual predicate that is supported by admissible evidence. The memorandum of the insurers in opposition to the Emhart motions ("Ins. Mem.") does not address the flaws in the opinions of their experts. Instead, the insurers address collateral matter. Even if those collateral matters were resolved in favor of the insurers, admission of the challenged testimony still would not be warranted. The cases cited by the insurers do not support their arguments.

- Opinions that are based on a "due care" or "best practices" standard and opinions that purport to address "sloppiness" or the failure to undertake "heroic measures" are not relevant to whether damage was "expected or intended," regardless of

whether the "expected or intended" issue is decided using an objective or a subjective standard.

- Documents that do not concern dioxin are not a permissible basis for an opinion concerning whether the insured "expected or intended" property damage from dioxin.

- Documents that are not connected to the insured are not a permissible basis for an opinion that the insured "expected or intended" property damage.

- A corporation's expectation or intent is not determined by the conduct of a different corporation.

- The challenged opinions are not relevant to issues other than the "expected or intended" issue.

- Alternatively, exclusion pursuant to Fed. R. Evid. 403 is warranted since any probative value of the opinions is outweighed by the risk of confusion or prejudice as the opinions have no factual basis and are predicated on personal conspiratorial views that government and industry chose "jobs over fishes."

## ARGUMENT

### A. The Opinions Are Inadmissible Under Either An Objective Or A Subjective Standard

#### 1. Negligence Does Not Equate To Intent

The principal argument of the insurers is that an objective standard is appropriate for determining whether the property damage at issue was "expected or intended from the standpoint of the insured." Proceeding from that premise, the insurers suggest that this Court either deny the Emhart motions or defer ruling on those motions until it determines whether an objective or a subjective standard is appropriate. This argument misses the mark. The challenged opinions would not be admissible even if an objective standard were applicable.

Emhart has shown that Dr. Cheremisinoff admittedly reached his opinions by comparing the alleged conduct of Metro-Atlantic to "due care" and "best practices" and that the

methodology used by Dr. Cheremisinoff in evaluating the alleged conduct of Metro-Atlantic places a heavier burden on an insured than the pertinent policy language, which only precludes coverage for damage "expected or intended from the standpoint of the insured."[1] The insurers ignore this issue. They cite no authority for the proposition that a failure to exercise "due care" or to follow "best practices" is evidence of an expectation or intent to cause damage. They are unable to make such a showing when the policy language is considered in the context of the fundamental difference between negligence and conduct intended to cause injury. The basic purpose of the liability insurance policies at issue is to provide coverage for acts of negligence. E.g., Couch on Insurance § 103:19 (3d ed. 1995) ("As policies of liability insurance are designed to cover an insured's tort liability, it follows that acts of negligence on the part of the insured are covered events.") The Cheremisinoff approach would deny insurance coverage for the very negligent acts for which insurance policies were intended to provide coverage.

The minority[2] objective test for the expected or intended issue, advocated by the insurers, does not equate negligence with an expectation or intent to cause damage. Under an objective standard, the inquiry is not merely whether injury was intended, but whether a reasonable insured knew or should have known that injury was "substantially probable" or

---

1 See Emhart memorandum in support of its motion to exclude the Cheremisinoff opinions ("Cheremisinoff Mem.") at 14-15. The memoranda Emhart filed in support of its motions in limine are cited herein by the name of the expert, followed by "Memorandum" or "Mem."

2 The cases cited in the Cheremisinoff Memorandum at 9-10 demonstrate that the subjective standard is both the majority rule and the better rule. Those cases are also cited in the Woodard Memorandum at 10-11 and the Calabrese Memorandum at 9-10.

"certain" to result. See Ins. Mem. at 21-22.[3] Failure to exercise due care or to follow best practices is not evidence that an insured knew to a substantial probability or certainty that injury would result from its conduct. The opinions of Dr. Cheremisinoff should be excluded whether the "expected or intended" issue is analyzed under an objective or a subjective standard.

For the same reasons, the Woodard opinions, based on assertions that Metro-Atlantic engaged in "sloppy practices" and failed to take "heroic measures,"[4] are irrelevant to whether Metro-Atlantic knew or should have known there was a "certainty" or "substantial probability" that its alleged conduct would cause the environmental damage at issue. Those opinions also address due care, rather than whether damage was "expected or intended." For the same reasons as stated above concerning the similar opinions of Dr. Cheremisinoff, these opinions of Dr. Woodard should be excluded.[5]

---

3 The language is from portions of the cases quoted by the insurers at pages 21-22 of their memorandum. "Substantially probable" (or "substantial probability") was used in the cases applying New York law (County of Broome v. Aetna Cas. & Sur. Co., 540 N.Y.S.2d 620, 622 (3d Dept. 1989); Borg-Warner Corp. v. Ins. Co. of N. Am., 577 N.Y.S.2d 953, 959 (3d Dept. 1992)), and "certain" was used in the cases applying New Hampshire law (New Hampshire Ball Bearings v. Aetna Cas. & Sur. Co., 43 F.3d 749, 753-54 (1st Cir. 1995); EnergyNorth Natural Gas, Inc. v. Continental Ins. Co., 781 A.2d 969, 974 (N.H. 2001)).

4 See Woodard Mem. at 5-6, 15-16.

5 In their memorandum, the insurers do not specifically discuss Emhart's motion to exclude the testimony of Dr. Calabrese, except to restate his opinions. Emhart's motion with respect to Dr. Calabrese should therefore be granted for the reasons set forth in the Calabrese Memorandum.

### 2. The Opinions Are Impermissibly Based On Matter Not Connected To The Contamination At Issue

Admissions by the insurers' experts establish that the challenged opinions of those experts are based on documents unrelated to the contaminant at issue, dioxin.[6] The insurers do not dispute this fact.

In its initial memoranda, Emhart cited cases holding that only information concerning the contaminant that caused the property damage is relevant to whether that property damage was "expected or intended" from the standpoint of the insured.[7] See Upjohn Co. v. Aetna Casualty & Surety Co., 1994 WL 1029337, at *28 (W.D. Mich. July 22, 1994) ("even if the Court were to apply the test advocated by Aetna, and question whether Upjohn 'should have known' about the potential for contamination ...," proffered evidence would be insufficient as the "method of disposal employed at the landfills differed entirely from the practices on Upjohn's own property which resulted in pollution of a pond").

In contrast, the insurers cite no authority supporting the proposition that documents unrelated to dioxin contamination are evidence that a reasonable insured knew or should have known to a "certainty" or a "substantial probability" that dioxin contamination would result from its activities (Ins. Mem. at 24). In the cases they cite, the intent of the insured was proved by evidence that environmental damage was caused by particular operations and contaminants, not by generic statements that contamination could be caused by waste or

---

6 See Cheremisinoff Mem. at 13; Woodard Mem. at 14-15.

7 See Cheremisinoff Mem. at 13; Woodard Mem. at 14-15 (citing case holding that documents regarding contamination from chromium are not relevant to whether contamination from a chlorinated solvent was expected or intended).

chemicals. In EnergyNorth and PSI,[8] contamination was caused by tar and other waste from gas manufacturing plants. The evidence at issue in those cases described environmental contamination caused by disposal of tar and related waste from gas manufacturing plants.

In New Hampshire Ball Bearings, the fact finder determined that the insured, in discharging solvents, intentionally contaminated soil and wetlands. See 43 F.3d at 752. The only issue was whether, under New Hampshire law, that intention sufficed to establish that the same solvent releases also were "expected or intended" to contaminate groundwater. Id. Similarly, CPC Int'l, Inc. v. Northbrook Excess & Surplus Ins. Co., 144 F.3d 35, 44-45 (1st Cir. 1998), cited by the insurers, supports the proposition that the evidence must be related to the contaminant at issue. The CPC court held that the trial court permissibly excluded evidence regarding contaminants other than those at issue, noting that evidence of contamination associated with dissimilar "chemicals and methods of transport" was of questionable relevance, and, even if the evidence were "somewhat relevant," it properly was excluded under Fed. R. Evid. 403.[9]

The insurers err in their assertion that the trial court decision affirmed on appeal in Utica Mut. Ins. Co. v. Hamel, 708 N.E.2d 145, 147 (Mass. App. Ct. 1999),[10] supports the proposition that the "expected or intended" issue is considered without regard to the contaminant at issue (Ins. Mem. at 23-24). Utica involved flood-related damage caused by repeated

---

8 PSI Energy, Inc. v. Home Ins. Co., No. 32A01-0503-CV-130, slip op. (Ind. Ct. App. April 28, 2006) (a copy of this unpublished opinion is included as Exhibit 9 to the appendix to the insurers' opposition memorandum.)

