**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| EMHART INDUSTRIES, INC., Plaintiff, v. HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, LIBERTY MUTUAL INSURANCE COMPANY, THE NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICA INSURANCE CO. and UNITED STATES FIRE INSURANCE COMPANY, Defendants | Civil Action No.: 02-053-S |

**DEFENDANT THE NORTH RIVER INSURANCE COMPANY'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON THE "ALLOCATION" ISSUE**

Pursuant to Fed.R.Civ.P. 56, LR Cv 56 and the Court's Order at the Hearing held on August 3, 2006, defendant The North River Insurance Company ("North River") submits the following Statement of Undisputed Facts in support of its Motion for Summary Judgment on the "Allocation" Issue. [*See* Joint Statement Pursuant to Pretrial Conference, 5/16/06 at 19-20; Issue No. III.7].

1. North River issued a "Commercial Comprehensive Catastrophe Liability Policy," Policy No. 523-313109-9, to Emhart Corporation ("Emhart") for the policy period from January 1, 1984 to January 1, 1985 (the "North River Policy"). A true copy of the North River Policy is included in the "Joint Appendix of Exhibits to the Parties' Motions for Summary Judgment Dated July 24, 2006" ("Joint App.") at Exhibit E.

2. By endorsement, the definition of "Named Insured" in the North River Policy was amended as follows:

> It is agreed that Item I of the declarations, Named Insured, is amended to read as follows:
>
> Emhart Corporation and any or all subsidiaries, entities, affiliated, or associated companies that are wholly owned or controlled, as may now exist or hereafter be constituted and their predecessor companies including entities merged into the named insured.
>
> [Joint App., Ex. E at MISC 01074].

3. The Insuring Agreement in the North River Policy provides, in relevant part, as follows:

> **INSURING AGREEMENTS**
>
> I. **COVERAGE**
>
> The Company agrees to pay on behalf of the insured the ultimate net loss in excess of the retained limit hereinafter stated, which the insured may sustain by reason of the liability imposed upon the insured by law, or assumed by the insured under contract, for:
>
> (a) Bodily Injury Liability,
>
> (b) Personal Injury Liability,
>
> (c) Property Damage Liability, or
>
> (d) Advertising Liability,
>
> arising out of an occurrence.
>
> [Joint App., Ex. E at MISC 01082].

4. The North River Policy defines "Property Damage" as follows:

> **"PROPERTY DAMAGE"**
>
> "Property Damage" means:
>
> (a) ***physical injury to or destruction of tangible property which occurs during the policy period,*** including the loss of use thereof at any time resulting therefrom;

[Joint App., Ex. E at MISC 01084 (emphasis added)].

5. The North River Policy defines "occurrence" as follows:

**"OCCURRENCE"**

"Occurrence" means:

(a) with respect to Bodily Injury Liability or Property Damage Liability, injurious exposure to conditions which results in Bodily Injury or Property Damage neither expected nor intended from the standpoint of the insured. All damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

[Joint App., Ex. E at MISC 01084].

6. The North River Policy defines "Ultimate Net Loss"" as follows:

**"ULTIMATE NET LOSS"**

"Ultimate Nets Loss" means the total of the following sums with respect to each occurrence:

(a) all sums which the insured is legally obligated to pay as damages whether by reason of adjudication or settlement, because of bodily injury, personal injury, property damage or advertising liability to which this policy applies;

[Joint App., Ex. E at MISC 01084].

7. The North River Policy defines the "Retained Limit" as follows:

**RETAINED LIMIT – LIMIT OF LIABILITY**

The Company's liability shall be only for the Ultimate Net Loss in excess of the insured's retained limit defined as the greater of:

(a) the total of the applicable limits of the underlying policies listed in Schedule A hereof, and the applicable limits of any other insurance collectible by the insured; or

(b) the self-insured retention stated in Item 4(c) of the declarations as the result of all occurrences not covered by said underlying insurance, and which shall be borne by the insured, separately as respects each annual period of this policy.

[Joint App., Ex. E at MISC 01085].

8. In this action, Emhart alleges that it is entitled to coverage for "property damage" at the Centredale Manor Superfund Site in North Providence, Rhode Island (the "Centredale Site") that took place continuously from at least 1968 to 1999, when Emhart was notified of the contamination at the Centredale Site by the United States Environmental Protection Agency. [Joint App., Exs. F-I, P].

9. Emhart's expert witness, John R. Kastrinos, has opined that dioxin contamination has caused "property damage" at the Centredale Site continuously from 1968 to the present. As stated in Mr. Kastrinos' report: "Based on the above information and observations, it is my professional opinion that dioxins and PCBs that would have been detected between 1968 and 1985 (had they been sampled for and analyzed) were present at concentrations as great or greater than concentrations detected at the property from the mid-1990s through the present." [Expert Report of John R. Kastrinos, 6/13/03 at 4; Ex. A hereto].

Respectfully submitted,

**THE NORTH RIVER INSURANCE COMPANY**,

By its attorneys,

/s/ Mark T. Nugent
Mark T. Nugent, RI Bar# 2637
**MORRISON MAHONEY LLP**
121 South Main Street, Suite 600
Providence, RI 02903-7141
(401) 331-1660

John T. Harding, *pro hac vice*
**MORRISON MAHONEY LLP**
250 Summer Street
Boston, MA 02210-1181
(617) 439-7500

Dated: August 9, 2006

**CERTIFICATION**

I hereby certify that on this 9 day of August 2006, a copy of the foregoing was sent via ECF/mailed, postage prepaid, to:

Jack R. Pirozzolo
Rick Binder
Willcox, Pirozzolo & McCarthy
50 Federal Street
Boston, Massachusetts 02110
(617) 482-5470

James T. McCormick #2614
128 Dorrance Street - Suite 330
Providence, RI 02903
(401) 831-2970

John F. Glowacki
220 Lake Drive East, Suite 304
Cherry Hills, NJ 08002
(856) 667-2080

Ian Wallach
Kimball Ann Lane
Luce, Forward, Hamilton & Scripps LLP
153 East 53rd Street, 26th Floor
New York, NY 10022
(212) 744-1414

James T. Murphy #1698
Kelly N. Michels #6478
Hanson Curran LLP
146 Westminster Street
Providence, RI 02903
(401) 421-2154

Kevin J. O'Connor
Peter C. Netburn
Hermes, Netburn, O'Connor & Spearing, P.C.
265 Franklin Street, 7th Floor
Boston, MA 02110-3113
(617) 728-0050

Lawrence Nathanson
Siegal, Napierkowski & Park
533 Fellowship Road, Suite 120
Mt. Laurel, NJ 08054-3412
(856) 380-8900

______/s/ Mark T. Nugent____________

# EXPERT REPORT OF JOHN R. KASTRINOS
# CENTREDALE MANOR SUPERFUND SITE
# NORTH PROVIDENCE, RHODE ISLAND

## INTRODUCTION

My professional experience in the geosciences and hydrogeology, specifically, dates back to the mid-1980s. I received a Bachelors of Science degree in Geology from Dickinson College in 1983 and a Masters of Science degree in Environmental Pollution Control from the Pennsylvania State University in 1985. I worked as a field hydrologist under contract with the U.S. Geological Survey (USGS) in 1984 and 1985 while finishing my Master's degree. I have been employed as a hydrogeologist with Haley & Aldrich, Inc. since 1985. I am a certified Professional Hydrogeologist with the American Institute of Hydrology (No. 96-HG-1145), a registered Professional Geologist in the State of Pennsylvania (No. 001872G) and a Massachusetts Licensed Site Professional (No. 9623). My resume is attached.

