UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| EMHART INDUSTRIES, INC.<br><br>Plaintiff,<br><br>v.<br><br>HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICAN, LIBERTY MUTUAL INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICAN INSURANCE COMPANY and United States FIRE INSURANCE COMPANY<br><br>Defendants | Civil Action No.: 02-053-S |

**DEFENDANT THE NORTH RIVER INSURANCE COMPANY'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS RENEWED MOTION FOR SUMMARY JUDGMENT ON THE "POLLUTION EXCLUSION"**

Pursuant to Fed.R.Civ.P. 56, LR Cv 56, the Court's Order dated June 28, 2006 and the Court's Order at the Hearing held on August 3, 2006, defendant The North River Insurance Company ("North River") submits the following Statement of Undisputed Facts in support of its Renewed Motion for Summary Judgment on the "Pollution Exclusion." [*See* Joint Statement Pursuant to Pretrial Conference, 5/16/06 at 16-18; Issue No. III.5].

**The North River Policy**

1. North River issued a "Commercial Comprehensive Catastrophe Liability Policy" to Emhart Corporation ("Emhart"), Policy No. 5233131099, that was in effect during the period from January 1, 1984 to January 1, 1985 (the "North River Policy"). A true and complete copy of the North River Policy is included in the Joint Appendix of Exhibits to the Parties' Motions for Summary Judgment Dated July 24, 2006 ("Joint App.") as Exhibit E.

2. The North River Policy states:

> the "Company agrees to pay on behalf of the insured the ultimate net loss in excess of the retained limit hereinafter stated, which the insured may sustain by reason of the liability imposed upon the insured by law, or assumed by the insured under contract...for...(c) Property Damage Liability...arising out of an occurrence."
>
> [Joint App., Ex. E at MISC 01082].

3. The North River Policy defines an "Occurrence" to mean:

> (a) with respect to Bodily Injury or Property Damage Liability, injurious exposure to conditions which results in Bodily Injury or Property Damage neither expected nor intended from the standpoint of the insured. All damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence.
>
> [Joint App., Ex. E at MISC 01084].

4. The North River Policy defines "Property Damage" to mean:

> (a) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom.
>
> [Joint App., Ex. E at MISC 01084].

5. The North River Policy contains a pollution exclusion which states that the policy does not apply to:

> Liability arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.
>
> [Joint App., Ex. E at MISC 01085].

**<u>The Pollution at Issue</u>**

6. The EPA has alleged that Emhart is liable for remediating dioxin contamination at the Centredale Manor Superfund Site in North Providence, Rhode Island (the "Centredale Site").

The pollution arises out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water. [Joint App., Exs. F-I, P].

7. The EPA has alleged that the dioxin contamination at the Centredale Site resulted from the operations of MetroAtlantic and/or New England Container Company. [Joint App., Exs. F-I, P].

8. The dioxin contamination at the Centredale Site is driving the remediation process that is being required by the EPA. [Emhart's Pretrial Mem. at 29-31, 45].

9. Dioxin is the major contaminant at the Site. [Id.].

**Alleged "Sudden and Accidental" Events**

***August 1972 Fire***

10. A fire occurred at the Centredale Site in August 1972 that destroyed most of the structures at the site.

11. The fire occurred approximately four years after MetroAtlantic's operations at the Centredale Site had ceased.

12. There is no documentation or other evidence that any of the buildings at the Centredale Site contained unused or stored TCP at the time of the fire.

13. Emhart's expert, J. Ronald Hass ("Hass"), does not have any information regarding the contents of the buildings that were burned in the fire. [*See* Deposition of Hass, 3/15/06 at 165-166; 11/6/03 at 261-268; Ex. A hereto].

14. There is no documentation or other evidence that the August 1972 fire caused or resulted in the discharge or release of dioxin into the environment at the Centredale Site.

15. Emhart's expert, Hass, has not offered an opinion that the August 1972 fire caused or resulted in the discharge or release of dioxin into the environment at the Centredale Site. [*See* Deposition of Hass, 3/15/06 at 165-166; 11/6/03 at 261-268; Ex. A hereto].

16. Emhart's expert, Hass, has not offered an opinion that the August 1972 fire is the source of the dioxin contamination at the Centredale Site. [Id.].

17. Emhart's expert, Hass, does not have any information that TCP was burned in the August 1972 fire. [Id.].

18. There is no documentation or other evidence regarding the specific contents of any barrel or drum that burned or exploded at the Centredale Site during the August 1972 fire.

19. There is no documentation or other evidence that the burning or explosion of a barrel or drum at the Centredale Site during the August 1972 fire caused or resulted in the discharge or release of dioxin into the environment at the Centredale Site.

***July 1972 Fire***

20. There was also a fire at the Centredale Site in July 1972.

21. There is no documentation or other evidence that the July 1972 fire caused or resulted in the discharge or release of dioxin into the environment at the Centredale Site.

22. Emhart's experts have not offered an opinion that the July 1972 fire caused or resulted in the discharge or release of dioxin into the environment at the Centredale Site. [*See* Deposition of Hass, 3/15/06 at 165-166; 11/6/03 at 261-268; Ex. A hereto].

23. Emhart's expert, Hass, has no information that TCP was burned during the course of the July 1972 fire. [Id].

***Explosions***

24. A formaldehyde tank explosion took place at the Centredale Site in January 1968.

25. There is no documentation or other evidence that the formaldehyde tank explosion caused or resulted in the discharge or release of dioxin into the environment at the Centredale Site.

26. Emhart alleges that another explosion occurred at the Centredale Site when a chemical was mistakenly pumped into a large storage tank containing a different chemical.

27. There is no documentation or other evidence identifying the chemicals involved in this second explosion.

28. There is no documentation or other evidence that the second explosion alleged by Emhart caused or resulted in the discharge or release of dioxin into the environment at the Centredale Site.

29. Emhart alleges that a fire occurred at the Centredale Site in the mid-1960's when a truck driver opened a 3000 gallon tank of methanol in an attempt to obtain fuel for his space heater.

30. There is no documentation or other evidence that the methanol fire referred to above caused or resulted in the discharge or release of dioxin into the environment at the Centredale Site.

31. Emhart's expert, Hass, testified that there is no connection between the methanol fire and the dioxin contamination at the Centredale Site. [*See* Deposition of Hass, 11/6/03 at 263-264; Ex. A hereto].

32. Emhart's expert, Hass, testified that there is no documentation that TCP was involved in any of these incidents. [*See* Deposition of Hass, 3/15/06 at 165-166; 11/6/03 at 261-268; Ex. A hereto].

***Floods***

33. Emhart contends that there were certain "floods" at or in the vicinity of the Centredale Site.

34. There is no documentation or other evidence concerning the specific impact of these "floods" on the operations of MetroAtlantic or New England Container Co. at the Centredale Site.

35. There is no documentation or other evidence that dioxin was released or discharged from the operations of MetroAtlantic or New England Container Co. into the environment at the Centredale Site as a result of any of these floods.

36. There is no documentation that one or more of these floods caused or resulted in an initial discharge of dioxin into the environment at the Centredale Site.

37. Emhart's experts have not offered the opinion that one or more of the floods caused or resulted in an initial discharge of dioxin into the environment at the Centredale Site.

38. Emhart's experts have not offered the opinion that one or more of the floods was the source of the dioxin contamination at the Centredale Site.

39. Emhart's expert, Kastrinos, has opined that any flooding would only have caused any dioxins already contained in the soil to migrate or be transported. [Report of John R. Kastrinos, June 3, 2003 at 12; Ex. B hereto].

