**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| EMHART INDUSTRIES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, LIBERTY MUTUAL INSURANCE COMPANY, THE NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICA INSURANCE CO. and UNITED STATES FIRE INSURANCE COMPANY,<br><br>Defendants | Civil Action No.: 02-053-S |

**DEFENDANT THE NORTH RIVER INSURANCE COMPANY'S**
**RENEWED MOTION FOR SUMMARY JUDGMENT**
**ON THE "POLLUTION EXCLUSION"**

Pursuant to Fed.R.Civ.P. 56, LR Cv 56, the Court's Order dated June 28, 2006 and the Court's Order at the Hearing on August 3, 2006, defendant The North River Insurance Company ("North River") requests that the Court enter an Order granting it summary judgment based upon the "pollution exclusion" contained in the North River Policy. [*See* Joint Statement Pursuant to Pretrial Conference, 5/16/06 at 16-18, Issue No. III.5]. Specifically, North River requests that the Court rule that Plaintiff Emhart Industries, Inc. ("Emhart") cannot carry its burden of proving that the dioxin contamination at the Centredale Manor Superfund Site in North Providence, Rhode Island (the "Centredale Site"), was caused by a "sudden and accidental" discharge or release of contaminants. Accordingly, North River is entitled to judgment as a matter of law on Emhart's claims against North River.

As grounds for this Motion, North River relies upon its Statement of Undisputed Facts ("North River St.") and supporting Memorandum of Law filed herewith and further states as follows:

1. North River issued a "Commercial Comprehensive Catastrophe Liability Policy," No. 523-313109-9, to Emhart that was in effect during the period from January 1, 1984 to January 1, 1985 (the "North River Policy") [North River St., ¶1; Joint Appendix of Exhibits to the Parties' Motions for Summary Judgment Dated July 24, 2006 ("Joint App."), Ex. E].

2. The North River Policy states that "the Company agrees to pay on behalf of the insured the ultimate net loss in excess of the retained limit hereinafter stated, which the insured may sustain by reason of the liability imposed upon the insured by law, or assumed by the insured under contract, for:. . .(c) Property Damage Liability, . . .arising out of an occurrence." [North River St., ¶2].

3. The North River Policy defines "Property Damage" to mean "physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom. . ." [North River St., ¶4].

4. The North River Policy defines "Occurrence" to mean "(a) with respect to Bodily Injury Liability or Property Damage Liability, injurious exposure to conditions which results in Bodily Injury or Property Damage neither expected nor intended from the standpoint of the insured. All damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence." [North River St., ¶3].

5. The North River Policy contains a "pollution exclusion" which bars all coverage for:

> Liability arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water, but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

[North River St., ¶5].

6. The Court has determined that New York law applies to all issues relating to the North River Policy. [Report and Recommendation, February 15, 2005 at 38-39 (PACER No. 220); Memorandum and Order, May 17, 2005 (PACER No. 238)].

7. The New York Court of Appeals has consistently held that the pollution exclusion contained in the North River Policy is clear and unambiguous and bars coverage unless the policyholder, Emhart, can prove that the pollution at issue arose from a "discharge, dispersal, release or escape" of pollutants that was both "sudden and accidental." *Northville Industries Corp. v. National Union Fire Ins. Co.,* 89 N.Y.2d 621, 631-634, 679 N.E.2d 1044, 1046-1049 (1997)(policyholder bears burden of proof on the exception to the pollution exclusion).

8. Whether Emhart (or a corporate predecessor for whose operations it is now liable) was the "actual polluter" who caused the contamination at the Centredale Site is irrelevant to whether coverage is barred by the pollution exclusion. *Powers Chemco, Inc. v. Federal Ins. Co.,* 74 N.Y.2d 910, 911, 548 N.E.2d 1301, 1302 (1989).

9. Emhart is required to prove both elements of the exception: that the release of contaminants was "sudden" and "accidental." *Northville,* 89 N.Y.2d at 632, 679 N.E.2d at 1047 (the two terms have separate meanings, each of which must be established for the exception to apply).

10. Emhart is required to establish causation between an allegedly "sudden and accidental" event and the contamination for which it is being held responsible. *Northville,* 89

N.Y.2d at 634, 679 N.E.2d at 1048 (policyholder must establish that there was a "discharge, abruptly or within a short time span, of a significant quantity of the pollutant sufficient to have some potentially damaging effect"); *Employers Ins. of Wausau v. The Duplan Corp.,* No. 94 Civ. 3143, 1999 U.S. Dist. LEXIS 15368, *33-34 (S.D.N.Y. Sept. 30, 1999)(a metaphysical possibility of a sudden and accidental discharge is not sufficient to invoke the exception).

