UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| EMHART INDUSTRIES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>HOME INSURANCE COMPANY,<br>INSURANCE COMPANY OF NORTH AMERICA,<br>LIBERTY MUTUAL INSURANCE COMPANY,<br>NORTH RIVER INSURANCE COMPANY,<br>ONEBEACON AMERICA INSURANCE COMPANY<br>and UNITED STATES FIRE INSURANCE COMPANY,<br><br>Defendants. | Civil Action No. 02-053 S |

**MEMORANDUM OF LAW OF EMHART INDUSTRIES, INC. IN SUPPORT OF ITS OBJECTION TO ONEBEACON AMERICA INSURANCE COMPANY'S MOTION (REFORMATION) FOR PARTIAL SUMMARY JUDGMENT**

Gerald J. Petros (#2931)
Hinckley, Allen & Snyder LLP
1500 Fleet Center
Providence, Rhode Island 02903
(401) 274-2000

Jack R. Pirozzolo
Richard L. Binder
Willcox, Pirozzolo & McCarthy
Professional Corporation
50 Federal Street
Boston, Massachusetts 02110
(617) 482-5470

Dated: August 16, 2006

Counsel for Plaintiff, Emhart Industries, Inc.

## INTRODUCTION

OneBeacon seeks reformation of its policy over thirty years after the fact. OneBeacon made the identical argument, virtually verbatim, two and a half years ago. Magistrate Judge Lovegreen rejected this argument (Docket Item ("D.I.") 220 at 50-52); this Court denied the OneBeacon objection. A mistake must be mutual and must be proven by clear and convincing evidence. Relying upon the same record it presented before, OneBeacon still fails. OneBeacon lacks evidence sufficient to meet its high burden of proof on this issue and has not shown that it has any admissible evidence whatsoever to support an essential element of such a claim, mistake by Crown Metro. The OneBeacon summary judgment motion must be denied. Indeed, if any summary judgment is to enter, it should enter in favor of Emhart, and any evidence of purported reformation of the OneBeacon policy should be precluded at trial.

## BACKGROUND

OneBeacon[1] issued an excess insurance policy to Crown Metro (Tab C).[2] The policy provides $4,000,000 of excess insurance coverage. Originally written for the period April 24, 1969 through February 15, 1972, the policy was cancelled on January 1, 1970. This excess policy expressly incorporates the terms of INA Policy No. XBC 64674 (Tab D). That INA policy has no pollution exclusion. Id. Seeking to impose a pollution exclusion on Emhart, OneBeacon asserts that its excess policy should have incorporated the terms of a subsequent INA policy, No. XBC 46961 (Tab B) that contains such an exclusion. Over thirty years after the fact,

---

1 The policy was issued by Employers Surplus Life Insurance Company ("ESLIC"). OneBeacon admits that it is the successor to ESLIC. For convenience ESLIC will be referred to as OneBeacon.

2 References to "Tab __" are to the tabbed exhibits in the Joint Appendix Of Exhibits To The Parties' Motions For Summary Judgment Dated July 24, 2006.

OneBeacon seeks to alter its excess policy to incorporate the terms (and pollution exclusion) of the later INA policy.

Other than the policies, OneBeacon relies solely on the Affidavit of Vincent Puccio, a former OneBeacon employee.[3] Mr. Puccio asserts that, a third of a century earlier, he made an error in his reference to the INA policy whose terms were to be incorporated in the excess policy on a report. Mr. Puccio asserts that his claimed error "was carried through [by OneBeacon] and appears in the Copy of the Policy as issued" (Ex. A, ¶ 19). One Beacon has provided no evidence of how it went about actually issuing its excess policy. The Puccio Affidavit provides no evidence of the relevant actions of OneBeacon in its actual issuance of the policy, instead stating, without any showing of actual knowledge, that "the error was carried through and appears in the Copy of the Policy as issued" (id.). While the policy as issued does contain the policy number of the policy that did not contain a pollution exclusion, there is no evidence that the issuing entity at OneBeacon did make a mistake in issuing this policy.

The Puccio Affidavit provides no admissible evidence concerning the intentions or understanding of Crown Metro, the other party to the policy. That affidavit fails to meet the burden OneBeacon must meet for summary judgment. The Puccio Affidavit is clear that he did not deal with Crown Metro or with Crown Metro's agent, Laren Insurance Agency, Inc. Instead, all of Mr. Puccio's references are to dealings with George Busnach, an employee of a different entity, Maurice H. Saval, Inc. (see Ex. A, ¶¶ 11-15, 22). OneBeacon does not mention Mr. Busnach in its motion, memorandum or statement of facts. Mr. Busnach has no specific

---

[3] The Puccio Affidavit was included in Volume III of the Joint General Appendix to the prior summary judgment motions, filed in March 2004, at A3200-3274. In its memorandum and statement of fact, OneBeacon refers to the Puccio Affidavit only by appendix page, with no indication that the references are to an affidavit, and with no reference to the specific paragraphs that OneBeacon assert support its claims. As virtually all of the substantive references by OneBeacon are to the text of that affidavit, a copy, without exhibits, is attached hereto as Exhibit A.

recollection of the details or circumstances of this policy or its terms (see Exhibit B hereto (Bushnach Dep.)).

**PRIOR PROCEEDINGS**

In 2004, OneBeacon sought summary judgment (D.I. 159). In its memorandum at 21-23 it made the same argument that it makes here.[4] Emhart opposed the motion. In his March 15, 2005 Report and Recommendation (D.I. 220), Magistrate Judge Lovegreen concluded:

> The reformation of a contract based on testimony suggesting an error which remained undiscovered for thirty years is not appropriate for summary judgment, but clearly falls within the purview of a finder of fact to assess the weight of the evidence and the credibility of the affiant. Under Rhode Island law,
>
> > "[t]o warrant reformation it must appear that by reason of mistake, common to both parties, their agreement fails in some material respect correctly to reflect their prior completed understanding…And there can be no reformation unless the variance between what is written and what was originally intended, as well as the mutual mistake, are demonstrated by clear and convincing evidence."
>
> Hopkins v. Equitable Life Assurance Society, 270 A.2d 915, 918 (R.I. 1970) (internal citations omitted.)
>
> * * * Although OneBeacon offers the testimony of the original underwriter to support its conclusion, Emhart disputes the existence of mutual mistake. While the testimony can shed some light on how the purportedly wrong policy number may have come to be on the OneBeacon policy, it does nothing to illuminate the insured's intention of which INA Policy terms should be applicable. Consequently, OneBeacon's request for reformation of its policy and a decision by this court that Emhart has no claim under either policy is not ripe for summary judgment and OneBeacon's motion should be denied.

---

[4] Indeed, the current OneBeacon argument is a virtually verbatim copy of its January 2004 argument, save for the addition of footnotes, two out-of-state case citations and three sentences of summary argument after the last citation of authority on page 5 of its memorandum.

(D.I. 220 at 51-52). OneBeacon objected to the report and recommendation of Magistrate Judge Lovegreen, repeating its prior argument and asserting that no mutuality of mistake was required (D.I. 222 at 17-21). Emhart opposed this objection (D.I. 227). This Court overruled OneBeacon's objection (D.I. 238).

In its April 6, 2006 Pretrial Memorandum at 19-22, OneBeacon again repeated its original argument concerning reformation. It now has renewed its summary judgment motion, making the same argument as in its initial motion and its pretrial memorandum.

**ARGUMENT**

**1. Under Rhode Island Law, Mistake Must Be Mutual**

In its submissions regarding this issue over the past two and a half years, OneBeacon has failed to cite, much less address, any decisions applying Rhode Island law. Rhode Island permits reformation of an insurance policy only on the grounds of mutual mistake, not unilateral mistake. Associates in Anesthesia, Inc. v. Mutual Benefit Life Insurance Co., 504 A.2d 477, 478 (R.I. 1986). "[T]here can be no reformation unless the variance between what is written and what was originally intended, as well as the mutual mistake, are demonstrated by clear and convincing evidence." Hopkins v. Equitable Life Assurance Society, 270 A.2d 915, 918 (R.I. 1970). These principles recently were reaffirmed in McEntee v. Davis, 861 A.2d 459, 463 (R.I. 2004), where the court rejected a claim of mistake in a consent judgment:

> By definition, a mutual mistake is one that is "common to both parties wherein each labors under a misconception respecting the same terms of the written agreement sought to be canceled." Rivera v. Gagnon, 847 A.2d 280, 284 (R.I. 2004) (quoting Leonard v. McDowell, 824 A.2d 1266, 1270 (R.I. 2003)). "An agreement containing a mutual mistake fails in a material respect correctly to reflect the understanding of both parties." Rivera, 847 A.2d at 284. For the court to intervene and correct a written instrument, there "must be, as it is usually expressed, the mistake of both parties to it; that is, such a mistake in the draughting [sic] of the

> writing, as makes it convey the intent or meaning of neither party to the contract." Vanderford v. Kettelle, 75 R.I. 130, 142, 64 A.2d 483, 489 (1949) (quoting Diman v. Providence, Warren, and Bristol R.R. Co., 5 R.I. 130, 134-35 (1858)). A party must prove mutual mistake by clear and convincing evidence before the court will reform, vacate, or dismiss a contractual agreement. See Rivera, 847 A.2d at 284.

Further, "it is not merely the existence of common error that creates mutual mistake. Instead, 'the parties' intent is a determinative factor.'" Id. (quoting Nunes v. Meadowbrook Development Co., 824 A.2d 421, 425 (R.I. 2003)). "A policy of insurance comes squarely within the rule." Ferla v. Commercial Casualty Inc., 59 A.2d 714, 716 (R.I. 1948). "For a court to find mutual mistake, and to warrant reformation, 'the credibility of the witnesses and the weight of the evidence must be such as clearly to convince the court without hesitancy of the truth of the precise facts in issue.'" McEntee, 861 A.2d at 464 (quoting Nunes, 824 A.2d at 425).

To obtain reformation of the policy, OneBeacon must present clear and convincing evidence not only of its own understanding of the agreement, but clear and convincing evidence of Crown Metro's separate understanding and intent. This it has not done and cannot do. It has no evidence of the understanding or intent of Crown Metro. Indeed, the sole evidence that has been provided by OneBeacon, the Puccio Affidavit, fails even to provide adequate evidence of an actual mistake by OneBeacon.

