UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| EMHART INDUSTRIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, LIBERTY MUTUAL INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICA INSURANCE COMPANY and UNITED STATES FIRE INSURANCE COMPANY, <br><br> Defendants. | Civil Action No. 02-053 S |

**OBJECTION OF EMHART INDUSTRIES, INC. TO CENTURY'S MOTION FOR PARTIAL SUMMARY JUDGMENT UNDER ITS 1969 PRIMARY POLICY BASED ON TRIGGER OF COVERAGE**

Plaintiff, Emhart Industries, Inc. ("Emhart"), opposes the motion for partial summary judgment filed by Century Indemnity Company ("Century") based on trigger of coverage. The Century motion should be denied for the following reasons.

1. Century unsuccessfully sought summary judgment on this issue in 2004. Its motion was denied in the Report and Recommendation of Magistrate Judge Lovegreen dated February 15, 2005, and its objection to the Report and Recommendation was overruled by the Court on May 17, 2005. In the present motion, Century is repeating its prior motion, citing the same cases and portions of the record as in its earlier motion. The reasons for denial of the original summary judgment motion apply with equal force to the current Century motion.

2. The facts and expert opinions of all parties' expert witnesses establish that during the 1969 policy period, property damage was "discoverable" within the meaning of Textron, Inc.

v. Aetna Casualty and Surety Co., 754 A.2d 742 (R.I. 2000) ("Textron-Wheatfield"), and Textron, Inc. v. Aetna Cas. & Sur. Co., 723 A.2d 1138 (R.I. 1999) ("Textron-Gastonia"). The Century motion questions only one element of "discoverability," whether there was a reason to test. That element is met. There is extensive testimony regarding leaks and spills of chemicals at the Site, similar to the testimony that required denial of summary judgment in the Textron decisions. In addition, there was information during the policy period about dangers associated with a chemical that has previously been used at the Site.

3. While Emhart has established that the policy is triggered under the discoverability trigger, there is an independent basis for denying the motion. In Textron-Gastonia, the Rhode Island Supreme Court indicated that it might adopt an additional trigger of coverage, the continuous trigger. 723 A.2d at 1141. Under that test, the policies would unquestionably be triggered.

In support of its objection, Emhart relies on its Memorandum Of Law In Support Of Its Objections To Defendants' Motions For Summary Judgment Based On Trigger Of Coverage, its Statement of Disputed Facts and Additional Facts and its Appendix of Exhibits, all filed herewith and incorporated herein

Respectfully submitted,

/s/ Gerald J. Petros

Gerald J. Petros (#2931)
Hinckley, Allen & Snyder LLP
1500 Fleet Center
Providence, Rhode Island 02903
(401) 274-2000
(401) 277-9600
gpetros@haslaw.com

Jack R. Pirozzolo
Richard L. Binder
Willcox, Pirozzolo & McCarthy
Professional Corporation
50 Federal Street
Boston, Massachusetts 02110
(617) 482-5470

Counsel for Plaintiff, Emhart Industries, Inc.

Dated: August 16, 2006

**CERTIFICATE OF SERVICE**

I hereby certify that on August 16, 2006, a copy of the foregoing Objection Of Emhart Industries, Inc. To Century's Motion For Partial Summary Judgment Under Its 1969 Primary Policy Based On Trigger Of Coverage was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Gerald J. Petros

Gerald J. Petros (#2931)
Hinckley, Allen & Snyder LLP
1500 Fleet Center
Providence, Rhode Island 02903
(401) 274-2000
(401) 277-9600
gpetros@haslaw.com

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

EMHART INDUSTRIES, INC.,

Plaintiff,

v.

HOME INSURANCE COMPANY,
INSURANCE COMPANY OF NORTH AMERICA,
LIBERTY MUTUAL INSURANCE COMPANY,
NORTH RIVER INSURANCE COMPANY,
ONEBEACON AMERICA INSURANCE COMPANY
and UNITED STATES FIRE INSURANCE COMPANY,

Defendants.

