UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| EMHART INDUSTRIES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, LIBERTY MUTUAL INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICA INSURANCE COMPANY and UNITED STATES FIRE INSURANCE COMPANY,<br><br>Defendants. | CIVIL ACTION<br>NO. 02-53-S |

**EMHART INDUSTRIES, INC.'S STATEMENT OF DISPUTED FACTS AND ADDITIONAL FACTS IN SUPPORT OF ITS OBJECTION TO CENTURY'S MOTION FOR PARTIAL SUMMARY JUDGMENT UNDER ITS 1969 PRIMARY POLICY BASED ON TRIGGER OF COVERAGE**

Pursuant to LR Cv 56(a)(4), plaintiff Emhart Industries, Inc. ("Emhart") submits the following as its response to the Statement Of Undisputed Facts In Support Of Century's Motion For Partial Summary Judgment Under Its 1969 Primary Policy Based On Trigger Of Coverage and in support of Emhart's objection thereto.

**GENERAL STATEMENT**

This response is subject to, and without waiver of, the contention of Emhart that assertions in the Century Statement of Undisputed Facts, even if true, are immaterial, incomplete or misleading, in view of the applicable legal standards, as explained in the Memorandum Of Law Of Emhart Industries, Inc. In Support Of Its Objections To Defendants' Motions For Summary Judgment Based On Trigger Of Coverage ("Emhart Memorandum"), filed herewith.

## DISPUTED FACTS

Century ¶ 4: The last sentence of this paragraph is misleading as, under the discoverability trigger, contamination is discoverable regardless of whether the insured owned or operated the site during the policy period. The applicable legal standard is discussed in the Emhart Memorandum at 4.

Century ¶ 5: The last sentence of this paragraph is misleading as, under the discoverability trigger, contamination is discoverable regardless of whether the insured owned or operated the site during the policy period. The applicable legal standard is discussed in the Emhart Memorandum at 4.

Century ¶ 6: This paragraph is misleading, as the trigger of coverage is not limited to when contamination was discovered or manifested.

Century ¶ 7: This paragraph is misleading, as the trigger of coverage is not limited to when contamination was discovered or manifested.

## ADDITIONAL FACTS

1. Prior to the consolidation in which Crown Metro was formed, Metro-Atlantic had operated on a portion of the Centredale Manor Restoration Project Superfund Site ("Site"). It is asserted that some of the dioxin on the Site was associated with Metro-Atlantic having manufactured hexachlorophene, an ingredient in pHisoHex, an anti-bacterial soap for a period of fewer than twelve months in 1964 and 1965 (Ex. B (Cleary Dep.) at 17, 40, 49-50).[1] One of the ingredients in hexachlorophene is trichlorophenol, a chemical that is now known to contain dioxin.

[1] References to "Ex. __" are to exhibits contained in the Appendix Of Exhibits To The Objections Of Emhart Industries, Inc. To Defendants' Motions For Summary Judgment Based On Trigger Of Coverage, filed herewith.

2. Metro-Atlantic used pipes to bring raw materials used in its products from storage areas to the manufacturing areas and used hoses to pump finished product from the manufacturing area to an area where it was stored in drums for delivery to customers (Ex. D (J. Nadeau Dep.) at 32-33, 87; Ex. E (Palumbo Dep.) at 20, 27, 55-57). Employees observed leaks from those pipes (Ex. D at 32-33, 87). As one employee of Crown Metro testified, spills and leaks inevitably take place in the course of manufacturing operations as “nobody is perfect” (Ex. F (J. Buonanno Dep.) at 15-16). There are inevitably leaks from pipes (Ex. G (Bonchonsky Dep.) at 85-86, 125-26).

3. The trichlorophenol used to manufacture hexachlorophene was delivered in tank trucks and either remained in the tank truck until it was piped to the manufacturing building or was stored before it was used to manufacture hexachlorophene (Ex. B at 59). The building where the hexachlorophene was manufactured contained storage tanks and centrifuges (Ex. F at 74-75; Ex. H). The finished hexachlorophene was pumped from the manufacturing facility to a storage facility or a truck used to deliver the finished product (Ex. I (Paterson Dep.) at 24-25). Spills or leaks inevitably occurred when the trichlorophenol was brought onto the Site by tankers or when it was piped to the building where hexachlorophene was manufactured (Ex. G at 189-90).

