UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| EMHART INDUSTRIES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>HOME INSURANCE COMPANY,<br>INSURANCE COMPANY OF NORTH AMERICA,<br>LIBERTY MUTUAL INSURANCE COMPANY,<br>NORTH RIVER INSURANCE COMPANY,<br>ONEBEACON AMERICA INSURANCE COMPANY<br>and UNITED STATES FIRE INSURANCE COMPANY,<br><br>Defendants. | Civil Action No. 02-053 S |

**OBJECTION OF EMHART INDUSTRIES, INC. TO DEFENDANT THE NORTH RIVER INSURANCE COMPANY'S RENEWED MOTION FOR SUMMARY JUDGMENT ON THE "POLLUTION EXCLUSION"**

Plaintiff, Emhart Industries, Inc. ("Emhart"), opposes Defendant The North River Insurance Company's Renewed Motion For Summary Judgment On The "Pollution Exclusion." The North River motion should be denied for the following reasons.

1. North River unsuccessfully sought summary judgment on this issue in 2004. Its motion was denied in the Report and Recommendation of Magistrate Judge Lovegreen dated February 15, 2005, and its objection to the Report and Recommendation was overruled by the Court on May 17, 2005. In the present "renewed" motion, North River is repeating its prior motion, citing the same cases and making the same arguments that were rejected by the Court. The reasons for denial of the original summary judgment motion apply with equal force to the current North River motion.

2. The fires, floods and explosions that occurred at the Site are "sudden and accidental" under New York law. The North River argument that these events should be disregarded is based on inapposite decisions regarding intentional disposal of waste at landfills. Here, in contrast, waste unintentionally resulted from operations at a manufacturing facility. Under New York law, the pollution exclusion does not preclude coverage for sudden and accidental events that occur after waste is generated at a manufacturing facility.

3. Emhart has provided unrebutted scientific evidence that floods at the Site caused the transport and migration of dioxin. Similarly, the water used to fight major fires at the Site in 1972 caused dioxin contamination to spread. There is also evidence from which a reasonable jury could determine that it is more likely than not that the fires and accompanying explosions created dioxin and introduced dioxin into the environment. These questions of fact warrant denial of the North River motion.

In support of its objection, Emhart relies on its Memorandum Of Law In Support Of Its Objection To Defendant The North River Insurance Company's Renewed Motion For Summary Judgment On The "Pollution Exclusion," its Statement of Disputed Facts and Additional Facts and its Appendix of Exhibits, including the Affidavit of John R. Kastrinos dated August 18, 2006 (Appendix Ex. L), all filed herewith and incorporated herein.

Respectfully submitted,

/s/ Gerald J. Petros

Gerald J. Petros (#2931)
Hinckley, Allen & Snyder LLP
1500 Fleet Center
Providence, Rhode Island 02903
(401) 274-2000
(401) 277-9600
gpetros@haslaw.com

Jack R. Pirozzolo
Richard L. Binder
Willcox, Pirozzolo & McCarthy
Professional Corporation
50 Federal Street
Boston, Massachusetts 02110
(617) 482-5470

Counsel for Plaintiff, Emhart Industries, Inc.

Dated: August 18, 2006

**CERTIFICATE OF SERVICE**

I hereby certify that on August 18, 2006, a copy of the foregoing Objection Of Emhart Industries, Inc. To Defendant The North River Insurance Company's Renewed Motion For Summary Judgment On The "Pollution Exclusion" was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Gerald J. Petros

Gerald J. Petros (#2931)
Hinckley, Allen & Snyder LLP
1500 Fleet Center
Providence, Rhode Island 02903
(401) 274-2000
(401) 277-9600
gpetros@haslaw.com

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| EMHART INDUSTRIES, INC., Plaintiff, | ) | |
| v. | ) | Civil Action No. 02-053 S |
| HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, LIBERTY MUTUAL INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICA INSURANCE COMPANY and UNITED STATES FIRE INSURANCE COMPANY, Defendants. | ) | |

