UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

EMHART INDUSTRIES, INC.,

Plaintiff,

v.

HOME INSURANCE COMPANY,
INSURANCE COMPANY OF NORTH AMERICA,
LIBERTY MUTUAL INSURANCE COMPANY,
NORTH RIVER INSURANCE COMPANY,
ONEBEACON AMERICA INSURANCE COMPANY
and UNITED STATES FIRE INSURANCE COMPANY,

Defendants.

Civil Action No. 02-053 S

**EMHART INDUSTRIES, INC.'S STATEMENT OF DISPUTED FACTS AND ADDITIONAL FACTS IN SUPPORT OF ITS OBJECTION TO THE NORTH RIVER INSURANCE COMPANY'S RENEWED MOTION FOR SUMMARY JUDGMENT ON THE "POLLUTION EXCLUSION"**

Pursuant to LR Cv 56(a)(4), plaintiff Emhart Industries, Inc. ("Emhart") submits the following as its response to the Defendant The North River Insurance Company's Statement Of Undisputed Facts In Support Of Its Renewed Motion For Summary Judgment On The "Pollution Exclusion" and in support of Emhart's objection thereto.

**GENERAL STATEMENT**

This response is subject to, and without waiver of, the contention of Emhart that assertions in the North River Statement, even if true, are immaterial, incomplete or misleading, in view of the applicable legal standards, as explained in the Memorandum Of Law Of Emhart Industries, Inc. In Support Of Its Objection To Defendant The North River Insurance Company's Renewed Motion For Summary Judgment On The "Pollution Exclusion," filed herewith.

**DISPUTED FACTS**

North River ¶ 6: Emhart objects to this statement insofar as it states that "the pollution arises," rather than "the alleged pollution arises," as the cited documents refer to allegations.

North River ¶ 12: Emhart disputes this statement. Customers of NECC, who brought barrels to NECC for reconditioning, sold trichlorophenol (Ex. T,[1] especially SBSF 25037, 25156). Accordingly, there is evidence that supports the inference that buildings at the Centredale Site contained unused or stored trichlorophenol at the time of the 1972 fire.

North River ¶ 14: Emhart disputes this statement. Dioxin is produced when heat is applied to trichlorophenol and other chemicals containing carbon and chlorine (Ex. S at 118-19). Heating trichlorophenol and other compounds containing chlorine and carbon in the temperature range that occurs during a fire produces dioxin and the creation of dioxin is facilitated where, as occurred at NECC, the heat was applied in the presence of a caustic (id. at 114-17). The temperature range in a fire, or other combustion process, results in the optimal conditions for creating dioxin (id.) Customers of NECC sold trichlorophenol and other products containing chlorine and carbon (Ex. T, especially SBSF 25037, 25156; see Ex. U at 12, 22-24). Accordingly, there is evidence that supports the inference that the August 1972 fire caused or resulted in the discharge or release of dioxin into the environment at the Centredale Site.

North River ¶ 15: Emhart disputes this statement. Dr. Hass testified that when heat is applied to trichlorophenol and other chemicals containing carbon and chlorine, dioxin is produced (Ex. S at 118-19). Emhart further incorporates its response to ¶ 14, supra.

North River ¶ 18: Emhart disputes this statement. NECC has provided evidence of the products sold by its customers (Ex. T).

[1] References to "Ex. __" are to the Appendix of Exhibits filed herewith.

North River ¶ 19: Emhart disputes this statement, and incorporates its response to ¶ 14, supra.

North River ¶ 21: Emhart disputes this statement, and incorporates its response to ¶ 14, supra.

North River ¶ 22: Emhart disputes this statement, and incorporates its response to ¶¶ 14 and 15, supra.

North River ¶ 32: Emhart objects to this statement. The term "these incidents" is unduly vague and does not adequately identify the incident to which it refers. Based on its understanding of this vague and ambiguous statement, Emhart disputes this statement and incorporate its responses to ¶¶ 12, 14, 15, 18, 19, 21 and 22, supra.

North River ¶ 34: Emhart objects to this statement. The terms "specific impact" and "operations" are unduly vague and ambiguous. Based on its understanding of this vague and ambiguous statement, Emhart disputes this statement. Dioxin is sorbed (attached) to soil and, as a result of floods and other high water flow events, soils containing dioxin are transported by erosion of surface soils from areas adjacent to the river by storm water runoff (Ex. L at 12; Ex. M, ¶ 4). Once in the river, dioxin is also transported by scouring (the erosion of river banks and river bottoms caused by stream flow, which is enhanced during high flow events, such as floods) (Ex. L at 11; Ex. M, ¶ 5). Dioxin is also transported by re-deposition of contaminated sediments that are transported within the river as suspended load settle to the river bottom at downstream locations (Ex. L at 11; Ex. M, ¶ 5). At the Centredale Site, as a result of floods, dioxin was transported by erosion and transport of eroded materials from the land to the Woonasquatucket River, by runoff, and by scouring, transport and re-deposition of bed materials within the river itself (Ex. M, ¶¶ 4-6, Ex. L at 11). In view of the nature of these transport

mechanisms, they occur during floods and other high water flow events, including "significant floods" as defined by the United States Geological Survey (Ex. L at 12; see generally id. at 10-12; Ex. M, ¶ 10). There were significant flood events at the Centredale Site in March 1968 and April 1983 that resulted in streamflow that was ten to twenty times greater than average. At the Centredale Site, significant amounts of dioxin were transported in the environment during floods and other periods of high streamflow. The dioxins were transported from land to the river by erosion and transport in runoff, and were also transported within the river by erosion from the river banks and bottom, entrainment and transport as suspended load, and re-deposition downstream (Ex. M, ¶ 9; Ex. L at 11).

