UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| EMHART INDUSTRIES, INC., Plaintiff, v. HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, LIBERTY MUTUAL INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICA INSURANCE COMPANY, and UNITED STATES FIRE INSURANCE COMPANY, Defendants. | CIVIL ACTION NO. CA 02-053S<br><br>DEFENDANT NORTH RIVER INSURANCE COMPANY'S MOTION TO STRIKE THE AFFIDAVIT OF RODNEY J. TAYLOR CONTAINED IN THE OPPOSITION MEMORANDUM ON THE "ALLOCATION" ISSUE |

Now comes the Defendant North River Insurance Company, by its attorneys, pursuant to Fed.R.Civ.P. 26, and moves this court to strike the affidavit of Rodney J. Taylor.

As grounds for this motion, North River Insurance Company states that the affidavit is an impermissible effort to introduce previously undisclosed expert testimony on the eve of trial. In further support of this motion, the defendant offers the attached memorandum.

WHEREFORE, North River Insurance Company respectfully requests that the Court strike the Affidavit of Rodney J. Taylor.

Respectfully submitted,
**THE NORTH RIVER INSURANCE COMPANY,**
By its attorneys,

/s/ Mark T. Nugent
Mark T. Nugent, RI Bar# 2637
**MORRISON MAHONEY LLP**
121 South Main Street, Suite 600
Providence, RI 02903-7141
(401) 331-4660

John T. Harding, *pro hac vice*
**MORRISON MAHONEY LLP**
250 Summer Street
Boston, MA 02210-1181
(617) 439-7500

August 22, 2006

**CERTIFICATION**

I hereby certify that on this _22 day of __Aug_______ 2006, a copy of the foregoing was via ECF/mailed, postage prepaid, to:

Jack R. Pirozzolo
Rick Binder
Willcox, Pirozzolo & McCarthy
50 Federal Street
Boston, Massachusetts 02110
(617) 482-5470

James T. McCormick #2614
128 Dorrance Street - Suite 330
Providence, RI 02903
(401) 831-2970

John F. Glowacki
Siegal Napierkowski & Park
533 Fellowship Road, Suite 120
Mount Laurel NJ 08054-3412 (856) 667-2080

Ian Wallach
Kimball Ann Lane
Luce, Forward, Hamilton & Scripps LLP
153 East 53rd Street, 26th Floor
New York, NY 10022
(212) 744-1414

James T. Murphy #1698
Kelly N. Michels #6478
Hanson Curran LLP
146 Westminster Street
Providence, RI 02903
(401) 421-2154

Kevin J. O'Connor
Peter C. Netburn
Hermes, Netburn, O'Connor & Spearing, P.C.
265 Franklin Street, 7th Floor
Boston, MA 02110-3113
(617) 728-0050

Lawrence Nathanson
Siegal, Napierkowski & Park
533 Fellowship Road, Suite 120
Mt. Laurel, NJ 08054-3412
(856) 380-8900

________/s/ Mark T. Nugent_________

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| EMHART INDUSTRIES, INC.,<br>Plaintiff,<br>v.<br>HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, LIBERTY MUTUAL INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICA INSURANCE COMPANY, and UNITED STATES FIRE INSURANCE COMPANY,<br>Defendants. | CIVIL ACTION<br>NO. CA 02-053S<br><br>MEMORANDUM IN SUPPORT OF DEFENDANT NORTH RIVER INSURANCE COMPANY'S MOTION TO STRIKE THE AFFIDAVIT OF RODNEY J. TAYLOR CONTAINED IN THE OPPOSITION MEMORANDUM ON THE "ALLOCATION" ISSUE |

Now comes the Defendant North River Insurance Company, and moves this court to strike the affidavit of Rodney J. Taylor (attached as Exhibit A) pursuant to Fed.R.Civ.P. 26.

The opinion of Mr. Taylor was first disclosed to opposing counsel in an affidavit on August 18, 2006, approximately two and a half weeks before jury empanelment and only three and a half weeks before trial.

