UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| EMHART INDUSTRIES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>HOME INSURANCE COMPANY,<br>INSURANCE COMPANY OF NORTH AMERICA,<br>LIBERTY MUTUAL INSURANCE COMPANY,<br>NORTH RIVER INSURANCE COMPANY,<br>ONEBEACON AMERICA INSURANCE COMPANY<br>and UNITED STATES FIRE INSURANCE COMPANY,<br><br>Defendants. | Civil Action No. 02-053 S |

MOTION *IN LIMINE* OF EMHART INDUSTRIES, INC.
TO PRECLUDE EVIDENCE BY ONEBEACON
OF PURPORTED REFORMATION OF ITS INSURANCE POLICY

Emhart moves to preclude defendant OneBeacon from offering evidence of a purported reformation of Policy No. S-16-07084 that it issued to Crown Metro, Inc., or from referring to any such purported reformation in opening statement. OneBeacon lacks evidence sufficient to meet its high burden of proof on this issue and has not shown that it has any admissible evidence whatsoever to support an essential element of such a claim, mistake by Crown Metro. In support of this motion, Emhart relies on the Memorandum Of Emhart Industries, Inc. In Support Of Its Motion In Limine To Preclude Evidence By OneBeacon Of Purported Reformation Of Its Insurance Policy, filed herewith.

Respectfully submitted,

/s/ Gerald J. Petros
Gerald J. Petros (#2931)
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, Rhode Island 02903
(401) 274-2000
(401) 277-9600
gpetros@haslaw.com

Counsel for Plaintiff, Emhart Industries, Inc.

Jack R. Pirozzolo
Richard L. Binder
Foley Hoag LLP
Seaport World Trade Center West
155 Seaport Boulevard
Boston, Massachusetts 02210
(617) 832-1000

Dated: September 5, 2006

## CERTIFICATE OF SERVICE

I hereby certify that on September 5, 2006, a copy of the foregoing Motion *In Limine* Of Emhart Industries, Inc. To Preclude Evidence By OneBeacon Of Purported Reformation Of Its Insurance Policy, was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Gerald J. Petros
Gerald J. Petros (#2931)
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, Rhode Island 02903
(401) 274-2000
(401) 277-9600
gpetros@haslaw.com

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| EMHART INDUSTRIES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, LIBERTY MUTUAL INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICA INSURANCE COMPANY and UNITED STATES FIRE INSURANCE COMPANY,<br><br>Defendants. | Civil Action No. 02-053 S |

MEMORANDUM OF EMHART INDUSTRIES, INC. IN SUPPORT OF ITS MOTION *IN LIMINE* TO PRECLUDE EVIDENCE BY ONEBEACON OF PURPORTED REFORMATION OF ITS INSURANCE POLICY

Emhart moves to preclude defendant OneBeacon from offering evidence of a purported reformation of Policy No. S-16-07084 that it issued to Crown Metro, Inc., or from referring to any such purported reformation in opening statement. OneBeacon lacks evidence sufficient to meet its high burden of proof on this issue and has not shown that it has any admissible evidence whatsoever to support an essential element of such a claim, mistake by Crown Metro. This Court has addressed reformation in denying a OneBeacon summary judgment motion on the issue (Docket Index ("D.I.") 378). The evidence that OneBeacon has proffered to meet its burden on this issue is so insufficient that OneBeacon is not entitled to present this issue to the finder of fact. The legal principles and pertinent facts discussed in this memorandum were also addressed in Emhart's memorandum in opposition to the OneBeacon motion.

BACKGROUND

OneBeacon[1] issued an excess insurance policy (Tab[2] C) to Crown Metro. The policy provides $4,000,000 of excess insurance coverage. Originally written for the period April 24, 1969 through February 15, 1972, the policy was cancelled on January 1, 1970. This excess policy expressly incorporates the terms of INA Policy No. XBC 64674 (Tab D). That INA policy has no pollution exclusion. Id. Seeking to impose a pollution exclusion on Emhart, OneBeacon asserts that its excess policy should have incorporated the terms of a subsequent INA policy (Tab B) that contains such an exclusion. OneBeacon seeks to reform its excess policy to incorporate the terms (and pollution exclusion) of the later INA policy.

