UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

EMHART INDUSTRIES, INC.,

Plaintiff,

v.

HOME INSURANCE COMPANY,
INSURANCE COMPANY OF NORTH AMERICA,
LIBERTY MUTUAL INSURANCE COMPANY,
NORTH RIVER INSURANCE COMPANY,
ONEBEACON AMERICA INSURANCE COMPANY
and UNITED STATES FIRE INSURANCE COMPANY,

Defendants.

Civil Action No. 02-053 S

**PLAINTIFF'S MOTION *IN LIMINE* TO EXCLUDE CERTAIN STATEMENTS CONTAINED IN THE INTERIM FINAL REMEDIAL INVESTIGATION REPORT**

Emhart moves to exclude from evidence certain statements contained in the Interim Final Remedial Investigation report issued by the United States Environmental Protection Agency ("EPA") concerning the Centredale Manor Superfund Site ("Site"). While much of the report is not objectionable, it contains some unsupported speculation concerning the manner in which certain contaminants were introduced into the environment. Such statements are outside the scope of the report and lack the trustworthiness necessary for admission pursuant to Fed. R. Evid. 803(8)(C). In addition, the report asserts that hexachloroxanthene ("HCX") was a byproduct of the hexachlorophene manufacturing process that took place at the Site for a short time in the mid-1960s. These assertions are not scientifically supported and therefore also should be deemed untrustworthy under Rule 803(8)(C). Finally, even if the statements in question were admissible under Rule 803(8)(C), the Court should exclude them pursuant to Fed. R. Evid. 403, as admission of the statements would tend to mislead the jury as the scientific

issues concerning the cause of dioxin contamination should be decided on the basis of the parties' expert witnesses who have provided opinions regarding the dioxin at the Site and are available for cross-examination, not statements of unidentified individuals who may lack qualifications to provide opinions on the issues. In support of this motion, Emhart relies on the Memorandum In Support Of Plaintiff's Motion *In Limine* To Exclude Certain Statements Contained In The Interim Final Remedial Investigation Report, filed herewith.

Respectfully submitted,

/s/ Gerald J. Petros

Gerald J. Petros (#2931)
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, Rhode Island 02903
(401) 274-2000
(401) 277-9600
gpetros@haslaw.com

Jack R. Pirozzolo
Richard L. Binder
Foley Hoag LLP
Seaport World Trade Center West
155 Seaport Boulevard
Boston, Massachusetts 02210
(617) 832-1000

Dated: September 7, 2006

Counsel for Plaintiff, Emhart Industries, Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that on September 7, 2006, a copy of the foregoing Motion *In Limine* To Exclude Certain Statements Contained In The Interim Final Remedial Investigation Report, was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Gerald J. Petros

Gerald J. Petros (#2931)
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, Rhode Island 02903
(401) 274-2000
(401) 277-9600
gpetros@haslaw.com

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| EMHART INDUSTRIES, INC., Plaintiff, | ) | |
| v. | ) | Civil Action No. 02-053 S |
| HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTHAMERICA, LIBERTY MUTUAL INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICA INSURANCE COMPANY and UNITED STATES FIRE INSURANCE COMPANY, Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION *IN LIMINE* TO EXCLUDE CERTAIN STATEMENTS CONTAINED IN THE INTERIM FINAL REMEDIAL INVESTIGATION REPORT**

Plaintiff, Emhart Industries, Inc. ("Emhart"), submits this memorandum in support of its motion in limine to exclude from evidence certain statements contained in the Interim Final Remedial Investigation report issued by the United States Environmental Protection Agency ("EPA") concerning the Centredale Manor Superfund Site ("Site"). While much of the report is not objectionable, it contains some unsupported speculation concerning the manner in which certain contaminants were introduced into the environment. Such statements are outside the scope of the report and lack the trustworthiness necessary for admission pursuant to Fed. R. Evid. 803(8)(C). In addition, the report asserts that hexachloroxanthene ("HCX") was a byproduct of the hexachlorophene manufacturing process that took place at the Site for a short

time in the mid-1960s. These assertions are not scientifically supported and therefore also should be deemed untrustworthy under Rule 803(8)(C). Finally, even if the statements in question were admissible under Rule 803(8)(C), the Court should exclude them pursuant to Fed. R. Evid. 403, as admission of the statements would tend to mislead the jury as the scientific issues concerning the cause of dioxin contamination should be decided on the basis of the parties' expert witnesses who have provided opinions regarding the dioxin at the Site and are available for cross-examination, not statements of unidentified individuals who may lack qualifications to provide opinions on the issues.

