UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| EMHART INDUSTRIES, INC.<br><br>Plaintiff,<br><br>v.<br><br>HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, LIBERTY MUTUAL INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICAN INSURANCE COMPANY and UNITED STATES FIRE INSURANCE COMPANY,<br><br>Defendants. | DOCKET NO: 02-53-S |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO EMHART'S MOTION *IN LIMINE* TO EXCLUDE CERTAIN STATEMENTS CONTAINED IN THE INTERIM FINAL REMEDIAL INVESTIGATION REPORT**

Defendants The North River Insurance Company ("North River"), Century Indemnity Company ("CIC") and OneBeacon America Insurance Company ("OneBeacon") oppose the "Plaintiff's Motion in Limine to Exclude Certain Statements Contained in the Interim Final Remedial Investigation Report," filed on 9/7/06 [PACER No. 416]("Plaintiff's Motion"). Plaintiff seeks to exclude certain "excerpts" of the official Interim Final Remedial Investigation (the "RI") solely on the grounds that it does not like the facts and conclusions recited therein and because these facts do not square with certain of the "opinions" that Emhart's experts (primarily Dr. Hass) may seek to introduce at trial. There is absolutely no basis for the Court to "exclude" selected portions of this document which, of course, Emhart's experts simultaneous rely upon for many of their opinions. The project manager who supervised the preparation of the RI, Ms. Dahlen, was deposed in this action and will be available to testify at trial. In short, there is no



1021247v1

reason for the Court to start "carving up" this document based upon some supposed notion that it is not "trustworthy." In further support of its opposition to Plaintiff's Motion, the Defendants state as follows:

1. The United States Environmental Protection Agency (the "EPA") has been involved in investigating the contamination at the Centredale Manor Superfund Site (the "Site") since the 1990's. In June 2005, the EPA issued the RI, which compiles all of the information and data that the EPA had assembled concerning the contamination at the Site during the course of this investigation. The EPA has paid the engineering firm of Battelle Memorial Institute ("Battelle") and other entities millions of dollars to investigate the contamination and to present these findings in the RI. The RI will form the basis for the yet to be issued "Feasibility Study" in which the EPA will propose a recommended course of remediation to address the contamination at the Site. In essence, the RI is the operative document that will govern the EPA's handling of the Site going forward.

2. Because the RI is a public report within the meaning of FRE 803(8), there is a presumption of admissibility that Emhart must overcome. As numerous Courts have held, once the admitting party has shown that the document has met the elements of a public report, the proffered evidence should be admitted unless the party opposing the admission of the evidence makes an affirmative showing of untrustworthiness. *U.S. v. Davis*, 826 F. Supp. 617, 621 (D. RI 1993), *citing Kehm v. Procter & Gamble Mfg. Co.*, 724 F.2d 613, 618 (8th Cir. 1983). "In CERCLA cases, courts have consistently held that public records excepted from the hearsay rule by FRE 803(8)(C) include precisely the type of data sought to be admitted here -- results of environmental investigations of hazardous substances conducted or commissioned by federal and state agencies." *U.S. v. Davis*, 826 F. Supp. 617, 621 (D. RI 1993) *citing U.S. v. Summit Equipment & Supplies, Inc.*, 805 F. Supp. 1422 (N.D. Ohio 1992); *U.S. v. Northernaire Plating*

*Co.*, 670 F. Supp. 742 (W.D. Mich. 1987), *aff'd sub nom U.S. v. R.W. Meyer, Inc.*, 889 F.2d 1497 (6th Cir. 1989), *cert. denied*, 494 U.S. 1057 (1990).

3. Under these circumstances, there is no basis for Emhart to contend that any portion of the RI is "untrustworthy" and should not be admitted under the clearly applicable exception to the hearsay rule contained in FRE 803(8). As Ms. Dahlen testified at her deposition, the RI was based upon a comprehensive review of all of the information that had been gathered during the course of the investigation. [Dahlen Dep., 3/6/06 at 11-43; Ex. A hereto]. Emhart's claims of "untrustworthiness" are based solely upon its ***disagreement*** with certain of the facts and conclusions contained in the RI, including because these facts and conclusions conflict with its theory in this case and certain aspects of the testimony that it intends to offer through its experts. A mere disagreement with the statements in the report, however, is not an adequate basis for the Court to conclude that the statements are so inherently "untrustworthy" that they should not be heard or seen by the jury. *See, e.g., Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003) (By attempting to evaluate the credibility and the persuasiveness of competing evidence, the district court confuses the questions of the admissibility of testimony and the weight appropriately to be accorded such testimony by a fact finder); *City of Bangor v. Citizens Communications Co.*, 339 F. Supp. 2d 135, 139 (D. Maine 2004) (explaining that the best course is to allow the party opposing a public report to present evidence that may impinge on the credibility of the report at trial, where the finder of fact decides what weight to give the report on any particular issue); *U.S. v. Santiago*, 156 F. Supp. 2d 145, 148-149 (D. P.R. 2001) ("Lower courts should not confuse the role of judge and jury by forgetting that 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof', rather than exclusion, 'are the traditional and

appropriate means of attacking shaky but admissible evidence,'" *citing Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 596).

4. In particular, Emhart cannot point to any specific statement or conclusion contained in the RI that is so obviously "wrong" that it should be excluded from the jury's consideration. The project manager, Ms. Dahlen, provided extensive testimony at her deposition as to the methodology that was followed by Battelle in preparing the report and the sources of information that were used. [*See* Dahlen Dep. at 11-43]. *But cf., Ellis v. International Playtex, Inc.*, 745 F.2d 292, 302-303 (4th Cir. 1984) (finding that the unavailability of the investigators is not reason alone to exclude their studies). The fact that Emhart and its experts may reach different conclusions does not render the RI (or any portions of it) inadmissible. Instead, Emhart's challenges go (at most) to the weight to be accorded to certain statements in the report and the jury can readily assess its reliability in the context of the trial. *See, Quiet Tech. DC-8, Inc.*, 326 F.3d at 1341 (noting that a district court's gatekeeper role under *Daubert* is not intended to supplant the adversary system or the role of the jury); *Scordill v. Louisville Ladder Group, LLC*, 2004 U.S. Dist. LEXIS 2359 *1, 7 (E.D. La. 2004) (in determining the admissibility of expert testimony, a district court must defer to "the jury's role as the proper arbiter of disputes between conflicting opinions. As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration," *quoting Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987).

5. Emhart's assertions that the statements in the RI concerning the sources of contamination are pure "speculation" ignores the historical sources of information upon which the EPA relied, such as the analysis of historical aerial photographs at the Site from the 1930's and forward which clearly document the staining, liquid impoundments and other visible



1021247v1

evidence of contamination associated with the operations of Emhart's predecessors. Far from being "speculative", this series of photographs provides graphic support for the conclusions reached by the EPA concerning the historical sources of dioxin contamination at the Site.

6. Emhart's challenges are particularly inappropriate since Ms. Dahlen can be called as a witness to testify at trial and Emhart will have every opportunity to cross-examine her regarding the bases for her statements. To the extent that Emhart believes that certain of the statements contained in the RI are unsupported or contrary to other evidence, it will have the chance to challenge these aspects of the RI at trial.

7. Further, while there is no basis for the Court to exclude any aspect of the substance of the RI, the document is independently admissible because it clearly forms a part of the EPA's ***allegations*** against Emhart. As such, the RI is relevant to Emhart's claims regarding the alleged duty to defend. To the extent that the RI is being offered for this reason, it does not constitute "hearsay" as it is not being offered for the truth of the matters asserted, but rather to demonstrate the allegations that are being made against Emhart in the context of the EPA administrative proceeding.

For the reasons stated, the Court should deny Plaintiff's Motion. Any challenges to certain aspects of the RI can be handled in the context of the trial and through cross-examination.

Respectfully submitted,

**THE NORTH RIVER INSURANCE COMPANY,**
By its attorneys,

*/s/ Mark T. Nugent*

Mark T. Nugent, RI Bar# 2637
MORRISON MAHONEY LLP
121 South Main Street, Suite 600
Providence, RI 02903-7141
(401) 331-1660

*/s/ John T. Harding*

John T. Harding, Esquire
MORRISON MAHONEY LLP
250 Summer Street
Boston, MA 02210-1181
(617) 439-7500

Dated: September 11, 2006

**CERTIFICATE OF SERVICE**

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on September 8, 2006.

*/s/ John T. Harding*

John T. Harding, Jr. BBO #221270

**EXHIBIT A**

PAGES 1 - 119

EXHS. 1 - 4

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * * * * *

| | | |
|---|---|---|
| Emhart Industries, Inc. | * | |
| v. | * | |
| Home Insurance Company, Insurance Company of North America, Liberty Mutual Insurance Company, North River Insurance Company, and America Insurance Company | * | Civil Action No. 02-053 |

* * * * * * * * * * * * * * * * * * *

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Rule 30(b)(6) Notice to Battelle Memorial Institute

Deposition of Deirdre T. Dahlen

Monday, March 6, 2006

Hermes Netburn O'Connor & Spearing, P.C.

265 Franklin Street - 7th Floor

Boston, Massachusetts 02110

----------- J. EDWARD VARALLO, RMR, CRR ----------
COURT REPORTER
FARMER ARSENAULT BROCK LLC BOSTON, MASSACHUSETTS
617.728.4404

evarallo@fabreporters.com

Counsel for Emhart Industries, Inc.:
Richard L. Binder, Esq.
Willcox Pirozzolo & McCarthy
50 Federal Street - 6th Floor
Boston, Massachusetts 02110
617.482.5470 Fax 617.423.1572
rbinder@wpmlaw.com
- and -
Jerome C. Muys, Jr., Esq.
Bingham McCutchen LLP
150 Federal Street - 25th Floor
Boston, Massachusetts 02110
617.951.8000 Fax 617.951.8736
jerome.muys@bingham.com
Counsel for North River Insurance Company:
John T. Harding, Esq.
Morrison Mahoney LLP
250 Summer Street
Boston, Massachusetts 02210
617.439.7500 Fax 617.439.7590
jharding@morrisonmahoney.com
Counsel for OneBeacon America Insurance Company:
Kevin J. O'Connor, Esq.
Hermes Netburn O'Connor & Spearing, P.C.
265 Franklin Street - 7th Floor
Boston, Massachusetts 02110
617.728.0050 Fax 617.728.0052
koconnor@hnso.org
Counsel for Century Indemnity Company:
Lawrence A. Nathanson, Esq.
Siegal Napierkowski & Park
533 Fellowship Road - Suite 120
Mt. Laurel, New Jersey 08054
856.380.8910 Fax 856.380.8911
lawrence.nathanson@mclowlaw.com
Counsel for Battelle Memorial Institute and the deponent:
Anne Troutman, Esq.
1 Cranberry Hill
Lexington, Massachusetts 02421
781.869.1405
troutmana@battelle.org



---------------------------------------------------

MORNING SESSION
9:35 a.m.

---------------------------------------------------

DEIRDRE T. DAHLEN,
having been first duly sworn on oath,
was examined and testified as follows:
EXAMINATION
BY MR. HARDING:
Q. Would you state your name for the record, please?
A. Deirdre Dahlen.
Q. And, Ms. Dahlen, I am going to be taking your deposition here today. My name is John Harding. I represent North River Insurance Company in this case that has been brought by Emhart Industries against a number of their insurers. Have you ever had an occasion to have your deposition taken before?
A. No.
Q. Has anyone explained to you how a deposition works so that you have at least some idea of how it's going to proceed?
A. Yes.



Q. Good. Basically I'll just be asking you a series of questions. After I'm finished, the other counsel in the room may have some questions as well. I would just ask that you try to answer the questions to the best of your ability. If at any time you don't understand what I'm asking or what other counsel are asking, please just let us know, we'll be happy to rephrase and see if we can clarify it. And if you need a break for any reason at any time, just let us know that and we'll do so.
A. Mm-hmm.
MR. HARDING: I would like to have marked as Exhibit Number 1 --
MR. BINDER: Before we get too much into the substance, can we see if we can just reach an agreement on stipulations?
MR. HARDING: Sure. Propose to stipulate that objections except as to form be reserved until the time of trial.
MR. BINDER: Also reserve motions to strike until the time of trial?
MR. HARDING: That's agreeable with me, yes, if it's agreeable with everybody else.
MR. NATHANSON: Sure.



