UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

EMHART INDUSTRIES, INC.,

Plaintiff,

v.

HOME INSURANCE COMPANY,
INSURANCE COMPANY OF NORTH AMERICA,
LIBERTY MUTUAL INSURANCE COMPANY,
NORTH RIVER INSURANCE COMPANY,
ONEBEACON AMERICA INSURANCE COMPANY
and UNITED STATES FIRE INSURANCE COMPANY,

Defendants.

Civil Action No. 02-053 S

**MEMORANDUM CONCERNING EVIDENCE**
**<u>OF CONTAMINANTS OTHER THAN DIOXIN</u>**

**INTRODUCTION**

This memorandum addresses the issue discussed at the conclusion of trial on September 21, 2006.

Contrary to defendants' assertions, chemicals other than dioxin have been pertinent to this case since the beginning. Dioxin is the contaminant that is presently "driving" the remediation at the Centredale site, but, in the future, that may change, as the EPA has not yet determined the final acceptable remedy for the site. Contaminants found on the site include, in addition to dioxin, PCBs, VOCs, SVOCs and metals. Some are water soluble and potentially impact groundwater and some, like dioxin and PCBs, are generally not water soluble. Of interest is the circumstance that trichlorophenol is water soluble. Accordingly, although the cost of removing the driver, dioxin, will probably include the cost of removing the other contaminants,

there is no reason to limit evidence of chemicals on the site to dioxin. Evidence concerning other contaminants is pertinent to the duty to defend and the duty to indemnify. It is pertinent to the "expected and intended" issue and to the discoverability issue.

The other chemicals are part of the complaint. There is nothing new. Paragraph 34 of the complaint in the action alleges that:

> The EPA has determined that "[n]umerous hazardous substances", including dioxin, PCB's volatile organic compounds, semi-volatile organic compounds and metals have been found on the Site and in off-site locations.

Similarly, the first EPA Order alleged that the property damage at the Site was caused by "numerous hazardous substances", "including … [d]ioxin, PCBS, volatile organic compounds, semi-organic compounds, and metals"[1] and lists the concentrations of numerous contaminants. The Third Order (Ex. 15 par. 41) requires installation of a cap in the tail race "to reduce the potential risk for migrations of, and direct contact with, dioxin, PCBs, PAHs, VOCs and SVOCs". As these allegations are not limited to dioxin, in analyzing the charging documents to determine whether there is a duty to defend, issues regarding all contaminants must be considered. Similarly, the duty to indemnify is for all costs of remediating the site, not merely the costs to remediate dioxin. To date, dioxin is the "driver" of the remediation as the remedial work performed to address dioxin contamination will probably remediate other contamination. However, it remains possible that some portion of the future remedial work may be required to remediate contaminants other than dioxin. This would occur if the EPA later determines that portions of the Site that are contaminated by chemicals other than dioxin, such as PCBs, must be separately remediated. Accordingly, although the jury is not being asked to quantify damages, it

[1] See paragraphs 4 and 29 of the First Order (Ex. 13).

is being asked to answer questions pertinent to the duty to indemnify for the cost of cleanup. The Court is apparently considering trial testimony and other evidence on the duty to defend.

The evidence of other chemicals on the site is directly relevant to the trigger of coverage issue. Defendants' assertion that substances other than dioxin should be ignored is based on a misunderstanding of the "discoverability" trigger recognized in Textron, Inc. v. Aetna Casualty and Surety Co., 754 A.2d 742 (R.I. 2000) ("Textron-Wheatfield"); and Textron, Inc. v. Aetna Cas. & Sur. Co., 723 A.2d 1138 (R.I. 1999) ("Textron-Gastonia")[2]. The discoverability trigger is invoked "when "[p]roperty .. damage … in the exercise of reasonable diligence is discoverable." Textron-Wheatfield, 754 A.2d at 746; Textron-Gastonia, 723 A.2d at 1142-43. That trigger is satisfied where "(1) the property damage occurred during the policy period, (2) the property damage was capable of being detected, and (3) the insured had reason to test for the property damage." Textron-Gastonia, 723 A.2d at 745-46. Property damage is caused by all the contaminants found on the site.

Nothing in either Textron decision provides that a policy is triggered only if the contaminant driving remediation is discoverable. There is reason to test if there was "some reason to test" for any contaminant present at the Site. The facts giving rise to the discoverability formulation in Textron demonstrate that the pertinent inquiry is the character of the site in relation to the chemical contamination later found in EPA proceedings to constitute damage. In the Textron decisions, the "some reason to test" element was satisfied when the insured provided evidence that there were spills, leaks and other releases of contaminants that were later found at the site; there was no requirement that a particular contaminant be discoverable or that discoverability related only to the driver of the remediation. Textron-

[2] Copies of those decisions, with pertinent portions highlighted, are attached.

Gastonia, 723 A.2d at 1144 ("in order to trigger coverage in the absence of actual discovery, [the insured] must have had some reason to test for the contamination….").

Textron-Gastonia involved contamination from three solvents: trichloroethylene, trichloroethane and methyl ethyl ketone. 723 A.2d at 1140. Yet, there was no requirement that each, or any, of the three solvents be discoverable. Rather, this element was satisfied by evidence of "overflow and other leaks of solvents" and the court concluded that such events "could cause a person exercising reasonable diligence to test for, and to discover, soil and groundwater contamination." 723 A.2d at 1144. The evidence that sufficed to establish trigger were spills and leaks of "solvents", not of particular solvents. The court noted the affidavits provided evidence of "overflow and other leaks of solvents", "overfill[ing] an above ground solvent storage tank", "'accidental leakage of liquids from valves and pumps", and "'spills and leaks from degreasing units, storage drums, and other containers.'" 723 A.2d at 1138.

Similarly, in Textron-Wheatfield, the court held that the reason to test factor was met by affidavits that described leaks and spills not linked to particular chemicals. The entire discussion of the evidence that satisfied the reason to test requirement (754 A.2d at 747) was a summary of evidence of spills and leaks, without any attempt to ascertain whether there were spills or leaks of particular chemicals. The court addressed only that the contamination was caused by "toxic chemicals". The court stated that there were "'small leaks and spills'" of "the same toxic chemicals" that were later discovered on the site, "arguably giving [the insured's] engineers reasons to test for contamination." In its discussion, the court cited testimony that did not identify specific contaminants, i.e., "spills of the chemicals that later ended up in the groundwater 'certainly' occurred" and evidence of spills associated with "a building used since 1956." The quantum of evidence needed to satisfy the reason to test standard is emphasized by

the expert affidavit of Michael Trelecky submitted in Textron-Wheatfield, which noted the leaks, but contained no explanation as to why the leaks provided a reason to test.[3] The Textron-Wheatfield court held that the affidavit was sufficient to establish a reason to test. Id.

Thus, as each Textron case found, on the facts before the court, there was a reason to test, there is no basis for reading into the decisions a limitation on the scope of the discoverability trigger. Each case contains a set of facts that created a reason to test. There is nothing that limits the discoverability trigger to the facts in either Textron decision, although it should be noted that the facts presented by Emhart are stronger than in either of the Textron decisions. The Textron decisions ruled that the discoverability trigger is satisfied by evidence that "could cause a person exercising reasonable diligence to test for, and to discover, soil and groundwater contamination" (Textron-Gastonia, 723 A.2d at 1142, emphasis added) or if the insured has "some reason to test" (id. at 1144, emphasis added), without providing a catalogue of the circumstances that could provide such a reason. In view of the procedural history, there is nothing in either Textron decision which provides the insurers a basis for adding a requirement that a reason to test be based on a particular contaminant.

The Textron cases also indicate that the reason to test arises from a site being an old industrial site that conducted manufacturing activities for a period of years. Textron-Gastonia involved a facility used to manufacture equipment and Textron-Wheatfield involved a facility that was used to manufacture aerospace equipment. The inevitability of spills and leaks in such a facility inherently create a risk of contamination caused by manufacturing activities. Thus, evidence that the site was one on which manufacturing occurred suggests a reason to conduct

3 The Trelecky affidavit was included in the Appendix of Exhibits to Emhart's opposition to the Century summary judgment motion regarding trigger.

tests to determine whether manufacturing activities, using numerous chemicals, had resulted in any of the chemicals escaping.

Even if there were a requirement that discoverability be tied to a particular contaminant, evidence regarding other contaminants would remain relevant. Spills of one chemical provide a reason to conduct tests for the range of chemicals that had been used at a site. A manufacturer knowing that it had suffered spills of one chemical would conduct tests to determine whether any other chemicals it used had spilled or leaked. It is the use of chemicals, and the risk of spillage, that creates a reason to test. Thus, a reason to test for PCBs would be a reason to test for all chemicals used at the site, as such chemicals could have escaped pumps and tanks in the same manner that PCBs had. The reason to test is permissibly focused on knowledge that chemicals escaped their containers, not that particular chemicals had escaped. Armed with that information, a manufacturer would design tests to determine whether any chemicals it used had spilled, not arbitrarily limit the test to a particular contaminant. The reason to test is even stronger where, as here, the manufacturer knew that it had previously used a chemical, such as trichlorophenol, that it learns, during the policy period, contains a dangerous contaminant.

Here, there is evidence of extensive spills and leaks at the site that is comparable to the evidence in the Textron cases. Metro-Atlantic used pipes to bring raw materials used in its products from storage areas to the manufacturing areas and used hoses to pump finished product from the manufacturing area to an area where it was stored in drums for delivery to customers. Employees observed leaks from those pipes. Such spills and leaks inevitably take place in the course of manufacturing operations

The trichlorophenol used to manufacture hexachlorophene was delivered in tank trucks and either remained in the tank truck until it was piped to the manufacturing building or was

stored before it was used to manufacture hexachlorophene. The building where the hexachlorophene was manufactured contained tanks and centrifuges. Spills or leaks inevitably occurred when the trichlorophenol was brought onto the site by tankers or when it was piped to the building where hexachlorophene was manufactured.

Employees of Metro-Atlantic were also aware of major releases of chemicals. A large formaldehyde tank explosion blew out several windows at the plant, and a "'giant mushroom' of formaldehyde" was released that reached houses in the surrounding area. There was an explosion, fire and release of chemicals when a truck driver opened a 3000 gallon tank of methanol in an attempt to obtain methanol for his space heater and when a chemical was mistakenly pumped into a large storage tank containing a different chemical. The overflow when the chemical was pumped into a storage tank is similar to Textron-Gastonia, in which "'a vendor accidentally overfilled an aboveground solvent storage tank.'" 723 A.2d at 1144 (quoting an affidavit).

