UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| EMHART INDUSTRIES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, LIBERTY MUTUAL INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICA INSURANCE COMPANY, and UNITED STATES FIRE INSURANCE COMPANY,<br><br>Defendants. | CIVIL ACTION<br>No. 02-053-S |

MOTION TO ENFORCE SUBPOENA TO EDWARD J. CALABRESE

Emhart is entitled to enforcement of a subpoena that it will issue to Dr. Edward J. Calabrese, an expert witness retained by North River. This afternoon, North River advised Emhart that it does not intend to call Dr. Calabrese as a witness at trial.

MEMORANDUM

Attached hereto are the following cases which demonstrate that an expert witness retained by a party is subject to a subpoena to testify concerning opinions he has previously formed:

Carter-Wallace, Inc. v. Otte, 474 F.2d 529 (2nd Cir. 1972);

Kaufman v. Edelstein, 539 F.2d 811 (2nd Cir. 1976); and

Fitzpatrick v. Holiday Inns, Inc., 507 F.Supp. 979 (E.D. Pa. 1981).

Relevant sections of each case are bracketed.

Respectfully submitted,

/s/Alexandra K. Callam

Alexandra K. Callam (#5358)
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, Rhode Island 02903
(401) 274-2000
(401) 277-9600
acallam@haslaw.com
Counsel for Plaintiff, Emhart Industries, Inc.

Jack R. Pirozzolo
Richard L. Binder
Foley Hoag LLP
Seaport World Trade Center West
155 Seaport Boulevard
Boston, Massachusetts 02210
(617) 832-1000
Dated: September 21, 2006

**CERTIFICATE OF SERVICE**

I hereby certify that on September 26, 2006, a copy of the foregoing Motion to Enforce Subpoena was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Alexandra K. Callam

Alexandra K. Callam
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, RI 02903
(401) 274-2000
(401) 277-9600
acallam@haslaw.com

The petition for the writ of habeas corpus and for declaratory injunctive relief is therefore denied.

**Joseph A. FITZPATRICK and Jane B. Fitzpatrick, h/w**

**v.**

**HOLIDAY INNS, INC.**

**Civ. A. No. 80-263.**

United States District Court, E. D. Pennsylvania.

Feb. 26, 1981.

In suit to recover for injuries plaintiff suffered when she fell on ice while on defendant's property, plaintiff sought to subpoena physician and defendant objected and motions in limine were filed. The District Court, Huyett, J., held that, although defendant which had plaintiff examined by physician decided not to call physician as witness and was unwilling to agree to plaintiff's introducing a report prepared by physician, plaintiff would be permitted to subpoena physician as the only witness who could lay the necessary foundation for introduction of the report, but examination of physician must be limited to preparation of his report and facts and opinions contained therein and plaintiff must tender to physician customary expert fee for trial testimony.

Defendant's motion in limine denied and plaintiff's motion granted.

**1. Witnesses ⇐4**

Court has power to subpoena expert witness and, though it cannot require him to conduct any examinations or experiments to prepare himself for trial, it can require him to state whatever opinions he may have previously formed.

**2. Witnesses ⇐4**

Although defendant which had plaintiff examined by physician decided not to call physician as witness and was unwilling to agree to plaintiff's introducing report prepared by physician, plaintiff would be permitted to subpoena physician as the only witness who could lay the necessary foundation for introduction of the report, but examination of physician must be limited to preparation of his report and facts and opinions contained therein and plaintiff must tender to physician customary expert fee for trial testimony. Fed.Rules Civ.Proc. Rule 35, 28 U.S.C.A.

---

Edwin B. Barnett, Strong, Barnett, Hayes & Hamilton, Philadelphia, Pa., for plaintiffs.

Peter T. Parashes, White & Williams, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

HUYETT, District Judge.

The plaintiff alleges that because of the defendant's negligence she was injured when she fell on ice while on the defendant's property. At the defendant's request and pursuant to Rule 35 of the Federal Rules of Civil Procedure, the plaintiff was examined by a physician. The physician prepared a report which he delivered to the defendant. The defendant gave the plaintiff a copy of this report. The defendant has decided not to call this physician as a witness and will not be offering his report into evidence. In addition, the defendant is unwilling to agree that the plaintiff may introduce the report. Since the plaintiff wants to use the report and the defendant will not stipulate to its authenticity, the plaintiff intends to subpoena the physician who prepared the report and is the only witness who can lay the necessary foundation. The defendant vigorously objects to the plaintiff's plan to subpoena an expert that the defendant hired to prepare for litigation but who will not be called as a witness. Motions *in limine* have been filed.

[1] I recognize that the securing of expert testimony by subpoena is an unusual

practice. Nevertheless, the weight of authority holds that "a court does have the power to subpoena an expert witness and, though it cannot require him to conduct any examinations or experiments to prepare himself for trial, it can require him to state whatever opinions he may have previously formed." *Kaufman v. Edelstein*, 539 F.2d 811, 817 (2d Cir. 1976), *quoting Carter-Wallace, Inc. v. Otte*, 474 F.2d 529, 536 (2d Cir. 1972).

[2] So long as the examination of this witness is limited to the preparation of his report and the facts and opinions contained therein, the use of a subpoena to secure his testimony is clearly appropriate under the rule stated above. Since this is a matter largely within my discretion and because it is in the interests of fairness, I shall order the plaintiff to tender to the physician the customary expert witness fee for testimony at trial.

The defendant's motion *in limine* will be denied; the plaintiff's motion will be granted. The plaintiff should take whatever action it deems appropriate to secure the testimony of the physician.

**KLAMATH LAKE PHARMACEUTICAL ASSOCIATION, an Oregon Nonprofit Corporation, on behalf of its assignors, Plaintiff,**

**v.**

**KLAMATH MEDICAL SERVICE BUREAU, an Oregon Nonprofit Corporation, and Klamath Bureau Pharmacy, Inc., a now-dissolved Oregon Nonprofit Corporation, Defendants.**

**Civ. No. 78–868.**

United States District Court,
D. Oregon.

Feb. 27, 1981.

Association of pharmacies brought an action against nonprofit provider of health insurance and health care services under the antitrust laws. The District Court, Solomon, J., held that: (1) the pharmacy benefit provision in provider's health policies, which permitted insureds to purchase prescription drugs from provider's pharmacy at a cost of only one or two dollars for each prescription, satisfied the "business of insurance" requirement of the McCarran-Ferguson Act; (2) the regulation of provider by the Oregon Insurance Code satisfied the requirement of the McCarran-Ferguson Act that the business of insurance be regulated by state law; and (3) provider's requirement that its insureds use provider's pharmacy to receive the pharmacy benefit did not amount to an attempt to boycott, coerce, or intimidate other pharmacies, and thus the section of the Act which provides that anticompetitive practices which take the form of coercion, intimidation or boycott are not exempted from the antitrust laws was not applicable.

Ordered accordingly.

**1. Monopolies ⚷=18**

Pharmacy benefit provision in health policy which permitted insureds to purchase prescription drugs from pharmacy operated by insurer, a nonprofit provider of health insurance and health care services, at a price of only one or two dollars for each prescription satisfied "business of insurance" requirement of the McCarran-Ferguson Act, which exempts certain insurance practices from the Clayton and Sherman Acts, in that pharmacy benefit, like other provisions in the insurance policy, spread risk that insured might need the covered service among all those who paid premiums for such coverage. Sherman Anti-Trust Act, § 1 et seq., 15 U.S.C.A. § 1 et seq.; Clayton Act, § 1 et seq., 15 U.S.C.A. § 12 et seq.; McCarran-Ferguson Act, §§ 1 et seq., 2, 3(b), 15 U.S.C.A. §§ 1011 et seq., 1012, 1013(b).

See publication Words and Phrases for other judicial constructions and definitions.

**Felix KAUFMAN and Frederic G. Withington, Petitioners,**

**v.**

**Hon. David N. EDELSTEIN, Chief Judge, United States District Court for the Southern District of New York, Respondent.**

**UNITED STATES of America, Plaintiff-Appellee,**

**v.**

**INTERNATIONAL BUSINESS MACHINES CORPORATION, Defendant.**

**Felix Kaufman and Frederic G. Withington, Appellants.**

**Nos. 934, 935, 942 and 943, Dockets 76-3008, 76-3009, 76-6017 and 76-6024.**

United States Court of Appeals, Second Circuit.

Argued March 10, 1976.

Decided April 20, 1976.

Expert witnesses appealed from judgments of the United States District Court for the Southern District of New York, David N. Edelstein, Chief Judge, 406 F.Supp. 175 and 406 F.Supp. 178, denying motions to quash subpoenas directing them to testify on behalf of government in antitrust actions and filed petitions for mandamus. The Court of Appeals, Friendly, Circuit Judge, held that orders denying motions to quash subpoenas were not appealable until witnesses had subjected themselves to contempt; that court had the power to issue prerogative writs; and that refusal to quash subpoenas directing unwilling expert witnesses to testify in actions against computer manufacturer as to prior expressed opinions and as to advice they gave users of computer systems was not an abuse of discretion; thus, mandamus would not lie.

Appeals dismissed, petitions for mandamus denied.

Gurfein, Circuit Judge, filed a concurring opinion.

**1. Courts ⟹405(3.8)**

**Criminal Law ⟹1023(1)**

An order in a civil or criminal case denying a motion by a nonparty witness to quash a subpoena is not appealable until witness has subjected himself to contempt. 28 U.S.C.A. § 1291.

**2. Courts ⟹404(1)**

Court of Appeals which is vested with jurisdiction over final judgments in government civil antitrust actions has power to issue prerogative writs. Expediting Act, § 2(a, b) as amended 15 U.S.C.A. § 29(a, b).

**3. Witnesses ⟹5**

Under Federal Rules of Evidence there is not a general privilege for experts not to testify. Federal Rules of Evidence, rules 501, 701-706, 706(a), 28 U.S.C.A.

**4. Witnesses ⟹5**

There is no constitutional or statutory privilege against compulsion of expert testimony.

**5. Witnesses ⟹4**

Where good cause is shown, court may extend protection to expert witness and prohibit compulsion of expert's testimony. Federal Rules of Evidence, rules 501, 701-706, 28 U.S.C.A.

**6. Witnesses ⟹9**

Unwilling expert witness may be compelled to testify in antitrust action on behalf of government without a preliminary showing of the unavailability of a voluntary expert equally qualified.

**7. Witnesses ⟹9**

Factors to be considered in determining if unwilling expert witness should be compelled to testify include the degree to which expert is being called because of his knowledge of facts relevant to case rather than in order to give opinion testimony, difference between testifying to previously formed or expressed opinion and forming a new one, uniqueness of witness, extent to which call-

ing party is able to show unlikelihood that any comparable witness will willingly testify and degree to which witness is able to show that he has been oppressed by having continually to testify.

8. **Mandamus** ⚡40
**Witnesses** ⚡9

Refusal to quash subpoenas directing unwilling expert witnesses to testify in government civil antitrust actions against computer manufacturer as to prior expressed opinions and as to advice they gave users of computer systems was not an abuse of discretion; thus, mandamus would not lie to require granting of motions to quash. Expediting Act, § 2(a, b) as amended 15 U.S.C.A. § 29(a, b).

---

Powell Pierpoint, New York City (Hughes, Hubbard & Reed, and David F. Hixson, New York City, of counsel), for petitioner Felix Kaufman.

Robert B. Davidson, New York City (Baker & McKenzie, New York City, of counsel), for petitioner Frederic G. Withington.

Robert B. Nicholson, Dept. of Justice, Washington, D.C. (Thomas E. Kauper, Asst. Atty. Gen., John J. Powers, III, Raymond M. Carlson, Eugene M. Katz, and Grant G. Moy, Jr., Dept. of Justice, Washington, D.C.), for appellee.

Kenneth J. Bialkin, Howard C. Buschman, III, and Willkie, Farr & Gallagher, New York City, for The American Institute of Certified Public Accountants, amicus curiae.

Before FRIENDLY, MULLIGAN and GURFEIN, Circuit Judges.

FRIENDLY, Circuit Judge:

We have here appeals from and petitions for mandamus to vacate two orders of Chief Judge Edelstein in the Government's civil antitrust action in the District Court for the Southern District of New York against International Business Machines Corporation (IBM). These orders denied motions to quash subpoenas directing Felix Kaufman, a partner in the international accounting firm of Coopers & Lybrand, and Frederic G. Withington, a senior staff member of the well-known management consulting firm of Arthur D. Little, Inc., to appear and testify on behalf of the Government. The issue is entirely between the United States on the one hand and Dr. Kaufman and Mr. Withington on the other; IBM has taken no position either in the District Court or here.

As the cases now stand, the sole issue sought to be raised on the merits is whether Dr. Kaufman and Mr. Withington are entitled to be excused from responding to the subpoenas because the Government is seeking to interrogate them on the basis of their expert knowledge of the computer industry. In affidavits opposing the motions to quash the subpoenas, the Government stated its desire as being to develop testimony "concerning the nature and structure of the general purpose electronic digital computer systems market, and of the electronic data processing industry in general"—a subject on which petitioners are highly qualified.[1] So far as concerned opinion testimony, the Government made clear that it would not require appellants to state their present opinions but rather "prior opinions expressed during the period from 1960 through 1972." In its brief here the Government has somewhat amplified the range of the proposed testimony; it intends

1. Dr. Kaufman has had fifteen years experience, first as Regional Director for the Northeast Region and then as National Director of Consulting Services for Coopers & Lybrand. Mr. Withington affirms that he is "a management consultant to a wide variety of manufacturers, sellers and users of electronic computers" served by Arthur D. Little. He also is "primarily responsible for preparing analyses and forecasts of the computer industry based on Arthur D. Little estimates of the performance of the participants" which are distributed periodically to paying subscribers, and is the author of three books and numerous articles concerning the industry. The books are entitled "The Organization of the Data Processing Function," "The Real Computer—Its Influences, Uses and Effects," and "The Use of Computers in Business Organizations."

also to ask the witnesses "to explain the nature of their duties as computer systems consultants, and especially to recount the advice which they gave to various users and potential users of computer systems." It states, however, that the witnesses "will not be asked at trial for their expert evaluation of the government's evidence" and that "their testimony will be confined to events which occurred between 1960–1972." It is not seeking to have either witness or his firm conduct any examinations or undertake any special studies in preparation for trial.

The Government also states in brief that it "will pay both witnesses as experts for their services" in amounts to be negotiated between them and Government counsel. According to the Government's affidavits, although contested in part by petitioners, both witnesses had initially agreed to testify but later declined at the direction of their firms. Although some claims on the score of conflict of interest were raised in the district court, these have not been pressed on appeal.[2] The issue on the merits is posed most bluntly in the concluding paragraph of Mr. Withington's affidavit—"the government is seeking the very core of my expertise which I do not wish to provide and which I consider to be a proprietary asset available solely to my employer or to those for whom I wish to work."

