UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| EMHART INDUSTRIES, INC., Plaintiff, v. HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, LIBERTY MUTUAL INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICA INSURANCE COMPANY, and UNITED STATES FIRE INSURANCE COMPANY, Defendants. | ) | CIVIL ACTION No. 02-053-S |

**PLAINTIFF'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR A NEW TRIAL REGARDING ITS CLAIMS AGAINST CENTURY AND ONEBEACON**

Emhart renews its motion for judgment as a matter of law regarding its claims against Century and OneBeacon and, in the alternative, moves for a new trial regarding those claims.

The jury found that the dioxin contamination was not discoverable. That finding resulted from both incorrect jury instructions and the jury disregarding uncontroverted evidence. Even based on the jury instructions provided by the Court, which imposed an undue burden on Emhart, no reasonable jury could find that property damage from dioxin contamination did not result during the policy periods of the OneBeacon and Century policies.

The jury instructions concerning the discoverability trigger erroneously converted that trigger into a discovery or manifestation trigger. The jury should have been instructed that

the discoverability trigger is considered using an objective standard. It also should have been instructed that evidence of spills and leaks and the ability to detect contamination are sufficient to trigger the policies. If the requested instructions had been given, no reasonable jury could find that property damage from dioxin contamination did not result during the policy periods of the OneBeacon and Century policies.

Alternatively, the Court should have instructed the jury that, in the circumstances of this action, a continuous trigger or injury-in-fact trigger is appropriate. The failure to instruct concerning one of those triggers was contrary to the definition of occurrence in the policies. The instructions were also inconsistent with the decisions of the Rhode Island Supreme Court that rejected the manifestation and discovery triggers and indicated the likelihood that Rhode Island would adopt a continuous trigger. If the requested instruction had been given, no reasonable jury could find that property damage from dioxin contamination did not result during the policy periods of the OneBeacon and Century policies

When the impermissible finding that the dioxin contamination was not discoverable is corrected, Emhart is entitled to judgment. The jury found that Metro-Atlantic did not expect or intend to cause property damage from dioxin contamination. While the jury did not reach the question regarding the Exclusion of Waste Products Endorsement, there was no basis on which the jury could find that exclusion was applicable. There was no evidence that Metro-Atlantic intentionally introduced to the Site any waste products, materials or fluids associated with dioxin. That exclusion is not contained in either the Century Primary Policy or the OneBeacon policy. Accordingly, Emhart is entitled to entry of judgment on its claims against OneBeacon and Century.

Emhart is entitled to judgment against Century as Century was in breach of its duty to defend. The allegations of the charging documents "bring the case within or potentially within the risk coverage of the policy". Employers' Fire Ins. Co. v. Beals, 240 A.2d 397, 403 (R.I. 1968). As a result of its breach of the duty to defend, Century is foreclosed from contesting that it has a duty to indemnify under either the Century Primary Policy or the Century Excess Policy. Conanicut Marine Svcs., Inc. v. Ins. Co. of N. America, 511 A.2d 967, 971 (R.I. 1986).

If the Court determines that Emhart is not entitled to judgment as a matter of law, it should grant Emhart's alternative motion for a new trial. Emhart was prejudiced by the incorrect jury instructions that imposed an unduly onerous burden to prove trigger of coverage. It was also prejudiced by the exclusion of the testimony of Dr. Calabrese.

In support of its motion, Emhart relies upon the memorandum of law and appendix of exhibits in support of this motion, filed herewith and incorporated herein, the Memorandum of Law In Support Of Plaintiff's Motion For Summary Judgment And Renewed Motion For Judgment As A Matter of Law As To The Duty To Defend Under The Century Primary Policy and Plaintiff's Submission To Address Corporate Successorship And The Century Primary Policy, both filed herewith and incorporated herein.

By its attorneys,

/s/Gerald J. Petros

Gerald J. Petros (#2931)
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, Rhode Island 02903
(401) 274-2000
(401) 277-9600
gpetros@haslaw.com

Jack R. Pirozzolo
Richard L. Binder
Foley Hoag LLP
Seaport World Trade Center West
155 Seaport Boulevard
Boston, Massachusetts 02210
(617) 832-1000
jpirozzolo@foleyhoag.com

Dated: November 20, 2006

Counsel for Plaintiff, Emhart Industries, Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that on November 20, 2006, a copy of the foregoing Plaintiff's Renewed Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial Regarding its Claims Against Century and OneBeacon was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's Cm/ECF System.

/s/Gerald J. Petros
Gerald J. Petros

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| EMHART INDUSTRIES, INC., Plaintiff, v. HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, LIBERTY MUTUAL INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICA INSURANCE COMPANY, and UNITED STATES FIRE INSURANCE COMPANY, Defendants. | ) | CIVIL ACTION No. 02-053-S |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR A NEW TRIAL REGARDING ITS CLAIMS AGAINST CENTURY AND ONEBEACON**

## INTRODUCTION

Emhart has renewed its motion for judgment as a matter of law regarding its claims against Century and OneBeacon and, in the alternative, has moved for a new trial regarding those claims. The jury found that the dioxin contamination was not discoverable. That finding resulted from both incorrect jury instructions and the jury disregarding uncontroverted evidence. The jury instructions concerning the discoverability trigger erroneously converted that trigger into a discovery or manifestation trigger. The jury should have been instructed that the discoverability trigger is considered using an objective standard. It also should have been instructed that evidence of spills and leaks and the ability to detect contamination are sufficient to trigger the policies.

Alternatively, the Court should have instructed the jury that in the circumstances of this action a continuous trigger or injury in fact trigger is appropriate. The failure to instruct concerning one of those triggers was contrary to the definition of occurrence in the policies. That definition requires "injurious exposure to conditions which results during the policy period in … property damage …." It does not add the further requirement that the property damage be discoverable. The instructions were also inconsistent with the decisions of the Rhode Island Supreme Court which rejected the manifestation and discovery triggers and indicated the likelihood that Rhode Island would adopt a continuous trigger.

When the impermissible finding that the dioxin contamination was not discoverable is corrected, Emhart is entitled to judgment. The jury found that Metro-Atlantic did not expect or intend to cause property damage from dioxin contamination. While the jury did not reach the question regarding the Exclusion of Waste Products Endorsement ("waste product exclusion"), there was no basis on which the jury could find that exclusion was applicable. There was no evidence that Metro-Atlantic intentionally introduced to the Site any waste products, materials or fluids associated with dioxin. Accordingly, Emhart is entitled to entry of judgment on its claims against OneBeacon and Century.

There is an independent reason that Emhart is entitled to judgment against Century. Century was in breach of its duty to defend and, therefore, was foreclosed from contesting indemnification. The issue of the duty to defend is addressed in a separate memorandum, filed herewith.

If the Court determines that Emhart is not entitled to judgment as a matter of law, it should grant Emhart's alternative motion for a new trial. Emhart was prejudiced by the jury

instructions that incorrectly imposed an unduly onerous burden for proving trigger of coverage. It was also prejudiced by the exclusion of the testimony of Dr. Calabrese.

## BACKGROUND

### A. The Jury Verdict

The jury answered two questions pertinent to the claims under the Century and OneBeacon policies. In response to the first question, it found that Metro-Atlantic did not "expect or intend to cause property damage from dioxin contamination". In response to the second question, it found that "the dioxin contamination" was not "discoverable in the exercise of reasonable diligence during the policy periods" of the OneBeacon and Century policies, i.e., 1969.

