UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| EMHART INDUSTRIES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>HOME INSURANCE COMPANY,<br>INSURANCE COMPANY OF NORTH AMERICA,<br>LIBERTY MUTUAL INSURANCE COMPANY,<br>ONE BEACON AMERICA INSURANCE COMPANY<br>and UNITED STATES FIRE INSURANCE COMPANY,<br><br>Defendants. | Civil Action No. 02-053-S |

**PLAINTIFF'S SUBMISSION TO ADDRESS CORPORATE SUCCESSORSHIP AND THE CENTURY PRIMARY POLICY**

Plaintiff Emhart Industries, Inc. hereby submits this memorandum to address issues of corporate successorship related to the Century Primary Policy. (Although the Court only called for briefing on the Century Primary Policy, the same reasoning set forth in this memorandum would apply to the Century Policy No. XBC 46961 [Pl.'s Ex. 1] and the OneBeacon Policy No. S-16-07084 [Pl.'s Ex. 3], which were issued around this same time period to Crown-Metro.) Although Century has not previously taken issue with Emhart Industries' description of corporate successorship, it has argued that a sale of certain assets in 1980 placed the Policy in the hands of non-party Bengal Corporation. This position ignores the plain language of the purchase and sale agreement with Bengal and is without merit.

## I. CORPORATE SUCCESSION AND TRANSFER OF ASSETS AND LIABILITIES

At trial, Emhart Industries presented evidence and uncontradicted testimony from Robert Cattaneo, outside counsel to The Black & Decker Corporation (Emhart Industries' ultimate parent corporation), setting forth the following timeline of mergers, acquisitions, and sales:

1. In 1952, Atlantic Chemical Corporation, a chemical company located in Rhode Island, changed its name to Metro-Atlantic Inc. [Pl.'s Ex. 217; 9/13/06 Trial Tr. at 11:20-12:5, 12:18-19]

2. In 1968, Metro-Atlantic and another Rhode Island chemical company, Crown Chemical Company, consolidated, creating a new corporation called Crown-Metro, Inc. [Pl.'s Ex. 217; 9/13/06 Trial Tr. at 12:6-13:12] As part of this consolidation, Crown-Metro succeeded to the assets and liabilities of the two previous corporations. [9/13/06 Trial Tr. at 13:13-19]

3. On or about February 15, 1969, Century issued Policy No. GAL 36597 to Crown-Metro (the "Century Primary Policy") with a policy period of February 15, 1969 to February 15, 1970. [Pl.'s Ex. 2] The policy was cancelled on January 1, 1970. [Pl.'s Ex. 2]

4. In 1969, USM Corporation, a business conglomerate, acquired all of the stock of Crown-Metro, making Crown-Metro a wholly-owned subsidiary of USM. [Pl.'s Ex. 217; 9/13/06 Trial Tr. at 13:20-24, 15:5-13; Stip. Facts ¶ 50]

5. In 1976, Emhart Corporation, a Connecticut-based business conglomerate, acquired USM through reverse triangular merger after which USM became a wholly-owned subsidiary of Emhart Corporation. [Pl.'s Ex. 217; 9/13/06 Trial Tr. at 15:17-22, 16:6-17:4; Stip. Facts ¶ 51] Also, Crown-Metro, which was still a subsidiary of USM, changed its name to Bostik South, Inc. [Pl.'s Ex. 217; 9/13/06 Trial Tr. at 17:5-16; Stip. Facts ¶ 52]

6. In 1977, Bostik South was liquidated and all of its assets and liabilities were distributed to its parent corporation, USM. [Pl.'s Ex. 217; 9/13/06 Trial Tr. at 17:19-18:8; ; Stip. Facts ¶ 53]

7. In 1980, USM sold to Bengal Corporation certain assets of the business formerly conducted by Bostik South in Greenville, South Carolina. [DX89; Stip. Facts ¶ 54]

8. In 1987, USM changed its name to Emhart Enterprises Corporation and later, in that same year, merged with another subsidiary of Emhart Corporation called Emhart Industries, Inc. [Pl.'s Ex. 217; 9/13/06 Trial Tr. at 18:11-19:11; Stip. Facts ¶¶ 55, 56] Emhart Industries survived the merger and succeeded to the assets and liabilities of Emhart Enterprises Corporation (formerly USM), which ceased to exist. [Pl.'s Ex. 217; 9/13/06 Trial Tr. at 18:11-19:11]

As a result of these mergers and acquisitions, Emhart Industries succeeded to Crown-Metro's assets and liabilities, which included Crown-Metro's environmental contamination liability and its insurance policies (e.g., the Century Primary Policy). [9/13/06 Trial Tr. at 18:11-19:11, 20:10-22:1]

