UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| EMHART INDUSTRIES, INC.,<br><br>Plaintiff,<br>v.<br><br>HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, LIBERTY MUTUAL INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICA INSURANCE COMPANY, and UNITED STATES FIRE INSURANCE COMPANY<br><br>Defendants. | CIVIL ACTION<br>NO. CA 02-053S<br><br>CENTURY'S AND ONEBEACON'S OPPOSITION TO PLAINTIFF'S SUBMISSION TO ADDRESS CORPORATE SUCCESSORSHIP AND THE CENTURY PRIMARY POLICY |

## I. INTRODUCTION

Defendants Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America ("Century"), and OneBeacon America Insurance Company ("OneBeacon") submit this memorandum of law in opposition to Plaintiff's Submission to Address Corporate Successorship and the Century Primary Policy. Century and OneBeacon submit that Emhart is not a corporate successor to Crown-Metro because Crown-Metro's rights under the Century and OneBeacon policies were transferred to Bengal Corporation in 1980.

## II. STATEMENT OF FACTS

Century issued a primary liability insurance policy to Crown-Metro in February 1969, and an excess liability insurance policy to Crown-Metro in December 1968. OneBeacon issued an excess liability insurance policy to Crown-Metro in April

1969. Later that year, USM acquired the stock of Crown-Metro. [Cattaneo D-X at 13.][1] As a result of that acquisition, the Century and OneBeacon policies were terminated.

At the time of the acquisition, Crown-Metro was operating a chemical manufacturing plant in Providence, Rhode Island. In 1974, Crown-Metro sold its Rhode Island chemical manufacturing plant and consolidated its business operations in South Carolina. Crown-Metro continued to operate a chemical manufacturing plant in Greenville, South Carolina. [PX-11 at 5;[2] Muys C-X at 10-12.[3]]

In 1976, Crown-Metro changed its name to Bostik-South, Inc. In 1977, USM liquidated Bostik-South and all of Bostik-South's assets and liabilities were transferred to USM. The business that had been conducted by Crown-Metro under the name Bostik-South continued to be conducted as a division of USM. [Appendix Tab A at 17-18.]

In 1980, USM sold certain assets of Bostik-South to Bengal Corporation. Section 3(2) of the Purchase and Sale Agreement between USM and Bengal Corporation describes the assets being transferred. Those assets include "executory contracts." [DX-89 at 3-4.][4]

Bengal Corporation subsequently changed its name to Crown-Metro. The EPA has asserted a claim against Crown-Metro as a successor to Metro-Atlantic for the dioxin contamination at the Centredale Manor Restoration Project Superfund site. That claim has not been resolved. [Appendix Tab C at 13-15.]

---

[1] Appendix in Support of Defendants' Opposition to Plaintiff's Submission to Address Corporate Successorship and the Century Primary Policy ("Appendix") Tab A.
[2] Appendix Tab B.
[3] Appendix Tab C.
[4] Appendix Tab D.

# III. ARGUMENT

## A. The Century and OneBeacon policies are "executory contracts" and, thus, were transferred to Bengal Corporation in 1980.

Under the Purchase and Sale Agreement, USM transferred Bostik-South's "executory contracts" to Bengal Corporation. The term "executory contracts" includes the Century and OneBeacon insurance policies issued to Crown-Metro.

The Fifth Edition of Black's Law Dictionary, which was the current edition when the Purchase and Sale Agreement was drafted, defines an "executory contract" as "[a] contract that has not as yet been fully completed or performed. A contract the obligation (performance) of which relates to the future." Black's Law Dictionary, at 512 (5th ed. 1979); *see* Appendix Tab A at 53. As such, an insurance policy is an "executory contract" in that an insurance company accepts a premium in exchange for its agreement to perform certain services in the future.

