UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| EMHART INDUSTRIES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, LIBERTY MUTUAL INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICA INSURANCE COMPANY, and UNITED STATES FIRE INSURANCE COMPANY,<br><br>Defendants. | CIVIL ACTION<br>No. 02-053-S |

**EMHART'S POST-TRIAL MEMORANDUM REGARDING THE ONE BEACON CLAIM FOR REFORMATION OF THE INSURANCE POLICY IT ISSUED**

**INTRODUCTION**

OneBeacon seeks to "reform" its insurance policy, Excess Umbrella Policy No. S-16-07084 ("OneBeacon Policy"), by adding a pollution exclusion. The evidence it presented was insufficient. Reformation requires a mutual mistake by both parties even if the claimed mistake is a scrivener's error. Here, there was no evidence of the intent of the insured, Crown Metro.

OneBeacon did not even provide clear and convincing evidence that it made a unilateral mistake. The testimony of Vincent Puccio about his alleged mistake is not consistent with the OneBeacon underwriting file and is not even internally consistent. Mr. Puccio claimed that he mistakenly copied a number from a policy, but he did not have that policy in his possession at the time of the alleged mistake. His testimony that he would not backdate coverage precludes any argument that he issued the policy after its April 24, 1969 inception date.

If reformation were appropriate, the policy would contain the Exclusion of Waste Products Endorsement that was part of the Century Excess Policy[1], the policy to which OneBeacon seeks to "follow form". The policy, as reformed, would not contain a pollution exclusion that was deleted by endorsement. The Century Excess Policy expressly states that it could be modified "by endorsement issued to form a part of this policy". Thus, OneBeacon, by issuing a policy following form to the Century Excess Policy, agreed to incorporate all modifications that were made to that policy, including subsequent modifications. The OneBeacon assertion that the deleted endorsement was material is of no legal significance and is belied by its failure to protest when it learned of the deletion.

## BACKGROUND

On April 24, 1969, OneBeacon issued the OneBeacon Policy (PX 3)[2] to Crown-Metro. The policy period was April 24, 1969 to February 15, 1972 and the policy limits were $4,000,000 (id.). The One Beacon Policy was "subject to all the terms and conditions of Policy No. XBC64674" (id.). Policy No. XBC-64674 ("Excess Blanket Policy"), which was incorporated in the OneBeacon Policy, was issued to Crown Chemical Company and did not contain any exclusion for damage caused by pollution (PX 4).

In late 1968, Crown Chemical and Metro-Atlantic were consolidated to form Crown-Metro, Inc., which succeeded to the assets of its two predecessors, including the Excess Blanket Policy[3] (PX 217; Tr. 9/13/06 at 11-12)[4]. Shortly thereafter, the Century Excess Policy was

1 The Century Excess Policy is policy number XBC-46961.

2 Plaintiff's trial exhibits are cited as "PX" followed by the exhibit number; defendants' trial exhibits are cited as "DX" followed by the exhibit number.

3 Emhart addressed the issue of corporate succession in a previous filing. See Emhart's Submission To Address Corporate Successorship (Court's Docket No. 466).

4 The trial transcript is cited as "tr." followed by the date and page number.

issued to Crown-Metro for the period December 1, 1968 to February 15, 1970 (PX 1, at CIC 153).

Endorsement 5 of the Century Excess Policy, entitled Pollution and Contamination Exclusion Endorsement, was an absolute exclusion for damage caused by pollution. It provided, in pertinent part, that the policy "shall not apply to any claim for damages arising out of contamination or pollution of land, air, water or other real or personal property" (PX 1 at CIC 162). That endorsement was expressly deleted from the Century Excess Policy by a subsequent endorsement, Endorsement 6, which had an "effective date" of December 1, 1968. Endorsement 6, the Exclusion of Waste Products Endorsement that was at issue during the trial, provided that "Endorsement #5, Pollution Contamination Exclusion Deletion is deleted" (PX 1 at CIC 165). The Exclusion of Waste Products Endorsement excluded only property damage caused by "intentional or willful introduction of waste products, fluids or materials" (Id.).

