**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| EMHART INDUSTRIES, INC.<br>Plaintiff,<br><br>v.<br><br>HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, LIBERTY MUTUAL INSURANCE COMPANY, THE NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICA INSURANCE COMPANY and UNITED STATES FIRE INSURANCE COMPANY,<br>Defendants | ) | Civil Action No.: 02-053-S |

**DEFENDANT THE NORTH RIVER INSURANCE COMPANY'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR A NEW TRIAL**

Emhart's Renewed Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial ("Emhart's Motion") should be denied. The trial of this case was long and the positions of all parties were vigorously presented. The jury carefully considered the evidence presented and the court's clear instructions and found in favor of Defendant The North River Insurance Company ("North River"). There was no legal error and the jury's decision should not be set aside. The Court should enter Final Judgment for North River.

## ARGUMENT

### I. EMHART IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW OR TO A NEW TRIAL

### A. Emhart Cannot Meet the Standard for a New Trial

Emhart's Motion fails to present any reason why the Court should seriously entertain a request to schedule another six week trial in this matter. Emhart was allowed to present all of its

relevant evidence to the jury (and a fair amount of evidence that was not relevant). The Court clearly and fairly instructed the jury on the critical issues of New York law based upon applicable decisions of the New York Court of Appeals, the Second Circuit Court of Appeals and the New York District Court. Emhart cannot point to any error in these proceedings that could possibly justify requiring the parties, the Court and a Rhode Island jury to hear this case again.

The decisions of the First Circuit Court of Appeals establish that setting aside a jury's verdict and ordering a new trial is not warranted unless "the verdict is so clearly against the weight of the evidence as to amount to a manifest miscarriage of justice." *Castillo v. Autokirey, Inc.*, 379 F.3d 4, 13 (1st Cir. 2004) (*quoting Federico v. Order of St. Benedict in R.I.*, 64 F.3d 1, 5 (1st Cir. 1995)). District Courts have the discretion to grant a new trial, but such a remedy is to be used sparingly and only in the most compelling of circumstances. *Johnson v. Spencer Press of Maine, Inc.*, 364 F.3d 368, 375 (1st Cir. 2004). In particular, a District Court may grant such a motion only if it is necessary to address or correct "questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." *Id.* However, if the verdict is supported by the evidence, the instructions to the jury were proper, and upholding the verdict will not result in any miscarriage of justice, then the motion for a new trial must be denied. *Spencer Press*, 364 F.3d at 375. The correct result here is clear: Emhart has failed to put forth any argument that would justify granting a new trial.

**B. <u>Emhart Is Not Entitled to Judgment as a Matter of Law</u>**

The jury determined that Emhart failed to meet its substantive burden of proving that the dioxin contamination at the Centredale Manor Superfund Site (the "Centredale Site") resulted from a "sudden and accidental" release of pollutants. [Ex. A]. There is no basis for the Court to

second-guess the jury's determination, much less overturn it and conclude that Emhart was entitled to judgment in its favor on this issue.

The standards for granting a motion for judgment as a matter of law are stringent. *Castillo v. Autokirey, Inc.*, 379 F.3d 4, 9 (1st Cir. 2004). "Courts may grant a judgment contravening a jury's determination only when 'the evidence points so strongly and overwhelmingly in favor of the moving party that no reasonable jury could have returned a verdict adverse to that party.'" *Id.* (*quoting Keisling v. SER Jobs for Progress, Inc.*, 19 F.3d 755, 759-60 (1st Cir. 1994)); *see also EnergyNorth Natural Gas, Inc. v. Century Indem. Co.*, 452 F.3d 44, 50 (1st Cir. 2006).

The Court is required to err on the side of sustaining the jury's verdict. As the relevant cases hold, the Court must determine whether the evidence presented by the nonmoving party, combined with all the reasonable inferences that may be drawn from it, is sufficient to support the verdict when viewed in the light most favorable to the party winning the verdict. *Tennes v. Mass. Dept. of Revenue*, 944 F.2d 372, 377 (7th Cir. 1991); *see also Censullo v. Brenka Video, Inc.*, 989 F.2d 40, 42 (1st Cir. 1995) (*citing Conway v. Electro Switch Corp.*, 825 F.2d 593, 598 (1st Cir. 1987)); *Nydam v. Lennerton*, 948 F.2d 808, 810 (1st Cir. 1991). In making its determination, the Court must apply the substantive evidentiary standard of proof that applies in a trial on the merits. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252-54 (1985).

In considering Emhart's Motion, the Court is not permitted to take into account its views of the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence in the record. *Hendricks & Assoc., Inc. v. Daewoo Corp.*, 923 F.2d 209, 214 (1st Cir. 1991) (*citing Wagenmann v. Adams*, 829 F.2d 196, 200 (1st Cir. 1987); *Richards v. Relentless,*

*Inc.*, 341 F.3d 35, 41 (1st Cir. 2003); *Miranda v. Munoz*, 770 F.2d 255, 257 (1st Cir. 1985). Emhart cannot possibly meet this exacting standard.

As discussed in greater detail below, Emhart never contested that the pollution exclusion contained in the subject North River policy operated on its face to bar the claim.[1] The central issue before the jury as to North River was whether the limited exception for property damage that was directly caused by an initial release of pollutants or contaminants that was both "sudden" and "accidental" operated to restore coverage under the policy. The New York Court of Appeals has repeatedly held that the pollution exclusion contained in the North River policy is clear and unambiguous and bars coverage for all pollution liability unless the policyholder, Emhart, proves that the pollution at issue arose from a "discharge, dispersal, release or escape" of pollutants that was both "sudden and accidental." *Northville Industries Corp. v. Nat'l Union Fire Ins. Co.,* 89 N.Y.2d 621, 634, 679 N.E.2d 1044, 1049 (1997) ("shifting the burden to establish the exception conforms with an insured's general duty to establish coverage where it would otherwise not exist"); *Powers Chemco, Inc. v. Federal Ins. Co.,* 74 N.Y.2d 910, 911, 548 N.E.2d 1301, 1302 (1989); *Technicon Elecs. Corp. v. Am. Home Assur. Co.*, 74 N.Y.2d 66, 73, 542 N.E.2d 1048, 1049 (1989) (pollution exclusion is unambiguously plain and operative and will bar coverage unless the release of the contaminants at issue is both "sudden" and "accidental"). Emhart was required to prove both elements of the exception to the coverage exclusion: that the release of contaminants was "sudden" *and* "accidental." *Northville,* 89 N.Y.2d at 632, 679 N.E.2d at 1047 (the two terms have separate meanings, each of which must be established for the exception to apply). Moreover, any such "sudden and accidental" release must directly cause the property damage; an appreciable amount of the property damage must

---

[1] In any event, the jury so determined. [Ex. A at Question 5].

have resulted from the "sudden and accidental" discharge. *Northville,* 89 N.Y.2d at 634, 679 N.E.2d at 1048.

Here, Emhart failed to carry its burden of proof. Emhart was never able to make a direct causal link between a specific and identifiable "sudden and accidental" release of pollutants and an appreciable amount of the dioxin contamination at the Centredale Site. Emhart did not even try to make such a connection in its closing argument with respect to its claims against North River. [Tr. 10/17/06, p. 52; Ex. B]. Given this utter failure by Emhart to make out a *prima facie* case as to why the exception to the pollution exclusion would operate to restore coverage—much less to show that the evidence could ***only*** result in a verdict for Emhart—Emhart's suggestion that the Court substitute a verdict for Emhart in place of the jury's findings should be summarily denied.

## II. THE COURT CORRECTLY APPLIED NEW YORK LAW TO THE NORTH RIVER POLICY

There is no basis at this late stage of the case for Emhart to challenge the Court's determination that New York law (rather than the law of Rhode Island) applies to Emhart's claims under the North River policy. The Magistrate (Lovegreen, USM) carefully considered all of the arguments on this issue in his Report and Recommendation dated February 15, 2005 [Dkt. No. 220]. The Court considered Emhart's challenges to the Magistrate's Report and Recommendation and affirmed the Order. [Dkt. No. 238]. Tellingly, when the Court offered the parties a chance to brief any legal issues that might narrow the case for trial at the conference on August 3, 2006 [Dkt. Entry 8/3/06], Emhart chose not to renew its argument on choice of law. It

is too late now for the Court to revisit this issue and Emhart has not presented any factual or legal basis for it to do so.[2]

Even a brief review of the applicable legal principles demonstrates that the Court correctly applied New York law to the North River policy. The Court was required to undertake a choice-of-law analysis because the North River policy does not contain a choice-of-law provision. Sitting in diversity, the Court applies the substantive law of the forum state, including its conflict-of-law rules. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1974); *Crellin Technologies, Inc. v. Equipmentlease Corp.*, 18 F.3d 1, 4 (1st Cir. 1994) ("[i]n determining what state law pertains, the court must employ the choice-of-law framework of the forum state, here, Rhode Island").

Under Rhode Island law, courts apply the law of the state where the contract was executed when the contract does not contain a choice-of-law provision. *DeCesare v. Lincoln Benefit Life Co.*, 852 A.2d 474, 483-84 (R.I. 2004). The interest weighing approach urged by Emhart was not squarely before the Rhode Island Supreme Court in *DeCesare* because it was not the proper choice-of-law analysis, as *DeCesare* was neither a tort action nor a case involving a secured transaction. *Cf. Gordon v. Clifford Metal Sales Co.*, 602 A.2d 535, 538-39 (R.I. 1992) (explaining that Rhode Island has adopted the Uniform Commercial Code, including its choice-of-law provision, and that "this is not a simple contracts issue governed by general contract principles. Rather, the apparent intention of [the secured party] to create a security interest in the [goods] until further payment brings this controversy into the realm of the law governing secured

---

[2] Emhart did not submit any proposed jury instructions under Rhode Island law with respect to North River. Moreover, even if the Court had given the instructions proposed by Emhart on the pollution exclusion (or some variant thereof) it still would have been open to the jury to find as a factual matter that a "sudden and accidental" release did not cause the dioxin contamination at the Centredale Site. Thus, there is no basis for a claim of error.

transactions"); *Najarian v. Nat'l Amusements, Inc.*, 768 A.2d 1253 (R.I. 2001) (applying the "interest weighing" approach to an action based in negligence). In such cases, a court may employ the interest weighing approach but here, as in *DeCesare*, the Court is faced with a contract dispute which, requires the Court to apply the *lex loci contractus* rule.

The facts that are relevant to this analysis were never in dispute. The North River policy was issued to be effective as of January 1, 1984 through North River's broker, Jardine, Ter Bush & Powell, Inc. ("Jardine"), located in New York. At the time the policy was issued, Emhart's principal place of business was in Connecticut. The North River Policy was executed by Jardine in its capacity as North River's "Authorized Representative" in Schenectady, New York. [Dkt. No. 220 at 38]. Because the contract for insurance between North River and Emhart was executed in New York, New York law applies to this dispute under the holding in *DeCesare*.

Even if the Court were to apply the interest weighing approach to the choice-of-law issue, instead of the *lex loci* rule, New York law would still govern. The simple fact is that at the time North River issued its policy to Emhart, there was no connection between North River, Emhart and Rhode Island. North River's policy was issued some sixteen years after the Centredale plant had ceased its operations and, at that time, neither the former Metro-Atlantic nor Crown Metro corporations was a part of Emhart.

At the time the North River policy was issued, North River was (and still is) a New Jersey corporation, which issued insurance through its New York broker to Emhart, which was (and still is) a Connecticut corporation. Although Emhart subsequently became a part of Black & Decker, Inc. and is headquartered in Maryland, when the North River policy was issued, Emhart was located in Connecticut. Even considering the location of the principal insured risk in an interest weighing analysis, Rhode Island would still not be an appropriate choice of law. At

the time the North River policy was in place, the principal risk was located in Connecticut, not in Rhode Island. North River's insured, Emhart Corporation, never operated the Centredale Site, as all operations ceased there some sixteen years prior to the issuance of the policy by North River. The tenuous connection to Rhode Island urged by Emhart is by virtue of Emhart's liability to the EPA as the corporate successor to Metro-Atlantic and Crown Metro, which North River could not have known about, or even predicted, in 1984.

Given these facts, there is no reason for the Court to revisit its choice-of-law ruling. The Court correctly applied New York law as the law of the state in which the insurance contract was executed. Even if the Court were to engage in an interest weighing analysis, New York would still have a more substantial interest in this dispute, based on the execution of the contract and location of the placing broker, than Rhode Island, which has no connection at all to the contractual relationship between Emhart and North River. There is no basis for the Court to conclude that this case was tried under the wrong state's law.

## III. EMHART IS NOT ENTITLED TO A NEW TRIAL OR JUDGMENT AS A MATTER OF LAW ON THE POLLUTION EXCLUSION ISSUE

There is no basis for Emhart to challenge the legal rulings made by the Court concerning the interpretation and application of the pollution exclusion contained in the North River policy. As embodied in the Court's instructions to the jury [Ex. C], those rulings reflect a careful analysis and application of controlling New York precedent as developed in a long line of cases including *Technicon Elec. Corp. v. Am. Home Assurance Co.,* 74 N.Y.2d 66, 73, 542 N.E. 2d 1048, 1049 (1989) (pollution exclusion is "unambiguously plain and operative" and bars coverage unless the release of the contaminants at issue is both "sudden and accidental"); *Powers Chemco, Inc. v. Federal Ins. Co.,* 74 N.Y.2d 910, 911, 548 N.E.2d 1301, 1302 (1989) (issues of intent to cause property damage and whether the policyholder was the actual polluter are

irrelevant); and *Northville Indus., Inc. v. Nat'l Union Fire Ins. Co.,* 89 N.Y.2d 621, 634, 679 N.E.2d 1044, 1048 (1997) (policyholder bears burden of proof on the "sudden and accidental" exception to the pollution exclusion). Emhart cannot point to any error in the Court's legal rulings, nor any basis upon which the Court should conclude that the jury erred in finding that Emhart failed to carry its burden of proof.

**A. The Court's Instructions to the Jury Were Correct**

There is no ground for Emhart to predicate a claim of error upon the Court's jury instructions with respect to the pollution exclusion issue. [Ex. C at 27-31]. Where a jury instruction is duly objected to, there is reversible error only if the instruction (i) is misleading, unduly complicating, or incorrect as a matter of law, and (ii) the error cannot be considered to be harmless. *Davignon v. Clemmey*, 322 F.3d 1, 9 (1st Cir. 2003); *Richards v. Relentless, Inc.*, 341 F.3d 35, 46 (1st Cir. 2003). The party claiming reversible error based upon a jury instruction must demonstrate that the charge was erroneous and that the error was prejudicial. *Federico v. Order of St. Benedict in R.I.*, 64 F.3d 1, 3 (1st Cir. 1995). In determining whether an instruction was prejudicial, the Court should review the record in its entirety. *Id.* Unless a jury instruction misleads the jury as to the correct legal standard or otherwise inadequately informs the jury of the controlling law, there is no error. *Id.* at 4; *see also Crigger v. Fahnestock & Co., Inc.*, 443 F.3d 230, 235 (2nd Cir. 2006). Further, an error is harmless unless it adversely affects the jury's deliberations. *Davignon*, 322 F.3d at 9-10; *Richards*, 341 F.3d at 48; *Allen v. Chance Mfg. Co., Inc.*, 873 F.2d 465, 469 (1st Cir. 1989). Where the jury's verdict or its answers to special questions make clear that its findings were not affected by any erroneous instruction, disturbing the verdict is not appropriate. *Id.* at 469-70.

The so-called "initial release instruction" given by the Court was fully in accord with New York law. The exception to the pollution exclusion applies only in limited situations involving "a discharge of the pollutant abruptly, precipitately or brought about in a short time." *Northville Indus. Corp. v. Nat'l Union Fire Ins. Co.,* 89 N.Y.2d 621, 632, 679 N.E.2d 1044, 1047 (1997). Under New York law, the focus of the pollution exclusion is on the original discharge of pollutants into the environment and not on any subsequent migration through the soil or groundwater. *See e.g., Rheem Mfg. Co. v. Home Indem. Co.,* 723 N.Y.S.2d 354, 354 (N.Y. App. Div. 2001); *Redding-Hunter, Inc. v. Aetna Cas. & Sur. Co.,* 615 N.Y.S.2d 133, 134 (N.Y. App. Div. 1994). The instruction given by the Court, which required Emhart to prove that an initial discharge of contaminants caused dioxin contamination, reflected an accurate construction and application of New York law. The instruction did not mislead the jury as to the correct legal standard or otherwise inadequately inform the jury of the controlling law. There was no error.

Emhart also argues that the Court's repetition of the "initial release instruction" in response to an inquiry from the jury seeking further clarification suggested to the jury that the pollution exclusion barred coverage [Tr. 10/19/06, pp. 6-9; Ex. D]. Had the instruction given by the Court been erroneous, repetition might have compounded any harm involved, but the instruction was a correct statement of the applicable law and did not mislead the jury. *See Gebhard v. United States*, 422 F.2d 281, 288 (9th Cir. 1970). Moreover, the Court did not merely repeat an instruction favorable to only one party in any way that might mislead the jury because the Court was responding to a request from the jury for clarification of the given instruction. *Id.* A judge's repetition to the jury of an instruction that correctly states the law is not reversible error. *Bluestein v. Groover*, 1991 U.S. App. LEXIS *1, 21 (9th Cir. 1991) (unpublished).

B. **The Court Correctly Interpreted New York Law**

While Emhart may wish it were not so, New York law was properly applied to the North River policy and the Court should reject Emhart's desperate attempt to distinguish settled New York precedent interpreting the pollution exclusion. Emhart has offered only the thinnest of support for its contention that the "initial release" jury instruction, which was given by the Court in accordance with the New York Court of Appeals' interpretation of the pollution exclusion, somehow caused "a result that conflicts with the policy language…." [Emhart's Motion at p. 5].

Inexplicably, Emhart principally relies upon a lone decision of the Appellate Division of the New York Supreme Court from 1978, *Farm Family Mut. Ins. Co. v. Bagley*, 409 N.Y.S.2d 294 (N.Y. App. Div. 1978). As later decisions have noted, *Farm Family* was "decided relatively early in the history of 'pollution exclusion' litigation and prior to a number of Federal and State decisions which expressly hold that the 'sudden and accidental' exception refers to accidental discharges and not accidental consequences." *Technicon Elecs. Corp. v. Am. Home Assurance Co.*, 533 N.Y.S.2d 91, 101 (N.Y. App. Div. 1988) (*explaining Farm Family*). As Emhart is grudgingly forced to admit, the *Farm Family* court's interpretation of the pollution exclusion clause has been questioned and challenged by numerous subsequent New York decisions. Indeed, since the decision in *Farm Family* proceeds from the premise that the "pollution exclusion" is "ambiguous," 409 N.Y.S.2d at 296 --a premise that is flatly inconsistent with the decisions of the Court of Appeals in *Technicon*, *Powers Chemco* and *Northville Industries*, it is hard to see how Emhart can possibly contend that *Farm Family* has any continued viability. Yet, in an effort to avoid the great weight of New York authority holding that the focus of the pollution exclusion is on the initial placement or discharge of wastes into the environment, Emhart invites this Court to follow *Farm Family's* discredited reasoning.

Recent New York precedent, including a case from the New York Court of Appeals, has made it abundantly clear that the focus of the pollution exclusion is only on the original discharge of pollutants into the environment, and not on their subsequent migration through the soil or groundwater. *See e.g., Rheem Mfg. Co. v. Home Indem. Co.,* 723 N.Y.S.2d 354, 354 (N.Y. App. Div. 2001) (coverage barred because eventual consequences after an initial discharge of pollutants is irrelevant); *Redding-Hunter, Inc. v. Aetna Cas. & Sur. Co.,* 615 N.Y.S.2d 133, 134 (N.Y. App. Div. 1994) (focus of exclusion is on the initial placement of the wastes into the environment, not when they subsequently migrated and leached out of the landfill). As the New York Court of Appeals made clear in *Northville:*

> The focus in determining whether the temporally sudden discharge requirement is met, for the purpose of nullifying the pollution coverage exclusion, is on the initial release of the pollutant, not on the length of time the discharge remains undiscovered, nor the length of time that damage to the environment continued as a result of the discharge, ***nor on the time span of the eventual dispersal of the discharged pollutant in the environment.***

*Northville*, 89 N.Y.2d 621 at 633, 679 N.E.2d at 1048 (1997) (emphasis added). Since the Court's instruction on the pollution exclusion closely followed this holding [Ex. C at 27-31], it is impossible to understand how Emhart can make a good faith claim that the instruction was erroneous, much less so far off the mark that a new trial or judgment in its favor is warranted.

Indeed, the passage from *Northville Industries* quoted above lays to rest Emhart's suggestion that the inclusion of the word "dispersal" in the exception to the exclusion somehow supports its theory that proof of a "secondary discharge" of pollutants due to a "sudden and accidental" release is sufficient for it to meet its evidentiary burden.[3] The Court of Appeals

---

[3] North River does not agree that there was proof at trial even of a "secondary discharge" of dioxin that was both "sudden and accidental" or that such a discharge caused new and identifiable property damage to a site that was already thoroughly contaminated.

clearly stated that the "eventual dispersal" of a pollutant that has been discharged to the environment by a means other than a "sudden and accidental" release is entirely irrelevant to the analysis and does not operate to restore coverage. Instead, the focus of the inquiry is solely upon whether the initial release or discharge of a pollutant into the environment was both "sudden and accidental."

This holding in *Northville* is entirely consistent with the earlier precedents of the New York Court of Appeals. For example, *Technicon* (a case which Emhart inexplicably cites for the principle that it did not disturb *Farm Family's* "construction of the discharge, dispersal, release or escape language") clearly held that the application of the pollution exclusion depends upon the initial placement of waste into the environment. "In our view, the logical and proper application of the pollution exclusion depends ***solely upon the method by which the pollutants entered the environment***." *Technicon*, 533 N.Y.S.2d at 103 (emphasis added) (*citing Jonesville Prods. v. Transamerica Ins. Group*, 156 Mich. App. 508, 512, 402 N.W.2d 46, 48 (1986) ["The pollution exclusion focuses on the release of pollutants"]).

In another attempted end-run around clear New York precedent, Emhart cites to several cases from other, irrelevant jurisdictions that have found that events after the initial discharge might be considered to be "sudden and accidental." Similar to *Farm Family*, and contrary to the holdings of the New York Court of Appeals, these courts generally found that the pollution exclusion clause at issue was ambiguous. *See Queen City Farms v. Cent. Nat'l Ins. Co.*, 126 Wn. 2d 50, 82, 882 P.2d 703, 721 (Wash. 1994) (holding that the term "sudden" is ambiguous and that the pollution exclusion provision essentially restates the "occurrence" definition); *Compass Ins. Co. v. City of Littleton*, 984 P.2d 606, 617 (Colo. 1999) (upholding a prior opinion that the

phrase "sudden or accidental" was ambiguous). Put simply, what courts in states that have held the pollution exclusion to be ambiguous have said about the secondary discharge issue is irrelevant here. The Court's instructions adhered to the decisions of the New York Court of Appeals. There was no error.[4]

### C. Emhart Cannot Show that There is No Evidence to Support the Verdict

Given the deficiencies in its legal arguments, Emhart attempts to distinguish controlling New York authority by contending that: (1) no dioxin initially reached the site as a result of intentional acts of Metro-Atlantic; (2) the evidence established that Emhart did not intentionally discharge any dioxin or contaminants containing dioxin; and (3) Emhart proved there were abrupt and accidental discharges of dioxin in fires and floods. If each of these statements were true, one wonders how Emhart lost the case.

Emhart manufactures a distinction without a difference in attempting to distinguish between NECC's barrel reconditioning activities at the Centredale Site (which it contends caused dioxin contamination at the Centredale Site) and the waste disposal activities of Metro-Atlantic. However, Emhart ignores the fact that the pollution exclusion provision does not require North River to show that the pollution to be remediated originated from Emhart's (or Metro-Atlantic's) operations. In *Powers Chemco, Inc. v. Federal Ins. Co.,* 74 N.Y.2d 910, 548 N.E.2d 1301 (1989), the New York Court of Appeals squarely rejected the argument that the pollution exclusion does not apply where someone other than the insured is alleged to have been the source of the contamination:

---

[4] All of the relevant issues and nuances of New York law concerning the pollution exclusion were fully briefed to the Court by North River, including in its "Renewed Motion for Summary Judgment" on the Pollution Exclusion dated August 11, 2006 [Dkt. No. 352] and in its proposed Jury Instructions, as revised and submitted to the Court on October 5, 2006, including authorities supporting North River's proposed instructions. North River incorporates these arguments and authorities by reference here.

