**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| **EMHART INDUSTRIES, INC.,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, LIBERTY MUTUAL INSURANCECOMPANY, NORTH RIVER INSURANCE COMPANY, and ONEBEACON AMERICA INSURANCE COMPANY**<br><br>**Defendants.** | **CIVIL ACTION NO. 02-053** |

**OPPOSITION OF CENTURY INDEMNITY COMPANY AND ONEBEACON AMERICA INSURANCE COMPANY TO EMHART'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR A NEW TRIAL REGARDING ITS CLAIMS AGAINST CENTURY AND ONEBEACON**

After nearly six weeks of trial, the jury found in favor of Century and OneBeacon on the ground that the dioxin contamination at the Centredale Manor Restoration Project Superfund Site was not discoverable in the exercise of reasonable diligence by Emhart's predecessor, Crown-Metro, Inc., during the OneBeacon and Century 1969 policy periods. Emhart now seeks to overturn that jury verdict by arguing (1) the Court failed to provide proper instructions to the jury regarding the applicable trigger of coverage and (2), even under the instructions given, the jury "disregarded uncontroverted evidence" about whether the dioxin contamination at the Site was discoverable in reaching its decision. Emhart also seeks judgment as a matter of law with respect to it claims that Century

breached its duty to defend and that Century's Endorsement 6 waste products exclusion does not apply to preclude coverage.

Century and OneBeacon oppose Emhart's motion on the grounds that: (1) the jury charge provided by the Court was correct under Rhode Island law on the trigger of coverage question; (2) there was sufficient evidence to support the jury's determination that the dioxin contamination at the Site was not discoverable in the exercise of reasonable diligence during the relevant time period; and (3) there was sufficient evidence from which the jury could have found that the Endorsement 6 waste products exclusion barred coverage. Century opposes Emhart's motion with respect to breach of the duty to defend on the grounds that it is premature, to be decided only after a determination by the Court on the existence of a duty to defend by Century and, if necessary, an evidentiary hearing on breach of that duty. OneBeacon also opposes Emhart's motion on the grounds that its policy should be reformed to include the Century Endorsement 5 pollution exclusion and that, under the terms of that exclusion, OneBeacon is entitled to judgment as a matter of law in its favor.

In support of this opposition, Century and OneBeacon submit a supporting Memorandum of law and an Appendix of supporting materials from trial.

Century and OneBeacon respectfully request that the Court deny Emhart's motion for judgment as a matter of law or, in the alternative for a new trial, and grant such other and further relief in favor of Century and OneBeacon as is just and appropriate

Dated: January 12, 2007

Respectfully submitted,

James R. Murphy
Kelly N. Michels
Hanson Curran LLP
146 Westminster Street
Providence, RI 02903
(401) 421-2154
- and -
Kevin J. O'Connor
Peter C. Netburn
Hermes, Netburn, O'Connor
& Spearing, P.C.
265 Franklin Street, Seventh Floor
Boston, MA 02110-3113
(617) 728-0050

Attorneys for OneBeacon America Insurance Company

James T. McCormick
McKenna & McCormick
128 Dorrance Street, Suite 330
Providence, RI 02903
(401) 831-2970
- and –
Lawrence A. Nathanson
Scott E. Levens
Siegal, Napierkowski & Park
533 Fellowship Road, Suite 120
Mt. Laurel, NJ 08054
(856) 380-8900

Attorneys for Century Indemnity Company, as successor to CCI Insurance Company,
as successor to Insurance Company of North America

**CERTIFICATE OF SERVICE**

I hereby certify that on January 12, 2006, a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by electronic mail to all parties by operation of the court's electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

Kelly N. Michels

G:\DOCS\KJO\CGU\Emhart\Trial Prep\Opp to motion for judgment as a matter of law.doc

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| **EMHART INDUSTRIES, INC.,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, LIBERTY MUTUAL INSURANCECOMPANY, NORTH RIVER INSURANCE COMPANY, and ONEBEACON AMERICA INSURANCE COMPANY**<br><br>**Defendants.** | **CIVIL ACTION NO. 02-053** |

**MEMORANDUM OF CENTURY INDEMNITY COMPANY AND ONEBEACON AMERICA INSURANCE COMPANY IN OPPOSITION TO EMHART'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR A NEW TRIAL REGARDING ITS CLAIMS AGAINST CENTURY AND ONEBEACON**

After trial, the jury found that the dioxin contamination at the Centredale Manor Restoration Project Superfund Site was not discoverable in the exercise of reasonable diligence by Emhart's predecessor, Crown-Metro, Inc., during the OneBeacon and Century 1969 policy periods. Emhart now seeks to overturn that jury verdict by arguing (1) the Court failed to provide proper instructions to the jury regarding the applicable trigger of coverage and (2), even under the instructions given, the jury "disregarded uncontroverted evidence" about whether the dioxin contamination at the Site was discoverable in reaching its decision. Emhart also seeks judgment as a matter of law with respect to it claims that Century breached its duty to defend and that Century's Endorsement 6 waste products exclusion does not apply to preclude coverage.

