UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| EMHART INDUSTRIES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, LIBERTY MUTUAL INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICA INSURANCE COMPANY, and UNITED STATES FIRE INSURANCE COMPANY,<br><br>Defendants. | CIVIL ACTION<br>No. 02-053-S |

**EMHART'S REPLY MEMORANDUM IN SUPPORT OF ITS RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR A NEW TRIAL, REGARDING ITS CLAIMS AGAINST NORTH RIVER**

The Court, at North River's request, instructed the jury to disregard discharges, dispersals, releases or escapes of contaminants that occurred after the initial release of the contaminants to the environment ("Initial Release Instruction"). That instruction was inconsistent with the language of the pollution exclusion and is contrary to the only New York decision to address the issue in its holding. North River ignores this critical issue. It cites decisions holding that the terms "sudden" and "accidental" are not ambiguous. Those decisions provide no guidance regarding the meaning of "discharge, dispersal, release, or escape" and, therefore, provide no support for the Initial Release Instruction. The record belies the argument that Mr. Kastrinos' extensive testimony regarding the floods at the Site somehow failed to show that appreciable amounts of dioxin were discharged, dispersed, released or escaped during the floods.

The North River argument concerning the Court's answer to the jury question misses the mark. The jury asked a straightforward question regarding whether a series of small sudden and accidental events could satisfy the pollution exclusion. The correct answer to that question was yes; not a repetition of the Initial Release Instruction. The Initial Release Instruction was not relevant to the jury's question. Emhart is entitled to judgment as a matter of law or, in the alternative, a new trial.

## ARGUMENT

### 1. Farm Family Is The Only New York Decision To Address The Discharge Dispersal, Release, Or Escape Issue

As demonstrated at pages 5-7 of Emhart's memorandum ("Em. Mem."), Farm Family Mut. Ins. Co. v. Bagley, 409 N.Y.S.2d 294, 296 (N.Y. App. Div. 1978), is the only New York decision to address, in its holding, whether a discharge, dispersal, release or escape of a contaminant following the initial release may be considered for purposes of the pollution exclusion. The court ruled that "the word 'dispersal' may refer to the original release or it may refer to a secondary dissemination after the original release. . .". In so doing, it distinguished "dispersal", from "the word 'discharge' [which] clearly relates to the original release". In response, North River merely repeats dicta from other decisions (North River Memorandum ("N.Riv. Mem.") at 12). It does not, and cannot, cite any New York decision which held that a sudden and accidental discharge, dispersal, release or escape of contaminants must be disregarded for purposes of the pollution exclusion or that the words dispersal, release or escape are limited to an initial release. Thus, North River fails to provide any support for the Initial Release Instruction.

The North River citation of Technicon Elec. v. Atl. Mut. Ins. Co., 533 N.Y.S.2d 91 (1988), is of no avail as the court held that an intentional discharge by an insured cannot be

accidental for purposes of exception to the pollution exclusion. Id. at 100. Here, the floods were not intentional. Similarly, the dicta North River cites from Northville Ind. Corp. v. Nat'l Union Fire Ins. Co., 89 N.Y.2d 621, 679 N.E.2d 1044 (1997), does not address the initial release issue. Northville addressed the meaning of "sudden"; it did not address whether a sudden and accidental release must be ignored merely because it was not the initial release.

North River does not address Farm Family on the meaning of dispersal. North River does not offer a construction of the words "dispersal", "release" or "escape", either in isolation or in the context of the pollution exclusion, that is limited to the initial release. Instead, North River makes the irrelevant argument that other portions of Farm Family have been overruled. That a decision has been followed, or disapproved, on one ground does not address whether the decision correctly states the law on a different issue. The Supreme Court of Rhode Island rejected this erroneous mode of analysis in Town of Cumberland v. Rhode Island Interlocal Risk Management Trust, Inc., 860 A.2d 1210 (R.I. 2004). There, defendants argued that the court should follow a Third Circuit decision that had been cited favorably by the court on a different point of law than the one at issue. In rejecting that argument, the court explained:

> [t]he defendants rely on Koppers Co. v. Aetna Cas. and Sur. Co., 98 F.3d 1440, 1446 (3d. Cir. 1996), which applies the fortuity principle, noting that this Court cited Koppers with approval in Ins. Co. of North America v. Kayser-Roth Corp., 770 A.2d 403, 413-414 (R.I. 2001). However, in Kayser-Roth, we cited Koppers for the principle that 'non-settling insurers are entitled either to a setoff of settlement amounts received by the insured or to a proportional credit for those shares that would have been allocated to the settling insurers." Kayser-Roth, 770 A.2d at 413 (citing Koppers, 98 F.3d at 1443). We did not cite Koppers as it pertains to the fortuity principle, nor have we held that insureds are precluded from coverage for damages resulting from intentional acts.

