UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| EMHART INDUSTRIES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>HOME INSURANCE COMPANY,<br>INSURANCE COMPANY OF NORTH AMERICA,<br>LIBERTY MUTUAL INSURANCE COMPANY,<br>ONE BEACON AMERICA INSURANCE COMPANY<br>and UNITED STATES FIRE INSURANCE COMPANY,<br><br>Defendants. | Civil Action No. 02-053-S |

**EMHART'S REPLY MEMORANDUM**
**<u>REGARDING CORPORATE SUCCESSORSHIP</u>**

**INTRODUCTION**

In its opening memorandum ("Em. Mem."), Emhart demonstrated that it succeeded to the insurance policies issued to Crown Metro that are at issue in this action. It established the relevant corporate history and that the insurance policies were not among the assets its predecessor, USM Corporation, sold to Bengal Corporation. Century's response ("C. Mem.") essentially amounts to an assertion that Emhart maintained the environmental liability for the Centredale site, for which the EPA seeks to recover millions of dollars, while transferring to Bengal the insurance policies providing coverage for those liabilities. Neither the premise nor the Century argument is supported by case law, logic or the agreement between USM and Bengal (DX 89 ("Agreement")).

For the insurance polices to be transferred, Century must make two showings. First, it must establish that the insurance policies were among the limited class of assets sold to

Bengal, pursuant to ¶ 3(A)(2) of the Agreement, i.e., executory contracts.[1] Then, it must establish that the Agreement does not otherwise prevent the insurance policies from being transferred.

Century is unable to establish the first prerequisite. Where, as here, the premium for an insurance policy has been paid and the policy term has expired, the policy is not an executory contract. The cases Century cites do not address such insurance policies. Further, the Agreement transfers to Bengal "assets of Bostik South relating ***only to*** the business of manufacturing and selling chemicals, colors, intermediates and reservol," and "specifically exclud[es]" from the definition of transferred assets those relating to "the manufacture and sale of adhesives and coatings." As the insurance policies, by definition, are equally applicable to both businesses, they are excluded by ¶ 3(A)(2).

In an attempt to satisfy the second prerequisite, Century asserts an illogical construction of the Agreement. First, Century attempts to remove the requirement of ¶ 1 that the transferred assets are limited to those located in South Carolina. This strained interpretation would result in USM selling its real property throughout the world. Second, in an attempt to avoid the illogical result of USM retaining liabilities for which it transferred insurance coverage, Century interprets ¶ 7(B)(3) as transferring to Bengal environmental liabilities for a location 1,000 miles from the location of the only assets that USM sold to Bengal. The Court need not address ¶ 7(B)(3) as ¶ 7(B)(2) provides that liabilities for "insured claims" were not transferred to Bengal. Further the argument regarding ¶ 7(B)(3) is erroneous. Conditions which are to be remediated under CERCLA are not a "violation" of a statute. As CERCLA is a remedial statute,

[1] Century does not assert that the insurance policies are any other type of asset enumerated in the Agreement.

such conditions are not a violation. The premise of the Century argument also ignores that Emhart, not Bengal, is the subject of the EPA proceeding regarding the Centredale site.[2]

**ARGUMENT**

1. The Insurance Policies Are Not Executory Contracts

By 1970, approximately a decade before the transaction in which USM sold certain assets to Bengal, the terms of the insurance policies had expired, and all premiums had been paid. The insurance policies provided "occurrence" coverage, leaving open the possibility of "long-tail" claims years after the expiration of the policy terms. See Textron, Inc. v. Liberty Mutual Ins. Co., 639 A.2d 1358, 1361 nn. 1, 2 (R.I. 1994). In such circumstances, the expired insurance policies are not executory. See Em. Mem. at 5-6 (citing In re Vander Estates Holding, LLC, 328 B.R. 18 (Bank. E.D.N.Y. 2005); In re CVA Gen. Contractors, Inc., 267 B.R. 773 (Bankr. W.D. Tex. 2001)).

