UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| EMHART INDUSTRIES, INC., Plaintiff, | CIVIL ACTION NO. CA 02-053S |
| v. | |
| HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, LIBERTY MUTUAL INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICA INSURANCE COMPANY, and UNITED STATES FIRE INSURANCE COMPANY Defendants. | **SUPPLEMENTAL MEMORANDUM OF LAW OF DEFENDANT CENTURY INDEMNITY COMPANY TO ADDRESS THE ISSUES THE COURT RAISED IN ITS MARCH 27, 2007 ORDER** |

Defendant Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America ("Century"), submits this supplemental memorandum of law to address the issues the Court raised in its March 27, 2007 Order.

**ISSUE NO. 1:** Whether, and to what extent, Century (in its capacity as an excess insurer) would have a duty to defend under the Excess Policy if the Court were to determine:

(A) that Century owes Emhart a duty to defend under the Primary Policy (GAL 36597);

(B) that Century does not owe Emhart a duty to defend under the Primary Policy.

**RESPONSE:**

Century does not have a duty to defend Emhart under the Excess Policy, regardless of whether Century owes Emhart a duty to defend under the Primary Policy. Even if the Court finds that Century has a duty to defend Emhart under the Primary Policy; the Court

should still find that Century has no duty to defend Emhart under the Excess Policy because (1) the coverage under the Primary Policy is at least as broad as the coverage under the Excess Policy with respect to the underlying claim, (2) the coverage under the Primary Policy has not been exhausted, and (3) Century has no continuing duty to defend Emhart under either the Primary Policy or Excess Policy based on the jury's finding that the dioxin contamination at the site was not discoverable in the exercise of reasonable diligence during Century's policy periods. If the Court finds that Century has no duty to defend Emhart under its Primary Policy; then the Court should also find that Century has no duty to defend Emhart under the Excess Policy because the coverage under the Primary Policy is at least as broad as the coverage under the Excess Policy.

Century would only have a duty to defend Emhart under the Excess Policy if (1) the coverage under the Excess Policy is broader than the coverage under the Primary Policy with respect to the underlying claim, or (2) if the limits of liability under the Primary Policy became exhausted [PX-1 at CIC 0154]. Century has no duty to defend Emhart under the Excess Policy because these conditions have not been met and most likely will never be met.

With respect to the first condition, Century has no duty to defend Emhart under the Excess Policy because the property damage is not within the terms of coverage of either the Primary Policy or the Excess Policy. The jury found that the dioxin contamination at the site was not discoverable in the exercise of reasonable diligence during Century's policy periods [Document 454, filed 10/19/2006]. Thus, liabilities arising out of that property damage are not covered under both policies. *See Textron, Inc. v. Aetna Cas. and Sur. Co.*, 754 A.2d 742, 745 (R.I. 2000); *CPC Intern. Inc. v. Northbrook Excess & Surplus Ins. Co.*, 668 A.2d 647, 650 (R.I. 1995). Because the Excess Policy is no broader than the Primary Policy with respect to the

underlying claim, Century has no duty to defend Emhart based on the first condition. *See SCSC Corp. v. Allied Mut. Ins. Co.*, 515 N.W.2d 588, 602-03 (Minn. App. 1994) ("Allied cannot show that any of the defense costs were for claims that were covered only under broader coverage afforded by Tower."), *affirmed in part, reversed in part on other grounds by*, 536 N.W.2d 305 (Minn. 1995); *Harrow Products, Inc. v. Liberty Mut. Ins. Co.*, 833 F.Supp. 1239, 1250 (W.D. Mich. 1993) ("The first condition is not applicable because the INA pollution exclusion is co-extensive with the Liberty Mutual pollution exclusion."), *judgment affirmed in part, reversed in part on other grounds by*, 64 F.3d 1015 (6th Cir. 1995).

