UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| EMHART INDUSTRIES, INC., Plaintiff, | ) | |
| v. | ) | Civil Action No. 02-053-S |
| HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, LIBERTY MUTUAL INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICA INSURANCE COMPANY and UNITED STATES FIRE INSURANCE COMPANY, Defendants. | ) | |

**EMHART'S MEMORANDUM REGARDING CENTURY'S DUTY TO DEFEND UNDER THE EXCESS POLICY (XBC 46961), AND ONEBEACON'S DUTY TO DEFEND UNDER EXCESS UMBRELLA POLICY (S-16-07084)**

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS .......... i

TABLE OF AUTHORITIES .......... iii

INTRODUCTION .......... i

SUMMARY OF ISSUES BRIEFED .......... 1

ARGUMENT .......... 4

I. CENTURY OWES A DUTY TO DEFEND UNDER THE EXCESS POLICY .......... 4

A. Under the Pleadings Test, Century Has a Duty to Defend. .......... 6

B. Extrinsic Evidence Demonstrates the Existence of Century's Duty to Defend. .......... 8

1. Metro-Atlantic Did Not Intend to Introduce Waste onto the Site. .......... 9

2. Metro-Atlantic Did Not in Fact Introduce Waste onto the Site. .......... 10

C. Century's Duty to Defend Under the Excess Policy Has Been Triggered. .......... 15

II. ONEBEACON OWES A DUTY TO DEFEND UNDER EXCESS UMBRELLA POLICY .......... 16

III. CENTURY'S AND ONEBEACON'S DUTY TO DEFEND AS EXCESS INSURERS HAS BEEN TRIGGERED .......... 19

A. Century's Duty to Defend Under the Excess Policy Has Been Triggered. .......... 19

1. Century's Duty to Defend under Excess Policy Was Triggered Because Claim Clearly Exceeds Underlying Coverage. .......... 20

2. Even if Court Were to Conclude Payments Are Required to Exhaust Primary Coverage, Emhart Has Made Sufficient Payments. .......... 23

3. Duty to Defend Was Triggered Under Excess Policy When Emhart Did Not Receive a Defense Under the Primary Policy. .......... 23

B. OneBeacon's Duty to Defend Under the Excess Umbrella Policy Has Been Triggered .......... 25

IV. WASTE PRODUCT EXCLUSION DOES NOT OBVIATE CENTURY'S DUTY TO DEFEND UNDER THE EXCESS POLICY .......... 27

V. NO EVIDENTIARY HEARING IS NECESSARY TO DETERMINE THAT CENTURY IS IN BREACH OF ITS DUTY TO DEFEND UNDER THE PRIMARY AND EXCESS POLICIES ........ 28

A. Century Is In Breach Of Its Duty to Defend under the Primary Policy. ........ 30

B. Century Is In Breach of Its Duty to Defend under the Excess Policy. ........ 32

C. OneBeacon Is in Breach of Its Duty to Defend under the Excess Umbrella Policy. ........ 33

D. Facts Regarding Liberty Mutual Policy Are Irrelevant to Whether Century Has Breached Its Duty to Defend Under Either Policy. ........ 34

CONCLUSION ........ 35

## TABLE OF AUTHORITIES

## CASES

Aetna Casualty & Surety Co. v. Souras, 552 A.2d 908 (Md. Ct. Spec. App. 1989).................... 32

Aetna Causualty & Surety Co. v. Dow Chemical Co., 10 F. Supp. 2d 800 (E.D. Mich. 1998) .......... 32

Allstate Insurance v. Riverside Insurance, 509 F. Supp. 43 (E.D. Mich. 1981).......................... 24

American Family Life Assurance Co. v. United States Fire Co., 885 F.2d 826 (11th Cir. 1989) .......... 20

American Motorists Insurance Co. v. Trane, 544 F. Supp. 669 (D. Wis. 1982), aff'd 718 F.2d 842 (7th Cir. 1983) ..........20, 25

Broadhead v. Hartford Casualty Insurance Co., 773 F. Supp. 882 (S.D. Miss. 1991) .......... 17

Casualty Insurance Co. v. E.W. Corrigan Construction Co., 617 N.E.2d 228 (Ill. App. Ct.), appeal denied, 622 N.E.2d 1201 (Ill. 1993) .......... 31

Celina Mutual Insurance Co. v. Citizens Insurance Co. of America, 349 N.W.2d 547 (Mich. Ct. App. 1984) .......... 20

Cincinnati Companies v. West Amerian Insurance Co., 701 N.E.2d 499 (Ill. 1998) .................. 31

Conanicut Marine Svcs., Inc. v. Insurance Co. of N. America, 511 A.2d 967 (R.I. 1986) ..........25, 26, 30

Continental Casualty Co. v. Synalloy Corp., 667 F. Supp. 1523 (S.D. Ga. 1983), aff'd, 826 F.2d 1024 (11th Cir. 1987) ..........24, 25

Employers' Fire Insurance Co. v. Beals, 240 A.2d 397 (R.I. 1968)…….. ...................4, 15, 17, 27

Employers Mutual Casualty Co. v. PIC Contractors, Inc., 24 F. Supp. 2d 212 (D.R.I. 1998).......... 8

F.D.I.C. v. Oldenburg, 34 F.3d 1529 (10th Cir. 1994)........................................................... 32

Flori v. Allstate Insurance Co., 388 A.2d 25 (R.I. 1978) .............................................4, 6, 17, 27

General Accident Insurance Co. of America v. Safety National Casualty Corp., 825 F. Supp. 705 (E.D. Pa. 1993).......... 17

Great Atlantic Insurance Co. v. Liberty Co., 773 F.2d 976 (8th Cir. 1985) ............................... 17

Grossman v. American Family Mutual Insurance Co., 461 N.W.2d 489 (Minn. Ct. App. 1990) ............................................................................................. 24

Hatco Corp. v. W.R. Grace & Co. Conn., 849 F. Supp. 931 (D.N.J. 1994) ............................... 21

La Grange Memorial Hospital v. St. Paul Insurance Co., 740 N.E.2d 21 (Ill. App. Ct. 2000) ............................................................................................. 31

Leader National Insurance Co. v. Lindsey, 477 So. 2d 1323 (Miss. 1985) ................................ 32

Liberty Mutual Insurance Co. v. Black & Decker Corp., 2004 WL. 1771589 (D. Mass. Aug. 5, 2004) ............................................................................34, 35

Liberty Mutual Insurance Co. v. Black & Decker Corp., No. 96-10804-DPW, 04-10651-DPW, 2004 WL. 1771589 (D. Mass. Aug. 5, 2004) ......................................... 6, 7

Liberty Mutual Insurance Co. v. Insurance Corp. of Ireland, Ltd., 693 F. Supp. 340 (W.D. Pa. 1988) ............................................................................................. 21

Michaud v. Merrimack Mutual Fire Insurance Co., C.A. No. 94-0175B, 1994 WL. 774683 (D.R.I. Nov. 16, 1994) ..................................................25, 26, 29, 30

Millers' Mutual Insurance Association of Illinois v. Iowa National Mutual Insurance Co., 618 F. Supp. 301 (D. Colo 1985) ......................................................... 21

Montrose Chemical Corp. v. Superior Court, 861 P.2d 1153 (Cal. 1993) ................................... 7

New Hampshire Indemnity Co. v. Budget Rent-A-Car Systems, Inc., 64 P.3d 1239 (Wash. 2003) ............................................................................24, 25

Nortek, Inc. v. Liberty Mutual Insurance Co., 858 F. Supp. 1231 (D.R.I. 1993) .................... 6, 27

Ohio Causalty Group v. Risinger, 960 S.W.2d 708 (Tex. App. 1997) ....................................... 32

Pacific Employers Insurance Co. v. Servco Pacific, Inc., 273 F. Supp. 2d 1149 (D. Haw. 2003) ............................................................................................. 22

Providence Journal Co. v. Travelers Indemnity Co., 938 F. Supp. 1066 (D.R.I. 1996) ..........................................................................................6, 8, 9, 10

Public Utility District No. 1 v. International Insurance Co., 881 P.2d 1020 (Wash. 1994) ............................................................................................. 17

Rivere v. Heroman, 688 So. 2d 1293 (La. App. Ct. 1997) ........................................................ 17

Samson v. Transamerica Insurance Co., 636 P.2d 32 (Cal. 1981) ..... 31

School District No. 1, Multnomah Co. v. Mission Insurance Co., 650 P.2d 929 (Or. Ct. App. 1982) ..... 25

Shelby Insurance Co. v. Northeast Structures, Inc., 767 A.2d 75 (R.I. 2001) ..... 11

Siligato v. Welch, 607 F. Supp. 743 (D. Conn. 1985) ..... 24

Sinclair Oil Corp. v. New Hampshire Insurance Co., 268 A.2d 281 (R.I. 1970) ..... 31

Sjogren v. Metropolitan Property & Casualty Co., 703 A.2d 608 (R.I. 1997) ..... 22

St. Paul Fire and Marine Insurance Co. v. Warwick Dyeing Corp., 26 F.3d 1195 (1st Cir. 1994) ..... 10

Textron, Inc. v. Aetna, 754 A.2d 742 (R.I. 2000) ..... 10

Textron, Inc. v. Aetna Casualty & Surety Co., 638 A.2d 537 (R.I. 1994) ..... 22

Travelers Indemnity Co. v. Insurance Co. of North America, 886 F. Supp. 1520 (S.D. Cal. 1995) ..... 11

Weyerhaeuser Co. v. Commercial Union Insurance Co., 15 P.3d 115 (Wash. 2001) ..... 33


**MISCELLANEOUS**


Couch on Insurance (3d ed. 2004) ..... 19, 23, 35

Insurance Claims and Disputes (4th ed. 2002) ..... 24

## INTRODUCTION

Pursuant to the Court's March 27, 2007 Order, Emhart hereby submits this memorandum regarding Century's duty to defend under its Excess Blanket Catastrophe Liability Policy No. XBC 46961 ("Excess Policy"), and OneBeacon's duty to defend under its Excess Umbrella Policy No. S-16-07084 ("Excess Umbrella Policy"), to address the issues set forth in this Court's Order dated March 27, 2007.