9 The Rule 403 considerations in CPC included that the proffered testimony was in the form of judicial findings.

10 The lower court decision in that case is Exhibit 8 to the appendix to the insurers' memorandum.

overflowing of a waste water system, not contamination caused by a particular chemical. The evidence was that the insured knew, for more than a year, that the overflowing of tanks used in its manufacturing operations caused flood damage, including that "[t]wo to three inches of water constantly pooled on the floors below the fifth floor." 708 N.E.2d at 146. The insured had even disregarded orders of state and municipal authorities to correct the conditions that caused flood damage. Id. at 147. The damage was caused by water; the knowledge at issue concerned that very water. Nothing in Utica supports the proposition that the insured's expectation or intent is determined based on matter unrelated to the chemical that caused the damage.

While New Hampshire Ball Bearings indicates that it was not necessary to know the precise environmental media (e.g., soil, surface water or groundwater) that would be contaminated, it does not obviate the requirement that the insured's expectation or intent must be proved with regard to the contaminant at issue. Here, the proffered opinions do not have the requisite nexus to dioxin. Those opinions should be excluded.

3. The Opinions Are Impermissibly Based On Matter Not Connected To Metro-Atlantic

The insurers have not rebutted the showing that their experts have failed to prove any nexus between Metro-Atlantic and the documents upon which the opinions of their experts are based.[11] The insurers' experts are able to establish no more than that documents exist. The mere existence of a document, without establishing that a party knew of and understood that document, is not relevant to determining whether an insured expected or intended injury under either an objective or a subjective standard. As Emhart has shown, evidence of so-called industry standards is not evidence of subjective intent, absent "a showing that the insured

---

[11] See Cheremisinoff Mem. at 12-13; Woodard Mem. at 13-14; Calabrese Mem. at 11-12.

actually received and understood the information." Aetna Cas. & Sur. Co. v. Dow Chem. Co., 28 F. Supp. 2d 421, 433 (E.D. Mich. 1998) ("Aetna/Dow"). The existence of a reference without evidence tying it to the insured is also insufficient under an objective standard. The mere existence of a document does not demonstrate the insured knew or should have known to a "certainty" or to a "substantial probability" information contained in the reference. The insurers cite no case to the contrary.

The insurers' argument that circumstantial evidence may be used to establish the insured's knowledge is of no avail to them. Their experts have not offered any circumstantial evidence that even attempts to link those documents to Metro-Atlantic. The failure to link the documents to Metro-Atlantic is highlighted by comparing the cases upon which the insurers rely to the circumstances of the instant case. For example, in the unpublished appellate decision in PSI, cited by the insurers, the holding is not accurately characterized as "no abuse of discretion in admitting various gas industry publications as evidence of the industry's knowledge of problems associated with gas plants" (Ins. Mem. at 26). Rather, the court held that the evidence was admissible where both parties' "testimony establishe[d] that PSI and its predecessors likely had copies of the publications at issue and/or were aware of the information contained in those publications." PSI, slip op. at 10. The evidence in PSI included a contemporaneous letter sent to the insured referencing one of the publications and evidence that employees of the insured were members of the associations issuing the publications in question. Id. at 9-10. Similarly, in Utica, the circumstantial evidence of intent was that the insured violated regulations and had

disregarded orders to correct the water damage caused by its activities. 708 N.E.2d at 147. Here, there is no direct or circumstantial evidence favoring the insurers.[12]

There is no merit to the assertion by the insurers that the law should be changed because it is too difficult to prove that the insured knew of material that the insurers believe shows expectation or intent (Ins. Mem. at 27-28). There always is circumstantial evidence that could exist, such as the presence or absence of environmental regulations. See Hatco Corp. v. W.R. Grace & Co., 801 F. Supp. 1334, 1376 (D.N.J. 1992); New Castle County v. Continental Cas. Co., 725 F. Supp. 800, 804-05, 814 (D. Del. 1989), aff'd in part, rev'd in part on other grounds, 933 F.2d 1162 (3d Cir. 1991).[13] The existence of regulations is circumstantial evidence as citizens "are chargeable with the knowledge of rules and regulations duly adopted pursuant to and under the authority of law." Didden v. Village of Port Chester, 322 F. Supp. 2d 385, 390 (S.D.N.Y. 2004). Here, the limited period in which hexachlorophene was manufactured took place in the mid 1960s, when concern regarding what now are regarded as environmental issues was limited to "sewage, oxygen demanding materials, solids, odors and other nuisances."[14] After the formation of the EPA and the enactment of statutes and regulations in the 1970s,

---

12 The nexus to the insured is not established by a newspaper article, a decade before Metro-Atlantic began manufacturing hexachlorophene, stating that the insured had skilled employees. See Woodard Mem. at 6, 17. That newspaper article is hardly a basis for the insurers' attempt to distinguish Aetna/Dow, 28 F. Supp. 2d at 433, on the ground that Metro-Atlantic, a small chemical manufacturing company, is "sophisticated" and apparently more so than Dow Chemical Company. See Ins. Mem. at 27.

13 These cases are discussed at page 14 of Emhart's memorandum in opposition to the North River motion to exclude the expert opinions of Michael Bonchonsky.

14 See page 8 of the expert report of Michael Bonchonsky (included as Exhibit A to the appendix to Emhart's opposition to the North River motion in limine to exclude the opinions of Mr. Bonchonsky) and the testimony of Dr. Woodard that during that time period there were no environmental concerns (Woodard Mem. at 2, 14).

environmental concerns about the type of contamination at issue began. The report of Emhart expert witness Michael Bonchonsky addresses this issue.[15] Mr. Bonchonsky's analysis is also supported by the testimony of witnesses, including individuals not employed by Metro-Atlantic, that the activities at Metro-Atlantic and NECC were consistent with the practices of the time (see Deposition of Joseph Nadeau at 68-69; Deposition of Raymond Nadeau at 43; Deposition of John Turcone at 43-44; Deposition of Kenneth Neri at 59-62).[16] See also Liberty Mut. Ins. Co. v. Black & Decker Corp., C.A. No. 96-10804-DPW, slip op. at 106, 126 (D. Mass. Dec. 5, 2003) (in view of the lack of environmental knowledge prior to 1970, "practices, which sound obviously harmful to the modern ear" or "benighted" may conform to then-current standards and indicate that such practices were not expected or intended to cause environmental harm).[17] The absence of such regulations harms the position of the insurers. It is the insurers, not Emhart, who seek "to bury [their] head[s] in the sand about the state of industry knowledge" (Ins. Mem. at 28).

Here, the insurers are unable to prove what was proven in PSI and Utica. While the insurers assert that requiring a nexus between the documents and the insured allows the

---

15 The insurers have moved to exclude the Bonchonsky opinions, asserting that "generic" material concerning regulatory concern is not relevant. While they assert that Emhart is taking inconsistent positions by offering the Bonchonsky opinions while moving to exclude the opinions of the insurers' experts (Ins. Mem. at 27 n.11), it is the insurers who are taking inconsistent opinions. Emhart asserts in connection with both motions that the presence or absence of regulations or regulatory concern that pertain to the activities of the insured that are at issue is circumstantial evidence of the intent. It is the insurers who are taking the inconsistent position that regulations are not evidence of the insured's intent, but the existence of an obscure reference in a library, without evidence connecting it to the insured, is evidence of the insured's intent.

16 Excerpts from these depositions are collected in Exhibit A to this memorandum.

17 A copy of this opinion was filed with the Court in support of Emhart's motions.

insured to ignore existing relevant knowledge, they are mistaken. As the policy language permits the insurer to deny coverage only if the damage was "expected or intended from the standpoint of the insured," it is necessary to show a nexus between a document located by an expert and the insured. That a document was located in a literature search conducted in litigation forty years after the insured ceased manufacturing its products is not "illuminating" [18] concerning the insured's expectation or intent. The absence of any evidence of a nexus between the documents cited by the insurers' experts and Metro-Atlantic requires precluding the opinions at issue. The insurers are not entitled to call expert witnesses who would opine about the expectation and intent of Metro-Atlantic based on documents that are not linked to Metro-Atlantic. The need to preclude such opinions is particularly acute in view of Drs. Woodard and Cheremisinoff having demonstrated that they will provide opinions based on assumptions with no basis in fact or based upon personal views that government and industry chose "jobs over fishes."[19] See Cheremisinoff Mem. at 15-20; Woodard Mem. at 15-19.

B. The Opinions Based On Activities Of NECC Are Not Connected To The Expectation Or Intent Of Metro-Atlantic

In response to the Emhart showing that activities of New England Container Company ("NECC"), a third party, are not evidence of the intent of Metro-Atlantic,[20] the

---

18 See Ins. Mem. at 22.

19 Dr. Woodard also refers to his belief in the "jobs over fishes" argument at page 2 of the rebuttal report that is Exhibit 1 to the appendix to the insurers' memorandum.