This expert report provides opinions as to likely mechanisms for transport of dioxin. The Centredale Manor Superfund Site, as defined by U.S. Environmental Protection Agency (EPA), includes the Centredale Manor and Brook Village properties, and an area of the Woonasquatucket River extending approximately 2,500 ft south (downstream) of the two properties (to just below Lymansville Dam), hereinafter referred to as "the Site." My professional opinion was developed based on review of documents regarding the Site provided by the law firm of Willcox, Pirozzolo and McCarthy (WP&M); other published sources; and observations made during a visit to the property on 12 May 2003, as described below.

- Documents provided by WP&M included EPA correspondence, historical atlases (Sanborn Fire Atlases) and drawings, and environmental site investigation reports by others including Loureiro Engineering Associates (LEA) and NUS Corporation.

- Historical information on land use, demolition/development, earthwork and flooding, as contained in the files provided by WP&M, published information filed at Haley & Aldrich, and information available on the Internet. The available sources of information included: aerial photographs; historical insurance maps (Sanborn maps); meteorological, chemical, and hydrological information and data available on the Internet; and records of local municipal offices and government agencies.

- A visit was made on 12 May 2003 to review existing surficial features at the properties. I was accompanied on the visit by Kelsey Doub and Andrew Nichols of Haley & Aldrich, Inc.

Based on my review of these documents, and personal observations of the properties, my understanding of property conditions, property history, and environmental conditions is summarized in the following sections.



HALEY & ALDRICH

## PROFESSIONAL OPINION

### Property Conditions

The property comprises approximately 9.7 acres of land distributed over two parcels located at 2072 and 2074 Smith Street in North Providence, Rhode Island (the "property"). The property is abutted by Smith Street (Route 44) to the North, a small stream (known as the "tailrace") and residential properties to the east, and the Woonasquatucket River to the south and west. The Brook Village and Centredale Manor apartment buildings occupy the property. Brook Village is an eight-story brick structure at the northernmost portion of the property, with a paved parking area to the south of the building. Centredale Manor is a six-story structure located approximately 600 ft south of the Brook Village building. Paved parking areas are located north and southwest of Centredale Manor. An access road extends from Smith Street south, between the two buildings. The Brook Village building is west of the access road and the Centredale Manor building is east of the road.

The southern portion of the property comprises an undeveloped, unpaved parcel of open land approximately 2.1 acres in size. Tall grasses cover most of the open area; mature trees up to approximately 1 ft in diameter are present along the eastern and western limits of the open area. The confluence of the tailrace and the Woonasquatucket River, located approximately 375 ft south of the Centredale Manor building, forms the southern property boundary. Based on property features observed in aerial photographs [1], trees were located on the open area section of the property. The trees were removed for the construction of an interim soil cap over contaminated soils in 1999 (described subsequently in this Report). An island approximately 4 acres in size extends southward for 750 ft beyond the confluence of the Woonasquatucket River and the tailrace. According to a 1933 historical plan, the area of the island was formerly the Allendale Mill Pond (38). The island was likely created by the breach of the downstream Allendale dam in 1991, which lowered the Woonasquatucket River level.

Based on historical USGS topographic maps dating back to 1939 [2], a 1981 pre-construction survey plan prepared for the Centredale Manor project [3], and a 1983 plan depicting as-built data following construction of Centredale Manor [4], topography has remained relatively consistent at the property. Specifically, these maps indicate ground surface elevations of 94 to 99 ft above Mean Sea Level, with topography sloping southward to the Woonasquatucket River at an approximate grade of 0.5% (5 ft/approximately 900 ft). In the southern portion of the Centredale property, a cap was placed over contaminated soils in 2000. Based on comparison of a construction survey plan dated 1983, which post-dated the Centredale Manor construction, with a 2002 Survey Plan by LEA, capping raised the grade by up to approximately 1 ft in this area of the property. In addition, in areas south of the Centredale Manor building footprint and parking lot, pre-construction topographic contours shown on an October 1981 pre-survey plan are consistent with those shown on the 1983 final as-built plan.

### Property History

From the turn of the 20th century until the early 1970's, the northern portion of the property, extending from Smith Street a distance of approximately 750 ft south, was used for manufacturing while the undeveloped, approximately 2.1-acre southern portion of the property remained undeveloped. Between approximately 1900 and 1936, the property was

occupied by Centredale Worsted Mills, a manufacturer of woolens. Atlantic Chemical Company, a chemical manufacturer, occupied the property from 1940 until 1953. In 1953, Atlantic Chemical Company changed its name to Metro Atlantic, Inc., and operated under this name until the late 1960s. In 1968, Metro Atlantic, Inc. merged with Crown-Chemical and operated under the name of Crown-Metro, Inc. Manufacturing at the Centredale property ceased in 1968, when operations were moved to their Providence, Rhode Island plant. In 1969, Crown-Metro, Inc.'s business was acquired by USM Corporation. A fire in 1972 destroyed most of the structures that formerly belonged to Crown-Metro, Inc. on the Centredale Property [5,6,7]. The Brook Village Apartment complex was built between 1976 and 1977; the Centredale Manor complex was built in 1982 [5,6].

The following is based on a review of Sanborn historical maps dated 1900, 1921, 1951, 1956, and 1965 [8]. The Centredale Worsted Mills is depicted at the northern end of the property (near the current location of Brook Village) on the 1900 and 1921 Sanborn maps. A small building that was indicated as a Wagon Shed on the 1900 map and as an auto building on the 1921 map was located immediately south of the Mills. The land south of the small building was vacant, as shown on the 1900 and 1921 Sanborn maps, and the tailrace and Woonasquatucket River bordered the property to the east and west, respectively. The tailrace extended north beneath Smith Street and the section north of Smith Street is identified as a "headrace" on the 1951 map. The headrace was apparently filled between 1951 and 1956, because it is not shown on the 1956 USGS topographic quadrangle. The former Mill buildings are labeled "ATLANTIC CHEMICAL CO. CHEM MFG" on the 1951 Sanborn map; the small building in the south is labeled "STGE" indicating it was used for storage. Several buildings located at the western edge of the property along the River are also labeled "STGE" and one section is labeled "CHEM MFG." The 1951 map shows that land south of the buildings was vacant and the tailrace and River bordered the property to the east and west, consistent with the earlier Sanborn map. On the 1956 map, the plant is labeled "METRO-ATLANTIC, INC. CHEM. MFG." (the company name change occurred in 1953). An L-shaped small building in the south section of the property is labeled "BARREL STGE." on the 1956 Sanborn map, and an abutting trapezoidal-shaped building is labeled "BARREL CLEANING." Land to the south of these buildings appears vacant. The 1965 Sanborn map depicts the buildings much as they were on the 1956 map, including the buildings in the south section of the property; however, the building formerly labeled "BARREL STGE" is labeled "STEEL DRUM RECONDITIONING" on the 1965 map. Due west of these buildings, an additional building is shown adjacent to the Woonasquatucket River. The building is labeled "CHEM. MFG."

As referenced in the February 2003 deposition of Thomas F. Cleary [9], hexachlorophene was produced at Metro - Atlantic for less than 1 year, at a building located between Metro-Atlantic's main buildings and the Woonasquatucket River. Based on Cleary's description, the 17 December 2002 deposition of Mr. Joseph Nadeau [10], the 17 January 2003 deposition of Mr. Joseph Buonanno, Jr. [29], and the distribution of dioxin concentrations at the Site as shown on maps prepared by IT Corporation (referenced subsequently in this Report), the building where hexachlorophene was manufactured corresponds to the roughly square building located adjacent to the river and southwest of Metro-Atlantic's main buildings shown on the Sanborn map dated 1965. In Nadeau's deposition [10], he indicated hexachlorophene was manufactured at the Centredale property for approximately eight or nine months.