**THE NORTH RIVER INSURANCE COMPANY,**

By its attorneys,

/s/ Mark T. Nugent

Mark T. Nugent, RI Bar# 2637
MORRISON MAHONEY LLP
121 South Main Street, Suite 600
Providence, RI 02903-7141
(401) 331-1660

John T. Harding, *pro hac vice*
MORRISON MAHONEY LLP
250 Summer Street
Boston, MA 02210-1181
(617) 439-7500

Dated: August 11, 2006

CERTIFICATION

I hereby certify that on August 11, 2006, a copy of the foregoing was via ECF/mailed, postage prepaid to:

Jack R. Pirozzolo
Rick Binder
Wilcox, Pirozzolo & McCarthy
50 Federal Street
Boston, MA 02110

James T. McCormick
128 Dorrance Street, Suite 330
Providence, RI 02903

John F. Glowacki
220 Lake Drive East, Suite 304
Cherry Hills, NJ 08002

Ian Wallach
Kimball Ann Lane
Luce, Forward, Hamilton & Scripps LLP
153 East 53rd Strett, 26th Floor
New York, NY 10022

James T. Murphy
Kelly N. Michels
Hanson Curran LLP
146 Westminster Street
Providence, RI 02903

Kevin J. O'Connor
Peter C. Netburn
Hermes, Netburn, O'Connor & Spearing , P.C.
265 Franklin Street, 7th Floor
Boston, MA 02110-3113

Lawrence Nathanson
Siegal, Napierkowski & Park
533 Fellowship Road, Suite 120
Mt . Laurel, NJ 08054-3412

/s/ Mark T. Nugent

Mark T. Nugent

# EXHIBIT A

Exhibits: 1 - 2 Volume 1, Pages 1 - 177

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

Docket No. 02-053

---------------------------

EMHART INDUSTRIES, Inc.

Plaintiff

vs.

HOME INSURANCE COMPANY, et al.

Defendants

(Complete caption on next page.)

-----------------------------

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

DEPOSITION Of JAMES RONALD HASS

Wednesday, March 15, 2006, 10:12 a.m.

Hermes, Netburn, O'Connor & Spearing, P.C.

265 Franklin Street - 7th Floor

Boston, Massachusetts

------- Reporter: David A. Arsenault, RPR -------

darsenault@fabreporters.com www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415

Boston, Massachusetts 02109

617.728.4404 fax 617.728.4403

146

**(A recess was taken.)**
**(Mr. Harding is not present; Mr. O'Connor is present.)**

**EXAMINATION**

**BY MR. HARDING:**

**Q. Just so we are clear, is it correct that you are not offering an opinion today that New England Container Company's operations are, in fact, the source of dioxin contamination at the Centredale Manor site?**
A. That is correct.
**Q. Is it also correct that you are not offering an opinion today as to the date on which dioxin contaminants entered the environment at the Centredale Manor site?**
A. That is correct.
**Q. Do you have an understanding as to the approximate years of operation of the New England Container Company facility?**
A. Based on the testimony that I've read, they began operations sometime around 1952 and I believe are still in operation at a different site.
**Q. The Centredale Manor, the subject matter of this case, do you know about when their operation**

147

**ceased?**
A. Sometime in the 1969 to 1971 range, I believe. I would have to check.
**Q. Do you recall which depositions you relied upon for any of the information in your report concerning the NECC operations?**
A. Not off the top of my head.
**Q. In checking the references in the December '05 report, they don't seem to be listed. Are they listed in one of your earlier reports?**
A. They would be listed in my first report.
**Q. Do you have an understanding based on the information that you've looked at as to the approximate volume of drums or barrels that were brought to the NECC facility for reconditioning?**
A. I recall seeing numbers in the order of 50,000 drums a year. The ones I paid particular attention to were American Hoechst and George Mann, which between them were delivering a couple thousand a month, according to the 104(e) report.
**Q. Why did you pay particular attention to barrels or drums whose source were one of those?**
A. Because according to the 104(e) report they were engaged in the business of distributing

148

2,4,5-T.
**Q. Does the 104(e) response indicate that in fact barrels or drums were brought to the Centredale Manor site from either the American Hoechst Company or George Mann that contained 2,4,5-TCP?**
A. I don't recall seeing any testimony on what the contents of any particular set of barrels were coming from those places.
**Q. To the best of your recollection, does the 104(e) response indicate the contents of any of the barrels that were brought to the site while NECC was in operation?**
A. I'm not sure how to answer that. I got the information that's in Table 2 from the 104(e) report. So there was something in the 104(e) report that said American Hoechst, George Mann both handled 2,4,5-T. I don't recall anything in any report that said any particular drum had any specific waste that they manufactured or distributed.
**Q. Based on your review of the 104(e) response, those two companies were identified as ones who in the course of their regular operations used 2,4,5-TCP; is that correct?**
A. Correct.

149

**Q. Based on the information that you've reviewed, how were the contents of any barrels or drums that still had some chemicals in them handled? In other words, what was done with the contents?**
A. There were several. The reason I'm pausing is that there were several different people who had different variations on the story of what happened at the drum company. My recollection is that there was some testimony that the drums that came in were always clean and had nothing in them to a range of a fourth full and whatever it was that these people sold was dumped in the fire and/or was buried on the site.
**Q. Is it your understanding that there was a pit where the contents of drums were dumped?**
A. Yes.
**Q. To your knowledge, were any of the contents dumped in the pit flammable materials?**
A. Many of the materials listed on the 104(e) report would have been flammable. I'm assuming that has something to do with the situation, yes.
**Q. Were the contents of these drums dumped near a source of heat?**
A. My understanding is that the pit was

**is that correct?**
A. I can offer the opinion it was after 1900. In terms of a specific year, no.
**Q. Are you able to offer an opinion as to whether dioxin contamination at the site was present on or before February 15, 1970?**
A. Yes, I believe it would have been.
**Q. Earlier you testified that you were not able to give an opinion as to whether dioxin at the site was present on or before January 1970. Do you recall that testimony?**
A. I have thought further since I said that, though.
**Q. Do you want to explain the basis for your change in testimony?**
A. The activities that would have led to dioxin showing up on the site had occurred before 1970, whatever the date was. My understanding of the use of the site after January of 1970, there was little or no activity that should have resulted in the formation of dioxins, or their introduction into the site, even.
**Q. You say your understanding of the activities. Could you tell me what your**



**understanding of the activities is based upon?**
A. Having read the interim final report, the supporting reports to that, the expert reports, and the various depositions that are cited in my first expert report.
**Q. What activities are you referring to that brought dioxin to the site?**
A. At this point I would say the most likely thing was the barrel-burning facility.
**Q. Anything else?**
A. The brief period when hexachlorophene was being synthesized, dioxins would have been bought to the site. But in my view, they are no longer there.
**Q. Any other activities?**
A. If I'm not mistaken, there was a fire reported sometime in 1972 which could have resulted in the formation of dioxins from any precursor materials that might have been still onsite. So I can't say that there weren't things. I would need to know more things about what was still there.
**Q. 1972 would be after the time period I asked about. I said prior to 1970. You raised the issue of a 1972 fire. How do you have knowledge of a 1972 fire?**



A. I believe it was mentioned in the IFR. I had seen it before then in some testimony or records of some sort. I don't remember specifically when I saw that.
**Q. How would that be an activity?**
A. It is more of an event. I would use the word "event" instead of "activity" for that.
**Q. An event that would have brought dioxin to the site?**
**MR. O'CONNOR: Objection.**
A. Had there been any 2,4,5-trichlorophenol on the site at the time, for example, that could have been converted to dioxin during such a fire. If there was any other precursor material around during the heat of the fire, it could have been converted.
**Q. This falls into an event with combustion as we talked about earlier?**
A. There has to be a source of heat.
**Q. A source of?**
A. Of heat.
**Q. I have nothing further.**
MR. PIROZZOLO: I've got a few.
MR. O'CONNOR: I have got a few on his question.