11. Similarly, the focus of the pollution exclusion is on the original discharge of pollutants into the environment, not on whether a later event (such as a fire or flood) caused the pollutants to move or be redistributed within the environment. *Duplan, id.* at 40.

12. There is no evidence that the dioxin contamination at the Centredale Site was caused by a "sudden and accidental" discharge or release of contaminants. [North River St., ¶¶10-39; Exs. A, B thereto]. Emhart's efforts to resist summary judgment rely upon pure speculation as to what "might" have happened at the Centredale Site. [*See* Emhart's Pretrial Mem. of Law, 4/6/06 at 41-45]. Since Emhart has failed to come forward with actual proof linking any alleged "sudden and accidental" event to the dioxin contamination at the Centredale Site, its claims against North River are barred by the "pollution exclusion" as a matter of law. *Northville,* 89 N.Y. 2d 621, 679 N.E. 2d 1044.

For the reasons stated above and in the accompanying Memorandum of Law, North River respectfully requests that the Court enter judgment in its favor.

Respectfully submitted,

**THE NORTH RIVER INSURANCE COMPANY,**
By its attorneys,

/s/ Mark T. Nugent
Mark T. Nugent, RI Bar# 2637
**MORRISON MAHONEY LLP**
121 South Main Street, Suite 600
Providence, RI 02903-7141
(401) 331-1660

John T. Harding, *pro hac vice*
**MORRISON MAHONEY LLP**
250 Summer Street
Boston, MA 02210-1181
(617) 439-7500

Dated: August 11, 2006

## CERTIFICATION

I hereby certify that on this _11th_____ day of August, 2006, a copy of the foregoing was via ECF/mailed, postage prepaid, to:

Jack R. Pirozzolo
Rick Binder
Willcox, Pirozzolo & McCarthy
50 Federal Street
Boston, Massachusetts 02110
(617) 482-5470

James T. McCormick #2614
128 Dorrance Street - Suite 330
Providence, RI 02903
(401) 831-2970

John F. Glowacki
220 Lake Drive East, Suite 304
Cherry Hills, NJ 08002
(856) 667-2080

Ian Wallach
Kimball Ann Lane
Luce, Forward, Hamilton & Scripps LLP
153 East 53rd Street, 26th Floor
New York, NY 10022
(212) 744-1414

James T. Murphy #1698
Kelly N. Michels #6478
Hanson Curran LLP
146 Westminster Street
Providence, RI 02903
(401) 421-2154

Kevin J. O'Connor
Peter C. Netburn
Hermes, Netburn, O'Connor & Spearing, P.C.
265 Franklin Street, 7th Floor
Boston, MA 02110-3113
(617) 728-0050

Lawrence Nathanson
Siegal, Napierkowski & Park
533 Fellowship Road, Suite 120
Mt. Laurel, NJ 08054-3412
(856) 380-8900

________/s/ Mark T. Nugent_________



619519v1

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| EMHART INDUSTRIES, INC.<br><br>Plaintiff,<br><br>v.<br><br>HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICAN, LIBERTY MUTUAL INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICAN INSURANCE COMPANY and United States FIRE INSURANCE COMPANY<br><br>Defendants | Civil Action No.: 02-053-S |

**DEFENDANT THE NORTH RIVER INSURANCE COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF ITS RENEWED MOTION FOR SUMMARY JUDGMENT ON THE "POLLUTION EXCLUSION"**

**THE NORTH RIVER INSURANCE COMPANY,**
By its attorneys,

Mark T. Nugent, RI Bar# 2637
MORRISON MAHONEY LLP
121 South Main Street, Suite 600
Providence, RI 02903-7141
(401) 331-1660

John T. Harding, *pro hac vice*
MORRISON MAHONEY LLP
250 Summer Street
Boston, MA 02210-1181
(617) 439-7500