**2. OneBeacon Has Made No Showing Of Mistake**

Citation to claims by Mr. Puccio of error in his preparation of a "draft Daily Report" (Ex. A, ¶ 19) is not enough to prove a mistake by OneBeacon. OneBeacon cites 2 Couch on Insurance § 27:27 (3d ed.) to support its position. However, as noted in that section, "there is some authority which denies reformation where the mistake is the fault of the insurer's home office as distinguished from that of an ordinary agent, and where it apparently is to the advantage of the insured but the latter has acted in good faith." Id. Couch cites Hayes v. Travelers

Insurance Co., 93 F.2d 568 (10th Cir. 1937), where the court denied reformation of a policy to follow the term used in the policy for disability coverage limits, rather than the higher payment stated in the policy. There was no evidence that the insured had meant to have the lower coverage. In Hayes, as here, the insurer claimed a clerical error by an employee drafting the policy absolved the insurer that issued the policy. This also was rejected:

> Dimon testified that the policy provided for $100.00 instead of $50.00 monthly disability benefits due to "a clerical error made by the people who were checking the file." It is a fair assumption that the officers executed the converted policy without reading it, relying on their clerical assistants. Had they read it, it is reasonable to suppose they would have discovered the error.
>
> One having the capacity and opportunity to read a contract, who executes it without reading it, in the absence of fraud or imposition, or special circumstances excusing his failure to read it, is charged with knowledge of its contents and cannot avoid the contract by asserting that it did not express what he intended.

93 F.2d at 571 (footnote omitted). This is in accordance with Rhode Island law. Ferla denied reformation of an insurance policy and noted that the policyholder "cannot avoid the effect of his own conduct in failing to observe the plain endorsement of an exclusion in the policy on the ground that he could not read English. In legal contemplation knowledge of the terms of a policy of insurance is possessed by the insured even though he be illiterate." 59 A.2d at 717.

OneBeacon relies upon the assertion by Mr. Puccio that his claimed error "was carried through" and included in the policy (Ex. A, ¶ 19). In other words, OneBeacon did not bother to review the related documents to ascertain the terms of the policy that were being incorporated. OneBeacon and Mr. Puccio claim that the asserted error is clear. If so, however, then the issuing entity at OneBeacon would have noted the error as well. If the issuing entity at OneBeacon did not bother to conduct such a review, then, like the insurer in Hayes and the insured in Ferla, OneBeacon is charged with knowledge of the terms of the policy that it issued. On the other

hand, if the related documents were reviewed before the policy was issued, then there was no mistake; the policy was issued as OneBeacon intended. Neither scenario excuses the subsequent issuance by OneBeacon of the policy as written. OneBeacon has failed to present any evidence of a mistake in the issuance of the policy, as opposed to a self-serving claim of error in the preparation of an internal form a third of a century after the fact. Summary judgment in favor of OneBeacon must be denied.

**3. The Parties Contemplated Excess Coverage That Incorporated Terms Of Expired Policies.**

OneBeacon also relies upon the assertion by Mr. Puccio that OneBeacon would not provide excess coverage that did not incorporate the terms of the underlying coverage during its term (Ex. A, ¶¶ 6, 7, 21). However, until it was cancelled, the term of the excess policy was to be for almost three years (April 24, 1969 - February 15, 1972). The policy whose pollution exclusion OneBeacon seeks to impose by reformation was to expire on February 15, 1970 (Tab B at CIC 0153). That policy and its terms would not have been in effect during the final two years (February 15, 1970 – February 15, 1972) of the contemplated term of the excess policy. Therefore, incorporation into the OneBeacon excess policy of terms different from those in the underlying policy that was to be in effect during portions of the term clearly was within the contemplation and expectation of OneBeacon. OneBeacon presents no evidence to support any finding that Crown Metro would have concluded otherwise. The OneBeacon argument is based on the premise that no coverage would be based on a cancelled policy. However, the policy as issued, and even as reformed, contemplated and expected coverage based on an expired policy. Summary judgment in favor of OneBeacon does not lie.

**4. The Failure Of OneBeacon To Claim Mistake For Over Thirty Years Bars Reformation Of The Policy**

The passage of time also bars reformation. OneBeacon seeks to reform the terms of a policy over thirty years after it was written. At no point while the policy was in force did OneBeacon raise any issue about the policy. Again, this stands in contrast with Ferla. In Ferla, the court noted the absence of any complaint prior to the loss: "Nor was any effectual means taken by the complainant, when the policy in question was delivered to him, to ascertain its contents and to apprise the respondent that it was not in accordance with his desire. If there was a mistake in the circumstances it was the mistake of the complainant himself, the respondent having been induced to contract and act for many months in the belief that the policy was exactly what had been ordered." 59 A.2d at 716. Here, the delay is over 30 years, not the matter of months in Ferla. As noted by Magistrate Judge Lovegreen, this is a basis for questioning the appropriateness of summary judgment here.

**5. OneBeacon Has No Evidence Of A Mistake By Crown Metro**

A mistake must be mutual. A unilateral mistake by one party, combined with ignorance thereof by the other party, is insufficient to support reformation. See Vanderford v. Kettelle, 64 A.2d 483, 489 (R.I. 1949) ("A mistake by one party coupled with ignorance thereof by the other party does not constitute a mistake within this rule"). Fleet National Bank v. 175 Post Road LLC, 851 A.2d 267 (R.I. 2004), denied an attempt to reform a contract after additional asbestos abatement work was discovered, where there was extensive negotiation of the scope of the abatement work. Id. at 269-271. Rejecting the attempt at reformation, the court quoted Vanderford and noted that "[t]he mistake alleged must be mutual." Id. at 274 (emphasis in original).

OneBeacon has provided no evidence of a mistake or of knowledge of a mistake by Crown Metro. OneBeacon has no evidence that Crown Metro knew or intended to obtain an excess policy that incorporated the terms of another policy, as opposed to a policy having its own terms and conditions. Even assuming that Crown Metro intended to incorporate the terms of another policy into the One Beacon excess policy, One Beacon has no evidence as to which policy Crown Metro intended to have so incorporated, particularly whether it wanted to have incorporated the terms of a policy with a pollution exclusion as opposed to a policy with no pollution exclusion. OneBeacon has not shown any negotiation or statement concerning what policy terms, if any, were to be incorporated by reference. There is no indication of the specific terms and conditions sought by Crown Metro, other than the amount and duration of coverage. There is no evidence that Crown Metro sought a "follow the form" excess policy or that it knew that OneBeacon would issue the policy in such a form before it was issued. There is no evidence that Crown Metro understood and expected that the terms of the second INA policy would be so incorporated. Absent such an expectation or understanding, there can be no mistake by Crown Metro, and thus no mutual mistake, the predicate for reformation.

The statements by Mr. Puccio concerning the intention of Crown Metro are inadmissible speculation. They do not even address Crown Metro or its insurance agent, Laval. Mr. Puccio does no claim to have had any direct communications with Crown Metro or Laval. Instead, Mr. Puccio dealt solely with Mr. Busnach. The deposition of Mr. Busnach was taken and it provides no information as to the intent of Crown Metro concerning whether it wanted coverage with or without a pollution exclusion.

McEntee shows reformation cannot be based on unilateral mistake. In McEntee, the plaintiffs and defendant entered into a consent judgment concerning the location of a driveway.

Defendant subsequently learned that a survey error had placed the driveway inside his property, rather than on the border. 861 A.2d at 461-462. Plaintiffs, however:

> argue that there has been no mistake on their part. Instead, they contend that they relied on the already-existing driveway, coupled with the terms of both the consent judgment and release, when entering the agreement, and that the consent judgment, as it stands, embodies their bargain precisely. Indeed, plaintiff Michael McEntee testified that he was unaware of the location of the property line when he agreed to Davis's proposal and that he based his agreement on what he saw. Significantly, he testified that he had never received a copy of Sheldon's survey before signing the agreement.

Id. at 464. In McEntee, where plaintiff did not know that there was a mistake, even though the matter was visible to it, the mistake was unilateral and not eligible for reformation. Here, simply because OneBeacon issued a policy that referred to another policy, there was no reason for Crown Metro to know or to understand that there had been any mistake.

The evidence is that Crown Metro wanted excess coverage. It got such coverage. There is no evidence that there was agreement that the OneBeacon policy was to incorporate the terms of another policy, rather than stating the coverage provisions independently. There is no evidence that OneBeacon advised Crown Metro that it intended to incorporate the terms of an INA policy into its policy, much less any discussion of which policy OneBeacon sought to so incorporate. There is no showing that Crown Metro considered any of these issues. As such, there was no mutual mistake. At most the mistake was unilateral.

**6. The Authority Cited By One Beacon Is Inapposite**

The three cases from other jurisdictions cited by OneBeacon are inapposite. In each case, there is mutuality, as both parties expressly knew and had discussed the relevant term, or had agreed that there was a mistake. Cincinnati Insurance Co. v. Fred S. Post, Jr., Co., 747 S.W.2d 777 (Tenn. 1988), permitted reformation where pre-policy correspondence between the parties

expressly addressed which of two sites were to have contents coverage, and the policy incorrectly inverted the coverage for the two sites. Id. at 778-79. In Cincinnati, the court concluded that "[r]eformation would result in correcting the typographical error in the policy so that it would then correspond to the antecedent agreement …." Id. at 782. Here, there is no evidence of express agreement as to the specific policy, if any, whose terms were to be incorporated by reference.

OneBeacon's citation to Board of Trustees of the University of Illinois v. Insurance Corp. of Ireland, Ltd., 969 F.2d 329 (7th Cir. 1992), is equally misplaced. In Trustees, the testimony of those directly involved on both sides of the transaction agreed as to the intention of the parties as to the term in issue. 969 F.2d at 332-33 ("Gallivan, Fleming, and Burston were the only three people involved in negotiating and implementing the policy, and they all swore that the policy was to provide separate $5,000,000 limits."). Here, there is no such evidence regarding the intention of Crown Metro.