Civil Action No. 02-053 S

**MEMORANDUM OF LAW OF EMHART INDUSTRIES, INC.
IN SUPPORT OF ITS OBJECTIONS TO DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT BASED ON TRIGGER OF COVERAGE**

Gerald J. Petros (#2931)
Hinckley, Allen & Snyder LLP
1500 Fleet Center
Providence, Rhode Island 02903
(401) 274-2000

Jack R. Pirozzolo
Richard L. Binder
Willcox, Pirozzolo & McCarthy
Professional Corporation
50 Federal Street
Boston, Massachusetts 02110
(617) 482-5470

Dated: August 16, 2006

Counsel for Plaintiff, Emhart Industries, Inc.

## INTRODUCTION

Emhart opposes the Century[1] summary judgment motion regarding trigger of its 1969 primary policy and the OneBeacon joinder in that motion. Century unsuccessfully sought summary judgment on this issue in 2004. The motion was denied in the Report and Recommendation of Magistrate Judge Lovegreen dated February 15, 2005 ("Report"). Its objection to the Report was overruled and the Report was adopted by the Court on May 17, 2005. The trigger issue was argued in detail to the Court before it adopted the Report.[2] Century is repeating its prior motion, citing the same cases and portions of the record as in its earlier motion. The reasons for denial of the original summary judgment motion apply with equal force to that motion as recently re-filed.

The facts and expert opinions of all parties' expert witnesses establish that during the 1969 policy period, property damage was "discoverable" within the meaning of Textron, Inc. v. Aetna Casualty and Surety Co., 754 A.2d 742 (R.I. 2000) ("Textron-Wheatfield"); and Textron, Inc. v. Aetna Cas. & Sur. Co., 723 A.2d 1138 (R.I. 1999) ("Textron-Gastonia"). The present Century motion questions only one element of "discoverability," whether there was a reason to test. That element is met. There is extensive testimony regarding leaks and spills of chemicals at the Site, similar to the testimony that required denial of summary judgment in the Textron decisions. Here, that evidence is buttressed by evidence of an independent reason to test. During the policy period, there was information about dangers associated with a chemical that

---

1 OneBeacon, which issued an excess policy during essentially the same period as the Century policy, filed a summary judgment motion relying solely on the Century summary judgment submissions on this issue. The arguments showing that Century is not entitled to summary judgment are equally applicable to the OneBeacon motion. For convenience, the two insurers will be referred to collectively as "Century." OneBeacon and Century have incorporated each other's motions, apparently because each issued policies in 1969 which are governed by Rhode Island law.

2 See Transcript of Hearing on Objections to Report & Recommendation, pp. 29-42 (included in the Appendix of Exhibits to this motion as Exhibit A).

has previously been used at the Site. Nothing in the Textron decisions supports the Century assertion that the discoverability trigger is inapplicable unless leaks and spills occurred during the policy period. Rather, in both cases leaks and spills that occurred in prior years satisfied the test.

While Emhart has established that the policy is triggered under the discoverability trigger, there is an independent basis for denying the motion. In Textron-Gastonia, the Rhode Island Supreme Court indicated that it might adopt an additional trigger of coverage, the continuous trigger. 723 A.2d at 1141. Under that test, the policies would unquestionably be triggered.

**SITE BACKGROUND**

Crown Metro, Inc. ("Crown Metro"), the named insured under the Century and OneBeacon policies, was formed in December 1968 when Metro-Atlantic, Inc. ("Metro-Atlantic") entered into an agreement of consolidation with Crown Chemical Corporation ("Crown Chemical").[3] Prior to the consolidation, Metro-Atlantic had operated on a portion of the Site. It is asserted that some of the dioxin on the Site was associated with Metro-Atlantic having manufactured hexachlorophene, an ingredient in pHisoHex, an anti-bacterial soap for a period of fewer than twelve months in 1964 and 1965 (Ex. B (Cleary Dep.) at 17, 40, 49-50).[4] One of the ingredients in hexachlorophene is trichlorophenol, a chemical that is now known to contain dioxin.