4. Employees of Metro-Atlantic were also aware of major releases of chemicals. A large formaldehyde tank explosion blew out several windows at the plant, and a “‘giant mushroom’ of formaldehyde” was released that reached houses in the surrounding area (Ex. F at 97-98, Ex. D at 99-100; Ex. J; Ex. K). There was an explosion, fire and release of chemicals when a truck driver opened a 3000 gallon tank of methanol in an attempt to obtain methanol for

his space heater (Ex. D at 39-40) and when a chemical was mistakenly pumped into a large storage tank containing a different chemical (id. at 41-42).

5. Employees of Metro-Atlantic worked for Crown Metro after the consolidation that resulted in the formation of Crown Metro (Ex. F at 6-7; Ex. I at 34)

5. By 1969, dioxin present in trichlorophenol was recognized as an occupational risk (Ex. L (Hass Report) at 4, ¶¶ 1-5). Prior to that date, Dow, a manufacturer of trichlorophenol, was marketing its trichlorophenol as having less dioxin impurity than its competitors (id. at 4, ¶ 6; Ex. M (Hass Dep.) at 200-01). There was a reason for "a reasonable person engaged in the manufacture of chemicals using trichlorophenol" to have conducted tests in view of "the Dow chemical marketing programs and articles published in industry magazines such as Chemical & Engineering News" and "the public debate over Agent Orange and its dioxin contamination [that] developed in the late 1960s" (Ex. L at 4, ¶ 7).

6. Dr. Edward Calabrese, an expert retained by certain insurers testified that, by 1969, spills of trichlorophenol would have been a "serious issue" warranting an "evaluation and review" as to possible environmental harm (Ex. N (Calabrese Dep.) at 40-43). Dr. Calabrese also asserted that Metro-Atlantic, years earlier, must have been aware of this risk (Ex. P (Calabrese Report) at 17; see also id. at 14-16).

7. Dr. Nicholas Cheremisinoff, another witness retained by certain insurers, testified that, prior to 1969 there was reason to test for the other contaminants found at the Site, including PCBs and chlorinated solvents (Ex. O (Cheremisinoff Dep.) at 384).

8. The concentrations of dioxin later found at the Site were at least as high as 140 parts per billion during the policy period (Ex. S (Kastrinos Report) at 7).

9. The concentrations of dioxin later found at the Site were detectable using two techniques in use since at least as early as the mid 1960s: a rabbit ear test bioassay (Ex. Q (Hass Rebuttal Report) at 3; Ex. L at 6) and a gas chromatograph equipped with an electron capture detector (Ex. Q at 3; Ex. L at 7). Researchers and the Food & Drug Administration used those methods to find and characterize dioxin (Ex. L at 6-7). See also Ex. O at 388-91; Ex. N at 35-37; Ex. R.

Respectfully submitted,

/s/ Gerald J. Petros

Gerald J. Petros (#2931)
Hinckley, Allen & Snyder LLP
1500 Fleet Center
Providence, Rhode Island 02903
(401) 274-2000
(401) 277-9600
gpetros@haslaw.com

Counsel for Plaintiff, Emhart Industries, Inc.

Jack R. Pirozzolo
Richard L. Binder
Willcox, Pirozzolo & McCarthy
Professional Corporation
50 Federal Street
Boston, Massachusetts 02110
(617) 482-5470

Dated: August 16, 2006

**CERTIFICATE OF SERVICE**

I hereby certify that on August 16, 2006, a copy of the foregoing Emhart Industries, Inc.'s Statement Of Disputed Facts And Additional Facts In Support Of Its Objection To Century's Motion For Partial Summary Judgment Under Its 1969 Primary Policy Based On Trigger Of Coverage was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Gerald J. Petros

Gerald J. Petros (#2931)
Hinckley, Allen & Snyder LLP
1500 Fleet Center
Providence, Rhode Island 02903
(401) 274-2000
(401) 277-9600
gpetros@haslaw.com