**MEMORANDUM OF LAW OF EMHART INDUSTRIES, INC. IN SUPPORT OF ITS OBJECTION TO DEFENDANT THE NORTH RIVER INSURANCE COMPANY'S RENEWED MOTION FOR SUMMARY JUDGMENT ON THE "POLLUTION EXCLUSION"**

Gerald J. Petros (#2931)
Hinckley, Allen & Snyder LLP
1500 Fleet Center
Providence, Rhode Island 02903
(401) 274-2000

Jack R. Pirozzolo
Richard L. Binder
Willcox, Pirozzolo & McCarthy
Professional Corporation
50 Federal Street
Boston, Massachusetts 02110
(617) 482-5470

Dated: August 18, 2006

Counsel for Plaintiff, Emhart Industries, Inc.

## INTRODUCTION

At the hearing on August 3, 2006, the Court ordered that any additional summary judgment motions be filed by August 9, 2006 and suggested that the parties not address issues resolved in prior rulings on summary judgment motions. On the August 9 deadline, several motions were filed, but North River did not move for summary judgment regarding the pollution exclusion. However, on August 11, North River filed a "renewed" motion for summary judgment regarding the pollution exclusion. Contrary to the Court's suggestion, the "renewed" motion repeats the arguments that were asserted by North River's prior counsel in the summary judgment motion filed in January 2004 and the objection to the denial of that motion. Those arguments were incorrect when previously asserted and are still incorrect. They should not be renewed on the basis that the Report and Recommendation on the prior motion ("Report"), adopted by the Court, stated that the motion was denied "at this time." See Defendant The North River Insurance Company's Memorandum Of Law In Support Of Its Renewed Motion For Summary Judgment On The "Pollution Exclusion" Issue ("NR Mem.") at 2 n.1.

North River does not question that certain events, including fires, floods and explosions, occurred at the Site. Such events are "sudden and accidental" under New York law. The North River argument that these events should be disregarded relies on decisions regarding landfills which are inapposite in the instant action which involves a manufacturing facility. Even if, under New York law, the pollution exclusion precludes coverage for sudden and accidental events that take place after waste is deposited at a landfill, it does not preclude coverage for sudden and accidental events that occur after waste is generated at a manufacturing facility. This crucial distinction was pointed out by Emhart in its briefs and noted by the Court during the hearing on North River's objections to the Report on May 13, 2005.

North River also ignores undisputed principles of hydrogeology to the extent that it asserts that there is no evidence that dioxin is transported in flood events. It is undisputed that dioxin is transported in floods by the processes of erosion, scouring and re-deposition.

North River attempts to bolster its arguments by seeking a decision based on inappropriate considerations. Summary judgment is not appropriate to allow North River to avoid "participat[ing] in a multi-week jury trial" (NR Mem. at 2) or to "streamline the trial" and "avoid any need for the Court to instruct the jury on the law of New York" (id. at 3 n.2). As the Court previously ruled, there are issues of fact for trial. The North River motion for summary judgment should be denied.

## ARGUMENT

### A. The Motion Was Filed In Violation Of The Court's Order

North River did not file its motion by the August 9 date set by the Court. It did not heed the admonition to avoid filing motions on issues decided by the Court. It cites no new law or facts.[1] The motion should be denied as being in violation of the August 3 order. The filing of a previously-decided motion on the eve of trial places an undue burden on Emhart and the Court. The burden is magnified in view of the one week response time ordered by the Court. Repetition is not excused by the unwarranted suggestion "that the Court did not fully consider all of the contours of New York law" (NR Mem. at 2 n.1).

---

1 The North River reference to unspecified testimony by Dr. Hass (NR Mem at 2 n.1) is not a basis for renewing the motion. Regardless of whether Dr. Hass had personal knowledge of the contents of a drum, sudden and accidental events, including floods, explosions and fires (including water to extinguish fires), unquestionably occurred that resulted in releases of contaminants.