North River ¶ 35: Emhart objects to this statement. The term "operation" is unduly vague and ambiguous. Based on its understanding of this vague and ambiguous statement, Emhart disputes this statement. Emhart further incorporates its response to ¶ 34, supra.

North River ¶ 36: Emhart objects to this statement. The terms "documentation" and "initial discharge" are unduly vague and ambiguous. Based on its understanding of this vague and ambiguous statement, Emhart disputes this statement. Emhart further incorporates its response to ¶ 34, supra.

North River ¶ 37: Emhart objects to this statement. The term "initial discharge" is unduly vague and ambiguous. Based on its understanding of this vague and ambiguous statement, Emhart disputes this statement. Emhart further incorporates its response to ¶ 34, supra.

North River ¶ 38: Emhart objects to this statement. The term "the source of the contamination" is unduly vague and ambiguous. It is not ascertainable whether this request is seeking information as to whether the floods were the sole source of the entire contamination or

a source of some of the contamination. Based on its understanding of this vague and ambiguous statement, Emhart disputes this statement. Emhart further incorporates its response to ¶ 34, supra.

North River ¶ 39: Emhart disputes this statement as an incomplete and misleading purported summary of the opinion of Mr. Kastrinos concerning the transport of dioxin in the flood conditions that occurred at the Centredale Site. Emhart further incorporates its response to ¶ 34, supra.

**ADDITIONAL FACTS**

1. A portion of the Centredale Site was used by Metro-Atlantic as a facility where it manufactured chemicals (Joint Appendix to the Parties' Motions for Summary Judgment Dated July 24, 2006, previously filed, Exs. F-I).

2. Hexachlorophene was manufactured at the Centredale Site for a period of fewer than twelve months in 1964 and 1965 (Ex. K at 17, 40, 49-50, 53-54).

3. The results of the analytical testing results that detected the presence of dioxin at the Centredale Site demonstrate that there was no intentional disposal of waste containing dioxin at the Centredale Site by the insured's predecessor and are consistent with unintentional spills and leaks of chemicals (Ex. O at 1-3, 8; see also, Ex. H at 32-33, 87; Ex. K at 40-41; Ex. P at 20, 27, 55-57; Ex. Q at 85-86, 125-26, 189-190).

4. There was an explosion at the Centredale Site that occurred when a chemical mistakenly was pumped into a large storage tank containing a different chemical (Ex. H at 41-42).

5. There was a fire at the Centredale Site in the mid 1960s that was started when a truck driver opened a 3000 gallon tank of methanol in an attempt to obtain fuel for his space heater (Ex. H at 39-40).

6. In January 1968 there was an explosion at the Centredale Site, when the top of a tank of formaldehyde blew off due to a delivery error, creating a "giant mushroom," sending two people to the hospital, and causing other damage (Ex. F; Ex. G).

7. While the major contaminant at the Centredale Site is dioxin, the EPA Request for Information asked specifically about formaldehyde (Ex. I at AON 00447-48), the stored chemical involved in the January 1968 explosion (Ex. F; Ex. G). The EPA subsequently reported the presence of volatile organic compounds at the Centredale Site (Ex. J at 2; see also, Joint Appendix to the Parties' Motions for Summary Judgment Dated July 24, 2006, previously filed, Ex. G at 2 and Ex. I at 4).

8. There was a major fire at the Centredale Site in July, 1972, in which five fire trucks, operating for at least an hour, pumped water at the Centredale Site (see Ex. B at 1; Ex. E).

9. There was a general alarm blaze at the Centredale Site in August 1972 with "20 fire trucks and 200 firefighters" from several communities on the scene, "light[ing] up" the area (Ex. B at 1; see Ex. C). Barrels and buildings, having chemical residue, burned or exploded (id. at 3; Ex. D at 15, 18-20). Two buildings were destroyed within five minutes, there were three explosions, and 50-gallon drums were thrown 150 feet (Ex. B at 1). Thousands of gallons of pressurized water were used to fight the fire (Ex. D at 28-29).

Respectfully submitted,

/s/ Gerald J. Petros

Gerald J. Petros (#2931)
Hinckley, Allen & Snyder LLP
1500 Fleet Center
Providence, Rhode Island 02903
(401) 274-2000
(401) 277-9600
gpetros@haslaw.com

Jack R. Pirozzolo
Richard L. Binder
Willcox, Pirozzolo & McCarthy
Professional Corporation
50 Federal Street
Boston, Massachusetts 02110
(617) 482-5470

Dated: August 18, 2006

Counsel for Plaintiff, Emhart Industries, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2006, a copy of the foregoing Emhart Industries, Inc.'s Statement Of Disputed Facts And Additional Facts In Support Of Its Objection To OneBeacon America Insurance Company's Motion (Pollution Exclusion) For Partial Summary Judgment was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Gerald J. Petros

Gerald J. Petros (#2931)
Hinckley, Allen & Snyder LLP
1500 Fleet Center
Providence, Rhode Island 02903
(401) 274-2000
(401) 277-9600
gpetros@haslaw.com