Mr. Taylor's expert opinion is offered by the plaintiff on the issue of allocation. In essence, Mr. Taylor opines that pollution coverage was not "generally available" after 1986. Plaintiff apparently believes that, if this point is true, the allocation period (1944 – 1999) would not include the years 1986-1999. North River denies the accuracy of these legal and factual arguments. Moreover, the expert opinion of Mr. Taylor must be stricken because it was not disclosed or produced in accordance with the court's deadline for Rule 26(a)(2) disclosures. As a result, the plaintiff has offered previously undisclosed expert opinion which must be deemed to be improper and inadmissible.

**The Expert Disclosure Deadline**

The expert disclosure deadline was originally set for April 14, 2003.[1] The order was subsequently amended,[2] but was last set for October 22, 2003.[3]

**The Federal Rules of Civil Procedure**

> (2) Disclosure of Expert Testimony.
>
> (A) . . . a party shall disclose to other parties the identity of any person who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence.
>
> (B) Except as otherwise stipulated or directed by the court, this disclosure shall, with respect to a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony, be accompanied by a written report prepared and signed by the witness. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

---

[1] See Docket Entry #31 - SCHEDULING ORDER setting Fact Discovery cutoff 2/13/03 & Expert Discovery cutoff 4/14/03 ; Deadline for filing of dispositive motions 5/14/03 ; Pretrial Memorandum Deadline 6/16/03 ; ( signed by Judge Mary M. Lisi ) (Duhamel, J) (Entered: 06/13/2002).

[2] See Docket Entry #125 - ORDER granting [124-1] joint motion to Enlarge Time in pretrial order to 8/8/03 for expert discovery; exchange of expert reports 6/30/03; exchange of rebuttal reports 7/18/03 to 8/29/03 for dispositive motions; and to 9/30/03 for pretrial memorandum ( signed by Judge William E. Smith ) (faxed to counsel of record) (Mercurio, A) Modified on 12/04/2003 (Entered: 05/29/2003).

[3] See Docket Entry #144 - ORDER granting [143-1] joint motion to Extend Deadlines in Pretrial Order: Completion of expert discovery to October 22, 2003; Filing of motions to November 7, 2003; Filing of Pretrial memorandum to December 5, 2003. ( signed by Judge William E. Smith ) (faxed to counsel of record) (Mercurio, A) (Entered: 09/08/2003)

> (C) These disclosures shall be made at the times and in the sequence directed by the court. In the absence of other directions from the court or stipulation by the parties, the disclosures shall be made at least 90 days before the trial date or the date the case is to be ready for trial or, if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under paragraph (2)(B), within 30 days after the disclosure made by the other party. The parties shall supplement these disclosures when required under subdivision (e)(1).

Federal Rules of Civil Procedure 26(a)(2).

> A party that without substantial justification fails to disclose information required by Rule 26(a) . . . is not, unless such information is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed.

Fed. R. Civ. P. 37(c).

**Argument**

Mr. Taylor's proposed testimony was never disclosed before 4:00 pm on Friday, August 18, 2006. At this late date, it should not be admissible in a trial of this matter. Similarly, it should not serve as the basis for an opposition to a motion for summary judgment.

The plaintiff has offered the affidavit in opposition to North River's Motion for Summary Judgment on the Allocation Issue. Because the affidavit is inadmissible, it should not be considered in any decision on that matter.

> The nonmovant bears "the burden of producing specific facts sufficient to deflect the swing of the summary judgment scythe." Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003). Those facts, typically set forth in affidavits, depositions, and the like, must have evidentiary value; as a rule, "evidence that is inadmissible at trial, such as inadmissible hearsay, may not be considered on summary judgment." Vazquez v. Lopez-Rosario, 134 F.3d 28, 33 (1st Cir. 1998).

Noviello v. City of Boston, 398 F.3d 76 (1st Cir. 2005).

> A party that without substantial justification fails to disclose information required by Rule 26(a) . . . is not, unless such

> information is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed.

Fed. R. Civ. P. 37(c).