The only evidence proffered by OneBeacon in support of its reformation claim is the affidavit of Vincent Puccio, a former OneBeacon employee[3]. Mr. Puccio asserts that, a third of a century earlier, he made an error in his reference to the INA policy whose terms were to be incorporated in the excess policy on a report. Mr. Puccio asserts that his claimed error "was carried through [by OneBeacon] and appears in the Copy of the policy as issued." Ex. A., ¶ 19.

The Puccio Affidavit provides no admissible evidence concerning the intentions or understanding of Crown Metro, the other party to the policy. Mr. Puccio's affidavit makes it clear that he did not deal with Crown Metro or with Crown Metro's agent, Laren Insurance

---

1 The policy was issued by Employers Surplus Life Insurance Company ("ESLIC"). OneBeacon admits that it is the successor to ESLIC. For convenience ESLIC will be referred to as OneBeacon.

2 References to "Tab __" are to the tabbed exhibits in the Joint Appendix Of Exhibits To The Parties' Motions For Summary Judgment Dated July 24, 2006.

3 A copy of the text of the Puccio affidavit is attached as Exhibit A.

Agency, Inc. ("Laren"). Instead, all of Mr. Puccio's references are to dealings with one George Busnach, an employee of a broker, Maurice H. Saval, Inc. Ex. A ¶¶ 11-15, 22. Mr. Busnach has testified that he has no specific recollection of the details or circumstances of this policy or its terms[4].

## ARGUMENT

### A. Under Rhode Island Law, Mistake Must Be Mutual

Rhode Island permits reformation of an insurance policy only on the grounds of mutual mistake, not unilateral mistake. Associates in Anesthesia, Inc. v. Mutual Benefit Life Insurance Co., 504 A.2d 477, 478 (R.I. 1986). "[T]here can be no reformation unless the variance between what is written and what was originally intended, as well as the mutual mistake, are demonstrated by clear and convincing evidence." Hopkins v. Equitable Life Assurance Society, 107 R.I. 679, 685, 270 A.2d 915, 918 (1970). These principles recently were reaffirmed in McEntee v. Davis, 861 A.2d 459, 463 (R.I. 2004), where the court rejected a claim of mistake in a consent judgment:

> By definition, a mutual mistake is one that is "common to both parties wherein each labors under a misconception respecting the same terms of the written agreement sought to be canceled." Rivera v. Gagnon, 847 A.2d 280, 284 (R.I. 2004) (quoting Leonard v. McDowell, 824 A.2d 1266, 1270 (R.I. 2003)). "An agreement containing a mutual mistake fails in a material respect correctly to reflect the understanding of both parties." Rivera, 847 A.2d at 284. For the court to intervene and correct a written instrument, there "must be, as it is usually expressed, the mistake of both parties to it; that is, such a mistake in

---

[4] The Busnach deposition was Exhibit B to the memorandum that Emhart filed on August 16, 2006 in opposition to a summary judgment motion that OneBeacon filed regarding reformation (D.I. 359). Magistrate Judge Almond determined, in a Report and Recommendation dated August 22, 2006 (D.I. 378), that the OneBeacon motion should be denied.

> the draughting [sic] of the writing, as makes it convey the intent or meaning of neither party to the contract." Vanderford v. Kettelle, 75 R.I. 130, 142, 64 A.2d 483, 489 (1949) (quoting Diman v. Providence, Warren, and Bristol R.R. Co., 5 R.I. 130, 134-35 (1858)). A party must prove mutual mistake by clear and convincing evidence before the court will reform, vacate, or dismiss a contractual agreement. See Rivera, 847 A.2d at 284.

Further, "it is not merely the existence of common error that creates mutual mistake. Instead, 'the parties' intent is a determinative factor.'" Id. (quoting Nunes v. Meadowbrook Development Co., 824 A.2d 421, 425 (R.I. 2003)). "A policy of insurance comes squarely within the rule." Ferla v. Commercial Casualty Inc., 59 A.2d 714, 716 (1948). "For a court to find mutual mistake, and to warrant reformation, 'the credibility of the witnesses and the weight of the evidence must be such as clearly to convince the court without hesitancy of the truth of the precise facts in issue.'" McEntee, 861 A.2d at 464 (quoting Nunes, 824 A.2d at 425).