The Remedial Investigation Report

In August 1999, the EPA began initial remedial investigation activities at the Site. The purpose of the remedial investigation/feasibility study process "is to assess site conditions and evaluate alternatives to the extent necessary to select a remedy." 40 C.F.R. § 399.430(a)(2). The remedial investigation was conducted on behalf of the EPA by a number of contractors, including Battelle. Following the completion of the remedial investigation, Battelle produced an Interim Final Remedial Investigation report ("RI Report") dated June 30, 2005.[1] The RI Report primarily summarizes the results of field investigations conducted at the Site to determine the nature and extent of contamination at the Site, characterizes the fate and transport of the contaminants, and discusses the potential human health and ecological risks resulting from potential exposure to contaminants found at the Site. However, the anonymous author or authors of the RI Report also speculate concerning the manner in which the contaminants found at the Site were introduced into the environment.

---

1 A copy of the relevant portions of the RI Report (i.e., the text of the RI Report and Appendix E thereto) is filed as Exhibit 1 to the Appendix to this memorandum.

- "Potential historical sources of contamination include improper storage and disposal of chemicals in drums, stockpiles and surface impoundments" (RI Report at iii, emphasis added.)

- "HCX and dioxin are believed to be primarily derived from a hexacholorophene manufacturing process which took place on the CMRP site for a relatively short period of time in the mid-1960s. If these byproducts were contained in waste that was directly discharged to the Woonasquatucket River, then dioxin and HCX could have been carried downstream in the water column adsorbed to suspended sediment particles. Source area contaminants (e.g. dioxins, HCX, PCBs, and pesticides) probably mostly entered the river via surface runoff and erosion and transport of contaminated soils from the source area." (RI Report at v, emphasis added.)

- "Chemicals apparently were released directly to the ground, buried and discharged directly to the Woonasquatucket River." (RI Report at 4-1, emphasis added.)

- "These contaminants [chlorinated solvents, dioxin and nonaqueous-phase liquid] may be residual waste material from the hexachlorophene manufacturing process." (RI Report at 4-6, emphasis added.)

- "One source of dioxin (primarily 2,3,7,8-TCDD) and HCX to the river may have been the direct discharge of dioxin-bearing waste from the hexachlorophene manufacturing process into the river." (RI Report at 5-3, emphasis added.)

- "Chemicals were apparently released directly to the ground, buried, and possibly discharged directly to the Woonasquatucket River." (RI Report at 7-1, emphasis added.)

- "The spatial distributions and concentrations of dioxin (primarily 2,3,7,8-TCDD) and HCX in soil and sediment suggest that these contaminants may have been released to the Woonasquatucket River via the direct discharge of dioxin-bearing waste…. Dioxins/furans, PCBs, pesticides and other chemicals also probably migrated to the river and Allendale Pond via surface runoff and erosion of contaminated soils from the source area." (RI Report at 7-1 to 7-2, emphasis added.)

The RI Report includes an "environmental forensics review of soil and sediment chemistry data," the purpose of which was "to differentiate if possible chemical contaminant signatures from the CMRP site from those in background or reference samples." (RI Report at 2-9). This environmental forensics review ("EFR"), prepared by Stephen Emsbo-Mattingly of NewFields-Environmental Forensics Practice, LLC, is included in the RI Report as Appendix E.

The EFR, like the body of the RI Report, contains rank speculation as to the methods by which contaminants were introduced into the environment. Specifically, the EFR contains the following statements:

- "[T]he concentration of 2,3,7,8-TCDD was higher in Allendale Pond and Lyman Mill Pond sediments than in Source soils. We speculated that this pattern resulted from either 1) the gradual erosion of contaminants from the source area to the proximal sediments, or 2) the direct discharge of dioxin-containing byproducts into the proximal water body during the manufacture of hexachlorophene. It was not possible to definitively determine the dominant transport process with the available data." (RI Report, App. E at 5.)