MR. HARDING: Can we have marked as Exhibit Number 1 a copy of the notice of taking deposition of Battelle Memorial Institute dated January 31, 2006.
(Battelle Deposition Exhibit 1 marked for identification.)
BY MR. HARDING:
Q. Ms. Dahlen, could you take a look at what we've marked as Exhibit Number 1, which is a copy of the notice of taking deposition of Battelle Memorial Institute in this case, and just tell me, have you ever seen this notice before?
A. Yes.
Q. Do you have an understanding that you are here today as a corporate designee on behalf of Battelle?
A. Yes.
Q. Do you have an understanding as to how it came to be that you were chosen to be the person to respond to the notice?
A. Yes.
Q. And how did that happen?
A. Because I'm the project manager.
Q. For what project?

Page 6

A. For the Centredale project.
Q. Can you tell me, are you currently an employee of Battelle?
A. Yes.
Q. What is your current position?
A. I'm a principal research scientist.
Q. Overall how long have you been employed by Battelle in any capacity?
A. Seventeen, eighteen years.
Q. And how long have you held the current title of principal research scientist?
A. Probably two or three years. That's me trying to remember, though.
Q. Right. We won't hold you to it.
A. Okay.
Q. Can you tell me, first of all, what type of organization Battelle Memorial Institute is?
A. Mm-hmm. Battelle is a not-for-profit organization set up as a charitable trust, and we do a lot of research and development and application of research and development in science and industry.
Q. And in what sorts of areas or industries does Battelle do research?
A. Well, do a lot of support in chemical,

Page 7

well, in the chemical industry in the sense of for, let's say, Department of Defense or Homeland Security. We do work for, let's see, Corps of Engineers, state and local governments. I can probably speak with a little bit more familiarity about where I work and what I do.
Q. Okay, you could do that, and describe sort of what the focus of your work has been while you've been at Battelle.
A. Mm-hmm. Well, let's see, I'm a project manager and I manage different projects under our contract with the Corps of Engineers, New England District, which could involve dredging studies, monitoring studies, et cetera. I also work for state and local government and I do monitoring studies for them. I'm a chemist, so I have project management and chemist experience that I bring to the projects.
Q. And as a principal research scientist, what specifically are your duties?
A. Well, I think it's pretty similar to what I just told you. I mean, that's a title, so I will manage projects; I will mentor staff; I will attend scientific conferences.

Page 8

Q. Prior to having that title, what title did you have with Battelle and for what period of time?
A. Hmmm. Trying to remember. I don't really remember the specific title name.
Q. Okay. How if at all were your job functions or duties different in the position you had before?
A. Probably just that I have more experience and maybe can manage projects that are at a higher level.
Q. Can you tell me a little bit about your educational background?
A. Mm-hmm. I have a bachelor's of science in chemistry from Bates College in Lewiston, Maine.
Q. And do you recall what year that was?
A. 1987.
Q. And after leaving Bates did you have any other formal degree work?
A. No degree.
Q. Have you had other educational training of any kind?
A. Yes.
Q. Can you describe what sorts of educational training you've had after college?

Page 9

A. I have taken some classes with Hewlett Packard that applied to analytical services that we did at Battelle. I took a class on advanced principles of mass spectrometry by Dr. Ron Hites, who is a specialist in that area.
Q. Anything else that you can recall?
A. No.
Q. And what was your first work experience after graduating from Bates?
A. Battelle.
Q. So you've been there essentially the whole time since you got out of college?
A. Mm-hmm, yes.
Q. Do you recall what your job was when you first started working at Battelle?
A. Yes.
Q. And what was that?
A. I worked in the sample preparation lab preparing environmental samples for organic analyses.
Q. And do you recall for approximately how long you held that position?
A. That was probably less than a year.
Q. What did you do next at Battelle?

A. Then I was an analyst.
Q. And what type of analytical work did you do?
A. I was an analyst for mass spectrometry, analyzed environmental samples for polycyclic aromatic hydrocarbons, semivolatile organic compounds.
Q. Do you recall in what sort of context you would do this analytical work, what types of projects it related to?
A. Well, either government projects or industrial projects.
Q. Overall at Battelle how much of your work would you say has been environmental-related?
A. A hundred percent.
Q. And before the Centredale project that we're here to talk about today, had you been involved in working on any other Superfund sites?
A. Yes.
Q. Do you recall what any of those were?
A. Yes.
Q. Can you tell me?
A. The Baird & McGuire Superfund site.
Q. That's the one in Holbrook?



A. Yes.
Q. Do you recall about what period of time you were involved with that site?
A. I don't know the exact year. It was the fourth year of long-term monitoring. Could have been around 2000. I can't remember for sure.
Q. Do you have any recollection as to what the nature of the contamination was at that site?
A. There were metals. We also looked at semivolatile organic compounds, pesticides. It was a while ago.
Q. Any other major Superfund sites that you recall being involved in working on?
A. Not that I know of.
Q. Prior to involvement in the Centredale Manor site project, had you worked on any other sites where dioxin was an issue?
A. I don't think so.
Q. Do you recall how it was that Battelle came to be involved in working on the Centredale Manor site project?
A. We were contracted by the Corps of Engineers.
Q. So your understanding is that the contract



for the work that's being performed is with the Army Corps of Engineers rather than directly with EPA. Is that correct?
A. Yes.
Q. To your knowledge, is there any contractual relationship between Battelle and EPA with respect to the work that's being performed on the Centredale Manor site?
A. What do you mean, contracted? I mean, I don't have a contract with the EPA. Is that what you mean?
Q. I guess that's what I meant, yes.
A. I don't.
Q. So all of your bills and everything else go to Army Corps of Engineers?
A. Uh-huh, correct.
Q. Do you recall approximately when Battelle first came to be involved with the Centredale Manor site?
A. I think it was mid to late 2000.
Q. And do you recall what the nature of the project assignment was at the time you first became involved?
A. Well, we were contracted to support the



remedial investigation and feasibility study for the site.
Q. And in what way were you to support the remedial investigation and feasibility study?
A. We would provide technical project planning, conduct investigations, oversee the risk assessments, prepare the remedial investigation.
Q. Any other major support activities?
A. I don't think so.
Q. Are there any other companies or entities that have been involved in preparing the remedial investigation apart from Battelle?
A. Well, Battelle prepared the report but we relied on information from other investigations conducted by other parties.
Q. Did you have any subcontractors in connection --
A. Yes.
Q. -- with the work that was done?
A. Yes, we did.
Q. And who were those subcontractors and what did they do?
A. MACTEC conducted the risk assessments, the baseline human health and ecological risk

Page 14

assessments. We also had another subcontractor, Quantitative Environmental Analysis LLC, who conducted a sediment stability test for us. You want all the subcontractors?
Q. Ones you can think of that did some significant part of the work that's embodied in the remedial investigation.
A. Oh, mm-hmm. NewFields Forensics -- I don't know their full name -- LLC. They conducted a forensic review for us. That's probably the major ones I can think of.
Q. And can you describe for me what your role was with respect to the remedial investigation for the site?
A. Mm-hmm. I am the project manager.
Q. And do you have a staff of people that have worked under you in connection with this project?
A. We have a team of people who supported the project, yes.
Q. Can you describe for me who's been on the team?
A. Yes. There's Patty White's been on our team, myself, are probably the major people. Then

Page 15

we've had support from our Columbus office. The Battelle laboratory has done analyses, the dioxin analyses. They have done mapping for us with the database. Do you want their names? Trying to think of all their names.
Q. The name of anyone who did a significant amount of work.
A. Mm-hmm. Well, in support of the project or actually writing the report? I guess I'm not -- Writing the actual RI?
Q. Either.
A. Either, okay. Well, for the lab, a significant person would be Karen Tracy; she was in charge of the dioxin analyses. Jim Hicks has provided a lot of support with data mapping. Our quality assurance unit, Roseanna Buell. I'm still thinking. Myself, obviously. That's probably about it.
MR. HARDING: I would like to have marked as Exhibit Number 2 a copy of the interim filed remedial investigation Centredale Manor Restoration Project Superfund Site Report dated June 30, 2005.
(Battelle Deposition Exhibit 2 marked for identification.)

Page 16

BY MR. HARDING:
Q. Ms. Dahlen, could you take a look at the document we've marked as Exhibit 2 and tell me if that's a copy of Battelle's remedial investigation report that was issued on or about June 30, 2005.
A. (Pause) Yes, it is.
Q. Okay. And that document at the time it was issued, I take it, was sent to both EPA and the Army Corps of Engineers?
A. Correct.
Q. Can you tell me what EPA's role was, if any, with respect to the preparation of this report?
A. Well, they provided copies of technical reports that had been prepared that we referenced and used to compile the RI.
Q. Anything else that EPA did in connection with this report?
A. They reviewed it.
Q. Before June 30?
A. Yes.
Q. And can you tell me who the principal contacts are at EPA that you've dealt with in connection with the Centredale Manor study?
A. Certainly. Anna Krasko, she's the

Page 17

remedial project manager, RPM. Cornell Rosiu, Chau Vu. They're the principal people I work with.
Q. And were you personally involved in actually drafting this report?
A. I was a contributor to it, yes.
Q. Are you able to identify particular sections that you contributed to or were the principal author of?
A. I'm not the principal author; I just contributed to the report.
Q. Is there anyone that you can identify as the principal author of the report?
A. Yes.
Q. And who would that be?
A. Patty White.
Q. Do you know what Ms. White's title is at Battelle?
A. She's no longer at Battelle.
Q. But she was there as of --
A. Yes.
Q. Was Ms. White still at Battelle on June 30, 2005, when the report was issued?
A. Yes.
Q. What was her title at that time?

Page 18

A. I don't know. I can't remember for sure.
Q. Do you know what her area of expertise or training was?
A. She's a geologist and she has experience preparing remedial investigations.
Q. Do you know about how much of this report is her work product?
A. She's the principal author and I contributed, so we worked together as a team.
Q. And you reviewed everything she prepared before it went into the report. Is that correct?
A. Well, we did conduct reviews. I would sometimes review her work and we would also send the report to our quality assurance unit for review and we had a technical review.
Q. Would it be fair to say that you ultimately were the person at Battelle who had to sign off on this before it was filed?
A. Yes.
Q. And at the time you did so, were you satisfied that the information reported in this report was true and accurate to the best of Battelle's knowledge at the time?
MR. BINDER: Objection.

Page 19

MR. HARDING: You can go ahead and answer.
A. Yes.
Q. Since the time of this report, have you become aware of any way in which this report is not true and accurate?
A. Well, I think I found one table where something wasn't highlighted that should have been highlighted, but that's about....
Q. Anything of substance that has come to light --
A. Oh, anything of substance? No.
Q. Let me just finish.
A. I'm sorry.
Q. Is there anything that has come to light since June 30, 2005, that would in any way change the conclusions that are made by Battelle in the remedial investigation report?
MR. BINDER: Objection.
A. No.
MR. NATHANSON: The basis of the objection?
MR. BINDER: Form.
MR. NATHANSON: What specifically? What is the form objection?

Page 20

MR. BINDER: I think the question is leading and is asking the witness for information beyond personal knowledge.
BY MR. HARDING:
Q. I am going to get back to this in a minute. But can you tell me, since the time of this report, has Battelle continued to do any work on the Centredale Manor site?
A. Yes.
Q. And what is the nature of the work that Battelle has been involved in at Centredale Manor since the remedial investigation report was issued in June of last year?
A. We are contracted to conduct a feasibility study.
Q. Can you describe for me what a feasibility study is in this context?
A. It will evaluate remedial alternatives for cleaning up the site.
Q. Do you know what the current status of that feasibility study work is?
A. Yes. It's ongoing.
Q. Has there been any type of draft feasibility study prepared at this point?

Page 21

A. No.
Q. Has Battelle been involved in -- Well, have you identified any proposed remedial alternatives for the site at this point?
A. We have identified potential, but we have not selected anything; it's too premature.
Q. Is work on the feasibility study currently ongoing or is it on hold?
A. It's ongoing.
Q. Is there an anticipated date when a feasibility study would be completed for the site?
A. There is no defined date. It is possibly later this year, but it could get held up for any number of reasons.
Q. Has Battelle been involved in trying to quantify the cost of any potential remedial alternatives for the site?
A. We haven't done that yet. I mean, part of the feasibility study will be looking at the different alternatives and evaluating them, and I believe cost is one element, but nothing's been conducted yet.
Q. So you haven't put any numbers with any potential remedial alternatives that might be

Page 22

selected at the site?
A. No.
Q. Have you been involved in any meetings with EPA and Emhart Industries to discuss settlement of the EPA claim?
A. No.
Q. Could you take a look back at Exhibit 2 at the iii which is under the heading of Executive Summary on that page.
A. Yes.
Q. Do you see in the first paragraph sort of toward the end there's a statement, quote, "The purpose of the RI is to determine the sources, nature and extent of contamination at the site, characterize the fate and transport of contaminants and evaluate potential human health and ecological risks resulting from exposure to site-related contaminants." You see that?
A. Yes.
Q. Are those essentially the three purposes of the RI?
A. Yes. That's the primary purpose of the RI.
Q. It has those three different components?