The record is replete with evidence of accidental discharges or exposures to a wide variety of chemicals. Further, manufacturing at Metro-Atlantic stopped in 1968 and the barrel operation ceased shortly thereafter. There is no evidence of other sources of the chemicals now of concern. Accordingly, as Mr. Kastrinos explained, the chemicals found in the recent investigation must have been on the site since at least the late 1960's.

The cryptic statements in Textron concerning the circumstances that could cause a person "exercising reasonable diligence to test" for contamination become more understandable when considered in the context of the test equipment and the testing methods that were available during the 1969 policy period of the Century and OneBeacon policies. Using a mass spectrometer, a party exercising reasonable diligence would run a series of tests that would result

in showing the molecular weights and structures of various chemicals that were found by the test equipment. That person, knowing the chemicals used at the site and the molecular weight and structures of those chemicals, would search the analytical results to determine the possible presence of chemicals that were historically used at the site and impurities, such as dioxin, that would have been associated with those chemicals. If the tester used gas chromatography with an electron capture device, a party exercising reasonable diligence would run a series of tests to determine certain properties of the chemicals and the duration of the period in which the chemicals remain on the column of the gas chromatograph and compare those to the properties of the compounds that are hypothetically present. Thus, the leaks and spills created a reason to test, the spectrum of chemicals used at the site creates a hypothesis that those chemicals might have been discharged during operations at the site and, accordingly, might be present. The tester guided by the hypothesis focuses the test on the particular chemicals that could be present.

## CONCLUSION

For the foregoing reasons, the Court should deny the insurers' attempt to exclude evidence regarding chemicals other than trichlorophenol that Metro-Atlantic used in its manufacturing activities

Respectfully submitted,

/s/ Alexandra K. Callam

Jack R. Pirozzolo
Richard L. Binder
Foley Hoag LLP
155 Seaport Blvd
Boston, Massachusetts 02210-2600
(617) 832-1000

Alexandra K. Callam (#5358)
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, Rhode Island 02903
(401) 274-2000
(401) 277-9600
acallam@haslaw.com

Dated: September 22, 2006

Counsel for Plaintiff, Emhart Industries, Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that on September 22, 2006, a copy of the foregoing Memorandum Concerning Evidence Of Contaminants Other than Dioxin was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Alexandra K. Callam

Alexandra K. Callam (#5358)
Hinckley, Allen & Snyder LLP
1500 Fleet Center
Providence, Rhode Island 02903
(401) 274-2000
(401) 277-9600
alexandracallam@haslaw.com

750108v1

**H**

**Briefs and Other Related Documents**

Supreme Court of Rhode Island.
TEXTRON, INC.
v.
AETNA CASUALTY AND SURETY COMPANY
et al.
**No. 98-138-Appeal.**

Feb. 10, 1999.

Insured brought action against liability insurers to recover cleanup costs. The Superior Court, Providence County, Gagnon, J., granted partial summary judgment in favor of insurers on the basis of the trigger of coverage. Insured appealed. The Supreme Court, Goldberg, J., held that: (1) a trigger of coverage occurs when property damage is discoverable in the exercise of reasonable diligence, and (2) questions of fact precluded summary judgment as to when the contamination was discoverable in the exercise of reasonable diligence.

Vacated and remanded.

West Headnotes

**[1] Appeal and Error 893(1)**
30k893(1) Most Cited Cases
Summary judgment is reviewed on a de novo basis.

**[2] Appeal and Error 863**
30k863 Most Cited Cases
Supreme Court on review of summary judgment is bound by the same rules as those applicable to the trial justice.

**[3] Appeal and Error 863**
30k863 Most Cited Cases

**[3] Appeal and Error 934(1)**
30k934(1) Most Cited Cases
Supreme Court will affirm summary judgment if, after reviewing the evidence in the light most favorable to the nonmoving party, drawing all reasonable inferences from that evidence in support of the nonmoving party's claim, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.

**[4] Judgment 185(2)**
228k185(2) Most Cited Cases
The party opposing a motion for summary judgment cannot rely exclusively on mere allegations or on blanket denials contained in the pleadings; consequently, the nonmoving party must affirmatively set forth facts that raise a genuine issue to be resolved by the fact finder. Superior Court Rules Civ.Proc., Rule 56(e).

**[5] Insurance 2265**
217k2265 Most Cited Cases
The trigger of coverage under general liability insurance policy occurs when property damage (1) manifests itself; (2) is discovered; or (3) in the exercise of reasonable diligence is discoverable.

**[6] Judgment 185.3(12)**
228k185.3(12) Most Cited Cases
Affidavits by insured's former and current employees on leaks and spills during the policy period and affidavit by insured's expert on time of groundwater contamination created a genuine issues of material fact precluding summary judgment as to when the contamination was discoverable in the exercise of reasonable diligence and the trigger of coverage occurred under general liability insurance policies.

**[7] Insurance 2265**
217k2265 Most Cited Cases
Liability coverage for pollution was not triggered in the absence of actual discovery, unless the insured had some reason to test for the contamination and was actually able to discover it in the exercise of reasonable diligence.

***1139** John Tarantino, Providence, James W. McKay, for plaintiff.

Mark Lavioe, Dominic Shelzi, East Greenwich, Kenneth P. Borden, Robert D. Parrillo, Paul V. Reynolds, George M. Vetter, Thomas C. Angelone, William M. Heffernan, Stephen H. Burke, Barbara S. Cohen, Brooks R. Magratten, Timothy P. Gallogly, Andrew B. Prescott, Providence, Shelia High King, Steven M. Richard, Providence, Mark T. Reynolds, Peter McNamara, for defendant.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**OPINION**

GOLDBERG, J.

This appeal arose from a trial justice's grant of partial summary judgment on behalf of several defendant insurance companies in an action filed by the plaintiff, Textron, Inc. (Textron). In August 1987, this lawsuit was born, and in June 1988, Textron filed a third amended complaint in the Superior Court against approximately forty insurance companies for reimbursement costs associated with environmental cleanups of multiple sites scattered across the continental United States. [FN1] In seeking reimbursement, Textron alleged that the defendants wrongfully refused to make payments on primary and excess liability insurance policies purchased by Textron from the carriers.

FN1. When this appeal was filed, among the defendant insurance companies were the following entities: Hanover Insurance Company, Commercial Union Insurance Companies, London Market Insurers, Home Insurance Company, Allstate Insurance Company, Associated International Insurance Company, American Home Assurance Company, American International Underwriters, Inc., Granite State Insurance Company, Lexington Insurance Company (US), Lexington Insurance Company (UK), and National Union Fire Insurance Company of Pittsburgh (collectively carriers). Several insurance companies were granted partial summary judgment and thus made part of this appeal, however, they have settled the claims with Textron prior to oral argument.

The polemical policies, for the years 1960 through 1986, provided coverage to Textron for environmental cleanups and other environmental liabilities. Although the instant complaint dealt with several sites, the issues presented to us on appeal concern only Textron's claims against those insurance companies from which it purchased general liability policies [FN2] for its "Gastonia" site, located in Gastonia, North Carolina. [FN3]

FN2. It is undisputed that all policies at issue contain essentially the same trigger-of-coverage language, which is similar to the language in *CPC International, Inc. v. Northbrook Excess & Surplus Insurance Co.*, 668 A.2d 647 (R.I.1995). *See infra.*

FN3. The term complaint is used to encompass all amended complaints, as well as the original complaint. Textron's Homelite Facility, known as the "Gastonia" site, was added to Textron's third amended complaint in June of 1988, following discovery of the contamination at that site.

A cleanup program at the Gastonia site was instituted as a result of Textron's detection of contaminants when underground storage tanks were removed from the site. Once the contamination was discovered, Textron took the appropriate steps to notify the proper authorities and sought to establish a cleanup program. Textron initially funded the cleanup program and now seeks reimbursement from the insurance carriers. However, their plans for reimbursement were thwarted by the trial justice when he granted partial summary judgment on behalf of defendants. [FN4] Textron now appeals this judgment. [FN5]

FN4. Final judgment was entered pursuant to Rule 54(b) of the Superior Court Rules of Civil Procedure.

FN5. The insurance carriers suggest that this case is very similar to *Truk-Away of Rhode Island v. Aetna Casualty & Surety Co.*, 723 A.2d 309 (R.I. 1999), which was on simultaneous appeal to this Court. The insurance companies in *Truk-Away* were granted summary judgment several months before the insurance companies in this case were granted summary judgment. Similarly, *Truk-Away* was heard on oral argument by this Court immediately preceding *Textron, Inc.* Both cases turn on the trigger-of-coverage standard employed by the trial court; moreover, counsel for defendant, Commercial Union Insurance Company, indicated before this Court and the trial court that he had considered a certain quote by Yogi Berra that was particularly applicable to the current situation. He said "[t]his is [*sic* ] déjà Yogi all over again." This statement was made presumably in the hope that we would defer to the trial court's determination in *Truk-Away*. We note, however, that neither the facts of this case, nor the law, call for a collective resolution. Finally, if we were to assign one of Yogi Berra's familiar adages to this litigation, it

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

would more likely be "[i]t ain't over 'til it's over!" *See* Yogi Berra, *The Yogi Book,* 121 (1998).

***1140 Facts and Travel**

This toxic tale has its origins in the soil of a North Carolina manufacturing plant. Textron owned and operated a manufacturing facility known as the "Gastonia" facility, which was managed through Textron's Homelite Division (Homelite). [FN6] Because of the nature of the materials used to manufacture equipment, production required the use of several degreasing solvents including: trichloroethylene ("TCE"); trichloroethane ("TCA"); and methyl ethyl ketone ("MEK"). Accordingly, these types of solvents had been an integral part in the operation of the Gastonia plant, including manufacturing, finishing, and assembling precision parts. To safely contain these metal waste materials and other organic liquids, the Gastonia site maintained both underground and above-ground storage facilities.

FN6. The facility has been in operation since 1957.

In 1986, in response to impending state and federal regulations concerning underground storage tanks, [FN7] the North Carolina Department of Natural Resources and Community Development ("NCDNRCD") made inquiries of all underground storage tank users for the purpose of insuring compliance with the soon-to-be-effective regulations. Shortly after receiving notification from NCDNRCD, Sloan Robinson, the Director of Facilities Planning for Homelite, suggested that the Gastonia tanks be removed in order to avoid the risk of accidental spillage or leakage, which would result in contamination. Accordingly, an excavation and extraction plan was established by Homelite in conjunction with Four Seasons, an industrial contractor. Beginning on January 6, 1988, the underground storage tanks were removed in accordance with the plan, whereupon contamination was discovered. It became obvious that the storage receptacles used at the site ultimately proved to be porous, and that the solvents had percolated into the surrounding soil. The analysis of the samples revealed the presence of volatile organic compounds (VOCs), which by the spring of 1988, required the removal of approximately 1,500 cubic yards of contaminated soil. Upon discovering the presence of this contaminated on-site soil, Homelite notified the state's Environmental Management Department.