Chief Judge Edelstein, in opinions, denied the motions to quash. His rulings were based largely on statements in this court's opinion in *Carter-Wallace, Inc. v. Otte*, 474 F.2d 529, 536 (2 Cir. 1972), *cert. denied*, 412 U.S. 929, 93 S.Ct. 2753, 37 L.Ed.2d 156 (1973), which are discussed below. He added "that an even stronger basis may be said to exist in the case at bar for recognizing the court's power to compel expert testimony than existed in *Carter-Wallace*," since "[t]his is not an attempt by a litigant in a private controversy to support its case through the assistance of an unwilling expert" but "an attempt by the United States to summon a member of the public to testify in a major government antitrust case, a case which, by definition, greatly affects the commonweal," citing *Pennsylvania Co. for Insurances On Lives and Granting Annuities v. City of Philadelphia*, 262 Pa. 439, 441, 105 A. 630 (1918). Dr. Kaufman and Mr. Withington have appealed and also have petitioned for writs of mandamus to require Chief Judge Edelstein to grant their motions. The United States has moved to dismiss the appeals for want of jurisdiction and asks us to deny the petitions both on that ground and on the basis that this is not a proper case for mandamus. If we should reach the merits, it contends that the district court's decision was right.

*Appealability*

Our jurisdiction of appeals in government civil antitrust cases is governed by the 1974 amendment to the Expediting Act, 15 U.S.C. § 29. This, so far as here relevant, provides:

> (a) Except as otherwise expressly provided by this section, in every civil action brought in any district court of the United States under the Act entitled "An Act to protect trade and commerce against unlawful restraints and monopolies", approved July 2, 1890, or any other Acts having like purpose that have been or hereafter may be enacted, in which the United States is the complainant and equitable relief is sought, any appeal from a final judgment entered in any such action shall be taken to the court of appeals pursuant to sections 1291 and 2107 of Title 28. Any appeal from an interlocutory order entered in any such action shall be taken to the court of appeals pursuant to sections 1292(a)(1) and 2107 of Title 28 but not otherwise.

One would have supposed it to be beyond argument that, despite *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 546–47, 69 S.Ct. 1221, 1225–1226, 93 L.Ed. 1528, 1536–1537 (1949), "An order compelling tes-

2. Counsel for IBM advised counsel for Dr. Kaufman by letter that it made no objection on this score.

timony . . . in an ordinary civil or criminal action is neither a final order [under § 1291] nor an interlocutory order granting an injunction [under § 1292(a)(1)] and it is not appealable. This is the oft-cited rule of *Alexander v. United States* [201 U.S. 117, 26 S.Ct. 356, 50 L.Ed. 686 (1906)]." 9 Moore, Federal Practice ¶ 110.13[2] at 153–54 (Ward ed. 1975). The remedy of the party witness wishing to appeal is to refuse to answer and subject himself to criminal contempt; that of the non-party witness is to refuse to answer and subject himself to civil or criminal contempt. *Id.* at ¶ 110.13[4] at 165–66. We have applied this rule in many cases of non-party witnesses, in one of which, *United States v. Fried*, 386 F.2d 691, 694 (2 Cir. 1967), we specifically rejected a contrary view expressed in *Covey Oil Co. v. Continental Oil Co.*, 340 F.2d 993, 996–97 (10 Cir.), *cert. denied*, 380 U.S. 964, 85 S.Ct. 1110, 14 L.Ed.2d 155 (1965)—as four other circuits have done, *Ryan v. CIR*, 517 F.2d 13, 18–20 (7 Cir.), *cert. denied*, 423 U.S. 892, 96 S.Ct. 190, 46 L.Ed.2d 124 (1975); *Gialde v. Time, Inc.*, 480 F.2d 1295, 1300–01 (8 Cir. 1973); *United States v. Anderson*, 150 U.S.App.D.C. 336, 464 F.2d 1390 (D.C. Cir. 1972); *Borden Co. v. Sylk*, 410 F.2d 843, 846 (3 Cir. 1969). The doctrine has since been reaffirmed by a unanimous Court in *United States v. Ryan*, 402 U.S. 530, 91 S.Ct. 1580, 29 L.Ed.2d 85 (1971), and was again recognized in *United States v. Nixon*, 418 U.S. 683, 690–92, 94 S.Ct. 3090, 3098–99, 41 L.Ed.2d 1039, 1053–54 (1974), although the Court, for reasons stated in its opinion which are wholly inapplicable here, made an exception where the subpoena was directed to the President of the United States.

[1] Apart from a suggestion that the rule against appeals from orders refusing to quash subpoenas is limited to appeals from such orders in criminal cases, an assertion contradicted by *Alexander* itself which concerned a subpoena issued in a government civil antitrust case, as well as by *Fried*, appellants' sole reliance for our departing from the established rule is the discussion in the majority opinion in *International Business Machines Corp. v. United States*, 471 F.2d 507, 511–16 (2 Cir. 1972), a case which concerned an order requiring the production of documents by a party, and which, on the merits, turned on issues of privilege and waiver thereof. The majority held that the order was appealable under *Cohen's* gloss on § 1291, relying in part on the discussion in *Covey Oil*. At best this was an alternative holding, since the majority also found that it had power to issue mandamus, under 28 U.S.C. § 1651, 471 F.2d at 516–17. More to the point, the opinion failed to state the basis upon which *Fried* and *Ryan* were thought to be inapplicable, although these cases had been correctly cited by the Government as directly rejecting *Covey Oil*. These cases were again pressed in the Government's Petition for Rehearing, although they were not in terms discussed in the subsequent *en banc* opinion, 480 F.2d 293 (1973), cert. denied, 416 U.S. 979, 980, 94 S.Ct. 2413, 40 L.Ed.2d 776 (1974), in which the court reversed the panel primarily on the basis that the Expediting Act in its then form, as recently explicated in *Tidewater Oil Co. v. United States*, 409 U.S. 151, 93 S.Ct. 408, 34 L.Ed.2d 375 (1972), wholly deprived the courts of appeals of both appellate and mandamus jurisdiction in government civil antitrust suits. However, the court added, 480 F.2d at 298–99, that, even if this were not true with respect to orders not going to the merits, *Cohen* would be inapplicable. We therefore must decline to recognize the opinion of the majority in 471 F.2d 507 as altering the rule established by many decisions of the Supreme Court and this court (including the later decision of this court *en banc*) that an order in a civil or a criminal case denying a motion by a non-party witness to quash a subpoena is not appealable until the witness has subjected himself to contempt.[3]

3. Although it is hardly necessary to adduce reasons for such a well-settled rule, it may be worthwhile to state the most important ones. To allow immediate review on the denial of a motion to quash a subpoena may produce an appeal that otherwise would not occur, since the case may be settled, or the party proposing to call the witness or the witness himself may

*Availability of Mandamus*

At the outset we must consider a possible barrier to the issuance of mandamus arising from the language of 15 U.S.C. § 29(a) which we have quoted above. As our discussion has shown, the orders refusing to quash the subpoenas were not final judgments under 28 U.S.C. § 1291, but were interlocutory orders. However, they were not interlocutory orders granting or denying a temporary injunction under § 1292(a)(1), and 15 U.S.C. § 29(a) directs that appeals from interlocutory orders shall be taken to a court of appeals "pursuant to sections 1292(a)(1) and 2107 of Title 28 but not otherwise."[4]

Since the enactment of this statute, this court has granted a writ of mandamus relating to other orders in this same case, *International Business Machines Corp. v. Edelstein*, 526 F.2d 37 (2 Cir. 1975). IBM argued there that the revisions to the Expediting Act removed the previous impediments to court of appeals' consideration of a mandamus petition; the Government responded that the terms of the new statute limited review of interlocutory orders to those involving injunctive relief. While the court must have been of the view that mandamus could properly issue, the impact of the cited language in the revised Expediting Act in this respect was not discussed, see 526 F.2d at 40–41. In the present case the Government has renewed its argument, although with the caveat that mandamus might issue "under exceptional circumstances"; petitioners respond that "[a]s the government undoubtedly knows, this argument was recently laid to rest by this Court." Given the silence of the preceding opinion on this point, we think it useful to record the considerations that impel us to agree that the current Expediting Act does not preclude our issuing mandamus in an appropriate case.

We begin by comparing the language of the Expediting Act quoted above with that of 28 U.S.C. § 1447(d), "An order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise. . . ." This provision, or rather is predecessors, has long been construed to prohibit review not only by appeal but by mandamus or in any other way. See *In re Pennsylvania Co.*, 137 U.S. 451, 11 S.Ct. 141, 34 L.Ed. 738 (1890); *Ex parte Matthew Addy S.S. Co.*, 256 U.S. 417, 41 S.Ct. 508, 65 L.Ed. 1027 (1921); *Employers Reinsurance Corp. v. Bryant*, 299 U.S. 374, 57 S.Ct. 273, 81 L.Ed. 289 (1937). But see *Thermtron Products, Inc. v. Hermansdorfer*, 423 U.S. 336, 96 S.Ct. 584, 46 L.Ed.2d 542 (1976), 44 U.S.L.W. 4085 (restriction against mandamus with respect to remand order inapplicable where it was conceded that removal had been neither improvident nor without jurisdiction under 28 U.S.C. § 1447(c) and district court remanded solely because of congestion of its own docket).

However, the language of the revised Expediting Act does not evince the clear purpose to outlaw mandamus that has been found in the removal statute. The Act states that "Any appeal from an interlocutory order" may be taken in the specified manner "but not otherwise;" syntactically these words as used in the new Expediting Act can be read about equally well to mean that they encompass all forms of review other than by appeals under § 1292(a)(1), or that they prohibit only other forms of "appeal." We think the legislative history supports the second of these readings and thus leaves the potential mandamus power of this court unimpaired.

[2] Although the final Committee Reports on the bill that was enacted, Sen.Rep. 93–298, 93d Cong., 1st Sess. (1973), and H.R. Rep.93–1463, 93d Cong., 2d Sess. (1974), shed no light on the purpose of the "but not otherwise" language, illumination is cast by

have second thoughts. Also, as illustrated by this case, postponing the appeal until the witness has placed himself in contempt would normally provide the appellate court with a record of just what questions the witness had been asked and refused to answer which is generally unavailable on the denial of a motion to quash.

4. Section 2107 deals only with the time for taking appeals.

earlier reports on the legislation, H.R.Rep. 91–1129, 91st Cong., 2d Sess. (1970), and S.Rep.91–1214, 91st Cong., 2d Sess. (1970). These contain a letter from the then Attorney General in which, after explaining the need for court of appeals review of orders granting or denying temporary injunctions, especially in merger or other acquisition cases,[5] he added that no such need existed in respect of interlocutory appeals under 28 U.S.C. § 1292(b):

> One reason against applicability of section 1292(b) is the desire to avoid undue delay and disruption. . . . A second reason is the inappropriateness of review of controlling questions of law by a court which later may never get review of the final judgment. The theory of 1292(b) is that the appellate court should have an opportunity to rule early, before getting the final judgment, on questions that may be decisive. It would be anomalous for the courts of appeals to undertake interlocutory resolution of such issues when, at the end of trial, if a certificate is filed, the final judgment would go directly to the Supreme Court.

While one may debate the weight of these arguments, which would apply with almost equal force to orders granting or denying temporary injunctions, they evidently were what Congress had in mind. In contrast there is no indication that Congress gave any thought to the question of mandamus. Since the courts of appeals are now vested with jurisdiction over final judgments in government civil antitrust cases, save in the special circumstances provided in 15 U.S.C. § 29(b), they have the same power to issue the prerogative writs as the Supreme Court did before the amendment.[6]

To put the matter in another way, prior to the amendment the law was that prerogative writs could be issued in government civil antitrust cases, but only by the Supreme Court, since it had sole appellate jurisdiction; by contrast, appeals under § 1292(b) simply could not be taken, either to the courts of appeals or to the Supreme Court, *Tidewater Oil Co. v. United States*, 409 U.S. 151, 93 S.Ct. 408, 34 L.Ed.2d 415 (1972). The legislative history supports the view that the "but not otherwise" phrase in the amendment was intended, despite the general routing of appeals to the courts of appeals, to keep the latter rule in force,[7] but gives no reason for belief that the power to issue prerogative writs was still to be confined to the Supreme Court.

*The Propriety of Issuing Mandamus*

In availing itself of its jurisdiction to issue prerogative writs in two government civil antitrust cases, *United States Alkali Export Ass'n v. United States*, 325 U.S. 196, 65 S.Ct. 1120, 89 L.Ed. 1554 (1945), and *DeBeers Consolidated Mines, Ltd. v. United States*, 325 U.S. 212, 65 S.Ct. 1130, 89 L.Ed. 1566 (1945), the Court cautioned against liberality in their use.[8] Although "hardship is imposed on parties who are compelled to await the correction of an alleged error at an interlocutory stage by an appeal from a final judgment . . . such hardship does not necessarily justify resort to certiorari or other of the extraordinary writs as a means of review," *United States Alkali*, *supra*, 325 U.S. at 202, 65 S.Ct. at 1125, 89

5. The grant of an unreviewable temporary injunction would often spell the doom of a proposed merger since one or another or both of the parties to it would not be willing to undergo the delay incident to a full trial. On the other hand, consummation of a merger would pose serious practical obstacles to the Government's obtaining adequate final relief.

6. In determining our power to issue mandamus, we are no more required to speculate whether the appeal from a final judgment in this antitrust case will be taken here or directly to the Supreme Court under 15 U.S.C. § 29(b), than a court of appeals needs to speculate whether a notice of appeal from a final judgment will ever be filed. *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 25, 63 S.Ct. 938, 941, 87 L.Ed. 1185, 1189 (1943).

7. The contrary is stated in 7B Moore, Federal Practice JC–422 (1976), without discussion of the "but not otherwise" language or the legislative history.

8. Four Justices dissented from the issuance of certiorari even on the extraordinary facts in *DeBeers*.

L.Ed. at 1560. Again, "The writs may not be used as a substitute for an authorized appeal; and where, as here, the statutory scheme permits appellate review of interlocutory orders only on appeal from the final judgment, review by certiorari or other extraordinary writ is not permissible in the face of the plain indication of the legislative purpose to avoid piecemeal reviews." *Id.* at 203, 65 S.Ct. at 1125, 89 L.Ed. at 1561. "When Congress withholds interlocutory review [§ 202] [the all writs statute] can, of course, not be availed of to correct a mere error in the exercise of conceded judicial power," *DeBeers, supra*, 325 U.S. at 217, 65 S.Ct. at 1133, 89 L.Ed. at 1572. If such statements continue to be the law with respect to government civil antitrust suits, issuance of mandamus here would clearly be precluded; the only hardship to petitioners from a refusal to issue the writ is the relatively mild one of declining to answer the questions propounded to them and subjecting themselves to a sentence of contempt—in all likelihood of civil contempt.

The case against this is that these statements reflected the narrow view with respect to the scope of the prerogative writs which the Supreme Court then entertained but from which it has since departed, notably in *LaBuy v. Howes Leather Co.*, 352 U.S. 249, 77 S.Ct. 309, 1 L.Ed.2d 290 (1957), and *Schlagenhauf v. Holder*, 379 U.S. 104, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964). See also the dicta in *Will v. United States*, 389 U.S. 90, 88 S.Ct. 269, 19 L.Ed.2d 305. (1967), and Note, Supervisor and Advisory Mandamus under the All Writs Act, 86 Harv.L. Rev. 595 (1973). That it has departed in some degree is clear enough; what is unclear is how far. Probably this cannot be completely determined until the Court speaks again; there is an obvious tension between the final judgment rule and increased use of the prerogative writs to review orders that are interlocutory even in light of *Cohen*, which must be resolved on a more principled basis than how much a court of appeals disapproves the district court's ruling in the particular case. As we wrote in *United States v. DiStefano*, 464 F.2d 845, 850 (2 Cir. 1972), even if "the judge was wrong, indeed very wrong that is not enough."