### B. Metro-Atlantic Did Not Cause Or Contribute To The Dioxin Contamination

The evidence at trial led inevitably to the jury's finding that Metro-Atlantic did not expect or intend property damage from dioxin contamination. There was uncontroverted testimony of fact witnesses that Metro-Atlantic did not dispose of hexachlorophene, or waste associated with hexachlorophene, on any portion of the Site. Rather, Metro-Atlantic was quite concerned about not wasting its products or raw materials. As Joseph Buonanno testified[1], Metro-Atlantic did not dispose of any products or raw materials as those materials had economic value. Moreover, Metro Atlantic reused, rather than discarded, products that did not meet either its quality criteria or those of its customers. Whenever possible such "off-spec" product was recycled by returning it to the vat that was used to make the next batch of the product (J. Buonanno 9/13). If such reuse was not feasible, Metro-Atlantic sold the product to a jobber who

---

1 The portion of the transcript containing the testimony of Mr. Buonanno is not presently available.

would use the material for other purposes (Id.). Solid waste was shoveled into a dumpster and sent off-Site (Id. see also tr.[2] 9/15: 27-28, 48-49 (J. Nadeau); tr. 9/18: 5-7 (Turcone)).

The only activity of Metro-Atlantic that could possibly have resulted in dioxin contamination was the manufacture of hexachlorophene. Metro-Atlantic manufactured hexachlorophene for "a period of less than one year beginning in 1964" (Stipulation paragraph 29). During that period, Metro-Atlantic used a dumpster, that was hauled off-site, for disposal of solid waste (Tr. 9/13 (J. Buonanno); see also tr. 9/15: 27-28, 48-49 (J. Nadeau); tr. 9/18: 5-7 (Turcone)). One ingredient used to manufacture hexachlorophene was trichlorophenol, a product that contains dioxin (Plaintiff's Exhibit ("PX") 193; tr. 9/26: 69-70 (Hass)).

The Metro-Atlantic practice of not disposing of material or waste was followed with respect to hexachlorophene. The hexachlorophene was made for sale to Sterling Winthrop as an ingredient in PhisoHex soap (Cleary Dep. 31-32, 42[3]). The hexachlorophene that did not meet the product specifications of Sterling-Winthrop was sold to Kalo Laboratories for use as a seed disinfectant (id., at 41-42). There was no evidence that Metro-Atlantic disposed of hexachlorophene, or residue associated with hexachlorophene, at the Site. The orange material that Mr. Turcone observed (Tr. 9/9: 11, 26-27 (Turcone)) was treflan, which did not contain dioxin (Tr. 9/27: 135 (Hass)). No drums were associated with the manufacture of hexachlorophene (V. Buonanno Dep. 26-27[4]). Thus, none of the dioxin created by the activities of New England Container Company ("NECC") was associated with barrels that Metro-Atlantic provided to NECC for reconditioning.

---

[2] Trial testimony will be cited by the abbreviation "tr." followed by date, page number and witness. If a volume of the transcript is not currently available, the citation will be to the witness and the date.

[3] The cited portion of the deposition was admitted at trial.

[4] The cited portion of the deposition was admitted at trial.

The dioxin that was later discovered on the Site was present at high concentrations in two hot spots. One hot spot was in the vicinity of the NECC furnace and the other was in a dump at the southern portion of the Site (Tr. 9/19 (Kastrinos), PX 236), where NECC regularly disposed of residue from its barrel reconditioning activities (Tr. 9/15: 57-60, 75, 85 (R. Nadeau); tr. 10/4: 26 (Carbone)). There is no evidence to support any suggestion by the insurers that Metro-Atlantic disposed of residue from hexachlorophene in the dump. Their reliance on the testimony of Raymond Nadeau is misplaced. He testified that NECC disposed of residue from its activities at the dump (Tr. 9/15: 57-60, 75, 85 (R. Nadeau) and that NECC borrowed trucks owned by Metro-Atlantic for that purpose (id.; at 93-94) . He also testified that he saw the trucks take barrels to the dump, but that he could not determine who used the trucks at that time (id., at 95) and was not in a position to identify the material that the trucks transported to the dump. If Mr. Nadeau saw an unidentified black sludge being disposed of in the dump[5] any such sludge was not associated with the manufacture of hexachlorophene. Dr. Woodard testified that the sludge associated with hexachlorophene was the color of oatmeal (light brown) (Tr. 10/6: 48 (Woodard)). Whatever Mr. Nadeau observed at the dump occurred during the period 1957-1962, before he assumed a new position as a full-time truck driver and spent the bulk of his time away from NECC (Tr. 9/15: 51-52 (R. Nadeau)).

Dr. Hass provided scientific evidence demonstrating that the dioxin found on the Site could not have been associated with the manufacture of hexachlorophene. The hexachlorophene was made with Nuchar, an activated carbon (Tr. 9/27: 64 (Hass); see also PX 193). As a result, the dioxin was firmly bound to the activated carbon (Tr. 9/27: 67-70, 89

[5] He denied there was disposal of a black sludge from Metro-Atlantic (Tr. 9/15: 70-71 (R. Nadeau), then testified regarding the fact of disposal in response to misleading compound questions from North River's counsel that asked about the fact of disposal, but also assumed the material that was purportedly brought to the dump was black sludge (Id., at 72-73, 75, 79-81).

Hass)). Dr. Wade agreed with Dr. Hass that dioxin was tightly bound to activated carbon (Tr. 10/12: 13-14 (Wade)). The analytical results showed that dioxin at the Site was not bound to carbon (Tr. 9/27: 89-92 (Hass)). If activated carbon had been present in the samples brought to the analytical laboratories, it would have interfered with the recovery of internal standard that were used to ensure that the analytical procedures accurately measured the samples (Id., at105, 111-17). However, the analytical results demonstrated satisfactory recovery of internal standards (Id., at 109-10). The solvents used to extract the samples would not have caused the dioxin to dissociate from the activated carbon (Id., at 9/27: 91-92, 99-100, 109-10, 115-117, 119-120). Similarly, Dr. Wade testified that he did not know whether hexane, a solvent used to extract the dioxin from samples analyzed in the laboratories, would cause dioxin to become dissociated from activated carbon (Tr. 10/12: 14 (Wade)). Dr. Hass' testimony that the dioxin found at the Site was not associated with the hexachlorophene made at Metro-Atlantic was unrebutted[6].

There was also unrebutted testimony that the dioxin at the Site was caused by the barrel reconditioning process at NECC and fires that occurred at the Site. Dr. Hass explained that the combustion associated with NECC burning barrels, as part of its reconditioning process, created dioxin (Tr. 9/27: 124-127, 131-32 (Hass); Defendants' Exhibit ("DX") 556 at ES-1-2, 16-17). Dr. Wade also recognized those scientific principles and that the NECC activities caused dioxin at the Site (Tr. 10/12: 43 (Wade)). As NECC did not use activated carbon, the analytical results were consistent with NECC being the source of the dioxin (Tr. 9/27: 128-29 (Hass)). Similarly, Dr. Hass and Dr. Wade agreed that the fires in the dump and large fires in the NECC facility created dioxin (Tr. 9/27: 130-32 (Hass); tr. 10/12: 41-42) (Wade)).

---

6 In an attempt to question Dr. Hass' opinion, Dr. Woodard speculated that during the process of manufacturing hexachlorophene, dioxin may have entered the environment before activated carbon was used. That surmise was fatally flawed as it assumed a reaction that was not chemically possible (Tr. 10/13 (Hass rebuttal)).