## II. THE CENTURY PRIMARY POLICY WAS NOT TRANSFERRED TO THE BENGAL CORPORATION.

Century does not take issue with the timeline of events or the details of corporate successorship set forth above. Rather, Century argues, to seek to avoid its obligations under the Century policies, that the policies actually belong to Bengal, not Emhart Industries, as a result of the 1980 sale of a portion of USM's assets located in Greenville, South Carolina. [Joint Statement Pursuant to Pre-Trial Conference, at 7 (May 16, 2006); Mem. Century's Mot. to Bar Testimony of Robert Cattaneo, at 5 (May 16, 2006)]

### A. *Under the Plain Language of the Purchase and Sale Agreement, Insurance Contracts Were Not Transferred to Bengal.*

#### 1. Section 1

The 1980 Purchase and Sale Agreement between USM and Bengal (the "P&S") makes clear that the transaction concerned only USM's chemical facility and certain related assets located in Greenville, South Carolina. Section 1 of the P&S states:

> [Bengal] agrees to purchase, acquire and accept, and [USM] agrees to sell, assign and deliver to [Bengal] at the "Closing," as hereunder defined, that portion of the business, and those assets, of Bostik South, ***located at Echelon Road, Donaldson Center, Greenville, South Carolina, as hereunder more particularly described in Section 3***, subject to those liabilities of Bostik South to be assumed by [Bengal] set forth in Section 7.

[DX89 § 1, at 2 (emphasis added)] By its terms, § 1 indicates that this was a limited transaction involving only the assets "located" in Greenville, South Carolina.[1] [DX, § 1, at 2; 9/14/06 Trial Tr. at 34:12-35:5] There was no suggestion at trial that the Century Primary Policy was among the assets at that location. Further, § 1 also narrows the transferred assets to those set forth in § 3. [DX, § 1, at 2]

2. Section 3

Section 3(A)(2) carefully identifies the USM assets that were transferred to Bengal:

> Those personal properties and assets of Bostik South relating only to the business of manufacturing and selling chemicals, colors, intermediates and reservol, such categories of products being described in Exhibit B attached hereto …. Included in the assets and properties to be transferred are … executory contracts, customer purchase orders, leases, [and] contracts with vendors and suppliers ….

[DX89 § 3(A)(2), at 3 (emphasis added)] This language makes clear that the transaction was specific to the Greenville facility. [DX89 § 3(A)(2), at 3; 9/14/06 Trial Tr. at 37:17-38:2] Further, § 3(A)(2) omits any mention of insurance contracts in its listed categories of transferred contracts. [DX89 § 3(A)(2), at 4]

3. Section 7

Century's suggestion that the Century Primary Policy was transferred from USM to Bengal also defies the overall logic of the P&S. Indeed, §§ 7(B)(2) and 7(B)(3) of the P&S expressly exclude pre-closing "acts or omissions" and "violation[s] of laws, rules and regulations including, without limitation, EPA and OSHA regulations (and any other governmental agency) …." [DX89 §§ 7(B)(2), (3), at 12-13] Under Century's preferred interpretation of the P&S, USM would have transferred the Century Primary Policy to Bengal, but it would have

[1] This is further supported by the P&S's first recital, which states: "WHEREAS, [USM] desires to sell certain assets and the related business of the business carried on by its operations ***located in Greenville, South Carolina*** …." [DX89 at 1 (emphasis added); 9/14/06 Trial Tr. at 33:19-34:11]

maintained the liabilities covered by the policy. This result simply does not make sense. As Mr. Cattaneo testified, without contradiction, USM would have wanted to "match the retention of those insurance policies and the coverage they afford to the retention of the liabilities that are insured against." [9/14/06 Trial Tr. at 38:9-39:17]

4. Omissions

In further support, and as Mr. Cattaneo testified, it would have been customary for a transaction of this type that also transferred ownership of insurance contracts to include (i) the seller's representations regarding insurance coverage, and (ii) a schedule of insurance contracts. [9/14/06 Trial Tr. at 39:18-40:25] The P&S does not contain either. [DX89 § 9, at 15-24; 9/14/06 Trial Tr. at 39:18-40:25] Also, although the Agreement requires USM and Bengal to notify "the public and the trade including creditors and customers" of the transfer of ownership of the Greenville business, it omits mention of any required notice to insurers of the alleged transfer of insurance contracts. [DX89 § 14, at 29] These omissions indicate that neither USM nor Bengal intended to transfer any insurance contracts under the P&S.