Numerous courts throughout the country have referred to insurance policies as "executory contracts." *See Burkett v. Mott by Maricopa County Public Fiduciary,* 152 Ariz. 476, 478, 733 P.2d 673, 675 (1986); *Massachusetts Bonding & Ins. Co. v. Chapman,* 176 Ark. 349, 3 S.W.2d 18, 19 (1928); *Marez v. Dairyland Ins. Co.,* 638 P.2d 286, 289 (Colo. 1981), *overruled on other grounds by, Friedland v. Travelers Indem. Co.*, 105 P.2d 639 (Colo. 2005); *Lain v. Metropolitan Life Ins. Co,* 322 Ill.App. 643, 648, 54 N.E.2d 736, 738 (Ill.App. 1 Dist.), *judgment reversed on other grounds by,* 388 Ill. 576, 58 N.E.2d 587 (1944); *Indiana Life Endowment Co. v. Reed,* 54 Ind.App. 450, 103 N.E. 77, 80 (1913); *Spears v. Independent Order of Foresters,* 107 S.W.2d 126, 130 (Mo. App. 1937); *Graphic Arts Mut. Ins. Co. v. Monello,* 41 Misc.2d 943, 946 (N.Y. City Civ. Ct. 1963); *Giroux v. Bockler,* 98 Or. 398, 401, 194 P. 178, 179 (1921); *Knepp v.*

*Nationwide Ins. Co.*, 324 Pa. Super. 479, 487, 471 A.2d 1257, 1261 (1984) (Wieand, J., concurring); *Kansas City Life Ins. Co. v. Blackstone,* 143 S.W. 702, 707 (Tex. App. 1912), *reversed on other grounds by,* 107 Tex. 102 (1915); *Heidner v. St. Paul & Tacoma Lumber Co.,* 124 Wash. 652, 664, 215 P. 1, 5 (1923), *certiorari denied by,* 263 U.S.721 (1924).

Ignoring these cases, Emhart contends that an "executory contract" is not an insurance policy because an executory contract is one in which neither side has completed its performance. That definition, however, is from the Seventh Edition of Black's Law Dictionary, which was published in 1999 – 19 years after the Purchase and Sale Agreement was executed. The definition of "executory contract" in Black's Law Dictionary at the time the Purchase and Sale Agreement was executed is not limited to contracts in which neither side has completed its performance. The earlier definition only requires that the contract has not been fully completed or performed and, thus, includes insurance policies.

Emhart's reliance on recent cases that define an "exectuory contract" to require some remaining performance from both sides is similarly misplaced. Those cases define the term "executory contract" in specialized circumstances only, like under the bankruptcy code, *see In re Vanderveer Estates Holding, LLC,* 328 B.R. 18 (Bankr. E.D.N.Y. 2005); *In re CVA Gen. Contractors, Inc.,* 267 B.R. 773 (Bankr. W.D. Tex. 2001), and under the Connecticut statute of limitations, *see John H. Kolb & Sons, Inc. v. G and L Excavating, Inc.,* 821 A.2d 774 (Conn. App. 2003). The definition of "executory contract" that appears in the Sixth Edition of Black's Law Dictionary makes clear that

before 1999, when the Seventh Edition was published, it was understood that the term "executory contract" had different meanings in different contexts:

> **Executory contract.** A contract that has not as yet been fully completed or performed. A contract the obligation (performance) of which relates to the future. [Citation omitted.] **In context of Bankruptcy Code, is contract under which obligation of both bankrupt and other party to contract are so far unperformed that failure of either to complete performance would constitute material breach excusing performance of either.**

Black's Law Dictionary, at 570 (6th ed. 1990) (emphasis added).

A corporate lawyer in 1980 would have understood that the term "executory contracts" is not limited to contracts in which both sides have not completed their performance. The term included any contract that had not been fully completed and performed and, thus, would have included insurance policies. By using the term "executory contracts," the drafters of the Purchase and Sale Agreement intended to include insurance policies.

## B. The Purchase and Sale Agreement is not limited to those assets that are physically located in South Carolina.

The first "WHEREAS" clause in the Purchase and Sale Agreement states that USM intends to sell "certain assets and the related business of the business carried on by its operations located in Greenville, South Carolina." [Appendix Tab D at 1.] At that time, Bostik-South had no other operations. [Appendix Tab A at 44.] Thus, this clause is only identifying the address of the operations being transferred and is not intended to limit the transfer to only those assets that are physically located at that address.