**THE EVIDENCE AT TRIAL**

The only evidence OneBeacon introduced in support of its reformation claim was the testimony of its former underwriter, Vincent Puccio, and its underwriting file (DX 551). Mr. Puccio's testimony consisted of interpreting the underwriting file. He testified that he had no "active memory" of the events, which occurred in 1969, that he was basing his testimony on a review of the claim file and that "all [he was] here testifying to is what [he] presumed to be an error based upon [his] review of the [underwriting] file" (Tr. 10/11/06 at 67-68, 86-87).

The testimony and the underwriting file establish the following chronology. In March and April, 1969, Mr. Puccio discussed with a broker the possible issuance of an excess umbrella insurance policy to Crown Metro (DX 551 at 27-28). Mr. Puccio had no information or understanding of the intent of Crown Metro other than that it sought excess umbrella coverage

(Tr. 10/11/06 at 26-27). The OneBeacon Policy commenced on April 24, 1969 (PX 3). In issuing the policy, Mr. Puccio completed a Daily Report which, like the policy itself, stated that the OneBeacon Policy was "subject to all the terms and conditions of Policy No. XBC 64674", the Excess Blanket Policy (DX 551 at 10). Mr. Puccio testified that he "would not back-date coverage" (Tr. 10/11/06 at 89) and that he bound coverage by April 24, 1969 (id.). Thus, he necessarily prepared the undated "Daily Report" on April 24, 1969. On that date, the Century Excess Policy was not in his possession. Indeed, Mr. Puccio received "the underlying policy" with a cover letter dated May 9, 1969 (DX 551 at OBA 27). The May 9 letter refers to Mr. Puccio having received a letter dated April 24, 1969, which is unaccountably missing from the OneBeacon underwriting file (DX-551 at OBA 27; tr. 10/11/06 at 31-32, 81-82). Mr. Puccio did not know whether the "underlying policy" he received on May 9 was the Century Excess Policy (Tr. 10/11/06 at 33). The policy that was sent with the transmittal letter is not attached to that letter in the underwriting file (Id.).

The chronology is inconsistent with Mr. Puccio's testimony concerning the manner in which he made the alleged mistake. Mr. Puccio testified that he looked at the face of the Century Excess Policy, which contains the policy numbers of both the Century Excess Policy and the Excess Blanket Policy, and he mistakenly wrote down "XBC64674", the number of the Excess Blanket Policy, as the number of the policy underlying the OneBeacon Policy. He asserts that he intended to write "XBC46961", the number of the Century Excess Policy (Tr. 10/11/06 at 41-42). He could not have made the mistake in the manner he described. He did not have the Century Excess Policy in his possession on the date he issued the policy, April 24, 1969. By his own testimony, he may not have received the Century Excess Policy with the letter dated May 9, 1969 (Id., at 33).

Mr. Puccio received Endorsement 6 to the Century Excess Policy on July 3, 1969 (DX 551 at 1-3). He has no recollection of protesting the deletion of the absolute pollution exclusion or seeking to cancel the OneBeacon policy due to the deletion (Tr. 10/11/06 at 84-85). His conduct is inconsistent with Mr. Puccio's characterization of the deletion as a "material" change (Id., at 54). While Mr. Puccio had extensive experience as an underwriter (Id., at 12-15) and testified to what he viewed as the custom and standard in the industry (Id., at 46-47), he acknowledged that the underlying policy contained a provision permitting it to be modified by endorsement (Id., at 86). If he had seen Endorsement 5 and considered the absolute pollution exclusion to be significant, he would have either written the OneBeacon Policy to follow form to the Century Excess Policy as it existed at a specific date, with that provision, or reacted to learning that the endorsement had been deleted. He did neither (Id., at 84-85, 88).