> We also reject plaintiff's contention that since it was not the actual polluter, but merely inherited the problem from the prior landowner, the pollution exclusion clause cannot bar its present insurance claim. Simply put, there is nothing in the language of the pollution exclusion clause to suggest that it is not applicable when liability is premised on the conduct of someone other than the insured.

*Powers Chemco,* 74 N.Y. 2d at 911, 548 N.E.2d at 1302. *Accord Rosen v. CNA Ins. Co.,* 583 N.Y.S.2d 78, 79 (N.Y. App. Div. 1992) (insured's claim that he is not an "actual polluter" does not affect pollution exclusion analysis). Thus, even assuming that only NECC's activities caused the contamination (contrary to the evidence), this distinction is not relevant to the applicability of the pollution exclusion. Under the plain terms of the pollution exclusion contained in the North River policy, the only relevant issue is whether Emhart's liability arises out of "sudden and accidental" discharges or releases of pollutants or contaminants at the Centredale Site, not who caused them.

Moreover, as the evidence received at trial made clear, NECC was hardly a stranger operating next door to Metro-Atlantic. The intimate connection between NECC and Metro-Atlantic is apparent from the trial record.[5] Indeed, as Vincent Buonanno testified by deposition received at trial, NECC was actually formed to support the operations of Metro-Atlantic:

> So there came a time when it seemed logical for Metro-Atlantic to have some sort of a recycling operation, where containers were received in empty of raw materials could be cleaned up and put back in service to be shipped back out again. So the genesis of New England Container was kind of a captive operation where they could take containers which they were emptying everyday,

---

[5] Vincent Buonanno also testified that from its formation until approximately 1967, NECC was a corporate affiliate of Metro-Atlantic. [V. Buonanno Dep., 3/25/03 (read into record on September 18, 2006) at 12-14, 36-38 (Ex. E)]. Bernard Buonanno was a 50% stockholder of NECC and also served as the President of NECC and as a Supervisor and General Manager at Metro-Atlantic. [V. Buonanno Dep., 3/25/03 at 10, 14, 31 (Ex. E) Although he was the President of NECC, Bernard Buonanno's office was located at the Metro-Atlantic facility. [V. Buonanno Dep., 3/25/03 at 31 (Ex. E)].

> have them cleaned, and break down the-- at the end of the property in a barn and then to return them to be filled again for their own products going out.

[V. Buonanno Dep., 3/25/03 at 15-16 (Ex. E).] Similarly Joseph Nadeau was employed by both companies and described the relationship between Metro-Atlantic and NECC as incestuous:

> It was family. They were brothers that owned them, and it was incestuous to me. (Joseph Nadeau Tr. 9/15/06, p. 49) [Ex. F].

It was certainly permissible for the jury to infer from this testimony that Metro-Atlantic was well aware of the nature of the operations at NECC, including the routine dumping of chemicals onto the ground and the mass burnings that occurred in connection with the reconditioning operations. Thus, Emhart's argument that the operations at NECC are somehow divorced from the conduct of Metro-Atlantic is contrary to the trial record.

Emhart also contends that the jury's determination that Emhart (or its predecessors) did not expect or intend the dioxin contamination at the Centredale Site [Jury Verdict, Q. 1; Ex. A] somehow requires that the jury's finding that Emhart's claim was barred by the North River pollution exclusion be set aside. Emhart is conflating two different concepts. The decisions in *Powers Chemco*, *Technicon* and *Northville Industries* make it clear that the policyholder's or polluter's "intent" to cause property damage is legally irrelevant; all that matters is whether the discharge was both "sudden" (temporally abrupt) and "accidental" (not routine). There is nothing at all inconsistent about the jury's determination that Emhart did not subjectively expect property damage to result from its operations at the Centredale Site and its simultaneous finding that the dioxin contamination did not result from an identifiable "sudden and accidental" discharge of pollutants. They are two different things.[6]

---

[6] Emhart contended throughout the trial that the employees of Metro-Atlantic did not even know that they were using materials that contained dioxin in the hexachlorophene manufacturing

As an initial matter, for Emhart to contend that the evidence established that Metro-Atlantic did not intentionally discharge any dioxin or contaminants containing dioxin is certainly a sanguine description of the trial record. To the contrary, the testimony included multiple and corroborating descriptions of both Metro-Atlantic's and NECC's routine and intentional disposal of chemicals as part of their routine business operations. By way of example only:

- "Barrels also came from the Metro-Atlantic plant. Some of these barrels were filled with a black sludge which came from the Metro-Atlantic presses. The sludge was taken to the landfill located below the New England Container plant and dumped, and then the barrels were reconditioned." (Raymond Nadeau Tr. 9/15/06, p. 72) [Ex. G].

- Raymond Nadeau personally observed Metro-Atlantic trucks down at the landfill and Metro-Atlantic drivers dumping barrels at the landfill. (Raymond Nadeau Tr. 9/15/06, pp. 73-74) [Ex. G]. Barrels containing black sludge came from Metro-Atlantic and were dumped behind the NECC building a few times a week. (Raymond Nadeau Tr. 9/15/06, p. 79) [Ex. G]. Mr. Nadeau's brother-in-law would beep the horn as he was taking the barrels containing black sludge from Metro-Atlantic to the landfill. (Raymond Nadeau Tr. 9/15/06, pp. 80-81) [Ex. G].

- With respect to Metro-Atlantic's routine business operations, Joseph Nadeau described how the chemicals would erode the pipes and drip or spill during transfer. This raw chemical product ended up on the floor. As Mr. Nadeau described it, the employees of Metro-Atlantic would hose down and wash the spilled chemicals into a French drain that emptied directly into the tail race section of the river. There was no question in Mr. Nadeau's mind that the raw materials deposited into the French drain were not going to the municipal sewer. (Joseph Nadeau Tr. 9/15/06, pp. 23, 27, 28, 30, 32, 33) [Ex. F].

---

process. Whether that was true or not, the subjective state of knowledge of Metro-Atlantic employees is entirely irrelevant to the question of whether the contamination resulted from a "sudden and accidental" release.

- David Carbone described the dump on the side of the barrel shop and, in particular, a substance similar to play-dough rubber which was described as " ... sediment, sludge that was in the barrels....So if they put one there and it was leaking and there was sludge in it, they'd just throw that in the dump, the barrel and the sludge." (David Carbone Tr. 10/4/2006, pp. 6-8) [Ex. H].

- Kenneth Neri remembered a pipe that protruded from the river bank along the side of the Metro-Atlantic plant. Every day between 1963 and 1968, chemicals would pour from the pipe directly into the river. (Kenneth Neri Tr. 10/6/06, pp. 9-11) [Ex. I].

- John Turcone, a former Metro-Atlantic employee, explained that the metal pipe leading from the Metro-Atlantic building to the river (as similarly described by Kenneth Neri) had to be replaced regularly because it corroded and deteriorated as a result of the chemicals that were being discharged through the pipe. (John Turcone Tr. 9/18/06, pp. 14-15). [Ex. J].

Similarly, NECC's routine and intentional emptying and incineration of thousands of barrels of chemicals at the Centredale Site can hardly be characterized as either "sudden" or "accidental." Emhart's own expert, Dr. Hass, testified that NECC's routine business practices (barrel and residue incineration) resulted in a discharge of dioxin. Dr. Hass testified that during the 20 years or so that New England Container's barrel incineration facility was in operation, hundreds of thousands of barrels were put through the incinerator, and chemical residue in the barrels was dumped in the fire pit. (James Hass Tr. 10/3/06, pp. 78-81) [Ex. K]. Dr. Hass concluded, "[a]nd through the combustion and disposal of waste associates with that, the TCDD found on the site would have originated from the New England Container operation." (James Hass Tr. 9/27/06, p. 126) [Ex. L]. According to Dr. Hass, there were fires in the NECC barrel incineration pit "all the time." (James Hass Tr. 10/3/06 p. 80). [Ex. K]. To the extent that Emhart attempted to establish at trial that the dioxin contamination at the Centredale Site resulted

from the routine burning and fires at NECC, Emhart simply demonstrated why the pollution exclusion bars its claim: routine fires are, by definition, not "sudden and accidental" discharges.[7]

Dr. Hass was forced to admit that the type of dioxin contaminating the Centredale Site was the ***exact same type*** of dioxin that was contained in the hexachlorophene shipped to Metro-Atlantic from Diamond Alkali. (James Hass Tr. 10/3/06, pp. 88, 107-108). [Ex. K]. Moreover, Dr. Woodard explained that the process of manufacturing hexachlorophene produced dioxin as a waste product which would resemble oatmeal in terms of consistency and would be brownish to black in color. (Franklin Woodard Tr. 10/6/06, pp. 48, 51). [Ex. M]. Dr. Woodard further identified 2, 3, 7, 8 dioxin as the primary constituent of the waste material created when crude trichlorophenol is distilled into hexachlorophene (Franklin Woodard Tr. 10/6/06, p. 52). [Ex. M]. Dr. Woodard's testimony is consistent with other witnesses' testimony describing the waste byproduct regularly hauled from Metro-Atlantic and dumped behind NECC.

These types of routine, on-going, or continuing discharges occurring over a period of time are not "sudden," nor can they be considered to be an "accident." *See Ogden Corp. v. Travelers Indem. Co.,* 924 F.2d 39, 42 (2nd Cir. 1991); *State of New York v. AMRO Realty Corp.,* 936 F.2d 1420, 1428-1429 (2nd Cir. 1991); *Borg-Warner Corp. v. Ins. Co. of N. Am.,* 577 N.Y.S.2d 953, 957-958 (N.Y. App. Div. 1992); *County of Fulton v. U.S. Fid. & Guar. Co.,* 600 N.Y.S.2d 972, 974 (N.Y. App. Div. 1993) (disposal over the course of a number of years was not sudden).

---

[7] As the Court will recall, North River objected to Dr. Hass being permitted to offer these opinions on the grounds that they had not been disclosed in his expert reports. [James Hass Tr. 9/27/06, pp. 129-131; Ex. L]. However, to the extent that the Court permitted the testimony over North River's objections, Emhart can hardly claim that the jury's evident reliance upon this testimony to conclude that the dioxin contamination did not result from a "sudden and accidental" event supports a claim of error.

Even apart from the fact that New York law focuses exclusively on the initial release of the contaminants (and not any subsequent dispersal or whether the policyholder had an expectation of damage), Emhart failed to produce evidence of any causal connection between its hypothetical theories and a significant quantity of the dioxin contamination at the Centredale Site as required by *Northville,* 89 N.Y.2d at 634, 679 N.E.2d at 1048. As the New York Court of Appeals made clear in *Northville,* New York law mandates that there be a causal link between the discharge of the pollutant and the environmental damage for which the policyholder is being held liable. *Id.*

Emhart merely offered speculation that certain "high water" events and fires may have either caused a release or further distributed the contamination. Emhart's expert, John Kastrinos, testified: (1) as to how dioxin would be transported or move through the environment; and (2) how the amount of dioxin detected at the Site in 1999 and thereafter compared with what was on the Site between 1968 and 1985. (John Kastrinos Tr. 9/20/06, p. 191) [Ex. N]. In particular, Mr. Kastrinos testified:

- "Basically, during rainfall, particularly heavy rainfall, as the soil particles are picked up just from the intensity of the rainfall, some of those materials get entrained in the water, which, again, runs off the land surface and typically seeks out lower ground, usually surface waters, wetlands, streams, rivers, lakes. So by this mode, dioxins traveling, essentially, attached to the soil particles will move entrained in that run-off. If you could see the run-off, it would look muddy, basically. If you've ever seen water running off a construction site, for example, that might give you a picture of what this would look like." (John Kastrinos Tr. 9/19/06, pp. 93-94) [Ex. N].

- "I have developed an opinion that dioxins have moved from the land portion of the site to the water over time by erosion and transport and run-off. Secondly, and this will become clearer with subsequent slides, in general, the dioxin concentrations declined with increasing depth below ground surface. So in the first case, it follows that there is less dioxin by weight, less mass of dioxin in 1999 on the land than back in 1968 because of the mass of what

has been transferred from the land to the water. So there's less on the land, more on the water. Secondly, because, in general, the higher dioxin concentrations have been found at shallow depths, it follows that the concentrations that would have been present historically during the operation of Metro-Atlantic and New England Container, would have been approximately as high or perhaps slightly higher than the concentrations that were detected in 1999, because, again, the shallowest of the soils are those that will be eroded and transported." (John Kastrinos Tr. 9/20/06, p. 121) [Ex. N].

- "As mentioned previously, the highest concentrations include what's been identified as the former dump area to the south of New England Container, which is right here. Sort of due east of the New England Container buildings, there are concentrations that are fairly high right here, in excess of one hundred parts per billion. In the area of the Metro-Atlantic buildings, concentrations are lower. The highest concentration being in the vicinity of the former hexachlorophene building, right here. The highest concentration in that little cluster of samples you see there was approximately four parts per billion." (John Kastrinos Tr. 9/20/06, p. 140). [Ex. N].

Mr. Kastrinos' analysis and testimony is subject to the following qualifications: there is no data on what the dioxin concentrations were at any level of the Site during the '60's, '70's, '80's or any time prior to 1999 (John Kastrinos Tr. 9/20/06, p. 145); Kastrinos was not asked to determine a source of the dioxin contamination at the site (John Kastrinos Tr. 9/20/06, p. 147); Kastrinos could not approximate the date when dioxin was first introduced to the soils at the Centredale Site (John Kastrinos Tr. 9/20/06, p. 146); Kastrinos could not precisely determine what portion of the site was flooded on any given date (John Kastrinos Tr. 9/20/06, p. 170); Kastrinos did not quantify whether there was two feet of standing water on the site during any flood event or any other specific amount (John Kastrinos Tr. 9/20/06, p. 171); Kastrinos could not quantify how much soil moved during any of the flood events (John Kastrinos Tr. 9/20/06, p. 171); and Kastrinos could not opine as to the quantity of soil that moved in a specific calendar year at the Centredale Site due to erosion or other events. (John Kastrinos Tr. 9/20/06, p. 190) [Ex. N]. Accordingly, even if the Court were to conclude that Emhart had satisfied some

minimal threshold showing of "sudden and accidental" events that contributed to contamination at the Centredale Site, the jury could have just as easily concluded that Mr. Kastrinos' testimony was so riddled with significant gaps in the data that it had little (if any) probative value. The jury was not required to accept whatever theory Mr. Kastrinos put forth and there is no legal basis for the Court to rule that the jury was obligated to accept his theories which, in any event, did not relate to any claimed initial release of dioxin containing materials.

Indeed, Mr. Kastrinos' testimony is directly contrary to Emhart's suggestion that a flood, fire or explosion caused the initial release of dioxin at the Centredale Site. Mr. Kastrinos expressly agreed that the dioxin being transported was released or discharged from some facility and got into the soil, but that any flood event did not cause the dioxin to be discharged into soil in the first place (John Kastrinos Tr. 9/20/06, p. 173) [Ex. N]. ***In other words, the soil was already contaminated when it moved.*** (John Kastrinos Tr. 9/20/06, p. 174) [Ex. N]. Moreover, Mr. Kastrinos did not calculate the volume of dioxin that moved at any particular time or in relation to any particular event, including the flood events offered by Emhart to explain the dioxin contamination, nor did he measure the quantity of dioxin that was transported during any of the flood events. (John Kastrinos Tr. 9/20/06, pp. 172 and 219) [Ex. N]. Thus, Emhart utterly failed to make out a case that an appreciable quantity of the dioxin contamination resulted from any such event, as required by *Northville*.[8]

---

[8] Mr. Kastrinos' testimony illustrates the dilemma that Emhart confronted at trial by simultaneously attempting to establish coverage under all of the policies at issue. Under any concept of Rhode Island's trigger theory, Emhart had to show that dioxin contamination was present at the Centredale Site not later than 1969, which Mr. Kastrinos readily conceded. (John Kastrinos Tr. 9/19/06, p. 17 and John Kastrinos Tr. 9/20/06, pp. 121, 176, 191)[Ex. N]. Since the Centredale Site was already contaminated by not later than 1969 and no new dioxin was introduced to the site after that date, any subsequent movement by means of an alleged "flood" event was of soil that was already contaminated. Mr. Kastrinos never testified that he had a

To the extent that Emhart attempted to rely upon evidence concerning other alleged "events" (e.g., the August 1972 fire), Emhart produced no documents or other evidence to establish: (1) what materials were at the Centredale Site at the time of the fires or floods (some of which occurred years after active operations had ceased); (2) what chemicals were in the barrels that were damaged in any fire; (3) what quantity (if any) of dioxin was produced in any fire; (4) what quantity (if any) of dioxin migrated to soil, groundwater or the sediments of the Woonasquatucket River due to any such events; or (5) any other information that would establish a causal link between any of these events and a substantial release of dioxin. Although Dr. Hass referred to the routine fires at NECC as having generated dioxin, [James Hass Tr. 9/2706, p. 126; Ex. L] he never purported to offer an opinion on where the dioxin generated in any such fires went. In particular, he did not offer an opinion that any dioxin released in these routine fires went into the ground, rather than being in large part consumed during the fire. Further, Emhart's reliance upon certain alleged "explosions" at the Centredale Site, reported either by former employees or in newspaper accounts suffers from the very same deficiencies: there is nothing linking these events (from a causal perspective) to the dioxin contamination at issue.[9]

The common theme that emerges from Emhart's expert and fact witnesses was that not one single witness could tie any alleged "sudden and accidental" event to the dioxin contamination at the Centredale Site. In the absence of documents and testimony demonstrating that dioxin was discharged to the Centredale Site during the course of any of these events, it was not open to the jury to infer or speculate that a fire or flood event ***may*** have resulted in

---

scientific basis to opine that any such event caused entirely new contamination or property damage.

[9] For example, the explosion described by Joseph Nadeau was of a tank containing methanol, not any materials that contained dioxin. (Joseph Nadeau Tr. 9/15/06, pp. 29-30) [Ex. F].

contamination. Clearly, the jury were not ***obligated*** to do so and there is no basis for Emhart to claim that their rejection of any of the theories put forward by Emhart requires a new trial or the entry of judgment in favor of Emhart as a matter of law.

## IV. THE COURT'S EXCLUSION OF CERTAIN EVIDENCE WAS NOT ERRONEOUS

There is no reason for the Court to order a new trial based upon its decision to preclude Emhart from introducing into evidence certain newspaper articles [Plaintiff's Exhibits 113, 115, 117, 119, 120, 123, 124] that describe fires or other events. In addition to having no relevance to the issues that were in dispute at the trial, the articles are replete with multiple levels of hearsay. The Court carefully considered Emhart's position on any number of occasions before and during the trial. There is no reason to revisit the issue now.

The articles date back to the 1960's and recount certain explosions, fires and floods that Emhart alleges occurred at or near the Centredale Site. However, as the Court noted on October 3, 2006, one of the articles related to flooding in another part of Rhode Island. (James Hass Tr. 10/3/06, p. 126) [Ex. K]. Another article described a hexachlorophene tank explosion that Emhart's own experts admitted was not relevant to the contamination at the Centredale Site. [Ex. O].

The articles were not relevant to the "pollution exclusion" issue because the articles could not assist Emhart in establishing a causal link between any of the events described in the articles and the dioxin contamination at the Centredale Site. Nothing in the articles related to any alleged release of dioxin-containing materials. There is no dispute that the articles describe certain historical events that occurred over the years, such as the August 1972 fire and a number of flood events that impacted Rhode Island. However, each of these facts were either uncontested by North River or introduced by Emhart's own expert and fact witnesses during the

trial. The articles were nothing more than superfluous and dramatic news accounts that Emhart sought to introduce in an effort to generate juror confusion.

Moreover, the articles included multiple levels of inadmissible hearsay under Fed.R.Evid. 801(c) (quotes and other statements from named and unnamed witnesses including police officers, fire fighters and anonymous residents of the area). The mere fact that the articles are over twenty years old does not remedy the dangers of faculty perception that the hearsay rule is meant to remedy. Neither the reporters nor the declarants testified at trial to verify and corroborate their out-of-court statements or the descriptions in the articles.

In summary, these articles are merely vivid news accounts that describe the events for the benefit of the newspaper's readers, but which do not provide any evidence that the events actually resulted in the release of dioxin contamination that the EPA is requiring Emhart to investigate and remediate. Given the graphic descriptions of events that were not disputed at trial, the articles could have been excluded on the grounds that they were unfairly prejudicial to North River under Fed.R.Evid. 403.

Put simply, the issue in dispute at the trial was the environmental significance of these sudden events and the articles contained no evidence that was helpful to the jury. In the absence of a causal connection between any of the events and the dioxin contamination, whether the articles describe "significant" events is similarly not pertinent to the pollution exclusion issue. Merely noting that the articles are ancient documents that are not sensationalistic, as Emhart does in its Renewed Motion, oversimplifies the hearsay issues and ignores the fact that the articles lend no proof of a "sudden and accidental" discharge of pollutants that were a substantial cause of the pollution at the Centredale Site. Emhart's Motion fails to point to any specific and significant fact that was ***only*** available by means of the newspaper articles. At best, they were

cumulative of other evidence received at trial and it was entirely within the Court's discretion under Fed.R.Evid. 401 to exclude this evidence. There was no error in excluding the newspaper articles, and therefore, Emhart is not entitled to judgment as a matter of law or a new trial on the issues relating to North River.[10]

## CONCLUSION

The trial of this case was long; it was also fair to all parties. The jury's determination should be respected. Emhart's Motion should be denied and a Final Judgment should be entered in favor of North River.

**THE NORTH RIVER INSURANCE COMPANY,**
By its attorneys,
/s/ Mark T. Nugent
Mark T. Nugent, RI Bar# 2637
MORRISON MAHONEY LLP
121 South Main Street, Suite 600
Providence, RI 02903-7141
(401) 331-1660

/s/ John T. Harding, Jr.
John T. Harding, Jr., *pro hac vice*
MORRISON MAHONEY LLP
250 Summer Street
Boston, MA 02210-1181
(617) 439-7500

**Dated: January 12, 2007**

---

[10] North River incorporates by reference its Motion *In Limine* to Preclude Emhart from Introducing Newspaper Articles into Evidence filed with the Court on September 13, 2006 (Dkt. No. 431).

**CERTIFICATE OF SERVICE**

I hereby certify that foregoing has been filed through the ECF system, and will be sent electronically to all registered participants. I further certify that paper copies will be sent to any counsel who are not able to receive electronic copies.

/s/ Mark T. Nugent

Mark T. Nugent

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| EMHART INDUSTRIES, INC.<br><br>Plaintiff,<br><br>v.<br><br>HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, LIBERTY MUTUAL INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICA INSURANCE COMPANY and UNITED STATES FIRE INSURANCE COMPANY<br><br>Defendants. | C.A. No. 02-53S |

**JURY VERDICT FORM**

1. Did Metro-Atlantic expect or intend to cause property damage from dioxin contamination?

YES or NO: No.

**If your answer is YES, do not answer any other Questions.**

**If your answer is NO, proceed to Question 2.**

2. With respect to the Century Primary, Century Excess, and OneBeacon policies, was dioxin contamination discoverable in the exercise of reasonable diligence during the policy periods?

YES or NO: No.

**If your answer is YES, proceed to Question 3.**

**If your answer is NO, do not answer Question 3; instead, proceed directly to Question 4.**

3. With respect to the Century Excess policy, does the exclusion in endorsement 6 bar coverage for property damage from dioxin contamination?

YES or NO: ________

**Proceed to Question 4.**

4. With respect to the North River policy, did dioxin contamination cause actual property damage at the site during the policy period?

YES or NO: Yes.