Century and OneBeacon oppose Emhart's motion on the grounds that: (1) the jury charge provided by the Court was correct under Rhode Island law on the trigger of coverage question; (2) there was sufficient evidence to support the jury's determination that the dioxin contamination at the Site was not discoverable in the exercise of reasonable diligence during the relevant time period; and (3) there was sufficient evidence from which the jury could have found that the Endorsement 6 waste products exclusion barred coverage. Century opposes Emhart's motion with respect to breach of the duty to defend on the grounds that it is premature, to be decided only after a determination by the Court on the existence of a duty to defend by Century and, if necessary, an evidentiary hearing on breach of that duty. OneBeacon also opposes Emhart's motion on the grounds that its policy should be reformed to include the Century Endorsement 5 pollution exclusion and that, under the terms of that exclusion, OneBeacon is entitled to judgment as a matter of law in its favor.[1]

## ARGUMENT

### I. THE COURT PROPERLY CHARGED THE JURY WITH RESPECT TO TRIGGER OF COVERAGE.

As a preliminary matter, to the extent Emhart's motion for judgment as a matter of law is based upon any claimed defects in the jury charge provided by the Court, the motion should be denied because Emhart did not move for judgment as a matter of law on this ground at the close of the defendants' case or the close of all evidence. A post-

[1] Emhart also argues, in a brief and cursory fashion, that it is entitled to a new trial because the Court precluded Emhart from calling North River's non-testifying expert, Dr. Calabrese, as a fact witness. The Court properly refused to allow Emhart to call Dr. Calabrese. Rather than reargue issues already briefed, Century and OneBeacon incorporate herein the arguments raised by North River in opposition to Emhart's motion to enforce the subpoena it served on Dr. Calabrese. *See*, Docket No. 447.

verdict motion for judgment as a matter of law is limited to grounds timely raised in a pre-verdict motion for judgment as a matter of law. In any event, whether viewed as a basis for a motion for judgment as a matter of law or a motion for a new trial, the trigger of coverage jury charge provided by the Court was proper under Rhode Island law and provides no basis for the relief sought by Emhart.

The Century and OneBeacon policies collectively were in effect between December 1, 1968 and January 1, 1970.[2] Regarding what must occur during that time period to trigger coverage under those policies, the Court instructed the jury as follows:

> Under the circumstances of this case, the Century and OneBeacon Policies can be triggered only if property damage was discoverable in the exercise of reasonable diligence during the policy periods. That is, whether by exercising reasonable diligence Crown-Metro… could have discovered the dioxin contamination during the policy periods applicable to the Century and OneBeacon policies. Note that Emhart does not need to show that property damage was actually discovered during the policy periods.
>
> With respect to the question of whether the property damage was discoverable in the exercise of reasonable diligence, you must consider two issues. The first is: was dioxin contamination capable of being detected at the site during the policy periods? This requires Emhart to show that dioxin contamination actually existed at the site during the policy period, as well as the existence of technology and expertise that could have detected that dioxin contamination. The second is: did Crown-Metro have a reason to test for dioxin contamination at the site during the policy period, or other contamination that would have lead to the discovery of the dioxin contamination at the site during the policy period? Considering all the evidence then, you must decide whether Crown-Metro in the exercise of reasonable diligence could have discovered the dioxin contamination.

Jury Charge at 25-26.

Emhart contends that this instruction was in error for two reasons. First, Emhart contends that the Court should have instructed the jury regarding a

[2] For ease of reference, this thirteen month time period is referred to herein as "the 1969 policy periods."

continuous trigger or an injury-in-fact trigger. Second, Emhart contends that the Court impermissibly instructed the jury that the discoverability trigger is determined based upon the subjective knowledge of Crown-Metro. For the reasons stated below, Emhart is not correct.

### A. **Rhode Island Law Does Not Apply A Continuous Or Injury In Fact Trigger.**

Four times over the five year period from 1995 to 2000, the Rhode Island Supreme Court determined and reiterated that the policy language at issue in this case means a particular policy is "triggered" for coverage only if the underlying property damage is discovered or manifested during the policy period or is discoverable in the exercise of reasonable diligence during the policy period. In *CPC International, Inc. v. Northbrook Excess & Surplus Ins. Co.*, 668 A. 2d 647 (R.I. 1995), responding to a certified question from the United States Court of Appeals for the First Circuit, the Rhode Island Supreme Court held:

> The question certified by the First Circuit asks us to determine, under Rhode Island law, when there has been an "occurrence" sufficient to trigger coverage under a general liability policy. ... We answer that an "occurrence" under a general liability policy takes place when property damages, which includes property loss, manifests itself or is discovered or in the exercise of reasonable diligence, is discoverable.

Id. at 649. In *Truk-Away of Rhode Island, Inc. v. Aetna Cas. & Sur. Co.*, 723 A. 2d 309, 313 (R.I. 1999), the insured argued for application of a "continuous" trigger. The Rhode Island Supreme Court reaffirmed that the discoverability trigger governed its decision on the issue, holding that there was insufficient evidence of discoverability during the policy period for the insured to recover.

In each of the *Textron* cases, the Rhode Island Supreme Court again made clear that the three part discovery, manifestation and discoverability trigger enunciated in *CPC* was the law of Rhode Island. In *Textron-Gastonia*, the Court specifically identified *CPC* as the controlling law on the applicable trigger of coverage:

> In determining whether summary judgment is appropriate in this case, it is essential to have an understanding of *CPC International, Inc.*, which is the controlling authority in this jurisdiction.

*Textron, Inc. v. Aetna Cas. and Sur. Co.*, 723 A.2d 1138, 1141 (R.I. 1999). In *Textron-Wheatfield* the Court again reaffirmed the application of the three part CPC trigger:

> Property damage triggers coverage under this type of comprehensive general liability-insurance policy when the damage (1) manifests itself, (2) is discovered or, (3) in the exercise of reasonable diligence is discoverable.

*Textron, Inc. v. Aetna Cas. and Sur. Co.*, 754 A.2d 742, 746 (R.I. 2000).

Emhart's contentions that Rhode Island law follows a different rule, described by Emhart as a continuous or injury-in-fact trigger, is without basis. In *CPC*, the Rhode Island Supreme Court specifically considered and rejected these and other alternative trigger theories. 668 A.2d at 649.

Emhart argues that the Rhode Island Supreme Court left this issue open in *Textron-Gastonia*, apparently relying upon the court's notation that it was not going to address the continuous trigger standard. The court, however, did not leave this issue open; it was only responding to an argument the policyholder made in its brief. The policyholder argued in favor of a continuous trigger as an alternative, to be addressed only in the event that the court held that coverage would not be triggered when the property damage manifested itself or was discoverable in the exercise of reasonable

diligence.[3] The court, having concluded that coverage may be triggered when the property damage manifested itself or was discoverable in the exercise or reasonable diligence, correctly concluded it did not have to address the policyholder's argument. 723 A.2d at 1141.