Town of Cumberland v. Rhode Island Interlocal Risk Management Trust, Inc., 860 A.2d 1210, 1217-1218 (R.I. 2004). Thus, the overruling of Farm Family on the meaning of sudden and accidental is not relevant to the continued vitality of that decision regarding the meaning of dispersal, release or escape. North River also addresses the wrong issue when it cites numerous decisions stating that sudden and accidental are not ambiguous under New York law and that sudden means abrupt. N.Riv. Mem. at 11-12. The pertinent point is that nothing in the meaning of "dispersal", "release" or "escape" limits those words to initial dispersals, releases or escapes.

North River also addresses the wrong issue when it responds to Emhart's showing (Em. Mem. at 7-8) that numerous courts in other jurisdictions have found that the plain meaning of dispersal, release or escape applies to both initial events and subsequent events. The characterization of those decisions as viewing the pollution exclusion as ambiguous, particularly the phrase "sudden and accidental," (N.Riv. Mem. at 13-14) does not address their analysis of the meaning of dispersal[1], release[2] or escape[3]. The meanings of dispersal, release and escape are not related to the meaning of sudden. The decisions Emhart cited, like Farm Family, explain, in accordance with the plain language of the pollution exclusion, that the sudden and accidental exception applies to all discharges, dispersals, releases or escapes of contaminants.

---

[1] WEBSTER'S THIRD NEW INT'L DICTIONARY 653 (2002) defines "disperse" as "to cause to break up and go in different ways; send or drive into different places; scatter; to cause to become spread widely; distribute" and defines "dispersal" as "the act or result of dispersing; dispersion; distribution".

[2] CERCLA defines "release" as "*any* spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)" 42 U.S.C. § 9601(22) (emphasis added). The New York Superfund regulations define "release" as "*any* pumping, pouring, emitting, emptying, or leaching, directly or indirectly, of a contaminant so that the contaminant or any related constituent thereof, or any degradation product of such a contaminant or of a related constituent thereof, may enter the environment, or the disposal of any contaminant" 6 NYCCR § 375-1.2(am) (emphasis added).

[3] WEBSTER'S THIRD NEW INT'L DICTIONARY 774 (2002) defines "escape" as "leakage or outflow".

Any suggestion that a jurisdiction that views "sudden" as limited to abrupt events would necessarily adopt the Initial Release Instruction is erroneous. See Millipore Corp. v. Travelers Indemnity Co., 115 F.3d 21 (1st Cir. 1997). In applying Massachusetts law, which interprets "sudden" as meaning "abrupt", the court concluded that the "sudden and accidental" exception might in fact apply to a "subsequent unexpected and abrupt release of a significant amount of pollutants into the environment [and] may sometimes defeat the insurer's motion for summary judgment based on the pollution exclusion." Id. at 33 (citing Nashua Corp. v. First State Ins. Co., 648 N.E.2d 1272 (Mass. 1995)). In Nashua, the insureds presented evidence of a fire and subsequent explosion. Nashua, 648 N.E.2d at 1275-1276. The court held that this evidence could be considered, noting that "the fire and explosion caused the sudden and accidental release of pollutants into the environment, thus placing the resulting damage into the exception to the pollution exclusion clause." Millipore, 115 F.3d 21, 29 (1st Cir. 1997) (explaining the holding in Nashua). Nashua is strongly analogous to the facts of the case at bar, and, like Farm Family, reaches the conclusion that both the initial release, and all subsequent releases, must be considered in analyzing whether the "sudden and accidental" exception to the pollution exclusion applies.

2. The Kastrinos Testimony Demonstrated Sudden And Accidental Events

The North River assertion that had the jury been able to consider the floods and fires for purposes of the "sudden and accidental" exception, it would have been possible for them to disbelieve Mr. Kastrinos is of no avail. There is no question that floods occurred. There is no question that floods were sudden and accidental Yet, in an apparent attempt to salvage the jury verdict if the Court finds that the Initial Release Instruction was erroneous, North River questions the sufficiency of the Kastrinos testimony (N. Riv. Mem. at 20-22). That argument

must be rejected. The jury should have had the opportunity to evaluate the evidence in view of the correct instruction. As Emhart has shown, an erroneous instruction regarding the standard for liability warrants a new trial (Em. Mem. at 11-12, citing Hiller v. County of Suffolk, 199 F.R.D. 101, 106 (E.D.N.Y. 2001) and Soledad v. Dept. of Transportation, 116 F.Supp.2d 790, 798 (W.D. Tex. 2000)).