Century does not cite any authority addressing insurance policies whose terms have expired and whose premiums have been paid. Rather it lists, without discussion, eleven cases, ranging in date from 1912–1986, which it cites for the proposition that "insurance policies" are executory contracts. See C. Mem. at 3. It cites one case that does not even involve an insurance policy[3] and another in which it was the complaint — ***not the court*** — that characterized the insurance policy as executory.[4] The nine cases in which the court addressed insurance policies, all involve personal injury, accident, or life insurance policies, where

---

[2] It is doubtful that Century would argue that Bengal (now Crown Metro) owns the insurance policies if Emhart asserted a claim against Bengal for the costs of remediating the Site.

[3] Heidner v. St. Paul & Tacoma Lumber Co., 215 P. 1 (Wash. 1923) concerns the effects of World War I on a contract for the purchase of lumber.

[4] Giroux v. Bockler, 194 P. 178, 179 (Or. 1921).

continuing scheduled premium payments remained, with the result that the insured's obligation to pay premiums continued into the future.[5] Indeed, in the life insurance context, the insurer's obligation to pay the death benefit would necessarily arise in the future. None of the cases that Century cites involve occurrence insurance policies, like those here in issue, where premiums had been paid and the policy terms expired.

Century's argument about whether a 1979 definition, a 1999 definition, or a bankruptcy court definition of executory contract applies is irrelevant. The insurance policies at issue are not "executory contracts" within the meaning of any of the three definitions. Even the 1979 definition advocated by Century states that an executory contract is a "contract the obligation (performance) of which relates to the future." When the premiums have been paid in full and the policy term has expired, the possibility that a long-tail claim could arise in the future does not make an insurance policy a "contract the obligation (performance) of which relates to the future." The possibility of a future claim is dramatically different from the certainty of future obligations that exists with installment contracts, supply agreements, leases, insurance policies where premiums remain due and other contracts that have been found to be executory. Indeed, Century cites no authority in which an insurance policy has been found to be executory after all premiums have been paid and the term has expired. It cites no authority indicating that there is a

---

[5] See Burkett v. Maricopa County Pub. Fiduciary, 733 P.2d 673 (Ariz. 1986) (life insurance); Mass. Bonding & Ins. Co. v. Chapman, 3 S.W.2d 18 (Ark. 1928) (personal injury insurance); Marez v. Dairyland Ins. Co., 638 P.2d 286 (Colo. 1982) (accident insurance), overruled by Friedland v. Travelers Indem. Co., 105 P.3d 639 (Colo. 2005); Lain v. Metro. Life Ins. Co., 54 N.E.2d 736 (Ill. App. Ct. 1944), rev'd, 54 N.E.2d 587 (Ill. 1944) (life insurance); Ind. Life Endowment Co. v. Reed, 103 N.E. 77 (Ind. Ct. App. 1913) (same); Spears v. Indep. Order of Foresters, 107 S.W.2d 126 (Mo. Ct. App. 1937) (same); Graphic Arts Mut. Ins. Co. v. Monello, 41 Misc.2d 943 (N.Y. Civ. Ct. 1963) (workman's compensation insurance), rev'd, 254 N.Y.2d 351 (1964); Knepp v. Nationwide Ins. Co., 471 A.2d 1257 (Pa. Super. Ct. 1984) (personal medical insurance); Kansas City Life Ins. Co. v. Blackstone, 143 S.W. 702 (Tex. Civ. App. 1912) (life insurance), rev'd, 107 Tex. 102 (1915).

meaningful difference between the definitions of "executory contract" in bankruptcy or any other context.