With respect to the second condition, Century has no duty to defend Emhart under the Excess Policy because the limits under the Primary Policy have not been exhausted, and most likely never will be exhausted. The limits under the Primary Policy have not been exhausted to date because Century has not paid anything to Emhart under the Primary Policy for the underlying claim. *See U.S. Fidelity and Guar. Co. v. Federated Rural Elec. Ins. Corp.*, 37 P.3d 828, 832-33 (Okla. 2001) ("Most jurisdictions that have addressed the question have concluded that where an insured has both primary and excess liability insurance, the excess insurer is not responsible to participate in the costs of defense until after the limits of the primary policy are exhausted."); *Weyerhaeuser Co. v. Commercial Union Ins. Co.*, 15 P.3d 115, 135 (Wash. 2001) ("The majority of jurisdictions adhere to the following rule: once the underlying insurer has paid its limits in *settlement or judgments*, the supplemental insurer's obligation to defend arises.").

Moreover, the limits under Century's Primary Policy most likely never will be exhausted.[1] The jury found that the dioxin contamination was not discoverable in the exercise of

---

[1]Theoretically, the limits under the Primary Policy could still be exhausted. Emhart has filed a motion for judgment as a matter of law or for a new trial against Century. Emhart also contends that Century has a duty to indemnify Emhart, even if the underlying claim is not covered, based on *Conanicut Marine Services, Inc. v. Insurance Co. of North America*, 511 A.2d 967 (R.I. 1986).

reasonable diligence during Century's Primary Policy period. Thus, Century has no duty to indemnify Emhart under the Primary Policy and will not pay anything to Emhart for the claim. Also, all of Emhart's indemnity costs to date have been covered by another insurer. Emhart must exhaust all of the coverage from that other insurer, in addition to the limits under the Primary Policy, before Century would have any duty to defend under the Excess Policy. *See GenCorp., Inc. v. AIU Ins. Co.*, 138 Fed.Appx. 732, 734 (6th Cir. 2005).

Even if the Primary Policy were to be exhausted in the future, Century would still have no duty to defend under the Excess Policy because once the jury determined that the claim was not covered, Century would have no continuing duty to defend Emhart under either the Primary Policy or Excess Policy. *See Shelby Ins. Co. v. Northeast Structures, Inc.*, 767 A.2d 75, 77 (R.I. 2001) ("The plaintiff has a duty to defend the underlying action at trial until there has been a finding of fact that the cause of the collapse was excluded from coverage under the policy or until a settlement has been reached."); *see also* Emhart's Reply Memorandum in Support of its Motion for Summary Judgment as a Matter of Law as to the Duty to Defend under the Century Primary Policy at 12-13 [Document 487, filed on 2/9/2007].

**ISSUE NO. 2:** Whether OneBeacon would have a duty to defend under the Excess Umbrella Policy, were the Court to reform that Policy (as OneBeacon requests) and further determines that:

(A) Endorsement 6 applies;

(B) Endorsement 5 applies.

**RESPONSE:**

OneBeacon's attorneys will address this issue.

**ISSUE NO. 3:** Whether the underlying coverage has been exhausted such that it would trigger the defense obligations under the Excess Policy or the Excess Umbrella Policy, or both.

**RESPONSE:**

The underlying coverage has not been exhausted. See Century's Response to Issue No. 1.

**ISSUE NO. 4:** Whether the Waste Product Exclusion obviates Century's duty to defend under the Excess Policy.

**RESPONSE:**

The "Waste Product Exclusion" obviates Century's duty to defend. It bars coverage for claims arising out of the intentional discharge of pollutants, irrespective of whether the policyholder intended to harm the environment [PX-1 at CIC 0165]. Just like the EPA's allegations do not raise a reasonable possibility that the dioxin contamination at the site was discoverable in the exercise of reasonable diligence during Century's policy periods, the EPA's allegations also do not raise a reasonable possibility that the dioxin contamination at the site was the result of accidental discharges. To the contrary, the EPA alleges that the dioxin contamination at the site is the result of Metro-Atlantic's intentional waste disposal activities.