## SUMMARY OF ISSUES BRIEFED

Assuming that Century has a duty to defend under its primary policy, No. GAL 36597 ("Primary Policy"), Century would also have a duty to defend under the Excess Policy unless the Waste Product Exclusion in Endorsement 6 (which precludes coverage only for willful and intentional pollution) were to bar coverage of Emhart's claim. In this case, however, Endorsement 6 does not bar coverage because neither intentional nor willful pollution has been alleged or proven. If the Court were to reform the OneBeacon Excess Umbrella Policy so as to apply Endorsement 6 of the Century Excess Policy, OneBeacon also would owe Emhart a duty to defend. While Endorsement 5 would bar coverage, there is no reason, even if the Excess Umbrella Policy were reformed, to apply Endorsement 5. If the Court does not reform the Excess Umbrella Policy at all, OneBeacon would owe the same duty to defend that Century owes under the Primary Policy.

In Rhode Island, insurers owe a duty to defend whenever there is a possibility of coverage based on the face of the pleadings. The only fair reading of the EPA documents constituting the underlying suit – the February 28, 2000 Notice of Potential Liability ("PRP Letter") and the EPA's three Administrative Orders for Removal Action ("EPA Orders") – is that the EPA is seeking damages and remedies for unintentional pollution of the Centredale Manor Restoration Superfund Site ("Site").

The PRP Letter and EPA Orders leave open the possibility that the EPA is seeking cleanup of unintentional pollution; therefore, the claim falls within the scope of coverage. The Court should not consider extrinsic evidence beyond the pleadings; however, even if the Court were to consider extrinsic evidence, that evidence overwhelmingly demonstrates that Emhart did not intentionally or willfully deposit any dioxin-contaminated waste on the Site. (In fact, the evidence demonstrates to a certainty that the dioxin contamination did not originate with Emhart or its predecessors.) Consequently, Endorsement 6 does not bar coverage, thus, OneBeacon and Century owe a duty to defend.

Not only is there a duty to defend under both the Excess Policy and the Excess Umbrella Policy, but the duty to defend has been triggered under both policies. Excess insurers owe a duty to defend once it is clear that the claim will exceed the amount of the underlying coverage. Based on the complaining documents and the nature of environmental cleanup claims, it was clear to both Century and OneBeacon that the claim would exceed the coverage underlying their respective policies. Moreover, Century's duty to defend under the Excess Policy was triggered as soon as Century failed to provide a defense under the Primary Policy. Similarly, OneBeacon's duty to defend was triggered once Century failed to provide a defense under either the Primary or Excess Policies.

No evidentiary hearing is necessary to determine that Century was in breach of its duty to defend under both the Primary and Excess Policies. Emhart repeatedly notified Century of the suit and sent Century the complaining documents. Under Rhode Island law, notice to an insurer under one policy is sufficient notice for the purpose of all policies issued by that insurer. The delay of Century in focusing upon the Primary Policy is irrelevant to its breach of its duty to defend. Once Century failed to provide a defense under the Primary Policy, it was obligated to

provide a defense under the Excess Policy. Century's failure to do so, constituted a breach. Because Liberty Mutual did not actually defend Emhart, any references to Liberty Mutual are irrelevant in concluding that Century and OneBeacon were in breach of their duties to defend under both the Primary Policy and the Excess Policy.

It is important to emphasize that the jury verdict does not abridge or restrict OneBeacon's and Century's respective duties to defend. Rather, in the circumstances of this case, it underlines the importance of the insurers' obligation to defend. Here, Emhart's predecessors were entirely innocent of the deposit of the contaminating dioxin on the Site; the fault lay elsewhere. Emhart was entitled to a defense in support of its position that it was without fault. The jury verdict is entirely consistent with the conclusion that Emhart's predecessors were without fault.

The evidence at trial overwhelmingly demonstrated that Metro-Atlantic was not responsible for the dioxin contamination on the Site. In response to Question 1, the jury determined that Metro-Atlantic did not expect or intend property damage. If it did not even cause the property damage, as the evidence conclusively demonstrated, it could not have intended property damage. In view of that finding and the evidence presented at trial, the jury determination that Emhart's predecessors had no reason to test is entirely consistent with the conclusion that Emhart's predecessors did not cause the dioxin contamination, but that, in fact, NECC was the culpable party. Emhart's predecessors, under such circumstances, would have had no reason to test for contamination. The verdict supports the conclusion that Emhart was without responsibility. As an innocent party, Emhart was, and is, entitled to have its insurers provide a defense under the settled principle that the duty to defend lies even if the suit is

groundless, false or fraudulent. As Emhart is not liable, it was and is entitled to have its insurers provide a vigorous defense against the EPA claim.[1]

## ARGUMENT[2]

## I. CENTURY OWES A DUTY TO DEFEND UNDER THE EXCESS POLICY[3]

Under Rhode Island law, the duty to defend under an insurance policy is decided solely by comparing the allegations of the complaining documents to the insurance policy, and the insurer has a duty to defend "if the complaint discloses a statement of facts bringing the case potentially within the risk coverage of the policy." Flori v. Allstate Ins. Co., 388 A.2d 25, 26 (R.I. 1978). In general, the duty to defend exists so long as there is any possibility of coverage. See id. at 27 (insurer has a duty to defend where the pleadings "leave in doubt whether a state of facts exists that will" permit coverage); Employers' Fire Ins. Co. v. Beals, 240 A.2d 397, 403 (R.I. 1968) (when the complaining documents are "potentially within the risk of coverage of the policy, the insurer has an unequivocal duty to defend"). The same standard applies to excess policies as applies to primary policies for determining whether there is a duty to defend.

If the Court were to determine that Century owes Emhart a duty to defend under the Primary Policy, Century may also owe a duty to defend under the Excess Policy. To determine whether there is a duty to defend under the Excess Policy, the Court must determine whether the

[1] Rather than attempt to list all the facts relevant to the various issues addressed in this memorandum, Emhart will provide the relevant facts (and citations) as the facts arise within the discussion of each issue. Copies of cited documents and of the relevant pages from trial and deposition transcripts can be found in Emhart's Appendix ("App.") to this memorandum.

[2] In the March 27, 2007 Order, the Court identified several issues on which it wanted additional briefing. Emhart has endeavored to address those issues in the order in which they appear in the March 27, 2007 Order. There is some overlap, however, of the legal issues. To the extent there is overlap, Emhart has provided cross-references to the relevant sections of this brief rather than repeat the legal arguments.

[3] Section I of this memorandum addresses the first issue identified in the Court's March 27, 2007 order: "Whether, and to what extent, Century (in its capacity as an excess insurer) would have a duty to defend under the Excess Policy if the Court were to determine: (A) that Century owes Emhart a duty to defend under the Primary Policy (GAL 36597); (B) that Century does not owe Emhart a duty to defend under the Primary Policy."

Century Excess Policy provides coverage for the underlying suit. The scope of coverage under the Century Primary Policy and the Century Excess Policy are very similar. Both policies provide coverage for amounts "which the insured shall become legally obligated to pay as damages because of… property damage… to which this insurance applies, caused by an occurrence…." [PX1 at CIC0154 (App. 1); PX2 at CIC0483 (App. 2).][4] Both policies define "occurrence" as including "injurious exposure to conditions which results, during the policy period, in… property damage… neither expected nor intended from the standpoint of the insured." [PX 1 at CIC0155 (App. 1); PX 2 at CIC0478 (App. 2).] Both policies have the same definition for "property damage." [PX 1 at CIC0155 (App. 1); PX 2 at CIC0478 (App. 2).] The only difference in the scope of coverage between the two policies is in the Waste Product Exclusion, Endorsement 6, of the Century Excess Policy. Endorsement 6 provides that the policy does not apply to "[i]njury to or destruction of property caused by <u>intentional</u> or <u>willful</u> introduction of waste products, fluids or materials, including oil refuse, gas or gas bleed water, into any soil or inland or tidal waters, irrespective of whether the insured possed [sic] knowledge of the harmful effects of such acts." [PX1 at CIC0165 (App. 1). (emphasis added)] Here, the Waste Product Exclusion in Endorsement 6 is not applicable to preclude coverage because no intentional or willful conduct is alleged or shown. Therefore Century owes Emhart a duty to defend under the Primary Policy as well as under the Excess Policy.

Endorsement 6 is effectively a limited pollution exclusion. The entire analysis as to whether the exclusion applies turns on the insured's intent to discharge, disperse or introduce materials onto the Site or lack thereof. Applying Rhode Island's "pleadings test" to determine whether there is a duty to defend, it is clear from the PRP Letter and the subsequent three EPA

[4] Plaintiff's trial exhibits are cited as "PX" followed by the exhibit number; defendants' trial exhibits are cited as "DX" followed by the exhibit number.

Orders that the claims are for unintentional acts that do not fall within the scope of the exclusion. Moreover, even if the Court were to find that the circumstances of this case warrant looking beyond the charging documents, as Century has advocated, the evidence overwhelmingly shows that Emhart did not intentionally or willfully introduce any waste products onto the Site.

**A. Under the Pleadings Test, Century Has a Duty to Defend.**

It is well-settled in Rhode Island that an insurer's duty to defend is decided solely by comparing the allegations of the complaining documents to the insurance policy. As noted earlier, the insurer has a duty to defend "if the complaint discloses a statement of facts bringing the case potentially within the risk of coverage of the policy." Flori, 388 A.2d at 26. This is true "even if the known facts conflict with the facts alleged in the third-party complaint." Id. Moreover, "[t]he court must resolve any uncertainty as to the adequacy of the pleadings in this respect in favor of the insured." Providence Journal Co. v. Travelers Indem. Co., 938 F. Supp. 1066, 1072 (D.R.I. 1996).