20 See Cheremisinoff Mem. at 10; Woodard Mem. at 11 (citing, inter alia, State Mut. Life Assur. Co. of Am. v. Lumbermens Mut. Cas. Co., 874 F. Supp. 451, 456 (D. Mass. 1995) ("Knowledge of the manufacturer's disposal practices and of the attendant dangers cannot be imputed to the insured simply because executives from the insured took an active interest in the manufacturer's management, and expressed a broad intent to deal with its 'problems'")).

insurers cite testimony that Metro-Atlantic and NECC had some common stockholders and employees and that Metro-Atlantic was one of NECC's numerous customers (Ins. Mem. at 18-19). Such evidence falls short of the quantum of evidence required to pierce the corporate veil. See Doe v. Gelineau, 732 A.2d 43, 48-49 (R.I. 1999) ("when two corporations are connected through common-stock ownership, we will respect the separateness of each entity 'unless the totality of circumstances surrounding their relationship indicates that one of the corporations "is so organized and controlled, and its affairs are so conducted, as to make it merely an instrumentality, agency, conduit, or adjunct [of the other]"'") (citations omitted). NECC was hardly a conduit of Metro-Atlantic. After its incorporation, it conducted its own business operations with numerous customers besides Metro-Atlantic and maintained a separate corporate existence (Deposition of Vincent Buonanno (excerpts attached as Exhibit B) at 16-17, 76-84). As one employee of Metro-Atlantic noted when counsel for one of the insurers attempted to elicit testimony that Metro-Atlantic and NECC were not separate entities, "they were different compan[ies] altogether" (Deposition of Felix Palumbo (excerpts attached as Exhibit C) at 47-48; see also id. at 53-54, 58).

The only case cited by the insurers in connection with this issue, Powers Chemco, Inc. v. Federal Ins. Co., 548 N.E.2d 1301 (N.Y. 1989), is inapposite. The issue in Powers was whether the intentional acts of "plaintiff's predecessor," not those of a third party, were attributable to plaintiff. 548 N.E.2d at 1302. Powers would be potentially applicable only if Emhart were contesting its responsibility for intentional acts of Metro-Atlantic, not its responsibility for the acts of NECC. Further, Powers addresses the pollution exclusion, not the "expected or intended" provision. The attempt to prove Metro-Atlantic's expectation or intent based on the activities of NECC must be rejected.

C. The Inadmissible Opinions May Not Be Salvaged On The Basis Of The North River Pollution Exclusion

While the challenged opinions address the expected or intended issue, the insurers suggest that isolated portions of the opinions may also be relevant to the North River pollution exclusion (Ins. Mem. at 16-17). They assert, without support, that statements that some pollution was caused by "sloppy," "improper" or "routine operations" is relevant to whether the contamination is sudden and accidental within the meaning of the pollution exclusion. Where, as here, the expected or intended provision does not bar coverage, the pollution exclusion as construed under New York law would bar coverage only if the event was not sufficiently "abrupt."[21] Northville Indus. Corp. v. National Union Fire Ins. Co. of Pittsburgh, 679 N.E.2d 1044, 1047-48 (N.Y. 1997). Thus, whether an abrupt event is caused by sloppiness, routine operations or the like is not relevant to the pollution exclusion. Northville does not use those terms. Further, no expertise is required to determine what is "routine" or "sloppy." Opinions on those subjects would be inadmissible as "[w]hen the normal experiences and qualifications of laymen jurors are sufficient for them to draw a proper conclusion from given facts and circumstances, an expert witness is not necessary and is improper." Wilson v. Muckala, 303 F.3d 1207, 1219 (10th Cir. 2002); United States v. Hanna, 293 F.3d 1080, 1086 (9th Cir. 2002) (abuse of discretion in allowing expert testimony concerning an issue within the "common knowledge of the average layperson"). See also 1972 Advisory Committee Notes to Rule 702 of the Federal Rules of Evidence. Further, as the fires, explosions and floods that are asserted to be

---

21 The accidental portion of the pollution exclusion would not bar coverage for events where the damage is not "expected or intended." The "expected or intended" language applies to both "accident-based" and "occurrence-based" policies. See Liberty Mut. Ins. Co. v. Black & Decker Corp., 2004 WL 187387, at *5 (D. Mass. Jan. 27, 2004) ("the [Massachusetts Supreme Judicial Court] and other courts have held that the 'occurrence' definition simply codified how courts had already construed 'accident'".)

outside the scope of the pollution exclusion cannot rationally be viewed as "routine" or "sloppy," opinions applying those labels to other events would not be relevant.

D. The Opinions Should Be Excluded Pursuant To Fed. R. Evid. 403

If it were determined that any portions of the challenged opinions were relevant, the opinions should be excluded pursuant to Fed. R. Evid. 403 as the marginal relevance would be outweighed by the substantial risk of confusion or prejudice. As demonstrated in Emhart's initial memoranda, Drs. Cheremisinoff and Woodard have demonstrated a tendency to make unwarranted accusations about the purported intent of Metro-Atlantic to cause contamination based on assumptions having no evidentiary basis, beliefs in a conspiracy between industry and government to allow pollution in order to save jobs, or "subjective" credibility analysis. See Cheremisinoff Mem. at 15-20; Woodard Mem. at 15-19. As "[c]itizens do not look fondly on industrial polluters," there is a "danger such evidence would lead to a decision based on a desire to punish," thus warranting exclusion under Fed. R. Evid. 403. CPC, 144 F.3d at 145.

## CONCLUSION

For the foregoing reasons and for the reasons set forth in Emhart's initial memoranda, this Court should grant the Emhart motions to exclude the expert testimony of Dr. Nicholas Cheremisinoff, Dr. Franklin Woodard and Dr. Edward Calabrese.

Respectfully submitted,

Gerald Petros /MRE

Gerald J. Petros (#2931)
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza
Suite 1500
Providence, Rhode Island 02903
(401) 274-2000
(401) 277-9600 (fax)

Jack R. Pirozzolo
Richard L. Binder
Willcox, Pirozzolo & McCarthy
50 Federal Street
Boston, Massachusetts 02110
(617) 482-5470

Dated: June 21, 2006

Counsel for Plaintiff, Emhart Industries, Inc.

# CERTIFICATION

To:

James T. Murphy, Esquire
Kelly N. Michels, Esquire
Hanson Curran LLP
146 Westminster Street
Providence, Rhode Island 02903

Kevin J. O'Connor, Esquire
Hermes, Netburn, O'Connor & Spearing, P.C.
265 Franklin Street, 7th Floor
Boston, Massachusetts 02110

Mark T. Nugent, Esquire
Michael Marcello, Esquire
Michael T. Farley, Esquire
Morrison Mahoney LLP
121 South Main Street, Suite 600
Providence, Rhode Island 02903-7141

John T. Harding, Esquire
Morrison Mahoney LLP
250 Summer Street
Boston, Massachusetts 02210

James T. McCormick, Esquire
McKenna & McCormick
128 Dorrance Street, Suite 330
Providence, Rhode Island 02903

Lawrence A. Nathanson, Esquire
Siegal & Napierkowski
533 Fellowship Road
Mount Laurel, New Jersey 08054

I hereby certify that on the 21st day of June, 2006, a copy of the within document was served by first class mail, postage prepaid, upon the counsel of record listed above.

Cynthia Thomas

726877v1 (14349/126611)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * * * * * * *
EMHART INDUSTRIES, INC. *
*
vs. * C.A. No. 02-053S
HOME INSURANCE COMPANY, *
INSURANCE COMPANY OF NORTH *
AMERICA, LIBERTY MUTUAL INSURANCE *
COMPANY, NORTH RIVER INSURANCE *
COMPANY, ONEBEACON AMERICAN *
INSURANCE COMPANY, and UNITED STATES *
FIRE INSURANCE COMPANY *
* * * * * * * * * * * * * * * * * * * * *

DEPOSITION OF JOSEPH NADEAU, a Witness in the above-entitled case, taken on behalf of the Defendant, Liberty Mutual, before Linda L. Guglielmo, RPR-RMR, a Notary Public in and for the State of Rhode Island, at the offices of Holland & Knight, LLP, One Financial Plaza, Providence, Rhode Island on December 17, 2002, at 9:30 A.M.