According to the EPA and the IPCS INCHEM website (www.inchem.org) [11], hexachlorophene contains hexachloroxanthene (HCX) and dioxin 2,3,7,8-TCDD as byproducts of hexachlorophene manufacturing.

In the southern portion of the Centredale Manor property, New England Container (NEC) performed barrel refurbishing. According to Mr. Joseph Nadeau [10], who worked loading and unloading trucks at NEC in the mid-1960s, NEC dumped remaining contents of drums on the ground, sent them through an incinerator, sandblasted the drums, painted the drums, and then sold the "reconditioned" drums. According to Nadeau's deposition, the drums received by NEC contained various quantities of oil, powdered dyes, and other substances. Prior to reconditioning, the drums were stacked on the ground between the NEC plant and the Woonasquatucket River.

**Environmental History**

The Rhode Island Department of Environmental Management (RIDEM) initiated environmental investigations at the property in 1970. These investigations continued through 1986. Based on preliminary investigations completed by EPA contractors, the site was added to the National Priorities List (NPL) on 4 February 2000, which officially identified the site as a Superfund Site. The limits of the Superfund Site included the property and an area of the Woonasquatucket River extending approximately 2,500 ft south (downstream) of the property. The following presents a chronology of environmental conditions observed (by others) at the site and results of environmental investigations completed by others:

| | |
|---|---|
| 1957 – 1963 | Forklifts moved barrels and a bulldozer buried the barrels 5 days a week in areas south of the former manufacturing area, as observed and stated in deposition by Kenneth M. Neri, a neighbor who lived along Amber Street between 1956 and 1968 [12]. Amber Street is located across the Woonasquatucket River and west of the Centredale Manor site. Neri's deposition also indicates that drums were reportedly disposed of in the southern portion of the property, in the area where the tailrace and the Woonasquatucket River meet [1]. |
| Nov. 1977 | Approximately sixty (60) drums were identified "over a wide swampy area." Ten (10) of the drums reportedly containing sulfuric acid ($H_2SO_4$) were removed from the property [13,14]. |
| March 1981 | During a property inventory, RIDEM identified 600 drums; reportedly, 95% of the drums were empty [15]. |
| October 1981 | One (1) smoking drum was removed from the property by Jet-Line Services (disposal location or facility was not indicated) [16]. |
| February 1982 | During construction of the Centredale Manor apartments, 6,000 cubic yards (CY) of soil containing chloroform, toluene, trichloroethylene (TCE), bis(2-ethylhexyl)phthalate, and barium at concentrations that were below RIDEM regulatory levels, were removed from the Centredale Manor construction area by Marshall (a construction company) [6,17,13]. Based on the generalized soil profile reported by GZA [22], this volume is consistent with the volume of fill that |

would have been removed for geotechnical purposes from beneath the building footprint (to support the building slab and foundation) and from below the proposed parking area (for placement of a pavement base-course layer). The soils were disposed of as non-hazardous solid waste at an in-state licensed landfill. The Silvestri landfill was reportedly proposed as the in-state landfill [18]; however, Haley & Aldrich found no documentation of what disposal facility was ultimately used for disposal of the soils. Reportedly, two composite samples that were derived from 10 borings in the proposed construction area were submitted for analysis to satisfy the landfill acceptance criteria [17].

| | |
|---|---|
| February 1982 | C. Pezza & Sons removed 400 drums from the property. After analyses of the contents, 30 additional drums were removed from the property. Based on chemical analyses of the contents, eight (8) of the 30 drums were transported off the property to an "approved facility" as hazardous materials by Jet-Line Services [17]. |
| 1982/1983 | C. Pezza & Sons reportedly backfilled at the Centredale Manor property but did not indicate the quantity, quality, and source(s) of the backfill. The available documentation provided no information on the exact locations where the backfill was placed [19]. Based on the generalized soil profile reported by GZA [22], and the approximate area comprised by the building and parking area (located west/southwest of the building), the fill was likely used for geotechnical purposes to backfill the building footprint area (to support the building slab and foundation) and the proposed parking area (for placement of a pavement base-course layer). |
| March 1986 | A Ground-Penetrating Radar (GPR) survey was conducted. The GPR survey revealed evidence of buried metallic objects, such as drums, along the western edge of the Property [17]. |
| 1996-1998 | As part of the EPA Providence Urban Initiative (1996), tissue samples were collected from fish and eel taken from the Woonasquatucket River watershed. Dioxin concentrations were first identified in fish tissue samples in 1998 [5]. |
| 1998 | In June 1998, EPA initiated an Expanded Site Inspection (ESI) of the Centredale Manor property to assess the extent of contamination in areas of potential human exposure, the potential for source areas to be located up-river from the Centredale Manor property, and the presence of dioxin/furan and HCX contamination on the Centredale Manor property. Additional sediment samples were collected in September 1998 [5]. |
| January 1999 | EPA initiated emergency actions that included installing temporary fencing around areas of surface soil contamination on the Centredale Manor property, and collecting an additional 300 surface soil samples to further assess extent of surface soil contamination. [5] |

| | |
|---|---|
| Summer 1999 | Trees formerly located immediately south of the Centredale Manor parking lot were removed when an interim protective cap was constructed in that area [5]. |
| June-Nov 1999 | IT Corporation (under EPA direction) collected 889 soil/sediment samples at the property and areas downstream to further assess the nature and extent of contamination [20]. |
| 2000 | At the direction of the EPA, 1,097 CY of "common fill" and 745 CY of topsoil were placed on the property to form a soil cap. Based on comparison of a construction survey plan dated 1982, which post-dated the Centredale Manor construction, with a 2002 Survey Plan by LEA, capping increased the grade by up to approximately 1 ft in this area of the property. Samples of the material brought to the property were collected and analyzed for total petroleum hydrocarbons (TPH), polychlorinated biphenyls (PCBs), pesticides and herbicides. PCBs or pesticides and herbicides were not detected in the samples; trace levels of TPH were detected [21]. |

**Property Subsurface Conditions**

A summary document prepared by Goldberg-Zoino Associates (GZA) in 1982, prior to the construction of the apartment building, describes subsurface conditions at the Centredale Manor property. The information was obtained from the results of eight borings and six test pits conducted at the Centredale Manor property in 1981 and 1982 [22]. GZA described the subsurface conditions as follows:

- Granular fill consisting of a mixture of loose to dense sand, gravel, silt, and trash overlies much of the property, varying in thickness from 2 to 6 ft.
- A layer of black organic silt, varying from 1 to 2 ft in thickness, underlies the fill.
- A gravel/sand layer underlies the organic silt, ranging in thickness from 6.5 to 14.5 ft, followed by a layer of fine sand/silt of 4 to 12 ft in thickness.
- A sand/gravel layer was encountered below the fine sand/silt layer. The thickness of the sand/gravel layer was not reported since the borings were terminated within this material, but the layer was encountered below 45 ft in depth at two of the borings.