EXAMINATION
BY MR. O'CONNOR:
**Q. Do you have any direct knowledge of what the contents of the Metro-Atlantic building was on the day of the fire in 1972.**
A. I have no direct knowledge.
**Q. Do you have any knowledge that you can point to in a document or any other source that there was 2,4,5-TCP in that building on the day of the fire?**
A. I have not researched that question. I have no idea.
**Q. Do you have any knowledge as to any other, specific knowledge as to what you refer to as precursor material that was in that building on the day of the fire?**
A. I have not researched that question.
**Q. And am I correct that you are not offering an opinion here today that the 1972 fire was the source of the dioxin contamination at the site?**
A. No.
**Q. You are not?**
A. I am offering no opinion. My understanding of the question was, what were possibilities. Those

166

are possibilities. It is certainly not an opinion.
**Q. Thank you.**

**EXAMINATION**

**BY MR. PIROZZOLO:**

**Q. Dr. Hass, if dioxin was released to the site as a result of the delivery of raw material to the site, would that have occurred at the time of the delivery of the raw material to the site?**

MR. LEVENS: Objection.
MR. O'CONNOR: Objection.
MR. HARDING: Objection.
MR. LEVENS: Can you read back the question.

**Q. If dioxin were released to the site as a result of the delivery of raw materials to the site, would that release have occurred at the time that raw material was delivered to the site?**

MR. LEVENS: Objection.
MR. HARDING: Objection.

A. It is conceivable that such release could have occurred.

**Q. It was a hypothetical?**

A. Hypothetically it could have occurred.

**Q. And if dioxin was released to the site**

167

**during the period when Metro-Atlantic was manufacturing hexachlorophene, would dioxin have been released at the site during the period that that kind of manufacturing was going on?**

MR. LEVENS: Objection.
MR. O'CONNOR: Objection.
MR. HARDING: Objection.

A. Yes.

**Q. And if dioxin was released to the site as a result of waste material generated in the hexachlorophene manufacturing process, would that dioxin have been released to the site during the time that that waste material was being generated?**

MR. LEVENS: Objection.

A. On the hypothetical that it was being released to the site, that would be the appropriate time, yes.

**Q. And if dioxin was released to the site as a result of either waste material or raw materials or any other materials being stored on the site or present in the building, would that release have occurred subsequent to the time that that material was either stored or contained in the building?**

MR. HARDING: Objection.

168

MR. O'CONNOR: Objection.

A. I'm not sure I understand the question. Is the question would it have been released during the time period it was being stored?

**Q. Yes, as opposed to before it was being stored. Subsequent to the time it was being stored.**

**MR. O'CONNOR: Objection.**

MR. LEVENS: Could I have the question again.

**Q. If dioxin were released to the site as a result of material containing dioxin being stored in the building or on the site, would that release have occurred sometime subsequent to the commencement of the storage of the material?**

MR. LEVENS: Objection.
MR. O'CONNOR: Objection.

A. Yes.

**Q. If dioxin was released to the site as a result of a fire or explosion that occurred on the site, would that release have occurred at about the time of the fire or the explosion?**

**MR. O'CONNOR: Objection.**

A. Yes.

**Q. And if material were stored on the site**

169

**containing dioxin, that material being either raw materials or waste material, and there was a subsequent fire or explosion, would that material have been released from storage as a result of the fire or the explosion?**

MR. HARDING: Objection to the form.

A. That would depend on the precise nature of the fire. It is certainly conceivable.

**Q. And if dioxin were formed in the course of the New England Container operations on the site, would that formation of dioxin have occurred during the time that New England Container was conducting its operations on the site?**

MR. HARDING: Objection to form.

A. Yes.

**Q. And if that dioxin that was formed during the time that New England Container was conducting operations on the site were released to the environment, would that release have occurred during the time that New England Container was manufacturing, conducting its operations on the site?**

**MR. O'CONNOR: Objection.**

MR. HARDING: Objection to form.

VOLUME II
PAGES 171-430
EXHIBITS Per Index

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

--------------------------------x

EMHART INDUSTRIES, INC.,
Plaintiff
v.
HOME INSURANCE COMPANY,
INSURANCE COMPANY OF NORTH
AMERICA, LIBERTY MUTUAL INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICA INSURANCE COMPANY, AND UNITED STATES FIRE INSURANCE COMPANY,
Defendants

Civil Action No. 02-053-S

--------------------------------x

CONTINUED DEPOSITION OF J. RONALD HASS, Ph.D.
Thursday, November 6, 2003, 10:00 a.m.
HOLLAND & KNIGHT LLP
10 St. James Avenue, Boston, Massachusetts
REPORTER: Virginia L. Barry, RPR/CSR

Page 260

And I further note that the origin, as stated in the previous deposition, the origin of this issue arose from statements that were contained in the rebuttal report of Doctor Woodard that upon being reviewed did not seem to have a sound basis. And that in all the circumstances of this case you've had an ample opportunity to address this matter, be informed of it, and to examine Doctor Haas.

MS. MAIN: Well, I fear by saying any more we're just going to engage in this back and forth, but I need to put on the record that Doctor Woodard's rebuttal report, for whatever way it is involved in Exhibit 6, was submitted in July of '03, and I think the record of September 24th speaks for itself as far as the details or lack thereof that we received regarding what ultimately became a supplemental rebuttal of Doctor Haas.

MR. BINDER: I'll let you get the last word in on the merits of this objection. We'll state our position later. Why don't we move on to things more appropriately done in the deposition record?

(Discussion off the record.)

Page 261

Q. I'd like to turn back to Exhibit 3, please.
A. That's my original expert report?
Q. Correct.
A. Okay.
Q. In item No. 12 you refer to, "at the time Metro-Atlantic was manufacturing hexachlorophene"; what is your understanding of the time period at which Metro-Atlantic was manufacturing hexachlorophene?
A. Approximately, '64 to '65, and that's based on the date that's on the ZEP Manufacturing document that Mr. Cleary produced, and his statement that the production probably was less than a year in the plant. I give credence to that because he was getting commission from the sale, and also he made the statement that he visited the facility three or four times a year, so that he should have been aware if things were going on.
Q. And 13 on page 3, the same document, you reference fires and explosions at the site; do you see that, sir?
A. Yes.
Q. Which fires and explosions are you

Page 262

referring to?
A. The ones that were described in the depositions and newspaper articles I was provided to review for this case.
Q. And do you know the dates of the fires and -- strike that.
Was there more than one fire?
A. It's my understanding that there were a number of fires on site, but I also understand there's some controversy about that amongst the depositions.
Q. Do you recall the dates of the various fires?
A. No.
Q. Do you recall which decades the various fires fell into?
A. Mostly focusing on mid '60s, until the facility closed.
Q. And was there --
A. But, well, let's see, many of the depositions talked about things that happened in the early '60s, as well, so I'm not sure I sorted those clearly in my mind.
Q. But the decade would be the 1960s for the

Page 263

fires?
A. Yes, plus there was a major one in '72, I believe
Q. And would the one in '72 create, as you say in your second sentence of No. 13, an additional reason to have the site evaluated?
A. Yes, on the presumption that trichlorophenol was present, burning it would have generated dioxins.
Q. You don't know if there was trichlorophenol on the site in 1972; do you?
A. Not directly, no.
Q. You also reference explosions in No. 13; how many explosions are you referring to?
A. I don't remember the specific number. The one that comes to mind is the guy who was filling up his space heater with methanol.
Q. Do you know when that occurred?
A. Mid '60s, I believe, I'd have to go back and check the depositions to get the exact dates.
Q. Do you remember the years in which the explosions occurred that you're referencing in No. 13?
A. During the '60s is all I can tell you.