Dated: August 11, 2006

## INTRODUCTION[1]

The excess insurance policy issued by Defendant The North River Insurance Company ("North River") to Plaintiff Emhart Industries, Inc. ("Emhart") contains a clear and unambiguous pollution exclusion. North River should not have to participate in a multi-week jury trial when Emhart has utterly failed to come forward with admissible evidence that the dioxin contamination at the Centredale Manor Superfund Site (the "Centredale Site") resulted from a "sudden and accidental" discharge of pollutants. Emhart has not provided the Court with ***any*** admissible evidence which actually links an alleged "event" at the Centredale Site (*e.g.*, the 1972 fire) to an appreciable portion of the dioxin contamination. Emhart cannot show that any such "event" actually resulted in a release of dioxin at all. Emhart's expert witnesses have disavowed the ability to make this causal connection. Emhart cannot carry its burden of proof by asking the jury to speculate as to what "might" have happened at the Centredale Site. Accordingly, the Court should enter judgment in favor of North River as a matter of law. *Northville Industries Corp. v. National Union Fire Ins. Co.,* 89 N.Y.2d 621, 631-634, 679 N.E.2d 1044, 1046-1049 (1997)(policyholder bears burden of proof on the "sudden and accidental" exception to the

---

[1] North River understands that the Court previously denied North River's Motion for Summary Judgment based on the "pollution exclusion" contained in its policy. [Report and Recommendation, 2/15/05 at 45-50 (PACER No. 220); Memorandum and Order, May 17, 2005 (PACER No. 238)]. The Court noted that it was denying the motion "at this time." In renewing its motion, North River relies in part upon the recent deposition testimony of Emhart's expert, Hass, in which he admitted that he could not opine as to the sources of the dioxin contamination at the Centredale Site or make a connection between the dioxin contamination and any allegedly "sudden and accidental" event. The Court is always free to revisit its earlier rulings, particularly when doing so will significantly reduce the length and complexity of the trial. The fact that the Court previously ruled on this issue has not deterred Emhart from inventing new "theories" to try to support its claim that there was a "sudden and accidental" release at the Centredale Site. [*Compare*, Report and Recommendation at 45-50; Emhart's Pretrial Mem., 4/6/06 at 41-45]. Further, the Court's initial decision on this issue was made in the context of simultaneously deciding the issue of choice of law and North River respectfully suggests that the Court did not fully consider all of the contours of New York law.

pollution exclusion; alleged release must result in a significant quantity of the contaminant); *Mesnick v. General Electric Co.*, 950 F.2d 816, 822 (1st Cir. 1991)(on issues where non-movant bears the ultimate burden of proof, he must present definite, competent evidence to rebut the motion).[2]

## UNDISPUTED FACTS

The undisputed facts upon which North River relies for this motion are set forth in North River's Statement of Undisputed Facts, which North River incorporates here. There are, in essence, only two critical facts that are relevant to this motion: (1) North River's Policy contains a clear and unambiguous "pollution exclusion" with a limited exception for property damage caused by the "sudden and accidental" discharge of pollutants; and (2) Emhart cannot present admissible and competent evidence that the dioxin contamination at the Centredale Site is causally related to any allegedly "sudden and accidental" discharge of pollutants.

## ARGUMENT

### I. EMHART'S CLAIM IS BARRED BY THE NORTH RIVER POLLUTION EXCLUSION

### A. The Pollution Exclusion is Clear, Unambiguous and Bars the Claim

There can be no dispute that the pollution exclusion contained in the North River Policy operates on its face to bar Emhart's claim for coverage with respect to the Centredale Site. The exclusion states, in its entirety:

> This policy shall not apply:
>
> (f) to liability arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants,

---

[2] Granting summary judgment for North River will also considerably streamline the trial since it will avoid any need for the Court to instruct the jury on the law of New York as well as the law of Rhode Island.

> contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

[North River St., ¶5; Joint App., Ex. E at MISC 01085].