Reynolds v. Farmers Insurance Co., 960 P.2d 432 (Wash. Ct. App. 1998), also is inapposite. The issue in Reynolds was the time a policy became effective. The insured was advised of the correct effective time of the policy from the outset. No such advice is in the record here. Further, the test in Reynolds was not one of mutual mistake, but rather one of unilateral mistake where the other party was charged with knowledge of the error. 960 P.2d at 434. Here, OneBeacon points to no such knowledge or constructive knowledge on the part of Crown Metro.

**7. OneBeacon's Attempt To Characterize The Entry In Issue As A "Scrivener's Error" Does Not Alter The Result**

While not expressly argued in its current motion, OneBeacon at times has asserted that the alleged mistake by OneBeacon was a "scrivener's error," and implying that the burden of proof for such errors somehow is lessened. This is incorrect.

A "scrivener's error" occurs where the parties agree on a term, but the person recording the agreement errs in its reduction to writing. The threshold remains the existence of an agreement of the parties regarding the term in issue. See 27 Williston on Contracts § 70:93 (4th ed.) ("where there is no mistake about the agreement and the only mistake is in the reduction of the agreement to writing, such mistake of the scrivener or of either party, no matter how it occurred, may be corrected") (emphasis added). This still must be proven by clear and convincing evidence. Any such argument by OneBeacon also fails.

Rhode Island law does not recognize some form of "scrivener's error" exception to the rules for reformation for mistake. Particularly on point is Hopkins, which involves a clerical error of the type claimed by OneBeacon. In Hopkins, the insured changed his beneficiary under his employer's group life insurance policy, replacing his ex-wife with his sister. When the group policy was transferred to a new insurer, the new insurer issued a new insurance certificate that did not name the beneficiary, but instead referred to the designation on file. 270 A.2d at 916-17. In preparing the new enrollment card, the prior change of beneficiary was overlooked due to a clerical error. 270 A.2d at 917. The insured had no notice of the error and continued to understand that his sister was the named beneficiary. In finding that the policy could be reformed due to this clerical mistake, the court applied the same test as otherwise used in mistake cases:

> To warrant reformation it must appear that by reason of a mistake, common to both parties, their agreement fails in some material

> respect correctly to reflect their prior completed understanding. Vanderford v. Kettelle, 75 R.I. 130, 142, 64 A.2d 483, 488. And there can be no reformation unless the variance between what is written and what was originally intended, as well as the mutual mistake, are demonstrated by clear and convincing evidence. Kornstein v. Almac's, Inc., 98 R.I. 318, 323, 201 A.2d 645, 648; Vanderford v. Kettelle, supra, 75 R.I. at 139, 64 A.2d at 487; New England Box & Barrel Co. v. Travelers Fire Ins. Co., 63 R.I. 315, 320, 8 A.2d 805, 807.

270 A.2d at 918 (emphasis added). Evaluating the evidence, the court concluded: "In the case before us … clear and convincing evidence demonstrates that, as a result of mutual mistake, the designation of [the ex-wife] as Walter's beneficiary on the enrollment card failed to correctly express the agreement of the parties. In those circumstances it was not error for the trial justice to reform the beneficiary agreement and to award Cora the proceeds of the policy." 270 A.2d at 918 (emphasis added). Thus, in Hopkins, the court found that there could be reformation of a contract due to a clear clerical error, like the one claimed here, only when there was clear and convincing evidence of mutual mistake. As already shown, there is no such showing of mistake here. Similarly, in Rosen v. E. Rosen Co., 818 A.2d 695 (R.I. 2003), a list of assets in an asset sale was reformed to add certain copyrights, where both the buyer and seller agreed that the omission was a mistake. Again, mutual mistake was necessary and, in Rosen, conceded.

This principle is well settled in Rhode Island law. In one of the first reported Rhode Island cases addressing reformation of a contract based upon a claim of mistake, Diman v. Providence, Warren & Bristol Railroad Co., 5 R.I. 130 (1858), a party claimed that the wrong amount was entered in a stock subscription book. Rejecting this claim, the court stated:

> A court of equity has no power to alter or reform an agreement made between parties, since this would be in truth a power to contract for them; but merely to correct the writing executed as evidence of the agreement, so as to make it express what the parties actually agreed to. It follows, that the mistake which it may correct in such a writing must be, as it is usually expressed, the mistake of *both* parties to it; that is, such a mistake in the

> draughting of the writing, as makes it convey the intent or meaning of neither party to the contract. If the court were to reform the writing to make it accord with the intent of one party only to the agreement, who averred and proved that he signed it, as it was written, by mistake, when it exactly expressed the agreement as understood by the other party, the writing, when so altered, would be just as far from expressing the agreement of the parties as it was before; and the court would have been engaged in the singular office, for a court of equity, of doing right to one party, at the expense of a precisely equal wrong to the other.

Id. (emphasis added in part). A mistake in the drafting of a writing, a "scrivener's error," is exactly what requires clear and convincing proof of mutual mistake. Absent the initial proof of mutual mistake, such an error cannot be reformed.

In Diman, the court went on to explain why mutual mistake is required and why unilateral mistake does not suffice, even for a "scrivener's error":

> Without therefore going into the question, whether, considering the grounds of the well-known rule of evidence, it would be proper, however competent, to alter a written contract, unambiguous in its terms, upon oral proof alone of a supposed mistake in them, and such proof consisting almost wholly in the testimony of the party applying for the alteration, we must decline to reform this subscription in the mode proposed, upon the distinct ground, that it is not competent for us thus to make it express the contract of one party, when, by so doing, we shall make it cease to express the contract which the other party fairly entered into, and so long acted upon.

Id. (emphasis added). Reformation fails here because OneBeacon lacks evidence of its own intention, much less the intention of Crown Metro, when the contract was made.

Finally, Diman also addressed claims by the plaintiff similar to the proffered testimony of Mr. Puccio here:

> There was no mistake here at all, in the sense in which a court of equity recognizes it in order to relief. … Grant that he designed, and at the time expressed the design, of renewing only his old subscription of a thousand dollars; yet it is not possible to account for his actual subscription otherwise than by supposing, either, that at the moment he had forgotten what the amount of his old

> subscription was, or, that he wrote this subscription with a mind so preoccupied with something else that he did not attend to what he wrote. As a witness he does not attempt to account for it; but merely states the fact, that designing one thing, he did another. … In cases like this, where there has been no intermixture of fraud or surprise to put the applicant for relief off his guard, we must invent a new head of equity before we can interpose to save him, to the injury of others, against the effects of his own carelessness.

Id. Diman thus addresses a situation highly similar to OneBeacon's claim. Mr. Puccio claims that while he meant to use one policy number, he used another due to inadvertence. This is no different from the claimed error in Dinan. It does not matter whether OneBeacon terms the claimed mistake a "scrivener's error," a "clerical error" or something else. It cannot show mutual error by clear and convincing evidence. Summary judgment in favor of OneBeacon does not lie here.

## CONCLUSION

For the foregoing reasons, the OneBeacon summary judgment motion should be denied.

Respectfully submitted,

/s/ Gerald J. Petros

Gerald J. Petros (#2931)
Hinckley, Allen & Snyder LLP
1500 Fleet Center
Providence, Rhode Island 02903
(401) 274-2000
(401) 277-9600
gpetros@haslaw.com

Counsel for Plaintiff, Emhart Industries, Inc.

Jack R. Pirozzolo
Richard L. Binder
Willcox, Pirozzolo & McCarthy
Professional Corporation
50 Federal Street
Boston, Massachusetts 02110
(617) 482-5470

Dated: August 16, 2006

**CERTIFICATE OF SERVICE**

I hereby certify that on August 16, 2006, a copy of the foregoing Memorandum Of Law Of Emhart Industries, Inc. In Support Of Its Objection To OneBeacon America Insurance Company's Motion (Reformation) For Partial Summary Judgment was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Gerald J. Petros

Gerald J. Petros (#2931)
Hinckley, Allen & Snyder LLP
1500 Fleet Center
Providence, Rhode Island 02903
(401) 274-2000
(401) 277-9600
gpetros@haslaw.com

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| EMHART INDUSTRIES, INC., Plaintiff, v. HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, LIBERTY MUTUAL INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, and ONEBEACON AMERICA INSURANCE COMPANY, Defendants. | CIVIL ACTION No. 02-053-S |

**AFFIDAVIT OF VINCENT A. PUCCIO**

I, Vincent A. Puccio, on oath, depose and state as follows.

1. My name is Vincent Puccio. I reside at 1232 Delmar Drive, Palatine, Illinios. Until January 3, 2004, I was a principal of and was employed at ANP Agency, an insurance underwriting agency formerly located in Palatine and Mundelein, Illinois.

2. I have personal knowledge of the facts set forth herein.

3. I have been employed in the insurance business as an underwriter since 1958. From 1958 to 1962 I was an underwriter at Hartford Accident and Indemnity Company. Between 1962 and 1966, I was an underwriter at Firemen's Fund Insurance Company. I was an underwriter at Commercial Union Insurance Company in New York from 1966 to 1968.

4. In 1968, Commercial Union purchased The Employers Group, including Employers Surplus Lines Insurance Company. At that time, I transferred to The Employers Group in Boston. Between 1968 and 1972, I worked at the Employers Group, which became known as Employers Commercial Union, as a senior underwriter.

5. Since 1972, I have been employed in the insurance underwriting business continuously to the present.

6. During my career, both at The Employers Group and elsewhere, I have underwritten many excess and excess umbrella insurance policies issued on a "following form" basis. By the term "following form," I mean an excess or excess umbrella policy that, with stated exceptions, rather than fully state its own terms and conditions, incorporates the terms and conditions of an underlying insurance policy.

7. My practice in underwriting excess and excess umbrella following form insurance policies always has been to follow form to the primary umbrella carrier. The primary umbrella carrier is the carrier that issues the policy for the first excess layer immediately over the primary insurance coverages.

8. My practice was consistent with general practice and custom within the insurance underwriting business throughout my career, including during the time I worked at The Employers Group.