---

[3] See Century Statement of Undisputed Facts, ¶ 5.

[4] References to "Ex. __" are to the Appendix Of Exhibits To The Objections Of Emhart Industries, Inc. To Defendants' Motions For Summary Judgment Based On Trigger Of Coverage, filed herewith.

## ARGUMENT

### 1. There Are Issues Of Fact Regarding Whether The Property Damage Was Discoverable

#### a. The Spills, Leaks, Releases And Knowledge Regarding Tricholophenol And Dioxin Provided A Reason To Test

Rhode Island has recognized that, at a minimum, "[p]roperty damage triggers coverage [under a CGL policy] when the damage (1) manifests itself, (2) is discovered or, (3) in the exercise of reasonable diligence is discoverable." Textron-Wheatfield, 754 A.2d at 746; Textron-Gastonia, 723 A.2d at 1142-43. The third of these alternative triggers, discoverability in the exercise of reasonable diligence, is applicable. That trigger is satisfied where "(1) the property damage occurred during the policy period, (2) the property damage was capable of being detected, and (3) the insured had reason to test for the property damage." Textron-Gastonia, 723 A.2d at 745-46. The discoverability trigger is satisfied where "(1) the property damage occurred during the policy period, (2) the property damage was capable of being detected, and (3) the insured had reason to test for the property damage." Id. The Century motion challenges only the third of these elements, whether the insured "had reason to test for property damage."

The reason to test element is satisfied if there was "some reason to test." Textron-Gastonia, 723 A.2d at 1144 ("in order to trigger coverage in the absence of actual discovery, [the insured] must have had some reason to test for the contamination…."). In the Textron decisions, the some reason to test element was satisfied when the insured merely provided evidence that there were spills, leaks and other releases of contaminants that were later found at the site. In Textron-Gastonia, this element was satisfied by evidence of "overflow and other leaks of solvents" and the court's conclusion that such events "could cause a person exercising reasonable diligence to test for, and to discover, soil and groundwater contamination." 723 A.2d

at 1144. In Textron-Wheatfield, the court held that the reason to test factor was met by affidavits stating that there were "'small leaks and spills'" of the chemicals that were later discovered on the site, "arguably giving [the insured's] engineers reasons to test for contamination." 754 A.2d at 747. The quantum of evidence needed to satisfy the reason to test standard is emphasized by the expert affidavit of Michael Trelecky submitted in Textron-Wheatfield, which noted the leaks, but contained no explanation as to why the leaks provided a reason to test.[5] The Textron-Wheatfield court held that the affidavit was sufficient to establish a reason to test. 754 A.2d at 747.

Here, there is similar evidence of extensive spills and leaks at the Site. Metro-Atlantic used pipes to bring raw materials used in its products from storage areas to the manufacturing areas and used hoses to pump finished product from the manufacturing area to an area where it was stored in drums for delivery to customers (Ex. D (J. Nadeau Dep.) at 32-33, 87; Ex. E (Palumbo Dep.) at 20, 27, 55-57). Employees observed leaks from those pipes (Ex. D at 32-33, 87). As one employee of Crown Metro testified, spills and leaks inevitably take place in the course of manufacturing operations as "nobody is perfect" (Ex. F (J. Buonanno Dep.) at 15-16). There are inevitably leaks from pipes (Ex. G (Bonchonsky Dep.) at 85-86, 125-26).

The trichlorophenol used to manufacture hexachlorophene was delivered in tank trucks and either remained in the tank truck until it was piped to the manufacturing building or was stored before it was used to manufacture hexachlorophene (Ex. B at 59). The building where the hexachlorophene was manufactured contained storage tanks and centrifuges (Ex. F at 74-75; Ex. H). The finished hexachlorophene was pumped from the manufacturing facility to a storage facility or a truck used to deliver the finished product (Ex. I (Paterson Dep.) at 24-25). Spills or

---

[5] The Trelecky affidavit is included in the Appendix of Exhibits as Exhibit C. The portion of the affidavit quoted in the opinion is the last sentence of paragraph 9.

leaks inevitably occurred when the trichlorophenol was brought onto the Site by tankers or when it was piped to the building where hexachlorophene was manufactured (Ex. G at 189-90).