**B. The North River Motion Repeats The Prior Arguments Which Have Been Rejected By The Court**

North River acknowledges that its "renewed" motion repeats its prior summary judgment motion (NR Mem. at 2 n.1). In its original summary judgment memorandum ("NR Initial Mem.," D.I. 162) and in its objection to the Report ("NR Obj.," D.I. 223), North River fully addressed the same issue that it now raises: whether, applying New York law, the claims of Emhart are barred by the pollution exclusion in the North River policy.

In the Report (D.I. 220), Magistrate Judge Lovegreen clearly found that genuine issues of material fact existed for trial on this very issue. Id. at 47-50. After reviewing evidence of fires, flooding and other "sudden and accidental" events, the Magistrate Judge concluded:

> Given such disputed fact issues regarding the nature and source of the contamination, as well as contributory factors that may qualify as "sudden and accidental", this matter at this time cannot be resolved by summary judgment, and North River's motion should be denied.

Id. at 50.

The arguments in the current North River motion were previously asserted in its prior summary judgment memorandum and/or in its objection to the Report:

1. the pollution exclusion bars the claim (compare NR Mem. at 3-4 with NR Obj. at 3 and NR Initial Mem. at 12);

2. Emhart has the burden of proving an exception to the exclusion (particularly any "sudden and accidental" release and discharge) (compare NR Mem. at 5-7, 8-11 with NR Obj. at 3-5 and NR Initial Mem. at 12-13,16-17);

3. a redistribution of extant pollutants is not a "sudden and accidental" release or discharge (compare NR Mem. at 11-12 with NR Obj. at 6-7);

4. the identity of the party causing the pollution is not relevant (compare NR Mem. at 7 with NR Initial Mem. at 18-19 (addressing pollution caused by NECC)); and

5. there is no causal connection between any "sudden and accidental" release or discharge and the dioxin contamination at the Site (compare NR Mem. at 13-15 with NR Obj. at 5-6).

The May 13, 2005 hearing before this Court on the objections to the Report (Transcript, D.I. 239) further establishes that the issues now raised by North River were addressed fully before. North River's former counsel made the same arguments to this Court that North River restates in its current motion:

> And the thrust of these cases is that when a company pollutes and this is an ongoing course of business type of pollution, the fact that there may have been intervening events which some could call sudden and accidental to thereby avoid the impact of the sudden and accidental pollution exclusion, that's immaterial. You look at the overall course of conduct. And even if there are some incidents in the middle, that is insufficient under New York law to defeat the pollution exclusion. Those cases we've supplied to the Court. Certainly, the Duplan case, Employers of Wausau versus Duplan, there's Northville, AMRO, Powers Chemco, Technicon, the Redding-Hunter case, the Bedford Associates case, all of which have been supplied to the Court. And your Honor, the picture which is painted by those cases is that, in fact, summary judgment is appropriate here under New York law
>
> We believe, again, that Magistrate Judge Lovegreen was entirely correct in using New York law and that when New York law is examined, that summary judgment is really the only course of action which the Court should take.

Id. at 4-5. North River directed the attention of this Court to the very cases upon which it continues to rely in its present motion. This Court considered and rejected North River's argument:

> THE COURT: Let me ask you some questions about these cases, because I think there's a distinction between, maybe, between what these cases are saying and what Emhart is arguing, at least partially arguing here.
>
> These cases to me seem to be saying that when you've got a situation where there's been systematic pollution over a period of time or systematic dumping of barrels, let's say, just to simplify it over a period of time, but the pollutants are actually still inside of the barrels, that if a natural disaster event or something like that that comes along that breaks open the barrels and releases the pollutants into the soil, that you can't claim that that was the