Since plaintiff cannot make a justification for the belated discovery, and because the error is not harmless, the late expert testimony must be excluded. Wilson v. Bradlees, 250 F.3d 10 (1st Cir. 2001). See also Heidtman v. County of El Paso, 171 F.3d 1038, 1040 (5th Cir. 1999); Salgado by Salgado v. General Motors Corp., 150 F.3d 735, 741-742 (7th Cir. 1998).

In determining whether the testimony should be allowed, the court should be guided by the consideration of four factors: (1) the explanation, if any, for the party's failure to identify the witness; (2) the importance of the witness's testimony; (3) the prejudice to the opposing party of allowing the witness to testify; and (4) the possibility of curing such prejudice by granting a continuance. *See* Samos Imex Corp. v. Nextel Communs., Inc., 194 F.3d 301, 305 (1st Cir. 1999); Hamburger v. State Farm, 361 F.3d 875, 883 (5th Cir. 2004); Geiserman v. MacDonald, 893 F.2d 787 (5th Cir. 1990); Bradley v. United States, 866 F.2d 120, 124-26 (5th Cir. 1989); Murphy v. Magnolia Elec. Power Ass'n, 639 F.2d 232, 234-35 (5th Cir. 1981); Central Maine Power Co. v. Foster Wheeler Corp., 115 F.R.D. 295, 297 (D.Me. 1987); 8 C. Wright & A. Miller, Federal Practice and Procedure, § 2050 at 327 (1970). See also Musser v. Gentiva, 356 F.3d 751, 757, (7th Cir. 2004); Klonoski v. Mahlab, 156 F.3d 255, 269 (1st Cir. 1998); Lohnes v. Level 3 Communs., Inc., 272 F.3d 49, 60 (1st Cir. 2001).

In the present case, the failure to identify Mr. Taylor at any point over the last four years cannot be justified. Moreover, this late disclosure is extremely prejudicial given the very limited time left before trial.

For these reasons, we respectfully request that the court strike the testimony of Mr. Rodney J. Taylor.

Respectfully submitted,
**THE NORTH RIVER INSURANCE COMPANY,**
By its attorneys,
/s/ Mark T. Nugent

Mark T. Nugent, RI Bar# 2637
**MORRISON MAHONEY LLP**
121 South Main Street, Suite 600
Providence, RI 02903-7141
(401) 331-4660

John T. Harding, *pro hac vice*
**MORRISON MAHONEY LLP**
250 Summer Street
Boston, MA 02210-1181
(617) 439-7500

August 22, 2006

**CERTIFICATION**

I hereby certify that on this _22 day of __Aug_______ 2006, a copy of the foregoing was via ECF/mailed, postage prepaid, to:

Jack R. Pirozzolo
Rick Binder
Willcox, Pirozzolo & McCarthy
50 Federal Street
Boston, Massachusetts 02110
(617) 482-5470

James T. McCormick #2614
128 Dorrance Street - Suite 330
Providence, RI 02903
(401) 831-2970

John F. Glowacki
Siegal Napierkowski & Park
533 Fellowship Road, Suite 120
Mount Laurel NJ 08054-3412 (856) 667-2080

Ian Wallach
Kimball Ann Lane
Luce, Forward, Hamilton & Scripps LLP
153 East 53rd Street, 26th Floor
New York, NY 10022
(212) 744-1414

James T. Murphy #1698
Kelly N. Michels #6478
Hanson Curran LLP
146 Westminster Street
Providence, RI 02903
(401) 421-2154

Kevin J. O'Connor
Peter C. Netburn
Hermes, Netburn, O'Connor & Spearing, P.C.
265 Franklin Street, 7th Floor
Boston, MA 02110-3113
(617) 728-0050

Lawrence Nathanson
Siegal, Napierkowski & Park
533 Fellowship Road, Suite 120
Mt. Laurel, NJ 08054-3412
(856) 380-8900

________/s/ Mark T. Nugent_________

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

EMHART INDUSTRIES, INC,

Plaintiff,

v.

HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, LIBERTY MUTUAL INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICA INSURANCE COMPANY, UNITED STATES FIRE INSURANCE COMPANY

Defendants.