To present a claim for reformation of the policy, OneBeacon would be required to present clear and convincing evidence of not only its own understanding of the agreement, but clear and convincing evidence of Crown Metro's separate understanding and intent. This it cannot do. It has no evidence of the understanding or intent of Crown Metro. Indeed, the sole evidence that has been provided by OneBeacon, the Puccio Affidavit, fails even to provide adequate evidence of an actual mistake by OneBeacon.

B. One Beacon Is Not Able To Make A Showing Of Mistake

Mr. Puccio's claim of error in his preparation of a "draft Daily Report," (Ex. A, ¶ 19) is not enough to meet the OneBeacon burden of proving a mistake. OneBeacon has cited 2 Couch on Insurance, § 27:27 (3d ed.) to support its position. However, as noted in that section, "there is some authority which denies reformation where the mistake is the fault of the insurer's home office as distinguished from that of an ordinary agent, and where it apparently is to the

advantage of the insured but the latter has acted in good faith." Id. Couch cites Hayes v. Travelers Insurance Co., 93 F.2d 568 (10th Cir. 1937), where the court denied reformation of a policy to follow the term used in the policy for disability coverage limits, rather than the higher payment stated in the policy. This claim was rejected. There was no evidence that the insured had meant to have the lower coverage. In Hayes, as here, the insurer claimed a clerical error by an employee drafting the policy absolved the insurer that issued the policy. This also was rejected:

> Dimon testified that the policy provided for $100.00 instead of $50.00 monthly disability benefits due to "a clerical error made by the people who were checking the file." It is a fair assumption that the officers executed the converted policy without reading it, relying on their clerical assistants. Had they read it, it is reasonable to suppose they would have discovered the error.
>
> One having the capacity and opportunity to read a contract, who executes it without reading it, in the absence of fraud or imposition, or special circumstances excusing his failure to read it, is charged with knowledge of its contents and cannot avoid the contract by asserting that it did not express what he intended.

93 F.2d at 571 (footnote omitted). This is in accordance with Rhode Island law. Ferla denied reformation of an insurance policy and noted that the policyholder "cannot avoid the effect of his own conduct in failing to observe the plain endorsement of an exclusion in the policy on the ground that he could not read English. In legal contemplation knowledge of the terms of a policy of insurance is possessed by the insured even though he be illiterate." 59 A.2d at 717.

OneBeacon cannot prove the elements of a mistake. Mr. Puccio asserts that his claimed error "was carried through" and included in the policy. Ex. A, ¶ 19. In other words, the issuing entity at OneBeacon did not bother to review the related documents to ascertain the terms of the policy that were being incorporated. Mr. Puccio claims that the asserted error is clear. If so, however, then the issuing entity at OneBeacon would have noted the error as well. If the

issuing entity at OneBeacon did not bother to conduct such a review, then, like the insurer in Hayes and the insured in Ferla, OneBeacon is charged with knowledge of the terms of the policy that it issued. On the other hand, if the related documents were reviewed before the policy was issued, then there was no mistake; the policy was issued as OneBeacon intended. In either scenario, Mr. Puccio's proffered testimony does not excuse the subsequent issuance by OneBeacon of the policy as written.

C. The Parties Contemplated Excess Coverage
That Incorporated Terms Of Expired Policies

Mr. Puccio asserts that OneBeacon would not provide excess coverage that did not incorporate the terms of the underlying coverage during its term. Ex. A, ¶¶ 6, 7, 21. However, until it was cancelled, the term of the excess policy was to be for almost three years (April 24, 1969 - February 15, 1972). The policy whose terms OneBeacon seeks to impose by reformation was to expire on February 15, 1970 (Tab B at CIC 0153). Therefore, that policy and its terms would not have been in effect during the final two years (February 15, 1970 - February 15, 1972) of the contemplated term of the excess policy. Therefore, the incorporation into the OneBeacon excess policy of terms different from those in the underlying policy that was to be in effect during portions of the term clearly was within the contemplation and expectation of OneBeacon. There is no evidence to support any finding that Crown Metro would have concluded otherwise.