- "[T]he dioxin and furan wastes associated with the production of hexachlorophene may have been directly discharged to Allendale Pond…." (RI Report, App. E at 7-8.

The RI Report and the EFR each include a "conceptual site model" based on this speculation regarding the source of contamination. The conceptual site model in the RI Report includes the premise that "[d]ioxins (primarily 2,3,7,8-TCDD), furans, and HCX were generated as hexachlorophene byproducts that were discharged directly into the Woonasquatucket River." (RI Report at 4-12, emphasis added.) The conceptual site model in the EFR, however, states that "dioxins were generated as hexachlorophene byproducts that were discharged directly into Allendale Pond." (RI Report, App. E at 15, emphasis added.) As the expert report submitted by Dr. J. Ronald Hass, Emhart's expert on dioxin, notes, Allendale Pond is 500 to 2000 feet downstream of the portion of the site at which hexachlorophene manufacturing occurred. (Hass Supplemental Report dated December 12, 2005 ("Supplemental Report") at 7.)[2] There is no explanation or justification given for this difference between the RI Report and the EFR upon which the Report is based.

---

[2] The Supplemental Report was attached as Exhibit E to the Appendix to the Memorandum of Law of Emhart Industries, Inc. in Opposition to Defendants' Motions in Limine to Exclude Expert Testimony of Dr. J. Ronald Hass.

In addition, both the RI Report and the EFR assume that dioxins and HCX were produced as a result of the hexachlorophene manufacturing process that occurred at the Site. E.g., RI Report at 1-3 (stating that HCX and dioxin "are byproducts of" the process by which Metro-Atlantic manufactured hexachlorophene); RI Report at iii (same); RI Report at 4-1 ("Dioxin … and HCX are byproducts of the hexachlorophene manufacturing process …, which is known to have taken place at the CMRP site"); RI Report at 4-11 ("the manufacture of hexachlorophene produced HCX in widely varying amounts depending on the reaction conditions of the manufacturing process"); RI Report, App. E at 2 (same). The authors of the RI Report and the EFR rely on a single source for this assumption regarding HCX, and as is discussed below, this assumption lacks a reasonable scientific basis.

## ARGUMENT

### I. Statements In The RI Report Which Lack Trustworthiness Are Not Admissible.

Federal Rule of Evidence 803 provides that certain types of hearsay statements are not excludable by the hearsay rule, even though the declarant is available to testify. Rule 803(8)(C) pertains to public records and reports which are not excludable as hearsay, specifically, "[r]ecords, reports, statements, or data compilations, in any form, of public offices and agencies, setting forth … factual findings resulting from an investigation made pursuant to the authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." This rule has two essential safeguards. "First, the requirement that reports contain factual findings bars the admission of statements not based on factual investigation. Second, the trustworthiness provision requires the court to make a determination as to whether the report, or any portion thereof, is sufficiently trustworthy to be admitted." Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 169 (1989). A trial judge therefore "has the discretion, and

indeed the obligation, to exclude an entire report or portions thereof – whether narrow 'factual' statements or broader 'conclusions' – that she determines to be untrustworthy." Id. at 167.

Courts have considered various factors in determining the question of trustworthiness. The Advisory Committee to the Federal Rules of Evidence proposed four non-exclusive factors to be considered: the timeliness of the investigation, the investigator's skill or experience, whether a hearing was held, and the existence of possible biases or motivational problems on the part of either the investigators or other sources of information. See Beech Aircraft, 488 U.S. at 167 n.11; United States v. Davis, 826 F. Supp. 617, 622-23 (D.R.I. 1993). Other courts have considered factors such as the finality of the findings made in the report; the extent to which the report is based on hearsay, confidential communications or ex parte evidence; the extent to which such information is supplied by persons with an interest in the outcome of the case; and where the report purports to offer expert opinion, the extent to which the facts or data are of a type reasonably relied upon by experts in the particular field. Davis, 826 F. Supp. at 623. In any event, the focus is on the reliability of the process used to reach the conclusion. Klein v. Vanek, 86 F. Supp. 2d 812, 820 (N.D. Ill. 2000). "Specifically, a court must determine 'whether the report was prepared or compiled in a way that indicated that its conclusions can be relied upon….'" Id. (quoting Moss v. Ole South Real Estate, Inc., 933 F.2d 1300, 1306-07 (5th Cir. 1991)).