Page 23

A. Mm-hmm.
Q. You need to say yes. That's another rule.
A. Yes. I'm sorry.
Q. The reporter can't interpret mm-hmms, so if it's a yes, it's a yes; if it's a no, it's a no.
A. Okay.
Q. Thank you.
With respect to the first thing that is described there in terms of determining sources, nature and extent of contamination at the site, could you tell me what methodology Battelle used to address those issues?
MR. BINDER: Objection.
A. The RI was conducted according to EPA guidance and our work plan. Sources -- Well, I guess that's what I would say simply, yes.
Q. So what would you do? Can you tell me what you did, for example, to try to determine what the sources of contamination at the site were?
A. Well, that was documented in other project records that we received from EPA.
Q. Are you able to either identify what those records were or point me where in the report they would be identified?

Page 24

A. Can I look in the report?
Q. Sure.
A. I don't want to misspeak.
Q. I realize this is a big document. I'm going to try to avoid questions that require hours of searching through the document, but for any of these things, if you need to consult with any part of the report to give an answer, please feel free to take your time to do that.
A. Okay. So can you repeat what your question was again? I'm sorry.
MR. HARDING: I'm not sure that I can. Could you read it back, please?
(The reporter read the last question.)
A. In Section 1.3.2, which is page 1-3 of the report, it identifies that evidence of improper waste disposal activities at the site was documented by U.S. EPA reports and this is what's believed to have caused the contamination.
Q. And just so we're clear, you're referencing the last paragraph that is on that page?
A. Yes, the last paragraph.
Q. Do you have an understanding today as to what the improper waste disposal activities that are

Page 25

referred to here were?
A. Yes.
Q. And what is your understanding?
A. That it was improper storage and disposal of chemicals in drum stockpiles and surface impoundments.
Q. Do you know where any of these impoundments or disposal areas were located on the site?
A. It's documented in the report; I can find it.
Q. Okay.
A. Okay, page 1-4, first paragraph, fourth line, it says "These features were concentrated in the central and southern parts of the site." They're talking about the waste disposal activities. And further on, second paragraph, fourth line near the end, "An apparent waste disposal area is evident at the southwest edge of the site in the area now occupied by the Centredale Manor south parking lot and Cap Area 1."
Q. Do you have a recollection of reviewing the EPA report with aerial photographs as referenced here?

Page 26

A. I may have reviewed that briefly, but I believe Patty did.
Q. And is it your understanding that that is the principal source of the information as to the location of historic waste disposal areas at the site?
A. There's been other project reports that may have documented similar information. I'm not sure if they referenced the EPA citation here.
Q. Going back to the executive summary section on page iii, in the second paragraph on that page there's a reference to "It is believed that hexachlorophene was manufactured at the site in approximately 1965." Then it says "HCX and dioxin were by-products of this process." Do you have an understanding as to what the source of that information is?
A. The source for the hexachloroxanthene and dioxin being by-products is Archer and Crone; and it's a referenced probably a little later on. We don't tend to put references, I don't think, in the executive summary. And "believe that hexachlorophene was manufactured in 1965" I believe is a personal communication with EPA.

Page 27

Q. Can you take a look at the Site History section? It's Section 1.3.2.
A. I'm there.
Q. And can you tell me, what is the purpose of this section within the context of the remedial investigation report?
MR. BINDER: Objection.
A. This is to set the background, the history of what occurred at the site.
Q. What did Battelle do to assemble the information that is reflected in this Site History section?
A. We reviewed project documents that had this information documented and summarized it in the RI.
Q. As part of your work on this project, did Battelle in fact develop conclusions regarding what the sources of contamination were at the site?
A. I believe we reiterated conclusions made in other studies and investigations conducted at the site.
Q. And what were those conclusions as to what the sources of contamination were at the site?
MR. BINDER: Objection.

Page 28

A. The conclusions were that improper waste disposal associated with chemical manufacturing activities and drum reconditioning activities at the site that occurred collectively between the 1940s and 1970s is associated with the contamination at the site.
Q. And in the course of your work on this project, was the focus of your efforts in terms of the sources of contaminants with respect to dioxin?
A. I don't understand your question.
Q. It was asked poorly.
Was the focus of what you were doing in terms of trying to identify sources of contamination centered on what were the sources of the dioxin contamination?
A. Well, we were summarizing what was previously reported as the sources of contamination and then we looked at the nature and extent of contamination based on the existing site data and tried to compare that with our understanding of site history.
Q. And engaging in that process, did you see any evidence from the current data that called into question any of the prior conclusions regarding the

Page 29

sources of the dioxin contamination?
MR. BINDER: Objection.
A. I haven't seen anything.
Q. In other words, just so I'm clear, I was asking whether you had gotten a certain set of data about where dioxin contamination was located or what the elevations were that called into question any of the historical conclusions as to what the sources of dioxin contamination were.
A. No, I don't think I've seen anything.
Q. So as far as the work that Battelle did in terms of analyzing data, it was consistent with the prior conclusions as to sources of contamination. Is that correct?
MR. BINDER: Objection.
A. We didn't go and conduct another investigation of site history, so this information has been presented in other project documents that have been accepted and verified. So we took that as verified.
Q. With respect to the references that are cited in the Site History, Section 1.3.2, in conducting your review did you see any ways in which those documents were inaccurate or unreliable?

Page 30

A. Not to my knowledge.
Q. Taking a look at the third paragraph of the Site History section, there's a statement about "Trichlorphenols were shipped to the site, where it is believed that Metro Atlantic manufactured hexachlorophene in approximately 1965." Do you have an understanding as to where the information came from as to the time period during which hexachlorophene was manufactured at the site?
A. Yes.
Q. And what is your understanding as to the source of that information?
A. It's been documented again in previous reports and also personal communication with EPA.
Q. And following that there is a reference to the Archer and Crone paper. Can you tell me what that source is?
A. It's a literature article that discusses how hexachloroxanthene and dioxin are by-products of a manufacturing process, manufacturing hexachlorophene in antibacterial soaps.
Q. And do you know how that publication came to be identified as a document to be relied upon in connection with the remedial investigation?

Page 31

MR. BINDER: Objection.
A. I can't remember exactly. Oh, I'm sorry, I can remember exactly.
Q. Okay, great.
A. We were analyzing the hexachloroxanthene in the samples and this article was referenced as a possible source of information to identify methods for analyzing hexachloroxanthene. It may have been brought up in other forms too, but I just don't remember.
Q. Based on the work that Battelle did in connection with the remedial investigation, did you conclude that dioxin at the site resulted from the manufacturing process?
MR. BINDER: Objection.
A. Again, we summarized that it's believed that dioxin is a by-product of this manufacturing process which occurred at the site.
MR. BINDER: Can I have that question and answer read back, please?
MR. HARDING: Sure.
(The reporter read the last question and answer.)
BY MR. HARDING:

Page 32

Q. Apart from the manufacturing process, did your investigation note any other potential sources of dioxin contamination at the site?
A. Yes.
Q. And what were the other sources that your investigation identified?
A. That it could be also a contaminant from the drum reconditioning operations that were conducted at the site. Could be.
Q. And what information led you to conclude that dioxin could have potentially resulted from the drum reconditioning operations?
A. Well, dioxin can be a by-product of waste incineration and it was a drum incineration facility.
Q. Do you know whether in the course of the work you did you had any information regarding the contents of the drums that were reconditioned?
A. I'm going to refer to the report. (Pause) On page 1-3, which is Section 1.3.2 of the report, the fifth paragraph in that section indicates that RIDEM, the Rhode Island Department of Environmental Management, was present at the site during investigations from 1970 to '86 and they observed

Page 33

drums that had been labeled as caustics, PBBs, halogenated solvent compounds.
Q. And what about that statement would lead you to conclude that the drums were a potential source of the dioxin at the site?
A. Well, we believed that during the drum reconditioning, waste material may have been either burned or poured off from the drums prior to reconditioning, and dioxin can be a by-product of waste incineration, so....
Q. Do you have an understanding as to how the drum reconditioning facility worked at the site, in other words, what process they used to recondition the drums?
A. If I may reference the report?
Q. Sure.
A. Page 1-3, third paragraph under Site History indicates that chemical residues were believed to have been dumped or burned prior to drum reconditioning; and then it goes on to say where that facility was located at the site.
Q. Do you know during what period of time the drum reconditioning operations took place?
A. Yes.

Q. And when was that?
A. I believe between 1952 and the early 1970s.
Q. So to your knowledge those activities in terms of active operations had ceased by the early 1970s?
A. Yes.
Q. And is it your understanding that the manufacturing of the hexachlorophene was for a limited period of time in or about 1965?
A. To the best of my knowledge.
Q. Did your work in connection with the remedial investigation attempt to determine how dioxin from the manufacturing process actually got into the environment?
A. Yes.
Q. And can you tell me what you did in that regard?
A. I'm going to refer to the report.
Q. Okay, absolutely.
A. It evaluated mechanisms by which the dioxin could have contaminated other media at the site. I believe that's Section 5. Section 5, which is labeled Contaminant Fate and Transport, and it



discusses mechanisms by which the contaminants would have migrated from the source area to other areas at the site and how.
Q. And is there a particular part of Section 5 of the report you can point me to that would describe what information there was as to how dioxin from the manufacturing process got into the environment?
MR. BINDER: Objection.
A. (Pause) Okay. In Section 5.2, which is page 5-2, it does mention that leaching of contaminants from soils to groundwater is one potential mechanism. Section 5.3, second paragraph, says "One source of dioxin and HCX to the river may have been the direct discharge of dioxin-bearing waste from the hexachlorophene manufacturing process" and then dioxin, which is hydrophobic, will adsorb to the sediment particles and travel downstream. Sediment resuspension and transport is another mechanism. Once it's adsorbed to the sediment particles, it will travel downstream.
Q. Let me just ask you, going back to the statement about that a source of dioxin to the river may have been the direct discharge of dioxin-bearing



waste from the manufacturing process into the river, do you have any knowledge as we sit here today as to what the source of that information was?
A. No, there's no source. It's just saying that it may have been directly discharged because there is dioxin contamination and HCX downstream quite a distance. So it is believed that it traveled, could have been discharged right to the river or adhered to sediment particulates that would travel downstream.
Q. And so it's the location where it is today that leads you to conclude that it might have been a direct discharge into the river. Is that fair to say?
A. It may have been the fact that it was so far downstream.
Q. About how far downstream has dioxin traveled?
A. Well, there's limited data as you move further downstream, but I believe we saw HCX and dioxin as far downstream as Manton Pond possibly. It's documented in here.
Q. Do you know about what that distance is?
A. No, I'm sorry. (Pause) I'm sorry. Are



you still waiting for me?
Q. Yes. I didn't know if there were any other sections of Section 5 that are relevant to the question we started with as to how dioxin got from its source point into the environment.
A. Yes. Again, Section 5.3, the final paragraph talks about that other contaminants from the source area, PCBs, pesticides, dioxin, furans probably entered the river primarily via surface runoff and erosion of contaminated source area soils. And I believe it goes on to say that this activity may have happened over a longer period of time. So I guess the point is the hexachlorophene manufacturing process probably happened during a short period of time but this erosion of contaminated source area soils happened over a longer period of time.
Q. And the erosion of source area soils, would that include soils that had been contaminated by dioxin both from the manufacturing process and the drum reconditioning facility?
A. Could be.
Q. Or it could be just one of those sources?
A. I don't know.

Page 38

MR. HARDING: I would like to mark as the next exhibit a document, Aerial Photographic Analysis Centredale Manor Site Subarea, dated July 2000.
(Battelle Deposition Exhibit 3 marked for identification.)
BY MR. HARDING:
Q. Ms. Dahlen, could you take a look at what's been marked as Exhibit 3 and tell me if you've ever seen this report before.
A. Yes.
Q. And is this the EPA report that is referenced in Section 1.3.2 of the remedial investigation?
A. I believe it is. Let me just look and confirm that reference. (Pause) Yes, it is.
MR. BINDER: Could we just clarify which portion of the report at 1.3.2 is being referred to? Is this U.S. EPA 2000 that she identified?
MR. HARDING: That's what my question was directed to.
MR. BINDER: I just wanted to be sure.
MR. HARDING: Let me just ask the question on the record.