FN7. The proposed environmental regulations were to become effective in 1988.

Recognizing the likelihood that the massive amount of contaminated on-site soil could lead to off-site contamination, off-site tests were performed to determine whether, and to what extent, the contamination had migrated to the subsurface environment. Subsequently, on April 28, 1988, VOCs were discovered in off-site water wells. In May and June of 1988, additional testing was conducted by the Gastonia County Department of Health, which revealed some trace elements and contamination of private wells in the Meadowbrook subdivision, a neighborhood adjacent to Homelite. Once it was determined that the wells were contaminated, the state notified the nearby residents who were being serviced by the contaminated wells. As a result of the widespread contamination, and in an effort to rectify it, Homelite installed a temporary water line to provide water to local residents who were formerly serviced by the contaminated water sources. [FN8] Textron alleged that it spent millions of dollars in connection with the contamination found at the Gastonia site, and sought reimbursement under the insurance policies issued by defendant carriers. When the insurance carriers refused to make payments on Textron's claims, this suit commenced. Having determined that there was insufficient evidence to raise a genuine issue of material fact, the trial justice granted ***1141** summary judgment on behalf of the carriers, which Textron now appeals. Additional facts will be provided as needed throughout this opinion.

FN8. The record indicates that the temporary connection was made from Homelite's facility to the Dockery Water System, which is privately owned, and which drew its water from the community wells found to be contaminated.

**Standard of Review**

[1][2][3] It is well settled that this Court reviews the granting of a summary judgment motion on a de novo basis. *See* Marr Scaffolding Co. v. Fairground Forms, Inc., 682 A.2d 455, 457 (R.I.1996). In conducting such a review, we are bound by the same rules as those applicable to the trial justice. *See* Rotelli v. Catanzaro, 686 A.2d 91, 93 (R.I.1996). Accordingly, we will affirm a trial justice's grant of summary judgment if, after reviewing the evidence in the light most favorable to the nonmoving party, drawing all reasonable inferences from that evidence

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

in support of the nonmoving party's claim, we conclude that no genuine issue of material fact exists, and that the moving party is entitled to judgment as a matter of the controlling law. *See* Avco Corp. v. Aetna Casualty & Surety Co., 679 A.2d 323, 327 (R.I.1996); *see also* Volino v. General Dynamics, 539 A.2d 531, 532-33 (R.I.1988).

[4] This Court often has declared that summary judgment is a harsh remedy that must be cautiously applied. *See* Avco Corp., 679 A.2d at 327; *see also* Mallette v. Children's Friend and Service, 661 A.2d 67, 69 (R.I.1995); McPhillips v. Zayre Corp., 582 A.2d 747, 749 (R.I.1990). The party opposing a motion for summary judgment cannot rely exclusively on mere allegations or on blanket denials contained in the pleadings. *See* Avco Corp., 679 A.2d at 327; *see also* Hydro-Manufacturing, Inc. v. Kayser-Roth Corp., 640 A.2d 950, 954 (R.I.1994). Consequently, the nonmoving party must affirmatively set forth facts that raise a genuine issue to be resolved by the factfinder. *See* Hydro-Manufacturing, Inc., 640 A.2d at 954. *See also* Super.R.Civ.P. 56(e).

In the present case, the trial justice was unable to find that Textron had raised a genuine issue of material fact concerning trigger-of-coverage. In making this determination, the trial justice noted that although there were "excellent theories" brought forward by Textron, there was no scientific evidence to justify the ultimate conclusions reached by its expert. Clearly, the trial justice relied heavily on his conclusion that both parties acknowledged that contamination was not actually discovered until May of 1988, approximately two years after the policies had expired.

After careful review of the evidence, we conclude that in granting the carriers' motion for summary judgment, the trial justice improperly interpreted *CPC International, Inc. v. Northbrook Excess & Surplus Insurance Co.*, 668 A.2d 647 (R.I.1995), to provide for a single trigger-of-coverage criterion under an occurrence-based liability policy, that single test being when the damage was actually discovered. Despite the trial justice's perception of a single test holding in *CPC,* in that case we enumerated a test consisting of three parts, each of which independently triggers liability coverage under an occurrence-based policy. *Id.* at 649. Because we conclude that liability under the policy may be established by one of the recognized *CPC* tests, we need not address the continuous trigger-of-coverage standard.

**The *CPC* Standard**

In determining whether summary judgment is proper in this case, it is essential to have an understanding of *CPC International, Inc .*, which is the controlling law in this jurisdiction. *CPC* came before us as a certified question from the United States Court of Appeals for the First Circuit seeking a determination of what trigger-of-coverage standard we would adopt to determine when an "occurrence" causing "property damage" took place within the meaning of the applicable insurance policy provisions. 668 A.2d at 647.

In *CPC,* the defendant, Northbrook Excess & Surplus Insurance Co. (Northbrook), issued a $25 million excess-liability policy to CPC International, Inc. (CPC International), effective from July 1, 1979 to July 1, 1980. *Id.* CPC International was a New Jersey packaging and manufacturing corporation. The Peterson/Puritan aerosol-packaging plant was a subsidiary of CPC International since 1968 and was located in Cumberland, Rhode Island, along the Blackstone River. ***1142** *Id.* at 647-48. Among other potentially poisonous products, Peterson/Puritan manufactured flea spray, hair spray, spot remover, and oven cleaner. During the years of 1963 through the late 1970s, employees routinely dumped chemicals into the septic systems of the Peterson/Puritan plant, and in 1974, an accidental rupture of a storage tank resulted in a massive spill of over 6,200 gallons of perchloroethylene into the soil at the Peterson/Puritan plant. At the time of the spill, CPC International denied any resulting contamination of nearby water supplies. Subsequently, in October of 1979, during the Northbrook policy period, Cumberland and the neighboring town of Lincoln, discovered contamination in their municipal water wells. Following this unsettling revelation, the wells were closed.

During all relevant times, Northwestern National Insurance Company (Northwestern) was CPC International's primary insurer with a coverage limit of $1 million. Once the Northwestern coverage was exhausted, CPC International turned to Northbrook to indemnify it for the remaining expenses associated with the cleanup. Northbrook denied liability under the policy, arguing that the property damage actually had occurred either before or after (but not during) the period the policy was in place, and therefore, coverage was not triggered. CPC International rejected this argument, and instead argued that the actual discovery of the well-field contamination was in October 1979, during the policy's effective period,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

thereby triggering coverage under the Northbrook policy. *Id.*

In July 1987, CPC International filed suit against Northbrook in New Jersey state court seeking a declaration that Northbrook must indemnify it for cleanup costs and other damages. This case eventually was removed to the United States District Court for the District of Rhode Island based on diversity jurisdiction, where the court adopted Northbrook's position that the appropriate trigger-of-coverage was when the aquifer was actually damaged. Consequently, the court granted Northbrook's motion for judgment as a matter of law. *Id.* Accordingly, the District Court held that coverage was not triggered because the triggering event occurred outside the policy period. *Id.* at 648-49. CPC International sought appellate review. The Court of Appeals for the First Circuit attempted to reconcile the trigger-of-coverage test, however, given the lack of any definitive Rhode Island case law on the issue, the court was unable to do so. Consequently, the First Circuit sought guidance from this Court through a certified question. *Id.* at 649. The question asked us to resolve, under Rhode Island law, when there has been an "occurrence" sufficient to trigger coverage under a general liability policy. The certified question stated:

> "What trigger-of-coverage standard would the Rhode Island Supreme Court use for determining at what point an 'occurrence' causing 'property damage' took place, within the meaning of the insurance policy provisions provided in the separate opinion in this case, where an insured alleges that a spill of hazardous contaminants in 1974 migrated through the groundwater, causing immediate injury to the pertinent property, which was not, in fact, discovered, however, until at least 1979?" *Id.* at 647.

"We answer[ed] that an 'occurrence' under a general liability policy takes place when property damage, which includes property loss, manifests itself or is discovered or in the exercise of reasonable diligence, is discoverable." *Id.* at 649. This test is the appropriate standard that should have been applied by the trial justice in this case in order to determine whether a genuine issue of material fact existed to defeat the insurance carriers' motion for summary judgment. By failing to apply this test, we determine that the trial justice has misapplied the *CPC* standard and erroneously granted summary judgment. Although the *CPC* case addressed a situation wherein the damage manifested itself and was discovered during the policy period, and therefore triggered coverage, *CPC* does not stand for the proposition that the damage actually must be discovered to trigger coverage. Rather, *CPC* includes circumstances in which property damage is discoverable in the exercise of reasonable diligence as a trigger of coverage.

***1143 Analysis**

[5] As indicated above, *CPC* sets forth three tests that trigger coverage under a general liability policy, when the property damage: (1) manifests itself; (2) is discovered; or (3) in the exercise of reasonable diligence is discoverable. CPC, 668 A.2d at 649. The trial justice in this case considered only the "discovered" trigger of this test and found no evidence to indicate that any damage actually was recognized at any time prior to 1988. It was error, however, for the trial justice to bring this analysis to a premature conclusion by refusing to acknowledge the remaining two triggers enumerated in the *CPC* case. Therefore, we shall do so at this time.

[6] This case requires us to determine, in the light most favorable to the nonmoving party, if the evidence presented raises a genuine issue of material fact. *Avco Corp.*, 679 A.2d at 327. We conclude that it does. The affidavit of Textron's expert setting forth the probable existence of property damage, read together with affidavits provided by former and current employees at the Gastonia site indicating the occurrence of leaks and spills during the policy period, creates a genuine issue of material fact concerning whether the contamination was discoverable in the exercise of reasonable diligence during the policy period, notwithstanding the fact that it was not actually discovered.