In considering the propriety of the issuance of mandamus, we must begin with the basis upon which the decision below was rendered. Chief Judge Edelstein considered that his power to compel the testimony of petitioners here sought by the Government was settled by this court's decision in *Carter-Wallace, Inc. v. Otte, supra*, 474 F.2d at 535–38. The question arose there in an unusual manner. Otte was the Chapter XI trustee in Bankruptcy of Davis-Edwards Pharmacal Corporation, which Carter-Wallace, Inc. had sued for infringement of its patent on meprobamate, widely marketed under the tradenames of Miltown and Equanil. Carter-Wallace had previously sued in the Court of Claims for infringement by the United States. In that action, which had not yet been decided, the United States had presented several expert witnesses whom Carter-Wallace had thoroughly cross-examined. Otte, who had insufficient funds to engage experts, was allowed to introduce the Court of Claims testimony of the Government's experts on the basis that the experts were unavailable since none of them were within the reach of the court's subpoena power under F.R.Civ.P. 45(e).

One of Carter-Wallace's arguments against this procedure was that the principle allowing the use of prior testimony of an unavailable witness did not apply "to expert witnesses whose opinions could under no circumstances be obtained through court process." The court, in a unanimous opinion by the writer, met the point head-on. We said:

> Carter-Wallace's reliance on the court's alleged lack of power to compel expert testimony is misplaced. The weight of authority holds that, although it is not the usual practice, a court does have the power to subpoena an expert witness and, though it cannot require him to conduct any examinations or experiments to prepare himself for trial, it can require him to state whatever opinions he may have previously formed. *Boynton v. R. J.*

*Reynolds Tobacco Co.*, 36 F.Supp. 593 (D.Mass.1941); *United States v. 284,392 Square Feet of Floor Space*, 203 F.Supp. 75 (E.D.N.Y.1962) (dictum); see 4 Moore, Federal Practice ¶ 26.66[1], at 26–469 (1972); 8 Wigmore, *supra*, § 2203(2)(c). Since the witnesses involved here had previously testified as to their opinions, it would seem that they could have been subpoenaed to repeat their testimony here.

Petitioners say that this was only dictum because we added the following:

> In any event, even if Carter-Wallace were correct that a court cannot require expert witnesses to appear, this argument would seem to lead to the conclusion that an expert witness is "unavailable" even if he is within the 100 mile radius of the court's usual subpoena powers, rather than to the result Carter-Wallace seeks.

We would regard this statement as an alternative ground of decision, and one on which less reliance was placed, rather than as one that rendered the previous statement dictum. Carter-Wallace's argument was that it was anomalous to allow the use of testimony of an expert not called by the proponent simply because the expert was outside the reach of process when the proponent could not have required the testimony if the witness had been within its reach. Our main answer was that, so far as concerned previously formed opinions, the latter assumption was wrong. Following this lead, the trial court here ruled that "[t]he law to which this court must adhere does not support [petitioners'] central contention that an unwilling expert may not be compelled to testify."

We can think of only one basis which, if well-founded, would have justified the district court in disregarding our decision in *Carter-Wallace*.[9] Unlike *Carter-Wallace*, this case is governed by the Federal Rules of Evidence. The trial court considered whether the Rules ran counter to our decision in *Carter-Wallace* and concluded that they did not. If anything, they tend to confirm it in a case like this which is governed by the "General Rule" of Rule 501 rather than the exception for claims or defenses in civil actions as to which State law provides the rule of decision. Article VII of the Rules deals with "Opinions and Expert Evidence" and contains six rules, 701–706. Although the framers of the rules must have been well aware of the frequently made contention that experts enjoy some kind of privilege, neither this chapter nor the proposed rules on privilege which the framers proposed but Congress rejected contain any suggestion that an expert enjoys either an absolute or a qualified privilege against being called by a party against his will. The only reference to the need of consent by an expert is in Rule 706(a), dealing with court appointed experts. This provides in part that "An expert witness shall not be appointed by the court unless he consents to act"—language taken verbatim from former F.R.Cr.P. 28. The situation of the court appointed expert who is expected to delve deeply into the problem and arrive at an informed and unbiased opinion differs utterly from that of an expert called by a party to state what facts he may know and what opinion he may have formed without being asked to make any further investigation. If any inference is to be drawn from the Federal Rules of Evidence, it is thus against the claim of privilege by an expert, not for it.

It is in light of this careful consideration given by the trial judge to the law as announced by this court and the effect of the Federal Rules of Evidence that we must consider whether mandamus lies. Clearly we are a great distance from the facts of *LaBuy, supra*, which concerned a district court's practice of referring cases to masters which the Supreme Court characterized as "little less than an abdication of the

9. There is no force in petitioners' contention that the *Carter-Wallace* decision conditioned compulsion of the testimony of an expert on a showing "that no other expert of similar qualifications is available or that the unavailable expert has some unique testimony to contribute," 474 F.2d at 536–37. This remark, as the opinion clearly shows, was directed to the different issue whether "former testimony" rather than live testimony could be used.

judicial function," and not much nearer the facts of *Schlagenhauf, supra*, which primarily concerned "the basic, undecided question of whether a district court could order the mental or physical examination of a defendant." Looking beyond the facts of these leading cases, we also think this case falls outside their rationale.

This court's major effort to outline the criteria for this broadened scope of mandamus, at least as regards situations similar to this one, is Judge Feinberg's opinion for a divided panel in *American Express Warehousing, Ltd. v. Transamerica Ins. Co.*, 380 F.2d 277, 282–83 (2 Cir. 1967), a discovery case. The majority thought the "touchstones" for the issuance of mandamus now were "usurpation of power, clear abuse of discretion, and the presence of an issue of first impression." The majority declined to issue mandamus in *American Express* since none of these factors was present; Judge Lumbard, who has consistently taken an expansive view of the use of mandamus,[10] dissented. In this case the judge's denial of a motion to quash subpoenas clearly was no "usurpation of power." F.R.Civ.P. 45 implicitly empowers a district judge to rule on such motions as it does explicitly in the case of motions to quash or modify subpoenas for the production of documentary evidence. No one could reasonably suppose that the Court has now subscribed, despite the contrary pronouncements in such cases as *Bankers Life & Casualty Co. v. Holland*, 346 U.S. 379, 382, 74 S.Ct. 145, 147, 98 L.Ed. 106, 141 (1953), and *Parr v. United States*, 351 U.S. 513 520, 76 S.Ct. 912, 917, 100 L.Ed. 1377, 1384 (1956), to a doctrine that any non-frivolous claim of error in a decision is a claim of "usurpation of power" on the theory that courts are bound to decide all issues correctly. "Jurisdiction is authority to decide the case either way," *The Fair v. Kohler Die Co.*, 228 U.S. 22, 25, 33 S.Ct. 410, 411, 57 L.Ed. 716, 717 (1913).

Whatever the usefulness of the "clear abuse of discretion" test for the issuance of mandamus may or may not be in other contexts, see *A. Olinick & Sons v. Dempster Bros.*, 365 F.2d 439 (2 Cir. 1966), it would not justify this in a case like the present where the judge reasonably considered that, in requiring petitioners to testify to facts within their ken and opinions "previously formed," he was acting in conformity with the law as recently declared by this court and consistently with the Federal Rules of Evidence, and that no sufficient grounds for a dispensation had been shown. Petitioners' argument thus must come down to a contention that, absent any other basis for its issuance, mandamus may be used to review an interlocutory order whenever a case presents an issue claimed to be novel and important.

If we were convinced that an expert witness is privileged against being called to testify against his will either under all circumstances or in the absence of a preliminary showing of "necessity" or on the basis of any other rule under which petitioners could bring themselves, we might be able to find a basis for overruling the pertinent portions of *Carter-Wallace* without invoking an *en banc* court. The decision could have been—although it was not—placed on the ground that Carter-Wallace could not in effect invoke the alleged privilege of the expert witnesses; it was wholly speculative whether they would have claimed it if they had been subject to the process of the district court. Moreover, as the writer freely concedes, the facts that the claim was made by a party rather than the witness and was one of many issues in a complicated pharmaceutical patent case led the court to place greater reliance on the briefs and to engage in less independent research than if a recalcitrant witness had been before us.

[3] We think it plain, however, that, quite apart from the inference to be drawn from the provision with respect to court-appointed experts, Rule 706(a), "the principles of the common law as they may be interpreted by the courts of the United States in

10. See, e. g., his dissents in *United States v. DiStefano*, 464 F.2d 845 (2 Cir. 1972), where Judge Mulligan and the writer constituted the majority, and in *Stans v. Gagliardi*, 485 F.2d 1290 (2 Cir. 1973), where Judge Feinberg and the writer were the majority.

the light of reason and experience," Federal Rule 501 of Evidence, do not recognize any general privilege for experts.

[4] In a notable case the Supreme Court has recently quoted its statement in *Branzburg v. Hayes*, 408 U.S. 665, 688, 92 S.Ct. 2646, 2660, 33 L.Ed.2d 626, 643 (1972), "that 'the public . . . has a right to every man's evidence,' except for those persons protected by a constitutional, common-law, or statutory privilege," *United States v. Nixon*, 418 U.S. 683, 709, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039, 1064 (1974).[11] Admittedly there is no constitutional or statutory privilege against the compulsion of expert testimony, and we perceive no sufficient basis in principle or precedent for holding that the common law recognizes any general privilege to withhold his expert knowledge.

The truth of the proposition that the high degree of a person's knowledge of a subject excuses him from giving testimony about it is not self-evident, to say the least. As Wigmore says, 8 Evidence § 2192 at 72 (McNaughton rev. 1961), the giving of such testimony

> may be a sacrifice of time and labor, and thus of ease, of profits, of livelihood. This contribution is not to be regarded as a gratuity, or a courtesy, or an ill-required favor. It is a duty not to be grudged or evaded. Whoever is impelled to evade or to resent it should retire from the society of organized and civilized communities, and become a hermit. He who will live by society must let society live by him, when it requires to.

He adds that "*all privileges of exemption from this duty* [of giving testimony] *are exceptional,* and are therefore to be discountenanced. There must be good reason, plainly shown, for their existence." *Id.* at 73 (emphasis in original). The opinion which, on its facts, most directly supports the view espoused by petitioners, *People ex rel. Kraushaar Bros. & Co. v. Thorpe,* 296 N.Y. 223, 72 N.E.2d 165 (1947), itself conceded that, as compared with three other states recognizing a privilege for experts,[12] there were eleven which compelled experts to testify to opinions which they "are able to give without study of the facts or other preparation."[13] See also Annotation, 77 A.L.R.2d 1182 (1961); Note, Requiring Experts to Testify in Maine, 20 Maine L.Rev. 297 (1968). The reasoning in *Kraushaar Bros.* for regarding the majority rule as "quite unsatisfactory"[14] ignores several important points. One is the enormous range of "expert" knowledge in modern life; if there is a privilege against the compulsion of "expert" testimony, this must extend not only to such learned professions as "medicine, law [and] science" but to the builder, the tug boat captain, the carpenter, the real estate broker, the stock broker, and a legion of other callings. Furthermore it assumes that the only purpose in calling an expert is to ask him to express an opinion about facts

11. The inner quote contains the words of Lord Hardwicke. See 8 Wigmore, Evidence § 2192 at 70 (McNaughton rev. 1961).

12. One of the three, Pennsylvania, would not allow the privilege in a situation where the state or, as here, the United States is seeking the testimony. See *Pennsylvania Co. for Insurance on Loans and Granting Annuities v. City of Philadelphia*, 262 Pa. 439, 441, 105 A. 630 (1918), cited in Chief Judge Edelstein's opinion.

In *Cheatham Electric S.D. Co. v. Transit Development Co.*, 261 F. 792, 796 (2 Cir. 1919), *appeal dismissed for want of jurisdiction*, 252 U.S. 567, 40 S.Ct. 343, 64 L.Ed. 719 (1920), holding that expert witness fees were not taxable as costs, Judge Hough argued that this was an *a fortiori* case as compared with the non-taxability of attorneys' fees since "An expert sells his opinions, as counsel sells his services, and he cannot by law be compelled to testify at all, while an attorney may be compelled to serve." No authority was cited for this dictum.

13. Petitioners' suggestion that in this case we should look to state law, and follow *Kraushaar Bros.* on that basis, flies in the face of Fed.Rule of Evidence 501.

14. This was that:

> In the realms of medicine, law, science, and many other callings where highly specialized knowledge is essential, only the most eminent are competent to answer ex tempore and defend impromptu opinions upon cross-examination, but none, without reflection upon his professional ability, may confess ignorance.

of which he has no personal knowledge. In such a case we see no reason why an expert cannot decline to testify "without reflection upon his professional ability" if, as may often happen, he believes that a hypothetical question does not give all the facts required for a full and fair answer. Often the inquiry may be about the development of techniques, the stage they had reached, opinions already formulated or expressed, even—as the Government claims to be the situation here—relevant knowledge about a party to the case or its products. To clothe all such expert testimony with privilege solely on the basis that the expert "owns" his knowledge free of any testimonial easement [15] would be to seal off too much evidence important to the just determination of disputes.

[5] What gives some pause about compelling expert testimony is not that the expert is called upon to make available to the community relevant knowledge that he has acquired through time and labor, but that since his knowledge, in contrast to that of the ordinary witness, is relevant to many cases, he may be summoned too often, both because of his eminence and because published views may eliminate the usual practical deterrent against calling an expert with whom counsel has not conferred in advance. See *Ex parte Roelker*, 20 F.Cas.P. 1092 (No. 11,995) (D.Mass. 1854). A court would indeed have cause for concern if, for example, a world-renowned surgeon were forced to spend a considerable share of his time in the courtroom rather than the operating room; [16] the interest in the saving of lives would outweigh a party's interest in obtaining testimony from an expert having no previous connection with the case. But to say, as we do, that there is no privilege to withhold testimony simply because it represents the result of study or experience does not entail a holding that courts may never extend protection when good cause is shown. It will be time for a federal court to consider what should be done about cases like the one we have framed when and if they should arise in situations governed by the first sentence of Rule 501. We can find no justification for a federal rule that would wholly exempt experts from placing before a tribunal factual knowledge relating to the case in hand,[17] opinions already formulated, or, even, in the rare case where a party may seek this and the witness feels able to answer, a freshly formed opinion, simply because they have become expert in a particular calling.

[6] We likewise see no basis for recognizing a narrower principle that an expert is privileged against being called against his will in the absence of a preliminary showing of the unavailability of a voluntary expert equally qualified. The task of determining whether the country contains a voluntary expert who is really as qualified and useful as the witness sought to be compelled would be an almost impossible one. Indeed, the facts of this case vividly illustrate the unworkability of such a "necessity" principle. A substantial part of the testimony which the Government here seeks from petitioners is testimony no one else can give. While it would seem that there must be other experts who could describe "the nature and structure of the general purpose electronic digital computer systems market, and of the electronic data processing industry in general," no one not connected with Coopers & Lybrand or Arthur D. Little can testify what advice these two important consultants gave to the large purchasers of

15. In view of the United States' offer to pay fair compensation to petitioners, we need not here express an opinion whether they could be compelled to testify for the ordinary witness fees. See the discussion in 8 Wigmore, Evidence § 2203(2)(c) (McNaughton rev. 1961), and the authorities there cited.

16. For a case that might have implicated this problem, see *Karp v. Cooley*, 493 F.2d 408, 424–25 (5 Cir.), *cert. denied*, 419 U.S. 845, 95 S.Ct. 79, 42 L.Ed.2d 73 (1974) (attempt to elicit testimony of Dr. Michael DeBakey in a malpractice action against another eminent heart surgeon with whom he was known to disagree).