B. The Dioxin Contamination Was Discoverable During The Policy Period

The unrebutted evidence also established that dioxin was discoverable during the 1969 policy period. The expert witnesses called by both parties agreed that by 1969 it was known that trichlorophenol was a dangerous chemical and that the danger was due to the presence of dioxin. Dr. Hass testified concerning an evolution of knowledge that began with the discovery that exposure to trichlorophenol caused chloracne and continued with the discovery that the presence of dioxin in the trichlorophenol caused the chloracne (PX 240, Tr. 9/26: 94-105, 110-132 (Hass)). There was knowledge about the dangers of exposure to trichlorophenol since the 1950s (Tr. 9/26: 95-98 (Hass)); tr. 9/27: 19-20 (Hass); tr. 10/3: 128-129 (Hass)). By 1965, when Metro-Atlantic discontinued the manufacture of hexachlorophene, the increasing knowledge about dioxin, led Dow Chemical Company, a leading manufacturer of trichlorophenol, to reduce the amount of dioxin present in trichlorophenol (Tr. 9/26: 98-103 (Hass); tr. 9/27: 20-22 (Hass)). It then conducted a marketing program to alert purchasers of trichlorophenol, such as Metro-Atlantic, to the advantages of trichlorophenol with low levels of dioxin (Tr. 9/26: 98-103)) The Dow marketing program included advertising in leading journals (Tr. 9/26: 100-101 (Hass)). It was also known that the dioxin in trichlorophenol caused chloracne (Id., at 111-118). By 1969, the literature revealed that dioxin caused disease in chickens (Tr. 9/26: 118-130 (Hass); tr. 9/27: 23-26 (Hass); tr. 10/3: 144-147 (Hass); PX 239) and that an herbicide made with ingredients similar to trichlorophenol caused cancer and its use was discontinued in the United States (Tr. 9/26: 113-33 (Hass); tr. 9/27: 28-32 (Hass)). This information was contained in journals that chemists employed by Metro-Atlantic would have read (Tr. 9/26: 119-22 (Hass)) as well as in the Washington Post (Tr. 9/27:32 (Hass); tr. 10/3: 147-48 (Hass); PX 244).

Dr. Hass' testimony concerning the knowledge of dioxin and its dangers was reinforced by Dr. Woodard. Dr. Woodard testified that by 1962, it was known that dioxin in trichlorophenol caused chloracne (Tr. 10/6: 118-19) (Woodard)). He also testified that trichlorophenol was known to be toxic and a warning label was issued for its use (Tr. 10/10 (Woodard); PX. 246) Dr. Woodard testified that between 1962 and 1970 there was "a continuous elucidation of the characteristics of [dioxin] and how to measure it" (Tr. 10/6:122 (Woodard)).

This knowledge that Metro-Atlantic had used trichlorophenol and the knowledge about the dangers associated with trichlorophenol would have provided a reason to test for dioxin at the Site. There was no evidence rebutting the testimony of Dr. Hass and Dr. Woodard. Mr. Leo testified that he was unaware that Metro-Atlantic manufactured chemicals, much less that it used trichlorophenol (Tr. 10/4). As such, his failure to test for dioxin was not probative of whether a reasonable person who knew the site history would have tested for dioxin. Mr. Leo's failure to test also was not probative of whether Metro-Atlantic, which knew of its past activities, would have had a reason to test. Indeed, Dr. Woodard testified to the importance of site history in determining what tests to conduct at a site (Tr. 10/6: 117 (Woodard)). Dr. Hughto testified that, after 1970, testing for dioxin was more extensive and sophisticated than in prior years. That testimony does not rebut the testimony that there was a reason to test in earlier years.

The dioxin in the hot spots in the dump and near the NECC furnace was present at concentrations of as much as 140 parts per billion (PX 183, table 5). There were numerous other locations where the concentration of dioxin was in excess of 10 parts per billion (Id.). Prior to the policy period, researchers, using the rabbit ear test and gas chromatography (either with a mass spectrometer on an electron capture detector), were able to detect dioxin at concentrations

as low as 1-4 parts per billion (PX 242; tr. 9/26: 135-137 (Hass); tr. 9/27: 58-59 (Hass)). Using a mass spectrometer or electron capture device, the tester would first determine certain properties of the chemicals and the period in which the chemicals remain on the column of the gas chromatograph and compare those to the known properties of dioxin (Tr. 9/27: 48-50, 56-59 (Hass); tr. 10/3: 135-36 (Hass)). These testing methods had been used to discover dioxin and were commercially available (Tr. 9/27: 52-53 (Hass); tr. 10/3: 133-34, 138-39 (Hass); see also PX 243).

This testimony about the ability to detect dioxin was also unrebutted and corroborated by the testimony of Dr. Woodard. Dr. Woodard testified that dioxin could have been detected using the chloroform extract test (Tr. 10/6: 118 (Woodard)). Defendants offered evidence that testing methods were improved and used more frequently at later dates. The subsequent improvements do not rebut the showing that the testing methods that existed during the policy period were more than adequate to detect the dioxin that was present at the Site. Dr. Hass acknowledged that subsequent improvements allowed detection of dioxin at concentrations as low as in the parts per trillion and the identification of additional congeners of dioxin, but emphasized that in 1969 it was possible to detect the dioxin congener of concern at the Site (TCDD) at the high concentrations, in the tens (and in some instances more than one hundred) parts per billion, in which it was present at the Site (Tr. 10/3: 131-32 (Hass)). No defendant introduced testimony, by an expert witness or otherwise, that the commercially available testing equipment was unable to detect dioxin in the concentrations present at the Site.

ARGUMENT

A. Emhart Is Entitled To Judgment As A Matter Of Law Regarding Trigger

The jury was given instructions concerning the discoverability trigger that placed an unduly onerous burden on Emhart by transforming the discoverability trigger into a discovery or manifestation trigger. However, as will be shown, even on the actual jury instructions, there was not an evidentiary basis for the jury to find that the dioxin contamination was not discoverable. In the alternative, Emhart is entitled to judgment as the Court should have given the instructions Emhart requested, which made proof of trigger less burdensome.

1. Emhart Is Entitled To Judgment On The Instructions As Given

It is settled that a party is entitled to judgment as a matter of law when there is not a legally sufficient basis for a reasonable jury to find against it on the issue. Judgment as a matter of law is appropriate when "the evidence points so strongly and overwhelmingly in favor of the moving party that no reasonable jury could have returned a verdict adverse to that party." Castillo v. Autokirey, Inc., 379 F.3d 4, 11 (1st Cir. 1994) (quoting Keisling v. SER - Jobs for Progress, Inc., 19 F.3d 755, 759-760 (1st Cir. 1994)). "The court may not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence" Gibson v. City of Cranston, 37 F.3d 731, 735 (1st Cir. 1994). However, "[a] jury is not at liberty under the guise of passing upon the credibility of a witness, to disregard his testimony, when from no reasonable point of view is it open to doubt." Chesapeake v. O. Ry. Co. v. Martin, 238 U.S. 209, 216 (1931); Quitana-Ruiz v. Hyundai Motor Corp., 303 F.3d 62, 75 (1st Cir. 2002) (party with burden of proving the utility of its design entitled to judgment as a matter of law where "no rational jury could have concluded on these facts that the risks of the airbag design

outweighed the benefits, and the credibility of uncontradicted expert testimony was not at issue.")

Here, the jury was instructed that Emhart was required to prove three elements: (1) "that contamination actually existed at the site during the policy period", (2) "the existence of technology and expertise that could have detected that contamination" and (3) that its predecessor, "Crown Metro, ha[d] a reason to test for dioxin contamination at the site during the policy period."

Emhart unquestionably proved each of those elements. There was unrebutted testimony from Mr. Kastrinos that there was dioxin contamination at the Site in 1969 and that the amount of dioxin at that time was greater than that found at the Site when the EPA conducted its investigation in 1999. Some of the dioxin had been transported by floods in the intervening years. There was no evidence that the contamination was not present until after 1969.

The testimony of Dr. Hass, summarized, supra, established the second element. He provided unrebutted testimony regarding the rabbit ear test and gas chromatography that could have detected dioxin at much lower concentrations than those present at the Site. He described the expertise required to detect that contamination. The operators of the gas chromatographs could, and did, detect dioxin by comparing the peaks on the chromatographs to the peaks associated with dioxin (Tr. 9/27: 48-50, 56-59 (Hass); tr. 10/3: 135-36 (Hass)). Dr. Woodard testified to the same effect. There was no contrary testimony.