**B. *The Century Primary Policy is Not an Executory Contract.***

Century has sought to characterize the Century Primary Policy as an executory contract, arguing that the policy was, therefore, transferred to Bengal under § 3(A)(2), which addresses the transfer of such contracts. [Joint Statement Pursuant to Pre-Trial Conference, at 7 (May 16, 2006); Mem. Century's Mot. to Bar Testimony of Robert Cattaneo, at 5 (May 16, 2006); DX89 § 3(A)(2), at 4] This is not so. At the time the P&S was signed, the Century Primary Policy's period had expired and the premium had been paid. [Pl.'s Ex. 2, at 1] Accordingly, the Policy was not an executory contract subject to transfer under § 3(A)(2). See, e.g., In re Vanderveer Estates Holding, LLC, 328 B.R. 18, 26 (Bankr. E.D.N.Y. 2005) ("It is well established that insurance policies for which the policy periods have expired and the premium has been paid are

not executory contracts ….”); In re CVA Gen. Contractors, Inc., 267 B.R. 773, 779 (Bankr. W.D. Tex. 2001) (where the “relevant policy period … expired at least two years prior to the time that CVA filed for bankruptcy,” the contract was not executory since the insured “had paid all the premiums due ….”); John H. Kolb & Sons, Inc. v. G & L Excavating, Inc., 821 A.2d 774, 780-81 (Conn. App. 2003) (“A contract is executory when neither party has fully performed his contractual obligations and is executed when one party has fully performed its contractual obligations.”); Black’s Law Dictionary, at 321 (7th ed. 1999) (defining an “executory contract” as “[a] contract that remains wholly unperformed or for which there remains something still to be done on both sides ….”).

**C. *Even if the Century Primary Policy was Deemed to be Executory, It was Not Transferred Under the Purchase and Sale Agreement with Bengal.***

Further, even if the Policy could be deemed executory (it cannot), Century ignores the language of § 3(A)(2) limiting the transferred assets to “[t]hose personal properties and assets of Bostik South relating ***only to*** the business of manufacturing and selling chemicals, colors, intermediates and reservol ….” [DX89 § 3(A)(2), at 3] Because the Century Primary Policy was not an asset that related “only to” the Greenville facility, but instead covers activities conducted by USM or its other subsidiaries, it was not transferred to Bengal. [DX89 § 3(A)(2), at 3 (excluding the “adhesives and coatings” manufacturing business from the transfer)] Indeed, later language in § 3(A)(2) confirms this by expressly excluding “assets used in common with any other plant, division or subsidiary of [USM] or [USM’s] parent.” [DX89 § 3(A)(2), at 4; 9/14/06 Trial Tr. at 36:19-37:14] Similarly, § 3(C) excludes “any contracts or agreements … with, any division or subsidiary or [USM] or Emhart Corporation … or any of Emhart’s divisions of subsidiaries, involving the Purchased Assets or the Purchased Business ….” [DX89 § 3(C), at 5]

Century's suggestion that the § 3(A)(2)'s reference to "Bostik South" meant that the sale included all of the property and assets of the former corporate entity called Bostik South were transferred to Bengal, including the Century Primary Policy, ignores the facts that (i) at the time of the sale, Bostik South no longer existed as a corporate entity, and (ii) by its terms, the P&S did not include all assets of the former Bostik South or all of its business (e.g., the "adhesives and coatings" branches). [Pl.'s Ex. 217; 9/13/06 Trial Tr. at 17:19-18:8; DX § 3(A)(2), at 3] Clearly, the term "Bostik South," as used in the P&S, was merely a term of convenience and did not, in some way, broaden the scope of the transferred assets.

## III. CONCLUSION

In light of the foregoing, it is clear that Emhart succeeded to the rights of Crown Metro under the Century Primary Policy.

Respectfully submitted,

/s/ Gerald J. Petros

Gerald J. Petros (#2931)
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, Rhode Island 02903
(401) 274-2000
(401) 277-9600
gpetros@haslaw.com

Jack R. Pirozzolo
Richard L. Binder
Foley Hoag LLP
Seaport World Trade Center West
155 Seaport Boulevard
Boston, Massachusetts 02210
(617) 832-1000
jpirozzolo@foleyhoag.com

Dated: November 20, 2006

Counsel for Plaintiff, Emhart Industries, Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that on November 20, 2006, a copy of the foregoing Plaintiff's Submission to Address Corporate Successorship and The Century Primary Policy was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's Cm/ECF System.

/s/Gerald J. Petros
Gerald J. Petros

761410v1