Similarly, Section 1 of the Purchase and Sale Agreement describes the assets being transferred as "that portion of the business, and those assets, of Bostik South,

located at Echelon Road, Donaldson Center, Greenville, South Carolina." [Appendix Tab D at 2.] Like the first "WHEREAS" clause, this section is only giving the address of Bostik South [Appendix Tab A at 51]. It is not limiting the transfer to those assets that are physically located in South Carolina.

Section 3(2) of the Purchase and Sale Agreement describes the assets being transferred as those "relating only to the business of manufacturing and selling chemicals, colors, intermediates and reservol." [Appendix Tab D at 3.] This Section does not limit the transfer to only those assets located in South Carolina. The Century and OneBeacon policies were issued to Crown-Metro. Crown-Metro was in the business of manufacturing chemicals. [Appendix Tab A at 12, 15.] Thus, insurance policies issued to Crown-Metro would be included under Section 3(2).

Section 3(2) also includes a list of assets that were not being transferred. Those assets include assets used in common with any other plant, division or subsidiary of Seller or Seller's parent. [Appendix Tab D at 4.] At the time of the agreement all of Bostik-South operations had been consolidated in South Carolina. Thus, the Century and OneBeacon policies were not assets used in common with any other plant, division or subsidiary of USM. As a result, they were transferred to Bengal Corporation.

**C. Under the Purchase and Sale Agreement, Bengal Corporation became responsible for the environmental contamination at the Centredale Manor Superfund Site.**

Under Section 7(B)(3) of the Purchase and Sale Agreement, USM agreed to be responsible for any violation of EPA regulations that occurred before the closing date. However, Bengal Corporation agreed to be responsible for any violation of EPA

regulations based on facts or conditions which existed before the closing date, but continued after:

> Anything in this Agreement to the contrary notwithstanding, it is expressly understood and agreed that Purchaser does not assume or agree to be responsible for, and Seller agrees to indemnify and hold Purchaser harmless against:
>
> * * *
>
> (3) Any violation of laws, rules or regulations including, without limitation, EPA and OSHA regulations (and any other governmental agency) to the extent that such violations relate only to the time prior to the Closing Date**; any violations occurring after the Closing Date or based on facts or conditions which existed prior to the Closing Date but which continue thereafter shall be the sole liability of Purchaser;**

[Appendix Tab D at 12-13 (emphasis added).]

The EPA alleges that Emhart is liable under CERCLA. [Appendix Tab C at 4-5.] That statute was not in effect during the time when Metro-Atlantic operated a chemical plant at the Centredale site in Rhode Island. Thus, Emhart is not being charged with the violation of any law, rule or regulation before the closing date. The EPA's claim, however, relates to facts or conditions that existed before the closing date and continued thereafter. As such, Bengal Corporation became responsible for that condition. [Appendix Tab A at 44, 46-47]. Because the parties intended for Bengal Corporation to be responsible for pre-existing contamination at the site, they also must have intended to transfer any rights under the applicable insurance policies to Bengal Corporation for that contamination.

## IV. CONCLUSION

For the reasons stated, Century and OneBeacon respectfully request that the Court find that Emhart is not a successor to Crown-Metro because Crown-Metro's rights under the Century and OneBeacon policies were transferred to Bengal Corporation.

Dated: January 12, 2007

McKENNA & McCORMICK

By: /s/ James T. McCormick

James T. McCormick (#2614)
McKENNA & McCORMICK
128 Dorrance Street, Suite 330
Providence, RI 02903
(401) 831-2970

- and -

Lawrence A. Nathanson
Scott E. Levens
SIEGAL, NAPIERKOWSKI & PARK
533 Fellowship Road, Suite 120
Mt. Laurel, NJ 08054
(856) 380-8910

Attorneys for Defendant Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America

## CERTIFICATE OF SERVICE

I hereby certify that on January 12, 2007, a copy of the foregoing Century's and OneBeacon's Opposition to Plaintiff's Submission to Address Corporate Successorship and the Century Primary Policy was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

By: /s/ James T. McCormick

James T. McCormick (#2614)
McKENNA & McCORMICK
128 Dorrance Street, Suite 330
Providence, RI 02903
(401) 831-2970