## I. ONEBEACON HAS FAILED TO PROVE THAT THE ONEBEACON POLICY SHOULD BE REFORMED TO "FOLLOW FORM" TO THE CENTURY EXCESS POLICY

### A. There Was No Evidence Of The Requisite Mutual Mistake

OneBeacon presented no evidence that the purported mistake was ***mutual***, rather than ***unilateral***. Mr. Puccio testified concerning only a unilateral mistake that he allegedly made. He acknowledged that he had no direct communications with Crown Metro, nor any knowledge of its intent other than that it sought an umbrella policy. There was no evidence of whether Crown-Metro intended that the OneBeacon Policy would follow form to any policy other than the Excess Blanket Policy (Tr. at 26-27, 86).

The testimony regarding a unilateral mistake is not sufficient to entitle OneBeacon to reformation. Under settled principles of Rhode Island law, to prove entitlement to the extraordinary equitable remedy of reformation, OneBeacon was required to prove that the language of the OneBeacon Policy expressly incorporating the terms of the Excess Blanket

Policy was a mutual mistake, contrary to the intentions of both OneBeacon and Crown-Metro. McEntee v. Davis, 861 A.2d 459, 463 (R.I. 2004) ("For the court to intervene and correct a written instrument, there 'must be, as it is usually expressed, the mistake of both parties to it; that is, such a mistake in the draughting of the writing, as makes it convey the intent or meaning of neither party to the contract'"); Hopkins v. Equitable Life Assurance Society, 270 A.2d 915, 918 (R.I. 1970) ("[T]here can be no reformation unless the variance between what is written and what was originally intended, as well as the mutual mistake, are demonstrated by clear and convincing evidence"); Associates in Anesthesia, Inc. v. Mut. Benefit Life Ins. Co., 504 A.2d 477, 478 (R.I. 1986) (requiring proof of mutual mistake in order to reform contract language); Diman v. Providence, Warren & Bristol R.R. Co., 5 R.I. 130, 136 (1858) ("the mistake which [a court] may correct in such a writing must be, as it is usually expressed, the mistake of both parties to it, that is, such a mistake in the draughting of the writing, as makes it convey the intent or meaning of neither party to the contract").

The same principle is stated in the Restatement (Second) of Contracts § 155 ("Where a writing that evidences or embodies an agreement … fails to express the agreement because of a mistake of both parties as to the contents of effect of the writing, the court may … reform the writing …."); id. cmt. b ("The rule stated in this Section applies only where both parties are mistaken with respect to the reduction to writing").

Applying this principle, Rhode Island courts have rejected reformation claims where, as here, there is evidence of only unilateral mistake. In Fleet Nat'l Bank v. 175 Post Road LLC, 851 A.2d 267, 269-71 (R.I. 2004), the court rejected the attempt to reform a contract after the need for asbestos abatement work was discovered as "[t]he mistake alleged must be mutual") (emphasis in original). Similarly Vanderford v. Kettelle, 64 A.2d 483, 489 (R.I. 1941), noted the

requirement for mutual mistake and stated that a "mistake by one party coupled with ignorance thereof by the other part does not constitute a mistake within this rule". The requirement of mutual mistake was recognized in Diman, 5 R.I. at 137. The court rejected a claim for reformation to correct a purported error in a stock subscription book where, as here, the claim was supported only by a witness' self-serving testimony about his own mistake. The court noted that to reform the contract on the basis of such testimony, "we must invent a new head of equity before we can interpose to save him, to the injury of others, against the effects of his own carelessness" and refused to do so. In McEntee, the claim for reformation was defeated as the mistake was unilateral, even though it was visible to the party opposing reformation. Here, no purported mistake on the part of Mr. Puccio was visible to Crown Metro or even made known to Crown Metro for more than thirty years.