**If your answer is YES, proceed to Question 5.**

**If your answer is NO, do not answer Question 5.**

5. With respect to the North River Policy, does the pollution exclusion bar coverage?

YES or NO: Yes.

**END.**

Signature of Foreperson ________________

Date: October 19, 2006

# EXHIBIT B

CLOSING ARGUMENTS

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
* * * * * * * * * * * * CIVIL ACTION
EMHART INDUSTRIES       * NO. 02-053S
                        *
VS.                     * OCTOBER 17, 2006
                        *
HOME INSURANCE CO.      *
* * * * * * * * * * * * PROVIDENCE, RI
```

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH
DISTRICT JUDGE
(CLOSING ARGUMENTS and OBJECTIONS TO JURY INSTRUCTIONS)

APPEARANCES:

FOR THE PLAINTIFF:

JACK PIROZZOLO, ESQ. and
RICHARD L. BINDER, ESQ.
Foley & Hoag LLP
Seaport World Trade Center West
155 Seaport Blvd.
Boston, MA 02110-2600
(617) 832-1250

FOR THE DEFENDANT
North River:

JOHN T. HARDING, ESQ.
Morrison, Mahoney, LLP
250 Summer Street
Boston, MA 02210
(617) 439-7558

MARK T. NUGENT, ESQ. and
MICHAEL T. FARLEY, ESQ.
Morrison, Mahoney, LLP
121 South Main Street
Suite 600
Providence, RI 02903
(401) 331-4660

FOR THE DEFENDANT
Century Indemnity:

LAWRENCE A. NATHANSON, ESQ.
Siegal, Napierkowski & Park
533 Fellowship Road
Suite 120
Mt. Laurel, NJ 08054
(856) 380-8900

□

2

APPEARANCES: (Continued)

them to the gauge height. So you take the -- you start with 93, and then you add to 93 and you can compare that. If anyone has gone hiking or whatever, that's just like the Appalachian Mountain guide map, which shows the elevations of different levels. Each one of these lines is marked with a number. And that line represents that elevation. For example, at the top, you'll see 95 and 97. And they're close together. That means that's kind of the bank of the river. So they're close together means it's going up quickly. You'll see you've got a 97, got a 97, there's a 96, 98, so you can do your own calculation in making a comparison between the gauge height bearing in mind 93 is your base.

I think I'm probably out of time.

THE COURT: Two minutes.



MR. PIROZZOLO: Two minutes. So I will leave this to your good judgment. If we could just quickly show Slide 112. 112 is the North River pollution exclusion. And what we've highlighted there is the language, but this exclusion does not apply if such discharge, dispersal, release, or escape is sudden and accidental. I don't think I have time to review the testimony on that, but I am confident, ladies and gentlemen, you'll remember the testimony and look at the exhibits very carefully and do a conscientious job of understanding this relatively complicated case and applying that understanding to the disputed issues to render a fair and just verdict.

I just, again, thank you on behalf of Emhart, and myself, and our team of lawyers who worked on the case. Thank you.

THE COURT: All right. Thank you, Mr. Pirozzolo.

MR. PIROZZOLO: Thank you, your Honor.

THE COURT: All right. Ladies and gentlemen, why don't we take a brief break. I'm going to keep it at ten minutes. I'm going to keep this thing moving so you can get into the jury room and get some real work done today. So, Charlie, show the jury out, please.

(Proceedings out of the presence of the jury as

53

follows:)

THE COURT: Keep it to ten minutes.

(Short recess.)

(Proceedings in the presence of the jury as follows:)

THE COURT: All right. Ladies and gentlemen, now we'll hear closing arguments by the defendants. As I indicated to you, each defendant has one half-hour. All right. Mr. Nathanson?

MR. NATHANSON: Good morning. It's been a while since the opening arguments so let me introduce myself again. My name is Larry Nathanson, and I represent Century Indemnity Company. Century is a successor to Insurance Company of North America or INA. And at issue in this case are two liability insurance policies that INA issued to Crown-Metro, Inc, in 1969. The first is a primary policy, the limits of which are

**EXHIBIT C**

**Duty of Jury to Find Facts and Follow Law**

Members of the jury, now that you have heard all the evidence and the arguments of the attorneys, it is my duty to instruct you on the law that applies to this case.

It is your duty to find the facts from all the evidence in the case. To those facts you will apply the law as I give it to you. You must follow the law as I give it to you whether you agree with it or not. You must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy. That means that you must decide the case solely on the evidence before you. You will recall that you took an oath promising to do so at the beginning of the case.

In following my instructions, you must follow all of them and not single out some and ignore others; they are all equally important. Also, you must not read into these instructions or into anything the court may have said or done as giving any suggestion as to what verdict you should return - that is a matter entirely up to you.

You should not worry about memorizing or writing down all of the instructions as I state them, because I will send into the jury room a written copy of my instructions. However, you must know that the law is as I will give it to you from the bench; the written copy is merely a guide to assist you.

## What Is Evidence

The evidence from which you are able to decide what the facts are consists of:

1. the sworn testimony of witnesses;
2. the exhibits which have been received into evidence; and
3. any facts to which the lawyers have agreed or stipulated or which I have instructed you to find.

## What Is Not Evidence

Certain things are not evidence, and you may not consider them in deciding what the facts are. I will list them for you:

1. Arguments and statements by lawyers are not evidence. The lawyers are not witnesses. What they have said in their opening statements and closing arguments, and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory controls.

2. Questions and objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence. You should not be influenced by the objection or by the court's ruling on it.

3. Testimony that has been excluded or stricken, or that you have been instructed to disregard, is not evidence and must not be considered.

4. Anything you may have seen or heard when the court was not in session is not evidence. You are to decide the case solely on the evidence received at trial.

## Direct and Circumstantial Evidence

Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact, such as the testimony of an eye witness. Circumstantial evidence is proof of one or more facts from which you could find another fact.

You should consider both kinds of evidence. As a general rule, the law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any evidence.

Direct evidence can prove a material fact by itself. It does not require any other evidence. It does not require you to draw any inferences. A witness's testimony is direct evidence when the witness testifies to what he or she saw, heard, or felt. In other words, when a witness testifies about what is known from his or her own personal knowledge by virtue of his or her own senses, what he or she sees, touches, or hears-that is direct evidence. The only question is whether you believe the witness's testimony. A document or physical object may also be direct evidence when it can prove a material fact by itself, without any other evidence or inference. You may, of course, have to determine the genuineness of the document or object.

Circumstantial evidence is the opposite of direct evidence. It cannot prove a material fact by itself. Rather, it is evidence

that tends to prove a material fact when considered together with other evidence and by drawing inferences. There is a simple example of circumstantial evidence that I used at the beginning of this trial that you may recall.

Assume that when you got up this morning it was a nice, sunny day. But when you looked around you noticed that the streets and sidewalks were very wet. You had no direct evidence that it rained during the night. But, on the combination of facts that I have asked you to assume, it would be reasonable and logical for you to infer that it had rained during the night.

Not all circumstantial evidence presents such a clear compelling inference; the strength of the inferences arising from circumstantial evidence is for you to determine. It is for you to decide how much weight to give to any evidence.

Inferences from circumstantial evidence may be drawn on the basis of reason, experience, and common sense. Inferences may not, however, be drawn by guesswork, speculation, or conjecture.

The law does not require a party to introduce direct evidence. A party may prove a fact entirely on circumstantial evidence or upon a combination of direct and circumstantial evidence. Circumstantial evidence is not less valuable than direct evidence.

You are to consider all the evidence in the case, both direct and circumstantial, in determining what the facts are, and in arriving at your verdict.

## Deposition Testimony

Some of the testimony before you was presented in the form of depositions which have been received into evidence. A deposition is a procedure whereby a lawyer for a party questions a witness under oath in the presence of a court stenographer. You may consider the testimony of a witness at a deposition according to the same standards you would use to evaluate the testimony of a witness at trial.

## Credibility of Witnesses

In deciding the facts of this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it at all. In considering the testimony of any witness, you may take into account:

1. the opportunity and ability of the witness to see or hear or know the things testified to;
2. the witness' memory;
3. the witness' manner while testifying;
4. the witness' interest in the outcome of the case and any bias or prejudice the witness may have;
5. whether other evidence contradicted the witness' testimony and/or whether the witness' own testimony was consistent; and
6. the reasonableness of the witness' testimony in light of all the evidence.

**Witness - Impeachment - Prior Statements**

In assessing the credibility of a witness, you may also consider whether, on some prior occasion, the witness made statements that contradict the testimony he or she gave at the time of trial. If you conclude that a witness did, at some prior time, make statements that were materially different from what the witness said during this trial, you may take this into account in assessing the credibility of such witness, or determining the weight that you will give to such witness's testimony.

**Witnesses - Number - Weight of Testimony**

In evaluating the testimonial evidence, remember that you are not required to believe something to be a fact simply because a witness has stated it to be a fact and no one has contradicted what that witness said. If, in the light of all of the evidence, you believe that the witness is mistaken or has testified falsely or that he or she is proposing something that is inherently impossible or unworthy of belief, you may disregard that witness' testimony even in the absence of any contradictory evidence.

You should also bear in mind that it is not the number of witnesses testifying on either side of a particular issue that determines where the weight of the evidence lies. Rather, it is the quality of the witnesses' testimony that counts.

Thus, just because one witness testifies on one side of an issue and one witness testifies on the other side does not necessarily mean that you must consider the evidence evenly balanced. If you feel that one of the witnesses was more credible than the other, for whatever reason, you may find that the weight of the evidence lies on the side of that witness.

Similarly, just because there may be more witnesses testifying on one side of an issue than on the other does not mean that the weight of the evidence lies in favor of the greater number of

witnesses. Once again, it is the credibility or quality of the testimony that determines where the weight of the evidence lies.

**Witnesses - Expert Witnesses**

During this trial, you have heard testimony from witnesses who claim to have specialized knowledge in a technical field. Such persons are sometimes referred to as expert witnesses. Because of their specialized knowledge, they are permitted to express opinions which may be helpful to you in determining the facts.

Since they do have specialized knowledge, the opinions of expert witnesses, whether expressed personally or in documents which have been admitted into evidence, should not be disregarded lightly.

On the other hand, you are not required to accept such opinions just because the witnesses have specialized knowledge.

In determining what weight to give to the testimony of a so-called expert witness, you should apply the same tests of credibility that apply to the testimony of any other witness. That is to say, you should consider such things as the witness':

-- opportunity to have observed the facts about which he or she testified; and

-- apparent candor or lack of candor.

In addition, you should take into account the witness':

-- qualifications, especially in comparison to the qualifications of expert witnesses who may have expressed contrary opinions;

-- the accuracy of the facts upon which the witness's opinions were based; and

-- the reasonableness of the rationale upon which the expert's opinions are based.

In short, you should carefully consider the opinions of expert witnesses, but they are not necessarily conclusive.

## Corporations

The law makes no distinction between corporations and private individuals, nor does it distinguish between the size or type of business in which a corporation engages. All persons, including corporations, stand equal before the law and are to be dealt with as equals in this case. The corporate defendant in this case is entitled to the same fair and unprejudiced treatment as an individual would be under like circumstances, and you should decide the case with the same impartiality you would use in deciding a case between individuals.

At all times, you should consider treating this matter as an action between persons of equal standing in the community, of equal worth and holding the same or similar stations in life or in the community. Corporations act through their agents and employees.

**The Relationship Between NECC and Metro-Atlantic**

In considering the issues you must decide in this case, you may consider the evidence that you have heard regarding the conduct of and relationship between New England Container Company ("NECC") and Metro-Atlantic.

**Patents**

You have heard testimony regarding various patents and these patents have been received into evidence. A patent is granted by the United States Patent and Trademark Office based upon an application filed by the named inventor. U.S. patent law states that an application must include a signed oath by the inventor "that believes himself to be the original and first inventor of the process, machine, manufacture, or composition of matter, or improvement thereof, for which he solicits a patent." Further, under the patent laws of the United States, a person is not entitled to a patent where "the invention was . . . in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States."

**Burden of Proof**

The law imposes on the Plaintiff the responsibility or burden of proving its claim. It is not up to the Defendant to disprove the claim. Furthermore, the Plaintiff must prove the things it claims by what is called a fair preponderance of the evidence, which I will shortly define in more detail.

In turn, where I instruct you in these instructions that the Defendant has a burden of proof with respect to an asserted defense, the Defendant's burden is also by a preponderance of the evidence.

**Burden of Proof - Fair Preponderance**

As I have just told you, the burden of proof in this case is on the Plaintiff who is making the claim in this case, and in a few minutes I am going to describe in detail just what the Plaintiff must prove in order to prevail on its claim. I will also tell you what the Defendants must prove to succeed in asserting a particular defense.

The Plaintiff must prove its claim by what the law refers to as "a fair preponderance of the evidence" which is another way of saying that the party must prove them by "the greater weight of the evidence."

To put it another way, you must be satisfied that the evidence shows that what the party making a claim is claiming is "more probably true than not."

Do not confuse the burden of proving something by a fair preponderance of the evidence with the burden of proving something beyond a reasonable doubt. As most of you probably know or have heard, in a criminal case the prosecution must prove the defendant is guilty beyond a reasonable doubt. That is a very stringent standard of proof. However, this is not a criminal case. Therefore, in order to prevail, the Plaintiff need not prove its claim beyond a reasonable doubt; it need only prove it by a fair preponderance of the evidence.

Perhaps the best way to explain what is meant by a fair preponderance of the evidence is to ask you to visualize an old fashioned scale with two counter balancing arms and use it to mentally weigh the evidence with respect to the claim being made by the Plaintiff.

If, after you have heard all the evidence relevant to the claim, you determine that the scale tips in favor of the Plaintiff, no matter how slightly it may tip, then the Plaintiff has sustained its burden of proving that particular claim to you by a fair preponderance of the evidence because it has made the scale tip in its favor.

If, on the other hand, you determine that the scale tips in favor of the Defendant, or that the scale is so evenly balanced that you cannot say whether it tips one way or the other, then the Plaintiff has failed to prove its claim by a fair preponderance of the evidence because it has not made the scale tip in its favor.

**Specific Claims**

I am now going to instruct you on the specific law that applies to this case. The law will guide you as to the factual determinations you must make. You must accept the law that I give you, whether you agree with it or not.

In this case, Emhart has the burden of proving by a fair preponderance of the evidence the facts necessary to establish its claims for coverage under its insurance policies. On the other hand, Defendants Century, OneBeacon, and North River have the burden of proving by a fair preponderance of the evidence all of the facts necessary to establish any exclusion to coverage. An exclusion to coverage is a policy term that removes from coverage some types of losses that policies otherwise cover. My instructions to you will flow logically. First, I will instruct you on Emhart's claims concerning coverage. Then, I will instruct you on the law concerning any exclusions to coverage, and also any exceptions to these exclusions.

## Occurrence

Now, with respect to the question of Trigger of Coverage, remember that I told you that Emhart must prove that property damage was caused by an occurrence. An occurrence is defined as "an accident, including injurious exposure to conditions, which results, during the policy period, in property damage neither expected nor intended from the standpoint of the insured." Here, this means that any unintended or unexpected property damage is an "accident."

In this context, "property damage" is defined as "injury to or destruction of tangible property." There is no dispute that the dioxin pollution or contamination of soil and sediment at issue in this case is property damage; the question for you is whether that property damage "occurred" during the respective policy periods.

Emhart thus must prove an occurrence – that is something that resulted in property damage during the respective policy periods. Emhart may do this in two ways:

First, Emhart can prove the positive; that is, it can show that the dioxin contamination was caused by a fortuitous event (such as a leak, spill, fire, or flood). It follows that if the act itself was a fortuitous event, the results flowing from that event would be neither expected nor intended.

Second, Emhart can prove the negative; that is, that Metro-Atlantic neither knowingly nor intentionally caused the specific property damage for which it seeks coverage. The focus of the term "accident," then, is whether the harm was expected or intended, not whether the act that caused the dioxin contamination was expected or intended. This means that accidents caused from intentional acts may still constitute an occurrence so long as the resultant property damage was not expected or intended. The harm which resulted in property damage must not have been caused intentionally or with the knowledge that the damage was substantially certain to occur.

Because the definition of occurrence includes the term "from the standpoint of the insured," you are to use a subjective standard in determining whether Metro-Atlantic intentionally or knowingly caused the dioxin contamination based on what it knew when it acted during the 1960s. It is irrelevant what a reasonably prudent person would have intended or would have known. In other words, it is irrelevant what Metro-Atlantic should have intended or should have known. Rather, you must look to the actual knowledge and intent of Metro-Atlantic to determine whether it expected or intended the contamination.

Rarely can intent be proved directly. You may consider any statement made or act done or omitted by a party whose intent is in issue and all other facts and circumstances which indicate his or

her state of mind. You may draw inferences and find that a person intended the natural and probable consequences of acts knowingly done or knowingly omitted. You may consider evidence of the state of knowledge within the industry during the policy period to determine what Metro-Atlantic actually knew, provided that Metro-Atlantic received and understood that information.

When considering this question of expected or intended, keep in mind that a corporation acts only through its officers, agents, and employees. The knowledge of the corporation's officers, agents, and employees within the scope of their employment is the knowledge of the corporation. By scope of employment I mean acts that are furthering the business and ends of the corporation. Knowledge gained by an officer, agent, or employee in the scope of employment is the knowledge of the corporation, whether or not that person communicated the information to anyone else at the corporation. A corporation cannot plead ignorance by asserting that information gained by one of its officers, agents, or employees was not know to any specific individual who would have comprehended its full import. Once a corporation has gained knowledge through an officer, agent, or employee, it retains that knowledge even if that person leaves the corporation.

Using these instructions, you must decide whether Emhart has proved that property damage was caused by an occurrence.

**During the Policy Periods**

In order to find that there has been an occurrence, you must conclude that there was property damage during the policy period. Keep in mind that an event that happened prior to the policy may cause property damage during the policy period. For reasons that you need not be concerned with, the Century and OneBeacon policies trigger somewhat differently than the North River policy. I will instruct you on the Century and OneBeacon policies first.

The Century and OneBeacon policies

Under the circumstances of this case, the Century and OneBeacon policies can be triggered only if ~~property damage~~ was discoverable in the exercise of reasonable diligence during the policy periods. That is, whether by exercising reasonable diligence Crown-Metro (the successor to Metro-Atlantic) could have discovered the dioxin contamination during the policy periods applicable to the Century and OneBeacon policies. Note that Emhart does not need to show that property damage was actually discovered during the policy periods.

With respect to the question of whether the property damage was discoverable in the exercise of reasonable diligence, you must consider two issues. The first is: was dioxin contamination capable of being detected at the site during the policy periods? This requires Emhart to show that dioxin contamination actually

existed at the site during the policy period, as well as the existence of technology and expertise that could have detected that dioxin contamination. The second is: did Crown-Metro have a reason to test for dioxin contamination at the site during the policy period, or other contamination that would have led to the discovery of dioxin contamination at the site during the policy period? Considering all the evidence then, you must decide whether Crown-Metro in the exercise of reasonable diligence could have discovered the dioxin contamination.

<u>The North River policy</u>

As I mentioned earlier, the North River policy triggers, if at all, differently than the Century and OneBeacon policies. For the North River policy, coverage is triggered by a showing of an occurrence during the policy period. That is, Emhart must prove that dioxin caused actual property damage at the site in 1984. However, Emhart does not need to prove that the dioxin was discovered in 1984 or that it was visible or apparent in 1984. Moreover, Emhart does not need to prove that dioxin was discoverable in 1984. Real but undiscovered damage, proved in retrospect to have occurred during the policy period, could establish coverage, irrespective of the time that damage was discovered.

## Pollution Exclusions

If you find that there has been an occurrence that triggers coverage as to one or more of the policies, you will then be asked to consider whether the exclusions present in some of the policies nevertheless preclude coverage. Just as the Trigger of Coverage language operates slightly differently as between the various policies, so too do the exclusions operate differently. I will instruct you now on the exclusions.

The Century Excess policy

The Century Excess policy precludes coverage for the destruction of property caused by the intentional or willful introduction of waste products, fluids or materials, including oil refuse, gas or gas bleed water, into any soil or inland or tidal waters, irrespective of whether the insured possessed knowledge of the harmful effects of such acts." In other words, this exclusion bars coverage for the intentional and damage-causing disposal of waste products, fluids or materials containing dioxin, no matter whether the policyholder knew that the disposal of such substances would be harmful.

The term waste means refuse or superfluous material, especially that remaining after a manufacturing or chemical process.

Unlike the North River policy, which we'll get to momentarily, this exclusion only applies to the intentional damage-causing introduction of waste products, fluids or materials by the insured; that is, Metro-Atlantic. The exclusion does not apply (or, in other words, there would still be coverage) if someone other than Metro-Atlantic intentionally introduced damage-causing waste products, fluids or materials.

Century has the burden to prove by a fair preponderance of the evidence that this exclusion applies, and bars coverage as a result.

<u>The North River policy</u>

The North River policy involves a two-stop analysis. North River has the initial burden to demonstrate that the pollution exclusion applies. This exclusion narrows the type of event for which coverage is afforded and will preclude coverage where any property damage arises out of the discharge, dispersal, release, or escape of any contaminant or pollutant. The time of the discharge, for purposes of the pollution exclusion, does not matter. For instance, the fact that the discharge of contaminants occurred ten years before the policy was purchased is not relevant for determining whether the pollution exclusion applies. Thus, you must first determine whether North River succeeded in showing that Emhart's liability to the EPA for the property damage here occurred