Emhart's argument in this regard also is illogical. If the *Textron-Gastonia* court intended to adopt a continuous trigger standard, then why would it remand the case for further proceedings under the *CPC* discoverability standard? Clearly, it would not have done so. Indeed, to put this argument aside, this Court needs look no further than the sentence of the *Textron-Gastonia* opinion appearing immediately after the Supreme Court's passing notation that it need not consider Textron's continuous trigger argument, quoted above, stating that *CPC* remains the controlling trigger of coverage authority under Rhode Island law. *Textron-Gastonia*, 723 A.2d at 1141.[4]

### B. <u>The Court Properly Instructed The Jury As To Trigger Of Coverage Under Rhode Island Law.</u>

Emhart also argues that the Court's jury charge and instruction was improper, even under the *CPC* discoverability standard, primarily because the Court phrased the instruction in terms of whether "Crown-Metro" had a reason to test the Site during the relevant time period and not whether "a person exercising reasonable diligence" would have had such reason. Emhart's motion should be denied because the Court's instruction was correct under Rhode Island law.

---

[3] *See* Appendix of Exhibits to Plaintiff's Memorandum in Support of its Renewed Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial regarding its Claims against Century and OneBeacon, Exhibit A at 32-34.

[4] Century and OneBeacon note also that the Supreme Court again applied the *CPC* trigger in the *Textron-Wheatfield* decision in 2000. Interpretation of the reference to a continuous trigger theory in the 1999 *Textron-Gastonia* decision to open the door for application of other trigger theories is not consistent with the Supreme Court's continued application of the *CPC* trigger in this subsequent case.

The question of when property damage is discoverable in the exercise of reasonable diligence was addressed and answered in *Textron-Gastonia*. There, the Rhode Island Supreme Court held specifically that the Rhode Island discoverability trigger requires that the insured, not some undefined "person exercising reasonable diligence," must have a reason to test during the policy period:

> Textron's burden, however, is not met by merely establishing that the contamination was present during the policy period. Rather, *CPC* requires that the contamination not only exist during the period of coverage, but also be discoverable in the exercise of reasonable diligence. [citation omitted]. *In other words, in order to trigger coverage in the absence of actual discovery, Textron must have some reason to test for the contamination, and must actually have been able to discover it in the exercise of reasonable diligence.*

Id. at 1144 (emphasis added). Any confusion over the issue of who – the insured or some unspecified reasonable person -- must have a reason to test was resolved by the Court's reiteration of its *Textron-Gastonia* holding in *Textron-Wheatfield*:

> [In *Textron-Gastonia*], we held that "discoverable in the underlying exercise of reasonable diligence" meant that (1) the property damage occurred during the policy period, (2) the property damage was capable of being detected, and (3) ***the insured had reason to test for the property damage.***

754 A.2d, at 745 (emphasis added). The language chosen by the Court for its jury charge appears to be drawn directly from this part of the *Textron-Wheatfield* decision, describing the issue to be considered by the jury as follows: "… ***did Crown-Metro have a reason to test for dioxin contamination at the site*** during the policy period…?" Jury Charge, at 26. There was no error in the jury charge given by the Court.[5]

[5] Emhart's contention that the Court employed in its jury charge a subjective test instead of an objective one is plainly incorrect. Twice the Court instructed the jury "you must decide whether Crown-Metro ***in the exercise of reasonable diligence*** could have discovered the dioxin contamination." This is not a subjective test, but an objective test centered on the concept of reasonable diligence.

Emhart also contends that the two *Textron* cases required the Court to instruct the jury that "if it found there were spills and leaks of contaminants at the site, it must then conclude that a person exercising reasonable diligence would have had a reason to test for dioxin." This argument twists the *Textron* holdings beyond recognition. Both cases involved the insured's appeal of trigger of coverage based summary judgment decisions in favor of its insurers. The Supreme Court in both cases merely held that evidence of leaks and spills in the summary judgment record was sufficient to create an issue of fact as to whether or not Textron had a reason to test for contamination. For example, in *Textron-Wheatfield*, after reviewing the affidavits submitted by Textron, which included evidence of leaks and spills, known to Textron, of the contaminants relevant to that case, the Court held:

> Textron introduced not only evidence of discoverable damage at the site during the policy period but also that [Textron] had a reason to test for it. Thus a genuine issue of material fact existed whether this evidence met *Textron-Gastonia*'s three-prong test for whether the damage was discoverable in the exercise of reasonable diligence. Hence, the Superior Court erred in granting summary judgment when it declined to apply the discoverability trigger of coverage to the facts of this case.

*Textron-Wheatfield*, 754 A.2d at 747. With respect to leaks and spills, this case means no more than proof of such events creates an issue of fact to be decided by the jury as to whether or not the insured had a reason to test for the relevant contaminants. Emhart made just this argument to the jury, based upon the evidence admitted. Emhart's interpretation of the *Textron* cases would transform those decisions into ones requiring, not merely permitting, that the jury find the insured had a reason to test due to evidence of leaks and spills. The *Textron* decisions do not support or require such an instruction and the Court properly refused to include this instruction in its charge to the jury.

## II. SUFFICIENT EVIDENCE WAS ADMITTED AT TRIAL THAT THE DIOXIN CONTAMINATION WAS NOT DISCOVERABLE IN THE EXERCISE OF REASONABLE DILIGENCE DURING 1969.