Further, the Kastrinos testimony is more than sufficient to establish that "appreciable"[4] damage was caused by the movement of dioxin in the significant flood events. Mr. Kastrinos testified that there were significant flood events at the Site, which included stream velocity of more than ten times the norm (Tr[5]. 83-85, 88-89, 201-202) and inundated parts of the Site, including the dump used by NECC to dispose of waste from its barrel reconditioning operations (Tr. 81, 210-212). Mr. Kastrinos explained in detail the manner in which dioxin moved in the flood events (E.g., tr. 93, 98-99, 102-103). While some flood events only push soil, the events at the Site were substantial enough to lift dioxin-contaminated soils and sediments from the ground and river bed (102-103, 203-206). During the floods dioxin "would move with whatever soil particles are eroded during that flood event, both from land to water and within the water" and materials would be picked up from the river bed by erosion and transported by the velocity of the flood waters (Id., at 104-105; see also id., at 203-206) While North River comments on the use of the word "would", Mr. Kastrinos testified, in response to a hypothetical question framed after a sidebar conference, that dioxin actually is transported during flood events (Id. at 104-105). The only assumption he made, in using the word "would" was that

4 The jury was instructed that "appreciable" meant having "some potentially damaging environmental effect".

5 Tr. refers to the testimony of Mr. Kastrinos.

dioxin was present in the soil and river at the time of the floods, a matter which was not in dispute(Id. at 105).

The other North River quibbles about the Kastrinos testimony are without merit. Given the magnitude of the floods in terms of water flow and the flood water being three feet higher than necessary to inundate portions of the site, there was no need for precise mathematical calculations to determine that more than a de minimis amount of dioxin was transported during those events (Tr. 212-213). The assertion that Mr. Kastrinos did not know when hexachlorophene was produced at the Site is incorrect; the witness testified to the approximate date (Tr. 213-214) and the information about the period of manufacture was presented to the jury in a stipulation and extensive testimony by other witnesses. Further, the jury's answer to question 4, that dioxin contamination caused actual property damage during the term of the North River policy, indicates that the jury would have been able to find that the dispersal, release or escape of dioxin during the floods caused "some potentially damaging environmental effect"[6].

In view of North River having urged the Court to provide the Initial Release Instruction, it is hardly in a position to speculate that had a different instruction been given, it would have been entitled to a verdict on a different basis.

3. There Was Unrebutted Evidence Of Sudden And Accidental Initial Discharges

Emhart was also entitled to judgment if the evidence was analyzed in accordance with the Initial Release Instruction (Em Mem. at 3). North River avoids the pertinent issue in its response to the Emhart showing that Dr. Hass provided unrebutted testimony that initial releases of dioxin were caused by the fires and explosions at the site. That NECC intentionally disposed of some material (N. Riv. Mem. at 17-19) does not rebut the showing that other material was

[6] See page 30 of the jury instructions.

abruptly and accidentally discharged in the sudden and accidental fires and explosions. Moreover, the case law cited by North River concerning routine, on-going or continuing discharges does not dispose of the inquiry as to whether non-routine fires and explosions fall within the meaning of "sudden" and "accidental." Accordingly, even if the Initial Release Instruction were correct, Emhart would be entitled to judgment as a matter of law.

4. The Response To The Jury Question Warrants A New Trial

North River concedes that "[h]ad the instruction given by the Court been erroneous, repetition might have compounded any harm involved . . ". N.Riv. Mem. at 10. Here, repetition compounded an error as the instruction had the prejudicial effect of suggesting that the Court believed there were no sudden and accidental initial discharges. North River does not, and cannot, attempt to justify, how repeating the Initial Release Instruction had any relevance to the question of whether a series of small sudden and accidental events was sufficient to invoke the exception to the pollution exclusion (See Em. Mem. at 11).

## CONCLUSION

For the foregoing reasons, and those stated in its initial brief, Emhart is entitled to judgment as a matter of law or, at a minimum, a new trial concerning its claims against North River.

Respectfully submitted,

/s/ Gerald J. Petros

Gerald J. Petros (#2931)
Hinkley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, Rhode Island 02903
(401) 274-2000
(401) 277-9600
gpetros@haslaw.com

Jack R. Pirozzolo
Richard L. Binder
Foley Hoag LLP
Seaport World Trade Center West
155 Seaport Boulevard
Boston, Massachusetts 02210
(617) 832-1000
jpirozzolo@foleyhoag.com

Dated: February 9, 2007

Counsel for Plaintiff, Emhart Industries, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on February 9, 2007, a copy of the foregoing Plaintiff's Reply to Defendant North River Insurance Company's Memorandum of Law in Opposition to Plaintiff's Renewed Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's Cm/ECF System.

/s/Gerald J. Petros
Gerald J. Petros