Vandeer and CVA explain that insurance policies cease to be executory after premiums have been paid. The analyses in those cases do not turn on their arising in bankruptcy. Bankruptcy happens to be an area of law where issues concerning whether a contract is executory arise. Indeed, Century was unable to distinguish John H. Kolb & Sons, Inc. v. G & L Excavating, Inc., 821 A.2d 774 (Conn. App. 2003)), a case not involving bankruptcy, on any substantive basis. It merely asserted, without explanation, that Kolb somehow arises in a "specialized" context because the issue was the statute of limitations. There is no apparent reason for Century to deem statute of limitations or bankruptcy to be more "specialized" than corporate succession.

As the insurance policies at issue were not executory, they were not transferred to Bengal. While the executory contract issue suffices to defeat the Century argument, there are independent bases for finding that the insurance policies were not transferred to Bengal.

2. The Insurance Policies Are Not "Assets Relating Only" To The Manufacture Of Chemicals

At page 6 of its memorandum, Century omits critical language concerning ¶ 3(A)(2)[6] that contradicts its position. Century states that ¶ 3(A)(2) provides that "assets relating only to the business of manufacturing and selling chemicals, colors, intermediates and reservol" were sold to Bengal, but omits the further language "specifically excluding the business, properties and assets … relating to the manufacture and sale of adhesives and coatings." The insurance policies are not limited to the chemical business. They relate equally to the business of

[6] This section is at page 3 of the Agreement. Century refers to it as section "3(2)."

manufacturing adhesives and coatings and are excluded pursuant to ¶ 3(A)(2). See also Em. Mem. at 6, § C.

3. The Agreement Is Inconsistent With The Transfer Of Insurance Policies

In its initial memorandum Emhart demonstrated that if the Agreement had been intended to transfer any insurance policies, it would have included: (1) representations by USM concerning the insurance coverage; (2) a schedule of insurance contracts; and (3) a requirement to notify the insurers of the alleged transfer. See Em. Mem. at 5 (citing 9/14/06 Trial Tr. at 39:18-40:25). These provisions are conspicuously missing from the Agreement, thus indicating that the parties did not intend to transfer any insurance contracts. Id.; DX 89 § 9, at 15-24; DX 89 § 14, at 29. Century does not attempt to, and cannot, refute this dispositive showing.

4. USM Did Not Retain Insured Liabilities While Transferring The Related Insurance Policies

In its initial brief, Emhart demonstrated that the Agreement would not have provided for USM retaining insured liabilities while transferring the applicable insurance policies (Em. Mem. at 4-5). In response, Century argues that liabilities for contamination at the Centredale site were transferred to Bengal due to ¶ 7(B)(3). See C. Mem. at 6-7. In so arguing, Century misreads the Agreement. It also assumes, without explanation, that a corporation purchasing only assets related to a business in South Carolina has thereby assumed liabilities for a business in Rhode Island.

Paragraph 7(B) of the Agreement, entitled “Liabilities and Obligations Excluded”, provides that Bengal “does not assume or agree to be responsible for” certain liabilities (DX 459 at 12). Thus, if the claims relating to the Centredale site fall within the scope of any of the six subparts of ¶ 7(B), they were not assumed by Bengal. Under ¶ 7(B)(2) of the Agreement, “insured claims against [USM] arising solely out of any acts or omissions occurring prior to the

Closing Date" were excluded from the liabilities to be assumed by Bengal. As the EPA alleged that the contamination occurred as a result of events at the site "from approximately 1943 to approximately 1971",[7] those claims are within the scope of ¶ 7(B(2) and are excluded liabilities not assumed by Bengal.