The EPA's allegations include the Interim Final Remedial Investigation, dated June 30, 2005 [DX-507].[2] The following excerpts from that report show that the EPA is alleging that the contamination at the site is the result of Metro-Atlantic's intentional waste disposal activities:

> Potential historical sources of contamination include improper storage and disposal of chemicals in drums, stockpiles and surface impoundments. It is believed that hexachlorophene was manufactured at the site in approximately 1965. Hexachloroxanthene (HCX) and dioxins were byproducts of this process.

[2] The Remedial Investigation Report explicitly states that the dioxin contamination at the site was not discovered until 1996, at the earliest, and contains no allegation that the dioxin contamination at the site was discoverable by Crown-Metro in the exercise of reasonable diligence during Century's policy periods [DX-507 at 1-4].

[DX-507, Executive Summary, at iii.]

> HCX and dioxin are believed to be primarily derived from a hexachlorophene manufacturing process, which took place on the CMRP site for a relatively short period of time in the mid-1960s. If these byproducts were contained in waste that was directly discharged to the Woonasquatucket River, then dioxin and HCX could have been carried downstream in the water column adsorbed to suspended sediment particles. Source area contaminants (e.g. dioxins, HCX, PCBs, and pesticides) probably mostly entered the river via surface runoff and erosion and transport of contaminated soils from the source area. These transport mechanisms would have operated for a longer period of time (throughout the duration of waste-related activities on the CMRP site, until contaminated source area soils were capped).

[DX-507, Executive Summary, at v.]

> Evidence of improper waste disposal activities at the source area is documented in an analysis of historical aerial photographs conducted by the U.S. EPA Office of Research and Development (U.S. EPA, 2000). U.S. EPA analyzed thirteen sets of black-and-white historical aerial photographs taken from 1939 to 2000 to assess landscape morphology, patterns of hazardous waste disposal, and other discernible activities and conditions of environmental significance at the source area. Results from the study showed evidence of waste disposal activities dating back to 1951, including presence of drums, stained soils, grading scars, evidence of solid and liquid waste materials, mixtures of solid waste and drums, and surface impoundments. These features were concentrated in the central and southern parts of the site. The historical aerial photographs show evidence of drainage leading away from waste disposal areas to the west into the Woonasquatucket River, and to the east towards the tailrace along the eastern boundary of the site.
>
> The most significant waste disposal activities, in terms of volume and spatial extent, were observed from 1962 through 1970. Annotated photographs from 1965 and 1970 are provided as Figures 1-4 and 1-5. Environmentally significant features observed from this time period included possible and probable drums, staining, solid and liquid wastes, mixtures of solid wastes, and drums. In particular, an apparent waste disposal area is evident at the southwest edge of the site, in the area now occupied by the Centredale Manor south parking lot and Cap Area #1. The

> 1970 photo shows an impoundment in the central part of the site, which appears to drain into the tailrace in the area now occupied by the Centredale Manor north parking lot.

[DX-507 at 1-3 to 1-4.]

> As described in Section 1.3.2, potential historical sources of contamination at the CMRP site include improper storage and disposal of chemicals in drums, stockpiles and surface impoundments. These activities appear to have been concentrated in the central and southern parts of the source area. Chemicals apparently were released directly to the ground, buried, and discharged directly to the Woonasquatucket River.

[DX-507 at 4-1.]

> Dioxins (primarily 2,3,7,8-TCDD), furans, and HCX were generated as hexachlorophene byproducts that were discharged directly into the Woonasquatucket River. 2,3,7,8-TCDD and HCX ratios are not constant because of variations in the hexachlorophene production process; however, the co-occurrence of HCX and 2,3,7,8-TCDD above background levels in sediments from Allendale Pond to downstream of Manton Dam indicates that the contaminants came from the manufacture of hexachlorophene on the CMRP site.