Applying this standard, namely comparing the allegations in the EPA's charging documents with the limited pollution exclusion contained in Endorsement 6, it is evident that the Notice of Potential Liability and the three Administrative Orders leave open the possibility that the presence of pollution on the Site was the result of unintentional acts. As such, because "any one of the acts alleged could possibly be covered under the [p]olicy," the insurer must defend "against all the claims." Nortek, Inc. v. Liberty Mut. Ins. Co., 858 F. Supp. 1231, 1236 (D.R.I. 1993). The PRP Letter states that the EPA "has documented the release or threatened release of hazardous substances or pollutants or contaminants at the Site." [PX 12 at 1 (App. 3).] This is analogous to the EPA allegation in Liberty Mut. Ins. Co. v. Black & Decker Corp., No. 96-10804-DPW, 04-10651-DPW, 2004 WL 1771589 (D. Mass. Aug. 5, 2004). There the court applied Connecticut law, which, like Rhode Island law, requires that the duty to defend be

determined solely on the basis of the allegations of the complaint. The court ruled that general allegations that hazardous substances were spilled, released, or disposed of gave rise to a duty to defend as "[w]hile it does not specifically allege that the releases were unexpected and unintended, the allegations are 'potentially within the coverage, and this suffices." Id. at *15.

Similarly, the second and third EPA Orders lack an intentionality component that would trigger the limited pollution exclusion and thus obviate coverage. Tracking identical language, these orders state, "[e]vidence suggests that the operations of the chemical companies and the drum reconditioning facility at the Site resulted in releases and threats of releases of hazardous substances at the Site." [PX 15 at AON 00020 – AON 00021 (App. 4); PX 16 at 4, ¶ 14 (App. 5).] As one court noted, although such a description is "'neutral' on the question of coverage - its allegations sufficed to raise the possibility that [insured] would be liable for property damage covered by the policies." Montrose Chem. Corp. v. Superior Court, 861 P.2d 1153, 1164 (Cal. 1993) (CERCLA complaint that did not specify whether [insured] negligently or intentionally disposed of DDT process wastes was within the scope of coverage).

The first EPA Order, with respect to Emhart and Crown Metro, states, "[t]he chemicals manufactured by these companies included hexachlorophene. The chemical companies also buried drums and other containers at the Site." [PX 13 at 3, ¶¶ 17, 18 (App. 6).] These statements, however, contain no allegations concerning the contents of the drums, such as whether the drums contained hazardous substances. This drum burial may not have occurred, may have been done by others and, in any event, may have had nothing to do with the pollution. Thus, this allegation does not exclude the possibility of the absence of introduction or any unintended introduction, discharge or dispersal of materials resulting in property damage. Moreover, there is at least a possibility that the introduction of hexachlorophene into the Site was

entirely unrelated to any burial of drums, even if it were shown that Emhart's predecessor did bury drums. Thus, the separate act that resulted in property damage due to pollution could have been unintentional and thus within the scope of coverage, notwithstanding the limited pollution exclusion. See Employers Mut. Cas. Co. v. PIC Contractors, Inc., 24 F. Supp. 2d 212, 215 (D.R.I. 1998) (duty to defend lies where pleadings did not "exclude the possibility" that the policies were triggered.)

**B. Extrinsic Evidence Demonstrates the Existence of Century's Duty to Defend.**

Century has argued that extrinsic evidence proves that Endorsement 6 bars coverage.[5] Given that under Rhode Island law the duty to defend is determined based solely on the complaining documents, there is no reason for the Court to consider extrinsic evidence. Even if the Court were inclined to look beyond the pleadings, the extrinsic evidence only further illustrates the existence of Century's duty to defend under the Excess Policy. In analyzing whether Metro-Atlantic intentionally or willfully introduced waste products onto the Site, the inquiry turns on what was expected or intended by the insured. See Providence Journal Co. v. Travelers Indem. Co., 938 F. Supp. 1066, 1077 (D.R.I. 1996) (duty to defend existed where the insured specifically intended the waste to be disposed somewhere other than where it ultimately was deposited). Evidence in the record clearly demonstrates that Metro-Atlantic lacked any intent to discharge any materials onto the Site. Moreover, it also shows that Emhart's predecessors in fact did not introduce any of the pollution found.

[5] See Opposition of Century Indemnity Company and OneBeacon America Insurance Company to Emhart's Renewed Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial Regarding Its Claims Against Century and OneBeacon (Court's Docket No. 479) at 22-24.

1. **Metro-Atlantic Did Not Intend to Introduce Waste onto the Site.**

The only activity of Metro-Atlantic that could possibly have resulted in dioxin contamination was the manufacture of hexachlorophene. One ingredient used to manufacture hexachlorophene was trichlorophenol, a product that contained dioxin. [PX 193 (App. 7); Tr. /26/06 (Hass) at 69-70 (App. 8).][6] This is the only potential source of the contaminant at issue from Emhart's predecessors.

It is undisputed that Metro-Atlantic manufactured hexachlorophene for "a period of less than one year, starting in 1964." [Stipulation of Facts, ¶ 15.] During that period, Metro-Atlantic used a dumpster, that was hauled off-site, for disposal of solid waste. [Tr. 9/13/06 (J. Buonanno)[7]; see also Tr. 9/15/06 (R. Nadeau) at 27-28, 48-49 (App. 9); Tr. 9/18/06 (Turcone) at 5-7 (App. 10).] Any dioxin would necessarily have been the result of accidental discharges.

These facts are analogous to those in Providence Journal Co. v. Travelers Indem. Co., 938 F. Supp. 1066 (D.R.I. 1996). The pollution exclusion at issue there, like Endorsement 6, focused exclusively on the intent of the insured. To the extent that the court in Providence Journal relied on extrinsic evidence, it found that the insured in that case specifically intended to dispose of material in a manner different than the manner in which it was actually disposed of. Consequently, the court concluded that the insured could not be deemed to have intended the actual introduction of pollutants that occurred for purposes of construing a limited pollution exclusion. The court explained, "[i]t would torture logic and the plain meaning of the [policy's]

---

[6] The trial transcript is cited as "tr.", followed by the date, witness, and page number.

[7] The portion of the transcript containing the testimony of Mr. Buonanno is not presently available.

pollution exclusion clause to hold that an insured which intends one discharge can simultaneously intend another." Id. at 1077.[8]

When (as is the case here) the insured can go beyond demonstrating that it did not intend the actual result and further show that indeed it intended a different act altogether, a pollution exclusion that focuses on the intent of the insured does not obviate coverage. Put differently, when the insured has "no reason to expect the unintended damage" and the insured "undertook reasonable efforts to contain the waste safely," the insured cannot be deemed to have intended the actual result. Textron, Inc. v. Aetna, 754 A.2d 742, 750 (R.I. 2000).

**2. Metro-Atlantic Did Not in Fact Introduce Waste onto the Site.**

In their Opposition to Emhart's Renewed Motion for Judgment as a Matter of Law, or in the Alternative, for a New Trial ("Def. Opp. to JMOL"), Century and OneBeacon have raised a litany of extrinsic, factual assertions that purportedly demonstrate Metro-Atlantic's intentional pollution. See Def. Opp. to JMOL (Court's Docket No. 479 at 22-24). However, the statements referenced do not demonstrate Metro-Atlantic's intent. Indeed, many speak to activities that had nothing to do with the manufacture of hexachlorophene. For instance, the insurers cite to Raymond Nadeau's testimony that barrels filled with sludge came from the Metro-Atlantic presses and were subsequently dumped on the Site. See Def. Opp. to JMOL at 23 (citing Tr. 9/15/06 (R. Nadeau) at 72 (App. 9)).[9] These presses, however, were in the main building at Metro-Atlantic and were never used in the manufacture of hexachlorophene. [Tr. 9/15/06 (J. Nadeau) at 23-24, 34-35 (App. 9).] The insurers have pointed to the testimony of Mr. Turcone

---

[8] This situation is distinguishable from the facts presented in St. Paul Fire and Marine Ins. Co. v. Warwick Dyeing Corp., 26 F.3d 1195 (1st Cir. 1994). In that case, the court found that the pollution exclusion applied where "[the insured] did not know the particular site where its waste would be disposed, and, indeed, the record does not reveal whether Warwick actually knew that its waste would be deposited in a landfill to begin with." Id. at 1202.

[9] Mr. Nadeau's testimony regarding the black sludge is dubious at best, given that he also denied that there was disposal of a black sludge from Metro-Atlantic. [Tr. 9/15/06 (R. Nadeau) at 70-71 (App. 9).]

regarding a pipe allegedly leading from the hexachlorophene building to the river. See Def. Opp. to JMOL at 23 (citing Tr. 9/18/06 (Turcone) at 14 (App. 10)). This testimony, however, is not relevant because the orange material Mr. Turcone observed being manufactured in that building [Tr. 9/18/06 (Turcone) at 11, 26-27 (App. 10)] was treflan, which did not contain dioxin. [Tr. 9/27/06 (Hass) at 134-135 (App. 11).] The facts upon which Century and OneBeacon rely are at best ambiguous and by no means show that intentional acts resulted in the property damage.