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
(401) 946-5500

down to us, fresh air from the factory. We also had to go down there to replace the agitator blades every couple of months. Reserve salt would eat that right off.
Q. After -- in addition to chiseling off the material in the tanks, you testified that material in the floor was collected and put into barrels?
A. Yes.
Q. And then into a dumpster?
A. It went to a dumpster, as far as I know, yes.
Q. Were you given instructions about cleaning the floor and collecting everything and putting it into barrels and in the dumpsters?
A. I was the little guy. I was in the tank. I'm just assuming that that was the edict. I know it was going into drums. I was sending it up in a five-gallon bucket, you would hear it clang in the bucket. It was a whole day job. You spent the whole day in the tank. It wasn't a fun day.
Q. How long did that process take place?
A. It was months between times that we ended up doing that. So I probably did it, in that year, three times.
Q. Now, there was a vat in which the reserve salt was



made; is that correct?
A. The reserve salt wasn't always made in the same vat, but it was made in a vat, yes.
Q. Roughly how many total vats were used in the manufacturing of the chemicals?
A. I'm thinking there were three or four in the building that I spent most of my time in. Bill Daley, here's another name for you. Bill Daley up closer to the office part of the building, he made some stuff. He might have been the guy making the soaps that you mentioned. I'm not quite sure what Bill did, but he had smaller tanks, I'm guessing they were less than 1,000 gallon tanks, they were smaller tanks.
Q. Where did you say the operations under Bill's supervision took place?
A. He was further up in the building, I'm not quite sure. I'm guessing right up in here (indicating). He was closer -- he was in the basement level near the shipping dock, you know, left or right of that. There was an office, there was a shipping dock and somewhere in that lower level of the shipping and receiving area is where Bill Daley had his little group, and a guy named



Johnny Joyal worked in that same corner of the world with him.
Q. Okay. Have you marked that location?
A. Marked that as 11, and that's a rough guess.
Q. Now, are there any other areas where Metro-Atlantic made its products?
A. The main building, like I said, where I was, there was like Johnny Joyal and Bill Daley's area. Across the street where the reserve salt was and the building that we lovingly referring to as the Texas Tower where the --.
Q. Where the hexachlorophene was made?
A. Hexachlorophene.
Q. Were you familiar with the way in which the manufacturing areas, other than the building in which you worked, were cleaned?
A. Either they were washed down or steamed down, or if it was powder, you swept it up, you put it in a fiber drum that eventually got tipped into the dumpster and taken away along with any barrels that the raw materials came in, or bags, I'm sorry.
Q. At the time you were working in the area with the manufacturing of the reserve salt and the cleaning of that area, at that point in time did you expect



that there would be any harm caused by the way in which the product was manufactured and cleaned?
MS. MAIN: Objection.
THE WITNESS: Harm to what?
MR. BINDER: Harm to the environment of any kind?
MS. MAIN: Objection.
A. No.
Q. At that time did you expect there would be any injury to the environment that would take place as a result of those activities?
MS. MAIN: Objection.
A. I didn't have any expectations at all, to tell you the truth. We just did what we did. The town and the State didn't come in and say we were doing something wrong.
Q. Were you aware of any laws or regulations that -- require?
A. At 17 years old I never thought about the law, except for speeding tickets.
Q. Did the Town and State officials come by the plant from time to time?
A. Only at election time.
Q. So, once during the time you were employed there?

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * * * * * * 
EMHART INDUSTRIES, INC. *
*
vs. * C.A. No. 02-053S
*
HOME INSURANCE COMPANY, *
INSURANCE COMPANY OF NORTH *
AMERICA, LIBERTY MUTUAL INSURANCE *
COMPANY, NORTH RIVER INSURANCE *
COMPANY, ONEBEACON AMERICAN *
INSURANCE COMPANY, and UNITED STATES *
FIRE INSURANCE COMPANY *
* * * * * * * * * * * * * * * * * * * * 

DEPOSITION OF RAYMOND NADEAU, a Witness in the above-entitled case, taken on behalf of the Defendant, Liberty Mutual, before Linda L. Guglielmo, RPR-RMR, a Notary Public in and for the State of Rhode Island, at the offices of Holland & Knight, LLP, One Financial Plaza, Providence, Rhode Island on December 17, 2002, at 12:00 Noon.

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
(401) 946-5500

Q. Were you also during that time working on the barrel reconditioning by the furnace?
A. Yes. When I wasn't delivering, I was working in the shop.
Q. For the most part was most of your time spent picking up and delivering?
A. Last seven years, yeah.
Q. And before that you were working basically full time at the site with the reconditioning operation?
A. Yeah. First seven years I worked all over the place. I did every job. Like I said, there were only five people working there. You did this job and jumped on this job and back to this job.
MR. AYLWARD Is that 5 or 25?
THE WITNESS: 5.
Q. Now, you mentioned in response to some of Ms. Main's questions that sometimes the contents of the pit below the conveyor belt were taken to a point where the two rivers met. Did you do that yourself?
A. Yeah.
Q. Was that during the first half of your employment at New England Container Company?
A. Yes, I couldn't tell you how many times.
Q. I'm not asking you how many times, I'm trying to get



the time period.
A. It was during the first half of the time.
Q. Say between '56 and '62?
A. Yeah.
MS. MAIN: Objection.
Q. Was it during the first half of your employment there?
A. Yeah.
Q. And at the time you disposed of the contents there, did you think it was going to cause any injury or damage?
A. No. If I did, I wouldn't have done it. If I knew it was going to injure me, I wouldn't have touched the stuff.
MS. MAIN: Objection.
Q. Did you think it was going to cause any injury or damage to the environment?
MS. MAIN: Objection.
MR. NETBURN: Objection.
A. There was no such thing as damage to the environment. It was legal then. I didn't think I was doing nothing wrong.
Q. Now, during the period 1962 to 1969 when you were a driver, did you also during that period take any of



the contents of the pit below the conveyor belt to that area?
A. No.
Q. During that period 1962 to 1969 did you ever go to that location, south of the --
A. No. I had no reason to.
Q. If you were on the -- how far was that location --
THE WITNESS: What location, the dump?
MR. BINDER: We'll call it the dump.
A. That's what I called it, the dump.
Q. How far was the dump from the location where you worked for New England Container?
A. Quite a distance, I couldn't tell you footagewise. It was quite a distance. I couldn't throw a stone. It was far.
Q. When you were working at the company, could you see into the dump?
A. You could see it.
Q. Could you see if any people were in there?
A. Never any people -- the only time people were in there is when they were dumping in there.
Q. Were you able to see if anybody was dumping in there at the time?



A. I seen guys dumping there from Metro.
Q. How far -- would you say it's a length of a football field?
A. I just told you, I don't remember.
Q. I want a rough sense.
A. My honest answer is I don't know. I can't tell you how many feet it was. All I say it was quite a distance away but you could see it. It wasn't that far where you couldn't see it.
Q. Could you recognize the faces of anybody who was dumping anything in there?
A. No. The only reason I knew who it was, it was guys that drove the truck for Metro.
MR. BINDER: Move to strike the last portion of the answer.
Q. But were you able to recognize, from looking into the dump, who, if anybody, dumped anything there during the period 1962 through 1967?
A. I just figured if it had -- it had a Metro truck, I knew it was one of the guys.
Q. You couldn't recognize these people, could you?
MS. MAIN: Asked and answered.
A. You already asked me that.
Q. I just want to be clear. Could you recognize the

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

EMHART INDUSTRIES, INC. :
:
vs. : C.A. No. 02-053-ML
:
HOME INSURANCE COMPANY, et als. :

DEPOSITION OF JOHN TURCONE, a Witness in the above-entitled cause, taken on behalf of the Defendants, before Angela M. Gallogly, RPR, Notary Public in and for the State of Rhode Island, held at the Holiday Inn, 3009 Tower Hill Road, South Kingstown, Rhode Island, on December 16, 2002, at 2:00 P.M.

-APPEARANCES-:

FOR THE PLAINTIFF......WILLCOX, PIROZZOLO & McCARTHY
BY: RICHARD L. BINDER, ESQUIRE
50 FEDERAL STREET
BOSTON, MA 02110

(LIBERTY MUTUAL INSURANCE COMPANY)
FOR THE DEFENDANT......HOLLAND & KNIGHT, LLP
BY: ROBIN L. MAIN, ESQUIRE
ONE FINANCIAL PLAZA, SUITE 1800
PROVIDENCE, RI 02903

(NORTH RIVER INSURANCE COMPANY & ONE BEACON AMERICA)
FOR THE DEFENDANT.....HANSON, CURRAN, LLP
BY: KELLY N. MICHELS, ESQUIRE
146 WESTMINSTER STREET
PROVIDENCE, RI 02903

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
(401) 946-5500

Page 42

Q. And did you discuss the claim with anybody other than Larry Bello?
A. Well, in actuality, I think I just went into the office, and they did the paperwork, and that's all I remember of it.
Q. When you say they did the paperwork, do you remember --
A. The office, whatever people were in the office.
Q. Do you remember any of the names?
A. No.
Q. And do you remember the -- did they tell you the name of the insurance company?
A. No, because I just assume it came through the State.
Q. And did you receive some kind of payment as a result of your workers' comp. claim?
A. I would say so, but I can't swear by it.
Q. Did you see anybody come by at any time and inspect the premises?
A. Not that I'm aware of.
Q. When you were at Metro-Atlantic, how many employees did it have?
A. I have really no idea other than guessing.
Q. All right, if you could make a reasonable

Page 43

approximation, do so; we don't want you to guess, though.
A. No, I couldn't do that.
Q. Now, other than Kenney and Mr. Bello, was there anybody else who had any supervisory role with respect to you, your activities?
A. No, I would say that was about it, basically, that was it.
Q. Now, in response to Ms. Main's questions, you described some different processes by which there was disposal of waste at Metro-Atlantic?
A. Yes.
Q. Did anybody instruct you about how to carry out these processes, what to do?
THE WITNESS: Other than putting the barrel and throwing it in in the Dumpster?
MR. BINDER: Yes.
A. That was about it.
Q. Now, at the time you took those steps, did you think you were doing anything that was going to cause any harm or damage?
MS. MAIN: Objection.
A. No.
Q. At the time you took those steps, were you aware of