**Hydrology**

The Woonasquatucket River forms the western boundary of the property. The Woonasquatucket River flows south, draining into the Atlantic Ocean, approximately 4.5 miles southeast of the property. A narrow stream, known as the "tailrace," is present along the approximate eastern boundary of the property, and likely represents the remnants of an excavated channel that formerly served the wool-manufacturing mill. The tailrace extended north beneath South Street, where it was identified as a "headrace," and appears to join the Woonasquatucket River. The River is dammed in two places south of the property – the Allendale Dam, located approximately 2,000 ft south of the property and just north of Allendale Avenue; and the Lymansville Dam, located approximately 1.25 miles south of the property near Lyman Avenue. The Allendale Dam was breached in 1991, which lowered the Woonasquatucket River level and reduced the area of Allendale Pond (the pond just north of the dam and south of the property).

USGS Streamflow Gauging Station 0111450 is located on the western bank of the Woonasquatucket River, adjacent to the Brook Village apartment complex, approximately 75 ft downstream (south) from the U.S. Highway 44 (Smith Street) Bridge. According to available USGS streamflow data, the Period of Record for Gauging Station 0111450 is July 1941 to 2001. The USGS uses annual peak streamflow data (in cubic feet per second [cfs]) from gauging stations to document trends in historic streamflow measurements recorded at regional gauging stations, including "significant flood events" (USGS Water Supply Paper 2502). A "significant flood" is a designation ascribed by the USGS to recorded streamflow measurements that rank in the top 5 percent of all annual maximum discharges for a gauging station's Period of Record [23].

Using these criteria, "significant flood events" measured at Station 0111450 occurred in 1968, 1983 and 1998. Seven of the 12 greatest annual peak streamflow measurements (top 20%) were recorded between 1968 and 1985 [23].

**Sources and Extent of Contamination**

**Soil**

According to the EPA's Action Memorandum – Non-Time-Critical Removal Action (NTCRA), dated 18 January 2001, the critical contaminant of concern is 2,3,7,8-tetrachlorodibenzo-p-dioxin (dioxin - 2,3,7,8-TCDD) [24]. Figures contained in IT Corporation's Final Site Investigation Report, dated 16 March 2000 [20], provide the locations and depths of detected contaminants. Based on soil samples collected at the property, dioxin concentrations up to 140 parts per billion (ppb) have been detected in the surficial soils (collected from 0 to 1 ft below ground surface [bgs]) and exposed swale sediments. The portion of the property adjacent to and south of the existing Centredale Manor apartment complex and associated parking lot has been identified as an area of the property exhibiting elevated concentrations of the dioxin compound 2,3,7,8-TCDD and PCBs in shallow (0 to 1 ft bgs) soils [20]. The highest concentrations of contaminants were generally located in soil and sediment collected at depths of less than 2 ft bgs or below sediment surface, in the wetland areas between the Centredale Manor and Allendale Pond [25]. At greater depths (up to 8 ft bgs), the highest concentrations (1 to 10 ppb) were detected near the building that is labeled "CHEM. MFG." and adjacent to the Woonasquatucket River, as shown on the 1965 Sanborn map [20].

The distribution of elevated levels of dioxin in the area south of the Centredale Manor apartment building and associated parking lot generally corresponds to the shape of the forested portion of the property, as it existed prior to removal of trees and placement of a soil cap. The dioxin levels decreased with increasing distance upslope from the shoreline of Lymansville Pond; accordingly, the lowest concentrations were detected in samples collected from the higher elevations along the banks of the pond [25]. A similar trend was observed in data from Allendale Pond, but with fewer supporting data [25]. Dioxin concentrations were generally lower in Lymansville Pond than in Allendale Pond. These results are based on a series of plans by IT Corporation, contained in their March 2000 report, which show the extent of dioxin (TCDD) and PCB contamination [20].

Additional contaminants detected at the property include 1,2,3,5,7,8-hexachloro(9H)xanthene (hexachloroxanthene), PCBs, chlorobenzene, toluene and

xylenes, respectively; tetrachloroethene (PCE), and benzene [25]. Elevated levels of additional chlorinated and aromatic volatile organic compounds (VOCs), semi-volatile organic compounds (SVOCs), polyaromatic hydrocarbons (PAHs), and metals were also detected in soils and sediments. The following describe the occurrence of these other contaminants [20]:

- Hexachloroxanthene was detected in most of the soil and sediment samples collected from locations where dioxins were also detected (25).
- Levels of VOCs exceeding Rhode Island Residential Standards were detected in the areas of the property surrounding the Brook Village and Centredale Manor apartment buildings.
- Levels of SVOCs and RCRA metals exceeding Rhode Island Residential Standards were detected in the area of the apartment buildings, as well as at several locations downstream and by the Allendale Dam.
- The highest concentrations of PCBs were detected within near-surface depths (0 to 1 ft bgs) in the area south of Centredale Manor, the area immediately south of the Brook Village parking area, and downstream north of Allendale Pond. The highest concentrations of PCBs detected at greater depths (up to 8 ft bgs) were generally detected in samples near the Centredale Manor property and to the south. The levels of PCBs decreased with increasing distance upslope from the shoreline of Lymansville Pond. [25]. PCBs generally were detected at lower concentrations in Lymansville Pond than in Allendale Pond [25].

According to the 31 August 2000 deposition of an unidentified person [26], other businesses that discharged waste to the River upstream of the property between 1952 and 1977 included Worcester Textile, and the Pawtucket Mills. According to the deposition, these industries were active between 1952 and 1977. Other industries active in the area included Colonial Chemical and an asphalt plant, which were located on the Johnston side of the River. The deposition did not indicate whether the facilities were located upstream or downstream of the property. According to the deposition of Mr. John Priest (truck driver/auto mechanic) [27], he saw discoloration in the Woonasquatucket River originating upstream from the Metro Atlantic facility. He named Esmond Mills, Worcester Textile and Evans Plating as companies that dumped waste into the river, and indicated that the companies were located upstream of the property. According to Mr. Priest, Esmond Mills and Worcester Textile produced and utilized dyes. These facilities were not mentioned in EPA documents relating the Centredale Manor Restoration Project Superfund Site. Additionally, in their Responsiveness Summary dated January 2001 [28], in a response to a comment concerning other industrial facilities that may have contributed to dioxin and PCB contamination in the River, EPA did not identify other facilities upstream or downstream of those formerly located in the Centredale Manor/Brook Village area. According to the deposition of Joseph Buonanno, Jr., facilities that used dyes and were located upstream from the Centredale Manor/Brook Village area included Esmond Dye and Greenville Dye. According to Mr. Buonanno, Jr., at times the tail race was discolored due to the presence of green or blue dye[29].

According to EPA, "the concentrations and distributions of dioxins found in the soil and sediment has directed the investigations to the River and more specifically the Centredale Manor and Brook Village properties. EPA believes that the contamination at the Site was primarily caused by former chemical company operations (including

the manufacture of hexachlorophene, which has dioxin as a by-product) and a former drum recycling operations (including uncontrolled incineration of drum residuals, which can cause the release of dioxin) at these properties prior to the early 1970s. As described in the Environmental Engineering/Cost Analysis (EE/CA) report, sediments in the Woonasquatucket River from Esmond [north of the Site] to below Olneyville [south of the Site] have been investigated, and highest concentrations of dioxin in the River have been found in sediment in the Allendale Pond, immediately downstream of the Centredale Manor property, where highest dioxin concentrations (above 100 ppb) were found in soil." [28]

EPA continues in their Responsiveness Summary, "Additionally, the fact that hexachloroxanthene (HCX) along with the 2,3,7,8-TCDD was found at the Site, indicates that this dioxin contamination originated from the manufacture of hexachlorophene, which records show occurred at the Site." [28]. According to Thomas Cleary's deposition [9], and information obtained from the International Programme on Chemical Safety (IPCS) INCHEM website (www.inchem.org) [11], hexachlorophene is manufactured from a reaction involving 2,4,5-trichlorophenol, formaldehyde, and PCE. Additionally, hexachlorophene contains HCX and produces the dioxin compound 2,3,7,8-TCDD as a byproduct. The EPA also states in their Responsiveness Summary that dioxins are widespread in the environment but are typically detected at much lower concentrations than those found at the Site [28].