Page 264

Q. The explosion where the person filled a space heater with methanol, is that in your opinion an additional reason to have a site evaluated, as you go on to say in the second sentence of No. 13?
A. Not that one specifically, that should not have added to any dioxin contamination.
Q. What types of explosions in your opinion that you've read about occurring would have contributed to dioxin contamination on the site?
A. Any one in which there was trichlorophenol present.
Q. Are you aware of any explosions where trichlorophenol was present?
A. There was inadequate information in the depositions to say what was or was not present in very many of the incidents reported, so I can't.
Q. So you can't?
A. I can't, one way or the other, I can't say whether it was or was not present
Q. So are you saying that only if the trichlorophenol had been involved in an explosion or fire would there be reason to evaluate the site?
MR. BINDER: Objection.
A. If the trichlorophenol had been involved

Page 265

in an explosion or fire, there would definitely have been a reason There may have been other chemicals present that could have generated dioxins, if in the event of an explosion, which I did not look through the list of everything they've ever had on site, so I cannot say that there are not other reasons as well.
Q. But the basis for your opinion which is shown in No. 13 doesn't reference --
A. Trichlorophenol was the issue I was thinking about at the time.
Q. I'm sorry, you really need to let me finish my question.
A I apologize.
Q. Your No. 13 does not reference any other chemicals on site that would have contributed to a reason to evaluate the site in the event of a fire or explosion; correct?
A. It does not.
Q. Are you aware of any trichlorophenol contaminated drums being processed by the drum manufacturing company that was adjacent to Metro-Atlantic?
A. I am not. The only thing I saw in the

Page 266

record on that was the statement that the trichlorophenol used by Metro-Atlantic came in tank, tank cars or tank, truck tankers, I'm sorry, of, approximately, 5,000 gallons each, so based on that there would have been no trichlorophenol drums coming from Metro-Atlantic. But my understanding is that New England Container collected drums from a fairly large area, so one would have to know what industries they were dealing with in order to answer that question; and I have -- I don't have that information.
Q. And so your reference here to trichlorophenol contaminated drums that might have been processed by New England Container is based on speculation; correct?
MR. BINDER: Objection.
A. It is my assumption that it is highly likely that somebody else within their catchment area for drums would have been using trichlorophenol, but I do not know that directly.
Q. What would you base that it's highly likely that trichlorophenol contaminated drums were coming into New England Container?
A. Just the probability that somebody else

Page 267

that they were doing business with would have been using -- the limited probability that no one out there they were doing business with would have been using any trichlorophenol.
Q. Do you bring any expertise to the table to say that there was a probability that New England Container would have been handling trichlorophenol contaminated drums?
A. No. Let me elaborate on the previous answers. What I was addressing there are what are reasons that one would have to test, and while you can't say -- while I can't say New England Container did not ever process a drum with trichlorophenol in it, neither can I -- no, let me start this over. I'm getting lost myself.
I cannot say that New England Container ever processed a drum that had trichlorophenol in it, equally, I cannot say that they did not process many drums that had trichlorophenol in them; there's simply no way of establishing that, given the information available. So in terms of whether or not to have considered evaluating the site, the fact that drums were being recycled there, in my view, is a reason to do that,

Page 268

because of the possibility that trichlorophenol would have been in some of the drums that were brought in.

Q And is it your opinion that a reasonable person, then, should have thought, well, it's a possibility trichlorophenol contaminated drums could be at New England Container, and, hence, the thermally induced by-product may cause, may be dioxin, and, hence, I should test there?

A. Once again, it looks, it depends on exactly when you look at history about that. The formation of dioxins from runaway reactions in trichlorophenol plants was well-known in the '60s, mid '60s, by those people who were in that business. So a reasonable person who was aware of that information would have had reason to test.

As time went on, more and more information came, more information became available to more people, so that by 1977 there was a publication of a very widely distributed journal, Science Magazine, or Science, that dioxins are formed as a thermal by-product from the combustion of trichlorophenols.

Q. And so is it your opinion, then, that a

Page 269

reasonable person as of 1977 should have tested for dioxin because of the possibility that New England Container dealt with trichlorophenol contaminated drums?

A. That's one of the reasons that in the particular case of the Metro-Atlantic site the test should have been done.

Q. If you look at page 5 of Exhibit 3, at the top you reference some I believe they're German articles regarding dioxin; do you see that, Doctor Haas?

A. The part that's been pasted in starting with reference No. 8?

Q. Correct.

A. Okay.

Q. And at least two of these are German articles; is that correct?

A. Yes, German language, yes.

Q. Do you know if those articles were translated in or around the time they were published, and I mean translated into English?

A. I do not know.

Q. Do you know if they've ever been translated into English?

Page 270

A. I believe they have. I can't cite specifically, but I think I've seen the first reference 16 article in English, but I can't remember exactly when or where.

Q. If you turn the page to page 6, the very first sentence at the top, where you state, "By the mid 1970s the adverse effects of dioxins and specifically 2,3,7,8-TCDD was widely known"; do you see that, Doctor Haas?

A. Yes, Ma'am.

Q. Do you mean widely known to the general public at that time in the mid 1970s?

A. The information was available to the general public by the 1970s. Once again, the interest generated by the use of Agent Orange in Vietnam in Congressional hearings, by this time there was concerns being raised about consideration of smoke stacks. The thing I struggle with is, when you say "general public," maybe housewives in Nebraska, but certainly people who were interested in things to do with the environment would have been aware of it by then.

Q. What about someone running a small chemical manufacturing facility in North Providence,

Page 271

Rhode Island?

A. By the mid '70s I think they should be aware.

Q. And you base that on?

A. What I believe to be a reasonable amount of understanding what's happening in your business.

Q. If you'd turn to page 9 of Exhibit 3, you state in the last sentence of the first paragraph, "This action should have resulted in, approximately, 1.3 kilograms of dioxin being brought onto the site by the amount brought to the site"; do you see that, sir?

A. I do.

Q. Could you tell me how you got to that calculation of 1.3 kilograms of dioxin?

A. My memory is I took the average of the reported numbers there and multiplied it by the 25,000 kilos that Cleary references having been brought on site.

Q. Do you have any work papers that show that calculation, or was it just --

A. Possibly, I mean, all you need is a calculator to do that; so I may or may not have done that someplace written down.

**EXHIBIT B**

**EXPERT REPORT OF JOHN R. KASTRINOS**
**CENTREDALE MANOR SUPERFUND SITE**
**NORTH PROVIDENCE, RHODE ISLAND**

## INTRODUCTION

My professional experience in the geosciences and hydrogeology, specifically, dates back to the mid-1980s. I received a Bachelors of Science degree in Geology from Dickinson College in 1983 and a Masters of Science degree in Environmental Pollution Control from the Pennsylvania State University in 1985. I worked as a field hydrologist under contract with the U.S. Geological Survey (USGS) in 1984 and 1985 while finishing my Master's degree. I have been employed as a hydrogeologist with Haley & Aldrich, Inc. since 1985. I am a certified Professional Hydrogeologist with the American Institute of Hydrology (No. 96-HG-1145), a registered Professional Geologist in the State of Pennsylvania (No. 001872G) and a Massachusetts Licensed Site Professional (No. 9623). My resume is attached.

This expert report provides opinions as to likely mechanisms for transport of dioxin. The Centredale Manor Superfund Site, as defined by U.S. Environmental Protection Agency (EPA), includes the Centredale Manor and Brook Village properties, and an area of the Woonasquatucket River extending approximately 2,500 ft south (downstream) of the two properties (to just below Lymansville Dam), hereinafter referred to as "the Site." My professional opinion was developed based on review of documents regarding the Site provided by the law firm of Willcox, Pirozzolo and McCarthy (WP&M); other published sources; and observations made during a visit to the property on 12 May 2003, as described below.

- Documents provided by WP&M included EPA correspondence, historical atlases (Sanborn Fire Atlases) and drawings, and environmental site investigation reports by others including Loureiro Engineering Associates (LEA) and NUS Corporation.

- Historical information on land use, demolition/development, earthwork and flooding, as contained in the files provided by WP&M, published information filed at Haley & Aldrich, and information available on the Internet. The available sources of information included: aerial photographs; historical insurance maps (Sanborn maps); meteorological, chemical, and hydrological information and data available on the Internet; and records of local municipal offices and government agencies.

- A visit was made on 12 May 2003 to review existing surficial features at the properties. I was accompanied on the visit by Kelsey Doub and Andrew Nichols of Haley & Aldrich, Inc.