The New York Court of Appeals has held that the pollution exclusion contained in the North River Policy is clear, unambiguous and bars coverage for claims arising from the discharge of pollutants or contaminants. *Technicon Elecs. Corp. v. American Home Assurance Co.*, 74 N.Y. 2d 66, 71-76, 542 N.E. 2d 1048, 1048-1051 (1989) (pollution exclusion is "unambiguously plain and operative"). The core of Emhart's claim against North River is for a declaration that North River is required to indemnify Emhart for the "Claim" asserted against Emhart by the EPA. [Complaint, ¶92; Joint App., Ex. P]. The "Claim" asserted by EPA is for the remediation of contaminants and pollutants at the Centredale Site. [Complaint, ¶34] ("The EPA has determined that '[n]numerous hazardous substances,' including PCBs, volatile organic compounds, semi-volatile organic compounds and metals have been found on the Site and in off-site locations and . . .that ***there have been releases of such hazardous materials. . .***" (emphasis added)]. In the Administrative Orders for Removal Actions issued by EPA in April 2000 and March 2001, the EPA found that the removal actions at the Centredale Site were necessary by virtue of the release and/or disposal of hazardous substances [Joint App., Exs. G, H]. Similarly, the Third Administrative Order on Consent issued in September 2003 confirmed that "evidence suggests that the operations of the chemical companies and the drum reconditioning facility at the Site resulted in releases and threats of releases of hazardous substances at the Site." [Joint App., Ex. I].

As the Court summarized the nature of the claims asserted by the EPA in the proceedings against Emhart:



1016364v1

> This First Administrative Order alleges that Respondents Crown-Metro and Emhart are successors to liability of several chemical companies which manufactured hexachlorophene and other chemicals and which buried chemical containers at the Site. Respondent NECC's operation is alleged to have included the disposal and/or incineration of chemical residuals from large drums obtained by NECC. EPA further details the elevated levels and types of certain contaminants found at the Site, the potential danger such contaminants represent to residents or animals in the vicinity of the Site, and the various human health effects that can result therefrom. Based on the finding that actual or threatened release of hazardous substances may pose "an imminent and substantial endangerment to the public health or welfare of the environment," EPA concludes that a removal action is necessary and appropriate.

[Report and Recommendation, Feb. 15, 2005 at 7-8]. The Court noted similar findings made by EPA in its later Administrative Orders. [Report and Recommendation at 9-12]. It is uncontested that dioxin is the principal contaminant driving the investigation and eventual remediation of the Centredale Site. [North River St., ¶8-9; Emhart's Pretrial Mem. at 29-31, 45]. Since Emhart's claim is for insurance coverage relating to environmental contamination, the pollution exclusion contained in the North River Policy operates on its face to bar the claim.

**B. Emhart Bears the Burden of Proving that the <u>Limited "Exception" to the Pollution Exclusion Applies</u>**

The New York Court of Appeals has held that the pollution exclusion contained in the North River policy is clear and unambiguous and bars coverage for all pollution liabilities ***unless the policyholder, Emhart***, is able to prove that the pollution at issue arose from a "discharge, dispersal, release or escape" of pollutants that is both "sudden and accidental." *Northville Industries Corp. v. National Union Fire Ins. Co.,* 89 N.Y.2d 621, 633, 679 N.E.2d 1044, 1049 (1997)("Shifting the burden to establish the exception conforms with an insured's general duty to establish coverage where it would otherwise not exist…"); *Powers Chemco, Inc. v. Federal Ins. Co.,* 74 N.Y. 2d 910, 911, 548 N.E.2d 1301, 1302 (1989); *Technicon,* 74 N.Y.2d 66,71-76, 542



1016364v1

N.E.2d 1048, 1048-1051 (1989)(pollution exclusion is "unambiguously plain and operative" and will bar coverage unless the release of the contaminants at issue is ***both*** "sudden" and "accidental").

Emhart's obligation to come forward with more than a merely speculative theory is also mandated by the procedures of Fed.R.Civ.P. 56. As one District Court summarized:

> The party filing a motion for summary judgment bears the initial burden of proof to show 'an absence of evidence to support the non-moving party's case.' *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S. Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-movant to affirmatively show, through the filing of supporting affidavits or otherwise, that there is a genuine issue for trial. *See First Nat'l Bank v. Cities Service Co.,* 391 U.S. 283, 288-89, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968); *Goldman v. First National Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir. 1992). In discharging this burden, the non-movant may not rest upon mere allegations or denials of the pleadings. *See Fed.R.Civ.P. 56(e); Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)('[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts."). ***On issues where the non-movant bears the ultimate burden of proof, it must present definite, competent evidence to rebut the evidence put forth by the moving party.*** *See Anderson,* 477 U.S. at 249-50.

*Underwriters at Lloyd's v. Labarca*, 106 F.Supp.2d 205, 209 (D.P.R. 2000)(emphasis added). The First Circuit Court of Appeals has similarly emphasized:

> [t]his evidence 'cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial.' *Mack v. Great Atl. & Pac. Tea Co.,* 871 F.2d 179, 181 (1st Cir. 1989); *see also Anderson,* 477 U.S. at 249-50 (evidence that 'is merely colorable or is not significantly probative' cannot deter summary judgment').