9. I have reviewed the documents attached as Exhibit A bearing Bates Stamp Nos. OBA 00001 through OBA 00054. These documents are the Employers Group underwriting file for Employers Surplus Lines Insurance Company ("ESLIC") Policy No. S-16-07084, issued to Crown Metro, Inc. I also have reviewed the document attached as Exhibit B, which appears to be a copy of Policy No. S-16-07084 ('the Policy").

10. I was The Employers Group underwriter for the Policy.

11. By letter dated March 21, 1969, George Busnach of Maurice H. Saval, Inc asked ESLIC to quote on a $5.0 million umbrella policy, excess only of primary insurance. See, Exhibit A, page OBA 0028 – 0034.

12. Mr. Busnach was an insurance broker with whom I was acquainted at that time. His company, Maurice H. Saval, Inc. was working with Crown Metro's broker, the Laren Insurance Agency of Providence Rhode Island, to place excess coverage for Crown Metro. See, Exhibit A, page OBA 0035.

13. On April 15, 1969, I provided the requested quote to Mr. Busnach. See, Exhibit A, page OBA 0028. That quote never was accepted by or on behalf of Crown Metro.

14. On May 9, 1969, Mr. Busnach sent me a copy of INA Policy No. XBC 46961. See, Exhibit A, page OBA 0027 and OBA 0014 – 0024. That policy is an umbrella policy with limits of $1.0 million, excess of Crown Metro's primary insurance. It provides the first $1.0 million of coverage on which Mr. Busnach had requested and I had provided a quotation.

15. Based upon the foregoing, I presume that Mr. Busnach asked me to provide a revised quote for the next $4.0 million of excess coverage.

16. I filled in, by hand, a draft Daily Report for the Policy, providing excess umbrella coverage in the amount of $4.0 million in excess of the underlying $1.0 million INA umbrella. See, Exhibit A, page OBA 0010.

17. On that page, the pre-printed form reads, in part, that ESLIC... " AGREES WITH THE INSURED named below in consideration of the payment of premium and,

except as herein provided, subject to all the terms and conditions of Policy No. ___________ issued by ___________..." Id.

18. I hand wrote "XBC 64674" in the policy number space and "INA" in the issuing company space.

19. Accidentally, I wrote the wrong policy number in on the draft Daily Report. This error was carried through and appears in the Copy of the Policy as issued. See, Exhibit B.

20. From my review of the underwriting file, how this happened is clear. I, and through me ESLIC, intended to follow form to the INA primary umbrella policy directly beneath the ESLIC policy, INA Policy No. XBC 46961. The INA declarations page bearing that policy number also indicates that it is a renewal of "Old Policy No. XBC 64674." Exhibit A, page OBA 0018. That old expired INA policy number appears at the top right hand corner of the INA declarations page. The correct number for the new INA policy appears further down the declarations page. Id. In preparing the draft ESLIC Daily Report, I transcribed the wrong INA policy number.

21. I am certain that I made this mistake because it would have been directly contrary to my practice to follow form to a policy other than the primary umbrella policy directly beneath the Policy. The old INA policy was expired by its terms and I would not have written excess coverage following its form. Additionally, in preparation of this affidavit, I have been provided with a copy of the old INA policy. It was not issued to Crown Metro, but to Crown Chemical Corporation. The ESLIC policy indicates that it follows form to a policy issued to Crown Metro, not to Crown Chemical. See, Exhibit A, page OBA 0010.

22. Nor did Mr. Busnach intend to have the ESLIC policy follow form to the old INA Policy. Following form to an old, expired policy issued to a different named insured was contrary to universal industry practice and would not be done by a knowledgeable broker like Mr. Busnach. If Mr. Busnach, for some reason did want to follow form to such a policy, there would be some specific indication of that request, and the reasons for it, in the underwriting file. Because there is no such information in the underwriting file, Mr. Busnach was not making such a highly unusual request. Further, if such a request had been made, I would not have agreed to write the coverage. I have never underwritten an excess policy on such terms. To follow form to a policy other than the primary umbrella policy underlying the excess policy being underwritten creates a risk that the excess policy being underwritten will drop down to a lower level of coverage due to some difference in terms. This risk is precisely what the concept of following form coverage is designed and intended to prevent.

Signed under the penalties of perjury, this 9th day of January, 2004

Vincent A. Puccio

Vincent A. Puccio

# EXHIBIT B

VOLUME: I
PAGES: 60
EXHIBITS: Per Index

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

- - - - - - - - - - - - - - - - x

EMHART INDUSTRIES, INC.
Plaintiff

CIVIL ACTION
NO. 02-053 S

Vs.

HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, LIBERTY MUTUAL INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICA INSURANCE COMPANY, AND UNITED STATES FIRE INSURANCE COMPANY
Defendants

- - - - - - - - - - - - - - - - x

DEPOSITION OF GEORGE BUSNACH taken on behalf of the Plaintiff pursuant to the Federal Rules of Civil Procedure before Carole M. Wallace, Certified Shorthand Reporter and Notary Public, at the offices of Willcox, Pirozzolo & McCarthy, 50 Federal Street, Boston, Massachusetts 02110, on Tuesday, February 4, 2000, commencing at 9:11 a.m.

HENNESSEY CORP. D/B/A ROBERT H. LANGE CO.
50 Congress Street - Boston, Massachusetts 02109
Tel: (617) 523-1874 Fax: (617) 523-7343



APPEARANCES:

Richard L. Binder, Esq.
Willcox, Pirozzolo & McCarthy
50 Federal Street
Boston, Massachusetts 02110
On behalf of the Plaintiff

Robin L. Main, Esq.
Holland & Knight, LLP
One Financial Plaza
Providence, Rhode Island 02903
On behalf of Defendant Liberty Mutual Insurance Company

Kevin J. O'Connor, Esq.
Hermes, Netburn, O'Connor & Spearing, PC
111 Devonshire Street
Boston, Massachusetts 02109
On behalf of Defendant OneBeacon America Insurance Co.

John F. Glowacki, Esq.
Siegal & Napierkowski
220 Lake Drive East - Suite 304
Cherry Hills, New Jersey 08002
On behalf of Century Indemnity Company

Michael F. Aylward, Esq.
Morrison, Mahoney & Miller, LLP
250 Summer Street
Boston, Massachusetts 02201
On behalf of Home Insurance Company

Edwin F. Landers, Esq.
Morrison, Mahoney & Miller, LLP
250 Summer Street
Boston, Massachusetts 02210
On behalf of the Witness



I N D E X


| Witness | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| GEORGE BUSNACH | | | | |
| By Mr. Binder | 5 | | | |
| By Mr. O'Connor | | 51 | | |
| By Mr. Glowacki | | 56 | | |
| By Mr. Aylward | | 56 | | |
| By Mr. Binder | | | 57 | |


* * * *

E X H I B I T S


| No. | Description | Ident. |
|---|---|---|
| 1 | MISC 1353 - 1359, letter of March 21, 1969, to Vincent Puccio | 12 |
| 2 | MISC 1331 from Michael Silverman . . . | 22 |
| 3 | OBA 35 - 51, April 7, 1969, . . . . . to George Busnach | 22 |
| 1A | OBA 0028 - 0034 . . . . . . . . . . . | 28 |
| 4 | OBA 11 . . . . . . . . . . . . . . . . | 32 |
| 5 | OBA 27 . . . . . . . . . . . . . . . . | 37 |





| No. | Description | Ident. |
|---|---|---|
| 6 | MISC 1332, letter of May 16, 1969, . . to George Busnach from Vince Puccio | 42 |
| 7 | MISC 1329 - 1330, letter of July 3, . 1969, from George Busnach to Vincent Puccio | 44 |
| 8 | MISC 1384, memo to James Maguire . . . | 45 |
| 9 | MISC 1379, letter to James Maguire . . | 46 |






664cc461-d9fd-4b89-a202-7809e578b907

GEORGE BUSNACH, SWORN
DIRECT EXAMINATION BY MR. BINDER
Q Good morning. Could you please state your name and address for the record?
A George Busnach, 57 Cole, C O L E, Terrace, Randolph, Massachusetts.
MR. LANDERS: Attorney Binder, for the record all objections except as to form are reserved for the time of trial including motions to strike?
MR. BINDER: That's fine.
MR. LANDERS: The witness will be allowed to read and sign the transcript, waive the notary.
MR. BINDER: That will be fine, also.
Q Are you currently employed?
A Yes.
Q By whom are you employed?
A H.T. Bailey Insurance Agency South. H.T. Bailey South Insurance Agency, Inc.
Q Thank you. What is the business of H.T. Bailey South Insurance Agency?
A We are wholesale insurance brokers.
Q Could you explain what insurance broker is?
A We are a broker's broker. We accept business as a wholesaler from various brokers in the New England



area.
Q You say you accept business for brokers?
A They broker business through us. We do not do business with the customers. Customers go to a broker, the broker in turn sends business to us, and we underwrite it and broker business.
Q Do you end up obtaining policies from insurers to meet the needs of the customers?
A Yes, sometimes.
Q For how long have you been an insurance broker?
A Since 1960. I started in the business in '60.
Q You have been in that business continuously?
A Yes.
Q Could you briefly describe your educational background, please.
A I graduated from high school and have some various insurance courses at Boston University, various insurance courses during the term of my career.
Q What was your first position of employment?
A It was in 1960 working for the Maurice H. Saval Insurance Agency. I started as an office boy.
Q For how long were you employed at Maurice H. Saval?
A Approximately 11 years.
Q During the course of those 11 years did you have



other positions in addition to being the office boy?
A Yes.
Q Could you describe those positions, please?
A I have worked in various departments starting with the property department and worked in the auto department, casualty department. That pretty much covers it.
Q Did you have any titles during that period?
A No.
Q Could you describe generally what your duties were at Maurice Saval?
A I was an insurance underwriter. Obviously when I started in the business, I was a trainee, but I was an insurance underwriter for Maurice Saval.
Q As an insurance underwriter what were your duties?
A Basically to underwrite business. Again the type of operation that they had at the time, it was a brokerage operation and we received most of the business from other brokers, so we would underwrite business that was submitted to us from other brokers.
Q When you say "underwrite business," would that be obtaining insurance policies to meet the needs of the customer?