Employees of Metro-Atlantic were also aware of major releases of chemicals. A large formaldehyde tank explosion blew out several windows at the plant, and a "'giant mushroom' of formaldehyde" was released that reached houses in the surrounding area (Ex. F at 97-98, Ex. D at 99-100; Ex. J; Ex. K). There was an explosion, fire and release of chemicals when a truck driver opened a 3000 gallon tank of methanol in an attempt to obtain methanol for his space heater (Ex. D at 39-40) and when a chemical was mistakenly pumped into a large storage tank containing a different chemical (id. at 41-42). The overflow when the chemical was pumped into a storage tank is similar to Textron-Gastonia, in which "'a vendor accidentally overfilled an aboveground solvent storage tank.'" 723 A.2d at 1144 (quoting an affidavit).

Here, the evidence of spills and leaks is supplemented by expert opinion explaining that the prior use of trichlorophenol at the Site provided "some reason to test." As explained by Dr. J. Ronald Hass, a witness retained by Emhart with expertise regarding the chemistry and analysis of dioxin, by 1969, dioxin present in trichlorophenol was recognized as a risk (Ex. L (Hass Report) at 4, ¶¶ 1-5). By 1965, Dow, a manufacturer of trichlorophenol, was marketing its trichlorophenol as having less dioxin impurity than its competitors (id. at 4, ¶ 6; Ex. M (Hass Dep.) at 200-01). There was a reason for "a reasonable person engaged in the manufacture of chemicals using trichlorophenol" to have conducted tests in view of "the Dow chemical marketing programs and articles published in industry magazines such as Chemical & Engineering News" and "the public debate over Agent Orange and its dioxin contamination [that] developed in the late 1960s" (Ex. L at 4, ¶ 7). Dr. Edward Calabrese, an expert retained by certain insurers testified that, by 1969, spills of trichlorophenol would have been a "serious

issue" warranting an "evaluation and review" as to possible environmental[6] harm (Ex. N (Calabrese Dep.) at 40-43).[7] Dr. Calabrese also mistakenly asserted that Metro-Atlantic, years earlier, must have been aware of this risk

> [a] basic understanding [that dioxin would be present in 2,4,5-Trichlorophenol that was used in the manufacture of hexachlorophene and that the waste material was highly toxic] and its seriousness from an environmental health and safety perspective should be [sic] been known and appreciated by responsible personnel at Metro-Atlantic as well. Such collective knowledge was widely and generally available from the mid 1960s from multiple and intersecting avenues such as the industry and the scientific community and this should be used as a trigger date.

(Ex. P (Calabrese Report) at 17; <u>see</u> <u>also</u> <u>id.</u> at 14-16).

**b. The <u>Textron</u> Decisions Do Not Require The Court To Ignore Events That Occurred Prior To The Policy Period**

Faced with the evidence that spills and leaks similar to those at issue in the <u>Textron</u> cases occurred at the Site, Century attempts to add the requirement that the spills and leaks must occur "during the relevant policy period" (Century Mem. at 5).[8] That assertion finds no support in the <u>Textron</u> decisions, and <u>Textron-Wheatfield</u> holds to the contrary. In that decision, the entire discussion of the evidence that satisfied the reason to test requirement (754 A.2d at 747) was a summary of evidence of spills and leaks, without any attempt to ascertain whether there were spills or leaks during each of the specific policy periods at issue (1963-1966, 1979-1981, 1982-

---

[6] Apparently, the insurers' experts viewed this information as a basis for an argument on the expected and intended issue. The evidence is not supportive of the insurers' position concerning this issue, particularly in view of the Court's rulings at the August 3 hearing. If such testimony is credited by the finder of fact, it would support the discoverability of the contaminants.