> sudden and accidental event which caused the pollution. You have to look back to how the barrels got into the soil in the first place.
>
> And if that was sort of a systematic, long-term process, that it's not sudden and accidental.
>
> MR. LATHROP: That's correct, your Honor, I agree with that.
>
> THE COURT: But I think what Emhart is arguing here is something slightly different than that. I think they're saying that that might have been going on, but that there was also something else that was going on. That is there were these fires and explosions that occurred in the '70's. And as a result of those, one of which I think they've described as there were 20-odd fire trucks, and was a major event.
>
> You had explosions and discharges occurring as a result of the fire out of the plant, that is barrels were being projected 150 feet out of the plant, and, presumably, pollutants were being released as a result of that. Now that's slightly different than what those cases are talking about, isn't it?

Id. at 5-7. This Court has already considered the cases currently cited by North River, as well as the arguments currently being made by North River, and rejected them. Counsel for North River went on to state that the case that it considered to be "closest" was "the Duplan case, which was a landfill admittedly" (id. at 7), then made the argument, repeated here, that there was no coverage because any "sudden and accidental" events merely moved contaminants that already were present at the Site (id. at 7-8). Counsel further acknowledged that the North River position was based on an "expansive" interpretation of New York law (id. at 8-9). North River again is repeating these arguments here. See NR Mem. at 11-12. As this Court responded over a year ago:

> THE COURT: But isn't that exactly the point of why the magistrate judge denied summary judgment on this issue, because it is a matter of dispute. And it might be that at trial you can prove that 99 percent of the pollution that occurred occurred as a result of these systematic discharges, and only one percent or less occurred as a result of these fires and explosions and so forth. But at the

> moment, we don't know the answer to that question. Isn't that why this thing needs to go to trial?

Id. at 8. There is no reason for North River to receive another "bite at the apple" as to this issue on the eve of trial.

North River seeks to excuse its renewal of its denied summary judgment motion by "respectfully suggest[ing] that the Court did not fully consider all of the contours of New York law" (NR Mem. at 2 n.1). This claim lacks merit. The transcript from the May 13, 2005 hearing demonstrates that North River fully argued the "contours" of New York law, citing the principal cases upon which North River continues to rely in arguing for an "expansive" interpretation of New York law. The transcript makes it clear that this Court had reviewed the relevant cases, considered the various arguments and concluded that summary judgment did not lie. This Court did consider the "contours," and found the position of North River to be wanting. There is no need for the Court to consider the same issues again.

**C. The Pollution Exclusion In The North River Policy Does Not Bar Emhart's Claim**

**1. There Were Sudden And Accidental Events At The Site Within The Scope Of The Exception To The Pollution Exclusion**

North River cannot question that there were events, including fires, floods and explosions, that are sudden and accidental under New York law. The New York Court of Appeals has ruled that, under New York law,[2] the sudden and accidental exception to the pollution exclusion applies when the events causing pollution are "abrupt." Northville Industries

---

2 In connection with the prior summary judgment motions filed in 2003 and 2004 and the objections to the Report regarding those motions, Emhart argued that Rhode Island law, and not New York law, applies to the North River Policy. The discussion of New York law in this memorandum is without waiver of Emhart's position that Rhode Island law is applicable to the North River policy.

Corp. v. National Union Fire Ins. Co. of Pittsburgh, 679 N.E.2d 1044, 1047-48 (N.Y. 1997). The record is clear that there were a number of "abrupt," sudden and accidental events that fall within this exception.