C.A. No. 02-053S

AFFIDAVIT OF RODNEY J. TAYLOR

Rodney J. Taylor deposes and says:

1. I am a Managing Director of Aon Environmental Services Group of Jericho, New York ("Aon"). Aon is a the world's largest commercial insurance broker and risk management consulting firm and provides insurance brokerage and consulting services to a wide range of industrial, commercial and institutional clients. It assists such entities in addressing construction, environmental and energy related risks.

2. I hold professional insurance designations, including Charter Property and Casualty Underwriter (CPCU), Charter Life Underwriter (CLU) and Associate in Risk Management (ARM). A more detailed statement of my professional qualifications and experience is set forth in my curriculum vitae, a copy of which is attached herewith as Exhibit A.

3. I have more than thirty years of experience in environmental risk management and insurance. My attached resume details my professional activities and experience in connection with insurance programs for environmental risks, including the development and implementation of insurance programs to address such risks. I have had professional experience in various aspects of the insurance industry, including rating, drafting of insurance policy language, negotiation of policy provisions and endorsements, and the administration of claims. I have worked with clients to develop insurance and risk management solutions for CERCLA, RCRA and other types of environmental exposures involving both statutory and tort liability. This has included the development of environmental insurance forms to meet the specific needs of clients with environmental risk issues. I have accumulated knowledge as a broker concerning US.-domiciled and London insurers active in writing general liability as well as environmental insurance risks. In connection with these professional activities, I have developed a comprehensive understanding and knowledge of insurance available for U.S. industrial accounts to cover environmental pollution and other similar types of insurance risks in the period from 1970 through the present.

4. My activities as an insurance broker have included the assembly and maintenance of an extensive library of insurance forms and other materials related to insurance and risk management. It includes information concerning available insurance, underwriting techniques and risk management approaches utilized by industrial accounts to address general liability and environmental liability risks for the period starting from 1970 to the present. This library includes copies of insurance policies and applications, descriptive materials, and underwriters' explanations of the coverage provided by their policies. It also includes documents that describe the origins of environmental insurance and its development for U.S. industrial risks. The library

has been kept up to date with the addition of materials as the market for environmental insurance has continued to evolve. Materials included in the library are utilized to provide alternatives to current clients that are seeking to utilize state–of-the-art wording for specific property, casualty and environmental risks, and to provide materials for research into past practices in underwriting and insuring these risks. The library contains a comprehensive collection of the environmental coverage available in the United States from 1975 through the present. I am familiar with the materials contained in that library and the methods used to catalog and retrieve information from the library.

5. In connection with my activities as a broker, I am frequently asked to evaluate the availability of environmental insurance for particular risk situations. In responding to requests of this type, I utilize my experience with environmental insurance, my familiarity with the underwriters offering such coverage and knowledge of industry practices to design and implement insurance and risk management programs. I keep up to date with developments in the industry by reading articles in and commentaries in publications such as Business Insurance, The National Underwriter, Best's Review, and Risk Management Magazine. I also speak at and attend conferences on environmental insurance and other risk management topics sponsored by bar associations, insurance trade organizations and private sponsors.

6. In connection with the above activities I have become familiar with underwriting practices of insurers offering environmental insurance during the period 1970 to the present and particularly the forms of coverage offered and the underwriting required for the issuance of such forms and coverage. This includes the familiarity with required disclosures by respective policyholders and exclusions of past acts and occurrences in connection with the writing of new environmental insurance. This professional activity and experience is pertinent to the

information set forth below concerning underwriting practices and forms of coverage available in the United States.

7. I have provided expert reports and/or testified at deposition in cases where the availability of insurance coverage for pollution conditions following the adoption by general and excess liability insurers of pollution exclusions was at issue (a list of cases in which I have prepared expert reports or testified is included in Exhibit A). In those cases, where the opposing parties have included insurance companies and where the insureds claimed millions of dollars in insurance benefits, there has not been any assertion that, following the adoption of the pollution exclusion, there was coverage for pollution other than the types of insurance coverage discussed, infra.

8. As a result of my education, experience and training, described above, I am knowledgeable about the various types of insurance coverage that were generally available to corporations to address environmental as well as general liability exposures in the United States from 1970 through the present.