D. The Failure Of OneBeacon To Claim Mistake
For Over Thirty Years Bars Reformation Of The Policy

The passage of time also bars reformation. OneBeacon seeks to reform the terms of a policy over thirty years after it was written. At no point while the policy was in force did OneBeacon raise any issue about the policy. Again, this stands in contrast with Ferla. In Ferla,

the court noted the absence of any complaint prior to the loss: "Nor was any effectual means taken by the complainant, when the policy in question was delivered to him, to ascertain its contents and to apprise the respondent that it was not in accordance with his desire. If there was a mistake in the circumstances it was the mistake of the complainant himself, the respondent having been induced to contract and act for many months in the belief that the policy was exactly what had been ordered." 59 A.2d at 716. Here, the delay is over 30 years, not the matter of months in Ferla.

E. OneBeacon Has No Evidence Of A Mistake By Crown Metro

A mistake must be mutual. A unilateral mistake by one party, combined with ignorance thereof by the other party, is insufficient to support reformation. See, Vanderford v. Kettelle, 64 A.2d 483, 489 (1941) ("A mistake by one party coupled with ignorance thereof by the other part does not constitute a mistake within this rule.") Fleet National Bank v. 175 Post Road LLC, 851 A.2d 267 (R.I. 2004), denied an attempt to reform a contract after additional asbestos abatement work was discovered, where the scope of the abatement work had been negotiated extensively. 851 A.2d at 269-271. Rejecting the attempt at reformation, the court quoted Vanderford, and noted that "[t]he mistake alleged must be mutual." Id. at 274 (emphasis in original).

OneBeacon has provided no evidence of knowledge of a mistake by Crown Metro. OneBeacon has no evidence that Crown Metro knew or intended to obtain an excess policy that incorporated the terms of another policy, as opposed to a policy having its own terms and conditions. Even assuming that Crown Metro intended to incorporate the terms of another policy into the OneBeacon excess policy, OneBeacon has no evidence that Crown Metro intended that the excess policy contain the less desirable terms of a policy with a pollution

exclusion as opposed to a policy with no pollution exclusion. All that OneBeacon has shown is that Crown Metro sought to obtain an excess policy. It has not shown any negotiation or statement concerning what policy terms, if any, were to be incorporated by reference. There is no indication of the specific terms and conditions sought by Crown Metro, other than the amount and duration of coverage. There is no evidence that Crown Metro sought a "follow the form" excess policy or that it knew that OneBeacon would issue the policy in such a form before it was issued. There is no evidence that OneBeacon was prevented in any way from choosing to issue a policy with separate terms and conditions. There is no evidence that Crown Metro understood and expected that the terms of the second INA policy would be so incorporated. Absent such an expectation or understanding, there can be no mistake by Crown Metro, and thus no mutual mistake, the predicate for reformation.

The statements by Mr. Puccio concerning the intention of Crown Metro are inadmissible speculation. They do not even address Crown Metro or its insurance agent, Laren. Mr. Puccio does no claim to have had any direct communications with Crown Metro or Laren. Instead, Mr. Puccio dealt solely with Mr. Busnach. The deposition of Mr. Busnach was taken and it provides no information as to the intent of Crown Metro concerning whether it wanted coverage with or without a pollution exclusion.

McEntee shows reformation cannot be based on unilateral mistake. In McEntee, the plaintiffs and defendant entered into a consent judgment concerning the location of a driveway. Defendant subsequently learned that a survey error had placed the driveway inside his property, rather than on the border. 861 A.2d at 461-462. Plaintiffs, however:

> argue that there has been no mistake on their part. Instead, they contend that they relied on the already-existing driveway, coupled with the terms of both the consent judgment and release, when entering the agreement, and that the consent judgment, as it stands, embodies their

> bargain precisely. Indeed, plaintiff Michael McEntee testified that he was unaware of the location of the property line when he agreed to Davis's proposal and that he based his agreement on what he saw. Significantly, he testified that he had never received a copy of Sheldon's survey before signing the agreement.