Emhart does not contest that the RI Report is a public report which is potentially admissible under Rule 803(8)(C). "However, EPA reports must survive a trustworthiness inquiry." O'Dell v. Hercules Inc., 904 F.2d 1194, 1206 (8th Cir. 1990). Any portion of the RI Report which fails the trustworthiness inquiry is not admissible.

## II. The Statements Regarding Direct Discharge Of Waste Into The Woonasquatucket River And Allendale Pond Are Not Trustworthy And Are Therefore Not Admissible.

The statements in the RI Report regarding the discharge of waste into the Woonasquatucket River and/or Allendale Pond cannot be relied upon as trustworthy. These statements are strongly qualified. The authors of the RI Report and the EFR make clear that they are only speculating as to possible ways in which contaminants were introduced into the environment, by stating that contaminants "may have been" or were "apparently" or "possibly" the result of waste discharged into the river. The author of the EFR even states that he has "speculated" that the observed pattern of contaminants resulted from either erosion or the direct discharge of dioxin-containing byproducts into the water, but that it "was not possible to definitively determine the dominant transport process with the available data." (RI Report, App. E at 5.)

This type of speculation has been found to be untrustworthy under Rule 803(8)(C). In Gross v. King David Bistro, Inc., 84 F. Supp. 2d 675, 678 (D. Md. 2000), the court considered the admissibility of a state health department report concerning the circumstances and causes of a shigellosis outbreak at a party. While finding certain portions of the report were admissible, the court barred the admission of the department's conclusion regarding the source of the shigella. The court noted that the report had concluded that the defendant was the "most likely" source of the contamination, but found that:

> This statement is only a hypothesis…. The hypothetical nature of this statement is evident from the context of the report…. In addition, the DHMH's conclusion about the source of the bacteria was greatly qualified…. Given the context of this conclusion, its qualified nature, and the investigators' own lack of certainty, it seems that the report's conclusion concerning [the defendant] as the source of [the bacteria] was only one possible explanation. Although this theory may indeed be plausible, it does not rise

> above the level of a guess informed by biased accounts. Such speculation is untrustworthy and inadmissible.

84 F. Supp. 2d at 678.

Similarly, the court in United States v. American Telephone & Telegraph Co., 498 F. Supp. 353, 367 (D.D.C. 1980), denied admission of a Federal Communications Commission report which the plaintiff sought to introduce because the report "appear[ed] to run the gamut from straight factual description to speculative conclusions about" the defendant which would require the Court "to extract factual findings from conjecture." In O'Dell v. Hercules Inc., 904 F.2d 1194 (8th Cir. 1990), the court upheld the exclusion of EPA reports pursuant to Rule 803(8)(C) where the reports "explicitly qualified" their conclusions and thus "facially exhibited substantial indicia of untrustworthiness." 904 F.2d at 1206-07. See also Moore v. Metro. Water Reclamation Dist., 2004 WL 2958769, at *6 n.9 (N.D. Ill. Nov. 22, 2004) (noting that even if the report in question qualified as a public record under Rule 803(8)(C), the trustworthiness of the report would be "a subject open to dispute, particularly in light of [the author's] disclaimer that the summary includes examples of 'alleged conduct in the workplace. For a variety of reasons there was no way to substantiate or refute some of these comments.'"). Because the statements regarding direct discharge of waste into the river and/or pond are speculative, they are untrustworthy under Rule 803(8)(C) and therefore inadmissible.