Page 39

BY MR. HARDING:
Q. Ms. Dahlen, in Section 1.3.2, the site history of the remedial investigation, there's a statement, quote, "Evidence of improper waste disposal activities at the source area is documented in an analysis of historical aerial photographs conducted by the U.S. EPA Office of Research and Development, U.S. EPA 2000," and then it goes on to describe the contents of that report. Is the report you have in front of you as Exhibit 3 the EPA report that was summarized in the site history?
A. Yes, it is.
Q. Do you know whether -- The copy we have obviously is problematic because it's aerial photographs and just a Xerox copy of it. To your knowledge, did Battelle have a copy of this report that had actual aerial photographs?
A. I believe that we also asked to see the original photographs, because the photocopy is hard to read.
Q. Can you tell me based on the work you did in connection with the remedial investigation where are the principal areas at the Centredale Manor site today where there is dioxin contamination?

Page 40

A. Well, there's dioxin contamination in the source area, the source area soils. And the report talks about that in Section 4. There's dioxin contamination in pond sediments, dioxin contamination to some extent in the floodplain soils, to some extent in the groundwater.
Q. And that's all described in the report?
A. It's all described in Section 4.
Q. And can you tell me based on the work that Battelle did, apart from the manufacturing process and the drum reconditioning facility, did Battelle identify any other sources of dioxin contamination at the site?
A. No. But we didn't conduct an investigation of the sources again; we relied on project documents, other studies.
Q. But based on all the work that had been done up until the date of your report, did you see any evidence of sources of dioxin contamination at the site other than the manufacturing process and/or the drum reconditioning facility operations?
MR. BINDER: Objection.
A. No, I don't think so.
Q. Could you take a look at Section 2.5.3 of

Page 41

the remedial investigation.
A. Yes?
Q. And there's a reference in the -- Well, first of all, can you tell me what information this section summarize?
A. This section is summarizing an investigation that was conducted at the site in 2003, a sediment investigation.
Q. And who conducted that sedimentment investigation?
A. I believe it was a joint investigation. U.S. EPA/ERTC conducted field investigations collecting sediment cores. The U.S. Army Corps of Engineers/ERDC participated in core logging. Battelle participated in the core logging and then we analyzed the samples.
Q. And what was the purpose of the investigation?
A. To better define the vertical and horizontal extent of contamination in the two ponds; to age-date the sediment cores; to see if we could correlate the date of the cores to when dioxin contamination was present in cores.
Q. And there is reference in this section to

radiometric age dating. Could you describe for me what that process is?
A. It's looking at sediment cores where you collect and analyze certain intervals. You analyze them for, in this case, lead210 and also cesium137 and there are methods you can use based on the results of those analyses to get an estimate of the sedimentation rate of the sediment in the ponds; and then from that, you can estimate the age with depth of the core.
Q. And was that type of analysis done in connection with the Centredale Manor site sediments?
A. It was done for this investigation, yes.
Q. And can you tell me what if anything that analysis showed with respect to the attempting to correlate the dates of the sediments?
A. Mm-hmm. From that analysis we were able to estimate the sedimentation rates in Allendale Pond, I believe it was .5 to .8 centimeters per year; and from there we were able to correlate or correspond the dioxin data that between 1940 and 1970, somewhere around there, was equal to one foot depth of contaminated sediment, which happens to correspond with where we found the highest amount of



dioxin.
Q. So did this analysis tell you anything about when the dioxin was potentially generated?
A. Yes. Well, it gives us an estimate; and what it looked like is that there was no dioxin above background let's say prior to 1940 and it looked like the major amount of dioxin contamination was found in that 1940 to 1970s time horizon.
Q. And that period roughly corresponded with the dates of actual operation at the Centredale Manor site?
MR. BINDER: Objection.
A. Yes, it did.
Q. Can you take a look at Section 2.6 of the remedial investigation, headed Baseline Ecological Risk Assessment.
A. Yes.
Q. Can you tell me what the purpose of this section is?
A. Well, it is to investigate potential current and future risks to ecological receptors at the site from exposure to site contaminants.
Q. And are you able to tell me generally what conclusions were reached with respect to ecological



risks at the site?
A. Yes. It's summarized -- I'm just trying to find the section -- I believe in Section 6 of the report. Section 2 just discusses the investigation conducted. Section 6 talks about in this case the primary or major findings of that investigation. Let me just get to it.
Q. Okay.
A. So Section 6.1.5 includes the major findings of the BERA.
Q. And within these findings, are there some that are more important or more significant with respect to potential ecological risks?
A. Well, there are some where they said certain receptors may be at substantial risk of harm from exposure to site contaminants in certain media and certain receptors may not be at substantial risk of harm, depending on the media and the exposure pathway.
Q. And which ones are at more substantial risk of harm?
A. I don't think we classified it that way. We just said this receptor may be at substantial risk of harm. We didn't try and say this receptor



was more important than that receptor.
Q. I am not finding the exact reference here, but in the report there is a discussion of the breach of the Allendale Dam that occurred at the site. Do you have an understanding as to what effect, if any, that event had on the spread of dioxin at the site?
A. We indicated that it may have contributed to the downstream transport of contaminated sediments when the dam breached.
Q. Do you have a recollection as to about when the breach of the dam took place?
A. Well, there was a partial breach I believe in 1991 and then a complete breach I'm going to say in 2000, but I'll verify that. (Pause) Table 1.1 of the report indicates that the Allendale Dam breached in 1991 and breached again in 2001.
Q. Take a look over at Section 4 of the report and specifically Section 4.1. Can you tell me what the purpose is of that section of the report?
A. This is where we did the evaluation of nature and extent of contamination in the source area.

Page 46

Q. And with respect to the source characterization section that is identified as Section 4.1, can you tell me what you did to come up with the information that is here?
A. Yes. We looked at all the available existing site data that is contained in the project database and analyzed the data. We did statistical analyses, we mapped it, all to give us an understanding of the distribution of the data.
Q. In Section 4.1, which is labeled Source Characterization, the first paragraph describes various sources of contamination at the site. Can you tell me what information was relied upon for the statements that are made in that paragraph?
A. Well, we relied upon the information regarding the storage and disposal of chemicals. That was discussed in this EPA 2000 report as well as in other project documents. And it also identified the areas where the waste disposal activities may have occurred. I think most of the information in here is all based on other project reports, that first paragraph.
Q. Do you have an understanding today as to what evidence there is of -- There's a reference in

Page 47

this paragraph to direct discharges to the Woonasquatucket River. Do you have any knowledge as we sit here today as to what evidence there is of those types of direct discharges?
MR. BINDER: Objection.
A. I am not sure if that is mentioned in the other project reports. I would have to go back and look. And again we thought, given the downstream extent of the contamination, that it's migrated to the river and then traveled downstream.
Q. And why would that sequence of events lead you to believe that there have been direct discharges rather than it just being discharged to the ground and then migrating from there?
MR. BINDER: Objection.
A. Well, if it was discharged to the river, then it would have been adhered to the sediment particulates and it would travel down the stream father than if there's more barriers, I guess, if it was just disposed. If it was disposed in the soil, then it would have to make its way to the river.
Q. And the work you did actually included the data sampling that would show where downstream dioxin is located today. Correct?

Page 48

A. Yes. Section 4 talks about the extent of contamination in the four impoundments in the river. Now, I want to say again we say may have been directly discharged. We're not saying it was. May have.
Q. Would you take a look at Section 4.4.5 of the report.
A. Yes.
Q. Can you tell me what the purpose of this section of the remedial investigation is?
A. This was, as it says, just a forensics review of the chlorinated organic compound data -- that's the dioxin, furans, pesticides, PCBs -- to look at which samples may be chemically similar/chemically distinct, to get an understanding of the distribution of the contaminants over the site.
Q. And did this section also include discussion of the source of the dioxins at the site?
A. I believe it summarized again that dioxin is a by-product of the hexachlorophene manufacturing process. Let me just look and see if it mentions anything else. (Pause) I don't find anything else with reference to dioxin.
Q. Can you take a look at page number 4-12

Page 49

that's within this section, and down toward the bottom of that page there is a statement, quote, "The following conceptual model is consistent with the findings of the environmental forensics analysis," and then there are various bullet points below that.
A. Yes.
Q. Can you tell me what is meant by the conceptual model that is being described in this section of the report?
A. It's the process by which contaminants may have been transported or pathways, exposure pathways and transport mechanisms. Just a visual sort of idea of how contamination may have spread at the site.
Q. And what were the principal conclusions reached in that analysis as to how contamination may have spread at the site?
MR. BINDER: Objection.
A. It's mentioned that dioxins, furans and HCX were generated as by-products from the hexachlorophene manufacturing process and that the contamination spread downstream. And then there is discussion of a PCB contamination as well from the

drum reconditioning facility.
Q. Take a look at Section 5 of the report, headed Contaminant Fate and Transport. Can you tell me what the purpose of this section of the report is?
A. Again, it's just to understand how contaminants may have migrated and transported within the site.
Q. And based upon the work that Battelle did in connection with preparing this report, what conclusions did you reach on that subject?
A. Well, there were conclusions about what were potentially the major pathways or mechanisms by which contamination may have spread.
Q. And what were the major pathways or mechanisms?
A. Soil erosion, erosion of surface area soils in the source area and runoff to the river which runs right through the site was listed as one. Sediment resuspension and transport of contaminated sediment downstream was listed as a pathway. Leaching of contaminants from soil to groundwater is a possible pathway, although we didn't think it was a major pathway. It is broken up as fate and



transport processes in the source area and then in the river. So in the source area it would be the soil erosion and possible leaching and in the river it would be sediment resuspension and transport. So as the physical processes make up the sediment, it can get transported downstream and contaminate the sediment. It talks about the flux of dioxin from the sediment bed to the water column under nonresuspending conditions, which is low flow.
So it's discussed pretty clearly what the different mechanisms are.
Q. Did your analysis consider at all the potential impact of any flood events in the area?
A. Yes, it did.
Q. And what if any conclusions did you reach on that subject?
MR. BINDER: Objection.
A. It evaluated different flood return periods and what the potential scour is, erosion of sediment. So when you have a flood, you're going to have physical forces that may scour the bottom sediment and transport it downstream. So we looked at that potential scour.
Q. And what if any conclusions were reached



on that subject?
MR. BINDER: Objection.
A. There are predictions of how much potential scour and possible areas in each pond that would scour in the event of let's say a hundred-year flood.
Q. Please take a look at Section 7 of the report. And what was the purpose of this section of the report?
A. Just to summarize the findings of the different evaluations that were done, to summarize as it says the primary sources of contaminants, the primary release and transplant mechanisms, the nature and extent, secondary release transport mechanisms, results from the risk assessments. Just an overall summary of the report.
Q. So the material that is under Section 7.1.1 summarizes the conclusions that Battelle reached based on the work it did as to the primary sources of contamination at the site?
MR. BINDER: Objection.
A. It summarizes our conclusions based on a review of the project documents of what were the primary sources of contamination. Again, we didn't



conduct our own investigation; we relied on project documents.
Q. And can you tell me, is there a place in the report that lists all the project documents you relied upon to arrive at these statements on sources? I mean, I realize that some of them such as the U.S. EPA report are specifically referenced in the text. But is there a table or list that gives the entirety of the project documents that were relied upon?
MR. BINDER: Objection. She isn't saying relied upon, she's saying documents that were summarized.
A. There is a reference list for the report for any references that we cite and there are tables that identify the different investigations conducted at the site and that would identify the data source for the whole remedial investigation.
Q. So anything that you considered is referenced in a table in here in terms of past work that was done before Battelle got involved?
A. If anything that we -- Yes.
Q. Do you have any information as to the approximate total number of hours that Battelle

personnel spent in the work that ultimately resulted in the remedial investigation report?
A. I just know it was a lot. I couldn't give you a defined number. Hundreds and hundreds of hours.
Q. Do you know about how much Battelle has been paid by the Army Corps of Engineers for the work at the site?
A. Well, I know our current contract value.
Q. And what's that?
A. That is approximately four million.
Q. And that includes work up to the present? In other words, does it include work beyond June 30, 2005, when this report was issued?
A. Yes.
Q. Do you know what the contract value was approximately as of June 30, 2005?
A. Not off the top of my head.
MR. HARDING: Could we take just a short break?
MS. TROUTMAN: Sure.
(In recess 11:01 a.m. to 11:14 a.m.)
MR. BINDER: When we get back on the record I am going to request that this deposition be



designated as confidential in accordance with the protective order in this action.
MR. HARDING: That's agreeable.
MR. O'CONNOR: No objection.
MR. BINDER: The reporter may just designate it Confidential - Pursuant to Protective Order.
BY MR. HARDING:
Q. I just have a few more questions and then other counsel may have a few questions as well. And I apologize if I asked this before. But before this remedial investigation was issued on June 30, had EPA been provided with drafts?
A. Yes. There was one draft.
Q. Do you recall approximately when that draft was presented to EPA?
A. It was, I believe, late in the year 2004.
Q. Do you have any recollection of whether EPA requested any changes or amendments to what was in the draft between the time it was shown to them and when this document was issued in June of 2005?
A. Well, EPA reviewed the document as well as the Army Corps and we discussed how to respond to some of the comments and EPA was part of that. So I



think they may have agreed with how we planned to respond to some of the comments.
Q. Some of the comments from?
A. The Corps of Engineers.
Q. Do you recall whether there was any concern by either EPA or the Corps of Engineers as to the information that was in the draft with respect to the identification of sources of contamination at the Centredale Manor site?
A. Not to my knowledge.
Q. And is it your understanding that EPA has now adopted this document as the remedial investigation report for the site?
MR. BINDER: Objection.
A. Yes.
Q. And is this report and the information contained in the report the basis for the feasibility study work that is now being conducted?
A. Yes.
MR. HARDING: Those are all the questions I have. Thank you.