The motion for summary judgment was heard over two days. During the first appearance, the trial justice entertained Textron's argument that *CPC* provided three alternate theories of coverage, any one of which would trigger coverage under the policy. Acknowledging the uncontroverted evidence that the damage was discovered at a point outside of the policy period, Textron suggested that the contamination could have been discovered during the policy period with the exercise of reasonable diligence. In contemplation of Textron's theory, the trial justice invited Textron to "give me an affidavit from an expert that says [that the damage was discoverable]." Approximately three and one-half months later, the parties appeared before the trial justice once again, only this time Textron was armed with an affidavit signed by its expert, Bryson D. Trexler, Jr., Ph.D., P.G.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Where a plaintiff can show through credible evidence, such as the affidavit of an expert witness, that property damage occurred sometime during the relevant policy period, the court should accept this as dispositive. *See* Gelman Sciences, Inc. v. Fidelity and Casualty Company of New York, 456 Mich. 305, 572 N.W.2d 617, 625 (Mich.1998). In the case at bar, the affidavit submitted by Dr. Trexler stated that in his "expert opinion to a reasonable degree of scientific certainty, ground water contamination beneath, and off-site of, the Gastonia facility manifested itself or was discoverable prior to 1960 and *** every year thereafter." To support this conclusion, Dr. Trexler relied on several sources of information, including review of soils, hydrogeology, average monthly rainfall amounts in the vicinity of Gastonia, scientific data, and an analysis of waste water containing solvents that had seeped into the surface soils. Through his research, Dr. Trexler determined that since 1957, the waste water management system at the Gastonia facility consisted, in part, of unlined sludge-drying beds. In addition, episodic spills and leaks occurred in a host of areas at the Gastonia facility. Doctor Trexler determined that the flow of contaminants, and the rate in which the waste water ultimately reached the aquifer system servicing neighboring communities, could be determined mathematically. [FN9] Based on these calculations, Dr. Trexler determined that the ground water beneath the Gastonia facility was polluted within thirty days after the discharge of waste water. He further determined that the VOCs migrated off-site and impacted off-site ground water one to two years after the on-site ground water was impacted. Based upon this information and the facts available to him, Dr. *1144 Trexler determined that "[p]roperty damage in the form of off-site ground water contamination in the vicinity of the Gastonia facility, physically existed and was discoverable in the late 1950s and in every year thereafter to today ." [FN10] Through his affidavit, Dr. Trexler assured the trial court that the method to determine whether there was off-site ground water contamination could "be accomplished simply by collecting and analyzing a ground water sample." The evidence of the occurrence as presented in Dr. Trexler's affidavit provides credence to Textron's argument that the contamination was present in on-site soil, as well as off-site soil and groundwater, before and during the policy period.

FN9. The equation to determine the time of travel is a function of seepage velocities and retardation factors. The use of a retardation factor creates a conservative approach to determine contaminant travel time because it assumes that the solvents alone are absorbed into the soil and rock, and that no bacterial or other chemical breakdown, or dilution of solvent contaminants, are occurring.

FN10. To support his theory that the contamination occurred before it was discovered in 1988, evidence was offered to show that TCE was used from 1957 until some time between 1973 and 1974 for cleaning and degreasing. The use of TCE subsequently was phased out and initially replaced by TCA, and then replaced by detergent and water in 1989. The presence of TCE in contaminated soil that was tested in 1988, therefore, suggests that the soil was contaminated by TCE prior to 1974, since the solvent was no longer used after that year.

[7] Textron's burden, however, is not met by merely establishing evidence to suggest that the contamination was present during the policy period. Rather, *CPC* requires that the contamination not only exist during the period of coverage, but also be discoverable in the exercise of reasonable diligence. CPC, 668 A.2d at 649. In other words, in order to trigger coverage in the absence of actual discovery, Textron must have had some reason to test for the contamination, and must actually have been able to discover it in the exercise of reasonable diligence. In an effort to meet its burden, Textron presented three affidavits from current or former employees of the Gastonia facility who had personal knowledge of overflow and other leaks of solvents at the Gastonia site. Charles White (White) indicated that "[i]n the 1970s, a vendor accidentally overfilled an aboveground solvent storage tank at the Gastonia facility," and in "approximately the mid to late 1970s, as was the regular practice in the industry at this time, an unlined waste water lagoon was located south of the waste water treatment plant area." Also, Clarence Hill (Hill), provided evidence that he had personal knowledge that "[a]ccidental leakage of liquids from valves and pumps occasionally resulted in releases of liquid in between inspections and maintenance of the tanks and associated equipment," and that "[i]n the late 1970s, a vendor accidentally overfilled an aboveground solvent storage tank." Hill also confirmed the existence of a waste water lagoon located south of the waste water treatment plant that contained treated industrial waste water. Finally, Sloan Robinson (Robinson), the Director of Facilities Planning for Homelite, provided

substantially similar information as White and Hill, and added "unintentionally, spills and leaks from degreasing units, storage drums, and other containers occasionally occurred, particularly during transfer from one container to another." Robinson was employed at the Gastonia facility from 1959 until 1975, and therefore had personal knowledge of the solvents used on-site.

Events such as these presumably would provide Textron with notice of possible contamination, and indeed could cause a person exercising reasonable diligence to test for, and to discover, soil and groundwater contamination. Read together, in the light most favorable to the nonmoving party, the affidavits of Dr. Trexler, Robinson, White, and Hill raise a genuine issue of material fact, specifically whether the contamination was discoverable with the exercise of reasonable diligence during the policy period in order to trigger coverage. We conclude that Textron presented sufficient evidence to submit to the jury the question of whether or not the contamination was discoverable with the exercise of reasonable diligence.

For the foregoing reasons, the plaintiffs appeal is sustained. The judgment appealed from is vacated and the papers in this case are remanded to the Superior Court for further proceedings consistent with this opinion.

723 A.2d 1138, 48 ERC 1266

**Briefs and Other Related Documents** **(Back to top)**

• 1998 WL 35143467 (Appellate Brief) Brief of Defendants-Appellees, Commercial Union Insurance Company (and Affiliated Companies), London Market Insurers and Northbrook Excess & Surplus Insurance Company (Sep. 18, 1998)

• 1998 WL 35143468 (Appellate Brief) Joinder of Defendant-Appellee the Home Insurance Company in Brief of Defendants-Appellees Commercial Union Insurance Company, the London Market Insurers and Northbrook Excess and Surplus Insurance Company (Sep. 17, 1998)

• 1998 WL 35143466 (Appellate Brief) Brief of Appellant (Jul. 14, 1998)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Supreme Court of Rhode Island.
TEXTRON, INC.
v.
AETNA CASUALTY AND SURETY COMPANY
et al.
**No. 98-357-Appeal.**

June 22, 2000.

Insured brought action against liability insurers to recover cleanup costs. The Superior Court, Providence County, Gagnon, J., granted partial summary judgment in favor of insurers on the basis of the trigger of coverage. Insured appealed. The Supreme Court, Goldberg, J., 723 A.2d 1138, vacated and remanded. On remand, the Superior Court, Gagnon, J., entered partial summary judgment in favor of comprehensive general liability (CGL) insurer. Insured appealed. The Supreme Court, Flanders, J., held that: (1) as a matter of first impression, the word "sudden" in the "sudden and accidental" exception to the pollution exclusion can mean "unexpected" and provides coverage to the insured that makes a good-faith effort to contain and to neutralize toxic waste; (2) drafting history of the exclusion could be considered; (3) discoverability in the exercise of reasonable diligence was applicable as a trigger of coverage for groundwater contamination; and (4) factual issues precluded summary judgment.

Reversed and remanded.

West Headnotes

**[1] Appeal and Error 893(1)**
30k893(1) Most Cited Cases
Summary judgment is reviewed de novo.

**[2] Judgment 185(6)**
228k185(6) Most Cited Cases
The superior court should grant summary judgments sparingly and only when a review of all pleadings, affidavits, and discovery materials properly before the court demonstrates that no issue of fact material to the determination of the lawsuit is in genuine dispute.

**[3] Appeal and Error 934(1)**
30k934(1) Most Cited Cases
In reviewing a grant of summary judgment, the Supreme Court views the evidence in the light most favorable to the nonmoving party.

**[4] Insurance 2265**
217k2265 Most Cited Cases
Discoverability in the exercise of reasonable diligence was applicable as a trigger of liability coverage for groundwater contamination.

**[5] Insurance 2265**
217k2265 Most Cited Cases
Property damage triggers coverage under comprehensive general liability (CGL) insurance policy when the damage (1) manifests itself, (2) is discovered or, (3) in the exercise of reasonable diligence is discoverable.

**[6] Judgment 181(23)**
228k181(23) Most Cited Cases
Genuine issue of material fact concerning whether the insured could have discovered groundwater contamination by reasonable diligence precluded summary judgment on whether coverage was triggered under comprehensive general liability (CGL) insurance policy.

**[7] Insurance 1810**
217k1810 Most Cited Cases

**[7] Insurance 1822**
217k1822 Most Cited Cases
A policy must be examined in its entirety, and the words used must be given their plain everyday meaning, if the meaning of the terms is contested.

**[8] Insurance 1832(1)**
217k1832(1) Most Cited Cases
Any ambiguous policy language is strictly construed in favor of the insured.

**[9] Insurance 2278(17)**
217k2278(17) Most Cited Cases
The word "sudden" is ambiguous in the "sudden and accidental" exception to the pollution exclusion of a comprehensive general liability (CGL) insurance policy.

**[10] Insurance 1832(1)**
217k1832(1) Most Cited Cases

**[10] Insurance 🔑1836**
217k1836 Most Cited Cases
An ambiguous policy term should be construed in favor of coverage and against the insurer.

**[11] Insurance 🔑2278(17)**
217k2278(17) Most Cited Cases
The word "sudden" in the "sudden and accidental" exception to the pollution exclusion of a comprehensive general liability (CGL) insurance policy bars coverage for the intentional or reckless polluter, but provides coverage to the insured that makes a good-faith effort to contain and to neutralize toxic waste but, nonetheless, still experiences unexpected and unintended releases of toxic chemicals that cause damage; thus, coverage will be provided when the contamination was unexpected from the insured's standpoint, that is, the insured reasonably believed that the waste-disposal methods in question were safe.

**[12] Judgment 🔑181(23)**
228k181(23) Most Cited Cases
The question whether a manufacturer was an intentional or reckless polluter with respect to waste disposal or with respect to selecting a waste-disposal system is usually a matter for fact-finding at trial on the applicability of the "sudden and accidental" exception to the pollution exclusion of a comprehensive general liability (CGL) insurance policy, and not a matter for summary judgment.

**[13] Judgment 🔑181(23)**
228k181(23) Most Cited Cases
Genuine issue of material fact concerning whether the insured tried to contain the contaminants safely in the neutralization pond or indiscriminately dumped them precluded summary judgment on whether release was "sudden" within the meaning of the "sudden and accidental" exception to the pollution exclusion of a comprehensive general liability (CGL) and umbrella insurance policies.

**[14] Insurance 🔑2278(17)**
217k2278(17) Most Cited Cases
The word "sudden" in the "sudden and accidental" exception to the pollution exclusion of a comprehensive general liability (CGL) insurance policy can mean "unexpected."

**[15] Insurance 🔑2278(17)**
217k2278(17) Most Cited Cases
Drafting history of the "sudden and accidental" exception to the pollution exclusion of a comprehensive general liability (CGL) insurance policy could be considered as supporting an interpretation of "sudden" to included unexpected; it was reasonable to hold insurers to the representations they made to regulators when seeking approval for an ambiguous pollution exclusion.