17. See Justice Traynor's opinion in *City & County of San Francisco v. Superior Court*, 37 Cal.2d 227, 233–34, 231 P.2d 26, 29 (1951).

computers who were their clients.[18] To be sure, there probably are other accounting and management consulting firms with clienteles as large as petitioners'. But if, and it would be a bit naive to assume otherwise, the Government has some reason to think the petitioners will give testimony on this subject considered favorable to its position, we see no reason why it must go down the list of great accounting and consulting firms until it finds one—if it should—that presents the combination of willingness to furnish a qualified expert and the helpfulness of his testimony which the Government evidently thinks it has found in Dr. Kaufman and Mr. Withington.

[7, 8] Since there is thus no federal rule giving expert witnesses any privilege that can be formulated as a principle of law, petitioners are really asking us to utilize mandamus to set standards that should guide a trial judge in exercising his power to grant dispensation to an expert witness from the general principle of testimonial compulsion and then to hold that the district court violated such standards here. They claim to find support for this in the portion of *Schlagenhauf, supra,* where the Supreme Court held that the court of appeals should not merely have decided the novel question of a trial court's power to order a physical or mental examination of a defendant, but also should have interpreted the terms "in controversy" and "good cause" as used in F.R.Civ.P. 35. However, as we read the opinion on this point, 379 U.S. 104 at 111, 85 S.Ct. 234 at 238, 13 L.Ed.2d 152 at 159, it was primarily because the basic issue of power was already presented that the Court urged the court of appeals to reach these subsidiary issues as well. Be that as it may, what we would be doing here is quite different from construing language in a statute or a rule having the effect of one. As indicated, the utmost we could do would be to list a variety of factors appropriate for consideration by a trial judge in determining whether the exercise of compulsion upon an expert would constitute such a misuse of the court's processes that, despite the lack of any general privilege, the expert should nevertheless be excused from testifying in the particular case. Appropriate factors for consideration—some pointing against a dispensation and some for one—would be the degree to which the expert is being called because of his knowledge of facts relevant to the case rather than in order to give opinion testimony; the difference between testifying to a previously formed or expressed opinion and forming a new one; the possibility that, for other reasons, the witness is a unique expert; the extent to which the calling party is able to show the unlikelihood that any comparable witness will willingly testify; the degree to which the witness is able to show that he has been oppressed by having continually to testify; and, undoubtedly, many others. But, as this discussion shows, the end result is that dispensation would represent an exercise of discretion by the trial judge, and mandamus could not issue unless there had been "clear abuse of discretion," see *American Express Warehousing Ltd. v. Transamerica Ins. Co., supra,* 380 F.2d at 282–83—a showing that would not be remotely approached here. It is not asking too much of an expert who seeks to invoke a discretionary dispensing power of the trial judge that, save in the exceedingly rare case where refusal altogether to quash a subpoena would be a "clear abuse of discretion," the witness must attend, see just what questions are propounded to him, allow the trial court to rule upon them, and, if he then wishes to pursue the point further, subject himself to contempt.

The appeals are dismissed for want of appellate jurisdiction; the petitions for mandamus are denied.

GURFEIN, Circuit Judge (concurring):

I concur in the decision that, in its present posture, the denial of the motion to

18. We do not and on this meagre record could not pass on the relevancy of such evidence; it suffices for this opinion that we cannot now say it necessarily would be irrelevant at least if connected with evidence of what the clients did. Petitioners have made no such argument.

quash the subpoenas by Chief Judge Edelstein is neither appealable nor the proper subject for a prerogative writ of mandamus. And I have only admiration for most of my brother Friendly's scholarly opinion. I believe, however, that the majority opinion goes beyond what is necessary for decision. I cannot subscribe to the necessity for its formulation of tests for summoning unwilling expert witnesses who are entire *strangers* to the issues in the particular lawsuit.

The appellants are in a different position from the ordinary expert who has no personal relationship with the *subject matter* of the litigation. These appellants were concededly involved both as observers of and as participants in the phenomenal growth of the electronic data processing industry. The parties and the court are entitled to their testimony in general, as Chief Judge Edelstein recognized. If the questioning should go beyond the anticipated scope, I would leave open the right of appeal by these non-party witnesses provided a contempt order, civil or criminal, issues upon refusal to answer.

I respectfully suggest that all that *Carter-Wallace, Inc. v. Otte*, 474 F.2d 529 (2 Cir. 1972), *cert. denied*, 412 U.S. 929, 93 S.Ct. 2753, 37 L.Ed.2d 156 (1973), decided was that "[s]ince the witnesses involved here had previously testified as to their opinion, it would seem that they could have been subpoenaed to repeat their testimony here." 474 F.2d at 536. These prior opinions were given on the very issues in the litigation; there was merely a change of party.[1] I suppose that once a judge files an opinion, he commits it to posterity. And every reader becomes as qualified as the writer to say what in the opinion was necessary to the decision and what was said *obiter*. For we are all normally bound by the words as we have written them, just as a scrivener is bound to the objective meaning of words in a contract. I, therefore, feel free to read *Carter-Wallace* in a limited way.

In the present case, all that the Government seeks by way of opinion testimony is the "prior opinions of appellants from 1960–1972." *Carter-Wallace* holds that experts called upon for such "prior opinions" on the issues involved may be required to testify, and this can be read as including unrecorded prior opinions on the issues involved. On my restricted view of the actual holding, Chief Judge Edelstein had the *power*, in the circumstances, upon the authority of *Carter-Wallace* to deny the motion to quash. This view of *Carter-Wallace* also makes it reconcilable as an exception to a general rule previously stated in this circuit by Judge Hough, noted by Judge Friendly, that "[a]n expert sells his opinion, as counsel sells his services, and he cannot by law be compelled to testify at all, while an attorney may be compelled to serve." *Cheatham Electric Switching Device Co. v. Transit Development Co.*, 261 F. 792, 796 (2 Cir. 1919).

For the reasons so well stated by Judge Friendly, I agree that the order is not appealable. I also agree that we should reject mandamus as a remedy since the trial judge did not lack power to make this order, and since there is no precise question of law which can be or need be decided by an advance supervisory ruling as in *Schlagenhauf v. Holder*, 379 U.S. 104, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964).

In short, I concur in all of the majority opinion save for the general discussion of the expert witness' alleged "privilege," which I think is unnecessary to the decision. A rule that experts may be called generally and required to attend, might make the lives of some experts unbearable. With all the public funding presently available, in addition to the private funds available to private litigants, and the consequent expansion of litigation, unwilling experts on school discrimination, environment and psychiatry, for example, as well as surgeons, could be made subject to intermittent call. I am concerned, particularly in view of its eminent authorship, that the majority opin-

1. The precise issue, of course, which the court went on to discuss, was the admissibility of prior recorded testimony without the presence of the witness himself.

ion will be cited as compelling authority on a subject where there is such a dearth of real authority, and where its implications so clearly contradict New York law, see *People ex rel. Kraushaar Bros. & Co. v. Thorpe,* 296 N.Y. 223, 72 N.E.2d 165 (1947), which we shall probably have to follow in diversity cases. Federal Rules of Evidence 501.

The difficult problems, as I see them, are how to avoid compelling the expert to go to the expense of hiring a lawyer to vindicate his position, and how much the trial judge must decide in advance of requiring the expert to appear and, in Judge Friendly's words, be "forced to spend a considerable share of his time in the courtroom rather than the operating room." See *Karp v. Cooley,* 493 F.2d 408, 424–25 (5 Cir.), *cert. denied,* 419 U.S. 845, 95 S.Ct. 79, 42 L.Ed.2d 73 (1974). Should the judge, for instance, require a statement by counsel of what testimony he seeks to elicit from the expert before allowing such a subpoena to be deemed properly issued? Can the matter be decided on papers rather than on oral testimony? Must such a subpoena be served sufficiently in advance of trial to permit its resolution before trial begins?

I am afraid that having stated that mandamus was not a proper vehicle for enunciating rules of guidance for the district court, we may have done just that.

I think the subject needs exploration in a truly adversary context on a case-by-case basis unless the Federal Rules of Evidence can be amended adequately. Thus, while I agree that there is no absolute privilege for experts, we should not try to define the limits of compelling expert testimony beyond the situation here presented. Here the "experts" are presumably to testify regarding facts and concerning their own activities which relate to the very subject matter of the litigation—practices in the electronic data processing industry. Even an absolute rule of exemption for experts would hardly cover this situation. But I hesitate to discuss the problem of experts who are utter strangers to the subject matter of the litigation, for that problem, I respectfully suggest, is not at all involved on this appeal.

**NATURAL RESOURCES DEFENSE COUNCIL, INC., et al., Petitioners,**

**v.**

**The UNITED STATES NUCLEAR REGULATORY COMMISSION and the United States of America, Respondents,**

**Allied General Nuclear Services, et al., Intervenors.**

**Nos. 963, 1051, Dockets 75–4276, 75–4278.**

United States Court of Appeals, Second Circuit.

Argued April 12, 1976.

Decided May 26, 1976.

As Amended Aug. 12, 1976.

Petition for Rehearing with Suggestion for Rehearing En Banc Denied Sept. 8, 1976.

Various environmental groups sought review of order of Nuclear Regulatory Commission which specified the procedures and schedule which it would follow for completion of its generic environmental impact statement on wide-scale use of mixed oxide fuels and for the conduct of associated hearings and which also set forth criteria under which commercial licensing of mixed oxide fuel activities would proceed in the interim prior to the decision on wide-scale use. The Court of Appeals, Pierce, District Judge, sitting by designation, held that the Commission had wide latitude in determining how it would conduct its hearing; that decision to use legislative hearings initially and to use adjudicatory hearings with cross-examination only if such hearings were thereafter found to be necessary was reasonable; that decision to bifurcate hearings was reasonable; that the Commission was not required to withhold its general environmental statement on mixed oxide fuels until its safeguards supplement was com-

Case 1:02-cv-00053-S-LDA Document 446-4 Filed 09/26/2006 Page 1 of 21



tice of readiness. There is every reason to believe both the Government counsel and the court below would have treated the motions to dismiss for failure to prosecute quite differently had they been grounded specifically on our Rules. Indeed, our Rules provide "failure of a defendant to move for discharge prior to plea of guilty or trial shall constitute waiver of . . . . rights [under the Rules]." Rule 8.

Judgment affirmed as to Infanti; reversed as to Kurtz.

CARTER-WALLACE, INC., Plaintiff-Appellant,

v.

William N. OTTE, as Trustee in Bankruptcy of Davis-Edwards Pharmacal Corp., Defendant-Appellee.

No. 297, Docket 72-1406.

United States Court of Appeals, Second Circuit.

Argued Sept. 14, 1972.

Decided Nov. 14, 1972.

Certiorari Denied June 4, 1973.
See 93 S.Ct. 2753.

Patent infringement action. The United States District Court for the Eastern District of New York granted temporary injunction against infringement. The Court of Appeals vacated order and directed further proceedings, 443 F.2d 867. The District Court, Dooling, J., held that patent was invalid and dismissed complaint, 341 F.Supp. 1303, and patentee appealed. The Court of Appeals, Friendly, Chief Judge, held that patent No. 2,724,720, for meprobamate, a tranquilizer and anticonvulsant, was invalid for obviousness, where molecular modification was obvious and neither original nor continuation in part application disclosed novel property of meprobamate as tranquilizer, and where utility of meprobamate as anticonvulsant and muscle paralyzant was obvious in view of prior art.

Affirmed.

1. Appeal and Error ⟹781(2)
Patents ⟹324(1)

Where patentee would be able to collect some amount, however small, if Court of Appeals reversed judgment of district court holding patent invalid, appeal was not moot.

2. Bankruptcy ⟹254

Referee in bankruptcy should not have allowed trustee to invade escrow account established under court order without giving beneficiary of fund notice and opportunity to be heard.

3. Patents ⟹324(6)

Where attorney for defendant in patent infringement action was not proficient in patent law, trial judge had been directed by appellate court to conduct trial expeditiously, and issue of patent validity had been explored in depth in trial of patentee's infringement action against government in court of claims, there was no impropriety in receiving exhibits which had been presented in government's cross-examination and case in chief in court of claims, which exhibits consisted principally of prior art references and other records whose authenticity was not challenged, which were separately considered by trial judge, and which were not received until patentee had full opportunity to object.

4. Evidence ⟹580

Where attorney for defendant in patent infringement action was not proficient in patent law, trial court had been directed by appellate court to conduct trial expeditiously, and issue of patent validity had been explored in depth in trial of patentee's infringement action against United States in court of claims, there was no impropriety in permitting defendant to offer as its cross-examination of patentee's witnesses government's cross-examination of such witnesses in court of claims.

**5. Patents ⇐324(5¼)**

Reception, in patent infringement action, of record of testimony of government witnesses in previous infringement action against government in court of claims, as defendant's case in chief, did not warrant reversal, even though defendant failed to establish that attempts had been made to secure voluntary attendance of such witnesses, or that there were no other witnesses who could have provided same information, where patentee did not press its objection in sufficient detail to force defendant to go beyond its proof that witnesses all resided beyond 100-mile limit, defendant's insolvency may have made any attempt to secure voluntary appearance of witnesses futile, it was likely that government's pharmacology expert would have been found to be unavailable expert having unique testimony to contribute, and no prejudice appeared.

**6. Evidence ⇐575**

To permit use of previous testimony, it must be established that prior proceeding involved substantially the same issue, that party against whom testimony is sought to be used, or someone having similar interest, had fair opportunity and adequate motive to cross-examine witness, and that witness is not available.

**7. Evidence ⇐581**

Generally, lack of power of court to compel attendance of witness at trial is sufficient proof of unavailability with respect to rules governing reception of former testimony.

**8. Witnesses ⇐4**

Although it is not usual practice, court has power to subpoena expert witness, and though it cannot require him to conduct any examinations or experiments to prepare himself for trial it can require him to state whatever opinions he may have previously formed.

**9. Witnesses ⇐4**

Witnesses who testified for government in former patent infringement action against government in court of claims as to their opinions could have been subpoenaed to repeat such testimony in subsequent infringement action.

**10. Evidence ⇐577**

Requirement of attempt to secure voluntary attendance of witness who lives beyond subpoena power of court is not ordinarily imposed before prior testimony can be used in civil litigation, but such requirement is particularly appropriate when dealing with testimony of expert witnesses whose earlier attendance was secured by voluntary arrangements.

**11. Evidence ⇐575**

Unavailability of particular expert witness should not without more allow use of his prior testimony in second action.

**12. Federal Civil Procedure ⇐1181**

General preference of federal rules is for oral testimony so that there will be opportunity for live cross-examination and observation of demeanor of witness.

**13. Evidence ⇐575**

Exception to rule favoring oral testimony which permits use of previous testimony is based on necessity of using prior testimony when alternative is loss of that testimony entirely.

**14. Evidence ⇐575**

Before former testimony of expert witness can be used, there should be some showing not only that witness is unavailable, but that no other expert of similar qualifications is available or that unavailable expert has some unique testimony to contribute.

**15. Patents ⇐328(2)**

Patent No. 2,724,720 for meprobamate, a tranquilizer and anticonvulsant, was invalid for obviousness, where molecular modification was obvious and neither original nor continuation-in-part application disclosed novel property of meprobamate as tranquilizer, and where utility of meprobamate as anticonvulsant and muscle paralyzant was obvious in view of prior art. 35 U.S.C.A. § 103.