Defendants' witnesses merely testified that the technology improved after 1970. While defendants questioned the availability of the technology in 1969, that was both and irrelevant and unsupported by any evidence. The jury was only required to find "the existence of technology and expertise that could have detected the dioxin contamination". The existence of

the technology and expertise was clearly established by the testimony of Dr. Hass and Dr. Woodard and an advertisement showing that technology (Tr. 9/27: 52-53 (Hass); tr. 10/3: 133-34, 138-39 (Hass); PX 243). Defendants asserted in closing argument that, after 1970, improved technology could detect even lower levels of dioxin than were present at the Site. That assertion has nothing to do with whether the technology that existed at the time could measure the high concentrations of dioxin present at the Site in 1969 (see PX 183, table 5). Similarly, the argument that there was difficulty in detecting dioxin congeners other than TCDD after 1970 does not rebut the evidence that it was possible to detect TCDD, the dioxin of concern, in 1969. There was no evidence from which a reasonable jury could find that the technology in existence in 1969 was incapable of detecting the concentrations of dioxin that were present at the Site.

The unrebutted evidence demonstrated that Crown Metro did "have a reason to test for dioxin contamination at the site". That reason was the knowledge of historical use of trichlorophenol in manufacturing activities at the Site combined with the knowledge that dioxin was a harmful substance present in trichlorophenol. Neither of those conclusive facts was rebutted. Defendants' only evidence or assertions concerning this issue had nothing to do with the existence of a reason to test. The reason to test is not determined by whether the insured conducts business operations at the Site. Metro Atlantic's knowledge of the events that caused contamination does not change if it moves to a new location. It had potential liability for past use of a product that contained a substance that, during the policy period, was known to be so toxic as to require warning labels (Tr. 10/10 (Woodard); PX 246). Similarly, the absence of environmental statutes does not change the dangers associated with toxic substances. The failure of Mr. Leo to conduct tests in the 1980's is not probative. Mr. Leo admitted that he was unaware that Metro-Atlantic had conducted any activities at the Site, much less that it used

trichlorophenol. Crown Metro knew of its past activities and the risks associated with those activities. The misleading and irrelevant testimony does not address whether Crown Metro had reason to test. The only evidence relevant to the discoverability trigger was the unrebutted testimony demonstrating that each factor listed in the Court's instructions was met. On the record at trial, Emhart is entitled to judgment as a matter of law.

### 2. Emhart Is Entitled To Judgment As A Matter Of Law When The Evidence Is Considered In Light Of Rhode Island Law Regarding Trigger

The verdict indicates that the jury disregarded the evidence and relied on matter that was irrelevant to the trigger issue. The unsupportable verdict highlights the error in not instructing that discoverability is analyzed on an objective basis and that leaks and spills create a reason to test.

#### a. The Court Erred In Failing To Instruct That An Objective Standard Applies

The "discoverability" trigger was one of the three potential "triggers" recognized in CPC Int'l, Inc. v. Northbrook Excess & Surplus Ins. Co., 668 A.2d 647, 650 (R.I. 1995), Textron, Inc. v. Aetna Cas. & Sur. Co., 723 A.2d 1138, 1143 (R.I. 1999) ("Textron-Gastonia"), and Textron, Inc. v. Aetna Cas. & Sur. Co., 754 A.2d 742, 745-46 (R.I. 2000) ("Textron-Wheatfield"). In those three decisions, the Rhode Island Supreme Court rejected the insurers' argument that trigger is limited to the discredited discovery and manifestation triggers, indicated that there was at least one additional trigger, the discoverability trigger, but, did not describe that trigger in detail.

Here, the jury's verdict was infected by the instruction that the discoverability trigger is analyzed using a subjective standard. In framing the inquiry as whether Crown-Metro had a reason to test, rather than as whether a person exercising reasonable diligence would have

reason to test, the instruction imposes a subjective standard (See instructions at 24). That instruction cannot be reconciled with the express statement in Textron Gastonia that the discoverability trigger was satisfied by evidence of "overflow and other leaks of solvents" that "could cause a person exercising reasonable diligence to test for, and to discover, soil and groundwater contamination." 723 A.2d at 1144 (emphasis added). While there is reference in the Textron decisions to Textron having some reason to test[7], those statements are best read as relating the standards to the facts of the case, not as statements concerning whether the reason to test is determined using an objective standard

The requirement of an objective standard is apparent from the lineage of the discoverability trigger as well as the express statement, above, that the standard is "a person exercising reasonable diligence." As Textron-Wheatfield explained, the discoverability trigger "descends from a long and venerable line of cases," including American Home Assurance Co. v. Libbey-Owens-Ford Co., 786 F.2d 22, 30 (1st Cir. 1986), a case that expressly held that the test for trigger is based on whether a "reasonable person" would have been aware of the defect. 754 A.2d at 746. Moreover, when Rhode Island first articulated the discoverability trigger in CPC (668 A.2d at 649-50), it relied upon Eagle-Pitcher Indus., Inc. v. Liberty Mut. Ins. Co., 682 F.2d 12, 25 (1st Cir. 1982). The issue in Eagle-Pitcher was whether lung damage from asbestos was diagnosable by a physician during the policy period. That, too, is an objective test, based upon clinical evaluation. A reasonable person exposed to asbestos would have had reason to seek a medical opinion. It was of no moment that the opinion had not been sought or the condition "medically diagnosed" during the policy period. Id. Given the foregoing, it is clear that under

7 Textron Gastonia, 723 A.2d at 1144 ("in order to trigger coverage in the absence of actual discovery, Textron must have had some reason to test for the contamination…."); Textron Wheatfield, 754 A.2d at 747 ("'small leaks and spills'" of "the same toxic chemicals" that were later discovered on the site, "arguably giving Textron's engineers reasons to test for contamination.")

Rhode Island law whether an insured had reason to test for contamination is analyzed using an objective, reasonable person, standard.

Further, the objective standard is mandated by the statements in the two Textron decisions that the discoverability trigger provides coverage where a discovery trigger would not. In both cases, the trial court was reversed for finding no coverage when the contamination was discovered after the policy period. The error was failing to consider whether the contamination was discoverable. Those holdings indicate that the discoverability trigger must provide coverage in some situations where a discovery trigger does not. Use of a subjective standard negates the court's purpose by effectively eroding the difference between discoverability and discovery. If the insured did not actually discover the contamination, it is difficult for a juror to conclude that the contamination was discoverable by the insured, rather than a reasonable person, in the exercise of reasonable diligence. The jury will, and presumably did, conclude that the insured exercised reasonable diligence and, accordingly, find that the failure to detect the contamination means that the contamination was not discoverable in the exercise of reasonable diligence.

The instruction to use a subjective discoverability test also created tension between trigger and the expected and intended provisions of the insurance policy. Under the expected or intended provision, the issue is whether the insured subjectively expected or intended to cause property damage. Thus, use of the subjective discoverability test forces an insured seeking coverage to prove that it had no subjective expectation of contamination, but also that it subjectively had enough knowledge of potential contamination to give it reason to test. Obviously, in many cases—particularly where little time has elapsed between the activities that resulted in the contamination and the inception of the policy—these requirements will be mutually exclusive, thereby negating coverage. Put differently, if the discoverability trigger

involved a subjective test, the insurer would be in a position to argue, as North River's counsel did, that (a) if an insured had a subjective reason for testing, it must have expected or intended the contamination; or (b) if the insured did not expect or intend the contamination, it had no subjective reason to test for contamination. In either event, coverage would not apply. This "Catch-22" scenario conflicts with the principle of Rhode Island law that insurance policies should not be interpreted so to "preclude coverage in almost any circumstance" and "render coverage illusory." Pressman v. Aetna Cas. & Sur. Co., 574 A.2d 757, 759 (R.I. 1990).

A similar dilemma would arise if, as here, sufficient time elapsed between the time of the events that caused the contamination and the commencement of the policy period. In that circumstance, under a subjective trigger standard, there would be a tension between the insured having a subjective reason to test and the insured not having sufficient knowledge of a loss for the insurer to assert the known loss doctrine[8].