OneBeacon's characterization of Mr. Puccio s alleged error as a scrivener's error does not change the legal standard, requiring that a mutual mistake be proven by clear and convincing evidence. First, a scrivener's error must be contrary to the intent of both parties concerning a term. See 27 Williston on Contracts 70:93 (scrivener's error exists "where there is no mistake about the agreement and the only mistake is in the reduction of the agreement to writing"). Thus, there may be a scrivener's error, only if there is proof that both parties intended a different writing. Here, OneBeacon presented no evidence as to the intent of Crown Metro regarding the policy to which the OneBeacon Policy would follow form.

Moreover, Rhode Island law has required proof of mutual mistake where the error is of the type that might be characterized as a scrivener's error. In Diman, the court emphasized the insufficiency of testimony regarding the unilateral error of the party preparing a document. There the error was clerical: writing the wrong number in a stock subscription book. In

Hopkins, the court addressed an error in recording the name of a beneficiary. After stating that reformation required a mutual mistake, it corrected the error only because there was "clear and convincing evidence demonstrat[ing] that, as a result of mutual mistake, the designation of [ex-wife] as Walter's beneficiary on the enrollment card failed to correctly express the agreement of the parties". 270 A.2d at 917. The principles followed by the Rhode Island courts are consistent with the majority rule. "Cases granting relief under the circumstances covered by [§ 155] often speak of 'scrivener's errors' or similar terms that point up the mistake as one of transcription of the parties' actual agreement." Restatement (Second) of Contracts § 155, reporter's note, cmt. a & cases cited. "Reformation is appropriate when an agreement has been made or a transaction entered into but, in reducing such agreement or transaction to a writing, the resulting instrument fails to express the parties' real agreement or transaction. The mistake must be mutual when a scrivener fails to record material provisions of a writing based upon a specific, prior oral agreement of the parties." 27 Richard A. Lord, Williston on Contracts § 70:93, at 498 (4th ed. 2003).

A mistake in writing a document is precisely the type of claimed mistake that cannot be altered in the absence of mutual mistake. Diman explained that, in the absence of this rule, "[i]f the court were to reform the writing to make it accord with the intent of one party only to the agreement, who averred and proved that he signed it, as it was written, by mistake, when it exactly expressed the agreement as understood by the other party, the writing, when so altered, would be just as far from being the agreement of the parties as it was before". 5 R.I. at 136. See also Cincinnati Ins. Co. v. Fred S. Post, Jr., Co., 747 S.W.2d 777, 778-79 (Tenn. 1988) (previously cited by OneBeacon) (reformation to correct typographical error permitted as the new document "would then correspond to the antecedent agreement" of the parties). Here, there

is no evidence, much less the requisite clear and convincing evidence, of a prior agreement between the parties regarding the policy to which the OneBeacon policy would follow form. Moreover, it is not plausible that Crown Metro intended that the OneBeacon Policy would follow form to a policy containing what Mr. Puccio characterized as an "absolute" pollution exclusion (Tr. 10/11/06 at 55). In 1969, the insurance industry had not yet included any form of pollution exclusion as a standard provision in insurance policies. In the summer of 1970, the first form of pollution exclusion, the sudden and accidental exclusion contained in the North River policy, was adopted by the insurance industry. See Millipore Corp. v. Travelers Indemnity Co., 115 F.3d 21, 25, n.2 (1st Cir. 1997).

B. OneBeacon Did Not Even Provide Clear And Convincing Evidence Of A Unilateral Mistake

OneBeacon did not even provide clear and convincing evidence that Mr. Puccio made a unilateral mistake. As discussed, supra, Mr. Puccio admitted that he had no recollection and was merely attempting to reconstruct events based on the underwriting file. The interpretation of a file, thirty years after the fact, by a witness having no memory of the events is not clear and convincing evidence. Mr. Puccio based his testimony on the OneBeacon claim file, which, unaccountably, was missing key documents, including a letter concerning the underlying policy that was written on April 24, 1969, the date of the alleged mistake.