from the discharge, dispersal, release or escape of any contaminant or pollutant into the air, ground, or water.

If you find that North River did meet its burden in establishing this, the burden shifts to Emhart to show that an exception to the pollution exclusion applies. This exception will restore coverage if Emhart has proven that the discharge, dispersal, or release of contaminants or pollutants that caused the property damage was "sudden and accidental."

In order for Emhart to restore coverage, it must show that both the requirements are met. In other words, discharges that are either nonsudden or nonaccidental do not qualify.

With respect to the "sudden" requirement, if the discharge of the pollutant occurred abruptly, precipitantly, or was brought about in a short period of time, it should be considered "sudden." Consequently, sudden does not describe a process that occurs slowly and incrementally over a relatively long time, no matter how unexpected or unintended the process.

In deciding whether the release was sudden, you must focus on the initial release of the pollutant or contaminant as opposed to the length of time the discharge remains undiscovered, or the length of time that damage to the environment continued as a result of the discharge. Moreover, once you've determined when the initial release occurred, intervening events, although they might be sudden and accidental, cannot be considered for the purposes of

the exception to the exclusion. Thus, for instance, where the initial release discharged pollutants onto the land, an intervening fire or flood, cannot satisfy the "sudden and accidental" exception. Instead, you must determine whether the initial discharge event was, itself, sudden. It may be the case, however, that a fire was the initial discharge event (assuming that the fire caused the at-issue property damage), in which case it would be proper to determine whether this event was sudden.

Likewise, the sudden discharge requirement cannot be established by merely showing that the release of the pollutant had its onset at some particular point in time. This is because every dispersal of pollution begins with an abrupt entry of some pollutant into the surrounding environment. Instead, the sudden discharge must be of a quantity sufficient to have some potentially damaging environmental effect. Therefore, you must determine not only whether the discharge was sudden (that is abrupt) but also whether the discharge was significant enough to have some potentially damaging environmental effect. If you find this to be the case, then the discharge is "sudden."

As I mentioned, however, in order for this exception to apply the discharge must not only be sudden, but also accidental. "Accidental" in this context means that a discharge occurred unexpectedly or by chance, or was unintended. However, any intentional discharge of a pollutant cannot be "accidental." This

includes discharges that were made intentionally but where the effects of those discharges were unintentional. Thus, for instance, where a discharge is made knowingly, it will be considered intentional and therefore cannot be considered accidental, even if the person discharging the material did not know or intend the harm caused.

In the context of the sudden and accidental exception to the North River pollution exclusion, the focus is on the actual act of discharge, as opposed to the harm ultimately caused. Thus where the discharge itself was intentional or knowing, even if the harm caused was unexpected, the "accidental" standard cannot be satisfied and the exception to the exclusion clause will not be operative. You should note that the concepts of accidental and the effect of knowledge and intent are different than for the issue of occurrence. Take care not to confuse these issues.

Additionally, for the purposes of this pollution exclusion, as compared with Century's waste exclusion, it does not matter who was the actual polluter, so you should only focus on whether the discharge was sudden and accidental, not on who actually was responsible for the discharge.

**Selection of Foreman and Duty to Deliberate**

When you begin your deliberations, you should elect one member of the jury as your foreperson. The foreperson will preside over the deliberations and speak for you here in court. You will then discuss the case with your fellow jurors to reach agreement if you can do so. Your verdict must be unanimous. Each of you must decide the case for yourself, but you should do so only after you have considered all of the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.

Do not be afraid to change your opinion during the course of the deliberations if the discussion persuades you that should. Do not come to a decision simply because other jurors think it is right.

## Communications with the Court

If it becomes necessary during your deliberations to communicate with me, you may send a note through the marshal, signed by the foreperson. No member of the jury should ever attempt to contact me except by a signed writing; and I will communicate with any member of the jury on anything concerning the case only in writing, or here in open court.

**Return of Verdict**

A verdict form has been prepared for you by the Court. After you have reached unanimous agreement on a verdict, your foreperson will fill in the form that has been given to you, sign and date it, and advise the Court that you are ready to return to the courtroom.

**Verdict - Unanimity Required**

In order to return a verdict in this case, all of you must agree as to what that verdict will be. You cannot return a verdict for either party unless your decision is unanimous.

Therefore there are two things that you should keep in mind during the course of your deliberations.

On the one hand, you should listen carefully as to what your fellow jurors have to say and should be open minded enough to change your opinion if you become convinced that it was incorrect.

On the other hand, you must recognize that each of you has an individual responsibility to vote for the verdict that you believe is the correct one based on the evidence that has been presented and the law as I have explained it. Accordingly, you should have the courage to stick to your opinion even though some or all of the other jurors may disagree as long as you have listened to their views with an open mind.

## Jury Recollection Controls - Rehearing Testimony

If any reference by the court or by counsel to matters of evidence does not coincide with your own recollection, it is your recollection which should control during your deliberations.

Occasionally, juries want to rehear testimony. Understand that, generally, your collective recollection should be sufficient for you to be able to deliberate effectively. However, if you feel that you need to rehear testimony, I will consider your request. However keep in mind that this is a time-consuming and difficult process, so if you think you need this, consider your request carefully and be as specific as possible.

## Copy of Instructions

I have instructed you on the law that governs your deliberations. As I mentioned at the beginning, I will send into the jury room a written copy of my instructions. You are reminded, however, that the law is as I have given it to you from the bench; and the written copy is merely a guide to assist you.

**EXHIBIT D**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| * * * * * * * * * * * * | * CIVIL ACTION |
| EMHART INDUSTRIES | * NO. 02-053S |
| | * |
| VS. | * OCTOBER 19, 2006 |
| | * |
| HOME INSURANCE CO. | * |
| * * * * * * * * * * * * | * PROVIDENCE, RI |

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH
DISTRICT JUDGE
(ARGUMENT REGARDING JURY QUESTION)

APPEARANCES:

FOR THE PLAINTIFF:
JACK PIROZZOLO, ESQ. and
RICHARD L. BINDER, ESQ.
Foley & Hoag LLP
Seaport World Trade Center West
155 Seaport Blvd.
Boston, MA 02110-2600
(617) 832-1250

FOR THE DEFENDANT North River:
JOHN T. HARDING, ESQ.
Morrison, Mahoney, LLP
250 Summer Street
Boston, MA 02210
(617) 439-7558

MARK T. NUGENT, ESQ. and
MICHAEL T. FARLEY, ESQ.
Morrison, Mahoney, LLP
121 South Main Street
Suite 600
Providence, RI 02903
(401) 331-4660

FOR THE DEFENDANT Century Indemnity:
LAWRENCE A. NATHANSON, ESQ.
Siegal, Napierkowski & Park
533 Fellowship Road
Suite 120
Mt. Laurel, NJ 08054
(856) 380-8900

2

APPEARANCES: (Continued)

THE COURT: Why don't we do this. After I instruct the jury, then if you have an objection to what I say, you can put that on the record, either of



you can.

MR. PIROZZOLO: Should we come to the side bar, your Honor?

THE COURT: No. Because I'm going to send them back into the room.

Charlie, bring them in.

(Proceedings in the presence of the jury as follows:)

THE COURT: Good morning, ladies and gentlemen. Have a seat.

All right. Ladies and gentlemen, I've received a copy of your question. I'm going to read that question for the record, and I've had a chance to discuss the question with counsel, and I am going to attempt to give you some clarification.

Your question reads: "Dear Judge Smith: Pertaining to your instructions regarding question number five, could a series of small, sudden and accidental events, which may have caused a small percentage of the overall property damage be enough to satisfy the 'sudden and accidental' provision. Can further clarification be given." And this is signed by the foreman, Mr. Fineberg.

Now, in attempting to give you some clarification, as you've requested, what I first want

to say is that question five, as you read the verdict form and you know, follows from question four, which asks: "With respect to the North River policy, did dioxin contamination cause actual property damage at the site during the policy period." You move to question five if you've answered question four affirmatively.

You get to question five then, and the question is: "With respect to the North River policy, does pollution exclusion bar coverage."

So the first thing I want to do is refocus your attention on the instructions that I've given you. These instructions have been very carefully drafted. There are legal considerations, different laws that govern the North River policy than govern the other policies, things that I don't need to spend a lot of time or waste your time on, but I do want to make sure that you focus carefully on all the language that is in the instructions with respect to the North River pollution exclusion, which is the subject of question five, and those instructions are on page 28 to 31 of the instructions. So you should refocus on that and read it carefully.

Now, as you read those instructions, you will see that with respect to the issue of sudden and

8

accidental, as I instructed you in these instructions, that the focus is on the initial release.

Now, in looking at your question, it occurs to

me that one thing you may be asking is whether there could be more than one initial release. And I will tell you that it is possible for there to be more than one initial release.

I want to emphasize to you, however, as it's stated in the instructions on page 30, the following sentence: "Therefore, you must determine not only whether the discharge was sudden, that is, abrupt, but also whether the discharge was significant enough to have some potentially damaging environmental effect."

So in telling you that there could be more than one initial release, you should also consider that instruction, that the discharge must be significant enough to have some potentially damaging environmental effect.

There is no fixed definition of what is significant. That's something that you all will have to deliberate about and decide if that issue is one that you're concerned about. There's not a fixed, legal definition for that term.

So to conclude, I hope I have given you some clarification. I want you to look at the instructions



again. I want you to focus on the words in the instructions, all of them. And, hopefully, that will allow you to work through whatever the question is that you're concerned about. Okay?

All right. I'm going to return you now to the jury room. Thank you.

(Proceedings out of the presence of the jury as

**EXHIBIT E**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| EMHART INDUSTRIES, INC., Plaintiff, | ) | |
| vs. | ) | NO. 02-053-S |
| HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, LIBERTY MUTUAL INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICA INSURANCE COMPANY, and UNITED STATES FIRE INSURANCE COMPANY, Defendants. | ) | |

Deposition of VINCENT BUONANNO taken before CHERYL F. GILMAN, C.S.R. and Notary Public, pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, at 131 South Dearborn Street, 30th Floor, Chicago, Illinois, commencing at 10:00 o'clock a.m. on the 25th day of March, A.D. 2003.

Page 10

owned by your uncle?
A He was one of several owners of it.
Q Do you know if your father ever owned part of Metro Atlantic?
A My father never did.
Q Did your father have any role with Metro Atlantic?
A He did. He had a role from the years -- I would say 1945 until the sale of Metro Atlantic, which was approximately in 1969 or '70, I'm not sure, my father had a role in supervision.
And in his last ten years, surely, I think he was general manager of Metro Atlantic.
Q Do you know if he ever held the position of an officer of Metro Atlantic?
A I don't think he was.
Q Do you know if he ever held the position of a director of Metro Atlantic?
A I'm quite sure he wasn't.
Q You said a few moments ago that your father was a part owner of New England Container?
A Yes -- No. Actually I said my uncle -- you asked me about, was a part owner of Metro Atlantic. You hadn't asked me yet about my

Page 11

father.
Q Okay. Fair enough. Thank you.
Let's just finish with Metro Atlantic for a moment then.
With Metro Atlantic, do you know who the other owners of that entity were besides your uncle?
A There were a number of owners at different periods. One of them, it may be hard to believe, had the name Bonino, B-o-n-i-n-o. Hugh Bonino. And another one's name was Ernest Nathan. And another one's name was -- I think there was another owner at some period by the name of Ernest Papini, P-a-p-i-n-i.
I don't know, but I was never really privy to their percentages of stock, I never worked for them, and I don't know, but these were all people that I knew because my Uncle Joe was involved in the business.
And I don't think Joseph Buonanno was a majority stockholder. I think he was a partner. Perhaps at times he was fifty percent, but I don't know.
Q Right.

Page 12

Just so the record is clear, Joseph Buonanno, Sr., your uncle, is the gentleman we've been talking about as a part owner of Metro Atlantic.
A Correct.
He's deceased, as is everyone pretty much, other than me and my father.
Q And again, just to clarify for the record --
A And of all those partners, they're all deceased of Metro Atlantic.
Q I believe you just stated that you never worked at Metro Atlantic, correct?
A Right.
Q Had you ever been inside the Metro Atlantic building in Centredale?
A Of course, because it was immediately adjacent to it.
Q Immediately adjacent to --
A New England Container.
For a certain period of time it was a part owner of New England Container.
Q During what time period was Metro Atlantic a part owner of New England Container?

Page 13

A New England's incorporation is slightly vague. However it started to do some business in about 1948. Whether it was actually incorporated by that, I'm not sure. I think the incorporation of Metro Atlantic was perhaps about 1938.
Metro Atlantic began Atlantic Chemical Company, and I believe it was still Atlantic Chemical Company well into the 19 -- maybe '60s -- '50s.
So New England Container's founding, beginning of business, and we're talking about something that might have filled this room in size, various operations, started in about 1948, and I think may not have been incorporated until 1950.
So it remained part of -- It was -- It remained, with the partial owner of it being Metro Atlantic from its founding, which we'll say was either 1948, 1950, until the sale of Metro Atlantic, which occurred, I'm not sure when they sold, but I think it was 1969.
Q Do you know --
A So it would have been a nineteen year period.

Q Okay. Do you know what percentage ownership Metro Atlantic had of New England Container?

A I believe it was fifty percent owned by my father, Bernard B., and it was the other fifty percent was owned by Metro Atlantic.

I'm not morally certain of that, but I think that is -- I think that is it.

Q Do you know the genesis of Metro Atlantic -- Excuse me. Strike that.

Do you know the genesis of New England Container?

A Atlantic Chemical Company was a manufacturer of textile chemicals and detergents. And New England was a great textile center before it all moved south, was a region full of basically where all the fabrics made in America were pretty much made in New England mills.

All the fabrics, for suits and everything, were made there. And of course there were supplier industries that were created to provide things they needed in addition to their fabrics and woolens and everything.

And one of those things was textile



chemicals, which was a huge industry. Textile chemicals included both dyes to color fabrics and included detergents to wash fabrics after they made them, and maybe it included fabrics to make them water repellant or to soften them or harden them. So those were all liquids.

And Metro Atlantic making those liquids, which it prepared for textile companies, received liquids to make those liquids in different kinds of containers. Sometimes tank trucks, sometimes wooden barrels at the beginning of the 1930s and '40s, and then steel drums.

So it was always receiving raw materials to make its product in steel drums, or drums, barrels. And it was always then refilling them with a product that it made of these different compounds back out in wooden barrels originally and then steel drums.

So there came a time when it seemed logical for Metro Atlantic to have some sort of a recycling operation, where containers were received in empty of raw materials could be cleaned up and put back in service to be shipped back out again.



So the genesis of New England Container was kind of a captive operation where they could take containers which they were emptying everyday, have them cleaned, and break down the -- at the end of the property in a barn, and then to return them to be filled again for their own products going out.

And beginning years of that, from let's say 1948 or '50 perhaps, the first five or ten years, that was almost exclusively wooden barrels, which were coopered. Coopering meant fixing those days and repairing the wood. And it slowly changed into steel drums, 55-gallon steel drums.

Does that answer that?

Q Yes, it does, very well. Thank you.

When New England Container first started either in the late 1940s or around 1950, was Metro Atlantic its sole customer?

A Yes, it was.

Q And I take it that over time the business of New England Container grew to include other customers, correct?

A Correct.

Q During the time that New England



Container and Metro Atlantic operated at the Centredale facility -- and let me focus really on the later part of the 1950s and 1960s, is it fair to say that Metro Atlantic was still the largest customer of New England Container?

A By the late '60s?

Q If you could take me through that time frame or I'll break down the question.

A It remained -- It probably remained a very large or one of its largest customers.

Q The property on which Metro Atlantic and New England Container operated, do you know who owned that property in Centredale?

A I think it was owned by -- It was owned by the -- by the owners of Metro Atlantic. It was owned by Metro Atlantic. And I don't know, I wouldn't have been privy to know if it had a separate real estate corporation or that they simply owned it within the company.

I know New England Container was a tenant. New England Container owned no property, so I don't know who owned it.

Q Does the entity name --

A There was no outside landlord. It was

Page 30

Q Do you know if Building 3 was connected at all to a municipal sewer system?
A I don't. I doubt it.
Q Why do you doubt that, Mr. Buonanno?
A Because it seemed like a temporary sort of building, but I don't know.
Q Do you know if Metro Atlantic, meaning the mill building, was connected to a municipal sewer system?
A I really don't know. I would assume they were.
Q Why would you assume that?
A Because they were there for a very long time. They had -- They had offices and all of the infrastructure of an office and plant with bathrooms and everything. So I would certainly presume they were on a municipal sewer system.
Q That is just an assumption on your part?
A It is.
Q Was New England Container hooked up to a municipal sewer system?
A I believe we were.
Q Do you know if there was any documentation on that, such as a permit?

Page 31

A I have no idea.
Q Were there any bathrooms in the New England Container facility?
A There were a few bathrooms. There was a locker room for the men in the barn building and there was a bathroom in the office.
Q When you began working as a salesman for New England Container in March of 1967, was your father the president of New England Container?
A He was. But he was not located there. He was located in an office in Metro Atlantic. And there was a general manager of New England Container who --
Q Who was that general manager?
A His name was John Mikucki, M-i-k-u-c-k-i.
Q Did your father spend any time at New England Container when you were working there as a salesman in '67?
A Very rarely.
Q Prior to --
A He entered and exited occasionally, but never worked there.
Q When you worked at -- Strike that.
When you worked at New England Container

Page 32

during the summers, was your father more often at Metro Atlantic or at New England Container?
A Always at Metro Atlantic.
Q Mr. Buonanno, I put before you a document marked as Exhibit 2, which is the subpoena that we provided Edwards & Angell for your deposition today.

(document marked as requested)

Q And I would just like you to review that and confirm that is the subpoena under which you're here today.
A Yes.
Q Okay. Great.
I'd like to just finish up talking about the Building 3 where the hexachlorophene was manufactured.
Do you know for whom the hexachlorophene was being manufactured by Metro Atlantic?
A I don't know who their customers were.
Q Do you know the use for the hexachlorophene?
A It's unclear to me. It was apparently

Page 33

some discussion that a defoliant was being made there. But I don't know if it was the hexachlorophene that was the defoliant or some other product produced in that building.
But during the fact-finding of this case, I've heard about a defoliant being made there and also hexachlorophene, but I don't know the exact usages.
There was some thought that hexachlorophene was used in skin product, but I don't know because we never -- had any business there.
Q All right. The defoliant that you're referring to, have you also heard it referred to more generally as an Agent Orange product?
A I have heard that mentioned.
Q All right.
A But I don't know if that is hexachlorophene.
Q Fair enough.
Is it fair to say, Mr. Buonanno, that you were very familiar with the mill building in which Metro Atlantic was operating in?
A No. I was familiar with it, but not very

familiar.

I certainly was not familiar with their processing of chemicals. I did not know what they did.

Q Can you give me a rough estimate of the number of times you were in the Metro Atlantic building?

A It was -- It was possible to walk in to see my father in his office, and then to go down there by walking through the building down some steps and walk through it.

And that really is the extent of my exposure to it.

I would walk through the building sometimes on my way down to that plant.

Q To the New England Container plant?

A So maybe did I do that -- did I walk through the building fifty times? I don't know.

Q Did you ever see Metro Atlantic discharging any materials to the Woonasquatucket River?

A Never.

Q Did you ever see any pipes coming from the mill building in which Metro Atlantic operated



at in leading to the river?

A No, I don't remember any piping.

Q Do you recall Metro Atlantic stacking any barrels outside of its buildings?

A There were occasionally small stacks of drums which were left outside the building that were meant to be picked up by New England Container and brought back to the processing plant.

Q Okay.

A But usually those containers were inside the building.

Q Do you recall any aboveground storage tanks around the Metro Atlantic building?

A I recall oil tanks, which I think were in this area. Aboveground oil.

I would have no way of knowing if they had underground tanks because I wasn't familiar with their operation.

Q Could you circle the area of the aboveground tanks and mark that with a 4, please?

A I have the recollection that this building was a boiler room.

Q Okay.



A And had an aboveground tank in the boiler room. So I'm going to put a 4 there.

Q Okay. Thank you. Great.

Next exhibit is Buonanno 3.

(document marked as requested)

Q I'd like to show you that document, sir. And it is a two page document, again produced by your counsel, that is from the State of Rhode Island, Office of the General Treasurer, for $25 for incorporation of New England Container on January 8, 1953.

My question to you, sir, does that refresh your recollection as to when New England Container was incorporated?

A I had no recollection previously. I guessed at the incorporation, so I'm sure this is correct, but I wasn't -- I was born in 1943, so I wouldn't have any recollection of it.

Q Okay. Fair enough.

I'm marking another document, Buonanno 4, which is a five page document received from your counsel. And it's an agreement dated



August 1st, 1967 between Metro Atlantic and Bernard Buonanno.

(document marked as requested)

Q Take a moment to look at that, and then tell me if you've ever seen this document before.

A I don't recall seeing this before. But I certainly was aware that my father was buying the other shares of the stock of the company, although I think I earlier today said a later date than this. So this date comes as a bit of a surprise. I'd guess that he bought this in about 1969. And I don't recall seeing this before.

Q Is it fair to say this document signifies the sale of Metro Atlantic shares and New England Container to your father, Bernard V. Buonanno?

A Yes.

Q Okay. Do you know, Mr. Buonanno, if Metro Atlantic was a fifty percent shareholder of New England Container from the inception of New England Container to August 1st, 1967?

A If Bernard Buonanno was?

Q No. Metro Atlantic.

A From the inception until then?
Q Uh-huh.
A I think so.
Q All right. If you turn to Page 3 of the exhibit please, and there is a section called Removal of Place of Business.
You see that paragraph?
A Yes.
Q Was there a reason why Metro Atlantic wanted New England Container to move off the Centredale property?
A How interesting.
I think it was because Metro Atlantic was preparing to sell their company and wanted to then have the freedom to dispose of their property, because the new company was not going to operate Metro Atlantic at that premises anymore.
So I'm sure that was the reason for that.
Q The next document I'd like marked, which is -- We're up to 5 please.

(document marked as requested)