Emhart's motion for judgment as a matter of law also argues, again for the first time, that under the jury charge given by the Court, it is entitled to judgment as a matter of law because there was an insufficient factual basis for the jury to decide that the contamination was not discoverable in the exercise of reasonable diligence. This argument cannot sustain Emhart's motion for two reasons. First, Emhart did not move at the close of the defendants' case for judgment as a matter of law with respect to trigger of coverage on the grounds that there was insufficient evidence for the jury to find the contamination was not discoverable during the Century and OneBeacon policy periods. Second, even a cursory review of the record shows there was ample evidence admitted at trial supporting the jury's conclusion that the dioxin contamination was not discoverable in the exercise of reasonable diligence during the Century and OneBeacon 1969 policy periods.

### A. Emhart Failed To Preserve Its Rights Regarding Whether There Was Sufficient Evidence For The Jury To Determine The Dioxin Contamination Was Not Discoverable In The Exercise Of Reasonable Diligence.

In a post-verdict renewed motion for judgment as a matter of law, a party cannot raise new grounds for judgment as a matter of law; its rights are limited to those issues raised in a pre-verdict motion. *Perdoni Bros., Inc. v. Concrete Systems. Inc.*, 35 F.3d 1, 3 (1st Cir. 1994) ("The law is crystal clear that a party may not base its motion for judgment j.n.o.v on a ground that was not argued in its motion for a directed verdict."). Here, Emhart made a motion for judgment as a matter of law at the close of the Defendants' case on October 12, 2006. That motion raised only the following issues:

1. Whether Century has a duty to defend (Tr. 10/12/06 at 3);
2. Application of the Century Endorsement 6 waste products exclusion (Tr. 10/12/06 at 3 – 4);
3. Application of the North River pollution exclusion (Tr. 10/12/06 at 4 – 5);
4. Whether the OneBeacon policy should be reformed (Tr. 10/12/06 at 6); and
5. Whether property damage was expected or intended by Metro-Atlantic (Tr. 10/12/06 at 5 – 6).[6]

No issue whatsoever was raised as to whether the evidence permitted the jury to find that the dioxin contamination at the Site was not discoverable during the Century and OneBeacon policy periods. Accordingly, Emhart is precluded from raising this argument and is not entitled to judgment as a matter of law on this ground.

**B. <u>The Jury Verdict As To Discoverability Is Supported By The Evidence.</u>**

A party challenging a jury verdict in a motion for judgment as a matter of law must meet a heavy evidentiary burden. *Che v. Massachusetts Bay Transp. Authority*, 342 F.3d 31, 37 (1st Cir. 2003). Such a motion may be granted only when, "after examining the evidence of record and drawing all reasonable inferences in favor of the non-moving party, the record reveals no sufficient evidentiary basis for the verdict." *Zimmerman v. Federal Direct Credit Union,* 262 F.3d 70, 75 (1st Cir. 2001). The jury's decision cannot be disturbed unless the evidence, "taken in the light most favorable to the prevailing party, points unerringly to an opposite conclusion." *Id.*

A party seeking a new trial based upon the jury's consideration of the evidence and determination of the case faces a similar heavy burden. A motion for "new trial should not be allowed unless the Court is convinced that the jury verdict was a seriously erroneous result and that denial of the motion will result in a clear miscarriage of justice."

---

[6] The trial transcript for the Plaintiff's Motion for Judgment as a Matter of Law made at the close of the defendants' case is attached at Tab A to the Appendix filed in support of Century and OneBeacon's opposition to Emhart's renewed motion.

*Chedd-Angiers Production co., Inc v. Omni Publications Intern., Ltd.*, 756 F.2d 930, 934 (1st Cir. 1985). A motion for a new trial requires a finding that the verdict is so seriously mistaken, so clearly against the law and the evidence as to constitute a miscarriage of justice. *Litho Corp. v. Brown*, 255 F.3d 19, 29 (1st Cir. 2001), *cert. den.* 122 S.Ct. 666, 534 U.S. 1066, 151 L.Ed. 2d 580 (internal quotations omitted). The jury's verdict must stand unless the weight of the evidence so far preponderates against the jury verdict that upholding it will perpetuate a manifest miscarriage of justice. *Correia v. Fitzgerald*, 354 F.3d 47, 55 (1st Cir. 2003).

Here, Emhart's motion is based upon a selective and one-sided recitation of the evidence bearing upon two factors material to the application of the discoverability trigger in this case: whether during the 1969 Century and OneBeacon policy periods (1) Crown-Metro had a reason to test for dioxin contamination at the Site and (2) that contamination could have been detected. Contrary to Emhart's contentions, there is ample evidence which supports the jury's verdict in this case. Therefore, Emhart is not entitled to judgment as a matter of law or to a new trial.

### 1. Evidence That Crown-Metro Had No Reason To Test For Dioxin Contamination During The 1969 Policy Periods.

The evidence supporting the view that Crown-Metro had no reason to test for dioxin contamination in 1969 begins at a most fundamental place – neither it nor its predecessor, Metro-Atlantic, was aware of any dioxin contamination at the Site. The simple fact that neither Metro-Atlantic nor its successor Crown-Metro was aware of the dioxin at the Site is adequate support for a reasonable jury to have concluded that reasonable diligence did not give Crown-Metro a reason to test for it. The only person to testify at trial as to what Crown-Metro did or did not know was Thomas Cleary. By

deposition, Mr. Cleary testified that he worked with Metro-Atlantic to set up the hexachlorophene manufacturing process at the Site in 1964 or 1965 and, at that time, was not aware of the presence of 2,3,7,8 TCDD in the 2,4,5 trichlorophenol used in the process.[7] (Cleary depo. at 27 – 28 and 30).[8] As the case was submitted to the jury, the record was entirely devoid of any proof that in 1969 Crown-Metro was aware of any dioxin ever being present at the Site. Mr. Bonchonsky, one of Emhart's own expert witnesses, testified that because so little was known about dioxins as an environmental contaminant, the fact that dioxin existed at the Site would not have been known to Metro-Atlantic and its employees (Tr. 9/21/06 at 70).[9] This presents a clear contrast to the sort of evidence found to create an issue for trial in the *Textron* cases. In both of those cases, the court found issues for trial based upon affidavits stating that Textron and its employees, during the policy periods in question, were aware of releases of the specific contaminants later found at the sites in question. *See, Textron-Gastonia*, 723 A.2d at 1144; *Textron-Wheatfield*, 754 A.2d at 747. Here, no such evidence was submitted to the jury.