While it is unnecessary to determine whether the liabilities are also excluded by ¶ 7(B)(3), the Century argument concerning that paragraph is incorrect. Century assumes that the conditions giving rise to CERCLA liability at the Centredale site are a "violation of laws, rules or regulations." C. Mem. at 7. That unsupported assumption is incorrect. CERCLA is a ***remedial*** statute and, therefore, cannot be "violated." See Dedham Water Co. v. Cumberland Farms Dairy, Inc., 805 F.2d 1074, 1081 (1st Cir. 1986) ("CERCLA is essentially a remedial statute …."); Diversified Servs., Inc. v. Simkins Indus., Inc., 974 F. Supp. 1448, 1452 (S.D. Fla. 1997) ("[A]s a remedial statute that establishes liability for existing contamination, CERCLA is not a 'requirement' of the law that requires affirmative action. The remedial environmental laws in this action are designed to hold polluters responsible and are not 'legal requirements' for [the plaintiff-lessee] to comply with.") (internal citation omitted); cf. Jones v. Ada S. McKinley Cmty. Servs., 1989 WL 152352, at *7 (N.D. Ill. Nov. 28, 1989) ("However, because the statute [§ 1983] is purely remedial, it cannot be violated as plaintiffs alleged in their complaint.") (citing Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 617 (1979)). As there is no "violation," the Century interpretation of ¶ 7(B)(3) is erroneous.

Although Century speculates as to the intent of both USM and Bengal in regard to assuming liability for contamination, it does not cite any evidence of the intent of either party. The only evidence is that Bengal filed a complaint, asserting that liabilities associated with the

---

7 See the first EPA order (PX 13) ¶ 18.

Centredale site were not transferred to it (DX 317). Contrary to the Century assertion, that complaint alleges that Bengal, by purchasing assets in South Carolina, did not "intend to be responsible for pre-existing contamination" at a site located more than 1,000 miles away. See C. Mem. at 7.

Neither the liability for contamination at the Centredale site, nor the insurance policies applicable to that liability were transferred to Bengal.

5. Bengal Purchased Only Assets That Were Located In South Carolina

The plain language of the Agreement states that the only assets sold to Bengal were physically located in Greenville, South Carolina. Both the initial recital and ¶ 3(A)(1) state the assets to be sold are "located in Greenville, South Carolina." That language is in accordance with the intent, stated in ¶ 3(A)(2) of the Agreement, to differentiate between the assets of the chemical business that were transferred to Bengal and those of the adhesives and coatings business which were retained by USM. "Greenville, South Carolina" is a geographical limit on the assets being transferred.

The Century assertion that references to the South Carolina location were intended to be nothing more than "the address of Bostik South," is without merit. The Agreement refers to "assets" located in Greenville, South Carolina. The Agreement does not refer to assets belonging to a division headquartered in South Carolina. When the Agreement chose to identify the location of a party, it did so by naming the party and stating "having its principal office at" a designated location. That language appears in the first sentence of the Agreement. Further, since USM owned property all over the world, the Century argument would achieve the absurd result that ¶ 3(A)(1) would transfer of all of USM's worldwide assets (something that neither Bengal nor USM ever contended happened).

The geographical limitation has meaning and must be enforced. Only assets located in Greenville, South Carolina were transferred to Bengal. Only the liabilities associated with assets located in Greenville, South Carolina were assumed by Bengal. Neither the insurance policies nor the liabilities for the Centredale site in Rhode Island were transferred to Bengal.

**CONCLUSION**

For the foregoing reasons, and those stated in Emhart's initial brief, this Court should rule that Emhart succeeded to the rights in the insurance policies at issue in this action that were issued to its predecessor, Crown Metro.

Respectfully submitted,

/s/ Gerald J. Petros
Gerald J. Petros (#2931)
Hinkley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, Rhode Island 02903
(401) 274-2000
(401) 277-9600
gpetros@haslaw.com

Jack R. Pirozzolo
Richard L. Binder
Foley Hoag LLP
Seaport World Trade Center West
155 Seaport Boulevard
Boston, Massachusetts 02210
(617) 832-1000
jpirozzolo@foleyhoag.com

Dated: February 9, 2007

Counsel for Plaintiff, Emhart Industries, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on February 9, 2007, a copy of the foregoing Plaintiff's Reply Memorandum Regarding Corporate Successorship was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's Cm/ECF System.

/s/Gerald J. Petros____________________
Gerald J. Petros

782370v1