[DX-507 at 4-12 to 4-13.]

> The spatial distributions and concentrations of dioxin (primarily 2,3,7,8-TCDD) and HCX in soil and sediment suggest that these contaminants may have been released to the Woonasquatucket River via the direct discharge of dioxin-bearing waste (see Section 7.1.3).

[DX-507 at 7-1.]

Even if the EPA had not alleged that Metro-Atlantic's intentional waste disposal practices caused the contamination at the site, Century would still have no duty to defend because the cause of the contamination is not relevant to the claim that the EPA has asserted against Emhart. Under CERCLA, Emhart is strictly liable for the contamination at the site. When an issue relating to coverage is not relevant to an underlying claim, the insurer's duty to

defend is based on the actual facts as opposed to the underlying allegations. *See Delta Airlines v. State Farm Fire and Cas. Co.*, 96 F.3d 1451 at *1 (9th Cir. 1996) (unpublished opinion) (an insurer may "rely on extrinsic facts to prove coverage is unavailable when the complaint is *silent* as to the existence of those facts and when the facts will not be determined in the underlying action."); *Western Heritage Ins. Co. v. River Entertainment,* 998 F.2d 311, 314-15 (5th Cir. 1993) ("when the petition does not contain sufficient facts to enable the court to determine if coverage exists, it is proper to look to extrinsic evidence in order to adequately address the issue."); *Miller Mut. Ins. Ass'n of Illinois v. Ainsworth Seed Co., Inc.*, 552 N.E.2d 254, 255 (Ill.App. 4 Dist. 1989) ("We conclude that extrinsic facts may be considered as long as they do not bear upon issues in the underlying litigation."); *Burd v. Sussex Mut. Ins. Co.,* 267 A.2d 7, 9 (N.J. 1970) ("but when coverage, i.e., the duty to pay, depends upon a factual issue which will not be resolved by the trial of the third party's suit against the insured, the duty to defend may depend upon the actual facts and not upon the allegations in the complaint."); B.Ostrager & T. Newman, *Handbook on Insurance Coverage Disputes* § 5.02[b] at 259-263 (12th ed. 2003).

Where coverage depends upon the resolution of a factual issue that is not relevant to the underlying claim, it makes no sense to consider those allegations to determine if coverage exists. The underlying allegations will not address the issue of coverage. Under those circumstances, courts should first determine whether coverage exists based on the actual facts. If coverage exists, then the insurer should be required to reimburse the policyholder for its defense costs. Whether the dioxin contamination at the site was intentional or accidental is not relevant to the underlying action, just like whether the dioxin contamination at the site was discoverable in the exercise of reasonable diligence during Century's policy periods is not relevant to the underlying action. For these types of issues, the Court should first decide whether coverage

exists based on the actual facts, before determining whether the insurer has a duty to defend.[3]

**<u>ISSUE NO. 5</u>:** Whether an evidentiary hearing is necessary to resolve the issue of breach, were the Court to determine that Century owes Emhart a duty to defend under either the Primary Policy or the Excess Policy, or both.

**<u>RESPONSE</u>:**

Should the Court determine that Century owes Emhart a duty to defend under either the Primary Policy or the Excess Policy, or both, an evidentiary hearing would be necessary on the issue of breach, as well as on the issues of reasonableness of Emhart's defense costs and allocation.

Emhart contends that Century breached its duty to defend under both the Primary Policy and the Excess Policy. As a result, Emhart argues that Century is obligated to indemnify Emhart, even if the underlying claim is not covered. Emhart's argument is based on the Rhode Island Supreme Court's holding in *Conanicut Marine Services, Inc. v. Insurance Co. of North America,* 511 A.2d 967 (R.I. 1986). In *Conanicut,* the insurer wrongfully refused to defend the policyholder. Based on that wrongful refusal, the court held that the insurer was obligated to pay the award of damages or settlement assessed against the policyholder, even though the underlying claim was not covered. *Id.* at 971. The court, however, said that the insurer could have avoided this penalty by either (1) defending the policyholder under a reservation of rights, or (2) bringing a declaratory judgment action against the policyholder on the question of coverage. *Id.* at 971 n. 10.