Moreover, insofar as the jury verdict, upon consideration of the evidence, can be deemed to bear on the duty to defend, it supports the conclusion that there has not been a finding of fact that would terminate the duty to defend. It is important to note that the jury verdict does not retroactively decide whether the duty to defend exists. This was explained in Shelby Insurance Co. v. Northeast Structures, Inc., 767 A.2d 75, 77 (R.I. 2001), where there was a "question of fact" as to the cause of the collapse of a structure. One cause was a covered "occurrence," one was not. The court ruled that the allegations of the complaint created the duty to defend. That duty extended "until there has been a finding of fact that the cause of the collapse was excluded from coverage." Id. Here there has been no factual finding concerning Metro-Atlantic's responsibility for the pollution. "If despite a potential for coverage, as alleged in the complaint, the insurer successfully proves that no potential for coverage existed, the duty to defend ceases at the time such proof is made. Such proof does not, however, retroactively delete the duty to defend as it had existed up to the point of proof." Travelers Indemnity Co. v. Insurance Co. of North America, 886 F. Supp. 1520, 1526 (S.D. Cal. 1995).

Here, the verdict does not establish that OneBeacon and Century made the showing required to terminate their duties to defend as of the date of judgment. In fact, the jury verdict is entirely consistent with Emhart continuing to receive a defense from its insurers. In response to

Question 1, the jury found that Metro-Atlantic did not expect or intend property damage from dioxin contamination. In view of that finding and the evidence presented at trial, the jury determination that Crown Metro (the corporate entity whose name was on the policies at issue) had no reason to test[10] is entirely consistent with the conclusion that Metro-Atlantic did not cause the dioxin contamination but that, in fact, NECC was the culpable party.

The unrebutted evidence presented at trial demonstrates conclusively that Metro-Atlantic did not dispose of hexachlorophene, or waste associated with hexachlorophene, on any portion of the Site. Metro-Atlantic had the business acumen to conserve its materials – even off-spec materials. It was quite concerned about not wasting its products or raw materials. Joseph Buonanno, who worked for Metro-Atlantic and whose father was part-owner of the company, testified that Metro-Atlantic did not dispose of any products or raw materials as those materials had economic value. [Tr. 9/13/06 (J. Buonanno).] Metro-Atlantic reused, rather than discarded, products that did not meet either its quality criteria or those of its customers. [Id.] Whenever possible, such "off-spec" product was recycled by returning it to the vat that was used to make the next batch of the product. [Id.] If such reuse was not feasible, Metro-Atlantic sold the product to a jobber who would use the material for other purposes. [Id.] Solid waste was shoveled into a dumpster and sent off-Site. [Tr. 9/13/06 (J. Buonanno); Tr. 9/15/06 (J. Nadeau) at 27-28, 48-49 (App. 9); Tr. 9/18/06 (Turcone) at 5-7 (App. 10).] By the time that Metro-Atlantic and Crown Chemical Corporation merged to form Crown-Metro, Inc. on November 29,

[10] On the issue of whether dioxin contamination was discoverable in the exercise of reasonable diligence, the Court instructed the jury that it had to answer the question: "did Crown-Metro have a reason to test for dioxin contamination that would have led to the discovery of dioxin contamination at the site during the policy period? In other words, did events exist that could have provided Crown-Metro with notice of dioxin contamination or other contamination, which then could have led to the detection of dioxin contamination?" [Jury Instructions at 24.]

1968, all Metro-Atlantic activities and operations at the Site had ceased. [Stipulation of Facts, ¶ 17.]

The evidence showed that the Metro-Atlantic practice of not disposing of material or waste was followed with respect to the manufacture of hexachlorophene – the only Metro-Atlantic activity that could possibly have resulted in dioxin contamination. Starting in 1964 and for a period of less than one year, Metro-Atlantic manufactured hexachlorophene at the Site. [Stipulation of Facts ¶ 15.] The hexachlorophene was made for sale to Sterling Winthrop as an ingredient in PhisoHex soap. [Cleary Dep. at 17, 31-33, 42-43 (App. 12).][11] The hexachlorophene that did not meet the product specifications of Sterling-Winthrop was sold to Kalo Laboratories for use as a seed disinfectant. [Id. at 42-43.] There was no evidence that Metro-Atlantic disposed of hexachlorophene, or residue associated with hexachlorophene, at the Site.

The scientific evidence demonstrated that the dioxin could not possibly have come from Emhart's predecessors. One ingredient used to manufacture hexachlorophene was trichlorophenol, a product that contained dioxin. [PX 193 (App. 7); Tr. 9/26/06 (Hass) at 69-70 (App. 8).] Dr. Hass explained that the first step in the Metro-Atlantic hexachlorophene manufacturing process was to purify the trichlorophenol using an activated charcoal called Nuchar. [Tr. 9/27/06 (Hass) at 63-64 (App. 11).] Dr. Hass opined that when the activated charcoal was added to the liquid trichlorophenol, virtually all of the dioxin present would have been adsorbed onto and tightly bound to the activated charcoal, and thus removed from the trichlorophenol. [Id. at 70-72, 97-98.] Thus, the dioxin in the Metro-Atlantic hexachlorophene manufacturing process was tightly bound to activated charcoal which was then removed with the

[11] The cited portion of the deposition was admitted at trial.

solid waste from the process. As noted earlier, Metro-Atlantic's solid waste was placed in a dumpster and sent off-Site. Thus, none of the dioxin associated with Metro-Atlantic's manufacturing of hexachlorophene was disposed of on the Site. Furthermore, no drums were associated with the manufacture of hexachlorophene. [V. Buonanno Dep. at 26-27 (App. 13).][12] Thus, none of the dioxin created by the activities of New England Container Company ("NECC") was associated with barrels that Metro-Atlantic provided to NECC for reconditioning.

The defendants did not rebut this evidence. Dr. Woodard attempted to challenge Dr. Hass' testimony that all of the dioxin from the contaminated trichlorophenol would have been associated with activated charcoal. [Tr. 10/6/06 (Woodard) at 39-52 (App. 14).] Dr. Woodard testified that before activated charcoal was used in the Metro-Atlantic process, a caustic (i.e., a substance that is basic on the pH scale) was added to the crude trichlorophenol to increase the pH of the solution and cause congeners of trichlorophenol other than 2,4,5-trichlorophenol to precipitate out of the solution. [Id. at 41-42.] According to Dr. Woodard, the dioxin would have bound to the solid trichlorophenol that had precipitated and would have been removed before activated charcoal was added. [Id. at 47-48.] Dr. Hass explained, however, that Dr. Woodard's theory was chemically impossible. [Tr. 10/13/06 (Hass) at 5-7, 18 (App. 15).] Adding caustic causes trichlorophenol to become more soluble, not less. [Id. at 18.] Thus, adding more caustic to the solution would not have caused any trichlorophenol to precipitate out of the solution and thus would not have resulted in dioxin being removed before the activated charcoal was added. [Id. at 5-7.]

Nor did Dr. Wade prove that the dioxin contamination on the Site was associated with Metro-Atlantic. In response to questions asked by the Court, Dr. Wade admitted that he had only

[12] The cited portion of the deposition was admitted at trial.

determined the chemical source of the dioxin on the Site and could not attribute that contamination to specific, physical activities that occurred on the Site. [Tr. 10/12/06 (Wade) at 58-59 (App. 16).] He assumed the pollution came from Metro-Atlantic because he knew Metro-Atlantic used 2,4,5-trichlorophenol. [Id. at 40.] Dr. Wade did not consider, however, the customers that sent barrels to NECC, what materials would be in those barrels, or whether NECC handled barrels that contained 2,4,5-trichlorophenol. [Id.] In fact, Dr. Wade acknowledged that the NECC operations contributed to the 2,4,5-trichlorophenol signal he observed. [Id. at 42-43.] None of the evidence presented by the defendants proves that Metro-Atlantic disposed of dioxin-contaminated waste on the Site or in the Woonasquatucket River.

Because Metro-Atlantic did not cause the dioxin contamination on the Site, Metro-Atlantic could not possibly have expected or intended to cause property damage from dioxin contamination. And if Metro-Atlantic did not cause dioxin contamination on the Site, Crown-Metro would have no reason to test for such dioxin contamination. Consequently, the jury verdict is entirely consistent with Metro-Atlantic not causing the 2,3,7,8-TCDD contamination but NECC being the responsible party. The verdict supports the conclusion that Emhart was without responsibility. As an innocent party, Emhart was, and is, entitled to have its insurers provide a defense under the settled principle that the duty to defend lies "even if the suit is groundless, false or fraudulent." Beals, 240 A.2d 397, 402. The duty to defend was particularly significant in this case as Emhart is not liable. Emhart was, and is, entitled to have its insurers provide a vigorous defense against the EPA claim.

### C. Century's Duty to Defend Under the Excess Policy Has Been Triggered.

Century's duty to defend has been triggered. The Century Excess Policy states that "[i]f limits of liability of the underlying insurance are exhausted because of… property damage… during the period of this policy… [Century] will… have the right and duty to defend any suit

against the insured seeking damages on account of such… property damage… even if any of the allegations of the suit are groundless, false or fraudulent….” [PX1 at CIC0154 (App. 1).] Thus, according to the policy language, Century has a duty to defend as an excess insurer once the limits of liability of the underlying insurance are exhausted. Payments under the Primary Policy are not required to exhaust coverage. As is explained below, excess insurers owe a duty to defend when the claim for coverage clearly exceeds the underlying insurance. See III.A.1 at 20-23, infra. Here it was clear from the complaining documents that the potential liability to Emhart would well exceed the coverage limits of the Primary Policy. See III.A.1 at 20-21, infra. If payments were required to show exhaustion of underlying coverage, that condition has been met. Emhart has already paid $711,732.00 for performing work required by the three EPA orders, an amount well in excess of the $100,000 coverage provided by the Primary Policy. See III.A.2 at 23, infra. Therefore, Century owes a duty to defend as an excess insurer.

The Court, however, need not address the issue of whether underlying coverage has been exhausted to find that Century owes a duty to defend as an excess insurer. If the Court finds that Century was in breach of its duty to defend under the Primary Policy, Century automatically owed a duty to defend under the Excess Policy. See III.A.3 at 23-25, infra.