Page 44

any law or regulation that prohibited taking those steps?
MS. MAIN: Objection.
MR. FARLEY: Objection.
A. No.
Q. Now, the scenario that you mentioned to Ms. Main was that there was a period of time initially in which waste went through a drain, then there was a period of time when the waste was put into a Dumpster; is that correct?
A. Yes.
Q. Okay, now, during the period when you were working at Metro-Atlantic, can you tell us roughly how long -- how much time they used the disposal through the drain rather than a Dumpster; half the time, a third, or some reasonable approximation?
MR. FARLEY: Objection.
MS. MAIN: Objection.
A. I'm going to say it was a short period of time, because -- and I'm going to stay it was a matter of months, because it was very abrupt, you were doing it this way today and doing it the exact opposite the other day.
Q. When you say -- just for clarification -- you say

Page 45

it's a matter of months, about how many months?
A. Three or four.
Q. Did somebody tell you about the change in the procedure?
A. Yes.
Q. And who was that?
A. I don't recall.
Q. Did whoever it was tell you why?
A. No.
Q. Could you turn to Exhibit 3, please. Forgive me if I look over your shoulder a bit to see some numbers. And this building that was marked as Number 4, was that building in use throughout the period of time when you were employed at Metro-Atlantic?
A. It was built when I started there, so it wasn't there when I first got there, it was a new building.
Q. Was the building built at some point after you went to Metro-Atlantic?
A. Started, yes.
Q. And do you recall about how long after you got there that the building was put up?
A. I don't know, six months, hard to say.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

EMHART INDUSTRIES, INC. :
:
vs. : C.A. No. 02-053-ML
:
HOME INSURANCE COMPANY, et als. :

DEPOSITION OF KENNETH NERI, a Witness in the above-entitled cause, taken on behalf of the Defendants, before Angela M. Gallogly, RPR, Notary Public in and for the State of Rhode Island, held at the offices of Holland & Knight, LLP, One Financial Plaza, Suite 1800, Providence, Rhode Island, on December 18, 2002, at 2:00 P.M.

-APPEARANCES-:

FOR THE PLAINTIFF......WILLCOX, PIROZZOLO & McCARTHY
BY: RICHARD L. BINDER, ESQUIRE
50 FEDERAL STREET
BOSTON, MA 02110

(LIBERTY MUTUAL INSURANCE COMPANY)
FOR THE DEFENDANT......HOLLAND & KNIGHT, LLP
BY: ROBIN L. MAIN, ESQUIRE
ONE FINANCIAL PLAZA, SUITE 1800
PROVIDENCE, RI 02903

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
(401) 946-5500

Q. You also mentioned another building you may have been referring to, would you mark that with 104.
MR. FARLEY: Objection.
MS. MAIN: Objection.
A. You are putting buildings in something that I don't know. In other words, I don't know if this was a building or this thing was a building when she asked me the question. She might have pointed to this particular rectangle or this particular rectangle, I don't know.
Q. One of those rectangles that you might have been pointing to is 103?
A. Yes.
Q. Now, you have referred to another one. Could you mark that as 104?
A. I don't know if there was another one.
Q. You said "this building" a moment ago, you were pointing to.
A. Correct.
MR. FARLEY: Objection.
MS. MAIN: Objection.
Q. When you said "this building" in answer to my prior question, what was the number of the building on that map?



A. This block -- she said it was a building, and she pointed to this building. I don't remember which block it was.
Q. When you were pointing to this block, you were pointing to 103?
A. Yes, she said it was a building there, I don't remember a building there.
Q. Did you ever work at a company called D & S Screw Company?
A. Yes, I did.
Q. And is the location of D & S Screw Company shown on Exhibit 2B?
THE WITNESS: This is 2B?
MR. BINDER: Yes, it is.
A. Again, I have to look at it. I would say from this particular one, there's two areas marked 9 and 8, but this 9 looks like a building, so I would say that would be it. On this, if you want, I can show you better on this map.
Q. Why don't we take just a second, and if you want to refresh your recollection, you can take a look at your deposition on Page 46.
A. I'm all set. This is the building, this is where they dumped it.



Q. When you said "this is the building," you were pointing to Number 9?
A. That's D & S Screw Products. Again, you are making buildings here, and I circled Number 9, and the question must have been circle D & S Screw Products, and I did, and, Number 8, I say that, because I started down here; 8 is the area that they dumped the stuff in, so I'm assuming that's 9 and 8.
Q. When you said 8 is the area they dumped the stuff in, what are you referring to?
A. The water.
Q. Who is "they"?
A. D & S Screw Products.
Q. What is the stuff they dumped in?
A. Raw findings, whatever you want to call it, liquid.
Q. Was that the wastewater from their operations that they dumped in there?
A. Yes.
Q. How did they dump that?
A. In barrel, from barrels.
Q. Did they dump from the barrels directly into the river?
A. Yes.



Q. Did they pour the contents of the barrel into the river?
A. Yes.
Q. And do you recall, approximately, when you saw D & S Screw Company engaging in those activities?
THE WITNESS: The time?
MR. BINDER: Yes.
A. Around 6 o'clock.
Q. No, I'm sorry, the time in terms of the year? Excuse me, I should have said the date, time period.
A. I worked there, I had to be in high school, somewhere around '64 to '67.
Q. Now, if you could turn to Page 50 of your deposition, please. Actually, I'm going to ask you, just so you have enough perspective, to take a look beginning on line 16 of Page 49, and continuing through line 11 on Page 50.
(WITNESS REVIEWS DOCUMENT)
A. Okay.
Q. Now, is your answer to the question, which was asked at line 4 of Page 50, continuing through line 11 on Page 50, an accurate answer?
A. What I can recollect, yeah.

Page 62

Q. And lines 9 to 11, when you said, "we are talking about stuff that we observed that was done on a day-to-day basis that nobody even questioned," were you referring to the activities of D & S Screw Company?
A. Yes.
Q. And, now, the activities at the time you observed them of the Metro-Atlantic/New England Container Company location, are those also activities which you observed that was done on a day-to-day basis that nobody even questioned at the time?
A. Yes.
Q. Now, do you recall awhile ago Ms. Main asked you about testimony on Page 35 of your deposition, and she read to you an area where you said that there was no fish in this area?
A. Okay.
Q. And what time period was it when you observed that there was no fish in that area?
THE WITNESS: What it says here?
MR. BINDER: Well, is what it says there correct?
A. To my knowledge.
Q. And what does it say there? What is that time

Page 63

period when you say that there was no fish in the area?
A. From the '50s to the late '60s.
Q. Well, didn't you say in your deposition that the time you saw there was no fish in the area was around '72?
MS. MAIN: Objection, that's not what it says.
MR. WALLACH: Objection.
MR. BINDER: There should not be speaking objections during the deposition. You should say the word "objection," you will be allowed to ask questions after.
MS. MAIN: They do allow you to explain it, so you can clarify your question.
MR. BINDER: Trying to suggest the testimony of the witness, that's inappropriate.
THE WITNESS: Do you mind if I read this whole page?
MR. BINDER: Sure.
(WITNESS REVIEWS DOCUMENT)
(QUESTION PG. 63, L. 4 - 6 READ)
MR. WALLACH: Objection.
A. Okay, I don't understand what you are trying to

Page 64

get on that. It was the water was polluted in the '60s, yes, it was, that's what I said.
Q. Didn't you say that it was around 1972 or so in this area that you saw there was no fish in this area?
MR. WALLACH: Objection.
MS. MAIN: Objection.
A. I did -- I answered the question yes, I did say '72, but that's not what I'm saying here. It was an incident where my next door neighbor, who was going fishing, and I was laughing because he was taking the fish out of the water, and that happened to be around '68 to '72, in that area -- I mean -- we are talking forty years ago, you know, but there was no fish in that water.
Q. There was no fish in that water in 1972?
MR. WALLACH: Objection.
Q. Is that correct?
A. No, that's not what I said.
Q. Was there fish in the water in 1972?
A. In the bottom part where they fished, yes.
Q. There was fish in the water in 1972, in the Woonasquatucket River?
A. In areas, yes. There's fish in there now, you can't eat it.