**Groundwater**

According to GZA's letter to Marshall Construction, Inc., dated 27 January 1982, three groundwater samples were collected in 1982 and analyzed for specific conductivity, pH, and VOCs. Reportedly, VOCs were not detected in two of the samples, and one unknown VOC was detected at a very low concentration in the third sample [30].

Goldman Environmental Consultants (GEC) installed seven groundwater monitoring wells around the Brook Village building in March 1999. Depths to groundwater measured by GEC on 22 March 1999 ranged from 2.64 to 7.45 ft below ground surface. Groundwater elevations ranged from 91.16 to 93.47 as reported by GEC. The elevations were based on an assumed benchmark elevation of 100 ft. established at the bolt on the largest underground storage tank (UST) cover closest to the River. Based on these interpreted groundwater elevations and the well locations, groundwater generally flows west/southwest, toward the River.

Groundwater samples were collected from the wells in March 1999 and submitted for chemical analyses. Results of VOC analyses were as follows:

- Acetone was detected in one sample (GEC-2); according to GEC, there was no RIDEM groundwater standard for acetone at the time the data were reported
- Benzene was detected in GEC-7 at a concentration that was below the RIDEM groundwater standards.
- Cis-1,2-dichloroethylene and PCE were detected in three of the samples (GEC-5, 6, and 7); according to GEC, there were no RIDEM groundwater standards for these compounds at the time the data were reported.

- TCE was detected in two of the samples (GEC-5 and 7); GEC reported that there was no RIDEM groundwater standard for this compound at the time the data were reported.
- Vinyl chloride was detected in two samples (GEC-4 and 7) at concentrations that exceeded the RIDEM groundwater standard.
- Xylenes were detected in two samples (GEC-1 and 7) at concentrations that did not exceed the RIDEM groundwater standard.

PAHs were detected in several of the samples. According to GEC's report, RIDEM groundwater objectives (analogous to guidelines) existed for benzo(a,e)pyrene and naphthalene. Benzo(a,e)pyrene was detected in three samples above the GA groundwater objective, and Naphthalene was not detected in any samples above the GA groundwater objective.

Four samples were submitted for Total RCRA 8 metals analysis. The reported results were as follows:

- Arsenic, barium, and chromium were detected in several samples below the RIDEM GA objectives (a groundwater objective was not provided for arsenic). Lead was detected in three of the samples (GEC-1, 5, and 6) at concentrations that exceeded the RIDEM GA objective.

PCBs (as Aroclor 1254) were detected in GEC-6 at a concentration that exceeded the RIDEM GA groundwater objective [31,32].

**Fate and Transport of Dioxins and PCBs**

Dioxins and PCBs have low solubility and high organic carbon/water partition coefficients ($K_{oc}$), so they are not readily leached from soils and sediment by infiltrating precipitation. In addition, they are considered resistant to degradation by natural means, such as bacterial activity (biodegradation) or exposure to sunlight (photodegradation) [11]. Based on these properties, once sorbed to soil or sediment these contaminants migrate in the environment principally by erosion, scouring and re-deposition. Scouring refers to erosion of the river bottom by stream flow, as distinguished from erosion of surface soils from areas adjacent to the river, by storm water runoff. For example, the following quotes describe migration properties of dioxin determined through research in dioxin fate and transport:

- "In soil, sediment, the water column, and probably air, CDDs/CDFs [chlorinated dibenzo dioxins and chlorinated dibenzo difurans] are primarily associated with particulate and organic matter because of their high lipophilicity and low water solubility. They exhibit little potential for significant leaching or volatilization once sorbed to particulate matter." [33]
- "Burial in-place or erosion of soil to water bodies appears to be the predominant fate of CDDs/CDFs sorbed to soil. CDDs/CDFs entering the water column primarily undergo sedimentation and burial. The ultimate environmental sink of CDDs/CDFs is believed to be aquatic sediments." [33]
- "Because of their very low water solubilities and vapor pressures, CDDs/CDFs below the soil surface (i.e., below the top few millimeters) are strongly adsorbed and show little upward or downward vertical migration, particularly in soils with a high organic carbon content." [34]
- "Although few studies have evaluated quantitatively the transport of soil-bound

CDDs/CDFs, the very low water solubilities and high $K_{oc}$s of these chemicals indicate that erosion of soil to water bodies appears to be the dominant surface transport mechanism for CDDs/CDFs sorbed to soil." [35]

- "Most CDDs/CDFs entering the aquatic environment are associated with particulate matter (e.g., dry deposition of atmospheric particles and eroded soil) and are likely to remain sorbed to the particulate matter once in the aquatic environment." [33]
- "If released to soil, TCDD is not expected to leach. As a rule, the amount of TCDD detected more than 8 cm below the surface has been approximately 1/10 or less than that detected down to 8 cm. Being only slightly soluble in water, its migration in soil may have occurred along with soil colloids and particles to which it may have been bound." [36]
- "Because of their chemical characteristics and very low solubility, dioxins accumulate in most soil types, with very little water leaching." [37]
- According to EPA's Responsiveness Summary, dated January 2001, "the chemical nature of dioxins bind them to the soil and sediment particles, and so they are only subject to movement by re-suspension of those particles presumably during flood conditions." [37]

Although PCBs were detected in one groundwater sample according to GEC, this was likely due to the presence of PCBs adsorbed to soil particles suspended in the water sample.

## CONCLUSIONS

Based on the above information and observations, it is my professional opinion that dioxins and PCBs that would have been detected between 1968 and 1985 (had they been sampled for and analyzed) were present at concentrations as great or greater than concentrations detected at the property from the mid-1990s through the present. In addition, based on the extent of dioxins and PCBs detected in the Site soils and sediments of the Woonasquatucket River, the chemical characteristics of these contaminants, and streamflow records, it is my professional opinion that erosion, scouring and re-deposition transported contaminated soil and sediment from the property to downstream areas (to the south) during a period that included 1968 to 1985. Due to these transport mechanisms, the mass of dioxin on the property from the mid-1990s to the present would be less than the mass on the property between 1968 and 1985. These opinions are based on the following lines of evidence:

- **Lack of an ongoing source:** The historical manufacturing, handling and disposal of chemicals including hexachlorophene has been identified by the EPA as the likely source of dioxin and PCB contamination at the Site. Based on depositions of individuals knowledgeable of the Site history, and the Site history information provided in reports that I reviewed, there is no evidence that disposal of wastes occurred after manufacturing operations ceased at the property around 1968. Therefore, it is my professional opinion that there was no introduction of dioxin, PCBs and other contaminants to the property after 1968.

- **Extent:** Dioxins and PCBs were detected in river sediments that are far downstream (south) of the Centredale Manor and Brook Village properties, including the contiguous marshy area between the tailrace and the Woonasquatucket River, and there is no evidence or reason to believe that disposal of waste took place downstream of the property.