Based on my review of these documents, and personal observations of the properties, my understanding of property conditions, property history, and environmental conditions is summarized in the following sections.

## PROFESSIONAL OPINION

### Property Conditions

The property comprises approximately 9.7 acres of land distributed over two parcels located at 2072 and 2074 Smith Street in North Providence, Rhode Island (the "property"). The property is abutted by Smith Street (Route 44) to the North, a small stream (known as the "tailrace") and residential properties to the east, and the Woonasquatucket River to the south and west. The Brook Village and Centredale Manor apartment buildings occupy the property. Brook Village is an eight-story brick structure at the northernmost portion of the property, with a paved parking area to the south of the building. Centredale Manor is a six-story structure located approximately 600 ft south of the Brook Village building. Paved parking areas are located north and southwest of Centredale Manor. An access road extends from Smith Street south, between the two buildings. The Brook Village building is west of the access road and the Centredale Manor building is east of the road.

The southern portion of the property comprises an undeveloped, unpaved parcel of open land approximately 2.1 acres in size. Tall grasses cover most of the open area; mature trees up to approximately 1 ft in diameter are present along the eastern and western limits of the open area. The confluence of the tailrace and the Woonasquatucket River, located approximately 375 ft south of the Centredale Manor building, forms the southern property boundary. Based on property features observed in aerial photographs [1], trees were located on the open area section of the property. The trees were removed for the construction of an interim soil cap over contaminated soils in 1999 (described subsequently in this Report). An island approximately 4 acres in size extends southward for 750 ft beyond the confluence of the Woonasquatucket River and the tailrace. According to a 1933 historical plan, the area of the island was formerly the Allendale Mill Pond (38). The island was likely created by the breach of the downstream Allendale dam in 1991, which lowered the Woonasquatucket River level.

Based on historical USGS topographic maps dating back to 1939 [2], a 1981 pre-construction survey plan prepared for the Centredale Manor project [3], and a 1983 plan depicting as-built data following construction of Centredale Manor [4], topography has remained relatively consistent at the property. Specifically, these maps indicate ground surface elevations of 94 to 99 ft above Mean Sea Level, with topography sloping southward to the Woonasquatucket River at an approximate grade of 0.5% (5 ft/approximately 900 ft). In the southern portion of the Centredale property, a cap was placed over contaminated soils in 2000. Based on comparison of a construction survey plan dated 1983, which post-dated the Centredale Manor construction, with a 2002 Survey Plan by LEA, capping raised the grade by up to approximately 1 ft in this area of the property. In addition, in areas south of the Centredale Manor building footprint and parking lot, pre-construction topographic contours shown on an October 1981 pre-survey plan are consistent with those shown on the 1983 final as-built plan.

### Property History

From the turn of the 20th century until the early 1970's, the northern portion of the property, extending from Smith Street a distance of approximately 750 ft south, was used for manufacturing while the undeveloped, approximately 2.1-acre southern portion of the property remained undeveloped. Between approximately 1900 and 1936, the property was

occupied by Centredale Worsted Mills, a manufacturer of woolens. Atlantic Chemical Company, a chemical manufacturer, occupied the property from 1940 until 1953. In 1953, Atlantic Chemical Company changed its name to Metro Atlantic, Inc., and operated under this name until the late 1960s. In 1968, Metro Atlantic, Inc. merged with Crown-Chemical and operated under the name of Crown-Metro, Inc. Manufacturing at the Centredale property ceased in 1968, when operations were moved to their Providence, Rhode Island plant. In 1969, Crown-Metro, Inc.'s business was acquired by USM Corporation. A fire in 1972 destroyed most of the structures that formerly belonged to Crown-Metro, Inc. on the Centredale Property [5,6,7]. The Brook Village Apartment complex was built between 1976 and 1977; the Centredale Manor complex was built in 1982 [5,6].

The following is based on a review of Sanborn historical maps dated 1900, 1921, 1951, 1956, and 1965 [8]. The Centredale Worsted Mills is depicted at the northern end of the property (near the current location of Brook Village) on the 1900 and 1921 Sanborn maps. A small building that was indicated as a Wagon Shed on the 1900 map and as an auto building on the 1921 map was located immediately south of the Mills. The land south of the small building was vacant, as shown on the 1900 and 1921 Sanborn maps, and the tailrace and Woonasquatucket River bordered the property to the east and west, respectively. The tailrace extended north beneath Smith Street and the section north of Smith Street is identified as a "headrace" on the 1951 map. The headrace was apparently filled between 1951 and 1956, because it is not shown on the 1956 USGS topographic quadrangle. The former Mill buildings are labeled "ATLANTIC CHEMICAL CO. CHEM MFG" on the 1951 Sanborn map; the small building in the south is labeled "STGE" indicating it was used for storage. Several buildings located at the western edge of the property along the River are also labeled "STGE" and one section is labeled "CHEM MFG." The 1951 map shows that land south of the buildings was vacant and the tailrace and River bordered the property to the east and west, consistent with the earlier Sanborn map. On the 1956 map, the plant is labeled "METRO-ATLANTIC, INC. CHEM. MFG." (the company name change occurred in 1953). An L-shaped small building in the south section of the property is labeled "BARREL STGE." on the 1956 Sanborn map, and an abutting trapezoidal-shaped building is labeled "BARREL CLEANING." Land to the south of these buildings appears vacant. The 1965 Sanborn map depicts the buildings much as they were on the 1956 map, including the buildings in the south section of the property; however, the building formerly labeled "BARREL STGE" is labeled "STEEL DRUM RECONDITIONING" on the 1965 map. Due west of these buildings, an additional building is shown adjacent to the Woonasquatucket River. The building is labeled "CHEM. MFG."

As referenced in the February 2003 deposition of Thomas F. Cleary [9], hexachlorophene was produced at Metro - Atlantic for less than 1 year, at a building located between Metro-Atlantic's main buildings and the Woonasquatucket River. Based on Cleary's description, the 17 December 2002 deposition of Mr. Joseph Nadeau [10], the 17 January 2003 deposition of Mr. Joseph Buonanno, Jr. [29], and the distribution of dioxin concentrations at the Site as shown on maps prepared by IT Corporation (referenced subsequently in this Report), the building where hexachlorophene was manufactured corresponds to the roughly square building located adjacent to the river and southwest of Metro-Atlantic's main buildings shown on the Sanborn map dated 1965. In Nadeau's deposition [10], he indicated hexachlorophene was manufactured at the Centredale property for approximately eight or nine months.

According to the EPA and the IPCS INCHEM website (www.inchem.org) [11], hexachlorophene contains hexachloroxanthene (HCX) and dioxin 2,3,7,8-TCDD as byproducts of hexachlorophene manufacturing.

In the southern portion of the Centredale Manor property, New England Container (NEC) performed barrel refurbishing. According to Mr. Joseph Nadeau [10], who worked loading and unloading trucks at NEC in the mid-1960s, NEC dumped remaining contents of drums on the ground, sent them through an incinerator, sandblasted the drums, painted the drums, and then sold the "reconditioned" drums. According to Nadeau's deposition, the drums received by NEC contained various quantities of oil, powdered dyes, and other substances. Prior to reconditioning, the drums were stacked on the ground between the NEC plant and the Woonasquatucket River.