*Mesnick v. General Elec. Co.,* 950 F.2d 816, 822 (1st Cir. 1991). A genuine issue of fact exists only when there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *F.D.I.C. v. Elder Care Serv's, Inc.*, 82 F.3d 524, 526 (1st Cir. 1996). In light of this standard, Emhart's attempt to posit that a "sudden and accidental" release caused the dioxin

contamination at the Centredale Site with absolutely no evidence to support its claim must be rejected.

C. **Whether Emhart is the "Actual Polluter" is Irrelevant**

Under the plain terms of the pollution exclusion contained in the North River Policy, all that matters is that Emhart's liability arises out of discharges or releases of pollutants or contaminants. Whether the contaminants resulted from the operations of Emhart's predecessor, Metro Atlantic; the operations of New England Container Company; or an unknown source is entirely irrelevant. The pollution exclusion does not require North River to show that the pollution to be remediated originated from the insured's operations. In *Powers Chemco, Inc. v. Federal Insurance Co.*, 74 N.Y.2d 910, 548 N.E.2d 1301 (1989), the New York Court of Appeals squarely rejected the argument that the pollution exclusion does not apply where someone other than the insured is alleged to have been the source of the contamination. In *Powers Chemco,* the policyholder contended that because it had not been directly involved in burying drums of waste or dumping waste liquids from the drums into open pits, the pollution exclusion should not bar coverage. The court rejected this argument, stating:

> We also reject plaintiff's contention that since it was not the actual polluter, but merely inherited the problem from the prior landowner, the pollution exclusion clause cannot bar its present insurance claim. Simply put, there is nothing in the language of the pollution exclusion clause to suggest that it is not applicable when liability is premised on the conduct of someone other than the insured.

*Powers Chemco,* 74 N.Y. 2d at 911, 548 N.E.2d at 1302. *Accord Rosen v. CNA Ins. Co.,* 583 N.Y.S.2d 78, 79 (4th Dept. 1992)(insured's claim that he is not an "actual polluter" does not affect pollution exclusion analysis).

**D. Emhart Must Establish that a "Sudden and Accidental" Release or Discharge Caused the Dioxin Contamination at the Site**

Emhart is required to prove both elements of the exception: that the release of contaminants was "sudden" ***and*** "accidental." *Northville,* 89 N.Y.2d at 632, 679 N.E.2d at 1047 (the two terms have separate meanings, each of which must be established for the exception to apply). Reaffirming its earlier decisions, the Court of Appeals held in *Northville* that "sudden" has a temporal quality and that the exception is limited to situations involving "a discharge of the pollutant abruptly, precipitately or brought about in a short time. Such a construction accords with the mandate of *Technicon Elecs. Corp., v. American Home Assur. Co., (supra),* to give effect to the dual, sudden and accidental discharge requirements of the exception, and with the general principle that courts, in interpreting insurance policies, should strive to give meaning . . .to every sentence, clause and word of a contract of insurance." *Id.* As the Court of Appeals went on to hold:

> Applying the temporal element of sudden—as an abrupt happenstance—in the pollution exclusion clause exception also conforms to the commonsense meaning of the term and the reasonable expectations of a business person since the exception exists in the context of an insurance contract which is universally recognized as intended to exclude damage from persistent pollution from the policy's expansive basic coverage of "occurrence" which includes "continuous or repeated exposure to conditions." As other courts have aptly observed, [w]e cannot reasonably call 'sudden' a process that occurs slowly and incrementally over a relatively long time, no matter how unexpected or unintended the process.

*Northville,* 89 N.Y.2d at 633, 679 N.E.2d at 1048 (citations omitted). Thus, repeated, on-going, or continuing discharges occurring over a period of time are not "sudden." *See Ogden Corp. v. Travelers Ind. Co.,* 924 F.2d 39, 42 (2d Cir. 1991); *State of New York v. AMRO Realty,* 936 F.2d 1420, 1428-1429 (2d Cir. 1991); *Borg-Warner Corp. v. Liberty Mutual Ins. Co.,* 577 N.Y.S.2d

953, 956-958 (3d Dept. 1992); *County of Fulton v. USF&G,* 600 N.Y.S.2d 972, 974 (3d Dept. 1993)(disposal over the course of a year was not sudden).