A No. There were two areas. One was -- Maurice Saval had a unique operation in that he owned two insurance companies. He owned American Universal and Canadian Universal, and he was the underwriting manager for those two companies. On occasion we would broker a piece of business with another company which was completely different. The underwriting was done by another, by the carrier where we placed the business. I don't know if that explains it.
Q Was Maurice Saval both an underwriter and a broker during the period when you were employed there?
A He was the owner of the insurance companies, American and Canadian Universal, and he was also a broker.
Q As a broker did he have relationships with other insurance companies?
A Yes.
Q Do you happen to recall some of the companies which he had brokerage relationships with?
A We were doing business on occasion with the Lexington Insurance Company which was part of the AIG, and I remember General Accident was one of his companies, and I think we may have placed some

business with the Home.
Q I believe you said that you were in three different departments. One of them was the casualty department?
A That's correct.
Q Was there a particular period of time when you were working in the casualty department?
A Probably sometime after I would say '66, '67. I'm not sure of the actual dates.
Q Would that be the last department in which you worked at Maurice Saval?
A Yes.
Q I believe you said you left Maurice Saval after about 11 years?
A That's correct.
Q When you left Maurice Saval, where did you next go for employment?
A H.T. Bailey Insurance Agency.
Q You have been employed at H.T. Bailey Insurance Agency continuously since 1971 or so?
A That's correct.
Q Do you have any licenses?
A Yes.
Q What licenses do you have?



A Insurance broker's license.
Q When did you obtain that?
A Around 1965 or '66. I'm not sure of the exact date.
Q Do you have any other licenses?
A Special broker's license.
Q When did you obtain that?
A I believe probably '86/'87.
Q What is the difference between an insurance broker's license and special broker's license?
A Special broker's license allows me to place business in not admitted companies in Massachusetts, file affidavits, and pay the Commonwealth of Massachusetts four percent tax.
Q You say "not admitted businesses." Are those companies that aren't registered to sell insurance in Massachusetts?
A They are licensed companies, but they are not approved companies.
Q "Companies" for the records would be insurance companies?
A Correct.
Q During the course of your employment with Maurice Saval were you familiar with a company called Employers Surplus Lines Insurance Company?



A Yes.
Q How did you become familiar with that company?
A They placed some reinsurance business with us, "us" meaning Maurice Saval. We brokered some reinsurance with them. We may have brokered some business with them, but I just don't recall.
Q Were you personally involved in some of that business?
A With the Employers Surplus Lines?
Q Yes.
A Yes.
Q Did that occur during the period when you were employed at the casualty department of Maurice Saval?
A I recall placing business with Employers Surplus Lines when I was in the casualty department, yes.
Q Were you familiar with a Vincent Puccio?
A You are talking ancient history. Yes, yes.
Q Who was Mr. Puccio?
A He was an underwriter at Employers Surplus Lines.
Q And you personally had business contacts with him?
A It has been --
MR. O'CONNOR: Objection.



A He was an underwriter at the company. Yes, we placed business with Puccio.
Q During the period you were employed at Maurice Saval, were you familiar with a James Maguire?
A No recollection of that insured.
Q Were you familiar with a Mary Nau, N A U?
A No.
MR. BINDER: I'm going to ask the reporter to mark as the first exhibit a letter dated March 21, 1969, with an attachment which is number MISC 1353 through 1359.
[Exhibit 1 marked for identification]
Q Can you identify Exhibit 1, please?
A It is a letter dated March 21, 1969, a letter by me to Vin Puccio at the Employers Surplus Lines Insurance Company asking for a quote for an umbrella policy on Crown Metro, Inc.
Q And that is your signature on Exhibit 1?
A Yes.
Q Is any of the handwriting on the document other than the signature yours?
A No.
Q The first page of Exhibit 1 refers to a Crown Metro, Inc, and the Re: line says Crown Metro, Inc. et al

umbrella liability?
A Correct.
Q Do you recall a company known as Crown Metro, Inc.?
A No, I do not.
Q Is this a letter you wrote to apply for an umbrella liability policy for Crown Metro, Inc.?
MR. LANDERS: Objection.
MR. O'CONNOR: Objection.
Q What was the purpose of the writing Exhibit 1?
MR. O'CONNOR: Objection.
MR. LANDERS: Objection.
Q Mr. Busnach, the Re: line in Exhibit 1 says Re: Crown Metro, Inc. et al Umbrella Liability?
MR. O'CONNOR: Objection. It has been asked and answered.
Q What did you mean when you wrote Re: Crown Metro, Inc. et al umbrella liability?
MR. LANDERS: Objection.
MR. O'CONNOR: Objection.
A Repeat the question.
Q Sure. Exhibit 1 says Crown Metro, Inc. et al umbrella liability. Could you explain what that means?
MR. LANDERS: Objection. You haven't



asked him if he recalls the document, if he has a memory of the document.
MR. BINDER: I think he said this is a document that he prepared.
MR. LANDERS: You said this is his signature.
A That's it.
Q Is Exhibit 1 a document that you prepared?
A Yes.
Q You prepared the document and you wrote on it Crown Metro, Inc. et al umbrella liability?
A Correct.
Q What does that designation that you placed on the letter mean?
MR. LANDERS: Objection. If you can recall, you can answer.
A It's a letter to the Employers Surplus Lines Insurance Company to obtain an umbrella quote from Vince Puccio.
Q An umbrella quote for a particular insured?
A Crown Metro.
Q If you look at the second page of the document it is entitled Umbrella Policy Application. Says "submitted to the office of Maurice Saval, Inc." at



the very top.
A That's what it says.
Q Was that a policy application that you prepared?
A No.
Q Was that an application that you submitted to Mr. Puccio?
MR. LANDERS: Objection.
A If the application was attached to the letter, it was submitted. I don't know whether it was, the application arrived at Vince Puccio's desk or not.
Q Do you see that the second page has on the bottom a notation "form 895" at the very bottom?
A Yes.
Q Was that a form used by Maurice Saval?
A I don't recall.
Q When you were employed by Maurice Saval in the late 1960s, did your duties include from time to time the submittal of applications for insurance policies?
A Excuse me, you are not phrasing it correctly. Okay.
MR. LANDERS: Just answer the question.
A No.
Q When you were employed at Maurice Saval in the late 1960s, did you have any duties and responsibilities in connection with applications for insurance



policies?
A No.
Q When you were employed by Maurice Saval, did you from time to time transmit applications for insurance?
A Submit to whom?
Q Submit to an insurance company.
A Yes.
Q In the ordinary course of business what did you do in the course of submitting insurance applications to an insurance company?
A Hopefully wait for an insurance quote by that company.
Q From time to time after waiting for the quote, did you receive the quote?
A Hopefully, yes.
Q After you received the quote, what did you next do in the course of submitting an application for insurance to an insurance company?
A I would take -- Repeat the question.
Q In the ordinary course of business when you submitted applications for insurance to an insurance company and you would receive a quote, what was the next step that you took?

MR. O'CONNOR: Objection.
MR. LANDERS: Objection.
A Wait for the quote to be returned.
Q When the quote was returned, what did you next do?
MR. LANDERS: Objection.
A Review it and send it to an insurance broker, the broker that was placing the business through us.
Q After sending it to the broker, what was the next step that you took?
MR. LANDERS: Objection.
A Nothing.
Q Did you at some point receive an application back from the broker?
A Not an application.
Q Did you receive some information back from the broker?
A Occasionally.
Q What was that type of information?
A May have had a question on the quotation.
Q Do you note the second page of Exhibit 2 where it says "umbrella policy application" on the third line, says "submitted through the office of Maurice Saval, Inc., Boston, Massachusetts"?
A Yes.



Q Is the universal policy application with the series of questions such as shown on pages 1354 through 1357 a type of document with which you were familiar?
MR. LANDERS: Objection.
A No.
Q Looking just at the top four lines on the second page, it says "umbrella policy application. All questions must be answered submitted through the offices of Maurice H. Saval, Inc., Boston, Massachusetts." Are you familiar with such a form?
MR. LANDERS: Objection.
MR. AYLWARD: Objection.
A No.
Q When you worked at Maurice Saval, did you from time to time receive from brokers policy applications?
A Yes.
Q When you received such policy applications, did you from time to time submit them to insurers?
A Yes.
Q Do pages 1354 through 1358 contain information of the type that you received from insurance brokers with policy applications?
MR. LANDERS: Objection.



A Yes.
Q When you received policy applications from brokers, did you then from time to time check with the brokers about the accuracy of the information before submitting it to the insurers, or would you submit it directly to the insurers?
MR. LANDERS: Objection.
MR. O'CONNOR: Objection.
A Yes, to make sure it was completed.
Q After you made sure it was completed, what was the next step you would do?
A I would send it to an insurance company for a quote.
Q During 1969 were you familiar with a Michael Silverman?
A I don't recall.
Q Were you familiar with an Edward Sofarenco?
A The name sounds familiar, but I just don't recall.
Q Do you recall a company called Insurance Underwriters, Inc.?
A I don't recall.
Q Do you recall a company called Laren Insurance Agency?
A Don't recall.
Q Let me go back to the first page of Exhibit 1.



There is some handwriting in the left center portion of the page that says "George to provide brochure info on flammables, premium with INA." Do you recall discussing such information with Mr. Puccio?
A No.
Q Based on your ordinary course of business in March of 1969, would you have had any discussions with Mr. Puccio before providing him with an application of the type submitted with Exhibit 1?
MR. O'CONNOR: Objection.
MR. LANDERS: Objection.
A Don't recall.
Q As of March 21, 1969, had you previously placed any insurance with Employers Surplus Lines Insurance Company?
A I'm not sure.
Q What is your best recollection?
MR. LANDERS: Objection.
MR. O'CONNOR: Objection.
A I just don't recall.
Q You testified that in the 1960s you had placed business with Employers Surplus Lines Insurance Company, is that correct?
MR. LANDERS: Objection.

Q During the course of your employment with Maurice H. Saval, did you place any insurance with Employers Surplus Lines Insurance Company?
A Prior to 1969?
Q No, during the course of your employment.
A Yes. I'm just not sure of the dates.
Q Okay. Do you recall whether or not you first placed such business before 1969?
MR. LANDERS: Objection.
A I think I answered that question.
MR. O'CONNOR: Objection.
MR. LANDERS: Objection.
MR. BINDER: I'm getting a lot of objections.
MR. LANDERS: You are asking the same question in a variety of different ways, and it's the exact same question you keep asking different ways, and I would appreciate it if you would move on.
Q When you placed business with Employers Surplus Lines Insurance Company, do you recall dealing with any individuals there in addition to Mr. Puccio?
A Yes.
Q Who else?