[7] Dr. Nicholas Cheremisinoff, another witness retained by certain insurers, testified that there was reason to test for the other contaminants found at the Site, including PCBs and chlorinated solvents (Ex. O (Cheremisinoff Dep.) at 384).

[8] In view of the evidence discussed above, Century could not be denying that the spills and leaks occurred.

1984 and 1984-1986). 754 A.2d at 746-47.[9] Rather, the court found the evidence was sufficient to establish discoverability as "the same toxic chemicals that later turned up in the groundwater had spilled or leaked accidentally at various times, arguably giving Textron's engineers reasons to test." 754 A.2d at 747 (emphasis supplied). In its discussion, the court cited testimony that provided no specific dates, i.e., "spills of the chemicals that later ended up in the groundwater 'certainly' occurred" and evidence of spills associated with "a building used since 1956." Similarly, in Textron-Gastonia, the policies at issue covered 1960-1986 (723 A.2d at 1139) and the affidavits satisfying the reason to test referred to spills or leaks "[i]n the 1970s," "approximately the mid to late 1970s" and "the late 1970s." 723 A.2d at 1144.

Moreover, nowhere in the Textron decisions did the court attempt to limit discoverability to the precise facts presented in those cases. Rather, the court reversed the grant of summary judgment, noting that the evidence presented was sufficient to withstand summary judgment. In Textron-Wheatfield, the court noted that there were "specific allegations of site contamination that amount to more than a mere assertion that it disposed of waste at a site" used as a commercial waste disposal area. 754 A.2d at 747. Neither Textron decision stated that the facts presented were the only facts that would establish some reason to test. Thus, while Textron operated the Gastonia and Wheatfield plants during the policy periods, that does not translate to a requirement that the insured operate the plant during the policy period. Moreover, Century has not provided any rationale for imposing such a requirement or pointed to anything in either Textron decision suggesting that once an insured discontinues its business operations at a site, it no longer has a reason in the exercise of reasonable diligence to test the site. There is no rationale for such a limitation on a reason to test. The court ruled that the discoverability trigger

---

9 The listed dates overlap, apparently because there were both primary and excess insurers who issued policies that partially overlapped the terms of other policies.

is satisfied by evidence that "could cause a person exercising reasonable diligence to test for, and to discover, soil and groundwater contamination" (Textron-Gastonia, 723 A.2d at 1142, emphasis added) or if the insured has "some reason to test" (id. at 1144, emphasis added), without providing a catalogue of the circumstances that could provide such a reason.

Century provides no explanation as to why a person "exercising reasonable diligence" would disregard events that occurred prior to the policy period. The consideration of leaks and spills that occurred in earlier years is particularly appropriate when the significance of those events is magnified by knowledge that the chemicals spilled and leaked were potentially dangerous. The exercise of the "care that an ordinary prudent person would exercise in the same or similar circumstances" (Berman v. King Union Ins. Co., 94 A.2d 428, 431 (R.I. 1953)) would include considering all relevant information. While Century may choose to contest whether the information about events in the recent past contributes to a reason to test, that argument is one of the weight of the evidence that is not appropriately considered on summary judgment.

Information about events that took place at Metro-Atlantic prior to the policy period was known to Crown Metro as employees of Metro-Atlantic worked for Crown Metro after the consolidation (Ex. F at 6-7; Ex. I at 34). Crown-Metro, a corporation formed by the consolidation of Metro-Atlantic and Crown Chemical Corporation, continued to be liable for the conduct of Metro-Atlantic. Thus, Crown Metro had the same incentive to conduct tests so as to avoid potential liability as it would have had if the events arose from business operations after the consolidation.