North River's argument that Emhart cannot rely upon fires or explosions "that occur all the time because of improper operations" (NR Mem. at 13 n.3) is unwarranted. North River nowhere cites to the supposed "extensive testimony as to the frequency with which such events occurred" at the Site (id.) and does not reference any such testimony in its Statement of Undisputed Facts ("NR Statement"). As the Magistrate Judge noted, the EPA found that "a major fire in the early 1970s destroyed most of the structures at the Site" (Ex. A at 3; see Report at 49).[3] This is confirmed by a contemporaneous newspaper article, which described a general alarm blaze with "20 fire trucks and 200 firefighters" from several communities on the scene, "light[ing] up" the area (Ex. B at 1; see Ex. C). Barrels and buildings, having chemical residue, burned or exploded (id. at 3; Ex. D at 15, 18-20). Two buildings were destroyed within five minutes, there were three explosions, and 50-gallon drums were thrown 150 feet (Ex. B at 1). Thousands of gallons of pressurized water were used to fight the fire (Ex. D at 28-29). There was also a major fire the month before, in which five fire trucks, operating for at least an hour, pumped water at the site (see Ex. B at 1; Ex. E). Both of these fires occurred after operations at the site had ceased (see NR Statement, ¶ 11).

There also were major explosions while the facility was still in operation. Both the local fire department and the local newspaper reported a January 1968 explosion at the site, when the top of a tank of formaldehyde blew off due to a delivery error, creating a "giant mushroom," sending two people to the hospital, and causing other damage (Ex. F; Ex. G). Another delivery

---

[3] References to "Ex. __" are to the Appendix of Exhibits filed herewith.

error involving chemicals destroyed a portion of a wall and damaged homes off-site (Ex. H at 41-42). The explosion at the formaldehyde tank occurred when "a deliveryman mistook a full tank of formaldehyde for an empty one" (Ex. G) and the other explosion occurred when a chemical was mistakenly pumped into a large storage tank containing a different chemical (Ex. H at 41-42). In addition, a fire was started in the mid 1960s when a truck driver opened a 3000 gallon tank of methanol in an attempt to obtain fuel for his space heater (id. at 39-40). The EPA sent a Request for Information asking specifically about formaldehyde (Ex. I at AON 00447-48), the stored chemical involved in the January 1968 explosion (Ex. F; Ex. G), and subsequently reported the presence of volatile organic compounds at the site (Ex. J at 2). While the contaminant of greatest concern at the Site is dioxin, the Magistrate Judge recognized that there were other contaminants at the site as well (Report at 50). Fires and explosions which destroy buildings, create mushroom clouds, cause hospitalizations and off-site property damage, and warrant lengthy newspaper coverage are not "routine."

In addition to the fires and explosions, there were sudden and accidental floods at the Site. After the period in which hexachlorophene was manufactured at the Site,[4] there were two "significant flood events," defined by the United States Geological Survey as floods that generated water discharges in the top 5% during the history of the site, at the Site (Ex. L at 12; see generally id. at 10-12; Ex. M, ¶ 8). Due to the duration and intensity of the rain and the force of the streamflow associated with the floods, significant amounts of dioxin were transported during floods and other periods of high streamflow (id., ¶¶ 3-6, 10). A flood on March 18, 1968 resulted from "the heaviest 24-hour March rainfall in the state's history [which] brought a 4.62-

---

4 Hexachlorophene was manufactured at the Site for a period of fewer than twelve months in 1964 and 1965 (Ex. K at 17, 40, 49-50, 53-54).

inch measure of rain" (Ex. N at 1). As a result, the streamflow on that day was 1,440 cubic feet per second, almost twenty times the mean streamflow for the year (Ex. M, ¶¶ 8-9 & Exhibit 1 thereto at 2, 3). As a result of the flood on April 24, 1983, the streamflow was 1,380 cubic feet per second, more than ten times the mean steamflow for that year (Ex. M, ¶¶ 8-9 & Exhibit 1 thereto at 1, 3). These significant flood events were measured at the USGS Streamflow Gauging Station 300 feet north of the portion of the Site on which Emhart's predecessor conducted its operations (Ex. L at 7; Ex. M, ¶ 7).