9. I have reviewed the Court's Report and Recommendation concerning the Centredale Manor Superfund Site in North Providence, Rhode Island, dated February 15, 2005 ("Report"), including the sections entitled "Factual Background", "The PRP Letter", "First Administrative Order", "Second Administrative Order", "The Insurance Policies", "Notifications of Insurance Claims" and "Corporate History of Emhart". I have also reviewed information concerning historical operations at the former Metro-Atlantic Chemical Co. Inc. ("Metro-Atlantic") manufacturing site at 2072 Smith Street, North Providence, Rhode Island and the former New England Container Company ("NECC") drum reconditioning site at 2074 Smith Street, North Providence, Rhode Island contained in the Report.

10. In the summer of 1970, U.S. insurers writing general and excess liability coverage adopted the so-called 1970 Insurance Services Office (ISO) Pollution Exclusion, which contained an exception for claims arising out of sudden and accidental releases of pollutants (hereinafter referred to as "1970 ISO Pollution Exclusion"). In 1986 these same insurers adopted a more comprehensive form of pollution exclusion known as the ISO "Absolute Pollution Exclusion", which did not include the exception for sudden and accidental releases that appeared in the 1970 ISO Pollution Exclusion. From the adoption of the 1970 ISO Pollution Exclusion through the present, the generally available primary and excess liability insurance for commercial, industrial and institutional risks in the United States contained either the 1970 ISO Pollution Exclusion or the Absolute Pollution Exclusion.

11. At various times following the introduction of the 1970 ISO Pollution Exclusion, insurance was offered by specialty markets that, to some extent, addressed claims arising out of releases of pollution that were not "sudden and accidental" within the meaning of the exception to the 1970 ISO Pollution Exclusion. These gradual releases of pollutants sometimes resulted in repeated or continuous property damage or progressive bodily injury. For example, an underground storage tank for gasoline might develop a leak as a result of corrosion that would not be detected until inventory shortages became measurable or the petroleum hydrocarbons migrated offsite and were discovered in wells, surfacewater or groundwater on the subject property or adjacent properties. Insurance policies that addressed some claims arising out of gradual pollution events of this type were known by several names depending upon the underwriters and the time period during which this insurance was offered. The earliest of these forms of gradual pollution insurance was called Environmental Impairment Liability insurance ("EIL Insurance"), which was first offered in the United States in 1975. Other similar policies

were called Environmental Protection Liability, Pollution Liability or Pollution Legal Liability. I will refer to these types of insurance offered by specialty underwriters prior to 1985 as ""Pollution Insurance". It should be noted that some of these policies were also modified to provide coverage for claims arising out of sudden and accidental releases. This was accomplished by deleting an exclusion that was normally included in the earlier forms of Pollution Insurance policies for claims arising out of sudden and accidental releases. This modification was made in some cases when underwriters providing general and excess liability to industrial accounts refused to offer coverage for any pollution claims (caused by either sudden or gradual releases) in their policies.

12. From my education, training and experience with environmental insurance for industrial risks in the United States, I am knowledgeable about Pollution Insurance, including the terms, conditions, exclusions and other provisions contained in the various Pollution Insurance policies offered by specialty underwriters in the period from 1986 through 1999, and with the underwriting practices of the specialty insurers that issued Pollution Insurance policies in this time period. I have written several articles concerning Pollution Insurance that have been published in insurance and legal journals, and have testified in matters concerning Pollution Insurance on numerous occasions.

13. During the period 1986-1999, insurance was not generally available to cover claims arising out of exposures involving pollution, such as the pollution that occurred at the Metro-Atlantic manufacturing site. The basis for this opinion is set forth in greater detail below.

14. The 1970 ISO Pollution Exclusion was adopted by insurers writing general and excess liability insurance in the United States in the summer of 1970 and was included in virtually all liability insurance policies issued or renewed for industrial accounts thereafter

through 1985 when the ISO Absolute Pollution Exclusion replaced the 1970 ISO Pollution Exclusion in general and excess liability policies written for U.S. industrial accounts.