Id. at 464. In McEntee, where plaintiff did not know that there was a mistake, even though the matter was visible to it, the mistake was unilateral and not eligible for reformation. Here, simply because OneBeacon issued a policy that referred to another policy, there was no reason for Crown Metro to know or to understand that there had been any mistake.

The evidence is that Crown Metro wanted excess coverage. It got such coverage. There is no evidence of an agreement that the OneBeacon policy was to incorporate the terms of another policy, rather than stating the coverage provisions independently. There is no evidence that OneBeacon advised Crown Metro that it intended to incorporate the terms of an INA policy into its policy, much less any discussion of which policy OneBeacon sought to so incorporate. There is no showing that Crown Metro considered any of these issues. As such, there was no mutual mistake. At most the mistake was unilateral.

F. The Authority Cited By One Beacon Is Inapposite

The cases previously cited by OneBeacon in its filings concerning reformation are inapposite. In each case, there is mutuality, as both parties expressly knew and had discussed the relevant term, or had agreed on the mistake. Cincinnati Insurance Co. v. Fred S. Post, Jr., Co., 747 S.W.2d 777 (Tenn. 1988), permitted reformation where pre-policy correspondence between the parties expressly addressed which of two sites were to have contents coverage, and the policy incorrectly inverted the coverage for the two sites. Id., at 778-79. In Cincinnati, the court concluded that "[r]eformation would result in correcting the typographical error in the policy so that it would then correspond to the antecedent agreement …." Id. at 782. Here, there is no

evidence of express agreement as to the specific policy whose terms were to be incorporated by reference.

OneBeacon's citation to Board of Trustees of the University of Illinois v. Insurance Corp. of Ireland, Ltd., 969 F.2d 329 (7th Cir. 1992), is equally misplaced. In Trustees, the testimony of those directly involved on both sides of the transaction agreed as to the intention of the parties as to the term in issue. 969 F.2d at 332-33 ("Gallivan, Fleming, and Burston were the only three people involved in negotiating and implementing the policy, and they all swore that the policy was to provide separate $5,000,000 limits"). Here, there is no such evidence regarding the intention of Crown Metro.

Reynolds v. Farmers Insurance Co., 960 P.2d 432 (Wash. Ct. App. 1998), also is inapposite. The issue in Reynolds was the time a policy became effective. The insured was advised of the correct effective time of the policy from the outset. No such advice is in the record here. Further the test in Reynolds was not one of mutual mistake, but rather one of unilateral mistake where the other party was charged with knowledge of the error. 960 P.2d at 434. Here, OneBeacon points to no such knowledge or constructive knowledge on the part of Crown Metro.

G. OneBeacon's Attempt To Characterize The Entry In Issue As A "Scrivener's Error" Does Not Alter The Result

OneBeacon has sought to support its claim by asserting that the alleged mistake by OneBeacon was a "scrivener's error," implying that the burden of proof for such errors somehow is lessened. This is incorrect.

A "scrivener's error" is where the parties agree on a term, but the person recording the agreement errs in its reduction to writing. The threshold remains the existence of an agreement of the parties regarding the term in issue. See 27 Williston on Contracts, § 70:93

("where there is no mistake about the agreement and the only mistake is in the reduction of the agreement to writing, such mistake of the scrivener or of either party, no matter how it occurred, may be corrected") (emphasis added). This still must be proven by clear and convincing evidence. OneBeacon's proffered evidence fails to meet this element of its reformation claim.

Rhode Island law does not recognize some form of "scrivener's error" exception to the rules for reformation for mutual mistake. Particularly on point is Hopkins, which involves a clerical error of the type claimed by OneBeacon. In Hopkins, the insured changed his beneficiary under his employer's group life insurance policy, replacing his ex-wife with his sister. When the group policy was transferred to a new insurer, the new insurer issued a new insurance certificate that did not name the beneficiary, but instead referred to the designation on file. 270 A.2d at 916-17. In preparing the new enrollment card, the prior change of beneficiary was overlooked due to a clerical error. 270 A.2d at 917. The insured had no notice of the error and continued to understand that his sister was the named beneficiary. In finding that the policy could be reformed due to this clerical mistake, the Court applied the same test as otherwise used in mistake cases:

> To warrant reformation it must appear that by reason of a mistake, common to both parties, their agreement fails in some material respect correctly to reflect their prior completed understanding. Vanderford v. Kettelle, 75 R.I. 130, 142, 64 A.2d 483, 488. And there can be no reformation unless the variance between what is written and what was originally intended, as well as the mutual mistake, are demonstrated by clear and convincing evidence. Kornstein v. Almac's, Inc., 98 R.I. 318, 323, 201 A.2d 645, 648; Vanderford v. Kettelle, supra, 75 R.I. at 139, 64 A.2d at 487; New England Box & Barrel Co. v. Travelers Fire Ins. Co., 63 R.I. 315, 320, 8 A.2d 805, 807.

270 A.2d at 918 (emphasis added). Evaluating the evidence, the court concluded: "In the case before us … clear and convincing evidence demonstrates that, as a result of mutual mistake, the designation of [the ex-wife] as Walter's beneficiary on the enrollment card failed to correctly

express the agreement of the parties. In those circumstances it was not error for the trial justice to reform the beneficiary agreement and to award Cora the proceeds of the policy." 270 A.2d at 918 (emphasis added). Thus, in Hopkins, the court found that there could be reformation of a contract due to a clear clerical error, like the one claimed here, only when there was clear and convincing evidence of mutual mistake. As already shown, there is no such showing of mistake here. Similarly, in Rosen v. E. Rosen Co., 818 A.2d 695 (R.I. 2003), a list of assets in an asset sale was reformed to add certain copyrights, where both the buyer and seller agreed that the omission was a mistake. Again, mutual mistake was necessary and, in Rosen, conceded.

This principle is well settled in Rhode Island law. In one of the first reported Rhode Island cases addressing reformation of a contract based upon a claim of mistake, Diman v. Providence, Warren & Bristol Railroad Co., 5 R.I. 130 (R.I. 1858), a party claimed that the wrong amount was entered in a stock subscription book. Rejecting this claim, the court stated:

> A court of equity has no power to alter or reform an agreement made between parties, since this would be in truth a power to contract for them; but merely to correct the writing executed as evidence of the agreement, so as to make it express what the parties actually agreed to. It follows, that the mistake which it may correct in such a writing must be, as it is usually expressed, the mistake of *both* parties to it; that is, such a mistake in the draughting of the writing, as makes it convey the intent or meaning of neither party to the contract. If the court were to reform the writing to make it accord with the intent of one party only to the agreement, who averred and proved that he signed it, as it was written, by mistake, when it exactly expressed the agreement as understood by the other party, the writing, when so altered, would be just as far from expressing the agreement of the parties as it was before; and the court would have been engaged in the singular office, for a court of equity, of doing right to one party, at the expense of a precisely equal wrong to the other.

Id. at 136 (emphasis added in part). A mistake in the drafting of a writing, a "scrivener's error," is exactly what requires clear and convincing proof of mutual mistake. Absent the initial proof of mutual mistake, such an error cannot be reformed.

In Diman, the Court went on to explain why mutual mistake is required and unilateral mistake does not suffice, even for a "scrivener's error":

> Without therefore going into the question, whether, considering the grounds of the well-known rule of evidence, it would be proper, however competent, to alter a written contract, unambiguous in its terms, upon oral proof alone of a supposed mistake in them, and such proof consisting almost wholly in the testimony of the party applying for the alteration, we must decline to reform this subscription in the mode proposed, upon the distinct ground, that it is not competent for us thus to make it express the contract of one party, when, by so doing, we shall make it cease to express the contract which the other party fairly entered into, and so long acted upon.

Id. (emphasis added). Reformation fails here because OneBeacon lacks evidence of its own intention, much less the intention of Crown Metro, when the contract was made.