Furthermore, the statements about direct discharge of contaminants into the river are peripheral to the purpose of the report. The remedial investigation conducted by or on behalf of the EPA is intended "to collect data necessary to adequately characterize the site for the purpose of developing and evaluating effective remedial alternatives." 40 C.F.R. § 300.430(d)(1). A remedial investigation report is meant to "describe[] the nature and extent of chemical contamination at the site." United States v. Consolidation Coal Co., 184 F. Supp. 2d 723, 734

n.10 (S.D. Ohio 2002), rev'd in part on other grounds, 345 F.3d 409 (6th Cir. 2003). The bulk of the RI Report is concerned with the nature and the extent of the contamination at the Site. However, the speculation as to the manner in which contaminants were initially introduced to the environment goes beyond this scope and the report's purpose. The statements in the RI Report regarding the manner in which waste may have been discharged are peripheral to the purpose of the RI Report and should therefore not be considered to be within the scope of Rule 803(8)(C). See McLellan Highway Corp. v. United States, 95 F. Supp. 2d 1, 8 (D. Mass. 2000) (statement regarding Navy policy in report meant to document the fair market value of property went "beyond the purview of the hearsay rule exception in 803(8)(C)" and was therefore stricken as inadmissible hearsay).

To the extent the Defendants may rely on Davis to oppose this motion, it is inapposite. First, Davis is factually distinguishable. While the RI Report in Davis summarized the EPA findings "regarding the nature of the soil contamination at the Site and the physical and chemical characteristics of the contaminated material," it had no indication that the authors of the RI Report speculated as to how the site came to be contaminated. Davis, 826 F.2d at 619-20. The RI Report in the present action, however, contains numerous speculative comments of this nature. Second, in Davis, the defendants argued that the RI Report should be excluded as a whole. Id. at 624. Emhart does not advocate such a broad exclusion, but instead seeks only to redact discrete portions of the RI Report that are unduly speculative.

## III. The Statements In The Report Regarding The Production Of Dioxin And Hexachloroxanthene Are Not Supported Scientifically And Are Therefore Untrustworthy.

The statements in the RI Report regarding dioxin (specifically 2,3,7,8-TCDD) and HCX as "byproducts" of the hexachlorophene manufacturing process at the Site must also be deemed untrustworthy. The authors of the RI Report and the EFR assume, based on a single source, that

dioxin and HCX were byproducts of the manufacturing process at the Site. However, as described in the Supplemental Report of Dr. J. Ronald Hass, there were significant differences between the conditions under which hexachlorophene was produced at the Site and the conditions described in the source upon which the authors of the RI Report and the EFR relied. The failure of the authors to address these differences, in light of the scientific principles involved, makes their conclusions untrustworthy, and those conclusions should not be admitted into evidence.

Scientific or technical evidence contained in a public report must still meet the requirements for such testimony under Daubert and Rule 702. "In other words, the district court's 'gatekeeper' role is not abrogated simply because the evidence falls under Rule 803(8)(C)." Desrosiers v. Flight Int'l of Florida Inc., 156 F.3d 952, 962 (9th Cir. 1998). In Desrosiers, the Ninth Circuit upheld the trial court's exclusion of certain opinions contained in a Judge Advocate General's report on the cause of an airplane crash. The court noted that the plaintiff had demonstrated that the author of the report was not qualified to render an expert opinion and had not reviewed all of the relevant information in formulating his opinions. Id.

Similarly, in Heavy Bros. Lightning Protection Co. v. Lightning Protection Institute, 287 F. Supp. 2d 1038, 1076 (D. Ariz. 2003), the court held that a United States Army Technical Manual was not admissible under Rule 803(8). The plaintiff sought to admit the Technical Manual, which contained statements regarding the "successful track records" of certain lighting protection systems and successful tests of those systems. After the defendants provided expert testimony which challenged the scientific basis of these systems, the court concluded that this testimony "establishe[d] that the 'sources of information [in the Technical Manual] indicate[] lack of trustworthiness'" and that there were "no affirmative guarantees within the Technical

Manual that the author has the expertise to evaluate the lightning tests, nor that the author undertook a comprehensive or reliable investigation of the scientific validity of lightning protection systems." Id. at 1070, 1076. Thus, if the scientific or technical opinions contained in the RI Report fail to meet the standards of Daubert, they must be excluded as untrustworthy. See United States v. Sutton, 337 F.3d 792, 798 n.4 (7th Cir. 2003) (noting that exclusion of government fingerprint reports would have been appropriate because "expert testimony" contained in reports failed to demonstrate that it was "the product of reliable principles and methods" and that the "witness has applied the principles and methods reliably to the facts of the case," citing Fed. R. Evid. 702(2) and 702(3)); Estate of Griffin v. Hickson, 2002 WL 988006, at *2 n.5 (E.D. Pa. May 9, 2002) (plaintiff's attempt to introduce result of gunshot tests by means of a written report within the scope of Rule 803(8)(C) rejected, because defendants' objections to the reliability of the tests "impugn[ed] the trustworthiness of the report in question").