EXAMINATION

BY MR. O'CONNOR:
Q. My name is Kevin O'Connor. I represent



OneBeacon and I'm going to have a few follow-up questions for you. I think they will be fairly brief.
You mentioned in going through your educational background that you had taken a class in, these are my notes I might have got this wrong, analytic mass spectrometry?
A. Principles of mass spectrometry.
Q. Principles of mass spectrometry?
A. I think that was the title.
Q. And where did you take that class?
A. It was a short course with Dr. Ron Hites, I believe that's Indiana University.
Q. And how do you spell his last name?
A. Ron Hites, H-i-t-e-s.
Q. What is mass spectrometry?
A. It's a detection technique for analyzing compounds, environmental compounds.
Q. In connection with your work at the Centredale site, did Battelle perform its own testing work or did it send that out to a lab for testing?
A. Battelle conducted not all the analyses but the majority. We conducted a dioxin analysis --

Page 58

For the investigations that we conducted, we conducted dioxin analyses, the PAH, PCB, pesticide analyses. We subcontracted out grain size, TOC.
Q. Total organic carbon?
A. Total organic carbon, yes. I'm sorry.
Q. Did you have any personal involvement with the dioxin analyses that were done?
A. I didn't conduct the tests.
Q. But aside from not physically performing the tests, did you have any involvement in what was done or was not done in conducting the dioxin analyses?
A. Yes.
Q. What involvement did you have?
A. I was the chemistry task leader and I worked directly, I served as the point of contact with our dioxin laboratory and made sure that the samples were being analyzed in accordance with the methods that were required. And I reviewed the data.
Q. Where is your dioxin testing laboratory?
A. It's in Columbus, Ohio.
Q. And that is Battelle's home office, so to speak?

Page 59

A. Correct.
Q. A moment ago you mentioned testing that was required for dioxin?
THE WITNESS: Can you read that back?
MR. O'CONNOR: Could you read back her last answer? And I may have misheard you.
(The reporter read back as requested.)
BY MR. O'CONNOR:
Q. I want you to direct your attention to what you referred to as the methods that were required. First of all, who required certain specific methods for dioxin testing?
A. Well, we wrote a work plan that would summarize how the samples would be collected and analyzed and reported, and that cited methods for the dioxin analyses, which I believe are the EPA methods.
Q. Were any special methods devised for testing dioxin samples that were collected at any part of the Centredale site?
A. For dioxin? No. We used Battelle standard operating procedures, which are based on EPA methods.
Q. And those would include Battelle standard

Page 60

operating procedures for testing of a dry soil dioxin sample, a sediment sample, or an aqueous sample?
A. The soils weren't really dry, so it was sediment. It was solid matrices like sediment or soils, water samples, biota.
Q. Biota would be some kind of living tissue, former living tissue?
A. Biological tissue such as fish.
Q. And those would be three separate standard operating procedures, one for biota, one for soil, and one for water?
A. The sample preparation SOP, which talks about how you prepare the sample for analysis, may be separate depending on the media. I don't know for sure. And then there is the analysis SOP which is, once you have an extract and you run it on an instrument, that's probably one SOP. Doesn't matter whether it was tissue or sediment, I think.
Q. So the difference between the three would be how you get to the point where you can run the actual analysis?
A. I believe so. I don't have the SOPs, though, in front of me.

Page 61

Q. Based upon your work at Battelle and your background as a chemist, do you know when standard operating procedures first were developed for testing of dioxin samples? Testing of samples for dioxin.
MR. BINDER: Objection.
A. No, I don't know the specific date. I would have to pull up the EPA method to look.
Q. Do you know where Patty White works now?
A. Yes.
Q. Where is that?
A. She works at CH2M Hill.
Q. At their local office here?
A. Yes.
Q. You mentioned when discussing whether or not you were -- You testified that you were not the principal author of the remedial investigation report; you indicated that you were involved with a quality assurance review.
MR. BINDER: Objection.
A. I don't think I said I did the quality assurance review.
Q. Did Battelle do a quality assurance review?

A. Yes, Battelle conducted a quality assurance review of this report.
Q. You also -- and I've got a note here, and I should have been more specific, which says "TA review," which I assume is technical assurance, TA?
A. Well, probably I think I said we conducted a technical review.
Q. A technical review, all right. What is the quality assurance review?
A. The quality assurance review is, our quality assurance department would look at the report and do a review, look at the tables, look at numbers, to ensure that -- they'll do it based on a certain percentage of the datapoints to look for accuracy and completeness.
Q. And what is the technical review?
A. That would be a senior scientist who's looking at the report and reading it and deciding whether technically it makes sense, the conclusions or the methods you used and what you're saying.
Q. I believe in the remedial investigation Battelle has indicated that dioxin contamination was first found in the area of the site in 1996?
A. We indicated that dioxin was first



detected in fish in the Woonasquatucket River in 1996, I believe so.
Q. And you also talk in the report about the Rhode Island State Department of Environmental Management being involved with the site between 1970 and 1986. Do you recall that?
A. Correct. That's in the site history, yes.
Q. Do you know if the State of Rhode Island authorities did any testing for dioxin contamination at the site during that time period?
A. Can I consult the report?
Q. You can.
MR. HARDING: What are the years in your question?
MR. O'CONNOR: 1970 to 1986.
(Pause)
MR. NATHANSON: Would you tell us what table you're looking in?
THE WITNESS: I'm looking in Table 1-2.
MR. NATHANSON: Thank you.
A. Our report indicates that RIDEM conducted or supervised several investigations of the source area. It doesn't say specifically whether they actually tested any examples for dioxin and I don't



see them listed as a reference in Table 1.2 of other investigations at the site. So I don't know if they tested samples for dioxin.
Q. But you are unable to find any evidence in your report that they did?
A. No, I don't see anything specifically called out. By tested, you mean that they collected samples and analyzed them and reported results?
Q. That's exactly what I meant.
You talked a little bit about the baseline ecological risk assessment.
A. Yes.
Q. Do you know if there is a predominant risk contributor, a specific substance that is a predominant risk contributor to the ecologic risk assessment?
MR. BINDER: Objection.
A. There are a group of chemicals that have been identified as contributors to ecological risk, and which ones may be the primary or predominant can depend on the ecological receptor and the exposure pathway.
Q. So you wouldn't characterize dioxin as a predominant risk contributor in the ecological risk



assessment?
A. I would characterize dioxin and PCBs, coplanar PCBs and PCBs, as primary contributors to risk depending on the ecological receptor, yes.
Q. And is the same true for the human health risk assessment?
A. I believe so. Again, there's a whole -- There's a group of chemicals that are identified in the RI.
Q. You also mentioned in response to some questions from Mr. Harding that the current contract value of Battelle with EPA was four million dollars?
A. Approximately, yes.
Q. What do you mean by the current contract value?
A. To date that's how much work we have been authorized to do.
Q. And that four million includes past work and future work?
A. It includes past work and current work.
Q. Can you tell me what the scope of future work or current work included in that four-million-dollar contract value is?
A. The current work that we are authorized to

Page 66

conduct is the feasibility study and -- Yes, right now, the feasibility study.
Q. And is a fair representation of the scope of work for that approximately four-million-dollar price that it covers the remedial investigation and feasibility study?
A. It covers all work to support the RI/FS, the remedial investigation/feasibility study.
Q. And does it include anything else?
A. No, I don't think so. All investigations that we have conducted have been done to support the RI/FS.
Q. Has Battelle yet prepared a draft feasibility study?
A. No.
MR. O'CONNOR: I don't have any further questions. Thank you.
EXAMINATION
BY MR. NATHANSON:
Q. My name, again, is Larry Nathanson. What is your business address?
A. The Battelle office I'm located at is 397 Washington Street, Duxbury, Massachusetts.
Q. What is your home address?

Page 67

A. My home address? 19 Shore Drive, Kingston.
Q. Kingston?
A. Kingston, Massachusetts.
Q. Are you generally available in May and June of this year?
A. I imagine.
Q. You don't have any plans to go out of the country or any extended vacations during that period?
A. Probably not.
Q. Ms. Dahlen, you are represented by an attorney at the deposition today?
A. Yes.
Q. And that is an attorney from Battelle?
A. Yes.
Q. And you're not being represented at the deposition today by any attorney from any of the insurance companies?
A. No.
Q. You are not being represented by an attorney from Emhart. Is that correct?
A. No.
Q. Have you had any contact with anyone from

Page 68

Emhart prior to the deposition today?
A. I've never spoken to anyone from Emhart.
Q. Have you had any contact with any of the insurance companies or representatives of the insurance companies before your deposition today about your testimony today?
A. No. The only person I've talked to is Battelle's counsel. Oh, and to let the client know that I was being deposed. Sorry. My client.
Q. You explained to Mr. O'Connor what a quality assurance review is and a technical review. What's a forensic review?
A. It is an evaluation of the data. It's almost like a fingerprinting exercise if you think in terms of that, to look at all the site data and use different analysis techniques to determine what samples are chemically similar or distinct, what makes them similar.
Q. You may have said this and if you did I apologize. But for the report we've been looking at, Battelle Exhibit 2, there was both a quality assurance review and a technical review?
A. Correct.
Q. Both you and Mr. O'Connor said Ms. White

Page 69

is located in the local office of a company here. By here, did you mean Boston?
A. Yes, CH2M Hill based out of Boston.
Q. Do you have a work file at Battelle in connection with the work that you've been doing besides the report itself?
A. I maintain copies of all the reports, yes.
Q. And does that have your work product as well too that led to the development of the report in your files?
A. I guess I'm not quite sure what you mean.
Q. In addition to the report itself, do you maintain a file that has all your drafts and notes and other documentation that you developed in connection with preparing the report?
A. I probably have information, yes, when I was doing the initial analyses and checking information, mm-hmm.
Q. Do you have any idea of the volume of your work files in connection with this assignment?
A. One full bookcase and several file cabinets.
Q. I'm looking at page 1.1-3 of your report. With respect to the hundreds of drums at the site

Page 70

that the RIDEM representatives observed and that were visibly smoking, do you know whose drums those were based upon the work you've done?
A. I don't know. I would have to -- This is documented in another report. They were buried drums.
Q. Whether the drums came from the chemical company or the drum reconditioning company, do you know from where the drums came?
A. I don't know.
Q. Turn to page 4-4. I'm looking at the carryover paragraph at the top of the page that talks about the distribution pattern. Why don't you take a look at that paragraph yourself on that page.
A. (Pause) Yes?
Q. What is meant in that paragraph by distribution pattern?
A. The distribution of the data. There is a figure that is referenced, I believe, that just shows you how the data are distributed throughout the source area, the dioxin data in this case.
Q. And when it says in the middle of the paragraph "This distribution pattern is consistent with the analysis of historical activities on the

Page 71

site," why is that so?
A. I think what it's saying is that the highest concentrations of dioxin are found in areas near where there was waste disposal activity.
Q. And what conclusions, if any, do you draw from that?
A. That it could be from the -- that the source of contamination could be those waste disposal activities.
Q. And then at the end of the next paragraph it states "Under Caps Number 1 and Number 2, the higher surface concentrations indicate discharge to the ground surface." What is meant there by discharge to the ground surface?
A. It could have been leaking or something just disposed of right to the ground. If you spill something on the ground and you have higher concentrations in the ground surface, that's what they're saying they found.
Q. Turn to page 4-6. And under Groundwater, could you just read the first paragraph there to yourself.
A. (Pause) Yes?
Q. There is a reference there that "the most

Page 72

significant groundwater contamination at the site was found in the vicinity of well MW-05S." What conclusions, if any, do you draw from that?
A. I think it says that the highest concentration of dioxin and some selected VOCs were found in the groundwater from this well MW-05S, which is located near where we believe the chemical manufacturing building was located at the site. So the contamination could be from that chemical manufacturing.
Q. Based upon the work you've done in connection with the Centredale site, to your knowledge when did the contamination that you've been investigating become known?
MR. BINDER: Objection.
A. I'm not quite sure I follow your question.
Q. With respect to the contamination at this site that you've been investigating, what did that first become known?
MR. BINDER: Objection.
A. I think it says in the report that in 1996 dioxin was first discovered in fish from the Woonasquatucket River. Prior to that, RIDEM obviously was at the site and observed buried drums

Page 73

and conducted investigations.
Q. Do you know sitting here now what conclusions RIDEM reached based upon anything it did at the site?
A. No, I'm sorry, I don't.
Q. Mr. O'Connor had asked you about, I think, standard operating procedures for testing for dioxin and you referred to an EPA method. What is it that you were referring to?
A. Well, Battelle has standard operating procedures that we follow for chemical testing and those procedures are specific to our lab but are based on EPA methods.
Q. So is there someplace you can check EPA methods to find out about the origins of those standard operating procedures?
A. You could get on-line and look up an EPA method and I'm sure it will give you a history.
Q. And would I just go to the EPA's website in order to do that?
A. You could go to EPA's website and do a search.
Q. Is that how you would go about doing it?
A. I have it bookmarked.