**[16] Judgment 🔑185.3(12)**
228k185.3(12) Most Cited Cases
Evidence that discharges other than those from the insured's containment pond could have been responsible for at least some of the environmental damage at issue precluded summary judgment on applicability of pollution exclusion of comprehensive general liability (CGL) and umbrella insurance policies.
***743** John Tarantino, James W. McKay, Providence, Eugene R. Anderson, Robert M. Horkovich, Edward J. Stein, Anderson Kill & Olick, P.C., New York City, for plaintiff.

Kenneth P. Borden, Robert D. Parrillo, John W. Kershaw, George M. Vetter, R. Kelly Sheridan, Harry W. Asquith, Jr., William M. Heffernan, Stephen H. Burke, Mark C. Hadden, Andrew B. Prescott, Providence, Shelia High King, Boston, MA, Dominic Shelzi, East Greenwich, Michael P. Duffy, Boston, MA, James Ackerman, Michael Sommerville and Mark B. Lavoie, Boston, MA, for Aetna Casualty & Surety Co.

Mark T. Reynolds, Providence, P. McNamara, for Allstate.

Michael A. Kelly, Gerald John Petros, Providence, for Cumberland Farms.

Alan Shoer, Providence, for D.E.M.

Michael P. Duffy, Boston, MA, Laura Foggan, Daniel Troy, Washington, DC, for Insurance Environmental Litigation.

John W. Kershaw, Providence, for John R. Ludbrooke & London Market.

***744** Present WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

**OPINION**

FLANDERS, Justice.

Insurance coverage for a manufacturer's pollution-

cleanup costs forms the declaration page of this appeal. A Superior Court motion justice granted partial summary judgment in favor of the defendant-insurer, Insurance Company of North America (INA), and against the plaintiff-insured, Textron, Inc. (Textron), ruling that no insurance coverage existed under the circumstances of this case. Textron argues on appeal that the motion justice: (1) incorrectly applied the trigger-of-coverage doctrine that we formulated in CPC International, Inc. v. Northbrook Excess & Surplus Insurance Co., 668 A.2d 647 (R.I.1995) (*CPC I*) and (2) erred in holding that the pollution-exclusion clauses in the insurance polices at issue precluded coverage for the type of gradually occurring damage in question (namely, the eventual contamination of groundwater as a result of chemical seepage from a so-called neutralization pond that Textron maintained at its Wheatfield, New York, plant site). For the reasons unearthed below, we reverse, vacate the summary judgment, and remand for further proceedings consistent with this opinion.

**Facts and Travel**

From 1960 to 1973, Textron, a manufacturer of aerospace equipment, leased an eighty-acre manufacturing site in Wheatfield, New York from Bell Aircraft Corporation (Bell). In 1973 it bought the property from Bell and, until 1987, it continued to use this site for manufacturing a wide range of aerospace-related equipment, including helicopter components, aircraft prototypes, and rocket-propulsion hardware. During its long-term use of the site, Textron's manufacturing processes generated toxic chemical wastes. To capture, contain, treat, and neutralize these wastes, it employed an artificial holding pond at the site as a waste receptacle and depository. After treating these wastes, Textron would release them into the site's sanitary-drainage system. However, unbeknownst to Textron, some of this toxic waste gradually seeped from the pond and, over the years, contaminated or contributed to the contamination of the surrounding groundwater.

During the 1980s the Environmental Protection Agency (EPA) charged Textron with polluting dozens of sites across the United States, including Wheatfield. As a result, the EPA sued Textron under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § § 9601 to 9675 (CERCLA), a strict-liability statute that allows the EPA either to demand that responsible parties voluntarily clean up polluted sites or else reimburse the EPA for its costs in conducting the cleanup operations. Textron, in turn, filed suit in August 1987 against approximately thirty of its own comprehensive general-liability insurers and excess-insurance carriers, including the present defendant, INA, seeking coverage for the site-cleanup costs. Because Textron has settled its claims with all of its other insurers that moved for summary judgment, INA is the only remaining defendant on this appeal.

The policies INA sold to Textron for 1979-81 and 1984-86 contained the following so-called pollution-exclusion clause:

"This insurance does not apply to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soots, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water, but this exclusion does not apply *if such discharge, dispersal, release or escape is sudden and accidental*." (Emphasis added.)

***745** The policy INA provided to Textron for the period 1982-84 stated as follows:

"This insurance does not cover liability for: (1) Personal Injury or Bodily Injury or loss of, damage to, or loss of use of property directly or indirectly caused by seepage, pollution or contamination, provided always that this paragraph (1) shall not apply to liability for Personal Injury or Bodily Injury or loss of or physical damage to or destruction of tangible property, or loss of use of such property damaged or destroyed *where such seepage, pollution or contamination is caused by a sudden, unintended and unexpected happening during the period of this Insurance.*"

"(2) The cost of removing, nullifying or cleaning-up seeping, polluting or contaminating substances *unless the seepage, pollution or contamination is caused by a sudden, unintended and unexpected happening* during the period of this Insurance." (Emphases added.)

For the period from 1963 to 1966, INA also issued to Textron an umbrella policy (that is, a policy that offered protection for losses in excess of the amounts covered by Textron's other liability insurance and that filled certain other gaps in coverage, *see* Fratus v. Republic Western Insurance Co., 147 F.3d 25, 27 (1st Cir.1998)). This policy did not contain a pollution-exclusion clause.

The Superior Court granted partial summary judgment in favor of INA on Textron's claim for cleanup costs at the Wheatfield site based upon its determination that (1) these costs did not trigger

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

coverage under the three-part test that this Court set forth in *CPC I,* and (2) for INA policies issued from 1979 to 1981, 1982 to 1984, and from 1984 to 1986, the incorporated pollution-exclusion clauses barred coverage because no temporally sudden event at the site caused the damage. Textron has appealed from that judgment.

**Standard of Review**

[1][2][3] This Court reviews the grant of a summary judgment motion de novo. *See Marr Scaffolding Co. v. Fairground Forms, Inc.,* 682 A.2d 455, 457 (R.I.1996). The Superior Court should grant summary judgments " 'sparingly [and] only when a review of all pleadings, affidavits, and discovery materials properly before the court demonstrates that no issue of fact material to the determination of the lawsuit is in genuine dispute.' " *Doe v. Gelineau,* 732 A.2d 43, 47-48 (R.I.1999). In reviewing a grant of summary judgment, we view the evidence in the light most favorable to the nonmoving party. *See Nichols v. R.R. Beaufort & Associates, Inc.,* 727 A.2d 174, 176 (R.I.1999).

**Analysis**

**I**

**Trigger of Coverage**

[4] Textron argues that the Superior Court erroneously granted partial summary judgment in favor of INA because it misread this Court's *CPC I* decision. According to Textron, the Superior Court wrongly construed *CPC I* as delineating only a single trigger of coverage for environmental property damage: namely, whether the insured discovered the damage during the policy period. In fact, Textron asserts, the holding in that case provided for three alternative triggers, one of which was a discoverability trigger: that is, whether by exercising reasonable diligence the insured could have discovered the environmental damage during the policy period. We later clarified this particular coverage trigger in *Textron, Inc. v. Aetna Casualty and Surety Co.,* 723 A.2d 1138 (R.I.1999) (*Textron-Gastonia* ). There, we held that "discoverable in the underlying exercise of reasonable diligence" meant that (1) the property damage occurred during the policy period, (2) the property damage was capable of being detected, and (3) the insured had reason to test for the property damage. *See* ***746***id.* at 1144. Nonetheless, the motion justice chose not to apply the discoverability trigger in this case because, he concluded, its reasonable-diligence standard was "inappropriate in this kind of a case." INA, on the other hand, asserts that, whether the motion justice misapplied the *CPC I* test was irrelevant because Textron failed to meet its burden of proving that, by exercising reasonable diligence, it would have discovered the damage during INA's policy period. We disagree.

[5] Property damage triggers coverage under this type of comprehensive general-liability-insurance policy when the damage (1) manifests itself, (2) is discovered or, (3) in the exercise of reasonable diligence is discoverable. *See CPC I,* 668 A.2d at 649. We agree with Textron that the motion justice's refusal to apply the third trigger of the *CPC I* test did indeed misconstrue that holding, as amplified by our later ruling in *Textron-Gastonia,* 723 A.2d at 1143-44. The third trigger of the *CPC I* test does not force a manufacturer to "go around looking to find out if he's contaminating anything," as the motion justice supposed. Instead, it simply addresses the problem of latent injury (such as asbestos poisoning) or latent damage (such as groundwater contamination), when the injury or damage, although covered by the policy, is not immediately discernible or occurs after an unexpected event sets in motion a series of incidents that eventually results in the manifestation of the damage. Moreover, the "discoverability" trigger in *CPC I* descends from a long and venerable line of insurance cases. *See, e.g., American Home Assurance Co. v. Libbey-Owens-Ford Co.,* 786 F.2d 22, 30 (1st Cir.1986) (holding that the trigger event for damages resulting from falling windows occurred when the architect informed the owner of the building that the windows were defective and that they posed a "clear and present danger to the public," because this disclosure would have put a reasonable person on notice that this problem existed). Thus, contrary to the motion justice's belief, applying the "discoverability" trigger to cases like this one is not anomalous.

In *CPC I,* the First Circuit certified to this Court a question about triggers of insurance coverage under Rhode Island law. See *CPC I,* 668 A.2d at 647. In *CPC I,* a plaintiff-manufacturer that routinely dumped toxic chemicals into the drains and septic system of its plant sued its insurer for recovery of cleanup costs under a policy that ran from 1979 to 1980. *See id.* at 648. In 1979, during the period covered by the defendant's policy, state investigators discovered that the chemicals had contaminated municipal water supplies. *See id.* The insurer argued that the coverage-triggering "occurrence" was either the plaintiff-manufacturer's routine dumping, or a 1974 massive toxic spill. The insurer argued that the massive spill occurred outside the policy period. *See id.* The manufacturer, however,

contended that the 1979 discovery of the contamination should have been the "occurrence" that triggered coverage. *See id.*

Unsure of and yet bound to apply Rhode Island law to the controversy before it, the First Circuit asked this Court to determine when there has been "an 'occurrence' sufficient to trigger coverage under a general liability policy when the insured sustains a chemical spill that results in a property loss that is not discovered until years after the spill took place." *Id.* at 649. This Court answered that "an 'occurrence' under a general liability policy takes place when property damage * * * manifests itself or is discovered or in the exercise of reasonable diligence, is discoverable." *Id.*

[6] Here, the evidence on summary judgment indicated that a genuine issue of material fact existed concerning whether Textron could meet the "discoverable by reasonable diligence" aspect of *CPC I* and *Textron-Gastonia.* First, the record contains evidence that damage not only existed but also was capable of being detected during the policy periods, 1979-81, 1984-86, ***747** 1982-84, and perhaps even during the 1963-66 period covered by the umbrella policy. P. Michael Terlecky, Jr. (Terlecky), the hydrogeologist who supervised environmental investigations at Textron's Wheatfield site, stated in his affidavit that "the groundwater, soil, sediments, and other materials such as bedrock became contaminated at the Wheatfield Site and such contamination was discoverable as early as 1960, [and that] new property damage arose in each and every year thereafter." Florin Gheorghiu, a geoscientist who worked at Textron's Wheatfield site from 1989 through 1992, stated in an affidavit that it would take contaminated water about fifty-four days to seep downward through soil and reach bedrock. This expert also indicated that, using simple analysis of groundwater samples, Textron could have discovered contamination at the neutralization pond from the time it first began using it in 1960.