**16. Patents ⚖16.25, 18**

To establish patentability of obvious molecular modification, novel, unexpected, or superior nonobvious property must be disclosed in patent application or at least in supporting documents.

**17. Patents ⚖90(1)**

Failure of original application to qualify for patentability would not preclude use of initial filing date with respect to new property disclosed in continuation-in-part application, provided that original application showed novelty and utility required by statute.

**18. Patents ⚖101(5)**

Continuation-in-part application for patent for meprobamate, reciting that compounds "possess marked anti-convulsant and other properties" and specifying as such property "a marked paralyzing action on voluntary muscles," referring to use in treating "anxiety" in manner superior to that of another compound, and further reciting that the "structure most sensitive to the effect of the drugs in the central nervous system are the interneurons" failed to disclose novel property of meprobamate as tranquilizer.

**19. Patents ⚖18**

Development in pharmacology cannot be regarded as unobvious simply because it was not first, or even second or third structural change of which researcher would think; but development should not be regarded as obvious merely because it lay somewhere along general stream of prior art although years of labor might be needed to achieve it.

**20. Patents ⚖36(1)**

Evidence in action for infringement of patent for meprobamate wherein defendant asserted invalidity of patent sustained finding, supporting conclusion of invalidity for obviousness, that prior art relating to compounds with muscle-paralyzant activity pointed sufficiently in direction of dicarbamation of disubstituted 1,3-propanediols that development of meprobamate was obvious at time of original application to persons having ordinary skill in the art.

On Petition For Rehearing

**21. Patents ⚖118.21**

Adequacy of patent applicant's disclosure is mixed question of law and fact, on which court must ultimately apply legal standard to complex set of facts; although expert testimony will often aid in understanding the underlying factual context, resolution of legal issue is for court.

**22. Patents ⚖118.21**

When it is clear that disclosure of patent application does not meet statutory standards, expert assistance is not necessary either in district court or on review.

**23. Patents ⚖118.17**

High standard of disclosure is required before novel property of otherwise obvious chemical compound can be relied upon to establish patentability.

**24. Patents ⚖118.17**

Disclosure with respect to chemical compound is not adequate if it is merely suggestion of art which might lead others to hit upon property relied upon for patentability.

**25. Patents ⚖118.2**

Disclosure of patent should, upon issuance, immediately add patentable invention to existing fund of knowledge in field and must do more than merely suggest experimentation which would lead to discovery of patentable property.

---

Edward J. Ross, New York City (Breed, Abbott & Morgan, New York City, of counsel), George B. Finnegan, Jr., New York City (Jerome G. Lee, John D. Foley, George P. Hoare, Jr., Stephen R. Smith, and Morgan, Finnegan, Durham & Pine, New York City, of counsel), for plaintiff-appellant.

Charles R. Brainard, New York City (Richard K. Parsell, Paul H. Heller, Stuart J. Sinder, George E. Badenoch, Kenyon & Kenyon, Reilly, Carr & Chapin, and Robert P. Herzog, New York City, of counsel), for defendant-appellee.

American Patent Law Assn, Arlington, Va. (Donald R. Dunner, Washington, D. C., Ellsworth H. Mosher, Arlington, Va., and John W. Brumbaugh, New York City, of counsel), filed a brief as amicus curiae.

Before FRIENDLY, Chief Judge, and LUMBARD and FEINBERG, Circuit Judges.

FRIENDLY, Chief Judge:

In Carter-Wallace, Inc. v. Davis-Edwards Pharmacal Corp., 443 F.2d 867 (2 Cir. 1971), we reversed a preliminary injunction issued by Judge Dooling in the District Court for the Eastern District of New York, restraining Davis-Edwards Pharmacal Corp. (Davis-Edwards), then a debtor in arrangement proceedings under Ch. XI of the Bankruptcy Act, from its conceded infringement of Claim 4 of United States Patent 2,724,720, owned by Carter-Wallace. Claim 4 was on a new composition of matter, meprobamate, which became a highly successful drug widely known by its trade-names, Miltown and Equanil. Our reversal was based on the settled rule that, in the absence of prior adjudication of validity or long acquiescence, "an injunction pendente lite in a patent suit should not go except when the patent is beyond question valid and infringed." Simson Bros., Inc. v. Blancard & Co., 22 F.2d 498, 499 (2 Cir. 1927). The majority's discussion of the patent went only so far as to hold that it was not "beyond question valid;" [1] we emphasized, 443 F.2d at 880, 884, that we were in no way intimating our view of the proper resolution of the issue of patent validity. Familiarity with our earlier opinion is here assumed.

On remand, a trial on the merits of the patent issues was conducted before Judge Dooling.[2] In a carefully considered and necessarily lengthy opinion, 341 F.Supp. 1303, 173 U.S.P.Q. 65 (E.D.N.Y. 1972), Judge Dooling found the patent claim for meprobamate invalid, dismissed the complaint, and directed that final judgment be entered on the claim of patent infringement, F.R.Civ.P. 54(b). From this ruling Carter-Wallace has appealed.

I. *Mootness*

[1] Before we reach the issue of the validity of the meprobamate patent, we must consider two preliminary issues raised by Carter-Wallace. The first is its motion to dismiss its own appeal as moot. Understandably, Carter-Wallace does not wish simply a dismissal of the appeal but seeks also an order vacating the judgment of the district court. We will assume that under United States v. Munsingwear, Inc., 340 U.S. 36, 39–40, 71 S.Ct. 104, 95 L.Ed. 36 (1950), it would be entitled to such an order if the case has in fact become moot.

Carter-Wallace's motion is grounded upon a series of events occurring since the trial. During the past winter, storm damage and water seepage at Davis-Edwards' Connecticut plant apparently contaminated its entire stock of pharmaceuticals. In January 1972, state health authorities, acting in conjunction with the Food and Drug Administration, seized and condemned these drugs, including all of Davis-Edwards' meprobamate, as having become unfit for pharmaceutical manufacture. As a result, Davis-Edwards ceased operations and, on April 12, 1972, was adjudicated a bankrupt. All of its tangible assets have now been sold. The trustee in bankruptcy is thus left with a bank account with a balance of approximately $61,000, subject to liens which he expects to settle for no more than $21,000, and a savings account of some $5600. Priority claims against the bankrupt estate vastly exceed these assets. Davis-Edwards' only other assets are an insurance claim, of unspecified amount and apparently subject to a se-

1. Judge Mansfield, dissenting, thought that "Carter ha[d] satisfied the burden imposed by the *Simson Bros.* rule." 443 F.2d at 886.

2. The judge had previously severed defendant's counterclaims for anti-trust violations, discussed by Judge Mansfield at 443 F.2d at 894. See 341 F.Supp. at 1340.

curity interest, arising out of the storm damage to its plant and consequent contamination of its physical inventory; and its counterclaims against Carter-Wallace for antitrust violations,[3] which Carter-Wallace deems valueless in light of Judge Mansfield's observations when the case was last here, 443 F.2d at 894,[4] and the disposition of similar defenses raised by the United States in the action against it by Carter-Wallace in the Court of Claims, Carter-Wallace, Inc. v. United States, 449 F.2d 1374, 196 Ct.Cl. 35 (1971) (Davis, J.).

Shortly after it was apprised of these facts, Carter-Wallace moved on June 15, 1972, to dismiss its appeal and vacate the judgment below, contending that since it would be impossible for Davis-Edwards to resume infringement before the patent expires on November 22, 1972, and since Carter-Wallace cannot recover monetary damages, the case has become moot. This motion was heard before a panel of this court on June 27, 1972, and referred to the panel hearing the merits of the appeal.

[2] Carter-Wallace's argument overlooks two critical points. First, its claim for damages for infringement subsequent to the filing of the Chapter XI petition ranks as an administration expense entitled to a first priority under § 64a of the Bankruptcy Act. See 443 F.2d at 874. Although there appears to be one claim of about $47,000 of higher priority, if Carter-Wallace should prevail on this appeal it seems likely that it could recover some small amount as its share among the first priority claims. Second, and more important, it became clear at oral argument that the trustee's savings account of $5600 represents the balance of the fund which we had directed, 443 F.2d at 884, be established by Davis-Edwards in the amount of 5% of the gross proceeds of its sales of meprobamate from the date of the preliminary injunction, February 25, 1971, to be held in escrow for Carter-Wallace's benefit should it prevail on the merits.[5] To be sure, this is exceedingly small meal when compared to the possible effect of a contrary decision as collateral estoppel, under Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971), in Carter-Wallace's suit against the United States, and the problems a contrary decision may create in the defense of an action brought in the District of New Jersey by Zenith Laboratories on behalf of itself and other purchasers of meprobamate, in which plaintiffs will doubtless also seek to avail themselves of collateral estoppel. Indeed, any possible recovery is much smaller than the expense of prosecuting this appeal. But we cannot see how we can hold this appeal to be moot when reversal would enable the appellant to collect something, however small. Moreover, if this were relevant, we do not regard the equities as being so impressively in Carter-Wallace's favor as it con-

3. Appellee also includes among its assets its right to recover payments from Carter-Wallace, if the patent is held to be invalid, for meprobamate purchased before it began to infringe. Apart from doubt as to the validity of this theory of recovery, see Troxel Mfg. Co. v. Schwinn Bicycle Co., 465 F.2d 1253 (6 Cir. 1972), this potential asset adds nothing to the assets available to Carter-Wallace should it ultimately recover on its patent infringement claim; Carter-Wallace's argument that it cannot benefit from a reversal is not answered by arguing that it may lose from an affirmance.

4. Because the majority reversed the grant of the preliminary injunction on the ground that the patent was not "beyond question valid," it had no occasion to consider the antitrust phase of the case.

5. Apparently the fund had once amounted to nearly $10,000 but, after the district court's decision, the referee in bankruptcy allowed the trustee to invade the escrow account, allegedly on the basis of a misrepresentation that we had affirmed the holding of invalidity. In view of our conclusion on the merits, we need not pursue this question beyond noting that the referee should not have allowed such invasion without at least giving Carter-Wallace notice and opportunity to be heard.

tends. Carter-Wallace has long been aware of Davis-Edwards' weak financial condition; indeed, when the case was last here, it was Carter-Wallace that argued that the defendant's insolvency justified the preliminary injunction it had been awarded. See 443 F.2d at 874. Yet it was Carter-Wallace that chose to pursue this impecunious infringer in the last years of the patent, to push ahead with the trial on the merits against an insolvent defendant, and to take up many days of judicial time with a prosecution which, even on the facts then known, could not of itself have warranted the large expense.

II. *Fairness of Trial*

Carter-Wallace also contends that the procedure allowed by Judge Dooling at the trial was such gross error, and so prejudiced the plaintiff, as to warrant summary reversal without consideration of the merits. To put this contention in its proper perspective, the circumstances which led to the procedure must be understood.

At the hearing with respect to the grant of a preliminary injunction, and on the appeal therefrom, Davis-Edwards, despite its precarious financial condition, was represented by experienced patent counsel, as its trustee again is on this appeal. However, although these lawyers did agree to handle the antitrust issues, contemplating that most of these would be presented by a motion for summary judgment, Davis-Edwards was unable to retain them to undertake the trial on the merits of the patent issues. Thus, William H. Bisnoff, house counsel for Davis-Edwards and defense counsel of record, was left to present the claims of patent invalidity without having practiced patent law, without having had significant previous involvement in this litigation, and with little time to prepare for the trial. Mr. Bisnoff sought postponement of trial of the patent issues until after resolution of the antitrust issues, but this motion was denied by Judge Dooling in light of the direction of this court on the prior appeal, 443 F.2d at 874, 884, induced by Carter-Wallace's expressed fears as to inability to collect damages for continuing infringement, that the trial be conducted expeditiously.

Faced with a situation in which the attorney for a Chapter XI debtor was not proficient in patent law but the patent issue had been explored in depth in a trial of Carter-Wallace's infringement action against the United States before a Commissioner of the Court of Claims, the court permitted an unusual procedure. Most of Carter-Wallace's witnesses appeared in person;[6] they gave substantially the same testimony which they had given in the Court of Claims, except for a few instances where they clarified their positions on matters that had been developed on their cross-examination there. But Davis-Edwards was allowed to offer the Government's cross-examination in the Court of Claims as its cross-examination, and to present its entire case-in-chief through the use of the testimony of the Government's witnesses in the Court of Claims action, with the judge often summarizing the testimony into the record and questioning counsel about it. Similarly, the exhibits presented in the Government's cross-examination and case-in-chief in the Court of Claims were marked into evidence, with the court again often questioning counsel about them.

6. Judge Dooling clearly gave Carter-Wallace the right to present *all* its witnesses in person if it so desired. When Davis-Edwards moved early in the trial to have the entire record of the Court of Claims proceeding accepted in evidence, the judge denied the motion, saying:

"Mr. Bisnoff, it would seem to me that I can't require them to try the case on that record, and that they can certainly put in the plaintiff's case as they wish."

And when counsel for the defendant persisted in setting out the grounds for his motion. Judge Dooling cut him off, saying:

"that is his right [to present testimony *viva voce*]. I have ruled. He may put in his case."

[3, 4] Although Carter-Wallace apparently claims that admission of any of this material from the Court of Claims action is patent error warranting summary reversal, the issue can be narrowed rather quickly. We see no possible impropriety in the admission of the exhibits, mostly prior art references and other records whose authenticity is not challenged. Admission of each exhibit was separately considered by Judge Dooling, with full opportunity for Carter-Wallace to object, and Carter-Wallace has not pointed to any specific ruling which it claims to be erroneous. We likewise find little difficulty in the use of the Government's cross-examination in the Court of Claims. Nothing would have prevented counsel for Davis-Edwards from reading the questions the Government had asked and, if the witness gave a different answer, reading into the record as impeachment the response he had previously made in the Court of Claims. Nor can Carter-Wallace object to admission of the cross-examination as substantive evidence rather than impeachment, for Judge Dooling carefully offered it the opportunity to withdraw or modify any of the answers previously given. Moreover, we fail to see how allowing use of the previous cross-examination of its own witnesses could possibly have prejudiced Carter-Wallace. Knowledge that one's witnesses would be asked only the same questions as on a previous trial would seem to be a trial lawyer's dream; indeed, Carter-Wallace freely admitted that its witnesses had modified their direct testimony so as to "clarify" problems explored by the Government's cross-examination.

[5] The issue is thus confined to the propriety of the receipt by the district court of the testimony of the Government's witnesses in the Court of Claims as defendant's case-in-chief in this action. It is highly debatable whether Carter-Wallace made a sufficient objection to the use of this testimony.[7] However, we think that the substantial question raised warrants futher discussion and, in light of our view of the merits of this question, we see no reason to rely solely on our doubts over the sufficiency of plaintiff's objection.