The use of a subjective discoverability trigger effectively precludes coverage for an insured that did not cause contamination. Here, Emhart, in rebutting the argument that it expected or intended dioxin contamination, presented evidence that it could not have caused the contamination. As a result, the jury undoubtedly inferred that an innocent party that had no role in causing the contamination would have no subjective reason to test. The rare party in a CERCLA proceeding who seeks to establish, in accordance with 42 U.S.C. § 9607(b)(3), that it has no liability because the contamination was caused solely by the conduct of a third party, has particular entitlement to a defense from its insurer and, if it is unable to establish that defense, to indemnification.

[8] Ins. Co. of North America v. Kayser-Roth Corp., 770 A.2d 403, 415 (R.I. 2001) ("known loss doctrine is applied when the insured has knowledge, before the inception of an insurance policy, that the insured has suffered the threat of an immediate economic loss, as a result of some event, and that the reality of that loss occurring is a certainty").

Here, the instruction that discoverability was determined from the perspective of Crown Metro, not a reasonable person, was error. Under the correct objective standard, no reasonable jury could have determined that the policies were not triggered.

The instructions also placed an unduly onerous burden on Emhart by not advising the jury, in accordance with both Textron decisions, that leaks and spills of chemicals suffice to create a reason to test. In Textron-Gastonia, the court ruled that evidence of leaks and spills, including those caused by overfilling a tank or when workers transferred material from one container to another, presumptively gives rise to a reason to test. Textron-Gastonia, 723 A.2d at 1144; see also Textron-Wheatfield, 754 A.2d at 747. As the Textron-Gastonia court explained, "[e]vents such as these presumably would provide Textron with notice of possible contamination, and indeed could cause a person exercising reasonable diligence to test for, and to discover, soil and groundwater contamination." Textron-Gastonia, 723 A.2d at 1144; see also Textron-Wheatfield, 754 A.2d at 747 ("'small leaks and spills'" of "the same toxic chemicals" that were later discovered on the site, "arguably giving [the insured's] engineers reasons to test for contamination.").

Accordingly, the jury should have been instructed that, if it found there were spills and leaks of contaminants at the site, it must then conclude that a person exercising reasonable diligence would have had a reason to test for dioxin. See Textron-Gastonia, 723 A.2d at 1144; Textron-Wheatfield, 754 A.2d at 747. The jury instructions failed to set forth this standard and, therefore, were erroneous. Armed with the information that spills and leaks suffice to create a reason to test, the jury would have found that the dioxin contamination was discoverable.

c. Emhart Is Entitled To Judgment Due To The Failure To Instruct On The Continuous Trigger

The Rhode Island Supreme Court has recognized the potential viability of triggers other than the manifestation, discovery or discoverability triggers. In Textron-Gastonia, the court stated "[b]because we conclude that liability under the policy may be established by one of the recognized CPC tests, we need not address the continuous trigger-of-coverage standard." 723 A.2d at 1141. Here, the jury found that liability could not be established under one of the three triggers articulated in Textron and CPC. Thus, this Court is confronted with the situation not addressed in Textron Gastonia, whether the continuous trigger standard is appropriate when there is gradual environmental contamination that is neither manifest nor discovered and that is not discoverable within the meaning of this Court's instructions. Since Textron-Gastonia, Rhode Island has not had occasion to address the continuous trigger standard. The policy language, the briefing in the Textron cases and the almost universal rejection of triggers focusing on manifestation or discovery all suggest that Rhode Island would adopt the continuous trigger in an appropriate case. Adoption of such a trigger would avoid the potential tension between the discoverability trigger and the requirement that damage not be expected or intended.

The first indication that Rhode Island would adopt the continuous trigger is the language of the policy. The term "trigger" does not appear in the policy language. Rather, it "describes that which, under the specific terms of an insurance policy must happen in the policy period in order for the potential of coverage to arise. The issue is largely one of timing-what must take place within the policy's effective dates for the potential of coverage to be "'triggered'?" EnergyNorth Natural Gas, Inc. v. Underwriters at Lloyd's, 848 A.2d 715, 718 (N.H. 2004) (quoting Montrose Chem. Corp. v. Admiral Ins. Co., 913 P.2d 878, 880, n.2 (Cal. 1995) (internal quotations omitted). Trigger refers to the portion of the definition of occurrence

that requires that property damage result during the policy period. Here, occurrence is defined as "an injurious exposure to conditions which results, during the policy period, in …property damage…".[9] There is nothing in that language which requires that property damage be manifest, discovered or discoverable during the policy period, only that it "result." Indeed, most courts have found that the policy language requires a trigger that focuses on whether there was damage during the policy period, not a trigger that grafts an additional requirement that the damage be discovered or discoverable. There are three triggers that focus on the presence of damage during the policy period: the injury-in-fact trigger that the Court addressed in its instructions under New York law, the exposure trigger and the continuous trigger. See Trustees of Tufts Univ. v. Commercial Union Ins. Co., 616 N.E.2d 68, 75 & n.9 (Mass. 1993).

Because the interpretation of insurance policies must "begin with the actual language of the policies, given its plain and ordinary meaning," (Brazes Sporting Arms, Inc. v. Am. Empire Surplus Lines Iosco., 220 F.3d 1,4 (1st Cir. 2000)), the cases adopting one of the three triggers focusing on damage find that interpretation required by the express policy language, which provides that an insurer's coverage obligations are implicated when there is injury during the policy period. For example, in Gelman Sciences, Inc. v. Fidelity & Casualty Co. of N.Y., 572 N.W.2d 617, 622 (Mich. 1998), the Supreme Court of Michigan stated that determining the applicable trigger "is fundamentally a question of insurance contract interpretation." Interpreting language identical or functionally identical to that at issue here, the Gelman court concluded that the policies required only that injury occur during the policy period, not that such injury be discovered, or be discoverable, during that period. See id. at 623. As the court stated:

[9] The quoted language is from the Century Excess Policy (PX 1), but the language in the Century Primary Policy is to the same effect.

> The plain language of the policies at issue unambiguously provides that an "occurrence" is an accident that results in property damage during the policy period. Otherwise stated, according to the policies' explicit terms, actual injury must occur during the time the policy is in effect in order to be indemnifiable, i.e., the policies dictate an injury-in-fact approach.

Id. See also Triangle Publications, Inc. v. Liberty Mut. Ins. Co., 703 F.Supp. 367, 370 (E.D. Pa. 1989) (rejecting manifestation trigger and stating, "[t]he plain meaning of the term 'occurrence,' as used in the CGL policy, is clear . . . injury must occur during the time the policy is in effect in order to be indemnifiable or compensable. Any other interpretation is simply not supported by the CGL policy language."); Abex Corp. v. Maryland Cas. Co., 790 F.2d 119, 127 (D.C. Cir. 1986) (plain language only requires injury during the policy period, the policy language "imposes no requirement that the injury be discovered at that time"); EnergyNorth Natural Gas. Inc. v. Underwriters at Lloyd's, 848 A.2d 715, 721 (N.H. 2004) (policy language unambiguously provides that existence of property damage during policy period triggers coverage whether or not discovered); Montrose Chem. Corp. of Cal. v. Admiral Ins. Co., 913 P.2d 878, 890 (Cal. 1995) (holding that express and unambiguous policy language required application of continuous trigger theory). As the Gelman court stated, "[t]he manifestation trigger is simply not supported by the policy language." Gelman, 572 N.W.2d at 623. By the same token, the discoverability and discovery triggers also find absolutely no support in the policy language. Id. at 624 ("the policy language does not even hint that property damage must be known to anyone in order to trigger coverage"). The discovery-related approaches have no reasonable support in the policy language. Even if there were some support for the interpretation, that would be of no avail to the insurers. The policies surely do not unambiguously require that interpretation, and because any ambiguity must be construed in favor of the insured, these approaches must be rejected. See Textron-Wheatfield, 754 A.2d at 748.