The most logical inference from the underwriting file and the testimony is that Mr. Puccio issued the OneBeacon Policy on April 24, 1969. This inference is supported by Mr. Puccio's testimony that he would not have backdated coverage. Therefore, the policy was issued on April 24, 1969, the beginning of the policy period. Thus, the alleged error was made on April

24, 1969[5]. On that date, Mr. Puccio could not have mistakenly copied the wrong number from the face of the Century Excess Policy, which contains the policy numbers for both the Century Excess Policy, as that policy was not in his possession until at least as late as May 9, 1979[6].

Mr. Puccio's testimony that he must have waited until May, when he may have received the Century Excess Policy, to issue the OneBeacon Policy directly contradicts his testimony that he (and OneBeacon) "would not back-date coverage", e.g., by issuing a policy with an April 24, 1969 effective date in May (Tr. 10/11/06 at 89).

Mr. Puccio's alternative theory for assuming that he issued the policy after April 24, 1969 is also not credible. He asserted that the OneBeacon Policy would not have followed form to the Excess Blanket Policy as the latter policy had expired and OneBeacon must have meant to incorporate the policy in effect in 1969 (Tr. 10/11/06 at 82-84). That testimony ignores that ***both*** the Century Excess Policy and the Excess Blanket Policy would expire long before the 1972 expiration date of the OneBeacon Policy[7]. OneBeacon, by issuing a policy for a three year period, would have provided coverage in excess of an expired policy for at least two years even if the OneBeacon Policy were the underlying policy.

There is also no merit to OneBeacon's prior argument that an error was necessarily made because the OneBeacon policy refers to the Excess Blanket Policy as being issued to Crown Metro, rather than Crown Chemical. The OneBeacon Policy identifies the policy it was incorporating by the name of insurer and the policy number, not by name of the insured. The policy provided as follow:

---

[5] If OneBeacon issued the policy in May, there is no reason it would have arbitrarily chosen April 24, 1969 as the commencement date.

[6] Indeed, there is not even clear and convincing evidence that he had receivedthe Century Excess Policy in May, 1969, as there is no evidence of the policy that accompanied the May 9, 1969 letter (Tr. 10/11/06 at 31-33).

[7] The February 15, 1972 expiration date of the OneBeacon Policy is shown on PX 3; the February 15, 1970 expiration date of the Century Excess Policy is shown on PX 1 at CIC 153.

> [OneBeacon] AGREES WITH THE INSURED named below in consideration of the payment of premium and, except as herein provided, subject to all the terms and conditions of Policy No. XBC64674 issued by I.N.A[8]. to: _____

The identity of the insured to whom INA issued the policy is not included in the OneBeacon Policy as One Beacon did not fill in the portion of the policy where such information could be included. Immediately below the quoted language, there is a list of four "items" providing information concerning the OneBeacon Policy, not the policy to which OneBeacon was following form. The first item identifies "THE INSURED named below" of the One Beacon Policy as "Crown Metro Inc.". The remaining three items state the "POLICY PERIOD"; which is April 24, 1969 to February 15,1972; the type of "COVERAGE", which is excess umbrella; and "EXCEPTIONS" -i.e., the policy limits of $4,000,000, of the OneBeacon Policy. Just as items 2-4 state the policy period, type of coverage and policy limits of the OneBeacon Policy[9], not those of the policy to which OneBeacon follows form, item 1 states that Crown Metro was the insured of the OneBeacon Policy, not of the underlying policy.

The attempt of Mr. Puccio to reconstruct events that occurred thirty five years earlier is inherently insufficient to meet the rigorous standard of clear and convincing evidence. The insufficiency is magnified in view of the documentary evidence rebutting his explanation. Accordingly, OneBeacon has failed to satisfy its burden of proving even a unilateral mistake by clear and convincing evidence. It offered no evidence that any mistake was mutual.