Q Exhibit 5 is also from your counsel, Mr. Buonanno, and it's a Centredale Fire Report dated July 3rd, 1961. And it has as an address, Rear Metro Atlantic, with a report of fire dump burning.
Now, I know this pre-dates your time at Metro Atlantic -- well, at the Centredale facility, Mr. Buonanno, but my question to you quite simply is, do you know where a dump was located at the Centredale facility?
And if it helps, you can use Exhibit 1 as a guide. 1 being the Sanborn map.
A I don't know about this event. And I don't know where the dump was.
Q Okay. Had you ever heard of a dump being located at the Centredale facility?
A A dump has been mentioned in discussions of Metro Atlantic. And apparently there was a place where some trash was brought to the lower end of the property. I don't know where. And I'm not familiar with it.
Q Okay. The lower end of the property meaning the southern-most point, is that correct?
A The southern-most point, yes.



Q Do you know which entity brought the trash there?
A I don't. I have no recollection of New England Container bringing trash there.
Q Would it leave Metro Atlantic bringing trash there?
A I would imagine. But I don't know where this dump was. I have no recollection of it.
Q The next fire report I'd like to mark, which is Exhibit 6, is again from your attorneys, and it's dated May 6, 1967.

(document marked as requested)

Q And on the report of fire on this one, it says stockpile the barrels on west side of shop. Six field drums exposing fire all over ground.
This fire report post-dates your employment as a salesperson at New England Container, correct, Mr. Buonanno?
A No, because -- Yes, it does. I was there by March, '67. Yes.
Q Okay. Do you remember a fire involving a stockpile of barrels close to the time you started



working at New England Container?
A I don't.
Q Did New England Container stockpile barrels outside?
A Yes, it did.
Q And earlier I believe you said that Metro Atlantic stockpiled their barrels inside, correct?
A It did. But Metro Atlantic also stockpiled some drums outside, down in the southern end of the property. Down here.
They also had containers that we did not -- that we did not take of theirs, which they stockpiled down here. Because in some of their relationships with suppliers, they received containers that were meant to go back directly to the supplier. And so they weren't for us to recycle.
And Metro Atlantic piled some of those drums down here.
Q And that is the southern --
A And in fact, this was the previous issue.
When we left the property, we left piles of drums on the property, which were Metro Atlantic's drums and not ours when we exited here,

**EXHIBIT F**

JOSEPH AND RAYMOND NADEAU EXCERPT

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| * * * * * * * * * * * * | CIVIL ACTION |
| EMHART INDUSTRIES * | NO. 02-053S |
| VS. * | SEPTEMBER 14 & 15, 2006 |
| HOME INSURANCE CO. * | |
| * * * * * * * * * * * * | PROVIDENCE, RI |

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH
DISTRICT JUDGE
(TESTIMONY OF JOSEPH NADEAU AND RICHARD NADEAU)

APPEARANCES:

FOR THE PLAINTIFF:
JACK PIROZZOLO, ESQ. and
RICHARD L. BINDER, ESQ.
Foley & Hoag LLP
Seaport World Trade Center West
155 Seaport Blvd.
Boston, MA 02110-2600
(617) 832-1250

FOR THE DEFENDANT North River:
JOHN T. HARDING, ESQ.
Morrison, Mahoney, LLP
250 Summer Street
Boston, MA 02210
(617) 439-7558

MARK T. NUGENT, ESQ. and
MICHAEL T. FARLEY, ESQ.
Morrison, Mahoney, LLP
121 South Main Street
Suite 600
Providence, RI 02903
(401) 331-4660

FOR THE DEFENDANT Century Indemnity:
LAWRENCE A. NATHANSON, ESQ.
Siegal, Napierkowski & Park
533 Fellowship Road
Suite 120
Mt. Laurel, NJ 08054
(856) 380-8900

2

APPEARANCES: (Continued)

FOR THE DEFENDANT

building?
A. (Indicating.)
Q. Can you point on the screen to the salt?
A. (Indicating.)
Q. Can you point on the screen to the hexachlorophene building?
A. (Indicating.)
Q. Can you point on the screen to the New England Container?
A. (Indicating.)
Q. Thank you.
MR. PIROZZOLO: I offer 137A.
THE COURT: Call it 137A. Without objection, it will be admitted in full.
(Plaintiff's Exhibit 137A marked full.)
Q. Now in the course of your working for Metro-Atlantic, as you said, you had the opportunity or the occasion to go through the entire plant, were fluids delivered from vessels and from storage areas in pipes?
A. Yes.
Q. Could you describe in your own words what the piping looked like?
A. Some of the piping came from the storage tanks that ran along the walls, had valves affixed to it with



nozzles that hoses were attached to. Some of the

product came out of storage tanks that we hooked the hose to and ran it to the particular vat we needed to move it to or pump it to or transport it from drums to.
Q. And did you ever notice any leaks or spills either from the vats or the pipes?
A. Yes.
Q. And could you describe what you observed?
A. On occasions, some of the chemicals would erode the pipes and whatever that product was, the raw product, it would drip.
Q. And what was done when that occurred, that kind of thing occurred?
A. Usually, we told someone, and someone from maintenance would come and replace that pipe.
Q. What would you do with whatever dripped or came out?
A. Hosed it down. Wash it away.
Q. And -- I'm sorry?
A. It would wash away.
Q. Thank you. Now, you pointed out the building that contained the -- where the hexachlorophene -- you called it the Texas tower?
A. Yes.
Q. What was that building used for?

24

A. They made the hexachlorophene product there. I was never in it. There was only two gentlemen, I believe, or three gentlemen that ever worked there, and I never was part of that operation.
Q. But that was the place where they made the

amount taken out of the barrel for a particular
process?
A. Yeah. They used scales or, if they knew the
volume that needed to go in, say they needed 50
gallons, then a 55-gallon -- or a 50-gallon drum would
be poured into the mix.
Q. That's the occasion when they pour the entire --
A. Yes.
Q. How did they go about pouring an entire 55-gallon
drum of liquid into the mix?
A. We had hand trucks that would tip over, and some
of the openings to the tanks were low enough that it

27

would just allow it to happen. Just dumped it over.
Q. On occasions when raw material was put into the
mix, would anything spill?
A. Sure.
Q. And what would you do with whatever might have
spilled?
A. We would -- depending on -- some things we didn't
add water to. They reacted violently to water. But
most of the time it was -- we would steam them or hit
them with water and then they would go down the French
drain.
Q. Thank you. Now, was there an occasion when an
explosion occurred?
A. Yes.
Q. Were you there when that happened?
A. I wasn't there when it happened. I heard about
it. I can't remember how I heard about it. I don't

know whether I was even still working there at the time when that happened, but I heard the story because my brother was there.

Q. But you didn't, in fact, see the explosion?

A. I didn't see it.

Q. Okay. Now, did Metro-Atlantic have a way of disposing of solid waste? Is there a Dumpster?

MR. NETBURN: Objection.



THE COURT: Don't lead the witness. Sustained. Ask another question.

Q. Did Metro-Atlantic have a way of disposing of solid waste?

A. Some of the things that we trashed went into the Dumpster. Some of the byproducts were shoveled and put into barrels. Some of the byproducts were washed off the floor into the drain.

Q. And in connection with the work you did at Metro-Atlantic, did you ever do anything with the expectation or intention of damaging the environment?

MR. NUGENT: Objection.

THE COURT: I'm going to allow it. Overruled.

A. Would you repeat that?

THE COURT: The reporter will read the question back.

(Pending question read by the reporter.)

A. No.

Q. Did you ever think you were doing anything wrong?

A. No.

MR. PIROZZOLO: Thank you. I have no further

questions.

One more question.

Q. Do you recall a time when there was a fire?

A. There were several fires.



Q. Do you remember a fire involving a heater of some kind?

A. Yes.

Q. Could you tell us about that fire? First of all, could you tell us when that occurred?

MR. NUGENT: Objection, your Honor, on relevance.

THE COURT: Can't tell yet. I'm going to allow it.

MR. NUGENT: Can I be heard on that, your Honor?

THE COURT: Well, let me find out the time period first, all right? What time period are you referring to?

Q. When did the fire occur, approximately?

A. '64, '65. That's my recollection. I remember the fire that involved a methanol tank.

Q. I don't understand. Methanol?

A. Methanol.

Q. What's methanol?

A. It was a raw product that was delivered. It's a very flammable product. I think they even use it in race cars.

Q. Where was that a fire, in the building or --

A. It was in the building.

Q. Which building?

A. It was in the main building.
Q. And did it require the fire department?
A. The fire department may have showed up, but my brother and I put it out.
Q. Okay. Could you describe it as fully as you can remember what the fire looked like?
A. I was across the street when the alarms went off. I went through the door. My brother was standing there with a hose. What was happening was the methanol was coming out of the valve on fire. I grabbed another hose and we -- together we walked towards it pushing the methanol on fire into the French drain. When we got to the valve, we shut it off. The fire stopped. The fire went down the drain into the river. Not the river but the tail section.
Q. Did the fire involve anything that a delivery man had done?
A. I think the delivery man might have got burned. He wasn't there when I came through the door.
Q. Do you know what started the fire?
A. The delivery man. He had a heater that he wanted to put methanol in to use. Apparently, it was either still hot or still burning when he cracked the valve.
MR. PIROZZOLO: Thank you. I have no further questions.

31

CROSS-EXAMINATION BY MR. NUGENT
Q. Good morning, Mr. Nadeau.

A. Good morning.
Q. You stated you worked at both Metro-Atlantic and New England Container; is that correct?
A. Yes.
Q. And during the year that you worked there, did you find that that was a common occurrence, that workers would work in both places?
A. Yes.
Q. In fact, would you say that they were interchangeable?
A. It was not the norm, but a lot of people did work in both places.
Q. Did you ever provide information to the EPA regarding the interchangeability of the workers between the two places?
A. I may have.
Q. You mentioned the French drains. They were in the basement of the main building?
A. True.
Q. And what was the floor of the main building made out of?
A. The basement floor was concrete.
Q. All right. And would you describe what the French

32

drains, as you call them, what they look like?
A. A French drain is basically a form trough, made out of concrete, and it had steel grates over the top. That drain ran along the length of the building, the building I worked in most of the time, and it had a hole on the far end that opened to the tail -- the

thing that people call the tail, the water area on the backside of the building.

Q. When you say the tail, you mean the water outside the building?

A. Yes.

Q. All right. And did you ever see the water outside the building change color after you washed the floor off?

A. I'm sure it did. I didn't look.

Q. But as you sit here today, do you remember ever seeing water change color after the floor was washed in the basement of the main building?

A. Like I said, I never looked to see if it changed. Logic tells me it did.

Q. All right. So at the time that you worked at Metro-Atlantic, and I presume you used the hose along with the other workers to wash off the basement floor?

A. Yes.

Q. And the material that was washed off the basement

33

floor came from the presses?

A. Came from the presses.

Q. And that included black sludge, or some kind of sludge?

A. I think it was carbon that they used to filter but, yes, it was black or gray.

Q. When you washed off the floor at that time, you were aware that it was going out to the tailrace, the river outside?

A. True.

Q. And so there was no question in your mind that it was not going to the municipal sewer, was it?
A. There was no question in my mind. It was going outside.
Q. You mentioned some leaks from pipes inside the building; is that correct?
A. Yes.
Q. And when the leaks would -- strike that. The leaks were inside the building and the material would fall on the concrete floor; is that correct?
A. If it was on the basement level, yes.
Q. Right. All right. But you mentioned you would wash the floor after a leak; is that correct?
A. Yes.
Q. All right. So when you washed the floor after a



leak, the workers for Metro-Atlantic caused that leak material to go out into the river; is that correct, by hosing it off the floor?
A. Yes.
Q. All right. So the leak itself never went out into the ground, right? It was inside the building?
A. It was in the building.
Q. And the leak itself never went directly into the river, did it?
A. No.
Q. The only way that leaked material got out into the environment was when the workers hosed it off the floor and pushed it and forced it outside into the river, isn't that true?

did it get to the Dumpster?
A. The Dumpster was right outside the second floor window. We walked -- actually, it was a big doorway. We walked over to the edge and pushed the empty barrels -- not the empty barrels, but the barrels with the solvents into the Dumpster.
Q. So if I get the picture then, you went to a doorway in the wall?
A. Yes.
Q. That was on the second or third story of the building?
A. That was above the basement so it was the first, second floor, however you look at it.
Q. It was up?
A. It was up.
Q. Up in the air, and we know that there was something to catch what you dumped out?
A. Yes.



Q. What was there to catch what you dumped out?
A. The Dumpster.
Q. A Dumpster?
A. Yes.
Q. All right. And did you ever look in that Dumpster?
A. Yes.
Q. And did you see plastic bags in that Dumpster?
A. There were plastic bags, paper bags, fiber drums, garbage.
MR. PIRÒZZOLO: Thank you. Thank you very much,

Mr. Nadeau.

THE COURT: Any recross?

MR. NUGENT: Briefly, your Honor.

RECROSS-EXAMINATION BY MR. NUGENT

Q. On redirect, Mr. Pirozzolo just asked you whether New England Container and Metro were two totally separate companies, and do you recall that question?

A. Yes.

Q. Did you ever describe the relationship between those two companies as incestuous?

A. Yes.

Q. Why was that?

A. It was family. They were brothers that owned them, and it was incestuous to me.

50

MR. NUGENT: Thank you.

THE COURT: All right. Mr. Nadeau, your testimony may be complete; may not be complete.

Do any of you ladies and gentlemen have any questions you'd like to hand up to the clerk? Anybody have any? No?

All right. Very well then. You may step down. Thank you very much.

Next witness.

MR. PIROZZOLO: Raymond Nadeau, please.

RAYMOND NADEAU, first having been duly sworn, testified as follows:

THE CLERK: Please state and spell your last name for the record.

THE WITNESS: Raymond Nadeau, N-A-D-E-A-U.

**EXHIBIT G**

JOSEPH AND RAYMOND NADEAU EXCERPT



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| * * * * * * * * * * * * | CIVIL ACTION |
| EMHART INDUSTRIES * | NO. 02-053S |
| VS. * | SEPTEMBER 14 & 15, 2006 |
| HOME INSURANCE CO. * | |
| * * * * * * * * * * * * | PROVIDENCE, RI |

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH
DISTRICT JUDGE
(TESTIMONY OF JOSEPH NADEAU AND RICHARD NADEAU)

APPEARANCES:

FOR THE PLAINTIFF:
JACK PIROZZOLO, ESQ. and
RICHARD L. BINDER, ESQ.
Foley & Hoag LLP
Seaport World Trade Center West
155 Seaport Blvd.
Boston, MA 02110-2600
(617) 832-1250

FOR THE DEFENDANT
North River:
JOHN T. HARDING, ESQ.
Morrison, Mahoney, LLP
250 Summer Street
Boston, MA 02210
(617) 439-7558

MARK T. NUGENT, ESQ. and
MICHAEL T. FARLEY, ESQ.
Morrison, Mahoney, LLP
121 South Main Street
Suite 600
Providence, RI 02903
(401) 331-4660

FOR THE DEFENDANT
Century Indemnity:
LAWRENCE A. NATHANSON, ESQ.
Siegal, Napierkowski & Park
533 Fellowship Road
Suite 120
Mt. Laurel, NJ 08054
(856) 380-8900

2

APPEARANCES: (Continued)

FOR THE DEFENDANT

Can you show him paragraph two on the first page.

A. I don't remember saying that, but if I --

THE COURT: Wait. There's no question before you. Wait a minute. What are you referring to? Direct me to what you're referring to.

MR. NUGENT: It's a handwritten statement.

THE COURT: No, no. What line?

MR. NUGENT: About half-way down the page begins with "Some of these" --

THE COURT: All right.

MR. NUGENT: Actually just before that, it says, "Barrels also came".

THE COURT: All right. You may read that to him.

MR. NUGENT: From where it says "Barrels also came" to the rest of that paragraph?

THE COURT: Yes.

MR. PIROZZOLO: Objection.

THE COURT: What? Yes.

MR. PIROZZOLO: Your Honor, this isn't a

72

foundation. This again is passive voice.

THE COURT: All right. I understand your objection. It's overruled. You may direct the witness to that portion of his prior statement.

Q. Mr. Nadeau, I'm going to read something from your statement. I'm going to ask you did I read it correctly, then I'll have some follow-up questions. First of all, "Barrels also came from the

Metro-Atlantic plant. Some of these barrels were filled with a black sludge which came from the Metro-Atlantic presses. The sludge was taken to the landfill located below the New England Container plant and dumped, and then the barrels were reconditioned"?

A. Right.

Q. Is that true?

A. Yes. We didn't take the full barrels.

THE COURT: Wait. I understand you might want to add things, but you need to only respond to the questions that are before you. That's the process that we work by here.

THE WITNESS: Sorry.

THE COURT: Go ahead.

Q. So you agree that barrels from Metro-Atlantic that were filled with a black sludge came over to New England Container and were dumped out the back in the



landfill?

A. They dumped it down in the dump.

Q. Right. So when you testified earlier on direct that plastic bags and the sand from the sandblasting went back, not only did plastic bags go to the landfill and sand product go to the landfill, but black sludge from Metro-Atlantic went to the landfill?

A. Yeah. From Metro, yeah.

Q. Did you ever see -- strike that. You worked there for a number of years, right?

A. Yeah.

Q. At New England Container. Did you know any of the

other workers at Metro-Atlantic? Did you ever talk to them?
A. Yeah.
Q. Did you know some of them by name?
A. Yes.
Q. And did you -- strike that. Were you familiar with Metro-Atlantic trucks?
A. Yes.
Q. Did you ever see Metro-Atlantic trucks down in the landfill?
A. Yes.
Q. Did you ever see the Metro-Atlantic trucks down in the landfill dumping the barrels?

74

A. Yes.
Q. Did you ever see workers from Metro-Atlantic dumping things in the landfill?
A. Just the truck drivers went down there. That's all I seen, the truck drivers went down there, and they dumped it, then they brought the empty barrel back to us.
Q. And you personally observed this?
A. Yes.
Q. Now, in addition to -- strike that. Did you ever see bulldozers or heavy equipment in that landfill area?
A. Yes.
Q. And what were they doing with the backhoe or the bulldozer?
A. The bulldozer. They were flattening it out.

Q. You witnessed this?
A. I witnessed it, yes.
Q. Was there a construction company that kept heavy equipment in the same area?
A. They was next to us.
Q. And was that heavy equipment used disperse the landfill or flatten it out?
A. Yes.
Q. Did you also see them putting gravel on top of



that landfill?
A. No.
Q. When they flattened it out, what did you observe them doing?
A. They just pushed everything right into the point.
Q. The point, the peninsula?
A. Where they both come together, yes.
Q. When you say they both came together, that's where the rivers came together?
A. Yes.
Q. So they were using -- strike that. The bulldozers were pushing the landfill material towards where the rivers met?
A. Yeah.
Q. And that material in the landfill, there's no doubt in your mind, included black sludge from Metro-Atlantic?
A. Yes.
Q. In addition to the barrels from Metro-Atlantic being dumped in the landfill, the material that ended

Q. Greenville Finishing?
A. Yes.
Q. I'm skipping over some I can't read. George Mann?
A. Yes.
Q. Those are some of the chemical companies and other manufacturers that sent their barrels to New England Container?
A. Yes.
Q. And if some of those barrels contained flammable liquid, before it went into the processing, did any of the workers throw a match --
A. Yes.
Q. -- in those barrels?
A. They did.
Q. So you remember workers from New England Container intentionally throwing a match into a barrel?
A. We burned it before it went in the burner.
Q. Right. When you threw a match into a barrel with flammable material, what happened?
A. Whoosh.
Q. And you knew, when you threw a match into a barrel, that's going to happen?
A. Yeah.
Q. There was another process that resulted in ash



being generated, where was that performed?
A. When it was sandblasted.
Q. Okay. Would that ash be dumped in the landfill, as well?
A. Yeah. That was like a fine, fine powder.

Q. During the painting process, was there any disposal of the painting materials?
A. Yes.
Q. Into the landfill?
A. Yes.
Q. Do you know what chemicals were disposed of through the painting process?
A. It was just the paint that the water caught. It was just like a lump. I used to throw it in a 5-gallon pail and put a cover on it, and we threw it down there.
Q. How often would you see barrels with black sludge come over from Metro-Atlantic and get dumped behind the New England Container building?
A. A few times a week.
Q. And did that go on every month?
A. Yeah.
Q. Every year you worked there?
A. Every time I see it, yeah.
Q. And you worked there --
A. Fifteen years.

80

Q. -- fifteen years?
A. Thirteen, 14, I think.
Q. When was your last year working?
A. '69.
Q. All right. So during 1965, did you see barrels come over from Metro-Atlantic and get dumped out in the back?
A. Yes.
Q. Were you aware of any arrangement between

Metro-Atlantic and New England Container where
Metro-Atlantic would ask New England Container to
dispose of their waste?
A. No.
Q. You just saw the Metro-Atlantic trucks going over there?
A. See them go by, yeah.
Q. Did you know any of those truck drivers?
A. Yeah. One was my brother-in-law. The other one was Johnnie Palumbo.
Q. So your brother-in-law was one of the guys driving a Metro-Atlantic truck?
A. He used to blow the horn at me when he went by.
Q. And your brother-in-law beeped the horn as he was taking those black sludge barrels from Metro-Atlantic out to the landfill?



A. Yeah.
Q. Johnnie Palumbo?
A. Yeah.
Q. Was he Felix? You mean Felix Palumbo?
A. Felix, yeah. We called him Johnnie, yeah.
Q. That's what I figured.
MR. NUGENT: That's all I have. Thank you.
THE COURT: Thank you, Mr. Nugent. Any questions for Century or OneBeacon?
MR. O'CONNOR: Not for OneBeacon, your Honor.
MR. LEVENS: No questions, your Honor.
THE COURT: Redirect.
MR. PIROZZOLO: Couple of questions.

JOSEPH AND RAYMOND NADEAU EXCERPT

REDIRECT EXAMINATION BY MR. PIROZZOLO

Q. Mr. Nadeau, you were trying to help us with the names of companies that you picked up barrels from.

A. Yes.

Q. If I show you a document, can it help you remember all of the names, or all of the names you at least remembered at one time?

A. I guess.

MR. PIROZZOLO: May I show the document to the witness?

THE COURT: What document is it?

MR. PIROZZOLO: It's a list of names.



THE COURT: No. What exhibit number is it?

MR. PIROZZOLO: It's Defendant's Exhibit 327.

THE COURT: All right. You may show him that.

MR. PIROZZOLO: May I just hand it to him, or show him on the ELMO?

THE COURT: It doesn't matter. Why don't you hand it to him. It might be easier for him to read.

Q. Mr. Nadeau, I'm going to hand you a document and ask you to look at the list that begins here and goes onto here. See if that refreshes your recollection as to the names of companies that you picked up barrels from.

(Witness reads document.)

Q. Could you tell us now, now that you've been refreshed, all the companies that you can remember that you picked up barrels from?

A. That's them.

**EXHIBIT H**

CARBONE EXCERPT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| * * * * * * * * * * * * | CIVIL ACTION |
| EMHART INDUSTRIES * | NO. 02-053S |
| VS. * | OCTOBER 4, 2006 |
| HOME INSURANCE CO. * | PROVIDENCE, RI |
| * * * * * * * * * * * * | |

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH
DISTRICT JUDGE
(EXCERPT OF TESTIMONY OF DAVID CARBONE)

APPEARANCES:

FOR THE PLAINTIFF:

JACK PIROZZOLO, ESQ. and
RICHARD L. BINDER, ESQ.
Foley & Hoag LLP
Seaport World Trade Center West
155 Seaport Blvd.
Boston, MA 02110-2600
(617) 832-1250

FOR THE DEFENDANT
North River:

JOHN T. HARDING, ESQ.
Morrison, Mahoney, LLP
250 Summer Street
Boston, MA 02210
(617) 439-7558

MARK T. NUGENT, ESQ. and
MICHAEL T. FARLEY, ESQ.
Morrison, Mahoney, LLP
121 South Main Street
Suite 600
Providence, RI 02903
(401) 331-4660

FOR THE DEFENDANT
Century Indemnity:

LAWRENCE A. NATHANSON, ESQ.
Siegal, Napierkowski & Park
533 Fellowship Road
Suite 120
Mt. Laurel, NJ 08054
(856) 380-8900

2

APPEARANCES: (Continued)

CARBONE EXCERPT

married.
Q. What was your father's position at Metro-Atlantic?
A. He was a truck driver.
Q. Did he remain a truck driver for that entire period of time?
A. Yes, he did.
Q. Did he ever work at New England Container as well?
A. Yeah. Usually, on a Saturday for many years he worked there for extra money.
Q. Was the New England Container job a part-time position?
A. Yeah. See, I thought it was the same company. You know, he had worked there on weekends.
MR. PIROZZOLO: May that be stricken, your Honor?
THE COURT: No. Overruled.
Q. Was there a reason why you thought it was the same company?
A. Yeah. The same family owned it. Brothers, I think, or something like that. He would just go, you know, work there. And when he needed extra money, he'd work at the other one.
Q. During the week, Monday through Friday --
A. He'd work at Metro-Atlantic.
Q. Metro-Atlantic. Did you ever have an occasion to

6

go to work with your father?
A. Yes. On a Saturday, I'd go with him sometimes,

spend time with him, or summer school vacation, if he went. Once in a great while he would go to Maine or Canada, and he would take me with him.
Q. Did he make deliveries?
A. Yeah. Just to one place. He'd go to one place and drive back. We wouldn't, you know, spend the night or anything. Just drive up, sleep in the truck, you know, and come home.
Q. Did you ever ride on the truck on the premises of Metro-Atlantic?
A. Yeah. Like on the barrel shop. If I got on, I'd see him a few times. I'd get in the truck, not in the back, but in the cab, and we'd drive to the dump and empty the truck out.
Q. When you say the dump, where was the dump?
A. The dump was behind -- it was behind the barrel shop. Well, on the side of the barrel shop. It was just like a big area where they'd throw the junky barrels and the junk.
Q. Did you ever ride with your father in the truck down to the dump?
A. Yeah. I mean, I wouldn't get out. I'd stay in the cab. He'd say, "It's dirty. Just stay there."

7

Q. So he told you to stay in the cab?
A. Yeah.
Q. What did you see when you rode down to the dump?
A. Just junk. Busted barrels. They'd throw the stuff that leaked, the barrels that leaked and stuff they couldn't fix, they'd throw in the dump, you know,

CARBONE EXCERPT

he called the dump.
Q. Besides barrels, did you ever see anything else on the ground in the dump area?
A. Just as -- it was so long ago as a kid. It was just junk. You know, garbage. I mean, not food garbage, but just garbage. Barrel rings. The rings that would hold the cover on. Covers. Just that type of junk.
Q. Was there any other type of substance that you saw out in the dump besides the barrels?