There was other evidence upon which the jury could have based a determination that Crown-Metro had no reason to test for dioxin contamination. For example, Mr. Bonchonsky and Dr. Hass both testified that prior to 1970, concerns with dioxin were limited to occupational exposure to workers at plants involved in the manufacture of

---

[7] Emhart contended at trial that the dioxin contamination was caused by the New England Container barrel cleaning operations and associated combustion of wastes. If the jury credited and believed Dr. Hass' testimony in this regard, it would not support any argument that Crown-Metro should have tested the site for dioxin. There was no evidence that Crown-Metro or anyone else was aware of any such dioxin formation during 1969.

[8] All portions of Mr. Cleary's deposition cited herein were admitted in evidence at trial. A copy of the pages to that deposition cited herein are attached at Tab B to the Appendix filed in support of Century and OneBeacon's opposition to Emhart's renewed motion.

[9] Copies of the pages to the trial transcript of Mr. Bonchonsky cited herein are attached at Tab C to the Appendix filed in support of Century and OneBeacon's opposition to Emhart's renewed motion.

2,4,5 trichlorophenol (Tr. 10/3/06 at 34; Tr. 9/21/06 at 46 - 49 and 70 - 71).[10] These concerns did not extend to the presence of minute, parts per billion range quantities of dioxin as an environmental contaminant in soils or sediments such as has been found at the Site. The jury reasonably could have concluded that these occupational exposure concerns, even if known to Crown-Metro, did not give Crown-Metro a reason to test for dioxin contamination of soil and sediments at the Site for any of a number of reasons, ranging from the fact that Metro-Atlantic never manufactured 2,4,5 trichlorophenol, but purchased it from Diamond Alkali (Cleary depo. at 40; Stipulation of Facts ¶16) to the fact that by 1969 Crown-Metro no longer was operating at the Site and therefore had no occupational exposure concerns for its workers (Stipulation of Facts ¶¶17-18).

Further, the jury reasonably could have concluded that the very heart of Emhart's case on discoverability – Dr. Hass' testimony regarding the "growing awareness" of dioxin contamination during the 1960's – was a flawed attempt by Dr. Hass to rewrite the history of public awareness of dioxin contamination and not related in any logical way to Crown-Metro and its operations in 1969. His testimony in this regard was based, not on his personal knowledge, but upon his research and review of publications and other materials relating to dioxin (Tr. 10/3/06 at 11-13). As revealed during his cross-examination, Dr. Hass' research sources for almost every single event mentioned by him as contributing to his alleged growing awareness of dioxin hazard – including his three primary sources, *The Chemical Sythe* by Allister Hay, *Dioxin, Agent Orange: The Facts* by Gough and the *Dow Toxicological Review: A Chronology* - were published or

[10] Dr. Hass testified over the course of three days. Cited portions of the trial transcript of his testimony are attached to Century and OneBeacon's Appendix. Tab C includes pages from the September 26, 2006 transcript. Tab D includes pages from the September 27, 2006 transcript. Tab E includes pages from the October 3, 2006 transcript.

prepared after 1970 (Tr.10/3/06 at 13-17). Dr Hass admitted that these sources could not have contributed to any growing awareness of dioxin hazard during the 1960s (Tr. 10/3/06 at 16-17). Given these publication and preparation dates, the jury reasonably could have concluded that the growing awareness alleged by Emhart and Dr. Hass simply did not exist.

Emhart's attempt to rewrite the history of knowledge of dioxin hazard suffers from a second logical flaw. The growing awareness testimony of Dr. Hass related to risks and hazards not presented to Crown-Metro in 1969 and entirely different from the type of environmental harm – contamination of soils and sediments at the Site. That testimony related to knowledge of chloracne caused occupational exposure to dioxin during TCP manufacture (Tr. 10/3/06 at 30-34), knowledge of an association between dioxins and disease affecting chicken and the poultry industry (Tr. 10/3/06 at 18-20) and knowledge of potential harm associated with herbicides containing 2,4,5 T, a chemical different from 2,4,5 trichlorophenol (Tr. 10/3/06 at 20-21). This knowledge bears no relation either to the operations of Crown-Metro and its predecessors at the Site, the risks Crown-Metro did or should have understood regarding the Site in 1969 or the contamination ultimately found there. Dr Hass admitted as much, testifying that the concerns that existed in the 1960s with respect to TCP and dioxin were only occupational health concerns associated with the manufacture of TCP (Tr. 10/3/06 at 34) and that knowledge of hazard associated with soil and sediment dioxin contamination such as is at the Site did not become well known until the 1970s (Tr. 10/3/06 at 34-35). The jury reasonably could have concluded, and likely did conclude, that (1) occupational exposure hazards associated with TCP manufacture did not give Crown-Metro a reason to test a

location it did not own and where it no longer was located or conducting operations, (2) the association of dioxin or TCP with poultry disease did not give Crown-Metro a reason to test the Site and (3) possible harm associated with a pesticide it neither made nor used did not give Crown-Metro a reason to test the Site.