To apply *Conanicut,* the Court, thus, must first find that Century wrongfully refused to defend Emhart. An evidentiary hearing would be necessary for the Court to make that

[3] The jury did not determine whether the "Waste Product Exclusion" bars coverage for property damage from dioxin contamination because it found that the dioxin contamination was not discoverable during the exercise of reasonable diligence during Century's policy periods. Thus, a determination of the applicability of the "Waste Product Exclusion" based on the actual facts would require a separate trial.

determination because the material facts are in dispute. Century is confident the evidence will show that Century did not wrongfully refuse to defend Emhart under either the Excess Policy or Primary Policy.

With respect to the Excess Policy, the evidence will show that Century reserved its rights and asked Emhart to advise Century when the underlying coverage became exhausted. Emhart, however, never advised Century that the underlying coverage had been exhausted until after Emhart filed this lawsuit. At that time, Century had the right to seek declaratory relief without risking the *Conanicut* penalty.

With respect to the Primary Policy, the evidence will show that before this lawsuit was filed neither Century nor Emhart was aware of the policy. Century first found the policy while searching for documents in response to Emhart's discovery requests. Century then produced the policy, denied coverage, and filed a motion to amend its counterclaim in this action to include the Primary Policy. By doing so, Century was following the procedure set forth in *Conanicut* and, thus, was entitled to deny coverage without incurring the *Conanicut* penalty.

An evidentiary hearing would also be necessary to determine whether Emhart's defense costs are reasonable and necessary. The evidence will show that Emhart has engaged out-of-town counsel at above-market rates. Further, the evidence will show that Emhart's attorneys have engaged in a scorched-earth approach to the underlying action, incurring costs in excess of $4 million. That approach has resulted in very little benefit, if any, to Emhart.

An evidentiary hearing would also be necessary to determine what portion of the defense costs, if any, should be allocated to Century. The evidence will show that Century issued policies to Crown-Metro for a little over a year. In contrast, the dioxin contamination at the site began in the mid-1960s and is still present. Thus, at most, Century would only be

responsible for a pro rata share of Emhart's reasonable defense costs based on the years of Century's coverage divided by the years of the dioxin contamination. Century also contends that the amount another insurer may have paid to Emhart does not reflect that other insurer's true exposure and was determined collusively between Emhart and that other insurer in order to try to maximize Emhart's recovery against Century. The facts relating to the settlement with that other insurer would also be relevant at an evidentiary hearing.

**ISSUE NO. 6:** Any other issues the parties see fitting to include.

**RESPONSE:**

Century has no other issues it sees fit to include at this time.

Dated: April 12, 2007

McKENNA & McCORMICK

By: /s/ James T. McCormick

James T. McCormick (#2614)
McKENNA & McCORMICK
128 Dorrance Street, Suite 330
Providence, RI 02903
(401) 831-2970

- and -

Lawrence A. Nathanson
Scott E. Levens
SIEGAL, NAPIERKOWSKI & PARK
533 Fellowship Road, Suite 120
Mt. Laurel, NJ 08054
(856) 380-8910

Attorneys for Defendant Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America

**CERTIFICATE OF SERVICE**

I hereby certify that on April 12, 2007, a copy of the foregoing Supplemental Memorandum of Law of Defendant Century Indemnity Company to Address the Issues the Court Raised in its March 27, 2007 Order was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

By: /s/ James T. McCormick
James T. McCormick (#2614)
McKENNA & McCORMICK
128 Dorrance Street, Suite 330
Providence, RI 02903
(401) 831-2970