Accordingly, Century owes Emhart a duty to defend under the Excess Policy (as well as under the Primary Policy).

## II. ONEBEACON OWES A DUTY TO DEFEND UNDER EXCESS UMBRELLA POLICY[13]

As Emhart has argued in a previous filing, the Excess Umbrella Policy should not be reformed at all. See Emhart's Post-Trial Memorandum Regarding the OneBeacon Claim for

[13] Section II of this brief addresses the second issue identified in the Court's March 27, 2007 order: "Whether OneBeacon would have a duty to defend under the Excess Umbrella Policy, were the Court to reform that Policy (as OneBeacon requests) and further determine that: (A) Endorsement 6 applies; (B) Endorsement 5 applies."

Reformation of the Insurance Policy It Issued (Court's Docket No. 475) and Emhart's Response to OneBeacon's Post-Trial Memorandum Regarding Reformation (Court's Docket No. 486). If there is no reformation, the Excess Umbrella Policy is "subject to all the terms and conditions of Policy No. XBC64674." [PX 3 (App. 17).] Policy No. XBC64674 does not contain any exclusion for damage caused by pollution. [PX 4 (App. 18).] Thus, if there is no reformation of the Excess Umbrella Policy, and the Court were to determine that Century owes a duty to defend under the Primary Policy, OneBeacon would also owe a duty to defend under the Excess Umbrella Policy.

Even if the Court were to reform the Excess Umbrella Policy so as to incorporate the Century Excess Policy, coverage and the duty to defend under the Excess Umbrella Policy would be the same as under the Century Excess Policy and, accordingly, OneBeacon would have a duty to defend. If, based on the pleadings, there is a possibility of coverage under the Excess Umbrella Policy, OneBeacon would owe a duty to defend. See Flori, 388 A.2d at 26-27; Beals, 240 A.2d at 403.

There can be no reasoned basis, even if the Excess Umbrella Policy were reformed, to conclude that Endorsement 6 governs the Century Excess Policy while Endorsement 5 governs OneBeacon's policy.[14] If Endorsement 6 were applicable to OneBeacon's obligations,

[14] Endorsement 5 of the Century Excess Policy No. 46961 constitutes an absolute pollution exclusion. "[S]uch insurance as is afforded by this policy or any other endorsement thereto shall not apply to any claim for damages arising out of contamination or pollution of land, air, water or other real or personal property." [PX 1 at CIC 0162 (App. 1).] As such, this exclusion applies to all pollution-related claims, regardless of the intent of the insured. The PRP Letter that the EPA sent on February 28, 2000 makes reference to "the release or threatened release of hazardous substances or pollutants or contaminants at the Site." [PX 12 at 1 (App. 3).] Thus, applying the strict "pleading test" as is the law in Rhode Island, it is clear that Endorsement 5 precludes coverage for any claims stemming from the EPA action. See Beals, 240 A.2d at 403 ("a liability insurer's duty to defend is predicated not upon information in its possession which indicates or even proves non-coverage, but instead upon the allegations in the complaint filed against the insured.").

However, as Emhart has previously argued, as a matter of law, Endorsement 5 does not apply if the Court reforms the OneBeacon policy. See Emhart's Post-Trial Memorandum Regarding the OneBeacon Claim for Reformation of the Insurance Policy It Issued (Court's Docket No. 475) at 12-15; and Emhart's Response to OneBeacon's Post-Trial

OneBeacon would owe Emhart a duty to defend. The analysis is the same as that pertaining to Century. See I.A. at 6-8, supra. There is the possibility of coverage based on the complaining documents. The EPA did not allege intentional or willful pollution, and, even if the Court were to look to extrinsic evidence, the evidence overwhelmingly demonstrates that Emhart's predecessors did not cause the pollution, much less that they intentionally or willfully disposed of dioxin-contaminated waste on the Site. See I.B. at 8-15, supra.

Under a reformed OneBeacon policy (like the Century Excess Policy), OneBeacon would owe a duty to defend once the limits of liability of the underlying insurance has been exhausted. As is explained below, OneBeacon's duty to defend has been triggered. See III.B. at 25-26, infra. Excess insurers owe a duty to defend when it is clear that the underlying coverage will be exhausted. See III.A.1. at 20-23, infra. Although the PRP Letter did not expressly state that damages exceeded $1,000,000 (the limit of coverage under the Century Excess Policy), the PRP Letter did identify the Site as a Superfund Site and demanded that Emhart pay in excess of $900,000 as well as undertake construction of a soil cap and implement flood control measures in response to contamination on the Site. See III.A.1. at 20-21, infra. Given the demand in the PRP Letter and the naturally expensive nature of environmental response activities, OneBeacon

---

Memorandum Regarding Reformation (Court's Docket No. 486) at 5-7. OneBeacon has expressly incorporated "all the terms and conditions of the underlying policy." [PX 3 (App. 17).] This effectively renders the OneBeacon policy a "follow form" policy. See Rivere v. Heroman, 688 So.2d 1293, 1294 (La. App. Ct. 1997) (policy that stated on its face that it was subject to the "conditions" of designated primary policy was a 'follow form' excess policy); Gen. Accident Ins. Co. of Am. v. Safety Nat'l Cas. Corp., 825 F. Supp. 705, 707-709 (E.D. Pa. 1993) (excess insurer had an obligation to contribute to defense costs in accordance with an obligation contained in the policy to which it followed form by referencing such policy's "terms and conditions" as its own).

As such, if the Excess Umbrella Policy is reformed, OneBeacon is bound by the substitution of Endorsement 6 for Endorsement 5. See Great Atl. Ins. Co. v. Liberty Co., 773 F.2d 976, 977-981 (8th Cir. 1985) (retroactive reformation of the geographic coverage area of an underlying insurance policy was binding on the excess insurer that used a follow-form excess policy); Broadhead v. Hartford Cas. Ins. Co., 773 F. Supp. 882, 914-915 (S.D. Miss. 1991) (an endorsement was effective retroactively and was incorporated as part of the follow-form excess policy as well); Public Util. Dist. No. 1 v. Int'l Ins. Co., 881 P.2d 1020, 1027 (Wash. 1994) (excess insurer was bound by retroactive endorsement added to underlying policy several months after the excess policy was written).

should have realized that the damages in this case would well have exceeded the underlying coverage, triggering its duty to defend Emhart under the Excess Umbrella Policy. See III.A. at 20-23, infra. Moreover, given that Century failed to provide Emhart a defense under either the Primary and Excess Policy, OneBeacon automatically owed Emhart a duty to defend. See III.B. at 26, infra.

## III. CENTURY'S AND ONEBEACON'S DUTY TO DEFEND AS EXCESS INSURERS HAS BEEN TRIGGERED[15]

### A. Century's Duty to Defend Under the Excess Policy Has Been Triggered.

Under the Century Excess Policy, Century – as an excess liability insurer – owes a duty to defend when the limits of liability of the underlying insurance are exhausted. [PX 1 at CIC0154 (App. 1).] See also 14 Couch on Insurance § 200:44 (3d ed. 2004) ("Where the insured maintains both primary and excess policies, the general rule is that an excess liability insurer is not obligated to participate in the defense until the primary policy limits are exhausted."). Exhausting the underlying coverage, however, does not require that Century pay the limits of the primary policy. Rather, excess insurers' duty to defend is triggered when it is clear that the claim exceeds the underlying coverage. Here, based on the PRP Letter and EPA Orders, it is clear that the claim vastly exceeded the limits of the Century Primary Policy, triggering Century's duty under the Excess Policy. Even if "payments" are required to exhaust the limits of underlying coverage, Emhart has already made sufficient payments to exhaust the limits of the Century Primary Policy. Regardless, the Court need not resolve whether or not the underlying coverage was exhausted. When the underlying insurer fails to provide a defense, the excess

[15] Section III of this brief addresses the third issue identified in the Court's March 27, 2007 Order: "Whether the underlying coverage has been exhausted such that it would trigger the defense obligations under the Excess Policy or the Excess Umbrella Policy, or both."

insurer is obligated to step in and defend the insured. When Century failed to offer a defense under the Primary Policy, it became obligated to provide a defense under the Excess Policy.

**1. Century's Duty to Defend under Excess Policy Was Triggered Because Claim Clearly Exceeds Underlying Coverage.**

Where a claim clearly exceeds the scope of coverage under the primary policy, the excess insurer is required to defend even before the primary insurer pays the limits of the underlying coverage. American Family Life Assurance Co. v. United States Fire Co., 885 F.2d 826, 832 (11th Cir. 1989) ("U.S. Fire became obligated to defend once it became clear that [the primary] policy would not cover American Family's liability") (emphasis added); Celina Mutual Ins. Co. v. Citizens Ins. Co. of America, 349 N.W.2d 547, 550-51 (Mich. Ct. App. 1984) (where two people were killed in an automobile accident, insurer "knew that the primary coverage would be exhausted" and was required to defend); American Motorists Ins. Co. v. Trane, 544 F. Supp. 669, 692 (D. Wis. 1982) ("If the claim against the insured exceeds the monetary limits set by the underlying insurer, the excess insurer's duty to defend is usually activated, even if the underlying insurer undertakes the defense as well."), aff'd 718 F.2d 842 (7th Cir. 1983).