Page 65

MR. BINDER: Move to strike, there's no question.
Q. Now, on Pages 34 and 35 of your deposition, you refer to the fact that a neighbor suggested that you go fishing in the Woonasquatucket River; is that correct?
A. Correct.
Q. And when did your neighbor make that suggestion?
A. Again, we are talking in the '60s here, I would say around what I said, about '68, '69, '70, somewhere around here.
Q. That's when you suggested that you go fishing in the Woonasquatucket River?
A. Yes.
Q. And where was that location in the Woonasquatucket River that he suggested you go fishing in in relationship to the Metro-Atlantic site?
A. It was upstream -- no, I'm sorry, it was downstream, which is the Allendale -- right here, the cove that I told you about earlier, this is Metro-Atlantic.
Q. Now, the cove that you referred to on Neri Exhibit 3, where would that be on?
A. It's not on there.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| EMHART INDUSTRIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. 02-053-S |
| | ) | |
| HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, LIBERTY MUTUAL INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICA INSURANCE COMPANY, and UNITED STATES FIRE INSURANCE COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

Deposition of VINCENT BUONANNO taken before CHERYL F. GILMAN, C.S.R. and Notary Public, pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, at 131 South Dearborn Street, 30th Floor, Chicago, Illinois, commencing at 10:00 o'clock a.m. on the 25th day of March, A.D. 2003.

Q Okay. Do you know what percentage ownership Metro Atlantic had of New England Container?
A I believe it was fifty percent owned by my father, Bernard B., and it was the other fifty percent was owned by Metro Atlantic.
I'm not morally certain of that, but I think that is -- I think that is it.
Q Do you know the genesis of Metro Atlantic -- Excuse me. Strike that.
Do you know the genesis of New England Container?
A Atlantic Chemical Company was a manufacturer of textile chemicals and detergents. And New England was a great textile center before it all moved south, was a region full of basically where all the fabrics made in America were pretty much made in New England mills.
All the fabrics, for suits and everything, were made there. And of course there were supplier industries that were created to provide things they needed in addition to their fabrics and woolens and everything.
And one of those things was textile



chemicals, which was a huge industry. Textile chemicals included both dyes to color fabrics and included detergents to wash fabrics after they made them, and maybe it included fabrics to make them water repellant or to soften them or harden them. So those were all liquids.
And Metro Atlantic making those liquids, which it prepared for textile companies, received liquids to make those liquids in different kinds of containers. Sometimes tank trucks, sometimes wooden barrels at the beginning of the 1930s and '40s, and then steel drums.
So it was always receiving raw materials to make its product in steel drums, or drums, barrels. And it was always then refilling them with a product that it made of these different compounds back out in wooden barrels originally and then steel drums.
So there came a time when it seemed logical for Metro Atlantic to have some sort of a recycling operation, where containers were received in empty of raw materials could be cleaned up and put back in service to be shipped back out again.



So the genesis of New England Container was kind of a captive operation where they could take containers which they were emptying everyday, have them cleaned, and break down the -- at the end of the property in a barn, and then to return them to be filled again for their own products going out.
And beginning years of that, from let's say 1948 or '50 perhaps, the first five or ten years, that was almost exclusively wooden barrels, which were coopered. Coopering meant fixing those days and repairing the wood. And it slowly changed into steel drums, 55-gallon steel drums.
Does that answer that?
Q Yes, it does, very well. Thank you.
When New England Container first started either in the late 1940s or around 1950, was Metro Atlantic its sole customer?
A Yes, it was.
Q And I take it that over time the business of New England Container grew to include other customers, correct?
A Correct.
Q During the time that New England



Container and Metro Atlantic operated at the Centredale facility -- and let me focus really on the later part of the 1950s and 1960s, is it fair to say that Metro Atlantic was still the largest customer of New England Container?
A By the late '60s?
Q If you could take me through that time frame or I'll break down the question.
A It remained -- It probably remained a very large or one of its largest customers.
Q The property on which Metro Atlantic and New England Container operated, do you know who owned that property in Centredale?
A I think it was owned by -- It was owned by the -- by the owners of Metro Atlantic. It was owned by Metro Atlantic. And I don't know, I wouldn't have been privy to know if it had a separate real estate corporation or that they simply owned it within the company.
I know New England Container was a tenant. New England Container owned no property, so I don't know who owned it.
Q Does the entity name --
A There was no outside landlord. It was

**A Whoever they were, I don't know.**
Q What is shot waste again?
**A Shot waste is the dust created by metal pellet shotblasting.**
Q So when they shoot the drums, it's what falls off the drums?
**A What falls off is dust, black dust.**
Q I'd like to introduce a document 11, and what this is, this is an affidavit of Mr. Theodore Lutkus, counsel to Black & Decker Corporation. This affidavit was submitted in an action bearing the caption, Liberty Mutual Insurance Company versus Black & Decker Corp, et al., and it took place before the United States District Court for the District of Massachusetts, bearing Civil Action No. 96-10804 DPW.

(document marked as requested)

Q Have you ever seen this document before?
**A No.**
Q I'm going to -- This document sets forth the alleged current corporate structure of Black & Decker and some of its subsidiary companies.



I'd like to ask you quickly if you're familiar with any of the officers or directors of any of these companies mentioned therein?
**A What page are we on.**
Q Beginning with USM, are you familiar -- mentioned in Paragraph 3, are you familiar or were you familiar with any of the officers or directors of USM?
**A No.**
Q And therefore you have no knowledge about USM's alleged acquisition of Metro Atlantic?
**A No.**
Q What about the company named Emhart Industries, Inc. that existed on or around 1964?
**A No.**
Q And Emhart Corporation existing on or about 1964?
**A No.**
Q New Emhart Corporation existing on or about 1976?
**A No.**
Q Emhart Enterprises Corporation existing on or about 1987?
**A No.**



Q Okay. That is it for that.

(document marked as requested)

Q I'm now introducing -- This is a document -- a document produced by your counsel in response to the subpoena, on New England Container's Christmas Gift List from December of 1968.
Does that ring a bell at all?
**A No.**
Q Have you ever seen it before?
**A No.**
Q Do you recall?
I'm going to very quickly run through the names of the companies and the contacts. And all I would like to know is if by any chance you still keep in touch with either any officers, employees, directors of those companies or the contacts listed thereunder. And I'm move as quickly as I can.
Alltex Specialties?
**A No.**
Q Peter Daley of Alltex Specialties?



**A No.**
Q American Mineral Spirits?
**A No.**
Q Ike Giese of American Mineral Spirits?
**A No.**
Q American Hoechst?
**A No.**
Q Carl Crucher of American Hoechst?
**A No.**
Q Charlie Young of that company?
**A No.**
Q Mr. Hart of that company?
**A No.**
Q T.H. Baylis?
**A No.**
Q Tom Baylis of T.H. Baylis.
**A I know he's deceased.**
Q Bercen Chemical?
**A No.**
Q Bryan Adriance of Bercen Chemical?
**A No.**
Q Cal Chemical?
**A No.**
Q Chuck Lamandola of Cal Chemical?

A No.
Q Cardinal Chemical?
A No.
Q Al Viola of Cardinal Chemical?
A No.
Q Colonial Chemical?
A I'm answering now if I have any contact with any of these people.
Q Right.
A Not if I ever heard of them before, but if I have any contact with them.
Q Unfortunately that wasn't what I was asking. But your question is right on the money, and I do need -- I'll start over quickly.
If you have heard of any of these individuals, please tell me in what context.
A Okay.
Q Have you ever heard of any of the individuals that we've already addressed, down to Al Viola?
A I've heard of Tom Baylis.
Q How have you heard of Tom Baylis?
A He was involved in T.H. Baylis Company.
Q What was T.H. Baylis Company?



A It was a chemical company.
Q Would they supply barrels to New England Container?
A They would buy barrels.
Q Are there any other companies that we've mentioned so far that ring a bell?
A American Mineral Spirits bought barrels from New England Container.
Q Okay. Colonial Chemical?
A I don't know.
Q Severino Natale?
A Don't know him.
Q Cloro-Bac Products?
A No.
Q Millie McNicholus?
A I don't know.
Q Crown-Metro?
A Jay Buonanno here I know. I know the company was the successor to Metro Atlantic, and Jay Buonanno is my cousin.
Q Would Crown-Metro both supply and buy barrels from New England Container?
A Yes.
Q Original Bradford Soap Works?



A Yes.
Q They would buy or --
A They would buy containers and perhaps generate empty containers.
Q And do you know any of these individuals from that company you keep in contact with?
A Al Howland is a former proprietor who is dead.
Q Paragon Chemical Company?
A I've heard of them. I don't know them.
Q Do you know Besaro?
A No.
Q Philipp Brothers Chemical?
A Never heard of them.
Q Rhode Island Chemical Company?
A I've heard of the name. Don't know Joe D'Antuono.
Q Ronnoco?
A Never heard of him.
Q Synthron, Inc.
A Synthron was a former customer of New England Container. I don't know those people.
Q Do you know if they were former -- prior to your involvement with New England Container?



A Yes.
Q Thompson Chemical Company?
A Was a former customer of New England Container.
And Bud Wahl was the man associated with that company.
Q And do you keep in contact with Mr. Wahl?
A No.
Q Do you know if Thompson Chemical supplied or purchased containers from New England?
A I can't remember.
Q Universal Chemicals Corporation?
A Was a former customer of New England Container.
Q Do you know who bought or supplied?
A At least one, I don't know.
Q And Jack Katz?
A I don't know him.
Q United States Oil Company?
A U.S. Oil Company was a former customer of New England Container. I knew Joe Pryor a long time ago, who was the manager responsible for buying containers.
Q Did U.S. Oil supply containers as well?