- **Resistance to degradation:** Due to their chemical properties, dioxin and PCBs are resistant to natural degradation (by microbial activity or photo-degradation [by sunlight], for example) and, once sorbed to soil or sediment, are not readily mobilized by precipitation, leaching and groundwater transport, or volatilization and precipitation by atmospheric deposition. Therefore, it is my professional opinion that dioxins detected from the mid 1990s to the present did not migrate to their current locations by leaching, groundwater transport and re-deposition, or volatilization and precipitation by atmospheric deposition; however, there was migration by other mechanisms as described below during a period that included 1968 to 1985. Furthermore, based on the relatively slow rates of natural degradation, it is my professional opinion that dioxins and PCBs that would have been detected between 1968 and 1985 (had they been sampled for and analyzed) were present at concentrations as great or greater than concentrations detected at the property from the mid-1990s through the present (the mass of dioxin on the property from the mid-1990s to the present would be less than the mass on the property between 1968 and 1985 due to the transport mechanisms described below).

- **Construction activity:** Construction of the Brook Village and Centredale Manor Apartment complexes took place in the mid-1970s, and 1982, respectively. Based on the available reports, there is no evidence that significant construction activity took place after 1985. Based on historical maps and property plans, there is no evidence of significant increases in grade, which would indicate widespread filling at the site after 1985. Therefore, it is my professional opinion that dioxins detected in the early 1990s did not result from waste disposal or fill placement after 1985.

- **Streamflow records and flooding:** A deposition by an unidentified person [26] and the deposition of Joseph Buonanno, Jr. [29] contain anecdotal reports of flooding of the southern portion of the property, where the highest concentrations of dioxins and PCBs were detected. In addition, streamflow records indicate that "significant floods," as defined by the USGS, occurred in the Woonasquatucket River during the period of 1968 to 1985.

- **Transport of sediment by streamflow and flooding:** Based on their chemical characteristics, dioxins and PCBs sorbed to organic matter in soils and sediments are not readily leached or volatilized. Contaminated sediments and surficial soils can be transported by erosion and scouring (erosion of riverbanks and river bottoms, typically during high flow events), then re-deposited (where sediments suspended in the river settle out to the river bottom) further downstream in the river and on floodplains during flood events. Based on available streamflow records spanning from 1936 to 2001 and information on flooding in Rhode Island, there is no evidence that streamflow and the frequency of flood events increased after 1985 through the present, the period when the contaminants were detected. Therefore, it is my professional opinion that dioxins and PCBs detected from the mid-1990s through the present resulted from erosion, scouring and re-deposition of soil and sediment from the property to downstream areas that occurred since at least 1968 if not earlier.

**COMPENSATION**

I expect that Haley & Aldrich will be compensated for my services as an expert at a rate of $173 per hour, the rate established for professional services in our Emhart Service Contract, dated July 1987 and Emhart Special Rate Schedule, dated January 2003. I have not testified as an expert witness at deposition or trial over the past four years. Documents reviewed for this expert report are listed on the attached table.

Sincerely yours,
HALEY & ALDRICH, INC.

John R. Kastrinos, P.G., LSP
Senior Hydrogeologist

3 June 2003

Attachments: References
Resume of John R. Kastrinos

G:\30018\JRK-XREP-Centredale_draft2.doc

**REFERENCES**

**Documents containing information cited in the report:**


1. Aerial Photographs, dated 1951, 1962, 1970, 1972, 1995.

2. USGS Topographic Maps, Providence, RI Quadrangle, dated 1899, 1939, 1947, 1957, 1970, 1975.

3. Survey, Centredale Manor 123 Unit Elderly Housing, prepared by Caputo and Wick Ltd., dated October 1981.

4. Final As-Built Data, Centredale Manor, prepared by Caputo and Wick Ltd., dated 5 January 1983.

5. EPA Memorandum, Approval for Engineering/Cost Analysis, dated 26 January 2000.

6. EPA Memorandum, Action Memo – Request for Approval, dated 23 January 2001.

7. Providence Evening Bulletin, 29 August 1972, "Explosion and Fire Light Up Centredale."

8. Sanborn maps dated 1900, 1921, 1951, 1955, 1956, and 1965.

9. Deposition of Thomas F. Cleary, 10 February 2003

10. Deposition of Joseph Nadeau, 17 December 2002

11. IPCS INCHEM website, www.inchem.org, visited 21 May 2003.

12. Deposition of Kenneth M. Neri, Sr., 30 June 1999

13. RIDEM Inspection/ Complaint Reports, 26 October 1977, 27 October 1977, 1 November 1977, 10 November 1977.

14. Roy F. Weston, Inc., Task Work Plan for Soil/Source and Sediment Sampling, Centredale Manor, North Providence, Rhode Island, 31 August 1998.

15. RIDEM Field Investigation Report and Drum Inventory, 17 March 1981.

15. Centredale Timeline (Last updated 9 June 1999)

17. Roy F. Weston, Inc., Final Site Inspection Prioritization Report for Centredale Manor, North Providence, Rhode Island, 16 May 1997.

18. Marshall Contractors, Inc., Job Meeting Minutes for meetings on 1 February 1982 and 23 April 1982.

19. Response to Requests for Information pursuant to Section 104 of CERCLA, C. Pezza & Son, Inc., 5 March 1999.

20. IT Corporation, 16 March 2000, Final Site Investigation Report, Centredale Manor Restoration Project, North Providence, Rhode Island.

21. Loureiro Engineering Associates, Inc., Completion of Work Report, dated August 2000.

22. Response to Requests for Information pursuant to Section 104 of CERCLA, GZA, 14 April 1999.

23. http://waterdata.usgs.gov/nwis/peak/?site_no=01114500

24. EPA Action Memorandum, Non-Time-Critical Removal Action, 18 January 2001.

25. Tetra Tech NUS, Inc., Final Engineering Evaluation/Cost Analysis, Centredale Manor Restoration Project Site, North Providence, Rhode Island, dated September 2000.

26. Deposition of Unidentified person, 31 August 2000

27. Deposition of John Priest, 17 January 2003

28. EPA, Responsiveness Summary, Centredale Manor Restoration Project Superfund Site, North Providence, Rhode Island, Action Memorandum, dated January 2001.

29. Deposition of Joseph Buonanno, Jr., 17 January 2003

30. GZA, Results of Limited Soil/Groundwater Testing, 27 January 1982.

31. Goldman Environmental Consultants, Inc., Submittal to EPA dated 12 April 1999: tables of laboratory data, a site plan of Brook Village with soil boring/groundwater monitoring well locations, and copies of historic Sanborn maps.

32. Goldman Environmental Consultants, Inc., Submittal to EPA dated 14 April 1999: copies of boring logs for Brook Village.

33. "The 1994 EPA Dioxin Reassessment - Exposure Document" found at http://www.cqs.com/epa/exposure/ v2chap2.htm – visited on 21 May 2003).

34. Yanders et al., 1989, from "The 1994 EPA Dioxin Reassessment - Exposure Document" found at http://www.cqs.com/epa/exposure/v2chap2.htm – visited on 21 May 2003

35. Paustenbach et al., 1992, from "The 1994 EPA Dioxin Reassessment - Exposure Document" found at http://www.cqs.com/epa/exposure/v2chap2.htm – visited on 21 May 2003

36. http://www.epa.gov/OGWDW/dwh/t-soc/dioxin.html- visited on 21 May 2003

37. http://europa.eu.int/comm/ environment/dioxin/task3.pdf- visited on 21 May 2003.