**Environmental History**

The Rhode Island Department of Environmental Management (RIDEM) initiated environmental investigations at the property in 1970. These investigations continued through 1986. Based on preliminary investigations completed by EPA contractors, the site was added to the National Priorities List (NPL) on 4 February 2000, which officially identified the site as a Superfund Site. The limits of the Superfund Site included the property and an area of the Woonasquatucket River extending approximately 2,500 ft south (downstream) of the property. The following presents a chronology of environmental conditions observed (by others) at the site and results of environmental investigations completed by others:

| | |
|---|---|
| 1957 – 1963 | Forklifts moved barrels and a bulldozer buried the barrels 5 days a week in areas south of the former manufacturing area, as observed and stated in deposition by Kenneth M. Neri, a neighbor who lived along Amber Street between 1956 and 1968 [12]. Amber Street is located across the Woonasquatucket River and west of the Centredale Manor site. Neri's deposition also indicates that drums were reportedly disposed of in the southern portion of the property, in the area where the tailrace and the Woonasquatucket River meet [1]. |
| Nov. 1977 | Approximately sixty (60) drums were identified "over a wide swampy area." Ten (10) of the drums reportedly containing sulfuric acid ($H_2SO_4$) were removed from the property [13,14]. |
| March 1981 | During a property inventory, RIDEM identified 600 drums; reportedly, 95% of the drums were empty [15]. |
| October 1981 | One (1) smoking drum was removed from the property by Jet-Line Services (disposal location or facility was not indicated) [16]. |
| February 1982 | During construction of the Centredale Manor apartments, 6,000 cubic yards (CY) of soil containing chloroform, toluene, trichloroethylene (TCE), bis(2-ethylhexyl)phthalate, and barium at concentrations that were below RIDEM regulatory levels, were removed from the Centredale Manor construction area by Marshall (a construction company) [6,17,13]. Based on the generalized soil profile reported by GZA [22], this volume is consistent with the volume of fill that |

| | |
|---|---|
| | would have been removed for geotechnical purposes from beneath the building footprint (to support the building slab and foundation) and from below the proposed parking area (for placement of a pavement base-course layer). The soils were disposed of as non-hazardous solid waste at an in-state licensed landfill. The Silvestri landfill was reportedly proposed as the in-state landfill [18]; however, Haley & Aldrich found no documentation of what disposal facility was ultimately used for disposal of the soils. Reportedly, two composite samples that were derived from 10 borings in the proposed construction area were submitted for analysis to satisfy the landfill acceptance criteria [17]. |
| February 1982 | C. Pezza & Sons removed 400 drums from the property. After analyses of the contents, 30 additional drums were removed from the property. Based on chemical analyses of the contents, eight (8) of the 30 drums were transported off the property to an "approved facility" as hazardous materials by Jet-Line Services [17]. |
| 1982/1983 | C. Pezza & Sons reportedly backfilled at the Centredale Manor property but did not indicate the quantity, quality, and source(s) of the backfill. The available documentation provided no information on the exact locations where the backfill was placed [19]. Based on the generalized soil profile reported by GZA [22], and the approximate area comprised by the building and parking area (located west/southwest of the building), the fill was likely used for geotechnical purposes to backfill the building footprint area (to support the building slab and foundation) and the proposed parking area (for placement of a pavement base-course layer). |
| March 1986 | A Ground-Penetrating Radar (GPR) survey was conducted. The GPR survey revealed evidence of buried metallic objects, such as drums, along the western edge of the Property [17]. |
| 1996-1998 | As part of the EPA Providence Urban Initiative (1996), tissue samples were collected from fish and eel taken from the Woonasquatucket River watershed. Dioxin concentrations were first identified in fish tissue samples in 1998 [5]. |
| 1998 | In June 1998, EPA initiated an Expanded Site Inspection (ESI) of the Centredale Manor property to assess the extent of contamination in areas of potential human exposure, the potential for source areas to be located up-river from the Centredale Manor property, and the presence of dioxin/furan and HCX contamination on the Centredale Manor property. Additional sediment samples were collected in September 1998 [5]. |
| January 1999 | EPA initiated emergency actions that included installing temporary fencing around areas of surface soil contamination on the Centredale Manor property, and collecting an additional 300 surface soil samples to further assess extent of surface soil contamination. [5] |

| | |
|---|---|
| Summer 1999 | Trees formerly located immediately south of the Centredale Manor parking lot were removed when an interim protective cap was constructed in that area [5]. |
| June-Nov 1999 | IT Corporation (under EPA direction) collected 889 soil/sediment samples at the property and areas downstream to further assess the nature and extent of contamination [20]. |
| 2000 | At the direction of the EPA, 1,097 CY of "common fill" and 745 CY of topsoil were placed on the property to form a soil cap. Based on comparison of a construction survey plan dated 1982, which post-dated the Centredale Manor construction, with a 2002 Survey Plan by LEA, capping increased the grade by up to approximately 1 ft in this area of the property. Samples of the material brought to the property were collected and analyzed for total petroleum hydrocarbons (TPH), polychlorinated biphenyls (PCBs), pesticides and herbicides. PCBs or pesticides and herbicides were not detected in the samples; trace levels of TPH were detected [21]. |

**Property Subsurface Conditions**

A summary document prepared by Goldberg-Zoino Associates (GZA) in 1982, prior to the construction of the apartment building, describes subsurface conditions at the Centredale Manor property. The information was obtained from the results of eight borings and six test pits conducted at the Centredale Manor property in 1981 and 1982 [22]. GZA described the subsurface conditions as follows:

- Granular fill consisting of a mixture of loose to dense sand, gravel, silt, and trash overlies much of the property, varying in thickness from 2 to 6 ft.
- A layer of black organic silt, varying from 1 to 2 ft in thickness, underlies the fill.
- A gravel/sand layer underlies the organic silt, ranging in thickness from 6.5 to 14.5 ft, followed by a layer of fine sand/silt of 4 to 12 ft in thickness.
- A sand/gravel layer was encountered below the fine sand/silt layer. The thickness of the sand/gravel layer was not reported since the borings were terminated within this material, but the layer was encountered below 45 ft in depth at two of the borings.

**Hydrology**

The Woonasquatucket River forms the western boundary of the property. The Woonasquatucket River flows south, draining into the Atlantic Ocean, approximately 4.5 miles southeast of the property. A narrow stream, known as the "tailrace," is present along the approximate eastern boundary of the property, and likely represents the remnants of an excavated channel that formerly served the wool-manufacturing mill. The tailrace extended north beneath South Street, where it was identified as a "headrace," and appears to join the Woonasquatucket River. The River is dammed in two places south of the property – the Allendale Dam, located approximately 2,000 ft south of the property and just north of Allendale Avenue; and the Lymansville Dam, located approximately 1.25 miles south of the property near Lyman Avenue. The Allendale Dam was breached in 1991, which lowered the Woonasquatucket River level and reduced the area of Allendale Pond (the pond just north of the dam and south of the property).

USGS Streamflow Gauging Station 0111450 is located on the western bank of the Woonasquatucket River, adjacent to the Brook Village apartment complex, approximately 75 ft downstream (south) from the U.S. Highway 44 (Smith Street) Bridge. According to available USGS streamflow data, the Period of Record for Gauging Station 0111450 is July 1941 to 2001. The USGS uses annual peak streamflow data (in cubic feet per second [cfs]) from gauging stations to document trends in historic streamflow measurements recorded at regional gauging stations, including "significant flood events" (USGS Water Supply Paper 2502). A "significant flood" is a designation ascribed by the USGS to recorded streamflow measurements that rank in the top 5 percent of all annual maximum discharges for a gauging station's Period of Record [23].

Using these criteria, "significant flood events" measured at Station 0111450 occurred in 1968, 1983 and 1998. Seven of the 12 greatest annual peak streamflow measurements (top 20%) were recorded between 1968 and 1985 [23].

**Sources and Extent of Contamination**

**Soil**

According to the EPA's Action Memorandum – Non-Time-Critical Removal Action (NTCRA), dated 18 January 2001, the critical contaminant of concern is 2,3,7,8-tetrachlorodibenzo-p-dioxin (dioxin – 2,3,7,8-TCDD) [24]. Figures contained in IT Corporation's Final Site Investigation Report, dated 16 March 2000 [20], provide the locations and depths of detected contaminants. Based on soil samples collected at the property, dioxin concentrations up to 140 parts per billion (ppb) have been detected in the surficial soils (collected from 0 to 1 ft below ground surface [bgs]) and exposed swale sediments. The portion of the property adjacent to and south of the existing Centredale Manor apartment complex and associated parking lot has been identified as an area of the property exhibiting elevated concentrations of the dioxin compound 2,3,7,8-TCDD and PCBs in shallow (0 to 1 ft bgs) soils [20]. The highest concentrations of contaminants were generally located in soil and sediment collected at depths of less than 2 ft bgs or below sediment surface, in the wetland areas between the Centredale Manor and Allendale Pond [25]. At greater depths (up to 8 ft bgs), the highest concentrations (1 to 10 ppb) were detected near the building that is labeled "CHEM. MFG." and adjacent to the Woonasquatucket River, as shown on the 1965 Sanborn map [20].