Equally, Emhart is required to show that the discharge was "accidental." As used in the exclusion, the term goes beyond the issue of whether the discharge was intended. As the Court of Appeals noted, "[f]urthermore, the term "accidental" includes not only an unintended event but also one "occurring ***unexpectedly*** or by chance." (Webster's 9th New Collegiate Dictionary 49). This meaning of accidental is well recognized and has generally been applied in construing insurance policies." *Northville,* 89 N.Y.2d at 632, 679 N.E.2d at 1047 (original emphasis). Thus, intentional discharges are not "accidental" whether or not the resulting pollution or property damage was expected or intended by the policyholder. *Technicon,* 74 N.Y.2d 66, 74-76, 542 N.E.2d 1048, 1050-1051; *Ogden,* 924 F.2d 39, 41-42. Nor, under these authorities, can releases be characterized as "accidental" which occur with such regular frequency that they constitute part of routine business operations even if a particular release was not specifically "intended."

Moreover, it is not enough that the policyholder can point to an allegedly "sudden" event at a site unless the policyholder can also show that the "sudden" event ***actually caused*** a discharge of pollutants that was sufficient to result in the contamination for which the policyholder is being held responsible. In short, there must be proof of causation. As the New York Court of Appeals held in *Northville,* the insured is required to show that there was a "discharge, abruptly or within a short time span, ***of a significant quantity of the pollutant sufficient to have some potentially damaging effect.***" 89 N.Y.2d at 634, 679 N.E.2d at 1048 (emphasis added). This statement makes it clear that it is not adequate for the policyholder simply to claim that there was an "event" at a site which, as a purely theoretical matter, "could"

or "might" have resulted in contamination. Instead, there must be proof of an actual discharge of pollutants. The release or discharge must be of a "significant quantity" of the pollutant that caused the damage. This standard mandates that there be a causal link between the discharge of the pollutant and the environmental damage for which the policyholder is being held liable. In simple terms, any discharge or release alleged to fall within the scope of the "exception" does not count unless it can be shown to be significant in the overall context of the pollution at the site. Since all of Emhart's witnesses agree that dioxin contamination is driving the remediation at the Centredale Site, Emhart is required to prove that there was significant dioxin contamination that resulted from a "sudden and accidental" discharge of pollutants. Emhart cannot do so. In fact, Emhart cannot establish that any "event" resulted in a discharge of contaminants at all.

Later cases applying the *Northville* standard have made it clear that offering mere "speculation" or a "hypothesis" as to how the pollution might have occurred is not sufficient for the policyholder to meet its burden of proof under the exception. Documentation or other proof of an actual "sudden and accidental" release of pollutants and its impact at a site is required. As the New York District Court observed in *Duplan*:

> Given its approval of the Appellate Division's holding and its articulation of the insured's burden, *Northville* is reasonably construed as standing for the proposition that a metaphysical possibility of a sudden and accidental discharge is not sufficient to invoke the exception; the insured must put forth proof of a sudden and accidental event. . .
>
> Few reported cases have interpreted the *Northville* decision. But one New York case relying upon *Northville* suggests that ***merely dispelling an alleged method of pollution and thereby creating uncertainty how pollution may have occurred does not allow an insured to resuscitate coverage after the pollution exclusion is triggered***. In *Hadco Corp. v. Fidelity & Cas. Co.*, No. 23420 (N.Y. Sup. Ct. May 22, 1998), slip op. at 13-16, the court held that where an insured had presented no proof of sudden and accidental

> discharge of pollutants and the evidence adduced in the underlying action of spillage of wastes from storage drums was "at best, inconclusive as to whether at their outset the discharges" were sudden, the exception did not apply as a matter of law. "Mere speculation" that the spillage may have occurred suddenly and accidentally, without more, was held insufficient to meet the insured's burden under *Northville*. *See also Rheem Manufacturing, supra,* slip op. at 11 (citing *Northville*, court held that allegations of intentional, long-term deposit of waste onto land precluded application of sudden and accidental exclusion).

*Employers Insurance of Wausau v. The Duplan Corp.,* No. 94 Civ. 3143, 1999 U.S. Dist. LEXIS 15368, *33-34 (S.D.N.Y. Sept. 30, 1999) (emphasis added). All that Emhart has offered here is pure "speculation" as to what "might" have happened at the Centredale Site, not any direct proof, documentation, or scientifically valid opinions deduced from the available facts.