A Joseph Falco. Bill Gately. Those are about the only ones I can remember.
MR. BINDER: I'm going to ask the reporter to mark as the next exhibit a document bearing production number MISC 1331.
[Exhibit 2 marked for identification]
Q Can you identify Exhibit 2, please, Mr. Busnach?
A It's a letter. I don't really know the name of the agency it was from, but -- I don't have a clear copy of it, signed by a Michael Silverman, references umbrella liability coverage for Crown Metro.
MR. BINDER: I'm going to ask the reporter to mark as Exhibit 3 a group of documents bearing production numbers OBA 35 to 51.
[Exhibit 3 marked for identification]
Q Do you note that the first page of Exhibit 3 appears to be a copy of Exhibit 2, the difference being that in the copying process it appears that the top of Exhibit 2 was cut off, the bottom of Exhibit 3 is cut off?
MR. O'CONNOR: I object. I don't believe these documents were produced in an assembled form. It's a document from OneBeacon's files.
Q Looking just at the first page of Exhibit 3, does



that appear to be a copy of the same document that is marked as Exhibit 2?
MR. LANDERS: Objection.
Q Would you compare the first page of Exhibit 3 with Exhibit 2, please.
A (The witness complies.) Would appear to be the same letter.
Q In Exhibit 3 you can see more clearly the name of the insurance agency?
A Yes.
Q Do you note that the name of the insurance agency is Laren Insurance Agency?
A It says Laren Insurance Agency.
Q Do Exhibits 2 and 3 refresh your recollection at all about Mr. Silverman or Laren?
A No. Obviously I must, they must have submitted something to me, but the name when you mentioned it didn't ring a bell.
Q I understand that. The question is do these documents now result in the name ringing a bell?
A Yes.
Q If we look at the second paragraph of the first page of Exhibit 3 it says "attached is a photostatic copy of a brochure." This would be the last sentence



starting the third line of the second paragraph of Exhibit 3.
A Excuse me.
Q About three lines down.
A Okay.
Q In that sentence Mr. Silverman says he is attaching a photostatic copy of a brochure?
A Correct.
Q Directing your attention to pages OBA 37 through 51 starting at the third page. There should be numbers on the bottom.
A Where are the numbers?
Q 37.
A Okay.
Q Are pages 37 through 51 a copy of the brochure that you received from Mr. Silverman?
A I don't know.
Q If we look at page OBA 36, could you identify that document, please.
A It's a memo from me to Vince Puccio at Employers Surplus Lines, and the term "by hand" is written across my typed name.
Q Does your memo say that it's to Mr. Puccio Re: Crown Metro, Inc.?





664cc461-d9fd-4b89-a202-7809e578b907

A Yes.
Q Do you recall whether what you sent to Mr. Puccio Re: Crown Metro, Inc. was the brochure marked OBA 37 through 51?
MR. O'CONNOR: Objection.
A I don't know.
Q Can we agree that you sent Mr. Puccio something together with the memo that is on page OBA 36?
MR. LANDERS: Objection.
Q Did you send something to Mr. Puccio together with the memo that is OBA 36?
A It said I did. I don't recall doing anything like this, no.
Q You wouldn't have just sent Mr. Puccio a single piece of paper that says "to Vince Puccio," would you?
MR. LANDERS: Objection.
A I don't know.
Q You were trying to provide some information to Mr. Puccio, weren't you?
MR. LANDERS: Objection.
A I just don't recall. I mean I don't see a date. Says received 4-10-69. That's not my writing.
MR. LANDERS: Just answer the question.



A I don't know.
Q Your writing is where it says "to Vince Puccio Employers Surplus Lines, 12th floor, Re: Crown Metro, Inc."?
A That's correct.
Q You would have provided something to Mr. Puccio together with this memo, wouldn't you?
MR. O'CONNOR: Objection.
MR. LANDERS: Objection.
A I don't know.
MR. LANDERS: That's fine.
Q Let's go back to Exhibit 1, please. Why don't you keep Exhibit 3 in front of you at the same time. I note that Exhibit 1 handwritten portion says "George to provide brochure"?
MR. LANDERS: Was that a question?
MR. BINDER: Yes, it is.
A Yes.
Q Can we agree that pages 37 through 51 of Exhibit 3 appear to be a copy of a brochure?
MR. O'CONNOR: Objection.
A Would appear.
Q What are pages 37 through 51?
MR. LANDERS: Objection.



A It's a technical bulletin.
Q Of Metro Atlantic, Inc.?
A Yes.
Q Would you consider that to be a brochure?
MR. O'CONNOR: Objection.
MR. LANDERS: Objection.
A No.
Q We note that second paragraph of page 35, Exhibit 3, says "attached is a photostatic copy of a brochure of the former Metro Atlantic, Inc. company."
MR. LANDERS: Objection. I believe he already answered that.
MR. BINDER: You may answer.
A It says that it's a brochure.
MR. LANDERS: That's fine.
Q Having looked at Exhibits 1 and 3 together, do you now recall whether pages 37 through 51 are the brochure that is referred to on page OBA 35 of Exhibit 1?
MR. O'CONNOR: Objection. At least three times you have asked him that question.
MR. LANDERS: If you don't know, you don't know.
A I don't know.



Q If we go back to Exhibit 1, do you note that the handwritten portion after saying "George to provide brochure" then says "info on flammables"?
A That's what it says.
Q If we look at the fourth paragraph of page one of Exhibit 3, does that contain information regarding flammables?
A Yes.
Q That would be the portion that says "they know of no flammable or explosive chemicals that are hauled"?
A That's what it says.
Q On Exhibit 1 in the handwritten section it refers to, also says "George to provide P R E M with INA."
A I don't see that.
MR. BINDER: Let me ask the reporter to mark as Exhibit 1A another copy of the March 21, 1969, document which was marked as Exhibit 1. Here are different Bates numbers, OBA 28 through 34.
[Exhibit 1A marked for identification]
Q Does Exhibit 1A appear to be a copy of the same document that is Exhibit 1?
MR. LANDERS: There is additional handwriting.
A I think it's the way the photocopy. They appear to

be the same.
Q If we look at Exhibit 1A, it may be a little easier to read the handwriting that we were just referring to. If we look in the lower left you see where it says in handwriting "George to provide brochures, information on flammables and P R E M with INA," --
A Yes.
Q -- is "P R E M" an abbreviation for "premium"?
A Premium.
Q If we look at the fourth paragraph of page OBA 35 of Exhibit 3, does that contain information about the premium with INA?
A Yes.
Q When you were at Maurice Saval, did you keep files concerning the matters on which you were working?
A Yes.
Q Did you maintain them in some organized fashion such as by client?
A I'm sure I did.
Q Did you take any of those files with you when you left Maurice Saval?
A No, I did not.
Q To your knowledge is Maurice Saval still in existence?



A No.
Q Do you know what happened to Maurice Saval?
A Passed away.
Q Do you know what happened to the business of Maurice Saval, Inc.?
A The business I think was, I think it was dissolved. It's been quite a few years. I know his companies are out of business.
Q Do you know what happened to the records of Maurice Saval, Inc. after it was dissolved?
A No.
Q Did you have with you when you left Maurice Saval any copies of files on matters that you were working?
A None whatsoever.
Q When you left Maurice Saval, were you in the casualty department?
A Yes.
Q Were there any other employees in the casualty department at that time?
A Yes.
Q Who were those other employees?
A Jack Gould. John Flaherty. Robert Lebrun. Those are the names that I can think of.



Q I didn't mean to cut you off. Do you know if any of those individuals are still alive?
A Yes.
Q Which if any of them are still alive?
A Pardon?
Q Which of those three are still alive?
A To the best of my knowledge they are all alive.
Q Do you know where they reside?
A Jack Gould is at AIG. John Flaherty I lost track of. He is in Detroit. And Bob LeBrund is at Excess Brokers.
Q Mr. LeBrund and Mr. Gould, would they be in the Boston area?
A Well, yes, immediate area.
Q Did one of those individuals succeed to matters on which you were working at the time you left Maurice Saval?
A I do not know.
Q At the time you were employed at Maurice Saval, the end of your employment, did you report to anybody?
A Yes.
Q To whom did you report?
A William Sliney.
Q Would you spell that?



A S L I N E Y.
Q Do you know if Mr. Sliney is still alive?
A No.
Q No, you don't know or no, he is not?
A No, he is not. Sorry.
MR. BINDER: No, it was my question.
I'm going to ask the reporter to mark as the next exhibit a document bearing production number OBA 11.
[Exhibit 4 marked for identification]
Q Is that your signature on Exhibit 4?
A Yes.
Q There is handwriting on the top that says "named insurance endorsement." Do you see that?
A Yes.
Q Do you know what a named insurance endorsement is?
A Yes. That would be the named insured on an insurance policy.
Q Is any of the handwriting on Exhibit 4 other than your signature yours?
A No.
Q Does Exhibit 4 contain a list of the entities that should be placed on a named insurance endorsement?
MR. LANDERS: Objection.

Page 33

A I don't know.
Q Let's go back to Exhibit 3 for moment. Note the first paragraph on page 35 refers to your letter of April 1, 1969, and states, "the following is the information that Home Insurance Company requested in order to provide the umbrella quotation for this account"?
A That's what it says.
Q Do you recall providing any information to Home Insurance Company in order to provide an umbrella quotation for this account?
A No.
Q If you look at the bottom of Exhibit 3 it says "I trust this will give you the information now to proceed to obtain the" --
A Where?
Q On the bottom.
A Okay.
Q -- "to obtain the quotation that I have been requesting."
A Right.
Q In 1969 did you from time to time assist brokers in obtaining quotations?
A Yes.