**c. The Other Elements Of The Discoverability Trigger Are Met**

Century does not contest that there is evidence of property damage during the policy period. Such a challenge is precluded by Textron-Gastonia. Metro-Atlantic used trichlorophenol as an ingredient in hexachlorophene in the 1964 and 1965 period and all manufacturing at the

Site necessarily ended in 1968, when Metro-Atlantic ceased operations there.[10] The presence of a contaminant in soil strongly suggests that property damage from that contaminant occurred before the insured ceased using the contaminant and is sufficient to withstand summary judgment on the property damage component of the discoverability trigger. Textron-Gastonia, 723 A.2d at 1144 & n.10. Contamination of soils and sediments by dioxin is property damage. Id; see also Insurance Co. of N. Am. v. Kayser-Roth Corp., 770 A.2d 402, 417 (R.I. 2001).

Similarly, Century also does not question that the concentrations of dioxin later found at the Site, which were at least as high as 140 parts per billion during the policy period (see Ex. S (Kastrinos Report) at 7), were detectable during the policy period. This could have been accomplished using two techniques in use since at least as early as the mid 1960's: a rabbit ear test bioassay (Ex. Q (Hass Rebuttal Report) at 3; Ex. L at 6) and a gas chromatograph equipped with an electron capture detector (Ex. Q at 3; Ex. L at 7). Researchers and the Food & Drug Administration used those methods to find and characterize dioxin (Ex. L at 6-7). This is confirmed by two of the insurers' experts, Nicholas Cheremisinoff and Edward Calabrese (Ex. O at 388-90; Ex. N at 35-37), and by a 1964 article cited by Dr. Cheremisinoff describing the gas chromatography equipment that could have detected the dioxin at those limits (Ex. O at 390-91; Ex. R).

**2. Summary Judgment Must Be Denied If The Continuous Trigger Standard Applies**

In both Textron-Wheatfield and Textron-Gastonia, the Supreme Court of Rhode Island reversed the lower court for limiting the trigger to the date contamination was discovered. Those decisions leave open the possibility that the court would adopt a more expansive trigger than the discoverability trigger. In Textron-Gastonia, the court stated that "[b]ecause we conclude that

---

[10] See Century Statement of Undisputed Facts, ¶ 5.

liability under the policy may be established by one of the recognized CPC tests, we need not address the continuous trigger-of-coverage standard." 723 A.2d at 1141. After the Textron-Gastonia decision, Rhode Island has not addressed the continuous trigger. Using a continuous trigger, "under which property damage occurs during each year from the time of first hazardous exposure through manifestation," all policies from disposal to discovery would be triggered. See Trustees of Tufts Univ. v. Commercial Union Ins. Co., 616 N.E.2d 68, 75 & n.9 (Mass. 1993). Here, as initial exposure to dioxin associated with the use of trichlorophenol occurred in 1964-1965, application of the continuous trigger would result in finding that the 1969 insurance policies are triggered.

**CONCLUSION**

For the foregoing reasons, the Court should deny the Century and OneBeacon summary judgment motions concerning trigger of coverage.

Respectfully submitted,

/s/ Gerald J. Petros

Gerald J. Petros (#2931)
Hinckley, Allen & Snyder LLP
1500 Fleet Center
Providence, Rhode Island 02903
(401) 274-2000
(401) 277-9600
gpetros@haslaw.com

Counsel for Plaintiff, Emhart Industries, Inc.

Jack R. Pirozzolo
Richard L. Binder
Willcox, Pirozzolo & McCarthy
Professional Corporation
50 Federal Street
Boston, Massachusetts 02110
(617) 482-5470

Dated: August 16, 2006

**CERTIFICATE OF SERVICE**

I hereby certify that on August 16, 2006, a copy of the foregoing Memorandum Of Law Of Emhart Industries, Inc. In Support Of Its Objections To Defendants' Motions For Summary Judgment Based On Trigger Of Coverage was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Gerald J. Petros

Gerald J. Petros (#2931)
Hinckley, Allen & Snyder LLP
1500 Fleet Center
Providence, Rhode Island 02903
(401) 274-2000
(401) 277-9600
gpetros@haslaw.com