Two cases decided under the law of Massachusetts, a state that, like New York, construes "sudden and accidental" as having a temporal limitation, have found events similar to those at Centredale to be outside the scope of the pollution exclusion. Nashua Corp. v. First State Ins. Co., 648 N.E.2d 1272, 1275-1276 (Mass. 1995) (concluding that "a tank seal [which] burst, resulting in 2,000 gallons of xylene being released at the Union Chemical site" and "a fire and subsequent explosion result[ing] in a release at the Silresim site" were sudden and accidental events outside the scope of the pollution exclusion); Goodman v. Aetna Casualty & Surety Co., 593 N.E.2d 233, 236 (Mass. 1992) (gasoline which had leaked from a storage tank for a period of eighteen months could be outside the scope of the pollution exclusion because the fact "that the discharge of the pollutants occurred over a lengthy period of time does not automatically mean that the suddenness element has not been met…. [U]ntil all the circumstances of the release in this case are fully developed, no adequate determination can be made as to whether the 'sudden and accidental exception' is applicable.") Similarly, in Mahl Brothers Oil Co. v. St. Paul Fire & Marine Ins. Co., 307 F. Supp. 2d 474, 496 (W.D.N.Y. 2004), decided under New York law, the court denied the insurers' motions for summary judgment based upon the pollution exclusion. Distinguishing Northville, the court explained that the record before it showed the

discharge of oil was through a pinhole-sized hole in an underground pipe, whereas the cause of the contamination at the Mahl site was unclear.[5]

Other cases in jurisdictions that require an abrupt event to avoid the pollution exclusion recognize that an insured may rely upon a flood as a "sudden and accidental" event. See Reichhold Chemicals, Inc. v. Hartford Accident & Indemnity Co., 1997 WL 255100, at *2 (Conn. Super. Ct. May 5, 1997) (post-Northville decision under New York law); EnergyNorth Natural Gas, Inc. v. Underwriters at Lloyd's, 2003 WL 1193060, at *4 (D.N.H. Mar. 13, 2003) (holding that proof that "[a] serious flood occurred in 1936, inundating the plant and seriously damaging gas holders, causing substantial amounts of tar and related toxic substances to be released into the environment" would satisfy New Hampshire's restrictive definition of "occurrence" and analogizing the issue to the "sudden and accidental" determination under Massachusetts law); see also EnergyNorth Natural Gas, Inc. v. Underwriters at Lloyd's, 2002 WL 1332567, at *6 (D.N.H. June 14, 2002) (regarding analogy to Massachusetts law).

**2. The Sudden And Accidental Events Were Not Merely Redistributions Of Intentionally Deposited Materials**

Perhaps recognizing that it cannot credibly contest that the fires, floods and explosions were "sudden and accidental," North River also argues that, where the initial disposal of hazardous materials was intentional, a subsequent "redistribution" of those materials by a fire, flood or explosion cannot be considered. This argument fails.

North River relies upon cases involving landfills or third-party disposal areas, in which there was no question that waste of the insured was intentionally sent to a landfill or similar site

5 See also Carpentier v. Hanover Ins. Co., 670 N.Y.S.2d 540 (App. Div. 1998), another post-Northville case, where a trial court, relying on a fire at an industrial site, found that factual issues precluded summary judgment for an insurer who relied on the pollution exclusion.

for disposal before a subsequent fire or flood occurred. For example, in Redding-Hunter, Inc. v. Aetna Cas. & Sur. Co., 615 N.Y.S.2d 133, 135 (App. Div. 1994), "the underlying complaint allege[d] … that plaintiff arranged for the disposal of wastes at the site." In Employers Ins. of Wausau v. The Duplan Corp., 1999 WL 777976, at *11 (S.D.N.Y. Sept. 30, 1999), the insured "did not contest that for years [it] intentionally and systematically arranged for the disposal of waste at the landfill…." In Rheem Manufacturing Co. v. Home Indemnity Co., Index No. 6349/89, slip op. at 11 (N.Y. Sup. Ct. July 20, 1998), it was "alleged that Rheem continuously deposited waste into the Stringfellow site for four years from July 1957 to November 1961…." A subsequent decision confirms that the deposits at Stringfellow were "concededly intentional." Rheem Manufacturing Co. v. Home Indemnity Co., 723 N.Y.S.2d 354 (App. Div. 2001).