15. From mid-1970 until 1974, Pollution Insurance was not generally available for U.S. industrial accounts. In 1974, certain foreign insurers perceived that there was a potential market for Pollution Insurance. As a result of this identified need for coverage, these underwriters developed the first Pollution Insurance (EIL Insurance) policies, which were offered only to risks outside the U.S. in 1974. In 1975, EIL Insurance was first offered to industrial and commercial accounts located in the United States by underwriters and Lloyds and other foreign insurers. This type of Pollution Insurance was offered continuously in the United States until 1984, when it became apparent that Pollution Insurance could not be offered on this basis for U.S. industrial accounts as a result of claims arising out of the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA or Superfund) and other U.S. legislation imposing strict liability on polluting industries. In fact, nearly all underwriters offering Pollution Insurance to industrial accounts withdrew from the U.S. market by early 1985.

16. Attached hereto as Exhibits B and C, respectively, are representative policy forms for PLI insurance, including a declaration page and policy jackets; attached hereto as Exhibit E is a representative policy form for EPL Insurance; attached hereto as Exhibit F is a representative form of EIL insurance, with an attached application; and attached hereto as Exhibit D is a representative form of application for EIL insurance.

17. Starting in 1980 several domestic insurers, including American International Group and Evanston Insurance Company, introduced other Pollution Insurance policies that also insured some claims arising out of pollution risks of U.S. industrial and commercial accounts. In 1982, a pool of insurers, known as the Pollution Liability Insurance Association (PLIA), made

another Pollution Insurance policy available to industrial accounts to insure claims of pollution. As mentioned earlier, these policies were known by various names such as Environmental Protection Liability, Pollution Liability or Pollution Legal Liability. Domestic and foreign insurers offered Pollution Insurance of the types described above to U.S. industrial accounts continuously through 1986 and beyond.

18. All Pollution Insurance that was available in the United States in any time period, including the period from 1986 through 1999, was offered only on a claims-made basis, rather than an accident or occurrence basis. A statement in capital letters warning that the coverage was provided only on a claims-made basis appears in each of Exhibits B-F. In a claims-made policy, insurance coverage is provided only for claims that are asserted against the insured during the policy term. Since the first notice of Emhart's involvement in pollution conditions at the Metro-Atlantic site discussed in the Report in this case did not occur until 2000, none of the claims-made Pollution Insurance policies available to U.S. industrial accounts prior to 1999 would have provided coverage for subsequent claims arising out of such pollution conditions...

19. Most generally available Pollution Insurance policies written for U.S. industrial sites where historic pollution conditions were present during the time period from 1986 through 1999 also contained so-called "retroactive date" provisions that excluded coverage for claims arising out of events or acts (i.e., releases of pollutants) that occurred prior to the retroactive date. A representative retroactive date provision from a Pollution Insurance policy written in the 1986 to 1999 time period is contained in Exhibit C. The underwriting practice of insurers offering Pollution Insurance with a retroactive date provision was to use the inception date of the policy as the retroactive date. The effect of this practice was to exclude coverage for claims arising out of events or acts of the insured, or releases of pollutants that occurred prior to the inception of

the Pollution Insurance policy. Accordingly, Pollution Insurance policies that included retroactive dates, which were the same as the inception dates, would not provide coverage for claims arising out of pollution conditions resulting from events or releases of pollutants that occurred at the Metro-Atlantic site prior to 1999, including the events in earlier years that are described in the Report.

20. Underwriters offering Pollution Insurance policies to U.S. industrial and commercial accounts in the time period from 1986 through 1999 required the applicant to identify and provide detailed historical information concerning every location that the applicant sought to be covered by the insurance, including the wastes that were or had been generated at each site. Completion of the application by an executive of the potential insured would have resulted in the disclosure of information about operations at the Metro-Atlantic site, as described in the Report. This disclosure would have resulted in decisions on the part of underwriters to either: (a) not offer Pollution Insurance to the prospective insured at all; or (b) to issue Pollution Insurance with exclusions for known pollution conditions including the historic releases of pollutants that had occurred at the Metro-Atlantic facility.