Finally, Diman also addressed claims by the plaintiff similar to the proffered testimony of Mr. Puccio here:

> There was no mistake here at all, in the sense in which a court of equity recognizes it in order to relief. … Grant that he designed, and at the time expressed the design, of renewing only his old subscription of a thousand dollars; yet it is not possible to account for his actual subscription otherwise than by supposing, either, that at the moment he had forgotten what the amount of his old subscription was, or, that he wrote this subscription with a mind so preoccupied with something else that he did not attend to what he wrote. As a witness he does not attempt to account for it; but merely states the fact, that designing one thing, he did another. … In cases like this, where there has been no intermixture of fraud or surprise to put the applicant for relief off his guard, we must invent a new head of equity before we can interpose to save him, to the injury of others, against the effects of his own carelessness.

Id. at 137. Diman thus addresses a situation highly similar to OneBeacon's claim. Mr. Puccio claims that while he meant to use one policy number, he used another due to inadvertence. This is no different form the claimed error of Mr. Dinan. It does not matter whether OneBeacon

terms the claimed mistake a "scrivener's error," a "clerical error" or something else. It cannot show mutual error by clear and convincing evidence.

CONCLUSION

For the foregoing reasons, this Court should enter an order that OneBeacon is precluded from presenting any evidence of any purported reformation of its excess insurance policy and from referring to any such reformation in its opening statement.

Respectfully submitted,

/s/ Gerald J. Petros

Gerald J. Petros (#2931)
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, Rhode Island 02903
(401) 274-2000

Jack R. Pirozzolo
Richard L. Binder
Foley Hoag LLP
Seaport World Trade Center West
155 Seaport Boulevard
Boston, Massachusetts 02210
(617) 832-1000

Dated: September 5, 2006

Counsel for Plaintiff, Emhart Industries, Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that on September 5, 2006, a copy of the foregoing Memorandum Of Emhart Industries, Inc. In Support Of Its Motion *In Limine* To Preclude Evidence By OneBeacon Of Purported Reformation Of Its Insurance Policy was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Gerald J. Petros

Gerald J. Petros (#2931)
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, Rhode Island 02903
(401) 274-2000
(401) 277-9600
gpetros@haslaw.com

746979v1

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| EMHART INDUSTRIES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, LIBERTY MUTUAL INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, and ONEBEACON AMERICA INSURANCE COMPANY,<br><br>Defendants. | CIVIL ACTION<br>No. 02-053-S |

**AFFIDAVIT OF VINCENT A. PUCCIO**

I, Vincent A. Puccio, on oath, depose and state as follows.

1. My name is Vincent Puccio. I reside at 1232 Delmar Drive, Palatine, Illinios. Until January 3, 2004, I was a principal of and was employed at ANP Agency, an insurance underwriting agency formerly located in Palatine and Mundelein, Illinois.

2. I have personal knowledge of the facts set forth herein.

3. I have been employed in the insurance business as an underwriter since 1958. From 1958 to 1962 I was an underwriter at Hartford Accident and Indemnity Company. Between 1962 and 1966, I was an underwriter at Firemen's Fund Insurance Company. I was an underwriter at Commercial Union Insurance Company in New York from 1966 to 1968.

4. In 1968, Commercial Union purchased The Employers Group, including Employers Surplus Lines Insurance Company. At that time, I transferred to The Employers Group in Boston. Between 1968 and 1972, I worked at the Employers Group, which became known as Employers Commercial Union, as a senior underwriter.

5. Since 1972, I have been employed in the insurance underwriting business continuously to the present.

6. During my career, both at The Employers Group and elsewhere, I have underwritten many excess and excess umbrella insurance policies issued on a "following form" basis. By the term "following form," I mean an excess or excess umbrella policy that, with stated exceptions, rather than fully state its own terms and conditions, incorporates the terms and conditions of an underlying insurance policy.

7. My practice in underwriting excess and excess umbrella following form insurance policies always has been to follow form to the primary umbrella carrier. The primary umbrella carrier is the carrier that issues the policy for the first excess layer immediately over the primary insurance coverages.

8. My practice was consistent with general practice and custom within the insurance underwriting business throughout my career, including during the time I worked at The Employers Group.