As Dr. Hass' Supplemental Report indicates, the RI Report's conclusions that dioxin and HCX were byproducts[3] of the hexachlorophene manufacturing process at the Site are not based on a scientifically valid reasoning and methodology. The authors of the RI Report rely on a single scientific reference for the proposition that dioxin (specifically 2,3,7,8-TCDD) and HCX result from hexachlorophene production. However, as Dr. Hass explains, this scientific reference is based on a single site (the NEPACCO plant in Missouri), which is not comparable to the Centredale Site for a number of reasons. First, the NEPACCO site produced both hexachlorophene and 2,4,5-trichlorophenol ("trichlorophenol"), which is one of the raw materials used to make hexachlorophene, and the waste streams of both production processes were mingled. (Supplemental Report at 10.) No trichlorophenol was manufactured at the

[3] Dr. Hass also states that there was dioxin present in the 2,4,5-trichlorophenol that was used to manufacture hexachlorophene. (Supplemental Report at 5.) However, the RI Report – without scientific support – suggests that additional dioxin was created by the process of manufacturing hexachlorophene.

Centredale site, only hexachlorophene. (Id. at 11.) While 2,3,7,8-TCDD is a well-known byproduct of the manufacture of trichlorophenol (id. at 5), Dr. Hass' research has found "no example in which any data were presented to demonstrate that 2,3,7,8-TCDD is actually formed during hexachlorophene production processes…." (Id. at 11, emphasis added.) In addition, the purification of the hexachlorophene at NEPACCO took place under basic conditions, while the purification of the hexachlorophene at Centredale took place under acidic conditions. (Id. at 3-4, 6-7.) HCX is produced under basic conditions, but not under acidic conditions. (Id. at 6-7.) All of these facts make the NEPACCO and Centredale sites uncomparable.

The authors of the RI Report did not know how the reaction conditions used at the Centredale facility compared to the reaction conditions used at NEPACCO (Dahlen Dep. at 99:20-24.)[4] Nor could the authors have known how the conditions compared. The authors did not review the reaction conditions used at the Centredale facility (id. at 99:15-19), and they had no information about whether acidic or basic conditions were used at the Centredale facility to manufacture hexachlorophene. (Id. at 80:21-81:1.)[5] They only skimmed an article referencing the process used at the NEPACCO site (id. at 81:5-12), and did not review any of the references cited in that article. (Id. at 86:3-14, 87:3-17.) Indeed, the authors admitted that the purpose of the RI Report was not to conduct a scientific analysis of the nature to which there is support for the proposition that there is a correlation between HCX and hexachlorophene – rather it was merely to determine the nature and extent of contamination. (Id. at 87:22-88:10.) Consequently, there is therefore no scientific basis for the conclusion set forth in the RI Report that "dioxin …

---

4 Pages cited from the deposition of Deirdre T. Dahlen (dated March 6, 2006), pursuant to the Rule 30(b)(6) Notice to Battelle Memorial Institute, are attached as Exhibit 2 to the Appendix to this memorandum.

5 Information about the reaction conditions was developed during the deposition of Thomas Cleary conducted in this action.

and HCX are byproducts of the hexachlorophene manufacturing process …, which is known to have taken place at the CMRP site." (RI Report at 1-3.)

As Dr. Hass' Supplemental Report indicates, the assumptions and speculation in the RI Report regarding the existence of dioxin and HCX as byproducts of the hexachlorophene manufacturing process are based on an inadequate foundation and are contradicted by the known facts about the manufacturing process. These statements must therefore be excluded as untrustworthy under Rule 803(8)(C) and the principles enunciated in Daubert.

## IV. Even If The Statements In The RI Report Were Admissible Under Rule 803(8)(C), They Are Unduly Prejudicial And Should Be Excluded Under Rule 403.