Page 74

Q. On your computer?
A. I have it bookmarked, yes.
Q. And when you say bookmarked, you mean on your computer?
A. On my computer, sorry. Yes.
Q. And that is from the EPA website?
A. Yes.
MR. NATHANSON: That's all the questions I have. Thank you.
MR. BINDER: I have a few questions. I'm going to suggest, if counsel don't mind, maybe I switch seats with Mr. Harding so that we don't have to twist around in our seats.
MR. HARDING: Sure.
EXAMINATION
BY MR. BINDER:
Q. My name is Richard Binder. I represent Emhart.
In the last couple of questions you were asked about Battelle's standard operating procedures for testing for different contaminants. Are those SOPs published somewhere?
A. At Battelle.
Q. Are they published anyplace that is

Page 75

publicly available?
A. Well, they shouldn't be, because it's proprietary information.
Q. Okay. And are those intended to implement certain of the published EPA test methods?
A. They are based on EPA methods or comparable to EPA methods.
Q. They are comparable but they differ in some proprietary way?
A. I don't know specifically for the dioxin method.
Q. You are aware that EPA has a couple of different methods for testing for dioxin in test methods with numbers?
A. Right, two methods that I'm aware of.
Q. Do you remember what those two numbers are?
A. I believe it's 8290 and 1613 maybe. I'm not sure.
Q. And Battelle has confidential standard operating procedures that are intended to implement those or be consistent with those test methods?
A. Yes.
Q. And do you know whether or not the dioxin

Page 76

analyses in connection with this report were conducted in accordance with those methods?
A. Yes.
Q. And in reviewing those, was your area of interest the concentrations that were detected?
A. I reviewed the data to look at the extent of the contamination. I also reviewed results from the quality control samples which give you an indication of accuracy and precision of the method.
Q. And in the course of your review, did you have any reason to question the test results?
A. On occasion I might find something and say can you double-check this result, something seems unusually high possibly. Or if a QC result was not acceptable, we might have reextracted some samples.
Q. In your review of the test results, did you analyze at all the internal quality standards, the internal controls?
A. Do you mean the quality control samples?
Q. The quality control samples, yes.
A. I reviewed the results of that.
Q. And in the course of that review, subject to one or two results that you questioned and had rerun, did you see any problems with those results?

Page 77

A. No. I found the data to be usable.
Q. If my notes are right, your background in college was as a chemistry major?
A. Correct.
Q. And your employment has been with Battelle for about roughly twenty years?
A. About eighteen years, correct.
Q. Eighteen years, excuse me.
In connection with this report that was Exhibit 2, if my notes are correct, you did not prepare the report?
A. I am not the primary author; I contributed.
Q. You contributed. Did you contribute to specific sections?
A. I'm sure I did, with the nature and extent of contamination probably primarily, and maybe summarizing investigations conducted previously at the site.
Q. Now, I think there was a question, somebody asked about environmental forensic review.
A. Mm-hmm.
Q. There was an environmental forensic review conducted in connection with this site. Is that

Page 78

correct?
A. Yes.
Q. And that is one of the appendices?
A. Correct.
Q. I think it's Appendix E?
A. Correct.
Q. And that was conducted by an independent contractor?
A. A consultant, yes.
Q. A consultant. Does that consultant have a contract, a subcontract with Battelle?
A. Not currently.
Q. Did it at the time it prepared the report?
A. Yes.
Q. And did you participate at all in the preparation of the environmental forensic report?
A. I was not the author of that report.
Q. Was the contract between Battelle and the author of that report terminated?
A. It was completed when they completed the work.
Q. The work was completed and there's no current contract?
A. Not for this Centredale project.

Page 79

Q. Is there going to be a further environmental forensic review in connection with the Centredale project?
A. Not to my knowledge.
Q. The contract we're talking about to prepare the forensic environmental review, that was NewFields?
A. Correct.
Q. And who was the person at NewFields who was primarily responsible for the preparation of that report, if you know?
A. I worked primarily with Steven Emsbo-Mattingly.
Q. If my notes are correct, you testified you had a personal communication in which you were told of the manufacture of the hexachlorophene at the site.
A. Right. I believe EPA informed me of that, of that certain time frame, 1965. Otherwise it's documented in the other project reports.
Q. You spoke with somebody at EPA and got that information?
A. Yes.
Q. Do you recall who you spoke with?

Page 80

A. I believe it was Anna Krasko.
Q. And in that voluminous file of yours described to Mr. Nathanson, would you have any notes of that communication?
A. I may.
Q. In the course of that communication, did Anna Krasko describe to you the method in which the hexachlorophene was manufactured at the site?
A. No, I don't think so. She just pointed to other project documents.
Q. She pointed to other project documents that stated that hexachlorophene was manufactured at the site?
A. I believe so.
Q. Either from your recollection of your conversation with her or from your review of the other documents she cited, was there any information regarding the method in which the hexachlorophene was manufactured?
A. Just as a manufacturing process.
Q. They described a process such as telling you the temperature, the pressure, whether an acidic or basic solution was used?
A. I don't have that information, I don't

Page 81

think.
Q. Now, when you were told it was a hexachlorophene manufacturing operation, were you provided information as to whether -- Let me back up for a second. Are you familiar with the manufacture of hexachlorophene?
A. No. I mean, I'm familiar with the Archer and Crone reference to that process.
Q. The Archer and Crone reference is something you read?
A. It's an article, yes, and I skimmed through that.
Q. Did you skim through it in connection with your role in the preparation of Exhibit 2?
A. Yes.
Q. Now, do you know whether trichlorphenol is an ingredient that is used in connection with the manufacture of hexachlorophene?
A. I believe it is.
Q. And were you told whether or not trichlorphenol was purchased or whether it was manufactured at the site?
A. Well, the RI indicates that it was shipped to the site.

Page 82

Q. So based on that, it is your understanding that it was not manufactured at the site but rather was purchased from a third party?
A. That it was shipped, right, and then used in the manufacturing process for hexachlorophene.
Q. You mentioned that you skimmed a reference from Archer and Crone?
A. Yes.
Q. And that is the reference that is cited in several places in Exhibit 2?
A. It is cited several times, mm-hmm.
Q. And that is the reference that is cited in Exhibit 2 for the proposition that there could be a correlation between hexachloroxanthene and hexachlorophene manufacture. Is that right?
MR. NATHANSON: Objection to form.
A. That hexachloroxanthene and dioxin are by-products of the hexachlorophene manufacturing process.
Q. And that is the sole basis that you are aware of for that statement in your report?
A. That and other project reports where it talks about the site history and what occurred. I'm not sure what those references were for dioxin being

Page 83

a by-product of that manufacturing process.
Q. So the basis for the statement of a correlation between hexachloroxanthene and dioxin is Archer and Crone and some other project documents that may mention this relationship between the two?
A. Yes.
Q. And as you sit here now, you're not aware of any of the other project documents or reports that speak to a relationship between hexachloroxanthene and dioxin?
A. There have been source characterization studies. Or, there is a source characterization study conducted where this is probably included in the site history.
Q. Now, looking at Exhibit 2, Ms. Dahlen, can you give us a citation to the source characterization study? (Pause) Take your time.
A. It is the TetraTech 2002 reference on page 2-2; Section 2.3 says Source Area Investigation.
Q. I'm sorry. Could you just back up again, tell me what you're reading from and where you are?
A. I'm looking at Section 2.3, Source Area Investigation, of the RI, which is page 2-2, and that first paragraph under the section indicates

Page 84

that "A sampling and analysis program was conducted in the source area in 2001 to determine the nature and extent of soil and groundwater contamination," et cetera, and it is a TetraTech 2002 reference. So I believe that that TetraTech reference is a project document and they would also have a summary of the site history of what occurred at the site, including the chemical manufacturing activities and drum reconditioning operations.
Q. I'm sorry. Did you finish your answer?
A. I'm all set.
Q. So do you know whether that document discusses any correlation between hexachloroxanthene and hexachlorophene manufacture?
A. I would have to go back and look at the document.
Q. Fair enough.
Would you take a look at page 4-11.
A. Yes?
Q. And that begins with Section 4.4.5, which says Environmental Forensic Review of Chlorinated Organic Compounds in Sediment?
A. Correct.
Q. Is that environmental forensic review that

Page 85

is referred to there Appendix E?
A. Yes.
Q. And at the end of the first paragraph under 4.4.5 it says "Major findings of this review are summarized below and a full analysis is provided in Appendix E"?
A. Yes.
Q. Does that mean that Section 4.4.5 summarizes the information as contained in Appendix E?
A. Yes.
Q. Now, if we go back to the executive summary, which is pages iii to vi, is the executive summary a summary of the information that appears otherwise throughout in different portions of the report?
A. Yes, it is.
Q. Are you familiar with the process in which -- Withdrawn. You were asked some questions about the Archer and Crone reference that I think you testified you skimmed.
A. Yes.
Q. Let me show you a document that I'm going to ask the reporter to mark as the next exhibit.