Finally, with respect to the question of whether Textron had reason to test for environmental damage during the policy period, expert affidavits suggested that it did. For example, Terlecky asserted that there were "small leaks and spills during transfer of metal parts and leakage through cracks in the concrete" of a building used since 1956 for solvent degreasing and for acid treatment of metal parts. *See Textron-Gastonia,* 723 A.2d at 1144 (holding that knowledge of overflow and other leaks of solvents at the site provided the insured with reasons to test for contamination). Another Textron employee testified that sudden and accidental spills of the chemicals that later ended up in the groundwater "certainly" occurred. Employees also testified that Textron used concrete "pads" from the rocket cell-testing area into the neutralization pond to catch accidental spills and leaks, and that these ramps themselves had cracks that allowed toxic chemicals to leak from them onto the ground. Thus, the same toxic chemicals that later turned up in the groundwater had spilled or leaked accidentally at various times, arguably giving Textron's engineers reasons to test for contamination. Indeed, according to their affidavits, they did, in fact, regularly conduct certain limited types of testing for contamination at the site.

In conclusion, Textron's specific allegations of site contamination amount to more than a mere assertion that it disposed of waste at the site. *See Truk-Away of Rhode Island, Inc. v. Aetna Casualty & Surety Co.,* 723 A.2d 309, 313 (R.I.1999) (holding that such a showing was inadequate to prove a triggering event). "Where a plaintiff can show through credible evidence, such as the affidavit of an expert witness, that property damage occurred sometime during the relevant policy period, the court should accept this as dispositive," *Textron-Gastonia,* 723 A.2d at 1143, at least for the purpose of creating a genuine issue of material fact on summary judgment. Textron introduced not only evidence of discoverable damage at the site during the policy period but also that it had reason to test for it. Thus, a genuine issue of material fact existed concerning whether this evidence met *Textron-Gastonia* 's three-prong test for whether the damage was discoverable in the exercise of reasonable diligence. Hence, the Superior Court erred in granting summary judgment when it declined to apply the discoverability trigger of coverage to the facts of this case.

**II**

**The Pollution-Exclusion Clause**

Textron also argues that genuine issues of material fact exist concerning the application of the policies' exceptions to the pollution-exclusion clause, particularly the "sudden and accidental" language used therein. First, it asserts that the word "sudden" in this exception can mean "unexpected," as opposed to "abrupt," and thus the policy can be construed to cover damages resulting from a gradual seepage of toxic chemicals from the containment pond. Textron also suggests that insurance-***748** industry records concerning the clause and its drafting history support a finding of coverage when the contamination was "unintended and unexpected," although not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

temporally abrupt. Textron maintains that it should have the opportunity to prove this theory at trial through the submission of pertinent insurance-industry documents. It further contends that a genuine issue of material fact exists concerning whether the artificial containment pond was intended to be a safe container for toxic waste or merely a convenient dumping slough. If, as Textron posits, the previous owner had built and enhanced the pond as a safe receptacle for contaminants, then the relevant discharges for purposes of this litigation may be the subsequent accidental discharges from the pond, rather than the initial placements of wastes in it. If Textron establishes that this was a true containment pond for toxic wastes, then the relevant seepage could prove to be "unintended and unexpected," thus falling under the "sudden and accidental" exception in the pollution-exclusion clause as Textron interprets it. Finally, Textron insists that even if the word "sudden" in the pollution-exclusion clause means only "abrupt," it has presented ample evidence of releases at the site other than those emanating from the neutralization pond that were abrupt and that could have contaminated the groundwater.

INA, on the other hand, asserts that the word "sudden" necessarily contains a temporal element, and thus it can apply only to events that happened abruptly, but not to gradual ones that are merely "unintended or unexpected," as Textron asserts. It adds that Textron has presented no evidence of temporally "sudden" discharges of waste at the Wheatfield site.

The meaning of the word "sudden" in this kind of pollution-exclusion clause is a matter of first impression in Rhode Island. Moreover, our examination of the relevant cases from other jurisdictions reveals no clear majority among state or federal courts concerning whether this word entails a temporal element. (Both sides claim to hold the majority view, but the numbers are close enough that any slight preponderance of one position over the other is not particularly meaningful.) As one court has colorfully described it,

> "The cases swim [in] the reporters like fish in a lake. The Defendants would have this Court pull up its line with a trout on the hook, and argue that the lake is full of trout only, when in fact the water is full of bass, salmon and sunfish too." *Pepper's Steel & Alloys, Inc. v. United States Fidelity and Guaranty Co.*, 668 F.Supp. 1541, 1549-50 (S.D.Fla.1987).

[7][8] When we are asked to interpret contested terms in an insurance policy, "[t]he policy must be examined in its entirety and the words used must be given their plain everyday meaning." *McGowan v. Connecticut General Life Insurance Co.*, 110 R.I. 17, 19, 289 A.2d 428, 429 (1972). Moreover, we strictly construe any ambiguous policy language in favor of the insured. *See Bartlett v. Amica Mutual Insurance Co.*, 593 A.2d 45, 47 (R.I.1991).

**A. Ambiguity of the Word "Sudden"**

[9] Giving the word "sudden" its "plain everyday meaning" is no easy task. Both sides muster dictionary support of their respective positions, half of which accord a temporal meaning to the word and the other half of which give it the meaning of unexpected. [FN1] This diversity proves only ***749** that the word's meaning is legitimately subject to different interpretations--in other words, that it is ambiguous. Moreover, this Court has also held that "diversity of judicial thought [as to the meaning of terms in an insurance contract] is proof positive" of ambiguity. *Zanfagna v. Providence Washington Insurance Co.*, 415 A.2d 1049, 1051 (R.I.1980). Here, a multitude of cases exists on both sides. Furthermore, a slim but persuasive majority of other jurisdictions holds that the word "sudden" in this type of clause is ambiguous; that is, it is susceptible to more than one reasonable interpretation, as Textron argues. *See Alabama Plating Co. v. United States Fidelity and Guaranty Co.*, 690 So.2d 331, 334 (Ala.1996) (per curiam) (noting that "[a] narrow majority of state supreme courts that have considered the meaning of the 'pollution exclusion,' * * * have held that the 'sudden and accidental' exception is ambiguous and must be construed in favor of the policyholder to provide coverage where migration of contaminants into the soil or groundwater was 'unexpected and unintended' "). *See also Queen City Farms, Inc. v. Central National Insurance Co. of Omaha*, 126 Wash.2d 50, 882 P.2d 703, 727 (1994) (concluding that "these exclusions are ambiguous, and therefore should be construed against the drafter-insurer, to mean that if the polluting event is unexpected and unintended, coverage is provided").

FN1. Because the parties cumulatively cite eight dictionaries in their briefs, we take the liberty of indulging in a brief etymological foray of our own. First, we note that the American Heritage Dictionary offers three meanings for the word "sudden:" "[h]appening without warning; unforeseen;" "[c]haracterized by hastiness; abrupt or

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

rash;" and "[c]haracterized by rapidity; quick and swift." American Heritage Dictionary of the English Language, 1794 (3d ed.1996). Black's Law Dictionary defines "sudden" as "[h]appening without previous notice or with very brief notice; coming or occurring unexpectedly; unforeseen; unprepared for." Black's Law Dictionary, 1432 (6th ed.1990) (citing Hagaman v. Manley, 141 Kan. 647, 42 P.2d 946, 949 (1935)). The Seventh Edition of Black's Law Dictionary does not define "sudden" but does describe "pollution exclusion." *See* Black's Law Dictionary, 586 (7th ed.1999). The first meaning of the word "sudden" in the American Heritage Dictionary is "[h]appening without warning, unforeseen[,]" and its second and third denote a temporal element. In fact, the modern English word "sudden" is derived from the Latin verb "subire" meaning "to approach stealthily [or secretly]." American Heritage, 1794. The Oxford English Dictionary gives this example: "A sudden little river crossed my path As unexpected as a serpent comes." *Claussen v. Aetna Casualty & Surety Co.*, 259 Ga. 333, 380 S.E.2d 686, 688 (1989) (quoting Oxford English Dictionary, 96 (1933)). While the modern word certainly has acquired a secondary, temporal meaning, the original and still perfectly functional meaning of the word is happening without warning or anticipation. Thus, reading the word "sudden" in the context of insurance policies to mean "unexpected" not only harmonizes with its context but also remains true to the word's original meaning. Our present interpretive problems with this word may arise from our modern forgetfulness that it is often used to describe a subjective state, that is, the mental state of the person visited by the event. In other words, even though a snake may have been slowly slithering toward a person, that person may still experience its appearance as temporally abrupt *because* it is unexpected. Thus, the temporal connotation given to "sudden" can arise from the subjective perception of an event and it does not denote necessarily any *objectively* temporal element.

[10] Under Rhode Island law, an ambiguous policy term should be construed in favor of coverage and against the insurer. *See Campbell v. Norfolk & Dedham Mutual Fire Insurance Co.*, 682 A.2d 933, 935 (R.I.1996) (holding that "[i]f the terms of an insurance contract are subject to more than one reasonable interpretation, the policy will be construed in favor of the insured to avoid forfeiture"); *Zanfagna*, 415 A.2d at 1051 (charging the fault for any ambiguity "to the insurer who selected the language"). Other jurisdictions have noted that this principle holds not only when the insured is an unsophisticated consumer, but also when, as here, the insured is a corporation that might presumably have more business acumen and bargaining power. *See Queen City*, 882 P.2d at 726. [FN2]

FN2. To apply this principle to large corporations such as Textron makes more sense in the insurance-policy context than it might in other settings: while business customers of insurance companies may at first glance appear to have more power in negotiating an insurance contract, in fact the only negotiation that typically occurs over the policy language is that between state regulators and the insurers. *See Morton International, Inc. v. General Accident Insurance Co. of America*, 134 N.J. 1, 629 A.2d 831, 851 (1993). Often the commercial insured such as Textron does not even view the policy's language until after it pays the premiums. *See generally*, Nancer Ballard and Peter M. Manus, *Clearing Muddy Waters: Anatomy of the Comprehensive General Liability Pollution Exclusion*, 75 Cornell L.Rev. 610, 621 (1990).