[6, 7] Davis-Edwards contends that the use of the testimony of the Government's witnesses in the prior action met the three essentials to the use of previous testimony, namely, (1) that the prior proceeding must have involved substantially the same issue; (2) that the party against whom the testimony is sought to be used (or someone having a similar interest) had a fair opportunity and adequate motive to cross-examine the witness; and (3) that the witness is unavailable. See McCormick, Evidence §§ 255–57 (Cleary ed. 1972). The first two conditions were clearly met here. Davis-Edwards claims that the third requirement was satisfied by evidence that none of the witnesses lived within the reach of the court's subpoena power un-

7. Carter-Wallace's only objection on hearsay grounds to the introduction of testimony from the Court of Claims record came at the beginning of the trial, when defendant moved the court to accept the entire record of the Court of Claims action. This objection was *sustained* by the court so as to allow the plaintiff to present its case as it wished. The court ruled, however, that the defendant could renew its motion when it was time to present its case, at which time the plaintiff might "feel differently . . . [and] not even oppose your motion to put in some parts or all of the Court of Claims record as your defense." Carter-Wallace's only other objection during the course of the trial came when Davis-Edwards sought to introduce the Government's cross-examination of Carter's first witness. This objection was limited to the alleged immateriality of much of this cross-examination and the delay and confusion that its admission would produce. No objection on hearsay grounds to the use of the cross-examination was made; in any event, as we have held above, any such objection would not have been meritorious. Most important, Carter-Wallace did not object at all, despite many opportunities to do so, at the critical point when Davis-Edwards introduced the testimony of the Government's witnesses in the Court of Claims as its defense.

der F.R.Civ.P. 45(e). Certainly the general rule is that lack of power of the court to compel attendance at trial is sufficient proof of unavailability. See McCormick, *supra*, § 253, at 609; 5 Wigmore, Evidence § 1404 (3d ed. 1940). But Carter-Wallace argues that this principle does not apply "to expert witnesses whose opinions could under no circumstances be obtained through court process."

[8, 9] Carter-Wallace's reliance on the court's alleged lack of power to compel expert testimony is misplaced. The weight of authority holds that, although it is not the usual practice, a court does have the power to subpoena an expert witness and, though it cannot require him to conduct any examinations or experiments to prepare himself for trial, it can require him to state whatever opinions he may have previously formed. Boynton v. R. J. Reynolds Tobacco Co., 36 F.Supp. 593 (D.Mass.1941); United States v. 284,392 Square Feet of Floor Space, 203 F.Supp. 75 (E.D.N.Y.1962) (dictum); see 4 Moore, Federal Practice ¶ 26.66 [1], at 26–469 (1972); 8 Wigmore, *supra*, § 2203(2)(c). Since the witnesses involved here had previously testified as to their opinions, it would seem that they could have been subpoenaed to repeat their testimony here. In any event, even if Carter-Wallace were correct that a court cannot require expert witnesses to appear, this argument would seem to lead to the conclusion that an expert witness is "unavailable" even if he is within the 100 mile radius of the court's usual subpoena powers, rather than to the result Carter-Wallace seeks.

[10] Still, we agree there is something unusual about the use of the prior testimony of an expert witness that calls for further scrutiny of his unavailability. First, unlike the typical witness whose involvement with the case may depend on the fortuity of his observing a particular event and whose presence at trial is often involuntary, a party ordinarily has the opportunity to choose the expert witness whose testimony he desires and invariably arranges for his presence privately, by mutual agreement, and for a fee. Although a requirement of an attempt to secure the voluntary attendance of a witness who lives beyond the subpoena power of the court is not ordinarily imposed before prior testimony can be used in civil litigation, see 5 Wigmore, *supra*, § 1404; Barber v. Page, 390 U.S. 719, 723, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968), we think that such a requirement is particularly appropriate when dealing with the testimony of expert witnesses whose earlier attendance is almost invariably secured by such voluntary arrangements.

[11–14] Moreover, even the unavailability of a particular expert witness should not without more allow the use of his prior testimony in a second action. It must be recognized that the general preference of the federal rules, as expressed in F.R.Civ.P. 43(a), is for oral testimony so that there will be an opportunity for live cross-examination and observation of the demeanor of the witness. While the use of previous testimony is a well-established exception to this rule, it is an exception based on the necessity of using the prior testimony when the alternative is loss of that testimony entirely. See 5 Wigmore, *supra*, § 1402, at 148. When the ordinary witness is unavailable, his unique knowledge of the facts will be lost unless the use of his prior testimony is allowed. But the expert witness generally has no knowledge of the *facts* of the case. Instead, he is called upon to express a professional opinion upon the facts as they are presented to him, often expressing his opinions in the form of answers to hypothetical questions. Thus, even if one particular expert is unavailable, there is no need to use his previous testimony to prevent the loss of evidence, because there will usually be other experts available to give similar testimony orally. It seems to us, therefore, that before the former testimony of an expert witness can be used, there should be some showing not only that the witness is unavailable, but that no other expert of similar

qualifications is available or that the unavailable expert has some unique testimony to contribute.

Although there has been no showing here that attempts were made to secure the voluntary attendance of the Government's witnesses in the Court of Claims or that there were no other witnesses who could have provided the same information, we do not believe that reversal is warranted in the circumstances of this case.[8] Undoubtedly one reason that there was no such showing was Carter-Wallace's failure to press its objection in sufficient detail to force Davis-Edwards to go beyond its proof that the witnesses all resided beyond the 100 mile limit, see note 7 *supra*. Second, if Judge Dooling had been aware of the requirements we have set out above, we do not think it would have been an abuse of discretion to admit the the prior testimony on a showing that Davis-Edwards' insolvency made any attempt to secure the voluntary appearance of these witnesses futile. Moreover, it seems likely that the Government's pharmacology expert, Dr. O'Leary, who testified at length on the obviousness of meprobamate and who was by far the most important of the witnesses whose testimony is in question, would have been found to be an "unavailable expert [who] has some unique testimony to contribute," *supra*, since his doctoral dissertation, written at about the same time as the discovery of meprobamate, involved a study of the relevant prior art and the testing of new compounds in a search for meprobamate-like properties. Dr. O'Leary's failure to suggest meprobamate in his thesis formed the basis of extensive cross-examination in the Court of Claims and is one of the prime arguments of Carter-Wallace in favor of the non-obviousness of the drug.

Most important, however, Carter-Wallace has failed to show that it has been prejudiced by the use of the Court of Claims testimony. Carter-Wallace knew from the beginning of the trial that Davis-Edwards would rely on the previous testimony and had the rare opportunity to tailor its case to the defense that would be presented. The only instance of possible prejudice to which Carter-Wallace points was the judge's inability to observe the alleged breakdown of Dr. O'Leary when, in the hearing before the Commissioner of the Court of Claims, he was confronted with his doctoral dissertation. We cannot be-

8. Davis-Edwards argues that the prior testimony is admissible under the laws of New York, which, if true, would be an alternative ground for holding it admissible in this action. F.R.Civ.P. 43(a). Defendant relies on N.Y.Civ.Prac.Law § 4517 (McKinney supp. 1972), which states in relevant part:

> In a civil action, if a witness' testimony is not available because of . . . absence beyond the jurisdiction of the court to compel appearance by its process . . . his testimony, taken or introduced in evidence at a former trial . . . may be introduced in evidence by any party upon any trial of the same subject-matter in the same or another action between the same parties . . . .

The requirement that the action be between the same parties has been held to mean only that the party against whom it is sought to introduce the testimony is the same as the party against whom the evidence was first introduced. Healy v. Rennert, 9 N.Y.2d 202, 213 N.Y.S.2d 44, 173 N.E.2d 777 (1961). Defendant's argument is further bolstered by an apparently long-forgotten decision of the Appellate Division of the New York Supreme Court, Wallach v. Manhattan Ry., 105 App.Div. 422, 94 N.Y.S. 574 (1st Dep't 1905), which holds that a party can use the former testimony of a now-deceased expert witness notwithstanding the availability of other experts. But there is a suggestion in the New York case law that before the prior testimony of an unavailable witness can be used there must be some showing of efforts to secure his voluntary attendance, Longacre v. Yonkers R.R., 191 App.Div. 770, 182 N.Y.S. 373 (2d Dep't 1920), and there has been no consideration whether this requirement is particularly appropriate when expert testimony is involved. Since this hurdle is one that must be surmounted even under New York law, we prefer to rest our holding on grounds more generally applicable to the federal courts.

lieve that this would have altered the result, especially since the trier of fact was a sophisticated judge, having many years of trial experience at the bar and on the bench, whose opinion and questions during trial reveal an extraordinary understanding of this esoteric subject matter.

We would not wish to be understood as thinking, any more than did the district judge, that the procedure followed below was a model, or even a desirable, form for the trial of a patent case. But the judge was confronted with a difficult problem and solved it in a way we cannot find to have been defective. To be sure, it would have been better if the issue of validity had been first decided by the Court of Claims, whose commissioner had seen and heard the witnesses, and we do not view with favor the efforts the Government is said to have made to avoid this. But, as on the issue of mootness, Carter-Wallace's discomfiture is largely of its own making, arising from its determination to press its claim for infringement against this insolvent infringer, with little prospect of any monetary gain, despite the red flags raised in our previous opinion, rather than await the decision of the Court of Claims.

Carter-Wallace urges us to consider the collateral estoppel effect that will attach to a finding of invalidity by this court, see Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, *supra*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 and the requirement that the patentee have "a fair opportunity procedurally, substantively and evidentially to pursue his claim the first time." 402 U.S. at 333, 91 S.Ct. at 1445. Decision whether the unorthodox form of the trial should deprive the judgment of effect as collateral estoppel is more appropriately a matter for courts where such effect is asserted.

### III. *Validity of the Meprobamate Patent*

We therefore turn to the merits. In view of the elaborate statement of the facts by the district court, we can greatly abbreviate our own. The parent application, filed on July 29, 1950, was, as Judge Dooling stated, "simplicity itself," 341 F.Supp. at 1313. The application sought patents on a class of organic compounds as new compositions of matter. As said by the district court, *id.*:

> The invention was described as propanediol dicarbamates, that is, 1,3-propanediol dicarbamates with disubstitution of alkyl or aryl radicals having one to six carbon atoms at the middle carbon of the propane chain. The disubstituted radicals can be the same or different ones. So far as properties and implied uses were concerned, the application said simply "we have discovered that the 2,2-disubstituted-1,3-propanediol dicarbamates of the invention possessed marked anticonvulsant properties."

Example 6 of the application detailed the preparation of 2-methyl-2-n-propyl-1,3-propanediol dicarbamate, the compound at issue here.

The prosecution of the application took the familiar course of rejection by the Examiner, submission of arguments and affidavits, and, in this instance, a final rejection on March 12, 1953. A continuation-in-part (CIP) application was filed on August 3, 1953. Again we adopt the characterization by the district court, 341 F.Supp. at 1318:

> The new application disclosed and claimed as a group 3 propanediol dicarbamates, 2-methyl-2-isopropyl-1,3-propanediol dicarbamate, 2-ethyl-2-phenyl-1,3-propanediol dicarbamate and 2-methyl-2-n-propyl-1,3-propanediol dicarbamate (meprobamate).
>
> . . . . The specification adds to the disclosure of anticonvulsant properties a disclosure of "marked paralyzing action on voluntary muscles," which emphasizes that the paralysis is produced without loss of consciousness or impairment of vital functions, such as respiration and heart action. The discussion indicates that the structure most sensitive to the effects of the

> drugs in the central nervous system are the interneurons. The application states that meprobamate is similar to mephenesin in numerous respects but is of much longer duration of action, and is more effective in oral administration; without explicitly saying that meprobamate shares all of such uses, it is then said that mephenesin is widely used "in the treatment of muscle spasm, anxiety and many disorders of the nervous system."

The patent issued on the CIP application on November 22, 1955.

If the case hinged solely on whether it was obvious "to a person having ordinary skill in the art to which said subject matter pertains," 35 U.S.C. § 103, that nature would permit the arrangement of atoms comprising meprobamate and that chemists could synthesize the compound, the answer would be easy. Although meprobamate was undeniably a new composition of matter, 341 F.Supp. at 1306, the state of the prior art of chemical synthesis was such as to make the compound "chemically obvious," to use Judge Dooling's expression, 341 F.Supp. at 1337. As noted in our earlier opinion, 443 F.2d at 876, the 1,3-propanediol, which has long been known in the art, can be written as



or as



The parent diol of meprobamate, a disubstituted 1,3-propanediol with a methyl group, $CH_3$, substituted for $R_1$, and a normal propyl group, $C_3H_7$, substituted for $R_2$, was first disclosed in a 1913 article in a German journal by Adolf Franke. The diol was brought to the attention of researchers in the art by the work of Dr. Berger just prior to the synthesis of meprobamate. Dr. Berger's 1949 article, which has generally been referred to in this litigation as Berger I, was a study of the pharmacological properties of a group of disubstituted 1,3-propanediols, where the $R_1$ and $R_2$ of the propanediol were replaced by various combinations of ethyl, methyl, propyl, and other related groups; in particular, Berger I reported the pharmacological properties of 2-methyl-2-n-propyl-1,3-propanediol.

The only remaining step in the synthesis of meprobamate was the carbamation of the terminal hydroxyls of the propanediol, that is, the replacement of the X and $X^1$ of the propanediol by carbamate groups, each in the form



But no one skilled in the art would have doubted the feasibility of doing this. As Judge Dooling observed, 341 F.Supp. at 1337, the propanediols "could be carbamated as countless alkyl moieties had been carbamated" since the early 1900's. More recently, a 1948 British patent issued to William Baird, et al., taught a new process for the synthesis of organic polycarbamates through reaction with phosgene. One of Baird's examples specifically disclosed the carbamation of 1,3-propanediols, and, since the patented process applied to dicarbamation of any such radical, "substituted or not," the Baird patent clearly comprehended the synthesis of meprobamate. Although the Baird process was not explicitly followed in the synthesis of meprobamate by Drs. Berger and Ludwig, the process actually used "appears not to differ radically from the method suggested in the patent," 341 F.Supp. at 1338.

However, the obviousness that such a compound could be made, as thousands of other variants could also be, does not necessarily dispose of the issue. Chemists do not invent new compounds just for fun. As this court has observed in a decision upholding the validity of a patent on a new chemical compound even though the compound was "the end product of a fairly simple series of chemical

reactions," Schering Corp. v. Gilbert, 153 F.2d 428, 431 (2 Cir. 1946), it must be "kept in mind that such things must be evaluated not alone by the degree of the change but also by reference to the purpose sought to be accomplished." 153 F.2d at 432. The Court of Customs and Patent Appeals has similarly rejected the contention that the obvious chemical structure of a new compound should bar patentability as a new composition of matter. In re Papesch, 315 F.2d 381, 50 CCPA 1084 (1963). The doctrine which that court has evolved, as approved by the Court of Appeals for the District of Columbia Circuit in Commissioner of Patents v. Deutsche Gold-und-Silber Scheideanstalt Vormals Roessler, 130 U.S.App.D.C. 95, 397 F.2d 656, 661 (1968), holds that:

> Obvious molecular modification coupled with a showing of novel [or unexpected] properties or superiority of known properties can establish patentability.

[15] Davis-Edwards here challenges the validity of this doctrine, and Judge Dooling, in the latter part of his opinion, agreed that it was too liberal a test of patentability, resulting in the grant of patent monopolies exceeding the scope of the actual invention. The court below argued that chemical obviousness should bar patentability of the new compound as a new composition of matter, and that the discovery of novel or unexpected properties should entitle the inventors only to a patent on the uses to be made of these properties. Although Judge Dooling's remarks have been expressly rejected by the Court of Customs and Patent Appeals, see In re Murch, 464 F.2d 1051, 1055 (1972), and have provoked the American Patent Law Association to filing a brief in this court as *amicus curiae*, we find it unnecessary to consider the question he raised. For we hold, as did the court below, that the patent for meprobamate is invalid for obviousness even under the more liberal standard of *Papesch*.