Further, use of a trigger focusing on injury, rather than discoverability, is mandated by the policies being occurrence, rather than claims-made, policies. A number of courts have recognized that use of a trigger focusing on discovery, rather than injury, would transform an occurrence policy into a claims-made policy. An occurrence policy permits recovery for "long-tail" claims that are asserted after the policy term, while a claims-made policy permits recovery only if the claim is asserted during the term of the policy[10]. See e.g., Gelman, 572 N.W.2d at 625 ("[f]rom the insurer's standpoint, in retrospect, property damage resulting from gradual or latent contamination would have been better suited to a claims-made policy. This does not change the fact, however, that the policies at issue are 'occurrence' policies and does not provide a basis to deny coverage by application of a judicially created manifestation theory."); Montrose, 913 P.2d at 904 (effect of applying manifestation trigger "would be to effectively rewrite [the policies], transforming the broader and more expensive occurrence-based CGL policy into a claims made policy").

When Textron Gastonia is read together with the facts and the briefing, it becomes apparent that the discoverability trigger, as applied in that decision, was effectively a continuous trigger or an injury-in-fact trigger. CPC had addressed trigger in the context of one spill of a contaminant, rather than the ongoing gradual contamination resulting from continuous exposure to conditions that is present here and in Textron-Gastonia. Textron-Gastonia presented the issue of whether policies in effect for a period of nearly twenty years could be triggered as a result of gradual environmental contamination. The insured argued that if the discoverability trigger were narrowly construed so as to permit recovery in only one year, the court should adopt "an 'injury in fact' trigger of coverage regarding environmental liabilities" in view of "the

[10] The Rhode Island Supreme Court has recognized the distinction between the two types of policies. Textron, Inc. v. Liberty Mutual Ins. Co., 639 A.2d 1358, 1361 n. 1, 2 (R.I. 1994).

insurance policies' plain language and structure, with the trend of other state supreme court rulings on issues similar to those presented here …". Textron Opening Brief at 32-33; see also Textron Reply Brief at 30-42[11]. The insurers viewed the appeal as effectively presenting the issue of whether Rhode Island would adopt the continuous trigger. They argued that permitting the insured to recover would be erroneous as Textron's assertion "that the property damage could have been discovered at any time between 1960 and 1988 essentially suggests a continuous 'trigger' to the facts of this case." (Appellants' Brief at 18, n.9)[12]. The court's statement that it was not necessary to consider the continuous trigger must be viewed in the context that it was confronted with facts that, in essence, required adoption of such a trigger in order to permit coverage.

Faced with these arguments, the court found for the insured despite minimal evidence of a reason to test. This suggests that it intended discoverability to provide coverage of a breadth associated with the continuous trigger. As stated in the opinion, the reason to test was merely that events had occurred which caused the contamination, i.e., spills, leaks and other releases of contaminants later found at the site. The Court held:

> [t]he affidavit of Textron's expert setting forth the probable existence of property damage, read together with affidavits provided by former and current employees at the Gastonia site indicating the occurrence of leaks and spills during the policy period, creates a genuine issue of material fact concerning whether the contamination was discoverable in the exercise of reasonable diligence during the policy period.

Textron-Gastonia, 723 A.2d at 1143. Textron-Wheatfield was to the same effect, as the court noted that Textron-Gastonia "[held] that knowledge of overflow and other leaks of solvents at

---

11 Those briefs are Exhibits A and B, respectively, to the appendix to this memorandum ("App.").

12 App. Ex. C.

the site provided the insured with reasons to test for contamination" and found that similar events permitted recovery by the insured. 754 A.2d at 746-47.

In Textron-Gastonia, the evidence of the ability to discover the contaminants was also quite thin. The court found that the ability to detect contamination from 1950's forward was established by the possibility that insured could have "collect[ed] and analyz[ed] a groundwater sample". Textron-Gastonia, 723 A.2d at 1144. The insurers argued that the affidavit regarding those tests did "not establish that the scientific tests [affiant] relied upon were available or 'in the exercise of reasonable diligence' would have been used at that time" (App. Ex. C at 20, n.10). See also Textron-Wheatfield, 754 A.2d at 747 (issue of fact sufficient to withstand summary judgment raised by testimony that "using simple analysis of groundwater samples, Textron could have discovered contamination" as early as 1960). Thus, the evidence in Textron indicates that the discoverability trigger is not materially different from the continuous trigger or the injury-in-fact trigger and that Rhode Island would adopt one of those triggers to the extent that it has not done so sub silentio in Textron.

There is an additional factor indicating that the Rhode Island Supreme Court would either interpret the discoverability trigger as being an injury-in-fact or continuous trigger or adopt one of those triggers. The court would not choose to adopt an aberrant doctrine universally rejected by other courts. Triggers focusing on discovery, rather than existence, of damage, have been almost universally rejected in environmental cases. As a commentator stated:

> During the past few years, state supreme courts in California, Maryland, Michigan, Minnesota, New Jersey, North Carolina, North Dakota and South Carolina have all rejected "manifestation" in favor of broader "actual injury" or "continuous trigger models". State supreme courts in California, Hawaii, Illinois, Indiana, Maryland, Massachusetts, Michigan, Minnesota, New Jersey,

> North Dakota, Oregon, Pennsylvania, South Carolina and Vermont have all rejected manifestation as the sole trigger of coverage for long-tail claims of various sorts.

Leitner, 4 Law and Practice of Ins. Coverage Litig. 44.26.

In addition, decisions that adopted the manifestation trigger have been overruled. Gatson County Dyeing Mach. Co. v. Northfield Ins. Co., 524 S.E.2d 558, 564-65 (N.C. 2000) (overruling prior decision applying a manifestation or discovery trigger as not true to the policy language and finding injury in fact most appropriate trigger where the damage resulted from one events); Harford County v. Harford Mutual Ins. Co., 610 A.2d 286, 294 (Md. 1992) (finding that prediction in Mraz v. Canadian Universal Ins. Co., 804 F.2d 1325 (4th Cir. 1986), that Maryland would adopt the manifestation trigger was incorrect because "[n]othing in the language of the policies, affording words their ordinary and accepted meanings, requires that the claimed property damage actually be discovered or manifested during the policy period"). See also EnergyNorth Natural Gas, Inc. v. Underwriters at Lloyd's, 848 A.2d 715 (N.H. 2004) (adopting injury in fact trigger in response to a question certified by the United States District Court of the District of New Hampshire).

Rhode Island is the only jurisdiction that has articulated a "discoverability" trigger. One commentator has incorrectly viewed that trigger as being a type of manifestation trigger and characterized Rhode Island as being the only jurisdiction to employ the discredited manifestation trigger. Leitner, supra, 44:26[13] . Another commentator has explained that the discoverability trigger is a variant of the manifestation trigger, as manifestation triggers permit coverage under policies in effect when damage "should reasonably have been discovered". 23 E.

---

13 Leitner refers to North Carolina as being the only other jurisdiction to have adopted manifestation, but then also notes that in Gatson County, North Carolina reversed a prior decision recognizing manifestation.

Holmes, Appleman on Insurance 2d 145.3(B)(1) at 13-14 (2003) (quoted in EnergyNorth, 848 A.2d at 718).

The clear statement in both Textron decisions that Rhode Island does not intend to limit trigger to manifestation or discovery coupled with the incorrect assumption of commentators that Rhode Island has, contrary to its intent, so limited that trigger cry out for the court clearly to adopt one of the recognized triggers. Indeed, under Rhode Island law, the numerous decisions from other jurisdictions finding that the policy language requires a trigger based on damage, rather than discovery, are "proof positive" of ambiguity in the definition of occurrence and, therefore, require the definition to be construed in favor of the insured. Textron-Wheatfield, 754 A.2d at 748. Applying that principle to the sudden and accidental pollution exclusion, the Textron Wheatfield court found that the exclusion was ambiguous and must be construed as not having a temporal limitation. While there was a division of authority among courts regarding whether the pollution exclusion contained a temporal limitation, the case law regarding trigger universally rejects the interpretation that trigger is limited to discovery or discoverability. Rhode Island would hardly choose to be the only jurisdiction to adopt the aberrant trigger that would convert an occurrence policy into a claims-made policy. Instead, the Rhode Island Supreme Court would adopt one of the three accepted triggers that are consistent with the policy language.