Further even if the Court were to find that OneBeacon has satisfied its burden, the Court would still have the equitable discretion to deny reformation. See Restatement (Second) of Contracts, § 155 cmt. d. Three and a half decades have elapsed between the issuance of the

---

8 INA was a predecessor of Century.

9 In contrast, the policy period of the Century Excess Policy is December 1, 1968 to February 15, 1970; the type of coverage of the Century Excess Policy is "Excess Blanket Catastrophe" and the limits of the Century Excess Policy is $1,000,000.

OneBeacon Policy and the OneBeacon request for reformation. After receiving a claim under the policy in 2001, OneBeacon denied coverage on bases other than the purported mistake in its policy (PX 42A; see also tr. 10/11/06 at 71-73). OneBeacon, in the middle of litigation, then added the reformation claim. The circumstances do not warrant affording equitable relief to OneBeacon.

## II. EVEN IF THE ONEBEACON POLICY IS REFORMED, IT WOULD CONTAIN THE WASTE PRODUCTS ENDORSEMENT CONTAINED IN THE CENTURY EXCESS POLICY AS ISSUED, NOT A DELETED ENDORSEMENT

If the Court does reform the OneBeacon Policy to "follow form" to the Century Excess Policy, the policy would contain Endorsement 6, the form of pollution exclusion that was applicable to the Century Excess Policy, rather than Endorsement 5, which was expressly "deleted" from that policy by Endorsement 6 (PX 1 at CIC 165). Endorsement 6 had an effective date of December 1, 1968 (Id.), prior to the inception date of the OneBeacon Policy.

### A. The Policy Language Policy Requires That Endorsement 6 Would Be Applicable

The Century Excess Policy expressly provided that its terms could be modified by endorsement. Condition No. 8 provides "nor shall the terms of this policy be waived or changed, except by endorsement issued to form a part of this policy" (PX 1 at CIC 156). Mr. Puccio acknowledged this provision (Tr. 10/11/06 at 85-86). One Beacon, by incorporating "all terms and conditions of the underlying policy"[10] (PX 3), adopted the provision permitting modification by endorsement. This provision is a standard provision contained in the policy jacket and also is present in the policy jacket of the Excess Blanket Policy (PX 4 at AON 9, condition 9)[11].

---

[10] OneBeacon adopted all terms and conditions "except as herein provided", but did not subsequently except the provision regarding modification (PX 3).

[11] Indeed, the Century Excess Policy as originally written contained five such endorsements (PX 1 at CIC 158-163).

The OneBeacon Policy is simply a "follow form" policy, which incorporates the terms of the underlying insurance policy. See, e.g., Rivere v. Heroman, 688 So.2d 1293, 1294 (La. App. Ct. 1997) (policy that stated on its face that it was subject to the "conditions" of designated primary policy was a "follow form" excess policy); Allison E. Butler, "Excess Insurance," in 23 Holmes' Appleman on Insurance 2d § 145.1, at 6 (Eric Mills Holmes ed., 2003) ("[A] follows form excess policy incorporates by reference the terms of the underlying policy and is designed to match the coverage provided by the underlying policy").

It is settled that an insurer that issues a policy following form to an underlying policy is bound by all modifications to the underlying policy to which its policy follows form, including retroactive modifications. See Great Atl. Ins. Co. v. Liberty Mut. Ins. Co., 773 F.2d 976, 977-81 (8th Cir. 1985) (retroactive reformation of the geographic coverage area of an underlying insurance policy was binding on the excess insurer that used a follow-form excess policy); Broadhead v. Hartford Cas. Ins. Co., 773 F. Supp. 882, 914-15 (S.D. Miss. 1991) (an endorsement was effective retroactively and was incorporated as part of the follow-form excess policy as well); Gen. Accident Ins. Co. of Am. v. Safety Nat'l Cas. Corp., 825 F. Supp. 705, 707-09 (E.D. Pa. 1993) (excess insurer had an obligation to contribute to defense costs in accordance with an obligation contained in the policy to which it followed form by referencing such policy's "terms and conditions" as its own); Public Util. Dist. No. 1 v. Int'l Ins. Co., 881 P.2d 1020, 1027 (Wash. 1994) (excess insurer was bound by retroactive endorsement added to underlying policy several months after the excess policy was written).