A. Yeah. There was some stuff. I used to see a lot of -- even later when I bought the house on that land, it looked like a Play-Dogh rubber. You know, he said it was sediment, sludge that was in the barrels. In other words, if they got a barrel, to wash it out, clean it, paint it and resell it, I guess, you know if it leaked it was no good so they'd throw it in the dump. So if they put one there and it was leaking and there was sludge in it, they'd just throw that in the

8

dump, the barrel and the sludge.
Q. Did you ever see this sludge on the ground outside of the barrels in the dump area?
A. Are you talking when I was a kid or --
Q. Yes.
A. Yeah. Like I said, it looked like mud all the time. That's why my father would say, you know, "Stay in the truck. You'll get that junk all over you."
Q. Did you have an occasion to drive through the Metro-Atlantic plant or walk through the plant with

him, too?

A. Yeah.

MR. NUGENT: Can we have Plaintiff's 137, please. I believe it's a full exhibit already, your Honor.

THE COURT: It's ID.

MR. NUGENT: It's for ID?

Can we show the witness?

Your Honor, can we ask that it be enlarged a little bit so we can see the buildings.

THE COURT: This is a plaintiff's exhibit. Maybe they don't have any objection to it.

MR. PIROZZOLO: Your Honor, I have no objection to this exhibit.

THE COURT: All right. So let's make it a full

9

exhibit.

MR. PIROZZOLO: I thought it was.

THE COURT: Plaintiff's 137 will be full, and you may show that to the jury.

(Plaintiff's Exhibit 137 marked full.)

MR. NUGENT: Can you enlarge the left portion. That's good.

Q. Mr. Carbone, can you see the map on your screen?

A. Yeah.

Q. Do you see where Smith Street is, the road at the top of the page?

A. Yeah.

Q. Can you -- on this screen, if you use your finger and touch the screen, you can actually place a mark on

**EXHIBIT I**

NERI EXCERPT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| * * * * * * * * * * * * | CIVIL ACTION |
| EMHART INDUSTRIES * | NO. 02-053S |
| * | |
| VS. * | OCTOBER 6, 2006 |
| * | |
| HOME INSURANCE CO. * | |
| * * * * * * * * * * * * | PROVIDENCE, RI |

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH
DISTRICT JUDGE
(TESTIMONY OF KENNETH MICHAEL NERI)

APPEARANCES:

FOR THE PLAINTIFF:

JACK PIROZZOLO, ESQ. and
RICHARD L. BINDER, ESQ.
Foley & Hoag LLP
Seaport World Trade Center West
155 Seaport Blvd.
Boston, MA 02110-2600
(617) 832-1250

FOR THE DEFENDANT
North River:

JOHN T. HARDING, ESQ.
Morrison, Mahoney, LLP
250 Summer Street
Boston, MA 02210
(617) 439-7558

MARK T. NUGENT, ESQ. and
MICHAEL T. FARLEY, ESQ.
Morrison, Mahoney, LLP
121 South Main Street
Suite 600
Providence, RI 02903
(401) 331-4660

FOR THE DEFENDANT
Century Indemnity:

LAWRENCE A. NATHANSON, ESQ.
Siegal, Napierkowski & Park
533 Fellowship Road
Suite 120
Mt. Laurel, NJ 08054
(856) 380-8900

2

APPEARANCES: (Continued)

NERI EXCERPT

lived in Johnston, but most of my friends were in North Providence, because I went to St. Lawrence so we used to go back and forth every day.
Q. When you were in high school, did you ever have an occasion to walk along those railroad tracks?
A. Yes.
Q. How often would you go down there?
A. When I was in high school, I went there every night because my girlfriend lived in North Providence, but until I got my own car, which was maybe about 16, 17 years old.
I still used the tracks after that because we were only allowed to use the car on weekends and stuff like that. We had only one car so --
Q. So up until the time you were 16, you would walk along those tracks?



A. Yeah. Every day.
Q. When you walked along the tracks to the west side of the Woonasquatucket River, did you ever look back at the former Metro-Atlantic plant?
A. Every day.
Q. And did you ever notice anything unusual along the riverbank?
A. They used to stack barrels along the river banks from where I was, which is Amber Street, and if you -- I can't -- this map is pretty small, but if you walked down Amber Street, and I was facing Metro-Atlantic area, okay, it would be from Amber Street to the right where all the barrels were.

NERI EXCERPT

Q. Okay. Did you ever notice anything else unusual along the riverbank from the side of the Metro-Atlantic plant?
A. Yeah. Between where the bridge was, between the bridge and I would say between anywhere from -- because I don't have a tape line, but anywhere from a hundred feet to a hundred yards, which is 300 feet, there was a pipe protruding out of the bank about one to two feet below the surface.
Q. When you mentioned the bridge, can you point to the bridge you're referring to?
A. I would imagine it would be right here.

10

Q. All right. And that's the Smith Street overpass above the Woonasquatucket River?
A. Correct.
Q. And you estimated a distance from that point down --
A. Towards my house. From Smith Street towards my house, which is the bridge, on the left side of the bank, which would be North Providence side, there was a pipe protruding out. And it used to stick out I'm going to estimate -- well, it was enough to go -- the bank went this way, and the pipe went that way so the stuff would come out, the chemical would come out and go right into the water.
Q. When you observed something coming out, what did it look like?
A. It was different colors. Sometimes it was yellow, sometimes it was black, sometimes purple. It was all

different colors when it hit the water.
Q. Did you observe the water change color when it hit the water?
A. Absolutely.
Q. How often would you see any activity with that pipe?
A. Again, like, the pipe used to extract approximately around 3:30, 4:00 approximately every



day. Like I said, I mean, every day I'd go by the same exact time but -- I'm sorry, I didn't see the extractions all the time. But when I went by there after school, if I stayed after school or something, I would see the chemical.
Q. You don't actually know what was coming out of the pipe; is that right?
A. No, I do not.
Q. As far as a time frame goes, what years would you estimate that you would see the material coming out of that pipe and in the river?
A. I'd say from '64 to -- '63 to '68.
Q. When you walked along the river, did you ever see any activity, trucks or equipment?
A. Yes. We used to kid because we saw trucks and tractor -- well, it's actually a bulldozer. And we used to see the -- well, mostly here, because we were kind of blind-sided with the trees. There was trees that were there, but it would sound like if you watch a desert movie with tanks, you would hear that clatter on the tank think. We would hear that a lot, going back

and forth, back and forth. That started about 3:30 and then around dusk.

Q. If you were to point out on this map where that tree area was, could you show us?



A. I'm trying to figure out where Amber Street is on the map, and I can give you a better idea. This thing is so small.

Q. Are you familiar with Steere Avenue on the opposite side?

A. Yes. I know where Steere Avenue is. I think that was a little -- probably, if I was looking at the river here, Steere Avenue is probably a little to the right for me.

Q. So Amber would be north of where Steere Avenue is?

A. If that's what --

Q. Up is north. You mentioned that you would hear this sound, like a tank sound. How often would you hear these sounds?

A. Okay. We heard those every night. It was mostly in the summertime because it would get dark early in the winter, but mostly it would from the time about 3:30, four o'clock until dusk.

Q. Was that every day?

A. Every day.

Q. And was that a constant thing every year or just one year?

A. No. That was all the time.

Q. And the time frame, can you tell us what years you would hear this?

**EXHIBIT J**

TURCONE EXCERPT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| * * * * * * * * * * * * | * CIVIL ACTION |
| EMHART INDUSTRIES | * NO. 02-053S |
| | * |
| VS. | * SEPTEMBER 18, 2006 |
| | * |
| HOME INSURANCE CO. | * |
| * * * * * * * * * * * * | * PROVIDENCE, RI |

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH
DISTRICT JUDGE
(TESTIMONY OF JOHN TURCONE)

APPEARANCES:

FOR THE PLAINTIFF:

JACK PIROZZOLO, ESQ. and
RICHARD L. BINDER, ESQ.
Foley & Hoag LLP
Seaport World Trade Center West
155 Seaport Blvd.
Boston, MA 02110-2600
(617) 832-1250

FOR THE DEFENDANT North River:

JOHN T. HARDING, ESQ.
Morrison, Mahoney, LLP
250 Summer Street
Boston, MA 02210
(617) 439-7558

MARK T. NUGENT, ESQ. and
MICHAEL T. FARLEY, ESQ.
Morrison, Mahoney, LLP
121 South Main Street
Suite 600
Providence, RI 02903
(401) 331-4660

FOR THE DEFENDANT Century Indemnity:

LAWRENCE A. NATHANSON, ESQ.
Siegal, Napierkowski & Park
533 Fellowship Road
Suite 120
Mt. Laurel, NJ 08054
(856) 380-8900

APPEARANCES: (Continued)

TURCONE EXCERPT

A. Yes.
Q. And I'm going to read, starting on line 12 the question and answer, then I'm going to ask you if I read that correctly. "And this building that was marked as number 4, was that building in use throughout the period of time when you were employed at Metro-Atlantic?
Answer: It was built when I started there. So it wasn't there when I first got there. It was a new building.
Question: Was the building built at some point after you went to Metro-Atlantic?
Answer: Started, yes.
Question: And do you recall about how long after you got there that the building was put up?
Answer: I don't kno. Six months. Hard to say".
Did I read that correctly?
A. Yes.
Q. Does that refresh your recollection as to whether that building was a newly constructed building when you were working between '63 and '65 at Metro-Atlantic?
A. If I said it, I guess I did. Let me tell you something. I had a heart attack in January. So some things I remember fully and some things I don't.

14

Q. I understand that. It's fair to say you had a better memory back in 2002 when you gave this deposition than today?

TURCONE EXCERPT

A. Yes.
Q. Did you ever observe a pipe from that building that we just described, the new building outside of the building?
A. Yes.
Q. And where did that pipe lead?
A. To the river.
Q. Was there some reason why you remember that pipe from the new building into the river?
A. It had to be replaced every so often.
Q. Is that based on your observations?
A. Yes.
Q. And what did you observe about the pipe that led from the new building into the river?
A. That it would deteriorate through use.
Q. Was it kind of a corrosive effect?
A. Yes.
Q. So the metal pipe that led from the new building into the river would corrode away; is that correct?
A. Yeah. Actually, when they showed it to me, the bottom would wear out. It would go from a regular size pipe on top to a thin piece of steel on the bottom.

15

Q. Your personal knowledge is that it was replaced on a regular basis?
A. Yes. They would have to shut it down, and they would call them, and they would come and replace it.
Q. In that new building, is that where they were making this product that you referred to as Agent Orange?

A. Yes.
Q. In the other buildings, the main plant buildings, did you ever observe waste materials being washed down the drain, the French drains, when you were working there?
A. Just when we cleaned up the mess from the presses, whatever residue was left on the floor, we would just wash it into the drain.
Q. Do you know where that drain led to?
A. To be honest with you, no.
Q. Would it be fair to say that -- strike that. Was it your understanding that it led to somewhere out back of the building?
MR. PIROZZOLO: Objection, your Honor.
THE COURT: Sustained.
MR. NUGENT: Your Honor, referring to page 12 of the witness's deposition.
THE COURT: Line?



MR. NUGENT: Just a minute, your Honor. Actually, line 13.
THE COURT: Line 13 or page 13?
MR. NUGENT: No. Page 13, line 15.
THE COURT: All right.
MR. NUGENT: Do you have lines 15 through 21?
Q. Do you see that, Mr. Turcone?
THE COURT: Just a minute. There's an objection to the question.
THE WITNESS: Do you want me to answer that?
MR. NUGENT: Let's wait for the Judge for a

**EXHIBIT K**

HASS EXCERPT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| * * * * * * * * * * * * | CIVIL ACTION |
| EMHART INDUSTRIES | NO. 02-053S |
| VS. | OCTOBER 3, 2006 |
| HOME INSURANCE CO. | PROVIDENCE, RI |
| * * * * * * * * * * * * | |

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH
DISTRICT JUDGE
(TESTIMONY OF DR. JAMES ROBERT HASS)

APPEARANCES:

FOR THE PLAINTIFF:
JACK PIROZZOLO, ESQ. and
RICHARD L. BINDER, ESQ.
Foley & Hoag LLP
Seaport World Trade Center West
155 Seaport Blvd.
Boston, MA 02110-2600
(617) 832-1250

FOR THE DEFENDANT North River:
JOHN T. HARDING, ESQ.
Morrison, Mahoney, LLP
250 Summer Street
Boston, MA 02210
(617) 439-7558

MARK T. NUGENT, ESQ. and
MICHAEL T. FARLEY, ESQ.
Morrison, Mahoney, LLP
121 South Main Street
Suite 600
Providence, RI 02903
(401) 331-4660

FOR THE DEFENDANT Century Indemnity:
LAWRENCE A. NATHANSON, ESQ.
Siegal, Napierkowski & Park
533 Fellowship Road
Suite 120
Mt. Laurel, NJ 08054
(856) 380-8900

APPEARANCES: (Continued)

exactly when they stopped.
Q. So it was in operation for more than 20 years, correct?
A. Around 20 years.



Q. And is it your understanding that up to 50,000 barrels were delivered to that facility throughout the time that it operated on an annual basis?
A. That's not exactly true. Fifty thousand a year were being delivered at some point in its history. There's no evidence to suggest it was that much in 1950, for example.
Q. Okay. Do you know about what the total number of barrels were that were delivered to this facility over the course of its more than 20 years of operation?
A. I have not done the sums.
Q. Is it fair to say it's in the hundreds of thousands?
A. I would expect that, yes.
Q. And these barrels, when they got to the facility, they were put through an incinerator, correct?
A. Yes.
Q. And the incinerator here was a big fire, is that a simple way to refer to it?
A. Perhaps too simple. My understanding is that there were gas-fired jets that were pointing at the barrels as they went into the furnace area being dragged on a chain. There was also open flames involved from materials burning in the pit below.
Q. And this is what they did every day at this

facility in its more than 20 years of operation,
correct?
A. My understanding is that in the early part of the
business --
Q. Can you answer my question, please. Is the
procedure you just described --
A. No.
Q. That's not the procedure they followed at this --
A. Not for the entire 20 years.
Q. Not for the entire 20 years. For most of the
time?
A. That's my understanding, yes.
Q. And did they use heat in this process?
A. Yes.
Q. They used open jets?
A. That's my understanding, yes.
Q. Is it your understanding from the depositions and
other things you've read that some of these barrels
came in and had some type of residues in them, correct?
A. That's correct.
Q. And before they were put through the open flame,
the residues were dumped on the ground into a pit?
A. There was testimony to that, yes.
Q. In fact, in your report on pages 16 and 17 that
you have in front of you, you refer to a fire pit; is

80

that correct?
A. Yes.

Q. And what were you -- how were you using the reference "fire pit" in this document?
A. I think I took the term from Mr. Turcone's deposition that was meant was there was a furnace with a drag chain pulling barrels through it. Below that furnace was a cement container, roughly three feet wide, a few feet deep and six or eight feet long, as I recall. It was referred to as the fire pit, I believe, in some of the testimony so I used the same term.
Q. And you have no reason to dispute their testimony that this fire pit existed at the site?
A. None.
Q. And there were fires in it all the time, according to your report, isn't that true?
A. There was testimony to that effect, yes.
MR. HARDING: Can I have pages 16 and 17 he's testified about published to the jury.
MR. PIROZZOLO: I move that the whole report be admitted, your Honor.
MR. HARDING: That's fine with me.
THE COURT: You want the whole report now?
MR. PIROZZOLO: Yes, your Honor. Subject to the protective order, of course.



THE COURT: I'm trying to accommodate you by taking small amounts at a time.
MR. PIROZZOLO: I think it should all be admitted.
THE COURT: All right. Then the entire document then will be admitted at the defendants next in line.

(Defendants' Exhibit 556 marked full.)
THE COURT: You may publish page 17, is it?
MR. HARDING: Sixteen and 17.
THE COURT: All right. Sixteen and 17.
MR. HARDING: Can I turn to the next page now?
THE COURT: Sure.
Q. Dr. Hass, the chemical residues you described, they were dumped into this pit, correct, out of the barrels?
A. That's one thing that happened to them, yes.
Q. These residues were not put into any type of sanitary landfill, correct?
A. That's correct.
Q. And to your knowledge, based on your study of the site, no sanitary landfill existed at this site while it was in operation, did it?
A. I'm unaware of any sanitary landfill.
Q. And on occasion, is it your understanding that some of the employees had to extinguish fires that



started in the pit?
A. Yes.
Q. And is it your understanding that there were some occasions when the fire department had to be called out to put out the fire in the pit?
A. Yes. Sorry. In the pit?
Q. Yes.
A. That I'm not sure about.
Q. You're not sure. These fires involved the burning of chemicals and chemical residues, correct?

HASS EXCERPT

or does it have some element of liquid in it?
A. It's probably a moist powder is what I would expect it to be.
Q. Would you have any problem referring to it as a sludge?
A. Not particularly.
Q. Do you have an understanding as to how much sludge or waste material would be produced per batch of TCP in this process?
A. Subject to checking the ZEP recipe, the charcoal would be about ten pounds, and I think they added about ten pounds of some other material in there, plus whatever solids were in the TCP solution that came from Diamond Alkali, and I really have no knowledge of how much solvent would have been there.
Q. Okay. I guess I'm a little confused. Are you able to tell us just approximately, you know, what sort of volume of sludge would come out of the first step A that's shown on your diagram?
A. Well, subject to my memory of the amount of the, I think it was called filter flow or something like that, there would be about 20 pounds of solids plus whatever moisture that is their waste.
Q. So a little over 20 pounds is your best estimate?
A. Twenty to 30 pounds probably is about right.

88

Q. And this 20 or 30 pounds of sludge that comes out has dioxin in it, correct?

Q. Okay. And this particular example that we're on lists the products identified for American Hoechst Company, correct?

A. Correct.

Q. And isn't it correct that there are about 20 pages or more of products listed?

A. There are a lot of pages.

Q. Okay. And the same is true for the other entities that are listed here?

A. I don't know specifically about each one.

Q. Okay. Well, wouldn't it be fair to say that New England Container, when it put this together, it went through each company that it knew it did business with and based on historical sources listed the products

107

that each of those companies manufactured or sold during the relevant time period?

A. That was my understanding, yes.

Q. And based on your review, isn't it fair to say that there are hundreds of different products and chemicals listed in those pages, correct?

A. Yes.

Q. And you can't tell us today which of those chemicals were in any of the drums that were delivered to NECC?

A. I'm basing this on what NECC said.

Q. Okay. So your information is no better than what's in NECC's documents, correct?

A. I think that's true, yes. That's the whole report including the Chemical Week Buyer's Guide study.

Q. Right. But as a general matter, NECC was not able to tell the EPA what each and every one of these companies sent to the NECC site over the 20 years that it operated, correct?
A. I think that's correct, yes.
Q. And your opinion, if I understand it correctly, is that the unknown chemicals that came in from these deliveries are the source of most of the dioxin contamination at this Centredale site, correct?
A. Correct.



Q. That's even though you don't have data as to what was sent and burned and dumped on the ground at the site during this 20-year period, correct?
A. Correct.
Q. And it's your testimony that this burning of residual chemicals formed the precise form of 2,3,7,8 dioxin that is driving the remediation at the Centredale site, correct?
A. The reality is there are many other forms of dioxin there as well, but the combustion of 2,4,5-trichlorophenol would account for the particular dioxin that's driving this remediation.
Q. Right. But you don't have a document to show the 2,4,5-trichlorophenol was burned at the NECC site, do you?
A. No.
MR. HARDING: That's all I have, thank you.
THE COURT: Okay. Thank you, Mr. Harding.
Mr. Levens.

HASS EXCERPT

CROSS-EXAMINATION BY MR. LEVENS

Q. Hello, Dr. Hass.

A. Hi.

Q. My name is Scott Levens. I represent Century Indemnity. We met a few times on depositions in this case.



A. We have.

Q. Dr. Hass, you testified about how samples were received at your laboratory, Triangle Labs, for analysis, do you recall that?

A. I think I was testifying about receiving in general, but it does apply to Triangle Laboratories as well.

Q. And I believe you said, again, I think you said as to Triangle Labs that soil samples were actually received in ice chests; is that correct?

A. Normally, yes.

Q. Generally, Dr. Hass, would there be any reason for an individual to add anything or alter a sample in any way from the time it was collected up until the time it was received by Triangle Laboratories?

A. I can't testify to what reason someone else may have had.

Q. Well, is there any chemical reason, any preservation of the sample, anything that you know that would have needed to be added?

A. I'm sorry. Not for dioxin analyses.

Q. Okay. So that's a no?

A. That's a no.

MR. LEVENS: Thank you, Dr. Hass.



Nothing further, your Honor.

THE COURT: Thank you, Mr. Levens.

All right. Ladies and gentlemen, this is probably a good time to take our afternoon break. Again, we'll take 15 minutes, reconvene at 12:30 and proceed to about 2:00, 2:15.

Charlie, could you show the jury out.

(Proceedings out of the presence of the jury as follows:)

THE COURT: Couple of things. With respect to Exhibit 125, I've relooked at the testimony surrounding 125 and that document has a lot more in it besides the flood statistics at the Centredale marker. Testimony was admitted respecting the contents of the document as to the Centredale site, but the rest of the document is not relevant. It talks about floods and draughts throughout Rhode Island history and that really isn't relevant to this case.

So I think the testimony that was allowed suffices. If you think there's an extract from the exhibit that didn't get in that needs to be, I guess we can consider that. But that's it with respect to 125.

How much time do you need for redirect?

MR. PIROZZOLO: I'm thinking half hour to an hour.



THE COURT: All right. I'm going to give you a

# EXHIBIT L

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * CIVIL ACTION
EMHART INDUSTRIES * NO. 02-053S
*
VS. * SEPTEMBER 27, 2006
* VOLUME 10
*
HOME INSURANCE CO. * PROVIDENCE, RI
* * * * * * * * * * * *

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH
DISTRICT JUDGE
(JURY TRIAL)

APPEARANCES:

FOR THE PLAINTIFF: JACK PIROZZOLO, ESQ. and
RICHARD L. BINDER, ESQ.
Foley & Hoag LLP
Seaport World Trade Center West
155 Seaport Blvd.
Boston, MA 02110-2600
(617) 832-1250

FOR THE DEFENDANT
North River: JOHN T. HARDING, ESQ.
Morrison, Mahoney, LLP
250 Summer Street
Boston, MA 02210
(617) 439-7558

MARK T. NUGENT, ESQ. and
MICHAEL T. FARLEY, ESQ.
Morrison, Mahoney, LLP
121 South Main Street
Suite 600
Providence, RI 02903
(401) 331-4660

FOR THE DEFENDANT
Century Indemnity: LAWRENCE A. NATHANSON, ESQ.
Siegal, Napierkowski & Park
533 Fellowship Road
Suite 120
Mt. Laurel, NJ 08054
(856) 380-8900

2

APPEARANCES: (Continued)

opinion.

A. Yes.

MR. HARDING: Your Honor, can I just have a standing objection to this line.

THE COURT: Yes.

MR. HARDING: Thank you.

THE COURT: Yes. Your objection is noted.

A. New England Container Corporation was engaged in the business of recycling or reconditioning used drums. According to the testimony that I read, the waste from those drums was disposed on site, both before it was burned, that is to say the contents of drums were disposed on site, as well as the ash that resulted from the, I think they described it as a furnace that was used to burn the paint from the drums and any material that was still in them. Combustion processes are well-established as a source of dioxin in general, more than just --

MR. HARDING: Objection. Move to strike, non-responsive.

126

THE COURT: Well, he's testifying as the basis of his opinion. Overruled. Keep going.

A. Combustion is a well-documented process of generating dioxins from a wide variety of material. The particular contaminant, TCDD, at issue at this site, is formed in very good yield from 2,4,5-trichlorophenol when it is combusted. And by very good yield, that ranges from about a half a percent in the lowest end of things to maybe -- well,

certainly more than 50 percent or higher yield of TCDD from any 2,4,5-trichlorophenol that might be present.

So therefore -- and also, I looked at the 104-E reports from New England Container, which included a table that listed the materials that their customers were using, and then a large series of sheets, essentially, Chemical Weekly I believe was its name, a magazine that listed what their customers sold.

So I used that to inform myself as to the kinds of materials that were likely to be in the drums that came into New England Container, and, on that basis, concluded that it was far more likely than not that some of the drums would have contained 2,4,5-TCP. And through the combustion and disposal of waste associates with that, the TCDD found on the site would have originated from the New England Container operation.

127

Q. Are you familiar -- have you learned of the New England Container operation of burning barrels?
A. Yes.
Q. In that operation, if TCDD were generated, would it have been associated with activated charcoal?

MR. HARDING: Object. Leading, speculative, foundation.

THE COURT: I'm going to sustain the objection. You need to ask him a few more foundational questions for this.

Q. Do you have an opinion as to -- could you describe what chemically would happen in that operation, having in mind whether or not activated charcoal would be

much TCDD from the reaction as we had TCP going in in the first place.

Q. And would that TCDD be bound to charcoal?

A. No.

Q. What is your reason for that?

A. There would be no charcoal present.

Q. Would it be bound to carbon?

A. Possibly.

129

Q. To what extent -- would it be bound to activated carbon?

A. Not at all. There's none there.

Q. I'm sorry?

A. There's no activated carbon there. There would be some soot particles formed, possibly, during the combustion process.

Q. From reading the depositions and being in court during the trial, have you learned that there were dump fires?

A. Yes.

Q. Do you have an opinion as to whether the dump fires would generate dioxin?

A. Yes.

MR. HARDING: Objection. Foundation, scope of expert report.

MR. PIROZZOLO: Maybe I could cover it more generally, your Honor. Make it easier.

THE COURT: Is it in the expert report or not?

MR. PIROZZOLO: A fire is a fire, your Honor. He's --

THE COURT: Don't -- come back up.

(Side-bar conference.)

THE COURT: Now, this is really causing a lot of delay.



MR. PIROZZOLO: I don't understand what is the objection, your Honor. He said combustion creates dioxin. That's all I'm trying to bring out.

MR. HARDING: Why isn't there a statement, a dump fire caused dioxin.

THE COURT: There's nothing in here about dump fires. And what does he know about dump fires?