Further, the jury reasonably could have believed the testimony of Dr. Hughto and Dr. Bonchonsky that dioxin was unknown as an environmental contaminant until after the formation of the EPA in 1970 and several well known and publicized incidents of dioxin contamination that occurred after 1970, such as the Times Beach, Missouri and Seveso, Italy incidents (Tr. 9/21 at 72 – 73; Hughto testimony, 10/12/06). Mr. Bonchonsky, one of Emhart's own expert witnesses, testified as follows:

Q. Now, one of the opinions you prepared in this case is the fact that dioxin existed and was causing harm or damage to the environment would not have been understood by the employees of Metro-Atlantic at the time of manufacturing of hexachlorophene, isn't that correct?
A. Yes.
***
Q. Isn't it a fact, Mr. Bonchonsky, that dioxin was not known to cause widespread harm to the environment until years after hexachlotrophene was manufactured at the site?
A. Yes.
Q. And at the EPA, attention and focus on dioxin did not exist in the early 1970's?
A. There was not a focus of attention on dioxin at that period of time. I'm trying to recall when the Verona beach matter became to come to the EPA's attention, which I believe was the 1970's, but I don't believe was the early 1970's.
Q. Right. The attention focus developed in the '70's as a significant environmental issue only after several nationally reported incident involving the large scale releases of materials containing dioxin?
A. That's correct.
Q. And one of those was a matter that occurred in Times Beach, Missouri?
A. That's correct.
Q. And that release was in 1971?
A. Approximately, yes.
Q. And most of the testing and popular dissemination of information surrounding Times Beach took place in the early 1980's?

A. In the late '70's, early '80's, yes.

(Tr. 9/21 at 70 – 72). Dr. Hass agreed with this testimony (Tr. 10/3/06 at 39-41).

Dr. Hughto also testified that concern with dioxin as an environmental contaminant did not arise in the United States until the early 1980s, when EPA ordered the evacuation of Times Beach, Missouri. He described this event as the watershed event in the development of public awareness of dioxin contamination as an environmental concern. (Hughto testimony, 10/12/06)

This expert testimony and the jury's verdict is supported by the actions of the State of Rhode Island and of the United States EPA in their historical investigations of dioxin contamination at the Site. During their investigations in the 1980s and early to mid 1990s, dioxin was not even included in the scope of investigations performed. John Leo testified about the investigations conducted at the Site by RIDEM in the early 1980s. He testified about the minimal knowledge of dioxin at RIDEM during that time period, and his decisions about what to test for and what not to test for. He considered testing for dioxin, but did not because it was too expensive, took too long to get results and he did not think it was necessary. He did not know what chemicals had been manufactured at the Site, but would not have tested for dioxin even if he knew that TCP had been used there or that hexachlorophene had been manufactured there. (Leo testimony, 10/04/06).

Dr. Hughto testified about EPA's early investigations at the Site. Its investigations did not even include dioxin within the scope of materials for which testing was performed. (Hughto testimony, 10/12/06; DX 128 and 130).[11] It was not until dioxin was actually discovered downstream from the Site in the Woonasquatucket River

[11] Copies of these exhibits are attached at Tabs G and H to Century and OneBeacon's Appendix.

that source investigations were conducted and the dioxin contamination at the Site was discovered (Stipulation of Facts, ¶¶48-52; Hughto testimony 10/12/06; DX 157).[12]

Based upon this testimony and other evidence, the jury reasonably could have concluded that Crown-Metro had no reason to test the Site for dioxin contamination during the Century and OneBeacon 1969 policy periods.

### 2. Evidence That The Dioxin Contamination At The Site Could Not Have Been Detected In 1969.

It is not disputed that in 1969, commercial analytic laboratories did not offer dioxin analysis services (Tr. 10/3/06 at 49). Emhart's two expert witnesses, Dr. Hass and Mr. Bonchonsky, both testified they were among the pioneers in the commercial dioxin analysis business when they set up laboratories with such capabilities in the 1980s. (Tr. 10/3/06 at 49; 9/21/06 at 73-74). Dr. Hughto testified that commercial laboratories did not have the capacity to test for dioxin in soils and sediment samples, such as those found at the Site, until long after 1970. (Hughto testimony, 10/12/06). Based upon this testimony alone, the jury reasonably could have determined that the contamination at the Site was not discoverable in the exercise of reasonable diligence in 1969.

Emhart's contention is that reasonable diligence under Rhode Island law would require Crown-Metro to locate and utilize whatever cutting edge equipment was available in 1969 to test for dioxin and, if that equipment was capable of detecting the dioxin later found at the Site, such was discoverable in the exercise of reasonable diligence. This argument stands the concept of reasonable diligence on its head, transforming the discoverability trigger into one of any possibility of discovery.

[12] A copy of defendants' Exhibit 157 is attached to Century and OneBeacon's Appendix at Tab I.

However, even under the standard Emhart seeks to impose, there is evidence in the record from which the jury reasonably could have concluded that the dioxin contamination at the Site could not have been detected in 1969. For example, Dr. Hass testified that analytical chemical testing requires not only the existence of equipment sufficient to detect and measure chemicals in a given sample, but also the development of procedures to prepare a given sample for analysis (Tr. 10/3/06 at 50). These steps included extraction or separation of the material to be tested from other substances in the sample (Tr. 10/3/06 at 50). Performing this step was necessary to accurate dioxin analysis (Tr. 10/3/06 at 50-51). Dr. Hass did not testify as to whether or not sample preparation procedures had been developed in 1969 to detect dioxin in soil or sediment samples at the levels found at the Site. His testimony was limited to his own personal experience with dioxin sampling, which began in 1974 (Tr. 9/26/03 at 27, 30 and 47-48). In fact, the only evidence admitted as to when such sample preparation methods became available for dioxin analysis is the article by Dr. Warren B. Crummett relied upon by Dr. Hass in formulating his opinions (DX 555).[13] That article is a survey of the historical development of dioxin testing and analysis. It identifies no dioxin sample preparation methodology available prior to 1970 (DX 555 at HASS 526). From this evidence, the jury reasonably could have concluded that the dioxin was not detectable in 1969.