Here, the limits of the underlying coverage are clearly exceeded. The PRP Letter identified the Site as a Superfund Site and demanded that Emhart pay in excess of $900,000 as well as undertake construction of a soil cap and implement flood control measures in response to contamination by dioxin and other hazardous chemicals. [PX 12 at 2-3 (App. 3).] The PRP Letter also referenced upcoming actions to remove contaminated soil and river sediments. [Id. at 4.] The First Order detailed the contamination and the seriousness of the problem. [PX 13 at 4-9 (App. 6).] In addition to setting forth the scope of work to be done, it required Emhart to engage a certified professional engineer as a contractor and to satisfy numerous reporting and other provisions in the course of completing the required work. [Id. at 11, 13-17.] Environmental

response activities are "notoriously expensive." Liberty Mut. Ins. Co. v. Insurance Corp. of Ireland, Ltd., 693 F. Supp. 340, 343 (W.D. Pa. 1988); see also Hatco Corp. v. W.R. Grace & Co. Conn., 849 F. Supp. 931, 937 (D.N.J. 1994) ("the cleanup of an industrial site may not only be expensive, but may involve a range of actors … engaging in a variety of activities…. The list of potentially required tasks is endless, so too are the potential costs"). This information was sufficient to inform Century that the claimed damages exceeded the underlying coverage. Consequently, Century is liable for the costs of defense under its excess policy. Century has not met its obligation.

Century may argue that its duty to defend under the excess policy cannot be triggered until it has paid the limits of the Primary Policy. Such an interpretation, however, is contrary to the plain language of the policy. The policy states that Century will owe a duty to defend "[i]f limits of liability of the underlying insurance are exhausted because of personal injury, property damage or advertising injury during the period of this policy." [PX 1 at CIC0154 (App. 1).] That policy language does not require a payment by Century to exhaust the underlying policy. Indeed, the Century Excess Policy does not require any payment to trigger the duty to defend. Had Century intended to make its duty to defend dependent upon exhaustion by "payment of judgments or settlements" in excess of any underlying insurance, it easily could have so drafted its policy. Instead, it wrote an excess policy where the duty to defend is triggered by the amount of the "property damage," not the amount paid in settlement of claims for property damage. See Millers' Mutual Ins. Ass'n of Illinois v. Iowa National Mut. Ins. Co., 618 F. Supp. 301, 304-05 (D. Colo 1985) (distinguishing exhaustion "by the payment of judgments or settlements" from "exhaustion by occurrence").

The court in Pacific Employers Ins. Co. v. Servco Pacific, Inc., 273 F. Supp. 2d 1149, 1154 (D. Haw. 2003) addressed a similar situation and found that the excess insurer's duty to defend was triggered before the primary insurer had paid the limits of the underlying policy. There, as here, the policy language regarding the duty to defend did not require "payment" of the limits of the underlying policy. The court concluded that there was a duty to defend under the excess policy after the insured's expenditures for indemnification exceeded the limits of the primary policy. It explained that "[t]he plain terms of [the excess insurer's] policy provide that its duty to defend arises when 'the limits of liability of the underlying insurance are exhausted because of … property damage' – not when the limits are exhausted by payments of judgments or settlements of the underlying claim." Id. at 1154 (emphasis added). Furthermore, in rejecting the excess insurer's argument, the Pacific Employers court noted that if the excess carrier's duty to defend did not trigger until the primary carrier paid its limits by either a judgment or settlement of the underlying claim, "the excess carrier's duty to defend would be illusory." Id. The Century Excess Policy contains the same language that was present in the Pacific Employers case. Similarly, it should not be interpreted as requiring payments to exhaust the underlying coverage.

The language in the Excess Policy is clear that no payment is required to trigger the duty to defend. Even if an ambiguity did exist, it must be resolved in favor of the insured. See, e.g., Textron, Inc. v. Aetna Casualty & Surety Co., 638 A.2d 537, 539 (R.I. 1994) (when the court "finds that an ambiguity exists or that the terms of an insurance contract are subject to more than one reasonable interpretation, the insurance contract will be strictly construed against the insurer"). See also Sjogren v. Metropolitan Property & Casualty Co., 703 A.2d 608, 612 (R.I. 1997) (ambiguity concerning whether driver of automobile was a "relative" of the owner

construed against insurer although "relative" was defined in the insurance policy). Consequently, no payments are required to trigger Century's duty to defend under the Excess Policy. Rather, Century's duty to defend as an excess carrier was triggered when it received notice of the claim because it was clear that the claim was well in excess of the underlying coverage.

**2. Even if Court Were to Conclude Payments Are Required to Exhaust Primary Coverage, Emhart Has Made Sufficient Payments.**

Even if the Court were to determine that payments are required to exhaust the underlying coverage, Emhart has made sufficient payments to exhaust the coverage under Century's Primary Policy. Prior to trial, the parties stipulated that through June 2006, Emhart has incurred costs in the amount of $711,732.00 for performing the work required by the three orders issued by the EPA. [Stipulation of Facts, ¶ 73.] Obviously, Emhart incurred costs in excess of the Primary Policy's $100,000 of underlying coverage well before June 2006. Thus, if "payments" are required to exhaust the underlying coverage, it is clear that Century owed a duty to defend under the Excess Policy. The only question would be when – and not if – that duty to defend was triggered.

**3. Duty to Defend Was Triggered Under Excess Policy When Emhart Did Not Receive a Defense Under the Primary Policy.**

The Court, however, need not determine whether or not underlying coverage has been exhausted to find that Century's duty to defend under the Excess Policy was triggered. Century's duty to defend as an excess insurer was triggered as soon as it failed to provide a defense under the Primary Policy. "If a primary insurer denies coverage, the excess insurer would be obligated to defend." 14 Couch on Insurance § 200:46 (3d ed. 2004). The rationale for this rule is that an "insured should not be left without a prompt and proper defense and if a primary insurer fails to assume the defense, for any reason, the secondary insurer which has a

duty to defend should provide the defense and, to do justice, should be entitled to recoup its costs from the primary insurer." New Hampshire Indemnity Co. v. Budget Rent-A-Car Systems, Inc., 64 P.3d 1239, 1243 (Wash. 2003). See Siligato v. Welch, 607 F. Supp. 743, 746 (D. Conn. 1985) ("In any default of the primary carrier's defense … [the excess carrier] may be obliged to assume up to the total defense of the insured subject to its right to be indemnified by the primary insurer for its expenses incurred by the excess insurer in discharging the primary insurer's duty to defend." (citing Allstate Ins. v. Riverside Ins., 509 F. Supp. 43, 48 (E.D. Mich. 1981)). In contrast, decisions finding that an excess insurer has no duty to defend until exhaustion of the primary policy:

> assume[] that the primary insurer has, in fact, assumed the defense. If it has not, the courts will apply a different rule. Recognizing that it is more equitable, vis-à-vis the insured, to condition the excess insurer's obligation to defend on the primary insurer's actually assuming the defense, it has been held that, when the primary insurer refuses to defend, an excess insurer that is not a "true" excess insurer and has a duty to defend provision in its policy must defend, assuming of course, that the claim against the insured exceeds the policy limits of the underlying insurance. The burden would then be on the excess insurer, rather than the insured, to obtain reimbursement from the primary insurer. The insured, having obtained the protection provided by the excess policy, should be entitled so to rely on the excess insurer.

Windt, Insurance Claims and Disputes § 4:11 at 330-31 (4th ed. 2002) (footnotes omitted).

Numerous courts have found that the excess insurer must defend when the primary insurer falters. "[T]he general rule is that an excess liability insurer is not obligated to participate in the defense until the primary policy limits are exhausted. But if the primary insurer denies coverage, the excess insurer would be obligated to defend." Continental Casualty Co. v. Synalloy Corp., 667 F. Supp. 1523, 1540 (S.D. Ga. 1983), aff'd, 826 F.2d 1024 (11th Cir. 1987) (citation omitted, emphasis added). See Grossman v. American Family Mut. Ins. Co., 461 N.W.2d 489, 494 (Minn. Ct. App. 1990) (same). Synalloy found that the excess insurer had "a

current duty to defend … those claims for which [the primary insurer had] denied coverage….” Synalloy Corp., 667 F. Supp. at 1541. See also id. at 1540 (the primary insurer's "position that some BNA claims are not covered by its policies triggers [the excess carrier's indemnity agreement as well as its duty to defend"); American Motorists Ins. Co. v. Trane, 544 F. Supp. 669, 692 (D. Wis. 1982), aff'd, 718 F.2d 842 (7th Cir. 1983); Budget Rent-A-Car Sys., Inc., 64 P.3d at 1243; School District No. 1, Multnomah Co. v. Mission Ins. Co., 650 P.2d 929, 944 (Or. Ct. App. 1982).

Century has failed to provide a defense under the Primary Policy in spite of Emhart's repeated requests for coverage under any and all applicable policies. Once it failed to provide a defense under the Primary Policy, Century owed Emhart a duty to defend under the Excess Policy. Century has failed to provide that defense. As a result, Century is liable not only for the costs of defense and attorneys' fees but also the indemnification costs. See Conanicut Marine Svcs., Inc. v. Ins. Co. of N. America, 511 A.2d 967, 971 (R.I. 1986) ("where an insurer refuses to defend an insured pursuant to a general-liability policy, the insurer will be obligated to pay, in addition to the costs of defense and attorneys' fees, the award of damages or settlement assessed against the insured"); Michaud v. Merrimack Mut. Fire Ins. Co., C.A. No. 94-0175B, 1994 WL 774683, at *9 (D.R.I. Nov. 16, 1994) (noting that the Conanicut rule was mandatory and required insurer that failed to defend "to indemnify these plaintiffs").

### B. OneBeacon's Duty to Defend Under the Excess Umbrella Policy Has Been Triggered.

Regardless of whether or not the Court reforms the OneBeacon policy, OneBeacon would have a duty to defend as an excess insurer if the underlying coverage is exhausted. Both policy XBC64674 (listed in the OneBeacon policy) and policy XBC46961 (the policy OneBeacon seeks to incorporate through reformation) state that a duty to defend is owed when the underlying

coverage is exhausted. See PX 1 at CIC0154 (App. 1) (owes a duty to defend "if limits of liability of the underlying insurance are exhausted because of… property damage"); PX 4 at AON00006 (App. 18) (owes a duty to defend "in the event that the limits of liability of the underlying insurance… are exhausted by an occurrence").