A They both bought and sold containers.
Q Warwick Chemical Company?
A Warwick Chemical Company I knew. I did not know any of these particular people, but they bought drums and sold drums to us.
Q A company named CNC?
A I knew CNC Company, which was a former customer, and I knew all three of its partners, Henry Noon, Bob Carlson and Ralph Carlson. And they bought drums from us.
Q Do you know -- Do you still have contact with any of these individuals?
A I don't.
Q Colfax Packing?
A Colfax Packing bought drums from us. And did not sell us drums.
I knew -- I knew Abbott, Earl Dressler, but I have no contact with them.
Q Okay. Eastern Color & Chemical?
A They bought and sold drums to us. And I knew that company.
Q And the individuals listed thereunder?
A Mike Shepard I knew.
Q Do you still have any contact with



Mr. Shepard?
A No.
Q French Worsted?
A I knew they were once a customer. I don't know what we did with them.
Q Emile Benoit of French Worsted?
A I don't know him.
Q Giffordline Chemical Company?
A I knew Giffordline was a former customer. I did not know Art Wilks.
Q Do you know if they bought or sold drums?
A They bought drums from us.
Q A. Harrison & Company?
A A. Harrison & Company bought drums from us.
I knew Allen Harrison, who was the proprietor.
Q Do you keep in contact with any of these individuals?
A No.
Q Kraus Chemical Company?
A Kraus Chemical Company brought drums from us.
Q Bernie Kraus?



A I knew him once.
Q Okay. Lubrx, L-u-b-r-x, Products, Inc.?
A We bought drums and sold drums to Lubrx. I do not know those managers.
Q Mancor Chemical Company?
A We sold drums to Mancor Chemical Company.
Q Mr. Newman of Mancor Chemical?
A I don't remember him.
Q George Mann & Company?
A We sold drums to George Mann and bought from them. I knew Bill Mann.
Q But you don't keep in contact with him?
A No.
Q Organic Chemical?
A We sold drums to Organic Chemical. I didn't know Frank Gonsalves.
Q The Woonsocket Color & Chemical?
A I remember that company. We bought and sold with them, and I knew Esmond O'Donnell, but I think he's long ago deceased.
Q And Wayland Chemical Company?
A I can't remember that.
Q And Jake Sarkisian?
A No recollection.



MR. WALLACH: Let me just check very quickly.
Mr. Buonanno, thank you so much and I have no further questions.
Kevin?
MS. MAIN: Kevin, any questions?
MR. O'CONNOR: A couple of follow-up things.
MS. MAIN: Okay. You are next.

EXAMINATION
by Mr. O'Connor:

Q Mr. Buonanno, my name is Kevin O'Connor, and I represent OneBeacon in this case. We're alleged to be an insurer of Crown-Metro, Inc.
Are you familiar with that company?
A Yes.
Q What is your understanding of the connection with the Centredale property, if anything?
A I believe Crown-Metro was a merge made between the old Metro Atlantic Chemical Company and the old Crown Chemical Company sometime in the 1960s. And I believe the company existed for a period of time until it was sold out together. And I don't recollect if it continued under that

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

EMHART INDUSTRIES, INC. :
Plaintiff :
:
VS. : C.A. No. 02-053ML
:
HOME INSURANCE CO., INSURANCE :
COMPANY OF NORTH AMERICA, :
LIBERTY MUTUAL INSURANCE CO., :
NORTH RIVER INSURANCE CO., :
ONEBEACON AMERICA INSURANCE :
CO., and UNITED STATES FIRE :
INSURANCE CO., :
Defendant :

DEPOSITION of FELIX PALUMBO, in the above-entitled cause, taken on behalf of the Defendants before Melanie M. Chace, RPR, Notary Public, in and for the State of Rhode Island, at the offices of Holland & Knight, LLP, One Financial Plaza, Suite 1800, Providence, Rhode Island on December 20, 2002 at 9:30 a.m.

PRESENT:

FOR THE PLAINTIFF: ....... WILLCOX, PIROZZOLO AND McCARTHY
50 FEDERAL STREET
BOSTON, MA 02110
BY: RICHARD L. BINDER, ESQUIRE

FOR THE DEFENDANT: ....... MORRISON, MAHONEY & MILLER
HOME INSURANCE CO. BY: MICHAEL T. FARLEY, ESQUIRE

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RI 02920
(401) 946-5500

Page 46

company folded up and that was it. Then I got a job with GM Gannon.
Q. When you first started out, you started with somebody else, Angelo?
A. Yeah, we were both together.
Q. He was -- how old was he?
A. Same age as me.
Q. Were most of the people that worked there younger or older?
THE WITNESS: How?
Q. When you first started?
A. Younger, mostly younger. Outside of Johnny Joyal, Walter Murphy, like that.
Q. How many people worked for Atlantic Chemical then?
THE WITNESS: How many?
Q. Yes, half a dozen, dozen?
A. Yeah, something like that.
Q. Which one: Five, ten?
A. It all depends whether it was receivers, shippers, chemists, truck drivers.
Q. So maybe a dozen?
A. Maybe a dozen or so.
Q. You would come in what time in the morning?
A. Eight o'clock, between eight and seven.

Page 47

Q. Did you have to punch in?
A. Uh-huh.
MR. NETBURN: You have to say yes for her.
A. Yes.
MR. NETBURN: Or you could say no, but if the answer is yes, you should say yes.
A. Yes, but if I made a delivery, I had to go to Maine, something like that, I took the truck home and just left in the morning, two o'clock in the morning, three o'clock in the morning.
Q. Did you load up the truck the night before?
A. Yep, and go up to Maine.
Q. But you were starting off in the yard, you punch in?
A. Yeah.
Q. And where is the punch-in clock?
A. Right when you walk in the door.
Q. Did everybody need to punch in?
A. Yes, I would say if they wanted to get paid.
Q. Good point. The people who work for the barrel company, they punch in on the same clock?
A. No, there were a different company altogether.
Q. Different?
A. Different.

Page 48

Q. You never worked for the barrel company?
A. No.
Q. Were there ever times when they were really busy and they needed somebody for a couple of hours and you would have to go down there?
MR. BINDER: Objection.
A. No, not that I know of.
Q. Were there ever times that other people from Atlantic Chemical would have to go down to help out?
A. Yeah, I would say like Walter Murphy and Buster Murphy, they worked two places.
Q. At the same time?
MR. BINDER: Objection.
A. Yeah, I guess so, same time.
MR. NETBURN: Was that a formal objection to my question?
MR. BINDER: Yes.
Q. There were times when things were really busy at the chemical company and people other than the Murphy's would come up from the barrel shop and help out?
MR. BINDER: Objection.
A. You mean come up from the barrel shop, you mean people from the barrel shop come up and work?
MR. NETBURN: Yes.

Page 49

A. Not that I know, I wasn't there, I was out on the road delivering chemicals.
MR. NETBURN: What's the basis for your objection?
MR. BINDER: You're leading him.
MR. NETBURN: Would you read my question back?
(PREVIOUS QUESTION READ BY REPORTER)
Q. I think you testified that you would deliver drums and chemicals to various customers; right?
A. Right.
Q. At times you would bring drums back with you?
A. Right.
Q. Would you load those drums on to the truck or would other people?
A. We both load them together. I wheel the drum in, another guy wheel a drum in. If they're on the ground, the guy picked up the drum, put it on my tailgate and I push it up in front.
Q. Were you given any instructions about whether or not to take drums with things in them?
A. No.
Q. So you could bring drums that had a couple of gallons of stuff?

Page 50

A. Yeah.
Q. Did you do that?
A. Not that I recall. I wanted a clean truck. Maybe I did a few that I don't know of.
Q. Did some of the customers try to slip in drums that had stuff in it?
A. I don't know that, sir.
Q. You didn't see?
A. I didn't see.
Q. Did the barrel company also pick up drums to be reconditioned?
A. Yes, there you go. Ray Nadeau, he picked them up, and the other guy, Joseph Cefali, he picked them up. You should ask them if they picked up hazardous waste or junk in the drums, I didn't.
Q. I wasn't talking about whether it was hazardous or not, I was trying to figure out whether drums came back with stuff in them?
A. I don't know, I couldn't tell you that. Mine were almost empty. I didn't open the cover up to see if there was stuff in it.
Q. Did they have covers on them?
A. Yes, mostly had covers, you wouldn't take an open drum, it's against the law.