38. **Map entitled "Centredale Worsted Mills, Situated in Centredale, North Providence, R.I. and also in Town of Johnston. Surveyed and drawn in 1933 by F.P. Sheldon & Son of Providence, Rhode Island.**

**Additional Documents reviewed**

IT Corporation Plans: Site Map and Cap #2 Interim Contours, 17 October 1999.

Tetra Tech NUS, Inc., Boring Logs and Monitoring Well Construction Logs, 2001.

Loureiro Engineering Associates, Inc., Draft Figures, Centredale Manor Restoration Superfund Site, dated 7 March 2002 and 9 May 2002.

Construction Specifications (including boring logs) for Brook Village, Housing for the Elderly, North Providence, Rhode Island.

Guerriere & Halnon, Inc., Topographic As-Built of Soil Cap #2 in North Providence, RI, 18 July 2000

USGS/ EPA, Figure, Woonasquatucket River Centredale Manor Site, North Providence, Rhode Island, 2000.

Fax from EPA to Laura Ford, 23 March 2000: Weston figures.

Assessor/ Estate Plans, 1878, 1913, 1933.

The Robinson Green Beretta Corporation, Plans for the construction of Centredale Manor, 10 March 1982.

Loureiro Engineering Associates, Inc., Design Work Plan, Centredale Manor Restoration Superfund Site, dated 9 May 2001.

EPA New England Newsletter, Allendale Dam, November 2001.

Letter from John Burton to EPA, dated 5 March 1999.

RIDEM, email correspondence, 4 February 2000.

EPA documents, Centredale Manor Site, Management Action Committee.

GZA Memorandum, Centredale Manor – Drum Removal, dated 1 April 1982.

GZA, Soil Quality Sampling and Analyses – Centredale Manor, 11 February 1982.

GZA, Field Summaries, February 1982.

Fax from Laura A. Ford, with Swidler, Berlin, to Margaret Averill, with Loureiro Engineering Associates, EPA Guidance on Dioxin Related Materials, dated 27 September 2001.

RIDEM Inter-Office Memorandum, Removal of Drums from the Old Metro Chemical Site, Centredale, North Providence.

Letter from EPA to Murtha Cullina Roche Carens & DeGiacomo, Re: Centredale Manor

Restoration Project Superfund Site, dated 19 October 2000.

RIDEM Inspection Reports, 1979.

TechLaw Inc., Narrative to Accompany Amendments to Draft Findings Report, dated 5 February 1999.

Responsive Documents A – G (Redacted) of Information Request Answers Pursuant to Section 104 CERCLA for Centredale Manor Site by GZA GeoEnvironmental, Inc. (GZA) on 14 April 1999, and copies of Robinson Green Beretta Test Pit Logs with summary.

Tetra Tech NUS, Inc., Sampling and Analysis Plan Woonasquatucket River Sediment Investigation, Centredale Manor Site, North Providence, Rhode Island, September 1999.

Goldman Environmental Consultants, Inc., Letter to RIDEM RE: Notification of Evidence of a Release of Oil or Hazardous Materials, Brook Village, 2075 Smith Street, North Providence, Rhode Island, 20 October 1998.

Roy F. Weston, Inc., Final Hazard Ranking System Package, Centredale Manor Restoration Project, North Providence, Rhode Island, 13 October 1999.

NUS Corporation, Final Screening Site Inspection, Centredale Manor, North Providence, Rhode Island, 15 October 1990.

Depositions of:

- Jeffrey J. Loureiro, 21 March 2003
- Linda Biagioni, 19 November 2001
- John Turcone, 16 December 2002
- Joseph Buonanno, Jr., 23 April 2001
- Felix Palumbo, 20 December 2002
- Daniel Paterson, 20 December 2002
- Gerald Sarracino, 27 February 2003
- David R. Benoit, 25 February 2003
- David Roland Benoit, 16 April 2003

Letter from Peabody & Arnold LLP to Catherine Garypie, EPA, dated 2 August 1999.

Marshall Contractors, Inc., Contract Purchase Order dated 19 May 1982.

Marshall Contractors, Inc., Letter to the Robinson, Green, Beretta Corp. dated 19 February 1982.

Responses to Requests for Information pursuant to Section 104 of CERCLA:

- Bernard V. Buonanno, Sr., 21 July 1999
- New England Container Company, Inc., 19 March 1999
- Malden Mills Industries, Inc., 31 July 2002
- ADP Marshall, Inc., 1 April 1999
- Crown Metro Chemicals, Inc., 14 July 1999
- Eli Lilly & Company – Supplement, 25 April 2002
- Joseph Buonanno, Jr.

Christopher T. DelSesto, Jr., Esquire, 26 January 2000
John L. Marshall, III, 7 April 1999
Lubrx Products, Inc., 11 June 2002
Unocal Corporation, 21 June 2002
Bruce S. Holland, 8 May 2002
THBC, Inc., 22 May 2002
Cranston Print Works Company, 12 June 2002
Plymouth Rubber Company, Inc., 18 June 2002

Affidavits/ Declarations:
Fred M. Perry, 22 April 2002
Thomas F. Cleary, 8 November 2001
Gennaro Zeoli, 12 June 2002
Vincent Buonanno, 4 June 2002
David Carbone
Edmund Izzo
Joseph Nadeau
Anthony Caputo
Donald Perron
Raymond Nadeau
Charlotte Knott
Lawrence R. Bello, 22 May 2001

Walker, Patrick N., 1989, Rhode Island Floods and Droughts: U.S. Geological Survey Water Supply Paper 2375.

Fax from Catherine Garypie, EPA, to Laura Ford, with Swidler, Berlin, dated 9 March 2000: copies of aerial photographs dated October 1951, May 1955, May 1956, February 1962, March 1970, May 1976, September 1979, March 1981, March 1985, August 1985, April 1995.

FEMA, Flood Insurance Rate Map, Town of North Providence, Rhode Island, Map revised 6 December 1999.

Providence Evening Bulletin, 2 April 1970, "9 Discharged from Hospital After Fire."

Providence Sunday Journal Business Weekly, 30 May 1965, "Pharmaceutical Products Added."

Unidentified Newspaper, 9 January 1968, "Tank Explosion Hurls Chemical."

Unidentified Newspaper, dates not provided, "Atlantic Chemical Controls Metro" and "Vacant Plant Ruined by Fire in Centredale."

Centredale Fire Department Fire Reports, various dates.

Apparel Manufacturer, Issue of December 1956, "This is Metro Atlantic."

Letter from EPA to Jerome Muys, Swidler Berlin, dated 8 July 1999: Site sketch, Sanborn maps, and aerial photographs.

**JOHN R. KASTRINOS, P.G. LSP**
Senior Hydrogeologist

**Summary of Qualifications**

In his 17 years of experience with Haley & Aldrich, Mr. Kastrinos has been involved in a broad range of projects including hydrogeologic investigations, oil and hazardous material site evaluations, groundwater supply studies, remedial action planning and implementation, and landfill expansion or siting.

His field-related work experience has included technical oversight and monitoring of test borings and soil sample collection; leader of field exploration and sampling teams; collection of land use history, geologic and hydrologic information for site evaluations; installation of test, observation and recovery wells; groundwater and surface water sampling for projects involving groundwater contamination; conducting pumping tests and recharge pilot tests, and field permeability testing.

Project management responsibilities include preparation of cost estimates, proposals and reports; coordination of field exploration and testing programs; and interpretation of hydrogeologic data including groundwater flow patterns, chemical testing results and permeability testing. In numerous projects he has interacted with federal, state, and local regulatory agencies to obtain permits and approvals for assessment and remediation work. He has made presentations to the Environmental Protection Agency, the Department of Environmental Protection, and to local boards of health and conservation commissions in public hearings.