The distribution of elevated levels of dioxin in the area south of the Centredale Manor apartment building and associated parking lot generally corresponds to the shape of the forested portion of the property, as it existed prior to removal of trees and placement of a soil cap. The dioxin levels decreased with increasing distance upslope from the shoreline of Lymansville Pond; accordingly, the lowest concentrations were detected in samples collected from the higher elevations along the banks of the pond [25]. A similar trend was observed in data from Allendale Pond, but with fewer supporting data [25]. Dioxin concentrations were generally lower in Lymansville Pond than in Allendale Pond. These results are based on a series of plans by IT Corporation, contained in their March 2000 report, which show the extent of dioxin (TCDD) and PCB contamination [20].

Additional contaminants detected at the property include 1,2,3,5,7,8-hexachloro(9H)xanthene (hexachloroxanthene), PCBs, chlorobenzene, toluene and

xylenes, respectively; tetrachloroethene (PCE), and benzene [25]. Elevated levels of additional chlorinated and aromatic volatile organic compounds (VOCs), semi-volatile organic compounds (SVOCs), polyaromatic hydrocarbons (PAHs), and metals were also detected in soils and sediments. The following describe the occurrence of these other contaminants [20]:

- Hexachloroxanthene was detected in most of the soil and sediment samples collected from locations where dioxins were also detected (25).
- Levels of VOCs exceeding Rhode Island Residential Standards were detected in the areas of the property surrounding the Brook Village and Centredale Manor apartment buildings.
- Levels of SVOCs and RCRA metals exceeding Rhode Island Residential Standards were detected in the area of the apartment buildings, as well as at several locations downstream and by the Allendale Dam.
- The highest concentrations of PCBs were detected within near-surface depths (0 to 1 ft bgs) in the area south of Centredale Manor, the area immediately south of the Brook Village parking area, and downstream north of Allendale Pond. The highest concentrations of PCBs detected at greater depths (up to 8 ft bgs) were generally detected in samples near the Centredale Manor property and to the south. The levels of PCBs decreased with increasing distance upslope from the shoreline of Lymansville Pond. [25]. PCBs generally were detected at lower concentrations in Lymansville Pond than in Allendale Pond [25].

According to the 31 August 2000 deposition of an unidentified person [26], other businesses that discharged waste to the River upstream of the property between 1952 and 1977 included Worcester Textile, and the Pawtucket Mills. According to the deposition, these industries were active between 1952 and 1977. Other industries active in the area included Colonial Chemical and an asphalt plant, which were located on the Johnston side of the River. The deposition did not indicate whether the facilities were located upstream or downstream of the property. According to the deposition of Mr. John Priest (truck driver/auto mechanic) [27], he saw discoloration in the Woonasquatucket River originating upstream from the Metro Atlantic facility. He named Esmond Mills, Worcester Textile and Evans Plating as companies that dumped waste into the river, and indicated that the companies were located upstream of the property. According to Mr. Priest, Esmond Mills and Worcester Textile produced and utilized dyes. These facilities were not mentioned in EPA documents relating the Centredale Manor Restoration Project Superfund Site. Additionally, in their Responsiveness Summary dated January 2001 [28], in a response to a comment concerning other industrial facilities that may have contributed to dioxin and PCB contamination in the River, EPA did not identify other facilities upstream or downstream of those formerly located in the Centredale Manor/Brook Village area. According to the deposition of Joseph Buonanno, Jr., facilities that used dyes and were located upstream from the Centredale Manor/Brook Village area included Esmond Dye and Greenville Dye. According to Mr. Buonanno, Jr., at times the tail race was discolored due to the presence of green or blue dye[29].

According to EPA, "the concentrations and distributions of dioxins found in the soil and sediment has directed the investigations to the River and more specifically the Centredale Manor and Brook Village properties. EPA believes that the contamination at the Site was primarily caused by former chemical company operations (including

the manufacture of hexachlorophene, which has dioxin as a by-product) and a former drum recycling operations (including uncontrolled incineration of drum residuals, which can cause the release of dioxin) at these properties prior to the early 1970s. As described in the Environmental Engineering/Cost Analysis (EE/CA) report, sediments in the Woonasquatucket River from Esmond [north of the Site] to below Olneyville [south of the Site] have been investigated, and highest concentrations of dioxin in the River have been found in sediment in the Allendale Pond, immediately downstream of the Centredale Manor property, where highest dioxin concentrations (above 100 ppb) were found in soil." [28]

EPA continues in their Responsiveness Summary, "Additionally, the fact that hexachloroxanthene (HCX) along with the 2,3,7,8-TCDD was found at the Site, indicates that this dioxin contamination originated from the manufacture of hexachlorophene, which records show occurred at the Site." [28]. According to Thomas Cleary's deposition [9], and information obtained from the International Programme on Chemical Safety (IPCS) INCHEM website (www.inchem.org) [11], hexachlorophene is manufactured from a reaction involving 2,4,5-trichlorophenol, formaldehyde, and PCE. Additionally, hexachlorophene contains HCX and produces the dioxin compound 2,3,7,8-TCDD as a byproduct. The EPA also states in their Responsiveness Summary that dioxins are widespread in the environment but are typically detected at much lower concentrations than those found at the Site [28].

**Groundwater**

According to GZA's letter to Marshall Construction, Inc., dated 27 January 1982, three groundwater samples were collected in 1982 and analyzed for specific conductivity, pH, and VOCs. Reportedly, VOCs were not detected in two of the samples, and one unknown VOC was detected at a very low concentration in the third sample [30].

Goldman Environmental Consultants (GEC) installed seven groundwater monitoring wells around the Brook Village building in March 1999. Depths to groundwater measured by GEC on 22 March 1999 ranged from 2.64 to 7.45 ft below ground surface. Groundwater elevations ranged from 91.16 to 93.47 as reported by GEC. The elevations were based on an assumed benchmark elevation of 100 ft. established at the bolt on the largest underground storage tank (UST) cover closest to the River. Based on these interpreted groundwater elevations and the well locations, groundwater generally flows west/southwest, toward the River.

Groundwater samples were collected from the wells in March 1999 and submitted for chemical analyses. Results of VOC analyses were as follows:

- Acetone was detected in one sample (GEC-2); according to GEC, there was no RIDEM groundwater standard for acetone at the time the data were reported
- Benzene was detected in GEC-7 at a concentration that was below the RIDEM groundwater standards.
- Cis-1,2-dichloroethylene and PCE were detected in three of the samples (GEC-5, 6, and 7); according to GEC, there were no RIDEM groundwater standards for these compounds at the time the data were reported.

- TCE was detected in two of the samples (GEC-5 and 7); GEC reported that there was no RIDEM groundwater standard for this compound at the time the data were reported.
- Vinyl chloride was detected in two samples (GEC-4 and 7) at concentrations that exceeded the RIDEM groundwater standard.
- Xylenes were detected in two samples (GEC-1 and 7) at concentrations that did not exceed the RIDEM groundwater standard.

PAHs were detected in several of the samples. According to GEC's report, RIDEM groundwater objectives (analogous to guidelines) existed for benzo(a,e)pyrene and naphthalene. Benzo(a,e)pyrene was detected in three samples above the GA groundwater objective, and Naphthalene was not detected in any samples above the GA groundwater objective.