### E. Any "Event" that Merely Redistributed Pollutants in the Environment Does Not Satisfy the Exception to the Exclusion

Although it has proffered absolutely no scientific proof or expert opinion to support its position, Emhart suggested during the course of the prior summary judgment proceedings that pouring water on the Centredale Site in connection with the 1972 fire "could" have caused dioxin-containing material that was already in the environment to migrate. While any such alleged "spreading" or "migration" of contaminants is purely hypothetical, it could only have occurred if the pollutants were already in the soil on which the water was poured. Emhart's "theory" ignores clear New York precedent that the focus of the pollution exclusion is only on the ***original discharge*** of pollutants into the environment, ***not*** on their subsequent migration through the soil or groundwater.

The argument advanced by Emhart has been squarely rejected by any number of New York decisions which hold that fires or other allegedly "sudden" events which occur at locations where disposal of wastes was routine and systematic do not satisfy the "sudden and accidental" exception to the pollution exclusion. For example, in *Employers Insurance of Wausau v. The*

*Duplan Corp.,* 1999 U.S. Dist. LEXIS 15368 (S.D.N.Y., Sept. 30, 1999), the District Court rejected the policyholder's argument that despite years of intentional and systematic disposal of wastes at a landfill, a flood and fire at the location were "sudden and accidental" events that could have caused a further release. In rejecting the argument, the court noted that focusing on a fire or flood that occurred at a site where intentional and long term disposal took place is unavailing because it shifts the focus to the subsequent dispersal of the contaminants, rather than the initial discharge that is the clear focus of the pollution exclusion. *Id.* at 40. In other words, once the contaminants are discharged or released into the environment, their subsequent movement as the result of an allegedly "sudden" event does not take the initial discharge outside the scope of the pollution exclusion.

Other decisions have followed the reasoning of *Duplan. See e.g., Rheem Manufacturing Co. v. Home Indemnity Co.,* 723 N.Y.S.2d 354 (1st Dept. 2001)(initial disposal of wastes at site caused the damage without regard to whether subsequent fires or floods exacerbated the damage); *Redding-Hunter, Inc. v. Aetna Cas. & Sur. Co.,* 615 N.Y.S.2d 133, 134 (3d Dept. 1994)(focus of exclusion is on the initial placement of the wastes into the environment, not when they leached out of the landfill). As the New York Court of Appeals summarized in *Northville:*

> The focus in determining whether the temporally sudden ***discharge*** requirement is met, for the purpose of nullifying the pollution coverage exclusion, is on the initial release of the pollutant, not on the length of time the discharge remains undiscovered, nor the length of time that damage to the environment continued as a result of the discharge, nor on the time span of the eventual dispersal of the discharged pollutant in the environment.

*Northville*, 89 N.Y.2d at 633, 679 N.E.2d at 1048 (original emphasis). To the extent that Emhart has suggested that fires or floods may have caused the migration of contaminants in the environment at the Centredale Site, Emhart's "suggestions" are legally irrelevant.

## II. EMHART CANNOT PROVE CAUSATION BETWEEN ANY ALLEGED "EVENT" AND DIOXIN CONTAMINATION

In its Pretrial Memorandum, Emhart identified certain alleged "events" that it contends satisfy its burden of proof on the "sudden and accidental" exception to the North River pollution exclusion. [Emhart Mem. at 41-45]. The fundamental problem with Emhart's position, however, is that Emhart cannot establish a scientific, causal link between any alleged "event" that it claims was "sudden and accidental" and the dioxin contamination at the Centredale Site. None of the "examples" identified by Emhart are sufficient to establish that the dioxin contamination at the Centredale Site was caused by a "sudden and accidental" release of pollutants as compared with the routine operations at the site, such as the incineration of thousands of barrels each year over several decades. Emhart cannot satisfy its burden of proof by having the jury speculate that an exploding barrel whose contents are unknown and undocumented "might" have caused contamination. Indeed, Emhart's own expert, Hass, has disavowed any ability to tie any of these alleged events to the dioxin contamination at the Centredale Site. [North River St., ¶¶22,23,31,32 and Ex. A thereto].