Page 34

Q When you assisted brokers in obtaining quotations, how did you go about doing that?
A I had them complete an application and those applications were sent to companies for quotes.
Q You would then submit the application and seek a quote from the insurer?
MR. LANDERS: Objection.
A Yes.
Q In view of the objection let me ask it again. What did you do to assist brokers in obtaining quotations after you received applications from the brokers?
A Rephrase it one more time. You are not phrasing it correctly, and I want to be specific in answering your question, if you won't mind repeating it.
Q I would be happy to repeat it. You testified that in 1969 you would assist brokers in obtaining quotations. Now you then said that you would receive applications. In addition to that what did you next do in assisting brokers to obtain quotations?
MR. LANDERS: Objection.
A If there was any information missing from an application, I would have them supply me with that information. They would complete the application

Page 35

that would enable me to submit that risk to a company for a quotation.
Q After you submitted a risk to a company for quotation, what did you next do?
A Waited for the quotation to come back or the declination.
Q After you received the quotation or the declination, what was your next step?
A To convey that information to the broker.
Q That would be a broker such as Mr. Silverman?
MR. LANDERS: Objection.
Q Would that be the broker who requested the quotation?
A If he requested a quotation and I had a quotation, I would give him the quotation.
Q In the course of your duties did you from time to time negotiate price with the insurer to whom you requested a quotation?
A Yes.
Q Going black to Exhibit 1 for a moment, you see the handwritten notation that says "quoted to George Busnach, April 15, 1969, 7200 annually"?
A Yes.
Q Did you from time to time receive quotes orally from

Page 36

the insurance companies?
A Yes.
Q When you received such information, did you make note of it?
A Yes. Sometimes. I guess so.
Q Is information such as stated in the first page of Exhibit 1, "7200 annually," the type of quote that you received from an insurer?
MR. O'CONNOR: Objection.
MR. LANDERS: Objection. He has already testified it's not his handwriting. I don't see how he could testify as to what the purpose of the handwriting is.
MR. BINDER: That's not what I asked.
MR. LANDERS: That is essentially what you are getting at.
Q Do you see Exhibit 1 refers to $7200 annually or $20,700 prepaid?
A That's what it says.
Q Is that the type of information that you would receive when soliciting a quote?
MR. LANDERS: Objection.
A No.
Q When you requested a quote, did you receive

responses from time to time?
A Yes.
Q In response to the quote, what type of information were you provided?
A A formal quote on the company.
Q Would the formal quote include the cost of the insurance?
A Yes.
Q Such as $7200 annually?
MR. O'CONNOR: Objection.
A Yes.
Q Did the formal quote also from time to time provide information about different prices if the insurance was prepaid rather than paid annually?
A Yes.
MR. LANDERS: Short break?
THE WITNESS: Yes.
[Recess]
MR. BINDER: I'm going to ask the reporter to mark as the next exhibit a document bearing production number OBA 27.
[Exhibit 5 marked for identification]
Q Is Exhibit 5 a document that you prepared and signed?



A Yes.
Q Exhibit 5 says "Crown Metro, Inc. umbrella liability 4 million excess of 1 million." What does "4 million excess of 1 million" mean?
A It means possibly an excess umbrella.
Q And the excess umbrella would take effect after the $1 million underlying policy?
A That's correct.
Q In Exhibit 5 you write "I'm enclosing photostatic copy of underlying policy."
A Correct.
Q What would the underlying policy be?
A The underlying policy, the first million.
Q That would be in effect before the $4 million umbrella?
A Generally, yes.
Q Where would you have obtained the underlying policy that you transmitted with this letter?
A I have no idea.
Q Would you expect you would have obtained it from the insured or the insured's broker?
A I have no idea where the underlying million was placed or by whom.
Q I understand that, but you physically transmitted



copies of an underlying policy?
A Correct.
Q I understand that you don't know right now who wrote that policy, where it is?
A That's correct.
Q But from whom would you have obtained the underlying policy to enclose it with your letter?
MR. O'CONNOR: Objection.
MR. LANDERS: Objection.
A No idea.
Q Based on your ordinary business practice, who would you have received an underlying policy for?
MR. LANDERS: Objection.
Q Would it be from the broker? Insured?
A Not from the insured.
Q Can you think of any source other than the broker from which you would have obtained the underlying policy to transmit to Mr. Puccio?
MR. O'CONNOR: Objection.
A I think I have answered the question. I don't know where the underlying policy came from. I didn't know there was an underlying policy.
Q You were enclosing the underlying policy?
A Your question to me was, okay, about obtaining the



underlying policy. I have no idea.
Q I understand that. You wrote you were enclosing the underlying policy.
A Right.
Q That was a true statement at the time, wasn't it?
A Apparently, yes.
Q Based on your business practices if you were obtaining an underlying policy to provide to an insurer, who would you have gone to to obtain that policy?
MR. LANDERS: Objection.
A Various sources.
Q What would those various sources have been?
A The broker.
Q Any other sources?
A The company that the coverage was placed at if I was placing a piece of business on behalf of a company. It could -- Obviously I had a copy of an underlying policy. I don't know where it came from.
Q Based on your business practice one source would have been the broker, one source would have been the insured that issued the underlying policy?
A Correct.
Q Based on your business practice, any other source

from which you would have obtained the underlying policy?
A I can't think of another source.
Q If we go back to Exhibit 3, the letter from Mr. Silverman --
A Yes.
Q -- who was requesting you to obtain the quotation that he had been requesting, based on Exhibits 3 and 5, would you expect that you would have obtained the underlying policy from Mr. Silverman rather than the insurer?
MR. O'CONNOR: Objection.
MR. LANDERS: Objection.
A I don't know.
Q At this point you don't recall from whom you obtained the underlying policy that you sent to Mr. Puccio?
MR. LANDERS: Objection.
A I don't remember anything about the primary or the excess.
MR. BINDER: I'm going to ask the reporter to mark as Exhibit 6 a letter dated May 16, 1969, that has production number MISC 1332.
[Exhibit 6 marked for identification]



Q Can you identify Exhibit 6, please.
A A letter from Employers Surplus Lines referencing a policy number S-16-07084, and it's signed by Vince Puccio, and it says "original plus two copies of the above policies."
Q That was a letter that was sent to you?
A That was sent to us, correct. It was sent to me at Maurice H. Saval's office.
Q When you received insurance policies, what did you do with the policies?
A When we received an insurance policy from a company?
Q From the insurer, yes.
A We would send it to the broker.
Q Exhibit 6 refers to the fact that you are receiving both an original and two copies.
A Correct.
Q In the instances when you received more than one copy of an insurance policy, what did you do with the various copies?
A We had an original copy which was the insured's copy and a copy for, well, for Maurice Saval's records and a copy for the broker, three copies, presumably that is the way we would do it. There wouldn't be a reason to hold onto all three copies.



Q So Maurice Saval kept copies of insurance policies when it received multiple copies, is that your understanding?
A Yes.
Q Do you know what Maurice Saval did with the insurance policies that it received?
A What did he do with the policy?
Q I can ask the question better. At some point in time you said Maurice Saval ceased to exist?
A That's correct.
Q Do you know at that time what happened to the insurance policies that were in Maurice Saval, Inc.'s files?
MR. LANDERS: Objection.
A Do not know. No idea.
Q Do you know if Maurice Saval, Inc. kept microfilm copies of policies that it had received?
A I have no idea. Do not know.
Q If you wanted to find a copy of an insurance policy that had been placed at Maurice Saval when you were there, where would you go to look for it?
A File drawer.
Q If you wanted to obtain a copy of a policy at some point after you left the company, who would you go



to see?
A Probably Bill Sliney.
MR. BINDER: I ask the reporter to mark as the next exhibit a letter dated July 3, 1969, that has been marked as production numbers MISC 1329 to 1330.
[Exhibit 7 marked for identification]
Q Could you identify Exhibit 7, please.
A It's a letter from me to Vince Puccio dated July 3 referencing the policy S-16-07084 and enclosing a copy of Endorsement 6 which was added to the primary umbrella policy issued by the INA. If you have any questions, give me a call.
Q Second page has a copy of an endorsement marked Endorsement 6. Is that correct?
A Correct.
Q Endorsement 6 is entitled Exclusion of Waste Products. Do you recall having seen that endorsement before?
A No.
Q Do you recall ever having seen the endorsement titled Exclusion of Waste Products?
A No.
Q Do you remember having discussions with anybody

regarding that endorsement?
A I don't remember.
Q Endorsement 6 refers to Endorsement 5 entitled Pollution Contamination Exclusion Endorsement.
A That's what it says.
Q Had you seen such an endorsement before?
A No.
Q Did you have any discussions with anybody regarding such endorsement?
A No.
Q When Maurice Saval, Inc. kept copies of insurance policies, how were those records organized, such as by date, by insured, by insurer?
A I'm not sure. I don't recall.
MR. BINDER: I would ask the reporter to mark as the next exhibit a document bearing production number MISC 1384.
[Exhibit 8 marked for identification]
Q Could you identify Exhibit 8, please.
A It is a handwritten memo to James Maguire at Employers Surplus Lines regarding Crown Metro, again referencing policy number S-16-07084. It basically asked Jim to forward a premium installment endorsement for the period 2-15-70 to 2-15-71.