North River also implies that "disposal of wastes was routine and systematic" at the Centredale site (NR Mem. at 11). However, North River has submitted no such evidence in support of this contention. Further, as Magistrate Judge Lovegreen recognized, this contention is disputed (see Report at 49). Dr. J. Ronald Hass, an expert regarding the analysis of dioxin, explained that analytical testing results that detected the presence of dioxin at the Site establish that the insured's predecessor did not intentionally dump or bury waste containing dioxin. During hexachlorophene manufacture, trichlorophenol was treated with activated carbon, resulting in dioxin being tightly bound to the carbon (Ex. K at 40-41; Ex. O at 1). If sludge or residue containing dioxin had been dumped or buried, carbon would have affected the recovery of the labeled dioxin that had been added as an "internal standard" prior to the analyses (id. at 2-3). In fact, recovery of the "internal standard" material was normal, thus indicating that carbon was not present and, therefore, that dioxin associated with the manufacture of hexachlorophene at the Site resulted from spills or leaks before the trichlorophenol was bound to carbon in the

manufacturing process (id. at 8). Such spills or leaks could have occurred when the trichlorophenol was brought onto the Site by tankers or when it was piped to the building where hexachlorophene was manufactured (Ex. H at 32-33, 87; Ex. P at 20, 27, 55-57; Ex. Q at 85-86, 125-26, 189-190). North River offers no evidence to support its contention that any, much less all, of the dioxin contamination found at the Site resulted from intentional discharges, such as those in Redding-Hunter, Duplan or Rheem. The Centredale site was not a landfill, where substances were intentionally deposited and then "rearranged" by a later fire or flood. Due to the presence of material issues of fact concerning whether there were intentional releases of contaminants, the cases upon which North River relies concerning "redistribution" are inapposite.

However, even if cases involving intentional disposal, such as Duplan, Redding-Hunter and Rheems were applicable, the record here, at a minimum, permits a finding that the fires and explosions resulted in the introduction of contaminants to the environment, not "rearrangements." The report of the August 1972 fire specifically refers to barrels and buildings with chemical residue, confirming that the chemicals involved had not already been released (Ex. C; see also Ex. D at 42-43). As noted, supra, explosions at the Site resulted in discharges of chemicals into the environment, and dioxin is not the only contaminant found at the Site. Accordingly, North River would not be entitled to summary judgment even if its "redistribution" theory were consistent with applicable law.

**3. There Is At Least A Question Of Material Fact As To Whether The Sudden And Accidental Events Caused The Contamination At Issue**

The North River argument that Emhart is unable to prove that sudden and accidental events caused dioxin contamination (NR Mem. at 13-15) misconstrues the evidence in the record. The North River argument that Emhart has no evidence "that any flood event resulted in

the release of dioxin" appears to be based primarily on its reliance on the inapposite cases, discussed supra, pertaining to landfills. It appears from the North River Statement of Undisputed Facts that North River recognizes that floods transport dioxin (NR Statement, ¶ 39). Accordingly, its argument as to the floods at the Site is predicated solely on its "redistribution" theory and should be rejected for the reasons discussed in the previous section.