21. The disclosure of manufacture, storage, use and potential releases of what are now known as hazardous substances including , hexachlorophene, trichlorophenol, pesticides, volatile organic compounds (VOCs) and semi-volatile organic compounds (SVOCs) at the Metro-Atlantic site would have resulted in underwriters either refusing to offer coverage for these sites or offering coverage with exclusions for claims arising out of the presence or release of these hazardous materials at these facilities. Underwriters would also have been aware of the possibility of releases from this facility migrating to the Woonasquatucket River.

22. These disclosures would have resulted in specific exclusions of claims arising out of all dioxin, hexachlorophene, pesticides, volatile organic compounds (VOCs) and semi-volatile organic compounds (SVOCs) releases from the Metro-Atlantic site. Furthermore, exclusions in the Pollution Insurance policies generally available to U.S. industrial accounts in the time period from 1986 through 1999 would also have affected the coverage available for claims asserted against Emhart. Representative examples of a waste disposal exclusion from Pollution Insurance policies are contained in Exhibits C, E and F. Moreover, such policies excluded indemnification when claims partially within the scope of coverage grant were combined with claims within the scope of exclusions. See Exhibit F.

23. Pollution Insurance policies that were generally available to industrial and commercial accounts in the United States from 1986 through 1999 contained exclusions for claims arising out of improving pre-existing pollution conditions at sites owned by the Insured, cleanup operations that were considered normal or routine, or upgrading, monitoring, neutralizing, restoring, cleaning up or inactivating waste disposal sites. Representative examples of such exclusions are contained in Exhibits B, E and F. Claims arising from events that occurred at the Metro-Atlantic facility, as described in the Report, would have resulted in coverage being barred by pre-existing pollution exclusions such as those described in this paragraph.

24. The provisions I have listed, other than the claims-made limitation, are examples of provisions that were commonly found in Pollution Insurance policies issued to industrial and commercial operations in the United States during the period 1986 through 1999. Such provisions either were found in policy forms, such as the attached exhibits, or were incorporated in endorsements issued with the policies. For exposures such as the conditions at the Metro-

Atlantic facility, any one of the exclusions or underwriting practices listed above would have foreclosed coverage of exposures such as the pollution arising from conditions at the Metro-Atlantic facility. The exclusion of coverage under one provision would have made the consideration of additional causes for excluding coverage irrelevant. For example, if a policy had a retroactive date that coincided with the date of inception of the policy, this would have served as a fundamental basis for denial of coverage for claims of pollution arising out of conditions that pre-dated the inception of the policy.

25. Based upon my work in the environmental insurance area and a review of the forms of insurance available for environmental risks in the time period from 1986 through 1999 (including a review of materials I have assembled and maintained in connection with that work), it is my opinion that Pollution Insurance policies that were generally available during the period 1986 through 1999 and beyond would not have covered claims of pollution arising from conditions at the Metro-Atlantic facility. This opinion is based on the fact that available policies were written only on claims-made forms and also due to the presence of one or more of the exclusionary provisions and the underwriting considerations for environmental insurance that I have discussed above.

26. The underwriting of Pollution Insurance became more sophisticated and somewhat more restrictive during the period from 1986 through 1999, especially when the significance of the liability imposed on U.S. industrial accounts by environmental regulations such as CERCLA was fully appreciated. In fact, the market for Pollution Insurance went through a disruptive period of restricted coverage in 1984 through 1986 that left only two markets and a maximum capacity of $10 million available for such risks by the end of 1985 and only slightly higher limits during 1986. A full recovery of the environmental market did not

occur until well into the mid-1990s, and this was associated with a more sophisticated underwriting approach that would have made underwriters aware of the historic pollution conditions at the Metro-Atlantic and NECC sites. Accordingly, it is my opinion that during the entire period 1985 to 1999 the generally available Pollution Insurance policies would not have covered exposures such as the historic conditions at the Metro-Atlantic facility. Furthermore, Pollution Insurance would not have been available for the historic pollution conditions at the Metro-Atlantic facility in 2000 when claims arising out of these conditions were actually made.

I declare under the penalty of perjury that the foregoing is true and correct.

Rodney J. Taylor

August 21, 2006