9. I have reviewed the documents attached as Exhibit A bearing Bates Stamp Nos. OBA 00001 through OBA 00054. These documents are the Employers Group underwriting file for Employers Surplus Lines Insurance Company ("ESLIC") Policy No. S-16-07084, issued to Crown Metro, Inc. I also have reviewed the document attached as Exhibit B, which appears to be a copy of Policy No. S-16-07084 ('the Policy").

10. I was The Employers Group underwriter for the Policy.

11. By letter dated March 21, 1969, George Busnach of Maurice H. Saval, Inc asked ESLIC to quote on a $5.0 million umbrella policy, excess only of primary insurance. See, Exhibit A, page OBA 0028 – 0034.

12. Mr. Busnach was an insurance broker with whom I was acquainted at that time. His company, Maurice H. Saval, Inc. was working with Crown Metro's broker, the Laren Insurance Agency of Providence Rhode Island, to place excess coverage for Crown Metro. See, Exhibit A, page OBA 0035.

13. On April 15, 1969, I provided the requested quote to Mr. Busnach. See, Exhibit A, page OBA 0028. That quote never was accepted by or on behalf of Crown Metro.

14. On May 9, 1969, Mr. Busnach sent me a copy of INA Policy No. XBC 46961. See, Exhibit A, page OBA 0027 and OBA 0014 – 0024. That policy is an umbrella policy with limits of $1.0 million, excess of Crown Metro's primary insurance. It provides the first $1.0 million of coverage on which Mr. Busnach had requested and I had provided a quotation.

15. Based upon the foregoing, I presume that Mr. Busnach asked me to provide a revised quote for the next $4.0 million of excess coverage.

16. I filled in, by hand, a draft Daily Report for the Policy, providing excess umbrella coverage in the amount of $4.0 million in excess of the underlying $1.0 million INA umbrella. See, Exhibit A, page OBA 0010.

17. On that page, the pre-printed form reads, in part, that ESLIC... " AGREES WITH THE INSURED named below in consideration of the payment of premium and,

except as herein provided, subject to all the terms and conditions of Policy No. ___________ issued by ___________..." Id.

18. I hand wrote "XBC 64674" in the policy number space and "INA" in the issuing company space.

19. Accidentally, I wrote the wrong policy number in on the draft Daily Report. This error was carried through and appears in the Copy of the Policy as issued. See, Exhibit B.

20. From my review of the underwriting file, how this happened is clear. I, and through me ESLIC, intended to follow form to the INA primary umbrella policy directly beneath the ESLIC policy, INA Policy No. XBC 46961. The INA declarations page bearing that policy number also indicates that it is a renewal of "Old Policy No. XBC 64674." Exhibit A, page OBA 0018. That old expired INA policy number appears at the top right hand corner of the INA declarations page. The correct number for the new INA policy appears further down the declarations page. Id. In preparing the draft ESLIC Daily Report, I transcribed the wrong INA policy number.

21. I am certain that I made this mistake because it would have been directly contrary to my practice to follow form to a policy other than the primary umbrella policy directly beneath the Policy. The old INA policy was expired by its terms and I would not have written excess coverage following its form. Additionally, in preparation of this affidavit, I have been provided with a copy of the old INA policy. It was not issued to Crown Metro, but to Crown Chemical Corporation. The ESLIC policy indicates that it follows form to a policy issued to Crown Metro, not to Crown Chemical. See, Exhibit A, page OBA 0010.

22. Nor did Mr. Busnach intend to have the ESLIC policy follow form to the old INA Policy. Following form to an old, expired policy issued to a different named insured was contrary to universal industry practice and would not be done by a knowledgeable broker like Mr. Busnach. If Mr. Busnach, for some reason did want to follow form to such a policy, there would be some specific indication of that request, and the reasons for it, in the underwriting file. Because there is no such information in the underwriting file, Mr. Busnach was not making such a highly unusual request. Further, if such a request had been made, I would not have agreed to write the coverage. I have never underwritten an excess policy on such terms. To follow form to a policy other than the primary umbrella policy underlying the excess policy being underwritten creates a risk that the excess policy being underwritten will drop down to a lower level of coverage due to some difference in terms. This risk is precisely what the concept of following form coverage is designed and intended to prevent.

Signed under the penalties of perjury, this 9th day of January, 2004

Vincent A. Puccio