Rule 403 of the Federal Rules of Evidence "is an 'umbrella rule' spanning the whole of the Federal Rules of Evidence. [citation omitted.] Accordingly, it is generally applies to evidence otherwise admissible under Rule 803(8)(C)." Coleman v. Home Depot, Inc., 306 F.3d 1333, 1343 (3d Cir. 2002). Rule 403 provides that relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." In this instance, there is the danger that the statements in the RI Report set forth above would unduly influence the jury into believing that the government has made a determination that wastes were discharged directly into the Woonasquatucket River or Allendale Pond, when in fact these are only possible scenarios being considered.

This risk is especially true of the "conceptual site models" discussed in the RI Report and EFR. The "conceptual site model" is essentially a hypothesis – the way in which the investigators imagine contaminants were introduced into the environment to explain how the contaminants ended up in their present locations. This is clear from the context of these documents, in which the authors discuss possibilities and qualify their statements about the

disposal of waste. However, the conceptual site models are not explicitly presented in such a qualified manner. Instead, the CSMs state that "dioxins and furans were generated as hexachlorophene byproducts that were discharged directly into" either the Woonasquatucket River or Allendale Pond. (RI Report at 4-12; RI Report, App. E at 15.) This conclusion, however, lacks an adequate scientific basis. As Dr. Hass explained, any dioxin present in the hexachlorophene manufactured at the Centredale Site was bound to the activated carbon used during the manufacturing process. (Hass Report dated November 3, 2003 ("November Report") at 2;[6] Hass Supplemental Report dated July 22, 2005 ("July Report") at 2.)[7] If any dioxin was contained in the waste stream, the activated carbon would have been present as well. (November Report at 2-3; July Report at 8.) The analytical results of the samples taken at Centredale indicate an absence of activated carbon, and therefore the dioxin found at the Site was not the result of the hexachlorophene manufacturing process. (July Report at 4-8.) Similarly, if any HCX had been formed as the result of the hexachlorophene manufacturing process, it too would have bound to the activated carbon. (Supplemental Report at 10.) The lack of activated carbon demonstrates that HCX could not have been in the waste stream. (Id.) While the Defendants' witness Dr. Michael J. Wade disagrees with Dr. Hass, the jury should make its own determination on the credibility of Dr. Hass and Wade on the merits of their opinions, without letting the insurers imply that Dr. Wade is supported by a government document – especially when statements in the RI Report are made without consideration of the significance of dioxin and HCX being bound to activated carbon in the manufacturing process at the Site. There is the

---

6 The November Report was attached as Exhibit B to the Appendix to the Memorandum of Law of Emhart Industries, Inc. in Opposition to Defendants' Motions in Limine to Exclude Expert Testimony of Dr. J. Ronald Hass.

7 The July Report was attached as Exhibit C to the Appendix to the Memorandum of Law of Emhart Industries, Inc. in Opposition to Defendants' Motions in Limine to Exclude Expert Testimony of Dr. J. Ronald Hass.

danger that the jury will focus on these statements as proof that Emhart's predecessor disposed of wastes containing dioxins into the river, when in fact this is only speculation by the authors of the RI Report. If Defendants choose to rely on the author of the IR Report, he should testify and have his opinions subjected to the rigors of cross-examination.

**CONCLUSION**

For the reasons set forth above, Emhart respectfully requests that this Court grant Emhart's motion and order that the RI Report only be admitted into evidence in redacted form, adopting the redactions reflected in Exhibit 3 to the Appendix to this memorandum.

Respectfully submitted,

/s/ Gerald J. Petros
Gerald J. Petros (#2931)
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, Rhode Island 02903
(401) 274-2000
(401) 277-9600
gpetros@haslaw.com

Jack R. Pirozzolo
Richard L. Binder
Foley Hoag LLP
Seaport World Trade Center West
155 Seaport Boulevard
Boston, Massachusetts 02210
(617) 832-1000

Dated: September 7, 2006

Counsel for Plaintiff, Emhart Industries, Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that on September 7, 2006, a copy of the foregoing Memorandum In Support Of Plaintiff's Motion *In Limine* To Exclude Certain Statements Contained In The Interim Final Remedial Investigation Report, was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Gerald J. Petros

Gerald J. Petros (#2931)
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, Rhode Island 02903
(401) 274-2000
(401) 277-9600
gpetros@haslaw.com

747386v1