Page 86

(Battelle Deposition Exhibit 4 marked for identification.)
Let me ask you, first of all, is Exhibit 4 a copy of the Archer and Crone article that you said you skimmed in connection with the preparation of this report?
A. Yes.
Q. Do you note that there are some references that are cited in Exhibit 4?
A. Yes.
Q. In the course of the preparation of Exhibit 2, did you review any of the references that are cited in Exhibit 4?
A. I didn't.
Q. If I read Exhibit 4 correctly, going back to the first page, second sentence, it reads "The production of hexachlorophene, which was used in antibacterial soaps and cosmetics in the United States, yields HCX as a by-product" and there's a footnote 1 there which cites a reference called Goth, R.; Wachtmeister, C.; in Acta Chem Scandinavia. Is that right?
A. Yes, I see that.
Q. And in the course of your work you didn't

Page 87

review that reference?
A. No, I didn't.
Q. And then a sentence later there's a sentence that reads "Another undesired by-product of the hexachlorophene process is the environmentally stable 2,3,7,8-tetrachlorodibenzo-p-dioxin. HCX and TCDD were reported in soil samples over 20 years ago from a variety of sites in eastern Missouri by Viswanathan and Kleopfer," and the citation supporting that is footnote 2, which is an article by Viswanathan and Kleopfer entitled Chlorinated Dioxins and Dibenzofurans in Perspective, and it cites editors Rappe, Choudhary and Keith. Is that right?
A. Yes.
Q. And you didn't read that reference?
A. No, I didn't.
MR. NATHANSON: Can you keep your voice up a little? I'm having trouble hearing you.
MR. BINDER: Sure. I'll be glad to.
BY MR. BINDER:
Q. And was it your intent in the work you did in connection with Exhibit 2 to conduct a scientific analysis of the nature to which there is support for

Page 88

the proposition that there is a correlation between hexachloroxanthene and hexachlorophene?
A. It was the purpose to determine the nature and extent of contamination, whatever that may be, and I believe that there was some discussion about a correlation between chemicals and grain size or TOC in the forensics review. There may have been discussion as well about a correlation with TCDD, which is the abbreviation for this 2,3,7,8-tetrachlorodibenzo-p-dioxin.
MR. BINDER: Could you read back the question and answer, please.
(The reporter read the answer.)
BY MR. BINDER:
Q. Now, if you were preparing a publication where you wanted to determine whether or not the Archer and Crone article was scientifically supported, would you have reviewed the references cited by Archer and Crone?
MR. HARDING: Objection.
MR. NATHANSON: Objection to form.
A. Probably.
Q. And why would that be?
A. Just to see what the background material

Page 89

is.
Q. And was it your intention in the preparation of this report?
MR. HARDING: Object to form.
A. Well, it was documented that HCX and TCDD were by-products of this manufacturing process, so I took that as verified.
Q. When you say it's documented and you took it as verified, you're referring to the Archer and Crone article?
A. Well, Archer and Crone and the previous project reports where this is documented.
Q. The previous reports, that would be the 2002 TTNUS report that you mentioned a little while ago?
A. That's one of them.
Q. Any others?
A. I'm sure there are other reports that we've referenced throughout.
Q. Do you know whether any of these other reports references a correlation between hexachloroxanthene and the manufacture of hexachlorophene?
A. I believe the reports reference that both

HCX and dioxin TCDD are by-products of that manufacturing process.
Q. Which reports do you think contain that information?
A. It's probably in the site history background as a starting point for each of the reports. Section 2 of the RI identifies the previous investigations conducted at the site, and -- I can't remember; I don't have each of those in front of me -- it's frequent that these reports would have a site history information at the beginning. Each of them may reference this, but I don't know for sure.
Q. So that if we wanted to see what other, look at the reports and see where there might have been such information, we would look in the site history section?
A. You would look at -- Well, the site history is a summary and then Section 2 talks about the different activities conducted at the site, the different investigations, and there'll be references to reports from each of those and they would have information.
Q. Let's back up; I think my question wasn't



clear. When you cited documents and other reports, did you say that you would look in a particular section of these other reports to see if there was a statement about a correlation between hexachloroxanthene and hexachlorophene?
A. I would probably look in the intro, the site history or background to see what was said.
Q. Would you look any other place?
A. Well, I'd look through the whole report, but....
Q. But you would expect to find it in the introduction and site history?
A. I would.
Q. If we look at Exhibit 4 for a moment, in the first paragraph there's a reference to eastern Missouri sites.
A. Yes.
Q. Do you know where -- Do you have any information about those eastern Missouri sites?
A. I don't.
Q. Do you know whether those were sites where waste was deposited from an operation that manufactured both trichlorphenol and hexachlorophene?



MR. NATHANSON: Objection, lack of foundation.
A. I haven't studied the site.
Q. And when you say the cite, you're referring to Archer and Crone?
A. No, I'm sorry, the eastern Missouri site that you're referring to.
Q. And if we look on the third page of Exhibit 4, do you note there is a table about three-quarters of the way down?
A. Yes.
Q. And one of the entries in the table is a ratio of the range between HCX and TCDD?
A. Yes.
Q. And HCX is hexachloroxanthene?
A. Hexachloroxanthene, correct.
Q. And TCDD is a kind of dioxin?
A. Right, a specific congener.
Q. And you see the ratio range of hexachloroxanthene to TCDD dioxin at the two sites named EM-1 and EM-2. Could you compare those to the ratio for hexachloroxanthene to TCDD at the sites NR-1 and NR-2?
MR. NATHANSON: Can I hear the question



back, please?
MR. BINDER: Let me just ask it again. Might be easier.
MR. NATHANSON: Okay.
BY MR. BINDER:
Q. Could you compare the ratio of hexachloroxanthene to TCDD from the two sites at locations EM-1 and EM-2 to the two sites at locations NR-1 and NR-2?
MR. NATHANSON: Objection to form; objection, lack of foundation.
A. Yes, I'm looking at the numbers.
Q. And what is that? What is the relationship between the two?
A. Well, at the eastern Missouri sites, which I presume are EM-1 and EM-2, the correlation or the ratio of HCX to TCDD is more similar, it's closer to 1, as opposed to at the NR-1 sites it's higher, so there's a higher amount of HCX to TCDD. I presume that's what it means, without having read the preceding paragraph.
Q. In the course of your work, did you study information regarding the chemicals that were contained in the drums that were reconditioned?

Page 94

A. Just what I read about what the drum labels said.
Q. Are you aware from any of the information you reviewed that some of the companies that provided the drums to New England Container Company for reconditioning were companies who were involved in the manufacture of trichlorphenols?
MR. O'CONNOR: Objection.
A. I don't remember that. I remember there being multiple sources. I remember reading of drums shipped from many sources.
Q. And would the burying of drums that contained a residue of trichlorphenol result in the introduction of dioxin?
MR. O'CONNOR: Objection.
MR. NATHANSON: Objection, form. Objection, lack of foundation.
A. Possibly.
Q. Is it more likely than not?
MR. NATHANSON: Objection.
A. I don't know.
Q. Are you familiar with the chemical reaction in which dioxin is created in the manufacture of trichlorphenol?

Page 95

A. I couldn't write it out for you. I'm sorry.
Q. Are you familiar with a process known as scouring?
A. Yes.
Q. Is scouring a mechanism by which dioxin can be transported?
A. Potentially.
Q. Can you explain how scouring works?
A. If there's sufficient physical forces applied to the sediment bottom, you could disturb the sediment bottom and there would be potential erosion so those surface sediments could be transported.
Q. And does the process of either erosion or scouring include a situation in which soil that contains dioxin can be moved from the soil into a river?
A. From a flood situation, you may have something where waters overtop the banks of the river and come up and are in contact with contaminated soils, which could then lead to or help migrate the contaminants into the river.
Q. And in that process -- Well, could you

Page 96

describe in a little more detail how that process works?
A. Just if there is a flood, again, the water comes up just like at a beach when it's high tide and you get that wave action. And if the floodwater is overtopping the banks of the river, it would come in contact with floodplain soils, which may be source area soils at the site, and so it's coming in contact with the soils which are contaminated. And that could be a mechanism by which the contamination can spread to the river.
Q. Is it the case that the waters that have overflowed the bank then capture some of the contaminated soil and bring that soil back into the river?
A. Could be, yes.
Q. From your review in connection with the preparation of Exhibit 2, did you learn that there was hexachloroxanthene that was upstream from the source area?
A. I believe there may have been one background sample with low levels of hexachloroxanthene.
Q. Could you turn to page 4-11? I don't mean

Page 97

to make this a memory test.
A. Yes.
Q. If we look to the bottom, there is a sentence that says "The presence of HCX in the upstream background samples may be due to discharge of soaps or cosmetics containing hexachloroxanthene into the river possibly from the North Smithfield WWTP."
A. Yes, I see that.
Q. And HCX is hexachloroxanthene?
A. Yes.
Q. And WWTP means wastewater treatment plant?
A. Correct.
Q. And there was a wastewater treatment plant upstream --
A. Right.
Q. -- of the source area?
A. Yes.
Q. And by source area, would that be the area where the chemical company and the barrel reconditioning company conducted their operations?
A. Yes.
Q. So there was an upstream source of hexachloroxanthene that was not connected with the

Page 98

manufacture of hexachlorophene. Is that correct?
MR. O'CONNOR: Object to form.
BY MR. BINDER:
Q. Was there an upstream source of hexachloroxanthene that was not connected with the manufacture of hexachlorophene at the site?
A. Possibly; because we're seeing some in the upstream background samples but I believe at significantly lower levels than downstream on the site.
Q. In any event, there was an upstream source of hexachloroxanthene?
MR. NATHANSON: Objection, asked and answered.
MR. HARDING: Objection.
A. There was an upstream signature. Where that came from I don't know.
Q. What do you mean by signature?
A. It was detected but at --
Q. Excuse me. I didn't mean to interrupt you; I thought you had stopped.
A. It was detected at significantly lower concentrations than downstream.
Q. Now, in the information where you learned

Page 99

about the manufacture of hexachlorophene at the site, did you learn whether or not the method of manufacture varied from time to time?
A. I think it's documented that that could be -- I would just like to take a look. (Pause) On Section 4.4-5, second paragraph, it does indicate that the manufacture -- this is midway in that paragraph -- the manufacture of hexachlorophene produced HCX in widely varying amounts depending on the reaction conditions of the manufacturing process.
Q. And the citation for that is Archer and Crone?
A. Archer and Crone, correct.
Q. And the information you received did not include any information about the reaction conditions of the process at the chemical company?
A. I don't think I have that information in my file.
Q. And you don't know how those reaction conditions compared to the reaction conditions of the manufacture of hexachlorophene at the sites that were mentioned by Archer and Crone?
A. Not personally.

Page 100

Q. In the course of preparing Section 4.4.5 of Exhibit 2, that was to summarize the information in the environmental forensic review. Is that right?
A. Yes. It's a summary of the information presented in Appendix E, the environmental forensics review.
Q. So if we look now to the bottom of page 4.12 and the first bullet point, it references a discharge directly into the Woonasquatucket River?
A. Yes.
Q. So that would be information that is contained in Exhibit E as the support for that statement?
A. I believe so, yes.
Q. And are you aware that on one side of the source area there is the Woonasquatucket River? The Woonasquatucket River borders the source area on one side.
A. Yes.
Q. And on the other side is the tail race?
A. That has since been remediated, yes.
Q. And there was a location where the tail race and the river converge?

Page 101

A. At one point in time, yes.
Q. And at that point where the tail race and the river converge, every place downstream of that -- Withdrawn. Do you know where Allendale Pond is in relationship to the location where the tail race and the river converge?
A. Immediately downstream, the first pond downstream.
Q. Could you take a look at the environmental forensic review, please.
A. The appendix or the summary?
Q. The appendix. Or if it's easier for you, I've got a clean copy.
A. Okay.
Q. Would you take a look at page 9, please.
A. Okay.
Q. On page 9 it states in the first bullet point "At the outset we observed that many background samples plotted near the top of the background footprint, indicating high abundances of HCX relative to other PCDDs and PCDFs. This was unexpected, given the intended use of HCX as a marker for the manufacture of hexachloroxanthene in the source area."

Page 102

A. I'm not finding where you started "At the outset." Page 9?
Q. If we look at the Spatial Patterns of Dioxin and Furans, page 9.
A. Yes.
Q. It's in the second paragraph under the bullet point which says "We approximated the variance."
A. Okay, "We approximated," okay. I thought you said "At the outset."
Q. And then about halfway down that paragraph --
A. Oh, okay, here we go.
Q. Okay? And then further down the authors state "In summary, HCX might not be an exclusive indicator of PCDDs and PCDFs originating from the source area within the concentration range of background." Is that correct?
A. That's what it says, within the concentration range of background.
Q. If we look at page 15 of the report -- Withdrawn.
Do you know roughly how far it is from the portion of the site on which the chemical company

Page 103

operated to Allendale Pond?
A. No. I'm sorry. Not very good at estimating distances.
Q. If you take a look at the site map that is attached, would that help you?
A. Well, not at estimating the distance. It's not that far. Figure 1-2 of the RI shows the source area, so you see where the apartment buildings are, where the caps are, and then down at the bottom of that is the area where the Woonasquatucket River and the tail race meet and then further down is Allendale Pond.
Q. Is there a scale on that?
A. There is.
Q. Would that help you to estimate the distance?
MR. O'CONNOR: From what to what?
MR. BINDER: From the location where the chemical company manufactured to Allendale Pond.
A. Got the wrong one. Figure 1-3. Sorry. In that one there's an arrow pointing to the former chemical manufacturing building where it's believed hexachlorophene was manufactured. I don't have a ruler.

Page 104

MR. BINDER: Kevin, could you manage to get us a ruler? I'm sorry, I didn't bring one. Could you get one?
MR. O'CONNOR: Yes.
MR. BINDER: Thanks.
(Mr. O'Connor left the room and returned shortly with a ruler.)
A. It looks like it's approximately 1200 feet lineally, at least as the bird flies.
Q. Okay, thank you.
And if we look at page 15 of the environmental forensic review, there is a reference to hexachlorophene by-products being discharged directly into Allendale Pond?
A. In one of the bullets or the paragraph?
Q. It's the first paragraph after the bullets; the second sentence. Do you see that?
A. Yes.
Q. So if this statement is correct, then somebody transported the by-products 1200 feet from the location of the manufacturing facility to the pond?
MR. NATHANSON: Objection to form.
MR. O'CONNOR: Objection.