[11][12] ***750** When used in the context of an insurance policy's pollution-exclusion clause, the word "sudden," we hold, bars coverage for the intentional or reckless polluter but provides coverage to the insured that makes a good-faith effort to contain and to neutralize toxic waste but, nonetheless, still experiences unexpected and unintended releases of toxic chemicals that cause damage. Thus, coverage will be provided when the contamination was unexpected from the insured's standpoint: that is, when the insured reasonably believed that the waste-disposal methods in question were safe. The insured must show that it had no reason to expect the unintended damage and that it undertook reasonable efforts to contain the waste safely. In other words, a manufacturer that uses state-of-the-art technology, adheres to state and federal environmental regulations, and regularly inspects, evaluates, and upgrades its waste-containment system in accordance

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

with advances in available technology should reap the benefits of coverage under our construction of this type of pollution-exclusion clause. But one that knowingly or recklessly disposes of waste without the necessary and advisable precautions will forfeit coverage under this clause. Thus, coverage will exist "[w]here the facts establish that materials were placed into a waste disposal site which was believed would contain or safely filter them, but, in fact, the materials unexpectedly and unintentionally are discharged or released into the environment, or disperse or escape into the environment * * *." *Queen City,* 882 P.2d at 726. Whether a manufacturer was an intentional or reckless polluter with respect to waste disposal or with respect to selecting a waste-disposal system, is, as here, usually a matter for fact-finding at trial and not for summary judgment.

Of course, we recognize that the two policies at issue here have slightly different language in their respective pollution-exclusion clauses. While the 1979-81 and 1984-86 policies bar coverage unless the event is "sudden and accidental," the 1982-84 policy bars coverage for discharges unless they are caused by a "sudden, unintended and unexpected happening." However, we construe the language of the second policy to have the same legal meaning and effect as that of the first under the analysis we have employed above. *See Public Service Co. of Colorado v. Wallis and Companies,* 986 P.2d 924, 933 (Colo.1999) (holding that "the phrase 'sudden, unintended and unexpected' [in the London pollution-exclusion clause] means 'unprepared for, unintended and unexpected' "). The language of the later policy follows the form of certain underlying insurance policies issued by Lloyd's of London. Courts have held that the language of pollution-exclusion clauses in Lloyd's policies is legally synonymous with the standard pollution-exclusion language. *See Olin Corp. v. Insurance Co. of North America,* 762 F.Supp. 548, 563 (S.D.N.Y.1991) (finding "no meaningful difference" between the standard pollution-exclusion clause and the one at issue here). Though Lloyd's has argued that it never misrepresented the meaning of its clause to American insurance regulators, courts have held nonetheless that such clauses should not benefit from the misleading explanation of the standard pollution exclusion submitted to state regulators by American insurance companies. *Chemical Leaman Tank Lines, Inc. v. Aetna Casualty and Surety Co.,* 89 F.3d 976, 991 (3d Cir.1996).

[13] Here, a genuine issue of material fact exists concerning whether Textron tried, albeit unsuccessfully, to contain the contaminants safely in the neutralization pond. Textron has offered evidence that it had established a "neutralization system," and had introduced chemicals into the pond to treat them. Textron's engineers ***751** regularly tested the pond's waters to measure their pH level, and to monitor the neutralization process. Only after Textron deemed the toxins harmless did it release them from the pond. While Textron's engineers did not line the pond artificially, they testified that clay lining constituted the state-of-the-art sealant at that time, and that no existing regulation required or even recommended further lining. Engineering reports indicated that Bell, Textron's predecessor at the site, dug out the pond as a waste-containment strategy. And Textron's engineers assert that it enhanced the pond on the site to a "state of the art" toxic-containment level, while INA insists Textron merely used the pond "as is" to dump waste. [FN3] Therefore, competent evidence exists in this record, which, if credited by the factfinder, could support the conclusion that Textron was not a deliberate or reckless polluter. Hence, summary judgment was inappropriate.

FN3. While it is technically true, as INA argues, that the pond preexisted Textron's presence at the site, this is because Bell, which occupied the Wheatfield site before Textron, had constructed the pond as a receptacle for waste. Whether Textron was reckless in failing to test and/or to check out the pond's alleged containment features and how well they worked in practice remains a subject for further fact-finding.

**B. "Sudden" as Meaning Unexpected and Unintended in Light of Drafting History and Public Policy**

[14][15] Construing "sudden" as capable of meaning "unexpected" constitutes both a defensible reading of the pollution-exclusion clause's drafting history and sound public policy. First, we note that most courts that have examined the drafting history of the pollution-exclusion clause as an aid in its construction have found the word "sudden" to mean unexpected. The most thorough of these, and the one with the most dramatic result, is *Morton International, Inc. v. General Accident Insurance Co. of America,* 134 N.J. 1, 629 A.2d 831 (1993). In *Morton,* the New Jersey Supreme Court examined the history of the pollution-exclusion clause's incorporation into insurance contracts and found that,

despite its literal terms, the clause should be taken as precluding coverage to " 'the reckless polluter as well as the intentional polluter.' " *Id.* at 851. Despite arguments about the insurance industry's intent in drafting the pollution-exclusion clause, the *Morton* court held insurers to the meaning of the word "sudden" as the court deemed they had represented it to insurance regulators--that is, as a clarification of the insurers' intention to exclude only intentional polluters from coverage--rather than as a word having a strictly temporal meaning. *See id.* at 875-76.

Similarly, in *Alabama Plating Co.,* the Alabama Supreme Court found that the phrase "sudden and accidental" in the pollution-exclusion clause was sufficiently ambiguous to require an inquiry into the drafters' intent, and found that this history demonstrated that the drafters of the clause meant to provide coverage when environmental contamination was "unexpected and unintended." *Alabama Plating Co.,* 690 So.2d at 335-36. The court described its historical reasoning as follows:

> "Before the addition of the so-called 'pollution exclusion' to 'occurrence'- based * * * policies * * * it was clear that the policies provided coverage for gradually occurring environmental contamination. The evidence of the intent of the drafter of the 'pollution exclusion' clause, an insurance industry group that represented [many insurers], reveals that when the clause was added * * * it was * * * with an expressed intent that there would be *no reduction in coverage,* but that the addition of the exclusion was merely a 'clarification' that the policies did not provide coverage for intentional polluters." *Id.* at 335; see also *Claussen v. Aetna Casualty & Surety Co.,* 259 Ga. 333, 380 S.E.2d 686, 689 (1989) (holding that "[d]ocuments presented by ***752** the Insurance Rating Board * * * to the Insurance Commissioner when the 'pollution exclusion' was first adopted suggest that the clause was intended to exclude only intentional polluters").

The *Alabama Plating* court also noted that the phrase had undergone years of judicial construction before insurers used it in property-damage policies and that "[c]ourts had uniformly interpreted [it] to mean that the damage had to be unexpected and unintended for the insurance to apply, so that the phrase provided coverage for gradual events." *Alabama Plating Co.,* 690 So.2d at 336. The court defended its historical reasoning by noting that the "judicial construction placed upon particular words or phrases made prior to the issuance of a policy employing them will be presumed to have been the construction intended to be adopted by the parties." *See id.* (quoting *Couch on Insurance 2d* § 15:20 (1984)).

The Washington Supreme Court has perhaps best articulated the rationale for according the word "sudden" the meaning of unexpected rather than temporally abrupt in the context of insurance-liability policies. *See Anderson & Middleton Lumber Co. v. Lumbermen's Mutual Casualty Co.,* 53 Wash.2d 404, 333 P.2d 938 (1959). The *Anderson* court explained that "the risk to the insurer would be the same, whether a break was instantaneous or began with a crack which developed over a period of time until the final cleavage occurred, as long as its progress was undetectable." *Id.* at 940. It reasoned that construing "sudden" as unforeseen effectuated the purpose of the liability policy at issue, and, impliedly, insurance contracts in general: namely, to protect the policyholder in case of accidental occurrences, but to prevent the insured from "proceed[ing] recklessly and hold[ing] the insurer liable for damage if [the policyholder] had been forewarned * * * and could have taken steps to forestall it * * *." *Id.* at 940-41.

In *Hudson v. Farm Family Mutual Insurance Co.,* 142 N.H. 144, 697 A.2d 501, 502-03 (1997), the insured was a farmer who made a claim against his insurer for injury to his cows caused by stray voltage. The farmer asserted that his insurance contract covered losses involving "Sudden and Accidental Damage from * * * Electrical Current." *See id.* The insurer countered that the long-term exposure at issue was not "sudden and accidental." *Id.* at 503. The court held that, in this context, the word "sudden" meant unexpected. *See id.* at 504. In support of this holding, it cited a leading insurance manual to the effect that " 'sudden' is not to be construed as synonymous with instantaneous." *See id.* The *Hudson* court also noted that construing "sudden" to mean "unexpected" as in the above cases did not, as INA argues, create a redundancy with respect to the succeeding word accidental. *See id.* Rather, "the joint use of the words 'sudden and accidental' serves distinct purposes not accomplished by either word standing alone." *Id.* "Simply put, sudden means unexpected, and accidental means unintended." *Id.* (quoting *New Castle County v. Hartford Acc. and Indem. Co.,* 933 F.2d 1162, 1194 (3d Cir.1991)).

Based upon the above authorities, we conclude that INA's proposed reading of the word "sudden" as necessarily including a temporal element breaks with the history of the word as courts have construed it in other standard insurance policies. Our examination of the pollution-exclusion clause's drafting history

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

similarly suggests that its original purpose--at least as the industry represented it to regulators--was to deny coverage to reckless or intentional polluters. We note first that the President of INA himself announced his company's intention to adopt the pollution-exclusion clause with these comments:

"INA will continue to cover pollution which results from an accidental discharge of effluents--the sort of thing that can occur when equipment breaks down. We will no longer insure the ***753** company which knowingly dumps its wastes. In our opinion, such repeated actions--especially in violation of specific laws--are not insurable exposures. * * * We at INA hope that our anti-pollution exclusion may help encourage many companies to take the first, crucial steps toward improving their manufacturing processes--the steps that will lead eventually to a cleaner, healthier and, we hope, happier life for all." Morton, 629 A.2d at 850 (quoting Charles K. Cox, *Liability Insurance in an Era of the Consumer,* Address Before the Annual Conference of the American Society of Insurance Management, (Apr. 9, 1970), quoted in Robert S. Soderstrom, *The Role of Insurance in Environmental Litigation,* 11 *Forum* 762, 767 (1976)).