[16] Carter-Wallace asserts that, once this standard is applied, the day is won since, as is in effect conceded, it was not obvious to a person having ordinary skill in the art that the change in molecular structure which resulted in meprobamate would produce one of the most effective tranquilizers the world has known. But the premise does not lead so swiftly to the conclusion. An essential link in the argument, and one that existed in the cases on which Carter-Wallace relies, see Illinois Tool Works, Inc. v. Continental Can Co., 397 F.2d 517, 520 (7 Cir. 1968); Technicon Instruments Corp. v. Coleman Instruments Corp., 385 F.2d 391, 393 (7 Cir. 1967); In re Zenitz, 333 F.2d 924, 52 CCPA 746 (1964), is that the novel, unexpected, or superior nonobvious property must be disclosed in the patent application or at least in supporting documents[9] in order to be relied upon as a basis for patentability. Abbott v. Coe, 71 App.D.C. 195, 109 F.2d 449, 450 (1939); Tinnerman Products, Inc. v. George K. Garrett Co., 292 F.2d 137, 140 (3 Cir.), cert. denied, 368 U.S. 833, 82 S.Ct. 58, 7 L.Ed.2d 35 (1961).

[17] Admittedly the initial application made no reference to the utility of meprobamate as a tranquilizer. But this would not be fatal, if the CIP application adequately disclosed this property. It is true that a February, 1952, article by Dr. Berger fully disclosed the synthesis of meprobamate and its anticonvulsant properties. Davis-Edwards argues that this forecloses issuance of a patent on the drug as a new composition of matter if, as it contends, the 1950 application did not establish patentability. But we agree with Judge Rich, In re Kirchner, 305 F.2d 897, 49 CCPA 1234 (1962), that under 35 U.S.C. § 120, the failure of the 1950 application to qualify for patentability would not preclude use of the initial filing date with

9. The facts of this case do not require us to determine whether disclosure only in supporting documents is sufficient.

respect to a new property disclosed in a CIP application provided that the original patent application showed the novelty and utility required by § 101, as was the case here. See also Indiana General Corp. v. Lockheed Aircraft Corp., 408 F.2d 294 (9 Cir. 1968). Whatever may be the proper scope of the relation-back doctrine, it surely covers a case where, as here, the only intervening publication —and that by the inventor—disclosed nothing more than the initial patent application.[10]

[18] Carter-Wallace's problem is not the 1952 Berger article but the failure of the CIP application adequately to disclose the tranquilizing property of meprobamate. While the specifications say the patented compounds "possess marked anti-convulsant and other properties," the only other property expressly disclosed is of "a marked paralyzing action on voluntary muscles." Carter-Wallace argues that disclosure of the tranquilizing property is implicit in two other statements in the specifications. First, it points to language where the specifications explain that the compounds overcome the drawback of very short duration of action that had limited the pharmaceutical utility of mephenesin, which is described as "a widely used drug of value in the treatment of muscle spasm, anxiety and many disorders of the nervous system," and relies heavily on the word "anxiety." Even if we accept for the moment Carter-Wallace's claim—which is disputed by Davis-Edwards—that use in the treatment of anxiety would be a sufficient teaching of tranquilizing properties of the kind possessed by meprobamate, which calms without dulling the senses as opposed to the dulling effect of the sedatives used prior to 1955 in the treatment of anxiety, we are unable to agree that this is a disclosure of meprobamate's tranquilizing property. The specifications do not say that meprobamate shares this property of mephenesin; they merely say that the action of meprobamate "is similar to that of mephenesin in numerous respects," and do not specify in which respects the two drugs are similar or, aside from the difference in duration of action, in which they may differ. We fail to see how this language can be regarded as an adequate disclosure when it is as consistent with the absence of tranquilizing properties as it is with their presence.[11]

10. The court below held that Carter-Wallace could rely only on the disclosure of anticonvulsant utility in the original application as a ground for establishing the non-obviousness of its discovery of meprobamate. So general a ruling would fail to recognize the significance of § 120 and the benefit of the earlier filing date that it accords. Moreover, we find no authority for such a position. The court cited only In re Herr, 304 F.2d 906, 909, 50 CCPA 705 (1962). But the holding in *Herr* was that disclosure of an additional property in an affidavit in support of the application could not be relied upon to establish patentability when the property was not disclosed in the application itself, a holding which, we should note, has been substantially eroded by later decisions of the C.C.P.A., *see* In re Khelghatian, 364 F.2d 870, 53 CCPA 1441 (1966). Importantly, the property upon which reliance was placed was not disclosed in any application; no continuation-in-part application had been filed; and the case did not involve the relation-back of additional disclosures in a CIP application. Indeed, when the applicant in *Herr* did disclose the additional properties in a new application, the compound was found patentable, with the C.C.P.A. rejecting the argument that the rejection of the initial application foreclosed patentability on grounds of *res judicata*. In re Herr, 377 F.2d 610, 54 CCPA 1315 (1967).

11. Carter-Wallace's argument is somewhat analogous to the argument unsuccessfully advanced by the patent applicant in Brenner v. Manson, 383 U.S. 519, 531–532, 86 S.Ct. 1033, 16 L.Ed.2d 69 (1966). There it was argued that the tumor-inhibiting effects of the compound which was the end-product of the process sought to be patented were sufficiently disclosed by reference to an adjacent homologue which had this property, the argument being that the compound in question would be likely to have similar properties. The Supreme Court upheld the rejection of this argument by the Patent Office and held that utility had not been sufficiently disclosed.

Second, Carter-Wallace points to the statement in the specifications that "[t]he structure most sensitive to the effect of the drugs in the central nervous system are the interneurons." Carter-Wallace explains that the tranquilizing effect of meprobamate follows from its effect on the interneurons because the limbic system and the thalamus of the brain, the centers of human emotion, have relatively large concentrations of interneurons. While this may be a persuasive *post hoc* explanation of meprobamate's tranquilizing action in light of current scientific understanding, it is building too much on too little to claim that the statement in the specifications would have made it apparent to the average worker in the art at the time that meprobamate was an effective tranquilizer. Perhaps the best refutation of Carter-Wallace's argument is contained in the next sentence of the specifications: "This [effect on the interneurons] may be of therapeutic value." How can it be seriously contended that the tranquilizing effect of meprobamate would be clear from the disclosure of its effect on the interneurons when the inventors themselves were uncertain whether or not this effect was of therapeutic value and were unable to state what that therapeutic value might be? On the other hand, if the inventors were aware of the drug's tranquilizing properties,[12] such vague disclosure would be inexcusable.

Even if we were willing to agree that meprobamate's tranquilizing properties were "intimated" in the specifications, as the district court suggested, 341 F. Supp. at 1322, so limited a disclosure would not be adequate to justify issuance of a patent on the basis of these properties. The trade-off made in the patent laws is the grant of a 17-year monopoly in return for a non-obvious invention coupled with a specification "in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains . . . to make and use the same." 35 U.S.C. § 112. Although the primary purposes of requiring this degree of disclosure may be to insure that the invention can be reconstructed and that the boundary separating legitimate experimentation from infringement is clear, see Norton Co. v. Bendix Corp., 449 F.2d 553, 555 (2 Cir. 1971), both of which are fulfilled here, similar reasoning justifies a high standard of disclosure when a property of an obvious chemical compound is relied upon to establish patentability under the *Papesch* doctrine. In the absence of such disclosure the public will not obtain the benefit of the particular use which justified the grant of the patent. Applying this standard, we conclude that nothing in the specifications of the CIP application would have led the typical skilled worker in the art to use meprobamate as a tranquilizer.

However, our refusal to accept Carter-Wallace's argument as to the disclosure in the CIP application does not end the case in Davis-Edwards' favor. All we have established up to this point is that the synthesis of meprobamate was chemically obvious and that, assuming *arguendo* that the *Papesch* doctrine of establishing patentability on the basis of unexpected properties provides a proper standard, Carter-Wallace nevertheless cannot take advantage of the compound's property as a tranquilizer in support of

12. Dr. Berger testified that the tranquilizing properties of meprobamate were discovered through experiments with Java and rhesus monkeys in July, 1952. After administration of meprobamate, these monkeys, normally quite aggressive and difficult to handle, were markedly more docile. In contrast to their usual behavior, they could be handled without biting, and would accept food from humans and eat it peacefully in front of observers. If this is so, there is no reason why Dr. Berger could not have amended the patent application to add the tranquilizing property and specify the results of his experiments before the rejection in March, 1953, or included this information in the August, 1953, CIP application. Though we can only speculate as to the reason, the simple fact is that he did not.

patentability because of the lack of adequate disclosure. There remains the question whether the utility of meprobamate as an anticonvulsant and muscle-paralyzant, clearly disclosed in the CIP application, was obvious as that term is used in § 103.

[19] Although the issue is by no means free from doubt, we have concluded that the revelant prior art had progressed to such a point—in no small part through the efforts of Dr. Berger before his retention by Carter-Wallace—that the development of meprobamate as an anticonvulsant and paralyzant was "obvious . . . to a person having ordinary skill in the art," 35 U.S.C. § 103. There is, of course, a conceptual difficulty in applying that time-worn phrase to an art so abstruse as this. Judge Medina spoke to the problem when he said in Indiana General Corp. v. Krystinel Corp., 421 F.2d 1023, 1030–1031 (2 Cir.), cert. denied, 398 U.S. 928, 90 S.Ct. 1820, 26 L.Ed.2d 91 (1970), that "experimentation is of the essence of the art involved in this lawsuit" since "the practitioners of this art are, and of necessity must be highly educated, sophisticated persons who generally have at their disposal laboratory facilities and staffs of competent assistants." In such an art a development cannot be regarded as unobvious simply because it was not the first, or even the second or third, structural change of which a researcher would think. On the other hand, a development should not be regarded as obvious merely because it lay somewhere along the general stream of the prior art, although years of labor might be needed to achieve it. "[T]he inspiration-perspiration process of the laboratory," Eli Lilly & Co. v. Generix Drug Sales, Inc., 460 F.2d 1096, 1103 (5 Cir. 1972), is as deserving of reward as the flash of genius, and surely more so than dumb luck. Where to draw the line between these extremes is among the most unrewarding of judicial tasks, necessary though it be. It is largely, as Judge L. Hand said, "to substitute our ignorance for the acquaintance with the subject of those who were familiar with it," Reiner v. I. Leon Co., 285 F.2d 501, 504 (2 Cir. 1960), and to do this—no matter how hard we try to resist—with the bias afforded by the brilliance of hindsight.

We start from the fact that at least since Dr. Berger's study of the properties of mephenesin, a substituted 1,2-propanediol, in 1946, it was known that propane derivatives had anticonvulsant and muscle-paralyzant effects. The practical utility of mephenesin, however, was severely limited, as previously noted, by its very short duration of action. As Dr. Berger testified, "the discovery of meprobamate was the product of a prolonged and determined search for a product that would have essentially the properties which he found in mephenesin, but would have them in a higher degree, and would be effective over a longer period after administration." 173 U.S.P.Q. at 77.

This search was significantly advanced by Dr. Berger's first 1949 article, entitled "Anticonvulsant Action of 2-Substituted-1,3-Propanediols." After referring to the paralyzing and anticonvulsant properties of mephenesin, he explained that his earlier published research "suggested the examination of the anticonvulsant properties of 2-substituted-1,3-propanediols." The results of Dr. Berger's examination were very encouraging. He reported that the 2,2-diethyl-1,3-propanediol, called DEP,[13] possessed outstanding anticonvulsant properties. He also found that several other of the disubstituted 1,3-propanediols had anticonvulsant activity on the order of that of mephenesin. Particularly relevant for present purposes is Dr. Berger's finding that the 2-methyl-2-n-propyl-1,3-propanediol, the parent diol of meprobamate, was also more effective as an anticonvulsant than mephenesin, re-

13. In terms of the second diagram above, DEP is synthesized through substitution of ethyl radicals, each in the form $C_2H_5$, for both $R_1$ and $R_2$, leaving the terminal hydroxyls unchanged.

quiring the lowest mean protective dose, except for the 2,2-diethyl-1,3-propanediol, to protect against convulsions induced by metrazol. Dr. Berger's stated conclusion was that DEP and other substituted 1,3-propanediols possessed pharmacological properties similar to mephenesin although having a weaker paralyzing and more powerful anticonvulsant action.

Still, the disubstituted 1,3-propanediols of Berger I shared the major drawback of mephenesin, for they too were of quite limited duration of action. But another 1949 article by Dr. Berger (with Richard F. Riley), which has been generally referred to in this litigation as Berger II, carried the matter further. It suggested that the relatively short duration of mephenesin might be due to the rapid oxidation of the terminal hydroxyl and that consequently it might be desirable to protect the group involved by esterification. Accordingly, a sample ester, mephenesin acid succinate, was prepared and tested. The test results seemed to confirm Dr. Berger's theory. The mephenesin acid succinate shared the anticonvulsant and muscle-paralyzant action of its parent diol, though this action was less intense. Most important, the succinate ester did indeed have a longer duration of action than the diol. As Dr. Berger concluded, "[t]he study of other organic esters of [mephenesin] therefore appears warranted."

The suggestion of the prior art that esterification might be the answer to the short duration of action of mephenesin and the disubstituted 1,3-propanediols was greatly strengthened by an article by Hine, Christensen, Murphy and Davis, also published in 1949. This article was in part a study of the effects of esterification on muscle-paralyzant activity. Although Hine, et al., concluded that "[e]sterification of the free hydroxy groups had a varying effect on potency," the article was "pointed in its insistence," 173 U.S.P.Q. at 83, that "[t]he outstanding effect of esterification was the increase in the duration of paralyzing activity."

The prior art had thus placed the disubstituted 1,3-propanediols high on the list of anticonvulsants and paralyzants with effectiveness greater than or equal to mephenesin, and had ranked the parent diol of meprobamate second among these propanediols. Clearly further experimentation with these compounds was indicated. Moreover, the prior art had strongly suggested esterification as an effective method for protecting the terminal hydroxyls of the 1,3-propanediols from too rapid oxidation in the system and thus prolonging the duration of action of the compounds.

Carter-Wallace correctly points out, however, that there are hundreds of esters other than carbamates that might have been tried in an attempt to prolong the duration of action of the parent diols, and that therefore the prior art suggestion of "esterification" does not, without more, lead to the carbamation of the diols and thus to meprobamate. But at this point the long history of central nervous system (CNS) depressant effects associated with numerous carbamate compounds becomes relevant. Paul Binet in 1893 had reported the CNS depressant effects of urethane, or ethyl carbamate. This report, together with the observations of Mies in 1924, indicated that urethane had anticonvulsant and muscle-paralyzant effects. A 1900 German patent disclosed Hedonal, or methyl-n-propyl carbinol carbamate, as a CNS depressant, and a 1948 study by Spielman found that Hedonal had significant anticonvulsant properties. Similarly, a 1912 United States patent issued to Thron taught that emylcamate, or 1-ethyl-1-methyl propyl carbamate, had CNS depressant effects; testing after the discovery of meprobamate confirmed that it too had anticonvulsant and muscle-paralyzant action.

But the prior carbamate art taught more than the mere fact that these carbamate compounds had CNS depressant effects. As Judge Dooling found, 341 F.Supp. at 1309, there was a consciousness from the beginning of the cited prior art, particularly in Binet's 1893

article, that union of a carbamate with another moiety which independently evinces a CNS depressant effect "might in some way contribute to a whole CNS depressant effect." Thus, the carbamate prior art certainly lent credence to the statement of Dr. O'Leary, the defendant's expert witness, that a researcher interested in esterification would be "most interested" in the carbamate esters.