While the Rhode Island Supreme Court has not expressly ruled that it would adopt one of the accepted triggers, this Court has sufficient indications to predict that the court would do so. See McKenna v. Ortho Parma. Corp., 622 F.2d 657, 663 (3d Cir. 1980) (where a state's highest court has yet to rule on an issue, a federal court's task is to predict how that court would rule were the issue before it, "with an eye toward the broad policies [and] doctrinal

trends" in the state). Accordingly, the Court should have instructed the jury on the continuous trigger standard or the analogous injury-in-fact trigger. As the evidence entitles Emhart to judgment as a matter of law under either trigger[14], the Court should grant Emhart's motion.

If the Court finds that it lacks sufficient guidance to make such a prediction, it should certify that issue to the Rhode Island Supreme Court, as Emhart seeks in a motion filed herewith.

d. Emhart Is Entitled To Judgment As A Matter Of Law As Century Is In Breach Of The Duty To Defend

1. The Century Primary Policy

As Emhart has demonstrated in a separate memorandum, filed herewith, Century is in breach of its duty to defend. It is settled under Rhode Island law that "where an insurer refuses to defend an insured pursuant to a general-liability policy, the insurer will be obligated to pay, in addition to the costs of defense and attorneys' fees, the award of damages or settlement assessed against the insured." Conanicut Marine Svcs., Inc. v. Ins. Co. of N. America, 511 A.2d 967, 971 (R.I. 1986); see also Michaud v. Merrimack Mut. Fire Ins. Co., 1994 WL 774683, at *9 (D.R.I. Nov. 16, 1994) (noting that the Conanicut rule was mandatory and required insurer that failed to defend "to indemnify these plaintiffs").

2. The Century Excess Policy

The determination that the complaining documents give rise to a duty to defend and that the Conanicut rule precludes an insurer in breach of that duty from contesting indemnification apply to the Century Excess Policy as well as to the Century Primary Policy. The only additional issue in connection with the Excess Policy is the argument that Century has

14 The jury's finding, in response to question 4, that there was injury in fact during the North River policy period indicates it would have made the same finding regarding the same issue in the Century/OneBeacon policy period.

no duty to defend under its excess policy until it has paid Emhart the limits of the primary policy[15]. This argument is contrary to the plain language of the excess policy: "If limits of liability of the underlying insurance are exhausted because of personal injury, property damage or advertising injury during the period of this policy, [Century] will … have the … duty to defend…." That provision does not require that the policy be exhausted by an indemnity payment by Century. The Century Excess Policy does not require that the duty to defend be triggered by any payment, much less payment by Century. The parties have stipulated Emhart, in complying with three orders of the EPA, has paid indemnity costs far in excess of the $100,000 limits of the Century Primary Policy (Stipulation, ¶ 123). This exhausts the liability limit of the primary policy. Pacific Employers Ins. Co. v. Servco Pacific, Inc., 273 F.Supp.2d 1149, 1154 (D. Haw. 2003), rejected the Century argument that the excess insurer's "duty to defend, as an excess carrier, is not triggered unless and until the primary carrier pays its limits by either a judgment or settlement of the underlying claim. If that were so, then the excess insurer's duty to defend would be illusory."

The duty to defend under the Century Excess Policy arose when Emhart did not receive a defense under the Century Primary Policy. In this situation, the excess insurer has a duty to defend. "If a primary insurer denies coverage, the excess insurer would be obligated to defend." 14 Couch on Insurance § 200:46 (3d ed. 2004). The rationale is that an "insured should not be left without a prompt and proper defense and if a primary insurer fails to assume the defense, for any reason, the secondary insurer which has a duty to defend should provide the defense and, to do justice, should be entitled to recoup its costs from the primary insurer." New Hampshire Indemnity Co. v. Budget Rent-A-Car Systems, Inc., 64 P.3d 1239, 1243 (Wash.

15 This issue was addressed in section III.I of the Joint Statement Pursuant To Pre-Trial Conference, filed on May 16, 2006.

2003). In contrast, decisions finding that an excess insurer has no duty to defend until exhaustion of the primary policy:

> assume[] that the primary insurer has, in fact, assumed the defense. If it has not, the courts will apply a different rule. Recognizing that it is more equitable, vis-a-vis the insured, to condition the excess insurer's obligation to defend on the primary insurer's actually assuming the defense, it has been held that, when the primary insurer refuses to defend, an excess insurer that is not a "true" excess insurer and has a duty to defend provision in its policy must defend, assuming of course, that the claim against the insured exceeds the policy limits of the underlying insurance. The burden would then be on the excess insurer, rather than the insured, to obtain reimbursement from the primary insurer. The insured, having obtained the protection provided by the excess policy, should be entitled so to rely on the excess insurer.

Windt, Insurance Claims and Disputes § 4:11 (4th ed. 2002) (footnotes omitted).

An excess insurer must defend when the primary insurer falters. "[T]he general rule is that an excess liability insurer is not obligated to participate in the defense until the primary policy limits are exhausted. But if the primary insurer denies coverage, the excess insurer would be obligated to defend." Continental Casualty Co. v. Synalloy Corp., 667 F. Supp. 1523, 1540 (S.D. Ga. 1983), aff'd, 826 F.2d 1024 (11th Cir. 1987) (citation omitted, emphasis added). Synalloy found that the excess insurer had "a current duty to defend ... those claims for which [the primary insurer] has denied coverage…." Id., at 1541; see also, id., at 1540 (the primary insurer's "position that some BNA claims are not covered by its policies triggers [the excess carrier's] indemnity agreement as well as its duty to defend….."); American Motorists Ins. Co. v. Trane, 544 F.Supp. 669, 692 (D. Wis. 1982), aff'd, 718 F.2d 842 (7th Cir. 1983).

Signal Cos. v. Harbor Ins. Co., 612 P.2d 889 (Cal. 1980), emphasized the distinction between two insurers disputing their respective responsibilities for paid defense costs and an insured being denied a defense. "The issue presented is the proper allocation between

insurance carriers of defense costs incurred in defending the insured when the amount of settlement of the underlying tort claim exceeds the limits of primary insurance coverage thus requiring some contribution by the excess insurer." 612 P.2d at 890. Signal indicated that a different result would likely occur if the insured had not received a defense and that the insured "was protected by [the primary insurer's] duty to defend." Id., at 894, 896.

The Century rationale does not apply where, as here, Century is both the primary and the excess insurer. "If an excess insurer were required to defend before exhaustion of an underlying carrier's duty, then the primary carrier would profit from its wrongful failure to defend." Weyerhaeuser Co. v. Commercial Union Ins. Co., 15 P.3d 115, 135 (Wash. 2001). That rationale does not apply here, where Century is both the primary and the excess insurer. All but one case cited by Century to date arose where different insurers issued the primary and excess policies.[16] Century seeks to deny Emhart a defense, not to collect a portion of defense costs (which it has not paid) from another insurer. Century is responsible for defense costs under both policies.

In contrast to the actual policy language, Century has cited cases where the excess policy had a narrower duty to defend. Again, the Century Excess Policy provides that "[i]f limits of liability of the underlying insurance are exhausted because of personal injury, property damage or advertising injury during the period of this policy, [Century] will … have the … duty to defend…." There is no requirement that the duty to defend be triggered by any payment, much less that Century make the payment. Even if "exhaustion" of the primary policy were required to trigger the duty to defend under the Century Excess Policy, Emhart met that

[16] Colorado Farm Bureau Mutual Ins. Co. v. North American Reinsurance Corp., 802 P.2d 1196 (Colo. Ct. App. 1990), was a dispute between an insurer and a reinsurer that was obligated to reimburse excess policy payments. In Colorado, one entity would profit if the defense obligation were assigned to a particular policy.

requirement when it paid remediation costs in excess of the limits of the Century Primary Policy. Had Century intended to make its duty to defend dependent upon exhaustion by "payment of judgments or settlements" in excess of any underlying insurance, it easily could have so drafted its policy. Instead, it wrote an excess policy where the duty to defend is triggered by the amount of the "property damage," not the amount paid in settlement of claims for property damage.