Indeed, the Public Utility court addressed a situation that was similar to the present case. There the excess insurer, International, "concede[d] its policy incorporated the initial terms of the [underlying] Transcontinental policy," but argued that its policy did "not incorporate the

[retroactive] errors and omissions endorsement, which was not added until several months ***after*** the International policy was written." Public Util., 881 P.2d at 1025 (emphasis added). In rejecting International's argument, the court noted:

> [International was] well aware that the terms of the [underlying] Transcontinental policy expressly provided for amendment as long as the amendments were in writing and attached as an endorsement, as was [the errors and omissions endorsement]. International could have, but did not, expressly exclude such endorsements from its coverage.

Id. at 1027. The Public Utility court held that the follow-form excess policy incorporated the retroactive endorsement to the underlying policy. Id.

Here, OneBeacon chose to rely on the judgment of the insurer that issued the underlying policy by "following form" and expressly incorporating the terms of the underlying policy. OneBeacon could have written a policy that contained independent or different terms. It could have written a policy that incorporated the terms of the underlying policy as it existed on a specific date. It did neither. Instead, it agreed to incorporate the underlying policy with all modifications that might exist.

B. OneBeacon Did Not Rely On Endorsement 5

The policy language results in OneBeacon being bound by Endorsement 6. In addition, the conduct of OneBeacon belies the argument that it relied on deleted Endorsement 5 in issuing the policy. Endorsement 6, which deleted Endorsement 5, was sent to OneBeacon on July 3, 1969 (DX551 at OBA 1-3). OneBeacon did not object to Endorsement 6 (Tr. 10/11/06 at 84-85). Such conduct is inconsistent with OneBeacon viewing the absolute pollution exclusion contained in Endorsement 5 as a material term of the OneBeacon Policy. Further, OneBeacon did not choose to incorporate the provisions of the underlying policy as it existed on a specific date (Tr.

10/11/06 at 87-88), as it would have done if it sought to ensure that the policy contained the unusual form of pollution exclusion it purportedly sought.[12]

## CONCLUSION

For the foregoing reasons, the Court should not rewrite the OneBeacon Policy so as to incorporate the terms of the Century Excess Policy. In the alternative, if the Court does reform the OneBeacon Policy, it should also conclude that Endorsement 6, the Waste Products Exclusion Endorsement, contained in the Century Excess Policy applies to the policy as reformed. The policy should not be reformed to include an endorsement that was expressly deleted from the Century Excess Policy.

Respectfully submitted,

/s/Alexandra K. Callam

Alexandra K. Callam (#5358)
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, Rhode Island 02903
(401) 274-2000
(401) 277-9600 (fax)
acallam@haslaw.com

Jack R. Pirozzolo
Richard L. Binder
Foley Hoag LLP
Seaport World Trade Center West
155 Seaport Boulevard
Boston, Massachusetts 02210
(617) 832-1000
(617) 832-7000 (fax)
jpirozzolo@foleyhoag.com
rbinder@foleyhoag.com

Dated: January 12, 2007

Counsel for Plaintiff, Emhart Industries, Inc.

---

12 For purposes of this section, it is assumed, contrary to the evidence, that OneBeacon established that it actually knew that the Century Excess Policy contained Endorsement 5 when it issued the OneBeacon Policy.

**CERTIFICATE OF SERVICE**

I hereby certify that on January 12, 2007, a copy of the foregoing Emhart's Post-Trial Memorandum Regarding The OneBeacon Claim For Reformation Of The Insurance Policy It Issued was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/Alexandra K. Callam
Alexandra K. Callam (#5358)
Hinckley, Allen & Snyder LLP
1500 Fleet Center
Providence, Rhode Island 02903
Tel: (401) 274-2000
Fax: (401) 277-9600
acallam@haslaw.com