MR. PIROZZOLO: All he knows is that a fire and in the presence of or with trichlorophenol would create a dioxin.

MR. HARDING: He's already testified to that. I'm just covering the dump fires.

THE COURT: He's covered it then. You're trying to take him into an area -- there's no indication in here that this 2,4,5-T in any of these drums, that any of that got into a dump, and then the dump caught on fire.

MR. PIROZZOLO: Your Honor, there's a stipulation that there were drums all over the place.

THE COURT: You don't know what kind of drums those are.

MR. PIROZZOLO: But there's only two possibilities. We have learned that dioxin is formed from trichlorophenol. Now, in order to have dioxin on that site, it has to have come from trichlorophenol.

THE COURT: You can ask -- listen. Listen. You can simply ask him a question that would combustion, which occurs in any other situation, which involved 2,4,5-T, would that have the same effect as what you've just described with respect to the NECC process. That will cover it. And then if you can prove the facts behind barrels of that stuff being in a dump or lying around the plant or whatever, then you can do what you will with it. Cover it that way. Let's keep going.

(End of side-bar conference.)

BY MR. PIROZZOLO: (Continuing)

Q. Dr. Hass, you explained how combustion at NECC in their barrel cleaning operation creates dioxin?

A. Yes.

Q. Does other combustion create dioxin?

A. Yes.

Q. Under what circumstances?

A. The creation of dioxin of any form will occur when you have carbon and chlorine --

MR. HARDING: Objection to the extent we're getting into other kinds.

THE WITNESS: I misunderstood the question.

THE COURT: I'm sorry?

THE WITNESS: I misunderstood the question.

MR. HARDING: I object. He's now starting to



testify about other kinds of dioxin, not what we're concerned about.

**EXHIBIT M**

WOODWARD EXCERPT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * CIVIL ACTION
EMHART INDUSTRIES * NO. 02-053S
*
VS. * OCTOBER 6, 2006
*
HOME INSURANCE CO. * PROVIDENCE, RI
* * * * * * * * * * * *

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH
DISTRICT JUDGE
(EXCERPT OF TESTIMONY OF DR. FRANKLIN E. WOODARD)

APPEARANCES:

FOR THE PLAINTIFF: JACK PIROZZOLO, ESQ. and
RICHARD L. BINDER, ESQ.
Foley & Hoag LLP
Seaport World Trade Center West
155 Seaport Blvd.
Boston, MA 02110-2600
(617) 832-1250

FOR THE DEFENDANT
North River: JOHN T. HARDING, ESQ.
Morrison, Mahoney, LLP
250 Summer Street
Boston, MA 02210
(617) 439-7558

MARK T. NUGENT, ESQ. and
MICHAEL T. FARLEY, ESQ.
Morrison, Mahoney, LLP
121 South Main Street
Suite 600
Providence, RI 02903
(401) 331-4660

FOR THE DEFENDANT
Century Indemnity: LAWRENCE A. NATHANSON, ESQ.
Siegal, Napierkowski & Park
533 Fellowship Road
Suite 120
Mt. Laurel, NJ 08054
(856) 380-8900

2

APPEARANCES: (Continued)

process is to add caustic to the liquid material that comes from Diamond Alkali and cause a precipitation of materials, and those -- precipitation means convert from dissolved state to solid state. So any dioxin, and there always was dioxin back the way they made this stuff, the dioxin would then absorb to the solids and would then be -- would be right there.

Q. So what you've labeled as solids with an arrow pointing to waste, that's the point in the process where dioxin comes out?

A. That is the point, yes.

Q. Could you just circle that, the solids and waste.

Now, do you have an opinion as to whether 100 percent of the dioxin comes out of the process at that point?

A. Dioxin is so insoluble and --

THE COURT: First of all, you have to say whether you have an opinion.

Q. Do you have an opinion?

A. Yes.

48

Q. What's your opinion on that issue?

MR. PIROZZOLO: Objection, your Honor. Foundation.

THE COURT: Overruled.

A. My opinion is that almost all of the dioxin would be absorbed there.

Q. Okay. You refer on your chart to the point in time where the dioxin comes out as you refer to it as a solid or waste. Do you have an understanding as to

what that solid or waste looks like?
A. Yes, I do. It would look like oatmeal.
Q. Do you have an understanding as to what color it would be?
A. It would be brownish to black.
Q. And what's your understanding of what it would look like based on?
A. My understanding is based on, number one, my experience; and number two, the description by Mr. Cleary that this crude TCP was brownish in color. And that brown color would color these solids.
MR. HARDING: I'd move for the admission of the diagrams as the defendants' next numbered exhibit.
THE COURT: Is there an objection?
MR. PIROZZOLO: Yes, your Honor.
THE COURT: All right. Overruled. This will be

49

590. The collection of those four boards, which are the diagram, will be Defendants's 590.
(Defendants' Exhibit 590 marked full.)
Q. Dr. Woodard, looking at that same first page of what's now been received into evidence as Defendants' Exhibit 590, could you tell me, does your diagram indicate whether or not nuchar or charcoal was used before the step at which the dioxin comes out?
A. I can tell you, yes.
Q. You can tell us?
A. Yes.
Q. And what's your opinion as to whether or not nuchar or charcoal was used in the part of the

purification process before the dioxin comes out?
MR. PIROZZOLO: Objection. Foundation.
THE COURT: Overruled.
A. It would not be -- it would not make any sense to add the nuchar here, because these other materials that precipitate out and become solids would stick to the nuchar and use it up. It would be very, very unefficient.
THE COURT: Just a second. I think you're getting ahead of the last question. The last question was whether or not nuchar was added as part of that purification process before the dioxin comes out. Just



answer that question, not the why question but --
Q. In your opinion, was nuchar or charcoal added to the initial purification step before the dioxin comes out?
MR. PIROZZOLO: Objection. Foundation and not in Dr. Woodard's report.
THE COURT: Overruled.
A. It is my opinion that it would not be added in the first step.
Q. Why is that your opinion?
MR. PIROZZOLO: Objection. Foundation.
THE COURT: Overruled.
A. That's my opinion because my experience, and I have a lot of experience with activated carbon, tells me that it would be a waste of that very expensive material, relatively expensive material to use it here because it would be used up by other things, other than

the color, which is its primary purpose. Its primary purpose is to remove color.
Q. In the materials you reviewed of Mr. Cleary's, his deposition and the other documents, did you see any indication that Mr. Cleary indicated that the nuchar would be used in that first part of the purification process?
A. The indication -- he doesn't speak to that, but



the indication is that it is --
MR. PIROZZOLO: Per your Honor's judgment, Mr. Cleary doesn't speak to --
THE COURT: Overruled.
Q. You may continue your answer, Dr. Woodard.
A. On the list of ingredients, they are given pretty much in the order in which they're used, and nuchar appears down at the bottom.
Q. Based on your diagram, do you have an opinion that nuchar or charcoal, was, in fact, used at some point in the process?
A. Yes.
Q. Could you show on your diagram, for the benefit of the jury, where in the process the nuchar was used?
A. It's used in one of the last steps here or here in order to make this or this solution colorless so that the crystals that come out of it will be colorless.
Q. And you've marked on that diagram where nuchar would be used in your opinion, correct?
A. Yes.
Q. Now, the solid material that comes out that you

described as being brownish, brownish/blackish and kind of an oatmeal consistency, to your knowledge, was that a waste product of the process?

A. Yes. That would be a waste product.



Q. Did it have any economic value?

A. No. Nobody wants it.

Q. Okay. You can sit down.

Now, you indicated that the hex manufacturing process you described produces this waste, correct?

A. Yes.

Q. Do you have an understanding as to whether that waste contained dioxin?

A. From the first step?

Q. From the first step.

A. Yes. Yes. I do.

Q. And what's your understanding?

A. It is my understanding that that's where almost all the dioxin would end up, would be in that first waste material.

Q. Do you have an understanding as to what type of dioxin was in that material?

A. Yes.

Q. And what's your understanding as to what type of dioxin was in that material?

A. It would be the 2,3,7,8 dioxin that is the primary amount that's created when crude trichlorophenol is made by the method that Diamond Alkali used.

Q. In the course of your work on this case, have you reviewed the available information concerning the

**EXHIBIT N**

KASTRINOS EXCERPT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| * * * * * * * * * * * * | * CIVIL ACTION |
| EMHART INDUSTRIES | * NO. 02-053S |
| | * |
| VS. | * SEPTEMBER 19, 2006 |
| | * & SEPTEMBER 20, 2006 |
| HOME INSURANCE CO. | * |
| * * * * * * * * * * * * | * PROVIDENCE, RI |

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH
DISTRICT JUDGE
(TESTIMONY OF JOHN KASTRINOS)

APPEARANCES:

FOR THE PLAINTIFF:

JACK PIROZZOLO, ESQ. and
RICHARD L. BINDER, ESQ.
Foley & Hoag LLP
Seaport World Trade Center West
155 Seaport Blvd.
Boston, MA 02110-2600
(617) 832-1250

FOR THE DEFENDANT
North River:

JOHN T. HARDING, ESQ.
Morrison, Mahoney, LLP
250 Summer Street
Boston, MA 02210
(617) 439-7558

MARK T. NUGENT, ESQ. and
MICHAEL T. FARLEY, ESQ.
Morrison, Mahoney, LLP
121 South Main Street
Suite 600
Providence, RI 02903
(401) 331-4660

FOR THE DEFENDANT
Century Indemnity:

LAWRENCE A. NATHANSON, ESQ.
Siegal, Napierkowski & Park
533 Fellowship Road
Suite 120
Mt. Laurel, NJ 08054
(856) 380-8900

2

APPEARANCES: (Continued)

A. Yes.
Q. What is that rate?



A. Haley and Aldrich is compensated at the rate -- at the start of the project, about $173 per hour for my time spent on the project, and recently it's upwards around $185 per hour.
Q. Thank you. Now, what do you understand to be your assignment in this case?
A. I was asked to render an opinion on the Centredale Manor Superfund site.
Q. Did you -- what is the fate and transport of materials, what does that mean?
A. Fate and transport means how materials move through the environment. What mechanisms. In some cases, it's by air; some cases by ground water, dissolved in the ground water. In other cases, it's through erosion of the soil and sediment. In some cases, contaminants will decay over time due to activity of bacteria, for example. Dilution comes into play with fate and transport.
Looking at river flows, for example, if you can predict the amount of contamination reaching a river and you know the river flow, you can assess what the concentrations within the river would be. These are some examples of what I consider fate and transport.
Q. And have you considered the fate and transport of dioxin?

KASTRINOS EXCERPT

A. Yes, I have.
Q. Thank you. Have you considered concentrations of dioxin found on the site in question in the years 1968 through 1970?
A. Yes.
Q. And have you prepared yourself to give your views on that?
A. I am.
Q. Thank you. Would you please tell the Court and jury what work you have done to prepare yourself to give the opinions that you expect to testify to.
A. Okay. First of all, we reviewed a very large volume of published material, some of which was done by the Environmental Protection Agency and their consultants, and there were various other engineering firms who have done investigations on the property, in some cases for different purposes.
We have also reviewed published information by the U.S. Geological Survey, including topographic quadrangle maps, and the information and data I mentioned earlier on flooding, stream flows and stream stages or elevations.
We have also reviewed Sanborn fire insurance maps. These were developed for the purposes of evaluating risk of fire on properties so they include



things like storage tanks for fuel, where chemicals were stored, this sort of thing. And those, again, are historical maps dating back to the '50's and even earlier.

particle --
A. Yes.
Q. -- is there anything about the way soil particles move that has a relationship to the way dioxin moves?
A. Well, dioxin will move with the soil particles. So if they are eroded and transported by run-off, or dug out and moved somewhere, the dioxin will be absorbed in those soils and move with it.
Q. So would it be correct that in whatever way soil



particles move, so would dioxin move?
A. Yes.
Q. And you said it would not normally become -- withdrawn. You say it would not normally go into solution with water?
A. Yes. It will not be dissolved in water.
Q. Okay. So would it be a fair way to understand how dioxin moves is it would move like sand?
A. Yes. Sand and other soils that it's attached to.
Q. Okay. And so are you able to explain how dioxin would move in the environment?
A. Yes.
Q. And would you relate the way dioxin moves in the environment with the way sand moves, and by sand or other soil particles would move in the environment?
A. Yes, it would.
Q. How would it?
A. Basically, during rainfall, particularly heavy rainfall, as the soil particles are picked up just from the intensity of the rainfall, some of those materials

get entrained in the water, which, again, runs off the land surface and typically seeks out lower ground, usually surface waters, wetlands, streams, rivers, lakes.

So by this mode, dioxins traveling, essentially,



attached to the soil particles will move entrained in that run-off. If you could see the run-off, it would look muddy, basically. If you've ever seen water running off a construction site, for example, that might give you a picture of what this would look like.

Q. Do you have a graphic to show, illustrate how dioxin attached to soil would move in -- would move?

A. I have graphics illustrating how the soils move, yes.

MR. PIROZZOLO: Your Honor, I have a series of graphics that I would like to publish to the jury as Mr. Kastrinos testifies so he can explain this movement.

THE COURT: Just follow the same procedure we've used before.

MR. PIROZZOLO: May we show the first graphic.

Q. Using the first slide, Mr. Kastrinos, would you explain how dioxin attached to soil would move?

THE COURT: First of all, is there any objection to the witness using this as part of his testimony?

MR. HARDING: No objection, your Honor.

THE COURT: All right. Go ahead and publish this to the jury and the witness may then testify.

Q. Could you use that to explain your testimony as to

how dioxin attached to soil would move.



A. Yes. There should be a series of slides, four or five slides here.

Q. Do you want them in order? Should we go one by one?

A. One by one.

Q. Okay. Thank you. They are showing the process by which soil particles and, of course, any contaminants attached to them would move once in a river environment.

So this shows in profile a stream or river, and you can see the bed of the stream or river dropping off in elevation to the right of the screen.

So what happens is, as a river enters either a deeper segment of the river, it could be deeper, wider or it could be emptying into a pond, since the amount of water flowing through the river isn't changing, the velocity naturally slows down as this relatively shallow river enters a deeper water environment.

So that's really all this slide is showing. You can see the ground surface in the background and, of course, these upland areas are the source of the soils that are within the river and entrained within the water.

And just, conceptually, you can see a legend at the bottom of the slide showing gravel size sediments,



sand grains and clay size particles, clay being the

were taken as indicated in the chart?
A. That's correct.
Q. Most of these are in 1999?
A. That's correct.
Q. Could you compare these concentrations with the concentrations as of, say, 1969 after the Metro-Atlantic plant closed?
MR. O'CONNOR: Objection. Foundation.
THE COURT: Well, the question is can he compare. So it may be yes or no. Let's find out.
A. Yes.
Q. Would you tell the Court and jury how you would go about making that comparison.
A. Yes. And basically, you have to look at the dioxin concentrations, obviously, in 1999; how the dioxin would have been transported through the environment; the history of the site, when did industrial operations stop such that there would be no dioxins and other contaminants added. So it's a series of lines of evidence. And we're talking about a relative order of magnitude. I can't say the precise concentration in 1968 or '69.
Q. And in what way would you make that comparison,

121

please?
A. Using the lines of evidence we've described so far, we've -- I have developed an opinion that dioxins have moved from the land portion of the site to the water over time by erosion and transport and run-off.
Secondly, and this will become clearer with

subsequent slides, in general, the dioxin concentrations declined with increasing depth below ground surface.

So in the first case, it follows that there is less dioxin by weight, less mass of dioxin in 1999 on the land than back in 1968 because of the mass of dioxin that has been transferred from the land to the water. So there's less on the land, more on the water.

Secondly, because, in general, the higher dioxin concentrations have been found at shallow depths, it follows that the concentrations that would have been present historically during the operation of Metro-Atlantic and New England Container, would have been approximately as high or perhaps slightly higher than the concentrations that were detected in 1999, because, again, the shallowest of the soils are those that will be eroded and transported.

Q. Thank you, Mr. Kastrinos. Now, if we were to go through Table 5, is that a report of several pages?

122

A. Yes, it is.

Q. And I believe you said that the samples are organized in declining order of concentration?

A. That's correct.

Q. So the top one is CFS 240, and that is 140 micrograms per kilogram; is that right?

A. That's correct.

Q. So without going through the entire chart sample by sample --

MR. PIROZZOLO: Could we show the last page of

Mr. Kastrinos. Could you -- if you look at the dioxin levels on the site at the zero to one foot depths, could you compare the concentrations of dioxin on the former Metro-Atlantic portion of the site with the New England Container portion of the site and the dump area south of New England Container?
A. Yes.
Q. And do you need anything to help you to make that comparison?
A. The one figure with dioxin shown at a depth of



zero to one foot would be helpful.
Q. Thank you.
A. 183A.
Q. That would be 183A20.
A. As mentioned previously, the highest concentrations include what's been identified as the former dump area to the south of New England Container, which is right here. Sort of due east of the New England Container buildings, there are concentrations that are fairly high right here, in excess of one hundred parts per billion. In the area of the Metro-Atlantic buildings, concentrations are lower. The highest concentration being in the vicinity of the former hexachlorophene building, right here. The highest concentration in that little cluster of samples you see there was approximately four parts per billion.
Q. How many parts per billion at the NECC portion of the site?
A. Well, the arrow in the middle was over 110. I

think 116 parts per billion, something of that nature.

Q. What were the concentrations in the dump area?

A. Up to 140 parts per billion.

Q. Thank you very much. Yesterday you explained, you prepared a chart showing the methods or the process of erosion in the Woonasquatucket River. Did you also



prepare one showing that process in Allendale Pond?

A. Yes, I did.

MR. PIROZZOLO: Okay. May the witness be shown that.

THE CLERK: What exhibit number is that?

MR. PIROZZOLO: Doesn't have an exhibit number yet.

Q. Is that similar to the chart you showed for the Woonasquatucket River?

A. Yes, it is.

Q. And you prepared it the same way?

A. I did.

MR. PIROZZOLO: May that be published to the jury, your Honor?

THE COURT: Yes. Let's give it an identification number though. We'll mark this for identification as Plaintiff's --

MR. PIROZZOLO: I have Exhibit 235.

THE COURT: Exhibit 235?

MR. PIROZZOLO: Yes.

THE COURT: All right. You may go ahead and show that to the jury.

(Plaintiff's Exhibit 235 marked for ID.)

your Honor.

THE COURT: All right.

CROSS-EXAMINATION BY MR. HARDING

Q. Good morning, Mr. Kastrinos.

A. Good morning.

Q. I'm representing the North River Insurance Company in this case. Could we have displayed the first of the concentration maps from Exhibit 183 that you just testified about. That would be the one showing the concentrations zero to one feet below ground surface. Do you have that in front of you?

A. Yes. Although this one, for some reason, is showing up with yellow highlights. I don't think they belong there. I'm referring to -- unless they do. This, this, this, and this, I don't believe they showed up when that was first shown.

Q. Okay.

MR. HARDING: The map we were given has a different Bates page.

THE COURT: Seem to be gone now.

Q. And this concentration map shows the

145

concentrations of dioxin in the soil that was detected at the zero to one foot below ground surface range; is that correct?

A. That is correct.

Q. And this is based on data collected in 1999; is that correct?

A. Yes.

Q. And would it be fair to say that you can't tell us

today what the concentration map would look like for
1969?
A. I cannot.
Q. And would it be fair to say that you can't tell us
today what the concentration of dioxin map would look
like for any time in the 1970's at the Centredale site?
A. That's correct.
Q. And would the same be true of the 1980's?
A. Correct.
Q. Would the same be true of the 1990's prior to the
1999 map?
A. Correct as well.
Q. And is that because there's no data on what the
dioxin concentrations were at any level at this site
during the '60's, '70's, '80's or any time prior to
1999?
A. There's no data that I'm aware of.

146

Q. Do you know when dioxin was first introduced to
the soils at the Centredale site?
A. Precisely?
Q. Approximately.
A. No. I only know of the industrial practices that
included some disposal of materials within the period
of operation of Metro-Atlantic and New England
Container.
Q. Did you have an understanding, based on the
information you reviewed, that hexachlorophene was
manufactured at the site starting sometime in 1964?
A. Yes. I don't know if it was that precise. I

remember mid- to late '60's.
Q. And for purposes of your opinions, have you assumed that there was dioxin introduced to the soils of the site shortly after the hexachlorophene manufacturing process began?
A. No. Not necessarily.
Q. Okay. You did review the EPA reports concerning the site; is that correct?
A. Yes, I did.
Q. And did you have an understanding that the EPA's conclusion was that dioxin was introduced to the site as a result of hexachlorophene manufacturing?
A. Yes, I believe they may have made statements to



that effect.
Q. And you don't have any basis to challenge that conclusion of EPA, do you?
A. Do I have any basis to challenge it? I do not think it can be reliably discerned as to whether the dioxins that are present at shallow depths, particularly in the south area of the site, were definitively associated with the hexachlorophene manufacturing or some other disposal, perhaps related to drums coming onto the site for reconditioning.
Q. Well, you were not asked to determine a source of the dioxin contamination at the site, correct?
A. I was not.
Q. And you haven't done so, correct?
A. That's correct.
Q. And you didn't do that in your expert report,

correct?
A. That's correct.
Q. And my prior question I did not mean to suggest that the hexachlorophene manufacture was the sole source, but do you disagree that EPA identified it as at least one source of dioxin contamination at this site?
A. I do not disagree with that statement.
Q. Can you take a look at the same map you have in



front of you. For the areas that are shown in the yellow are the highest concentrations, correct?
A. That's correct.
Q. Can you tell me what historical operating features of the site were associated with each of the yellow areas on the map?
A. Approximately, yes.
Q. Okay. Would you do that, please.
A. Okay. Could these arrows be removed?
Q. Sure.
A. Starting from north to south, I mentioned earlier that the hexachlorophene manufacturing building was in the approximate location of this little cluster of samples. In terms of the highest concentrations, and that was not one of the highest concentrations, forgive me, there is one, as I indicated earlier, in excess of one hundred parts per billion right here that is due west of the New England Container buildings, which were, basically, approximately, in this area.
THE WITNESS: Is there any way you can make

KASTRINOS EXCERPT

Q. Do you know how far back those records go?
A. Not off the top of my head, no.
Q. Did you look at any annual rainfall records to determine how many times it rained at the site from 1940 to the present?
A. No.
Q. Did you look at any records to determine what the total amount of rainfall was at the site in each year from 1940 to the present?
A. No, I did not.
Q. And wouldn't it be fair to say you can't quantify how much erosion at the site occurred from rainfall as compared with the flood events you described yesterday?
A. From rainfall in general, or are you talking about rainfall associated with the individual floods? I'm not sure I understand.

170

Q. I'm talking about rainfall not associated with flood events versus the specific flood events you described.

You can't tell me today a quantity of erosion that occurred because of rainfall from non-flood events versus the flood events?
A. I cannot.
Q. Would it be fair to say you're not a specialist in sediment transportation?
A. Not a specialist in sediment transport?
Q. Right.
A. Beyond my education, no.
Q. Would it be fair to say that any marshy or swampy

areas at this site would act as a trap for dioxins making it harder for them to move?
A. I'm not sure why that would be the case.
Q. Would it be fair to say that you can't tell us, precisely, what portion of the site was flooded on any given date?
A. Precisely?
Q. Yes.
A. No.
Q. Would it be fair to say that you can't tell us exactly how deep any water was on the site during those floods?



A. Not precisely. I described yesterday some elevations and the rationale for --
Q. Right. But you haven't quantified whether there was two feet of standing water on this site during any of those flood events or any other specific amount; is that correct?
A. No.
Q. And you can't tell us precisely what soil moved from one point to another during any of those events; is that true?
A. Precisely, no.
Q. And you can't tell us how much soil moved during any of those events, correct?
A. No. It's variable.
Q. And you can't tell us exactly how far any particulate of soil moved during any of those events; is that true?

A. Well, the dioxins have obviously come to be fairly far downstream of the site. Individual soil particles and their history, behavior, no.

Q. Can you -- strike that. The erosion process you described, isn't it fair to say that there would be a continuous process of erosion from the time the dioxin first entered the soils at the site through the present?

172

A. Yes. However, steps have been taken to minimize that as we described earlier.

Q. But the erosion process you described happens all the time at the site?

A. It does continue, yes.

Q. So it's not just on those days when there were floods?

A. Absolutely not.

Q. And there were, in fact, flood events before 1968; is that correct, at this site?

A. That's correct.

Q. And there were flood events after 1968?

A. Yes.

Q. And there were flood events after 1984?