Further, the jury reasonably could have concluded that prior to 1970 the 2,3,7,8 TCDD contamination at the Site was not capable of detection in the exercise of reasonable diligence by Crown-Metro because technology had not yet been developed to allow detection of 2,3,7,8 TCDD, the specific tetrachlorinated dioxin at issue in this case, from the other 21 tetra-chlorinated dioxins. Dr. Hass testified that the two key

[13] A copy of this exhibit is attached as Exhibit J to Century and OneBeacon's Appendix.

developments that allowed for the separate identification of 2,3,7,8 TCDD from other dioxins happened after 1970. The first was the development of negative ion chemical ionization ("NICI"). Mass spectrometry is a technology that identified and quantified specific chemicals in a sample based upon their atomic weight (Tr. 9/27/06 at 50; 10/3/06 at 59). This technology was limited in its ability to detect and quantify 2,3,7,8 TCDD in a sample because all of the 22 tetrachlorinated dioxins have the same atomic weight (Tr. 10/3/06 at 60). The key technology that allowed a mass spectrometer to separately detect and quantify 2,3,7,8 TCDD was the 1972 development of NICI (Tr. 10/3/06 at 60). This technology broke apart different dioxin molecules in predictable and different ways and, by identifying the mass of the molecule fragments, allowed for separate detection and quantification of the different tetrachlorinated dioxins (Tr. 10/3/06 at 58-61).

The second key development was the invention of capillary columns as a means to introduce samples into a gas chromatograph, a different type of testing equipment. The capillary columns allowed for samples to be introduced to the equipment one molecule at a time, which also allowed for separate identification of the different types of dioxin (Tr. 10/3/06 at 131). This technology was developed in 1975. (Tr. 10/3/06 at 151).

Proof of that separate detection and quantification of 2,3,7,8 TCDD was not possible prior to 1970 also was put before the jury in the above referenced article by Dr. Crummett, which stated:

> Progress in the development of analytical methodology for the determination of chlorinated dibenzodioxins (CCDs) and dibenzofurans (CDFs) in products and environmental samples has been extensive and systematic during the mast decade. ... [T]he ability to separate a specific isomer in a particular isomer group from all of its isomers and other congeners has advanced from the

> ability to separate 2,3,7,8 TCDD from only two of its isomers in 1974 to an ability to separate all of the 22 TCDD isomers in 1978.

(DX 555 at HASS 525). Clearly, the jury could infer from the inability even to separate 2,3,7,8 TCDD, the only contaminant at issue in this case, from other TCDD compounds – each of which is utterly irrelevant to this case – that the technology and expertise necessary to detect the 2,3,7,8 TCDD contamination at the Site did not exist until after 1970.

Based upon this evidence, the jury reasonably could have concluded that the dioxin contamination at the Site was not detectable or discoverable in the exercise of reasonable diligence at any time prior to 1970. Accordingly, Emhart is not entitled to judgment as a matter of law or a new trial.

## III. EMHART'S MOTION FOR JUDGMENT AS A MATTER OF LAW WITH RESPECT TO CENTURY'S DUTY TO DEFEND IS PREMATURE.

Emhart seeks a judgment as a matter of law as to whether Century breached its duty to defend under Century's primary and excess policies. The Court, however, denied Emhart's motion for summary judgment on that issue and later agreed to defer consideration of that issue until after the Court first determined whether Century had a duty to defend.

After completion of discovery, Emhart filed a motion for summary judgment against Century. In its motion, Emhart argued that Century had breached its duty to defend under Century's excess policy and, as a result, Century had a duty to indemnify Emhart under that policy. Magistrate Judge Lovegreen issued a Report and Recommendation denying Emhart's motion, in which the magistrate concluded it would

be premature to decide whether Emhart is entitled to a defense and indemnification under Century's excess policy until the Court first determined Century's obligations under its primary policy. Emhart then filed objections to the magistrate's report and recommendation. The Court, however, found that Emhart's objections were without merit and accepted the magistrate's findings in total.

A few days before trial, Emhart filed a motion to bar any reference to the Liberty Mutual policies and settlement agreement at trial. In response to that motion, Century argued, among other things, that reference to Liberty Mutual was necessary in order to respond to Emhart's allegations that Century had breached its duty to defend under Century's excess policy. In response to Emhart's allegations, Century planned to offer proof that Century had reserved its rights under that policy, and had asked Emhart to advise Century when the underlying coverage had been exhausted, so Century could make a final determination as to whether it had a duty to defend under that policy. Emhart, however, did not advise Century that the underlying coverage had been exhausted until after this lawsuit was filed. Instead, Emhart continued to pursue Liberty Mutual for its defense costs during that period. Century also planned to offer evidence it had not breached its duty to defend under its primary policy because Century had not discovered the primary policy until after this lawsuit was filed. After the policy was discovered, Century sent a copy to Emhart, denied coverage, and sought leave to amend its counterclaim to include that policy.

To resolve the dispute over whether the insurers could refer to Liberty Mutual during the trial, the parties agreed to waive their right to a jury trial on whether Century had breached its duty to defend under both the primary and excess policy. The Court

then barred the insurers from referring to Liberty Mutual at trial, but agreed to schedule an evidentiary hearing after the jury trial to determine whether Century had breached its duty to defend, if the Court first found that Century had such a duty.

Notwithstanding the parties' agreement, the Court's resolution of that issue, and the fact that Century offered no evidence as to whether it had breached its duty to defend, Emhart now seeks judgment as a matter of a law on whether Century breached its duty to defend. Such a ruling would be contrary to Magistrate Judge Lovegreen's report and recommendation denying Emhart's motion for summary judgment and the procedure the parties agreed to, and the Court approved, before trial. Accordingly, Emhart's motion as to Century's duty to defend should be denied.

Pursuant to the agreed procedure, the Court should first determine whether Century has a duty to defend under its primary policy. Should the Court conclude that Century has no such duty, then no further evidentiary hearing would be necessary. Should the Court conclude that Century has a duty to defend; the Court should then schedule an evidentiary hearing to address whether Century breached its duty to defend under both the primary and excess policy and to determine the reasonableness of Emhart's defense costs. In either case, the Court should deny Emhart's motion for judgment as a matter of law as to whether Century breached its duty to defend.