As stated earlier, an excess insurer owes a duty to defend when it is clear that the claim will exceed the underlying coverage. See III.A.1 at 20, supra. OneBeacon knew or should have known that the limits of the Century Primary and Excess Policies would be exceeded. The PRP Letter and EPA Orders identified the magnitude of the work to be done in cleaning up the Site. See III.A.1 at 20-21, supra. In the PRP Letter, the EPA identified the Site as a Superfund Site and demanded Emhart pay over $900,000 and undertake significant remediation steps to respond to contamination by dioxin and other hazardous substances. [PX 12 at 2-3 (App. 3).] The First Order detailed the contamination, seriousness of the problem, and the scope of the work to be done. [PX 13 (App. 6).] Although none of these documents expressly listed remediation costs in excess of $1,000,000, OneBeacon should have known that the costs of clean-up would exceed the limits of the Century Excess Policy given how expensive remediation activities can be on Superfund sites. See III.A.1 at 20-21, supra. Accordingly, OneBeacon's duty to defend was triggered.

Furthermore, OneBeacon owed a duty to defend Emhart once Century refused to provide a defense under either the Primary or Excess Policies. See III.A.3 at 23-25, supra. Given that OneBeacon has failed to provide that defense, OneBeacon is in breach of its duty to defend and has consequently lost its right to contest the duty to indemnify. Conanicut Marine Svcs., Inc., 511 A.2d at 971; Michaud, 1994 WL 774683 at *9.

## IV. WASTE PRODUCT EXCLUSION DOES NOT OBVIATE CENTURY'S DUTY TO DEFEND UNDER THE EXCESS POLICY[16]

As noted in Section I, before determining whether or not Century owes a duty to defend under the Excess Policy, the Court must first determine that the Waste Product Exclusion in Endorsement 6 of the Excess Policy does not preclude coverage. As was discussed above, the Waste Product Exclusion in Endorsement 6 does not bar coverage. See I.A at 6-8, supra. In Rhode Island, there is a duty to defend if there is any possibility based on the pleadings that the claim falls within the scope of coverage. Flori, 388 A.2d at 26-27; Beals, 240 A.2d at 403. The Waste Product Exclusion only bars coverage for "intentional or willful introduction of waste products, fluids or materials." [PX 1 at CIC0165 (App. 1) (emphasis added).] Here, the PRP Letter and EPA notices leave open the possibility for contamination at the Site that was unintentional. If any part of the claim is subject to coverage, the insurer is obligated to defend the entire claim. Nortek, Inc., 858 F. Supp. at 1236.

In determining whether there is a duty to defend, Rhode Island courts look strictly at the pleadings. As such, there is no reason to consider any of the extrinsic evidence that was presented at trial. Such evidence is irrelevant for determining whether, at the time notice was given, there was a possibility that the claim covered unintentional contamination of the Site. However, even if the Court were to consider extrinsic evidence, the evidence at trial overwhelmingly shows that Metro-Atlantic did not intentionally or willful contaminate the Site. See I.B at 8-15, supra. Therefore, the Waste Product Exclusion does not bar coverage of Emhart's claim and therefore does not obviate Century's duty to defend Emhart under the Excess Policy.

[16] Section IV of this brief addresses the fourth issue identified in the Court's March 27, 2007 Order: "Whether the Waste Product Exclusion obviates Century's duty to defend under the Excess Policy."

## V. NO EVIDENTIARY HEARING IS NECESSARY TO DETERMINE THAT CENTURY IS IN BREACH OF ITS DUTY TO DEFEND UNDER THE PRIMARY AND EXCESS POLICIES[17]

On July 21, 1999, at the time of the EPA information request, Emhart provided notice of loss under various Century policies and demanded a defense and indemnification. [Stipulation of Facts, ¶ 67; CIC0380-86 (App. 19).][18] On August 6, 1999 and August 10, 1999, Century acknowledged receipt of that notice but did not take a coverage position. [MISC01732-33 (App. 20); AON00378-80 (App. 21).] On March 14, 2000, Emhart forwarded the PRP Letter to Century and demanded a defense and indemnification. [CIC0387-90 (App. 22).] Century responded on October 23, 2000, once again acknowledging the demand but declining to take a coverage position. [MISC01734-36 (App. 23).]

Emhart then sent a third letter on November 22, 2000 which specifically referenced the Excess Policy. The letter also requested that Century immediately conduct a review of their records for any other insurance coverage that Century provided to Emhart and demanded a defense and indemnification. In that letter, Emhart referred to the EPA Information Request, the PRP Letter and the First Order and enclosed two complaints as well as two legal memoranda as notice of loss under any existing insurance policies. [CIC0066-67 (App. 24).] On December 12, 2000, Century acknowledged the November letter and denied coverage under the Excess Policy. [CIC0062-65 (App. 25).] Century only cited the corporate successorship issue as the grounds for denying coverage, stating that because the Crown Metro merged into Emhart after the expiration

---

[17] Section V of this memorandum addresses the fifth issue identified in the Court's March 27, 2007 Order: "Whether an evidentiary hearing is necessary to resolve the issue of breach, were the Court to determine that Century owes Emhart a duty to defend under either the Primary Policy or the Excess Policy, or both."

[18] Exhibits 1-6, 17-19, 22, 24, and 26 in Emhart's Appendix were previously submitted to the Court as part of the parties' Joint Appendix to the Parties' Summary Judgment Motions (Court's Docket No. 326) ("Joint App."). [See Joint App., Tabs A-D and F-M (Court's Docket No. 326).] To the extent that Century disputes the facts as stated in Appendix exhibits not contained in the Joint App., an evidentiary hearing may be necessary.

of the Excess Policy "Emhart is not entitled to coverage under [the policy]." [Id. at CIC0063.] On April 27, 2001, Emhart notified INA of the EPA's Second Administrative Order. [CIC0020-24 (App. 26).] On January 25, 2002 the Complaint in this action was filed.

On August 29, 2002 – almost two years after Emhart requested that Century conduct a policy search, and over seven months after the Complaint was filed – Century finally commenced a Policy Search Request (conducted by Century record searcher Cindy Crutcher). [Deposition of Janet Anne Lockhart ("Lockhart Dep.") at 39 (App. 27); Lockhart Exh. #3 (App. 28).] Century's Primary Policy was located in January 2003. [Lockhart Dep. at 30-31, 40 (App. 27); Lockhart Exh. #9 (App. 29).] Six months later, on July 2, 2003, the Primary Policy was sent from Century's Claims Handler, Alexandra Zajac, to Century's attorney, Stephen Brock. [Lockhart Dep. at 40 (App. 27); Lockhart Exh. #11 (App. 30).] The policy was finally produced to Emhart on July 10, 2003 – over two and a half years after Emhart originally requested the search and a year and a half after the Complaint was filed. [Lockhart Dep. at 32 (App. 27); Letter from S. Brock to R. Binder dated July 10, 2003 (App. 31).] On January 27, 2004, Century filed a Motion For Leave to File Counterclaim and Cross-Claim regarding Century's Primary Policy and requesting among other things a declaration of no duty to defend under the Primary Policy.

If this Court were to conclude that Century owed Emhart a duty to defend under the Primary Policy and Excess Policy, then Century's refusal to defend Emhart after receiving notice of the EPA suit in 1999, 2000, and 2001 constituted a wrongful refusal to defend and a breach of the duty to defend under both policies. See Michaud v. Merrimack Mut. Fire Ins. Co., 1994 WL 774683, at * 6 (D.R.I. Nov. 16, 1994) (finding a duty to defend and breach of that duty on a

motion for partial summary judgment where insurer had notice of suit and refused to defend insured on basis of non-coverage).

"The Rhode Island Supreme Court has stated that to avoid liability for wrongful failure to defend, the insurer may either enter into a nonwaiver agreement to defend an insured and later question coverage or bring a declaratory judgment action on the question of coverage." Michaud v. Merrimack Mut. Fire Ins. Co., 1994 WL 774683, at * 9 (D.R.I. Nov. 16, 1994) citing Rumford Property & Liability v. Carbone, 590 A.2d 398, 401 (R.I. 1991). Similar to the insurer in the Michaud case, Century has done neither and is therefore required to pay not only reasonable defense costs and expenses but also the award of damages assessed or settlement made assessed by Emhart. See id.; Conanicut Marine Svcs., Inc. v. Ins. Co. of N. America, 511 A.2d 967, 971 (R.I. 1986) (finding "where an insurer refuses to defend an insured pursuant to a general-liability policy, the insurer will be obligated to pay, in addition to the costs of defense and attorneys' fees, the award of damages or settlement assessed against the insured.") Therefore, Century by its conduct has lost the opportunity to contest its duty to defend.

**A. Century Is In Breach Of Its Duty to Defend under the Primary Policy.**

Century was in breach of its duty to defend when, after prompt notice of the EPA suit, it wrongfully refused to defend Emhart on the grounds on non-coverage. Century was given sufficient notice regarding its obligation to defend Emhart against the EPA suit and cannot sustain a notice defense. During the period between July 21, 1999 and April 27, 2001, Emhart provided Century with prompt notice of the EPA's request for information pursuant to Section 104(e) of CERCLA, the PRP Letter, the First Order and the Second Order. Those notices referenced the Century Excess Policy and other insurance policies issued by Century. They did not specifically reference Century's Primary Policy, as Emhart was not aware of the existence of that Policy until Century produced that policy following the close of fact discovery in this action.

However, the November 22, 2000 Letter by which Emhart gave formal notice of the claim to Century under Century's Excess Policy specifically stated that information was being supplied to Century "as notice of this loss under your confirmed insurance policies and any other policies your investigation identifies." [CIC0067 (App. 24).] Century had the Primary Policy in its files, but Emhart remained unaware of the Primary Policy until Century Produced it.