Page 51

Q. Back then it was, too?
A. Uh-huh.
Q. Is that a yes?
A. Yes.
Q. The truck that you were driving, was that a box truck?
A. Yes. 20-footer, if that's any help to you.
Q. The barrel company, did they deliver with a box truck, also?
A. No, they had an open truck, open, the whole thing was open.
Q. So your trucks were bigger than the barrel trucks?
A. No, no, they had a barrel truck was bigger than ours, it had an overrack on it.
Q. Did they pick up most the barrels for the barrel company or did you guys pick them up?
A. I say they did, because they were processing the barrels. We just picked up a few customers that give us the barrels.
Q. Not all of the customers that you delivered chemicals to would give you barrels?
A. No.
Q. When you came back with some barrels, you would drive them back to the barrel shop?
A. Yep.

Page 52

Q. And who would unload them?
A. Well, here we go again. If the Murphys were there, they unloaded them. If not, the Cefali boys would unload them, Nadeau would unload them, it all depends who was there.
Q. You would help them out?
A. Of course, I take -- I wouldn't take them off. I would be on the truck, put them on the tailgate and throw them down to them, that's it.
Q. The barrels were stacked outside; right?
A. Yes.
Q. Were they stacked near the burner shed or the burner area?
A. I don't know, no, I don't know offhand.
Q. Were they --
A. They weren't near the river, they weren't near the river. They were close to the building where they process them, that's all I remember.
Q. The processing started with this chain conveyer?
A. Something like that, yeah.
Q. Did you ever take the barrels off of your truck and did they go on the conveyer?
A. No.
Q. They would always be stacked up?

Page 53

A. Always stacked up, because at the time I came in it was late, it was time for them to go home and me to go home. So we put the barrels on the ground and they did what they did the next day.
Q. Did you smoke back then?
A. Yeah, of course I did.
Q. I assume, would they allow smoking inside the plant --
A. No.
Q. -- where they made the chemicals?
A. No.
Q. Some of the stuff was flammable?
A. Yes, you wouldn't smoke, around no chemical would you smoke.
Q. Was there an area where guys going out to smoke --
A. Yeah, the loading dock, out on the loading dock where they load the truck up.
Q. Where would the guys from the barrel shop go to smoke, would you hang out with them?
A. No, we never hang out at the barrel shop.
Q. How far apart was it?
A. Right down at the end the building there -- where is that map? I'll show you right now.
Q. I actually saw the map. I was wondering, people wouldn't walk down to hang out with the guys from the

Page 54

barrel shop?
A. No. Why should they? They got their own problem up front. You're talking barrel shop and the chemical plant, two different places. They're both the same owners, the Buonannos owned it, that's it.
Q. Out back there was an area where they dumped stuff, wasn't there?
MR. BINDER: Objection.
MR. NETBURN: You can answer.
A. I don't know.
Q. Did you ever take stuff out by the river to dump it there?
THE WITNESS: Such as what, what stuff?
Q. There were barrels of stuff, did you ever empty them out?
A. I couldn't do empty barrels -- I couldn't empty them out. I didn't work for the barrel shop. I left them on my truck, I brought them down to the area where they unloaded my truck and they stacked them. What they did with them, I don't know.
Q. Did you ever help out inside of the plant where they made the chemicals?
THE WITNESS: Help out?
MR. NETBURN: Yes.

Page 55

THE WITNESS: Such as what?
Q. Did you ever load up drums with finished product?
A. Yeah. No, no, unload them. I mean, I took them where they were. Say they were on the shipping floor or receiving floor down at the bottom, put them on a two wheel truck, wheeled them upstairs, yeah.
Q. Would you ever help them fill the drums?
A. No.
Q. They were never shorthanded and needed to get some stuff out?
A. No, not to my knowledge. I was the guy that delivered them, I was a truck driver. I'm going to take out chemicals too? I don't know.
Q. They were never shorthanded?
A. Maybe they were shorthanded.
Q. But they never brought you inside?
A. No.
Q. Inside -- let me ask you this -- how did they move the raw chemicals into the vessels?
A. There you go again. Ask Johnny Joyal, Bill Daily, Walter Murphy, Buster Murphy.
Q. Did you ever see any of the guys dumping chemicals into the manholes to fill them up to charge the vessels?

Page 56

MR. BINDER: Objection.
Q. I'll withdraw that question. Did you ever see them charging the vessels?
A. No, I don't think so. That wasn't my position to see them, anyways. What do I care what they did?
Q. How did the chemical company get raw materials delivered?
THE WITNESS: Raw materials?
MR. NETBURN: Yeah.
THE WITNESS: Not a finished product?
MR. NETBURN: Right.
A. We never did. Everything I delivered was a finished product.
Q. Right, but how did the company get the raw material to the plant?
A. Like I said, TH Baylis brought them in, or I picked them up from TH Baylis and brought them in.
Q. Would you pick up both liquids and bags?
A. Sometimes, yes.
Q. Did they ever get --
THE WITNESS: They leak?
Q. No, I don't care about that. Did tanker cars ever come?
A. Yes.

Page 57

Q. Tanker --
A. Tanker cars come loaded with formaldehyde, corrosive, caustic things like that.
Q. Where would they store the large amounts of formaldehyde?
A. That I don't know offhand.
Q. Would they pump them somewhere?
A. Yeah, they would be pumped somewhere. Where? I don't know. If you get a hold -- he's passed away. You got to get the guys that handled that stuff. You must have their names down there.
MR. NETBURN: Yeah. A lot of guys are dead.
A. That's what I mean. I remember what I did. I remember trucks coming in, like you say. Where they went, I don't know. They probably got on my truck and took off.
Q. Where did you have lunch at the plant?
A. At the plant.
Q. Was there a place to eat lunch?
A. No. Yeah, on the loading dock.
Q. When it was cold?
THE WITNESS: Huh?
Q. When it was cold?

Page 58

A. I don't know, I wasn't there when it was cold. Probably out to the road eating. They had a place upstairs where they dressed up, maybe that's where they eat the lunch, I don't know.
Q. Did the barrel guys ever come up to the loading dock to eat lunch?
A. No, forget the barrel guys, they didn't want to bother with us. Different company.
MR. NETBURN: Thank you, sir. I'm done.
THE WITNESS: Was I a help or what?
MR. NETBURN: You were a good help.
EXAMINATION BY MR. FARLEY
MR. FARLEY: My name is Mike Farley, we met earlier, nice to see you again.
THE WITNESS: Yep. Am I saying something bad or something over here?
MR. FARLEY: No. You're doing fine.
THE WITNESS: It seems like everybody is asking me the same question, over and over. What am I doing wrong?
MR. FARLEY: We're trying to get your memory the best that you can give to us, and sometimes the best way to get that is to ask the same question a different way.

Page 59

THE WITNESS: Five other guys come up and see me. I told them the same thing. I even signed the paper, you got that paper here?
MR. BINDER: We showed you that a little while ago.
THE WITNESS: See, I forget that already.
Q. Mr. Palumbo, did you have one truck that you drove?
A. Yeah, most of the time, yeah.
Q. It was your truck?
A. Yeah.
Q. Did you take that truck home with you every night?
A. No.
Q. It was stored in the yard?
A. Stored in the yard, yeah.
Q. Except for the time when you loaded it the night before?
A. And had to go to Bates or something like that.
Q. I get the impression you kept a clean truck?
A. Yes.
Q. Did you have to clean it yourself?
A. Yes.
Q. How did you clean it, how did you keep it clean?
A. Dust pan and brush.
Q. Did you wash it inside and out?

Page 60

A. Never washed the inside, it was always clean. You mean if you spilled anything on the floor?
Q. If you spilled or it got dirty?
A. Wash it with water.
Q. Was there a place that you would do that in the yard, was there a special truck cleaning area?
A. No.
Q. Would you pull it in the yard and clean it?
A. Yep.
Q. Wherever you could?
A. Yep.
Q. Mr. Palumbo, you mentioned earlier that the truck had to carry placards in some cases?
A. Yes.
Q. Do you remember who told you to use the placards?
A. Jeez, D.O.T., Department of Transportation.
Q. You mean it was their rule?
A. Their rule, right.
Q. Did they come out and give a class on placards?
A. No.
Q. It is your boss who told you that?
A. Yep. Like I said before, it was on the bill of lading. Paterson wrote "flammable," over one thousand pounds you placarded it, corrosive, you placarded it,

Page 61

dangerous, you placarded it, whatever it was.
Q. The placard, did that have just the words dangerous or was there also a logo?
A. There was dangerous and it was in red, flammable was red, corrosive was black with corrosive across it. You got any placards? I could show them to you.
Q. I know the present placards, I wondered if they were the same at the time you worked there?
A. Maybe, I don't know.
Q. Do you know, I see you've got a couple of tattoos, there is one on the inside your right arm?
A. This one.
Q. What is that one, is that a skull and cross bones?
A. Yes.
Q. Was that logo on the placards?
THE WITNESS: You mean poisonous?
Q. That placard stands for poisonous?
A. Yeah, it would, but we never delivered anything poisonous that I know of.
Q. You didn't get that tattoo around the same time?
A. No. We didn't carry nothing that was poisonous that I know of. Flammable, corrosive, that's all I remember.
Q. They --