Mr. Kastrinos also has experience in contaminant transport modeling, which has been used in predicting changes in groundwater flow directions and velocities in response to groundwater extraction (i.e, recovery wells) and/or injection to wastewater disposal systems or injection wells. Modeling has been performed in support of complex litigation cases where contaminant transport pathways and travel times were predicted for one or multiple sources. Transport models have also been used to predict contaminant migration times, contaminant source concentrations, and attenuation by contaminant decay, dilution by precipitation, and longitudinal and transverse dispersion.

**Relevant Project Experience**

**Hydrogeologic Investigation, UConn Landfill, Storrs, CT.** Project hydrogeologist for a detailed investigation of groundwater flow and contaminant migration pathways in overburden and fractured bedrock. Contaminant migration pathways were characterized through a comprehensive records review, reconnaissance of leachate breakout areas, characterization of the study area surficial geology, and the installation and monitoring of overburden wells and deep (125- to 300-ft below ground surface) bedrock wells. Working with the U.S. Geological Survey, who performed surface geophysics and borehole geophysics in the completed bedrock wells, a monitoring well network with multi-level packers and sampling ports were used to characterize contaminant migration pathways. The objectives of the investigation were to

assess whether the landfill and former chemical pits pose a potential threat of contamination to residential bedrock wells in the region, and to develop remedial alternatives for eliminating landfill leachate seeps. Prepared presentations summarizing the results of the work, to the CTDEP, U.S. EPA, the Town of Mansfield and their consultants, and the public, through monthly meetings and periodic public workshops.

**Landfill Assessment, Confidential Client, Pelham, NH.** Performed a contaminant transport analysis to predict source concentrations in a landfill, based on temporal and spatial distribution of contaminants detected in groundwater downgradient of the landfill.

**Phase II Site Assessment, Hyperion Industries, Watertown, MA.** Project manager for a Phase II MCP investigation of a site underlain by incinerator ash. Releases of chlorinated volatile organic compounds had contaminated the ash and groundwater. A subsurface exploration program was completed to delineate the extent of contamination. Ash samples were analyzed for dioxin due to test for dioxin byproducts associated with historical incineration of solid waste at the site.

**Phase II Comprehensive Site Assessment, former Shell Oil Company bulk terminal, West Boylston, MA.** Project manager for CSA including siting of two groundwater recovery wells in overburden and bedrock, respectively, and supervised a program of well and piezometer installation, well development, and step-rate and constant-rate pumping tests. Evaluated groundwater flow in bedrock fracture system, determined interrelationship between overburden contamination and bedrock aquifer systems. Assessed potential impacts to the Wachusett reservoir. Based on data from this program and earlier site characterization studies, developed a site-specific groundwater flow model using MODFLOW, a 3-dimensional finite difference flow model. The model was used to predict the area of contribution to the recovery wells under steady-state pumping conditions, and to evaluate the impacts of on-site recharge of treated groundwater on the area of contribution.

**Water Resources Protection Report, Fort Devens, MA.** Project manager for analysis of regional hydrogeology and review of pumping test analysis and groundwater modeling conducted by the Army in connection with delineating Zone II wellhead protection areas for four Fort Devens water supply well systems. Provided input for water resource planning and preparation of an Environmental Impact Report (EIR) on the watershed hydrology, land use characteristics within the watershed, risk assessment and management with respect to potential sources of contamination, and water resources protection planning strategies.

**Education**

Dickinson College, B.S. Geology 1983
Pennsylvania State University; M.S. Environmental Pollution Control 1985

**JOHN R. KASTRINOS, P.G.**

**Professional Registration**

Professional Geologist (P.G.), Pennsylvania
Licensed Site Professional (LSP), Massachusetts, #9623
Professional Hydrogeologist (P.H.G.), American Institute of Hydrology

**Special Studies and Courses**

"Finite Element Modeling of Groundwater Flow and Contaminant Transport in Groundwater," Dr. Peter Huyakorn of GeoTrans, Inc., Pennsylvania State University, November 1984.

"Computer Modeling," a three-credit course at Boston College, Spring Semester, 1990.

**Awards**

Harl Aldrich Excellence Award, 1993.
Staff Manager Excellence Award, 2002

**Publications and Papers**

"Seasonal, Hydrogeologic, and Land-Use Controls on Nitrate Contamination of Carbonate Ground Waters," with W. B. White, published in the Proceedings of the Environmental Problems on Karst Terranes and Their Solutions Conference, Sponsored by the NWWA, 1986.

"Proceedings of the Boston Society of Civil Engineers Section Construction Dewatering Seminar," co-editor, November 1992.

"Geologic Controls on High-Yield Bedrock Wells in Massachusetts," with B.A. Wilkinson, *New England Water Works Association Journal*, March 1994.

"Natural Attenuation of Nitrate from Wastewater Disposal Systems," with C.E. Worthy and W. W. Beck, published in the proceedings of the New England Environmental Expo, Boston, MA, 1996.

"Transient Effects on Construction Dewatering in an Urban Setting," with A.J. Bonasera, W.A. Weiler, and T.K. Liu, published in the proceedings of the American Institute of Hydrology Annual Meeting, 1996, entitled "Hydrology and Hydrogeology of Urban and Urbanizing Areas".

"Use of Geophysical, Hydraulic, and Geotechnical Methods to Develop a Site Conceptual Ground-Water Flow Model in Central Connecticut," with C. D. Johnson of the U.S. Geological Survey. Published in the proceedings of the National Ground Water Association confernece entitled "Fractured-Rock Aguifers 2002," Denver, Colorado, 2002.

## CERTIFICATE OF SERVICE

:

Robin L. Main, Esq.
Holland & Knight LLP
One Financial Plaza, Suite 1800
Providence, RI 02903

James T. Murphy, Esq.
Kelly N. Michels, Esq.
Hanson Curran LLP
146 Westminster Street
Providence, RI 02903

Mark T. Nugent, Esq.
Michael T. Farley, Esq.
Morrison, Mahoney & Miller, LLP
One Providence Washington Plaza, 6th Floor
Providence, RI 02903

James T. McCormick, Esq.
McKenna & McCormick
128 Dorrance Street, Suite 330
Providence, RI 02903

Richard W. MacAdams, Esq.
MacAdams & Wieck, Inc.
101 Dyer Street, Suite 400
Providence, RI 02903

Ralph T. Lepore, Esq.
Holland & Knight LLP
Ten St. James Avenue
Boston, MA 02116

Lourdes Slater, Esq.
Kimball Ann Lane, Esq.
Duane Morris LLP
380 Lexington Avenue,
New York, NY 10168

Michael F. Aylward, Esq.
Morrison, Mahoney & Miller, LLP
250 Summer Street
Boston, MA 02201

Steven F. Brock. Esq.
Siegal & Napierkowski
220 Lake Drive East
Suite 304
Cherry Hills, NJ 08002

Kurt Hirsh, Esq.
Baach, Robinson & Lewis, PLLC
One Thomas Circle, Suite 200
Washington, DC 20005

Kevin J. O'Connor, Esq.
Hermes, Netburn, O'Connor & Spearing, P.C.
111 Devonshire Street
Boston, MA 02109

I hereby certify that on the 30th day of June, 2003, a copy of the within document was by first class mail, postage prepaid, upon the counsel of record listed above.

[signature]
___________________________________