Four samples were submitted for Total RCRA 8 metals analysis. The reported results were as follows:

- Arsenic, barium, and chromium were detected in several samples below the RIDEM GA objectives (a groundwater objective was not provided for arsenic). Lead was detected in three of the samples (GEC-1, 5, and 6) at concentrations that exceeded the RIDEM GA objective.

PCBs (as Aroclor 1254) were detected in GEC-6 at a concentration that exceeded the RIDEM GA groundwater objective [31,32].

**Fate and Transport of Dioxins and PCBs**

Dioxins and PCBs have low solubility and high organic carbon/water partition coefficients ($K_{oc}$), so they are not readily leached from soils and sediment by infiltrating precipitation. In addition, they are considered resistant to degradation by natural means, such as bacterial activity (biodegradation) or exposure to sunlight (photodegradation) [11]. Based on these properties, once sorbed to soil or sediment these contaminants migrate in the environment principally by erosion, scouring and re-deposition. Scouring refers to erosion of the river bottom by stream flow, as distinguished from erosion of surface soils from areas adjacent to the river, by storm water runoff. For example, the following quotes describe migration properties of dioxin determined through research in dioxin fate and transport:

- "In soil, sediment, the water column, and probably air, CDDs/CDFs [chlorinated dibenzo dioxins and chlorinated dibenzo difurans] are primarily associated with particulate and organic matter because of their high lipophilicity and low water solubility. They exhibit little potential for significant leaching or volatilization once sorbed to particulate matter." [33]
- "Burial in-place or erosion of soil to water bodies appears to be the predominant fate of CDDs/CDFs sorbed to soil. CDDs/CDFs entering the water column primarily undergo sedimentation and burial. The ultimate environmental sink of CDDs/CDFs is believed to be aquatic sediments." [33]
- "Because of their very low water solubilities and vapor pressures, CDDs/CDFs below the soil surface (i.e., below the top few millimeters) are strongly adsorbed and show little upward or downward vertical migration, particularly in soils with a high organic carbon content." [34]
- "Although few studies have evaluated quantitatively the transport of soil-bound

CDDs/CDFs, the very low water solubilities and high $K_{oc}$s of these chemicals indicate that erosion of soil to water bodies appears to be the dominant surface transport mechanism for CDDs/CDFs sorbed to soil." [35]

- "Most CDDs/CDFs entering the aquatic environment are associated with particulate matter (e.g., dry deposition of atmospheric particles and eroded soil) and are likely to remain sorbed to the particulate matter once in the aquatic environment." [33]
- "If released to soil, TCDD is not expected to leach. As a rule, the amount of TCDD detected more than 8 cm below the surface has been approximately 1/10 or less than that detected down to 8 cm. Being only slightly soluble in water, its migration in soil may have occurred along with soil colloids and particles to which it may have been bound." [36]
- "Because of their chemical characteristics and very low solubility, dioxins accumulate in most soil types, with very little water leaching." [37]
- According to EPA's Responsiveness Summary, dated January 2001, "the chemical nature of dioxins bind them to the soil and sediment particles, and so they are only subject to movement by re-suspension of those particles presumably during flood conditions." [37]

Although PCBs were detected in one groundwater sample according to GEC, this was likely due to the presence of PCBs adsorbed to soil particles suspended in the water sample.

## CONCLUSIONS

Based on the above information and observations, it is my professional opinion that dioxins and PCBs that would have been detected between 1968 and 1985 (had they been sampled for and analyzed) were present at concentrations as great or greater than concentrations detected at the property from the mid-1990s through the present. In addition, based on the extent of dioxins and PCBs detected in the Site soils and sediments of the Woonasquatucket River, the chemical characteristics of these contaminants, and streamflow records, it is my professional opinion that erosion, scouring and re-deposition transported contaminated soil and sediment from the property to downstream areas (to the south) during a period that included 1968 to 1985. Due to these transport mechanisms, the mass of dioxin on the property from the mid-1990s to the present would be less than the mass on the property between 1968 and 1985. These opinions are based on the following lines of evidence:

- **Lack of an ongoing source:** The historical manufacturing, handling and disposal of chemicals including hexachlorophene has been identified by the EPA as the likely source of dioxin and PCB contamination at the Site. Based on depositions of individuals knowledgeable of the Site history, and the Site history information provided in reports that I reviewed, there is no evidence that disposal of wastes occurred after manufacturing operations ceased at the property around 1968. Therefore, it is my professional opinion that there was no introduction of dioxin, PCBs and other contaminants to the property after 1968.

- **Extent:** Dioxins and PCBs were detected in river sediments that are far downstream (south) of the Centredale Manor and Brook Village properties, including the contiguous marshy area between the tailrace and the Woonasquatucket River, and there is no evidence or reason to believe that disposal of waste took place downstream of the property.

- **Resistance to degradation:** Due to their chemical properties, dioxin and PCBs are resistant to natural degradation (by microbial activity or photo-degradation [by sunlight], for example) and, once sorbed to soil or sediment, are not readily mobilized by precipitation, leaching and groundwater transport, or volatilization and precipitation by atmospheric deposition. Therefore, it is my professional opinion that dioxins detected from the mid 1990s to the present did not migrate to their current locations by leaching, groundwater transport and re-deposition, or volatilization and precipitation by atmospheric deposition; however, there was migration by other mechanisms as described below during a period that included 1968 to 1985. Furthermore, based on the relatively slow rates of natural degradation, it is my professional opinion that dioxins and PCBs that would have been detected between 1968 and 1985 (had they been sampled for and analyzed) were present at concentrations as great or greater than concentrations detected at the property from the mid-1990s through the present (the mass of dioxin on the property from the mid-1990s to the present would be less than the mass on the property between 1968 and 1985 due to the transport mechanisms described below).

- **Construction activity:** Construction of the Brook Village and Centredale Manor Apartment complexes took place in the mid-1970s, and 1982, respectively. Based on the available reports, there is no evidence that significant construction activity took place after 1985. Based on historical maps and property plans, there is no evidence of significant increases in grade, which would indicate widespread filling at the site after 1985. Therefore, it is my professional opinion that dioxins detected in the early 1990s did not result from waste disposal or fill placement after 1985.

- **Streamflow records and flooding:** A deposition by an unidentified person [26] and the deposition of Joseph Buonanno, Jr. [29] contain anecdotal reports of flooding of the southern portion of the property, where the highest concentrations of dioxins and PCBs were detected. In addition, streamflow records indicate that "significant floods," as defined by the USGS, occurred in the Woonasquatucket River during the period of 1968 to 1985.

- **Transport of sediment by streamflow and flooding:** Based on their chemical characteristics, dioxins and PCBs sorbed to organic matter in soils and sediments are not readily leached or volatilized. Contaminated sediments and surficial soils can be transported by erosion and scouring (erosion of riverbanks and river bottoms, typically during high flow events), then re-deposited (where sediments suspended in the river settle out to the river bottom) further downstream in the river and on floodplains during flood events. Based on available streamflow records spanning from 1936 to 2001 and information on flooding in Rhode Island, there is no evidence that streamflow and the frequency of flood events increased after 1985 through the present, the period when the contaminants were detected. Therefore, it is my professional opinion that dioxins and PCBs detected from the mid-1990s through the present resulted from erosion, scouring and re-deposition of soil and sediment from the property to downstream areas that occurred since at least 1968 if not earlier.

## COMPENSATION

I expect that Haley & Aldrich will be compensated for my services as an expert at a rate of $173 per hour, the rate established for professional services in our Emhart Service Contract, dated July 1987 and Emhart Special Rate Schedule, dated January 2003. I have not testified as an expert witness at deposition or trial over the past four years. Documents reviewed for this expert report are listed on the attached table.

Sincerely yours,
HALEY & ALDRICH, INC.

John R. Kastrinos, P.G., LSP
Senior Hydrogeologist

3 June 2003

Attachments: References
Resume of John R. Kastrinos

G:\30018\JRK-XREP-Centredale_draft2.doc