In its Pretrial Memorandum, Emhart contends that "there were abrupt events, including explosions, fires and floods, that caused contamination." [Emhart Mem. at 41]. Emhart fails, however, to cite to even a single witness or document that would support its claim that any such alleged "event" actually caused dioxin contamination at the Centredale Site. Emhart has no direct proof of a "release" or "discharge" at all.[3]

---

[3] North River does not agree with Emhart's position that, in the context of this case, any fires, floods or explosions at the Centredale Site qualify as "sudden and accidental" events given the extensive testimony as to the frequency with which such events occurred at the Centredale Site. Fires that occur all the time because of improper operations are not "accidents." However, for purposes of the instant motion, the critical point is that even giving Emhart the benefit of the

Emhart claims, for example, that there was a major fire at the Centredale Site in the early 1970s. [Emhart Mem. at 42]. While there is no dispute that a fire occurred, there is no evidence that the fire actually resulted in the release of the dioxin contamination that the EPA is requiring Emhart to investigate and remediate. ***There are no documents or other evidence to prove what materials were on the site at the time of the fire (which occurred years after active operations had ceased); what was in any barrels that may have burned; or any other information that would establish a causal link between the fire and a substantial release of the dioxin detected at the site twenty five years later.*** There is nothing to show what quantity (if any) of dioxin was produced in the fire or that it migrated to soil, groundwater or the sediments of the Woonasquatucket River, rather than being consumed in the fire. Emhart's expert, Hass, has testified that he has no such information concerning the materials that were burned in the fire and cannot make any connection between the fire and the dioxin contamination at the Centredale Site. [North River St., ¶¶22, 23 and Ex. A thereto].

Emhart similarly fails to show what significance, if any, the fact that water was pumped at the Centredale Site to extinguish the fires would have with respect to dioxin contamination. As noted above, cases such as *Duplan* make it clear that the subsequent movement or migration of contaminants that have already been discharged into the environment is irrelevant to whether the policyholder can satisfy its burden of proof under the exception to the pollution exclusion. Thus, pouring water onto ground that already contained dioxin contamination does not create an issue of fact for trial.

Emhart's reliance upon certain alleged "explosions" at the Centredale Site, reported either by former employees or in newspaper accounts [Emhart's Mem. at 42] suffers from the

---

doubt as to whether such events were "sudden and accidental," there is nothing linking these "events" to specific contamination at the site.

same deficiencies: there is nothing linking these events (from a causal perspective) to the dioxin contamination at issue. There is nothing in the information relied upon by Emhart to show that these incidents had any environmental impact at all, much less are significant in the context of the remediation that will ultimately be required at the Centredale Site. There is no proof that any of these events released dioxin. Indeed, Emhart's expert, Hass, has testified that the methanol explosion cited by Emhart [Emhart Pretrial Mem. at 42] had absolutely ***no*** connection to any dioxin contamination at the site. [North River St., ¶31 and Ex. A thereto]. As *Northville* and *Duplan* make clear, simply pointing to an "event" that cannot be directly tied to the contamination for which coverage is sought does not permit the policyholder to avoid the pollution exclusion.

Finally, Emhart's attempt to rely upon certain floods that occurred at a site that was prone to flooding must be rejected. [Emhart's Mem. at 42-43]. The only evidence that Emhart has produced consists of various newspaper accounts of floods that happened in Providence and the general area of the Centredale Site with no specific reference to the site or the environmental impact (if any) that the floods may have had on the site. There are no documents demonstrating that dioxin was discharged to the Centredale Site during the course of any of these flood events. No witness has testified and no expert has opined that any flood event resulted in the release of dioxin. [North River St., ¶39 and Ex. C thereto]. It is not open to the jury to "infer" (*i.e.*, guess) that a flood "may" have resulted in contamination. Emhart is simply attempting to manufacture evidence which does not exist. Its efforts must be rejected.

## CONCLUSION

Emhart has been given every opportunity to try to establish a causal link between any alleged "sudden and accidental" event and the dioxin contamination at the Centredale Site.

Emhart has failed to do so and the trial is now at hand. The Court should enter judgment for North River as a matter of law.

Respectfully submitted,

**NORTH RIVER INSURANCE COMPANY,**
By its attorneys,

Mark T. Nugent, RI Bar# 2637
MORRISON MAHONEY LLP
121 South Main Street, Suite 600
Providence, RI 02903-7141
(401) 331-1660

John T. Harding, *pro hac vice*
MORRISON MAHONEY LLP
250 Summer Street
Boston, MA 02210-1181
(617) 439-7500

Dated: August 11, 2006