Q Is this a handwritten document that you prepared?
A Yes.
Q What is a premium installment endorsement?
A Generally it's for a policy that is written for a period longer than one year, and this would be the installment premium if the coverage was placed like that for the premium.
Q Is this requesting an endorsement to address the premium for the second policy year?
A It doesn't say that, it says for the period '70 to '71.
Q Which would be a period of a year?
A Period of a year, yes.
MR. BINDER: I ask the reporter to mark as the next exhibit a document bearing production number MISC 1379.
[Exhibit 9 marked for identification]
Q Could you identify Exhibit 9, please.
A It is a letter to James Maguire at the Employers Surplus Lines again referencing Crown Metro S-16-07084 policy number. Says, "Please disregard my memorandum of January 5, '69, wherein we requested an installment endorsement for the above-captioned account. Enclosed is a copy of the



letter that was sent by our insured stating that the USM Corporation acquired ownership of Crown Metro, Inc. and subsequently Crown Metro was included under their policies. Please cancel coverage effective January 1, 1970. The original copy of the policy is enclosed."
Q Is that a letter you prepared and sent to Mr. Maguire?
A Yes.
Q Is that your signature on it?
A Yes.
Q The letter refers to the return of the original policy, is that correct, that you are enclosing the original policy?
A That's what it says, yes.
Q Would you have also returned any other copies of the policy with that letter?
A No.
Q Do you recall having any discussions with any employees of Employers Surplus Lines Insurance Company regarding the placement of an umbrella liability policy for Crown Metro, Inc.?
A No.
Q Do you recall having any discussions with anybody



regarding placement of an umbrella liability policy for Crown Metro, Inc.?
A No.
Q Let's go back for a moment to Exhibit 1, please. Exhibit 1 is a letter where you are stating you are enclosing an application.
A Yes.
Q In the ordinary course of your business when you were seeking to obtain a quotation, did you have any communications with the insurer before submitting an application?
A I don't recall.
Q I'm asking now in your general practice, not specifically this insured.
A Okay. Repeat the question.
Q Was it your general practice in 1969 when seeking to obtain a quotation for coverage to take any steps in dealing with an insurer before enclosing an application?
A No.
Q In connection with your deposition here today, did you do anything to prepare?
A No.
Q Did you look at any documents?

A No.
Q At some point in time you learned that your deposition was noticed, is that right?
A I received notice.
Q You received notice and a subpoena?
A Yes.
Q In that time have you looked at any documents at all to prepare for this deposition?
A No, I have not.
Q Other than your counsel, have you spoken to anybody about the deposition?
A No.
Q You mentioned earlier that there was a Jack Gould who worked with you at Maurice Saval who is at AIG?
A That's correct.
Q Do you know what his business address is at AIG?
A Yes.
Q Would that be an AIG office in Boston?
A Yes.
Q You mentioned Mr. Lebrun. What is the spelling of his name, please?
A L E B R U N.
Q Is he also in the Boston area?
A He is in Quincy.



Q Do you recall approximately when Maurice H. Saval, Inc. ceased doing business?
A I could give you a guess, but I don't know how accurate it is. At least ten years. I'm guessing.
MR. LANDERS: Please don't guess.
Q Do you know whether either of those gentlemen, Mr. Gould or Mr. Lebrun, was with Maurice Saval, Inc. at or about the time it dissolved?
A I'm not sure.
Q Other than the documents that have been marked as exhibits here at this deposition, do you recall any business dealings or discussions you have had with Michael Silverman and Laren Insurance Agency, Inc.?
A No.
Q Do you recall any such dealings with Insurance Underwriters, Inc. or Edward Sofarenco, Insurance Underwriters, Inc. of Providence, Rhode Island?
A No.
Q When you were employed at Maurice Saval, Inc. focusing on the period of the late sixties, roughly how frequently did you attempt to place insurance for another broker?
A How many brokers was I dealing with?
Q Yes.



A In the course of a given year?
Q Yes.
A Over 100.
Q Was the placing of insurance policies for brokers one of your regular duties while you were working in the casualty department at Maurice H. Saval?
A It was one of my functions, yes.
Q Was it one of your primary functions?
A No.
Q What was your primary function?
A Underwriting business for companies that Maurice Saval owned.
Q Insurance companies that Maurice Saval owned?
A Yes. He owned two.
MR. BINDER: Okay. I have no further questions.
MR. O'CONNOR: I have a couple of follow-ups, and I'll be brief.

CROSS EXAMINATION BY MR. O'CONNOR

Q My name is Kevin O'Connor and I represent OneBeacon America Insurance Company which is the successor by a series of events too long to go through to Employers Surplus Lines.
A I understand.



Q You were asked a whole series of questions about correspondence dated in March, April and May of 1969 regarding Employers Surplus Lines, dealings you had mostly with Vince Puccio?
A Yes.
Q One of the last documents that was shown was Exhibit 8. Would you look at that for a moment.
A (The witness complies).
Q That document is dated fifth of January, 1969. Do you see that?
A Yes.
Q That is two months prior to the next earliest correspondence that you were shown today which Exhibit 1, March 21, 1969.
A Um-hum.
Q I believe you testified that this related to a premium installment endorsement for the period starting February 15, 1970?
A Yes.
Q Do you have any explanation as to why you would be looking for a premium endorsement on the fifth of January, 1969, for a policy that hadn't been issued yet?
MR. BINDER: Objection.

A No. I saw that myself. Unless I made a mistake. It could have been '70.
Q It was the fifth day of the year?
A Yes, maybe I used '69 instead of '70. I saw that myself.
Q Do you have a habit at the start of a new year of sometimes putting the prior year's date to a document?
MR. BINDER: Objection.
A Yes.
Q Do you have any other explanation for why you would be looking for a premium endorsement before a policy was issued?
MR. BINDER: Objection.
A No.
Q If you look at Exhibit 9, the January 16, 1970, letter, it refers to back to the January 5, 1969, memorandum.
A Um-hum.
Q Does that refresh your recollection at all given the date of this document as to whether or not that was the incorrect date in Exhibit 8?
A I really don't know.
Q Exhibit No. 7 is a document you testified that you



sent to Mr. Puccio enclosing a copy of Endorsement No. 6. Do you know if prior to July 3, 1969, you had sent a copy of Endorsement No. 6 to anyone at Employers?
A Copy of this.
Q The attachment is an endorsement?
A Yes.
Q Do you know if prior to July 3, 1969, you had sent a copy of that endorsement to anyone?
A I do not recall.
MR. BINDER: To anyone?
MR. O'CONNOR: To anyone at Employers.
Q Your answer is the same, you don't recall?
A I don't recall.
Q If you look at Endorsement No. 6, can you tell from that document the date it was added to the policy?
A Exhibit 6 is not an endorsement.
Q Exhibit 7, I'm sorry. I misspoke. I'm looking at Exhibit 7, the attachment which is Endorsement No. 6.
A Yes.
Q Can you tell from looking at the document when this document was physically drafted?
A December 1, 1968.



Q That is what it says under "effective date"?
A Right.
Q If you look at a copy date below that, says CC, 6-19-69.
A Oh. I have no idea. It looks like a carbon copy. 6-19-69, Insurance Underwriters. Irrespective of that, it is still effective December 1.
Q You can't tell me if it was added to the policy on December 1?
A I don't even know who wrote this policy. Insurance Company of North America. Okay. I don't know how that even came into play. I wasn't -- I don't recall writing a policy for insurance through the Insurance Company of North America.
Q So, therefore --
A It's not my endorsement.
Q -- you don't know when this was added to that policy?
A Exactly.
MR. O'CONNOR: I don't have anything further. Thank you.
MS. MAIN: I have no questions.
CROSS EXAMINATION BY MR. GLOWACKI
Q I'm John Glowacki and I represent Century Indemnity



Company which is successor to Insurance Company of North America. I think I only have one or two questions for you.
To the best of your recollection is it accurate to say that you had no role in the negotiation of Endorsement 6 that is attached to Exhibit 7 that has been marked today?
A That's correct.
Q Sir, is it also correct that you had no role in the negotiation of any policy that may have been issued to Crown Metro by the Insurance Company of North America?
A That is correct.
MR. BINDER: Objection.
MR. GLOWACKI: Nothing further. Thank you, sir.
CROSS EXAMINATION BY MR. AYLWARD
Q My name is Michael Aylward and I represent Risk Enterprise Management which is responsible for certain claims, policies issued by the Home Insurance Company.
Would you take a look at Exhibit 3, the April 7, 1969, letter to you from Laren Insurance Agency.





664cc461-d9fd-4b89-a202-7809e578b907

A (The witness complies).
Q In the opening paragraph there is referenced information that the Home wanted pursuant to a possible quote for umbrella coverage. Do you see where that is, the first paragraph of the letter?
A "The Home Insurance Company requested in order to provide the umbrella quotation for this account."
Q Do you know whether in fact the Home Insurance Company every issued a policy to Crown Metro?
A I do not.
MR. AYLWARD: Thank you very much. That's all the questions I have.
REDIRECT EXAMINATION BY MR. BINDER
Q Let me ask one other additional question.
A Sure.
Q Could you turn to Exhibit 4. Do you see on Exhibit 4 there are the names of a number of companies listed?
A Yes.
Q Do you recall any communication with anybody about insurance policies that were issued to any of the companies listed on Exhibit 4?
A No.
Q Do you understand my question to include all



insurance of any type?
A I don't recall the names.
Q You are not familiar with any of those names listed?
A Now with Crown Metro, but up until that, no. There are obviously some subsidiary companies, but this is not an endorsement.
MR. LANDERS: Just answer his question.
Q I understand. I'm asking you about the list of companies.
A No.
MR. BINDER: Okay. I have no further questions.
[Whereupon the deposition was concluded at 10:59 a.m.]

* * * *



C E R T I F I C A T E

I, George Busnach, certify that I have read the foregoing transcript of my testimony taken on February 4, 2003, and certify that, to the best of my knowledge, said transcript is true and accurate (with the exception of the following corrections):

Page Line Correction

____________________________________________
____________________________________________
____________________________________________
____________________________________________
____________________________________________
____________________________________________
____________________________________________
____________________________________________
____________________________________________
____________________________________________
____________________________________________

____________________ ____________________
George Busnach Date

Read and signed before me this _____ day of

____________________.

____________________ ____________________
Notary Public My Commission Expires:



COMMONWEALTH OF MASSACHUSETTS)
)
COUNTY OF SUFFOLK )

I, Carole M. Wallace, Certified Shorthand Reporter and Notary Public within and for the Commonwealth of Massachusetts, do hereby certify that I took the deposition of George Busnach at the offices of Willcox, Pirozzolo & McCarthy, 50 Federal Street, Boston, Massachusetts 02110, on Tuesday, February 4, 2003, commencing at 9:11 a.m.

I further certify that said witness was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth, and that the foregoing testimony was taken by me stenographically and thereafter by me reduced to typewriting and is a true record of the testimony of the witness.

I further certify that I am not related to any of the parties hereto or their counsel, and that I am in no way interested in the outcome of said cause.

Dated this 15th day of February 2003.

____________________________
Notary Public in and for the
Commonwealth of Massachusetts





664cc461-d9fd-4b89-a202-7809e578b907