To the extent that North River is arguing that there is no evidence that any dioxin was transported by the floods, North River ignores the undisputed principles concerning the transport of dioxin discussed in the expert report of John Kastrinos, a hydrogeologist, and his affidavit elaborating on some of the concepts discussed in his report. As Mr. Kastrinos explains, dioxin attaches to soil (Ex L at 11; see Ex. R at SBSF 14236). After floods, the soil containing dioxin is transported to the river by erosion of surface soils from areas adjacent to the river by storm water runoff (Ex. L at 12; Ex. M, ¶ 4). Once in the river, the contaminated soils and sediments are transported by scouring (the erosion of river bottom by stream flow, typically during high water events) and then re-deposited down stream (Ex. L at 11; Ex. M, ¶¶ 5-6). In view of the nature of these transport mechanisms, they occur during floods and other high water flow events, including "significant floods" as defined by the United States Geological Survey (Ex. L at 12; see generally id. at 10-12; Ex. M, ¶ 10). As discussed above, significant flood events occurring in March 1968 and April 1983 resulted in streamflow that was ten to twenty times greater than average. Mr. Kastrinos specifically stated that it is his "professional opinion that erosion, scouring and re-deposition transported contaminated soil and sediment from the property to downstream areas … during a period that included 1984 to 1985" (Ex. L at 11) and that "significant amounts of dioxin were transported in the environment during floods and other periods of high streamflow" (Ex. M, ¶ 9). Similarly, the thousands of gallons of pressurized

water used to put out the major fires at the site in 1972 (Ex. D at 28-29) would have caused those transport mechanisms to move any soil containing dioxin. The evidence presents questions of fact for the jury as to whether floods and/or the water used to fight the 1972 fires caused the dioxin contamination to spread.

North River also incorrectly states that there is no evidence that the fires at the Site in 1972 led to dioxin contamination. Dr. Hass has testified that dioxin is produced when heat is applied to trichlorophenol and other chemicals containing carbon and chlorine (Ex. S at 118-19, 170). While Dr. Hass does not have direct and definitive knowledge of the contents of the barrels which exploded in the fire, Emhart will offer evidence of the contents of the barrels from a response that New England Container Company ("NECC") made to the EPA pursuant to CERCLA. There is evidence that customers of NECC, the barrel reconditioning company where the fires and barrel explosions occurred, sold trichlorophenol and other compounds containing chlorine and carbon (Ex. T, especially SBSF 25037, 25156; see Ex. U at 12, 22-24). Heating trichlorophenol and other compounds containing chlorine and carbon in the temperature range that occurs during a fire produces dioxin and the creation of dioxin is facilitated where, as occurred at NECC, the heat was applied in the presence of a caustic (Ex. S at 114-17). The temperature range in a fire, or other combustion process, results in the optimal conditions for creating dioxin (id.). Based on this evidence, a reasonable jury could determine that it is more likely than not that the fires and explosions themselves caused the creation of dioxin and its introduction into the environment.[6] Any question as to the quantity of dioxin created or

---

6 North River misunderstands inferences when it disparagingly equates inferences, which a jury may permissibly draw from evidence, with speculation. See Ricci v. Alternative Energy Inc., 211 F.3d 157, 163-64 (1st Cir. 2000) (reversing grant of summary judgment due to presence of competing inferences).

introduced into the environment (NR Mem. at 14) is a question regarding damages for resolution after the extent of Emhart's ultimate liability for remediation is determined. North River is not entitled to summary judgment.

## CONCLUSION

For the foregoing reasons, the Court should deny the North River summary judgment motion concerning the pollution exclusion.

Respectfully submitted,

/s/ Gerald J. Petros

Gerald J. Petros (#2931)
Hinckley, Allen & Snyder LLP
1500 Fleet Center
Providence, Rhode Island 02903
(401) 274-2000
(401) 277-9600
gpetros@haslaw.com

Jack R. Pirozzolo
Richard L. Binder
Willcox, Pirozzolo & McCarthy
Professional Corporation
50 Federal Street
Boston, Massachusetts 02110
(617) 482-5470

Dated: August 18, 2006

Counsel for Plaintiff, Emhart Industries, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2006, a copy of the foregoing Memorandum Of Law Of Emhart Industries, Inc. In Support Of Its Objection To Defendant The North River Insurance Company's Renewed Motion For Summary Judgment On The "Pollution Exclusion" was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Gerald J. Petros

Gerald J. Petros (#2931)
Hinckley, Allen & Snyder LLP
1500 Fleet Center
Providence, Rhode Island 02903
(401) 274-2000
(401) 277-9600
gpetros@haslaw.com