Page 105

A. Oh, I see what you're saying. I think earlier we said that it was possibly discharged to the river earlier in the report.
Q. Here it says -- I'm sorry.
A. Here it refers --
Q. Go ahead. I apologize.
A. Here it says into Allendale Pond. But earlier in the report, I think consistently it's been discussed as possibly discharged into the river.
Q. So discharged directly into the pond is incorrect?
MR. HARDING: Object to form.
A. I would want to talk to the author of this and just see if he meant to say something else.
Q. It seems implausible to you. Is that right?
MR. HARDING: Object to form.
A. I'm not saying that. I just, I'm used to thinking of it as discharged to the river.
Q. If we look through Exhibit E, isn't it the case that nowhere in this exhibit does it refer to the discharge of hexachlorophene by-products into the river?

Page 106

A. (Pause) Page 5 under the Dioxins bullet says, fifth line down, "We speculated that this pattern resulted from either the gradual erosion of contaminants from the source area to the proximal sediments, or the direct discharge of dioxin-containing by-products into the proximal water body during the manufacture of hexachlorophene."
Q. That's what the authors speculated?
A. Yes.
Q. Do you see anyplace in this exhibit where there's anything more than speculation about the discharge of hexachlorophene by-products directly into the Woonasquatucket River?
MR. NATHANSON: Objection to the form.
BY MR. BINDER:
Q. Do you see any other reference other than this sentence that we read where the authors speculate or state that there was a discharge of waste from the hexachlorophene manufacturing process into the Woonasquatucket River?
MR. NATHANSON: Objection.
A. I just have to look, if you don't mind.
Q. No, go ahead.
A. Are you saying there are any other times

Page 107

where the same kind of statement is made or that there is proof, absolute proof, like someone saw someone putting something in the river? Is that what you're asking?
Q. I'm asking anything that this report states.
MR. NATHANSON: Objection.
A. This is speculation based on a review of the data and an analysis of the data. I'm going to continue looking.
Q. Please do.
A. In that same bullet it then goes on to say "It was not possible to definitively determine the dominant transport process with the available data. However, we believed that the higher concentration of PCDD/DFs in Allendale Pond, not the source area, helped identify the initial point of discharge."
So, again, speculation that the initial point of discharge is the source area based on a review of the existing site data.
Q. Anything else?
A. No.
Q. Now, if the dioxin were discharged into the pond, wouldn't you expect there to be a higher

Page 108

concentration of dioxin in the pond than in the source area?
A. Not specifically. If dioxin was discharged along the river, it would have adsorbed to fine particulates and been transported downstream and then deposited in depositional areas of which Allendale is the first impoundment downstream with depositional areas.
Q. Whatever dioxin was deposited directly in the pond would not have reached the site area. Is that correct?
MR. HARDING: Object to form.
A. Unlikely, unless there was some flood that again overtopped; maybe the waters came up out of the ponds and reached the southern boundary of the source area. That's a possibility.
Q. And flowed upstream?
A. But unlikely.
Q. The hypothesis you talk about would involve the dioxin flowing upstream. Is that correct?
A. Can you read back the question? I'm confused by what you're asking.
Q. Do you want it read back or do you want it

Page 109

asked again?
A. Go ahead, ask it again.
Q. If dioxin were discharged directly into the pond and the pond being downstream from the source area, how would dioxin that was discharged into the pond reach the source area other than by flowing upstream?
MR. HARDING: I object to the form and beyond the scope of the notice. We noticed Battelle to present a designee on what Battelle did at this site, and I think asking hypothetical questions is beyond the scope of the notice.
MR. O'CONNOR: I join in that objection.
THE WITNESS: I have no idea what that means. Does that mean I can still answer?
MR. BINDER: You can. And if the objection is well-founded, the judge will exclude it at trial, so please go ahead.
MR. HARDING: You can answer.
A. I can't remember reading in this report a transport mechanism that would discuss transport of dioxin in contaminated sediments in Allendale Pond going upstream to the source area. It is more likely that the dioxin contamination in the source

Page 110

area was from the waste disposal activities.
Q. So dioxin that was discharged into the pond would not have reached the source area?
MR. O'CONNOR: Object to form.
MR. NATHANSON: Objection to form.
A. If it was discharged in the pond, I don't know. I would want to ask another sediment stability expert.
Q. I would like to go back to the front now, page 1.3 of the report. If you look in the last paragraph, there's a sentence that begins "Evidence of improper waste disposal activities at the source area is documented in an analysis of historical aerial photographs conducted by the U.S. EPA Office of Research and Development." And I think you said the source of that statement was the photographs that were marked as Exhibit 3?
A. You're talking about Section 1.3.2 and I was looking at --
Q. No, I'm looking at page 1-3.
A. Oh, 1-3, okay. In the last paragraph, yes.
Q. And the first sentence says "Evidence of improper waste disposal activities at the source

Page 111

area is documented in an analysis of historical aerial photographs conducted by the U.S. EPA Office of Research and Development."
A. Yes.
Q. I think you said the source for that statement was the photographic analysis that is Exhibit 3?
A. Correct.
Q. When that sentence refers to improper, is the word "improper" a word that comes from Exhibit 3?
A. I don't know without looking through this whole exhibit.
Q. Was that a word you developed to characterize what was done at the site?
A. I would want to look through this whole exhibit to see if "improper" was used. Do you want me to do that?
Q. If you could, please.
A. Okay. (Pause) Well, I didn't see the word "improper" used. And that would mean that we used that word in our report, Battelle.
Q. Now, you are aware of what are proper and improper waste disposal activities following

Page 112

enactment of RCRA. Right?
MR. O'CONNOR: Objection.
A. I am not. I would have to look up the rule.
Q. You are aware of what kind of waste disposal activities are currently improper?
A. I don't know the specifics. I would have to look up the rule.
Q. So as you sit here now you're not sure what kind of waste disposal activities are proper or improper?
MR. O'CONNOR: Objection.
MR. NATHANSON: Objection.
A. Not me personally.
Q. I'm just trying to check. Thanks.
I think I'm set. Let me just take a moment to go over my notes.
(In recess 1:08 p.m. to 1:11 p.m.)
BY MR. BINDER:
Q. Just a couple more questions, Ms. Dahlen. Could you turn to page 2-5, please.
A. Yes in.
Q. Looking at the bottom paragraph, it begins with the radiometric age dating. If my memory is

Page 113

correct, your testimony was that as a result of that radiometric age dating there was an indication of the presence of dioxin between the '40s and the '70s?
A. Correct. I'm sorry. The highest concentrations.
Q. And are you aware of any work Battelle has done to more precisely date that period of higher concentrations?
A. For Allendale Pond, no. For Lyman Mill, we conducted another investigation to collect sediment cores for dating as well as dioxin analyses.
Q. What are the results of that additional testing on the pond?
A. It's not complete yet.
Q. In the course of your career, have you written any articles that have appeared in any kind of journals or publications?
A. Let's see. Well, I just submitted an article but it hasn't been accepted for publication yet. I have also I think a journal article from my research in college. I think I'm listed as a co-author on other articles during my time at

Battelle but I don't have that list with me.
Q. Is that something you could provide to us through your counsel?
A. Sure.
MS. TROUTMAN: We'll get your C.V.
MR. BINDER: Good.
BY MR. BINDER:
Q. And could you also possibly through your counsel provide to us any notes you may have of your conversation with Anna Krasko concerning the information she provided about the manufacture of hexachlorophene at the site?
A. I can look through my notes.
Q. And if you have those, we would appreciate --
MS. TROUTMAN: I'll get back to you on this. She's new at this and the last one of these I did was six years ago, so we'll check and get back to you.
MR. BINDER: And we're just requesting. You can let us know following the conclusion of the deposition.
MS. TROUTMAN: I understand. Very good.
MR. BINDER: Okay, thanks. I have no



further questions.
MR. HARDING: Nothing else.
MR. O'CONNOR: Nothing further.
FURTHER EXAMINATION
BY MR. NATHANSON:
Q. I just have one thing I wanted to follow up on back in Appendix E, page 9. In responding to Mr. Binder's questions on that paragraph, you mentioned in the last sentence the final words "within the concentration range of background." I didn't know why that was significant to you, so I'm asking.
A. I have to reread this, but I think what it -- I'm going to reread it before I tell you my answer. Okay?
Q. Sure, that's fine, please do.
A. (Pause) What this is saying is that there is an underlying background signature of HCX detected in what we are calling the background sample, the upstream location. So HCX is there; it's in the background. But later on as you read through it says that the concentrations of HCX and TCDD are significantly higher downstream and they tend to co-occur.



So I think what this is saying is that there's just an underlying background signature where HCX was present but downstream it's significantly higher. So you have the sort of underlying background and then you have your significantly higher concentrations.
MR. NATHANSON: Thank you. That's all the questions I have.
FURTHER EXAMINATION
BY MR. BINDER:
Q. Just one quick question. In response to Mr. Nathanson's question, were you summarizing the information that is in Appendix E to Exhibit 2?
MR. NATHANSON: Objection to form.
A. Yes, based on my quick review, yes.
Q. And you did not prepare that report?
A. I did not prepare it.
MR. BINDER: Okay, thank you.
MR. NATHANSON: We're done. Thank you.
MR. O'CONNOR: Thank you very much.
(Deposition concluded at 1:19 p.m.)



COURT REPORTER'S CERTIFICATE

I, J. Edward Varallo, Registered Professional Reporter and Notary Public in the Commonwealth of Massachusetts (my commission expires 01/09/2009), hereby certify that the deposition of Deirdre T. Dahlen taken on March 6, 2006, in the matter of Emhart Industries, Inc. v. Home Insurance Company, Insurance Company of North America, Liberty Mutual Insurance Company, North River Insurance Company and America Insurance Company, was recorded by me stenographically and transcribed; that before being sworn by me, the deponent provided satisfactory evidence of identification as required by Executive Order 455 (03-13) of the Governor.

I certify that the deposition transcript produced by me is true and accurate to the best of my ability.

I certify further that I am not counsel, attorney, or relative of any party litigant, and have no interest, financial or otherwise, in the outcome of this suit.

DATED: 3/10/2006 J. Edward Varallo

INDEX


| DEPONENT | PAGE |
|---|---|
| Deirdre T. Dahlen | |
| by Mr. Harding.......................... | 3 |
| by Mr. O'Connor......................... | 56 |
| by Mr. Nathanson........................ | 66, 115 |
| by Mr. Binder........................... | 74, 116 |

| EXHIBITS | FOR IDENTIFICATION | PAGE |
|---|---|---|
| Battelle Deposition Exhibit 1 | | 5 |
| Battelle Deposition Exhibit 2 | | 15 |
| Battelle Deposition Exhibit 3 | | 38 |
| Battelle Deposition Exhibit 4 | | 86 |


(ORIGINAL EXHIBITS RETURNED TO ATTORNEY HARDING)

Sent via UPS to counsel on 3/10/2006
Deirdre T. Dahlen
SIGNATURE PAGE/ERRATA SHEET INFORMATION
Deposition taken March 6, 2006
Emhart Industries, Inc. v. Home Insurance Company, Insurance Company of North America, Liberty Mutual Insurance Company, North River Insurance Company and America Insurance Company

SIGNATURE INFORMATION FOR COUNSEL

The original signature page/errata sheet has been sent to Anne Troutman, Esq., with a copy of the transcript, to obtain signature from the deponent. When complete, please send original to John T. Harding, Esq. A copy of the signed errata sheet should be sent to each party of record present at the deposition.

DEPONENT INSTRUCTIONS

After reading the transcript of your deposition, please note any change or correction and the reason on the errata/signature page. DO NOT make any notations on the transcript itself. Use additinal errata sheets if necessary.
PLEASE SIGN AND DATE the errata/signature page and return it to your counsel.



DEPONENT: Deirdre T. Dahlen
CASE: Emhart Industries, Inc. v. Home Insurance Company, Insurance Company of North America, Liberty Mutual Insurance Company, North River Insurance Company and America Insurance Company

SIGNATURE PAGE/ERRATA SHEET

| PAGE | LINE | CHANGE OR CORRECTION AND REASON |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

I have read the transcript of my deposition taken March 6, 2006. Except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

SIGNED THIS ________ DAY OF ____________________________
____________, 2006, UNDER THE Deirdre T. Dahlen
PAINS AND PENALTIES OF PERJURY