The Insurance Rating Board represents the insurance industry before state regulators. When seeking approval from the Rhode Island Department of Business Regulation (Insurance Division) for the policy language at issue, it submitted a circular containing an explanatory memorandum that read in part:

"Coverage for pollution or contamination is not provided in most cases under present policies because the damages can be said to be expected or intended and thus are excluded by the definition of occurrence. The above exclusion clarifies this situation so as to avoid any question of intent. *Coverage is continued for pollution or contamination caused injuries when the pollution or contamination results from an accident* * * *." (Emphasis added.)

Moreover, the above representations are consistent with those the insurance industry made to other states when seeking approval of the pollution-exclusion clause. For example, the secretary of Travelers Insurance Company's Product Management Division, in a letter to New York State's associate insurance examiner dated January 13, 1982, assured that state's Insurance Division that "there is nothing in the term 'sudden and accidental' which *requires* the elimination of gradually occurring events from the collective. A number of court decisions in many jurisdictions have essentially reached the same conclusion: there is nothing which prevents gradually occurring events from being construed to be 'sudden and accidental' as long as there is no intent to cause injury or damages."

As these cases suggest, state regulators as a practical matter often are the only parties who are in a position to negotiate language changes in proposed commercial insurance contracts. Under these circumstances, it is reasonable to hold insurers to the representations they made to regulators when seeking approval for a pollution-exclusion clause like this one, which is susceptible to more than one plausible interpretation.

Many of the cases INA cites in support of its position deal with manufacturers who entrusted the disposal of their waste to third-party waste haulers. *See, e.g.,* *Stamford Wallpaper Co. v. TIG Insurance,* 138 F.3d 75, 80 (2nd Cir.1998) (holding that the mere fact that the manufacturer had handed its waste over to a third party did not automatically cause the release of waste to fall within the "sudden and accidental" exception to the pollution exclusion); *St. Paul Fire and Marine Insurance Co. v. Warwick Dyeing Corp.,* 26 F.3d 1195, 1204 (1st Cir.1994) (holding that a manufacturer's use of a waste disposal company did not allow it to obtain coverage under the exception to the pollution-exclusion clause because the discharge that caused the damage was the hauler's deposit of the waste in the landfill, not an intervening, unexpected event such as a sudden leak). And one of these cases employs the same standard for determining whether coverage applies in cases of third-party waste disposal that we have enunciated above. *See* *A. Johnson & Co. v. Aetna Casualty and Surety Co.,* 933 F.2d 66 (1st Cir.1991). ***754** In *A. Johnson,* the plaintiff's predecessor had "arranged for the handling or transport of a pollutant which arrived at the Site and which has been discharged to ground water or other waters of the State." *Id.* at 67. Even though the First Circuit predicted that the Maine Supreme Judicial Court would construe the word "sudden" as having a temporal meaning, it held that the exclusion applied because "leakage from multiple storage tanks" at the disposal site constituted " 'common place events which occurred in the course of daily business' " and thus did not fall under the heading of sudden and accidental. *Id.* at 75-76 (quoting *Industrial Indemnity Insurance Co. v. Crown Auto Dealerships,* 731 F.Supp. 1517, 1520-21 (M.D.Fla.1990)). Whether the leaks in *A. Johnson* were temporally sudden was irrelevant; rather, their

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

visible occurrence as part of the manufacturer's daily operations precluded their classification as sudden and accidental. Because the discharges were obvious and ongoing, the plaintiff-manufacturer could not have claimed they were unexpected. *See id.* at 75.

Similarly, in Northern Insurance Co. of New York v. Aardvark Associates, Inc., 942 F.2d 189, 195 (3d Cir.1991), also cited by INA, the Third Circuit predicted that the Supreme Court of Pennsylvania would find a transporter of waste could not invoke the "sudden and accidental" exemption because the leakage had been occurring for some time and that "inspectors had 'noted approximately 1200 industrial waste drums in various stages of deterioration' and that * * * 'hazardous drum contents were leaking onto the soil * * *.' " A reading of "sudden" as meaning unexpected or unintended would not have changed the outcome of this case: again, the court used the clause to deny coverage to a knowing or reckless polluter whose contamination arose directly from its regular course-of-business activity without the aid of an intervening, unexpected event. *Id.* at 196.

Whether Textron's deposition of waste into the neutralization pond amounted to indiscriminate dumping of toxic chemicals conducted as part of its regular business activity, as in the above cases, or whether its regular practice was to contain the waste, neutralize it, and thereby try to prevent it from contaminating the environment, is a disputed question of material fact in this case. Unlike the manufacturer in *Warwick Dyeing,* Textron does allege--and may be able to prove at trial--that an intervening, unexpected event (namely, the unexpected leakage from the pond) caused the damage. *Cf.* Warwick Dyeing, 26 F.3d at 1204 (finding "no evidence of any intervening discharge between the disposal of waste on the landfill and the actual damage that eventually resulted"). Even though a separate line of cases refuses to absolve manufacturers from liability for toxic-waste cleanup costs simply because they turned the waste over to a third party whose actions caused environmental damage, this is not Textron's situation. Textron contends that its initial discharge into the pond did not cause the harm, but instead an intervening event, namely an unexpected leak, did so. The *Warwick Dyeing* court, as noted above, suggested that such an assertion would raise questions about the manufacturer's culpability for the leak. Thus, fact-finding is in order concerning whether these discharges were in fact unexpected and unintended, as Textron has alleged.

Construing the word "sudden" as meaning unexpected in pollution-exclusion clauses also represents sound public policy. Read this way, the clause rewards manufacturers with coverage if they undertake a good-faith effort to dispose of contaminants safely yet suffer an unexpected discharge despite these efforts, thus providing them with an incentive to arrange for the disposal of toxic waste with great care. In the case of manufacturers who independently contract for their waste disposal, this holding requires them to take reasonable steps to ascertain whether their hauler or carter complies with the highest ***755** standards for waste disposal. A contrary interpretation of the clause would fail to distinguish between intentional and unintentional discharges, between waste dumped onto or into the ground in the middle of the night, and waste that has been carefully sealed in lined, state-of-the-art containers but nonetheless accidentally escapes into the environment. As a matter of interpreting this ambiguous clause, it seems prudent to follow a path that affords companies that use toxins in their work the incentive to handle them carefully, but that still affords coverage for truly unexpected and unintended releases of toxic materials.

**III**

**Concurrent Causation**

Textron next argues that the so-called "concurrent causation doctrine" also should have precluded summary judgment because a genuine issue of material fact exists concerning whether INA can prove that the sole cause of the damage at issue fell within the pollution-exclusion clause. INA counters that Textron's operations at this site were simply "pollution-prone" and that the motion justice correctly refused to "microanalyze the facts."

Although no Rhode Island case addresses this issue, the First Circuit has held that a jury should determine which event among several alternate possibilities "primarily caused" alleged environmental damage. *See* CPC International, Inc. v. Northbrook Excess and Surplus Insurance Co., 144 F.3d 35, 48 (1st Cir.1998). In cases involving multiple discharges of pollutants, other courts have held that if property damage results from at least one covered cause, the fact that other non-covered causes also contributed to the property damage does not eliminate coverage. *E.g.,* SCSC Corp. v. Allied Mutual Insurance Co., 536 N.W.2d 305, 314 (Minn.1995). In *SCSC,* the insurers of a business that allegedly contaminated groundwater beneath its property argued that they did not have to provide coverage. *See id.* at 309. They

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

relied upon the same pollution-exclusion clause that is at issue in this case. *See id.* at 313. The jury found that multiple events caused the damage, yet it was unable to find that a covered event was the overriding cause. *See id.* at 314. In affirming the trial court's findings of liability on the part of the insurer, the Minnesota Supreme Court held that

> "Coverage is not defeated simply because a separate excluded cause contributes to the damages. * * * If the insurer asserts that a noncovered or excluded cause was the true cause, the insurer cannot simply show that this noncovered or excluded cause is a direct cause; it must show something more than that. It is consistent, therefore, to require the insurer to show that the noncovered or excluded cause is the overriding cause--so much so that it overrides the insured's showing of a direct, covered cause. To allow any less of a showing would conflict with the principle that the insured need show only one direct, covered cause." *Id.*

Similarly, in *Continental Casualty Co. v. Rapid-American Corp.*, 80 N.Y.2d 640, 593 N.Y.S.2d 966, 609 N.E.2d 506, 508 (1993), New York's highest court found that the insurer of a company that used asbestos was liable to defend against suits arising out of asbestos exposure even though the policy precluded coverage for any discharges into the atmosphere. The court held that even though some contamination may have occurred from ingestion through discharges into the air, some of it may also have occurred through direct contact with hands or clothing. See id. 593 N.Y.S.2d 966, 609 N.E.2d at 513. Hence, "[w]here contamination could occur in a variety of ways, only one of which is potentially excluded, [the insurer] cannot meet the heavy burden of showing that the exclusion applies * * *." *Id.*

Moreover, when, as here, an insured has offered "specific evidence creating a genuine ***756** issue as to whether the incidents at the sites were sudden and accidental and caused more than a de minimis release of pollutants into the environment," summary judgment is inappropriate. *Millipore Corp. v. Travelers Indemnity Co.*, 115 F.3d 21, 34 (1st Cir.1997). (Emphasis added.) Similarly, the Massachusetts Supreme Judicial Court has held that a grant of summary judgment in favor of an insurance company on the basis of the pollution-exclusion clause was error when, notwithstanding the fact that "most of the releases resulted from * * * routine business practices, * * * some of the releases were indeed 'sudden and accidental.' " *Nashua Corp. v. First State Insurance Co.*, 420 Mass. 196, 648 N.E.2d 1272, 1276 (1995).

[16] The reasoning in the above-cited cases persuades us that summary judgment was inappropriate here. Textron offered evidence of discharges other than those from the containment pond that could have been responsible for at least some of the environmental damage at issue. For example, the intermittent releases of steam from the rocket-cell testing waters and the accidental leaks of chemicals from the rocket-cell testing area and from the blade-bonding facility could have caused at least some of the damage in question. This evidence requires fact-finding on the part of the jury to apportion the damages between covered and noncovered damages or to determine that no such apportionment is possible.

**Conclusion**

In sum, then, we hold that the Superior Court erred in granting summary judgment because genuine issues of material fact exist that require resolution by the fact-finder. For these reasons we sustain Textron's appeal, vacate the Superior Court's judgment, and remand this case for further proceedings consistent with this opinion.

754 A.2d 742, 50 ERC 2065, 89 A.L.R.5th 677

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.