Carter-Wallace argues that in fact this carbamate prior art led away from the selection of the carbamate ester in efforts to prolong the effectiveness of the 1,3-propanediols. The early writings did not distinguish anticonvulsant, muscle-paralyzant, and other selective CNS depressant properties. Instead, the carbamates were described as possessing sedative-hypnotic action, then a broad term embracing what are now perceived as a wide range of specific CNS depressant effects. The anticonvulsant and muscle-paralyzant effects described in the early writings thus appeared to be mere side effects of large dosage of consciousness-dulling sedatives. Since these sedative-hypnotic properties would be undesirable in an ideal anticonvulsant or muscle-paralyzant, see 341 F.Supp. at 1310-1311, and since researchers would be unwilling to risk introducing these properties into the relatively selective action of the propanediols, Carter-Wallace argues that the prior art effectively ruled out the choice of the carbamate ester.

Judge Dooling rejected this conclusion that Carter-Wallace reaches, and instead took a position midway between the poles advanced by the experts of the parties. He found, 341 F.Supp. at 1311–1312, that although "it is not possible to say that the state of the art was such as to make carbamate esterification of the propanediols of Berger I the preeminent suggestion of the art or the evident first choice of the investigator interested in improved and prolonged mephenesin-like properties," still "[c]arbamate esterification of substituted propanediols was among the suggestions with which the prior art was enriched."

[20] There is ample evidence to support this finding. The district court was entitled to give weight to the testimony presented by Davis-Edwards which indicated that the chance that the general CNS depressant effects of the carbamates would enhance the activity of the parent diols justified the risk that carbamation would introduce undesirable side effects. Equally important is the objective evidence in the record which clearly shows that researchers in the art had *not* ruled out the carbamates. A group of men at the Squibb Institute for Medical Research had also been working in this field at about the same time as Dr. Berger; indeed, they had supplied Dr. Berger with some of the disubstituted 1,3-propanediols on which he had based his 1949 article. In a pair of 1950 articles referred to in this litigation as Yale I and Yale II, both conceded to be prior art on the issue of obviousness, the Squibb group reported the synthesis of both mephenesin monocarbamate and DEP monocarbamate, among others, in a search for compounds with muscle-paralyzant activity. Thus, we conclude that the prior art pointed sufficiently in the direction of dicarbamation of the disubstituted 1,3-propanediols that the development of meprobamate was obvious in 1950 to persons having ordinary skill in this extraordinary art.

Carter-Wallace advances a number of arguments in an unpersuasive attempt to show that the properties of meprobamate were sufficiently unexpected to make the compound patentable under the *Papesch* approach. First, it argues that the properties of meprobamate were unexpected because predictions of pharmacological activity from chemical structure are simply not meaningful in this area, pointing to a number of carbamate esters of substituted propanediols which are not active anticonvulsants or muscle-relaxants. While this may be generally true, the conclusion that meprobamate would be likely to have anticonvulsant and muscle-paralyzant activity of long

duration was far more than a mere prediction from its chemical structure. It was rather the result of a specific suggestion of the prior art of a solution for the troublesome short duration of prior art compounds, a suggestion based not on abstract reasoning from chemical structure but on a persuasive theoretical explanation of *why* longer duration of action could be expected. That a number of carbamate esters lack anticonvulsant activity does not change the conclusion that carbamate esterification of the propanediols was an obvious step. The experimentation which is the essence of this art need not require a guarantee of success before a step can be obvious; in any event, the fact is that quite a few of the carbamate esters of the propanediols did reveal the expected longer duration of action of pharmacological activity.

Carter-Wallace also argues that even if meprobamate's increased duration of action over its parent diol could have been predicted, its superior pharmacological intensity was unexpected and establishes the compound's patentability. The 1949 article of Hine *et al.*, however, had reported that esterification "had a varying effect on potency. In some instances it was increased, while in others it was decreased." Moreover, the carbamate prior art had suggested that carbamation might contribute to the CNS depressant activity of the propanediol. Thus, although meprobamate has approximately twice the pharmacological strength of its parent diol, this result is hardly so far out of the range of results that could have been contemplated by researchers as to warrant patentability. As Judge Dooling found, 341 F.Supp. at 1335, the anticonvulsant and muscle-paralyzant activity of meprobamate "was [not] significantly different from that of the prior art products that were structurally related. The kind of anticonvulsant [and muscle-paralyzant] activity is unchanged, the increment in intensity is not startling, and it appears to dissipate over time in a way that suggests a quantitative effect rather than an alteration in mode of activity." [14]

The final contrary argument proffered by Carter-Wallace is the failure of other interested parties to take the step required to discover meprobamate, a factor which, we should note, the Supreme Court has characterized as a "secondary consideration," Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed. 2d 545 (1966). Particular reference is made to the failure of the Squibb group, and of Dr. O'Leary, whose doctoral dissertation at the University of Rochester subsequent to Dr. Berger's departure found nothing, after two years of work, which constituted an improvement over mephenesin or DEP.

One answer is that this is not a case where the directly relevant prior art was old and there had been long and unsuccessful struggles to meet the unfilled need. As the district court said, 341 F.Supp. at 1335, "here the argument . . . is all but completely forestalled by the appearance at the last moment" of much of the relevant prior art. The two Berger articles and the Hine article were published in 1949; the two Yale articles were published in 1950; meprobamate was discovered in July, 1950. Compare Graham v. John Deere Co., *supra*, 383 U.S. at 36, 86 S.Ct. 684 (where the gap was four years), with Schering Corp. v. Gilbert, *supra*, 153 F.2d at 431 (nineteen years). Another point, particularly relevant to Squibb, is that the prospect of developing a commercially successful anticonvulsant and paralyzant

14. Carter-Wallace also argues that the properties of meprobamate were unexpected because, unlike prior art anticonvulsants, it acts selectively without dulling the senses. The proper comparison, however, is not to the prior art anticonvulsants, but to the parent diol of meprobamate. The diol was known to have selective mephenesin-like properties and Dr. Berger's work with mephenesin acid succinate had indicated that esters would share the selective properties of their parent diols. Although there may have been some possibility that carbamate esterification would destroy this selectivity, it is hardly sufficiently unexpected that it did not.

from the substituted propanediols under study was not as alluring as Carter-Wallace would make it seem. Meprobamate did not fill any long-felt need as an anticonvulsant. Phenobarbital, for example, an accepted prior art anticonvulsant, has both a longer duration of action and a far greater intensity than meprobamate. Meprobamate has found only a very limited utility as an anticonvulsant, in the treatment of petit mal epilepsy and tetanus. If Squibb had had any inkling that the various propanediols it prepared for Berger had utility as a tranquilizer, its failure to move forward would indeed be significant. But it had none, and neither did Berger at the time of the invention.

As for Dr. O'Leary, his thesis was only a study of the compounds available to him, most of which were provided by the Squibb group. He did not synthesize any compounds, nor did he in any way direct the design of the compounds provided to him by Squibb. Moreover, the primary purpose of his thesis was to learn the methodology of pharmacological testing. The limited purpose of the thesis obviously influenced the research he did; while he consulted much of the prior art, his bibliography shows no awareness of the articles of the Squibb group or of Hine or of the early carbamate art. Thus, we see nothing in the failure of the Squibb group or Dr. O'Leary which alters our conclusion that meprobamate was obvious as an anticonvulsant and muscle-paralyzant. In light of this holding, we are not required to pass on other objections raised by Davis-Edwards, notably, that the patent contains a claim known to be invalid at the time the CIP application was filed and which has still not been disclaimed, and that Carter-Wallace breached its duty to disclose relevant prior art to the Patent Office.

The judgment that claim 4 of the patent is invalid is affirmed.

## ON PETITION FOR REHEARING

Carter-Wallace has petitioned this court for reconsideration of our decision of November 14, 1972, p. 529, holding its patent on the drug meprobamate to be invalid. It argued that our ruling that the patent application failed to disclose meprobamate's tranquilizing properties, and therefore that those properties could not be considered in assessing the validity of the patent, at 540–543, was a finding of fact on an issue which the district court, because of its differing view of the applicable law, had not considered and on which no expert testimony had been presented. It asked that the case be remanded to the district court to take further evidence and make findings on what it contends to be this newly determinative issue. We called upon appellee to answer. After careful consideration, we find no infirmity in our decision.

[21, 22] The adequacy of a patent application's disclosure is a mixed question of law and fact, on which the court must ultimately apply a legal standard to a complex set of facts. There can be no doubt that expert testimony will often aid in understanding the underlying factual context. But the resolution of the legal issue is for the court, Minnesota Mining & Mfg. Co. v. Carborundum Co., 155 F.2d 746, 749 (3 Cir. 1946); Watson v. Bersworth, 102 U.S. App.D.C. 187, 251 F.2d 898, 900, cert. denied, 356 U.S. 972, 78 S.Ct. 1135, 2 L.Ed.2d 1146 (1958), and when it is clear that the disclosure of the patent application does not meet the statutory standard, expert assistance is not necessary either in the district court or on review. *Cf.* Kohn v. Eimer, 265 F. 900, 902 (2 Cir. 1920).

That is the case here. This issue was fully briefed by both parties and we had the benefit of Judge Dooling's exhaustive findings of fact, 341 F.Supp. 1303, based in large part on expert testimony concerning the relevant chemical concepts, in reaching our decision. We saw then, and we see now, no need for a remand. There is simply no room for plausible argument that the tranquilizing property of meprobamate was disclosed in the patent application in accordance with the

standard set out in section 112. Carter-Wallace relied only on the anticonvulsant and muscle-paralyzant properties of meprobamate to establish patentability before the Patent Office, did not urge the tranquilizing property as an additional basis of patentability, and did not establish this property as it would have been obliged to do if it had relied upon it. It is apparent that neither of the Patent Examiners—who possessed considerable expertise in this field and were under a statutory obligation to conduct an independent examination of the merits of the application—understood the application to disclose the drug's tranquilizing effect. At no point in the Patent Office proceedings was the tranquilizing property mentioned. At no point did the Patent Office have the opportunity to evaluate what is now claimed to be this basis of patentability against the relevant prior art.

Moreover, correspondence cited by Davis-Edwards lends support to its argument that Dr. Berger himself regarded the CIP application as disclosing only anticonvulsant and muscle-paralyzant properties. His letter to Carter-Wallace's patent counsel, on which the CIP application was largely based, made no mention of the drug's use in the treatment of anxiety. In light of this correspondence, and the fact that meprobamate's effect on the interneurons is as relevant to its muscle-relaxant or muscle-paralyzant property as it is to the tranquilizing property, we are convinced that the few sentences on which Carter-Wallace bases its argument of disclosure were intended as, and were understood as, part of the patent's discussion of meprobamate's muscle-relaxant property.

[23–25] Indeed, the petition for rehearing does not claim that there is anything in the patent application which clearly teaches meprobamate's tranquilizing properties. Instead, Carter-Wallace suggests that some skilled workers in the art might have been led to experiment with meprobamate as a tranquilizer on the basis of the application's reference to "anxiety" and its disclosure of meprobamate's longer duration of action. But this is not sufficient. We reiterate that a high standard of disclosure is required before a novel property of an otherwise obvious chemical compound can be relied upon to establish patentability. A disclosure is not adequate if it is merely a suggestion of the art which might lead others to hit upon the property relied upon for patentability. The disclosure of a patent should, upon issuance, immediately add a patentable invention to the existing fund of knowledge in the field; it must do more than merely suggest experimentation which would lead to the discovery of the patentable property.

This is not new law; this court has said much the same thing many times before. Thus, in Harries v. Air King Products Co., 183 F.2d 158 (2 Cir. 1950), we held that the patented invention was limited to the disclosure of radio vacuum tubes which utilized an electron stream of comparatively great length, and that the patent did not cover tubes in which the ratio of the length of the electron stream to its cross-section was large, notwithstanding the patentee's argument that this latter property was implicitly disclosed in the text and diagrams of the patent application. Judge Learned Hand's words are in point here:

> Even though it were possible that a person skilled in the art might see that it was not absolute length, but the ratio of length to cross-section that was important, we should not be justified in validating such an expansion of the original; it is the sort of artful extrapolation against which courts have over and over set their faces. . . . A patent must be a certain guide; not a congeries of pregnant suggestions.

Similarly, the Court of Customs and Patent Appeals has long followed the rule of Brand v. Thomas, 96 F.2d 301, 303, 25 CCPA 1053 (1938):

> Lack of clear disclosure is not supplied by a speculation as to what one skilled in the art might do or might not do if

he followed the teaching of the inventor. The disclosure should be clearer than to suggest that one skilled in the art *might* construct the device in a particular manner.

We see nothing in the decisions of the District Court of the Southern District of New York or of this court in a previous litigation involving the meprobamate patent, Carter-Wallace, Inc. v. Riverton Laboratories, Inc., 304 F.Supp. 357 (S.D.N.Y.1969), aff'd, 433 F.2d 1034 (2 Cir. 1970), which is inconsistent with our conclusion. While Carter-Wallace relies on statements of both courts seeming to accept that the tranquilizing properties of meprobamate had been disclosed, see 304 F.Supp. at 361; 433 F.2d at 1040, in neither court was there dispute that these properties had been disclosed. It is thus neither surprising nor significant that these courts mentioned in passing Carter-Wallace's characterization of the disclosure of the patent application; it is more significant that this court, in its description of the continuation in part application, 433 F.2d at 1036, noted only the disclosure of anticonvulsant and muscle-paralyzant properties. Carter-Wallace also points to a statement by the district judge in *Riverton* which it claims "excused" the failure of the patent application to specify meprobamate's tranquilizing properties on the ground that human testing had not been completed and therefore "[n]o positive representation of such use could have been made at that time." 304 F.Supp. at 365. But this statement was made in the context of Riverton's claim that the failure to disclose that the drug was intended for human use was a fraud on the patent office which made the patent invalid. Judge Cannella merely held that the failure to disclose "such [intended human] use" was not fraudulent; no question of the adequacy of the disclosure for purposes of patentability was presented, nor was the question of disclosure of tranquilizing properties in particular at issue. At most, Judge Cannella's remark might be construed as indicating his belief that no "positive representation" of human use could have been expected at that time. But this would not excuse the failure to disclose meprobamate's tranquilizing property; in any event, a reasonable excuse for failing to make a disclosure is not the equivalent of making one.

The petition for rehearing is denied.

**Clyde A. PERKINS, Plaintiff-Appellee,**

**v.**

**STANDARD OIL COMPANY OF CALIFORNIA, a corporation, Defendant-Appellant.**

**No. 71-1515.**

United States Court of Appeals, Ninth Circuit.

Feb. 12, 1973.

Certiorari Denied June 11, 1973. See 93 S.Ct. 2778.

The United States District Court for the District of Oregon, Robert C. Belloni, J., 322 F.Supp. 375, made an award of attorneys' fees in connection with private antitrust litigation and defendant appealed. The Court of Appeals, Koelsch, Circuit Judge, held that in light of record in private antitrust action showing that successful plaintiff's attorneys spent 2914.05 hours in first Supreme Court proceeding which affirmed judgment of trial court awarding over one million dollars in damages, that 900 of such hours were spent by plaintiff's local counsel and balance spent by Washington counsel, and that over 90% of the time spent by the Washington Firm was spent by associates, district court's award of $250,000 for attorneys' fees for first appeal to Supreme Court would be reduced to $116,562.

Modified and as modified affirmed.

**1. Courts ⚷406.5(20)**

In considering trial court's allowance of attorneys' fees for appeal in an-