While the policy language clearly indicated that no payment is required, if an ambiguity did exist, it must be resolved in favor of the insured. E.g., Textron, Inc. v. Aetna Casualty & Surety Co., 638 A.2d 537, 539 (R.I. 1994) (when the court "finds that an ambiguity exists or that the terms of an insurance contract are subject to more than one reasonable interpretation, the insurance contract will be strictly construed against the insurer"). See also, Sjogren v. Metropolitan Property & Casualty Co., 703 A.2d 608, 612 (R.I. 1997) (ambiguity concerning whether driver of automobile was a "relative" of the owner construed against insurer although "relative" was defined in the insurance policy).

The cases upon which Century has relied are inapposite. In those cases, the duty to defend was conditioned on payments, not on the existence of property damage, in excess of the policy limits.[17] As noted in National Union Fire Ins. Co. v. Travelers Ins. Co., 214 F.3d 1269, 1273 (11th Cir. 2000), "whether or not an excess insurer is required to 'drop down' and defend its insured depends solely on how that duty is defined by the terms of that excess

[17] Ryerson Tull, Inc. v. Employers Ins. of Wausau, No. 01 CH 14655, slip op. at 3 (Cook County Ill. Cir. Ct. Ch. Div. Mar. 11, 2004) ("plain language" of policy provided that the excess insurer's duty to defend arose only when the limits of the underlying policy "have been exhausted by payment of claims to which this policy applies" (emphasis added); Molina v. U.S. Fire Ins. Co., 574 F.2d 1176, 1178 (4th Cir. 1978) (court relied on the duty to defend being triggered "by reason of losses paid thereunder," as well as the insured's obligation to maintain "collectible" underlying insurance (emphasis added)). In National Union Fire Ins. Co. v. Travelers Ins. Co., 214 F.3d 1269, 1272 (11th Cir. 2000) (defense obligation applied when "occurrences not covered by any underlying insurance due to exhaustion of aggregate limits by reason of any losses paid thereunder" (emphasis added)). These cases are in the Appendix of State Court Decisions from Other Jurisdictions filed by CIC in support of its response to Emhart's objections to the report (Docket Index 232, March 18, 2005).

insurance contract." Here, under the operative contract, the Century Excess Policy, the amount of property damage, not exhaustion by payment of claims, triggered the duty to defend.

Pacific Employers, supra, is on point. There, as here, the duty to defend did not require "payment" of the limits of the underlying policy. The court reached a conclusion applicable to the instant case in finding there was a duty to defend under the excess policy after the insured's expenditures for indemnification exceeded the limits of the primary policy. It explained that "[t]he plain terms of [the excess insurer's] policy provide that its duty to defend arises when 'the limits of liability of the underlying insurance are exhausted because of … property damage' – not when the limits are exhausted by payments of judgments or settlements of the underlying claim." 273 F.Supp.2d at 1154. The Century Excess Policy contains the same language.

Where a claim clearly exceeds the primary policy, the excess insurer is required to defend even before the primary policy is exhausted. American Family Life Assurance Co. v. United States Fire Co, 885 F.2d 826, 832 (11th Cir, 1989) ("U.S. Fire became obligated to defend once it became clear that [the primary] policy would not cover American Family's liability" (emphasis added)); Celina Mutual Ins. Co. v. Citizens Ins. Co. of America, 349 N.W.2d 547, 550-51 (Mich. Ct. App. 1984) (where two people were killed in an automobile accident, insurer "knew that the primary coverage would be exhausted" and was required to defend); American Motorists, supra, 544 F.Supp. at 692 ("If the claim against the insured exceeds the monetary limits set by the underlying insurer, the excess insurer's duty to defend is usually activated, even if the underlying insurer undertakes the defense as well."). Here, the limits of the underlying policy are exceeded, and Century is liable for the costs of defense under its excess policy. Century has not met its obligation.

e. The Waste Products Exclusion Does Not Prevent Entry Of Of Judgment In Favor Of Emhart

The jury did not answer question 3 on the Verdict Form, which addressed the waste products exclusion in the Century Excess Policy. That exclusion would have applied only if Metro-Atlantic had intentionally introduced dioxin-containing waste into soil or inland waters. As previously discussed, there was no evidence that Metro-Atlantic disposed of waste containing dioxin. Raymond Nadeau, the only witness who arguably asserted that Metro-Atlantic disposed of any waste, did not testify that any such waste was associated with the hexachlorophene production. Dr. Hass' testimony demonstrated that the analytical results establish that the dioxin at the Site was not associated with the manufacture of hexachlorophene by Metro-Atlantic. Accordingly, no reasonable jury could find that Century satisfied its burden of proving that the waste products exclusion barred coverage. In addition, neither, the waste products exclusion, nor any type of pollution exclusion is contained in either the Century Primary Policy or the OneBeacon policy[18].

3. Emhart's Alternative Motion For A New Trial Should Be Granted

If the Court denies the motion for judgment as a matter of law, it should grant Emhart a new trial regarding trigger. The standard for a new trial is less stringent than for judgment as a matter of law. The errors in the jury instructions entitle Emhart to a new trial regarding the trigger issue. It is settled that an erroneous jury instruction that impacts the decision on an issue is a basis for a new trial. E.g., Hiller v. County of Suffolk, 199 F.R.D. 101, 106 (E.D.N.Y. 2001) (erroneous jury instruction concerning scope of damages recoverable for emotional distress warranted new trial as "erroneous jury instructions coupled with the

[18] OneBeacon will be able to rely on that exclusion only in the event of reformation of the policy it issued.

summation counsel was permitted to make because of those erroneous instructions led the jury to reach a seriously erroneous result …"); Soledad v. Department of Treasury, 116 F.Supp.790, 798 (W.D. Tex. 2000) (granting motion for new trial where "the jury's consideration of an incorrect liability standard effectively lowering Plaintiff's burden under the facts of this case is prejudicial error").. Here, the jury instructions concerning trigger of coverage increased plaintiff's burden of proof and defendants' counsel argued concerning factors that were unrelated to trigger of coverage.

Emhart is also entitled to a new trial in view of the erroneous exclusion of the testimony of Dr. Calabrese. Dr. Calabrese, an expert witness retained by North River, had testified at deposition concerning events that gave rise to a reason to test for dioxin. His status as an expert witness did not preclude his being called as a witness by the opposing party. It is likely that the exclusion of his testimony, which would have reinforced the testimony of Dr. Hass, prejudiced Emhart. The suggestion that there would have been prejudice because a juror might have recalled that during empanelment Dr. Calabrese was identified as an expert witness of North River is speculative and does not outweigh the prejudice to Emhart of depriving it of the opportunity to call an important witness. The prejudice is particularly apparent in view of the unsupportable jury verdict.

## CONCLUSION

For the foregoing reasons, Emhart is entitled to judgment as a matter of law or, at a minimum, a new trial concerning its claims against Century and OneBeacon that were the subject of the jury verdict.

Respectfully submitted,

/s/Gerald J. Petros

Gerald J. Petros (#2931)
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, Rhode Island 02903
(401) 274-2000
(401) 277-9600
gpetros@haslaw.com

Jack R. Pirozzolo
Richard L. Binder
Foley Hoag LLP
Seaport World Trade Center West
155 Seaport Boulevard
Boston, Massachusetts 02210
(617) 832-1000
jpirozzolo@foleyhoag.com

Counsel for Plaintiff, Emhart Industries, Inc.

Dated: November 20, 2006

**CERTIFICATE OF SERVICE**

I hereby certify that on November 20, 2006, a copy of the foregoing Plaintiff's Memorandum in Support of its Renewed Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial Regarding its Claims Against Century and OneBeacon was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's Cm/ECF System.

/s/Gerald J. Petros
Gerald J. Petros

761367 (55451/115705