A. Yes.

Q. And would it be fair to say that you can't measure the quantity of dioxin that was transported during any of these particular events?

A. I have not attempted to quantify that.

Q. And all of the dioxin that was transported during any of the events you described was already in the

ground, correct?
A. Can you restate that.
Q. Let me ask a different question.
A. Okay.



Q. You described a process yesterday by which dioxin is transported, correct?
A. Yes. I think a couple of different ways.
Q. And the dioxin that you're talking about is attached to soil particles, correct?
A. That's correct.
Q. So it's already in the soil?
A. Yes.
Q. And it's come there from somewhere else?
A. Yes.
Q. So is it fair to say that the dioxin you're talking about being transported was released or discharged from somewhere and got into the soil?
A. That's a fair statement.
Q. So the flood didn't cause the dioxin to be attached to soil in the first place?
A. No.
Q. Are you a chemist?
A. No, I'm not.
Q. Do you consider yourself an expert in waste disposal practices?
A. An expert in waste disposal practices? No.
Q. In connection with your work on this case, did you make any effort to determine what waste disposal practices occurred at the site?

A. Well, I think I've described my review of EPA reports, the various depositions such that I know there have been drums and other waste materials moved around the site, principally to the southern portion of the land.
Q. Is it your understanding that the hexachlorophene manufacturing process resulted in dioxins being produced?
A. My understanding is that dioxins were associated with trichlorophenol that was -- which was a component of the hexachlorophene production process.
Q. Okay. And do you have any direct knowledge of what happened to the dioxins that were in the TCP?
A. No direct knowledge.
Q. And would you agree with me that the soil that you talked about moving throughout the history of this site, that soil was already contaminated when it moved?
A. Soil was already -- yes.
Q. Would you agree that the area where the Metro-Atlantic plant was located was prone to flooding?
A. The plant itself?
Q. The area surrounding the plant?
A. Yes. The whole property is prone to flooding.
Q. And there were many more high water events at the site than the ones you described yesterday, correct?

175

A. There were others, yes.
Q. And you reviewed all the USGS data regarding this

KASTRINOS EXCERPT

area for a period of several decades, correct?
A. Yes.
Q. And both of the flood events that you referred to in '68 and 1983 were after the manufacturing operations at Metro-Atlantic had ceased; is that correct?
A. My understanding is that there was some manufacturing up to 1969. So in 1983 is certainly after manufacturing ceased.
Q. Do you know what the source of your information was that manufacturing continued into 1969?
A. Just various reports and depositions.
Q. The flood events were after dioxin had already been released or deposited onto the site, correct?
A. Which flood events?
Q. The '68 and '83.
A. Yes. There were -- well, can you restate the question. I'm sorry.
Q. Sure. By the time -- is it your understanding that by the time the 1968 flood happened that there was already dioxin that had been released into the soil at this site?
A. I don't really know that.
Q. Do you know that to be true with respect to 1983?

176

A. Yes.
Q. Okay. And in fact, it's your opinion that there was no new dioxin introduced to this site after the manufacturing operation ceased, correct?
A. That's correct.
Q. So all of the dioxin that has moved at the site

was present at or before the time the operations ceased, correct?
A. That's correct.
Q. To your knowledge, there weren't new sources of dioxin contamination after the Metro-Atlantic plant shut down?
A. There's no evidence of that.
Q. Do you have an understanding that USGS reported a high water event at the site in 1948?
A. 1948, yes. I believe that was one on the list.
Q. Was there another one in 1953?
A. That sounds about right. Not having the table in front of me.
Q. Would you like to look at the table -- would you need to look at the table that we marked yesterday?
A. It would be helpful.
MR. HARDING: Could we have Exhibit 122.
THE COURT: This is full? This a full exhibit, correct?

177

MR. HARDING: Yes. This has already been admitted in full.
THE COURT: Show it to the jury.
Q. Do you recognize this Exhibit 122 as one of the exhibits we looked at yesterday?
A. Yes.
Q. Can you just go through this chart from the earliest date to the latest and just tell us the years in which there were high water events at this site as defined by USGS?

Q. Did you have occasion, in the course of reviewing materials for this case, to review an affidavit submitted to the EPA by Ms. Charlotte Knott?



A. No, I do not recall that particular affidavit.
Q. Do you have your expert report handy?
A. Not handy, no.
Q. Mr. Kastrinos, I'd like to show you page 19 of your expert report in this matter.
A. Okay.
Q. And do you see a reference to an affidavit of Ms. Charlotte Knott?
A. Yes.
Q. Does that refresh your memory that you did, in fact, review that affidavit as part of your work in this case?
A. I did, but I do not remember it.
Q. Before we took our break, I asked you a question about dioxin being the driver of the remediation at the site, do you recall that?
A. I do.
Q. And you're a licensed site professional in Massachusetts; is that correct?
A. That's correct.
Q. So you're involved with clean-ups and remediation work?
A. Yes.
Q. What is your understanding of what it means for a particular contaminant to be the driver of remediation

KASTRINOS EXCERPT

at a site?

MR. PIROZZOLO: Objection, your Honor.

THE COURT: Overruled.

A. Well, I regard that as the compound of concern. Sometimes it's not just one compound. It can be many compounds that either exceed applicable standards or to which risk assessors have concluded would pose risk of harm to someone or something, human health or the environment, such that something has to be done to eliminate potential exposure to that contaminant.

Q. Is it your understanding that the EPA's main concern about the Centredale site is with respect to the dioxin contamination that exists there?

A. It is.

Q. Is it fair to say that you can't tell us today what specific movement of dioxin-containing particles took place in any particular year at this site?

A. Specific movement? Do you mean -- I'm not sure what you mean by that.

Q. Well, can you tell us a quantity of soil that moved in a specific calendar year at this site due to erosion or other events?

A. In a specific calendar year, no.

Q. So would that be true for 1984?

A. True.

191

Q. You were assigned to this matter by Mr. Binder and Mr. Pirozzolo, correct?

A. That's correct.

KASTRINOS EXCERPT

Q. And is it fair to say that they determined what years you should look at in terms of giving your opinions regarding movement of dioxin contamination?
A. They asked me to render an opinion on two things, on how dioxins moved through the environment, and how the amount of dioxin detected at the site in 1999 and thereafter compared with what was present on the site between the period 1968 and 1985.
Q. And they dictated the years 1968 and 1985 as being the focus of the inquiry?
A. Yes.
Q. Is dioxin containing -- or excuse me, soil containing dioxin still moving at this site through erosion events?
A. I have no knowledge of that.
Q. Okay. Do you have any knowledge that it ever stopped?
A. Well, the EPA has implemented measures to prevent its ongoing erosion transport. I have not investigated whether those measures have been effective in preventing any further transport of dioxins.
Q. Do you know when those measures were implemented

192

by EPA?
A. Approximately 1999 and 2000 were the initial measures.

MR. HARDING: Those are all the questions I have. Thank you very much.

THE WITNESS: You're welcome.

CROSS-EXAMINATION BY MR. NATHANSON.

Q. Have you ever talked to anyone from EPA regarding what their intention is with respect to remediating the site to the extent it hasn't already been done?

A. Anyone at the EPA? No.

Q. You're a scientist, correct?

A. As all geologists are.

Q. And scientists deal in quantitative methods, correct?

A. They do.



Q. Do you have a lot of math training in your background?

A. A fair amount.

Q. And in connection with your work on this case, you didn't make any calculations of the volume of dioxin that moved at any particular time or in relation to any particular event, correct?

A. No, I did not.

Q. And you didn't make any calculations as to the distance that any particles lifted up, as Mr. Pirozzolo described it, moved during any flood event or at any time at the site?

A. Specific particles and distances, no.

Q. So you didn't make any estimate of any quantities of dioxin that moved at the site; is that correct?

A. That's correct.

Q. And you didn't make any rough estimate on any of those points, correct?

A. We made rough estimates of the amount of soil moved from the site.

Q. Where is that in your report, do you know?
A. It is not in my report.
Q. Why not?
A. It was -- we did not feel that it was necessary to support my opinion.



Q. Okay. Did you feel that you didn't have enough information to even include that information in your report?
A. Well, with these processes, certainly you can produce numbers, but like much of hydrology, it's only as good as the assumptions you make. Every storm is different; every flood is different. So for that reason, I chose not to do any of those calculations that would have been prefaced with a slew of assumptions.
Q. Okay. I'd like to show you the exhibit that was just marked.
MR. HARDING: I'm sorry. I don't have the number. Is it two -- 237.
Q. This is the chart you did about other flood events, correct?
A. That is correct.
Q. And the low bars on here represent annual stream flow for an entire year, correct?
A. Average annual stream flow.
Q. And the tall bars represent the average stream flow on just a single day within each of those years, correct?
A. They are the maximum stream flow.

**EXHIBIT O**

reached five degrees below zero at 4 a.m. at the weather station, the lowest mark since Dec. 31, 1962 when the same reading was recorded.

The forecast called for temperatures of about 20 today, with light snow ending about 7 or 8 a.m. Light snow began falling in Providence about 11 p.m. The highest reading yesterday was 13 degrees at 4:15 p.m.

The cold spell is expected to continue through the weekend.

land Beach residence.

In Foster, Mr. and Mrs. Carmine DeMarco were aroused about 2:30 a.m. by the barking of their dog, "Fifi."

Mrs. DeMarco went upstairs and directed David, 11; Ricky, 8; and Deborah, 6, down the smoke-filled stairs to the first floor where Mr. DeMarco was waiting.

He pitched the three children out into the snow. A fourth child, Susan, 2, was asleep on the first

Continued on Page 12, Col. 3

# Tank Explosion Hurls Chemical

An explosion of a tank containing liquid formaldehyde blew out several windows and a penthouse wall at Metro-Atlantic Inc., a North Providence chemical firm, yesterday, spreading the chemical over a large area.

Police and state health officials warned that the chemical is dangerous if taken internally. Three ounces of the pure chemical is fatal, officials said.

Two persons, one about a quarter-mile away when the blast occurred at 3:05 p.m., were treated at Roger Williams General Hospital after what was described as a "giant mushroom" of formaldehyde and rust particles settled to the ground.

Steven Iozzi, 14, of 8 Justice St., North Providence, who was playing in the St. Lawrence School yard, and Richard I. Klein, 43, of 5 Falmouth Road, Cranston, who was in a Centredale parking lot, were treated at the hospital for contact with the chemical.

Traces of the yellow dust traveled in a southeasterly direction from the plant at 2072 Smith St. in the Centredale section. Some particles were found as far as the Allendale Baptist Church, about a half-mile away.

The explosion was reported to have shaken buildings in the immediate area and could be heard a half-mile away.

A company spokesman said the explosion occurred when a deliveryman mistook a full tank of formaldehyde for an empty one. The continued pressure of the pumping caused the top of the tank to blow off. The tank was not shattered and the deliveryman was not hurt, the spokesman said.

A number of persons reportedly called police shortly after the blast, complaining that they had come in contact with the chemical dust. They were told the chemical would cause minor skin irritation if not washed off immediately, police said.

Chief John P. Murphy of Centredale Fire Company said the blast blew out several third-floor windows on the east side of the chemical plant, where the

Continued on Page 12, Col. 7

# O'Connor Announces Middle School Plan

By CAROL J. YOUNG

School Supt. Charles A. O'Connor said last night he would recommend that at least four of the city's eight junior high schools be converted to "middle schools" by next September.

The proposal to establish a minimum of four middle schools for grades five through eight would free up to 18 elementary schools for other uses, he said.

Mr. O'Connor disclosed his definite plans for a major change in the school system at a meeting at Nathanael Greene Junior High School during which parents flatly rejected a proposal that their building be shared by 210 handicapped children. The school committee will make a decision on the Greene school use for the rest of the year at a meeting tonight.

In a related development, Raymond F. Fricker, chairman of the school committee, said last night that he has received several obscene phone calls and threats of bodily harm since parents of the handicapped started a sit-in at Central High School last Thursday. He said he intended to report the threats to police today.

The school superintendent referred to the plans for initiating middle schools in an attempt to allay the fears of Greene parents who feel the school will be taken over by the handicapped for more than just the remainder of this year.

He said he hopes to have Greene open in September with fifth and sixth grade children from elementary schools attending. Under the current plan to transfer the handicapped children to Greene, the school's ninth graders would be reassigned to high schools on Jan. 29.

Mr. O'Connor also listed similar plans for Roger Williams, which already has started a partial middle school program for grades six through eight; Gilbert Stuart and Nathan Bishop

## Today's Journal

A few of the spectators at the Transit Street blaze.

—Journal-Bulletin Photos by GEORGE E. ROONEY

'Lost Everything' in Fire

# He Weeps for His Home

By HAMILTON E. DAVIS

Joseph Souza sat at one end of the table in the warm, comfortable kitchen, his head in his hand, sobbing brokenly.

"It's no good any more," he said. "Everything is gone."

"No, don't say that Joe," said his mother-in-law. "Everyone is all right."

Another member of the family stooped to peer through the kitchen window at the smoke billowing from the tenement on the other side of Transit Street.

Outside, 150 persons watched as flames ate through the 2½-story wood structure and firemen battled to prevent the blaze from spreading through the congested neighborhood in the Fox Point section.

Among the spectators were Mr. and Mrs. Manuel DaRosa, who lived in the first floor tenement beneath the Souza's in the structure at 169 Transit. The DaRosa's five children were the only ones in the building when the fire broke out shortly before noon yesterday.

They escaped to the street, some without shoes and coats, and were taken into the homes of relatives and friends. Their parents and the adult Souza's parents and the adult Souzas two children, Stephen, 5, and Karen, 3, were at the home of Mrs. Souza's parents, across the street.

According to firemen, the flames spread from the lower part of the structure through the interior partitions to the second floor. By the time they arrived, firemen said, flames were seen coming through several windows.

The fire also broke through the roof in several places. High winds whipped clouds of white smoke and sparks across Wickenden and Sheldon Streets.

Mr. Souza said that he and his wife were at work in a jewelry shop when his mother-in-law, Mrs. Manuel P. Macedo, called to tell him of the fire. Mr. Souza, who is 26, said he had lived in the Transit Street apartment for about two years.

"I lost everything," he said.

"I'll take you up to my place," said an uncle.

"Oh, we'll manage," said Mrs. Macedo as the kitchen swirled with relatives in the hum of consoling conversation, some in English and some in Portuguese, rose and fell.

A few blocks away, Mario DaRosa, 15, and his sister Bettina, 10, were staying at the home of their grandparents, Mr. and Mrs. Arthur DaRosa. Mario's three brothers were at another relative's home.

With a cousin, Horaceo Pavao, translating from Portuguese, Mario said that he had been watching television while taking care of the rest of the children, and that the set had flicked off several times.

Shortly thereafter, he said, an oil truck driver who had been delivering fuel to the house came in and told him to get the youngsters out. So he did.

The only indication of the fire they saw was some smoke at the rear of the building, Mario said.

Late yesterday afternoon, James T. Killilea, fire chief, said that an investigation will be made to determine the cause of the blaze. William F. Kelly, battalion chief, said the blaze started in the front porch. There was "extensive" damage to the entire building, he added.

A fireman, Pvt. Manuel Furtado, 58, of 32 East Transit St., blacked out at the North Main Street fire station after returning from the fire. He was treated at Rhode Island Hospital.

Fire officials said the building belonged to someone named Batista, but they had no more information on the owner than that.

BROWN UNIVERSITY





Suffering from smoke inhalation, fireman is helped away from Pallas Street blaze. —Journal-Bulletin Photo by EDWARD LINCOLN



Refugees from Pallas Street blaze dash across icy street. —Journal-Bulletin Photo by EDWARD LINCOLN

# 3,500 Maine Families Suffer Loss of Heat

South Portland, Maine — (UPI) — Cots were set up in a National Guard armory last night to house 3,500 families who lost natural gas service on one of the coldest nights of the year.

The Portland Gas Light Co. shut off the gas of 20 per cent of their customers early yesterday because of a drastic reduction in pressure in natural gas lines owned by Tennessee Gas Pipeline Co. Tennessee said the reduced pressure, down from a normal 275 pounds per square inch to 15 pounds, was caused by the drain on gas supplies from companies in areas in the south, also hit by the cold wave.

Light, sent 74 servicemen, 31 of them from Boston, to homes to shut off valves so there would be no explosion when service is resumed.

Later last night the gas company said 500 of the 3,500 customers used gas to heat their homes.

The affected customers are all in South Portland and Cape Elizabeth. Industries in Portland itself and neighboring Westbrook also had their gas service cut off.

The Portland firm was scheduled to appear before the State Public Utilities Commission with a petition to provide natural gas service to the entire state. Louis Douglas, company vice president, said the session had been indefinitely postponed.

Gas companies in Boston, Springfield and Worcester had no reports of supply shortages.

Bridgeport, Conn. — (AP) — The supply of natural and propane gas to four large industrial users has been cut back because of the cold wave, the Southern Connecticut Gas Co. disclosed yesterday.

The "crisis in supply," according to Henry V. Lindeman, company vice president, resulted both directly and indirectly from plummeting temperatures during recent days. The curtailment was necessary to meet the sudden growth in demands from residential users.

A primary reason for the shortage is the inability of propane suppliers to obtain trucks to move extra shipments, Mr. Lindeman said.

The company said it has been faced with "record demands since Sunday" for gas from residential users, but cannot meet all needs because of a temporary shortage of pipeline sources.

Mr. Lindeman said that pipeline flow has been reduced because of major gas requirements in New York City, Massachusetts and Maine.

Hubbards of cots provided by the Red Cross and the Marine Corps were set up in the armory for the refugee homeowners and the Salvation Army was standing by with soup and coffee. But, to the surprise of officials, only two persons showed up at the armory.

Large areas of New Hampshire from Portsmouth to Concord were also threatened with a complete cutoff during the coldest weather of the year.

During the afternoon, police transported dozens of elderly citizens without gas to homes of friends and relatives. Twelve invalids were moved to heated accommodations by ambulance.

About 1,000 residents of the Redbank housing project in western Portland moved to an oil-heated community building in the complex for the night.

In Agawam, Mass., Herbert Hill, northern district manager for Tennessee, said help from the two other pipeline companies in New England, Algonquin Gas Transmission Co. and Transcontinental Pipeline Co., probably would enable the company to restore pressure by late last night.

However, Portland residents had little hope of immediate heat because servicemen must visit each home to relight its pilot light.

[illegible] Utilities Co., the parent company of Portland Gas

# Cold and Snow Sweep Nation; Death Toll 57

Continued From Page One

there with her parents, who got her out of the burning house.

The Walker Road home was destroyed, and $100 in cash was burned. Firemen believe the fire began in the cellar, perhaps in oil tanks.

The fire at 163 Transit St. burned for almost two hours. The five children of Mr. and Mrs. Manuel DeRosa fled that house after an oil delivery man spotted the fire about 11:30 a.m. and warned them.

Sparks from the fire carried across Sheldon Street to Wickenden Street, but firemen were able to confine the blaze to the tenement.

About 150 persons gathered to watch the blaze and a traffic tieup occurred on the congested street where many houses are separated by only a dozen feet.

Other alarms about noontime in Providence put a heavy strain on the fire department. At one point nearly half the city's available equipment was in use.

Four families were left homeless by a stubborn, smoldering fire in a three-story wood apartment block on Pallas Street in Federal Hill.

Residents of 6 Pallas St. fled when the basement filled with smoke about 10 p.m. They were Mrs. Sandra Phelps and her two children; Mr. and Mrs. Joseph Villani and their six children and Mr. and Mrs. Perry Caprio and their child.

At 8 Pallas St., in the same building, Mrs. Cecile Narduhlin, 25, fell on the stairs as she ran out of the house carrying a child. She was being examined at Rhode Island Hospital early today for a back injury. Her husband, Nicholas Narduhlin, and children escaped without injury. The other two apartments at 8 Pallas St. were vacant.

Fire Dept. Pvt. Joseph Serpa was being treated at the same hospital early today for smoke inhalation.

The six apartments at 6 and 8 Pallas St., owned by Nicola Caprio, were damaged heavily. At 10 Pallas St. three families fled the building but were able to return later.

Schools in Seekonk, Tiverton, Lincoln, Little Compton, Fall River and Swansea were closed because of the cold. The Lonsdale Elementary School in Newport was closed yesterday when trouble arose in the heating system. Decisions on whether to reopen schools in most of the systems closed yesterday were expected to be delayed until early morning because of the expected snowfall.

Sixteen water emergencies were reported by the Providence fire alarm division by late afternoon as pipes burst [illegible]

track Monday afternoon. A car attached to the engine blocked a portion of South Road, causing police to set up warning lights and barricades on the road. No accidents were reported at the scene. A coupling between the car and locomotive had been damaged in the derailment, making it impossible to detach the car and clear the crossing.

# Cold, Snow Tangle Traffic, Close Schools

Boston — (UPI) — Bitter cold [illegible] Northeast yesterday and made millions miserable. An ice and snow storm snarled traffic and closed schools [illegible]

[illegible]

A Narragansett Pier Railroad locomotive, which was partially derailed Monday in South Kingstown, was placed back on the tracks yesterday [illegible]

[illegible]

### Bullet in Heart

Moscow — (UPI) — A three-time wounded World War II veteran has been carrying a bullet in his heart for the last 25 years, the Soviet news agency Tass said yesterday.

[illegible]

# Tank Explosion Hurls Chemical

Continued From Page One

tank was located, and the east wall of a small penthouse on the roof of the three-story building.

Joseph Ruggiero Jr., assistant company manager, said the blast caused no injuries and aside from the tank, did not damage equipment. An estimate of the building damage had not been made last night.

Chief Murphy, who toured the area after the explosion with state and fire drug specialists, and Sgt. Joseph Gavin, assistant state fire marshal, said the exact cause of the explosion has not been officially determined.

One resident, Edward Bird of 421 George Waterman Rd., Johnston, said he was home when the blast occurred. He said he "thought it was a jet overhead" and that it "shook my whole house."

Chief Murphy said the fire company had just finished at a house fire at 1856 Mineral Spring Ave., about a quarter-mile away, when they heard the blast and were firefighter reported seeing the yellow cloud of dust.

The fire company went directly to the chemical plant, the chief said.

### Musical Warnings

Manila — (UPI) — [illegible]




"Let's eat [redacted] place different."

421-1200

Sheraton-Biltmore

CARTER'S LITTLE PILLS. Taken by millions for only 75 years in homes like yours

BLENDED WHISKEY • 86 PROOF • 65% GRAIN NEUTRAL SPIRITS © 1967 CALVERT DIST. CO., LOUISVILLE, KY.

The Soft drink for adults.




Calvert Extra, The Soft Whiskey, is mellow, easy to swallow. But a very grown-up 86 proof.

# Tank Explosion Hurls Chemical

Continued From Page One

tank was located, and the east wall of a small penthouse on the roof of the three-story building.

Joseph Buonanno Jr., assistant company manager, said the blast caused no injuries and aside from the tank, did not damage equipment. An estimate of the building damage had not been made last night.

Chief Murphy, who toured the area after the explosion with state and food and drug specialists, and Sgt. Joseph Godin assistant state fire marshal, said the exact cause of the explosion has not been officially determined.

One resident, Edward Ricci of 427 George Waterman Rd., Johnston, said he was home when the blast occurred. He said he "thought it was a jet overhead" and that it "shook my whole house."

Chief Murphy said the fire company had just finished at a house fire at 1856 Mineral Spring Ave., about a quarter-mile away, when they heard the blast and some firefighter reported seeing the yellow cloud of dust.

The fire company went directly to the chemical plant, the chief said.

## Musical Warnings

Manila — (UPI) — Vice squad detectives in Lipa City, 35 miles southeast of Manila, said Christmas carolers foiled their gambling crackdown. Groups of the singers stationed outside gambling houses broke into "Santa Claus is coming" when the police approached and "Silent Night," when the coast was clear.




"Let's eat at someplace different."

Good idea. The Mansion House offers elegant dining in an authentic Colonial setting The

BROWN UNIVERSITY LIBRARY