## IV. THE EVIDENCE AT TRIAL WAS SUFFICIENT FOR A REASONABLE JURY TO FIND THAT ENDORSEMENT 6 IN CENTURY'S EXCESS POLICY BARRED COVERAGE.

Endorsement 6 in Century's excess policy bars coverage for property damage caused by the intentional disposal of wastes products, fluids, or materials, no matter

whether the policyholder expected or intended the resulting property damage. The exclusion states that the policy does not apply to:

> Injury to or destruction of property caused by intentional or willful introduction of waste products, fluids or materials, including oil refuse, gas or gas bleed water, into any soil or inland or tidal waters, irrespective of whether the insured possessed knowledge of the harmful effects of such acts.

PX-1 at CIC 0165.[14]

The record at trial included sufficient evidence for a reasonable jury to find that Endorsement 6 barred coverage. That record, included, among other things:

- Raymond Nadeau testified that barrels filled with a black sludge came from the Metro-Atlantic presses. That sludge was taken to a location below the New England Container plant and dumped. (Tr. 9/15/06 at 72.)[15]

- Raymond Nadeau further testified he would see barrels with black sludge come over from Metro-Atlantic and get dumped behind the New England Container building a few times a week every month. (Tr. 9/15/06 at 79.)

- Raymond Nadeau further testified that in 1965 he saw barrels come over from Metro-Atlantic and get dumped out in the back. (Tr. 9/15/06 at 80.)

- Mr. Turcone testified he saw a pipe from the hexachlorophene operation that led to the river. The pipe had to be replaced every so often. It would deteriorate through use as a result of a corrosive effect. (Tr. 9/18/06 at 14.)[16]

- Dr. Hass testified he had no problem referring to the waste material from the hexachlorophene process as a sludge. (Tr. 10/3/06 at 87.)

---

[14] A copy of this exhibit is attached at Tab K to Century and OneBeacon's Appendix.
[15] A copy of the transcript to Mr. Nadeau's trial testimony is attached at Tab L to century and OneBeacon's Appendix.
[16] A copy of the transcript to Mr. Turcone's trial testimony is attached at Tab M to Century and OneBeacon's Appendix.

- Dr. Woodard testified the waste with the dioxin from the hexachlorophene operation would have the consistency of an oatmeal. It would be brownish to black. (Tr. 10/6/06 at 48, 51.)[17]

- Dr. Woodard further testified that almost all of the dioxin from the hexachlorophene operation would end up in the first waste material, and that nuchar would not have been added at that step. (Tr. 10/6/06 at 49-50, 52.)

- Even if nuchar had been added at that step, Dr. Wade testified that charcoal in the soil or sediments could not be ruled out based on the extraction efficiencies of toluene in the EPA data. (Tr. 10/10/06 at 44-45.)[18]

- Dr. Wade further testified that the primary source of the dioxin contamination at the site came from the Metro-Atlantic process. (Tr. 10/10/06 at 75.)

It was also undisputed at trial that at least part of the dioxin contamination at the Site came from the intentional disposal of waste products from New England Container Company's operations. Endorsement 6 in Century's excess policy bars coverage for property damage resulting from any intentional discharge, and is not limited to the policyholder's intentional discharges. Thus, Endorsement 6 bars coverage for any dioxin contamination resulting from New England Container Company's operations. Emhart's motion for judgment as a matter of law that this exclusion does not apply should be denied.

## V. EMHART IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW OR A NEW TRIAL AGAINST ONEBEACON BECAUSE ITS POLICY SHOULD BE REFORMED TO INCLUDE CENTURY'S ENDORSEMENT 5 POLLUTION EXCLUSION.

Emhart's motion entirely ignores that fact that the court has reserved and not yet decided whether or not OneBeacon's policy should be reformed to include the Century

[17] A copy of the transcript to Dr. Woodard's trial testimony is attached at Tab M to Century and OneBeacon's Appendix.
[18] A copy of the transcript to Dr. Wade's trial testimony is attached at Tab N to Century and OneBeacon's Appendix.

Endorsement 5 pollution exclusion. That issue is the subject of requests for rulings of law and findings of fact and supporting memoranda that will be submitted to the Court. For the reasons stated in the materials to be filed by OneBeacon, Emhart's motion for judgment as a matter of law or for a new trial should be denied.

## CONCLUSION

For the foregoing reasons, Century and OneBeacon respectfully request that the Court deny Emhart's motion for judgment as a matter of law or, in the alternative for a new trial and grant such other and further relief in favor of Century and OneBeacon as is just and appropriate

Dated: January 12, 2007

Respectfully submitted,

James R. Murphy
Kelly N. Michels
Hanson Curran LLP
146 Westminster Street
Providence, RI 02903
(401) 421-2154
- and -
Kevin J. O'Connor
Peter C. Netburn
Hermes, Netburn, O'Connor
& Spearing, P.C.
265 Franklin Street, Seventh Floor
Boston, MA 02110-3113
(617) 728-0050

Attorneys for OneBeacon America
Insurance Company

James T. McCormick
McKenna & McCormick
128 Dorrance Street, Suite 330
Providence, RI 02903
(401) 831-2970

- and –
Lawrence A. Nathanson
Scott E. Levens
Siegal, Napierkowski & Park
533 Fellowship Road, Suite 120
Mt. Laurel, NJ 08054
(856) 380-8900

Attorneys for Century Indemnity
Company, as successor to CCI
Insurance Company,
as successor to Insurance Company
of North America

## CERTIFICATE OF SERVICE

I hereby certify that on January 12, 2006, a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by electronic mail to all parties by operation of the court's electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

Kelly N. Michels

G:\DOCS\KJO\CGU\Emhart\Trial Prep\Opp to motion for judgment as a matter of law.doc