Under Rhode Island law, the happenstance that Emhart was not aware of the Century Primary Policy does not absolve Century of its obligations under that policy, as notice to an insurer under one policy is sufficient to notice under all policies issued by the insurer. Sinclair Oil Corp. v. New Hampshire Ins. Co., 268 A.2d 281, 285 (R.I. 1970) (rejecting insurer's assertion of late notice and finding that notice under workman's compensation policy served as notice under automobile liability policy). The law in other jurisdictions is to the same effect. See La Grange Memorial Hospital v. St. Paul Ins. Co., 740 N.E.2d 21, 29 (Ill. App. Ct. 2000) ("notice by an insured to its insurance company is sufficient to charge the insurer on all policies running in the insured's favor"); Casualty Ins. Co. v. E.W. Corrigan Constr. Co., 617 N.E.2d 228, 233 (Ill. App. Ct.) (concluding that an insurer "is chargeable with knowledge of all policies issued by it to the insured"), appeal denied, 622 N.E.2d 1201 (Ill. 1993).

It is settled that an insurer's actual knowledge satisfies a policy's notice requirement. See Samson v. Transamerica Ins. Co., 636 P.2d 32, 44 (Cal. 1981) ("Transamerica's claim of lack of notice is even less convincing in light of the company's admission , in its appellate briefs, that it had actual notice of the accident and the lawsuit, although not of the trial date"); Cincinnati Companies v. West Amerian Ins. Co., 701 N.E.2d 499, 505 (Ill. 1998) ("the insurer's duty to defend is triggered by actual notice of the underlying suit," meaning "notice sufficient to permit

the insurer to locate and defend the lawsuit."); Aetna Casualty & Surety Co. v. Souras, 552 A.2d 908, 911 (Md. Ct. Spec. App. 1989) ("In the instant case, although no formal notice was given, Aetna admitted in the request for admissions that it was aware of appellee's suit against both Reich and its insured…"); F.D.I.C. v. Oldenburg, 34 F.3d 1529, 1547 (10th Cir. 1994) ("the insurer may receive actual notice through other means" than formal notice from the insured); Aetna Causualty & Surety Co. v. Dow Chemical Co., 10 F.Supp.2d 800, 819-20 (E.D. Mich. 1998) ("Aetna/Dow I") (where "Aetna was aware in 1985 of the 1983 EPA suit," there was no prejudice "'regardless of the sources of its information'"); Ohio Causalty Group v. Risinger, 960 S.W.2d 708, 711 (Tex. App. 1997) (insured may defeat notice defense "by proving that the insurer had actual knowledge of the suit (which would show that the insurer was not prejudiced by its insured's failure)"). In Leader National Insurance Co. v. Lindsey, 477 So.2d 1323, 1327 (Miss. 1985), a telephone message and confirmatory letter from an insurance agent, stating that an insured "thought he was being sued," was sufficient to put the insurer on notice of the suit. The communications between Emhart and Century regarding the EPA proceedings were likewise sufficient to provide notice of the EPA's claim to Century. Notice being given, Century's refusal to defend Emhart on the grounds of non-coverage was wrongful and in breach of its duty to defend.

**B. Century Is In Breach of Its Duty to Defend under the Excess Policy.**

As noted earlier, Century's duty to defend Emhart under its Excess Policy arose when Emhart did not receive a defense under Century Primary Policy. See I.A.3 at 23-25, supra. Therefore, Century, in its role as excess policy insurer, is in breach of its duty to defend because it wrongfully refused to provide a defense for Emhart as required under the Excess Policy.

Furthermore, in this case, Century is both the primary and excess insurer. Therefore, the rationale for the general rule that a primary insurer should not have a portion of its defense

obligation borne by the excess insurer does not apply. Weyerhaeuser Co. v. Commercial Union Ins. Co., 15 P3d 115, 135 (Wash. 2001) ("If an excess insurer were required to defend before exhaustion of an underlying carrier's duty, then the primary carrier would profit from its wrongful failure to defend.") Century does not "profit" if a portion of the defense costs are allocated to the Excess Policy, because Century is responsible for defense costs whether they are assigned to the Primary Policy or the Excess Policy.

Even if the Court determines that the underlying coverage under the Primary Policy must be exhausted in order to trigger Century's duty to defend under the Excess Policy, that requirement has been met. See III.A.1 at 20-23, supra. It was clear from the pleading documents that the claim far exceeded the limits of liability under the Primary Policy. Thus, as soon as Century received notice of the suit, it was aware that the underlying coverage would be exhausted and should have offered Emhart a defense. Its failure to do so was a breach of its duty to defend under the Excess Policy.

### C. OneBeacon Is in Breach of Its Duty to Defend under the Excess Umbrella Policy.

Similar to Century, OneBeacon is also in breach of its duty to defend under the Excess Umbrella Policy. On November 28, 2000, Emhart gave OneBeacon notice of the EPA claim regarding the Site. [Stipulation of Facts, ¶ 70.] OneBeacon became aware of Century's failure to defend under the Excess Policy upon receiving Emhart's initial complaint in early 2002 See Complaint (Court's Docket No. 1) at ¶¶ 18, 39. OneBeacon learned of Century's denial of any defense obligation under the Primary Policy no later than January 2004, upon service of Century's Motion for Leave to File Counterclaim and Cross-Claim. See Exhibit 1 to Defendant Century Indemnity Company's Motion for Leave to File Counterclaim and Cross Claim (Court's Docket No. 167) at ¶¶ 16, 35. Once Emhart did not receive a defense under either Century's

Primary Policy or Excess Policy, OneBeacon's duty to defend under the Excess Umbrella Policy arose. See III.A.3. at 24-26, supra. OneBeacon's failure to tender that defense constituted a breach of its duty.

Furthermore, even if the Court determines that the underlying coverage had to be exhausted in order to trigger OneBeacon's duty to defend under the Excess Umbrella Policy, that requirement has been met as well. See II at 18-19, III.A.1 at 20-23 supra. It was clear from the pleading documents that the claim would far exceed the limits of liability under Century's Primary and Excess Policies. Thus, as soon as OneBeacon received notice of the suit, it was aware that the underlying coverage would be exhausted and should have offered Emhart a defense. Thus, OneBeacon is in breach of its duty to defend.

### D. Facts Regarding Liberty Mutual Policy Are Irrelevant to Whether Century Has Breached Its Duty to Defend Under Either Policy.

It is undisputed that Liberty Mutual, as a primary and excess insurer of Emhart, refused to provide a defense for Emhart against the EPA suits despite notice to Liberty Mutual of its duty to defend Emhart under both its primary and excess insurance policies. See Complaint (Court's Docket No. 1) at ¶ 50; Answer, Counterclaim, Cross-Claim, and Jury Demand of Liberty Mutual Insurance Company (Court's Docket No. 35) at ¶ 50. Because Liberty Mutual did not actually defend Emhart, any references to Liberty Mutual are irrelevant in concluding that Century is in breach of its duty to defend under both the Primary and Excess Policies. See Liberty Mut. Ins. Co. v. Black & Decker Corp., 2004 WL 1771589, at *22 (D. Mass. Aug. 5, 2004) (finding insurer was in breach of its duty to defend and liable for defense and indemnification costs although another insurer was in breach of its duty to defend and "later settled a claim of breach of duty to defend by paying litigation costs.") Specifically, in the Liberty Mutual case, the Court emphasized that "there is a world of difference, both practical and legal, between fulfilling a

contractual duty, and paying damages for the breach of that duty. See id. Similarly in this case, the fact that Liberty Mutual eventually paid a settlement for breach of its duty to defend, does not bear on Century's duty to defend and the subsequent breach of that duty. See id.

Furthermore, the same principles discussed above with regard to the Century Primary Policy, apply here. Century, in its role as excess policy insurer, is in breach of its duty to defend, because it wrongfully refused to provide a defense for Emhart when Emhart did not receive a defense from Liberty Mutual. E.g., 14 Couch on Insurance § 200:46 (3d ed. 2004) (stating that where "primary insurer denies coverage, the excess insurer would be obligated to defend"). See III.A.3 at 23-25, supra.

## CONCLUSION

Based on the foregoing analysis, Emhart respectfully submits that the Court should find that Century owes Emhart a duty to defend under both the Primary and Excess Policies; that whether or not the OneBeacon Policy is reformed OneBeacon owes Emhart a duty to defend; that Century's duties to defend were triggered under the Primary and Excess Policies; that OneBeacon's duty to defend was triggered under the Excess Umbrella Policy; that the Waste Product Exclusion does not bar coverage; that Century and OneBeacon are in breach of their duties to defend under; and that no evidentiary hearing is necessary to resolve the issue of breach.

**[SIGNATURE BLOCK ON NEXT PAGE]**

Respectfully submitted,

/s/ Gerald J. Petros
Gerald J. Petros (#2931)
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, Rhode Island 02903
(401) 274-2000
(401) 277-9600
gpetros@haslaw.com

Jack R. Pirozzolo
Kirk G. Hanson
Foley Hoag LLP
Seaport World Trade Center West
155 Seaport Boulevard
Boston, Massachusetts 02210
(617) 832-1000
jpirozzolo@foleyhoag.com

Dated: April 12, 2007 Counsel for Plaintiff, Emhart Industries, Inc.

CERTIFICATE OF SERVICE

I hereby certify that on April 12, 2007 a copy of Emhart's Memorandum Regarding Century's Duty to Defend Under the Excess Policy (XBC 46961), and OneBeacon's Duty to Defend Under Excess Umbrella Policy (S-16-07084) was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's Cm/ELF System.

/s/Gerald J. Petros
Gerald J. Petros