UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| EMHART INDUSTRIES, INC., Plaintiff, v. HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, LIBERTY MUTUAL INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICA INSURANCE COMPANY and UNITED STATES FIRE INSURANCE COMPANY, Defendants. | Civil Action No. 02-053-S |

**APPENDIX TO EMHART'S MEMORANDUM REGARDING CENTURY'S DUTY TO DEFEND UNDER THE EXCESS POLICY (XBC 46961), AND ONEBEACON'S DUTY TO DEFEND UNDER EXCESS UMBRELLA POLICY (S-16-07084)**

# INDEX

| Exhibit # | Exhibit |
|---|---|
| 1. | Insurance Company of North America Excess Blanket Catastrophe Liability Policy No. XBC 46961 issued to Crown-Metro, et al. (Dec. 1, 1968-Feb. 15, 1970) (Plaintiff's Exhibit 1) |
| 2. | Insurance Company of North America Multiple Liability Policy No. GAL 36597 issued to Crown-Metro, Inc., et al. (Feb. 15, 1969-Feb. 15, 1970) (Plaintiff's Exhibit 2) |
| 3. | Notice of Potential Liability for Centredale Manor Superfund Site, North Providence, Rhode Island from EPA to Emhart Industries, Inc. (Feb. 28, 2000) (Plaintiff's Exhibit 12) |
| 4. | Second Administrative Order for Removal Action, In the Matter of Centredale Manor Restoration Project Superfund Site, U.S. EPA New England CERCLA Docket No. CERCLA-1-2001-0032 (Plaintiff's Exhibit 15) |
| 5. | Third Administrative Order on Consent for Removal Action, In the Matter of Centredale Manor Restoration Project, Superfund Site, U.S. EPA Region I CERCLA Docket No. 01-2003-0073 (Plaintiff's Exhibit 16) |
| 6. | Unilateral Administrative Order for Removal Action, In the Matter of Centredale Manor Restoration Project Superfund Site, U.S. EPA Region I CERCLA Docket No. CERCLA1--2000-0026) (Plaintiff's Exhibit 13) |
| 7. | "ZEP" Manufacturing Process (Plaintiff's Exhibit 193) |
| 8. | Excerpts from Transcript of Trial Testimony of James Ronald Hass dated September 26, 2006 |
| 9. | Excerpts from Transcript of Trial Testimony of Raymond and Joseph Nadeau dated September 15, 2006 |
| 10. | Excerpts from Transcript of Trial Testimony of John Turcone dated September 18, 2006 |
| 11. | Excerpts from Transcript of Trial Testimony of James Ronald Hass dated September 27, 2006 |
| 12. | Excerpts from Transcript of Deposition of Thomas F. Cleary dated February 10, 2003 |
| 13. | Excerpts from Transcript of Deposition of Vincent Buonanno dated March 25, 2003 |

| **Exhibit #** | **Exhibit** |
|---|---|
| 14. | Excerpts from Transcript of Trial Testimony of Dr. Franklin E. Woodard dated October 6, 2006 |
| 15. | Excerpts from Transcript of Trial Testimony of James Ronald Hass dated October 13, 2006 |
| 16. | Excerpts from Transcript of Trial Testimony of Dr. Michael James Wade dated October 12, 2006 |
| 17. | Employers' s Surplus Lines Insurance Company Excess Umbrella Policy No. S-16-07084 issued to Crown-Metro Inc., et al (April 4, 2969-Feb. 2, 1972) (Plaintiff's Exhibit 3) |
| 18 | Insurance Company of North America Excess Blanket Catastrophe Liability Policy No. XBC 64674 issued to Crown Chemical Corporation, et al (Dec. 1, 1967-Dec. 1, 1968) (Plaintiff's Exhibit 4) |
| 19. | Letter from K. Alexander (Aon Risk Services) to Interested Underwriters dated July 21, 1999 (CIC0380-0386) |
| 20. | Letter from B. Smith (ACE USA) to K. Alexander (Aon Risk Services) dated August 6, 1999 (MISC01732-01733) |
| 21. | Letter from M. Nathanson (ACE USA) to K. Alexander (Aon Risk Services) dated August 10, 1999 (AON00378-00380) |
| 22. | Letter from S. Jones (Aon Risk Services) to Interested Underwriters dated March 14, 2000 (CIC0387-390) |
| 23. | Letter from M. Nathanson (ACE USA) to S. Jones (Aon Risk Services) dated October 23, 2000 (MISC01734-01736) |
| 24. | Letter from J. Hovermill (Miles & Stockbridge) to Insurance Company of North America dated November 22, 2000 (CIC0066-67) |
| 25. | Letter from A. Zajac (ACE USA) to J. Hovermill (Miles & Stockbridge) dated December 12, 2000 (Zajac Ex. 2) (CIC0062-65) |
| 26. | Letter from C. May (Aon Risk Services) to Interested Underwriters dated April 27, 2001 (CIC0020-24) |
| 27. | Excerpts from Transcript of Deposition of Janet Anne Lockhart dated November 11, 2005 |
| 28. | Lockhart Deposition Exhibit 3 |

| **Exhibit #** | **Exhibit** |
| --- | --- |
| 29. | Lockhart Deposition Exhibit 9 |
| 30. | Lockhart Deposition Exhibit 11 |
| 31. | Letter from S. Brock (Siegal & Napierkowski) to R. Binder (Wilcox, Pirozzolo & McCarthy) dated July 10, 2003 |

Respectfully submitted,

/s/ Gerald J. Petros
Gerald J. Petros (#2931)
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, Rhode Island 02903
(401) 274-2000
(401) 277-9600
gpetros@haslaw.com

Counsel for Plaintiff, Emhart Industries, Inc.

Jack R. Pirozzolo
Kirk G. Hanson
Foley Hoag LLP
Seaport World Trade Center West
155 Seaport Boulevard
Boston, Massachusetts 02210
(617) 832-1000
jpirozzolo@foleyhoag.com

Dated: April 12, 2007

CERTIFICATE OF SERVICE

I hereby certify that a copy of Appendix to Emhart's Memorandum Regarding Century's Duty to Defend Under the Excess Policy (XBC 46961), and OneBeacon's Duty to Defend Under Excess Umbrella Policy (S-16-07084) was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's Cm/ELF System.

/s/Gerald J. Petros
Gerald J. Petros

796154v1 (55451/115705)

# EXHIBIT 1

Service Office Number: Boston 524
Agency Number: 138024
Insurance Underwriters, Inc.
N

☐ New ☒ Renewal ☐ Rewrite of
Agency Name
Address

Old Policy No. XBC 64074

EXCESS BLANKET CATASTROPHE LIABILITY POLICY

# INSURANCE COMPANY OF NORTH AMERICA

XBC 46961

Named Insured Address: Crown-Metro, etal, per Named Insured Endorsement
12 Dudley Street
Providence, Rhode Island

Policy Period: From December 1, 1968 to February 15, 1970 12:01 A.M. standard time at the address of the Named Insured as stated herein.

Audit Period: Annual, unless otherwise stated.

Endorsements attached to policy at inception: Nuclear Energy Liability Exclusion
1. Name of Insured Endorsement
2. Property Damage Exclusion Endorsement #LC-1374
3. Premium Computation Endorsement #LC-746e
4. Persons or Entities Insured Endorsement
5. Contamination or Pollution Exclusion #5

## LIMITS OF LIABILITY

INA'S LIMIT OF LIABILITY:

ITEM 1. $ 1,000,000. arising out of any one occurrence because of personal injury, property damage or advertising injury or any combination thereof.

ITEM 2. $ 1,000,000. arising out of all occurrences during each policy year because of the products hazard, or the completed operations hazard, or both combined.

INSURED'S RETAINED LIMIT:
Underlying Insurance, or

ITEM 3. $ 10,000. because of personal injury, property damage or advertising injury arising out of any one occurrence not within the terms of coverage of underlying insurance but within the terms of the coverage of this insurance.

## PREMIUM COMPUTATION

| Estimated Annual Sales | Rate per 1000 | Total Advance Premium |
|---|---|---|
| 12,000,000. | .35 | $4,500 |

Plaintiff's Exhibit 1

Annual MINIMUM PREMIUM $ 4,500

In the event of cancellation by the Named Insured, INA shall receive and retain not less than $ 1,000.00 as the Minimum Premium.

38 5/2/69

Countersigned By__________

CIC 0153

INA

INSURANCE COMPANY OF NORTH AMERICA, PHILADELPHIA, PENNSYLVANIA

Crown-Metro, etal, per
Named Insured Endorsement
12 Dudley Street

EXCESS BLANKET CATASTROPHE
LIABILITY POLICY

A Stock Insurance Company, herein called INA

asideration of the payment of the premium, in reliance upon the statements in the declarations made a part hereof and subject to all of the terms of this policy, s with the Named Insured as follows:

## INSURING AGREEMENT

rage A—Personal Injury Liability

rage B—Property Damage Liability

rage C—Advertising Liability

will indemnify the Insured for ultimate net loss in excess of the retained limit inafter stated which the Insured shall become legally obligated to pay as dam- because of

A. personal injury or
B. property damage or
C. advertising injury

which this insurance applies, caused by an occurrence, and

With respect to any personal injury, property damage or advertising injury not within the terms of the coverage of underlying insurance but within the terms of coverage of this insurance; or

If limits of liability of the underlying insurance are exhausted because of personal injury, property damage or advertising injury during the period of this policy

INA will

(a) have the right and duty to defend any suit against the Insured seeking damages on account of such personal injury, property damage or advertising injury, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient; but INA shall not be obligated to pay any claim or judgment or to defend any suit after INA's limit of liability has been exhausted by payment of judgments or settlements;

(b) in adition to the amount of ultimate net loss payable:

(i) pay all expenses incurred by INA, all costs against the Insured in any suit defended by INA and all interest on the entire amount of any judgment therein which accrues after entry of the judgment and before INA has paid or tendered or deposited in court that part of the judgment which does not exceed the limit of INA's liability thereon;

(ii) pay premiums on appeal bonds required in any suit, premium on bonds to release attachments in any such suit for an amount not in excess of the applicable limit of liability of this policy, and the cost of bail bonds required of the Insured because of accident or traffic law violation arising out of the use of any vehicle to which this policy applies but INA shall have no obligation to apply for or furnish any such bonds;

(iii) pay reasonable expenses incurred by the Insured at INA's request, including actual loss of wages or salary (but not loss of other income) not to exceed $50 per day because of his attendance at hearings or trials at such request.

In jurisdictions where INA may be prevented by law or otherwise from carrying out this agreement, INA will indemnify the Insured for such expense incurred with its written consent in accordance with this provision.

## PERSONS OR ENTITIES INSURED

The *Named Insured* is the organization(s) named in the declarations of this policy and includes:

(a) any subsidiary company (including subsidiaries thereof) and any other company under their control and active management at the inception date of this policy;

(b) new organizations acquired by the Named Insured, during the policy period, through consolidation, merger with, purchase of the assets of, or assumption of control and active management of; provided such acquisition or assumption is reported to INA within 60 days after it is effected and endorsed on this policy for an additional premium to be determined; but unintentional failure to report such new acquisition or assumption shall not invalidate this insurance;

(c) *If the Named Insured in the declarations* is a partnership or joint venture, any partner or member thereof is included as a Named Insured but only with respect to his liability as a partner or member of such partnership or joint venture.

Each of the following is an Insured under this policy to the extent set forth below:

(a) any person, organization, trustee or estate to whom or to which the Named Insured is obligated by virtue of a written contract or permit to provide insurance such as is afforded by the terms of this policy, but only with respect to operations by on behalf of the Named Insured or to facilities of or used by the Named Insured and then only to the extent of the coverage required by such contract and for the limits of liability specified in such contract, but in no event for insurance not afforded by this policy nor for limits of liability in excess of the applicable limits of liability of this policy;

(b) at the option of the Named Insured and subject to the terms of the coverage of this insurance, any additional insured(s) included in the underlying insurance listed in Schedule A, but only to the extent that insurance is provided for such additional insured(s) thereunder;

(c) except with respect to the ownership, maintenance or use, including loading or unloading, of automobiles or aircraft,

(i) any officer, executive, employee, director or stockholder of the Named Insured while acting on behalf of such Named Insured; (ii) any person or organization while acting as real estate manager for the Named Insured;

CIC 0154

## NUCLEAR ENERGY LIABILITY EXCLUSION

This policy does not apply:

a. Under any Liability Coverage, to bodily injury or property damage:

(1) with respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(2) resulting from the hazardous properties of nuclear material and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

b. Under any Medical Payments Coverage, or under any Supplementary Payments provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

c. Under any Liability Coverage to bodily injury or property damage resulting from the hazardous properties of nuclear material, if:

(1) the nuclear material (a) is at any nuclear facility owned by, or operated by or on behalf of an insured, or (b) has been discharged or dispersed therefrom;

(2) the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

(3) the bodily injury or property damage arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions, or Canada, this exclusion (3) applies only to property damage to such nuclear facility and any property thereat.

d. As used in this Exclusion:

(1) "Hazardous properties" include radioactive, toxic, or explosive properties;

(2) "Nuclear material" means source material, special nuclear material or byproduct material;

(3) "Source material," "special nuclear material," and "byproduct material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

(4) "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

(5) "Waste" means any waste material (a) containing byproduct material and (b) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (6), (a) or (b) thereof;

(6) "Nuclear facility" means: (a) any nuclear reactor, (b) any equipment or device designed or used for (i) separating the isotopes of uranium or plutonium, (ii) processing or utilizing spent fuel, or (iii) handling, processing, or packaging waste; (c) any equipment or device used for the processing, fabricating, or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235; (d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste; and (e) includes the site on which any of the foregoing is located, all operations conducted on such site, and all premises used for such operations;

(7) "Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

(8) "Property damage" includes all forms of radioactive contamination of property.

## DEFINITIONS

When used in this policy (including endorsements forming a part hereof):

"advertising injury" means libel, slander, defamation, infringement of copyright, title or slogan, privacy, unfair competition, idea misappropriation or invasion of rights of privacy, arising out of the insured's advertising activities;

"completed operations hazard" includes personal injury and property damage arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the personal injury or property damage occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the insured. "Operations" include materials, parts or equipment furnished in connection therewith. Operations shall be deemed completed at the earliest of the following times:

(a) when all operations to be performed by or on behalf of the insured under the contract have been completed,

(b) when all operations to be performed by or on behalf of the insured at the site of the operations have been completed, or

(c) when the portion of the work out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

Operations which may require further service or maintenance work, or correction, repair or replacement because of any defect or deficiency, but which are otherwise complete, shall be deemed completed.

The completed operations hazard does not include personal injury or property damage arising out of

(1) operations in connection with the transportation of property, unless the personal injury or property damage arises out of a condition in or on a vehicle created by the loading or unloading thereof,

(2) the existence of tools, uninstalled equipment or abandoned or unused materials;

"damages" means only those damages which are payable because of personal injury, property damage or advertising injury to which this insurance applies and includes damages for (1) death and for care and loss of services resulting from personal injury, (2) loss of use of property resulting from property damage, and (3) advertising injury;

"insured" means any person or organization qualifying as an insured under the Persons or Entities Insured section of this policy. The insurance afforded applies separately to each insured against whom claim is made or suit is brought, except with respect to the limits of INA's liability;

"insured's products" means goods or products manufactured, sold, handled or distributed by the insured or by others trading under his name, including any container thereof (other than a vehicle) but "insured's products" shall not include a vending machine or any property other than such a container, rented to or located for use of others but not sold;

"occurrence" means an injurious exposure to conditions which results, during the policy period, in personal injury, property damage or advertising injury neither expected nor intended from the standpoint of the insured.

"personal injury" means, (a) bodily injury, sickness, disease, disability, shock, mental anguish and mental injury; (b) false arrest, detention or imprisonment, malicious prosecution or humiliation; (c) the publication or utterance of a libel or slander or of other defamatory material, including disparaging statements concerning the condition, value, quality or use of real or personal property, or a publication or utterance in violation of rights of privacy, except when any of the foregoing of this part (c) arises out of the insured's advertising activities; (d) wrongful entry or eviction, or other invasion of the right of private occupancy; (e) racial or religious discrimination, unless insurance therefor is prohibited by law not committed by or at the direction of the insured; and (f) assault and battery not committed by or at the direction of the insured, unless committed for the purpose of protecting persons or property;

"products hazard" includes personal injury and property damage arising out of the insured's products or reliance upon a representation or warranty made at any time with respect thereto, but only if the personal injury or property damage occurs away from premises owned by or rented to the insured and after physical possession of such products has been relinquished to others;

"property damage" means injury to or destruction of tangible property;

"ultimate net loss" means the sum actually paid or payable in cash in the settlement or satisfaction of losses for which the insured is liable either by adjudication or compromise with the written consent of INA, after making proper deduction for all recoveries and salvages collectible, but excludes all loss expenses and legal expenses (including attorneys' fees, court costs and interest on any judgment or award) and all salaries of employees and office expenses of the insured, INA or any underlying insurer so incurred.

## CONDITIONS

**1. Premium**

The premium for this policy shall be as stated in the Declarations.

If the premium as stated in the declarations is an advance premium, it shall be computed in accordance with the premium computation endorsement attached to the policy.

**2. Inspection and Audit**

INA shall be permitted but not obligated to inspect the Insured's property and operations at any time. Neither INA's right to make inspections nor the making thereof nor any report thereon shall constitute an undertaking, on behalf of or for the benefit of the Insured or others, to determine or warrant that such property or operations are safe. INA may examine and audit the Insured's books and records at any time during the policy period and extensions thereof and within three years after the final termination of this policy, as far as they relate to the subject matter of this insurance.

**3. Insured's Duties in the Event of Occurrence, Claim or Suit**

(a) In the event of an occurrence, reasonably likely to exceed the retained limit, written notice containing particulars sufficient to identify the Insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the Insured to INA or any of its authorized agents as soon as practicable. The expenses of all steps to prevent other personal injury or property damage or advertising injury from arising out of the same or similar conditions are not recoverable under this policy.

(b) If claim is made or suit is brought against the Insured, the Insured shall immediately forward to INA every demand, notice, summons or other process received by him or his representative.

(c) The Insured shall cooperate with INA and upon INA's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the Insured because of personal injury or property damage or advertising injury with respect to which insurance is afforded under this policy; and the Insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The Insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense; however, if the amount of ultimate net loss becomes certain either through trial court judgment or agreement among the Insured, the claimant and INA, then, the Insured may pay the amount of ultimate net loss to the claimant to effect settlement and, upon submission of due proof thereof, INA shall indemnify the Insured for that part of such payment which is in excess of the retained limit, or, INA will, upon request of the Insured, make such payment to the claimant on behalf of the Insured.

(d) The Named Insured shall promptly reimburse INA for any amount of ultimate net loss paid on behalf of any Insured within the retained limit.

(e) As this policy is excess insurance, the Insured warrants that coverage under the uninsured motorist laws will be maintained during the policy period. It is agreed that the Named Insured shall promptly reimburse INA for any amount of ultimate net loss paid on behalf of any Insured as respects any payment made under an uninsured motorist law, or any similar law.

**4. Appeals**

If the Insured or the Insured's underlying insurer elects not to appeal a judgment in excess of the retained limit, INA may elect to do so at its own expense, and shall be liable for the taxable costs, disbursements and interest incidental thereto, but in no event shall the liability of INA for ultimate net loss exceed the amount specified in the Limits of Liability section of the Declarations plus the taxable costs, disbursements and interest incidental to such appeal.

**5. Action Against INA**

No action shall lie against INA unless, as a condition precedent thereto, there shall have been full compliance with all the terms of this policy, nor until the amount of the Insured's obligation to pay shall have been finally determined either by judgment against the Insured after actual trial or by written agreement of the Insured, the claimant and INA. Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join INA as a co-defendant in any action against the Insured to determine the Insured's liability, nor shall INA be impleaded by the Insured or his Legal Representative. Bankruptcy or insolvency of the Insured shall not relieve INA of any of its obligations hereunder.

**6. Other Insurance**

If collectible insurance with any insurer is available to the Insured covering a loss also covered hereunder, the insurance hereunder shall be in excess of, and not contribute with, such other insurance provided, however, this does not apply to insurance which is written as excess insurance over INA's limit of liability provided in this policy.

When both this insurance and other insurance apply to the loss on the same basis, whether primary, excess or contingent, INA shall not be liable under this policy for a greater proportion of the loss than that stated in the applicable contribution provision below.

(a) Contribution by Equal Shares. If all of such other valid and collectible insurance provides for contribution by equal shares, INA shall not be liable for a greater proportion of such loss than would be payable if each insurer contributes an equal share until the share of each insurer equals the lowest applicable limit of liability under any one policy or the full amount of the loss is paid, and with respect to any amount of loss not so paid the remaining insurers then continue to contribute equal shares of the remaining amount of the loss until each such insurer has paid its limit in full or the full amount of the loss is paid.

(b) Contribution by Limits. If any of such other insurance does not provide for contribution by equal shares, INA shall not be liable for a greater proportion of such loss than the applicable limit of liability under this policy for such loss bears to the total applicable limit of liability of all valid and collectible insurance against such loss.

**7. Subrogation**

In the event of any payment under this policy, INA shall be subrogated to the Insured's rights of recovery therefor, and the Insured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. Any amount so recovered shall be apportioned as follows:

Any interest (including the Insured's) having paid an amount in excess of the retained limit plus INA's limit of liability hereunder shall be reimbursed first to the extent of actual payment. INA shall be reimbursed next to the extent of its actual payment hereunder. If any balance then remains unpaid, it shall be applied to reimburse the Insured or any underlying insurer, as their interest may appear. The expenses of all such recovery proceedings shall be apportioned in the ratio of respective recoveries. If there is no recovery in proceedings conducted solely by INA, it shall bear the expenses thereof.

**8. Changes**

Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this policy or estop INA from asserting any right under the terms of this policy; nor shall the terms of this policy be waived or changed, except by endorsement issued to form a part of this policy.

**9. Assignment**

Assignment of interest under this policy shall not bind INA until its consent is endorsed hereon; if, however, the Named Insured shall die, or be adjudged bankrupt or insolvent, such insurance as is afforded by this policy shall apply (a) to the Named Insured's legal representative, as the Named Insured, but only while acting within the scope of his duties as such, and (b) with respect to the property of the Named Insured, to the person having proper temporary custody thereof, as Insured, but only until the appointment and qualification of the legal representative.

**10. Three Year Policy**

If this policy is issued for a period of three years, the limits of INA's liability shall apply separately to each consecutive policy year thereof.

**11. Cancellation**

This policy may be cancelled by the Named Insured by surrender thereof to INA or any of its authorized agents or by mailing to INA written notice stating when thereafter the cancellation shall be effective. This policy may be cancelled by INA by mailing to the Named Insured at the address shown in this policy written notice stating when, not less than thirty days thereafter, such cancellation shall be effective. The mailing of notice as aforesaid shall be sufficient notice. The time of surrender or the effective date and hour of cancellation stated in the notice shall become the end of the policy period. Delivery of such written notice either by the Named Insured or by INA shall be equivalent to mailing. If the Named Insured cancels, earned premium shall be computed in accordance with the customary short rate table and procedure. If INA cancels, earned premium shall be computed pro rata. When this policy insures more than one Named Insured cancellation may be effected by the first named of such Named Insured for the account of all Insureds. Notice of cancellation by INA to the first named Named Insured shall be deemed notice to all Insureds and payment of any unearned premium to such first named Named Insured shall be for the account of all Insureds. Premium adjustment may be made either at the time cancellation is effected or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

**12. Acceptance**

By acceptance of this policy, the Insured agrees that this policy embodies all agreements existing between himself and INA or any of its agents relating to this insurance.

*IN WITNESS WHEREOF,* the INSURANCE COMPANY OF NORTH AMERICA has caused this policy to be signed by its President and Secretary-Treasurer at Philadelphia, Pennsylvania, and countersigned on the Declarations page by a duly Authorized Agent of the Company.

Secretary-Treasurer

Charles K. Cox

CIC 0156

ned
in-
me,
in-
to

remaining insurers then continue to contribute equal shares of the remaining amount of the loss until each such insurer has paid its limit or the full amount of the loss is paid.

(b) Contribution by Limits. If any of such other insurance does not provide for contribution by equal shares, INA shall not be liable for a greater portion of such loss than the applicable limit of liability under this policy for such loss bears to the total applicable limit of liability of all valid and collectible insurance against such loss.

## RETAINED LIMIT—INA'S LIMIT OF LIABILITY

Regardless of the number of (1) insureds under this policy, (2) persons or organizations who sustain injury or damage, or (3) claims made or suits brought because of personal injury, property damage, or advertising injury, INA's liability is limited as follows:

With respect to personal injury, property damage or advertising injury, or any combination thereof, INA's liability shall be only for the ultimate net loss in excess of the insured's retained limit defined as the greater of:

(a) an amount equal to the limits of liability indicated beside the underlying insurance listed in Schedule A hereof, plus the applicable limits of any other underlying insurance collectible by the insured; or

(b) the amount specified in Item 3. of the Limits of Liability section of the declarations because of personal injury, property damage or advertising injury not within the terms of the coverage of the underlying insurance listed in Schedule A;

and then for an amount not exceeding the amount specified in Item 1. of the Limits of Liability section of the declarations arising out of any one occurrence.

There is no limit to the number of occurrences during the policy period for which claims may be made, except that the liability of INA because of either the products hazard or the completed operations hazard, or both combined, arising out of all occurrences during each policy year shall not exceed the amount specified in Item 2. of the Limits of Liability section of the declarations.

If the aggregate limits of liability of the underlying insurance listed in Schedule A are reduced or exhausted because of personal injury, property damage or advertising injury during the period of this policy, INA will, subject to INA's limit of liability stated above, continue such coverage as is afforded by such listed underlying insurance for the remainder of the policy year of such underlying insurance in excess of the reduced or exhausted limits.

For the purpose of determining the limits of INA's liability, all damages arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

## POLICY PERIOD, TERRITORY

This policy applies to personal injury, property damage or advertising injury which occurs anywhere during the policy period.

## EXCLUSIONS

This policy does not apply:

(a) to any obligation for which the insured or any carrier as his insurer may be held liable under any workmen's compensation, unemployment compensation or disability benefits law, or under any similar law;

(b) to property damage to (1) property owned by the insured, or (2) the insured's products arising out of such products or any part of such products, or (3) work performed by or on behalf of the insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith;

(c) to personal injury or property damage resulting from the failure of the insured's products or work completed by or for the insured to perform the function or serve the purpose intended by the insured, if such failure is due to a mistake or deficiency in any design, formula, plan, specifications, advertising material or printed instructions prepared or developed by any insured; but this exclusion does not apply to bodily injury or property damage resulting from the active malfunctioning of such products or work;

(d) to damages claimed for the withdrawal, inspection, repair, replacement or loss of the use of the insured's products or work completed by or for the insured or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein;

(e) to advertising injury resulting from (1) failure of performance of contract, (2) infringement of trade mark, service mark or trade name by use thereof as the trade mark, service mark or trade name of goods or services sold, offered for sale or advertised, but this shall not relate to titles or slogans, (3) incorrect description of any article or commodity, or (4) mistake in advertised price;

(f) To property damage in accordance with the provisions of the property damage exclusion endorsement attached hereto;

INSURANCE COMPANY OF NORTH AMERICA

NAMED INSURED ENDORSEMENT

Endorsement #1

The named insured shall read as follows:

Crown-Metro, Inc.
The Cravenette Company, U.S.A.
Neva-Stain Corporation
I.B.C. Chemical., Ltd.
Crown-Metro, Inc. - Southern
Centredale Enterprises, Inc.
Ranedare Corporation
Bryant Chemical Corporation
Metro-Atlantic (Canada) Limited
Metro-Atlantic, Inc. (New Jersey)
Metro-Atlantic, Inc. (South Carolina)
Metro-Atlantic, Inc. (Eastern Division)
Bon Color Corp.
Metro-Atlantic Research Corporation

…thing herein contained shall vary, alter or extend any provision or condition of the policy other than as above stated.

| Effective Date December 1, 1968 at the hour specified in the policy. | Part of Policy No. XBC 46961 |
|---|---|
| Issued to Crown-Metro, Inc., etal. | |

CIC 0158

Authorized Agent

…ot valid unless countersigned by a duly authorized agent of the …NSURANCE COMPANY OF NORTH AMERICA

Charles K. Cox
President

-1660

100M 7-10-67 Ptd. in U.S.A.

# PROPERTY DAMAGE EXCLUSION ENDORSEMENT

(Excess Policy Forms Only)

Named Insured Crown-Metro, etal

Effective December 1, 1968 Policy No. XBC 46961

Issued by Insurance Company of North America

(Name of Insurance Company)

The above is required to be completed only when this endorsement is issued subsequent to the preparation of the policy.

Endorsement No. 2

In accordance with the provisions of Exclusion (f), this policy does not apply:

(f) to property damage to property rented to, occupied or used by or in the care, custody or control of the Insured to the extent the Insured is under contract to provide insurance therefor.

CIC 0159

Authorized Agent

## PREMIUM COMPUTATION ENDORSEMENT

Named Insured: Crown-Metro, etal

Effective: December 1, 1968 Policy No. XBC 46961

Issued by: Insurance Company of North America
(Name of Insurance Company)

The above is required to be completed only when this endorsement is issued subsequent to the preparation of the policy.

The premium for this policy shall be based upon the: Endorsement No. 3

1. [X] One year wording:

- [ ] Admissions
- [ ] Remuneration
- [ ] Receipts
- [ ] Cost
- [X] Sales
- [ ]

of the Named Insured during the policy period and shall be computed by applying to such estimated premium basis, the rate set forth in the declarations. Upon delivery of this policy the Named Insured shall pay the advance premium shown in the declarations and upon termination of the policy shall render to INA a statement of the premium basis for the policy period and the earned premium shall be computed thereon. If the earned premium thus computed exceeds the advance premium paid, the Named Insured shall pay the excess to INA; if less, INA shall return to the Named Insured the unearned premium paid by the Named Insured.

1. [ ] Three year wording:

- [ ] Admissions
- [ ] Remuneration
- [ ] Receipts
- [ ] Cost
- [ ] Sales
- [ ]

of the Named Insured during the policy period and shall be computed by applying to such estimated premium basis, the rate set forth in the declarations. Upon delivery of this policy the Named Insured shall pay the advance premium shown in the declarations and at the end of each twelve months during the policy period, shall render to INA a statement of the premium basis during that period and the earned premium shall be paid to INA, except that the advance premium shown in the declarations shall be credited against the premium found to be due INA for the last twelve months of the policy period.

2. Earned premiums shall be subject to any applicable minimum premiums stated in the declarations.

3. When used as a premium basis:

a) "admissions" means the total number of persons, other than employees of the Named Insured, admitted to the event(s) insured or to events conducted on the premises, whether on paid admission tickets, complimentary tickets or passes;

b) "remuneration" means the entire remuneration earned during the policy period by all employees of the Named Insured engaged in the Insured's operations, subject to any overtime earnings or limitation of remuneration rule applicable in accordance with the manuals in use by INA;

c) "receipts" means the gross amount of money charged by the Named Insured or by others trading under his name for all goods and products sold or distributed during the policy period and charged during the policy period for installation, servicing or repair, and includes taxes, other than taxes which the Named Insured and such others collect as a separate item and remit directly to a governmental division;

d) "cost" means the total cost to the Named Insured for operations performed for the Named Insured, during the policy period, by independent contractors on all work let or sub-let in connection with each specific project, including the cost of all labor, materials and equipment furnished, used or delivered for use in the execution of such work, whether furnished by the owner, contractor or sub-contractor, including all fees, allowances, bonuses or commissions made, paid or due;

e) "sales" means the gross amount of money charged by the Named Insured or by others trading under his name for all goods or products sold or distributed during the policy period and charged during the policy period for installation, servicing or repair and includes taxes, other than taxes which the Named Insured and such others collect as a separate item and remit directly to a governmental division; monies charged one Insured under this policy by another Insured under this policy, for goods, products, installation, servicing or repair shall not be considered sales within the meaning of this definition.

Authorized Agent

CIC 0160

INA INSURANCE COMPANY OF NORTH AMERICA

# PERSONS OR ENTITIES INSURED

Endorsement #4

The "Persons or Entities Insured" provisions of the policy are amended by the addition of the following:

(d) any person while using, with the permission of the Named Insured, any automobile or aircraft owned by, loaned to or hired for use by or on behalf of the Named Insured and any person or organization legally responsible for the use thereof, provided the actual operation or other actual use is within the scope of such permission, and any officer, director or stockholder of the Named Insured with respect to the use of an automobile or aircraft not owned by the Named Insured but only while such automobile or aircraft is being used in the business of the Named Insured. The insurance with respect to any person or organization other than the Named Insured does not apply under this paragraph (d):

(i) to any person or organization, or to any agent or employee thereof, operating an automobile sales agency, repair shop, service station, storage garage or public parking place;

(ii) to any automobile or aircraft hired by or loaned to the Named Insured, to the owner or a lessee (of whom the Named Insured is a sub-lessee) thereof other than the Named Insured, or to any agent or employee of such owner or lessee;

(iii) to any manufacturer of aircraft, aircraft engines or aviation accessories, or any aviation sales or service or repair organization or airport or hangar operator or their respective employees or agents.

Nothing herein contained shall vary, alter or extend any provision or condition of the policy other than as above stated.

| Effective Date | | Part of Policy No. |
|---|---|---|
| December 1, 1968 | at the hour specified in the policy. | XBC 45961 |
| Issued to Crown-Metro, etal. | | |

CIC 0161

Authorized Agent

*Not valid unless countersigned by a duly authorized agent of the INSURANCE COMPANY OF NORTH AMERICA*

Charles K. Cox
President

>-1660

100M 7-10-67 Ptd. in U.S.A.

INA

## INSURANCE COMPANY OF NORTH AMERICA

### POLLUTION AND CONTAMINATION EXCLUSION ENDORSEMENT

Endorsement #5

It is agreed that;

"(Except with respect to the products hazard), such insurance as is afforded by this policy or any other endorsement thereto shall not apply to any claim for damages arising out of contamination or pollution of land, air, water or other real or personal property."

Nothing herein contained shall vary, alter or extend any provision or condition of the policy other than as above stated.

| Effective Date December 1, 1968 at the hour specified in the policy. | Part of Policy No. XBC 46961 |
|---|---|
| Issued to Crown-Metro, etal | |

CIC 0162

Authorized Agent

Not valid unless countersigned by a duly authorized agent of the INSURANCE COMPANY OF NORTH AMERICA

C-1660

Charles K. Cox
President

100M 7-10-67 Ptd. in U.S.A.

# SCHEDULE OF UNDERLYING INSURANCE

SCHEDULE A

POLICY NO. XBC 46961

It is agreed by the insured that the following underlying insurance is in force as collectible insurance at inception of this policy for the limits of liability stated hereafter.

| Type of Policy | Applicable Limits |
|---|---|
| Standard Workmen's Compensation & Employers' Liability | Coverage B — Employers' Liability<br>$100,000 one accident |
| General Liability | Personal Injury Liability<br>$100,000 each occurrence<br>$300,000 each occurrence<br>$300,000 aggregate products |
| | Property Damage Liability<br>$100,000 each occurrence<br>$100,000 aggregate products |
| Automobile Liability | Bodily Injury Liability<br>$100,000 each person<br>$300,000 each accident |
| | Property Damage Liability<br>$100,000 each accident |

INA

INSURANCE COMPANY OF NORTH AMERICA

EXCLUSION OF WASTE PRODUCTS ENDORSEMENT 6

It is agreed that Endorsement #5, Pollution Contamination Exclusion Endorsement is deleted.

It is further agreed that this policy shall not apply to:

1.) Injury to or destruction of property caused by intentional or willful introduction of waste products, fluids or materials, including oil refuse, gas or gas bleed water, into any soil or inland or tidal waters, irrespective of whether the insured possessed knowledge of the harmful effects of such acts.

Nothing herein contained shall vary, alter or extend any provision or condition of the policy other than as above stated.

| Effective Date | Part of Policy No. |
|---|---|
| December 1, 1968 at the hour specified in the policy. | XBC 46961 |
| Issued to Cream-Metro, etal, per Named Insured Endorsement | |

cs 6/19/69 Insurance Underwriters, Inc.

Authorized Agent

Not valid unless countersigned by a duly authorized agent of the INSURANCE COMPANY OF NORTH AMERICA

C-1559

AGENT'S COPY

PROVIDENCE INSURANCE UNDERWRITERS INC

RECEIVED JUN 24 9 AM '69

Charles K. Cox
President

300M 7-10-67 Ptd. in U.S.A.

CIC 0165

CASE NO. 02-053S

Emhart Industries, Inc..

vs. Home Insurance Co., et al.

PLAINTIFF'S EXHIBIT 1

DATE ______________ IDEN.

DATE ______________ EVID.

BY ______________
Deputy Clerk

AO 386

# EXHIBIT 2.

INA

**Insurance Company of North America**

# ADVICE OF CANCELLATION

Total paid through Budget 22086.00
Total paid through Agency 8120.00

WEISTHAL S.R.P.C.

Name of Insured Crown - Metro, etal

Date January 30, 1970

Policy Period: From 2/15/69 To 2/15/70

Bond No. or Policy No. CAL 36597

Canc. Basis: ☐ PRO RATA ☒ SHORT RATE ☐ FLAT ☐ PREM. FULLY EARNED

Canc. Factor:

Canc. Date: 1/1/70

BUDGET

Return Premium $

Return Commission due on Subject to Audit
Unpaid Budget Premium - NONE

PRODUCER

Insurance Underwriters, Inc.
211 Angell St.
Providence, R.I.

Comm.:

Service Office 524

C-1490C 2/69 10-18-67 PTD. IN U.S.A.

PROCESSING OFFICE COPY

**Plaintiff's Exhibit 2**

CIC 0472

CANCELLATION TICKET

INSURED'S NAME
Crown - Metal

EFFECTIVE CANCELLATION DATE
1-1-70

POLICY NUMBER
GAL 36597

FLAT AS OF

CANCELLATION METHOD
PRO RATA  X SHORT RATE  FLAT

INSTALLMENT

"SPECIAL INSTRUCTIONS"

SUBJECT TO AUDIT
POLICYHOLDERS SERVICE INSPECTION (IF CHECKED INDICATE INSURED'S NAME ABOVE)

SIGNATURE (APPROVAL) Joan Law (Mrs) 1-13-70

C-1939E 400M 5-68
PRINTED IN U.S.A.

PROCESSING COPY

GAL 365 91

| Office Number | N | Agency Number | | Old Policy No. | |
|---|---|---|---|---|---|
| | | | | BIDY | |

INSURANCE COMPANY OF NORTH AMERICA — MULTIPLE LIABILITY POLICY

DEDUCTIBLE

SUBJECT TO BUDGET

AUTO FLEET

Named Insured: Crown-Metro, Inc., etal (per Named Insured Endorsement)
12 Dudley Street
Providence, Rhode Island

CANCELLED DATE 1-1-70

WM. W. HARDY

Audit

COMBINED CR

Policy Period: From February 15, 1969 to February 15, 1970 12:01 A.M., standard time at the address of the Named Insured as stated herein.

Audit Period: Annual, unless otherwise

SUBJECT TO EXPERIENCE RATING — EXPERIENCE CREDIT

The insurance afforded is only with respect to such of the following Parts and Coverages therein as are indicated by ☒. The limit of the Company's liability against each such Coverage shall be as stated herein, subject to all of the terms of the policy having reference thereto.

FLEET CREDIT

| Coverage | Bodily Injury Liability each occurrence | Bodily Injury Liability aggregate | | Property Damage Liability each occurrence | Property Damage Liability aggregate |
|---|---|---|---|---|---|
| ☐ Owners', Landlords' and Tenants' Liability Insurance | | | | | |
| ☐ Structural Alterations, New Construction, Demolition | | | | | |
| ☐ Manufacturers' and Contractors' Liability Insurance | | | | | |
| ☐ Independent Contractors | | | | | |
| ☐ Completed Operations and Products Liability Insurance | | | | | |
| ☒ Contractual Liability Insurance | 100,000 | 300,000 | nil | 100,000 | 100,000 |
| ☒ Comprehensive General Liability Insurance | 100,000 | 300,000 | 300,000 | 100,000 | 100,000 |
| ☒ Comprehensive Automobile Liability Insurance | 100,000 | 300,000 | nil | 100,000 | nil |
| ☒ Elevator Collision Insurance | | | | 10,000 | nil |

| Coverage | Personal Liability each occurrence | Personal Medical Payments each person | Personal Medical Payments each accident |
|---|---|---|---|
| ☐ Comprehensive Personal Insurance | $ | $ | $ |
| ☐ Farmer's Comprehensive Personal Insurance | Physical Damage to Property each occurrence $ | Animal Collision—Farmer's Part Only: Market Value not exceeding $300 each animal | |

| Coverage | each person | each accident |
|---|---|---|
| ☒ Premises Medical Payments Insurance | $ 1000 | $ 25,000 |
| ☒ Automobile Medical Payments Insurance | $ 5000 | |
| ☐ Insurance Against Uninsured Motorist | $ | $ |

| Coverage | each person aggregate | general aggregate |
|---|---|---|
| ☒ Personal Injury Liability Insurance | $ 100,000 | $ 300,000 |

| Coverage | |
|---|---|
| ☒ Automobile Physical Damage Insurance (Fleet Automatic or Non-Fleet) | (See Additional Declarations attached for Coverages and Limits of Liability) |
| ☐ Automobile Physical Damage Insurance (Dealers) | (See Additional Declarations attached for Coverages and Limits of Liability) |
| ☐ Garage Insurance | (See Additional Declarations attached for Coverages and Limits of Liability) |

Endorsements attached to policy at inception: D-1565, D-1485, D-1463, LC-937, LC-985, LC-968, LC-1072, LC-1042, Named Ins.End., Worldwide Cov.End., Incidental Prof.Liab., Broad Form Prop.Damage

With respect to the Named Insured, no insurer has cancelled, refused to renew, given notice of cancellation or declined insurance similar to that afforded hereunder during the past three years, unless otherwise stated herein:

BG sr 5/2/69

If the Policy Period is more than one year and the premium is to be paid in installments, premium is payable on:

| TOTAL ADVANCE PREMIUM | $ 22,086.00 |
|---|---|
| Effective Date | $ |
| 1st Anniversary | $ |
| 2nd Anniversary | $ |

WM W. HARDY

Countersigned By ________ Authorized Agent

This Declarations and Coverage Part(s), with Policy Standard Provisions and Endorsements, if any, issued to form a part thereof, completes the above numbered policy.

LC-934 50M 6/10/66 Printed in U.S.A.

PROCESSING COPY

CIC 0474

The named insured shall read as follows:

Crown-Metro, Inc.
The Gravenette Company, U.S.A.
Nova-Stain Corporation
I.B.C. Chemical., Ltd.
Crown-Metro, Inc. - Southern
Centredale Enterprises, Inc.
Ranedare Corporation
Bryant Chemical Corporation
Metro-Atlantic (Canada) Limited
Metro-Atlantic, Inc. (New Jersey)
Metro-Atlantic, Inc. (South Carolina)
Metro-Atlantic, Inc. (Eastern Division)
Bon Color Corp.
Metro-Atlantic Research Corporation

INA — CONTRACTUAL LIABILITY INSURANCE COVERAGE PART (Designated Contracts Only) — PEG

ADDITIONAL DECLARATIONS

Policy No. GAL 36597

It is agreed that the Limits of Liability set forth in the Policy Declarations for the Contractual Liability Coverage Part shall apply as respects any coverage afforded hereunder unless other specific limits are set forth below.

| Coverage | Limits of Liability (this Coverage Part only) | |
|---|---|---|
| Y. Contractual Bodily Injury Liability | $ 100,000 | each person |
| | $ 300,000 | each occurrence |
| Z. Contractual Property Damage Liability | $ 100,000 | each occurrence |
| | $ 100,000 | aggregate |

SCHEDULE

| Code No. | Designation of Contracts | Premium Bases | Rates B.I. | Rates P.D. | Advance Premiums Bodily Injury | Advance Premiums Property Damage |
|---|---|---|---|---|---|---|
| 0521 | Contractual Liability | (a) Number (b) Cost | (a) Per Contract (b) Per $100 of Cost | | | |
| | All written contracts between Named Insured and others | | Flat Charge | | 58.00 | 10.00 |
| | | | | TOTALS | $ 58.00 | $ 10.00 |

Minimum Premium(s)

TOTAL ADVANCE PREMIUM $ 68.00

When used as a premium basis, the word "cost" means the total cost to any indemnitee with respect to any contract which is insured of all work let or sub-let in connection with each specific project, including the cost of all labor, materials and equipment furnished, used or delivered for use in the execution of such work, whether furnished by the owner, contractor or the sub-contractor, including all fees, allowances, bonuses or commissions made, paid or due.

LC-886 50M 6/10/66 Printed in U.S.A.

PROCESSING COPY

CIC 0476

SPECIMEN FORM
From SSU

6AL - 69-71

INA

**INSURANCE COMPANY OF NORTH AMERICA,** PHILADELPHIA, PENNSYLVANIA

# GENERAL LIABILITY—AUTOMOBILE POLICY

**Standard Provisions**

A Stock Insurance Company, herein called the Company

in consideration of the payment of the premium, in reliance upon the statements in the declarations made a part hereof and subject to all of the terms of this policy, agrees with the Named Insured as follows:

## COVERAGE

Coverage is afforded under this policy in accordance with the specific Coverage Parts identified in the Declarations as being a part of this policy.

## SUPPLEMENTARY PAYMENTS

The Company will pay, in addition to the applicable limit of liability:

(a) all expenses incurred by the Company, all costs taxed against the Insured in any suit defended by the Company and all interest on the entire amount of any judgment therein which accrues after entry of the judgment and before the Company has paid or tendered or deposited in court that part of the judgment which does not exceed the limit of the Company's liability thereon;

(b) premiums on appeal bonds required in any such suit, premiums on bonds to release attachments in any such suit for an amount not in excess of the applicable limit of liability of this policy, and the cost of bail bonds required of the Insured because of accident or traffic law violation arising out of the use of any vehicle to which this policy applies, not to exceed $250 per bail bond, but the Company shall have no obligation to apply for or furnish any such bonds;

(c) expenses incurred by the Insured for first aid to others at the time of an accident, for bodily injury to which this policy applies;

(d) reasonable expenses incurred by the Insured at the Company's request, including actual loss of wages or salary (but not loss of other income) not to exceed $25 per day because of his attendance at hearings or trials at such request.

## DEFINITIONS

When used in this policy (including endorsements forming a part hereof):

"automobile" means a land motor vehicle, trailer or semitrailer designed for travel on public roads (including any machinery or apparatus attached thereto), but does not include mobile equipment;

"bodily injury" means bodily injury, sickness or disease sustained by any person;

"collapse hazard" includes "structural property damage" as defined herein and property damage to any other property at any time resulting therefrom. "Structural property damage" means the collapse of or structural injury to any building or structure due to (1) grading of land, excavating, borrowing, filling, back-filling, tunnelling, pile driving, cofferdam work or caisson work or (2) moving, shoring, underpinning, raising or demolition of any building or structure or removal or rebuilding of any structural support thereof. The collapse hazard does not include property damage (1) arising out of operations performed for the Named Insured by independent contractors, or (2) included within the completed operations hazard or the underground property damage hazard, or (3) for which liability is assumed by the Insured under an incidental contract;

"completed operations hazard" includes bodily injury and property damage arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the Named Insured. "Operations" include materials, parts or equipment furnished in connection therewith. Operations shall be deemed completed at the earliest of the following times:

(1) when all operations to be performed by or on behalf of the Named Insured under the contract have been completed,

(2) when all operations to be performed by or on behalf of the Named Insured at the site of the operations have been completed, or

(3) when the portion of the work out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

Operations which may require further service or maintenance work, or correction, repair or replacement because of any defect or deficiency, but which are otherwise complete, shall be deemed completed.

The completed operations hazard does not include bodily injury or property damage arising out of

(a) operations in connection with the transportation of property, unless the bodily injury or property damage arises out of a condition in or on a vehicle created by the loading or unloading thereof,

(b) the existence of tools, uninstalled equipment or abandoned or unused materials, or

(c) operations for which the classification stated in the policy or in the Company's manual specifies "including completed operations";

"damages" includes damages for death and for care and loss of services resulting from bodily injury and damages for loss of use of property resulting from property damage;

"elevator" means any hoisting or lowering device to connect floors or landings, whether or not in service, and all appliances thereof including any car, platform, shaft, hoistway, stairway, runway, power equipment and machinery; but does not include an automobile servicing hoist, or a hoist without a platform outside a building if without mechanical power or if not attached to building walls, or a hod or material hoist used in alteration, construction or demolition operations, or an inclined conveyor used exclusively for carrying property or a dumbwaiter used exclusively for carrying property and having a compartment height not exceeding four feet;

SPECIMEN FORM
From SSU

## DEFINITIONS CONTINUED

"explosion hazard" includes property damage arising out of blasting or explosion. The explosion hazard does not include property damage (1) arising out of the explosion of air or steam vessels, piping under pressure, prime movers, machinery or power transmitting equipment, or (2) arising out of operations performed for the Named Insured by independent contractors, or (3) included within the completed operations hazard or the underground property damage hazard, or (4) for which liability is assumed by the Insured under an incidental contract;

"incidental contract" means any written (1) lease of premises, (2) easement agreement, except in connection with construction or demolition operations on or adjacent to a railroad, (3) undertaking to indemnify a municipality required by municipal ordinance, except in connection with work for the municipality, (4) side-track agreement, or (5) elevator maintenance agreement;

"Insured" means any person or organization qualifying as an Insured in the "Persons Insured" provision of the applicable insurance coverage. The insurance afforded applies separately to each Insured against whom claim is made or suit is brought, except with respect to the limits of the Company's liability;

"mobile equipment" means a land vehicle (including any machinery or apparatus attached thereto), whether or not self-propelled, (1) not subject to motor vehicle registration, or (2) maintained for use exclusively on premises owned by or rented to the Named Insured, including the ways immediately adjoining, or (3) designed for use principally off public roads, or (4) designed or maintained for the sole purpose of affording mobility to equipment of the following types forming an integral part of or permanently attached to such vehicle: power cranes, shovels, loaders, diggers and drills; concrete mixers (other than the mix-in-transit type); graders, scrapers, rollers and other road construction or repair equipment; air-compressors, pumps and generators, including spraying, welding and building cleaning equipment; and geophysical exploration and well servicing equipment;

"Named Insured" means the person or organization named in the declarations of this policy;

"Named Insured's products" means goods or products manufactured, sold, handled or distributed by the Named Insured or by others trading under his name, including any container thereof (other than a vehicle), but "Named Insured's products" shall not include a vending machine or any property other than such container, rented to or located for use of others but not sold;

"occurrence" means an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the Insured;

"policy territory" means:

(1) the United States of America, its territories or possessions, or Canada, or

(2) international waters or air space, provided the bodily injury or property damage does not occur in the course of travel or transportation to or from any other country, state or nation, or

(3) anywhere in the world with respect to damages because of bodily injury or property damage arising out of a product which was sold for use or consumption within the territory described in paragraph (1) above, provided the original suit for such damages is brought within such territory;

"products hazard" includes bodily injury and property damage arising out of the Named Insured's products or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs away from premises owned by or rented to the Named Insured and after physical possession of such products has been relinquished to others;

"property damage" means injury to or destruction of tangible property;

"underground property damage hazard" includes underground property damage as defined herein and property damage to any other property at any time resulting therefrom. "Underground property damage" means property damage to wires, conduits, pipes, mains, sewers, tanks, tunnels, any similar property, and any apparatus in connection therewith, beneath the surface of the ground or water, caused by and occurring during the use of mechanical equipment for the purpose of grading land, paving, excavating, drilling, borrowing, filling, back-filling or pile driving. The underground property damage hazard does not include property damage (1) arising out of operations performed for the Named Insured by independent contractors, or (2) included within the completed operations hazard, or (3) for which liability is assumed by the Insured under an incidental contract.

## NUCLEAR ENERGY LIABILITY EXCLUSION
(BROAD FORM)

**This exclusion modifies the provisions of this policy relating to ALL LIABILITY AND MEDICAL PAYMENTS INSURANCE OTHER THAN COMPREHENSIVE PERSONAL AND FARMER'S COMPREHENSIVE PERSONAL INSURANCE.**

This policy does not apply:

a. Under any Liability Coverage, to bodily injury or property damage:

(1) with respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(2) resulting from the hazardous properties of nuclear material and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization;

b. Under any Medical Payments Coverage, or under any Supplementary Payments provision relating to first aid, to expenses incurred with respect to bodily injury resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization;

c. Under any Liability Coverage, to bodily injury or property damage resulting from the hazardous properties of nuclear material, if:

(1) the nuclear material (a) is at any nuclear facility owned by, or operated by or on behalf of, an insured, or (b) has been discharged or dispersed therefrom;

(2) the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

(3) the bodily injury or property damage arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions, or Canada, this exclusion (3) applies only to property damage to such nuclear facility and any property thereat;

d. As used in this Exclusion:

(1) "Hazardous properties" include radioactive, toxic, or explosive properties;

(2) "Nuclear material" means source material, special nuclear material or byproduct material;

(3) "Source material", "special nuclear material", and "byproduct material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

(4) "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

(5) "Waste" means any waste material (a) containing byproduct material and (b) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (6), (a) or (b) thereof;

(6) "Nuclear facility" means: (a) any nuclear reactor; (b) any equipment or device designed or used for (i) separating the isotopes of uranium or plutonium, (ii) processing or utilizing spent fuel, or (iii) handling, processing, or packaging waste; (c) any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235; (d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste; and (e) includes the site on which any of the foregoing is located, all operations conducted on such site, and all premises used for such operations;

(7) "Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

(8) "Property damage" includes all forms of radioactive contamination of property.

SPECIMEN FORM
From SSU

## CONDITIONS

**1. Premium**

All premiums for this policy shall be computed in accordance with the Company's rules, rates, rating plans, premiums and minimum premiums applicable to the insurance afforded herein.

Premium designated in this policy as "advance premium" is a deposit premium only which shall be credited to the amount of the earned premium due at the end of the policy period. At the close of each period (or part thereof terminating with the end of the policy period) designated in the declarations as the audit period the earned premium shall be computed for such period and, upon notice thereof to the Named Insured, shall become due and payable. If the total earned premium for the policy period is less than the premium previously paid, the Company shall return to the Named Insured the unearned portion paid by the Named Insured.

The Named Insured shall maintain records of such information as is necessary for premium computation, and shall send copies of such records to the Company at the end of the policy period and at such times during the policy period as the Company may direct.

**2. Inspection and Audit**

The Company shall be permitted but not obligated to inspect the Named Insured's property and operations at any time. Neither the Company's right to make inspections nor the making thereof nor any report thereon shall constitute an undertaking, on behalf of or for the benefit of the Named Insured or others, to determine or warrant that such property or operations are safe.

The Company may examine and audit the Named Insured's books and records at any time during the policy period and extensions thereof and within three years after the final termination of this policy, as far as they relate to the subject matter of this insurance.

**3. Financial Responsibility Laws**

When this policy is certified as proof of financial responsibility for the future under the provisions of any motor vehicle financial responsibility law, such insurance as is afforded by this policy for bodily injury liability or for property damage liability shall comply with the provisions of such law to the extent of the coverage and limits of liability required by such law. The Insured agrees to reimburse the Company for any payment made by the Company which it would not have been obligated to make under the terms of this policy except for the agreement contained in this paragraph.

**4. Insured's Duties in the Event of Occurrence, Claim or Suit**

(a) In the event of an occurrence, written notice containing particulars sufficient to identify the Insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the Insured to the Company or any of its authorized agents as soon as practicable. The Named Insured shall promptly take at his expense all reasonable steps to prevent other bodily injury or property damage from arising out of the same or similar conditions, but such expenses shall not be recoverable under this policy.

(b) If claim is made or suit is brought against the Insured, the Insured shall immediately forward to the Company every demand, notice, summons or other process received by him or his representative.

(c) The Insured shall cooperate with the Company and, upon the Company's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the Insured because of bodily injury or property damage with respect to which insurance is afforded under this policy; and the Insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The Insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of accident.

SPECIMEN FORM
From SSU

CONDITIONS CONTINUED

**5. Action Against Company**

No action shall lie against the Company unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the insured's obligation to pay shall have been finally determined either by judgment against the Insured after actual trial or by written agreement of the Insured, the claimant and the Company.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join the Company as a party to any action against the Insured to determine the Insured's liability, nor shall the Company be impleaded by the Insured or his legal representative. Bankruptcy or insolvency of the Insured or of the Insured's estate shall not relieve the Company of any of its obligations hereunder.

**6. Other Insurance**

The insurance afforded by this policy is primary insurance, except when stated to apply in excess of or contingent upon the absence of other insurance. When this insurance is primary and the Insured has other insurance which is stated to be applicable to the loss on an excess or contingent basis, the amount of the Company's liability under this policy shall not be reduced by the existence of such other insurance.

When both this insurance and other insurance apply to the loss on the same basis, whether primary, excess or contingent, the Company shall not be liable under this policy for a greater proportion of the loss than that stated in the applicable contribution provision below:

(a) Contribution by Equal Shares. If all of such other valid and collectible insurance provides for contribution by equal shares, the Company shall not be liable for a greater proportion of such loss than would be payable if each insurer contributes an equal share until the share of each insurer equals the lowest applicable limit of liability under any one policy or the full amount of the loss is paid, and with respect to any amount of loss not so paid the remaining insurers then continue to contribute equal shares of the remaining amount of the loss until each such insurer has paid its limit in full or the full amount of the loss is paid.

(b) Contribution by Limits. If any of such other insurance does not provide for contribution by equal shares, the Company shall not be liable for a greater proportion of such loss than the applicable limit of liability under this policy for such loss bears to the total applicable limit of liability of all valid and collectible insurance against such loss.

**7. Subrogation**

In the event of any payment under this policy, the Company shall be subrogated to all the Insured's rights of recovery therefor against any person or organization and the Insured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The Insured shall do nothing after loss to prejudice such rights.

**8. Changes**

Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this policy or estop the Company from asserting any right under the terms of this policy; nor shall the terms of this policy be waived or changed, except by endorsement issued to form a part of this policy.

**9. Assignment**

Assignment of interest under this policy shall not bind the Company until its consent is endorsed hereon; if, however, the Named Insured shall die, such insurance as is afforded by this policy shall apply (1) to the Named Insured's legal representative, as the Named Insured, but only while acting within the scope of his duties as such, and (2) with respect to the property of the Named Insured, to the person having proper temporary custody thereof, as Insured, but only until the appointment and qualification of the legal representative.

**10. Three Year Policy**

If this policy is issued for a period of three years, the limits of the Company's liability shall apply separately to each consecutive annual period thereof.

**11. Cancellation**

This policy may be cancelled by the Named Insured by surrender thereof to the Company or any of its authorized agents or by mailing to the Company written notice stating when thereafter the cancellation shall be effective. This policy may be cancelled by the Company by mailing to the Named Insured at the address shown in this policy, written notice stating when not less than ten days thereafter such cancellation shall be effective. The mailing of notice as aforesaid shall be sufficient proof of notice. The time of surrender or the effective date and hour of cancellation stated in the notice shall become the end of the policy period. Delivery of such written notice either by the Named Insured or by the Company shall be equivalent to mailing.

If the Named Insured cancels, earned premium shall be computed in accordance with the customary short rate table and procedure. If the Company cancels, earned premium shall be computed pro rata. Premium adjustment may be made either at the time cancellation is effected or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

**12. Declarations**

By acceptance of this policy, the Named Insured agrees that the statements in the declarations are his agreements and representations, that this policy is issued in reliance upon the truth of such representations and that this policy embodies all agreements existing between himself and the Company or any of its agents relating to this insurance.

IN WITNESS WHEREOF, the INSURANCE COMPANY OF NORTH AMERICA has caused this policy to be signed by its President and Secretary-Treasurer at Philadelphia, Pennsylvania, and countersigned on the Declarations page by a duly Authorized Agent of the Company.

Geoffrey Stengel Secretary-Treasurer
GEOFFREY STENGEL

Charles K. Cox
CHARLES K. COX President

CIC 0480

# CONTRACTUAL LIABILITY INSURANCE COVERAGE PART

## I. COVERAGE Y—CONTRACTUAL BODILY INJURY LIABILITY

## COVERAGE Z—CONTRACTUAL PROPERTY DAMAGE LIABILITY

The Company will pay on behalf of the Insured all sums which the Insured, by reason of contractual liability assumed by him under a contract designated in the schedule for this insurance, shall become legally obligated to pay as damages because of

Y. bodily injury or

Z. property damage

to which this insurance applies, caused by an occurrence, and the Company shall have the right and duty to defend any suit against the Insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the Company's liability has been exhausted by payment of judgments or settlements.

**Exclusions**

This insurance does not apply:

(a) if the Insured or his indemnitee is an architect, engineer or surveyor, to bodily injury or property damage arising out of professional services performed by such Insured or indemnitee, including

(1) the preparation or approval of maps, plans, opinions, reports, surveys, designs or specifications and

(2) supervisory, inspection or engineering services;

(b) to bodily injury or property damage due to war, whether or not declared, civil war, insurrection, rebellion or revolution or to any act or condition incident to any of the foregoing;

(c) to bodily injury or property damage for which the indemnitee may be held liable as a person or organization engaged in the business of manufacturing, distributing, selling or serving alcoholic beverages or as an owner or lessor of premises used for such purposes, by reason of the selling, serving or giving of any alcoholic beverage (1) in violation of any statute, ordinance or regulation, (2) to a minor, (3) to a person under the influence of alcohol, or (4) which causes or contributes to the intoxication of any person;

(d) to any obligation for which the Insured or any carrier as his insurer may be held liable under any workmen's compensation, unemployment compensation or disability benefits law, or under any similar law;

(e) to any obligation for which the Insured may be held liable in an action on a contract by a third party beneficiary for bodily injury or property damage arising out of a project for a public authority; but this exclusion does not apply to an action by the public authority or any other person or organization engaged in the project;

(f) to property damage to

(1) property owned or occupied by or rented to the Insured,

(2) property used by the Insured, or

(3) property in the care, custody or control of the Insured or as to which the Insured is for any purpose exercising physical control;

(g) to property damage to premises alienated by the Named Insured arising out of such premises or any part thereof;

(h) to bodily injury or property damage resulting from the failure of the Named Insured's products or work completed by or for the Named Insured to perform the function or serve the purpose intended by the Named Insured, if such failure is due to a mistake or deficiency in any design, formula, plan, specifications, advertising material or printed instructions prepared or developed by any Insured; but this exclusion does not apply to bodily injury or property damage resulting from the active malfunctioning of such products or work;

(i) to property damage to the Named Insured's products arising out of such products or any part of such products;

(j) to property damage to work performed by or on behalf of the Named Insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith;

(k) to damages claimed for the withdrawal, inspection, repair, replacement, or loss of use of the Named Insured's products or work completed by or for the Named Insured or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein;

(l) to property damage included within (1) the explosion hazard, (2) the collapse hazard, or (3) the underground property damage hazard.

## II. PERSONS INSURED

Each of the following is an Insured under this insurance to the extent set forth below:

(a) if the Named Insured is designated in the declarations as an individual, the person so designated;

(b) if the Named Insured is designated in the declarations as a partnership or joint venture, the partnership or joint venture so designated and any partner or member thereof but only with respect to his liability as such;

(c) if the Named Insured is designated in the declarations as other than an individual, partnership or joint venture, the organization so designated and any executive officer, director or stockholder thereof while acting within the scope of his duties as such.

## III. LIMITS OF LIABILITY

Regardless of the number of (1) Insureds under this policy, (2) persons or organizations who sustain bodily injury or property damage, or (3) claims made or suits brought on account of bodily injury or property damage, the Company's liability is limited as follows:

Coverage Y—The limit of bodily injury liability stated in the declarations as applicable to "each person" is the limit of the Company's liability for all damages because of bodily injury sustained by one person as the result of any one occurrence; but subject to the above provision respecting "each person", the total liability of the Company for all damages because of bodily injury sustained by two or more persons as the result of any one occurrence shall not exceed the limit of bodily injury liability stated in the declarations as applicable to "each occurrence".

Coverage Z—The total liability of the Company for all damages because of all property damage sustained by one or more persons or organizations as the result of any one occurrence shall not exceed the limit of property damage liability stated in the declarations as applicable to "each occurrence".

Subject to the above provision respecting "each occurrence", the total liability of the Company for all damages because of all property damage to which this coverage applies shall not exceed the limit of property damage liability stated in the declarations as "aggregate". Such aggregate limit of liability applies separately with respect to each project away from premises owned by or rented to the Named Insured.

Coverages Y and Z—For the purpose of determining the limit of the Company's liability, all bodily injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

## IV. ADDITIONAL DEFINITIONS

When used in reference to this insurance (including endorsements forming a part of the policy):

"contractual liability" means liability expressly assumed under a written contract or agreement; provided, however, that contractual liability shall not be construed as including liability under a warranty of the fitness or quality of the Named Insured's products or a warranty that work performed by or on behalf of the Named Insured will be done in a workmanlike manner;

"suit" includes an arbitration proceeding to which the Insured is required to submit or to which the Insured has submitted with the Company's consent.

## V. POLICY PERIOD; TERRITORY

This insurance applies only to bodily injury or property damage which occurs during the policy period within the policy territory.

## VI. ADDITIONAL CONDITION

**Arbitration**

The Company shall be entitled to exercise all of the Insured's rights in the choice of arbitrators and in the conduct of any arbitration proceeding.

INA

**COMPREHENSIVE GENERAL LIABILITY INSURANCE**

**COVERAGE PART**

PEG

**ADDITIONAL DECLARATIONS**

Policy No. CAL 36597

## SCHEDULE

Location of all premises owned by, rented to or controlled by the Named Insured

Interest of Named Insured in such premises ☐ Owner ☐ General Lessee ☐ Tenant

Part occupied by Named Insured

The following discloses all hazards insured hereunder known to exist at the effective date of this policy, unless otherwise stated herein:

| Code No. / Description of Hazards | Premium Bases | Rates B.I. | Rates P.D. | Advance Premiums Bodily Injury | Advance Premiums Property Damage |
|---|---|---|---|---|---|
| **Premises—Operations** | | | | | |
| Per Extension schedule attached | | | B.I. | 1054.00 | 1920.00 |
| Personal Injury Liability Ins. End. #LC893 | 9840 S-9 | | 5% | 212.00 | 384.00 |
| Additional Insured, Employees End. #LC968 | 0301 | | | 83.00 | 115.00 |
| Broad Form Property Damage Endorsement | 9680 5 L 9 | | | | 53.00 |
| | (a) Area (Sq. Ft.) (b) Frontage (c) Admissions (d) Remuneration (e) Receipts (f) Units | (a) Per 100 Sq. Ft. of Area (b) Per Linear Foot (c) Per 100 Admissions (d) Per $100 of Remuneration (e) Per $100 of Receipts (f) Per Unit | | | |
| **Elevators (Number at Premises)** (6A) | Number Insured | Per Elevator | | | |
| A. 023 Factory, not one Story | | 52.55 | 3.55 | 210.00 | 14.00 |
| Collision 0023 | | | 2.45 | | 10.00 |
| **Independent Contractors** | Cost | Per $100 of Cost | | | |
| 0518 Operations N.O.C. | If any | .021 | .011 | 12.00 | 8.00 |
| **Completed Operations** | (a) Receipts | (a) Per $1000 of Receipts | | | |
| Included | | | | | |
| **Products** | (b) Sales | (b) Per $1000 of Sales | | | |
| 1033 Chemicals - N.O.C. (Manufacturer) | 12,000,000 | .289 | .638 | 3,468.00 | 7,656.00 |
| P.D. Products deductible | | | | | |
| **Minimum Premium(s)** | | TOTALS | | $ 5,039 | $ 10,160.00 |
| | | TOTAL ADVANCE PREMIUM | | | $ 15,199.00 |

When used as a premium basis:

(1) "admissions" means the total number of persons, other than employees of the Named Insured, admitted to the event insured or to events conducted on the premises whether on paid admission tickets, complimentary tickets or passes;

(2) "remuneration" means the entire remuneration earned during the policy period by proprietors and by all employees of the Named Insured other than chauffeurs (except operators of mobile equipment) and aircraft pilots and co-pilots, subject to any overtime earnings or limitation of remuneration rule applicable in accordance with the manuals in use by the Company;

(3) "receipts" means the gross amount of money charged by the Named Insured for such operations by the Named Insured or by others during the policy period as are rated on a receipts basis other than receipts from telecasting, broadcasting or motion pictures, and includes taxes, other than taxes which the Named Insured collects as a separate item and remits directly to a governmental division;

(4) "cost" means the total cost to the Named Insured with respect to operations performed for the Named Insured during the policy period by independent contractors of all work let or sub-let in connection with each specific project, including the cost of all labor, materials and equipment furnished, used or delivered for use in the execution of such work, whether furnished by the owner, contractor or sub-contractor, including all fees, allowances, bonuses or commissions made, paid or due;

(5) "sales" means the gross amount of money charged by the Named Insured or by others trading under his name for all goods and products sold or distributed during the policy period and charged during the policy period for installation, servicing or repair, and includes taxes, other than taxes which the Named Insured and such others collect as a separate item and remit directly to a governmental division.

I. COVERAGE A—BODILY INJURY LIABILITY
COVERAGE B—PROPERTY DAMAGE LIABILITY

The Company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of

A. bodily injury or
B. property damage

to which this insurance applies, caused by an occurrence and the Company shall have the right and duty to defend any suit against the Insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the Company's liability has been exhausted by payment of judgments or settlements.

Exclusions

This insurance does not apply:

(a) to liability assumed by the Insured under any contract or agreement except an incidental contract; but this exclusion does not apply to a warranty of fitness or quality of the Named Insured's products or a warranty that work performed by or on behalf of the Named Insured will be done in a workmanlike manner;

(b) to bodily injury or property damage arising out of the ownership, maintenance, operation, use, loading or unloading of
(1) any automobile or aircraft owned or operated by or rented or loaned to the Named Insured, or
(2) any other automobile or aircraft operated by any person in the course of his employment by the Named Insured;
but this exclusion does not apply to the parking of an automobile on premises owned by, rented to or controlled by the Named Insured or the ways immediately adjoining, if such automobile is not owned by or rented or loaned to the Named Insured;

(c) to bodily injury or property damage arising out of and in the course of the transportation of mobile equipment by an automobile owned or operated by or rented or loaned to the Named Insured;

(d) to bodily injury or property damage arising out of the ownership, maintenance, operation, use, loading or unloading of any watercraft, if the bodily injury or property damage occurs away from premises owned by, rented to or controlled by the Named Insured; but this exclusion does not apply to bodily injury or property damage included within the products hazard or the completed operations hazard or resulting from operations performed for the Named Insured by independent contractors or to liability assumed by the Insured under an incidental contract;

(e) to bodily injury or property damage due to war, whether or not declared, civil war, insurrection, rebellion or revolution or to any act or condition incident to any of the foregoing, with respect to
(1) liability assumed by the Insured under an incidental contract, or
(2) expenses for first aid under the Supplementary Payments provision;

(f) to bodily injury or property damage for which the Insured or his indemnitee may be held liable, as a person or organization engaged in the business of manufacturing, distributing, selling or serving alcoholic beverages or as an owner or lessor of premises used for such purposes, by reason of the selling, serving or giving of any alcoholic beverage
(1) in violation of any statute, ordinance or regulation,
(2) to a minor,
(3) to a person under the influence of alcohol, or
(4) which causes or contributes to the intoxication of any person;

(g) to any obligation for which the Insured or any carrier as his insurer may be held liable under any workmen's compensation, unemployment compensation or disability benefits law, or under any similar law;

(h) to bodily injury to any employee of the Insured arising out of and in the course of his employment by the Insured; but this exclusion does not apply to liability assumed by the Insured under an incidental contract;

(i) to property damage to
(1) property owned or occupied by or rented to the Insured,
(2) property used by the Insured, or
(3) property in the care, custody or control of the Insured or as to which the Insured is for any purpose exercising physical control;
but parts (2) and (3) of this exclusion do not apply with respect to liability under a written sidetrack agreement and part (3) of this exclusion does not apply with respect to property damage (other than to elevators) arising out of the use of an elevator at premises owned by, rented to or controlled by the Named Insured;

(j) to property damage to premises alienated by the Named Insured arising out of such premises or any part thereof;

(k) to bodily injury or property damage resulting from the failure of the Named Insured's products or work completed by or for the Named Insured to perform the function or serve the purpose intended by the Named Insured, if such failure is due to a mistake or deficiency in any design, formula, plan, specifications, advertising material or printed instructions prepared or developed by any Insured; but this exclusion does not apply to bodily injury or property damage resulting from the active malfunctioning of such products or work;

(l) to property damage to the Named Insured's products arising out of such products or any part of such products;

(m) to property damage to work performed by or on behalf of the Named Insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith;

(n) to damages claimed for the withdrawal, inspection, repair, replacement, or loss of use of the Named Insured's products or work completed by or for the Named Insured or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein;

(o) to property damage included within:
(1) the explosion hazard in connection with operations identified in this policy by a classification code number which includes the symbol "x",
(2) the collapse hazard in connection with operations identified in this policy by a classification code number which includes the symbol "c",
(3) the underground property damage hazard in connection with operations identified in this policy by a classification code number which includes the symbol "u".

II. PERSONS INSURED

Each of the following is an Insured under this insurance to the extent set forth below:

(a) if the Named Insured is designated in the declarations as an individual, the person so designated but only with respect to the conduct of a business of which he is the sole proprietor;

(b) if the Named Insured is designated in the declarations as a partnership or joint venture, the partnership or joint venture so designated and any partner or member thereof but only with respect to his liability as such;

(c) if the Named Insured is designated in the declarations as other than an individual, partnership or joint venture, the organization so designated and any executive officer, director or stockholder thereof while acting within the scope of his duties as such;

(d) any person (other than an employee of the Named Insured) or organization while acting as real estate manager for the Named Insured; and

(e) with respect to the operation, for the purpose of locomotion upon a public highway, of mobile equipment registered under any motor vehicle registration law,
(i) an employee of the Named Insured while operating any such equipment in the course of his employment, and
(ii) any other person while operating with the permission of the Named Insured any such equipment registered in the name of the Named Insured and any person or organization legally responsible for such operation, but only if there is no other valid and collectible insurance available, either on a primary or excess basis, to such person or organization;

provided that no person or organization shall be an Insured under this paragraph (e) with respect to:
(1) bodily injury to any fellow employee of such person injured in the course of his employment, or
(2) property damage to property owned by, rented to, in charge of or occupied by the Named Insured or the employer of any person described in subparagraph (ii).

This insurance does not apply to bodily injury or property damage arising out of the conduct of any partnership or joint venture of which the Insured is a partner or member and which is not designated in this policy as a Named Insured.

III. LIMITS OF LIABILITY

Regardless of the number of (1) Insureds under this policy, (2) persons or organizations who sustain bodily injury or property damage, or (3) claims made or suits brought on account of bodily injury or property damage, the Company's liability is limited as follows:

Coverage A—The limit of bodily injury liability stated in the declarations as applicable to "each person" is the limit of the Company's liability for all damages because of bodily injury sustained by one person as the result of any one occurrence; but subject to the above provision respecting "each person", the total liability of the Company for all damages because of bodily injury sustained by two or more persons as the result of any one occurrence shall not exceed the limit of bodily injury liability stated in the declarations as applicable to "each occurrence".

Subject to the above provisions respecting "each person" and "each occurrence", the total liability of the Company for all damages because of (1) all bodily injury included within the completed operations hazard and (2) all bodily injury included within the products hazard shall not exceed the limit of bodily injury liability stated in the declarations as "aggregate".

Coverage B—The total liability of the Company for all damages because of all property damage sustained by one or more persons or organizations as the result of any one occurrence shall not exceed the limit of property damage liability stated in the declarations as applicable to "each occurrence".

Subject to the above provision respecting "each occurrence", the total liability of the Company for all damages because of all property damage to which this coverage applies and described in any of the numbered subparagraphs below shall not exceed the limit of property damage liability stated in the declarations as "aggregate":

(1) all property damage arising out of premises or operations rated on a remuneration basis or contractor's equipment rated on a receipts basis, including property damage for which liability is assumed under any incidental contract relating to such premises or operations, but excluding property damage included in subparagraph (2) below;

(2) all property damage arising out of and occurring in the course of operations performed for the Named Insured by independent contractors and general supervision thereof by the Named Insured, including any such property damage for which liability is assumed under any incidental contract relating to such operations, but this subparagraph (2) does not include property damage arising out of maintenance or repairs at premises owned by or rented to the Named Insured or structural alterations at such premises which do not involve changing the size of or moving buildings or other structures;

(3) all property damage included within the products hazard and all property damage included within the completed operations hazard.

Such aggregate limit shall apply separately to the property damage described in subparagraphs (1), (2) and (3) above, and under subparagraphs (1) and (2), separately with respect to each project away from premises owned by or rented to the Named Insured.

Coverages A and B—For the purpose of determining the limit of the Company's liability, all bodily injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

IV. POLICY PERIOD; TERRITORY

This insurance applies only to bodily injury or property damage which occurs during the policy period within the policy territory.

INA

**COMPREHENSIVE AUTOMOBILE LIABILITY INSURANCE**

**COVERAGE PART**

PEG

**ADDITIONAL DECLARATIONS**

Policy No. GAL 36597

**SCHEDULE OF AUTOMOBILE LIABILITY HAZARDS**

**DESCRIPTION OF HAZARDS** — **ADVANCE PREMIUM**

**1. Owned Automobiles—Premium Basis—Per Automobile**

| Town or City and State in Which the Automobile Will Be Principally Garaged | Year of Model | Trade Name | Body Type and Model; Truck Size; Tank Gallonage Capacity; or Bus Seating Capacity | Identification Number Serial Number Motor Number | Purposes of Use | Bodily Injury | Property Damage |
|---|---|---|---|---|---|---|---|
| | | | PER SCHEDULE ATTACHED | | | 4574.00 | 1900.00 |

**2. Hired Automobiles—Premium Basis—Cost of Hire**

| Types Hired | Locations Where Automobiles Will Be Principally Used | Purposes of Use | Estimated Cost of Hire | Rates Per $100 Cost of Hire BI | PD |
|---|---|---|---|---|---|
| | | Flat Charge | | | |

**3. Non-Owned Automobiles—Premium Basis—Class 1 Persons and Class 2 Employees**

| Class 1 Persons—Name of Each | Location of Headquarters of Persons Named Herein | | |
|---|---|---|---|
| | Flat Charge | 6.00 Min. | 1.00 Min. |

| Class 2 Employees—Estimated Average Number | Location of Headquarters of Class 2 Employees | Rates Per Employee BI | PD |
|---|---|---|---|
| | Flat Charge | | |

Minimum Premiums for 2 and 3 above $6.00 $1.00

TOTALS $4580.00 $1901.00

TOTAL ADVANCE PREMIUM $6481.00

The foregoing contains a complete list of (1) all automobiles and trailers owned by the Named Insured at the effective date of this policy and the purposes of use thereof, and (2) all persons within the definition of Class 1 persons at the effective date of this policy unless otherwise stated herein.

**When used as a premium basis:**

(1) "cost of hire" means the amount incurred for (a) the hire of automobiles, including the entire remuneration of each employee of the Named Insured engaged in the operation of such automobiles subject to an average weekly maximum remuneration of $100, and for (b) pick-up, transportation or delivery service of property or passengers, other than such services performed by motor carriers which are subject to the security requirements of any motor carrier law or ordinance. The rates for each $100 of "cost of hire" shall be 5% of the applicable hired automobile rates, provided the owner of such hired automobile has purchased automobile Bodily Injury Liability and Property Damage Liability insurance covering the interest of the Named Insured on a direct primary basis as respects such automobile and submits evidence of such insurance to the Named Insured;

(2) "Class 1 persons" means the following persons, provided their usual duties in the business of the Named Insured include the use of non-owned automobiles: (a) all employees, including officers, of the Named Insured compensated for the use of such automobiles by salary, commission, terms of employment, or specific operating allowance of any sort; (b) all direct agents and representatives of the Named Insured;

(3) "Class 2 employees" means all employees, including officers, of the Named Insured, not included in Class 1 persons.

COMPREHENSIVE AUTOMOBILE LIABILITY INSURANCE

I. COVERAGE C—BODILY INJURY LIABILITY

COVERAGE D—PROPERTY DAMAGE LIABILITY

The Company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of

C. bodily injury or

D. property damage

to which this insurance applies, caused by an occurrence and arising out of the ownership, maintenance or use, including loading and unloading, of any automobile, and the Company shall have the right and duty to defend any suit against the Insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the Company's liability has been exhausted by payment of judgments or settlements.

Exclusions

This insurance does not apply:

(a) to liability assumed by the Insured under any contract or agreement;

(b) to any obligation for which the Insured or any carrier as his insurer may be held liable under any workmen's compensation, unemployment compensation or disability benefits law, or under any similar law;

(c) to bodily injury to any employee of the Insured arising out of and in the course of his employment by the Insured, but this exclusion does not apply to any such injury arising out of and in the course of domestic employment by the Insured unless benefits therefor are in whole or in part either payable or required to be provided under any workmen's compensation law;

(d) to property damage to

(1) property owned or being transported by the Insured, or

(2) property rented to or in the care, custody or control of the Insured, or as to which the Insured is for any purpose exercising physical control, other than property damage to a residence or private garage by a private passenger automobile covered by this insurance;

(e) to bodily injury due to war, whether or not declared, civil war, insurrection, rebellion or revolution or to any act or condition incident to any of the foregoing, with respect to expenses for first-aid under the Supplementary Payments provision.

II. PERSONS INSURED

Each of the following is an Insured under this insurance to the extent set forth below:

(a) the Named Insured;

(b) any partner or executive officer thereof, but with respect to a non-owned automobile only while such automobile is being used in the business of the Named Insured;

(c) any other person while using an owned automobile or a hired automobile with the permission of the Named Insured, provided his actual operation or (if he is not operating) his other actual use thereof is within the scope of such permission, but with respect to bodily injury or property damage arising out of the loading or unloading thereof, such other person shall be an Insured only if he is:

(1) a lessee or borrower of the automobile, or

(2) an employee of the Named Insured or of such lessee or borrower;

(d) any other person or organization but only with respect to his or its liability because of acts or omissions of an Insured under (a), (b) or (c) above.

None of the following is an Insured:

(i) any person while engaged in the business of his employer with respect to bodily injury to any fellow employee of such person injured in the course of his employment;

(ii) the owner or lessee (of whom the Named Insured is a sub-lessee) of a hired automobile or the owner of a non-owned automobile, or any agent or employee of any such owner or lessee;

(iii) an executive officer with respect to an automobile owned by him or by a member of his household;

(iv) any person or organization, other than the Named Insured, with respect to:

(1) a motor vehicle while used with any trailer owned or hired by such person or organization and not covered by like insurance in the Company (except a trailer designed for use with a private passenger automobile and not being used for business purposes with another type motor vehicle), or

(2) a trailer while used with any motor vehicle owned or hired by such person or organization and not covered by like insurance in the Company;

(v) any person while employed in or otherwise engaged in duties in connection with an automobile business, other than an automobile business operated by the Named Insured.

This insurance does not apply to bodily injury or property damage arising out of (1) a non-owned automobile used in the conduct of any partnership or joint venture of which the Insured is a partner or member and which is not designated in this policy as a Named Insured, or (2) if the Named Insured is a partnership, an automobile owned by or registered in the name of a partner thereof.

III. LIMITS OF LIABILITY

Regardless of the number of (1) Insureds under this policy, (2) persons or organizations who sustain bodily injury or property damage, (3) claims made or suits brought on account of bodily injury or property damage or (4) automobiles to which this policy applies, the Company's liability is limited as follows:

Coverage C—The limit of bodily injury liability stated in the declarations as applicable to "each person" is the limit of the Company's liability for all damages because of bodily injury sustained by one person as the result of any one occurrence; but subject to the above provision respecting "each person", the total liability of the Company for all damages because of bodily injury sustained by two or more persons as the result of any one occurrence shall not exceed the limit of bodily injury liability stated in the declarations as applicable to "each occurrence".

Coverage D—The total liability of the Company for all damages because of all property damage sustained by one or more persons or organizations as the result of any one occurrence shall not exceed the limit of property damage liability stated in the declarations as applicable to "each occurrence".

Coverages C and D—For the purpose of determining the limit of the Company's liability, all bodily injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

IV. POLICY PERIOD; TERRITORY

This insurance applies only to bodily injury or property damage which occurs during the policy period within the territory described in paragraph (1) or (2) of the definition of "policy territory".

V. ADDITIONAL DEFINITIONS

When used in reference to this insurance (including endorsements forming a part of the policy):

"automobile business" means the business or occupation of selling, repairing, servicing, storing or parking automobiles;

"hired automobile" means an automobile not owned by the Named Insured which is used under contract in behalf of, or loaned to, the Named Insured, provided such automobile is not owned by or registered in the name of (a) a partner or executive officer of the Named Insured or (b) an employee or agent of the Named Insured who is granted an operating allowance of any sort for the use of such automobile;

"non-owned automobile" means an automobile which is neither an owned automobile nor a hired automobile;

"owned automobile" means an automobile owned by the Named Insured;

"private passenger automobile" means a four wheel private passenger or station wagon type automobile;

"trailer" includes semi-trailer but does not include mobile equipment.

VI. ADDITIONAL CONDITION

Excess Insurance—Hired and Non-Owned Automobiles

With respect to a hired automobile or a non-owned automobile, this insurance shall be excess insurance over any other valid and collectible insurance available to the Insured.

INA

ELEVATOR COLLISION-INSURANCE
COVERAGE PART

PEG

ADDITIONAL DECLARATIONS

Policy No. GAL 36597

SCHEDULE

| Designation of Elevators | Number of Elevators | Rate per Elevator | Premium |
|---|---|---|---|
| 023 Factory - not one story | 4 | 2.45 | 10.00 |
| LIFE 8^6 SL 9 0023 | | | |

TOTAL PREMIUM ▶ $ 10.00 Inc.

**I. COVERAGE Q—ELEVATOR COLLISION**

The Company will pay for loss

(1) to any elevator designated in the schedule for this insurance, or

(2) to any other property owned, occupied or used by, or rented to, or in the care, custody or control of the Named Insured or as to which the Named Insured is for any purpose exercising physical control,

caused by an elevator collision.

Exclusions

This insurance does not apply to any loss:

(a) caused by an elevator collision arising out of fire or caused by fire arising out of an elevator collision;

(b) caused by an elevator collision arising out of the breaking, burning out or disrupting of any electrical machine not located within the car of the elevator;

(c) due to war, whether or not declared, civil war, insurrection, rebellion or revolution or to any act or condition incident to any of the foregoing;

(d) with respect to which insurance is afforded by the policy under the Property Damage Liability Coverage or the Contractual Property Damage Liability Coverage.

**II. LIMITS OF LIABILITY**

The limit of the Company's liability for all loss as the result of any one accident shall not exceed the limit of liability stated in the declarations as applicable to "each elevator collision", nor what it would cost at the time of loss to repair or replace the property with other of like kind and quality. The Company may pay for the loss in money or may repair or replace the property and may settle any claim for loss of property either with the Named Insured or the owner thereof. Any property so paid for or replaced shall, at the option of the Company, become the property of the Company. The above limit of liability applies separately to each elevator designated in the declaration or schedule for this insurance.

**III. ADDITIONAL DEFINITIONS**

"elevator collision" means the collision of any part of an elevator designated in the schedule for this insurance, or of anything carried thereon, with another part of such elevator or with another object;

"loss" means direct and accidental injury or destruction.

**IV. APPLICATION OF INSURANCE**

This insurance applies only to collisions which occur during the policy period.

**V. NAMED INSURED'S DUTIES WHEN LOSS OCCURS; ACTION AGAINST COMPANY**

The conditions of the policy designated "Insured's Duties in the Event of Occurrence, Claim or Suit" and "Action Against Company" are replaced by the following:

**4. NAMED INSURED'S DUTIES WHEN LOSS OCCURS**

Upon knowledge of loss which may give rise to a claim for loss, the Named Insured shall:

(a) give notice thereof as soon as practicable to the Company or any of its authorized agents, and

(b) file detailed proof of loss, duly sworn to, with the Company within 60 days after the occurrence of loss.

Upon the Company's request, the Named Insured and every claimant hereunder shall submit to examination by the Company, subscribe to the same, under oath if required, and produce for the Company's examination all pertinent records, all at such reasonable times and places as the Company shall designate, and shall cooperate with the Company in all matters pertaining to loss or claims with respect thereto.

The Named Insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense. The Company agrees to reimburse the Named Insured for any expense incurred at its request.

**5. ACTION AGAINST COMPANY**

No action shall lie against the Company unless, as a condition precedent thereto, there shall have been full compliance with all the terms of this policy nor until 60 days after the required proofs of loss have been filed with the Company, nor at all unless commenced within two years from the date when the Named Insured has first knowledge of the loss. If any limitation of time for notice of loss or any legal proceeding herein contained is shorter than that permitted to be fixed by agreement under any statute controlling the construction of this insurance, the shortest permissible statutory limitation of time shall govern and shall supersede the time limitation herein stated.

**VI. APPRAISAL**

If the Named Insured and the Company fail to agree as to the amount of loss, each shall, on the written demand of either made within 60 days after receipt of proof of loss by the Company, select a competent and disinterested appraiser, and the appraisal shall be made at a reasonable time and place. The appraisers shall first select a competent and disinterested umpire, and failing for fifteen days to agree upon such umpire, on the request of the Named Insured or the Company such umpire shall be selected by a judge of a court of record in the county and state in which the appraisal is pending. The appraisers shall then appraise the loss, stating separately the actual cash value at time of loss and the amount of the loss, and failing to agree shall submit their differences to the umpire. An award in writing by the umpire and any or both appraisers, or by both appraisers, shall determine the amount of loss. The Named Insured and the Company shall each pay his or its chosen appraiser and shall bear equally the expenses of the umpire and the other expenses of appraisal.

The Company shall not be held to have waived any of its rights by any act relating to appraisal.

INA

# PREMISES MEDICAL PAYMENTS INSURANCE COVERAGE PART

PEG

ADDITIONAL DECLARATIONS — Policy No. GAL 36597

## SCHEDULE

| COVERAGE | ADVANCE PREMIUM |
|---|---|
| (a) Premises and operations | $ Not Covered |
| (b) Elevators | $ 17.00 (b) |
| (c) Sports activities | $ Not Covered |
| TOTAL ADVANCE PREMIUM ▶ | $ 17.00 |

0301

+ $ 168.- see end. eff. 2/15/69

### I. COVERAGE E—PREMISES MEDICAL PAYMENTS

The Company will pay to or for each person who sustains bodily injury caused by accident all reasonable medical expense incurred within one year from the date of the accident on account of such bodily injury, provided such bodily injury arises out of (a) a condition in the insured premises or (b) operations with respect to which the Named Insured is afforded coverage for bodily injury liability under this policy.

**Exclusions**

This insurance does not apply:

(a) to bodily injury

(1) arising out of the ownership, maintenance, operation, use, loading or unloading of any elevator unless a premium charge is entered for elevators in the policy with respect to Premises Medical Payments Coverage;

(2) arising out of the ownership, maintenance, operation, use, loading or unloading of

(i) any automobile or aircraft owned or operated by or rented or loaned to the Named Insured, or

(ii) any other automobile or aircraft operated by any person in the course of his employment by the Named Insured;

but this exclusion does not apply to the parking of an automobile on the insured premises, if such automobile is not owned by or rented or loaned to the Named Insured;

(3) arising out of the ownership, maintenance, operation, use, loading or unloading of any watercraft, if the bodily injury occurs away from the insured premises; or

(4) arising out of and in the course of the transportation of mobile equipment by an automobile owned or operated by or rented or loaned to the Named Insured;

(b) to bodily injury

(1) included within the completed operations hazard or the products hazard;

(2) arising out of operations performed for the Named Insured by independent contractors other than (i) maintenance and repair of the insured premises or (ii) structural alterations at such premises which do not involve changing the size of or moving buildings or other structures;

(3) resulting from the selling, serving or giving of any alcoholic beverage (i) in violation of any statute, ordinance or regulation, (ii) to a minor, (iii) to a person under the influence of alcohol or (iv) which causes or contributes to the intoxication of any person; but this exclusion (b) (3) applies only if the Named Insured is a person or organization engaged in the business of manufacturing, distributing, selling or serving alcoholic beverages or is an owner or lessor of premises used for such purposes;

(4) due to war, whether or not declared, civil war, insurrection, rebellion or revolution, or to any act or condition incident to any of the foregoing;

(c) to bodily injury

(1) to the Named Insured, any partner therein, any tenant or other person regularly residing on the insured premises or any employee of any of the foregoing if the bodily injury arises out of and in the course of his employment therewith;

(2) to any other tenant if the bodily injury occurs on that part of the insured premises rented from the Named Insured or to any employee of such a tenant if the bodily injury occurs on the tenant's part of the insured premises and arises out of and in the course of his employment for the tenant;

(3) to any person while engaged in maintenance and repair of the insured premises or alteration, demolition or new construction at such premises;

(4) to any person if any benefits for such bodily injury are payable or required to be provided under any workmen's compensation, unemployment compensation or disability benefits law, or under any similar law;

(5) to any person practicing, instructing or participating in any physical training, sport, athletic activity or contest unless a premium charge is entered for sport activities in the policy with respect to Premises Medical Payments Coverage;

(d) to any medical expense for services by the Named Insured, any employee thereof or any person or organization under contract to the Named Insured to provide such services.

### II. LIMITS OF LIABILITY

The limit of liability for Premises Medical Payments Coverage stated in the declarations as applicable to "each person" is the limit of the Company's liability for all medical expense for bodily injury to any one person as the result of any one accident; but subject to the above provision respecting "each person", the total liability of the Company under Premises Medical Payments Coverage for all medical expense for bodily injury to two or more persons as the result of any one accident shall not exceed the limit of liability stated in the declarations as applicable to "each accident".

When more than one medical payments coverage afforded by this policy applies to the loss, the Company shall not be liable for more than the amount of the highest applicable limit of liability.

### III. ADDITIONAL DEFINITIONS

When used in reference to this insurance (including endorsements forming a part of the policy):

"insured premises" means all premises owned by or rented to the Named Insured with respect to which the Named Insured is afforded coverage for bodily injury liability under this policy, and includes the ways immediately adjoining on land;

"medical expense" means expenses for necessary medical, surgical, x-ray and dental services, including prosthetic devices, and necessary ambulance, hospital, professional nursing and funeral services.

### IV. POLICY PERIOD; TERRITORY

This insurance applies only to accidents which occur during the policy period within the United States of America, its territories or possessions, or Canada.

### V. ADDITIONAL CONDITION

**Medical Reports; Proof and Payment of Claim**

As soon as practicable the injured person or someone on his behalf shall give to the Company written proof of claim, under oath if required, and shall, after each request from the Company, execute authorization to enable the Company to obtain medical reports and copies of records. The injured person shall submit to physical examination by physicians selected by the Company when and as often as the Company may reasonably require. The Company may pay the injured person or any person or organization rendering the services and the payment shall reduce the amount payable hereunder for such injury. Payment hereunder shall not constitute an admission of liability of any person or, except hereunder, of the Company.

INA

**AUTOMOBILE MEDICAL PAYMENTS INSURANCE COVERAGE PART**

PEG

**ADDITIONAL DECLARATIONS**

Policy No. GAL 36597

**SCHEDULE**

| DESIGNATED PERSON INSURED | ADVANCE PREMIUM |
|---|---|
| | |

TOTAL ADVANCE PREMIUM ▶ $ 145.00

**DESIGNATION OF AUTOMOBILES—Division 1 (Check appropriate box)**

- ☐ Any owned automobile
- ☐ Any hired automobile
- ☒ Any licensed owned private passenger automobile
- ☐ Any automobile described in the schedule and designated "M.P."
- ☐ Any non-owned automobile
- ☐ ____________

**I. COVERAGE F — AUTOMOBILE MEDICAL PAYMENTS**

The Company will pay all reasonable medical expense incurred within one year from the date of the accident:

Division 1. to or for each person who sustains bodily injury, caused by accident, while occupying a designated automobile which is being used by a person for whom bodily injury liability insurance is afforded under this policy with respect to such use;

Division 2. to or for each Insured who sustains bodily injury, caused by accident, while occupying or, while a pedestrian, through being struck by a highway vehicle.

Exclusions

This insurance does not apply:

(a) to bodily injury to any person or insured while employed or otherwise engaged in duties in connection with an automobile business, if benefits therefor are in whole or in part either payable or required to be provided under any workmen's compensation law;

(b) to bodily injury due to war, whether or not declared, civil war, insurrection, rebellion or revolution, or to any act or condition incident to any of the foregoing;

(c) under Division 1, to bodily injury to any employee of the Named Insured arising out of and in the course of employment by the Named Insured, but this exclusion does not apply to any such bodily injury arising out of and in the course of domestic employment by the Named Insured unless benefits therefor are in whole or in part either payable or required to be provided under any workmen's compensation law;

(d) under Division 2, to bodily injury sustained while occupying a highway vehicle owned by any insured, or furnished for the regular use of any insured by any person or organization other than the Named Insured.

**II. PERSONS INSURED—DIVISION 2**

Each of the following is an insured under this insurance to the extent set forth below:

(a) any person designated as insured in the schedule;

(b) while residents of the same household as such designated person, his spouse and the relatives of either,

and if such designated person shall die, any person who was an insured at the time of such death shall continue to be an insured.

**III. LIMIT OF LIABILITY**

The limit of liability for Automobile Medical Payments Coverage stated in the declarations as applicable to "each person" is the limit of the Company's liability for all medical expense for bodily injury to any person, including any insured, as the result of any one accident.

When more than one medical payments coverage afforded by this policy applies to the loss, the Company shall not be liable for more than the amount of the highest applicable limit of liability.

**IV. ADDITIONAL DEFINITIONS**

The additional definitions applicable to automobile bodily injury liability insurance also apply to this insurance; and when used in reference to this insurance (including endorsements forming a part of the policy):

"designated automobile" means an automobile designated in the schedule and includes:

(a) an automobile not owned by the Named Insured while temporarily used as a substitute for an owned automobile designated in the schedule when withdrawn from normal use for servicing or repair or because of its breakdown, loss or destruction; and

(b) a trailer designed for use with a private passenger automobile, if not being used for business purposes with another type automobile and if not a home, office, store, display or passenger trailer;

"highway vehicle" means a land motor vehicle or trailer other than

(a) a farm type tractor or other equipment designed for use principally off public roads, while not upon public roads,

(b) a vehicle operated on rails or crawler-treads, or

(c) a vehicle while located for use as a residence or premises;

"medical expense" means expenses for necessary medical, surgical, x-ray and dental services, including prosthetic devices, and necessary ambulance, hospital, professional nursing and funeral services;

"occupying" means in or upon or entering into or alighting from.

**V. POLICY PERIOD; TERRITORY**

This insurance applies only to accidents which occur during the policy period within the territory described in paragraph (1) or (2) of the definition of "policy territory".

**VI. ADDITIONAL CONDITIONS**

A. Medical Reports; Proof and Payment of Claim

As soon as practicable the injured person or someone on his behalf shall give to the Company written proof of claim, under oath if required, and shall, after each request from the Company, execute authorization to enable the Company to obtain medical reports and copies of records. The injured person shall submit to physical examination by physicians selected by the Company when and as often as the Company may reasonably require. The Company may pay the injured person or any person or organization rendering the services and such payment shall reduce the amount payable hereunder for such injury. Payment hereunder shall not constitute an admission of liability of any person or, except hereunder, of the Company.

B. Excess Insurance

Except with respect to an owned automobile, the insurance under Division 1 shall be excess insurance over any other valid and collectible automobile medical payments or automobile medical expense insurance.

The insurance under Division 2 shall be excess insurance over any other valid and collectible automobile medical payments or automobile medical expense insurance available to the insured under any other policy.

INA

**PERSONAL INJURY LIABILITY INSURANCE**
**COVERAGE PART**

PEG

**ADDITIONAL DECLARATIONS**

Policy No. GAL 36597

## SCHEDULE

The insurance afforded is only with respect to personal injury arising out of an offense included within such of the following groups of offenses as are indicated by specific premium charge or charges.

| GROUPS OF OFFENSES | ADVANCE PREMIUM |
|---|---|
| A. False Arrest, Detention or Imprisonment, or Malicious Prosecution | $ Inc. |
| B. Libel, Slander, Defamation or Violation of Right of Privacy | $ Inc. |
| C. Wrongful Entry or Eviction or Other Invasion of Right of Private Occupancy | $ Not Covered |

Insured's Participation 20 % Minimum Premium $ 25.00 TOTAL ADVANCE PREMIUM ▶ $ 596.00 Included

75 9840 SC9

### I. COVERAGE P—PERSONAL INJURY LIABILITY

The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury (herein called "personal injury") sustained by any person or organization and arising out of one or more of the following offenses:

Group A—false arrest, detention or imprisonment, or malicious prosecution;

Group B—the publication or utterance of a libel or slander or of other defamatory or disparaging material, or a publication or utterance in violation of an individual's right of privacy; except publications or utterances in the course of or related to advertising, broadcasting or telecasting activities conducted by or on behalf of the Named Insured;

Group C—wrongful entry or eviction, or other invasion of the right of private occupancy;

if such offense is committed during the policy period within the United States of America, its territories or possessions, or Canada, and the Company shall have the right and duty to defend any suit against the insured seeking damages on account of such personal injury even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the Company's liability has been exhausted by payment of judgments or settlements.

**Exclusions**

This insurance does not apply:

(a) to liability assumed by the insured under any contract or agreement,

(b) to personal injury arising out of the wilful violation of a penal statute or ordinance committed by or with the knowledge or consent of any insured;

(c) to personal injury sustained by any person as a result of an offense directly or indirectly related to the employment of such person by the Named Insured;

(d) to personal injury arising out of any publication or utterance described in Group B, if the first injurious publication or utterance of the same or similar material by or on behalf of the Named Insured was made prior to the effective date of this insurance;

(e) to personal injury arising out of a publication or utterance described in Group B, concerning any organization or business enterprise, or its products or services, made by or at the direction of any insured with knowledge of the falsity thereof.

### II. PERSONS INSURED

Each of the following is an insured under this insurance to the extent set forth below:

(a) if the Named Insured is designated in the declarations as an individual, the person so designated;

(b) if the Named Insured is designated in the declarations as a partnership or joint venture, the partnership or joint venture so designated and any partner or member thereof but only with respect to his liability as such;

(c) if the Named Insured is designated in the declarations as other than an individual, partnership or joint venture, the organization so designated and any executive officer, director or stockholder thereof while acting within the scope of his duties as such.

This insurance does not apply to personal injury arising out of the conduct of any partnership or joint venture of which the insured is a partner or member and which is not designated in this policy as a Named Insured.

### III. LIMITS OF LIABILITY-INSURED'S PARTICIPATION

Regardless of the number of (1) insureds under this policy, (2) persons or organizations who sustain personal injury, or (3) claims made or suits brought on account of personal injury, the total liability of the Company for all damages because of all personal injury to which this coverage applies, sustained by any one person or organization, shall not exceed the limit of personal injury liability stated in the declarations as "each person aggregate".

Subject to the above provision respecting "each person aggregate", the total limit of the Company's liability under this coverage for all damages shall not exceed the limit of personal injury liability stated in the declarations as "general aggregate".

If a participation percentage is stated in the schedule for the insured, the Company shall not be liable for a greater proportion of any loss than the difference between such percentage and one hundred percent and the balance of the loss shall be borne by the insured; provided, the Company may pay the insured's portion of a loss to effect settlement of the loss, and, upon notification of the action taken, the Named Insured shall promptly reimburse the Company therefor.

### IV. AMENDED DEFINITION

When used in reference to this insurance:

"damages" means only those damages which are payable because of personal injury arising out of an offense to which this insurance applies.

INA

# USE OF OTHER AUTOMOBILES COVERAGE—BROAD FORM

PEG

Named Insured: Crown-Metro, Inc., etal (per named Insured Endorsement)

Effective: February 15, 1969 Policy No.: GAL 36597

Issued by: Insurance Company of North America
(Name of Insurance Company)

The above is required to be completed only when this endorsement is issued subsequent to the preparation of the policy.

This endorsement modifies such insurance as is afforded by the provisions of the policy relating to the following:

COMPREHENSIVE AUTOMOBILE LIABILITY INSURANCE
AUTOMOBILE MEDICAL PAYMENTS INSURANCE

It is agreed that such insurance as is afforded by the policy, under the bodily injury liability and property damage liability coverages and division 1 of the Automobile Medical Payments coverage, with respect to any owned automobile covered under the policy also applies with respect to any other automobile, subject to the following additional provisions:

1. Persons Insured
Each of the following is an Insured under the bodily injury liability and property damage liability insurance afforded under this endorsement to the extent set forth herein:
(a) each individual named below and, while a resident of the same household, the spouse of such individual, and
(b) any other person or organization, not owning or hiring the automobile, but only with respect to his or its liability because of acts or omissions of an insured under (a) above.

2. Exclusions
This insurance does not apply:
(a) to any Insured while engaged in the business of his employer with respect to bodily injury to a fellow employee of such Insured injured in the course of his employment;
(b) to any Insured while employed in or otherwise engaged in duties in connection with an automobile business;
(c) if the individual named below is an employee, to the employer of such individual;
(d) if the individual named below is a partner, to the partnership of which such individual is a member;
(e) to any automobile owned by such named individual, his spouse or any resident of the same household other than a private chauffeur or domestic servant of such named individual or spouse;
(f) to any automobile while used in the business or occupation of the named individual or spouse except an automobile operated or occupied by such Named Insured, spouse or private chauffeur or domestic servant;
(g) under division 1 of Automobile Medical Payments insurance, to any automobile while being used by the Insured as a public or livery conveyance.

3. Excess Insurance. This insurance shall be excess insurance over any other valid and collectible insurance available to the Insured.

4. The insurance afforded because of the naming herein of any individual is only with respect to such and so many of the following coverages as are indicated by specific premium charge or charges for such person.

| Name of Individual: | Premium: Bodily Injury Liability | Premium: Property Damage Liability | Premium: Automobile Medical Payments |
|---|---|---|---|
| Hugh F. Bonino | 20.00 | 9.00 | 9.00 |
| Joseph E. Buonanno | 20.00 | 9.00 | 9.00 |

Total Premium $ 76.00

Authorized Agent

D-1565 (A6102) 7-15-66 Printed in U.S.A.

CIC 0490

INA

# DEDUCTIBLE PROPERTY DAMAGE LIABILITY

PEG

Named Insured Crown-Metro, Inc., etal (per named Insured Endorsement)

Effective February 15, 1969 Policy No. GAL 36597

Issued by Insurance Company of North America
(Name of Insurance Company)

The above is required to be completed only when this endorsement is issued subsequent to the preparation of the policy.

This endorsement modifies such insurance as is afforded by the provisions of the policy relating to the following:

COMPREHENSIVE AUTOMOBILE LIABILITY INSURANCE
GARAGE INSURANCE

It is agreed that the insurance as is afforded by the policy for property damage liability applies subject to the following additional provisions:

1. $ 50.00 shall be deducted from the total amount of all sums which the Insured shall become legally obligated to pay as damages on account of each occurrence, and the Company shall be liable only for the difference between such deductible amount and the limit of the Company's liability for each occurrence as stated in the policy.
2. The terms of the policy, including those relating to the Insured's duties with respect to an occurrence, claim or suit and the Company's right to defend, investigate, negotiate and settle any claim or suit, apply irrespective of the application of the deductible amount.
3. The Company may pay any part or all of the deductible amount to effect settlement of any claim or suit, and upon notification of the action taken, the Named Insured shall promptly reimburse the Company for such part of the deductible amount as has been paid by the Company.

Authorized Agent

INA — **SCHEDULE OF AUTOMOBILES** — PEG

Policy No. GAL36597

| Ident. No. | Year / Model | Trade Name; Body Type; Truck Load Capacity; Tank Capacity; Gallonage or Bus Seating Capacity / Identification Number; Principal Garage Location | Class (Liab. / Coll.) / F.O.B. List Price or Delivered Price at Factory | Rating Symbol | Actual cost to owner / Purchased New "N" Mo./Yr./Used "U" | Bodily Injury Premium | Property Damage Premium | Automobile Medical Payments Insurance Premium |
|---|---|---|---|---|---|---|---|---|
| 1 | 1960 | White Diesel Tractor 258571 Centredale R. I | Zones 2 & 4 Long Haul | | 15,900 | 410.00 | 152.00 | |
| 2 | 1951 | Mack Tractor LT51DL2200 Greenville, S.C. | Zones 2 & 4 Long Haul | | 10,000 | 410.00 | 152.00 | [illegible] |
| 3 | 1962 8400 TD | White Tractor 622722 Greenville, S.C. | Zones 2 & 4 Long Haul | | 13,700 | 410.00 | 152.00 | |
| 4 | 1956 | Std. Steel Tank Trailer 5525115 Greenville, S.C. | 10 % Zones 2 &4 Long Haul | | 12,000 | 41.00 | 15.00 | |
| 5 | 1954 | Fruehauf Van Trailer FW95136 Greenville S.C. | 10 % Zones 2 & 4 Long Haul | | 6,000 | 41.00 | 15.00 | |
| 6 | 1953 | Fruehauf Van Trailer AV1753533 Greenville S.C. | 10 0/0 Zones 2 & 4 Long Haul | | 7, 197 | 41.00 | 15.00 | |
| 7 | 1956 | S S Trailmobile 2 Compt. Tank Trl 5525081 Greenville, S. C. | 10 0/0 Zones 2&4 Long Haul | | 12,000 | 41.00 | 15.00 | |
| 8 | 1951 | Dodge 1 Ton Dual Wheel 3161123224 Greenville S.C. | 4CA & 25 Interm. Haul | | 2,800 | 94.00 | 55.00 | |
| 9 | 1962 | Ford Van Truck C600V-210402 Greenville S.C. | 4CA + 25 Interm. Haul | | 5,000 | 94.00 | 55.00 | |
| 10 | 1962 | International B/62 Van SH216005E Greenville S.C. | 4CA Local Haul | | 3,500 | 75.00 | 44.00 | |
| 11 | 1960 | Dorsey Tandem Axel Semi Trl 68481 Greenville, S.C. | 10 0/0 Zones 2&4 Long Haul | | 6,500 | 41.00 | 15.00 | |
| Totals | | | | | | | | |

| Ident. No. | Limit of Liability* | Comprehensive Rate | Comprehensive Premium | Collision Form or Ded. | Collision Premium | Fire Rate | Fire Premium | Theft Rate | Theft Premium | Combined Additional Rate | Combined Additional Premium | | Ins. Against Uninsured Motorists Premium |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Totals | | | | | | | | | | | | | |

*It is agreed that the loss to any covered automobile described above with respect to such Comprehensive; Fire, Lightning or Transportation; Theft; Windstorm, Hail, Earthquake or Explosion or Combined Additional Coverages as applies under the policy shall not exceed the limit of liability as shown opposite thereto in this schedule.

D-1467 50M 7-1-66 Ptd. in U.S.A.

PROCESSING COPY

CIC 0492

INA

## SCHEDULE OF AUTOMOBILES

PEG

Policy No. GAL36597

| Ident. No. | Year / Model | Trade Name / Identification Number — Body Type; Truck Load Capacity; Tank Capacity; Gallonage or Bus Seating Capacity / Principal Garage Location | Class (Liab. / Coll.) / Rating Symbol / F.O.B. List Price or Delivered Price at Factory | Actual cost to owner / Purchased New "N" Mo./Yr./Used "U" | Bodily Injury Premium | Property Damage Premium | Automobile Medical Payments Insurance Premium |
|---|---|---|---|---|---|---|---|
| 12 | 1967 | Chevrolet Van<br>88157P139557 Greenville, S.C. | 4CA<br>Local Haul | 2482 | 75.00 | 44.00 | ) |
| 13 | 1966 | Lincoln 4 dr. Sedan<br>6Y82G432996 Greenville S.C. | 199800 7-4 | | 68.00 | 29.00 | 13.00 |
| 14 | 1965 | Chevrolet 2 dr. Impala<br>164375Y-140568 Hawthorne, N.J. | 199800 4-4 | | 78.00 | 30.00 | 20.00 |
| 15 | 1962 | International Van<br>1890A-SB269052 F Hawthorne, N.J. | 4CA + 25<br>Interm. Haul | 7000 | 126.00 | 81.00 | |
| 16 | 1959 | Ford 3/4 Ton Truck<br>F25JOE-46646 Hawthorne, N.J. | 4CA<br>Local Haul | 3195 | 101.00 | 64.00 | [illegible] |
| 17 | 1960 | White Tractor<br>608308 Centredale, R. I. | Zones 2 & 4<br>Long Haul | 15,900 | 410.00 | 152.00 | |
| 18 | 1956 | Fruehauf WW4054 Trailer<br>WVERR -5533 Centredale, R.I. | 10 o/o Zones 2&4<br>Long Haul | 5,980 | 41.00 | 15.00 | |
| 19 | 1955 | Fruehauf 2 Compt. Tank Trailer<br>FW-46568 Centredale, R.I. | 10 o/o Zones 2&4<br>Long Haul | 12,000 | 41.00 | 15.00 | |
| 20 | 1959<br>F600 | Ford 2 Ton Van Truck<br>F60592-24822 Centredale, R.I. | 4CA<br>Local Haul | 4,700 | 156.00 | 72.00 | |
| 21 | 1965 | White Diesel Tractor<br>672304 Centredale R.I. | Zones 2&4<br>Long Haul | 17,900 | 410.00 | 152.00 | |
| 22 | 1966 | Fruehauf Van Semi Trailer<br>FWG-510810 Centredale, R.I. | 10 o/o Zones 2&4<br>Long Haul | 5,800 | 41.00 | 15.00 | |
| Totals | | | | | | | |

| Ident. No. | Limit of Liability* | Comprehensive Rate | Comprehensive Premium | Collision Basis | Collision Premium | Fire Rate | Fire Premium | Theft Rate | Theft Premium | Combined Additional Rate | Combined Additional Premium | | Ins. Against Uninsured Motorists Premium |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | |
| Totals | | | | | | | | | | | | | |

*It is agreed that the loss to any covered automobile described above with respect to such Comprehensive; Fire, Lightning or Transportation; Theft; Windstorm, Hail, Earthquake or Explosion or Combined Additional Coverages as applies under the policy shall not exceed the limit of liability as shown opposite thereto in this schedule.

D-1467 50M 7-1-66 Ptd. in USA.

PROCESSING COPY

CIC 0493

INA

# SCHEDULE OF AUTOMOBILES

PEC

Policy No. GA136997

| Ident. No. | Year / Model | Trade Name; Body Type; Truck Load Capacity; Tank Capacity; Gallonage or Bus Seating Capacity / Identification Number; Principal Garage Location | Class (Liab. / Coll.) / F.O.B. List Price or Delivered Price at Factory | Rating Symbol | Actual cost to owner / Purchased New "N" Mo./Yr./Used "U" | Bodily Injury Premium | Property Damage Premium | Automobile Medical Payments Insurance Premium |
|---|---|---|---|---|---|---|---|---|
| 23 | 1965 | Chevrolet Corvair Van Truck G-1255F106919 Centredale R.I. | 4CA Local Haul | | 3,000 | 156.00 | 72.00 | |
| 24 | 1966 | Lincoln Continental 6Y82H447348 Providence, R.I. | 199800 6-4 | | | 122.00 | 34.00 | 24.00 |
| 25 | 1965 | Dodge Polara 2 dr. HDTP. D-156-160404 Providence, R.I. | 199800 5-4 | | | 122.00 | 34.00 | 24.00 |
| 26 | 1967 | Oldsmobile 4 Dr, Luxury Sed. 386697M170439 Warwick, R. I. | 199800 5-3 | | | 85.00 | 30.00 | 20.00 |
| 27 | 1966 | Oldsmobile 4 Dr. Hardtop [illegible]134817 Cranston, R.I. | 199800 4-4 | | | 122.00 | 34.00 | 24.00 |
| 28 | 1966 | Ford F600 Stake Truck F61CK769348 Providence, R.I. | 4CA Local Haul | | 5,000 | 156.00 | 72.00 | |
| 29 | 1964 | Oldsmobile 98 4dr. Sedan 884M034429 West Warwick, R.I. | 199800 4-4 | | | 85.00 | 30.00 | 20.00 |
| 30 | 1964 | Ford Classic Cab Truck N-755U-564476 Providence, R.I. | 4CB Local Haul | | 8,184 | 246.00 | 113.00 | |
| Totals | | | | | | | | |

| Ident. No. | Limit of Liability* | Comprehensive Rate | Comprehensive Premium | Collision "Ded." | Collision Premium | Fire Rate | Fire Premium | Theft Rate | Theft Premium | Combined Additional Rate | Combined Additional Premium | | Ins. Against Uninsured Motorists Premium |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Totals | | | | | | | | | | | | | |

*It is agreed that the loss to any covered automobile described above with respect to such Comprehensive; Fire, Lightning or Transportation; Theft; Windstorm, Hail, Earthquake or Explosion or Combined Additional Coverages as applies under the policy shall not exceed the limit of liability as shown opposite thereto in this schedule.

D-1467 50M-7-1-66 Ptd. in USA.

PROCESSING COPY

CIC 0494

INA

**SCHEDULE OF AUTOMOBILES**

Policy No.: GA136597

PEC

| Ident. No. | Year / Model | Trade Name / Identification Number | Body Type; Truck Load Capacity; Tank Capacity; Gallonage or Bus Seating Capacity / Principal Garage Location | Class Liab. / Coll. / F.O.B. List Price or Delivered Price at Factory | Rating Symbol | Actual cost to owner / Purchased New "N" / Used "U" | Bodily Injury Premium | Property Damage Premium | Automobile Medical Payments Insurance Premium |
|---|---|---|---|---|---|---|---|---|---|
| 31 | 1966 / 9500TD | White Tractor / 681053 | Wellford, S.C. (Greenville S.C.) | 4CB +25 Long Haul | | 20,000 | 148.00 | 85.00 | |
| 32 | 1966 | Fruehauf Trailer / AVP439644 | Wellford, S.C. | 10 o/o 4CB+25 Long Haul | | 6,000 | 15.00 | 9.00 | |
| 33 | | Willys Jeep Truck / 4734 WH16018 | Providence, R.I. | Cl. Local Haul | | | 72.00 | 33.00 | |
| Totals | | | | | | | 4574.00 | 1900.00 | 145.00 |

| Limit of Liability* | Comprehensive Rate | Comprehensive Premium | Collision Form Deductible | Collision Premium | Fire Rate | Fire Premium | Theft Rate | Theft Premium | Combined Additional Rate | Combined Additional Premium | | Ins. Against Uninsured Motorists Premium |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Totals | | | | | | | | | | | | |

* It is agreed that the loss to any covered automobile described above with respect to such Comprehensive; Fire, Lightning or Transportation; Theft; Windstorm, Hail, Earthquake or Explosion or Combined Additional Coverage as applies under the policy shall not exceed the limit of liability as shown opposite thereto in this schedule.

D-1467 50M 7-1-66 Ptd. in USA.

PROCESSING COPY

CIC 0495

INA

# EXTENSION SCHEDULE OF GENERAL LIABILITY HAZARDS

Policy No. GAL 36597

PEG

Identify locations of all premises by address (same as shown on the Declarations unless otherwise indicated below).

| | Code No. | Description of Hazards | Premium Bases* | Rates B.I. | Rates P.D. | Advance Premiums Bodily Injury | Advance Premiums Property Damage |
|---|---|---|---|---|---|---|---|
| A. | 2471 | RHODE ISLAND<br>Chemical Mf. | (d) 500,000 | .085 | .227 | 425.00 | 1135.00 |
| B | 2471 | SOUTH CAROLINA<br>Chemical Mfg. | (d) 368,000 | .113 | .207 | 416.00 | 762.00 |
| C | 3432 | 100 NAZARAW RD. HAWTHORNE N.J.<br>Warehouses - storage Furniture or General Merchandise | (d) 9,200 | .578 | .152 | 53.00 | 14.00 |
| D | 0129A | 12 DUDLEY ST, PROVIDENCE R.I.<br>Buildings or Premises - bank, mercantile, manufacturing or office, not occupied by the insured (lessor's risk only) CHANGED to Code 0130 | (a) 40,000 | .376 | .017 | 150.00 | 7.00 |
| E | 0122 | 111 West 40th Street, New York, N.Y.<br>Buildings or Premises office | (a) 250 | .858 | .031 | 5.00 min. | 1.00 min. |
| F | 0122 | 37 Guy St, Granby, Quebec, Canada<br>Buildings or Premises-Office | (a) 200 | | | 5.00 min. | 1.00 min. |
| | | | | TOTALS | | 1054.00 | $ 1920.00 |
| | | | | TOTAL ADVANCE PREMIUM ▶ | | $ | Included |

*Same Premium Bases as shown on the applicable Additional Declarations unless otherwise indicated.

LC-837 50M 6/10/66 Printed in U.S.A.

PROCESSING COPY

INA

# REAL PROPERTY—LIABILITY—FIRE

PEG

Named Insured Gromi-Metro, Inc., etal (per named Insured Endorsement)

Effective February 15, 1969 Policy No. GAL 36597

Issued by Insurance Company of North America
(Name of Insurance Company)

The above is required to be completed only when this endorsement is issued subsequent to the preparation of the policy.

This endorsement modifies such insurance as is afforded by the provisions of the policy relating to the following:

COMPREHENSIVE GENERAL LIABILITY INSURANCE
MANUFACTURERS' AND CONTRACTORS' LIABILITY INSURANCE
OWNERS', LANDLORDS' AND TENANTS' LIABILITY INSURANCE
STOREKEEPER'S INSURANCE

It is agreed that the Property Damage Liability Coverage applies to property damage to structures or portions thereof rented to or occupied by the Named Insured and described in this endorsement, including fixtures permanently attached thereto, if such property damage arises out of fire, subject to the following additional provisions:

1. All of the exclusions of the policy are deleted and replaced by the following:

   This insurance does not apply to liability assumed by the Insured under any contract or agreement.

2. The limit of liability stated in this endorsement applies separately to the insurance under this endorsement and is in lieu of any other limit of liability stated in the policy.

| Description of Property | Limit of Liability | | Rate (per $100 of Limit) | Premium |
|---|---|---|---|---|
| | $ 10,000 | each occurrence | Flat Charge | $100.00 |

1. 111 West 40th Street, New York, New York
2. 100 Wagaraw Road, Hawthorne, New Jersey
3. 37 Guy Street, Granby, Quebec, Canada

86 — 9830 SC 9

Authorized Agent

LC-595 (6/09) 7-20-66 Printed in U.S.A.

CIC 0497

INA

**ADDITIONAL INSURED**
**(Employees)**

PEG

Named Insured Crown-Metro, Inc. etal

Effective February 15, 1969. Policy No. GAL 36597

Issued by Insurance Company of North America
(Name of Insurance Company)

The above is required to be completed only when this endorsement is issued subsequent to the preparation of the policy.

This endorsement modifies such insurance as is afforded by the provisions of the policy relating to the following:

COMPREHENSIVE GENERAL LIABILITY INSURANCE
MANUFACTURERS' AND CONTRACTORS' LIABILITY INSURANCE
OWNERS', LANDLORDS' AND TENANTS' LIABILITY INSURANCE
STOREKEEPER'S INSURANCE

It is agreed that the "Persons Insured" provision is amended to include any employee of the Named Insured while acting within the scope of his duties as such, but the insurance afforded to such employee does not apply:

1. to bodily injury to (a) another employee of the Named Insured arising out of or in the course of his employment or (b) the Named Insured or, if the Named Insured is a partnership or joint venture, any partner or member thereof;
2. to property damage to property owned, occupied or used by, rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by (a) another employee of the Named Insured or (b) the Named Insured, or, if the Named Insured is a partnership or joint venture, any partner or member thereof.

BUDGET 8-11-9

ml 6-9-69 Insurance UnderwritersInc.

Authorized Agent

LC-968 (G106) 7-28-66 Printed in U.S.A.

CIC 0498

INA

# DEDUCTIBLE LIABILITY INSURANCE

PEG

Named Insured [illegible], Inc., etal (per Named Insured Endorsement)

Effective February 15, 1969 Policy No. GAL 36297

Issued by Insurance Company of North America
(Name of Insurance Company)

The above is required to be completed only when this endorsement is issued subsequent to the preparation of the policy.

This endorsement modifies such insurance as is afforded by the provisions of the policy relating to the following:

COMPREHENSIVE GENERAL LIABILITY INSURANCE
MANUFACTURERS' AND CONTRACTORS' LIABILITY INSURANCE
OWNERS', LANDLORDS' AND TENANTS' LIABILITY INSURANCE

It is agreed that:

1. The Company's obligation under the Bodily Injury Liability and Property Damage Liability Coverages to pay damages on behalf of the Insured applies only to the amount of damages in excess of any deductible amounts stated in the schedule below as applicable to such coverages.

2. The deductible amounts stated in the schedule apply as follows:

(a) PER CLAIM BASIS—If the deductible is on a "per claim" basis, the deductible amount applies under the Bodily Injury Liability or Property Damage Liability Coverage, respectively, to all damages because of bodily injury sustained by one person, or to all property damage sustained by one person or organization, as the result of any one occurrence.

(b) PER OCCURRENCE BASIS—If the deductible is on a "per occurrence" basis, the deductible amount applies under the Bodily Injury Liability or Property Damage Liability Coverage, respectively, to all damages because of all bodily injury or property damage as the result of any one occurrence.

3. The terms of the policy, including those with respect to (a) the Company's rights and duties with respect to the defense of suits and (b) the Insured's duties in the event of an occurrence apply irrespective of the application of the deductible amount.

4. The Company may pay any part or all of the deductible amount to effect settlement of any claim or suit and, upon notification of the action taken, the Named Insured shall promptly reimburse the Company for such part of the deductible amount as has been paid by the Company.

SCHEDULE

| Coverage | Amount and Basis of Deductible |
|---|---|
| Bodily Injury Liability | $ - per claim<br>$ - per occurrence |
| Property Damage Liability | $500 per claim<br>$ - per occurrence |

APPLICATION OF ENDORSEMENT (Enter here any limitations on the application of this endorsement. If no limitation is entered, the deductibles apply to all loss however caused):— Applies to Products coverage only

Authorized Agent

LC-1042 (6604) 7-20-66 Printed in U.S.A.

CIC 0499

# EXHIBIT 2.2

INA INSURANCE COMPANY OF NORTH AMERICA

BUDGET

...ration of an Additional Premium of $124.00, it is agreed that the policy is amended as follows:

1. Insurance against Uninsured Motorist coverage is added to the policy with Limits of Liability of $10,000. each person $20,000 each accident - Additional Premium $54.00 as per Endorsement attached.

2, Use of Other Autos - Broad Form, Endorsement D-1565, the Name of Hugh F. Bonino is corrected to read: Hugh J. Bonino.

3. Personal Injury Liability Insurance, Endorsement #LC893, is corrected to include Group C.

4. Premises Medical Payments Insurance Coverage, endorsement LC-887 is amended to include (a) Premises and Operations-Additional Premium $168.00. 0301

5. The Description of Hazards at 12 Dudley St. Providence, Rhode Island on the Extension Schedule of General Liability Hazards, Endorsement #LC937, is corrected to read:

Buildings or premises - occupied by more than one interest for manufacturing or private warehousing purposes exclusively (Lessors risk only) Code 0130. Rates are amended to:

| B. I. | P.D. | B. I. | |
|---|---|---|---|
| $.129 | $.017 | $98.00 | Return Premium |

6. Endorsements attached: - Additional Insured, Broad Form Property Damage and Canada Excise Tax Information Form Endorsement are included in the Policy.

Nothing herein contained shall vary, alter or extend any provision or condition of the policy other than as above stated.

| Effective Date | | Part of Policy No. |
|---|---|---|
| February 15, 1969 | at the hour specified in the policy. | GAL 36597 |
| Issued to Crown-Metro Inc., etal | | |

mb 6/24/69 Insurance Underwriters, Inc.

Authorized Agent

Not valid unless countersigned by a duly authorized agent of the INSURANCE COMPANY OF NORTH AMERICA

Charles K. Cox
President

C-1650

COMPANY REGISTRATION COPY

100M 7-10-67 Ptd. in U.S.A.

CIC 0500

INA

# INSURANCE AGAINST UNINSURED MOTORISTS COVERAGE PART

PEG

## ADDITIONAL DECLARATIONS

Policy No. GAL 36597 NO PREM ENDORSEMENT

PREMIUM ▶ $ 54.00 Inc.

### SCHEDULE

**Designated Insured**

**Description of Insured Highway Vehicles (Check appropriate box)**

- ☒ Any automobile owned by the Named Insured
- ☐ Any private passenger automobile owned by the Named Insured
- ☐ Any highway vehicle to which are attached dealers' license plates issued to the Named Insured
- ☐ Any highway vehicle designated in the declarations of the policy by the letters "UM" and a highway vehicle ownership of which is acquired during the policy period by the Named Insured as a replacement therefor
- ☐ Any mobile equipment owned or leased by and registered in the name of the Named Insured
- ☐ ______

DUPLICATE

8-11-9

**I. COVERAGE U — UNINSURED MOTORISTS**
**(Damages for Bodily Injury)**

The Company will pay all sums which the insured or his legal representative shall be legally entitled to recover as damages from the owner or operator of an uninsured highway vehicle because of bodily injury sustained by the Insured, caused by accident and arising out of the ownership, maintenance or use of such uninsured highway vehicle; provided, for the purposes of this coverage, determination as to whether the Insured or such representative is legally entitled to recover such damages, and if so the amount thereof, shall be made by agreement between the Insured or such representative and the Company or, if they fail to agree, by arbitration.

No judgment against any person or organization alleged to be legally responsible for the bodily injury shall be conclusive, as between the Insured and the Company, of the issues of liability of such person or organization or of the amount of damages to which the Insured is legally entitled unless such judgment is entered pursuant to an action prosecuted by the Insured with the written consent of the Company.

Exclusions.

This insurance does not apply:

(a) to bodily injury to an Insured with respect to which such Insured, his legal representative or any person entitled to payment under this insurance shall, without written consent of the Company, make any settlement with any person or organization who may be legally liable therefor;

(b) to bodily injury to an Insured while occupying a highway vehicle (other than an insured highway vehicle) owned by the Named Insured, any designated Insured or any relative resident in the same household as the Named or designated Insured, or through being struck by such a vehicle, but this exclusion does not apply to the Named Insured or his relatives while occupying or if struck by a highway vehicle owned by a designated Insured or his relatives;

(c) so as to inure directly or indirectly to the benefit of any workmen's compensation or disability benefits carrier or any person or organization qualifying as a self-insurer under any workmen's compensation or disability benefits law or any similar law.

**II. PERSONS INSURED**

Each of the following is an Insured under this insurance to the extent set forth below:

(a) the Named Insured and any designated Insured and, while residents of the same household, the spouse and relatives of either;

(b) any other person while occupying an insured highway vehicle; and

(c) any person, with respect to damages he is entitled to recover because of bodily injury to which this insurance applies sustained by an Insured under (a) or (b) above.

The insurance applies separately with respect to each Insured, except with respect to the limits of the Company's liability.

**III. LIMITS OF LIABILITY**

Regardless of the number of Insureds under this policy, the Company's liability is limited as follows:

(a) The limit of liability stated in the declarations as applicable to "each person" is the limit of the Company's liability for all damages because of bodily injury sustained by one person as the result of any one accident and, subject to the above provision respecting "each person", the limit of liability stated in the declarations as applicable to "each accident" is the total limit of the Company's liability for all damages because of bodily injury sustained by two or more persons as the result of any one accident.

(b) Any amount payable under the terms of this insurance because of bodily injury sustained in an accident by a person who is an Insured under this coverage shall be reduced by

(1) all sums paid on account of such bodily injury by or on behalf of

(i) the owner or operator of the uninsured highway vehicle and

(ii) any other person or organization jointly or severally liable together with such owner or operator for such bodily injury,

including all sums paid under the bodily injury liability coverage of the policy, and

(2) the amount paid and the present value of all amounts payable on account of such bodily injury under any workmen's compensation law, disability benefits law or any similar law.

(c) Any payment made under this insurance to or for any Insured shall be applied in reduction of the amount of damages which he may be entitled to recover from any person insured under the bodily injury liability coverage of the policy.

(d) The Company shall not be obligated to pay under this insurance that part of the damages which the Insured may be entitled to recover from the owner or operator of an uninsured highway vehicle which represents expenses for medical services paid or payable under the medical payments coverage of the policy.

**IV. POLICY PERIOD; TERRITORY**

This insurance applies only to accidents which occur during the policy period and within the United States of America, its territories or possessions, or Canada.

**V. ADDITIONAL DEFINITIONS**

When used in reference to this insurance (including endorsements forming a part of the policy):

"designated Insured" means an individual named in the schedule under Designated Insured;

"highway vehicle" means a land motor vehicle or trailer other than

(a) a farm type tractor or other equipment designed for use principally off public roads, while not upon public roads,

(b) a vehicle operated on rails or crawler-treads, or

(c) a vehicle while located for use as a residence or premises;

"hit-and-run vehicle" means a highway vehicle which causes bodily injury to an insured arising out of physical contact of such vehicle with the insured or with a vehicle which the insured is occupying at the time of the accident, provided:

(a) there cannot be ascertained the identity of either the operator or owner of such highway vehicle;

(b) the insured or someone on his behalf shall have reported the accident within 24 hours to a police, peace or judicial officer or to the Commissioner of Motor Vehicles, and shall have filed with the Company within 30 days thereafter a statement under oath that the insured or his legal representative has a cause or causes of action arising out of such accident for damages against a person or persons whose identity is unascertainable, and setting forth the facts in support thereof; and

(c) at the Company's request, the insured or his legal representative makes available for inspection the vehicle which the insured was occupying at the time of the accident;

"insured highway vehicle" means a highway vehicle:

(a) described in the schedule as an insured highway vehicle to which the bodily injury liability coverage of the policy applies;

(b) while temporarily used as a substitute for an insured highway vehicle as described in subparagraph (a) above, when withdrawn from normal use because of its breakdown, repair, servicing, loss or destruction;

(c) while being operated by the Named or designated Insured or by the spouse of either if a resident of the same household;

but the term "insured highway vehicle" shall not include:

(i) a vehicle while used as a public or livery conveyance, unless such use is specifically declared and described in this policy;

(ii) a vehicle while being used without the permission of the owner;

(iii) under subparagraphs (b) and (c) above, a vehicle owned by the Named Insured, any designated Insured or any resident of the same household as the Named or designated Insured; or

(iv) under subparagraphs (b) and (c) above, a vehicle furnished for the regular use of the Named Insured or any resident of the same household;

"occupying" means in or upon or entering into or alighting from;

"state" includes the District of Columbia, a territory or possession of the United States, and a province of Canada;

"uninsured highway vehicle" means:

(a) a highway vehicle with respect to the ownership, maintenance or use of which there is, in at least the amounts specified by the financial responsibility law of the state in which the insured highway vehicle is principally garaged, no bodily injury liability bond or insurance policy applicable at the time of the accident with respect to any person or organization legally responsible for the use of such vehicle, or with respect to which there is a bodily injury liability bond or insurance policy applicable at the time of accident but the company writing the same denies coverage thereunder, or

(b) a hit-and-run vehicle;

but the term "uninsured highway vehicle" shall not include:

(i) an insured highway vehicle,

(ii) a highway vehicle which is owned or operated by a self-insurer within the meaning of any motor vehicle financial responsibility law, motor carrier law or any similar law,

(iii) a highway vehicle which is owned by the United States of America, Canada, a state, a political subdivision of any such government or an agency of any of the foregoing.

VI. ADDITIONAL CONDITIONS

A. Premium.

If during the policy period the number of insured highway vehicles owned by the Named Insured or spouse or the number of dealer's license plates issued to the Named Insured changes, the Named Insured shall notify the Company during the policy period of any change and the premium shall be adjusted in accordance with the manuals in use by the Company. If the earned premium thus computed exceeds the advance premium paid, the Named Insured shall pay the excess to the Company; if less, the Company shall return to the Named Insured the unearned portion paid by such Insured.

B. Proof of Claim; Medical Reports.

As soon as practicable, the Insured or other person making claim shall give to the Company written proof of claim, under oath if required, including full particulars of the nature and extent of the injuries, treatment, and other details entering into the determination of the amount payable hereunder. The Insured and every other person making claim hereunder shall submit to examinations under oath by any person named by the Company and subscribe the same, as often as may reasonably be required. Proof of claim shall be made upon forms furnished by the Company unless the Company shall have failed to furnish such forms within 15 days after receiving notice of claim. The injured person shall submit to physical examinations by physicians selected by the Company when and as often as the Company may reasonably require and he, or in the event of his incapacity [illegible] in the event of his death his legal representative [illegible] entitled to sue therefor, shall upon each request [illegible] authorization to enable the Company to obtain medical reports and copies of records.

C. Assistance and Cooperation of the Insured.

After notice of claim under this insurance, the Company may require the Insured to take such action as may be necessary or appropriate to preserve his right to recover damages from any person or organization alleged to be legally responsible for the bodily injury; and in any action against the Company, the Company may require the Insured to join such person or organization as a party defendant.

D. Notice of Legal Action.

If, before the Company makes payment of loss hereunder, the Insured or his legal representative shall institute any legal action for bodily injury against any person or organization legally responsible for the use of a highway vehicle involved in the accident, a copy of the summons and complaint or other process served in connection with such legal action shall be forwarded immediately to the Company by the Insured or his legal representative.

E. Other Insurance.

With respect to bodily injury to an Insured while occupying a highway vehicle not owned by the Named Insured, this insurance shall apply only as excess insurance over any other similar insurance available to such Insured and applicable to such vehicle as primary insurance, and this insurance shall then apply only in the amount by which the limit of liability for this coverage exceeds the applicable limit of liability of such other insurance.

Except as provided in the foregoing paragraph, if the Insured has other similar insurance available to him and applicable to the accident, the damages shall be deemed not to exceed the higher of the applicable limits of liability of this insurance and such other insurance, and the Company shall not be liable for a greater proportion of any loss to which this coverage applies than the limit of liability hereunder bears to the sum of the applicable limits of liability of this insurance and such other insurance.

F. Arbitration.

If any person making claim hereunder and the Company do not agree that such person is legally entitled to recover damages from the owner or operator of an uninsured highway vehicle because of bodily injury to the Insured, or do not agree as to the amount of payment which may be owing under this insurance, then, upon written demand of either, the matter or matters upon which such person and the Company do not agree shall be settled by arbitration, which shall be conducted in accordance with the rules of the American Arbitration Association unless other means of conducting the arbitration are agreed to between the Insured and the Company, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof. Such person and the Company each agree to consider itself bound and to be bound by any award made by the arbitrators pursuant to this insurance.

G. Trust Agreement.

In the event of payment to any person under this insurance:

(a) the Company shall be entitled to the extent of such payment to the proceeds of any settlement or judgment that may result from the exercise of any rights of recovery of such person against any person or organization legally responsible for the bodily injury because of which such payment is made;

(b) such person shall hold in trust for the benefit of the Company all rights of recovery which he shall have against such other person or organization because of the damages which are the subject of claim made under this insurance;

(c) such person shall do whatever is proper to secure and shall do nothing after loss to prejudice such rights;

(d) if requested in writing by the Company, such person shall take, through any representative designated by the Company, such action as may be necessary or appropriate to recover such payment as damages from such other person or organization, such action to be taken in the name of such person; in the event of a recovery, the Company shall be reimbursed out of such recovery for expenses, costs and attorneys' fees incurred by it in connection therewith;

(e) such person shall execute and deliver to the Company such instruments and papers as may be appropriate to secure the rights and obligations of such person and the Company established by this provision.

H. Payment of Loss by the Company.

Any amount due hereunder is payable

(a) to the Insured, or

(b) if the Insured be a minor to his parent or guardian, or

(c) if the Insured be deceased to his surviving spouse, otherwise

(d) to a person authorized by law to receive such payment or to a person legally entitled to recover the damages which the payment represents;

provided, the Company may at its option pay any amount due hereunder in accordance with division (d) hereof.

INA

**ADDITIONAL INSURED**
**(Premises Leased to the Named Insured)**

PEG

Named Insured Crown-Metro, Inc., etal

Effective May 19, 1969 Policy No. GAL 36597

Issued by Insurance Company of North America
(Name of Insurance Company)

The above is required to be completed only when this endorsement is issued subsequent to the preparation of the policy.

This endorsement modifies such insurance as is afforded by the provisions of the policy relating to the following:

COMPREHENSIVE GENERAL LIABILITY INSURANCE
MANUFACTURERS' AND CONTRACTORS' LIABILITY INSURANCE
OWNERS', LANDLORDS' AND TENANTS' LIABILITY INSURANCE
STOREKEEPER'S INSURANCE

BUDGET

It is agreed that the "Persons Insured" provision is amended to include as an Insured the person or organization designated below, but only with respect to liability arising out of the ownership, maintenance or use of that part of the premises designated below leased to the Named Insured, and subject to the following additional exclusions:

The insurance does not apply:

1. to any occurrence which takes place after the Named Insured ceases to be a tenant in said premises;

2. to structural alterations, new construction or demolition operations performed by or on behalf of the person or organization designated below.

SCHEDULE

| Designation of Premises (Part Leased to Named Insured) | Name of Person or Organization (Additional Insured) | Premiums: Bodily Injury Liability | Premiums: Property Damage Liability |
|---|---|---|---|
| 111 W. 40th Street<br>New York, New York | Robert H. Arnow | 2.00 | 1.00 |

mb 6/24/69 Insurance Underwriters, Inc.
Authorized Agent

LC-971 (G100) 7-20-66 Printed in U.S.A.

CIC 0503

INA INSURANCE COMPANY OF NORTH AMERICA

# FORM PROPERTY DAMAGE ENDORSEMENT

... agreed that exclusion (i) of the policy is replaced by the following:

NO PRIOR ENDORSEMENT

(i) to property damage

(1) to property owned or occupied by or rented to the insured, or held by the insured for sale or entrusted to the insured for storage or safekeeping,

(2) except with respect to liability under a written sidetrack agreement or the use of elevators to

(i) property while on premises owned by or rented to the insured for the purpose of having operations performed on such property by or on behalf of the insured,

(ii) tools or equipment while being used by the insured in performing his operations,

(iii) property in the custody of the insured which is to be installed, erected or used in construction by the insured,

(iv) that particular part of any property, not on premises owned by or rented to the insured,

(a) upon which operationsare being performed by or on behalf of the insured at the time of the property damage arising out of such operations, or

(b) out of which any property damage arises, or

(c) the restoration, repair or replacement of which has been made or is necessary by reason of faulty workmanship thereon by or, on behalf of the insured,

but parts (a), (b) and (c) of this exclusion do not apply (1) to the named insured's products where the insured has relinquished physical possession of such products to others, or (2) where the property damage arises out of the completed operations hazard,

(v) property which is being transported by the insured by automobile, mobile equipment or team; including the loading or unloading thereof.

Nothing herein contained shall vary, alter or extend any provision or condition of the policy other than as above stated.

| Effective Date | | Part of Policy No. |
|---|---|---|
| February 15, 1969 | at the hour specified in the policy. | GAL 36597 |
| Issued to Crown-Metro Inc., etal | | |

mb 6/24/69 Insurance Underwriters, Inc.

Authorized Agent

Not valid unless countersigned by a duly authorized agent of the INSURANCE COMPANY OF NORTH AMERICA

Charles K. Cox
President

C-1660

COMPANY REGISTRATION COPY

100M 7-18-67 Ptd. in U.S.A.

CIC 0504

INA INSURANCE COMPANY OF NORTH AMERICA

O.K. S.O.

NO PREM ENDORSEMENT

JUN 26 1969

Exhibit 4

## CANADA EXCISE TAX INFORMATION FORM ENDORSEMENT

The net premiums payable on the Canadian portion of this policy are subject to the 10 percent tax imposed upon the named insured by Section 4 of the Canada Excise Tax Act (Bill C-80).

By virtue of Section 5 of the law, compliance with the following reporting obligations is required:

BUDGET

**Insured**

On or before April 30th of the year following the date premiums were paid on this policy, remit the tax to the Minister of Finance, together with a return showing:

1. Name of insured;
2. Amount of insurance;
3. Net Premiums paid or payable;
4. Name and address of non-resident broker or agent

**Insurer**

On or before March 15th of the year following the date premiums were paid on this policy, file a return with the Minister of Finance, stating:

1. Name and address of the named insured;
2. Net premium paid or payable;
3. Name and address of the non-resident broker or agent through whom the contract was entered or renewed.

Nothing herein contained shall vary, alter or extend any provision or condition of the policy other than as above stated.

| Effective Date | | Part of Policy No. |
|---|---|---|
| February 15, 1969. | at the hour specified in the policy. | GAL 36597 |
| Issued to Crown-Metro Inc., etal | | |

ml eg 6-6-69

I received this and. 8/26/69 RB

Authorized Agent

Charles K. Cox
President

Not valid unless countersigned by a duly authorized agent of the INSURANCE COMPANY OF NORTH AMERICA

C-1560

COMPANY REGISTRATION COPY

100M 7-10-67 Ptd. in U.S.A.

CIC 0505

INA

# APPLICATION OF INSURANCE TO OWNER OF HIRED AUTOMOBILE

PEG

Named Insured: ~~Brown-Motro, Inc., etal, (per Named Insured Endorsement)~~

Effective: ~~February 15th, 1969~~ Policy No. ~~OAL 36597~~

Issued by: ~~INSURANCE COMPANY OF NORTH AMERICA~~
(Name of Insurance Company)

The above is required to be completed only when this endorsement is issued subsequent to the preparation of the policy.

This endorsement modifies such insurance as is afforded by the provisions of the policy relating to the following:

COMPREHENSIVE AUTOMOBILE LIABILITY INSURANCE
AUTOMOBILE MEDICAL PAYMENTS INSURANCE

NO PREM. ENDORSEMENT

A

With respect to the hired automobile described below or designated in the policy as subject to this endorsement, it is agreed that:

(1) The insurance applies as primary insurance.

(2) Subject otherwise to the Persons Insured provision, the insurance covers as an Insured the owner, any lessee (of whom the Named Insured is a sub-lessee) and any agent or employee of such owner or lessee, but only while such automobile is used in the business of the Named Insured as stated in the declarations, or by or on behalf of the Named Insured for personal or pleasure purposes, and subparagraph (ii) of the Persons Insured provision is amended accordingly.

Description of Automobile:

1966 White Tractor 9500T4907595S1053 Garaged in Greenville, S.C.

BUDGET

1-13-0

IF Insurance Underwriters Inc 130024 NEO 524

Authorized Agent

D-1567 (AG200) 7-15-66 Printed in U.S.A.

CIC 0506

INA

INSURANCE COMPANY OF NORTH AMERICA, PHILADELPHIA, PENNSYLVANIA

## LOSS PAYABLE CLAUSE

Named Insured Crown-Metro, Inc., etal GE PREM ENDORSEMENT

Effective June 6, 1969 Policy No. GAL 36597

Loss or damage, if any, under the policy shall be payable as interest may appear to South Carolina National Bank, Main Street, Greenville, South Carolina

and this insurance as to the interest of the Bailment Lessor, Conditional Vendor, Mortgagee or other secured party or Assignee of Bailment Lessor, Conditional Vendor, Mortgagee or other secured party (herein called the Lienholder) shall not be invalidated by any act or neglect of the Lessee, Mortgagor, Owner of the within described automobile or other Debtor nor by any change in the title or ownership of the property; provided, however, that the conversion, embezzlement or secretion by the Lessee, Mortgagor, Purchaser or other Debtor in possession of the property insured under a bailment lease, conditional sale, mortgage or other security agreement is not covered under such policy, unless specifically insured against and premium paid therefor; and provided, also, that in case the Lessee, Mortgagor, Owner or other Debtor shall neglect to pay any premium due under such policy the Lienholder shall, on demand, pay the same.

Provided also, that the Lienholder shall notify the company of any change of ownership or increase of hazard which shall come to the knowledge of said Lienholder and, unless permitted by such policy, it shall be noted thereon and the Lienholder shall, on demand, pay the premium for such increased hazard for the term of the use thereof; otherwise such policy shall be null and void.

The company reserves the right to cancel such policy at any time as provided by its terms, but in such case the company shall notify the Lienholder when not less than ten days thereafter such cancelation shall be effective as to the interest of said Lienholder therein and the company shall have the right, on like notice, to cancel this agreement.

If the insured fails to render proof of loss within the time granted in the policy conditions, such Lienholder shall do so within sixty days thereafter, in form and manner as provided by the policy, and further, shall be subject to the provisions of the policy relating to appraisal and time of payment and of bringing suit.

Whenever the company shall pay the Lienholder any sum for loss or damage under such policy and shall claim that, as to the Lessee, Mortgagor, Owner or other Debtor, no liability therefor existed, the company shall, to the extent of such payment, be thereupon legally subrogated to all the rights of the party to whom such payment shall be made, under all securities held as collateral to the debt, or may at its option, pay to the Lienholder the whole principal due or to grow due on the mortgage or other security agreement with interest, and shall thereupon receive a full assignment and transfer of the mortgage or other security agreement and of all such other securities; but no subrogation shall impair the right of the Lienholder to recover the full amount of its claim.

Whenever a payment of any nature becomes due under the policy, separate payment may be made to each party at interest provided the company protects the equity of all parties.

Nothing herein contained shall vary, alter or extend any provision or condition of the policy other than as stated above.

Applies to 1969 White Tractor #720603

BUDGET

EG sr Insurance Underwriters,Inc.,etal

Signature of Authorized Representative

D-1280C 10081 3-21-67 Printed in U.S.A. (MAUA-51b)

CIC 0507

INA INSURANCE COMPANY OF NORTH AMERICA

In consideration of an additional premium of $8355.00, it is agreed that Physical Damage Coverage is added to the policy as per Schedule of Automobiles attached.

WEISTHAL S.R.P.C.

BUTC

Nothing herein contained shall vary, alter or extend any provision or condition of the policy other than as above stated.

| Effective Date | | Part of Policy No. |
| --- | --- | --- |
| February 15, 1969 | at the hour specified in the policy. | GAL 36597 |
| Issued to Crown-Metro, Inc., etal | | |

EG sr 9/2/69 Insurance Underwriters,Inc.

524 13,8024

Authorized Agent

Not valid unless countersigned by a duly authorized agent of the INSURANCE COMPANY OF NORTH AMERICA

Charles K. Cox
President

C-1660

COMPANY REGISTRATION COPY

100M 3-69 Ptd. in U.S.A.

CIC 0508

INA

# SCHEDULE OF AUTOMOBILES

PEG

Policy No. GAL 36597

| Ident. No. | Year / Model | Trade Name / Identification Number — Body Type; Truck Load Capacity; Tank Capacity; Gallonage or Bus Seating Capacity / Principal Garage Location | Class (Liab. / Coll.) — F.O.B. List Price or Delivered Price at Factory | Rating Symbol | Actual cost to owner — Purchased New "N" Mo./Yr./Used "U" | Bodily Injury Premium | Property Damage Premium | Automobile Medical Payments Insurance Premium |
|---|---|---|---|---|---|---|---|---|
| 1 | 1960 | White Diesel Tractor 258571 Centredale R. I. | Zones 2 & 4 Long Haul | | 15,900 | | | |
| 2 | 1951 | Mack Tractor LT51D12200 Greenville, S. C. | Zones 2 & 4 Long Haul | | 10,000 | | | |
| 3 | 1962 S400 TD | White Tractor 622722 Greenville, S.C. | Zones 2 & 4 Long Haul | | 13,700 | | | |
| 4 | 1956 | Std. Steel Tank Trailer 5525115 Greenville, S. C. | 10% Zones 2 & 4 Long Haul | | 12,000 | | | |
| 5 | 1954 | Fruehauf Van Trailer FW95136 Greenville, S. C. | 10% Zones 2 & 4 Long Haul | | 6,000 | | | |
| 6 | 1953 | Fruehauf Van Trailer AV1753533 Greenville, S. C. | 10% Zones 2 & 4 Long Haul | | [illegible]197 | | A MFB | |
| 7 | 1956 | S S Trailmobile 2 Compt. Tank Trl 5525081 Greenville, S. C. | 10% Zones 2 & 4 Long Haul | | 12,000 | | | |
| 8 | 1951 | Dodge 1 Ton Dual Wheel 3161123224 Greenville, S. C. | 4CA & 25 Interm. Haul | | 2,000 | NO PREM ENDORSEMENT | | |
| 9 | 1962 | Ford Van Truck C60DV-210402 Greenville, S. C. | 4CA & 25 Interm. Haul | | 5,000 | | | |
| 10 | 1962 | International B/62 Van SE216005E Greenville, S. C. | 4CA Local Haul | | 3,500 | see above | | |
| 11 | 1966 | Dorsey Tandem Axel Semi Trl 68481 Greenville, S. C. | 10% Zones 2 & 4 Long Haul | | 6,500 | | | |
| Totals | | | | | | | | |

| Ident. No. | Limit of Liability* | Comprehensive Rate | Comprehensive Premium | Collision Form or Ded. | Collision Premium | Fire Rate | Fire Premium | Theft Rate | Theft Premium | Combined Additional Rate | Combined Additional Premium | | Ins. Against Uninsured Motorists Premium |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | ACV | | 96.00 | 250. | 541.00 | 38-75 | | | | | | | |
| 2 | ACV | | 75.00 | 250. | 509.00 | 39-03 | | | | | | | |
| 3 | ACV | | 110.00 | 250. | 593.00 | | | | | | | | |
| 4 | ACV | | 97.00 | 250. | 339.00 | | | | | | | | |
| 5 | ACV | | 43.00 | 250. | 216.00 | | | | | | | | |
| 6 | ACV | | 59.00 | 250. | 265.00 | | | | | | | | |
| 7 | ACV | | 97.00 | 250. | 339.00 | | | | | | | | |
| 8 | ACV | | 16.00 | 100. | 61.00 | | | | | | | | |
| 9 | ACV | | 26.00 | 100. | 72.00 | | | | | | | | |
| 10 | ACV | | 12.00 | 100. | 24.00 | | | | | | | | |
| 11 | ACV | | 43.00 | 250. | 216.00 | | | | | | | | |
| Totals | | | | | | | | | | | | | |

EG sr 9/3/69 Insurance Underwriters, Inc.

*It is agreed that the loss to any covered automobile described above with respect to such Comprehensive; Fire, Lightning or Transportation; Theft; Windstorm, Hail, Earthquake or Explosion or Combined Additional Coverages as applies under the policy shall not exceed the limit of liability as shown opposite thereto in this schedule.

D-1467 50M 7-1-66 Ptd. in USA.

PROCESSING COPY

INA

## SCHEDULE OF AUTOMOBILES

Policy No. GAL 36597

PEG

| Ident. No. | Year / Model | Trade Name / Identification Number | Body Type; Truck Load Capacity; Tank Capacity; Gallonage or Bus Seating Capacity / Principal Garage Location | Class (Liab. / Coll.) / F.O.B. List Price or Delivered Price at Factory | Rating Symbol | Actual cost to owner / Purchased New "N" Mo./Yr./Used "U" | Bodily Injury Premium | Property Damage Premium | Automobile Medical Payments Insurance Premium |
|---|---|---|---|---|---|---|---|---|---|
| 12 | 1967 | Chevrolet Van / GS157P139557 | Greenville, S. C. | 4CA / Local Haul | | 2,482 | | | |
| 13 | 1969 | Lincoln Continental / 9Y82A87290 | | 199800 / C - 1 | | | | | |
| 14 | 1965 | Chevrolet 2 dr. Impala / 164375Y-140568 | Hawthorne, N. J. | 199800 4-4 | | | | | |
| 15 | 1962 | International Van / 1890A-SB269952 | | 4CA + 25 / Interm. Haul | | 7,000 | | | |
| 16 | 1959 | Ford 3/4 Ton Truck / F25JOE-46646 | Hawthorne, N. J. | 4CA / Local Haul | | 3,195 | | | |
| 17 | 1960 | White Tractor / 608308 | Centredale, R. I. | Zones 2 & 4 / Long Haul | | 15,900 | | | |
| 18 | 1958 | Fruehauf WM4054 Trailer / WVEBR-5533 | Centredale, R. I. | 10% Zones 2 & 4 / Long Haul | | 5,980 | | | |
| 19 | 1955 | Fruehauf 2 Compt. Tank Trailer / FW-46568 | Centredale, R. I. | 10% Zones 2 & 4 / Long Haul | | 12,000 | | | |
| 20 | 1959 F600 | Ford 2 Ton Van Truck / F60592-24822 | Centredale, R. I. | 4CA / Local Haul | | 4,700 | | | |
| 21 | 1965 | White Diesel Tractor / 672304 | Centredale, R. I. | Zones 2 & 4 / Long Haul | | 17,900 | | | |
| 22 | 1966 | Fruehauf Van Semi Trailer / FWG-510810 | Centredale, R. I. | 10% Zones 2 & 4 / Long Haul | | 5,800 | | | |
| Totals | | | | | | | | | |

A
MEB

NO PREM ENDORSEMENT

| Ident. No. | Limit of Liability* | Comprehensive Rate | Comprehensive Premium | Collision Form or Ded. | Collision Premium | Fire Rate | Fire Premium | Theft Rate | Theft Premium | Combined Additional Rate | Combined Additional Premium | Ins. Against Uninsured Motorists Premium |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12 | ACV | | 10.00 | 50. | 36.00 | 39-03 | | | | | | |
| 13 | ACV | | 32.00 | 50. | 96.00 | 39-03 | | | | | | |
| 14 | ACV | | 11.00 | 50. | 48.00 | 29-03 | | | | | | |
| 15 | ACV | | 79.00 | 100. | 164.00 | | | | | | | |
| 16 | ACV | | 9.00 | 50. | 51.00 | | | | | | | |
| 17 | ACV | | 96.00 | 250. | 542.00 | 38-05 | | | | | | |
| 18 | ACV | | 32.00 | 250. | 151.00 | | | | | | | |
| 19 | ACV | | 72.00 | 250. | 292.00 | | | | | | | |
| 20 | ACV | | 15.00 | 50. | 43.00 | | | | | | | |
| 21 | ACV | | 110.00 | 250. | 601.00 | | | | | | | |
| 22 | ACV | | 32.00 | 250. | 151.00 | | | | | | | |
| Totals | | | | | | | | | | | | |

BUDGET

EG sr 9/3/69 Insurance Underwriters, Inc.

*It is agreed that the loss to any covered automobile described above with respect to such Comprehensive; Fire, Lightning or Transportation; Theft; Windstorm, Hail, Earthquake or Explosion or Combined Additional Coverages as applies under the policy shall not exceed the limit of liability as shown opposite thereto in this schedule.

D-1467 58M 7-1-66 Ptd. in USA.

PROCESSING COPY

CIC 0510

INA PEC

# SCHEDULE OF AUTOMOBILES

Policy No. GAL 36597

| Ident. No. | Year / Model | Trade Name; Body Type; Truck Load Capacity; Tank Capacity; Gallonage or Bus Seating Capacity / Identification Number; Principal Garage Location | Class (Liab. / Coll.); Rating Symbol / F.O.B. List Price or Delivered Price at Factory | Actual cost to owner / Purchased New "N" Used "U" | Bodily Injury Premium | Property Damage Premium | Automobile Medical Payments Insurance Premium |
|---|---|---|---|---|---|---|---|
| 23 | 1965 | Chevrolet Corvair Van Truck<br>C-1255P106919 Centredale, R. I. | 4CA<br>Local Haul | 3,000 | | | |
| 24 | 1966 | Lincoln Continental<br>6Y82C447348 Providence, R. I. | 199800 6-4 | | | | |
| 25 | 1965 | Dodge Polara 2 dr. Hdtp.<br>D-156-160404 Providence, R. I. | 199800 4-4 | | | | |
| 26 | 1967 | Oldsmobile 4 Dr. Luxury Sed.<br>386697M170439 Warwick, R. I. | 199800 5-3 | | | | |
| 27 | 1966 | Oldsmobile 4 Dr. Hardtop<br>35626E134817 Cranston, R. I. | 199800 4-4 | | | | |
| 28 | 1966 | Ford F600 Stake Truck<br>F61CK769348 Providence, R. I. | 4CA<br>Local Haul | 5,000 | | | |
| 29 | 1964 | Oldsmobile 98 4 dr. Sedan<br>884M034429 West Warwick, R. I. | 199800 4-4 | | | | |
| 30 | 1964 | Ford Classic Cab Truck<br>M-755U-564476 Hawthorne, N. J. | 4CB<br>Local Haul | 8,184 | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| Totals | | | | | | | |

PREM ENDORSEMENT

| Ident. No. | Limit of Liability* | Comprehensive Rate | Comprehensive Premium | Collision Form | Collision Premium | Fire Rate | Fire Premium | Theft Rate | Theft Premium | Combined Additional Rate | Combined Additional Premium | | Ins. Against Uninsured Motorists Premium |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 23 | ACV | | 9.00 | 50. | 41.00 | 38-05 | | | | | | | |
| 24 | ACV | | 38.00 | 50. | 123.00 | | | | | | | | |
| 25 | ACV | | 24.00 | 50. | 96.00 | | | | | | | | |
| 26 | ACV | | 29.00 | 50. | 97.00 | 38-02 | | | | | | | |
| 27 | ACV | | 24.00 | 50. | 96.00 | 38-05 | | | | | | | |
| 28 | ACV | | 15.00 | -- | -- | | | | | | | | |
| 29 | ACV | | 24.00 | 50. | 96.00 | 38-02 | | | | | | | |
| 30 | ACV | | 32.00 | -- | -- | 29-03 | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| Totals | | | | | | | | | | | | | |

EG sr 9/3/69 Insurance Underwriters, Inc.

* It is agreed that the loss to any covered automobile described above with respect to such Comprehensive; Fire, Lightning or Transportation; Theft; Windstorm, Hail, Earthquake or Explosion or Combined Additional Coverages as applies under the policy shall not exceed the limit of liability as shown opposite thereto in this schedule.

D-1467 50M 7-1-66 Ptd. in USA.

PROCESSING COPY

INA

SCHEDULE OF AUTOMOBILES

Policy No. GAL 36597

PEG

| Ident. No. | Year / Model | Trade Name / Identification Number | Body Type; Truck Load Capacity; Tank Capacity; Gallonage or Bus Seating Capacity / Principal Garage Location | Class Liab. | Class Coll. | Rating Symbol | Actual cost to owner / F.O.B. List Price or Delivered Price at Factory / Purchased New "N" / Used "U" | Bodily Injury Premium | Property Damage Premium | Medical Payments Insurance Premium |
|---|---|---|---|---|---|---|---|---|---|---|
| 31 | 1966 / 9500TD | White Tractor / 681053 | Wellford, S. C. 39- | 4CB + 25 Long Haul | | | 20,000 | | | |
| 32 | 1966 | Fruehauf Trailer / AVP43964 | Wellford, S. C. | 10% 4CB + 25 Long Haul | | | 6,000 | | | |
| Totals | | | | | | | | | | |

NO PREM ENDORSEMENT

| Ident. No. | Limit of Liability* | Comprehensive Rate | Comprehensive Premium | Collision Value per ded. | Collision Premium | Fire Rate | Fire Premium | Theft Rate | Theft Premium | Combined Additional Rate | Combined Additional Premium | Uninsured Motorists Premium |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 31 | ACV | | 148.00 | 250. | 682.00 | 39-01 | | | | | | |
| 32 | ACV | | 43.00 | 250. | 216.00 | | | | | | | |
| Totals | | | 1,558.00 | | 6,797.00 | | | | | | | |

XG sr 9/3/69 Insurance Underwriters, Inc.

* It is agreed that the loss to any covered automobile described above with respect to such Comprehensive; Fire, Lightning or Transportation; Theft; Windstorm, Hail, Earthquake or Explosion or Combined Additional Coverages as applies under the policy shall not exceed the limit of liability as shown opposite thereto in this schedule.

D-3467 50M 7-1-66 Ptd. in USA.

PROCESSING COPY

CIC 0512

INA **AUTOMOBILE ENDORSEMENT—GENERAL PURPOSE** PEG

| This Endorsement, Effective: | Forms a Part of Policy No. | Issued to: |
|---|---|---|
| August 7, 1969 | GAL 36597 | Crown-Metro, Inc., etal |

It is agreed that the policy is hereby amended in the following particulars: GENERAL CHANGES

Physical Damage Coverage amended on transfer of Item #24 from a 1966 Lincoln Continental to 1969 Cadillac Fleetwood Eldorado

**AUTOMOBILE ADDED**

To afford the insurance applicable under the policy with respect to the additional automobile described herein—Description of the automobile and facts respecting its purchase by the named insured:

| CAR | YEAR OF MODEL | TRADE NAME | MODEL | BODY TYPE | FOR COMMERCIAL VEHICLE USE ONLY: Truck Size; Truck Load Capacity; Tank Gallonage or Bus Seating Capacity | Radius Of Use: Within 50 mi. / 150 mi. / 300 mi. / Over 300 mi. |
|---|---|---|---|---|---|---|
| 1. | | | | | | |
| 2. | | | | | | |

| CAR | Identification, Serial or Motor Number | NO. CYL. | HORSE POWER | FOB List Price or Delivered Price at Factory | Actual Cost When Purchased Incl. Equipment | PURCHASED MO. | YR. | N | U | RATING Sym. | Liability Class | Collision Class |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | | | | $ | $ | | | | | 6-1 | | Priv.-Pass. |
| 2. | | | | $ | $ | | | | | | | |

LOSS PAYEE: Such insurance as is afforded for loss of or damage to the automobile is payable as interest may appear to the Named Insured and:
NAME AND ADDRESS

**AUTOMOBILE ELIMINATED**

To discontinue insurance with respect to the following automobile: (Insert year, model, trade name and number when necessary for identification)

1.
2.

**CHANGES IN COVERAGES, LIMITS OR PREMIUMS**

| COVERAGES (As Defined in the Policy) | EITHER (I)ncluded (D)eleted (A)mended | Limits of Liability Now Applicable: Each Person | Each Accident | CAR #1 $ Additional | CAR #1 $ Return | CAR #2 $ Additional | CAR #2 $ Return | TOTAL $ Additional | TOTAL $ Return | FOR CO. USE ONLY New Annual Premiums CAR #1 | CAR #2 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bodily Injury | | $ ,000 | $ ,000 | | | | | | | | |
| Property Dam. | | | $ ,000 | | | | | | | | |
| Medical Payments | | $ | | | | | | | | | |
| Comprehensive | A | $* ACV | | 14.00 | | | | | | | |
| Collision or Upset | A | *ACV Less $ 50. Deductible | | 22.00 | | | | | | | |
| Fire | | $* | | | | | | | | | |
| Theft | | $* | | | | | | | | | |
| Wind | | $* | | | | | | | | | |
| Comb. Add'l. Cov. | | $* | | | | | | | | | |
| Towing | | $ For each disablement | | | | | | | | | |
| Uninsured Motorists | | EACH PERSON | EACH ACCIDENT | | | | | | | | |
| Bodily Injury | | $ ,000 | $ ,000 | | | | | | | | |
| **Property Damage | | | $ ,000 | | | | | | | | |
| | | TOTALS | $ | 36.00 | | | | | | | |
| | | NET TOTALS | $ | | | | | 36.00 | | | |

BL cr 9/3/69 Insurance Underwriters, Inc.

†"Accident" shall be interpreted as "Occurrence", when family Automobile Coverage is afforded.
*"ACV" means Actual Cash Value.
**Complete in States where applicable.

| STAT. & ACCT. | SERVICE OFFICE 1-3 | AGENCY NO. 4-8 | SYM. 10-12 | POLICY NUMBER 13-18 | AUDIT TERM 19 | STAT. CD | 21 INC. | ACCT. CD. 22 | REGISTRATION 23-28 | BILL 29 | TRANS. 30 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | SEE ABOVE | | | | | | | | 1 | |

| RATE PLAN 30 | POL. YR. 31 | TERM 32-33 | EXPIRATION MO. 34-35 | STAT. YR. 36-37 | ACCT. YR. 38 | LINE 39-40 | TAX DIST. 41-44 | TAX STATE 45-46 | TERR. PLAN 47-48 | CLASS | LIMITS | EXPOSURE | TOTAL PREMIUM 64-70 | COMM. RATE 71-73 | F.O. PREMIUM OR COLL. COMM. AMT. 74-80 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | |

| RATE PLAN 30 | INCEPTION MO. 31-32 | YR. 33 | EXPIRATION MO. 34-35 | DAY 36-37 | YR. 38 | LINE 39-40 | INSURED 41-54 | 55-56 | NET PREMIUM 57-63 | PREMIUM 64-70 | COMM. RATE OR AMT. 71-73 | CERT. NO. 74-77 | SUP. 80 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | SEE ABOVE | | | | SEE ABOVE | | | | | | |

D-4705 200M 3-1-67 PTD. IN U.S.A. PROCESSING COPY

CIC 0513

INA AUTOMOBILE ENDORSEMENT-GENERAL PURPOSE PEG

| This Endorsement, Effective: | Forms a Part of Policy No. | Issued to: |
|---|---|---|
| July 1, 1969 | GAL 36597 | Crown-Metro, Inc., etal |

It is agreed that the policy is hereby amended in the following particulars: GENERAL CHANGES.

Physicial Damage Coverage deleted from Item #25

AUTOMOBILE ADDED

To afford the insurance applicable under the policy with respect to the additional automobile described herein—Description of the automobile and facts respecting its purchase by the named insured:

| CAR | YEAR OF MODEL | TRADE NAME | MODEL | BODY TYPE | FOR COMMERCIAL VEHICLE USE ONLY: Truck Size: Truck Load Capacity; Tank Gallonage or Bus Seating Capacity | Radius Of Use: Within 50 mi. | 150 mi. | 300 mi. | Over 300 mi. |
|---|---|---|---|---|---|---|---|---|---|
| 1. | | | | | | | | | |
| 2. | | | | | | | | | |

| CAR | Identification, Serial or Motor Number | NO. CYL. | HORSE POWER | F.O.B. List Price or Delivered Price at Factory | Actual Cost When Purchased-Incl. Equipment | PURCHASED MO. | YR. | N | U | RATING Sym. | Liability Class | Collision Class |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | | | | $ | $ | | | | | | | |
| 2. | | | | $ | $ | | | | | | | |

LOSS PAYEE: Such insurance as is afforded for loss of or damage to the automobile is payable as interest may appear to the Named Insured and:
NAME AND ADDRESS

AUTOMOBILE ELIMINATED

To discontinue insurance with respect to the following automobile: (Insert year, model, trade name and number when necessary for identification)
1.
2.

CHANGES IN COVERAGES, LIMITS OR PREMIUM

| COVERAGES (As Defined in the Policy) | EITHER (I)Included (D)Deleted (A)Amended | Limits of Liability New Applicable: EACH PERSON | EACH ACCIDENT† | CAR #1 $ Additional | CAR #1 $ Return | CAR #2 $ Additional | CAR #2 $ Return | TOTAL $ Additional | TOTAL $ Return | FOR CO. USE ONLY NEW ANNUAL PREMIUMS CAR #1 | CAR #2 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bodily Injury | | $ ,000 | $ ,000 | | | | | | | | |
| Property Dam. | | | $ ,000 | | | | | | | | |
| Medical Payments | | $ | | | | | | | | | |
| Comprehensive | D | $* ACV | | | 15.00 | | | | | | |
| Collision or Upset | D | *ACV Less $ 50.00 Deductible | | | 60.00 | | | | | | |
| Fire | | $* | | | | | | | | | |
| Theft | | $* | | | | | | | | | |
| Wind | | $* | | | | | | | | | |
| Comb. Add'l. Cov. | | $* | | | | | | | | | |
| Towing | | $ For each disablement | | | | | | | | | |
| Uninsured Motorists | | EACH PERSON | EACH ACCIDENT | | | | | | | | |
| Bodily Injury | | $ ,000 | $ ,000 | | | | | | | | |
| **Property Damage | | | $ ,000 | | | | | | | | |
| | | TOTALS $ | | | 75.00 | | | | | | |
| | | NET TOTALS $ | | | | | | | 75.00 | | |

†"Accident" shall be interpreted as "Occurrence", when Family Automobile Coverage is afforded.
*"ACV" means Actual Cash Value.
**Complete in States where applicable.

EG ar 9/3/69 Insurance Underwriters, Inc.

| STAT. & ACCT. | SERVICE OFFICE 1-3 | POLICY AGENCY NO. 4-9 | SYM. 10-12 | NUMBER 13-18 | AUDIT TERM 19 | STAT. CO. 21 | STAT. INC. | ACCT. CO. 21 | REGISTRATION 22-28 | INS. 29 | TRANS. 30 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | SEE ABOVE | | | | | | D | | 1 | |

| RATE PLAN 20 | POL. YR. 21 | TERM 22-23 | EXPIRATION MO. 24-25 | STAT. YR. 26-27 | ACCT. YR. 28 | LINE 39-40 | TAX DIST. 41-44 | TAX STATE 45-46 | TERR. 47-48 | CLASS 49-55 | LIMITS 56-58 | EXPOSURE 59-63 | TOTAL PREMIUM 64-70 | COMM. BASE 71-73 | P.D. PREMIUM OR COLL. COMM. AMT. 74-80 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | |

| RATE PLAN 20 | INCEPTION MO. 21-22 | INCEPTION YR. 23 | EXPIRATION MO. 24-25 | EXPIRATION DAY 26-27 | EXPIRATION YR. 28 | LINE 39-40 | INSURED 41-54 | 55-56 | NET PREMIUM 57-63 | PREMIUM 64-70 | COMM. RATE OR AMT. 71-73 | CERT. NO. 74-79 | EXP. 80 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | SEE ABOVE | | | | SEE ABOVE | | | | | | |

D-1705 200M 3-1-67 PTD. IN U.S.A. PROCESSING COPY

CIC 0514

INA **AUTOMOBILE ENDORSEMENT GENERAL PURPOSE** PEG

| This Endorsement, Effective: | Forms a Part of Policy No. | Issued to: |
|---|---|---|
| June 6, 1969 | GAL 36597 | Crown-Metro, Inc., etal |

It is agreed that the policy is hereby amended in the following particulars: GENERAL CHANGES.

Physical Damage Coverage added to additional vehicle garaged in Greenville, South Carolina - 1969 White Tractor #720603

**AUTOMOBILE ADDED**

To afford the insurance applicable under the policy with respect to the additional automobile described herein—Description of the automobile and facts respecting its purchase by the named insured:

| CAR | YEAR OF MODEL | TRADE NAME | MODEL | BODY TYPE | FOR COMMERCIAL VEHICLE USE ONLY: Truck Size, Truck Load Capacity, Tank Gallonage or Bus Seating Capacity | Radius Of Use Within 50 mi. / 150 mi. / 300 mi. / Over 300 mi. |
|---|---|---|---|---|---|---|
| 1. | | | | | | |
| 2. | | | | | | |

| CAR | Identification, Serial or Motor Number | NO. CYL. | HORSE POWER | FOB List Price or Delivered Price at Factory | Actual Cost When Purchased Incl. Equipment | PURCHASED MO. YR. N U | RATING Symbol | Liability Class | Collision Class |
|---|---|---|---|---|---|---|---|---|---|
| 1. | | | | $ | $ 20,085 | 6 69 X | | | Long Haul |
| 2. | | | | $ | $ | | | | |

LOSS PAYEE Such insurance as is afforded for loss of or damage to the automobile is payable as interest may appear to the Named Insured and:
NAME AND ADDRESS

**AUTOMOBILE ELIMINATED**

To discontinue insurance with respect to the following automobile: (Insert year, model, trade name and number when necessary for identification)
1.
2.

**CHANGES IN COVERAGES, LIMITS OR PREMIUM**

| COVERAGES (As Defined in the Policy) | EITHER (I) Included (D) Deleted (A) Amended | Limits of Liability Now Applicable: EACH PERSON | EACH ACCIDENT | CAR #1 $ Additional | CAR #1 $ Return | CAR #2 $ Additional | CAR #2 $ Return | TOTAL $ Additional | TOTAL $ Return | FOR CO. USE ONLY New Annual Premiums CAR #1 | CAR #2 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bodily Injury | | $ ,000 | $ ,000 | | | | | | | | |
| Property Dam. | | | $ ,000 | | | | | | | | |
| Medical Payments | | $ | | | | | | | | | |
| Comprehensive | I | $* ACV | | 170.00 | | | | | | | |
| Collision or Upset | I | *ACV Less $ 250. Deductible | | 626.00 | | | | | | | |
| Fire | | $* | | | | | | | | | |
| Theft | | $* | | | | | | | | | |
| Wind | | $* | | | | | | | | | |
| Comb. Add'l Cov. | | $* | | | | | | | | | |
| Towing | | $ For each disablement | | | | | | | | | |
| Uninsured Motorists Bodily Injury | | $ ,000 | $ ,000 | | | | | | | | |
| **Property Damage | | | $ ,000 | | | | | | | | |
| | | TOTALS $ | | 796.00 | | | | | | | |
| | | NET TOTALS $ | | | | | | 796.00 | | | |

*"Accident" shall be interpreted as "Occurrence", when family Automobile Coverage is afforded.
-*"ACV" means Actual Cash Value.
**Complete in States where applicable.

EG—SE—9/3/69—Insurance Underwriters, Inc.

| STAT. & ACCT. | SERVICE OFFICE 1-3 | AGENCY NO. 4-9 | STA. 10-12 | POLICY NUMBER 13-18 | AUDIT TERM 19 | SELL. CO. 20 | DIV. 21 | ACCT. CO. 22 | REGISTRATION 23-26 | IND. 29 | TRANS. 30 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | SEE ABOVE | | | | | | 9 | | | |

| RATE PLAN 30 | POL. YR. 31 | TERM 32-33 | EXPIRATION MO. 34-35 | STAR. YR. 36-37 | ACCT. YR. 38 | LINE 39-40 | TAX INST. 41-44 | TAX STATE 45-46 | TERR. 47-48 | CLASS 49-55 | LIMITS 56-58 | EXPOSURE 59-63 | TOTAL PREMIUM 64-70 | COMM. RATE 71-72 | P.D. PREMIUM OR COLL. COMM. AMT. 73-80 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | |

| RATE PLAN 30 | INCEPTION MO. 31-32 | YR. 33 | EXPIRATION MO. 34-35 | DAY 36-37 | YR. 38 | LINE 39-40 | INSURED 41-54 | 55-56 | NET PREMIUM 57-63 | PREMIUM 64-70 | COMM. RATE OR AMT. 71-73 | CERT. NO. 74-79 | REP. 80 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | SEE ABOVE | | | | SEE ABOVE | | | | | | |

D-1705 200M 3-1-67 PTD. IN U.S.A. PROCESSING COPY

CIC 0515

INA AUTOMOBILE ENDORSEMENT GENERAL PURPOSE PEG

| This Endorsement, Effective | Forms a Part of Policy No. | Issued to |
|---|---|---|
| April 30, 1969 | GAL 36597 | Crown-Metro, Inc., etal |

It is agreed that the policy is hereby amended in the following particulars: GENERAL CHANGES

Deleting Physical Damage Coverage on Item #16 - 1959 Ford 3/4 Ton Truck

## AUTOMOBILE ADDED

To afford the insurance applicable under the policy with respect to the additional automobile described herein—Description of the automobile and facts respecting its purchase by the named insured:

| CAR | YEAR OF MODEL | TRADE NAME | MODEL | BODY TYPE | FOR COMMERCIAL VEHICLE USE ONLY: Truck Size; Truck Load Capacity; Tank Gallonage or Bus Seating Capacity | Radius Of Use: Within 50 mi. | 150 mi. | 300 mi. | Over 300 mi. |
|---|---|---|---|---|---|---|---|---|---|
| 1. | | | | | | | | | |
| 2. | | | | | | | | | |

| CAR | Identification, Serial or Motor Number | NO. CYL. | HORSE POWER | FOB List Price or Delivered Price at Factory | Actual Cost When Purchased Incl. Equipment | PURCHASED MO. | YR. | N | U | RATING Spec. | Liability Class | Collision Class |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | | | | $ | $ | | | | | | | |
| 2. | | | | $ | $ | | | | | | | |

LOSS PAYEE. Such insurance as is afforded for loss of or damage to the automobile is payable as interest may appear to the Named Insured and:
NAME AND ADDRESS

## AUTOMOBILE ELIMINATED

To discontinue insurance with respect to the following automobile: (Insert year, model, trade name and number when necessary for identification)

1.
2.

## CHANGES IN COVERAGES, LIMITS OR PREMIUM

| COVERAGES (As Defined in the Policy) | Entries: (Included) (Deleted) (Amended) | Limits of Liability Now Applicable: EACH PERSON | EACH ACCIDENT | CAR #1 $ Additional | CAR #1 $ Return | CAR #2 $ Additional | CAR #2 $ Return | $ Additional | $ Return | FOR CO. USE ONLY NEW ANNUAL PREMIUMS CAR #1 | CAR #2 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bodily Injury | | $ ,000 | $ ,000 | | | | | | | | |
| Property Dam. | | | $ ,000 | | | | | | | | |
| Medical Payments | | $ | | | | | | | | | |
| Comprehensive | D | $* ACV | | | 7.00 | | | | | | |
| Collision or Upset | D | *ACV Less $ 50.00 Deductible | | | 41.00 | | | | | | |
| Fire | | $* | | | | | | | | | |
| Theft | | $* | | | | | | | | | |
| Wind | | $* | | | | | | | | | |
| Comb. Addit'l. Cov. | | $* | | | | | | | | | |
| Towing | | $ For each disablement | | | | | | | | | |
| Uninsured Motorists | | EACH PERSON | EACH ACCIDENT | | | | | | | | |
| Bodily Injury | | $ ,000 | $ ,000 | | | | | | | | |
| **Property Damage | | | $ ,000 | | | | | | | | |
| | | TOTALS $ | | | 48.00 | | | | | | |
| | | NET TOTALS $ | | | | | | | 48.00 | | |

†"Accident" shall be interpreted as "Occurrence", when family Automobile Coverage is afforded.
*"ACV" means Actual Cash Value.
**Complete in States where applicable.

EG sr 9/3/69 Insurance Underwriters, Inc.

D-1785 200M 5-1-67 PTD. IN U.S.A.

PROCESSING COPY

CIC 0516

INA — AUTOMOBILE ENDORSEMENT GENERAL PURPOSE — PEG

| This Endorsement, Effective: | Forms a Part of Policy No. | Issued to: |
|---|---|---|
| March 10, 1969 | GAL 36597 | Crown-Metro, Inc., etal |

It is agreed that the policy is hereby amended in the following particulars: GENERAL CHANGES

Deleting Physical Damage Coverage on Item #2 -
1951 Mack Tractor #LF5101220

AUTOMOBILE ADDED

To afford the insurance applicable under the policy with respect to the additional automobile described herein—Description of the automobile and facts respecting its purchase by the named insured:

LOSS PAYEE: Such insurance as is afforded for loss of or damage to the automobile is payable as interest may appear to the Named Insured and: NAME AND ADDRESS

AUTOMOBILE ELIMINATED

To discontinue insurance with respect to the following automobile: (Insert year, model, trade name and number when necessary for identification)

1.
2.

CHANGES IN COVERAGES, LIMITS OR PREMIUM

| Coverages | | Limits | Car #1 $ Additional | Car #1 $ Return |
|---|---|---|---|---|
| Comprehensive | D | $* ACV | | 70.00 |
| Collision or Upset | D | *ACV Less $ 250. Deductible | | 477.00 |
| TOTALS $ | | | | 547.00 |
| NET TOTALS $ | | | | 547.00 |

†"Accident" shall be interpreted as "Occurrence", when Family Automobile Coverage is afforded. *"ACV" means Actual Cash Value. **Complete in States where applicable.

EG SF 9/3/69 Insurance Underwriters, Inc.

D-1705 200M 3-1-67 PTD. IN U.S.A.

PROCESSING COPY

CIC 0517

INA

# AUTOMOBILE ENDORSEMENT GENERAL PURPOSE

This Endorsement, Effective: August 7, 1969

Forms a Part of Policy No.: GAL 36597

Issued to: Crown ...

It is agreed that the policy is hereby amended in the following particulars: GENERAL CHANGES

Transfer of Item #24

OK 8/11

AUTOMOBILE ADDED

To afford the insurance applicable under the policy with respect to the additional automobile described herein—Description of the automobile and facts respecting its purchase by the named insured:

| CAR | YEAR OF MODEL | TRADE NAME | MODEL | BODY TYPE | Truck Size; Truck Load Capacity; Tank Gallonage or Bus Seating Capacity | Radius of Use |
|---|---|---|---|---|---|---|
| 1. | 1969 | Cadillac | Fleetwood Eldorado | | | |
| 2. | | | | | | |

| CAR | Identification, Serial or Motor Number | NO. CYL. | HORSE POWER | FOB List Price or Delivered Price at Factory | Actual Cost When Purchased Incl. Equipment | PURCHASED MO. / YR. / N / U | Sym. | Liability Class | Collision Class |
|---|---|---|---|---|---|---|---|---|---|
| 1. | H9280388 | | | $ | $ | | | | |
| 2. | | | | $ | $ | | | | |

LOSS PAYEE: Such insurance as is afforded for loss of or damage to the automobile is payable as interest may appear to the Named Insured and:
NAME AND ADDRESS

AUTOMOBILE ELIMINATED

To discontinue insurance with respect to the following automobiles (Insert year, model, trade name and number when necessary for identification)

1. 1966 Lincoln Continental #6Y82G447348
2.

CHANGES IN COVERAGES, LIMITS OR PREMIUM

| COVERAGES (As Defined in the Policy) | EITHER (I) Included (D) Deleted (A) Amended | Limits of Liability Now Applicable EACH PERSON | EACH ACCIDENT | CAR #1 $ Additional | CAR #1 $ Return | CAR #2 $ Additional | CAR #2 $ Return | TOTAL $ Additional | TOTAL $ Return | FOR CO. USE ONLY NEW ANNUAL PREMIUMS CAR #1 | CAR #2 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bodily Injury | | $ 100 ,000 | $ 300 ,000 | No change | | | | | | | |
| Property Dam. | | | $ 100 ,000 | " | " | | | | | | |
| Medical Payments | | $ | | | | | | | | | |
| Comprehensive | | $* | | | | | | | | | |
| Collision or Upset | | *ACV less $ | Deductible | | | | | | | | |
| Fire | | $* | | | | | | | | | |
| Theft | | $* | | | | | | | | | |
| Wind | | $* | | | | | | | | | |
| Comb. Add'l. Cov. | | $* | | | | | | | | | |
| Towing | | $ | For each disablement | | | | | | | | |
| Uninsured Motorists | | EACH PERSON | EACH ACCIDENT | | | | | | | | |
| Bodily Injury | | $ 10 ,000 | $ 20 ,000 | " | " | | | | | | |
| **Property Damage | | | $ ,000 | | | | | | | | |
| | | | TOTALS $ | | | | | | | | |
| | | | NET TOTALS $ | | | | | | No change | | |

BUDGET

[signature] 9-25-9

HG/mb 8/22/69 Insurance Underwriters, Inc.

†"Accident" shall be interpreted as "Occurrence", when Family Automobile Coverage is afforded.
*"ACV" means Actual Cash Value.
**Complete in States where applicable.

| STAT. & ACCT. | SERVICE OFFICE | AGENCY NO. | SYM. | POLICY NUMBER | AUDIT TERM | STAT. CO. | ACCT. CO. | REGISTRATION | INS. | TRANS. |
|---|---|---|---|---|---|---|---|---|---|---|
| | 524 | 138024 | | SEE ABOVE | | | 9 | | 1 | |

D-1705 200M 2-14-68 PTD. IN U.S.A.

PROCESSING COPY

CIC 0518

INA [redacted] PEG

# AUTOMOBILE ENDORSEMENT GENERAL PURPOSE

| This Endorsement, Effective: | Forms a Part of Policy No. | Issued to |
|---|---|---|
| June 6, 1969 | GAL 36597 | Crown-Metro, Inc., etal. |

AUG 14 1969

It is agreed that the policy is hereby amended in the following particulars: GENERAL CHANGES

**Additional Vehicle garaged in Greenville, South Carolina**

## AUTOMOBILE ADDED

To afford the insurance applicable under the policy with respect to the additional automobile described herein—Description of the automobile and facts respecting its purchase by the named insured:

| CAR | YEAR OF MODEL | TRADE NAME | MODEL | BODY TYPE | FOR COMMERCIAL VEHICLE USE ONLY: Truck Size; Truck Load Capacity; Tank Gallonage or Bus Seating Capacity | Radius Of Use Within 50 mi. | 150 mi. | 300 mi. | Over 300 mi. |
|---|---|---|---|---|---|---|---|---|---|
| 1. | 1969 | White Tractor | 9564TD | Tractor | | | | | |
| 2. | | | | | | | | | |

| CAR | Identification, Serial or Motor Number | NO. CYL. | HORSE POWER | F.O.B. List Price or Delivered Price at Factory | Actual Cost When Purchased Incl. Equipment | PURCHASED MO. | YR. | N | U | RATING Sym. | Liability Class | Collision Class |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | 720603 | | | $ | $ 20,085 | 6 | 69 | N | | | Zone 2 + A | |
| 2. | | | | $ | $ | | | | | | | |

LOSS PAYEE: Such insurance as is afforded for loss of or damage to the automobile is payable as interest may appear to the Named Insured and:
NAME AND ADDRESS

## AUTOMOBILE ELIMINATED

To discontinue insurance with respect to the following automobiles: (Insert year, model, trade name and number when necessary for identification)

1.

2.

## CHANGES IN COVERAGES, LIMITS OR PREMIUM

| COVERAGES (As Defined in the Policy) | EITHER (I) Included (D) Deleted (A) Amended | Limits of Liability Now Applicable: Each Person | Each Accident† | Car #1 $ Additional | Car #1 $ Return | Car #2 $ Additional | Car #2 $ Return | Total $ Additional | Total $ Return | For Co. Use Only New Annual Premiums Car #1 | Car #2 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bodily Injury | I | $ 100,000 | $ 300,000 | 285.00 | | | | | | | |
| Property Dam. | I | | $ 100,000 | 106.00 | | | | | | | |
| Medical Payments | | $ | | | | | | | | | |
| Comprehensive | | $* | | | | | | | | | |
| Collision or Upset | | *ACV Less $ Deductible | | | | | | | | | |
| Fire | | $* | | | | | | | | | |
| Theft | | $* | | | | | | | | | |
| Wind | | $* | | | | | | | | | |
| Comb. Addt'l Cov. | | $* | | | | | | | | | |
| Towing | | $ For each disablement | | | | | | | | | |
| Uninsured Motorists Bodily Injury | I | $ 10,000 | $ 20,000 | | | | | | | | |
| **Property Damage | | | $ ,000 | 2.00 | | | | | | | |
| TOTALS $ | | | | 393.00 | | | | | | | |
| NET TOTALS $ | | | | | | | | | | | 393.00 |

†"Accident" shall be interpreted as "Occurrence", when family Automobile Coverage is afforded.
*"ACV" means Actual Cash Value.
**Complete in States where applicable.

BUDGET

not Billed

9-23-9

| STA. & ACC. | SERVICE OFFICE | AGENCY NO. | SYM. | POLICY NUMBER | REGISTRATION |
|---|---|---|---|---|---|
| | 524 | 138024 | EG | 8/7/69 | Insurance Underwriters, Inc. |

D-1705 200M 2-14-68 PTD. IN U.S.A.

PROCESSING COPY

CIC 0519

INA

# AUTOMOBILE ENDORSEMENT GENERAL PURPOSE

PEG

| This Endorsement, Effective: | Forms a Part of Policy No. | Issued to: |
|---|---|---|
| July 1, 1969 | GAL 36597 | Crown-Metro, Inc., etal. |

It is agreed that the policy is hereby amended in the following particulars: GENERAL CHANGES

Deleting Item #25

## AUTOMOBILE ADDED

To afford the insurance applicable under the policy with respect to the additional automobile described herein—Description of the automobile and facts respecting its purchase by the named insured:

| CAR | YEAR OF MODEL | TRADE NAME | MODEL | BODY TYPE | FOR COMMERCIAL VEHICLE USE ONLY: Truck Size: Truck Load Capacity; Tank Gallonage or Bus Seating Capacity | Radius Of Use Within 50 mi. | 150 mi. | 300 mi. | Over 300 mi. |
|---|---|---|---|---|---|---|---|---|---|
| 1. | | | | | | | | | |
| 2. | | | | | | | | | |

| CAR | Identification, Serial or Motor Number | NO. CYL. | HORSE POWER | F.O.B. List Price or Delivered Price at Factory | Actual Cost When Purchased Incl. Equipment | PURCHASED MO. | YR. | N | U | RATING Sym. | Liability Class | Collision Class |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | | | | $ | $ | | | | | | | |
| 2. | | | | $ | $ | | | | | | | |

LOSS PAYEE: Such insurance as is afforded for loss of or damage to the automobile is payable as interest may appear to the Named Insured and:
NAME AND ADDRESS

## AUTOMOBILE ELIMINATED

To discontinue insurance with respect to the following automobile: (Insert year, model, trade name and number when necessary for identification)

1. 1965 Dodge Polara 2 door hardtop.#D-156-160404
2.

## CHANGES IN COVERAGES, LIMITS OR PREMIUM

| COVERAGES (As Defined in the Policy) | EITHER (I)ncluded (D)eleted (A)mended | Limits of Liability Now Applicable: EACH PERSON | EACH ACCIDENT† | CAR #1 $ Additional | CAR #1 $ Return | CAR #2 $ Additional | CAR #2 $ Return | TOTAL $ Additional | TOTAL $ Return | FOR CO. USE ONLY NEW ANNUAL PREMIUMS CAR #1 | CAR #2 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bodily Injury | D | $ 100,000 | $ 300,000 | | 76.00 | | | | | | |
| Property Dam. | D | | $ 100,000 | | 21.00 | | | | | | |
| Medical Payments | D | $ 5,000 | | | 15.00 | | | | | | |
| Comprehensive | | $* | | | | | | | | | |
| Collision or Upset | | *ACV less $ Deductible | | | | | | | | | |
| Fire | | $* | | | | | | | | | |
| Theft | | $* | | | | | | | | | |
| Wind | | $* | | | | | | | | | |
| Comb. Add'l Cov. | | $* | | | | | | | | | |
| Towing | | $ For each disablement | | | | | | | | | |
| Uninsured Motorists Bodily Injury | D | EACH PERSON $ ,000 | EACH ACCIDENT $ ,000 | | | | | | | | |
| **Property Damage | | | $ ,000 | | 2.00 | | | | | | |
| | | | TOTALS $ | | 114.00 | | | | | | |
| | | | NET TOTALS $ | | | | | | 114.00 | | |

†"Accident" shall be interpreted as "Occurrence", when Family Automobile Coverage is afforded.
*"ACV" means Actual Cash Value.
**Complete in States where applicable.

BUDGET

| STAT. & ACCT. | SERVICE OFFICE | AGENCY NO. | POLICY NUMBER | AUDIT TERM | STAT. CO. | ACCT. CO. | REGISTRATION |
|---|---|---|---|---|---|---|---|
| | 524 | 138024 | Insurance Underwriters Inc. | | | | EG/vl 8/7/69 |

D-1705 200M 2-14-68 PTD. IN U.S.A.

PROCESSING COPY

CIC 0520

INA

# AUTOMOBILE ENDORSEMENT GENERAL PURPOSE

PEG

| This Endorsement, Effective | Forms a Part of Policy No. | Issued to |
|---|---|---|
| February 15, 1969 | GAL 36597 | Crown-Metro, Inc., etal. |

It is agreed that the policy is hereby amended in the following particulars: GENERAL CHANGES

1. Item #33 deleted

2. Transfer of Item #13

AUTOMOBILE ADDED

To afford the insurance applicable under the policy with respect to the additional automobile described herein—Description of the automobile and facts respecting its purchase by the named insureds

| CAR | YEAR OF MODEL | TRADE NAME | MODEL | BODY TYPE | FOR COMMERCIAL VEHICLE USE ONLY: Truck Size; Truck Load Capacity; Tank Gallonage or Bus Seating Capacity | Radius of Use |
|---|---|---|---|---|---|---|
| 1. | | | | | | |
| 2. | 1969 | Lincoln | Continental 4 dr. sedan | | | |

| CAR | Identification, Serial or Motor Number | NO. CYL. | HORSE POWER | F.O.B. List Price or Delivered Price at Factory | Actual Cost When Purchased Incl. Equipment | PURCHASED MO. | YR. | N | U | RATING Sym. | Liability Class | Collision Class |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | | | | $ | $ | | | | | | | |
| 2. | 9Y82A875290 | | | $ | $ | | | | | | | |

LOSS PAYEE: Such insurance as is afforded for loss of or damage to the automobile is payable as interest may appear to the Named Insured and:
NAME AND ADDRESS

AUTOMOBILE ELIMINATED

To discontinue insurance with respect to the following automobile: (Insert year, model, trade name and number when necessary for identification)

1. Wilby's Jeep Truck #4734WD16018.
2. 1966 Lincoln Continental 4 door sedan C#9Y82A875290

CHANGES IN COVERAGES, LIMITS OR PREMIUM

| COVERAGES (As Defined in the Policy) | Limits of Liability Now Applicable: EACH PERSON | EACH ACCIDENT | CAR #1 $ Additional | CAR #1 $ Return | CAR #2 $ Additional | CAR #2 $ Return | TOTAL $ Additional | TOTAL $ Return | FOR CO. USE ONLY New Annual Premiums CAR #1 | CAR #2 |
|---|---|---|---|---|---|---|---|---|---|---|
| Bodily Injury | $ 100,000 | $ 300,000 | | 72.00 | no change | | | | | |
| Property Dam. | | $ 100,000 | | 33.00 | | | | | | |
| Medical Payments | $ | | | | | | | | | |
| Comprehensive | $* | | | | | | | | | |
| Collision or Upset | *ACV less $ | Deductible | | | | | | | | |
| Fire | $* | | | | | | | | | |
| Theft | $* | | | | | | | | | |
| Wind | $* | | | | | | | | | |
| Comb. Add'l Cov. | $* | | | | | | | | | |
| Towing | $ | For each disablement | | | | | | | | |
| Uninsured Motorists Bodily Injury | $ 10,000 | $ 20,000 | | | | | | | | |
| **Property Damage | | $ ,000 | | 3.00 | | | | | | |
| TOTALS $ | | | | 108.00 | | | | | | |
| NET TOTALS $ | | | | | | | | 108.00 | | |

§"Accident" shall be interpreted as "Occurrence" when family Automobile Coverage is afforded.
*"ACV" means Actual Cash Value.
**Complete in States where applicable.

| STAT. & ACCT. | AGENCY OFFICE | AGENCY NO. | SYM. | POLICY NUMBER | | COUNTERSIGNATURE |
|---|---|---|---|---|---|---|
| | 524 | 138024 | EG/va 8/7/69 | | | Insurance Underwriters, Inc. |

D—1705 200M 2-14-68 PTD. IN U.S.A. PROCESSING COPY

CIC 0521

INA

# AUTOMOBILE ENDORSEMENT GENERAL PURPOSE

PEG

| This Endorsement Effective | Forms a Part of Policy No. | Issued to |
|---|---|---|
| April 30, 1969 | SAL 36597 | Crown-Metro, Inc., etal. |

It is agreed that the policy is hereby amended in the following particulars: GENERAL CHANGES

Item #16 Deleted

## AUTOMOBILE ADDED

To afford the insurance applicable under the policy with respect to the additional automobile described herein—Description of the automobile and facts respecting its purchase by the named insured:

| CAR | YEAR OF MODEL | TRADE NAME | MODEL | BODY TYPE | FOR COMMERCIAL VEHICLE USE ONLY: Truck Size: Truck Load Capacity; Tank Gallonage or Bus Seating Capacity | Radius Of Use: Within 50 mi. 150 mi. 200 mi. Over 300 mi. |
|---|---|---|---|---|---|---|
| 1. | | | | | | |
| 2. | | | | | | |

| CAR | Identification; Serial or Motor Number | NO. CYL. | HORSE POWER | FOB List Price or Delivered Price at Factory | Actual Cost When Purchased Incl. Equipment | PURCHASED MO. | YR. | N | U | RATING Sym. | Liability Class | Collision Class |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | | | | $ | $ | | | | | | | |
| 2. | | | | $ | $ | | | | | | | |

LOSS PAYEE: Such insurance as is afforded for loss of or damage to the automobile is payable as interest may appear to the Named Insured and
NAME AND ADDRESS

## AUTOMOBILE ELIMINATED

To discontinue insurance with respect to the following automobile: (Insert year, model, trade name and number when necessary for identification)

1. 1959 Ford 3/4 Ton Truck #F25JOE-46646.
2.

## CHANGES IN COVERAGES, LIMITS OR PREMIUM

| COVERAGES (As Defined in the Policy) | EITHER (I)Included (D)Deleted (A)Amended | Limits of Liability Now Applicable: EACH PERSON | EACH ACCIDENT† | CAR #1 $ Additional | CAR #1 $ Return | CAR #2 $ Additional | CAR #2 $ Return | TOTAL $ Additional | TOTAL $ Return | FOR CO. USE ONLY New Annual Premiums CAR #1 | CAR #2 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bodily Injury | | $ 100,000 | $ 300,000 | | 80.00 | | | | | | |
| Property Dam. | | | $ 100,000 | | 51.00 | | | | | | |
| Medical Payments | | $ | | | | | | | | | |
| Comprehensive | | $* | | | | | | | | | |
| Collision or Upset | | *ACV Less $ | Deductible | | | | | | | | |
| Fire | | $* | | | | | | | | | |
| Theft | | $* | | | | | | | | | |
| Wind | | $* | | | | | | | | | |
| Comb. Add'l Cov. | | $* | | | | | | | | | |
| Towing | | $ | For each disablement | | | | | | | | |
| Uninsured Motorists Bodily Injury | | $ 10,000 | $ 20,000 | | | | | | | | |
| **Property Damage | | | $ ,000 | | 4.00 | | | | | | |
| | | | TOTALS $ | | 135.00 | | | | | | |
| | | | NET TOTALS $ | | | | | | 135.00 | | |

†"Accident" shall be interpreted as "Occurrence", when Family Automobile Coverage is afforded.
*"ACV" means Actual Cash Value.
**Complete in States where applicable.

9-23

| STAT. & ACCT. | SERVICE OFFICE | POLICY AGENCY NO. | SUB. | NUMBER | AUDIT TERM | STATE | ACCT. CO. | REGISTRATION |
|---|---|---|---|---|---|---|---|---|
| | 524 | 138024 | EG | /V3 8/7/69 | | | 9 | Insurance Underwriters, Inc. |

PROCESSING COPY

D-1705 200M 2-14-68 PTD. IN U.S.A.

CIC 0522

INA

# AUTOMOBILE ENDORSEMENT GENERAL PURPOSE

PEC

| This Endorsement, Effective | Forms a Part of Policy No. | Issued to |
|---|---|---|
| February 15, 1969 | GAL 36597 | Crown-Me[illegible], Inc., etal. |

It is agreed that the policy is hereby amended in the following particulars: GENERAL CHANGES

Place of garaging on Item 30 - 1964 Ford Cab Truck #N7550-564476

changed to Hawthorne, New Jersey

## AUTOMOBILE ADDED

To afford the insurance applicable under the policy with respect to the additional automobile described herein—Description of the automobile and facts respecting its purchase by the named insured:

| CAR | YEAR OF MODEL | TRADE NAME | MODEL | BODY TYPE | FOR COMMERCIAL VEHICLE USE ONLY: Truck Size; Truck Load Capacity; Tank Gallonage or Bus Seating Capacity | Radius of Use: Within 50 mi. / 150 mi. / 300 mi. / Over 300 mi. |
|---|---|---|---|---|---|---|
| 1. | | | | | | |
| 2. | | | | | | |

| CAR | Identification, Serial or Motor Number | NO. CYL. | HORSE POWER | FOB List Price or Delivered Price at Factory | Actual Cost When Purchased Incl. Equipment | PURCHASED MO. | YR. | N | U | RATING: Sym. | Liability Class | Collision Class |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | | | | $ | $ | | | | | | 4CB | |
| 2. | | | | $ | $ | | | | | | | |

LOSS PAYEE: Such insurance as is afforded for loss of or damage to the automobile is payable as interest may appear to the Named Insured and:
NAME AND ADDRESS

## AUTOMOBILE ELIMINATED

To discontinue insurance with respect to the following automobiles: (Insert year, model, trade name and number when necessary for identification)

1.
2.

## CHANGES IN COVERAGES, LIMITS OR PREMIUM

| COVERAGES (As Defined in the Policy) | ENTER (A)Included (D)Deleted (A)Amended | Limits of Liability Now Applicable: EACH PERSON | EACH ACCIDENT | CAR #1 $ Additional | CAR #1 $ Return | CAR #2 $ Additional | CAR #2 $ Return | TOTAL $ Additional | TOTAL $ Return | FOR CO. USE ONLY New Annual Premiums CAR #1 | CAR #2 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bodily Injury | A | $ 100,000 | $ 300,000 | | 29.00 | | | | | | |
| Property Dam. | A | | $ 100,000 | | 2.00 | | | | | | |
| Medical Payments | | $ | | | | | | | | | |
| Comprehensive | | $* | | | | | | | | | |
| Collision or Upset | | *ACV Less $ Deductible | | | | | | | | | |
| Fire | | $* | | | | | | | | | |
| Theft | | $* | | | | | | | | | |
| Wind | | $* | | | | | | | | | |
| Comb. Add'l Cov. | | $* | | | | | | | | | |
| Towing | | $ For each disablement | | | | | | | | | |
| Uninsured Motorists | | EACH PERSON | EACH ACCIDENT | | | | | | | | |
| Bodily Injury | | $ ,000 | $ ,000 | | | | | | | | |
| **Property Damage | | | $ ,000 | | | | | | | | |
| | | | TOTALS $ | | 31.00 | | | | | | |
| | | | NET TOTALS $ | | | | | | 31.00 | | |

Not Budget

10 9-23-7

†"Accident" shall be interpreted as "Occurrence" when family Automobile Coverage is afforded.
*"ACV" means Actual Cash Value.
**Complete in States where applicable.

| STAT. & ACCT. | SERVICE OFFICE | AGENCY NO. | POLICY NUMBER | REGISTRATION | | |
|---|---|---|---|---|---|---|
| | 524 | 138024 | 80/v1 8/7/69 | Insurance Underwriters, Inc. | | |

D—1705 200M 2-14-68 PTD. IN U.S.A.

PROCESSING COPY

CIC 0523

INA PEG

# AUTOMOBILE ENDORSEMENT GENERAL PURPOSE

| Prefix and Number of Policy No. | Issued to |
|---|---|
| GAL 38597 | Crown-Metro, Inc., etal |

It is agreed that the policy is hereby amended in the following particulars: GENERAL CHANGES

.eted.

3.10

## AUTOMOBILE ADDED

To afford the insurance applicable under the policy with respect to the additional automobile described, description of the automobile and facts respecting its purchase by the named insured:

FOR COMMERCIAL VEHICLE USE ONLY

| CAR | YEAR OF MODEL | TRADE NAME | MODEL | BODY TYPE | Truck Size: Truck Load Capacity; Bus Size: Seating Capacity | Radius Of Use Within 50 mi. | 150 mi. | 300 mi. | Over 300 mi. |
|---|---|---|---|---|---|---|---|---|---|
| 1. | | | | | | | | | |
| 2. | | | | | | | | | |

| CAR | Identification, Serial or Motor Number | NO. CYL. | HORSE POWER | F.O.B. List Price or Delivered Price at Factory | Actual Cash Value Incl. Equipment | PURCHASED MO. | YR. | N | U | Sym. | RATING Liability Class | Collision Class |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | | | | $ | | | | | | | | |
| 2. | | | | $ | | | | | | | | |

LOSS PAYEE: Such insurance as is afforded for loss of or damage to the automobile is payable as interest may appear to the Named Insured and:
NAME AND ADDRESS

BUDGET

## AUTOMOBILE ELIMINATED

To discontinue insurance with respect to the following automobiles (Insert year, model, trade name and number when necessary for identification)

1. 1951 Mack Tractor #LT51D12200
2.

## CHANGES IN COVERAGES, LIMITS OR PREMIUM

| COVERAGES (As Defined in the Policy) | Enter (D) Deleted (A) Added | Limits of Liability Now Applicable EACH PERSON | EACH ACCIDENT | CAR #1 $ Additional | CAR #1 $ Return | CAR #2 $ Additional | CAR #2 $ Return | TOTAL $ Additional | TOTAL $ Return | FOR CO. USE ONLY NEW ANNUAL PREMIUMS CAR #1 | CAR #2 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bodily Injury | D | $ ,000 | $ ,000 | | 384. | | | | | 410 | |
| Property Dam. | D | | $ ,000 | | 142. | | | | | 152 | |
| Medical Payments | | $ | | | | | | | | | |
| Comprehensive | | $* | | | | | | | | | |
| Collision or Upset | | *ACV Less $ | Deductible | | | | | | | | |
| Fire | | $* | | | | | | | | | |
| Theft | | $* | | | | | | | | | |
| Wind | | $* | | | | | | | | | |
| Comb. Add'l.Cov. | | $* | | | | | | | | | |
| Towing | | $ | For each disablement | | | | | | | | |
| Uninsured Motorists | | EACH PERSON | EACH ACCIDENT | | | | | | | | |
| Bodily Injury | | $ ,000 | $ ,000 | | | | | | | | |
| **Property Damage | | | $ ,000 | | | | | | | | |
| | | TOTALS $ | | | 526. | | | | | | |
| | | NET TOTALS $ | | | | | | | | | 526.00 |

†"Accident" shall be interpreted as "Occurrence", when Family Automobile Coverage is afforded.
*"ACV" means Actual Cash Value.
**Complete in States where applicable.

| STAT. & ACCT. | SERVICE OFFICE 1-3 | AGENCY NO. 4-9 | SYM. | POLICY NUMBER | AUDIT | | CO. | ACCT. CO. | | REGISTRATION | | TRANS. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 524 | 138024 | | SEE ABOVE | / | | | 9 | N | AUG 9 G A 93 | 1 | 3 |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| X | 9 | 01 | 02 | 70 | 0 | 23 | — | 38 | 0 3 7 4 1 2 0 0 - 8 6 9 0 0 2 | 1 | 526— | 150 | 142— |

| RATE PLAN | INCEPTION MO. | YR. | EXPIRATION MO. | DAY | YR. | LINE | | | | PREMIUM | COMM. RATE | | EXP. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| X | 039 | | | | | 23 | SEE ABOVE | SEE ABOVE | X | 526.00 | 150 | | 0 |

D-1705 200M 2-14-68 PTD. IN U.S.A.

PROCESSING COPY

llc

CIC 0524

INA **INSURANCE COMPANY OF NORTH AMERICA, PHILADELPHIA, PENNSYLVANIA**

**MULTIPLE LIABILITY POLICY**

DECLARATIONS

GAL 36597

Named Insured: Crown-Metro, Inc., etal (per named Insured Endorsement)
Address: 12 Dudley Street
Providence, Rhode Island

The Named Insured is: ☐ Individual ☐ Partnership ☒ Corporation ☐ Joint Venture ☐ (Other)

Policy Period: From February 15, 1969 to February 15, 1970 12:01 A.M., standard time at the address of the Named Insured as stated herein.
Audit Period: Annual, unless otherwise stated

The insurance afforded is only with respect to such of the following Parts and Coverages therein as are indicated by ☒. The limit of the Company's liability against each such Coverage shall be as stated herein, subject to all of the terms of the policy having reference thereto.

| COVERAGE PARTS | LIMITS OF LIABILITY: Bodily Injury Liability – each person | each occurrence | aggregate | Property Damage Liability – each occurrence | aggregate |
|---|---|---|---|---|---|
| ☐ Owners', Landlords' and Tenants' Liability Insurance | | | | | |
| ☐ Structural Alterations, New Construction, Demolition | | | | | |
| ☐ Manufacturers' and Contractors' Liability Insurance | | | | | |
| ☐ Independent Contractors | | | | | |
| ☐ Completed Operations and Products Liability Insurance | | | | | |
| ☒ Contractual Liability Insurance | 100,000 | 300,000 | nil | 100,000 | 100,000 |
| ☒ Comprehensive General Liability Insurance | 100,000 | 300,000 | 300,000 | 100,000 | 100,000 |
| ☒ Comprehensive Automobile Liability Insurance | 100,000 | 300,000 | nil | 100,000 | nil |
| ☒ Elevator Collision Insurance | | | | 10,000 | nil |

| | Personal Liability – each occurrence | Personal Medical Payments – each person | each accident |
|---|---|---|---|
| ☐ Comprehensive Personal Insurance<br>☐ Farmer's Comprehensive Personal Insurance | $ | $ | $ |

| | Physical Damage to Property – each occurrence | Animal Collision—Farmer's Part Only – Market Value not exceeding $300 each animal |
|---|---|---|
| | $ | |

| | each person | each accident |
|---|---|---|
| ☒ Premises Medical Payments Insurance | $ 1000 | $ 25,000 |
| ☒ Automobile Medical Payments Insurance | $ 5000 | |
| ☐ Insurance Against Uninsured Motorist | $ | $ |

| | each person aggregate | general aggregate |
|---|---|---|
| ☒ Personal Injury Liability Insurance | $ 100,000 | $300,000 |

| | |
|---|---|
| ☒ Automobile Physical Damage Insurance (Fleet Automatic or Non-Fleet) | (See Additional Declarations attached for Coverages and Limits of Liability) |
| ☐ Automobile Physical Damage Insurance (Dealers) | (See Additional Declarations attached for Coverages and Limits of Liability) |
| ☐ Garage Insurance | (See Additional Declarations attached for Coverages and Limits of Liability) |

Endorsements attached to policy at inception: D-1565, D-1485, D-1467, LC-937, LC-985, LC-968, LC-1072, LC-1042, Named Ins.End.,Worldwide Cov.End.,Incidental Prof.Liab.,Broad Form Prop.Damage

With respect to the Named Insured, no insurer has cancelled, refused to renew, given notice of cancellation or declined insurance similar to that afforded hereunder, during the past three years, unless otherwise stated herein:

| TOTAL ADVANCE PREMIUM ▶ | $22,086.00 |
|---|---|
| Effective Date | $ |
| 1st Anniversary | $ |
| 2nd Anniversary | $ |

If the Policy Period is more than one year and the premium is to be paid in installments, premium is payable on:

INSURANCE UNDERWRITERS INC.

Countersigned By [signature] Authorized Agent

This Declarations and Coverage Part(s), with Policy Standard Provisions and Endorsements, if any, issued to form a part thereof, completes the above numbered policy.

LC-334 SOM 6/18/66 Printed in U.S.A.

CIC 0526

CASE NO. 02-053S

Emhart Industries, Inc.

vs. Home Insurance Co., et al.

PLAINTIFF'S EXHIBIT 2

DATE ______________ IDEN.

DATE ______________ EVID.

BY ______________
Deputy Clerk

AO 386

# EXHIBIT 3

**Plaintiff's Exhibit 12**

(3)

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
REGION 1
1 CONGRESS STREET, SUITE 1100
BOSTON, MASSACHUSETTS 02114-2023

SUPERFUND RECORDS CTR
Centredale Manor
11.9
8487

**URGENT LEGAL MATTER -- PROMPT REPLY NECESSARY**
**CERTIFIED MAIL: RETURN RECEIPT REQUESTED**

Emhart Industries, Inc.
c/o CT Corporation System
One Commercial Plaza
Hartford, CT 06103

Re: **NOTICE OF POTENTIAL LIABILITY FOR CENTREDALE MANOR SUPERFUND SITE, NORTH PROVIDENCE, RHODE ISLAND**

Dear Sir/Madam:

This letter serves to notify you of potential liability regarding the Centredale Manor Superfund Site, North Providence, Rhode Island ("Site"), as defined by Section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. § 9607(a). In addition, this letter requests that you pay certain costs related to the Site and that you participate in conducting or financing certain clean-up activities at the Site.

**NOTICE OF POTENTIAL LIABILITY**

The United States Environmental Protection Agency ("EPA") has documented the release or threatened release of hazardous substances or pollutants or contaminants at the Site, which is located in North Providence, Rhode Island. The main portion of the Site is known as 2072 and 2074 Smith Street (or, plat 14, lots 200 and 250). The Site extends on the flood plain of the Woonasquatucket River from the main portion of the Site south to the Allendale Dam. Currently, two high rise buildings (Centredale Manor and Brook Village) are located on the Site. In addition to the buildings, the Site is covered by roadway and parking lots. On the eastern portion of the Site is a drainage swale that begins near the northern portion of the Site and extends south, then curves to the west and discharges into a wooded wetland south of the Site and eventually into the Woonasquatucket River. The Site consists of all contaminated areas within this area as well as any other location to which contamination from that area has come to be located, or from which that contamination came.

Hazardous substances involved in the release or threat of release at the Site include, but are not limited to: 2,3,7,8 -Tetrachlorodibenzo-*p*-Dioxin ("dioxin") and hexachlorophene; pesticides; volatile organic compounds ("VOCs"), and; semivolatile organic compounds ("SVOCs"). EPA has spent or is considering spending additional public funds on actions to investigate and control such releases or threatened releases at the Site. Unless a potentially responsible party ("PRP") or parties commit to properly performing or financing such actions, EPA may perform these actions pursuant to Section 104 of CERCLA, 42 U.S.C. § 9604.

Under Sections 106(a) and 107(a) of CERCLA, 42 U.S.C. §§ 9606(a) and 9607(a), and other laws, liable parties may be obligated to implement response actions deemed necessary by EPA to protect public health, welfare, or the environment and may be liable for all costs incurred by the Government in responding to any release or threatened release at the Site. Such actions and costs may include, but are not limited to, expenditures for investigations, planning, response, oversight, and enforcement activities.

Responsible parties under CERCLA include current and former owners and operators of the Site, persons who arranged for disposal or treatment of hazardous substances found at the Site (often called "generators"), and persons who accepted hazardous substances for transport to the Site (often called "transporters").

EPA has evaluated evidence gathered during investigations of the Site. Based on this evidence, EPA has information indicating that you are a potentially responsible party under Section 107(a) of CERCLA with respect to the Site. Specifically, EPA has reason to believe that Emhart Industries, Inc., is a successor to the liability of a chemical company which operated at the Site. By this letter, EPA notifies you of your potential liability and urges you to voluntarily perform or finance those response activities that EPA determines are necessary at the Site.

**DEMAND FOR PAYMENT OF COSTS**

**In accordance with CERCLA and other authorities, EPA has undertaken certain actions and incurred costs in response to conditions at the Site. These response actions are described below. EPA's approximate costs as of September 30, 1999, are $947,140.89, excluding interest. The costs to date of the response actions performed at the Site through EPA funding is approximate and may not fully be fully reflective of total costs until all contractor costs have been submitted and approved by EPA. EPA anticipates that it will expend additional funds for response activities at the Site under the authority of CERCLA and other laws, including those response activities described below.**

In accordance with Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), demand is hereby made for payment of the above amount, and all interest authorized to be recovered under that Section or under any other provisions of law. Demand is also hereby made under these authorities for payment of all future costs, and interest thereon, that EPA may accrue in regard to the Site

In the event the addressee of this notice intends or has already filed for dissolution or reorganization under bankruptcy laws, you are hereby requested to include EPA-Region I, and the United States Department of Justice on any mailing or notice lists used in that proceeding. The United States reserves the right to file a proof of claim or application for reimbursement of administrative expenses in such a proceeding.

**OUTLINE OF SITE RESPONSE ACTIVITIES**

In accordance with CERCLA and other authorities, EPA has undertaken certain actions and incurred certain costs in response to conditions at the Site. These response actions have included conducting site assessments as well as other investigations which have revealed the presence of hazardous substances at the Site.

1. Completed Removal Actions

Due to the presence of hazardous substances at the Site, and in light of other conditions, EPA has determined that there may be an imminent and substantial endangerment to public health, welfare, or the environment. In response, EPA has conducted the following time-critical removal activities at the Site:

- established site security;
- restricted access to contaminated soils;
- conducted certain characterization activities to assist in determining the extent of contamination at the Site;
- entered into an Inter-Agency Agreement with the Army Corps of Engineers to complete a Flood Evaluation Study of the Site and surrounding area, provide flood control options and designs, and design interim soil caps for specific areas of the Site; and
- installed one and partially installed a second interim cap over two contaminated soil areas at the Site.

2. Upcoming Removal Actions

EPA anticipates completing the required time-critical removal activities in the spring of 2000. The activities left to complete are:

- completing the second interim soil cap described above; and
- implementing flood control measures recommended by the Army Corps of Engineers.

3. Ongoing Engineering Evaluation and Cost Analysis

Additionally, EPA is in the process of conducting Engineering Evaluation and Cost Analysis ("EE/CAs") for two non-time critical removal actions at the Site:

- The first EE/CA will address contaminated soils in the primarily residential parcels located in the floodplain of the Woonasquatucket River southerly from Route 44 (sampling analysis currently available shows that impacted residential parcels at the Site are primarily on the East side of the Allendale Pond):

- The second EE/CA will address contaminants in the Woonasquatucket River sediments and soils in its floodplain, including but not limited to the Allendale Pond and the Lymansville Pond areas.

4. Ongoing Remedial Investigation

The Site was recently listed on the National Priorities List ("NPL"). Therefore, EPA is also conducting the following response activities at the Site in anticipation of a possible remedial action:

- a remedial investigation to identify the characteristics of the Site, to define the nature and extent of soil, air, surface water, and ground water contamination at the Site, and to characterize the risk posed by the Site.

**INVITATION TO PERFORM SITE RESPONSE ACTIVITIES**

**Before EPA spends additional public funds to undertake removal activities at the Site, EPA urges you to voluntarily perform or finance the upcoming removal activities outlined in Section 2., above, which EPA has not already completed. Any such work performed by you in your capacity as a PRP must be conducted pursuant to an administrative order and an EPA-approved workplan as authorized by Section 106(a) of CERCLA, 42 U.S.C. § 9606(a). Prior to final issuance of such an order, a draft order will be sent to you or your representative for review and comment. Enclosed herewith is a copy of a summary of a generic Scope of Work. This document should provide you with an understanding of the types of plans and activities typically required by such an order.**

Be advised that even if you do not indicate a willingness to perform or finance necessary response actions, EPA may order you to undertake such actions under Section 106 of CERCLA, 42 U.S.C. § 9606. Failure to comply with a Section 106(a) administrative order may result in a fine of up to $27,500 per day under Section 106(b) or imposition of treble damages under Section 107(c)(3) of CERCLA. Further, you may be held liable under Section 107(a) for the cost of the response activities EPA performs at the Site and for any damages to natural resources. In addition, by virtue of Section 113 of CERCLA, 42 U.S.C. § 9613, other PRPs who agree to perform the necessary response action may seek contribution protection

A Notice of Potential Liability has also been sent to the following parties:

Brook Village Associates Limited Partnership:
c/o Colburn T. Cherney
Ropes & Gray
One Franklin Square
1301 K Street, NW, Suite 800 East
Washington, D.C. 20005-3333
PH 202-626-3900
FAX 202-626-3961

and

c/o Howard Castleman
Roche, Carens & DeGiacomo, P.C.
99 High Street
Boston, MA 02110
PH 617-457-4000
FAX 617-482-3868

Centerdale Manor Associates Limited Partnership (C/S Housing Associates):
c/o Leonard H. Freiman
Goulston & Storrs, A Professional Corporation
400 Atlantic Avenue
Boston, MA 02110-3333
PH 617-482-1776
FAX 617-574-4112

Centerdale Manor Associates Limited Partnership (Centerdale Associates):
c/o Richard J. Welch
Moses & Alfonso, Ltd.
170 Westminster Street, Suite 201
Providence, RI 02903
PH 401-453-3600
FAX 401-453-3604

New England Container Company, Inc.:
c/o Deming E. Sherman, Esq.
Edwards & Angell, LLP
2800 BankBoston Plaza
Providence, RI 02903-2499
PH 401-274-9200
FAX 401-276-6611

Crown Metro, Inc.
c/o Ivan E. Block, Registered Agent
315 Echelon Road
Donaldson Center
Greenville, SC 29605-5234

To date, Brook Village Associates Limited Partnership, Centerdale Manor Associates Limited Partnership, and New England Container Company, Inc., have declined to perform or fund any response activities at the Site. They have also declined to reimburse EPA for its past costs. You or your attorney may wish to discuss the matters set forth in this letter with the above-referenced parties or their attorneys.

**PRP RESPONSE AND EPA CONTACT**

You should contact EPA by the **close of business on Friday, March 3, 2000,** to indicate your willingness to perform or finance the response activities outlined above. If EPA does not receive a response within that time, EPA will assume that you do not wish to negotiate a resolution of your liabilities in connection with the response and that you have declined any involvement in performing response activities. Be advised, however, that liability under CERCLA is joint and several; therefore, each PRP is potentially liable for undertaking all response actions or reimbursing the Government for the entire amount of its response costs.

Please provide the name, address, and telephone number of a designated contact for future communications. Your written response, including any technical comments or questions concerning the proposed response activities, should be directed to the EPA On-Scene Coordinator (OSC) for the Site:

Ted Bazenas, On-Scene Coordinator
U.S. Environmental Protection Agency, Region 1 - New England
Site Evaluation and Response Section II
1 Congress Street Suite 1100, Mail Code HBR
(617) 918-1230

Legal questions and all communications from counsel should be directed to:

Catherine Garypie, Senior Enforcement Counsel
U.S. Environmental Protection Agency, Region 1 - New England
Office of Environmental Stewardship
1 Congress Street Suite 1100, Mail Code SES
Boston, Massachusetts 02203
(617) 918-1540

## DECISION NOT TO USE SPECIAL NOTICE

Under Section 122(e) of CERCLA, 42 U.S.C. § 9622(e), EPA has the discretionary authority to invoke special notice procedures to formally negotiate the terms of an agreement between EPA and PRPs to conduct or finance response activities. The use of special notice procedures triggers a moratorium on certain EPA activities at the Site while formal negotiations between EPA and the PRPs are conducted.

Due to the exigencies posed by conditions present at the Site, removal activities must be conducted as expeditiously as possible. EPA has therefore decided not to invoke the Section 122(e) special notice procedures with respect to CERCLA removal actions at this Site. Nonetheless, EPA is willing to discuss settlement opportunities without invoking a moratorium, but will initiate the response action as planned if such discussions do not lead to settlement expeditiously.

## ADMINISTRATIVE RECORD

Pursuant to Section 113(k) of CERCLA, 42 U.S.C. § 9613(k), EPA has established an administrative record containing documents that form the basis of EPA's decision on the selection of response actions for the Site. The administrative record files may be inspected and comments may be submitted by contacting the OSC for the Site: Ted Bazenas (617) 918-1230.

## SITE ACTIVITY OUTSIDE EPA ACTIONS

If you are already involved in discussions with state or other local authorities or involved in a lawsuit regarding this Site, you should continue such activities as you see fit. This letter is not intended to advise or direct you to restrict or discontinue any such activities. However, you are advised to report the status of any such discussions or actions in your response to this letter and to provide a copy of your response to any other parties involved in those discussions or actions.

## PURPOSE AND USE OF THIS NOTICE LETTER

The factual and legal discussions contained in this letter are intended solely to provide notice and information. Such discussions are not intended to be, and cannot be, relied upon as EPA's final position on any matter set forth herein.

Due to the seriousness of the environmental and legal problems posed by conditions at the Site, EPA urges that you give immediate attention and provide a prompt response to this letter.

By copy of this letter EPA is notifying the State of Rhode Island and the Natural Resources Trustees of EPA's intent to perform, or to enter into negotiations for the performance or financing of, response actions at the Site.

Thank you for your attention to this matter.

Sincerely,

[signature] for

Patricia L. Meaney, Director
Office of Site Remediation and Restoration

Enclosure

cc: Jerome C. Muys, Jr.
Swidler Berlin Shereff Friedman
3000 K Street, NW, Suite 300
Washington, DC 20007-5116

bcc: Ted Bazenas, EPA On-Scene Coordinator - OSRR
Sharon Fennelly, EPA Enforcement Coordinator - OSRR
Donna Murray, EPA Enforcement Coordinator - OSRR
Holly Inglis, EPA Administrative Records Coordinator - OSRR
Catherine Garypie, EPA Senior Enforcement Counsel - OES
Cheryl O'Halloran, EPA CERCLIS Coordinator - OSRR
Andrew Raddant, Acting Environmental Officer, U.S. Department of the Interior
Ken Finkelstein, National Oceanic and Atmospheric Administration
Matthew DeStefano, RIDEM

## SUMMARY OF GENERIC SCOPE OF WORK

**This summary of the Generic Scope of Work is provided for informational purposes only. More detailed provisions will be set forth in the site-specific Scope of Work. Provisions may vary from site to site.**

---

When EPA determines that a Potentially Responsible Party (PRP) has the ability to promptly and properly prevent, mitigate, or eliminate the threats posed by hazardous substances at the Site, EPA may issue an Administrative Order (Order) to such party (the Respondent) with an attached Scope of Work (SOW). The Order and SOW, among other things, compel the Respondent to develop a plan to clean the Site. The components of the plan (also called a "deliverable") must be submitted to EPA for approval before implementation. Detailed instructions for generating each component shall be provided in the SOW. The plan shall consist of the components listed below.

) **Site Security** - The Respondent shall provide on-site security service. Site security shall be maintained until EPA determines the threats posed by conditions at the Site are eliminated or substantially mitigated.

) **Notification of Contractor Selection** - The Respondent shall notify EPA of the proposed cleanup contractor selected to perform work required under the Order.

) **Site-Specific Health and Safety Plan (HASP)** - The Respondent shall develop and implement a HASP for all activities to be conducted at the Site. The HASP shall be developed to protect all on-site personnel and must comply with all applicable health and safety regulations.

**Quality Assurance Plan (QAP)** - The Respondent shall develop a QAP to be utilized in conducting all field and laboratory analysis. The QAP shall ensure that analytical results generated are of known quality.

) **Site Assessment Plan (SAP)** - The Respondent shall develop a SAP specifying the overall strategy of the field investigative work necessary to characterize site contamination.

) **Site Assessment** - A Site Assessment shall be conducted following EPA approval of the SAP.

) **Site Assessment Report and Cleanup Plan (SAR/CP)** - Following completion of the Site Assessment, the Respondent shall develop a SAR/CP that summarizes the Site Assessment and proposes cleanup methods necessary to substantially mitigate and/or eliminate the threats posed by hazardous substances present at the Site.

) **Site Cleanup** - The Site Cleanup shall be conducted according to the EPA approved Cleanup Plan.

) **Completion of Work Report (CWR)** - Upon completion of the Site Cleanup, the Respondent shall submit a CWR summarizing the work performed under the Order and SOW and outlining any remaining contamination.

At any time prior to or after the completion of the work specified in this SOW, EPA may determine that additional tasks are necessary in order to achieve the objectives of the Order, the SOW and CERCLA.

CASE NO. 02-053S

Emhart Industries, Inc.

VS. Home Insurance Co., et al.

PLAINTIFF'S EXHIBIT 12

DATE ______________ IDEN.

DATE ______________ EVID.

BY ______________
Deputy Clerk

AO 386

# EXHIBIT 4

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
NEW ENGLAND

| | |
|---|---|
| In the Matter of:<br><br>Centredale Manor Restoration Project<br>Superfund Site<br>Brook Village Associates Limited Partnership;<br>Centerdale Manor Associates Limited Partnership;<br>Crown Metro, Inc.; Emhart Industries, Inc., and;<br>New England Container Company, Inc.<br><br>Respondents,<br><br>Proceeding under Section 106(a) of the Comprehensive Environmental Response, Compensation and Liability Act, as as amended, 42 U.S.C. § 9606(a) | U.S. EPA New England<br>CERCLA Docket No.<br>CERCLA-1-2001-0032<br><br>SECOND ADMINISTRATIVE ORDER FOR REMOVAL ACTION |

## JURISDICTION

1. This Administrative Order ("Order") is issued pursuant to the authority vested in the President of the United States by section 106(a) of the Comprehensive Environmental Response, Compensation, and Liability Act, as amended ("CERCLA"), 42 U.S.C. § 9606(a). This authority was delegated to the Administrator of the United States Environmental Protection Agency ("EPA") on January 23, 1987, by Executive Order 12580, 52 Fed. Reg. 2926 (January 29, 1987), and further delegated to the Regional Administrators by EPA Delegation Nos. 14-14-A (April 15, 1994) and 14-14-B (May 11, 1994) and further delegated to the Director of the Office of Site Remediation and Restoration by EPA New England Delegation Nos. 14-14-A (September 29, 1995) and 14-14-B (September 3, 1996).

## STATE COORDINATION

2. Pursuant to section 106(a) of CERCLA, 42 U.S.C. § 9606(a), the State of Rhode Island has been notified in writing of the issuance of this Order.

Plaintiff's
Exhibit 15

## PURPOSE

3. The purpose of this Order is to compel the Respondents to perform removal activities at the Centredale Manor Restoration Project Superfund Site in North Providence, Rhode Island, as set forth in the Action Memorandum signed by the Director of the EPA New England Office of Site Remediation and Restoration on January 18, 2001, and the Scope of Work appended to this Order as Appendix A.

## FINDINGS OF FACT

### Site Description

4. The Centredale Manor Restoration Project Superfund Site ("Site") is located in North Providence, Rhode Island. It consists of two parcels, 2072 and 2074 Smith Street (or, Plat 14, Lots 200 and 250, encompassing approximately 9.7 acres) as well as sediments and floodplain areas of the Woonasquatucket River from Route 44 southerly to the breached Allendale Dam and further to an area just below the Lymansville Dam. The Site consists of all contaminated areas within this area as well as any other location to which contamination from that area has come to be located, or from which that contamination came.

5. The Brook Village Apartments are located at 2072 Smith Street, and consist of an eleven-story apartment building housing approximately 135 elderly residents. A series of three parking lots extend to the south of the building. The area around the building is landscaped with grass ground cover. The parcel is bordered to the north by Route 44, to the west by the Woonasquatucket River, to the east by a tailrace, and to the south by 2074 Smith Street. A road allowing 2074 Smith Street access to Route 44 is located on the eastern portion of the parcel.

6. The Centredale Manor Apartments are located at 2074 Smith Street, and consist of an eight-story apartment building housing approximately 200 elderly residents. There are two paved parking lots located to the north and west of the building. The area around the building is landscaped with grass ground cover. The building and parking lots are located on the northern end of the parcel. At the start of EPA's activities at the Site, the southern end of the parcel was heavily wooded. EPA activities at the Site, including the construction of an interim cap, have resulted in the removal of a number of trees in that portion of the Site. The southern end of the parcel is bordered by the Woonasquatucket River to the west and south and a tailrace to the east and south. The northern end of the parcel borders 2072 Smith Street to the north, the Woonasquatucket River to the west, and a tailrace to the east. The parcel accesses Route 44 via a road running along the western portion of 2072 Smith Street.

7. Pursuant to section 105(8)(B) of CERCLA, 42 U.S.C. § 9605(8)(B), the Site is listed on the National Priorities List, 40 C.F.R. Part 300, Appendix B.

**Respondents**

8. Respondent Brook Village Associates Limited Partnership is a Massachusetts limited partnership with its principal place of business at Six Faneuil Hall Marketplace, Boston, Massachusetts.

9. Respondent Centerdale Manor Associates Limited Partnership, is a Rhode Island limited partnership with its principal place of business at 75 Newman Avenue, Rumford, Rhode Island.

10. Respondent Crown-Metro, Inc., is a South Carolina corporation with its principal place of business in Greenville, South Carolina.

11. Respondent Emhart Industries, Inc., is a Connecticut corporation with its principal place of business in Towson, Maryland.

12. Respondent New England Container Corporation is a Rhode Island corporation with its principal place of business in Smithfield, Rhode Island.

13. By letter dated September 15, 1999, EPA notified three Respondents of their status as a potentially responsible party at the Site and afforded them the opportunity to perform or finance necessary removal activities: Brook Village Associates Limited Partnership; Centredale Manor Associates Limited Partnership; and New England Container Company, Inc. By letter dated February 28, 2000, EPA notified two additional Respondents of their status as a potentially responsible party at the Site and afforded them the opportunity to perform or finance necessary removal activities: Emhart Industries, Inc., and Crown-Metro, Inc.

**Site History**

14. Prior to 1936, the properties were occupied by Centredale Worsted Mills, a woolens manufacturing plant. Atlantic Chemical Company, a chemical manufacturer, began operating on a portion of the Site in approximately 1940. Atlantic Chemical Company changed its name in 1953 to Metro-Atlantic, Inc. and operated until the late 1960s or early 1970s. In the late 1960s or early 1970s, Metro-Atlantic, Inc., changed its name to Crown-Metro, Inc. The chemical company ceased operating in the early 1970s. New England Container Company operated a drum reconditioning facility on a portion of the Site from 1952 until approximately 1969. A major fire in the early 1970s destroyed most of the structures at the Site. Evidence

suggests that the operations of the chemical companies and the drum reconditioning facility at the Site resulted in releases and threats of releases of hazardous substances at the Site.

15. Centerdale Manor Associates Limited Partnership is a current owner of a portion of the Site, through its purchase of 2074 Smith Street on March 18, 1982. Brook Village Associates Limited Partnership is a current owner of a portion of the Site, through its purchase of 2072 Smith Street on October 19, 1976. New England Container Company, Inc., formerly operated at the Site. Crown Metro, Inc., and Emhart Industries, Inc., are successors of certain assets and liabilities of the chemical companies which operated at the Site.

16. From approximately 1970 to approximately 1986 the Rhode Island Department of Environmental Management ("RIDEM") was involved in the inspection of the Site as well as oversight of response actions taken by others at the Site. Hundreds of drums were observed by RIDEM representatives at the Site, some of which were visibly smoking. Some of these drums contained hazardous waste materials requiring disposal; other (empty) drums were crushed and disposed of as non-hazardous. RIDEM also directed that soil unearthed at the Site be disposed of at a solid waste landfill.

17. In November 1981, a Notice of Violation and Order was issued by RIDEM to the then-property owners (Joseph Buonanno and Edward Ricci) for violations of the State Hazardous Waste Management Act requiring the property owners to immediately identify all hazardous material on site, then dispose of all hazardous wastes off-site.

18. In August 1986, EPA's contractors conducted a Preliminary Assessment ("PA") of the Centredale Manor property. The PA recommended a Screening Site Inspection, which was completed in October 1990. Soil sample analysis detected several VOCs and SVOCs, pesticides, and two PCB cogeners (Aroclors 1242 and 1254).

19. In 1996, as part of the EPA Providence Urban Initiative Program, fish and eel tissue samples from the Woonasquatucket watershed were analyzed. This lead to a joint advisory from the Rhode Island Department of Health and EPA against eating fish and eels from the Woonasquatucket River, due to PCB, mercury, and dioxin contamination concerns.

20. In June 1998, EPA initiated an Expanded Site Inspection ("ESI") of the Centredale Manor property. The ESI assessed the extent of contamination in areas of potential human exposure, the potential for source areas to be located up-river from the Centredale Manor property, and the presence of dioxin/furan and hexachloroxanthene contamination on the Centredale Manor property.

21. Acting on a verbal approval of funding, EPA initiated a removal action (including sampling and placement of temporary fencing around contaminated surface soil) in January 1999. An Action Memorandum documenting this verbal approval, and authorizing additional activities, was issued on May 4, 1999. The additional activities included: site clearing; sampling activities; the erection of permanent fencing, and community outreach.

22. EPA has conducted certain Remedial Investigation activities at the Site starting in August 1999. These activities include: the use of vapor-diffusion samplers to identify possible discharge areas for contaminated groundwater into the surface water bodies at the Site and the initiation of biota, sediment, surface water and soil sampling at the Site (including the floodplain area from Route 44 southerly to below the Lymansville Dam).

23. On September 13, 1999, an Action Memorandum was issued which changed the scope of the ongoing removal activities and authorized the expenditure of additional funds. The removal activities approved in the September Action Memorandum include: designing and implementing a Flood Evaluation Study of the Site and surrounding area; designing and implementing interim soil caps for specific areas of the Site; and reconstruction of the former tailrace at the eastern edge of the Site.

24. On September 15,1999, EPA mailed Notice of Potential Liability letters to three PRPs: Brook Village Associates Limited Partnership; Centredale Manor Associates Limited Partnership; and New England Container Company, Inc.

25. On November 26, 1999, EPA issued a proposed Administrative Order on Consent ("AOC") for remedial investigation/feasibility study ("RI/FS") activities to Brook Village Associates Limited Partnership and Centredale Manor Associates Limited Partnership - the two parties who indicated a willingness to participate in Site activities after receiving General Notice letters. These negotiations were unsuccessful.

26. On December 2, 1999, EPA issued a proposed AOC for time-critical removal activities to Brook Village Associates Limited Partnership and Centredale Manor Associates Limited Partnership - the two parties who indicated a willingness to participate in Site activities after receiving General Notice letters. These negotiations were unsuccessful.

27. On February 3, 2000, EPA issued a letter to the three potentially responsible parties ("PRPs"), requesting that they voluntarily perform or finance an Engineering Evaluation/Cost Analysis ("EE/CA") for a portion of the Site. The parties declined to negotiate.

28. On February 28, 2000, EPA mailed two additional Notice of Potential Liability letters to Emhart Industries, Inc., and Crown-Metro, Inc. Negotiations with these two PRPs as

well as the three PRPs previously named, to perform or fund the remaining time-critical removal activities at the Site, were not successful.

29. On April 12, 2000, EPA issued a Unilateral Administrative Order ("UAO") to the five PRPs at the Site, ordering the parties to complete time-critical removal activities at the Site (completion of the second interim soil cap and implementation of certain flood control measures). All five PRPs complied with the UAO. EPA approved the PRPs' Completion of Work Report on September 11, 2000.

30. On April 27, 2000, EPA issued a letter to all five PRPs requesting that they indicate their interest in completing the RI/FS at the Site and reimbursing EPA for its past costs at the Site. These negotiations were unsuccessful and EPA is continuing its work on the RI/FS.

31. On June 1, 2000, an Action Memorandum was issued which changed the scope of the ongoing removal activities, authorized the expenditure of additional funds, and granted a 12-month exemption for a continued removal action. The change in scope primarily concerns the transition of certain time-critical removal activities to non-time-critical removal activities. The Action Memorandum also notes that the second interim soil cap and certain flood control measures will be performed by PRPs at the Site pursuant to a UAO.

32. On January 18, 2001, EPA issued an Action Memorandum to mitigate the human health threats posed by dioxin and other hazardous substances released at the Site by removing contaminated soils and sediments from properties subject to residential and recreational use located in the floodplain of the Woonasquatucket River southerly from Route 44 to an area just below the Lymansville Dam and by restoring the Allendale Dam to minimize further migration of contaminated sediment in the River.

33. On February 13, 2001, EPA issued a proposed AOC for non-time-critical removal activities to the five PRPs at the Site. These negotiations were unsuccessful.

34. On February 28, 2001, EPA issued a proposed AOC for past costs to the five PRPs at the Site. The parties declined to negotiate.

**Endangerment**

35. The conditions present at the facility constitute an imminent and substantial endangerment to public health, welfare, or the environment. Factors that may be considered are set forth in Section 300.415(b)(2) of the National Oil and Hazardous Substances Pollution Contingency Plan, as amended, 40 C.F.R. Part 300 ("NCP").

***"Actual or potential exposure to nearby human populations, animals, or the food chain from hazardous substances or pollutants or contaminants;" [300.415(b)(2)(i)].***

With regard to actual or potential exposure to nearby human populations, EPA has documented elevated levels of contaminants including dioxin and PCBs in numerous areas at the Site which could result in human exposure. First, elevated levels of dioxin have been found in surface soils and sediments at properties subject to residential and recreational use along the floodplain of the Woonasquatucket River.

Elevated levels of dioxin in surface soil include levels above 1 ppb. EPA has recommended that 1 ppb (TEQs, or toxicity equivalent) be used as a starting point for residential soil cleanup level for CERCLA non-time critical removal sites and as a preliminary remediation goal (PRG) for remedial sites (Approach for Addressing Dioxin on Soil at CERCLA and RCRA Sites, OSWER Directive 9200.4-26, April 13, 1998). Based on this guidance, 1 ppb of dioxins (as 2,3,7,8-TCDD) has been established as the PRG for the Site for situations involving residential exposure scenario. For the areas evaluated for the NTCRA, the criteria of 1 ppb is used for residential and recreational areas where cancer risk was estimated to exceed $1x10^{-4}$ and non-cancer risk was estimated to exceed 1.0.

The EE/CA evaluated exposure to floodplain sediments and soils for current and future residential and recreational receptors along the Woonasquatucket River between the Centredale Manor property and Lymansville Dam. Possible exposures of residents to site-related contaminants would be through play and yard work near their homes. Possible exposures of recreational users would be through activities such as walking, or exploring the edges of the ponds and river. Assumptions used in exposure assessment for each scenario are described in detail in the EE/CA. Dermal and accidental ingestion exposures were considered for both child and adult. Thirty-two different residential exposure areas and four recreational exposure areas were evaluated and carcinogenic and non-carcinogenic risk was calculated within each exposure area. The streamlined risk evaluation set a target cancer risk equal to or greater than one in ten thousand, or $1x10^{-4}$, and a target noncancer risk hazard index (HI) equal or greater than 1 was used as an indicator of unacceptable risk.

Elevated levels of numerous hazardous substances have been found in surface soils at the residential-use areas and in areas used by recreational users of the River.

EPA's time critical removal activities included placing fences and interim caps in the areas of surface soil contamination. However, the fences are clearly temporary measures and the caps are interim and will ultimately fail if no further action is taken where they are located. Contamination was found in Woonasquatucket River sediments between Route 44 and a point just below the Allendale Dam. The Woonasquatucket River becomes relatively shallow approximately 2,000 feet south of Route 44, in an area known as the Allendale Pond. Due to a 1991 breach of the Allendale Dam, the sediments in this portion of the river are readily accessible to neighborhood children who have been known to play in the area. Finally, data from the initial RI activities indicate that there are elevated levels of contaminants entering the Woonasquatucket River itself. The River is used by recreational boaters and wading fishermen. It is possible that these boaters and fishermen could come in contact with surface water contamination while in the Site area.

For additional information see EE/CA, Appendix B, Streamlined Human Health Risk Evaluation.

*"High levels of hazardous substances or pollutants or contaminants in soils largely at or near the surface, that may migrate;" [300.415(b)(2)(iii)].*

High levels of hazardous substances have been found in soils largely at or near the surface of the Site that will be the subject of this removal action. These soils are in areas subject to erosion by the Woonasquatucket River as well as periodic flooding. Erosion and flooding appear to have caused the contaminated soil to migrate, since elevated levels of hazardous substances have been found in Woonasquatucket River sediments located in the downstream portion of the Site, including below the Allendale Dam.

*"Weather conditions that may cause hazardous substances or pollutants or contaminants to migrate or be released;" [§300.415(b)(2)(v)].*

The land portions of the Site that will be the subject of this removal action are located in the floodplain and have been frequently flooded during high river stage. These weather conditions have caused and will continue to cause the migration of contaminated soil at the Site (particularly from those areas which are not covered by an interim cap) into the Woonasquatucket River and the migration of contaminated sediments further downstream. Allendale Dam, the first flood control structure downstream from 2072 and 2074 Smith Street (approximately 3,100 feet), was breached in November of 1991 and its condition is continuing to

deteriorate. This is causing the release of contaminated sediment into downstream reaches of the river, particularly during flood events.

*"The availability of other appropriate federal or state response mechanisms to respond to the release;" [§300.415(b)(2)(vii)].*

There are no other known federal or state funds or response mechanisms available to finance this action.

36. The following table identifies the highest concentrations of some of the chemical compounds detected by EPA in soil samples collected at the Site:

| CHEMICAL COMPOUND | HIGHEST CONCENTRATION (in parts per billion - ppb) |
|---|---|
| 2,3,7,8 -Tetrachlorodibenzo-*p*-Dioxin | 140 |
| PCBs | 1,300,000 |
| 1,2-dichlorobenzene | 2,800,000 |
| benzene | 480,000 |
| chlorobenzene | 1,000,000 |
| tetrachloroethene | 1,7000,000 |
| trichloroethene | 2,400,000 |
| cadmuim | 180,000 |
| lead | 3,160,000 |
| manganese | 6,420,000 |
| aluminum | 16,100,000 |
| antimony | 27,800 |
| arsenic | 49,300 |
| cadmium | 180,000 |
| chromium | 472,000 |
| copper | 934,000 |
| mercury | 7,400 |
| silver | 35,500 |
| vanadium | 72,500 |

37. The following table represents some of the dangers to human health associated with each of the hazardous substances found on-site, as well as the potential routes of human exposure to these wastes:

| HAZARDOUS SUBSTANCE | ROUTE(S) OF EXPOSURE | POTENTIAL HUMAN HEALTH EFFECTS |
|---|---|---|
| 2,3,7,8 – Tetrachlorodibenzo-*p*-Dioxin | inhalation; skin absorption; ingestion; skin and/or eye contact | irritated eyes, skin, and mucous membranes; chloracne; porphyria; gastrointestinal disturbances; possible reproductive problems; teratogenic effects<br><br>The World Health Organization has classified dioxin as a human carcinogen |
| PCBs | inhalation; skin absorption | irritated eyes; chloracne; liver damage; reproductive problems |
| 1,2-dichloro-benzene | inhalation; skin absorption; ingestion; skin and/or eye contact | irritated eyes and nose; liver and kidney damage; skin blisters |
| benzene | inhalation; skin absorption; ingestion; skin and/or eye contact | irritated eyes, skin, nose and respiratory system; giddiness; headache, nausea, staggered gait; fatigue, anorexia, lassitude; dermatitis; bone marrow depression<br><br>The U.S. Department of Health and Human Services has designated benzene as a known human carcinogen |
| chloro-benzene | inhalation; ingestion; skin and/or eye contact | irritated eyes, skin, nose; drowsiness, incoordination; central nervous system depression. |
| tetrachloro-ethene | inhalation; skin absorption; ingestion; skin and/or eye contact | irritated eyes, nose, throat; nausea; flushed face and neck; vertigo, dizziness, incoordination; headache, somnolence; skin erythema; liver damage |
| trichloro-ethene | inhalation ;skin absorption; ingestion; skin and/or eye contact | irritates eyes and skin; headache, vertigo; visual disturbance; fatigue; giddiness, tremors, somnolence, nausea, vomiting; dermatitis; cardiac arrhythmia, paresthesia, liver injury |
| cadmium | inhalation; ingestion | pulmonary edema, dyspnea, cough, chest tightness, substernal pain; headache, chills, muscle aches; nausea, vomiting, diarrhea; anosmia, emphysema, proteinuria, mild anemia |

| | | |
|---|---|---|
| lead | inhalation; ingestion; skin and/or eye contact | [NOTE: THESE SYMPTOMS ARE MORE PRONOUNCED IN CHILDREN] weakness, lassitude, insomnia; facial pallor; anorexia, weight loss; constipation, abdominal pain, colic, anemia; gingival lead line; tremors, paralysis of the wrist and ankles; encephalopathy; kidney disease, irritated eyes; hypotension |
| manganese | inhalation; ingestion | Parkinson's; asthenia, insomnia, mental confusion, metal fume fever; dry throat, cough, chest tightness, dyspnea, rales, flu-like fever; lower back pain; vomiting; malaise; fatigue; kidney damage |
| aluminum | inhalation; skin and/or eye contact | irritated eyes, skin and respiratory system |
| antimony | inhalation; ingestion; skin and/or eye contact | irritated eyes, skin, nose, throat, mouth; cough; dizziness; headache; nausea, vomiting, diarrhea; stomach cramps; insomnia; anorexia; unable to smell properly |
| arsenic | inhalation; skin absorption; ingestion; skin and/or eye contact | ulceration of nasal septum, dermatitis, gastrointestinal disturbances, peripheral neuropathy, respiratory irritation, hyperpigmentation of skin<br><br>The U.S. Department of Health and Human Services has designated arsenic as a known carcinogen |
| cadmium | inhalation; ingestion | pulmonary edema, dyspnea, cough, chest tightness, substernal pain; headache; chills, muscle aches; nausea, vomiting, diarrhea; anosmia, emphysema, proteinuria, mild anemia |
| chromium | inhalation; ingestion; skin and/or eye contact | irritated eyes and skin; lung fibrosis |
| copper | inhalation; ingestion; skin and/or eye contact | irritated eyes, nose, pharynx; nasal perforation; metallic taste; dermatitis |
| mercury | inhalation; skin absorption; ingestion; skin and/or eye contact | irritated eyes and skin; cough, chest pain, dyspnea, bronchial pneuitis; tremors, insomnia, irritability, indecision, headache, fatigue, weakness; stomatitis, salivation, gastrointestinal disturbance, anorexia, weight loss, proteinuria |
| silver | inhalation; ingestion, skin and/or eye contact | blue-gray eyes, nasal septum, throat and skin irritation, ulceration skin; gastrointestinal disturbance |

| | | |
|---|---|---|
| vanadium | inhalation; ingestion; skin and/or eye contact | irritated eyes, skin and throat; green tongue, metallic taste, eczema, cough; fine rales, wheezing, bronchitis, dyspnea |

38. A portion of the Site (the drainage swale and the Woonasquatucket River and its floodplain extending south from Route 44 to a point just below the Lymansville Dam) is adjacent to or includes a number of residential yards as well as church grounds used for picnics and other events. The non-time-critical removal action addresses areas down stream of the highrises.

39. The Agency for Toxic Substances and Disease Registry ("ATSDR") issued a Health Consultation on June 7, 1999. In that Health Consultation, ATSDR concluded that although current exposures are probably low, significant risks could exist for children or adults who have frequent contact with contaminated soils or sediment at the Site. ATSDR made several recommendations, including that public access be restricted to surface soils which exceed 1 part per billion (ppb) of dioxin. Additional risk information relating to the specific areas addressed by this response action is explained in paragraph 35, above, and the EE/CA supporting the January 18, 2001 Action Memorandum.

40. The excavation of floodplain sediments and soils described in the January 18, 2001 Action Memorandum will prevent possible exposures to contaminants for current and future residential and recreational receptors along the Woonasquatucket River between the Centredale Manor property and Lymansville Dam. As explained above, possible exposures of residents to site-related contaminants would be through play and yard work near their homes, while possible exposures of recreational users would be through activities such as walking, or exploring the edges of the ponds and river. Both the excavation and dam restoration activities will help prevent the migration of contaminants through erosion and flooding.

## CONCLUSIONS OF LAW AND DETERMINATIONS

On the basis of the findings of fact, EPA makes the following Conclusions of Law and Determinations:

41. The Centredale Manor Restoration Project Superfund Site is a "facility" as that term is defined in section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

42. Each Respondent is a "person" as that term is defined in section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

43. Each Respondent is a liable party within the meaning of section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

44. Each substance listed in paragraph 36, above, is a "hazardous substance" as that term is defined in section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

45. The conditions described above in paragraph 35 constitute an actual or threatened "release" into the "environment" within the meaning of section 101(8), (22) of CERCLA, 42 U.S.C. § 9601(8), (22).

46. The actual or threatened releases of hazardous substances at or from the Site may pose "an imminent and substantial endangerment to the public health or welfare or the environment" within the meaning of section 106(a) of CERCLA, 42 U.S.C. § 9606(a).

47. In order to protect public health and welfare and the environment, and prevent further release or threat of release of hazardous substances at or from the Site, a Removal Action is necessary and appropriate. The Removal Action will consist of implementation of the Scope of Work appended to this Order. The Removal Action is designed to prevent, minimize, and/or mitigate damage to the public health or welfare or the environment which may otherwise result from the release or threat of release of hazardous substances, and was developed in accordance with the criteria set forth at section 300.415 of the National Contingency Plan ("NCP"), 40 C.F.R. § 300.415.

48. The removal actions specified in this Order will be done promptly and properly by the Respondents, and will be consistent with the NCP, if performed in accordance with the terms of this Order and Scope of Work.

## ORDER

49. Based upon EPA's jurisdiction, and the findings of fact and determinations set forth above, the Respondents are **ORDERED** to perform all work required under this Order. The Respondents shall comply with the following provisions and perform all actions required by the terms and conditions of this Order.

## PARTIES BOUND

50. This Order shall apply to and be binding upon the Respondents and upon their receivers, trustees, successors, and assigns. No change in ownership or corporate status shall in any way alter the Respondents' responsibilities under this Order. Respondents are jointly and severally responsible for carrying out all activities required of them by this Order. The failure of

one or more Respondent to comply with all or any part of this Order shall not in any way excuse or justify noncompliance by any other Respondent, including but not limited to the failure to perform all obligations of any defaulting Respondent.

## DESIGNATION OF SUPERVISING CONTRACTOR AND PROJECT COORDINATOR

51. Within five (5) days after the effective date of this Order, the Respondents shall retain the services of a qualified and experienced Supervising Contractor for the purpose of performing the work required by this Order in accordance with the terms and conditions of the Scope of Work. Within the same five (5) day period, the Respondents shall notify EPA in writing of the name, address, and qualifications of the proposed supervising contractor and the name and telephone number of the supervising contractor's primary contact person. The Respondents shall also notify EPA of the identity and qualifications of any other contractor(s) or subcontractor(s) to be used at the Site at least seven (7) days in advance of their performing any work under this Order.

52. The supervising contractor shall be a qualified professional engineer with substantial expertise and experience in the cleanup of hazardous waste sites. EPA reserves the right to disapprove, based on professional qualifications, conflicts of interest, and/or deficiencies in previous similar work, any contractor or subcontractor or other person engaged directly or indirectly by the Respondents to conduct work activities under this Order. If EPA disapproves the selection of any proposed contractor, the Respondents shall notify EPA in writing of the name, address, and qualifications of another contractor within seven (7) days after receipt of the notice of disapproval.

53. The Respondents shall provide a copy of this Order to all contractors, subcontractors, laboratories, and consultants retained in connection with this Order within seven (7) days after the Order's effective date or of such retention, whichever is later. The Respondents shall ensure that all such contractors, subcontractors, laboratories and consultants will perform all work in conformity with CERCLA, the NCP, and the terms and conditions of this Order and Scope of Work.

54. Within five (5) days after the effective date of this Order, the Respondents shall designate a Project Coordinator who shall be responsible for administration of all of the Respondents' actions called for by this Order, and shall submit the designated coordinator's name, address, and telephone number to EPA. EPA will deem the project coordinator's receipt of any notice or communication from EPA relating to this Order as receipt by the Respondents.

COMMUNICATION AND COOPERATION AMONG THE RESPONDENTS

55. Within twenty-one (21) days after the effective date of this Order, the Respondents shall submit to EPA for approval a Communication and Coordination Plan (CCP) that specifies the requirements and procedures by which the Respondents will communicate and coordinate with one another in carrying out the requirements of this Order. The CCP shall include at a minimum the following:

A. Communication Strategy. The Respondents shall specify how the designated coordinator and the individual Respondents will communicate and disseminate information relative to this Order. The name, title, address and telephone number of the primary contact person for each Respondent shall be included in the communication strategy.

B. Coordination of Efforts. The Respondents shall describe with specificity how the technical, financial, and administrative requirements of this Order are to be coordinated and distributed among and performed by the Respondents. The CCP shall describe the obligations of each and every Respondent in full.

Each Respondent shall sign the CCP (by a duly authorized representative if the Respondent is other than a natural person) prior to its submission to EPA. Failure of any Respondent to sign the CCP will constitute a violation of this Order by that individual Respondent. The Respondents shall submit all proposed changes or amendments to the CCP to EPA for approval. The CCP as approved by EPA shall be incorporated into and enforceable under this Order.

EPA ON-SCENE COORDINATOR

56. The EPA On-Scene Coordinator ("OSC") will administer EPA's responsibilities and receive all written notices, reports, plans and other documents required by this Order. All submissions required by this Order shall be sent to EPA's OSC at the following address:

Anna Krasko, On-Scene Coordinator
U.S. Environmental Protection Agency New England
1 Congress Street, Suite 1100 (HBR)
Boston, MA 02114
(617) 918-1232
FAX (617) 918-1291

57. EPA's OSC shall have the authority vested in her/him by the NCP, including but not limited to the authority to stop work being performed pursuant to this Order and the authority to modify the Scope of Work. Absence of the OSC from the Site shall not be cause for stoppage of work by the Respondents unless specifically directed by the OSC.

## REMOVAL WORK TO BE PERFORMED; COMPLETION OF WORK

58. Respondents shall perform, at a minimum, the removal action described in the Statement of Work, which is included as Attachment A to this Order and generally includes: (1) excavation of impacted recreational and residential use soils and flood plain sediments; and (2) restoration of Allendale Dam.

### Work Plan and Implementation

59. Within fourteen (14) days after the effective date of this Order, the Respondents shall submit to EPA for approval and the State for review and comment, a Design Schedule for performing the removal action set forth above. Within thirty (30) days after the effective date of this Order the Respondents shall submit to EPA for approval and the State for review and comment, a Design Work Plan. Within ninety (90) days after the effective date of this Order, Respondents shall submit to EPA for approval and the State for review and comment, a 100% Design, an Institutional Controls Plan, an Implementation Schedule, an Implementation Work Plan, and a Project Operations Plan.

60. Within ten (10) days of EPA approval of the 100% Design, Respondents shall conduct a preconstruction meeting and start construction. Within one hundred twenty (120) days of EPA approval of the 100% Design, Respondents shall submit to EPA for approval and the State for review and comment, a Post-Removal Site Control Plan. Within one hundred eighty (180) days of EPA approval of the 100% Design, Respondents shall substantially complete construction and implement all institutional controls.

61. Within fifteen (15) days of completing all work required under this Order, the Respondents shall schedule and conduct a Pre-Final Inspection, including the development of a "Punch List". Within forty five (45) days of completing all work required under this Order, the Respondents shall submit to EPA for approval and the State for review and comment, a Completion of Work Report.

62. Within fifteen (15) days after the Respondents conclude that the "Punch List" deficiencies have been corrected and the Performance Standards have been met, the Respondents shall schedule and conduct a Final Inspection

AON 00033

63. Within ten (10) days of EPA approval of a Completion of Work Report, Respondents shall implement all Post-Removal Site Controls.

## Site Management Plan

64. Before any field activities shall commence at the Site, Respondents shall obtain EPA approval of a Site Management Plan pursuant to Appendix E to this Order.

## Sampling and Analysis Plan

65. Before any field activities shall commence at the Site, EPA Respondents shall obtain EPA approval of a Sampling and Analysis Plan pursuant to Appendix E to this Order.

## Health and Safety Plan

66. Before any field activities shall commence at the Site, Respondents shall submit to EPA and the State for comment a Health and Safety Plan pursuant to Appendix E to this Order. The Health and Safety Plan shall be an enforceable part of this Order.

## Community Relations Support Plan

67. Before any field activities shall commence at the Site, Respondents shall obtain EPA approval of a Community Relations Support Plan pursuant to Appendix E to this Order.

## REPORTING

68. The Respondents shall submit a written progress report to EPA concerning activities undertaken pursuant to this Order by the tenth day of each calendar month until termination of this Order. These reports shall describe all significant developments during the preceding month, including the work performed and any problems encountered, and the developments anticipated during the next calendar month, including the work to be performed, anticipated problems, and planned resolutions of past or anticipated problems.

69. Respondents shall submit a written progress report with a certification to EPA concerning actions undertaken pursuant to this Order every tenth (10th) day of each month, consistent with Appendix D.

70. Respondents or their representatives shall be listed as the generator(s) on all manifested shipments of hazardous waste generated during performance of the Work.

71. With respect to any property owned or controlled by the Owner Respondents that is located within the Site, within 15 days after the entry of this Order, the Owner Respondents shall submit to EPA for review and approval a notice to be filed with the Recorder's Office or Registry of Deeds or other appropriate office, Providence County, State of Rhode Island, which shall provide notice to all successors-in-title that the property is part of the Site, that EPA selected a non-time-critical removal remedy for the Site on January 18, 2001, and that potentially responsible parties have been issued an Order requiring implementation of the response action. Such notice(s) shall identify the name and administrative action number of this case, and the date the Order became effective. The Owner Respondents shall record the notice(s) within 10 days of EPA's approval of the notice(s). The Owner Respondents shall provide EPA with a certified copy of the recorded notice(s) within 10 days of recording such notice(s).

72. At least 30 days prior to the conveyance of any interest in property located within the Site including, but not limited to, fee interests, leasehold interests, and mortgage interests, the Owner Respondent conveying the interest shall give the grantee written notice of (i) this Order, (ii) any instrument by which an interest in real property has been conveyed that confers a right of access to the Site (hereinafter referred to as "access easements") pursuant to this Section VII.3 ("Access to Property and Information") and Section VII.4 ("Institutional Controls"), and (iii) any instrument by which an interest in real property has been conveyed that confers a right to enforce restrictions on the use of such property (hereinafter referred to as "restrictive easements") pursuant to Section VII.4 ("Institutional Controls"). At least 30 days prior to such conveyance, the Owner Respondent conveying the interest shall also give written notice to EPA and the State of the proposed conveyance, including the name and address of the grantee, and the date on which notice of the Order, access easements, and/or restrictive easements was given to the grantee.

73. In the event of any such conveyance, the Owner Respondents' obligations under this Order, including, but not limited to, its obligation to provide or secure access and institutional controls, as well as to abide by such institutional controls, pursuant to this Section VII.3 ("Access to Property and Information") and Section VII.4 ("Institutional Controls") of this Order, shall continue to be met by the Owner Respondents. In no event shall the conveyance release or otherwise affect the liability of the Owner Respondents to comply with all provisions of this Order, absent the prior written consent of EPA. If EPA approves, the grantee may perform some or all of the work under this Order.

## SUBMISSIONS REQUIRING AGENCY APPROVAL; RESPONDENTS' OBLIGATION TO PROCEED

74. After review of any deliverable, plan, report or other item ("submission") which the Respondents are required to submit for approval pursuant to this Order and Scope of Work, EPA may: (i) approve the submission; (ii) conditionally approve the submission with required

modifications; (iii) disapprove the submission and notify the Respondents of deficiencies; or (iv) disapprove the submission and modify the deliverable, plan, report, or other item itself to cure any deficiencies. In the event EPA approves or conditionally approves the submission, or disapproves and modifies the submission itself, the Respondents shall perform all actions required by the submission, as approved, conditionally approved, or modified by EPA.

75. Upon receipt of a notice of disapproval with deficiencies ((iii) above), the Respondents shall correct the deficiencies and resubmit the submission within seven (7) days or such other time period specified in the notice of disapproval. Notwithstanding a notice of disapproval, the Respondents shall proceed to take any action required by any non-deficient portion of the submission. If EPA does not approve the submission as resubmitted, Respondents shall be in violation of the Order.

76. For each submission provided to EPA, the Respondents shall submit such copies as specified by the OSC. Any deliverable, plan, or report submitted to EPA pursuant to this Order shall be dated and shall include, in a prominent location in the document, the following disclaimer: "Disclaimer: This document has been prepared pursuant to a government administrative order (U.S. EPA New England CERCLA Docket No. CERCLA-1-2001-0032) and is subject to approval by the U.S. Environmental Protection Agency. The opinions, findings, and conclusions expressed are those of the authors and not those of the U.S. Environmental Protection Agency." In addition, any such deliverable, plan, or report which has not received final approval from EPA shall be marked "Draft" on each page.

## INCORPORATION AND ENFORCEABILITY OF DOCUMENTS

77. The Scope of Work and all other appendices or attachments to this Order shall be deemed incorporated into, and made an enforceable part of, this Order. Upon approval by EPA pursuant to the procedures of paragraphs 74-76, all contracts, deliverables, plans, reports, specifications, schedules, or other items required by or developed under this Order shall be deemed incorporated into, and made an enforceable part of, this Order. In the event of conflict between this Order and any document attached to, incorporated into, or enforceable hereunder, the provisions of this Order shall control.

## SITE ACCESS

78. All Respondents that own, occupy, or control property at the Site, or property other than the Site to which access is required in order to properly carry out the terms of this Order, shall grant access to the other Respondents, the other Respondents' authorized representatives, and EPA and its officers, employees, agents, contractors, consultants, and other

authorized representatives for purposes of implementing and monitoring work to be performed under this Order.

79. To the extent access to, use or ownership of, or easements over property other than property owned by Respondent at the Site is required for the proper and complete implementation of this Order, the Respondents shall use their best efforts to obtain site access agreements or other interests in the property, in writing, sufficient to allow implementation of this Order within sixty (60) days after this Order's effective date. For purposes of this paragraph, "best efforts" include but are not limited to the payment of money in consideration of access to property.

80. Such written access agreements or other interests obtained pursuant to the preceding paragraph shall provide the Respondents, the Respondents' authorized representatives, and EPA and its officers, employees, agents, contractors, consultants, and other authorized representatives access to the Site at all times for purposes of implementing and monitoring work under this Order. Such written access agreements or other interests shall specify that the Respondents are not EPA's representatives or agents with respect to liability associated with the Site.

81. In the event that site access agreements or other interests sufficient for implementation and monitoring of work under this Order are not obtained within the time period specified above, the Respondents shall notify EPA in writing within three (3) days thereafter regarding the lack of such agreements and the efforts made by the Respondents to obtain them. Lack of access shall not excuse or justify failure to perform any activity or to meet any deadline not requiring or directly dependent upon such access.

## QUALITY ASSURANCE/SAMPLING

82. The Respondents shall submit to EPA, upon request, the results of all sampling or tests and all other data generated by the Respondents, their contractor(s), or on the Respondents' behalf in the course of implementing this Order. The Respondents shall also provide the quality assurance/quality control procedures followed by all sampling teams and laboratories performing data collection and/or analysis.

83. Upon request, the Respondents shall allow EPA or its authorized representatives to take split and/or duplicate samples of any samples collected by the Respondents while performing work under this Order. The Respondents shall notify EPA not less than fourteen (14) days in advance of any sample collection activity. In addition, EPA shall have the right to take any additional samples that it deems necessary.

84. The Respondents shall assure that EPA and its authorized representatives are allowed access to any laboratory utilized by the Respondents in implementing this Order. Upon request, the Respondents shall have a designated laboratory analyze samples submitted by EPA for quality assurance monitoring.

## ACCESS TO INFORMATION; RECORD PRESERVATION; CONFIDENTIALITY CLAIMS

85. Upon request, the Respondents shall provide EPA with copies of all records, documents, and other information generated by the Respondents and their contractor(s) which relates in any way to the Site or to the implementation of this Order, including but not limited to, sampling and analysis records, field sheets and field notes, engineering logs, chain of custody records, contracts, bills of lading, trucking logs, manifests, receipts, reports, and correspondence. In addition, the Respondents' employees, agents, or representatives with knowledge of facts concerning the conditions at the Site or performance of work under this Order shall be made available to EPA to provide such information.

86. For a period of at least nine (9) years following completion of all work conducted by the Respondents pursuant to this Order, the Respondents shall preserve all documents, records, and information of whatever kind, nature or description in their possession and/or control or that of their officers, employees, agents, accountants, contractors, attorneys, successors and assigns, that relate in any way to liability and/or the performance of work under this Order, or relate in any way to releases or threatened releases of hazardous substances which are the subject of the removal action addressed by this Order. After this nine (9) year period has expired, the Respondents shall provide EPA with thirty (30) days advance written notice prior to the destruction of any such records, documents, or information. The Respondents shall send such notice, accompanied by a copy of this Order, to:

Office of Environmental Stewardship
U.S. Environmental Protection Agency New England
1 Congress Street, Suite 1100 (SES)
Boston, MA 02114
Re: Removal Action at Centredale Manor Restoration Project Superfund Site,
CERCLA Docket No. CERCLA-1-2001-0032

Upon request, the Respondents shall provide to EPA copies of all such records, documents, or information.

87. The Respondents may assert a confidentiality claim, if appropriate, covering part or all of the information required by or requested under this Order, pursuant to section 104(e)(7)

of CERCLA, 42 U.S.C. § 9604(e)(7), and 40 C.F.R. § 2.203(b) (1989). The Respondents shall adequately substantiate all such assertions. Analytical and other data specified in section 104(e)(7)(F) of CERCLA shall not be claimed as confidential by the Respondents. Information determined to be confidential by EPA will be afforded the protection required by section 104(e)(7) of CERCLA and by 40 C.F.R. Part 2, Subpart B. If no confidentiality claim accompanies the information when submitted to EPA, EPA may make it available to the public without further notice to the Respondents.

**CREATION OF DANGER: EMERGENCY RESPONSE**

88. Upon the occurrence of any incident or change of conditions during the activities conducted pursuant to this Order that causes or threatens a release of hazardous substances from the Site or an endangerment to the public health or welfare or the environment, the Respondents shall immediately take all appropriate action to prevent, abate or minimize such release or endangerment. The Respondents shall also immediately notify the Regional Duty Officer of the Emergency Planning and Response Branch, EPA New England, telephone (617) 223-7265. In taking any actions under this paragraph, the Respondents shall act in accordance with all applicable provisions of the Health and Safety Plan prepared pursuant to the Scope of Work.

89. The Respondents shall submit a written report to EPA within seven (7) days after each incident specified above, setting forth the events that occurred and the measures taken and to be taken to mitigate any release or endangerment caused or threatened by the incident and to prevent the reoccurrence of such an incident.

90. Nothing herein shall limit the power and authority of EPA or the United States to take, direct, or order all actions necessary to protect public health, welfare, or the environment or to prevent, abate, or minimize an actual or threatened release of hazardous substances, pollutants or contaminants, or hazardous or solid waste on, at, or from the Site.

**OFF-SITE RULE**

91. All hazardous substances, pollutants, or contaminants removed off-site for treatment, storage, or disposal pursuant to this Order shall be treated, stored, or disposed of at a facility in compliance with the EPA Off-Site Rule pursuant to the National Contingency Plan, 40 C.F.R. § 300.440 (Procedures for Planning and Implementing Off-Site Response Actions). This Rule was published in the Federal Register, Volume 58, Number 182, Page 49200, on Wednesday, September 22, 1993.

## AMENDMENTS

92. This Order, other than the Scope of Work and the schedule of work in paragraphs 49-67 of this Order, may only be amended in writing by signature of the Director of the Office of Site Remediation & Restoration of EPA New England. Amendments to the Scope of Work and changes to the schedule of work in paragraphs 49-67 may be made in writing by the OSC or at the OSC's oral direction. Where the OSC makes an oral modification, he/she will memorialize the modification in writing to the Respondents within three (3) days; provided, however, that the effective date of the modification shall be the date of the OSC's oral direction.

93. No informal advice, guidance, suggestion, or comment by EPA regarding reports, plans, specifications, schedules, and any other writing submitted by the Respondents shall be construed as relieving the Respondents of their obligation to obtain such formal approval as may be required by this Order.

## OTHER APPLICABLE LAWS

94. Except as otherwise provided pursuant to paragraph 95 herein and Section 121(e) of CERCLA, all on-site and off-site actions required pursuant to this Order shall be performed in accordance with all applicable local, state, and federal laws and regulations. Such laws shall include, but not be limited to, the laws relating to occupational health and safety and worker's compensation.

95. In accordance with 40 C.F.R. § 300.415(i), all on-site actions required pursuant to this Order shall, to the extent practicable, as determined by EPA, considering the exigencies of the situation, attain applicable or relevant and appropriate requirements under federal environmental, state environmental, or facility siting laws.

## INSURANCE

96. At least seven (7) days prior to commencing any on-site work under this Order, the Respondents shall secure, and shall maintain for the duration of this Order, comprehensive general liability and automobile insurance with limits of $2.6 million dollars, combined single limit. The United States shall be named as an additional insured for all such insurance policies. Within the same time period, the Respondents shall provide EPA with certificates of such insurance and a copy of each insurance policy. If the Respondents demonstrates to EPA that any contractor or subcontractor maintains insurance equivalent to that described above or insurance covering the same risks but in a lesser amount, then the Respondents need provide only that portion of the insurance described above which is not maintained by such contractor or subcontractor.

ENFORCEMENT; PENALTIES FOR NONCOMPLIANCE

97. Violation of this Order may subject the Respondents to civil penalties of up to twenty-seven thousand five-hundred dollars ($27,500) for each day the violation occurs, as provided in section 106(b)(1) of CERCLA, 42 U.S.C. § 9606(b)(1). The Respondents may also be subject to punitive damages in an amount up to three (3) times the amount of any costs incurred by the United States as a result of such violation, as provided in section 107(c)(3) of CERCLA, 42 U.S.C. § 9607(c)(3).

DISCLAIMER OF LIABILITY BY EPA

98. By issuance of this Order, the United States and EPA assume no liability for injuries or damages to persons or property resulting from acts or omissions by the Respondents, its/their officers, employees, agents, representatives, successors, assigns, contractors, or consultants in carrying out activities pursuant to this Order. Neither the United States nor EPA shall be held as a party to any contract entered into by the Respondents or their directors, officers, employees, agents, representatives, successors, assigns, contractors, or consultants in carrying out activities pursuant to this Order.

NO RELEASE FROM LIABILITY

99. Nothing in this Order shall constitute or be construed as a satisfaction or release from any claim, cause of action, or demand in law or equity against the Respondents or any other person, whether or not a party to this Order, for any liability such person may have for any conditions or claims arising out of or relating in any way to the generation, storage, treatment, handling, transportation, release, or disposal of any hazardous substances, hazardous wastes, pollutants, or contaminants found at, taken to, or taken from the Site, including but not limited to any and all claims of the United States for money damages and interest under section 107(a) of CERCLA, 42 U.S.C. § 9607(a), or under any other applicable statute or the common law.

100. Nothing in this Order shall be deemed to constitute any decision on preauthorization of a claim within the meaning of section 111 of CERCLA, 42 U.S.C. § 9611.

RESERVATION OF RIGHTS BY THE UNITED STATES GOVERNMENT

101. The United States reserves all rights against the Respondents and all other persons to take any further civil, criminal, or administrative enforcement action pursuant to CERCLA and/or any other available legal authority, including the right to seek injunctive relief; the recovery of money expended or to be expended (plus interest); monetary penalties; criminal sanctions; and/or punitive damages regarding: (i) any violation of this Order, or (ii) any actual or

potential threat to human health or welfare or the environment, or any release or threat of release of hazardous substances on, at, in, or near the Site.

102. EPA further expressly reserves the right both to disapprove work performed by the Respondents and to request or order the Respondents to perform tasks in addition to those detailed in the Order. In addition, EPA reserves the right to undertake response actions at any time and to perform any and all portions of the work activities which the Respondents have failed or refused to perform properly or promptly.

103. EPA further expressly reserves, and this Order is without prejudice to, all rights against Respondents with respect to all other matters, including but not limited to, the following: (1) claims based on a failure by Respondents to meet a requirement of this Order; (2) liability arising from the past, present, or future disposal, release, or threat of release of waste materials outside of the Site; (3) liability for future disposal of waste material at the Site, other than as provided in the January 18, 2001 Action Memorandum, the Work, or otherwise ordered by EPA; (4) liability for damages for injury to, destruction of, or loss of natural resources, and for the costs of any natural resource damage assessments; (5) criminal liability; (6) liability for violations of federal or state law which occurred before, during or after implementation of the removal activities selected in the January 18, 2001 Action Memorandum; (7) liability for additional response actions that EPA determines are necessary; and (8) liability for costs that EPA and/or the United States have incurred or will incur related to the Site.

104. Notwithstanding any other provision of this Order, EPA shall retain all of its information gathering, entry, inspection, and enforcement authorities and rights under CERCLA and under any other applicable law, regulation, or permit.

**OPPORTUNITY TO CONFER**

105. Within three (3) business days after receipt of this Order, the Respondents may request a conference with EPA to be held no later than three (3) business days before the effective date. Requests for a conference should be submitted to:

Catherine Garypie, Senior Enforcement Counsel
Office of Environmental Stewardship
U.S. Environmental Protection Agency New England
1 Congress Street, Suite 1100 (SES)
Boston, MA 02114
(617) 918-1540
FAX (617) 918-1809

106. The purpose and scope of the conference shall be limited to issues involving the implementation of the response actions required by this Order and the extent to which the Respondents intend to comply with this Order. The conference is not an evidentiary or adversarial hearing and is not part of any proceeding to enforce or challenge the Order. The conference does not give the Respondents a right to seek review of this Order, or to seek resolution of potential liability, and no official stenographic record of the conference will be made. At any conference held pursuant to this section, the Respondents may appear in person or by attorney or other representative.

## EFFECTIVE DATE; COMPUTATION OF TIME

107. This Order shall be effective ten business (10) days after the Order is signed by the Director of the Office of Site Remediation & Restoration. All times for performance of obligations under this Order shall be calculated from the effective date. For purposes of this Order, the term "day" shall mean a calendar day unless otherwise noted herein. When computing any period of time under this Order, if the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the next working day.

**IT IS SO ORDERED.** Issued at Boston, Massachusetts this 26th day of March, 2001.

Patricia L. Meaney, Director
Office of Site Remediation & Restoration

# APPENDIX A

## Scope of Work

# APPENDIX A

## STATEMENT OF WORK

## NON-TIME CRITICAL REMOVAL ACTION (NTCRA)

## CENTREDALE MANOR RESTORATION PROJECT SUPERFUND SITE NORTH PROVIDENCE, RHODE ISLAND

# TABLE OF CONTENTS

I. INTRODUCTION AND PURPOSE ........ 1

II. DEFINITIONS ........ 1

III. NTCRA OVERVIEW ........ 3
A. Objectives of the NTCRA ........ 3
B. Major components of the NTCRA ........ 3

IV. PERFORMANCE STANDARDS ........ 4
A. NTCRA Performance Standards ........ 4
B. NTCRA Requirements ........ 4

V. DESIGN PHASE ........ 5
A. Deliverables ........ 6
1. Design Schedule ........ 6
2. Design Workplan ........ 7
3. Site Access Agreements ........ 7
4. 100% Design ........ 7
5. Institutional Controls Plan (ICP) ........ 8
6. Progress Reports ........ 10
B. Project Meetings ........ 10

VI. IMPLEMENTATION PHASE ........ 11
A. Deliverables ........ 11
1. Implementation Schedule ........ 11
2. Implementation of Work Plan ........ 12
3. Progress Reports ........ 14
4. Completion of Work Report ........ 15
5. Post-Removal Site Control Plan ........ 16
B. Project Meetings ........ 16

VII. SUBMISSIONS REQUIREMENTS FOR AGENCY APPROVAL ........ 17

## I. INTRODUCTION AND PURPOSE

This Non-Time-Critical Removal Action (NTCRA) Statement of Work ("SOW") defines the response activities and deliverable obligations of the Respondents pursuant to the Unilateral Administrative Order For Removal Action ("Order") at the Centredale Manor Restoration Project Superfund Site, located in North Providence, Rhode Island (the "Site"). The activities described in this SOW are based upon the United States Environmental Protection Agency ("EPA") Action Memorandum for the Site signed by the Director, Office of Site Remediation and restoration, EPA New England Region, on January 18, 2001.

## II. DEFINITIONS

The definitions provided in the Order are incorporated herein by reference. In addition, the following definitions shall apply to this SOW:

A. "Design" shall mean an identification of the technology to be used for the NTCRA and its performance and operational specifications, in accordance with all federal and state applicable or relevant and appropriate requirements, including, but not limited to:

1. All significant computations used to size units, to determine the appropriateness of technologies, and the projected effectiveness of the NTCRA;
2. Materials handling and system layouts for the Allendale Dam reconstruction, and excavation, characterization and off-site removal of debris, soil and sediments;
3. Scale drawings of all significant system layouts identified above and including, but not limited to, the Allendale Dam design drawings, and excavation areas and cross-sections;
4. Quantitative analysis demonstrating the anticipated effectiveness of the design to achieve the Performance Standards for the NTCRA;
5. Technical specifications, which detail the major components of the NTCRA and required performance criteria for each major component;
6. Description of the extent of ambient air monitoring including equipment, monitor locations, and data handling procedures;
7. Description of access, land easements and/or other institutional controls required, to be supplied with the construction plans and specifications; and
8. All final plans and specifications stamped by a State of Rhode Island Professional Engineer.

B. "Contaminated Soil and Sediment" shall mean soil and sediment containing contaminants at the Centredale Manor Restoration Project Superfund Site that exceed the dioxin levels of 1 part per billion (TEQ, or toxicity equivalent).

C. "Action Areas" shall mean the areas of the Site at specific locations along the eastern shore of the Allendale and Lymansville Ponds and Reaches, as well as an area around the Allendale Dam as generally depicted in the EE/CA and the January 18, 2001 Action Memorandum. Action Areas are to be defined by the extent of Contaminated Soil and Sediment and the work area necessary for the re-construction of the Allendale Dam.

These areas are shown on Figures 3-1 and 3-2 of the EE/CA and are generally defined as the following areas where dioxin concentrations in soil and sediment exceed 1 part per billion (ppb):

1. Flood plain sediments in Allendale Pond between elevations of 92.5 and 93.5 feet;
2. Flood plain sediments in Lymansville Pond between the existing shoreline and into the pond to a depth of one foot of water;
3. Residential and recreational use soils between elevation 93.5 feet and the 10-year flood elevation along the eastern shoreline of the Allendale Pond and the Allendale Reach of the Woonasquatucket River;
4. Residential and recreational use soils along the eastern shoreline of the Lymansville Pond and Lymansville Reach of the Woonasquatucket River, between the existing shoreline and the 10-year flood elevation; and
5. Floodplain and aquatic sediments in areas adjacent to and immediately upgradient and downgradient of the Allendale Dam that will be disturbed during dam restoration.

D. "NTCRA" shall mean the Non-Time Critical Removal Action approved in an Action Memorandum signed by the Director, Office of Site Remediation and Restoration, EPA New England Region, on January 18, 2001, which is further defined by this SOW.

E. "Respondents' Certification" shall mean the following statement, signed by a responsible corporate official of the Respondents or the Respondents' Project Coordinator:

"To the best of my knowledge, after thorough investigation, I certify that the information contained in or accompanying this submission is true, accurate and complete. I am aware that there are significant penalties for

submitting false information, including the possibility of fine and imprisonment for knowing violations."

F. "Performance Standards" shall mean those cleanup standards, standards of control, cleanup levels, Institutional Controls, and other substantive requirements, criteria or limitations set forth in Section IV of this SOW.

G. "Post Removal Site Controls" shall mean the activities found in Section VI.A.1. of the January 18, 2001 Action Memorandum, or other activities that EPA determines are necessary to ensure the protectiveness of the NTCRA.

## III. NTCRA OVERVIEW

The Action Memorandum, signed on January 18, 2001, generally describes the NTCRA that shall be performed by the Respondents.

### A. Objectives of the NTCRA

1. Prevent migration of contaminated sediments to downstream areas;
2. Eliminate or reduce the risk of human exposure to flood plain sediments containing concentrations of dioxin in excess of removal action levels (1 ppb);
3. Eliminate or reduce the risk of human exposure to residential and recreational use soils containing concentrations of dioxin in excess of removal action levels (1 ppb); and
4. Properly dispose of for off-site treatment the Waste Materials generated during the NTCRA.

### B. Major components of the NTCRA

1. Reconstruct Allendale Dam and restore Allendale Pond; and
2. Excavate contaminated soil and sediment from the Action Areas.

The process of design and implementation of the NTCRA will be further defined and approved in the Design Workplan, the 100% Design, and the Implementation Workplan. After the design phase, the Respondents shall implement the construction in compliance with the Performance Standards

The Respondents shall implement the NTCRA until EPA determines that the Performance Standards have been achieved, The Respondents shall maintain Post-Removal Site Controls upon completion of construction activities.

## IV. PERFORMANCE STANDARDS

The Respondents shall conduct investigations necessary to further define the Action Areas, conduct and confirm excavation of Contaminated Soil and Sediment, and to design and construct the Allendale Dam in compliance with all applicable or relevant and appropriate requirements ("ARARs") and Performance Standards specified in this SOW.

### A. NTCRA Performance Standards

The Respondents shall design and implement a NTCRA which meets the following Performance Standards:

1. Removing all soil and adjacent sediment from residential and recreational use properties that contains dioxin in excess of 1 ppb;
2. Replacing excavated soil with like clean fill materials placed to match the surrounding grade;
3. Destroying the dioxin in that soil through controlled incineration at a licensed off-site location; and
4. Restoring the Allendale Dam with provisions for water level controls and returning the Allendale Pond to the original elevation by use of completion of the spillway at 93.5 feet NGVD.

### B. NTCRA Requirements

To achieve the above Performance Standards the Respondents shall demonstrate to the satisfaction of EPA the following, at a minimum,

1. Refinement of the extent of Action Areas by establishing an organized sampling program and methodology which identifies horizontal and vertical limits of Contaminated Soil and Sediment removal;
2. Refinement of the estimates of Contaminated Soil and Sediment to be removed off-site;
3. Confirmation that Action Areas which undergo excavation met the cleanup level of 1 ppb for dioxin by establishing a post-excavation confirmatory soil and sediment sampling and analysis program;
4. Confirmation that upon re-construction of the Allendale Dam, no areas which were identified to exceed the dioxin level of 1 ppb remain under less than one (1.0) foot of water, by establishing a surveying and evaluation program of the excavated areas and water levels in the Allendale Pond, and a program for additional excavation if required by EPA to meet the Performance Standards;

5. Confirmation of an off-site facility chosen to accept, incinerate and dispose of the residual ashes;
6. Demonstration that the proposed sequence and scheme of construction for the Allendale Dam are safe and will not cause damage to features that will remain after restoration;
7. Establishment of measurements to control dust, odors and other air emissions during construction activities, including any air quality monitoring program deemed necessary by EPA;
8. Establishment of control and diversion of water during construction to minimize sediment migration downstream of the Allendale Dam
9. Establishment of the necessary controls at the Allendale Dam for future controls of the water levels in the Allendale Pond to prevent flooding of adjacent properties;
10. Employment of controlled methods of excavation and dewatering, including run-on and run-off controls, to mitigate the potential for contaminated sediment migration outside of the Action Areas;
11. Employment of erosion and sedimentation controls to minimize impact on adjacent wetlands, floodplains, water bodies, and wildlife resources, including minimization of adverse impacts or violation of water quality standards;
12. Employment of construction techniques and procedures to minimize disturbance and impacts on the affected residential and recreational use properties;
13. Restoration of all disturbed excavated areas to original elevations using suitable material such as clean fill and topsoil, and establishment of vegetative cover to minimize erosion;
14. Removal of trees and shrubs in the Allendale Pond area to be submerged, protection of landscape features outside the work areas, and establishment of temporary and permanent protection of disturbed areas.

In the event that EPA determines at any time during the NTCRA that the Respondents' design or implementation of the NTCRA do not satisfy the requirements of the Performance Standards, the Respondents shall propose to EPA adjustments to the NTCRA, and implement them as directed by EPA.

The Respondents shall design and implement the NTCRA in accordance with the Applicable and Relevant and Appropriate Requirements (ARARs) set forth in the Action Memorandum.

## V. DESIGN PHASE

The Design Phase shall include: 1) preparing performance and operational specifications for the Allendale Dam and excavation activities; 2) securing access required to perform the NTCRA; and 3) preparing an Institutional Controls Plan. The Respondents shall engage the services of a professional engineer licensed in Rhode Island and experienced in the design and construction of small dams. The Respondents may utilize preliminary design for the Allendale Dam prepared by the COE in 1997, with the necessary modifications for water level controls in the Allendale Pond, or propose an alternate design and construction sequence and scheme, which meets the objectives and Performance Standards of the NTCRA. The Design shall be in accordance with commonly accepted standards and practices and shall be sufficiently detailed to show the manner of construction of the Allendale Dam and that the NTCRA can be performed in the required time frame.

This section describes the Respondents' responsibilities for submitting deliverables and conducting project meetings during Design.

A. <u>Deliverables</u>

The Respondents shall submit the following deliverables to EPA and the Rhode Island Department of Environmental Management ("RI DEM") during the design of the NTCRA. Each deliverable shall be subject to review and approval or modification by EPA, pursuant to the procedures specified in Section VII of the Order (hereafter "EPA Review and Approval" or "EPA Approval").

1. Design Schedule
2. Design Workplan
3. Access Agreements
4. 100% Design
5. Institutional Controls Plan
6. Progress Reports

Any submittals by the Respondents to EPA and the RI DEM not referenced in Section VII of the Order, shall include the Respondents' certification, (hereafter "Respondents' Certification")

1. <u>Design Schedule</u>

Within 14 days of the effective date of the Order, the Respondents shall submit a Design Schedule. The Design Schedule shall identify the date, or if the milestone is dependant on completion of other tasks, the critical path, for performance of all major milestones to be performed for completion of the

design of the NTCRA, including the date for submission of all deliverables required by the SOW. If it is not possible to identify a submission date, the critical path task(s) which must be completed in order to produce the deliverable shall be identified. The Design Schedule shall include but not be limited to the following deadlines:

a. The Respondents shall submit to EPA and RI DEM the Design Workplan, within 30 days of the effective date of this Order;
b. The Respondents shall secure all Access Agreements required to perform the NTCRA within 60 days of the effective date of this Order; and
c. The Respondents shall submit to EPA and RI DEM the 100% Design within 90 days of the effective date of this Order.

2. <u>Design Workplan</u>

Within 30 days of the effective date of this Order, the Respondents shall submit a Design Workplan. The Design Workplan shall include:

a. A statement of objectives for the NTCRA and activities to be implemented to achieve such objectives;
b. A detailed Design Schedule and a preliminary Implementation Schedule;
c. A description of tasks required to complete the Design phase, including proposed sequence and scheme of Allendale Dam construction and excavation work at the residential properties;
d. An outline of required design specifications and drawings; and
e. A description of reporting and communications with EPA, RI DEM, and other interested parties, during the Design phase.

3. <u>Site Access Agreements</u>

Within 60 days of the effective date of this Order, the Respondents shall provide to EPA copies of all executed ACCESS AGREEMENTS required to perform the NTCRA.

4. <u>100% Design</u>

Within 90 days of the effective date of this Order, the Respondents shall submit a 100% DESIGN consisting of a PERFORMANCE SPECIFICATION SUBMITTAL, which at a minimum includes:

a. The description and basis of design of all activities to be undertaken in connection with the design and construction of the NTCRA;
b. A complete set of design calculations, drawings, description of equipment to be used, test and quality control procedures, material test reports, and permits, if required, for construction of the Allendale Dam;
c. A description of the project data base management;
d. A description of how all ARARs shall be attained.

5. Institutional Controls Plan (ICP)

Within 90 days fo the effective date of this Order, the Respondents shall submit an Institutional Controls Plan (ICP) outlining the approach, including a detailed schedule, to establish and maintain the necessary institutional controls and access restrictions which will ensure non-interference with the functional integrity and performance of the NTCRA. The Plan shall include the following elements:

a. Property Owned By Respondents

If the Site, or any other property where access and/or land/water use restrictions are needed to implement this Order, is owned or controlled by any of the Respondents, such Owner Respondents shall, consistent with this SOW, execute and record in the Recorder's Office or Registry of Deeds or other appropriate land records office of Providence County, State of Rhode Island an easement, running with the land, that grants the right to enforce the land/water use restrictions found in the January 18, 2001, Action Memorandum, or other restrictions that EPA determines are necessary to implement, ensure non-interference with, or ensure the protectiveness of the response measures to be performed pursuant to this Order. Respondents shall grant the rights to enforce the land/water use restrictions to one or more of the following persons, as determined by EPA, (i) EPA and its representatives, (ii) the State and its representatives, (iii) the other Respondents and their representatives, and/or (iv) other appropriate grantees. Respondents shall submit to EPA for review and approval with respect to such property:

1. A draft easement, in substantially the form attached hereto as Attachment 2, that is enforceable under the laws of the State of Rhode Island, free and clear of all prior liens and encumbrances (except as

approved by EPA), and acceptable under the Attorney General's Title Regulations promulgated pursuant to 40 U.S.C. § 255; and

2. a current title commitment or report prepared in accordance with the U.S. Department of Justice Standards for the Preparation of Title Evidence in Land Acquisitions by the United States (1970) (the "Standards").

Within 15 days of EPA's approval and acceptance of the easement, such Respondents shall update the title search and, if it is determined that nothing has occurred since the effective date of the commitment or report to affect the title adversely, record the easement with the Recorder's Office or Registry of Deeds or other appropriate office of Providence County. Within 30 days of recording the easement, such Respondents shall provide EPA with final title evidence acceptable under the Standards, and a certified copy of the original recorded easement showing the clerk's recording stamps.

b. Other Property

If the Site, or any other property where access and/or land/water use restrictions are needed to implement this Order, is owned or controlled by persons other than any of the Respondents, Respondents shall use best efforts to secure from such persons the execution and recordation in the Recorder's Office or Registry of Deeds or other appropriate land records office of Providence County, State of Rhode Island, of an easement, running with the land, that grants the right to enforce the land/water use restrictions found in the January 18, 2001 Action Memorandum, or other restrictions that EPA determines are necessary to implement, ensure non-interference with, or ensure the protectiveness of the response activities to be performed pursuant to this Order. Respondents shall grant the rights to enforce the land/water use restrictions to one or more of the following persons, as determined by EPA, (i) EPA and its representatives, (ii) the State and its representatives, (iii) the other Respondents and their representatives, and/or (iv) other appropriate grantees.

If EPA so requests, Respondents shall submit to EPA for review and approval with respect to such property:

1. A draft easement, in substantially the form attached hereto as Attachment 2, that is enforceable under the laws of the State of Rhode Island, free and clear of all prior liens and encumbrances (except as approved by EPA), and acceptable under the Attorney General's Title Regulations promulgated pursuant to 40 U.S.C. § 255; and

2. a current title commitment or report prepared in accordance with the U.S. Department of Justice Standards for the Preparation of Title Evidence in Land Acquisitions by the United States (1970) (the "Standards").

Within 15 days of EPA's approval and acceptance of the easement, Respondents shall update the title search and, if it is determined that nothing has occurred since the effective date of the commitment or report to affect the title adversely, the easement shall be recorded with the Recorder's Office or Registry of Deeds or other appropriate office of Providence County. Within 30 days of the recording of the easement, Respondents shall provide EPA with final title evidence acceptable under the Standards, and a certified copy of the original recorded easement showing the clerk's recording stamps.

6. Progress Reports

Within 30 days of the effective date of this Order, the Respondents shall submit to EPA and RI DEM monthly Progress Reports. The Progress Reports shall be submitted each month and shall summarize all activities that have been conducted that month and those planned for the next month. In addition, the Progress Reports shall identify any problems encountered, including projected problems in meeting the deadlines specified in the Design Schedule, if any. The Progress Report shall be due by the 10th day of each month.

B. Project Meetings

The Respondents and their contractors shall meet monthly with EPA and RI DEM during the design phase to discuss the status of the design, present the results of any investigations, and to discuss any issues associated with the development of the design. At least one week prior to the meeting, the Respondents shall submit to EPA and RI DEM an agenda for the meeting, a summary of the issues that will be discussed and any supporting information. To

the extent possible, the dates for these meetings shall be specified in the Design Schedule.

## VI. IMPLEMENTATION PHASE

The Implementation Phase shall include implementation of the NTCRA. This section describes the Respondents' responsibilities for submitting deliverables and conducting project meetings during implementation.

### A. Deliverables

The Respondents shall submit the following deliverables to EPA and the RI DEM during the Implementation Phase of the NTCRA. Each deliverable shall be subject to review and approval or modification by EPA, pursuant to the procedures specified in Section VII of the Order (hereafter "EPA Review and Approval" or "EPA Approval").

1. Implementation Schedule
2. Implementation Workplan
3. Progress Reports
4. Completion of Work Report
5. Post-Removal Site Control Plan

Any submittals by the Respondents to EPA and the RI DEM not referenced in Section VII of the Order, shall include the Respondents' certification, (hereafter "Respondents' Certification")

#### 1. Implementation Schedule

Within 90 days of the effective date of this Order, concurrently with the 100% Design, the Respondents shall submit an Implementation Schedule. The Implementation Schedule shall identify the date for performance of all major milestones to be performed in order to implement the NTCRA, including the date for submission of all deliverables required by this section of the SOW. The Implementation Schedule shall include the following deadlines:

a. The Respondents shall conduct a preconstruction meeting with representatives from the EPA, COE, RI DEM and shall start construction 10 days after EPA Approval of the 100% Design;

b. The Respondents shall substantially complete the construction of the NTCRA within 180 days of EPA Approval of the 100% Design;
c. The Respondents shall submit to EPA and RI DEM the Implementation Workplan and the Project Operations Plan concurrently with the 100% Design, within 90 days of the effective date of this Order;
d. The Respondents shall submit to EPA and RI DEM the Post-Removal Site Control Plan within 120 days of EPA Approval of the 100% Design; and
e. The Respondents shall implement all required institutional controls within 180 days of EPA Approval of the 100% DESIGN.

The Respondents shall receive EPA Approval of the determination that construction is complete in compliance with the Performance Standards. Prior to receiving EPA Approval, the Respondents shall perform a final inspection with EPA and submit a Demonstration of Compliance Report, demonstrating that the construction has been completed and the system is operating in compliance with the Performance Standards.

2. <u>Implementation of Work Plan</u>

Within 90 days of the effective date of this Order, concurrently with the 100% Design, the Respondents shall submit to EPA and RI DEM an Implementation Work Plan and the Project Operations Plan. The Implementation Work Plan shall include:

a. descriptions of all activities necessary to implement the NTCRA, consistent with the Performance Standards, including but not limited to the following:

(1) A pre-construction photographic survey of the Action Areas, including Allendale Dam. The purpose of this survey is to fully document existing conditions of the project. The survey shall photographically record all major topographic and landscaping features of the Action Areas and tall major components of the Allendale Dam and related pertinent historical features. Photographs shall be taken to document such items as dam structures, access ways, fencing, vegetation, etc., with corresponding written descriptions. Similarly, the Respondents shall prepare a post-construction photographic survey;
(2) A pre-excavation investigation to further establish horizontal and vertical delineation of Action Areas; performance monitoring during the excavation program; and post-excavation confirmatory investigation. The objective of these investigations shall be to establish an organized

sampling program and methodology which refines the limits of soil and sediment removal and ensures that all Contaminated Soil and Sediment is removed. The Respondents shall include such information as, but not limited to, the sampling grid size, sampling frequency, sampling methodology, analytical methods, quality assurance, quality control, and/or other exploratory methods which will be used as part of the investigation. The Respondents shall identify the statistical basis for their recommendations and shall use as guidance the information contained in the US EPA document titled "Methods for Evaluating the Attainment of Cleanup Standards", Volume I: Soils and Solid Media, EPA 230/02-89-042, February 1989. It is anticipated that a mobile laboratory will be utilized on-site to use immunoassay screening for dioxin analyses; in such case an appropriate percentage of samples shall be sent for analyses at a fixed laboratory. The Respondents shall evaluate a need to conduct additional correlation studies and to propose a "safety factor" in utilizing such immunoassay screening;

(3) A topographic survey to lay out the 93.5 foot elevation, the 10-year flood elevation and the lower limits of the Action areas, based on 1.0 foot below the 93.5 elevation in the Allendale Pond and 1.0 foot below the existing shoreline in the Lymansville Pond;

(4) A surveying and evaluation program of the excavated areas and established water levels in the Allendale Pond to confirm that upon re-construction of the Allendale Dam, no areas which were identified to exceed the dioxin level of 1 ppb remain under less than one (1.0) foot of water. If such areas are found, the Respondents shall implement a program for additional excavation to meet the Performance Standards in all areas under less than 1.0 foot of water;

(5) Layout of the work areas, including staging areas, and description of the transportation routes and operations;

(6) To the extent that any liquid and/or solid wastes/residues/debris are produced during the excavation of soils and reconstruction of Allendale Dam, as well as dioxin-containing waste materials, it shall be the responsibility of the Respondents to store, treat, and dispose of such wastes/residues. The Respondents shall identify what liquid and solid wastes/residues are anticipated and how such wastes/residues will be stored, treated, and disposed of. The dioxin containing waste material shall be transported to an of-site incinerator. All storage, treatment, and disposal activities will be carried out in accordance with Federal and State applicable or relevant and appropriate requirements;

(7) A detailed statement of how all Federal and State applicable or relevant and appropriate public health and environmental requirements and standards will be met, given the specific circumstances and response activities to be undertaken at this Site, including, but not limited to, all standards and requirements referenced in the January 18, 2001 Action Memorandum;
(8) Award of project contracts, including all agreements with off-site treatment and/or disposal facilities;
(9) Activities to support contractor mobilization/Site preparation;
(10) Resolution of any outstanding issues regarding establishment and maintenance of institutional controls, access, access restrictions; and
(11) Site restoration and demobilization of all facilities.

b. a Construction Quality Control Plan in support of all construction operations, including plans, procedures, personnel, tests, and records necessary to implement the project in accordance with the specifications and Performance Standards;

c. a Contingency Plan which shall specify the measures to be taken in the event of an accident or emergency to protect on-site construction workers and the local community; and,

d. a Project Operations Plan in support of all fieldwork to be conducted according to the Implementation Workplan, to be prepared in accordance with Attachment 1.

3. <u>Progress Reports</u>

Within 30 days of approval of the 100% Design, the Respondents shall submit to EPA and RI DEM monthly Progress Reports. Submittal of Design Phase Progress Reports may be discontinued at this time. The Progress Reports shall be submitted each month and shall summarize all activities that have been conducted that month, those planned for the next month, the percentage of construction completed, problems encountered, including projected problems in meeting the Implementation Schedule. Progress Reports shall include digital photographs of the site activities. Photographs shall be labeled with the date, brief description of the activity, weather conditions and direction/orientation of the photograph. After completion of all construction activities, Respondents may, upon EPA Approval, reduce the frequency of submission of Progress Reports, or terminate their obligation to

submit such reports. The Progress Report shall be due by the 10th day of each month.

4. Completion of Work Report

Within 45 days after completing all work required under the Order, with the exception of any continuing obligations required by this Order, including post-removal site controls, and this SOW, the Respondents shall submit the Completion of Work Report for EPA Review and Approval, after reasonable opportunity for review and comment by the RI DEM. The Completion of Work report shall satisfy the requirements of Paragraph 59 of the Order, Section 300.165 of the NCP entitled "OSC Reports" and OSWER Directive 9360.3-03 "Removal Response Reporting". In addition to the requirements set forth in the Order and the NCP, the Completion of Work Report shall include:

a. a synopsis of the work defined in the SOW and certification that this work was performed;
b. an explanation of any modifications to work in the SOW and why these were necessary for the project;
c. a chronology of events and procedures used to excavate the Contaminated Soil and Sediment and to reconstruct the Allendale Dam, handle any and all residues (solid or liquid) from the excavation and construction, and documentation of the off-site disposal of any materials generated during the NTCRA;
d. tabulation of all analytical data and field notes prepared during the course of the NTCRA including, but not limited to, data to confirm the removal of all Contaminated Soil and Sediment, and any other analytical data collected during NTCRA (full copies of all results and notes shall be available and produced for EPA and RI DEM upon request);
e. validation reports describing review of all chemical data;
f. all information necessary to demonstrate compliance with the Performance Standards; including, but not limited to: sampling locations and procedures to confirm that all Contaminated Soil and Sediments have been excavated and removed off-site;
g. Quality assurance/quality control (QA/QC) construction documentation;
h. presentation of sampling results in appropriate figures and tables;
i. a description, with appropriate photographs, maps and tables, of the conditions of the Site, including areas and volumes of soil and sediment removed and disturbance;
j. copies of all signed waste manifests;

- k. final, detailed cost breakdowns for contract cost items specific to the NTCRA;
- l. a description of access restrictions and institutional controls established;
- m. a pre-construction and post-construction photographic survey reports, with photographic prints and the written reports;
- n. as built drawings and specifications with design changes and construction change orders; and
- o. electronic version of data base with all analytical data and electronic version of Geographic Information System (GIS) or Computer Aided Design (CAD) files;

5. Post-Removal Site Control Plan

Within 120 days of EPA Approval of the 100% Design, the Respondents shall submit a Post-Removal Site Control Plan. This plan shall be consistent with Section 300.415(k) of the NCP and OSWER Directive 9360.2-02 and shall address provisions for inspection, continued maintenance and repair of the Allendale Dam and provisions for maintaining the Institutional Controls, including submission to EPA and RI DEM the necessary periodic status reports. The Post-Removal Site Control Plan shall include, at a minimum, the following:

- a. a description and schedule of routine maintenance and inspection requirements of the Allendale Dam;
- b. a description of potential operational problems;
- c. an operational safety plan;
- d. annual operation and maintenance budget; and
- e. record keeping and reporting requirements, including periodic reviews of the effectiveness of established institutional controls.

Within ten (10) days of receiving EPA's Approval of the Respondents' Completion of Work Report, the Respondents shall implement all Post-Removal Site Controls in accordance with the terms and schedules set forth in the Post-Removal Site Control Plan as approved by EPA.

B. Project Meetings

1. 10 days after EPA Approval of the 100% Design, the Respondents shall conduct a Preconstruction Meeting. The purpose of the meeting will be to review communications procedures between the Respondents, EPA, COE, RI DEM, and the contractors who will be working on the project, to review

construction quality control procedures, and to review the health and safety procedures for the Site;

2. The Respondents and their contractors shall meet monthly with EPA and RI DEM during implementation of the NTCRA to discuss the status of the project, and to discuss any issues that arise. At least one week prior to the meeting, the Respondents shall submit to EPA and the RI DEM an agenda for the meeting, a summary of the issues that will be discussed and any supporting information: The Respondents shall take minutes documenting major points of discussions and agreements and distribute to attendees within one week after the meetings. To the extent possible, the dates for these meetings shall be specified in the Implementation Schedule;

3. Within fifteen (15) days after the Respondents conclude that the construction of the NTCRA has been fully implemented, the Respondents shall schedule and conduct a Pre-Final Inspection. This inspection shall include participants from the Respondents and their contractors, EPA, COE and RI DEM. As a result of this inspection, the Respondents shall develop and submit a "Punch List" of items to be resolved. This inspection and any deficiency corrections shall be accomplished within the time slated for completion of NTCRA construction;

4. Within fifteen (15) days after the Respondents conclude that the punch list items (including deficiencies), identified in the Pre-Final inspection have been corrected and the Performance Standards have been met, the Respondents shall schedule and conduct a Final Inspection. This inspection shall include participants from the Respondents and their contractors, EPA, COE and RI DEM. The Final Inspection shall occur no longer than 60 days following the Pre-Final Inspection.

## VII. SUBMISSIONS REQUIREMENTS FOR AGENCY APPROVAL

A. All plans, deliverables and reports identified in the SOW for submittal, shall be submitted to EPA and RI DEM and shall be delivered to EPA and RI DEM in accordance with the Unilateral Administrative Order and this SOW. The Respondents shall submit to EPA and RI DEM 6 copies of each deliverable, including monthly progress reports. Along with required paper copies of the plans, deliverables and reports, the Respondents shall provide their electronic version to EPA and RI DEM along with electronic version of the data base and the GIS files.

B. Any plan, deliverable, or report submitted to EPA and RI DEM for review shall be printed using two-sided printing and marked "Draft" on each page and shall include, in a prominent location in the document, the following disclaimer: "Disclaimer: This document is a DRAFT document prepared by the Respondents under a government Unilateral Administrative Order. This document has not undergone formal review by the EPA and RI DEM. The opinions, findings, and conclusions, expressed are those of the author and not those of the U.S. Environmental Protection Agency or the Rhode Island Department of Environmental Management."

C. Approval of a plan, deliverable or report does not constitute approval of any model or assumption used by the Respondents in such plan, deliverable or report.

## ATTACHMENT 1

## PROJECT OPERATIONS PLAN

Before any field activities shall commence on the Site, several site-specific plans shall be written to establish procedures to be followed by the Respondents in performing field, laboratory, and analysis work and community and agency liaison activities. These site-specific plans include the:

1) Site Management Plan;
2) Sampling and Analysis Plan (SAP) which includes the Field Sampling Plan (FSP) and the Quality Assurance Project Plan (QAPP);
3) Health and Safety Plan (HSP); and
4) Community Relations Support Plan.

The Respondents shall combine these plans to prepare the Project Operations Plan. The four components of the Project Operations Plan are discussed in the following Sections.

The respondents shall modify the format and scope of each plan as required by EPA, after reasonable opportunity for review and comment by RI DEM, to describe changes to the sampling, analyses, and other matters which may arise as the NTCRA progresses. EPA, after reasonable opportunity for review and comment by RI DEM, may modify the scopes of these activities at any time during the NTCRA at the discretion of EPA in response to the evaluation of NTCRA results, changes in NTCRA requirements, and other developments or circumstances.

### 1. Site Management Plan

The overall objective of the Site Management Plan is to provide EPA with a written understanding and commitment of how various project aspects such as access, security, contingency procedures, management responsibilities, waste disposal, budgeting, and data handling are being managed by the Respondents. As part of the plan, the Respondents shall include, at a minimum:

a. a map and list of properties, the property owners, and addresses of owners to whose property access may be required and where

access agreements are in place;

b. a clear indication of the exclusion zone, contamination reduction zone, and clean area for on-site activities;

c. necessary procedures and sample letters to land owners to arrange field activities and to ensure EPA is kept abreast of access-related problems and issues;

d. a provision for the security of government and private property on the Site;

e. measures to prevent unauthorized entry to the Site, which might result in exposure of persons to potentially hazardous conditions;

f. the location of a field office for on-site activities;

g. contingency and notification plans for potentially dangerous activities associated with the NTCRA;

h. provision for the monitoring of airborne contaminants released by Site activities which may affect the local populations;

i. communication to EPA, the State of Rhode Island, and the public the organization and management of the NTCRA, including key personnel and their responsibilities;

j. a list of potential contractors and subcontractors of the Respondents in the NTCRA and a description of their activities and roles;

k. provisions to provide to EPA regular financial reports of Respondents expenditures on NTCRA activities;

l. provision for the proper disposal of materials used and wastes generated during the NTCRA (e.g., excavated debris, soil and sediment, protective clothing, disposable equipment). These provisions shall be consistent with the offsite disposal requirements of CERCLA, RCRA, and applicable state laws. The Respondents, a representative of the Respondents, or another party acceptable

to EPA, after reasonable opportunity for review and comment by RI DEM, shall be identified as the generator of wastes for the purpose of regulatory or policy compliance; and

m. plans and procedures for organizing, evaluating, and presenting the data generated and for verifying its quality before and during the NTCRA. These plans shall include the description of the proposed computer data base management system that is compatible with the existing Site-wide data base based on hardware and software available to EPA New England personnel for handling media-specific sampling results obtained before and during the NTCRA (GIS-based data management system): The description shall include data input fields, examples of data base management output from the coding of all pre-NTCRA sample data, appropriate quality assurance/quality control to ensure accuracy, and capabilities of data manipulation. To the degree possible, the data base management parameters shall be compatible with the EPA New England data storage and analysis system. The newly generated data shall be downloaded periodically into a master data base for the Site maintained by EPA New England.

2. <u>Sampling and Analysis Plan (SAP)</u>

The purpose of the Sampling and Analysis Plan is to ensure that sampling data collection activities will be comparable to and compatible with previous data collection activities performed at the site while providing a mechanism for planning and approving field activities.

The overall objectives of the sampling and analysis plan are as follows:

a. to document specific objectives, procedures, and rationales for field work and sample analytical work;

b. to provide a mechanism for planning and approving Site and laboratory activities;

c. to ensure that sampling and analysis activities are necessary and sufficient; and

d. to provide a common point of reference for all parties to ensure the comparability and compatibility of all objectives and of sampling and analysis activities.

To achieve these objectives, the SAP shall document all anticipated field objectives and activities (e.g., sampling objectives, data quality objectives, evaluation of existing data, standard operating procedures) and contain specific information on the field work (e.g., sampling locations and rationale, sample numbers and rationale, analyses of samples). During the NTCRA, the SAP shall be revised as necessary. Revisions or a statement regarding the need for revisions shall be included in each deliverable describing new field work.

The SAP consists of two parts: (1) a Quality Assurance Project Plan (QAPP), and (2) the Field Sampling Plan (FSP). Components of these two individual plans are described in the following sections. The FSP and QAPP should be submitted as a single document (although they may be bound separately to facilitate use of the FSP in the field).

The SAP shall specify in the FSP provisions for notifying EPA thirty (30) days before initiation of field sampling or monitoring activities. The plan shall also allow split, replicate, or duplicate samples to be taken by EPA, RI DEM (or their contractor personnel), and by other parties approved by EPA. At the request of EPA or RI DEM, the Respondents shall provide these samples in appropriate containers to the government representatives. Identical procedures shall be used to collect the Respondents', EPA and RI DEM parallel samples unless otherwise specified by EPA or RI DEM.

Guidance on the topics covered in the QAPP and FSP and their integration into each of these plans and the integration of the QAPP and the FSP into the SAP can be found in the following several references and shall be used to develop the SAP:

<u>Region I, EPA-New England, Compendium of Quality Assurance Project Plan Guidance</u>, Draft-Final, September 1998;

<u>Guidance for Conducting Remedial Investigations and Feasibility Studies Under CERCLA</u> (OSWER Directive 9355.3-01, EPA/540/G-89/004, October 1988);

Guidance for the Data Quality Objectives Process for Hazardous Waste EPA QA/G-4HW Draft

Guidance for the Data Quality Objective Process, EPA/600/R-96/055, Final, September 1994,(EPA QA/G-4);

Data Quality Objectives Decision Errors Feasability Trials (DEFT) Software, EPA QA/G-4D(EPA/600/R-96/056, September 1994)

Test Methods for Evaluating Solid Waste, Physical/Chemical Methods (EPA Pub. SW-846, Third Edition, December 1996) Third Update June 1998;

Guidance for Data Usability for in Risk Assessment, Part A (EPA pub. 9285.7-09A/FS, April, 1992;

EPA Requirements for Quality Assurance Project Plans for Environmental Data Operations, Draft-Final, October 1998,(EPA QA/R-5);

EPA Guidance for Quality Assurance Project Plans (EPA QA/G-5), EPA/600/R-98/018, February 1998;

EPA Quality Manual for Environmental Programs (EPA Order 5360) 1998;

Performance Evaluation Program Guidance (EPA Region 1), July 1996;

Region 1, EPA-New England Data Validation Functional Guidelines for Evaluating Environmental Analyses, Parts 1 and II, December 1996;

EPA NEIC Policies and Procedures Manual (revised May 1986, EPA 330/9-78-001-R)

Guidance for the Preparation of Standard Operating Procedures for Quality Related Documents, EPA QA/G-6 (EPA/600/R-96-027)

Guidance for Data Quality Assessment: Practical Methods for Data Analysis, EPA QA/G-9(EPA/600/R-96-084)

A. Quality Assurance Project Plan (QAPP)

The Quality Assurance Project Plan (QAPP) shall document in writing site-specific objectives, policies, organizations, functional activities, and specific quality assurance/ quality control activities designed to achieve the data quality objectives (DQOs) of the NTCRA. The QAPP shall cover all environmentally related measurements. The QAPP developed for this project shall document quality control and quality assurance policies, procedures, routines, and specifications.

All project activities throughout the NTCRA shall comply with the QAPP. All QAPP sampling and analysis objectives and procedures shall be consistent with EPA Requirements for Quality Assurance Project Plans for Environmental Data Operations, Draft-Final, October 1998, (EPA QA/R-5); EPA Guidance for Quality Assurance Project Plans (EPA QA/G-5) EPA/600/R-98/018, February 1998; and appropriate EPA handbooks, manuals, and guidelines including Test Methods for Evaluating Solid Waste, Physical/Chemical Methods (EPA Pub. SW-846, Third Edition, as amended by update 3) and Guidelines Establishing Test Procedures for the Analysis of Pollutants (40 CFR, Part 136).

The basic groups and elements of the QAPP are:

- Project Management Elements;

  - Title and Approval Sheet;
  - Table of Contents;
  - Distribution List;
  - Project/Task Organization;
  - Problem Definition/Background;
  - Project/Task Description;
  - Quality Objectives and Criteria for Measurement Data;
  - Special Training Requirements/Certification;
  - Documentation and Records;

- Measurement/Data Acquisition Elements;

  - Sampling Process Design (Experimental Design);
  - Sampling Methods Requirements;
  - Sample Handling and Custody Requirements;
  - Analytical Methods Requirements;
  - Quality Control Requirements;

- Instrument/Equipment Testing, Inspection, and Maintenance Requirements;
- Instrument Calibration and Frequency;
- Inspection/Acceptance Requirements for Supplies and Consumables;
- Data Acquisition Requirements (Non-direct Measurements);
- Data Management;

- Assessment/Oversight Elements;

- Assessments and Response Actions;
- Reports to Management;

- Data Validation and Usability:

- Data Review, Validation, and Verification Requirements;
- Validation and Verification Methods; and
- Reconciliation with User Requirements.

As indicated in, EPA Guidance for Quality Assurance Project Plans Draft-Final July 1998 (EPA QA/G-5); and EPA Requirements for Quality Assurance Project Plans for Environmental Data Operations, Draft-Final, October 1998, (EPA QA/R-5),and Region I, EPA-New England, Compendium of Quality Assurance Project Plan Guidance, Draft-Final, September 1998; the above list of essential elements must be considered in the QAPP for the NTCRA. If a particular element is not relevant to a project and therefore excluded from the QAPP, specific and detailed reasons for exclusion must be provided.

Information in a plan other than the QAPP may be cross-referenced clearly in the QAPP provided that all objectives, procedures, and rationales in the documents are consistent, and the reference material fulfills the requirements of EPA QA/R-5 and subsequent guidance referenced above. Examples of how this cross reference might be accomplished can be found in the Guidance for the Data Quality Objectives Process EPA QA/G-4 and the Data Quality Objectives Decision Errors Feasability Trials EPA QA/ G-4D(EPA/600/R-96/056). EPA-approved references, or equivalent, or alternative methods approved by EPA shall be used, and their corresponding EPA-approved guidelines shall be applied when they are available and applicable.

Laboratory QA/QC Procedures

The QA/QC procedures for any laboratory (both fixed and mobile) used during the NTCRA shall be included in the Respondents' QAPP. When this work is performed by a contractor to a private party, each laboratory performing chemical analyses shall meet the following requirements:

1) be approved by the State Laboratory Evaluation Program, if available;

2) have successful performance in one of EPA's National Proficiency Sample Programs (i.e., Water Supply or Water Pollution Studies or the State's proficiency sampling program);

3) be familiar with the requirements of 48 CFR Part 1546 contract requirements for quality assurance;

4) have a QAPP for the laboratory including all relevant analysis. This plan shall be referenced as part of the contractor's QAPP; and

5) perform all analyses according to accepted EPA methods. See "Contract Lab Program Statement of Work for Inorganic Analysis" and the "Contract Lab Program Statement of Work for Organic Analysis", dated February 1988.

Data Validation Procedures

The Respondents are required to certify that all data has been validated by an independent person according to the EPA New England Data Validation Functional Guidelines for Evaluating Organic Analyses, the EPA New England Data Validation Functional Guidelines for Evaluating Inorganic Analyses, and EPA New England Data Validation Functional Guidelines for Evaluating Environmental Analyses, Parts I and II (USEPA New England) December 1996 (amended as necessary to account for the differences between the approved analytical methods for the project and the Contract Laboratory Procedures (CLP) procedures). Approved validation methods shall be contained in the QAPP.

The independent person shall not be the laboratory conducting the analyses and should be a person with a working knowledge of or prior experience with EPA New England data validation procedures. The independent person shall certify that the data has been validated, discrepancies have been resolved if possible, and the appropriate qualifiers have been provided.

The Respondents must keep the complete data package and make it available to EPA or RI DEM on request in order for EPA and RI DEM to conduct an independent validation of the data. The complete data package shall consist of all results, the raw data, and all relevant QA/QC information. An example set of data package deliverables is listed below.

1) a summary of positive results and detection limits of non-detects with all raw data;

2) tabulated surrogate recoveries and QC limits from methods 3500 and 8000 in SW-846 and all validation and sample raw data;

3) tabulated matrix spike/matrix spike duplicate recoveries, relative percent differences, spike concentrations, and QC limits from methods 3500 and 8000 in SW-846 and all validation and sample raw data;

4) associated blanks (trip, equipment, and method) with accompanying raw data for tests;

5) tabulated initial and continuing calibration results (concentrations, calibration factors or relative response factors and mean relative response factors, % differences and % relative standard deviations) with accompanying raw data;

6) tabulated retention time windows for each column;

7) a record of the daily analytical scheme (run logbook, instrument logbook) which includes samples and standards order of analysis;

8) the chain of custody for the sample shipment groups, SAS packing slip, SAS request forms;

9) a narrative summary of method and any problems encountered during extraction or analysis;

10) tabulated sample weights, volumes, and % solids used in each sample calculation;

11) example calculations for positive values and detection limits; and

12) SW-846 method 3500 and 8000 validation data for all tests.

The forms contained in Chapter 1 of SW-846 (Second Edition 1982 as amended by Update I, April 1984, and Update II, April 1985) must be utilized to report the data when applicable. Raw data includes the associated chromatograms and the instrument printouts with area and height peak results. The peaks in all standards and samples must be labeled. The concentration of all standards analyzed with the amount injected must be included.

B. <u>Field Sampling Plan (FSP)</u>

The objective of the Field Sampling Plan is to provide EPA, RI DEM, and all parties involved with the collection and use of field data with a common written understanding of all fieldwork. The FSP shall address the NTCRA objectives and conform to the procedures in Section 2 of this document and the National Contingency Plan (NCP).

The FSP shall define in detail the sampling and data gathering methods used on a project. The FSP should be written so that a field sampling team unfamiliar with the Site would be able to gather the samples and field information required. Guidance for the selection of field methods, sampling procedures, and custody can be acquired from the <u>Compendium of Superfund Field Operations Methods</u>, (OSWER Directive 9355.0-12, EPA/540/P-87/001), which is a compilation of demonstrated field techniques that have been used during remedial response activities at hazardous waste sites.

The FSP shall be site-specific and shall include the following information:

Site Background The analysis of the existing Site details must be included in the FSP. This analysis shall include a conceptual Site model. A conceptual Site model includes a description of the Site and surrounding areas and a discussion of known and suspected contaminant sources, probable transport pathways, and other information about the Site. The FSP shall also include descriptions of specific data gaps and ways in which sampling is designed to fill those gaps, including further delineation of areas requiring removal actions and post-excavation confirmation that cleanup levels have been achieved.

Sampling Objectives Specific objectives of a sampling effort that describe the intended uses of data must be clearly and succinctly stated.

Sample Location, Analytes, and Frequency This section of the sampling plan identifies each sample matrix to be collected and the constituents to be analyzed. *A justification of where samples will be collected and how many samples will be collected must be documented in the plan.* Tables shall be used to clearly identify the number of samples to be collected along with the appropriate number of replicates and blanks. Figures shall be included to show the locations of existing or proposed sample points.

Sample Designation A sample numbering system shall be established. The sample designation should include the sample number, the sample round, the sample matrix (e.g., surface and subsurface soil, sediments), and the name of the Site.

Sampling Equipment and Procedures Sampling procedures must be clearly written. Step-by-step instructions for each type of sampling are necessary to enable the field team to gather data that shall meet the DQOs. A list should include the equipment to be used and the material composition (e.g., Teflon, stainless steel) of equipment along with decontamination procedures.

Sampling Handling and Analysis A table shall be included that identifies sample preservation methods, types of sampling jars, shipping requirements, and holding times. Examples of paperwork such as traffic reports, chain of custody forms, packing slips, and sample tags filled out

for each sample as well as instructions for filling out the paperwork must be included. Field documentation methods including field notebooks and photographs shall be described.

3. Health and Safety Plan

The objective of the site-specific Health and Safety Plan (HSP) is to establish the procedures, personnel responsibilities, and training necessary to protect the health or safety of all on-site personnel during the NTCRA. The plan shall provide for routine but hazardous field activities and for unexpected Site emergencies.

The site-specific health or safety requirements and procedures in the HSP shall be based on an ongoing assessment of Site conditions, including the most current information on each medium. For each field task during the NTCRA, the HSP shall identify:

a. possible problems and hazards and their solutions;

b. environmental surveillance measures;

c. specifications for protective clothing;

d. the appropriate level of respiratory protection;

e. the rationale for selecting that level; and

f. criteria, procedures, and mechanisms for upgrading the level of protection and for suspending activity, if necessary.

The HSP shall also include the delineation of exclusion areas on a map and describe provisions for this delineation in the field. The HSP shall indicate the on-site person responsible for implementing the HSP as a representative of the Respondents, protective equipment, personnel decontamination procedures, and medical surveillance.

The site-specific HSP must meet the requirements stipulated by the Hazardous Waste Operations and Emergency Response, (Department of Labor, Occupational Safety and health Administration, (OSHA) 29 CFR Part 1910); in addition, the following documents shall be used:

Interim Standard Operations Safety Guides, (Hazardous Response Support Division, Office of Emergency and Remedial Response EPA, Wash. D.C. 1982); and

Occupational Safety and Health Guidance Manual for Hazardous Waste Site Activities: Appendix B, (NIOSH/OSHA/USCG/EPA 1985).

The measures in the HSP shall be developed and implemented to ensure compliance with all applicable State and Federal occupational health and safety regulations. The HSP shall be consistent with the objectives and contents of all other plans submitted by the Respondents. The HSP shall be updated at the request of EPA, after reasonable opportunity for review and comment by RI DEM, during the course of the NTCRA, and as necessary.

4. **Community Relations Support Plan**

EPA has developed a Community Relations Plan to describe public relations activities for this Site. The Respondents shall develop a Community Relations Support Plan, whose objective is to ensure and specify adequate support from the Respondents for the community relations efforts of EPA. This support shall be at the request of EPA and may include, at a minimum:

a. participation in public informational or technical meetings, including periodic meetings with the Management Action Committee, including the provision of visual aids and equipment;

b. publication and copying of fact sheets or updates; and

c. communications with individual property owners affected by the NTCRA, including preparation of individual data packages upon completion of the NTCRA.

**ATTACHMENT 2**

**DRAFT**

**DECLARATION OF COVENANTS AND ENVIRONMENTAL PROTECTION/CONSERVATION EASEMENT**

1. This Declaration of Covenants and Environmental Protection/Conservation Easement is made this ___ day of ___, 2001, by and between __________ ("Grantor"), having an address of _______________, and the following Grantees:

a) the UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and its assigns and personal representatives, having an address of: United States Environmental Protection Agency New England, Office of Site Remediation and Restoration, New Hampshire and Rhode Island Superfund Branch, mail code HBR, 1 Congress St., Suite 1100, Boston, MA 02114; and

b) the STATE OF RHODE ISLAND and its assigns and personal representatives, having an address of: Rhode Island Department of Environmental Management, Office of Waste Management, 235 Promenade St., Providence, Rhode Island 02908.

**WITNESSETH:**

2. WHEREAS, Grantor is the owner in fee simple of a parcel of land located in the Town of __________, __________ County, State of Rhode Island, designated as Lot __, Plat ___ on the 2001 tax assessor's map of the Town of ________ in _______ County, more particularly described on Exhibit A (Legal Description and Definition of Property), which is attached to this Instrument and made a part of this Instrument; and

***[PLEASE DRAFT "EXHIBIT A," WHICH WILL DESCRIBE THE LOCATION OF THE PROPERTY. STREET ADDRESSES OR TAX MAP REFERENCES ARE NOT ADEQUATE DESCRIPTIONS FOR THE DEED DESCRIPTION IN EXHIBIT A.]***

3. WHEREAS, the United States Environmental Protection Agency ("EPA") has determined that the Property and certain land in close proximity to the Property contain hazardous materials and other adverse environmental conditions;

4. WHEREAS, the Property is part of the Non-Time-Critical Removal Action of the Centredale Manor Restoration Project Superfund Site ("Site"), which EPA, pursuant to Section 105 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. Sect. 9605, placed on the National Priorities List, set forth at 40 C.F.R. Part 300, Appendix B, by publication in the Federal Register on March 6, 2000; and

5. WHEREAS, in an Action Memorandum dated January 18, 2001, (the "Action

Memorandum"), the EPA New England Director of the Office of Site Remediation & Restoration selected a "removal action" for the Site, which provides, in part, for

> "[institutional controls to] be used at the restored [Allendale] Dam in order to prevent another dam breach and the potential movement of contaminated sediments downstream. Specifically, EPA expects that a negative easement restricting alteration of the Dam will be obtained from the owner of the Dam and enforced by the holder of the easement until such time as the Dam is no longer considered by EPA to be necessary for meeting response action objectives at the Site."

6. WHEREAS, a Unilateral Administrative Order, numbered _________, was issued by EPA New England on ______________.

7. WHEREAS, the Respondents to the Unilateral Administrative Order are, pursuant to the terms of the Unilateral Administrative Order: to obtain from the owner of the Allendale Dam an easement restricting alteration of the Dam, enforceable by the easement until such time as the Dam is no longer considered by EPA to be necessary for meeting response action objectives at the Site.

**NOW, THEREFORE:**

8. Grant: For and in consideration of the terms of the Consent Decree and other good and valuable consideration paid and the agreements and promises hereinafter set forth, the receipt and sufficiency of which is hereby acknowledged, Grantor, on behalf of itself, its heirs, successors, successors-in-title, and assigns, does hereby covenant and declare that the Property shall be subject to the covenants, conditions, and restrictions on use set forth below, and does give, grant, and convey to the Grantees and Grantees' personal representatives and assigns a) the right to enforce said use restrictions, and b) an environmental protection/conservation easement of the nature and character set forth below.

9. Covenant, Conditions, and Restrictions on Use: The following covenants, conditions, and restrictions apply to the use of the Property. They run with the land and are binding on the Grantor and Grantor's heirs, successors, successors in title, and assigns:

> No alteration of the Dam will be conducted without the written consent of EPA New England until the Grantor is informed in writing that EPA New England no longer considers this restriction to be necessary for meeting response action objectives at the Site.

10. Modification or Termination of Restrictions: The above covenants and restrictions may be modified or terminated, in whole or in part, in writing and recorded with the Records of Land

Evidence of the Town of ______, Rhode Island, by the EPA New England after reasonable opportunity for review and comment by the State of Rhode Island. At the very latest, such covenants and restrictions shall be terminated when EPA notifies the Grantor, after a reasonable opportunity for review and comment by the State of Rhode Island, that the First Operable Unit of the Site does not pose a threat to human health and the environment. EPA shall review such termination at the time it reviews the Completion of Work Report submitted by Respondents pursuant to Paragraph 59 of the Unilateral Administrative Order, and if EPA decides to approve the Completion of Work Report but not terminate the above covenants and restrictions, EPA will explain the reasons why it believes that a threat to human health and the environment exists at that time and describe the timing and steps that will be required to terminate the above covenants and restrictions. If requested by the Grantor, EPA New England will execute any termination or modifications of covenants and restrictions in recordable form. If EPA New England ever assigns its interest in the above covenants and restrictions to the State of Rhode Island, the State of Rhode Island shall have the authority to modify or terminate this Instrument.

11. <u>Environmental Protection/Conservation Easement</u>: Grantor hereby grants to the Grantees, their personal representatives and assigns, an irrevocable right of access at all reasonable times to the Property with men and by equipment for the purposes of conducting any activity related to the Unilateral Administrative Order, including, but not limited to:

a) Monitoring the Work required by the Unilateral Administrative Order;

b) Verifying any data or information submitted to EPA New England;

c) Conducting investigations relating to contamination at or near the Site;

d) Obtaining samples;

e) Assessing the need for, planning or implementing additional response actions at or near the Site;

f) Inspecting and copying records, operating logs, contracts, or other documents maintained or generated by Settling Defendants or their agents, consistent with the Unilateral Administrative Order and

g) Assessing Respondents' compliance with the Unilateral Administrative Order.

12. <u>Reserved Rights of Grantor</u>: Grantor hereby reserves all rights and privileges in and to the use of the Property, including the right to maintain, repair, use, operate, and replace the existing facilities on the Property, as long as the Grantor's use of the Property is not incompatible with the restrictions, rights, and easements granted in this Instrument. EPA New England has found that the current use of the Property, as such use exists on the effective date of this Instrument, is compatible with the removal action and is specifically permitted. However, the permitted use

does not include any right to alter the existing improvements and facilities of the Property if such activity would disturb the removal action or be incompatible with the restrictions, rights, and easements granted in this Instrument.

13. Nothing in this document shall limit or otherwise affect EPA New England's or the State of Rhode Island's rights of entry and access provided by law or regulation.

14. No Public Access and Use: This Instrument does not convey a right of access or use by the general public to any portion of the Property.

15. Requirements for Conveyances: Grantor, and any person who subsequently acquires any interest in Grantor's property, including, but not limited to, by deeds, leases, and mortgages, shall give a) written notice of the Unilateral Administrative Order and this Instrument to the person or entitity that will receive the conveyance (the transferee), and b) written notice to EPA New England and Rhode Island Department of Environmental Management of the conveyance, including the name and address of the transferee and the date on which the Grantor gave the notice to that transferee. Such transfer shall take place only if the transferee agrees, as a part of the agreement to purchase or otherwise obtain the property, that it will comply with the obligations of the Grantor to provide access to the Property and with the Declarations set forth in this Instrument. Grantor agrees to include in any Instrument conveying an interest in any portion of the Property a notice, which is in substantially the following form:

> NOTICE: THE INTEREST CONVEYED HEREBY IS SUBJECT TO THE EFFECT OF A DECLARATION OF COVENANTS AND ENVIRONMENTAL PROTECTION/ CONSERVATION EASEMENT, DATED ________, RECORDED IN THE RECORDS OF LAND EVIDENCE FOR THE TOWN OF ____________, RHODE ISLAND ON ________, IN BOOK ________, PAGE ______, ENFORCEABLE BY, THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, THE STATE OF RHODE ISLAND, BROOK VILLAGE ASSOCIATES LIMITED PARTNERSHIP, CENTERDALE MANOR ASSOCIATES LIMITED PARTNERSHIP, NEW ENGLAND CONTAINER COMPANY, INC., EMHART INDUSTRIES, INC., AND CROWN-METRO, INC.

Within thirty (30) days of executing any such an instrument of conveyance, Grantor must provide Grantees with a true copy of the instrument of conveyance and, if it has been recorded in the public land records, its recording reference.

16. Construction Activities: Grantor shall notify EPA, the Rhode Island Department of Environmental Management, and the settling defendants listed in paragraph ___ of this Instrument (entitled "Notices") prior to undertaking any facility improvements or other construction activities that could disturb removal action activities (including, but not limited to, disturbing the Allendale Dam).

17. Administrative jurisdiction: The Regional Administrator of EPA New England or his or her delegate shall exercise the discretion and authority granted to EPA herein. The Rhode Island Department of Environmental Management is the state agency having administrative jurisdiction over the interests acquired by the State of Rhode Island through this Instrument. The Director of Rhode Island Department of Environmental Management or his or her delegate shall exercise the discretion and authority granted to the State herein. If the EPA or the State of Rhode Island assigns interests created by this Instrument, the discretion and authority referred to in this paragraph shall also be assigned, unless otherwise provided in the assignment document, and a document evidencing same shall be recorded with the Records of Land Evidence of the Town of ______, Rhode Island.

18. Enforcement: Each Grantee is entitled to enforce the terms of this Instrument by resorting to specific performance or legal process. Each Grantee must notify, consult and coordinate with the other grantee before taking any action to enforce the terms of this Instrument. In addition to the remedies available under this Instrument, Grantee may seek any and all other remedies available at law or in equity, including CERCLA. Grantees shall have the discretion to enforce the terms of this Instrument. Any forbearance, delay, or omission to enforce in the event of a breach of any provision of this Instrument shall not be deemed to be a waiver of a) such provision or b) of any subsequent breach of the same or any other provision, or c) of any of the rights of the Grantees under this Instrument. Grantor hereby waives any defense of laches, estoppel, or prescription against the EPA or the State of Rhode Island in any action taken to enforce the terms of this Instrument. In accordance with the Rhode Island General Laws, Title 34, Chapter 39, entitled "Conservation and Preservation Restrictions on Real Property," no provision of this Instrument shall be unenforceable on account of a) lack of privity of estate or contract, b) lack of benefit to a particular land, c) the benefit being assignable or being assigned to any governmental body or to any entity with like purposes, or d) any other doctrine of Property law which might cause the termination of the provision. The Respondents to the Unilateral Administrative Order (Brook Village Associates Limited Partnership, Centredale Manor Associates Limited Partnership, New England Container Company, Inc., Emhart Industries, Inc., and Crown-Metro, Inc.) also are entitled to enforce the terms of this Instrument.

19. Covenants: The Grantor, for itself and for its heirs, successors, successors-in-title, assigns, executors, and administrators, hereby covenants to and with the Grantees and their assigns, that the Grantor is lawfully seized in fee simple of the Property, that the Grantor has a good right, full power and lawful right to grant and convey the above easement, covenants, and land use restrictions, that the Property is free and clear of encumbrances, except those noted on Exhibit B attached hereto, ***[NOTE, PLEASE DRAFT AND ATTACH AN EXHIBIT B, WHICH LISTS ALL THE ENCUMBRANCES ON THE PROPERTY (E.G., MORTGAGES, LIENS AND EASEMENTS) AND INCLUDES EVIDENCE OF TITLE]*** that the Grantees and their assigns shall at all times hereafter peacefully and quietly have and enjoy the granted interest in the property, and that the Grantor and its heirs, successors, successors-in-title, assigns, executors and administrators shall warrant and defend the premises to the Grantees and their assigns and personal representatives forever against the lawful claims and demands of all persons.

20. Notices: Any notice, demand, request, consent, approval, or communication that either party desires or is required to give to the other shall be in writing. Such written notice shall be directed to the individuals at the addresses specified below, unless those individuals or their successors give notice of a change to the other parties in writing.

As to the EPA:

Anna Krasko
On-Scene Coordinator/Remedial Project Manager
for the Centredale Manor Restoration Project Superfund Site
United States Environmental Protection Agency New England
Congress St., Suite 1100 (mail code HBR)
Boston, MA 02114

As to the State:

Sarah Martino
State Project Coordinator
RIDEM
Division of Site Remediation
291 Promenade St.
Providence, RI 02908

As to the Respondents:

For Brook Village Associates Limited Partnership:
Colburn T. Cherney
Ropes & Gray
One Franklin Square
1301 K Street, NW, Suite 800 East
Washington, D.C. 20005-3333
PH 202-626-3900
FAX 202-626-3961

Howard Castleman
Murtha Cullina Roche Carens & DeGiacomo
99 High Street
Boston, MA 02110
PH 617-457-4000
FAX 617-482-3868

For Centerdale Manor Associates Limited Partnership (C/S Housing Associates):
Leonard H. Freiman

Goulston & Storrs, A Professional Corporation
400 Atlantic Avenue
Boston, MA 02110-3333
PH 617-482-1776
FAX 617-574-4112

For Centerdale Manor Associates Limited Partnership (Centerdale Associates):
Richard J. Welch
Moses & Alfonso, Ltd.
170 Westminster Street, Suite 201
Providence, RI 02903
PH 401-453-3600
FAX 401-453-3604

For Emhart Industries, Inc.
Jerome C. Muys, Jr.
Swidler Berlin Shereff Friedman LLP
3000 K Street, NW, Suite 300
Washington DC 20007-5116
PH 202-424-7547
FAX 202-424-7643

For Crown-Metro, Inc.
Knox L. Haynsworth, III
Brown, Massey, Evans, McLeod & Haynsworth, P.A.
P.O. Box 2464
Greenville, SC 29602
PH 864-271-7424
FAX 864-242-6469

For New England Container Company, Inc.:
Deming E. Sherman, Esq.
Edwards & Angell, LLP
2800 BankBoston Plaza
Providence, RI 02903-2499
PH 401-274-9200
FAX 401-276-6611

As to Grantor:

[INSERT NAME/ADDRESS]

21. General provisions:

a) Controlling law: The interpretation and performance of this Instrument shall be governed by the laws of the United States or, if there are no applicable federal laws, by the law of the State of Rhode Island.

b) Definitions: Any provision or term not otherwise defined in this Instrument shall have the meaning set forth in the Unilateral Administrative Order and the appendices to the Unilateral Administrative Order.

c) Liberal construction: Any general rule of construction to the contrary notwithstanding, this Instrument shall be liberally construed in favor of the grant to effect the purpose of this Instrument, the Unilateral Administrative Order and its appendices, and the policy and purpose of CERCLA. If any provision of this Instrument is found to be ambiguous, an interpretation consistent with the purpose of this Instrument that would render the provision valid shall be favored over any interpretation that would render it invalid.

d) Severability: If any provision of this Instrument, or the application of it to any person or circumstance, is found to be invalid, the finding of invalidity will not affect i) the validity of the remainder of the provisions in the Instrument, or ii) the application of such provisions to any other person or circumstances.

e) Entire Agreement: This Instrument sets forth the entire agreement of the parties with respect to rights and restrictions created hereby, and supersedes all prior oral understandings relating thereto, all of which are merged into this Instrument.

f) No Forfeiture: Nothing contained in this Instrument will result in a forfeiture or reversion of Grantor's title in any respect.

g) Successors: The covenants, terms, conditions, and restrictions of this Instrument shall be binding upon, and inure to the benefit of, the parties hereto and their respective personal representatives, successors, successors-in-title, and assigns and shall continue as a servitude running with the Property. The term "Grantor" wherever used herein, and any pronouns used in place of the term "Grantor," shall include the person and/or entity named at the beginning of this document, identified as "Grantor" and its heirs, successors, successors-in-title, personal representatives and assigns. The term "Grantee," wherever used herein, and any pronouns used in place of the term "Grantee," shall include the persons and/or entities named at the beginning of this document, identified as "Grantees," and their personal representatives and assigns. The rights of the Grantee and Grantor under this Instrument are freely assignable, subject to the notice provisions contained in Paragraph 21 of this Instrument. Any transferee of the fee title to the Property or any leasehold interest in the Property shall automatically be deemed, by acceptance of such interest, to have acquired such title or interest subject to the restrictions contained or referred to in this Instrument and to have agreed to execute any and all

Instruments reasonably necessary to carry out the provisions of this Instrument. Consistent with the Rhode Island Code, Title 34, Chapter 39-3(c), the rights and obligations under this Instrument shall not be subject to a 30-year limitation on restrictive covenants.

h) Termination of Rights and Obligations: A party's rights and obligations under this Instrument terminate upon transfer of the party's interest in the referenced in paragraph ___ of this Instrument or Property, except that liability for acts or omissions occurring prior to the transfer shall survive the transfer.

i) Captions: The captions in this Instrument have been inserted solely for convenience of reference and are not a part of this Instrument and shall have no effect upon the construction of this Instrument.

j) Counterparts: The parties may execute this Instrument in two or more counterparts, which shall, in the aggregate, be signed by all parties; each counterpart shall be deemed an original instrument as against any party who has signed it. In event of any disparity between the counterparts produced, the recorded counterpart shall control.

k) Further Assurances: From time to time after the execution of this Instrument and without further consideration, the parties hereto will execute and deliver, or arrange for the execution and delivery of, such other instruments and take such other action or arrange for such other actions as may reasonably be requested to more effectively complete any of the transactions provided for in this Instrument.

TO HAVE AND TO HOLD unto the Grantees and Grantees' personal representatives and assigns forever.

IN WITNESS WHEREOF, Grantor has caused this Instrument to be executed by its duly authorized representative this ____ day of ______, 2001.

WITNESS:

*[NAME OF GRANTOR COMPANY]*

By:_______________________

*[TYPED OR PRINTED NAME AND TITLE]*

STATE OF _______________

COUNTY OF _______________

On this ____ day of ____, 2001, before me, the undersigned, a Notary Public in and for the State of Rhode Island, duly commissioned and sworn, personally appeared ***[INSERT NAME AND TITLE OF PERSON]*** of ***[INSERT NAME OF GRANTOR COMPANY]***, known by me to be the party so executing the foregoing agreement for and on behalf of ***[INSERT NAME OF GRANTOR COMPANY]***, and he acknowledged said Instrument, by him so executed, to be his free act and deed in said capacity and the free act and deed of ***[INSERT GRANTOR CO. NAME]***

______________________________
Signature

______________________________
NOTARY PUBLIC

My Commission Expires: ________.

The undersigned, the holder of a ***[INSERT NAME OF INTEREST IN PROPERTY, E.G. MORTGAGE, EASEMENT]***, recorded in the Records of Land Evidence of the Town of _______, Rhode Island in Book ___ at Page ___, by execution hereof, agrees that the rights and easements reserved to it and to the portion of the Property described therein and in Exhibit B of this Instrument, shall be subject and subordinate to the terms and provisions of this Instrument.

WITNESS:

***[NAME OF INTEREST HOLDER]***

By:______________________

[***TYPED OR PRINTED NAME AND TITLE***]

STATE OF ______________

COUNTY OF ______________

On this ____ day of ____, 2001, before me, the undersigned, a Notary Public in and for the State of ______, duly commissioned and sworn, personally appeared ***[INSERT NAME AND TITLE OF PERSON SIGNING ON BEHALF OF INTEREST HOLDER]*** of ***[INSERT NAME OF INTEREST HOLDER]***, known by me to be the party so executing the foregoing agreement for and on behalf of ***[INSERT NAME OF INTEREST HOLDER]***, and he acknowledged said Instrument, by him so executed, to be his free act and deed in said capacity

and the free act and deed of ***[INSERT NAME OF INTEREST HOLDER]***.

____________________________________

Signature

____________________________________

NOTARY PUBLIC

My Commission Expires: _________.

This easement and declaration of covenants is accepted this ____ day of ______, 2001.

U.S. ENVIRONMENTAL PROTECTION AGENCY

By: ________________________________

________________________________

Its: ________________________________

Attachments:
Exhibit A -- legal description of the Property
Exhibit B -- list of persons, other than Grantor, who hold interests in the Property

CASE NO. 02-053S

Emhart Industries, Inc.

vs. Home Insurance Co., et al.

PLAINTIFF'S EXHIBIT 15

DATE ______ IDEN.

DATE ______ EVID.

BY ______
Deputy Clerk

AO 386

# EXHIBIT 5

Plaintiff's
Exhibit 16

7

# Centredale Manor

10.7 Third Administrative Order on Consent (AOC) for Removal Action (US EPA R1) 09/11/2003

**************************************************************************

## SUPERFUND RECORDS CENTER
## RECORDS CODING SHEET

All records transferred to the Superfund Records Center must be accompanied by a Coding Sheet. The Superfund Records Center does not accept duplicates.

1. **Site Name:** Centredale Manor
2. **Operable Unit(s)? (Identify if Yes)** No (Yes:) Future ROD Admin Record (on-going)
3. **Major/Minor Break for this Record: (Refer to File Structure Guidance)** 10.7, Sept 11, 2003
4. **Confidential? (Explain if Yes)** (No) Yes: ______
5. **Direction: (Circle One)** Priority Processing (Standard Processing)

   Transfer to FRC: EPA Series No. ______
6. **Name of Person Submitting Record:** ANNA KRASKO
7. **Telephone Number:** 8x1232
8. **Date:** 9/4/03

**Please attach completed form to the record(s) and send to the Superfund Records Center.**

**************************************************************************

(3/24/98)

Superfund Records Center
SITE: Centredale
BREAK: 10.07
OTHER: 204619

SDMS DocID 000204619

**UNITED STATES**
**ENVIRONMENTAL PROTECTION AGENCY**
**REGION 1 - NEW ENGLAND**

IN THE MATTER OF:

Centredale Manor Restoration Project Superfund Site

North Providence, Rhode Island

American Mineral Spirits Company, Brook Village Associates Limited Partnership; Centredale Manor Associates Limited Partnership; Cranston Print Works Company; CNA Holdings, Inc., Emhart Industries, Inc., New England Container Company, Inc., Sequa Corporation; The Original Bradford Soap Works, Inc.; and Teknor Apex Company.

Respondents

THIRD ADMINISTRATIVE ORDER ON CONSENT FOR REMOVAL ACTION

U.S. EPA Region I
CERCLA Docket No. 01-2003-0073
Proceeding Under Sections 104, 106(a), and 122 of the Comprehensive Environmental Response, Compensation, and Liability Act, as amended, 42 U.S.C. §§ 9604, 9606(a), 9607 and 9622

## TABLE OF CONTENTS


| | | |
|---|---|---|
| I. | JURISDICTION AND GENERAL PROVISIONS | 1 |
| II. | PARTIES BOUND | 1 |
| III. | DEFINITIONS | 2 |
| IV. | EPA'S FINDINGS OF FACT | 3 |
| V. | EPA'S CONCLUSIONS OF LAW AND DETERMINATIONS | 12 |
| VI. | ORDER | 12 |
| VII. | DESIGNATION OF CONTRACTOR, PROJECT COORDINATOR, AND ON-SCENE COORDINATOR | 13 |
| VIII. | WORK TO BE PERFORMED | 14 |
| IX. | SITE ACCESS | 18 |
| X. | ACCESS TO INFORMATION | 18 |
| XI. | RECORD RETENTION | 19 |
| XII. | COMPLIANCE WITH OTHER LAWS | 20 |
| XIII. | EMERGENCY RESPONSE AND NOTIFICATION OF RELEASES | 20 |
| XIV. | AUTHORITY OF ON-SCENE COORDINATOR | 21 |
| XV. | DISPUTE RESOLUTION | 21 |
| XVI. | FORCE MAJEURE | 21 |
| XVII. | STIPULATED PENALTIES | 22 |
| XVIII. | COVENANT NOT TO SUE BY EPA | 24 |
| XIX. | RESERVATIONS OF RIGHTS BY EPA | 24 |
| XX. | COVENANT NOT TO SUE BY RESPONDENTS | 25 |
| XXI. | OTHER CLAIMS | 26 |
| XXII. | CONTRIBUTION PROTECTION | 26 |
| XXIII. | INDEMNIFICATION | 27 |
| XXIV. | INSURANCE | 27 |
| XXV. | FINANCIAL ASSURANCE | 28 |
| XXVI. | MODIFICATIONS | 28 |
| XXVII. | NOTICE OF COMPLETION OF WORK | 28 |
| XXVIII. | SEVERABILITY/INTEGRATION/APPENDICES | 29 |
| XXIX. | EFFECTIVE DATE | 29 |

## I. JURISDICTION AND GENERAL PROVISIONS

1. This Administrative Order on Consent ("Order") is entered into by the United States Environmental Protection Agency ("EPA") and Respondents listed in Appendix A to this Order ("Respondents"). This Order provides for the performance of a removal action by Respondents at or in connection with the property located at 2072 and 2074 Smith Street in North Providence, Rhode Island, as well as other locations to which contamination from that area has come to be located or from which that contamination came, known as the "Centredale Manor Restoration Project Superfund Site" or the "Site."

2. This Order is issued under the authority vested in the President of the United States by Sections 104, 106(a) and 122 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9604, 9606(a), and 9622, as amended ("CERCLA").

3. EPA has notified the State of Rhode Island of this action pursuant to Section 106(a) of CERCLA, 42 U.S.C. § 9606(a).

4. EPA and Respondents recognize that this Order has been negotiated in good faith and that the actions undertaken by Respondents in accordance with this Order do not constitute an admission of any liability. Respondents do not admit, and retain the right to controvert in any subsequent proceedings other than proceedings to implement or enforce this Order, the findings of fact, conclusions of law, determinations or statements in this Order or submissions made pursuant thereto. This Order does not and will not constitute any precedent for allocation of liability among the Respondents. Respondents agree to comply with and be bound by the terms of this Order and further agree that they will not contest the validity of this Order or its terms.

## II. PARTIES BOUND

5. This Order applies to and is binding upon EPA and upon Respondents and their heirs, successors and assigns. Any change in ownership or corporate status of a Respondent including, but not limited to, any transfer of assets or real or personal property shall not alter such Respondent's responsibilities under this Order.

6. Performing Respondents are jointly and severally liable for carrying out all activities required by this Order to be carried out by Performing Respondents. Payment Respondents are jointly and severally liable for the Cash Payments required by Paragraph 46. In the event of the insolvency or other failure of any one or more Performing Respondents to implement the requirements of this Order, the remaining Performing Respondents shall complete all such requirements.

7. The Performing Respondents shall ensure that their contractors, subcontractors, and representatives receive a copy of this Order and comply with this Order. The Performing Respondents shall be responsible for any noncompliance with the performance of the Work required by this Order. Payment Respondents shall be responsible for making the Cash Payments required by this Order.

## III. DEFINITIONS

8. Unless otherwise expressly provided herein, terms used in this Order which are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in CERCLA or in such regulations. Whenever terms listed below are used in this Order or in the appendices attached hereto and incorporated hereunder, the following definitions shall apply:

a. "CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. § 9601, *et seq.*

b. "Day" shall mean a calendar day. In computing any period of time under this Order, where the last day would fall on a Saturday, Sunday, or Federal holiday, the period shall run until the close of business of the next working day.

c. "Effective Date" shall be the effective date of this Order as provided in Section XXIX.

d. "EPA" shall mean the United States Environmental Protection Agency and any successor departments or agencies of the United States.

e. "State of Rhode Island" shall mean the Rhode Island Department of Environmental Management ("RIDEM") and any successor departments or agencies of the State.

f. "Interest" shall mean interest at the rate specified for interest on investments of the EPA Hazardous Substance Superfund established by 26 U.S.C. § 9507, compounded annually on October 1 of each year, in accordance with 42 U.S.C. § 9607(a). The applicable rate of interest shall be the rate in effect at the time the interest accrues. The rate of interest is subject to change on October 1 of each year.

g. "National Contingency Plan" or "NCP" shall mean the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and any amendments thereto.

h. "Order" shall mean this Third Administrative Order on Consent and all appendices attached hereto. In the event of conflict between this Order and any appendix, this Order shall control.

i. "Paragraph" shall mean a portion of this Order identified by an Arabic numeral.

j. "Payment Respondents" shall be those parties identified in Appendix B.

k. "Parties" shall mean EPA and Respondents.

l. "Performing Respondents" shall mean those parties identified in Appendix C.

m. "RCRA" shall mean the Solid Waste Disposal Act, as amended, 42 U.S.C. §§ 6901, *et seq.* (also known as the Resource Conservation and Recovery Act).

n. "Respondents" shall mean those Parties identified in Appendix A.

o. "Section" shall mean a portion of this Order identified by a Roman numeral.

p. "Site" shall mean the Centredale Manor Restoration Project Superfund Site, located at 2072 and 2074 Smith Street, North Providence, Rhode Island, and all areas where contamination from that source area has come to be located, or from which that contamination came.

q. "State" shall mean the State of Rhode Island.

r. "Statement of Work" or "SOW" shall mean the statement of work for implementation of the removal action, as set forth in Appendix D to this Order, and any modifications made thereto in accordance with this Order.

s. "Work" shall mean all activities Respondents are required to perform under this Order.

## IV. EPA'S FINDINGS OF FACT

### Background

9. The Centredale Manor Restoration Project Superfund Site is located in North Providence, Rhode Island. It consists of two parcels, 2072 and 2074 Smith Street (Plat 14, Lots 200 and 250, encompassing approximately 9.7 acres) as well as sediments and floodplain areas of the Woonasquatucket River from Route 44 southerly to the breached Allendale Dam and further to an area just below the Lymansville Dam. The Site consists of all contaminated areas within this area as well as any other location to which contamination from that area has come to be located, or from which that contamination came.

10. The Brook Village Apartments are located at 2072 Smith Street, and consist of an eleven story apartment building housing approximately 135 elderly residents. A series of three parking lots extend to the south of the building. The area around the building is landscaped with grass and ground cover, including a fenced-in interim soil cap next to the Woonasquatucket River. The parcel is bordered to the north by Route 44, to the west by the Woonasquatucket River, to the east by a tailrace, and to the south by 2074 Smith Street. A road allowing 2074 Smith Street access to Route 44 is located on the eastern portion of the parcel.

11. Centredale Manor Apartments are located at 2074 Smith Street, and consist of an eight-story apartment building housing approximately 200 elderly residents. There are two paved parking lots located to the north and west of the building. The area around the building is landscaped with grass ground cover. The building and parking lots are located on the northern end of the parcel. At the start of EPA's activities at the Site, the southern end of the peninsula

was heavily wooded. EPA activities at the Site resulted in the removal of trees in that portion of the Site and construction of a fenced-in interim soil cap. The southern end of the parcel is bordered by the Woonasquatucket River and a tailrace to the east and south. The northern end of the parcel borders 2072 Smith Street to the north, the Woonasquatucket River to the west, and a tailrace to the east. The parcel accesses Route 44 via a road running along the western portion of 2072 Smith Street.

12. Prior to 1936, the properties were occupied by Centredale Worsted Mills, a woolens manufacturing plant. Atlantic Chemical Company, a chemical manufacturer, began operating on a portion of the Site in approximately 1940. Atlantic Chemical Company changed its name in 1953 to Metro-Atlantic, Inc., and operated until the late 1960s or early 1970s. In the late 1960s or early 1970s, Metro-Atlantic, Inc., changed its name to Crown-Metro, Inc. The chemical company ceased operating in the early 1970s. New England Container Company operated a drum reconditioning facility on a portion of the Site from 1952 until the early 1970s. A major fire in the early 1970s destroyed most of the structures at the Site. Evidence suggests that the operations of the chemical companies and the drum reconditioning facility at the Site resulted in releases and threats of releases of hazardous substances at the Site.

13. Centredale Manor Associates Limited Partnership is a current owner of a portion of the Site, through its purchase of 2074 Smith Street on March 18, 1982. Brook Village Associates Limited Partnership is a current owner of a portion of the Site, through its purchase of 2072 Smith Street on October 19, 1976. New England Container Company, Inc., formerly operated at the Site. Emhart Industries, Inc., is a successor of certain assets and liabilities of the chemical companies which operated at the Site. American Mineral Spirits Company, CNA Holdings, Inc., Cranston Print Works Company, The Original Bradford Soap Works, Inc., Sequa Corporation, and Teknor Apex Company are alleged generators of hazardous substances found at the Site.

14. From approximately the 1970s to approximately 1986, RIDEM was involved in the inspection of the Site as well as oversight of response actions taken by others at the Site. Hundreds of drums were observed by RIDEM representatives at the Site, some of which were visibly smoking. Some of these drums contained hazardous waste materials requiring disposal, other (empty) drums were crushed and disposed of as non-hazardous. RIDEM also directed that soil unearthed at the Site be disposed of at a solid waste landfill.

15. In November 1981, a Notice of Violation and Order was issued by RIDEM to the then-property owners (Joseph Buonanno and Edward Ricci) for violations of the State Hazardous Waste Management Act requiring the property owners to immediately identify all hazardous material on site, then dispose of all hazardous wastes off-site.

16. In August 1986, EPA's contractors conducted a Preliminary Assessment ("PA") of the Centredale Manor property. The PA recommended a Screening Site Inspection, which was completed in October 1990. Soil sample analysis detected several VOCs and SVOCs, pesticides, and two PCB cogeners (Aroclors 1242 and 1254).

17. In 1996, as part of the EPA Providence Urban Initiative Program, fish and eel tissue samples from the Woonasquatucket watershed were analyzed. This led to a joint advisory from the Rhode Island Department of Health and EPA against eating fish and eels from the Woonasquatucket River, due to PCB, mercury, and dioxin contamination concerns.

18. In June 1998, EPA initiated an Expanded Site Inspection ("ESI") of the Centredale Manor property. The ESI assessed the extent of contamination in areas of possible human exposure, the potential source areas to be located up-river from the Centredale Manor property, and the presence of dioxin/furan and hexachloroxanthene contamination on the Centredale Manor property.

19. Acting on a verbal approval of funding, EPA initiated a removal action (including sampling and placement of temporary fencing around contaminated surface soil) in January 1999. An Action Memorandum documenting this verbal approval, and authorizing additional activities was issued on May 4, 1999. The additional activities included: site clearing; sampling activities; the erection of permanent fencing; and community outreach.

20. On September 13, 1999, an Action Memorandum was issued which changed the scope of the ongoing removal activities and authorized the expenditure of additional funds. The removal activities approved in the September Action Memorandum included: designing and implementing a Flood Evaluation Study of the Site and surrounding area; designing and implementing interim soil caps for specific areas of the Site; and reconstruction of the former tailrace at the eastern edge of the Site.

21. In 1999, EPA began conducting Remediation Investigation ("RI") activities at the Site. These activities include: biota, sediment, vapor-diffusion, surface water and soil sampling and analyses at the Site (including the reference areas and floodplain areas from Route 44 southerly to Manton and Dyerville reaches of the Woonasquatucket River).

22. On September 15, 1999, EPA mailed Notice of Potential Liability letters to three potentially responsible parties ("PRPs"): Brook Village Associates Limited Partnership; Centredale Manor Associates Limited Partnership; and New England Container Company, Inc.

23. On November 26, 1999, EPA issued a proposed Administrative Order on Consent ("AOC") for remedial investigation/feasibility study ("RI/FS") activities to Brook Village Associates Limited Partnership and Centredale Manor Associates Limited Partnership-the two parties who indicated a willingness to participate in Site activities after receiving General Notice letters. These negotiations were unsuccessful.

24. On December 2, 1999, EPA issued a proposed Administrative Order on Consent ("AOC") for time-critical removal activities to Brook Village Associates Limited Partnership and Centredale Manor Associates Limited Partnership. These negotiations were unsuccessful.

25. On February 3, 2000, EPA issued a letter to the three PRPs requesting that they voluntarily perform or finance an Engineering Evaluation/Cost Analysis ("EE/CA") for a portion

of the Site. The parties declined to negotiate. The EE/CA was completed in September 2000, and the public comment period was held in October/November 2000.

26. On February 28, 2000, EPA mailed two additional Notice of Potential Liability letters to Emhart Industries, Inc. and Crown- Metro, Inc. Negotiations with these two PRPs, as well as the three PRPs previously named, to perform or fund the remaining time-critical removal activities at the Site were not successful.

27. The Site was placed on the National Priorities List ("NPL") on March 6, 2000.

28. On April 12, 2000, EPA issued a Unilateral Administrative Order ("UAO") to the five PRPs at the Site, ordering the parties to complete time-critical removal activities at the Site (completion of the second interim soil cap, and implementation of certain flood control measures). All five PRPs complied with the UAO. EPA approved the PRPs' Completion of Work Report on September 11, 2000.

29. On April 27, 2000, EPA issued a letter to all five PRPs requesting that they indicate their interest in completing the RI/FS at the Site, and reimbursing EPA for its past costs at the Site. These negotiations were unsuccessful and EPA is continuing work on the RI/FS.

30. On June 1, 2000, a second Action Memorandum was issued which changed the scope of the ongoing removal activities, authorized the expenditure of additional funds, and granted a 12-month exemption for a continued removal action. The change in scope primarily concerned the transition of certain time-critical removal activities to non-time critical removal activities. The Action Memorandum also noted that the second interim soil cap and certain flood control measures would be performed by PRPs at the Site pursuant to a UAO.

31. On January 18, 2001, EPA issued an Action Memorandum to mitigate the human health threats posed by dioxin and other hazardous substances released at the Site by removing contaminated soils and sediments from properties subject to residential and recreation use located in the floodplain of the Woonasquatucket River southerly from Route 44 to an area just below the Lymansville Dam and by restoring the Allendale Dam to minimize further migration of contaminated sediment in the River.

32. On March 26, 2001, EPA issued a Second UAO to the five PRPs at the Site, ordering the parties to implement the non-time-critical removal action in accordance with the January 18, 2001 Action Memorandum. The Allendale Dam restoration was completed in February, 2002. Activities associated with the removal of contaminated soil are on-going.

33. On May 16, 2002, EPA mailed a Notice of Potential Liability letter to Bernard V. Buonanno, Sr.

34. On March 3, 2003, EPA mailed Notice of Potential Liability letters to eleven PRPs: American Hoechst Corporation, American Mineral Spirits Company, Ciba Geigy, Cranston Print Works Company, Eastern Color and Chemical Company, Eastern Smelting, Organic Dyestuffs Corporation, The Original Bradford Soap Works, Inc., Warwick Chemical

Company, T.H. Baylis, Co., and Teknor Apex Company. EPA mailed an additional Notice of Potential Liability letter to Refinity Corporation on March 31, 2003.

35. By letter dated May 5, 2003, EPA requested the PRPs to participate in an Administrative Order on Consent for a Removal Action to complete time critical removal activities in the tailrace portion of the Site.

Endangerment

36. The conditions present at the facility constitute an imminent and substantial endangerment to public health, welfare, or the environment. Factors that may be considered are set forth in Section 300.415(b)(2) of the National Oil and Hazardous Substances Pollution Contingency Plan, as amended, 40 C.F.R. Part 300 ("NCP").

a. **"Actual or potential exposure to nearby human populations, animals, or the food chain from hazardous substances or pollutants or contaminants;" [§300.415(b)(2)(i)].**

There are elevated levels of numerous substances in surface soils, sub-surface soils, and sediments in proximity to residential areas at the Site. Contaminated soils have been identified within fifty feet of the Centredale Manor apartments and in wetlands immediately adjacent to a residential neighborhood. Levels of dioxin up to 140 ppb and PCBs up to 1300 ppm along with several other chemicals have been identified in soil samples from the Site. Analysis of fish and eel tissue samples collected in the Woonasquatucket River indicate that dioxin is present in these animals and the food chain. In a Health Consultation (June 07, 1999) and a Record of Activity (March 19, 1999), the Agency for Toxic Substances and Disease Registry has recommended that EPA take actions to reduce exposure at the Site.

EPA's earlier time critical removal activities included placing fences as interim measures in the areas of surface soil contamination that are the subject of this removal action.

b. **"High levels of hazardous substances or pollutants or contaminants in soils largely at or near the surface, that may migrate;" [§300.415(b)(2)(iii)].**

High levels of hazardous substances have been found in soils largely at or near the surface at the Site that will be subject to this removal action. These soils are in the areas subject to erosion by runoff as well as periodic flooding. Erosion and flooding appear to have caused the contaminated soil to migrate, since elevated levels of hazardous substances have been found in Woonasquatucket River sediments located in the downstream portion of the Site.

c. **"Actual or potential contamination of drinking water supplies or sensitive ecosystems;" [§300.415(b)(2)(ii)].**

Dioxin, PCBs and other contaminants have been identified at elevated levels in wetlands, surface soils and flood plain soil samples that will be subject to this removal action. Wetlands, sediments and flood plains are sensitive ecosystems.

d. **"Weather conditions that may cause hazardous substances or pollutants or contaminants to migrate or be released;" [§300.415(b)(2)(v)].**

Heavy rainfall may produce significant flooding of the Woonasquatucket River and its floodplain. These conditions have caused and will continue to cause the migration of contaminants and deposition of contaminants in the floodplain further downstream. The tailrace area subject to this removal action is a continuing source of contamination through erosion and flooding.

e. **"The availability of other appropriate federal or state response mechanisms to respond to the release;" [§300.415(b)(2)(vii)].**

The RIDEM has indicated that funding and staffing limitations will restrict their ability to respond to this situation. There are no other known federal or state funds or response mechanisms available to finance this action. Conditions at the Site support removal actions as described in the NCP.

f. **"Other situations or factors that may pose threats to public health or welfare or the environment." [§300.415(b)(2)(viii)].**

Public access to the contaminated surface soils is restricted by fencing to reduce exposure via contact and incidental ingestion. Migration of the contaminants will continue to pose a human health and environmental threat until addressed by the action proposed in this Order.

37. The following table identifies the highest concentrations of some of the chemical compounds detected by EPA in soil samples collected at the Site:

| CHEMICAL COMPOUND | HIGHEST CONCENTRATION (in parts per billion - ppb) |
|---|---|
| 2,3,7,8 -Tetrachlorodibenzo-*p*-Dioxin | 140 |
| PCBs | 1,300,000 |
| 1 ,2-dichlorobenzene | 2,800,000 |
| Benzene | 480,000 |
| Chlorobenzene | 1,000,000 |
| Tetrachloroethene | 1,7000,000 |
| Trichloroethene | 2,400,000 |
| Cadmium | 180,000 |

| | |
|---|---|
| Lead | 3,160,000 |
| Manganese | 6,420,000 |
| Aluminum | 16,100,000 |
| Antimony | 27,800 |
| Arsenic | 49,300 |
| Cadmium | 180,000 |
| Chromium | 472,000 |
| Copper | 934,000 |
| Mercury | 7,400 |
| Silver | 35,500 |
| Vanadium | 72,500 |

38. The following table represents some of the dangers to human health associated with each of the hazardous substances found on-site, as well as the potential routes of human exposure to these wastes:

| HAZARDOUS SUBSTANCE | ROUTE(S) OF EXPOSURE | POTENTIAL HUMAN HEALTH EFFECTS |
|---|---|---|
| 2,3,7,8 - Tetrachlorodibenzo-*p*-Dioxin | inhalation; skin absorption; ingestion; skin and/or eye contact | irritated eyes, skin, and micous membranes; chloracne; porphyria; gastrointestinal disturbances; possible reproductive problems; teratogenic effects<br><br>The World Health Organization has classified dioxin as a human carcinogen |
| PCBs | inhalation; skin absorption | irritated eyes; chloracne; liver damage; reproductive problems |
| 1,2-dichloro-benzene | inhalation; skin absorption; ingestion; skin and/or eye contact | irritated eyes and nose; liver and kidney damage; skin blisters |
| benzene | inhalation; skin absorption; ingestion; skin and/or eye contact | irritated eyes, skin, nose and respiratory system; giddiness; headache; nausea; staggered gait; fatigue; anorexia; lassitude; dermatitis; bone marrow depression<br><br>The U.S. Department of Health and Human Services has designated benzene as a known human carcinogen |
| chlorobenzene | inhalation; ingestion; skin and/or eye contact | irritated eyes, skin, nose; drowsiness, incoordination; central nervous system depression |
| tetrachloro-ethene | inhalation; skin absorption; ingestion; skin and/or eye contact | irritated eyes and skin; vertigo; dizziness; incoordination; headache, somnolence; skin erythema; liver damage |

| | | |
|---|---|---|
| trichloroethene | inhalation; skin absorption; ingestion; skin and/or eye contact | irritates eyes and skin; headache; vertigo; visual disturbance; fatigue; giddiness; tremors; somnolence; nausea; vomiting; dermatitis; cardiac arrhythmia; paresthesia; liver injury |
| cadmium | inhalation; ingestion | pulmonary edema; dyspnea; cough; chest tightness; substernal pain; headache; chills; muscle aches; nausea; vomiting; diarrhea; anosmia, emphysema; proteinuria; mild anemia |
| lead | inhalation; ingestion; skin and/or eye contact | [NOTE: THESE SYMPTOMS ARE MORE PRONOUNCED IN CHILDREN] weakness; lassitude insomnia; facial pallor; anorexia; weight loss; constipation; abdominal pain; colic; anemia; gingival lead line; tremors; paralysis of the wrist and ankles; encephalopathy; kidney disease; irritated eyes; hypotension |
| manganese | inhalation; ingestion | Parkinson's; asthenia; insomnia; mental confusion; metal fume fever: dry throat, cough, chest tightness, dyspnea, rales flu-like fever; lower back pain; vomiting; malaise; fatigue; kidney damage |
| aluminum | inhalation; ingestion; skin and/or eye contact | irritated eyes, skin and respiratory system |
| antimony | inhalation; skin and/or eye contact | irritated eyes, skin, nose, throat, mouth; cough; dizziness; headache; nausea; vomiting; diarrhea; stomach cramps; insomnia; anorexia; unable to smell properly |
| arsenic | inhalation; skin absorption; ingestion; skin and or eye contact | ulceration of nasal septum; dermatitis, gastrointestinal disturbances; peripheral neuropathy; respiratory irritation; hyperpigmentation of skin<br><br>The U.S. Department of Health and Human Services has designated arsenic as a known human carcinogen |
| cadmium | inhalation; ingestion | pulmonary edema; dyspnea; cough; chest tightness; substernal pain; headache; chills; muscle aches; nausea; vomiting; diarrhea; anosmia; emphysema; proteinuria; mild anemia |
| chromium | inhalation; ingestion; skin and/or eye contact | irritated eyes and skin; lung fibrosis |
| copper | inhalation; ingestion; skin and/or eye contact | irritated eyes, nose, pharynx; nasal perforation; metallic taste; dermatitis |

| | | |
|---|---|---|
| mercury | inhalation; skin absorption; ingestion; skin and/or eye contact | irritated eyes and skin; cough, chest pain, dyspnea, bronchial pneutis; tremors; insomnia; irritability; indecision; headache; fatigue; weakness; stomatitis; salivation; gastrointestinal disturbance; anorexia; weight loss; proteinuria |
| silver | inhalation; ingestion; skin and/or eye contact | blue-gray eyes; nasal septum, throat and skin irritation, ulceration skin; gastrointestinal disturbance |
| vanadium | inhalation; ingestion; skin and/or eye contact | irritated eyes, skin and throat; green tongue; metallic taste; eczema; cough; fine rales; wheezing; bronchitis; dyspnea |

39. Analysis of soils, sediments, wetlands and flood plain samples at the Site indicated elevated levels of hazardous substances, pollutants or contaminants, including 2,3,7,8-Tetrachlorodibenzo-p-Dioxin ("dioxin"), polychlorinated biphenyls ("PCBs" or "Aroclors"), polycyclic aromatic hydrocarbons ("PAHs"), including benzo(a)anthracene, benzo(a)pyrene, benzo(b)fluoranthene, benzo(k)fluoranthene, dibenzo(a,h)anthracene, and indeno(1,2,3-cd)pyrene, metals (including antimony, arsenic, chromium, lead, and manganese), and several Volatile Organic Compounds ("VOCs") and Semi-Volatile Organic Compounds ("SVOCs").

40. In the spring and summer of 2002, as part of a non-time critical removal action, samples for dioxin analysis were collected in the former tailrace behind the Centredale Manor, on the eastern embankment which also abuts residential-use properties. The area had not been previously extensively characterized. Levels of dioxin up to 128 ppb were found at depths to 3 feet, with results in surface samples as high as 40 ppb. EPA and the Army Corps of Engineers ("ACOE") also investigated the surface hydrology of the former tailrace, which indicated that significant drainage run-off flows enter the former tailrace during storm events. The soils and sediments are accessible to residential and recreational users.

41. A portion of the Site (the tailrace) is adjacent to or includes the Centredale Manor property and a number of residential and commercial-use properties, and is immediately upstream of the Allendale Pond. The tailrace is one of the remaining source areas of contamination at the Site. Additional risk information relating to the specific area of the tailrace addressed by this response action is explained in Paragraph 36. The removal action is a continuing response to reduce the potential for migrations of, and direct contact with, dioxin, PCBs, PAHs, VOCs and SVOCs in contaminated surface soils, sub-surface soils and exposed sediments at the Site, and further, to address the potential migration of contaminants by moderating the impact of flood conditions at the Site.

42. EPA/OSWER Directive 9200.4-26, Memorandum – Approach for Addressing Dioxin in Soil at CERCLA and RCRA Sites, April 13, 1998, was considered in developing interim cleanup goals for dioxin at this Site. The work contemplated by Appendix D will reduce risks from exposure to contaminants in the area of concern.

43. The reconstruction of the tail-race, including a cap over contaminated soil and sediment, and construction of a drainage swale in the tailrace will help prevent the migration of contaminants through erosion and flooding.

44. This removal action is based on documents and data which will be available to the public in the Administrative Record, to be available for public review within 60 days of the inception of these proposed actions, as described in the National Contingency Plan (40 C.F.R. 300.415(m)(i)).

## V. EPA'S CONCLUSIONS OF LAW AND DETERMINATIONS

45. Based on the Findings of Fact set forth above, EPA has determined that:

a. The Centredale Manor Restoration Project Superfund Site is a "facility" as defined by Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

b. The contamination found at the Site, as identified in the Findings of Fact above, includes "hazardous substances" as defined by Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

c. Each Respondent is a "person" as defined by Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

d. Each Respondent is a responsible party under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), and is jointly and severally liable for performance of response action and for response costs incurred and to be incurred at the Site.

e. The conditions described in Paragraphs 36 through 43 of the Findings of Fact above constitute an actual or threatened "release" of a hazardous substance from the facility as defined by Section 101(22) of CERCLA, 42 U.S.C. § 9601(22).

f. The removal action required by this Order is necessary to protect the public health, welfare, or the environment and, if carried out in compliance with the terms of this Order, will be considered consistent with the NCP, as provided in Section 300.700(c)(3)(ii) of the NCP.

## VI. ORDER

WHEREAS, based upon the foregoing Findings of Fact, Conclusions of Law, Determinations, and the Administrative Record for this Site, and without admission of any factual or legal allegations or any liability or violation of law, it is hereby ORDERED and AGREED as follows:

46. The Payment Respondents, as identified on Appendix B, shall pay prior to the Effective Date an amount equal to $210,000 (the "Cash Payment") with payments by each of $35,000 (thirty-five thousand dollars) into an escrow account to be established by the Performing Respondents for performance of the Work by the Performing Respondents pursuant to this Order.

Except as provided in Paragraph 6, these payments shall be the sole obligations of the Payment Respondents for performance of the Work under this Order.

47. The Performing Respondents shall perform the following Work in accordance with the terms of this Order.

48. Any potentially responsible party who seeks to participate in the Order after the Effective Date shall do so on terms agreed to by the Performing Respondents and EPA.

## VII. DESIGNATION OF CONTRACTOR, PROJECT COORDINATOR, AND ON-SCENE COORDINATOR

49. The Performing Respondents shall retain one or more contractors to perform the Work and shall notify EPA of the name and qualifications of such contractor within seven (7) days of the Effective Date. The Performing Respondents shall also notify EPA of the name and qualifications of any other contractor or subcontractor retained to perform the Work at least seven (7) days prior to commencement of such Work. EPA retains the right to disapprove of any or all of the contractors and/or subcontractors retained by the Performing Respondents. If EPA disapproves of a selected contractor, the Performing Respondents shall retain a different contractor and shall notify EPA of that contractor's name and qualifications within five (5) days of EPA's disapproval.

50. Within seven (7) days after the Effective Date, Performing Respondents shall designate a Project Coordinator who shall be responsible for administration of all actions by Performing Respondents required by this Order and shall submit to EPA the designated Project Coordinator's name, address, telephone number, and qualifications. To the greatest extent possible, the Project Coordinator shall be present on Site or readily available during Site work. EPA retains the right to disapprove of the designated Project Coordinator. If EPA disapproves of the designated Project Coordinator, Performing Respondents shall retain a different Project Coordinator and shall notify EPA of that person's name, address, telephone number, and qualifications within five (5) days following EPA's disapproval. Receipt by Performing Respondents' Project Coordinator of any notice or communication from EPA relating to this Order shall constitute receipt by all Performing Respondents.

51. EPA has designated Edward Bazenas of the Emergency Planning and Response Branch, Region I, as its On-Scene Coordinator ("OSC"). Except as otherwise provided in this Order, the Performing Respondents shall direct all submissions required by this Order to the OSC at the U.S. Environmental Protection Agency, Region I, One Congress Street, Suite 1100, Mail Code HBR, Boston, Massachusetts 02114-2023.

52. EPA and the Performing Respondents shall have the right, subject to Paragraph 50, to change their respective designated OSC or Project Coordinator. The Performing Respondents shall notify EPA five (5) days before such a change is made. The initial notification may be made orally, but shall be promptly followed by a written notice.

## VIII. WORK TO BE PERFORMED

53. The Performing Respondents shall perform the actions necessary to implement the Statement of Work which is included as Appendix D to this Order and generally includes: (1) control of storm drain runoff and sedimentation entering the tailrace; and (2) construction and short-term maintenance of a protective cap over the tailrace area, pursuant to Paragraph 58.

### Plans and Implementation

54. Work Plan.

a. Within fourteen (14) days after the Effective Date, the Performing Respondents shall submit to EPA for approval a draft Work Plan for performing the removal action generally described in Paragraph 53. The draft Work Plan shall provide a description of, and an expeditious schedule for, the actions required by this Order.

b. EPA may approve, disapprove, require revisions to, or modify the draft Work Plan in whole or in part. If EPA requires revisions, the Performing Respondents shall submit a revised draft Work Plan within seven (7) days of receipt of EPA's notification of the required revisions. The Performing Respondents shall implement the Work Plan as approved in writing by EPA in accordance with the schedule approved by EPA. Once approved, or approved with modifications, the Work Plan, the schedule, and any subsequent modifications shall be incorporated into and become fully enforceable under this Order.

c. The Performing Respondents shall not commence any Work except in conformance with the terms of this Order. The Performing Respondents shall not commence implementation of the Work Plan developed hereunder until receiving written EPA approval pursuant to Paragraph 54(b).

55. Health and Safety Plan.

Within seven (7) days after the Effective Date, the Performing Respondents shall submit for EPA review and comment a plan that ensures the protection of the public health and safety during performance of on-Site work under this Order. This plan shall be prepared in accordance with EPA's Standard Operating Safety Guide (PUB 9285.1-03, PB 92-963414, June 1992). In addition, the plan shall comply with all currently applicable Occupational Safety and Health Administration ("OSHA") regulations found at 29 C.F.R. Part 1910. If EPA determines that it is appropriate, the plan shall also include contingency planning. The Performing Respondents shall incorporate all changes to the plan recommended by EPA and shall implement the plan during the pendency of the removal action.

56. Construction Quality Assurance

The Performing Respondents shall submit a Construction Quality Assurance Plan ("CQAP") with the Work Plan required in Paragraph 54. The CQAP shall detail the testing and inspections required to assure that the purchase and installation of specified materials are in conformance with the project plans and specifications. The CQAP shall include references to

standard test methods customarily employed in the construction of similar work (such as those produced by the American Society of Testing Materials ("ASTM")). The frequency of testing and inspections along with acceptance criteria for each test or inspection shall also be specified.

57. Community Relations Support Plan.

Within seven (7) days after the Effective Date, the Performing Respondents shall provide to EPA a Community Relations Support Plan, the objective of which is to ensure and specify support activities for the community relations efforts of EPA.

58. Post-Removal Site Control.

In accordance with the Work Plan schedule, or as otherwise directed by EPA, the Performing Respondents shall submit a proposal for post-removal site control consistent with Section 300.415(*l*) of the NCP and OSWER Directive No. 9360.2-02. Upon EPA approval, Performing Respondents shall implement such controls until June 30, 2005.

59. Reporting.

a. The Performing Respondents shall submit a written progress report to EPA concerning actions undertaken pursuant to this Order every thirtieth (30th) day after the date of receipt of EPA's approval of the Work Plan until termination of this Order, unless otherwise directed in writing by the OSC. These reports shall describe all significant developments during the preceding period, including the actions performed and any problems encountered, analytical data received during the reporting period, and the developments anticipated during the next reporting period, including a schedule of actions to be performed, anticipated problems, and planned resolutions of past or anticipated problems.

b. The Performing Respondents shall submit four (4) copies of all plans, reports or other submissions required by this Order, the Statement of Work, or any approved work plan. Upon request by EPA, the Performing Respondents shall submit such documents in electronic form.

c. The Performing Respondents who own or control property at the Site shall, at least 30 days prior to the conveyance of any interest in real property at the Site, give written notice that the property is subject to this Order to the transferee and written notice to EPA and the State of the proposed conveyance, including the name and address of the transferee. The Performing Respondents who own or control property at the Site also agree to require that their successors comply with the immediately proceeding sentence and Sections IX (Site Access) and X (Access to Information).

60. Final Report.

Within forty five (45) days after completion of all Work required by this Order, Performing Respondents shall submit for EPA review and approval a final report summarizing the actions taken to comply with this Order. The final report shall conform with the requirements set forth in Section 300.165 of the NCP entitled "OSC Reports." The final report shall include a

listing of quantities and types of materials removed off-Site or handled on-Site, a discussion of removal and disposal options considered for those materials, a listing of the ultimate destination(s) of those materials, a presentation of the analytical results of all sampling and analyses performed, and accompanying appendices containing all relevant documentation generated during the removal action (e.g., manifests, invoices, bills, contracts, and permits). The final report shall also include the following certification signed by a person who supervised or directed the preparation of that report:

"Under penalty of law, I certify that to the best of my knowledge, after appropriate inquiries of all relevant persons involved in the preparation of the report, the information submitted is true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

61. EPA Approval of Plans and Other Submissions.

After review of any plan, report or other item which is required to be submitted for approval pursuant to this Order, EPA, shall: (a) approve, in whole or in part, the submission; (b) approve the submission upon specified conditions; (c) modify the submission to cure the deficiencies; (d) disapprove, in whole or in part, the submission, directing that the Performing Respondents modify the submission; or (e) any combination of the above. Provided, however, EPA may modify, or require the modification of, the submission pursuant to this Order only to the extent such modifications are materially consistent with Appendix D.

62. In the event of approval, approval with conditions, or modification by EPA pursuant to Paragraph 61(a), (b), or (c), the Performing Respondents shall proceed to take any action required by the plan, report, or other item, as approved or modified by EPA unless the Performing Respondents invoke the Dispute Resolution procedures set forth in Section XV (Dispute Resolution) with respect to the modifications or conditions made by EPA. In the event that EPA modifies the submission to cure deficiencies pursuant to Paragraph 61 and the submission has a material defect, EPA retains its right to seek stipulated penalties under this Order.

63. Resubmission of Plans. Upon receipt of a notice of disapproval pursuant to Paragraph 61(d), the Performing Respondents shall, within 14 days or such longer time as specified by EPA in such notice, correct the deficiencies and resubmit the plan, report, or other item for approval. Any stipulated penalties applicable to the submission shall accrue during the 14 day period or otherwise specified period but shall not be payable unless the resubmission is disapproved or modified due to a material defect.

64. Notwithstanding the receipt of a notice of disapproval pursuant to Paragraph 61(d), the Performing Respondents shall proceed, at the direction of EPA, to take any action required by any non-disapproved portion of the submission. Implementation of any non-disapproved portion of a submission shall not relieve Performing Respondents of any liability for stipulated penalties under this Order for the disapproved portion.

65. In the event that a resubmitted plan, report or other item, or portion thereof, is disapproved by EPA, EPA may again require the Performing Respondents to correct the deficiencies, in accordance with the preceding Paragraphs. EPA also retains the right to modify or develop the plan, report or other item, provided, however, that such modifications or developments must be materially consistent with Appendix D. Performing Respondents shall implement any such plan, report, or item as modified or developed by EPA, unless the Performing Respondents invoke the Dispute Resolution procedures set forth in Section XV (Dispute Resolution).

66. If upon resubmission, a plan, report, or item is disapproved or modified by EPA due to a material defect, the Performing Respondents shall be deemed to have failed to submit such plan, report, or item timely and adequately unless the Performing Respondents invoke the dispute resolution procedures and EPA's action is overturned pursuant to that Section. The provisions of Section XV (Dispute Resolution) and Section XVII (Stipulated Penalties) shall govern the implementation of the Work and accrual and payment of any stipulated penalties during Dispute Resolution. If EPA's disapproval or modification is upheld, stipulated penalties shall accrue for such violation from the date on which the initial submission was originally required, as provided in Section XVII (Stipulated Penalties).

67. All plans, reports, and other items required to be submitted to EPA under this Order shall, upon approval or modification by EPA, be enforceable under this Order. In the event EPA approves or modifies a portion of a plan, report, or other item required to be submitted to EPA under this Order, the approved or modified portion shall be enforceable under this Order.

68. Off-Site Shipments.

a. The Performing Respondents shall, prior to any off-Site shipment of Waste Material from the Site to an out-of-state waste management facility, provide written notification of such shipment of Waste Material to the appropriate state environmental official in the receiving facility's state and to the On-Scene Coordinator. However, this notification requirement shall not apply to any off-Site shipments when the total volume of all such shipments will not exceed 10 cubic yards.

1. The Performing Respondents shall include in the written notification the following information: 1) the name and location of the facility to which the Waste Material is to be shipped; 2) the type and quantity of the Waste Material to be shipped; 3) the expected schedule for the shipment of the Waste Material; and 4) the method of transportation. The Performing Respondents shall notify the state in which the planned receiving facility is located of major changes in the shipment plan, such as a decision to ship the Waste Material to another facility within the same state, or to a facility in another state.

2. The identity of the receiving facility and state will be determined by the Performing Respondents following the award of the contract for the removal action. The Performing Respondents shall provide the information required by Paragraphs 68(a) and (b) as

soon as practicable after the award of the contract and before the Waste Material is actually shipped.

b. Before shipping any hazardous substances from the Site to an off-site location, the Performing Respondents shall obtain EPA's certification that the proposed receiving facility is operating in compliance with the requirements of CERCLA Section 121(d)(3), 42 U.S.C. § 9621(d)(3), and 40 C.F.R. § 300.440. The Performing Respondents shall only send hazardous substances from the Site to an off-site facility that complies with the requirements of the statutory provision and regulation cited in the preceding sentence.

## IX. SITE ACCESS

69. If the Site, or any other property where access is needed to implement this Order, is owned or controlled by any of the Performing Respondents, such Performing Respondents shall, commencing on the Effective Date, provide EPA, the State, and their representatives, including contractors, with access at all reasonable times to the Site, or such other property, for the purpose of conducting any activity related to this Order.

70. Where any action under this Order is to be performed in areas owned by or in possession of someone other than the Performing Respondents, Performing Respondents shall use their reasonable efforts to obtain all necessary access agreements within fourteen (14) days after the Effective Date, or at a later date as specified in writing by the OSC. The Performing Respondents shall immediately notify EPA if after using their reasonable efforts they are unable to obtain such agreements. Performing Respondents shall describe in writing their efforts to obtain access. EPA may then assist Performing Respondents in gaining access, to the extent necessary to effectuate the response actions described herein, using such means as EPA deems appropriate. EPA reserves the right to bring an action to recover any costs and attorney's fees incurred in obtaining such access, in accordance with Section XIX (Reservation of Rights By EPA).

71. Notwithstanding any provision of this Order, EPA and the State retain all of their access authorities and rights, including enforcement authorities related thereto, under CERCLA, RCRA, and any other applicable statutes or regulations.

## X. ACCESS TO INFORMATION

72. Respondents shall provide to EPA and the State, upon request, copies of all documents and information within their possession or control or that of their contractors or agents relating to activities at the Site or to the implementation of this Order, including, but not limited to, sampling, analysis, chain of custody records, manifests, trucking logs, receipts, reports, sample traffic routing, correspondence, or other documents or information related to the Work. The Respondents shall also make available to EPA and the State, for purposes of investigation, information gathering, or testimony, their employees, agents, or representatives with knowledge of relevant facts concerning the performance of the Work.

73. Respondents may assert business confidentiality claims covering part or all of the documents or information submitted to EPA and the State under this Order to the extent permitted by and in accordance with Section 104(e)(7) of CERCLA, 42 U.S.C. § 9604(e)(7), and 40 C.F.R. § 2.203(b). Documents or information determined to be confidential by EPA will be afforded the protection specified in 40 C.F.R. Part 2, Subpart B. If no claim of confidentiality accompanies documents or information when they are submitted to EPA and the State, or if EPA has notified Respondents that the documents or information are not confidential under the standards of Section 104(e)(7) of CERCLA or 40 C.F.R. Part 2, Subpart B, the public may be given access to such documents or information without further notice to Respondents.

74. Respondents may assert that certain documents, records and other information are privileged under the attorney-client privilege or any other privilege recognized by federal law. If the Respondents assert such a privilege in lieu of providing documents, they shall provide EPA and the State with the following: 1) the title of the document, record, or information; 2) the date of the document, record, or information; 3) the name and title of the author of the document, record, or information; 4) the name and title of each addressee and recipient; 5) a description of the contents of the document, record, or information; and 6) the privilege asserted by Respondents. However, no final documents, reports or other information submitted pursuant to the requirements of this Order shall be withheld on the grounds that they are privileged.

75. No claim of confidentiality shall be made with respect to any data, including, but not limited to, all sampling, analytical, monitoring, hydrogeologic, scientific, chemical, or engineering data, or any other documents or information evidencing conditions at or around the Site.

## XI. RECORD RETENTION

76. Until 10 years after Performing Respondents' receipt of EPA's notification pursuant to Section XXVII (Notice of Completion), each Performing Respondent shall preserve and retain all non-identical copies of records and documents (including records or documents in electronic form) now in its possession or control or which come into its possession or control that relate in any manner to the performance of the Work or the liability of any person under CERCLA with respect to the Site, regardless of any corporate retention policy to the contrary. Until 10 years after Performing Respondents' receipt of EPA's notification pursuant to Section XXVII (Notice of Completion), Performing Respondents shall also instruct their contractors and agents to preserve all documents, records, and information of whatever kind, nature or description relating to performance of the Work.

77. Prior to the conclusion of this document retention period, and upon request by EPA or the State, the Performing Respondents shall deliver any such records or documents to EPA or the State. Respondents may assert that certain documents, records and other information are privileged under the attorney-client privilege or any other privilege recognized by federal law. If Respondents assert such a privilege, they shall provide EPA or the State with the following: 1) the title of the document, record, or information; 2) the date of the document, record, or information; 3) the name and title of the author of the document, record, or information; 4) the name and title of each addressee and recipient; 5) a description of the subject of the document,

record, or information; and 6) the privilege asserted by Respondents. However, no final documents, reports or other information submitted pursuant to the requirements of this Order shall be withheld on the grounds that they are privileged.

78. Each Respondent hereby certifies individually that to the best of its knowledge and belief, after thorough inquiry, it has not altered, mutilated, discarded, destroyed or otherwise disposed of any records, documents or other information (other than identical copies) relating to its potential liability regarding the Site since notification of potential liability by EPA or the State or the filing of suit against it regarding the Site and that it has fully complied with any and all EPA requests for information pursuant to Sections 104(e) and 122(e) of CERCLA, 42 U.S.C. §§ 9604(e) and 9622(e), and Section 3007 of RCRA, 42 U.S.C. § 6927.

## XII. COMPLIANCE WITH OTHER LAWS

79. The Performing Respondents shall perform all actions required pursuant to this Order in accordance with all applicable local, state, and federal laws and regulations except as provided in Section 121(e) of CERCLA, 42 U.S.C. § 6921(e), and 40 C.F.R. §§ 300.400(e) and 300.415(j). In accordance with 40 C.F.R. § 300.415(j), all on-Site actions required pursuant to this Order shall, to the extent practicable, as determined by EPA, considering the exigencies of the situation, attain applicable or relevant and appropriate requirements ("ARARs") under federal environmental or state environmental or facility siting laws. The ARARs to be attained, if any, shall be identified in the Work Plan subject to EPA approval.

## XIII. EMERGENCY RESPONSE AND NOTIFICATION OF RELEASES

80. In the event of any action or occurrence during performance of the Work which causes or threatens a release of a hazardous substance from the Site that constitutes an emergency situation or may present an immediate threat to public health or welfare or the environment, the Performing Respondents shall immediately take all appropriate action. The Performing Respondents shall take these actions in accordance with all applicable provisions of this Order, including, but not limited to, the Health and Safety Plan, in order to prevent, abate or minimize such release or endangerment caused or threatened by the release. The Performing Respondents shall also immediately notify the OSC or, in the event of his unavailability, the Regional Duty Officer, Emergency Planning and Response Branch, EPA Region I, at (617) 723-8928, and the National Response Center at (800) 424-8802 of the incident or Site conditions. In the event that Respondents fail to take appropriate response action as required by this Paragraph, and EPA takes such action instead, EPA reserves the right to bring an action to recover such costs, in accordance with Section XIX (Reservation of Rights By EPA).

81. The Performing Respondents shall submit a written report to EPA within 7 days after any such release, setting forth the events that occurred and the measures taken or to be taken to mitigate any release or endangerment caused or threatened by the release and to prevent the reoccurrence of such a release. This reporting requirement is in addition to, and not in lieu of, reporting under Section 103(c) of CERCLA, 42 U.S.C. § 9603(c), and Section 304 of the Emergency Planning and Community Right-To-Know Act of 1986, 42 U.S.C. § 11004, *et seq.*

## XIV. AUTHORITY OF ON-SCENE COORDINATOR

82. The OSC shall be responsible for overseeing the Performing Respondents' implementation of this Order. The OSC shall have the authority vested in an OSC by the NCP, including the authority to halt, conduct, or direct any Work required by this Order, or to direct any other removal action undertaken at the Site. Absence of the OSC from the Site shall not be cause for stoppage of work unless specifically directed by the OSC.

## XV. DISPUTE RESOLUTION

83. Unless otherwise expressly provided for in this Order, the dispute resolution procedures of this Section shall be the exclusive mechanism for resolving disputes arising under this Order. EPA and the Performing Respondents shall attempt to resolve any disagreements concerning this Order expeditiously and informally.

84. If the Performing Respondents object to any EPA action taken pursuant to this Order, they shall notify EPA in writing of their objections within seven (7) days of such action, unless the objection has been resolved informally. EPA and Performing Respondents shall have fourteen (14) days from EPA's receipt of the Performing Respondents' written objection to resolve the dispute through formal negotiations (the "Negotiation Period"). The Negotiation Period may be extended upon agreement by the EPA and the Performing Respondents.

85. Any agreement reached by EPA and the Performing Respondents pursuant to this Section shall be in writing and shall, upon signature by both EPA and the Performing Respondents, be incorporated into and become an enforceable part of this Order. If EPA and the Performing Respondents are unable to reach an agreement within the Negotiation Period, the Performing Respondents or EPA may, by providing notice in writing, request the employment of a neutral mediator to be selected in accordance with EPA guidance on the use of Alternative Dispute Resolution. The Performing Respondents and EPA shall, in the first instance, consider employing EPA's in house mediator. Such mediation shall be non-binding and shall no last longer than 30 days from the date of selection of the mediator unless extended by written agreement of EPA and Performing Respondents. If neither party requests mediation, or the dispute is not resolved at the end of the mediation period, an EPA management official at the branch chief level or higher will issue a written decision on the dispute to Performing Respondents. If the Performing Respondents and EPA agree to change any EPA action or no agreement is reached and EPA issues its final position on the dispute, the Performing Respondents shall begin to implement the activities required by the EPA decision no later than 15 days after agreement is reached or after receipt of EPA's final position.

## XVI. FORCE MAJEURE

86. The Performing Respondents agree to perform all requirements of this Order within the time limits established under this Order, unless the performance is delayed by a *force majeure*. For purposes of this Order, a *force majeure* is defined as any event arising from causes beyond the control of the Performing Respondents, or of any entity controlled by the Performing Respondents, including but not limited to their contractors and subcontractors, that delays or

prevents performance of any obligation under this Order despite the Performing Respondents' best efforts to fulfill the obligation. *Force majeure* does not include financial inability to complete the Work or increased cost of performance.

87. If any event occurs or has occurred that may delay the performance of any obligation under this Order, whether or not caused by a *force majeure* event, the Performing Respondents shall notify EPA orally within seven (7) days of when Respondents first knew that the event would cause a delay. Within seven (7) days thereafter, the Performing Respondents shall provide to EPA in writing an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; the Performing Respondents' rationale for attributing such delay to a *force majeure* event if they intend to assert such a claim; and a statement as to whether, in the opinion of the Performing Respondents, such event may cause or contribute to an endangerment, to public health, welfare or the environment.

88. If EPA agrees that the delay or anticipated delay is attributable to a *force majeure* event, the time for performance of the obligations under this Order that are affected by the *force majeure* event will be extended by EPA for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the *force majeure* event shall not, of itself, extend the time for performance of any other obligations that are not affected by the *force majeure* event. If EPA does not agree that the delay or anticipated delay has been or will be caused by a *force majeure* event, EPA will notify the Performing Respondents in writing of its decision. Upon receipt of the notice from EPA, Performing Respondents shall have an opportunity to pursue Dispute Resolution according to Section XV of this Order. If EPA agrees that the delay is attributable to a *force majeure* event, EPA will notify the Performing Respondents in writing of the length of the extension for performance of the obligations affected by the *force majeure* event.

## XVII. STIPULATED PENALTIES

89. The Performing Respondents shall be liable to EPA for stipulated penalties in the amounts set forth in Paragraphs 90 and 91 for failure to comply with the requirements of this Order specified below, unless excused under Section XVI (*Force Majeure*). "Compliance" by the Performing Respondents shall include completion of the activities under this Order or any work plan or other plan approved under this Order identified below in accordance with all applicable requirements of law, this Order, the SOW, and any plans or other documents approved by EPA pursuant to this Order and within the specified time schedules established by and approved under this Order.

90. Stipulated Penalty Amounts - Work.

a. The following stipulated penalties shall accrue per violation per day for any noncompliance with the milestones identified in Paragraph 90(b):

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|

| | |
|---|---|
| $250 | 1st through 4th day |
| $500 | 5th through 30th day |
| $1,000 | 31st day and beyond |

b. Compliance Milestones: Deadlines for Commencing Work, and Completing Work, shall be specified in the Work Plan.

91. Stipulated Penalty Amounts - Reports.

The following stipulated penalties shall accrue per violation per day for failure to submit timely or adequate reports or other written documents pursuant to Paragraphs 54 through 60:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $100 | 1st through 4th day |
| $250 | 5th through 30th day |
| $500 | 31st day and beyond |

92. All penalties shall begin to accrue on the day after the complete performance is due or the day a violation occurs, and shall continue to accrue through the final day of the correction of the noncompliance or completion of the activity. However, stipulated penalties shall not accrue: 1) with respect to a deficient submission under Section VIII (Work to be Performed), during the period, if any, beginning on the 31st day after EPA's receipt of such submission until the date that EPA notifies the Performing Respondents of any deficiency; and 2) with respect to an agreement reached or a final position issued pursuant to Section XV (Dispute Resolution), during the period, if any, beginning on the 21st day after the Negotiation Period begins until the date that an agreement is reached or a final position is issued regarding such dispute. Nothing herein shall prevent the simultaneous accrual of separate penalties for separate violations of this Order.

93. Upon EPA's determination that the Performing Respondents have failed to comply with a requirement of this Order, EPA shall give the Performing Respondents written notification of the failure and describe the noncompliance without unreasonable delay. EPA may send the Performing Respondents a written demand for payment of the penalties. However, penalties shall accrue as provided in the preceding Paragraph regardless of whether EPA has notified the Performing Respondents of a violation.

94. All penalties accruing under this Section shall be due and payable to EPA within 30 days of the Performing Respondents' receipt from EPA of a demand for payment of the penalties, unless Performing Respondents invoke the dispute resolution procedures under Section XV (Dispute Resolution). All payments to EPA under this Section shall be paid by certified or cashier's check(s) made payable to "EPA Hazardous Substances Superfund," shall be mailed to EPA Region I, Attn: Superfund Accounting, P.O. Box 360197 M, Pittsburgh, PA 15251, shall indicate that the payment is for stipulated penalties, and shall reference the EPA Region and Site/Spill ID Number 016P, the EPA Docket Number 01-2003-0073, and the name and address

of the party(ies) making payment. Copies of check(s) paid pursuant to this Section, and any accompanying transmittal letters, shall be sent to EPA as provided in Paragraph 51, and to Eve Vaudo, EPA Enforcement Counsel, U.S. Environmental Protection Agency, Region I, One Congress Street, Suite 1100, Mail Code SES, Boston, Massachusetts 02114-2023.

95. The payment of penalties shall not alter in any way the Performing Respondents' obligation to complete performance of the Work required under this Order.

96. Penalties shall continue to accrue during any dispute resolution period, pursuant to Paragraph 92, but need not be paid until 15 days after the dispute is resolved by agreement or by receipt of EPA's final position.

97. If the Performing Respondents fail to pay stipulated penalties when due, EPA may institute proceedings to collect the penalties, as well as Interest. The Performing Respondents shall pay Interest on the, unpaid balance, which shall begin to accrue on the date of demand made pursuant to Paragraph 93. Nothing in this Order shall be construed as prohibiting, altering, or in any way limiting the ability of EPA to seek any other remedies or sanctions available by virtue of Performing Respondents' violation of this Order or of the statutes and regulations upon which it is based, including, but not limited to, penalties pursuant to Sections 106(b) and 122(l) of CERCLA, 42 U.S.C. §§ 9606(b) and 9622(*l*), and punitive damages pursuant to Section 107(c)(3) of CERCLA, 42 U.S.C. § 9607(c)(3). Provided, however, that EPA shall not seek civil penalties pursuant to Section 106(b) or 122(*l*) of CERCLA or punitive damages pursuant to Section 107(c)(3) of CERCLA for any violation for which a stipulated penalty is provided herein, except in the case of a willful violation of this Order. Notwithstanding any other provision of this Section, EPA may, in its unreviewable discretion, waive any portion of stipulated penalties that have accrued pursuant to this Order.

## XVIII. COVENANT NOT TO SUE BY EPA

98. In consideration of the actions that will be performed and the payments that will be made by Respondents under the terms of this Order, and except as otherwise specifically provided in this Order, EPA covenants not to sue or to take administrative action against Respondents pursuant to Section 106 of CERCLA, 42 U.S.C. § 9606 for performance of the Work. This covenant not to sue shall take effect upon the Effective Date and is conditioned upon the complete performance by Respondents of all obligations under this Order. This covenant not to sue extends only to Respondents and does not extend to any other person.

## XIX. RESERVATIONS OF RIGHTS BY EPA

99. Except as specifically provided in this Order, nothing herein shall limit the power and authority of EPA or the United States to take, direct, or order all actions necessary to protect public health, welfare, or the environment or to prevent, abate, or minimize an actual or threatened release of hazardous substances, pollutants or contaminants, or hazardous or solid waste on, at, or from the Site. Further, nothing herein shall prevent EPA from seeking legal or equitable relief to enforce the terms of this Order, from taking other legal or equitable action as it

deems appropriate and necessary, or from requiring Respondents in the future to perform additional activities pursuant to CERCLA or any other applicable law.

100. The covenant not to sue set forth in Section XVIII above does not pertain to any matters other than those expressly identified therein. EPA reserves, and this Order is without prejudice to, all rights against Respondents with respect to all other matters, including, but not limited to:

a. claims based on a failure by Respondents to meet a requirement of this Order;

b. liability for costs incurred or to be incurred by EPA at the Site;

c. liability for performance of response actions other than the Work;

d. criminal liability;

e. liability for damages for injury to, destruction of, or loss of natural resources, and for the costs of any natural resource damage assessments;

f. liability arising from the past, present, or future disposal, release or threat of release of Waste Materials outside of the Site; and

g. liability for costs incurred or to be incurred by the Agency for Toxic Substances and Disease Registry related to the Site.

101 Work Takeover.

In the event EPA determines that the Performing Respondents have ceased implementation of any portion of the Work, are seriously or repeatedly deficient or late in their performance of the Work, or are implementing the Work in a manner which may cause an endangerment to human health or the environment, EPA may assume the performance of all or any portions of the Work as EPA determines necessary. The Performing Respondents may invoke the procedures set forth in Section XV (Dispute Resolution) to dispute EPA's determination that takeover of the Work is warranted under this Paragraph. EPA reserves the right to bring an action to recover any costs incurred by the United States in performing the Work pursuant to this Paragraph, in accordance with Section XIX (Reservation of Rights By EPA). Notwithstanding any other provision of this Order, EPA retains all authority and reserves all rights to take any and all response actions authorized by law.

## XX. COVENANT NOT TO SUE BY RESPONDENTS

102. Respondents covenant not to sue and agree not to assert any claims or causes of action against the United States, or its contractors or employees, with respect to the Work or this Order, as follows:

a. any direct or indirect claim for reimbursement from the Hazardous Substance Superfund established by 26 U.S.C. § 9507, based on Sections 106(b)(2), 107, 111, 112, or 113 of CERCLA, 42 U.S.C. §§ 9606(b)(2), 9607, 9611, 9612, or 9613, or any other provision of law; or

b. any claim arising out of response actions at or in connection with the Site, including any claim under the United States Constitution, the State Constitution, the Tucker Act, 28 U.S.C. § 1491, the Equal Access to Justice Act, 28 U.S.C. § 2412, as amended, or at common law; or

c. any claim against the United States pursuant to Sections 107 and 113 of CERCLA, 42 U.S.C. §§ 9607 and 9613, relating to the Site.

103. These covenants not to sue shall not apply in the event the United States brings a cause of action or issues an order pursuant to the reservations set forth in Paragraphs 100 (b), (c), and (e) - (g), but only to the extent that Respondents' claims arise from the same response action, response costs, or damages that the United States is seeking pursuant to the applicable reservation.

104. Nothing in this Agreement shall be deemed to constitute approval or preauthorization of a claim within the meaning of Section 111 of CERCLA, 42 U.S.C. § 9611, or 40 C.F.R. § 300.700(d).

## XXI. OTHER CLAIMS

105. By issuance of this Order, the United States and EPA assume no liability for injuries or damages to persons or property resulting from any acts or omissions of Respondents. The United States or EPA shall not be deemed a party to any contract entered into by Respondents or their directors, officers, employees, agents, successors, representatives, assigns, contractors, or consultants in carrying out actions pursuant to this Order.

106. Except as expressly provided in Section XVIII (Covenant Not to Sue by EPA), nothing in this Order constitutes a satisfaction of or release from any claim or cause of action against Respondents or any person not a party to this Order, for any liability such person may have under CERCLA, other statutes, or the common law, including but not limited to any claims of the United States for costs, damages and interest under Sections 106 and 107 of CERCLA, 42 U.S.C. §§ 9606 and 9607.

107. No action or decision by EPA pursuant to this Order shall give rise to any right to judicial review, except as set forth in Section 113(h) of CERCLA, 42 U.S.C. § 9613(h).

## XXII. CONTRIBUTION PROTECTION

108. The Parties agree that Respondents are entitled, as of the Effective Date, to protection from contribution actions or claims as provided by Sections 113(f)(2) and 122(h)(4) of CERCLA, 42 U.S.C. §§ 9613(f)(2) and 9622(h)(4), for "matters addressed" in this Order. The "matters addressed" in this Order are the Work. Nothing in this Order precludes the United

States or Respondents from asserting any claims, causes of action, or demands against any persons not parties to this Order for indemnification, contribution, or cost recovery.

## XXIII. INDEMNIFICATION

109. Performing Respondents shall indemnify, save and hold harmless the United States, its officials, agents, contractors, subcontractors, employees and representatives from any and all claims or causes of action arising from, or on account of, negligent or other wrongful acts or omissions of Performing Respondents, their officers, directors, employees, agents, contractors, or subcontractors, in carrying out actions pursuant to this Order. In addition, Performing Respondents agree to pay the United States all costs incurred by the United States, including, but not limited to, reasonable attorneys fees and other expenses of litigation and settlement, arising from or on account of claims made against the United States based on negligent or other wrongful acts or omissions of Performing Respondents, their officers, directors, employees, agents, contractors, subcontractors and any persons acting on their behalf or under their control, in carrying out activities pursuant to this Order. The United States shall not be held out as a party to any contract entered into by or on behalf of Performing Respondents in carrying out activities pursuant to this Order. Neither Performing Respondents nor any contractor shall be considered an agent of the United States.

110. The United States shall give Performing Respondents notice of any claim for which the United States plans to seek indemnification pursuant to this Section and shall consult with Performing Respondents prior to settling such claim.

111. Performing Respondents waive all claims against the United States for damages or reimbursement or for set-off of any payments made or to be made to the United States, arising from or on account of any contract, agreement, or arrangement between any one or more of Performing Respondents and any person for performance of Work on or relating to the Site, including, but not limited to, claims on account of construction delays. In addition, Performing Respondents shall indemnify and hold harmless the United States with respect to any and all claims for damages or reimbursement arising from or on account of any contract, agreement, or arrangement between any one or more of Performing Respondents and any person for performance of Work pursuant to this Order, including, but not limited to, claims on account of construction delays.

## XXIV. INSURANCE

112. At least 7 days prior to commencing any on-Site work under this Order, the Performing Respondents shall secure, and shall maintain for the duration of this Order, comprehensive general liability insurance and automobile insurance with limits of one (1) million dollars, combined single limit. Within the same time period, the Performing Respondents shall provide EPA with certificates of such insurance and a copy of each insurance policy. In addition, for the duration of the Order, the Performing Respondents shall satisfy, or shall ensure that their contractors or subcontractors satisfy, all applicable laws and regulations regarding the provision of worker's compensation insurance for all persons performing the Work on behalf of the Performing Respondents in furtherance of this Order. If the Performing

Respondents demonstrate by evidence satisfactory to EPA that any contractor or subcontractor maintains insurance equivalent to that described above, or insurance covering some or all of the same risks but in an equal or lesser amount, then the Performing Respondents need provide only that portion of the insurance described above which is not maintained by such contractor or subcontractor.

## XXV. FINANCIAL ASSURANCE

113. Within 30 days of the Effective Date, Performing Respondents shall establish an account in the amount of $437,000, including the Cash Payments by the Payment Respondents, for the performance of the Work pursuant to this Order. The depletion of funds in this account does not excuse Performing Respondents' obligations under this Order.

## XXVI. MODIFICATIONS

114. The OSC and the Respondents may make mutually agreed upon modifications to any plan or schedule or Statement of Work in writing or by oral direction. Any mutually agreed upon oral modification will be memorialized in writing by EPA promptly, but shall have as its effective date the date of the OSC's oral direction. Any other requirements of this Order may be modified in writing by mutual agreement of the parties.

115. If the Performing Respondents seek permission to deviate from any approved work plan or schedule or Statement of Work, Respondents' Project Coordinator shall submit a written request to EPA for approval outlining the proposed modification and its basis. The Performing Respondents may not proceed with the requested deviation until receiving oral or written approval from the OSC pursuant to Paragraph 114.

116. No informal advice, guidance, suggestion, or comment by the OSC or other EPA representatives regarding reports, plans, specifications, schedules, or any other writing submitted by the Performing Respondents shall relieve Performing Respondents of their obligation to obtain any formal approval required by this Order, or to comply with all requirements of this Order, unless it is formally modified.

## XXVII. NOTICE OF COMPLETION OF WORK

117. When EPA determines, after EPA's review of the Final Report, that all Work has been fully performed in accordance with this Order, with the exception of any continuing obligations required by this Order, including post removal site controls, pursuant to Paragraph 58, or record retention, EPA will provide written notice to the Performing Respondents. If EPA determines that any such Work has not been completed in accordance with this Order, EPA shall notify Performing Respondents, provide a list of the deficiencies, and require that Performing Respondents modify the Work Plan if appropriate in order to correct such deficiencies. The Performing Respondents may invoke the Dispute Resolution procedures in Section XV, within seven (7) days of receipt of such EPA notice. Performing Respondents shall implement the modified and approved Work Plan, if any, and shall submit a modified Final Report in

accordance with the EPA notice. Failure by the Performing Respondents to implement the approved modified Work Plan, if any, shall be a violation of this Order.

## XXVIII. SEVERABILITY/INTEGRATION/APPENDICES

118. If a court issues an order that invalidates any provision of this Order or finds that Respondents have sufficient cause not to comply with one or more provisions of this Order, Respondents shall remain bound to comply with all provisions of this Order not invalidated or determined to be subject to a sufficient cause defense by the court's order.

119. This Order and its appendices constitute the final, complete and exclusive agreement and understanding among the Parties with respect to the settlement embodied in this Order. The Parties acknowledge that there are no representations, agreements or understandings relating to the settlement other than those expressly contained in this Order.

## XXIX. EFFECTIVE DATE

120. This Order shall be effective five (5) days after the Order is signed by the Director, Office of Site Remediation and Restoration.

The undersigned representatives of Respondents certify that they are fully authorized to enter into the terms and conditions of this Order and to bind the parties they represents to this document.

Agreed this ____ day of ______________, 2003.

For Respondent ______________

By ________________________

Title ________________________

It is so ORDERED and Agreed this 5th day of September, 2003.

By Susan Studlien

Susan Studlien, Acting Director
Office of Site Remediation and Restoration
Region I
U.S. Environmental Protection Agency

EFFECTIVE DATE

The undersigned representatives of Respondents certify that they are fully authorized to enter into the terms and conditions of this Order and to bind the parties they represents to this document.

Agreed this 26th day of August, 2003.

For Respondent Teknor Apex Company

By Jonathan D. Fain

Title President

It is so ORDERED and Agreed this 11 day of September, 2003.

By Susan Studlien

Susan Studlien, Acting Director
Office of Site Remediation and Restoration
Region I
U.S. Environmental Protection Agency

EFFECTIVE DATE

The undersigned representatives of Respondents certify that they are fully authorized to enter into the terms and conditions of this Order and to bind the parties they represents to this document.

Agreed this 27TH day of AUGUST, 2003.

For Respondent SEQUA CORPORATION

By [signature]

Title SR. ASSOC. GENERAL COUNSEL

It is so ORDERED and Agreed this ~~5th~~ 11th day of September, 2003.

By Susan Studlien

Susan Studlien, Acting Director
Office of Site Remediation and Restoration
Region I
U.S. Environmental Protection Agency

EFFECTIVE DATE

The undersigned representatives of Respondents certify that they are fully authorized to enter into the terms and conditions of this Order and to bind the parties they represent to this document.

Agreed this 3rd day of September, 2003.

For Respondent Centredale Manor Associates L.P.
By its General Partners

Centredale Associates L.P.

By [signature]
John L. Marshall, III

Its General Partner

and

C/S Housing Associates L.P.
By C/S Centredale Corp.
Its General Partner

By ______________________
Paul Tryder

Its President

It is so ORDERED and Agreed this ~~5th~~ 11 day of September, 2003.

By [signature: Susan Studlien]

Susan Studlien, Acting Director
Office of Site Remediation and Restoration
Region I
U.S. Environmental Protection Agency

EFFECTIVE DATE

16/369642.1

The undersigned representatives of Respondents certify that they are fully authorized to enter into the terms and conditions of this Order and to bind the parties they represent to this document.

Agreed this 3rd day of September, 2003.

For Respondent Centredale Manor Associates L.P..
By its General Partners

Centredale Associates L.P.

By ______________________
John L. Marshall, III

Its General Partner

and

C/S Housing Associates L.P.
By C/S Centredale Corp.
Its General Partner

By [signature]
Paul Tryder

Its President

It is so ORDERED and Agreed this ~~5th~~ 11th day of September, 2003.

By [signature: Susan Studlien]

Susan Studlien, Acting Director
Office of Site Remediation and Restoration
Region I
U.S. Environmental Protection Agency

EFFECTIVE DATE

SEP-04-2003 THU 04:27 PM EDWARDS ANGELL 6 FAX NO. 4012766611 P. 03/04
AUG-29-2003 10:12 RRMC LAW 714 577 2980 P.13



The undersigned representatives of Respondents certify that they are fully authorized to enter into the terms and conditions of this Order and to bind the parties they represents to this document.

Agreed this 29th day of August, 2003.

For Respondent [signature]
AMERICAN MINERAL SPIRITS COMPANY

By Christopher A. Meyer

Title Operations Team Manager
UNOCAL CORPORATION

It is so ORDERED and Agreed this 5th day of September, 2003.

By Susan Studlien

Susan Studlien, Acting Director
Office of Site Remediation and Restoration
Region I
U.S. Environmental Protection Agency

EFFECTIVE DATE

The undersigned representatives of Respondents certify that they are fully authorized to enter into the terms and conditions of this Order and to bind the parties they represents to this document.

Agreed this 2 day of September, 2003.

For Respondent The Original Bradford Soap Works, Inc.

By [signature]

Title President/CEO

It is so ORDERED and Agreed this ~~5th~~ 11 day of September, 2003.

By Susan Studlien

Susan Studlien, Acting Director
Office of Site Remediation and Restoration
Region I
U.S. Environmental Protection Agency

EFFECTIVE DATE

The undersigned representatives of Respondents certify that they are fully authorized to enter into the terms and conditions of this Order and to bind the parties they represent to this document.

Agreed this 29th day of August, 2003.

For Respondent Emhart Industries, Inc.

By [signature]

Title Vice President

It is so ORDERED and Agreed this 11th day of September, 2003.

By Susan Studlien

Susan Studlien, Acting Director
Office of Site Remediation and Restoration
Region I
U.S. Environmental Protection Agency

EFFECTIVE DATE

The undersigned representatives of Respondents certify that they are fully authorized to enter into the terms and conditions of this Order and to bind the parties they represents to this document.

Agreed this 28 day of August, 2003.

For Respondent New England Container

By Robert T. Baker

Title V.P. of Operations

It is so ORDERED and Agreed this 11th day of September, 2003.

By Susan Studlien

Susan Studlien, Acting Director
Office of Site Remediation and Restoration
Region I
U.S. Environmental Protection Agency

EFFECTIVE DATE

The undersigned representatives of Respondents certify that they are fully authorized to enter into the terms and conditions of this Order and to bind the parties they represents to this document.

Agreed this 27TH day of AUGUST, 2003.

For Respondent SEQUA CORPORATION

By [signature]

Title SR ASSOC. GENERAL COUNSEL

It is so ORDERED and Agreed this ~~5th~~ 11th day of September, 2003.

By Susan Studlien

Susan Studlien, Acting Director
Office of Site Remediation and Restoration
Region I
U.S. Environmental Protection Agency

EFFECTIVE DATE

The undersigned representatives of Respondents certify that they are fully authorized to enter into the terms and conditions of this Order and to bind the parties they represent to this document.

Agreed this 3rd day of September, 2003.

For Respondent Centredale Manor Associates L.P.
By its General Partners

Centredale Associates L.P.

By [signature]
John L. Marshall, III

Its General Partner

and

C/S Housing Associates L.P.
By C/S Centredale Corp.
Its General Partner

By ______________________
Paul Tryder

Its President

It is so ORDERED and Agreed this ~~5th~~ 11th day of September, 2003.

By [signature: Susan Studlien]

Susan Studlien, Acting Director
Office of Site Remediation and Restoration
Region I
U.S. Environmental Protection Agency

EFFECTIVE DATE

The undersigned representatives of Respondents certify that they are fully authorized to enter into the terms and conditions of this Order and to bind the parties they represent to this document.

Agreed this 3rd day of September, 2003.

For Respondent Centredale Manor Associates L.P.
By its General Partners

Centredale Associates L.P.

By ______________________
John L. Marshall, III

Its General Partner

and

C/S Housing Associates L.P.
By C/S Centredale Corp.
Its General Partner

By [signature]
Paul Tryder

Its President

It is so ORDERED and Agreed this ~~5th~~ 11th day of September, 2003.

By [signature: Susan Studlien]

Susan Studlien, Acting Director
Office of Site Remediation and Restoration
Region I
U.S. Environmental Protection Agency

EFFECTIVE DATE

The undersigned representatives of Respondents certify that they are fully authorized to enter into the terms and conditions of this Order and to bind the parties they represents to this document.

Agreed this 29th day of August, 2003.

For Respondent AMERICAN MINERAL SPIRITS COMPANY

By Christopher A. Meyer

Title Operations Team Manager UNOCAL CORPORATION

It is so ORDERED and Agreed this 11th day of September, 2003.

By Susan Studlien

Susan Studlien, Acting Director
Office of Site Remediation and Restoration
Region I
U.S. Environmental Protection Agency

EFFECTIVE DATE

The undersigned representatives of Respondents certify that they are fully authorized to enter into the terms and conditions of this Order and to bind the parties they represents to this document.

Agreed this 2 day of September, 2003.

For Respondent The Original Bradford Soap Works, Inc.

By [signature]

Title President/CEO

It is so ORDERED and Agreed this ~~5th~~ 11 day of September, 2003.

By Susan Studlien

Susan Studlien, Acting Director
Office of Site Remediation and Restoration
Region I
U.S. Environmental Protection Agency

EFFECTIVE DATE

## APPENDIX A

**Respondents**

American Mineral Spirits Company
Brook Village Associates Limited Partnership
Centredale Manor Associates Limited Partnership
Cranston Print Works Company
CNA Holdings, Inc.
Emhart Industries, Inc.
New England Container Company, Inc.
Sequa Corporation
The Original Bradford Soap Works, Inc.
Teknor Apex Company,

## APPENDIX B

**Payment Respondents**

American Mineral Spirits Company
Cranston Print Works Company
CNA Holdings, Inc.
Sequa Corporation
The Original Bradford Soap Works, Inc.
Teknor Apex Company,

## APPENDIX C

**Performing Respondents**

Brook Village Associates Limited Partnership
Centredale Manor Associates Limited Partnership
Emhart Industries, Inc.
New England Container Company, Inc.

## APPENDIX D

## STATEMENT OF WORK

**This Statement of Work is provided for the Centredale Manor Restoration Project in North Providence, Rhode Island**

### Preface

EPA has determined that Potentially Responsible Parties (PRPs) have the ability to promptly and properly prevent, mitigate, or eliminate the threats posed by hazardous substances at the Site. Therefore, EPA and such parties (the Respondents) have entered into an Administrative Order on Consent for Removal Action with this attached Statement of Work (SOW).

As described previously in the Order, EPA and some of the Respondents have undertaken Removal Action at the Site to prevent exposure and control migration of contaminants at the Site including, but not limited to, dioxins, PCBs, PAHs, VOCs, SVOCs and other substances.

The Order and SOW compel the Performing Respondents to develop a plan for implementing the specific action described below. The components of this plan (also called a "deliverable") must be submitted to EPA for approval before implementation. The plan shall consist/describe of the components listed below:

### GENERAL COMPONENTS

1. All actions taken by the Performing Respondents shall be consistent with the National Contingency Plan (NCP), found in Title 40, Part 300 of the Code of Federal Regulations (40 CFR 300).

2. The Performing Respondents shall communicate freely with the On-Scene Coordinator (OSC) prior to and during development of plans and deliverables, and throughout the implementation of approved plans. At a minimum, weekly progress meetings will be scheduled throughout the implementation of the Order.

3. **Site Security** - The plan shall provide for on-site security during construction by, at a minimum, maintaining the current fences and signs which are in place to limit access to the portion of the Site where work is proposed under this Order. The effectiveness of signs, fences, and barriers at the portion of the Site where work is proposed under this Order will be evaluated during the construction phase to determine if they adequately restrict access. If not deemed to be sufficient by the OSC, additional fencing, the placement of security guards or other measures may be warranted. Site security shall be maintained until June 30, 2005.

4. **Project schedule** - The plan will provide a detailed project schedule, including completion dates for interim activities. Out of respect for the residents, noisy equipment (such as dump trucks or bulldozers) will be operated not earlier than 0800AM. ***A daily work schedule will also be provided to the OSC.***

5. **Site-Specific Health and Safety Plan (HASP)** - The Performing Respondents shall develop and implement a HASP for all activities to be conducted at the Site in accordance with the NCP §300.150, and OSHA. The HASP shall be developed to protect all on-site personnel and the general public. Private employers are responsible for the health and safety of their own employees. Nothing contained in this SOW or the Order shall relieve the Performing Respondents of their liability in this regard.

6. **Construction Quality Assurance Plan (CQAP)** -- The CQAP shall detail the testing and inspections required to assure that the purchase and installation of specified materials are in conformance with the project plans and specifications. The CQAP shall include references to standard test methods customarily employed in the construction of similar work (such as those produced by the American Society of Testing Materials (ASTM)). The frequency of testing and inspections along with acceptance criteria for each test or inspection shall also be specified. If requested by EPA pursuant to Paragraph 61 of the Order, the Performing Respondents shall develop a Quality Assurance Plan (QAP) to be used in conducting any field and laboratory analysis. The QAP shall ensure that analytical results generated are of known quality. The QAP will be consistent with the Region I, EPA-New England Compendium of Quality Assurance Project Plan Guidance.

7. **Community Relations Support Plan** - The Performing Respondents shall develop a Community Relations Support Plan, with the objective of ensuring and specifying support activities for the community relations efforts of EPA.

8. **Proposal for Post-Removal Site Control** - The Performing Respondents shall submit a proposal for post-removal site control consistent with Section 300.415(*l*) of the NCP and OSWER Directive No. 9360.2-02. Upon EPA approval, Performing Respondents shall implement such controls until June 30, 2005

9. **Final Report/Completion of Work Report (CWR)** - Upon completion of the tasks in this Order and SOW, the Performing Respondents shall submit a CWR summarizing the work performed. At a minimum, the CWR will identify all required activities and certify that each has been completed in accordance with the approved plans; include original photographs with written descriptions; include analytical results of any environmental samples collected during the period of performance, in both tables and on site maps; include 'as-built' drawings of any structures or features constructed; contain a chronology of onsite activities; and identify subcontractors and their roles.

**SPECIFIC ACTIONS**

10. Conduct all action summarized in Attachment 1.

11. **Obtain all necessary local, state or federal permits for construction, except as specifically exempted by the OSC.**

ATTACHMENT 1

- Lower the elevation of Allendale Pond using the gate structure in the rebuild dam.
- Perform land survey to layout project limits and provide ground control. The lateral extent of the soil and stone caps is as shown on the attached map. As indicated, the limits of the soil and stone "caps" do not extend onto private properties bordering the east side of the project. However, the extent of clearing and loam/seed activities to back up the edge of the caps does extend onto some of these properties. The soil cap consists of 20 inches of bank-run gravel and 4 inches of loam while the stone cap consists of 6 inches of sand and 6 inches of stone in a 5 inch cellular confinement system.
- Clear and grub within the project limits.
- Power wash and dispose of stumps (non- hazardous).
- Install decontamination pads for equipment and anti-tracking pad for general construction traffic.
- Install hay bale erosion controls at the outlet of each piped discharge to the swale and install a check dam at the southern limit of the work.
- Rough grade the project limits and install the gravity dewatering trench – dust control will be conducted using clean water to moisten traffic areas. All storm water and groundwater from the project will be routed through the check dam referenced above to Allendale pond.
- Regrade the north end of the project as indicated on the attached cross-sections. Install the sediment trap on existing 24 inch diameter CMP drain from Smith Street, relocate excess material in adjacent area of new soil cap.
- Install sand bedding layer over area of new stone cap.
- Install geotextile filter fabric throughout the limits of both the soil and stone caps.
- Place bank-run gravel (clean fill) to bring soil cap to grade.
- Place cellular confinement system over area of stone cap and fill with one and one half inch stone.
- Place loam over area of new soil cap and along the perimeter of the stone cap to blend into existing grade.
- Seed and mulch the newly loamed areas.
- Remove erosion and sediment controls.

CASE NO. 02-053S
Emhart Industries, Inc.
VS. Home Insurance Co., et al.
PLAINTIFF'S EXHIBIT 16
DATE ______ IDEN.
DATE ______ EVID.
BY ______
Deputy Clerk
AO 386

# EXHIBIT 6

Plaintiff's
Exhibit 13

#4

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
EPA NEW ENGLAND

Centredale Manor
10.7
9306

| | |
|---|---|
| In the Matter of: | U.S. EPA Region I<br>CERCLA Docket No.<br>CERCLA I-2000-0026 |
| Centredale Manor Restoration Project<br>Superfund Site | |
| Brook Village Associates Limited Partnership;<br>Centerdale Manor Associates Limited Partnership;<br>Crown Metro, Inc.; Emhart Industries, Inc.,<br>and; New England Container Company, Inc. | |
| Respondents, | UNILATERAL ADMINISTRATIVE ORDER FOR REMOVAL ACTION |
| Proceeding under Section 106(a) of the Comprehensive Environmental Response, Compensation and Liability Act, as as amended, 42 U.S.C. § 9606(a) | |

## JURISDICTION

1. This Administrative Order ("Order") is issued pursuant to the authority vested in the President of the United States by Section 106(a) of the Comprehensive Environmental Response, Compensation, and Liability Act, as amended ("CERCLA"), 42 U.S.C. § 9606(a). This authority was delegated to the Administrator of the United States Environmental Protection Agency ("EPA") on January 23, 1987, by Executive Order 12580, 52 Fed. Reg. 2926 (January 29, 1987), and further delegated to the Regional Administrators by EPA Delegation Nos. 14-14-A (April 15, 1994) and 14-14-B (May 11, 1994)) and further delegated to the Director, Office of Site Remediation and Restoration by Region I Delegations 14-14-A (September 29, 1995) and 14-14-B (September 3, 1996).

## STATE COORDINATION

2. Pursuant to Section 106(a) of CERCLA, 42 U.S.C. § 9606(a), the State of Rhode Island has been notified in writing of the issuance of this Order.

9304

## PURPOSE

3. The purpose of this Order is to compel the Respondents to perform certain removal activities at the Centredale Manor Restoration Project Superfund Site in North Providence, Rhode Island, as set forth in the Action Memoranda signed by Director of the Office of Site Remediation and Restoration on May 4, 1999, and September 13, 1999, and the Scope of Work appended to this Order as Appendix A.

## FINDINGS OF FACT

4. Numerous hazardous substances have been found at the Centredale Manor Restoration Project Superfund Site ("Site"), including 2,3,7,8 -Tetrachlorodibenzo-*p*-Dioxin, PCBs, volatile organic compounds, semi-volatile organic compounds, and metals.

5. These hazardous substances have been found in surface and subsurface soil, sediment and at the groundwater/surface water interface in the Woonasquatucket River at the Site. Surface soil locations include areas within 50 feet of the senior highrise housing complexes located on the main portion of the Site, and areas on residential parcels along the River.

6. Hazardous substances were disposed of at the Site as part of former operations of several chemical companies (the Atlantic Chemical Company, Metro-Atlantic Inc., and Crown Metro, Inc.) and a drum recycler (New England Container Co., Inc.).

7. The current owners at the Site include Brook Village Associates Limited Partnership and Centerdale Manor Associates Limited Partnership, both of which conducted extensive construction activities at the Site.

## SITE DESCRIPTION

8. The Centredale Manor Restoration Project Superfund Site ("Site") is located in North Providence, Rhode Island. The main portion of the Site is known as 2072 and 2074 Smith Street (or, plat 14, lots 200 and 250). The Site extends on the flood plain of the Woonasquatucket River from the main portion of the Site south to the Allendale Dam.

9. Currently, two high rise buildings (Centredale Manor and Brook Village) are located on the Site. In addition to the buildings, the Site is covered by roadway and parking lots. On the eastern portion of the Site is a drainage swale that begins near the northern portion of the Site and extends south, then curves to the west and discharges into a wooded wetland south of the Site and eventually into the Woonasquatucket River. The Site consists of all contaminated areas within this area as well as any other location to which contamination from that area has come to be located, or from which that contamination originated.

10. Pursuant to Section 105(8)(B) of CERCLA, 42 U.S.C. § 9605(8)(B), the Site is listed on the National Priorities List, 40 C.F.R. Part 300, Appendix B (1990).

## RESPONDENTS

11. Respondent Brook Village Associates Limited Partnership ("BVALP") is a Massachusetts limited partnership with its principal place of business in Boston, Massachusetts.

12. Respondent Centerdale Manor Associates Limited Partnership ("CMALP") is a Rhode Island limited partnership with its principal place of business in East Providence, Rhode Island.

13. Respondent Crown Metro, Inc. ("Crown Metro") is a South Carolina corporation with its principal place of business in Greenville, South Carolina.

14. Respondent Emhart Industries, Inc. ("Emhart") is a Connecticut corporation with its principal place of business in Towson, Maryland.

15. Respondent New England Container Co., Inc. ("NECC") is a Rhode Island corporation with its principal place of business in Smithfield, Rhode Island.

16. By letters dated September 15, 1999 and February 28, 2000, EPA notified the Respondents of their status as potentially responsible parties at the Site and afforded them the opportunity to perform or finance necessary removal activities. Attempts by EPA to reach settlement with the Respondents have been unsuccessful.

## SITE HISTORY

17. Respondent Crown Metro is a successor to liability of several chemical companies which operated at the Site from approximately 1943 to approximately 1971. The chemicals manufactured by these companies included hexachlorophene. The chemical companies also buried drums and other containers at the Site.

18. Respondent Emhart is also a successor to liability of several chemical companies which operated at the Site from approximately 1943 to approximately 1971. The chemicals manufactured by these companies included hexachlorophene. The chemical companies also buried drums and other containers at the Site.

19. Respondent NECC operated at the Site from approximately 1952 to approximately 1969. NECC's operations included obtaining 55-gallon drums containing residual chemicals,

disposing of certain drum residuals in the soil at the Site and incinerating other drum residuals at the Site.

20. Respondent BVALP acquired a portion of the Site by two deeds dated October 19, 1976 and October 20, 1976. BVALP constructed a high-rise on the main portion of the Site (2072 Smith Street) in approximately 1976-77.

21. Respondent CMALP acquired a portion of the Site by a deed dated March 18, 1982. CMALP constructed a high-rise on the main portion of the Site (2074 Smith Street) in approximately 1982-83.

## ENDANGERMENT

22. With regard to actual or potential exposure to nearby human populations, EPA has documented elevated levels of contaminants including dioxin and PCBs in numerous areas at the Site which could result in human exposure. First, elevated levels of dioxin have been found in surface soils at primarily residential parcels along the floodplain of the Woonasquatucket River. Elevated levels of dioxin in surface soil include levels above the Agency-recommended 1 ppb (TEQs, or toxicity equivalent) to be used as a starting point for residential soil cleanup level for CERCLA non-time critical removal sites and as a preliminary remediation goal for remedial sites (Approach for Addressing Dioxin on Soil at CERCLA and RCRA Sites, OSWER Directive 9200.4-26, April 13, 1998). Levels as high as 140 ppb have been found in soil located near the highrises at the Site. Second, elevated levels of numerous hazardous substances have been found in surface soils at 2072 and 2074 Smith Street–including areas as close as 50 feet from the apartment complexes located on these parcels. Because the contaminants are found at the surface of the soil, they are readily accessible to residents of and visitors to the apartment complexes at 2072 and 2074 Smith Street, as well as neighborhood children who have been known to play in the southern portion of this area. Third, contamination was found in Woonasquatucket River sediments between Route 44 and a point just below the Allendale Dam. The Woonasquatucket River becomes relatively shallow approximately 2,000 feet south of Route 44, in an area known as the Allendale Pond. Due to a 1991 breach of the Allendale Dam, the sediments in this portion of the river are readily accessible to neighborhood children who have been known to play in the area. Finally, there are elevated levels of contaminants entering the Woonasquatucket River itself. The river is occasionally used by fishermen and recreational boaters. It is possible that these people could come in contact with sediment/surface water contamination while in the Site area.

23. With regard to actual or potential exposure to animals or the food chain, in the fall of 1999 the Rhode Island Department of Health (DOH) documented elevated levels of dioxin in fish tissue from fish collected in the portion of the Woonasquatucket River which flows through the Site. Although other animal/food chain studies have not been conducted, the potential for

exposure of animals or the food chain to hazardous substances or pollutants or contaminants is great. As explained above, elevated levels of hazardous substances have been found in surface soils, sediment, surface water and wetland areas. All of these areas are natural habitat for numerous species of plants and animals (ecological receptors).

24. The Woonasquatucket River and its associated wetlands and floodplain represent a sensitive ecosystem at the Site. Numerous media in this ecosystem have been affected by contamination: sediment, surface water, soil, and wetland areas. Although an ecological risk assessment has not yet been conducted at the Site, numerous birds, fish and animals have been observed at the Site by EPA employees and EPA contractors, including but not limited to: great blue herons; black crown night herons; black ducks; mallard ducks; Canada geese; spotted sandpipers; muskrat; mink; squirrels; snapping turtles; small mouth bass; large mouth bass; sucker fish; and sunfish. These ecological receptors would likely be damaged by exposure to the types of hazardous substances found at the Site.

25. There is evidence that drums and other waste material may be buried at the property. Drum carcasses were found by EPA in certain areas of the Site. Buried drums and waste material may be leaching contaminants into the Woonasquatucket River.

26. High levels of hazardous substances have been found in soils largely at or near the surface of the Site. These soils are in areas subject to erosion by the Woonasquatucket River as well as periodic flooding. Erosion and flooding appear to have caused the contaminated soil to migrate, since elevated levels of hazardous substances have been found in Woonasquatucket River sediments located in the downstream portion of the Site, including below the Allendale Dam. In addition, high levels of chlorinated solvents (TCE and PCE) found at the groundwater/surface water interface in the river indicate migration of contaminants from suspected buried waste near the riverbanks and likelihood of a non-aqueous phase liquid source of contamination that may continue to impact surface water and sediment.

27. The land portions of the Site are located in the floodplain and have been frequently flooded during high river stage. These weather conditions have caused and will continue to cause the migration of contaminated soil at the Site (particularly from those areas which are not covered by an interim cap) into the Woonasquatucket River and the migration of contaminated sediments further downstream. Allendale Dam, the first flood control structure downstream from 2072 and 2074 Smith Street, was breached in 1991 and its condition is continuing to deteriorate. This is causing the release of contaminated sediment into downstream reaches of the river, particularly during flood events.

28. The time critical removal activities already completed by EPA include sampling and analysis as well as placing fences and interim caps (one of which is completed, a second which is partially completed and a third which was determined to be beyond the scope of a time-critical

removal action) in the areas of surface soil contamination. EPA is also conducting two Engineering Evaulation/Cost Analysis studies and a Remedial Investigation at the Site.

29. The following table identifies the highest concentrations of some of the chemical compounds detected by EPA in soil samples collected at the Site:

| CHEMICAL COMPOUND | HIGHEST CONCENTRATION (in parts per billion - ppb) |
|---|---|
| 2,3,7,8 -Tetrachlorodibenzo-*p*-Dioxin | 140 |
| PCBs | 1,300,000 |
| 1,2-dichlorobenzene | 2,800,000 |
| benzene | 480,000 |
| chlorobenzene | 1,000,000 |
| tetrachloroethene | 1,7000,000 |
| trichloroethene | 2,400,000 |
| cadmuim | 180,000 |
| lead | 3,160,000 |
| manganese | 6,420,000 |
| aluminum | 16,100,000 |
| antimony | 27,800 |
| arsenic | 49,300 |
| cadmium | 180,000 |
| chromium | 472,000 |
| copper | 934,000 |
| mercury | 7,400 |
| silver | 35,500 |
| vanadium | 72,500 |

30. The following table represents some of the dangers to human health associated with each of the hazardous substances found on-site, as well as the potential routes of human exposure to these wastes:

| HAZARDOUS SUBSTANCE | ROUTE(S) OF EXPOSURE | POTENTIAL HUMAN HEALTH EFFECTS |
|---|---|---|
| 2,3,7,8 - Tetrachlorodibenzo-*p*-Dioxin | inhalation; skin absorption; ingestion; skin and/or eye contact | irritated eyes, skin, and mucous membranes; chloroacne; porphyria; gastrointestinal disturbances; possible reproductive problems; teratogenic effects<br><br>The World Health Organization has classified dioxin as a human carcinogen |
| PCBs | inhalation; skin absorption | irritated eyes; chloroacne; liver damage; reproductive problems |
| 1,2-dichloro-benzene | inhalation; skin absorption; ingestion; skin and/or eye contact | irritated eyes and nose; liver and kidney damage; skin blisters |
| benzene | inhalation; skin absorption; ingestion; skin and/or eye contact | irritated eyes, skin, nose and respiratory system; giddiness; headache, nausea, staggered gait; fatigue, anorexia, lassitude; dermatitis; bone marrow depression<br><br>The U.S. Department of Health and Human Services has designated benzene as a known human carcinogen |
| chloro-benzene | inhalation; ingestion; skin and/or eye contact | irritated eyes, skin, nose; drowsiness, incoordination; central nervous system depression. |
| tetrachloro-ethene | inhalation; skin absorption; ingestion; skin and/or eye contact | irritated eyes, nose, throat; nausea; flushed face and neck; vertigo, dizziness, incoordination; headache, somnolence; skin erythema; liver damage |
| trichloro-ethene | inhalation ;skin absorption; ingestion; skin and/or eye contact | irritates eyes and skin; headache, vertigo; visual disturbance; fatigue, giddiness, tremors, somnolence, nausea, vomiting; dermatitis; cardiac arrhythmia, paresthesia, liver injury |
| cadmuim | inhalation; ingestion | pulmonary edema, dyspnea, cough, chest tightness, substernal pain; headache, chills, muscle aches; nausea, vomiting, diarrhea; anosmia, emphysema, proteinuria, mild anemia |

| | | |
|---|---|---|
| lead | inhalation, ingestion; skin and/or eye contact | [NOTE: THESE SYMPTOMS ARE MORE PRONOUNCED IN CHILDREN] weakness, lassitude, insomnia; facial pallor; anorexia, weight loss; constipation, abdominal pain, colic, anemia; gingival lead line; tremors, paralysis of the wrist and ankles; encephalopathy; kidney disease, irritated eyes; hypotension. |
| manganese | inhalation; ingestion | Parkinson's; asthenia, insomnia, mental confusion, metal fume fever: dry throat, cough, chest tightness, dyspnea, rales, flu-like fever; lower back pain; vomiting; malaise; fatigue; kidney damage |
| aluminum | inhalation; skin and/or eye contact | irritated eyes, skin and respiratory system |
| antimony | inhalation; ingestion; skin and/or eye contact | irritated eyes, skin, nose, throat, mouth; cough; dizziness; headache; nausea, vomiting, diarrhea; stomach cramps; insomnia; anorexia; unable to smell properly |
| arsenic | inhalation; skin absorption; ingestion; skin and/or eye contact | ulceration of nasal septum, dermatisis, gastrointestinal disturbances, peripheral neuropathy, respiratory irritation, hyperpigmentation of skin<br><br>The U.S. Department of Health and Human Services has designated arsenic as a known carcinogen |
| cadmium | inhalation; ingestion | pulmonary edema, dyspnea, cough, chest tightness, substernal pain; headache; chills, muscle aches; nausea, vomiting, diarrhea; anosmia, emphysema, proteinuria, mild anemia |
| chromium | inhalation; ingestion; skin and/or eye contact | irritated eyes and skin; lung fibrosis |
| copper | inhalation; ingestion; skin and/or eye contact | irritated eyes, nose, pharynx; nasal perforation; metallic taste; dermatisis |
| mercury | inhalation; skin absorption; ingestion; skin and/or eye contact | irritated eyes and skin; cough, chest pain, dyspnea, bronchial pneuitis; tremors, insomnia, irritability, indecision, headache, fatigue, weakness; stomatitis, salivation, gastrointestinal disturbance, anorexia, weight loss, proteinuria |
| silver | inhalation; ingestion; skin and/or eye contact | blue-gray eyes, nasal septum, throat and skin irritation, ulceration skin; gastrointestinal disturbance |

| | | |
|---|---|---|
| vanadium | inhalation; ingestion; skin and/or eye contact | irritated eyes, skin and throat; green tongue, metallic taste, eczema, cough; fine rales, wheezing, bronchitis, dyspnea |

31. Approximately 200 residents live in the two high-rise housing complexes for the elderly located at the Site. Some of the highest levels of dioxin at the Site were found near these high-rises. Additionally, elevated levels of volatile organic compounds and semi-volatile organic compounds were found very close to the high-rises. The remainder of the Site (the drainage swale and the Woonasquatucket River and its floodplain extending south from Route 44 to the Allendale dam) is adjacent to or includes a number of residential yards as well as church grounds used for picnics and other events.

32. The Agency for Toxic Substances and Disease Registry (ATSDR) issued a Health Consultation on June 7, 1999. In that Health Consultation, ATSDR concluded that although current exposures are probably low, significant risks could exist for children or adults who have frequent contact with contaminated soils or sediment at the Site. ATSDR made several recommendations, including that public access be restricted to surface soils which exceed 1 part per billion (ppb) of dioxin.

33. By completing the second interim cap at the Site and implementing certain flood control measures at the Site, the removal action will minimize direct contact threat to humans. This removal action will also address the threat to the environment by minimizing contamination resulting from surface water run-off into the Woonasquatucket River and the drainage swale at the Site.

## CONCLUSIONS OF LAW AND DETERMINATIONS

On the basis of the findings of fact, EPA makes the following Conclusions of Law and Determinations:

34. The Centredale Manor Restoration Project Superfund Site is a "facility" as that term is defined in Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

35. Each Respondent is a "person" as that term is defined in Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

36. Each Respondent is a liable party within the meaning of Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

37. Each substance listed in paragraph 29 above is a "hazardous substance" as that term is defined in Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

38. The conditions described above in paragraphs 22 through 33 constitute an actual or threatened "release" into the "environment" within the meaning of Section 101(8), (22) of CERCLA, 42 U.S.C. § 9601(8), (22).

39. The actual or threatened releases of hazardous substances at or from the Site may pose "an imminent and substantial endangerment to the public health or welfare or the environment" within the meaning of Section 106(a) of CERCLA, 42 U.S.C. § 9606(a).

40. In order to protect public health and welfare and the environment, and prevent further release or threat of release of hazardous substances at or from the Site, a Removal Action is necessary and appropriate. The Removal Action will consist of implementation of the Scope of Work appended to this Order. The Removal Action is designed to prevent, minimize, and/or mitigate damage to the public health or welfare or the environment which may otherwise result from the release or threat of release of hazardous substances, and was developed in accordance with the criteria set forth at Section 300.415 of the National Contingency Plan ("NCP"), 40 C.F.R. § 300.415.

41. The removal actions specified in this Order will be done promptly and properly by the Respondents, and will be consistent with the NCP, if performed in accordance with the terms of this Order and Scope of Work.

## ORDER

42. Based upon EPA's jurisdiction, and the findings of fact and determinations set forth above, the Respondents are **ORDERED** to perform all work required under this Order. The Respondents shall comply with the following provisions and perform all actions required by the terms and conditions of this Order.

## PARTIES BOUND

43. This Order shall apply to and be binding upon the Respondents and upon their receivers, trustees, successors, and assigns. No change in ownership or corporate status shall in any way alter the Respondents' responsibilities under this Order. Respondents are jointly and severally responsible for carrying out all activities required of them by this Order. The failure of one or more Respondent to comply with all or any part of this Order shall not in any way excuse or justify noncompliance by any other Respondent, including but not limited to the failure to perform all obligations of any defaulting Respondent.

## DESIGNATION OF SUPERVISING CONTRACTOR AND PROJECT COORDINATOR

44. Within seven (7) days after the effective date of this Order, the Respondents shall retain the services of a qualified and experienced Supervising Contractor for the purpose of performing the work required by this Order in accordance with the terms and conditions of the Scope of Work. Within the same seven (7) day period, the Respondents shall notify EPA in writing of the name, address, and qualifications of the proposed supervising contractor and the name and telephone number of the supervising contractor's primary contact person. The Respondents shall also notify EPA of the identity and qualifications of any other contractor(s) or subcontractor(s) to be used at the Site at least seven (7) days in advance of their performing any work under this Order.

45. The supervising contractor shall be a qualified and certified professional engineer with substantial expertise and experience in the cleanup of hazardous waste sites. EPA reserves the right to disapprove, based on professional qualifications, conflicts of interest, and/or deficiencies in previous similar work, any contractor or subcontractor or other person engaged directly or indirectly by the Respondents to conduct work activities under this Order. If EPA disapproves the selection of any proposed contractor, the Respondents shall notify EPA in writing of the name, address, and qualifications of another contractor within seven (7) days after receipt of the notice of disapproval.

46. The Respondents shall provide a copy of this Order to all contractors, subcontractors, laboratories, and consultants retained in connection with this Order within seven (7) days after the Order's effective date or of such retention, whichever is later. The Respondents shall ensure that all such contractors, subcontractors, laboratories and consultants will perform all work in conformity with CERCLA, the NCP, and the terms and conditions of this Order and Scope of Work.

47. Within seven (7) days after the effective date of this Order, the Respondents shall designate a single Project Coordinator who shall be responsible for administration of all of the Respondents' actions called for by this Order, and shall submit the designated coordinator's name, address, and telephone number to EPA. EPA will deem the project coordinator's receipt of any notice or communication from EPA relating to this Order as receipt by the Respondents.

## COMMUNICATION AND COOPERATION AMONG THE RESPONDENTS

48. Within three (3) days after the effective date of this Order, the Respondents shall submit to EPA for approval a Communication and Coordination Plan (CCP) that specifies the requirements and procedures by which the Respondents will communicate and coordinate

with one another in carrying out the requirements of this Order. The CCP shall include at a minimum the following:

A. Communication Strategy. The Respondents shall specify how the designated coordinator and the individual Respondents will communicate and disseminate information relative to this Order. The name, title, address and telephone number of the primary contact person for each Respondent shall be included in the communication strategy.

B. Coordination of Efforts. The Respondents shall describe with specificity how the technical, financial, and administrative requirements of this Order are to be coordinated and distributed among and performed by the Respondents. The CCP shall describe the obligations of each and every Respondent in full.

Each Respondent shall sign the CCP (by a duly authorized representative if the Respondent is other than a natural person) prior to its submission to EPA. Failure of any Respondent to sign the CCP will constitute a violation of this Order by that individual Respondent. The Respondents shall submit all proposed changes or amendments to the CCP to EPA for approval. The CCP as approved by EPA shall be incorporated into and enforceable under this Order.

## EPA ON-SCENE COORDINATOR

49. The EPA On-Scene Coordinator ("OSC") will administer EPA's responsibilities and receive all written notices, reports, plans and other documents required by this Order. All submissions required by this Order shall be sent to EPA's OSC at the following address:

Ted Bazenas
Office of Site Remediation and Restoration
U.S. Environmental Protection Agency - New England
1 Congress Street, Suite 1100 (HBR)
Boston, MA 02114-2023
(617) 918-1230
FAX (617) 918-1291

50. EPA's OSC shall have the authority vested in her/him by the NCP, including but not limited to the authority to stop work being performed pursuant to this Order and the authority to modify the Scope of Work. Absence of the OSC from the Site shall not be cause for stoppage of work by the Respondents unless specifically directed by the OSC.

## REMOVAL WORK TO BE PERFORMED; COMPLETION OF WORK

51. Within fourteen (14) days after retention of the supervising contractor, the Respondents shall commence the work detailed in the Scope of Work (completing the second interim soil cap and implementing flood control measures). All work performed by the Respondents shall be conducted in accordance with CERCLA, the NCP, applicable guidance documents provided by EPA, and the provisions of this Order including any standards, specifications, and time schedules contained in the Scope of Work or specified by the OSC.

52. Within thirty (30) days after completing all work required under this Order, the Respondents shall submit for EPA approval a Completion of Work Report summarizing the activities conducted pursuant to the Scope of Work. The Completion of Work Report shall include the categories of information and conform to the requirements specified in the Scope of Work. The Completion of Work Report shall be certified by the supervising contractor, to the effect that all removal activities have been completed in full satisfaction of the requirements of this Order.

53. When EPA determines that all work has been fully performed in accordance with this Order (with the exception of all continuing obligations required by this Order, including record preservation), and that all goals and objectives of this Order and the Scope of Work have been satisfied, EPA will provide written notice to the Respondents. If EPA determines that all removal activities have not been completed in accordance with the provisions of this Order, it will so notify the Respondents and provide a list of the tasks remaining and a schedule for their completion. The Respondents shall perform all remaining tasks and shall submit an amended Completion of Work Report in accordance with the EPA notice. If EPA determines that the remaining tasks have not been completed in accordance with the provisions of the EPA notice and this Order, the Respondents shall be in violation of this Order.

54. EPA's issuance of the notice referred to in paragraph 53 shall not preclude it from later determining, based upon new information or otherwise, that the Respondents have not completed all removal activities in accordance with the provisions of this Order.

## SUBMISSIONS REQUIRING AGENCY APPROVAL; RESPONDENTS' OBLIGATION TO PROCEED

55. After review of any deliverable, plan, report or other item ("submission") which the Respondents are required to submit for review and approval pursuant to this Order and Scope of Work, EPA may: (i) approve the submission; (ii) conditionally approve the submission with required modifications; (iii) disapprove the submission and notify the Respondents of deficiencies; or (iv) disapprove the submission and modify the deliverable, plan, report, or other

item itself to cure any deficiencies. In the event EPA approves or conditionally approves the submission, or disapproves and modifies the submission itself, the Respondents shall perform all actions required by the submission, as approved, conditionally approved, or modified by EPA.

56. Upon receipt of a notice of disapproval with deficiencies ((iii) above), the Respondents shall correct the deficiencies and resubmit the submission within seven (7) days or such other time period specified in the notice of disapproval. Notwithstanding a notice of disapproval, the Respondents shall proceed to take any action required by any non-deficient portion of the submission. If EPA does not approve the submission as resubmitted, Respondents shall be in violation of the Order.

57. For each submission provided to EPA, the Respondents shall submit such copies as specified by the OSC. Any deliverable, plan, or report submitted to EPA pursuant to this Order shall be dated and shall include, in a prominent location in the document, the following disclaimer: "Disclaimer: This document has been prepared pursuant to a government administrative order (U.S. EPA Region I CERCLA Docket No. CERCLA1-2000-0026) and is subject to approval by the U.S. Environmental Protection Agency. The opinions, findings, and conclusions expressed are those of the authors and not those of the U.S. Environmental Protection Agency." In addition, any such deliverable, plan, or report which has not received final approval from EPA shall be marked "Draft" on each page.

## INCORPORATION AND ENFORCEABILITY OF DOCUMENTS

58. The Scope of Work and all other appendices or attachments to this Order shall be deemed incorporated into, and made an enforceable part of, this Order. Upon approval by EPA pursuant to the procedures of paragraphs 55-57, all contracts, deliverables, plans, reports, specifications, schedules, or other items required by or developed under this Order shall be deemed incorporated into, and made an enforceable part of, this Order. In the event of conflict between this Order and any document attached to, incorporated into, or enforceable hereunder, the provisions of this Order shall control.

## SITE ACCESS

59. All Respondents that own, occupy, or control property at the Site, or property other than the Site to which access is required in order to properly carry out the terms of this Order, shall grant access to the other Respondents, the other Respondents' authorized representatives, the State of Rhode Island, and EPA and its officers, employees, agents, contractors, consultants, and other authorized representatives for purposes of implementing and monitoring work to be performed under this Order.

60. To the extent access to, use or ownership of, or easements over property not owned, occupied, or controlled by the Respondents, or property other than the Site is required for the proper and complete implementation of this Order, the Respondents shall use their best efforts to obtain site access agreements or other interests in the property, in writing, sufficient to allow implementation of this Order within fourteen (14) days after the Order's effective date. For purposes of this paragraph, "best efforts" include but are not limited to the payment of money in consideration of access to property.

61. Such written access agreements or other interests obtained pursuant to the preceding paragraph shall provide the Respondents, the Respondents' authorized representatives, the State of Rhode Island, and EPA and their officers, employees, agents, contractors, consultants, and other authorized representatives access to the Site at all times for purposes of implementing and monitoring work under this Order. Such written access agreements or other interests shall specify that the Respondents are not EPA's representatives or agents with respect to liability associated with the Site.

62. In the event that site access agreements or other interests sufficient for implementation and monitoring of work under this Order are not obtained within the time period specified above, the Respondents shall notify EPA in writing within three (3) days thereafter regarding the lack of such agreements and the efforts made by the Respondents to obtain them. Lack of access shall not excuse or justify failure to perform any activity or to meet any deadline not requiring or directly dependent upon such access.

## QUALITY ASSURANCE/SAMPLING

63. The Respondents shall submit to EPA, upon request, the results of all sampling or tests and all other data generated by the Respondents, their contractor(s), or on the Respondents' behalf in the course of implementing this Order. The Respondents shall also provide the quality assurance/quality control procedures followed by all sampling teams and laboratories performing data collection and/or analysis.

64. Upon request, the Respondents shall allow EPA or its authorized representatives to take split and/or duplicate samples of any samples collected by the Respondents while performing work under this Order. The Respondents shall notify EPA not less than fourteen (14) days in advance of any sample collection activity. In addition, EPA shall have the right to take any additional samples that it deems necessary.

65. The Respondents shall assure that EPA and its authorized representatives are allowed access to any laboratory utilized by the Respondents in implementing this Order. Upon request, the Respondents shall have a designated laboratory analyze samples submitted by EPA for quality assurance monitoring.

**ACCESS TO INFORMATION; RECORD PRESERVATION; CONFIDENTIALITY CLAIMS**

66. Upon request, the Respondents shall provide EPA with copies of all records, documents, and other information generated by the Respondents and their contractor(s) which relates in any way to the Site or to the implementation of this Order, including but not limited to, sampling and analysis records, field sheets and field notes, engineering logs, chain of custody records, contracts, bills of lading, trucking logs, manifests, receipts, reports, and correspondence. In addition, the Respondents' employees, agents, or representatives with knowledge of facts concerning the conditions at the Site or performance of work under this Order shall be made available to EPA to provide such information.

67. For a period of at least nine (9) years following completion of all work conducted by the Respondents pursuant to this Order, the Respondents shall preserve all documents, records, and information of whatever kind, nature or description in their possession and/or control or that of their officers, employees, agents, accountants, contractors, attorneys, successors and assigns, that relate in any way to the performance of work under this Order, or relate in any way to releases or threatened releases of hazardous substances which are the subject of the removal action addressed by this Order. After this nine (9) year period has expired, the Respondents shall provide EPA with thirty (30) days advance written notice prior to the destruction of any such records, documents, or information. The Respondents shall send such notice, accompanied by a copy of this Order, to:

Office of Environmental Stewardship
U.S. Environmental Protection Agency
1 Congress Street, Suite 1100 (SES)
Boston, MA 02114-2023
Re: Removal Action at Centredale Manor Restoration Project Superfund Site,
CERCLA Docket No. CERCL1-2000-0026

Upon request, the Respondents shall provide to EPA copies of all such records, documents, or information.

68. The Respondents may assert a confidentiality claim, if appropriate, covering part or all of the information required by or requested under this Order, pursuant to Section 104(e)(7) of CERCLA, 42 U.S.C. § 9604(e)(7), and 40 C.F.R. § 2.203(b) (1989). The Respondents shall adequately substantiate all such assertions. Analytical and other data specified in Section 104(e)(7)(F) of CERCLA shall not be claimed as confidential by the Respondents. Information determined to be confidential by EPA will be afforded the protection required by Section 104(e)(7) of CERCLA and by 40 C.F.R. Part 2, Subpart B. If no confidentiality claim

accompanies the information when submitted to EPA, EPA may make it available to the public without further notice to the Respondents.

**CREATION OF DANGER; EMERGENCY RESPONSE**

69. Upon the occurrence of any incident or change of conditions during the activities conducted pursuant to this Order that causes or threatens a release of hazardous substances from the Site or an endangerment to the public health or welfare or the environment, the Respondents shall immediately take all appropriate action to prevent, abate or minimize such release or endangerment. The Respondents shall also immediately notify the OSC or, in the event of his/her unavailability, shall notify the Regional Duty Officer of the Emergency Planning and Response Branch, EPA Region I, telephone (617) 223-7265. In taking any actions under this paragraph, the Respondents shall act in accordance with all applicable provisions of the Health and Safety Plan prepared pursuant to the Scope of Work.

70. The Respondents shall submit a written report to EPA within seven (7) days after each incident specified above, setting forth the events that occurred and the measures taken and to be taken to mitigate any release or endangerment caused or threatened by the incident and to prevent the reoccurrence of such an incident.

71. Nothing herein shall limit the power and authority of EPA or the United States to take, direct, or order all actions necessary to protect public health, welfare, or the environment or to prevent, abate, or minimize an actual or threatened release of hazardous substances, pollutants or contaminants, or hazardous or solid waste on, at, or from the Site.

**OFF-SITE RULE**

72. All hazardous substances, pollutants, or contaminants removed off-site for treatment, storage, or disposal pursuant to this Order shall be treated, stored, or disposed of at a facility in compliance with the EPA Off-Site Rule pursuant to the National Contingency Plan, 40 C.F.R. § 300.440 (Procedures for Planning and Implementing Off-Site Response Actions). This Rule was published in the Federal Register, Volume 58, Number 182, Page 49200, on Wednesday, September 22, 1993.

**AMENDMENTS**

73. This Order, other than the Scope of Work, may only be amended in writing by signature of the EPA New England Director of the Office of Site Remediation and Restoration. Amendments to the Scope of Work may be made in writing by the OSC or at the OSC's oral direction. Where the OSC makes an oral modification, he will memorialize the modification in

writing to the Respondents within three (3) days; provided, however, that the effective date of the modification shall be the date of the OSC's oral direction.

74. No informal advice, guidance, suggestion, or comment by EPA regarding reports, plans, specifications, schedules, and any other writing submitted by the Respondents shall be construed as relieving the Respondents of their obligation to obtain such formal approval as may be required by this Order.

## OTHER APPLICABLE LAWS

75. Except as otherwise provided pursuant to paragraph 76 herein and Section 121(e) of CERCLA, all on-site and off-site actions required pursuant to this Order shall be performed in accordance with all applicable local, state, and federal laws and regulations. Such laws shall include, but not be limited to, the laws relating to occupational health and safety and worker's compensation.

76. In accordance with 40 C.F.R. § 300.415(i), all on-site actions required pursuant to this Order shall, to the extent practicable, as determined by EPA, considering the exigencies of the situation, attain applicable or relevant and appropriate requirements under federal environmental, state environmental, or facility siting laws.

## INSURANCE

77. At least seven (7) days prior to commencing any on-site work under this Order, the Respondents shall secure, and shall maintain for the duration of this Order, comprehensive general liability and automobile insurance with limits of three hundred thousand dollars ($200,000), combined single limit. The United States shall be named as an additional insured for all such insurance policies. Within the same time period, the Respondents shall provide EPA with certificates of such insurance and a copy of each insurance policy. If the Respondents demonstrate to EPA that any contractor or subcontractor maintains insurance equivalent to that described above or insurance covering the same risks but in a lesser amount, then the Respondents need provide only that portion of the insurance described above which is not maintained by such contractor or subcontractor.

## ENFORCEMENT; PENALTIES FOR NONCOMPLIANCE

78. Violation of this Order may subject the Respondents to civil penalties of up to twenty-seven thousand five hundred dollars ($27,500) for each day the violation occurs, as provided in Section 106(b)(1) of CERCLA, 42 U.S.C. § 9606(b)(1). The Respondents may also be subject to punitive damages in an amount up to three (3) times the amount of any costs

incurred by the United States as a result of such violation, as provided in Section 107(c)(3) of CERCLA, 42 U.S.C. § 9607(c)(3).

**DISCLAIMER OF LIABILITY BY EPA**

79. By issuance of this Order, the United States and EPA assume no liability for injuries or damages to persons or property resulting from acts or omissions by the Respondents, their officers, employees, agents, representatives, successors, assigns, contractors, or consultants in carrying out activities pursuant to this Order. Neither the United States nor EPA shall be held as a party to any contract entered into by the Respondents or their directors, officers, employees, agents, representatives, successors, assigns, contractors, or consultants in carrying out activities pursuant to this Order.

**NO RELEASE FROM LIABILITY**

80. Nothing in this Order shall constitute or be construed as a satisfaction or release from any claim, cause of action, or demand in law or equity against the Respondents or any other person, whether or not a party to this Order, for any liability such person may have for any conditions or claims arising out of or relating in any way to the generation, storage, treatment, handling, transportation, release, or disposal of any hazardous substances, hazardous wastes, pollutants, or contaminants found at, taken to, or taken from the Site, including but not limited to any and all claims of the United States for money damages and interest under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), or under any other applicable statute or the common law.

81. Nothing in this Order shall be deemed to constitute any decision on preauthorization of a claim within the meaning of Section 111 of CERCLA, 42 U.S.C. § 9611.

**RESERVATION OF RIGHTS BY THE UNITED STATES GOVERNMENT**

82. The United States reserves all rights against the Respondents and all other persons to take any further civil, criminal, or administrative enforcement action pursuant to CERCLA and/or any other available legal authority, including natural resource damages, the right to seek injunctive relief; the recovery of money expended or to be expended (plus interest); monetary penalties; criminal sanctions; and/or punitive damages regarding: (i) any violation of this Order; or (ii) any actual or potential threat to human health or welfare or the environment, or any release or threat of release of hazardous substances on, at, in, or near the Site.

83. EPA further expressly reserves the right both to disapprove work performed by the Respondents and to request or order the Respondents to perform tasks in addition to those detailed in the Order. In addition, EPA reserves the right to undertake response actions at any

time and to perform any and all portions of the work activities which the Respondents have failed or refused to perform properly or promptly.

84. Notwithstanding any other provision of this Order, EPA shall retain all of its information gathering, entry, inspection, and enforcement authorities and rights under CERCLA and under any other applicable law, regulation, or permit.

## OPPORTUNITY TO CONFER

85. Within two (2) days after receipt of this Order, the Respondents may request a conference with EPA to be held no later than two (2) days before the effective date. Requests for a conference should be submitted to:

Catherine Garypie, Senior Enforcement Counsel
Office of Environmental Stewardship
U.S. Environmental Protection Agency - New England
1 Congress Street, Suite 1100 (SES)
Boston, Massachusetts 022114-2023
(617) 918-1540
FAX (617) 918-1809

86. The purpose and scope of the conference shall be limited to issues involving the implementation of the response actions required by this Order and the extent to which the Respondents intend to comply with this Order. The conference is not an evidentiary or adversarial hearing and is not part of any proceeding to enforce or challenge the Order. The conference does not give the Respondents a right to seek review of this Order, or to seek resolution of potential liability, and no official stenographic record of the conference will be made. At any conference held pursuant to this section, the Respondents may appear in person or by attorney or other representative.

## EFFECTIVE DATE; COMPUTATION OF TIME

87. This Order shall be effective ten (10) days after the Order is signed by the EPA New England Director of the Office of Site Remediation and Restoration. All times for performance of obligations under this Order shall be calculated from the effective date. For purposes of this Order, the term "day" shall mean a calendar day unless otherwise noted herein. When computing any period of time under this Order, if the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the next working day.

**IT IS SO ORDERED**. Issued at Boston, Massachusetts this 12th day of April 2000.

Patricia L. Meaney, Director
Office of Site Remediation and Restoration

## SCOPE OF WORK

**This Scope of Work is provided for the Centredale Manor Restoration Project in North Providence, Rhode Island as an attachment to the Unilateral Administrative Order.**

---

### Preface

EPA has determined that Potentially Responsible Parties (PRPs) have the ability to promptly and properly prevent, mitigate, or eliminate the threats posed by hazardous substances at the Site Therefore, EPA has issued a Unilateral Administrative Order (Order) to such parties (the Respondents) with this attached Scope of Work (SOW).

As described previously in the Order, EPA has undertaken Removal Action at the Site to prevent exposure and control migration of contaminants at the Site including, but not limited to, dioxins, PCBs and others. This scope of work addresses the completion of Removal Activities which were proposed in the Action Memorandum (May, 1999) and the Action Memorandum Addendum (September, 1999). It should be noted that several actions proposed in these Action Memoranda were subsequently determined to be beyond the scope of Removal Action and have been incorporated into the Engineering Evaluation/Cost Analysis (EE/CA) process that EPA has undertaken to address the larger scale threats at the Site.

All actions taken by the Respondents shall be consistent with the National Contingency Plan (NCP), found in Title 40, Part 300 of the Code of Federal Regulations (40 CFR 300).

The Respondents shall communicate freely with the On-Scene Coordinator (OSC) prior to and during development of plans and deliverables, and throughout the implementation of approved plans.

The Order and SOW compel the Respondent to commence the work detailed in the Scope of Work. Therefore, within seven (7) days of retaining the services of a qualified and experienced Supervising Contractor for the purpose of performing the work required by this Order, the respondent shall submit a general plan (the Plan) to EPA for approval. The Plan shall address the components listed below:

### GENERAL COMPONENTS

1. **Site Security** - The plan shall provide for on-site security during construction and thereafter by, at a minimum, maintaining the current fences and signs which are in place

to limit access to contaminated areas of the site. The effectiveness of signs, fences, and barriers will be evaluated during the construction phase to determine if they adequately restrict access. If not deemed to be sufficient by the OSC, additional fencing, the placement of security guards or other measures may be warranted. Site security shall be maintained until EPA determines that the threats posed by conditions at the Site are eliminated or substantially mitigated.

2. **Work Plan** - The Work Plan will provide a detailed description of expected activities and the **project schedule**, including completion dates for interim activities. Out of respect for the nearest residents, noisy equipment (such as dumptrucks or bulldozers) will not be operated before 0800AM. A **daily work schedule** will also be provided to the OSC. At a minimum, **weekly progress meetings** will be scheduled with the OSC throughout the implementation of the Order.

3. **Site-Specific Health and Safety Plan (HASP)** - The Respondents shall develop and implement a HASP for all activities to be conducted at the Site in accordance with the NCP §300.150, and OSHA. The HASP shall be developed to protect all on-site personnel and the general public. Private employers are responsible for the health and safety of their own employees. Nothing contained in this SOW or the Order shall relieve the Respondents of their liability in this regard.

4. **Quality Assurance Plan (QAP)** - If sample collection and analysis is necessary, the Respondents shall develop a QAP to be used in conducting all field and laboratory analysis. The QAP shall ensure that analytical results generated are of known quality. The QAP will be consistent with the Region 1, EPA- New England *Compendium of Quality Assurance Project Plan Guidance.*

5. **Completion of Work Report (CWR)** - Upon completion of the tasks in this Order and SOW, the Respondent shall submit a CWR summarizing the work performed. At a minimum, the CWR will provide an estimate of the Respondents' costs incurred; identify all required activities and certify that each has been completed in accordance with the approved plans; include original photographs with written descriptions; include analytical results of any environmental samples collected during the period of performance, in both tables and on site maps; include 'as-built' drawings of any structures or features constructed ; contain a chronology of onsite activities; identify subcontractors and their roles.

SPECIFIC ACTIONS

6. **Complete construction of Interim Cap #2** - The Army Corps of Engineers (ACOE) ha provided a Preliminary Plan for completion of an interim protective cap with flood management berms over the area of contaminated soil adjacent to the Woonasquatucket River and between the Centredale Manor and Brook Village parking lots. (Refer to the attached plans.) The Respondents will complete construction of the interim cap with berms to the specifications provided by the ACOE through the OSC.

7. **Other specific actions requested by EPA** - At any time prior to or after the completion of the work specified in this SOW, EPA may determine that additional tasks are necessary in order to achieve the objectives of the Order, the SOW and CERCLA. Therefore, this SOW may be modified by the OSC at anytime.

CASE NO. 02-053S

Emhart Industries, Inc.

VS. Home Insurance Co., et al.

PLAINTIFF'S EXHIBIT 13

DATE IDEN.

DATE EVID.

BY Deputy Clerk

AO 386

# EXHIBIT 7

6/8/64

ZEP Manufacture

Phase #1

Purification Equipment

Steel tank equipped with cooling jacket and gate type agitator and centrifuge.

Basic Charge:

| Lbs. | Materials |
|---|---|
| | Sodium TCP (Concentration 36-38%) So as to contain 1000 lbs. TCP contained |
| 5280 | 30% Caustic Soda |
| 800 | 30% Caustic Soda (Wash) |
| 450 | 66° Be' Sulfuric Acid (Precipitating acid) |
| 370 | 66° Be' Sulfuric Acid (Purification acid) |
| 4800 | Perchloroethylene |
| 10 | Nuchar |
| 10 | Fiber Flo |
| 1000 | Theo. Yield (Total Isomers) |
| 787 | Minimum Yield TCP |
| 880 | Maximum Yield TCP |
| 65°C | Melting Point (Minimum) |

PLAINTIFF'S EXHIBIT 8 CLEARY-7/10/03

Plaintiff's Exhibit 193

This is Geo Hoeses
Bill of Materials for
Purification of Trichlorophenol

"Zep" was our nickname
for Hexachlorophene.

CASE NO. 02-053S

Emhart Industries, Inc.

vs. Home Insurance Co., et al.

PLAINTIFF'S EXHIBIT 193

DATE ______________________ IDEN.

DATE ______________________ EVID.

BY ______________________
Deputy Clerk

AO 386

# EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

COPY

| | | |
|---|---|---|
| * * * * * * * * * * * * | * | CIVIL ACTION |
| EMHART INDUSTRIES | * | NO. 02-053S |
| | * | |
| VS. | * | SEPTEMBER 26, 2006 |
| | * | VOLUME 9 |
| | * | |
| HOME INSURANCE CO. | * | PROVIDENCE, RI |
| * * * * * * * * * * * | * | |

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH
DISTRICT JUDGE
(JURY TRIAL)

APPEARANCES:

FOR THE PLAINTIFF:

JACK PIROZZOLO, ESQ. and
RICHARD L. BINDER, ESQ.
Foley & Hoag LLP
Seaport World Trade Center West
155 Seaport Blvd.
Boston, MA 02110-2600
(617) 832-1250

FOR THE DEFENDANT
North River:

JOHN T. HARDING, ESQ.
Morrison, Mahoney, LLP
250 Summer Street
Boston, MA 02210
(617) 439-7558

MARK T. NUGENT, ESQ. and
MICHAEL T. FARLEY, ESQ.
Morrison, Mahoney, LLP
121 South Main Street
Suite 600
Providence, RI 02903
(401) 331-4660

FOR THE DEFENDANT
Century Indemnity:

LAWRENCE A. NATHANSON, ESQ.
Siegal, Napierkowski & Park
533 Fellowship Road
Suite 120
Mt. Laurel, NJ 08054
(856) 380-8900

APPEARANCES: (Continued)

FOR THE DEFENDANT Century Indemnity:

JAMES P. McCORMACK, ESQ.
McKenna & McCormack
128 Dorrance Street
Suite 330
Providence, RI 02903
(401) 831-2970

FOR THE DEFENDANT OneBeacon America:

KEVIN J. O'CONNOR, ESQ.
and PETER NETBURN, ESQ.
Hermes, Netburn, O'Connor & Spearing, P.C.
265 Franklin St.
7th Floor
Boston, MA 02110
(617) 728-0050

JAMES T. MURPHY, ESQ.
and KELLY N. MICHELS, ATTY.
Hanson Curran, LLP
146 Westminster Street
Providence, RI 02903
(401) 421-2154

Court Reporter:

Anne M. Clayton, RPR
One Exchange Terrace
Providence, RI 02903

Proceeding reported and produced by computer-aided stenography

# I N D E X


| WITNESS | | PAGE |
|---|---|---|
| JAMES RONALD HASS | | |
| Direct Examination by Mr. Pirozzolo: | | 14 |

| PLAINTIFF'S EXHIBITS | ID | FULL |
|---|---|---|
| 100 - | 6 | |
| 239 - | 123 | 124 |
| 240 - | 128 | |

gray ones to the chlorines; red to the oxygens; and the blue to the carbons.

So we see we have six-membered ring, six-membered ring. I can't really get it to work. But anyway, there's two six-member rings joined together by the oxygens.

Q. And the bonds are those sharing of the electrons you've previously described. They're represented by the stick?

A. Yes, sir. They're indicated by the stick holding the balls together.

Q. Another substance of interest in this matter is trichlorophenol?

A. Yes.

Q. Have you prepared a diagram of trichlorophenol?

A. Yes.

MR. PIROZZOLO: May that be shown to the witness first? May that be shown to the jury?

THE COURT: Any objection?

MR. O'CONNOR: No, your Honor.

THE COURT: Show it to the jury.

Q. In what way is trichlorophenol related to the dioxin that's of concern in this case?

A. The trichlorophenol will react with itself to form the dioxin of interest. Trichlorophenol was one of the

raw materials used at the site in the production of hexachlorophene.

Q. Is this a diagram of trichlorophenol?

A. It is.

Q. Is it a particular kind of trichlorophenol?

A. Yes. This is what chemists would term as 2,4,5-trichlorophenol.

Q. Would you explain the structure of 2,4,5-trichlorophenol.

A. Yes. We still have the same rules about four bonds around carbons, one to oxygens, one to chlorines, and one to hydrogens. The numbering convention for six-membered rings that have what we call substituents are other atoms attached to the ring, start with -- the requirement is that you use the smallest set of numbers possible.

In this particular case, that's accomplished by labeling the position to which the oxygen is attached as carbon number one.

If we had no chlorines around this, that molecule would be called phenol. So anything that comes from phenol -- phenol you may be familiar with from Listerine. If you start with phenol, then add a chlorine to it in the two position, the four position and the five position, you have 2,4,5-trichlorophenol.

# EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

COPY

| | |
|---|---|
| EMHART INDUSTRIES | CIVIL ACTION NO. 02-053S |
| VS. | SEPTEMBER 14 & 15, 2006 |
| HOME INSURANCE CO. | PROVIDENCE, RI |

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH
DISTRICT JUDGE
(TESTIMONY OF JOSEPH NADEAU AND RICHARD NADEAU)

APPEARANCES:

FOR THE PLAINTIFF:

JACK PIROZZOLO, ESQ. and
RICHARD L. BINDER, ESQ.
Foley & Hoag LLP
Seaport World Trade Center West
155 Seaport Blvd.
Boston, MA 02110-2600
(617) 832-1250

FOR THE DEFENDANT North River:

JOHN T. HARDING, ESQ.
Morrison, Mahoney, LLP
250 Summer Street
Boston, MA 02210
(617) 439-7558

MARK T. NUGENT, ESQ. and
MICHAEL T. FARLEY, ESQ.
Morrison, Mahoney, LLP
121 South Main Street
Suite 600
Providence, RI 02903
(401) 331-4660

FOR THE DEFENDANT Century Indemnity:

LAWRENCE A. NATHANSON, ESQ.
Siegal, Napierkowski & Park
533 Fellowship Road
Suite 120
Mt. Laurel, NJ 08054
(856) 380-8900

APPEARANCES: (Continued)

FOR THE DEFENDANT
Century Indemnity:

JAMES P. McCORMACK, ESQ.
McKenna & McCormack
128 Dorrance Street
Suite 330
Providence, RI 02903
(401) 831-2970

FOR THE DEFENDANT
OneBeacon America:

KEVIN J. O'CONNOR, ESQ.
and PETER NETBURN, ESQ.
Hermes, Netburn, O'Connor &
Spearing, P.C.
265 Franklin St.
7th Floor
Boston, MA 02110
(617) 728-0050

JAMES T. MURPHY, ESQ.
and KELLY N. MICHELS, ATTY.
Hanson Curran, LLP
146 Westminster Street
Providence, RI 02903
(401) 421-2154

Court Reporter:

Anne M. Clayton, RPR
One Exchange Terrace
Providence, RI 02903

Proceeding reported and produced by computer-aided stenography

# I N D E X


| WITNESS | PAGE |
|---|---|
| JOSEPH NADEAU | |
| Direct Examination by Mr. Pirozzolo: | 4 |
| Cross-Examination by Mr. Nugent: | 31 |
| Redirect Examination by Mr. Pirozzolo: | 45 |
| Recross-Examination by Mr. Nugent: | 49 |
| RAYMOND NADEAU | |
| Direct Examination by Mr. Pirozzolo: | 50 |
| Cross-Examination by Mr. Nugent: | 65 |
| Redirect Examination by Mr. PIrozzolo: | 81 |
| PLAINTIFF'S EXHIBITS | |
| 137A - | 22 |

nozzles that hoses were attached to. Some of the product came out of storage tanks that we hooked the hose to and ran it to the particular vat we needed to move it to or pump it to or transport it from drums to.

Q. And did you ever notice any leaks or spills either from the vats or the pipes?

A. Yes.

Q. And could you describe what you observed?

A. On occasions, some of the chemicals would erode the pipes and whatever that product was, the raw product, it would drip.

Q. And what was done when that occurred, that kind of thing occurred?

A. Usually, we told someone, and someone from maintenance would come and replace that pipe.

Q. What would you do with whatever dripped or came out?

A. Hosed it down. Wash it away.

Q. And -- I'm sorry?

A. It would wash away.

Q. Thank you. Now, you pointed out the building that contained the -- where the hexachlorophene -- you called it the Texas tower?

A. Yes.

Q. What was that building used for?

A. They made the hexachlorophene product there. I was never in it. There was only two gentlemen, I believe, or three gentlemen that ever worked there, and I never was part of that operation.
Q. But that was the place where they made the hexachlorophene?
A. Yes.
Q. Do you know how the raw materials got to that building?
A. I do not.
Q. Do you know how the finished product left that building?
A. I do not.
Q. Do you know any of the other products that Metro-Atlantic made?
A. Well, they made the reserve salt. They made a product called Rane-Pel, which was a water repellant. Actsoft PE, which I think was another repellant. There was a product called 40S. I'm not quite sure what that product was, but it was a filtered product. We ran it through a filter press.
They had dozens of products. I can't remember them all at this point in time.
Q. We're not asking for all, but can you give us the ones you do remember?

would just allow it to happen. Just dumped it over.
Q. On occasions when raw material was put into the mix, would anything spill?
A. Sure.
Q. And what would you do with whatever might have spilled?
A. We would -- depending on -- some things we didn't add water to. They reacted violently to water. But most of the time it was -- we would steam them or hit them with water and then they would go down the French drain.
Q. Thank you. Now, was there an occasion when an explosion occurred?
A. Yes.
Q. Were you there when that happened?
A. I wasn't there when it happened. I heard about it. I can't remember how I heard about it. I don't know whether I was even still working there at the time when that happened, but I heard the story because my brother was there.
Q. But you didn't, in fact, see the explosion?
A. I didn't see it.
Q. Okay. Now, did Metro-Atlantic have a way of disposing of solid waste? Is there a Dumpster?
MR. NETBURN: Objection.

THE COURT: Don't lead the witness. Sustained. Ask another question.

Q. Did Metro-Atlantic have a way of disposing of solid waste?

A. Some of the things that we trashed went into the Dumpster. Some of the byproducts were shoveled and put into barrels. Some of the byproducts were washed off the floor into the drain.

Q. And in connection with the work you did at Metro-Atlantic, did you ever do anything with the expectation or intention of damaging the environment?

MR. NUGENT: Objection.

THE COURT: I'm going to allow it. Overruled.

A. Would you repeat that?

THE COURT: The reporter will read the question back.

(Pending question read by the reporter.)

A. No.

Q. Did you ever think you were doing anything wrong?

A. No.

MR. PIROZZOLO: Thank you. I have no further questions.

One more question.

Q. Do you recall a time when there was a fire?

A. There were several fires.

leak, the workers for Metro-Atlantic caused that leak material to go out into the river; is that correct, by hosing it off the floor?
A. Yes.
Q. All right. So the leak itself never went out into the ground, right? It was inside the building?
A. It was in the building.
Q. And the leak itself never went directly into the river, did it?
A. No.
Q. The only way that leaked material got out into the environment was when the workers hosed it off the floor and pushed it and forced it outside into the river, isn't that true?
A. That's probably one of the ways.
Q. All right. The washing of the floor in the main building after the presses had the sludge discharged onto the floor, was that a regular occurrence, washing the floor down?
A. A better picture of that -- we did wash the floor down, but we were always instructed to shovel off, and it's not like we dumped the sludge on the ground and just washed it over on the drain. Most of it, most of it -- most of the guys, there were a few guys that wouldn't shovel it, but most of us shoveled the bulk of

it up, and then whatever was on the floor there was no other way to get it out of there but to wash it off the floor.
Q. But at the time you worked there, how old were you?
A. I was 17, 18.
Q. All right. So when you're 17, 18 years old, you were not in charge of disposing of those barrels, were you?
A. No.
Q. Your job was basically to provide labor inside to shovel or to hose off, is that correct?
A. Filter it, clean it up, shovel it.
Q. All right. So the disposal of those barrels that contain the sludge, that was somebody else's job?
A. After it was shoveled up, if we put it into the fiber drums, we took it up onto the second floor and put it in a Dumpster.
Q. And after that, do you know where it went?
A. I have no clue.
Q. With regard to the material that went down the drain that was washed in the drain, the sludge material, how often would that occur?
A. Filtering was done pretty much on a daily basis for the two products, reserve salts and 40S.

Q. Um-hum. (Affirmative.)
A. It was either put in drums, tossed into the Dumpster, and residues that were on the floor were hosed off.
Q. Was there a Dumpster?
A. Yes.
Q. How was the material from the upper floors, how did it get to the Dumpster?
A. The Dumpster was right outside the second floor window. We walked -- actually, it was a big doorway. We walked over to the edge and pushed the empty barrels -- not the empty barrels, but the barrels with the solvents into the Dumpster.
Q. So if I get the picture then, you went to a doorway in the wall?
A. Yes.
Q. That was on the second or third story of the building?
A. That was above the basement so it was the first, second floor, however you look at it.
Q. It was up?
A. It was up.
Q. Up in the air, and we know that there was something to catch what you dumped out?
A. Yes.

Q. What was there to catch what you dumped out?
A. The Dumpster.
Q. A Dumpster?
A. Yes.
Q. All right. And did you ever look in that Dumpster?
A. Yes.
Q. And did you see plastic bags in that Dumpster?
A. There were plastic bags, paper bags, fiber drums, garbage.
MR. PIROZZOLO: Thank you. Thank you very much, Mr. Nadeau.
THE COURT: Any recross?
MR. NUGENT: Briefly, your Honor.

RECROSS-EXAMINATION BY MR. NUGENT

Q. On redirect, Mr. Pirozzolo just asked you whether New England Container and Metro were two totally separate companies, and do you recall that question?
A. Yes.
Q. Did you ever describe the relationship between those two companies as incestuous?
A. Yes.
Q. Why was that?
A. It was family. They were brothers that owned them, and it was incestuous to me.

the gentleman from the EPA before you signed the statement?

A. I don't even remember which guy was the EPA.

Q. Do you remember what answers you gave to him?

A. I don't remember the guy, I'm telling you. If I signed the paper, I said it. How can I explain it any different? I had to say it if I signed the paper. But there's things in there that I -- if you asked me, I wouldn't remember.

Q. Today you wouldn't remember?

A. But I have to admit I said it, because I signed the paper.

Q. Okay.

A. I don't want to hide nothing.

Q. Do you recall discussing the barrels from Metro-Atlantic coming over to New England Container with that gentleman from EPA?

THE COURT: Mr. Nugent, I think rather than asking him whether he recalls what he said at an earlier time, you need to just ask him about the substance of whatever it was.

MR., NUGENT: Okay.

Q. When you worked at New England Container, did barrels come over from Metro-Atlantic?

A. Yes.

Q. And did those barrels contain black sludge?
A. No.
MR. NUGENT: Now I have another reason to use this, your Honor. May I use 327?
Can you show him paragraph two on the first page.
A. I don't remember saying that, but if I --
THE COURT: Wait. There's no question before you. Wait a minute. What are you referring to? Direct me to what you're referring to.
MR. NUGENT: It's a handwritten statement.
THE COURT: No, no. What line?
MR. NUGENT: About half-way down the page begins with "Some of these" --
THE COURT: All right.
MR. NUGENT: Actually just before that, it says, "Barrels also came".
THE COURT: All right. You may read that to him.
MR. NUGENT: From where it says "Barrels also came" to the rest of that paragraph?
THE COURT: Yes.
MR. PIROZZOLO: Objection.
THE COURT: What? Yes.
MR. PIROZZOLO: Your Honor, this isn't a

foundation. This again is passive voice.

THE COURT: All right. I understand your objection. It's overruled. You may direct the witness to that portion of his prior statement.

Q. Mr. Nadeau, I'm going to read something from your statement. I'm going to ask you did I read it correctly, then I'll have some follow-up questions. First of all, "Barrels also came from the Metro-Atlantic plant. Some of these barrels were filled with a black sludge which came from the Metro-Atlantic presses. The sludge was taken to the landfill located below the New England Container plant and dumped, and then the barrels were reconditioned"?

A. Right.

Q. Is that true?

A. Yes. We didn't take the full barrels.

THE COURT: Wait. I understand you might want to add things, but you need to only respond to the questions that are before you. That's the process that we work by here.

THE WITNESS: Sorry.

THE COURT: Go ahead.

Q. So you agree that barrels from Metro-Atlantic that were filled with a black sludge came over to New England Container and were dumped out the back in the

landfill?
A. They dumped it down in the dump.
Q. Right. So when you testified earlier on direct that plastic bags and the sand from the sandblasting went back, not only did plastic bags go to the landfill and sand product go to the landfill, but black sludge from Metro-Atlantic went to the landfill?
A. Yeah. From Metro, yeah.
Q. Did you ever see -- strike that. You worked there for a number of years, right?
A. Yeah.
Q. At New England Container. Did you know any of the other workers at Metro-Atlantic? Did you ever talk to them?
A. Yeah.
Q. Did you know some of them by name?
A. Yes.
Q. And did you -- strike that. Were you familiar with Metro-Atlantic trucks?
A. Yes.
Q. Did you ever see Metro-Atlantic trucks down in the landfill?
A. Yes.
Q. Did you ever see the Metro-Atlantic trucks down in the landfill dumping the barrels?

# EXHIBIT 10

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

COPY

| | | |
|---|---|---|
| * * * * * * * * * * * | * | CIVIL ACTION |
| EMHART INDUSTRIES | * | NO. 02-053S |
| | * | |
| VS. | * | SEPTEMBER 18, 2006 |
| | * | |
| HOME INSURANCE CO. | * | |
| * * * * * * * * * * * | * | PROVIDENCE, RI |

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH
DISTRICT JUDGE
(TESTIMONY OF JOHN TURCONE)

APPEARANCES:

FOR THE PLAINTIFF: JACK PIROZZOLO, ESQ. and
RICHARD L. BINDER, ESQ.
Foley & Hoag LLP
Seaport World Trade Center West
155 Seaport Blvd.
Boston, MA 02110-2600
(617) 832-1250

FOR THE DEFENDANT North River: JOHN T. HARDING, ESQ.
Morrison, Mahoney, LLP
250 Summer Street
Boston, MA 02210
(617) 439-7558

MARK T. NUGENT, ESQ. and
MICHAEL T. FARLEY, ESQ.
Morrison, Mahoney, LLP
121 South Main Street
Suite 600
Providence, RI 02903
(401) 331-4660

FOR THE DEFENDANT Century Indemnity: LAWRENCE A. NATHANSON, ESQ.
Siegal, Napierkowski & Park
533 Fellowship Road
Suite 120
Mt. Laurel, NJ 08054
(856) 380-8900

APPEARANCES: (Continued)

FOR THE DEFENDANT
Century Indemnity:

JAMES P. McCORMACK, ESQ.
McKenna & McCormack
128 Dorrance Street
Suite 330
Providence, RI 02903
(401) 831-2970

FOR THE DEFENDANT
OneBeacon America:

KEVIN J. O'CONNOR, ESQ.
and PETER NETBURN, ESQ.
Hermes, Netburn, O'Connor &
Spearing, P.C.
265 Franklin St.
7th Floor
Boston, MA 02110
(617) 728-0050

JAMES T. MURPHY, ESQ.
and KELLY N. MICHELS, ATTY.
Hanson Curran, LLP
146 Westminster Street
Providence, RI 02903
(401) 421-2154

Court Reporter:

Anne M. Clayton, RPR
One Exchange Terrace
Providence, RI 02903

Proceeding reported and produced by computer-aided stenography

# INDEX


| WITNESS | PAGE |
| --- | --- |
| JOHN TURCONE | |
| Direct Examination by Mr. Pirozzolo: | 4 |
| Cross-Examination by Mr. Nugent: | 9 |
| Cross-Examination by Mr. Netburn: | 18 |
| Redirect Examination by Mr. Pirozzolo: | 23 |

Q. Okay. During what period of time did you work for Metro-Atlantic?
A. It was either August or September of '63 through January of '65.
Q. And what type of work did you do for Metro-Atlantic?
A. It was basically a laborer or a go-for.
Q. What type of laborer or going for things did you do?
A. Cleaned up matter. We moved barrels around. We delivered stuff here and there around the complex, watched the tanks, washed the tanks, cleaned the tanks, ground flake substance into a powder. That was about it.
Q. In the course of working for Metro-Atlantic, did you have the occasion to go to different parts of the plant and operation?
A. Yes.
Q. And did you have the opportunity to observe whether Metro-Atlantic had a Dumpster?
A. Yes.
Q. Could you tell us where the Dumpster was located?
A. It was in the driveway near the rear door. We had access through it through the second floor. You had the ground floor, then you had the second floor.

MR. PIROZZOLO: Could we exhibit to the witness Plaintiff's Exhibit 222.

Can we enlarge the portion of 222 that shows the Metro-Atlantic's building.

Q. Do you recall, Mr. Turcone, at your deposition, you made some marks on a plan showing the Metro-Atlantic and the New England Container sites, or buildings, I should say?

A. If I did, I honestly don't recall but --

Q. Are you able to show us where the Dumpster was located?

A. I would say it's number 10.

Q. There's a number 10 on the map?

A. Yeah.

Q. Thank you. You believe the Dumpster was located there?

A. Yes.

Q. Now, you said something about the first floor and second floor. Was the Dumpster on the ground?

A. Yes.

Q. And how did material from the second floor get into the Dumpster?

A. It had some old doors that opened in, and we would just take the stuff to the doors and tip it into the Dumpster.

Q. And push it down?
A. Um-hum. (Affirmative.)
Q. And how did other material get into the Dumpster?
A. It was either thrown in or dumped in.
Q. Okay. And was the Dumpster used to deposit Metro-Atlantic's solid waste?
MR. NUGENT: Objection, your Honor, leading.
Q. What was the Dumpster used for?
A. Whatever debris we had left over that we were told to dump in it. That's what we did. Whatever debris or materials left over, we just threw it in the Dumpster.
Q. Okay. Now, during the time you worked for Metro-Atlantic, did you also work part-time for NECC?
A. Yes.
Q. And what type of work did you do for NECC?
A. We used to open the drums and burn them.
Q. And could you briefly describe the process of opening the drums and burning them?
A. Opening the drum, it's like a giant can opener, and it would take the lid off and have another machine to put the bead on it. Then we would throw the -- pile the drums outside, and they would be burned to clean them so they could be sandblasted and painted.
Q. When you say "burned," how -- can you describe how they were burned?

Q. What did you do in that building?
A. Whatever was being made in there, I would watch. They tell me to watch like for an hour. And after that, I would either turn water on that was down or shut it down, and go over and get one of the managers in the main building, and they'd come over and take care of it.
Q. I'm going to ask you, do you know what was made in the building? I'm not asking you for the technical name. Did you call that material something?
A. For lack of knowledge, if I recall properly, the final product that came out of it was a reddish-orangy solution. Water was added to it. It turned bright yellow. So we used to call it Agent Orange.
Q. That's what I was going to ask you. When you worked at Metro-Atlantic, is it fair to state that the product that was being made in the building along the river that you have indicated on Exhibit 222, you and others would call it Agent Orange; is that correct?
A. I'm going to say that I referred to it as that. I don't know if others did.
Q. Okay. Of all the buildings at the Metro-Atlantic site, was that the closest building to the river?
A. Looking at the picture, I'd say yes. You had the main building next to that other tributary on the other

Q. I understand that. It's fair to say you had a better memory back in 2002 when you gave this deposition than today?
A. Yes.
Q. Did you ever observe a pipe from that building that we just described, the new building outside of the building?
A. Yes.
Q. And where did that pipe lead?
A. To the river.
Q. Was there some reason why you remember that pipe from the new building into the river?
A. It had to be replaced every so often.
Q. Is that based on your observations?
A. Yes.
Q. And what did you observe about the pipe that led from the new building into the river?
A. That it would deteriorate through use.
Q. Was it kind of a corrosive effect?
A. Yes.
Q. So the metal pipe that led from the new building into the river would corrode away; is that correct?
A. Yeah. Actually, when they showed it to me, the bottom would wear out. It would go from a regular size pipe on top to a thin piece of steel on the bottom.

MR. NUGENT: Objection, your Honor.
MR. PIROZZOLO: Same point, your Honor.
THE COURT: Overruled. Go ahead.
A. Yes.
Q. Okay. And how did the material come out of the plant in a way that you could see it?
MR. NUGENT: Objection, your Honor. I think the question is overly broad. If he means -- the pipe that I referred to is one thing, but if he's referring -- I think he's referring to the --
MR. PIROZZOLO: I'm not referring to that pipe.
THE COURT: Rephrase the question. Counsel is correct. It's too broad.
Q. Did you see finished product come out of the plant?
A. I really don't know.
Q. Now, in cross-examination by my brothers, you were asked about whether there was a name for the material in the plant?
A. I'm sure they had a specific name for it, but what I called it was a nickname because of what was going on in that era.
Q. Your nickname was Agent Orange?
A. Orange, yes.
Q. Didn't you name it Agent Orange because you saw

something of an orange color?
A. Yes.
Q. How did you see the orange color? Where did you see this orange color?
A. That was one of the -- whatever came out. Whether it was complete or not, it was that color that they shipped out.
Q. The product was orange?
A. Right.
Q. How did you happen to see the product that was shipped out? Was it -- maybe that question -- was it in a barrel? Did it go out of a pipe? How did you see what color the product was that went out?
A. It was transferred to a barrel.
Q. And you saw it being transferred to the barrel?
A. Yes.
Q. Okay. Did you see the raw materials transferred into the barrels? I misspoke. Did you see the raw materials transferred into the mixing containers or vats?
A. Yes.
Q. What color was that?
A. I don't recall, to be honest with you.
Q. But you say the material that came out of the vats was orange in color?

# EXHIBIT 11

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

COPY

| | |
|---|---|
| EMHART INDUSTRIES | CIVIL ACTION NO. 02-053S |
| VS. | SEPTEMBER 27, 2006 VOLUME 10 |
| HOME INSURANCE CO. | PROVIDENCE, RI |

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH
DISTRICT JUDGE
(JURY TRIAL)

APPEARANCES:

FOR THE PLAINTIFF:

JACK PIROZZOLO, ESQ. and
RICHARD L. BINDER, ESQ.
Foley & Hoag LLP
Seaport World Trade Center West
155 Seaport Blvd.
Boston, MA 02110-2600
(617) 832-1250

FOR THE DEFENDANT North River:

JOHN T. HARDING, ESQ.
Morrison, Mahoney, LLP
250 Summer Street
Boston, MA 02210
(617) 439-7558

MARK T. NUGENT, ESQ. and
MICHAEL T. FARLEY, ESQ.
Morrison, Mahoney, LLP
121 South Main Street
Suite 600
Providence, RI 02903
(401) 331-4660

FOR THE DEFENDANT Century Indemnity:

LAWRENCE A. NATHANSON, ESQ.
Siegal, Napierkowski & Park
533 Fellowship Road
Suite 120
Mt. Laurel, NJ 08054
(856) 380-8900

APPEARANCES: (Continued)

FOR THE DEFENDANT
Century Indemnity:

JAMES P. McCORMACK, ESQ.
McKenna & McCormack
128 Dorrance Street
Suite 330
Providence, RI 02903
(401) 831-2970

FOR THE DEFENDANT
OneBeacon America:

KEVIN J. O'CONNOR, ESQ.
and PETER NETBURN, ESQ.
Hermes, Netburn, O'Connor &
Spearing, P.C.
265 Franklin St.
7th Floor
Boston, MA 02110
(617) 728-0050

JAMES T. MURPHY, ESQ.
and KELLY N. MICHELS, ATTY.
Hanson Curran, LLP
146 Westminster Street
Providence, RI 02903
(401) 421-2154

Court Reporter:

Anne M. Clayton, RPR
One Exchange Terrace
Providence, RI 02903

Proceeding reported and produced by computer-aided stenography

# I N D E X


| WITNESS | | PAGE |
|---|---|---|
| JAMES ROBERT HASS | | |
| Continuation of Direct Examination by Mr. Pirozzolo: | | 18 |

| PLAINTIFF'S EXHIBITS | ID | FULL |
|---|---|---|
| 238 - | | 86 |
| 240 - | 35 | |
| 241 - | 62 | 80 |

process worked?

MR. PIROZZOLO: Can the chart be seen, your Honor.

THE COURT: I think the jury can follow along. Use your pointer. It will work out.

A. The first step in the process involved purification of the crude trichlorophenol. According to Mr. Cleary's testimony, the trichlorophenol was purchased exclusively from Diamond Alkali and was the crude reaction mixture from the Diamond Alkali reactor that prepared the trichlorophenol with no attempt by Diamond Alkali to purify it in any way.

So this material would have arrived, according to testimony, in tank trucks and, when needed, piped into the factory for uses. At this point, the materials in the ZEP recipe would be added, which included, amongst other things, activated carbon and also a material to assist with solid flow, filter flow I believe is the name they used for it.

This material, this mixture would have been agitated for some period of time to, essentially, give a chance for the activated charcoal to remove impurities. And my understanding from Mr. Cleary's patent is the target impurities were other chlorinated phenols that might be present and also the methyl

derivative of 2,4,5-trichlorophenol, which has the common name Anisole.

At this point, I don't believe that anyone at Metro-Atlantic realized that there was dioxin in there, but any TCDD that was in the sample would also -- or in the material coming in.

MR. HARDING: I move to strike that commentary.

THE COURT: Yes. The jury will disregard the statement with respect to what people at Metro-Atlantic believed. Stick to the process here.

A. Okay. The carbon that was used at this point is an activated charcoal known as nuchar which is commercially available from West Bay Co.

Q. Why don't, if we could, just to slow down a little, Dr. Hass. In that first purification step, are things mixed together?

A. Yes.

Q. Would you explain what's mixed together.

A. It's the material on the ZEP diagram, which included some additional caustic solution. The nuchar, which is an activated charcoal available from West Bay Co. Corporation, I believe it was a material called filter flow, which would be there to assist the solids that might be in the solution when they start filtering it to assist with the flow of that.

Q. How would the solids be removed?
A. Most likely by scraping the material from inside the centrifuge.
Q. And would that be the material that contained dioxin?
A. Yes.
Q. And what would be the relationship at that point between the dioxin and the activated charcoal?
A. It would be bound to the activated charcoal.
Q. And would that be a waste material?
A. Yes.
Q. Now, when the trichlorophenol -- withdrawn.
When the resulting liquid is taken out of the centrifuge A and goes on to the next process, is there any amount of dioxin left in it?
A. Very small or none.
Q. What do you mean by "very small"?
A. My estimate is that starting with roughly 25 parts per million dioxin, which I think is on the upper end of the possible range, that the remaining dioxin in the sample would be on the order of ten parts per trillion.
Q. What happened to most, if not all, of the dioxin by that time?
A. It would be bound to the carbon.
THE COURT: Can you just, if you can, express

that in a percentage? Is that possible for you to do?

THE WITNESS: Yes.

THE COURT: I have a hard time grasping numbers like parts per million and parts per trillion.

THE WITNESS: The remaining part will, in fact, be parts per billion of what was added in the first place. I agree with the difficulty of understanding large numbers, whether they're very big or very small.

Would you like me to elaborate on what a part per billion means?

THE COURT: That would be fine and a part per trillion, but then try to answer my question, which is trying to express this as a percentage, if you can.

THE WITNESS: Part per billion is, in fact, the same thing as a percentage. One percent is point 01, which is ten to the minus two. A part per billion is .000000001.

We scientists don't like -- we're lazy like everybody else, so we don't like writing out all these numbers, so we have a little nomenclature we call scientific notation. So one percent, for example, would be expressed as one times ten to the minus two. Where the minus two means there's two digits between the decimal point and the number we just said. So if we're saying one percent, that would be one times ten

to the minus two.

THE COURT: I'm really asking a fairly simple question maybe because I'm a simple person, but you talked about a starting point of 25 parts per million.

THE WITNESS: Yes.

THE COURT: Then you said the amount left after the process would be in the order of several parts per trillion. I forget how many parts.

THE WITNESS: Roughly ten.

THE COURT: Ten parts per trillion. So my question is what percentage of the starting amount is ten parts per trillion.

THE WITNESS: The percentage will be on the order of a part per billion, which is .000000001 percent.

THE COURT: Okay. I think that answers the question.

Q. Maybe for the rest of us, Dr. Hass, is that less than one percent?

A. Certainly.

Q. Is it less than a tenth of a percent?

A. Certainly.

Q. Is it less than a hundredth of a percent?

A. Yes.

THE COURT: I think he's answered the question.

a sponge the way it's -- start out with something solid and have all kinds of holes going out through it is what happens as the particles are made into activated carbon.

So that the edges of the material become exposed through the activation process. In fact, it's not at all unlike the process that was described earlier for collecting samples where they drill a hole in the ground and then take material off the edges at different depths.

Q. Once TCDD is bound to activated charcoal, is it -- how hard is it to remove it?

A. The answer depends on the binding. The material that's on the surface can be removed as long as you use a solvent that is more strongly bound to the charcoal than the dioxin itself, or one that's as comparable binding affinity. Because the way equilibrium works, there will be a low concentration of dioxin in the solvent solution so that there will be a tendency for it to leave and come back, leave and come back, but because there's not very much there, if there's a solvent that can replace the dioxin on the surface it will tend to just leave. The material that's down between the layers will be much, much more difficult to get out.

Q. And is TCDD easily removed from activated charcoal?
A. No.
Q. Have you prepared some slides to illustrate that?
A. I have.
MR. PIROZZOLO: May counsel be shown Slide 86.
MR. HARDING: No problem.
MR. PIROZZOLO: May that be shown to the jury?
THE COURT: Yes.
A. In the Centredale Manor samples, there were two solvents used for extraction. One was hexane, so I'll discuss that first.
Q. Before you go on, Dr. Hass, when you say two solvents were used, who used them?
A. The what is now known as Severn Trent Laboratories now known as Quintera.
Q. Was that an EPA contractor?
A. It was done under EPA contract. They were contracted to by an engineering firm who, in turn, were working on an EPA contract.
Q. And what do you mean by a solvent?
A. A solvent is something that you use to dissolve something.
Q. And as with respect to dioxin, can you explain the relationship between hexane as a solvent and dioxin?

The first set of conditions they attempted was under acetic conditions, and they reported no yield of any mutual compounds which would have included the hexachloroxanthene they were attempting to synthesize.

They next reacted the hexachlorophene under basic conditions for two hours, and then put the reaction mixture in the refrigerator overnight to crystalize it, and after 28 hours total elapsed time, recovered 77 percent of the original hexachlorophene having reacted as hexachloroxanthene or to hexachloroxanthene.

So the summary is, under acetic conditions, there's no measurable yield. Under basic conditions, there's a very high yield.

Q. And in what way does that lead you to conclude that it was impossible for hexachloroxanthene to be made in the Metro-Atlantic hexachlorophene process?

A. There was no occasion in which the hexachlorophene at the Metro-Atlantic facility was under basic conditions. The entire process was acetic.

MR. PIROZZOLO: Thank you. Could I have just one more moment, your Honor.

Q. One other question, Dr. Hass. Was hexachlorophene orange?

A. No.

Q. What color was hexachlorophene?
A. It's a white crystalline solid.
Q. And was trichlorophenol orange?
A. No.
Q. What color is that?
A. The trichlorophenol itself is a white crystalline solid. The material delivered to Metro-Atlantic was a solution in water.
Q. And what color would that be?
A. White or clear.
Q. Do you know what Treflan looks like?
A. Treflan?
Q. Yes.
A. Treflan is an orange crystalline solid.
Q. Thank you. And does Treflan contain TCDD?
A. No.
MR. PIROZZOLO: Thank you. No further questions.
THE COURT: All right. Thank you.
MR. PIROZZOLO: Your Honor, I would offer the slides we used, and perhaps we could organize them overnight, the paper copies of them.
THE COURT: Is there any objection?
MR. O'CONNOR: I'd like to see them as reorganized, your Honor.

# EXHIBIT 12

All of the testimony at pages 17, 31-33, and 42-43 of this deposition was admitted at trial

UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

---oOo---

| | |
|---|---|
| EMHART INDUSTRIES, INC., Plaintiff, vs. HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, LIBERTY MUTUAL INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICA INSURANCE COMPANY, and UNITED STATES FIRE INSURANCE COMPANY, Defendants. | Civil Action No. 02-053 S |

RECEIVED
MAR -1 2004
Willcox, Pirozzolo & McCarthy

DEPOSITION OF THOMAS F. CLEARY

Monday, February 10, 2003

Mendocino, California

Reported by:
LUEL J. SIMSON, CSR No. 4720

SIMSON REPORTING
Certified Shorthand Reporters
9546 Ashley Drive
Windsor, California 95492
(707) 838-6724

BE IT REMEMBERED THAT, pursuant to Notice, on Monday, February 10, 2003, commencing at the hour of 9:03 a.m., thereof, at the Mendocino Hotel, 45080 Main Street, Mendocino, California, before me, LUEL J. SIMSON, CSR No. 4720, State of California, personally appeared:

THOMAS F. CLEARY,

called as a witness by the Plaintiff; who, having been duly sworn by me, was thereupon examined and testified as is hereinafter set forth:

---oOo---

A P P E A R A N C E S

For the Plaintiff:

Law Offices of WILLCOX, PIROZZOLO & McCARTHY
50 Federal Street
Boston, Massachusetts 02110

By: RICHARD L. BINDER, Esq.

For the Defendant, LIBERTY MUTUAL INSURANCE COMPANY:

Law Offices of HOLLAND & KNIGHT
50 California Street, Suite 2800
San Francisco, California 94111

By: H. LARRY ELAM, III, Esq.

/////
/////



A P P E A R A N C E S--(Cont'd.)

For the Defendant, NORTH RIVER INSURANCE COMPANY:

Law Offices of LUCE, FORWARD, HAMILTON & SCRIPPS
600 West Broadway, Suite 2600
San Diego, California 92101

By: ANDREW R. McCLOSKEY, Esq.

For the Defendant, ONEBEACON AMERICA INSURANCE COMPANY:

Law Offices of HERMES, NETBURN, O'CONNOR & SPEARING
111 Devonshire Street
Boston, Massachusetts 02109

By: KEVIN J. O'CONNOR, Esq.
(Via Telephone)

For the Witness:

JOHN C. PORTER, Esq.
45351 South Caspar Drive
Mendocino, California 95460

Also Present:

Law Offices of SWIDLER, BERLIN, SHEREFF & FRIEDMAN
3000 K Street, N.W.
Suite 300
Washington, D.C. 20007

By: LAURA A. FORD, Esq.



I N D E X


| WITNESS: | PAGE |
|---|---|
| THOMAS F. CLEARY | |
| Examination by Mr. Binder | 7 |
| Examination by Mr. Elam | 83 |
| Examination by Mr. O'Connor | 84 |
| Examination by Mr. McCloskey | 89 |
| Further Examination by Mr. Binder | 96 |




E X H I B I T S


| PLAINTIFF'S: | | PAGE |
|---|---|---|
| 1 | Five-page United States Patent Office Letters Patent No. 2,814,597 dated November 26, 1957 | 20 |
| 2 | Two-page United States Patent Office Letters Patent No. 3,456,020 dated July 15, 1969 | 23 |
| 3 | Seven pages of microfilmed newspaper article dated May 30, 1965 from the Providence Sunday Journal Business Weekly | 38 |
| 4 | Two-page enlargement of newspaper article marked as Plaintiff's Exhibit No. 3 | 38 |
| 5 | Photocopy of photograph from newspaper article with the caption, "Upper level of new hexachlorophene plant at Metro-Atlantic, Inc., Centredale..." | 38 |
| 6 | Photocopy of photograph from newspaper article with the caption, "Large perforate centrifuge located in new plant..." | 38 |
| 7 | Chemical diagram drawn by the witness | 47 |
| 8 | Two-page document entitled, "ZEP Manufacture" dated June 8, 1964 | 48 |
| 9 | One-page handwritten letter, undated, with the caption, "Vinny" | 68 |
| 10 | One-page handwritten letter, undated, with the caption, "Dear Vinny" | 68 |
| 11 | Three-page Affidavit of Thomas F. Cleary dated November 8, 2001 | 68 |

I could develop chemical processes, I could go back to the pharmaceutical companies for -- with whom I was acquainted, tell them that I was -- if they needed production in this particular item, that I was prepared to help in supplying such an item. And this happened many times.
Q. Okay. From your beginning as the chief technical person, did you also obtain other positions at Centerchem?
A. Yes. I was CEO of the company when I left.
Q. Okay. So that would have been in 197- --
A. '78.
Q. Okay. And for how long were you CEO of the company?
A. About two years.
Q. About 1976 to 1978?
A. Something like that.
Q. And did your duties at Centerchem include calling on small chemical companies?
A. Oh, yes; I still did the same kind of work.
Q. And did that include working out brokerage arrangements where you arranged for a small chemical company to make a product to meet the needs of another company?
A. Yes.
Q. In the course of that employment, did you have



occasion to come into contact with a company called Metro-Atlantic, Inc.?
A. Yes, I did. And the story of that is very simple. As a matter of fact, it happened as far back as 1960 when I was first employed there.
The company had been selling a chemical which is used in the textile business as what is known as an antibleeding agent, which means that when a fabric is dyed, the application of the substance beforehand prevents the dye from running over into the intended -- beyond the intended pattern.
This chemical was made in New Jersey, in Sayreville, New Jersey, by a small company who went out of business, and it was then my obligation, more or less, to find another source for it. Because we had been selling it for them, particularly to a firm who are still in that general business of dye stuff and dye stuff related chemicals, a company called Crompton and Knowles, which was located in Paterson, New Jersey. And we were a reseller of this substance, which is called meta-nitrobenzene sulfonate -- sodium sulfonate.
So I had to look for another source to keep our customer attached to us, and that is how I came to look up Metro-Atlantic and become acquainted with Joseph Buonanno. He was quite happy to supply our resale requirements of



this chemical, so the business continued.
Q. Okay.
A. And as the business continued, I became more and more acquainted and friendly with Joseph Buonanno, which led to our discussion of his being able to do some of this custom manufacturing in which I was already heavily involved.
Q. Okay. Could I just ask you a couple more detailed questions about this?
A. Sure.
Q. Would I be correct in understanding that you -- you originally contacted Metro-Atlantic to determine if they could manufacture this antibleeding agent for --
A. They were already manufacturing it. They were already manufacturing it.
Q. And they became another source of supply --
A. That's right.
Q. -- for your customer?
A. They were glad to have another customer which at that time was unknown to them. In other words, they were not selling it directly to this customer, this customer was not known to them. They were glad to have us as an intermediary to this customer, which was Crompton and Knowles.
Q. And as a broker in that arrangement, your company



received some type of a commission?
A. Yes, right.
Q. I guess I forgot to ask this earlier, but are you a named inventor on any United States patents?
A. Oh, many, yes.
Q. And in the '50s and '60s, were you familiar with anti -- products known as antigermicidal soaps?
A. Oh, yes, yeah.
Q. Could you explain your familiarity with those products.
A. The fact is that I used them. One was Dial soap, which was the largest -- well, there were two principal users of such materials. One was Dial, which is still using one which is not hexachlorophene. The other was pHisoHex, which was manufactured by Winthrop Sterling [sic]. Between those two companies, they probably consumed over 90 percent of all of the hexachlorophene that was manufactured.
Q. I'm sorry; did both Dial and pHisoHex use hexachlorophene?
A. Yes. Dial contained 2 percent of it on a weight basis; and I don't know how much was contained in pHisoHex, but it was at least 2 percent.
Q. Okay. And who was the manufacturer of Dial at that period?

being observed there.
Q. When you say "dioxin," do you mean Agent Orange?
A. Well, Agent Orange was a mixture of 2,4,5-trichlorophenoxy acetic acid and 2,4-dichlorophenoxy acetic acid, which were made, respectively, from crude trichlorophenol, such as the material which came out of reactors making this, and dichlorophenol, which was made in a slightly less -- less troublesome way.
But that's what -- Agent Orange was basically 2,4,5-trichlorophenoxy acid made from impure trichlorophenol. All of which, as we now know, contained dioxin.
Q. So it was not until sometime in the '70s or later that it was identified as dioxin?
A. If you will look at a piece of literature which I lent to you -- lent to you or gave to you from the Merck Index, you will find a chronology of toxicological studies that were made on dioxin during the '70s -- mainly from '73 onward -- which describes some of the toxicology of dioxin.
Q. Sure. I appreciate that.
And getting back to your patent, which is Exhibit 2, as I look at the first column, it describes certain advantages of your method of hexachlorophene over the prior -- if we look at Column 1, lines 49 through 69.

30

Is that correct?
A. Uh-huh.
Q. And was one of the objects of your patent to produce high purity hexachlorophene?
A. Yes, indeed.
Q. And why was that one of the objectives?
A. Well, to appeal to the customer, certainly, for one thing. For another, the specifications outlined at that time in the U.S. Pharmacopeia were quite loose, in our estimation, and they had been formulated mainly by Givaudan, to give themselves a break, I suppose.
But this substance was purchased by people like Sterling Winthrop on the basis of Sterling Winthrop's own specs, which were, at that time, as were most chemical specs, rather meager because of the absence of the kind of sophisticated analytical equipment that's available today. They involved mainly melting point, which is a highly significant property, color, odor, and not much else.
Q. Now, at some point in time, did you work with Metro-Atlantic to develop hexachlorophene made in accordance with your patent that's Exhibit 2?
A. Well, the history of that is that the first, what I call, custom jobs that was done at Metro-Atlantic was done for Eli Lilly & Company in connection with the project called -- or a product called Treflan, which was a

31

selective pre-emergent weed control substance. More or less the first of its kind that had been developed.
And at that particular time, I had a very close relationship with Eli Lilly. I had access to their technical people, which was unusual at the time, and I recognized that production as a very difficult chemical job and one which, let us say, was not easily developed by the rank and file of other persons, of whom there were many, who were seeking that kind of work. And I developed a key reaction in that process before seriously approaching Lilly with the prospect of doing that work.
Q. Let's put aside Lilly for a moment. And after you worked with Metro-Atlantic on Lilly, did you then work with Metro-Atlantic to develop the kind of hexachlorophene as described in your patent that's Exhibit 2?
A. Yes; I already had that process ready.
Q. And when you worked with Metro-Atlantic on that process, were you acting as a broker to obtain -- with a customer to whom the product could be provided?
A. Yes.
Q. And who was that customer?
A. I had, myself, done a commercial study of that product before discussing it with Metro-Atlantic. I already had some relationships of various kinds with Sterling Winthrop in Rensselaer. I knew their purchasing

32

agent well. I discussed with him the possible availability of another source of supply, about which he was extremely enthusiastic. He was ready to take every pound we made and to -- sort of to say to Givaudan, "Hey! You're not the boss anymore." I mean, monopolists always make enemies and Givaudan made a few.
Q. So your process would allow Sterling Winthrop to purchase hexachlorophene from Metro-Atlantic rather than Givaudan?
A. Well, along with Givaudan. Metro-Atlantic couldn't supply enough to meet Sterling Winthrop's needs. They were probably the largest user in the country.
Q. When you spoke with the purchasing agent at Sterling Winthrop about the purchase of hexachlorophene from Metro-Atlantic, did you obtain the Sterling Winthrop specification that you mentioned earlier?
A. Oh, yes.
Q. And did you provide that to Metro-Atlantic?
A. Oh, yes.
Q. And at some point, did you have occasion to demonstrate the process that Metro-Atlantic was using for the hexachlorophene to Sterling Winthrop?
A. As a matter of fact, I did. Sterling Winthrop was exceedingly interested in this plant. As a matter of fact, they sent their vice-president of manufacturing down

33

in there before the filtration was done to neutralize the sulfuric acid. And, lo and behold, that worked.
And then that clear solution, which was almost colorless, was put into a crystallizing vessel, which was made, I believe, out of stainless steel, and it was cooled down slowly in order to get the desired size of crystals. And, finally, the product which had crystallized was filtered out in that centrifuge. I think the same one that was used to separate the purified trichlorophenol. After appropriate cleaning up, of course.
And then the hexachlorophene, which still had a little bit of solvent in it after centrifuging, was put in the dryer and the so-called mother liquor, which is the filtrate you get from crystals, was very easy to recover because perchloroethylene and water form what is known as a constant boiling mixture. And all you have to do is heat it up with water. And in constant boiling mixtures, the boiling point of each of the two constituents is lower than that of either of the substances alone. And it's possible to recover the solvent in full by distilling off this constant boiling mixture.
And, of course, some product remained dissolved in it, which is inevitable, which was rather impure, but we had a customer for the impure stuff, too. Which was Kalo Laboratories of Kansas City, who used it as a seed



disinfectant or as a pesticide against organisms that attack seeds.
Q. Okay.
A. So we recovered all of the trichlorophenol and all of the hexachlorophene.
Q. So the mechanism of recovering the crystal that is shown, say, in Exhibit 6, the crystal that was recovered, was that the hexachlorophene that was recovered in the centrifuge?
A. Yes.
Q. Does Exhibit 6 depict the process of using a centrifuge to recover crystal?
MR. PORTER: Six, I think, is this one.
THE WITNESS: Whatever it is, it was recovered in the centrifuge. That's for sure.
MR. BINDER: Q. At Metro-Atlantic, the crystal was recovered in the centrifuge.
A. Yes.
Q. And you mentioned that the pure hexachlorophene was developed by your process at Metro-Atlantic, that was sold to Sterling Winthrop?
A. Virtually all of it, yes.
Q. And it was a less pure by-product that was sold to Kalo?
A. Right. I would call it -- it's known in the



trade as the second crop.
Q. What do you mean by "second crop"?
A. Well, the first crop is the good stuff that you take out first, and the second crop is what's left over in the mother liquor.
Q. Okay. So rather than -- so you found some productive use to be made of the second crop.
A. We did.
Q. And it was important that the hexachlorophene that was sent to Sterling Winthrop be pure and meet the Sterling Winthrop specs?
A. That's right.
Q. And Kalo did not have such a rigorous spec?
A. They had no specs at all. They were glad to get anything that contained hexachlorophene.
Q. Now, at the time that Metro-Atlantic was manufacturing hexachlorophene using your process as described in your patent that's Exhibit 2, did you believe that that was a superior method of manufacturing hexachlorophene to any other known method?
A. Well, I thought it was different. Whether it was superior or not would be the judgment of the customer.
Q. But you viewed your -- the goal of your patent, which was Exhibit 2, was to develop a batter way of making hexachlorophene.



A. It was to develop a different way of making hexachlorophene.
Q. And, hopefully, a better one.
A. It was meeting specs.
Q. Meeting specs of someone like Sterling Winthrop?
A. That's right.
Q. Your patented method that Metro-Atlantic was using was better, at least in the sense that there was a two-stage reaction and you didn't have to worry about the problem of boiling over that you described.
A. It solved the balance of formaldehyde and trichlorophenol, which was vital to the quality of the product.
Q. And if I understand your patent correctly, your patent used one mole of trichlorophenol to one mole of -- excuse me. Let me strike that.
Yes. If I understand your patent correctly, your invention involved the use of one mole of formaldehyde and one mole of trichlorophenol; while the previous method used two moles of trichlorophenol to one mole of formaldehyde?
A. No, that's not quite how it worked.
Q. Okay. Could you correct me, then.
A. It used one mole of paraformaldehyde and one mole of trichlorophenol -- no. To start with, you had all of

# EXHIBIT 13

The testimony at pages 26, line 21 to page 27, line 8 of this deposition was admitted at trial

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

EMHART INDUSTRIES, INC., )
)
Plaintiff, )
)
vs. ) NO. 02-053-S
)
HOME INSURANCE COMPANY, )
INSURANCE COMPANY OF NORTH )
AMERICA, LIBERTY MUTUAL )
INSURANCE COMPANY, NORTH RIVER )
INSURANCE COMPANY, ONEBEACON )
AMERICA INSURANCE COMPANY, and )
UNITED STATES FIRE INSURANCE )
COMPANY, )
)
Defendants. )

Deposition of VINCENT BUONANNO taken before CHERYL F. GILMAN, C.S.R. and Notary Public, pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, at 131 South Dearborn Street, 30th Floor, Chicago, Illinois, commencing at 10:00 o'clock a.m. on the 25th day of March, A.D. 2003.

There were present at the taking of this deposition the following counsel:

WILLCOX, PIROZZOLO & McCARTHY by
MR. JAMES J. NICKLAUS
50 Federal Street
Boston, Massachusetts 02110
(617) 482-5470
on behalf of the Plaintiff;

HOLLAND & KNIGHT, LLP by
MS. ROBIN L. MAIN
One Financial Plaza
Suite 1800
Providence, Rhode Island 02903
(401) 751-8500
on behalf of the Defendant, Liberty Mutual Insurance Company;

LUCE, FORWARD, HAMILTON & SCRIPPS by
MR. IAN M. WALLACH
100 Park Avenue
32nd Floor
New York, New York 10017
(212) 715-3700
on behalf of the Defendants, North River Insurance Company and OneBeacon America Insurance Company;

HERMES, NETBURN, O'CONNOR & SPEARING by
MR. KEVIN J. O'CONNOR (via telephone)
111 Devonshire Street
Boston, Massachusetts 02109
(617) 728-0050
on behalf of the Defendant, OneBeacon America Insurance Company;



EDWARDS & ANGELL by
MS. ANNE MARIE CARNEY
2800 Financial Place
Providence, Rhode Island 02903
(401) 274-9200
on behalf of the Deponent.

ALSO PRESENT:
SWIDLER, BERLIN, SHEREFF, FRIEDMAN by
MS. LAURA A. FORD
3000 K Street, N.W.
Suite 300
Washington, D.C. 20007-5116
(202) 424-7861

* * * * * * * * * * *


| EXAMINATION BY | PAGE |
|---|---|
| Ms. Main | 5 |
| Mr. Wallach | 68 |
| Mr. O'Connor | 85 |
| Mr. Nicklaus | 88 |




EXHIBITS


| | |
|---|---|
| Buonanno Deposition Exhibit No. 1 | Page 22 |
| Buonanno Deposition Exhibit No. 2 | 32 |
| Buonanno Deposition Exhibit No. 3 | 36 |
| Buonanno Deposition Exhibit No. 4 | 37 |
| Buonanno Deposition Exhibit No. 5 | 38 |
| Buonanno Deposition Exhibit No. 6 | 40 |
| Buonanno Deposition Exhibit No. 7 | 45 |
| Buonanno Deposition Exhibit No. 8 | 45 |
| Buonanno Deposition Exhibit No. 9 | 63 |
| Buonanno Deposition Exhibit No. 10 | 66 |
| Buonanno Deposition Exhibit No. 11 | 74 |
| Buonanno Deposition Exhibit No. 12 | 76 |




VINCENT BUONANNO,
called as a witness herein, having been first duly sworn, was examined upon oral interrogatories and testified as follows:

EXAMINATION
by Ms. Main:

Q Please state your full name for the record.
A **Vincent Joseph Buonanno.**
Q Mr. Buonanno, again my name is Robin Main, and I represent a defendant in a case brought by Emhart Industries. The name of my client is Liberty Mutual.
And with me today are some of my co-defendant counsel, some of whom -- well, these two gentlemen here also represent other insurance companies.
Also on the phone is another co-defendant --
A **Emhart -- All Emhart insureds?**
Q Allegedly.
A **Allegedly.**
Q Yes, allegedly.
So with that, let me ask you, have you

1890. There was always a mill on the river, and there was a barn down here, so this had been done in addition to the barn, but I don't know the details of it.

Q Mr. Buonanno, if we continue westward from that barn building, there is another building on-site that is along the Woonasquatucket River. Do you see that, sir?

A Yes, I do.

Q Was that building part of New England Container?

A It was not.

Q Was it part of Metro Atlantic?

A It was part of special processing at Metro Atlantic.

Q Do you know what kind of special processing Metro Atlantic put on that building?

A I just put a 3 on that building.

Q Thanks. I was going to ask you to do that. Thanks.

A That building I believe is where a few experimental products were made. The most memorable of which was hexachlorophene.

Q Why is hexachlorophene memorable?



A Because Metro Atlantic had never made it before, and it was something that was a completely non-textile chemical.

And I only know that because there were no drums connected with it. It didn't consume drums and it didn't generate drums. So we had no relationship with it, but it was over there across the way.

Q Okay. Do you know when hexachlor -- Strike that.

Did you say that hexachlorophene was manufactured in that building?

A It was.

Q Do you know when that occurred?

A I -- I think that it was about 1965.

Q You mentioned a few minutes ago that the fortunes of Metro Atlantic in the 1960s started to wane as the textile industry moved south.

A Right.

Q Was the advent of manufacturing in that building we've marked as 3 coincident with that time period of the textile industry moving south from Rhode Island to the Carolinas?

A I don't know their company history, and I



was never privy to what was going on with their strategy. But I would guess that they were looking for new products to replace their old operations of the soaps and other products that they made before the new products.

Q The building that you've marked as No. 3, do you know when that was constructed?

A I don't.

Q Was it newer than the mill building that you --

A Yes.

Q Okay.

A It was of recent construction. I would say purpose built for special processing, it must have been in the -- I can't remember if it was there when I was summer help or if it was built sometime in that period, 1960. It's a guess.

Q Do you know what other products were manufactured in Building 3 besides the hexachlorophene?

A I don't, but I know that others were tried.

Q The hexachlorophene you stated did not consume any barrels.



Do you know how the hexachlorophene was stored?

A I don't know. I know that it was produced in reactors, which are giant tanks, which are tall -- tall tanks.

And I know that the building was very vertical, so it was noticeable because it wasn't just a low shrunk building like these processing things. It was a tall building with chemicals inside, and I think made of rather temporary corrugated materials, as I remember it.

Q Do you know if there were any storage tanks associated with the hexachlorophene?

A I don't know what was storage and what was processing. I don't remember and I never knew it. I never knew.

Q Did you ever notice aboveground storage tanks around Building 3?

A I think there was an outside tank.

Q Do you know the size?

A I couldn't guess.

Q Do you know if there are any underground storage tanks associated Building 3?

A I don't know.

# EXHIBIT 14

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

COPY

| | | |
|---|---|---|
| * * * * * * * * * * * * | * | CIVIL ACTION |
| EMHART INDUSTRIES | * | NO. 02-053S |
| | * | |
| VS. | * | OCTOBER 6, 2006 |
| | * | |
| HOME INSURANCE CO. | * | PROVIDENCE, RI |
| * * * * * * * * * * * * | * | |

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH
DISTRICT JUDGE
(EXCERPT OF TESTIMONY OF DR. FRANKLIN E. WOODARD)

APPEARANCES:

FOR THE PLAINTIFF:
JACK PIROZZOLO, ESQ. and
RICHARD L. BINDER, ESQ.
Foley & Hoag LLP
Seaport World Trade Center West
155 Seaport Blvd.
Boston, MA 02110-2600
(617) 832-1250

FOR THE DEFENDANT North River:
JOHN T. HARDING, ESQ.
Morrison, Mahoney, LLP
250 Summer Street
Boston, MA 02210
(617) 439-7558

MARK T. NUGENT, ESQ. and
MICHAEL T. FARLEY, ESQ.
Morrison, Mahoney, LLP
121 South Main Street
Suite 600
Providence, RI 02903
(401) 331-4660

FOR THE DEFENDANT Century Indemnity:
LAWRENCE A. NATHANSON, ESQ.
Siegal, Napierkowski & Park
533 Fellowship Road
Suite 120
Mt. Laurel, NJ 08054
(856) 380-8900

APPEARANCES: (Continued)

FOR THE DEFENDANT
Century Indemnity:

JAMES P. McCORMACK, ESQ.
McKenna & McCormack
128 Dorrance Street
Suite 330
Providence, RI 02903
(401) 831-2970

FOR THE DEFENDANT
OneBeacon America:

KEVIN J. O'CONNOR, ESQ.
and PETER NETBURN, ESQ.
Hermes, Netburn, O'Connor & Spearing, P.C.
265 Franklin St.
7th Floor
Boston, MA 02110
(617) 728-0050

JAMES T. MURPHY, ESQ.
and KELLY N. MICHELS, ATTY.
Hanson Curran, LLP
146 Westminster Street
Providence, RI 02903
(401) 421-2154

Court Reporter:

Anne M. Clayton, RPR
One Exchange Terrace
Providence, RI 02903

Proceeding reported and produced by computer-aided stenography

# INDEX


| WITNESS | | PAGE |
|---|---|---|
| FRANKLIN E. WOODARD | | |
| Continuation of Direct Examination by Mr. Harding: | | 4 |
| Cross-Examination by Mr. Pirozzolo: | | 84 |

| DEFENDANTS EXHIBITS | ID | FULL |
|---|---|---|
| 306 - | | 83 |
| 306A - | 84 | |
| 588 - | | 21 |
| 589 - | | 33 |
| 590 - | | 49 |

MR. HARDING: Can we just for a moment zoom back out and show the entirety of this document.

Q. You testified earlier that this shows a Phase 1?

A. Yes.

Q. Does this document show a Phase 2?

A. No.

Q. Were there any documents produced by Mr. Cleary from this time period that showed a Phase 2?

A. No.

Q. Okay. Now, in connection to explaining to the jury your understanding of the purification process, would it be helpful for you to draw a picture or a diagram?

A. Yes.

Q. Okay. Would you like to use either the poster board or flip chart and Sharpie markers to do that?

A. Please.

MR. HARDING: I believe the clerk has a hand-mike you can use for this process.

Can I just inquire as to whether all the jurors have an adequate view of the easel, or do we need to move it closer?

THE COURT: Why don't you get started. If you need to move it closer, you may.

Q. Dr. Woodard, using the easel or poster board,

could you please explain and draw for the jury your understanding of the purification process of the manufacture of hexachlorophene at the Metro-Atlantic facility.

A. Yes. What I'm going to do is draw what is called normally a block diagram that explains an industrial process.

I've already explained that the crude trichlorophenol, which was produced at Diamond Alkali in New Jersey, has a lot of material in it that is not wanted. One of those materials is dioxin.

Now, dioxin is particularly non-soluble. It's extremely non-soluble in water. And so, if there's any solid particle in the solution that contains dioxin, a dioxin will absorb, stick onto that particle, no matter what the particle is because it doesn't like to be in water.

The scientific explanation of that is simple, it's the second law of thermodynamics. But the non-scientific explanation is that dioxin doesn't like to be in water and water doesn't like dioxin to be in it. So if there's any solid particles around, that's where the dioxin is going to go.

Now, another principle of chemical manufacture --

MR. PIROZZOLO: Objection, your Honor.

THE COURT: I understand. I'm going to allow some latitude here to explain what he's going to diagram. Go ahead.

A. Another principle, this is very important in this case here --

MR. PIROZZOLO: Your Honor --

THE COURT: I understand your objection. Don't comment on the evidence. The jury is to disregard the comment with respect to what's important. Go ahead.

A. Let me go ahead and go through the steps, and then I'll have something to say about the steps later.

MR. PIROZZOLO: Your Honor, may we approach the bench?

THE COURT: No. He's diagramming the process. That's what he was asked to do.

A. Okay. The first step involves crude 2,4,5-trichlorophenol being purified. It is pumped into a steel-jacketed kettle for temperature control, and then added to that kettle is caustic. It is 5,280 pounds of 30 percent caustic. I'll just say caustic.

Q. And your reference to caustic is from Plaintiff's 193; is that right?

A. Yes. What this does is it raises the pH in here to a point where trichlorophenol species other than

2,4,5, for instance, 2,3,5 or 2,3,6, those materials, those chemicals will precipitate out. They'll come out of solution. But the 2,4,5-TCP, which they're trying to purify, will stay in solution at this pH and the temperature that's controlled by the jacket on the kettle.

So then, after the reaction is complete, this mixture of solids is put in a separator, which could be a centrifuge. A centrifuge is something that spins around fast and heavy things go to the outside and the lighter things stay inside. The solids can be separated that way.

So the solids, which are the unwanted species of 2,4,5-TCP and some other things like impure -- well, contaminants that were in the original tetrachlorobenzene that was used to make the TCP at Diamond Alkali, some of those things come out as solids and those go to waste, wherever the waste goes. And then the liquid that's left, which still contains the 2,4,5-TCP and some other things, that goes to another reactor, which could be a different kettle or it could be put right back into the same original kettle.

So I'll draw that one again. The liquid is put into another reactor. Might actually be the same vessel. Temperature-controlled. And now, more caustic

is put in.

This amount of caustic causes the 2,4,5, the material they're trying to purify to precipitate.

MR. PIROZZOLO: Your Honor, there's no question.

THE COURT: I'm sorry.

MR. PIROZZOLO: The witness is making --

THE COURT: No. The witness is diagramming the process. Don't interrupt him.

A. Well, I should have gone to a centrifuge before that. Once the 2,4,5-TCP is precipitated out in much more pure form than it was when it came from Diamond Alkali -- I say centrifuge. It's a separator of some kind. Now, the solids come out, and those go to further processing, and the liquid goes to waste.

Okay. So now we've got TCP, trichlorophenol in quite pure form but not pure enough.

Q. Dr. Woodard, would you mind just maybe in the top right-hand corner put a number 2 on there just so that we know that this is the second page of your diagram. Thank you.

Could you please continue to explain the process using diagrams.

A. Yes. Okay. So the solids now are put into a reactor, and now acid is added. And what the acid does is it dissolves, I should say a certain amount of acid.

And in fact, the first chart of acid is 450 pounds of sulfuric acid. What that does is it dissolves some of the TCP and other impurities that are not 2,4,5-TCP.

So, again, you have to have a separator, and the solids go to waste -- no, excuse me. The solids are what we want. It's the purified TCP. The liquid goes to waste.

Okay. Now, the solids are put into another kettle and more acid is added. In this case, 370 pounds of 66 degree -- that is the strength of acid. And what that does is that dissolves the 2,4,5-TCP. And now you have 2,4,5-TCP very pure dissolved in an acid solution.

Now, you can do one of two things. You can either add the nuchar to this acid solution to take the color out, or you can -- let's see. This is an alternate. Or you can add the perchloroethylene, we'll call it PCE. And what happens there is that the PCE does not mix with the acid, forms another layer, but the 2,4,5-TCP will migrate from the acid layer into the perchloroethylene. Then that can be separated out and nuchar can be put in there to take the color out.

What Cleary explains in his deposition is that these chemical processes always produce some amount of color.

MR. PIROZZOLO: Objection, your Honor.

THE COURT: Overruled.

Q. Go ahead.

A. Okay. Two critical questions now. One, where did the dioxin go --

THE COURT: Let me just -- right now you've been describing the -- diagramming the process. He can ask another question.

Q. Dr. Woodard, just so we're clear, have you finished drawing your diagram of the process?

A. What I've finished is drawing the diagram of the process of purifying trichlorophenol.

Q. Okay. So these, I believe you're on -- are you up to number four or just on three? How many charts are we up to?

A. There are four.

Q. The four charts that you've drawn are meant to illustrate just the purification process as a component of the hex manufacturing; is that right?

A. Yes. Now, I haven't quite finished.

Q. Just with the purification step?

A. Right.

Q. Okay. Could you draw what you need to to complete just the purification step of the hexachlorophene manufacturing process.

A. Yes. The next step, once the nuchar has been added to either this one or this one, the next step is to put this through a filter, a plate and frame filter to take out the nuchar and whatever is absorbed to it.

And what comes, the product of the filter when the nuchar is taken away is, in this case, trichlorophenol dissolved in PCE, perchloroethylene. In this case, what you've got is 2,4,5-trichlorophenol dissolved in acid solution.

Now, you take this, the first step in making hexachlorophene from trichlorophenol is to dissolve the hexachlorophene -- dissolve the trichlorophenol in perchloroethylene, PCE.

If you go this way, you've already got that, and you can go right on to making hexachlorophene. If you do it this way, you've got to go back and extract it, extract this solution with PCE, perchloroethylene.

In both cases, you get waste, which has to be disposed of.

Q. Have you now completed your diagram of the purification process?

A. I have.

Q. Okay. Now, using the diagram that you just prepared, could you tell the jury, first, do you have an opinion as to whether there's a point in the process

when dioxin comes out of the process?
A. Yes.
Q. Okay. Could you show on your diagram where in the process the dioxin comes out?
A. Yes. The very first step in the purification process is to add caustic to the liquid material that comes from Diamond Alkali and cause a precipitation of materials, and those -- precipitation means convert from dissolved state to solid state. So any dioxin, and there always was dioxin back the way they made this stuff, the dioxin would then absorb to the solids and would then be -- would be right there.
Q. So what you've labeled as solids with an arrow pointing to waste, that's the point in the process where dioxin comes out?
A. That is the point, yes.
Q. Could you just circle that, the solids and waste.
Now, do you have an opinion as to whether 100 percent of the dioxin comes out of the process at that point?
A. Dioxin is so insoluble and --
THE COURT: First of all, you have to say whether you have an opinion.
Q. Do you have an opinion?
A. Yes.

Q. What's your opinion on that issue?

MR. PIROZZOLO: Objection, your Honor. Foundation.

THE COURT: Overruled.

A. My opinion is that almost all of the dioxin would be absorbed there.

Q. Okay. You refer on your chart to the point in time where the dioxin comes out as you refer to it as a solid or waste. Do you have an understanding as to what that solid or waste looks like?

A. Yes, I do. It would look like oatmeal.

Q. Do you have an understanding as to what color it would be?

A. It would be brownish to black.

Q. And what's your understanding of what it would look like based on?

A. My understanding is based on, number one, my experience; and number two, the description by Mr. Cleary that this crude TCP was brownish in color. And that brown color would color these solids.

MR. HARDING: I'd move for the admission of the diagrams as the defendants' next numbered exhibit.

THE COURT: Is there an objection?

MR. PIROZZOLO: Yes, your Honor.

THE COURT: All right. Overruled. This will be

590. The collection of those four boards, which are the diagram, will be Defendants's 590.

(Defendants' Exhibit 590 marked full.)

Q. Dr. Woodard, looking at that same first page of what's now been received into evidence as Defendants' Exhibit 590, could you tell me, does your diagram indicate whether or not nuchar or charcoal was used before the step at which the dioxin comes out?

A. I can tell you, yes.

Q. You can tell us?

A. Yes.

Q. And what's your opinion as to whether or not nuchar or charcoal was used in the part of the purification process before the dioxin comes out?

MR. PIROZZOLO: Objection. Foundation.

THE COURT: Overruled.

A. It would not be -- it would not make any sense to add the nuchar here, because these other materials that precipitate out and become solids would stick to the nuchar and use it up. It would be very, very unefficient.

THE COURT: Just a second. I think you're getting ahead of the last question. The last question was whether or not nuchar was added as part of that purification process before the dioxin comes out. Just

answer that question, not the why question but --
Q. In your opinion, was nuchar or charcoal added to the initial purification step before the dioxin comes out?
MR. PIROZZOLO: Objection. Foundation and not in Dr. Woodard's report.
THE COURT: Overruled.
A. It is my opinion that it would not be added in the first step.
Q. Why is that your opinion?
MR. PIROZZOLO: Objection. Foundation.
THE COURT: Overruled.
A. That's my opinion because my experience, and I have a lot of experience with activated carbon, tells me that it would be a waste of that very expensive material, relatively expensive material to use it here because it would be used up by other things, other than the color, which is its primary purpose. Its primary purpose is to remove color.
Q. In the materials you reviewed of Mr. Cleary's, his deposition and the other documents, did you see any indication that Mr. Cleary indicated that the nuchar would be used in that first part of the purification process?
A. The indication -- he doesn't speak to that, but

the indication is that it is --

MR. PIROZZOLO: Per your Honor's judgment, Mr. Cleary doesn't speak to --

THE COURT: Overruled.

Q. You may continue your answer, Dr. Woodard.

A. On the list of ingredients, they are given pretty much in the order in which they're used, and nuchar appears down at the bottom.

Q. Based on your diagram, do you have an opinion that nuchar or charcoal, was, in fact, used at some point in the process?

A. Yes.

Q. Could you show on your diagram, for the benefit of the jury, where in the process the nuchar was used?

A. It's used in one of the last steps here or here in order to make this or this solution colorless so that the crystals that come out of it will be colorless.

Q. And you've marked on that diagram where nuchar would be used in your opinion, correct?

A. Yes.

Q. Now, the solid material that comes out that you described as being brownish, brownish/blackish and kind of an oatmeal consistency, to your knowledge, was that a waste product of the process?

A. Yes. That would be a waste product.

Q. Did it have any economic value?
A. No. Nobody wants it.
Q. Okay. You can sit down.
Now, you indicated that the hex manufacturing process you described produces this waste, correct?
A. Yes.
Q. Do you have an understanding as to whether that waste contained dioxin?
A. From the first step?
Q. From the first step.
A. Yes. Yes. I do.
Q. And what's your understanding?
A. It is my understanding that that's where almost all the dioxin would end up, would be in that first waste material.
Q. Do you have an understanding as to what type of dioxin was in that material?
A. Yes.
Q. And what's your understanding as to what type of dioxin was in that material?
A. It would be the 2,3,7,8 dioxin that is the primary amount that's created when crude trichlorophenol is made by the method that Diamond Alkali used.
Q. In the course of your work on this case, have you reviewed the available information concerning the

# EXHIBIT 15

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

COPY

| | |
|---|---|
| * * * * * * * * * * * * | * CIVIL ACTION |
| EMHART INDUSTRIES | * NO. 02-053S |
| | * |
| VS. | * OCTOBER 13, 2006 |
| | * |
| HOME INSURANCE CO. | * PROVIDENCE, RI |
| * * * * * * * * * * * * | * |

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH
DISTRICT JUDGE
(REBUTTAL TESTIMONY OF DR. JAMES ROBERT HASS)

APPEARANCES:

FOR THE PLAINTIFF:
JACK PIROZZOLO, ESQ. and
RICHARD L. BINDER, ESQ.
Foley & Hoag LLP
Seaport World Trade Center West
155 Seaport Blvd.
Boston, MA 02110-2600
(617) 832-1250

FOR THE DEFENDANT North River:
JOHN T. HARDING, ESQ.
Morrison, Mahoney, LLP
250 Summer Street
Boston, MA 02210
(617) 439-7558

MARK T. NUGENT, ESQ. and
MICHAEL T. FARLEY, ESQ.
Morrison, Mahoney, LLP
121 South Main Street
Suite 600
Providence, RI 02903
(401) 331-4660

FOR THE DEFENDANT Century Indemnity:
LAWRENCE A. NATHANSON, ESQ.
Siegal, Napierkowski & Park
533 Fellowship Road
Suite 120
Mt. Laurel, NJ 08054
(856) 380-8900

APPEARANCES: (Continued)

FOR THE DEFENDANT
Century Indemnity:

JAMES P. McCORMACK, ESQ.
McKenna & McCormack
128 Dorrance Street
Suite 330
Providence, RI 02903
(401) 831-2970

FOR THE DEFENDANT
OneBeacon America:

KEVIN J. O'CONNOR, ESQ.
and PETER NETBURN, ESQ.
Hermes, Netburn, O'Connor &
Spearing, P.C.
265 Franklin St.
7th Floor
Boston, MA 02110
(617) 728-0050

JAMES T. MURPHY, ESQ.
and KELLY N. MICHELS, ATTY.
Hanson Curran, LLP
146 Westminster Street
Providence, RI 02903
(401) 421-2154

Court Reporter:

Anne M. Clayton, RPR
One Exchange Terrace
Providence, RI 02903

Proceeding reported and produced by computer-aided stenography

# I N D E X


| WITNESS | PAGE |
|---|---|
| JAMES RONALD HASS | |
| Direct Examination by Mr. Pirozzolo: | 4 |
| Cross-Examination by Mr. Harding: | 23 |
| Redirect Examination by Mr. Pirozzolo: | 36 |
| Recross-Examination by Mr. Harding: | 54 |

| PLAINTIFF'S EXHIBITS | | |
|---|---|---|
| 249 | - | 14 |
| 250 | - | 21 |
| 251 | - | 21 |

Q. And do you have an understanding of that which Dr. Woodard described?
A. Yes.
Q. Do you have an opinion regarding whether that process as Dr. Woodard described is a process that was used at Metro-Atlantic?
A. Yes.
Q. And what is that opinion?
A. My opinion is that the process as described by Dr. Woodard could not have been used at Metro-Atlantic, because it's chemically impossible.
Q. Would you explain your answer.
MR. PIROZZOLO: We've prepared a copy of Dr. Woodard's diagram. With the Court's permission may Dr. Hass step down and use the diagram to explain his testimony?
THE COURT: Yes.
MR. HARDING: Your Honor, could I also ask permission for Dr. Woodard to come forward so that he can simply observe whatever is being asked.
THE COURT: Sure. Right over there. Go ahead.
A. As the process was described by Dr. Woodard, the crude trichlorophenol arrived at the Metro-Atlantic plant as a solution and caustic. That solution was then, essentially, diluted with further caustic. As he

testified, there would have been a separation in which solvents would have precipitated out of that solution along with it carrying the dioxins. That, in fact, would not have occurred.

If you start with a caustic solution and add more caustic to it, that's not going to cause anything that was in it to precipitate. So, in fact, the liquid that arrived at this point would have still had everything in it that was in the solution that came in in the first place.

Q. Can I ask you to mark what would be in the liquid if the process that Dr. Woodard described were applied?

A. Yes.

THE COURT: Do you have a marker?

THE WITNESS: Yes. What I don't have is enough arms, and I'm also left-handed, so I'll have to stand over here.

A. First, this would not have occurred. And what you would have is the 2,4,5-TCP plus all impurities.

Q. Where would the dioxin be?

A. It would still be here.

Q. Now, if you could go to the next step and explain your testimony on chart number 2. It's right here.

A. Oh, sorry. One thing I forgot to mention on the previous slide is most of the caustic was added at that

point. There was probably one-sixth as much added at the second point in the process. So we would have started with the liquid from the preceding step, added a little more caustic to it and then centrifuged it.

Again, we're simply adding more caustic to a solution that is already caustic so nothing would have changed. So there would have been nothing in this step. And the step labeled "waste" here would have contained 2,4,5-trichlorophenol plus the impurities, which would have included the TCDD.

Q. Where would the dioxin be in that step?

A. In this portion here with the liquid.

Q. Would you go on to the third step or at least the third diagram.

A. So the third diagram we can't do because these are not solids. So at this point you stop.

Q. There are no solids?

A. No, the solids would have been -- this is liquid, okay?

Q. What would happen if you put the liquid containing the TCP, and the dioxin, and other impurities in at that stage?

A. To this?

Q. In that, yes.

A. If you add I think it was several hundred pounds

side, I remove the acid. That causes the reaction to be driven from left to right and create more of the trichlorophenate ion. This is important in understanding the process that we've been describing because any time we have the trichlorophenol that we're talking about in an acid form, we will have driven that reaction to the left side, and we will have made the trichlorophenol into a form that is very insoluble.

If we drive it to the right side, as would happen when we add caustic, then we have changed the trichlorophenol to a form that will make it very soluble.

So in order to understand the process, you have to remember any time it's acid, it's on the left, it's insoluble. Any time it's caustic, it's on the right and it is soluble. Was that --

Q. And in the case of the trichlorophenol, could you explain what it means to be soluble in a caustic and insoluble in an acid in terms of what, again, for a layman, what it's going to look like?

A. Could I make a hand chalk?

MR. PIROZZOLO: May the witness step down to do that?

THE COURT: To do what?

THE WITNESS: I'd like to make a simple diagram,

# EXHIBIT 16

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

COPY

* * * * * * * * * * * * CIVIL ACTION
EMHART INDUSTRIES * NO. 02-053S
*
VS. * OCTOBER 12, 2006
*
HOME INSURANCE CO. * PROVIDENCE, RI
* * * * * * * * * * * *

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH
DISTRICT JUDGE
(EXCERPT OF DIRECT TESTIMONY OF DR. MICHAEL JAMES WADE)

APPEARANCES:

FOR THE PLAINTIFF: JACK PIROZZOLO, ESQ. and
RICHARD L. BINDER, ESQ.
Foley & Hoag LLP
Seaport World Trade Center West
155 Seaport Blvd.
Boston, MA 02110-2600
(617) 832-1250

FOR THE DEFENDANT
North River: JOHN T. HARDING, ESQ.
Morrison, Mahoney, LLP
250 Summer Street
Boston, MA 02210
(617) 439-7558

MARK T. NUGENT, ESQ. and
MICHAEL T. FARLEY, ESQ.
Morrison, Mahoney, LLP
121 South Main Street
Suite 600
Providence, RI 02903
(401) 331-4660

FOR THE DEFENDANT
Century Indemnity: LAWRENCE A. NATHANSON, ESQ.
Siegal, Napierkowski & Park
533 Fellowship Road
Suite 120
Mt. Laurel, NJ 08054
(856) 380-8900

APPEARANCES: (Continued)

FOR THE DEFENDANT
Century Indemnity: JAMES P. McCORMACK, ESQ.
McKenna & McCormack
128 Dorrance Street
Suite 330
Providence, RI 02903
(401) 831-2970

FOR THE DEFENDANT
OneBeacon America: KEVIN J. O'CONNOR, ESQ.
and PETER NETBURN, ESQ.
Hermes, Netburn, O'Connor &
Spearing, P.C.
265 Franklin St.
7th Floor
Boston, MA 02110
(617) 728-0050

JAMES T. MURPHY, ESQ.
and KELLY N. MICHELS, ATTY.
Hanson Curran, LLP
146 Westminster Street
Providence, RI 02903
(401) 421-2154

Court Reporter: Anne M. Clayton, RPR
One Exchange Terrace
Providence, RI 02903

Proceeding reported and produced by computer-aided stenography

# I N D E X



| WITNESS | | PAGE |
|---|---|---|
| MICHAEL JAMES WADE | | |
| Direct Examination by Mr. O'Connor: | | 4 |
| Cross-Examination by Mr. Pirozzolo: | | 13 |
| Redirect Examination by Mr. Levens: | | 43 |
| Direct Examination by Mr. Harding: | | 44 |
| DEFENDANTS EXHIBITS | ID | FULL |
| 247 - | | 19 |
| 248 | | 24 |

Q. Did you consider whether the source was the operation of New England Container?
A. I don't know that New England Container used or handled 2,4,5-trichlorophenol. The only evidence I've seen is that Metro-Atlantic handled 2,4,5-trichlorophenol.
Q. Did you review the New England Container 104-E statement?
A. No, I did not.
Q. Did you review the substances in the barrels that -- did you review the manufacturers whose barrels were sent to New England Container to see what substances those manufacturers made?
A. I did not.
Q. Did you review any of the material that indicated that George Mann or American Hoescht had sent barrels to NECC?
MR. O'CONNOR: Objection, your Honor.
THE COURT: Overruled.
A. I never saw that evidence.
Q. Did you know that American Hoescht and George Mann sent barrels to NECC?
A. I did not.
Q. Did you know the combustion of materials other than trichlorophenol can generate dioxins?

third less diffuse source for dioxins in the data.

THE WITNESS: I'm sorry. Did I say less diffuse?

THE COURT: Did you need to correct something?

THE WITNESS: I need to correct something. It's more diffuse, not less diffuse.

Q. And did you believe that one of the three sources was the drum recycling process?

MR. LEVENS: Objection, your Honor. I don't believe that was part of his testimony. Outside the scope.

THE COURT: Well, it's -- he's asking if that's what he believed, so overruled.

A. Yes. I believe that it's likely that the fires that were involved in the drum recycling business may very well have contributed dioxins to the site, and I think that's what I'm seeing in that third more diffuse source.

Q. And you would say they contributed to what you call the 2,4,5-T signal?

MR. LEVENS: Objection, your Honor. It's a mischaracterization of his testimony.

MR. PIROZZOLO: It's not a mischaracterization. I'm sorry. I take umbrage at that. I'm reading it.

THE COURT: Don't argue with each other.

MR. PIROZZOLO: I'm sorry. I apologize.

THE COURT: Rephrase your question.

Q. Was that operation a contribution to the 2,4,5-T signal?

A. I believe that's a reasonable conclusion, yes.

Q. Thank you.

A. You're welcome.

MR. PIROZZOLO: No further questions, your Honor.

(Motion by Mr. Pirozzolo heard.)

(Short recess.)

THE COURT: All right. Mr. Levens.

MR. LEVENS: Thank you, your Honor.

**REDIRECT EXAMINATION BY MR. LEVENS**

Q. Good morning, Dr. Wade.

A. Good morning, Mr. Levens.

Q. Dr. Wade, Mr. Pirozzolo showed you a table on fly ash, correct?

A. Yes, he did.

Q. After you saw that table on the stand, does that change any opinions that you've given here during the trial?

A. No.

Q. Mr. Pirozzolo showed you a table on fireplace soot, correct?

samples.

One of the things I was interested in is do these three sources show up in just an analysis of the soil and sediment, and the answer is yes, they do.

THE COURT: And the white represent what?

THE WITNESS: The white represent all of the other samples in the database, your Honor. I didn't exclude any samples whatsoever.

THE COURT: Okay. So red is soil, blue is sediment, and white is everything else which could include -- just give us some examples.

THE WITNESS: Water, biological tissue. It might include other soil or sediment samples that I couldn't identify as being soil or sediment samples because of the sample labeling scheme. Just every sample that was in the database.

THE COURT: Okay. Now, do you feel that, based on this data, you can pinpoint, through hydrocarbon fingerprinting this EPA data, the -- can pinpoint the dioxin to specific physical activities that went on at the site.

THE WITNESS: That would be a level of detail below an identification of individual source signals. I believe these data would allow themselves to for that type of analysis, but I can't testify yes or no. I

haven't done that.

THE COURT: Okay. So your opinion goes to the sources from a chemical point of view, I guess, but you have not reduced it to specific activities.

THE WITNESS: A process viewpoint, yes. That's correct. I have not.

THE COURT: You've not reduced it to specific activities --

THE WITNESS: I've dealt specifically with the data --

THE COURT: Let me finish my question so the record is clear.

THE WITNESS: Certainly. Sorry.

THE COURT: You haven't reduced it to specific, physical activities that went on at the site during any particular time, is that what you're saying?

THE WITNESS: Yes. That's correct. I have not done that.

THE COURT: Now, do you have the knowledge necessary to know whether what's represented by hydrocarbon fingerprinting that you have done, whether that is something that can evolve over time, over a 25-year span, or is it something that is static and then remains static? Do you have the knowledge to answer that type of a question?

# EXHIBIT 17

REDACTED

Policy No. S-16-07084

# Employers' Surplus Lines Insurance Company

(WILMINGTON, DELAWARE)

(A Stock insurance company, herein called the Company)

Administrative Offices: 110 Milk Street, Boston, Massachusetts 02107

Cancelled S/R eff. 1-1-70

AGREES WITH THE INSURED named below in consideration of the payment of premium and, except as herein provided, subject to all the terms and conditions of Policy No. XBC64674 issued by I.N.A. to:

Item 1. INSURED: Crown Metro Inc. - Etal Per named insured end.
12 Dudley Street
Providence, Rhode Island

Item 2. POLICY PERIOD: April 24, 1969 to February 15, 1972

Item 3. COVERAGE: Excess Umbrella

Item 4. EXCEPTIONS: This insurance differs from the Policy which it follows in the following particulars:

(a) Rate

(b) Proportion of Risk Insured:

$4,000,000. each occurrence, $4,000,000. aggregate Umbrella xs $1,000,000. each occurrence, $1,000,000. aggregate.

(c) Premium: $6,958. payable 2,158. - 4/24/69
2,400. - 2/15/70
2,400. - 2/15/71

(d) Other:

Plaintiff's Exhibit 3

OBA 0377

CASE NO. 02-053S

Emhart Industries, Inc.

VS. Home Insurance Co., et al.

PLAINTIFF'S EXHIBIT 3

DATE ____________ IDEN.

DATE ____________ EVID.

BY ____________
Deputy Clerk

AO 386

# EXHIBIT 18

11/30/2001 12:37 FAX 2156405534 ACE TLP 16 002/010

Service Office Number: Boston 52[illegible]
Agency Number: 138024
Insurance Underwriters, Inc.

☐ New: ☒ Renewal: ☐ Rewrite of:
←Agency Name
←Address

| Old Policy No. | Prev. Carrier No. |
|---|---|
| XBC 11424 | |

# INSURANCE COMPANY OF NORTH AMERICA

## EXCESS BLANKET CATASTROPHE LIABILITY POLICY

XBC 64674

Named Insured: Crown Chemical Corporation, etal
Per Named Insured Endorsement
Address: 12 Dudley Street
Providence, Rhode Island

Policy Period: From December 1, 1967 to December 1, 1968 — 12:01 A.M., standard time at the address of the Named Insured as stated herein.

Audit Period: Annual unless otherwise stated not subject to audit

Endorsements attached to policy at inception:

1 - Name of Insured Endorsement

LIMITS OF LIABILITY

| | | |
|---|---|---|
| ITEM 1. | $ 10,000 | as the result of any one occurrence not covered by the underlying insurance listed in Schedule A or by other underlying insurance collectible by the Insured |
| ITEM 2. | $ 5,000,000 | as the result of any one occurrence on account of personal injury, property damage or advertising offense, or any combination thereof |
| ITEM 3. | $ 5,000,000 | on account of all occurrences during each policy year arising out of the products hazard or the completed operations hazard, or both combined |

PREMIUM COMPUTATION

| Estimated | Rate per | Total Advance Premium |
|---|---|---|
| | 2,350. fixed Premium not Subject to Audit | |

MINIMUM PREMIUM $ 2,350.00

In the event of cancellation by the Named Insured, INA shall receive and retain not less than $ 300.00 as the Minimum Premium.

er 11/28/67

Countersigned By ______ Authorized Agent

LC-1147 20M 8-25-[illegible] Printed in U.S.A.

PROCESSING COPY

AON 00004

Plaintiff's Exhibit 4

INA

# SCHEDULE OF UNDERLYING INSURANCE

SCHEDULE A

POLICY NO. XBC 64674

It is agreed by the Insured that the following underlying insurance is in force as collectible insurance at inception of this policy for the limits of liability stated hereafter.

| Type of Policy | Applicable Limits |
|---|---|
| Standard Workmen's Compensation & Employers' Liability | Coverage B - Employers' Liability<br>$100,000 one accident |
| General Liability | Injury Liability<br>$250,000 each person<br>$1,000,000 each occurrence<br>$1,000,000 aggregate products<br>Property Damage Liability<br>$100,000 each occurrence<br>$100,000 aggregate products |
| Automobile Liability | Bodily Injury Liability<br>$250,000 each person<br>$500,000 each accident<br>Property Damage Liability<br>$50,000 each accident |

SPECIMEN FORM
From SSU

INA

INSURANCE COMPANY OF NORTH AMERICA, PHILADELPHIA, PENNSYLVANIA

# EXCESS BLANKET CATASTROPHE LIABILITY POLICY

A Stock Insurance Company, herein called INA

In consideration of the payment of the premium, in reliance upon the statements in the declarations made a part hereof and subject to all of the terms of this policy, agrees with the Named Insured as follows:

## INSURING AGREEMENT

Coverage A—Personal Injury Liability

Coverage B—Property Damage Liability

Coverage C—Advertising Liability

INA will indemnify the Insured for ultimate net loss in excess of the retained limit hereinafter stated which the Insured shall become legally obligated to pay as damages because of

A. personal injury or
B. property damage or
C. advertising offense

to which this policy applies, caused by an occurrence.

## DEFENSE, SETTLEMENT AND SUPPLEMENTARY PAYMENTS

**When Underlying Insurance Does Not Apply to an Occurrence:**

With respect to any occurrence not covered by the underlying insurance listed in Schedule A hereof, or any other underlying insurance collectible by the Insured, but covered by this policy except for the amount of retained limit specified herein, INA will, in addition to the amount of the ultimate net loss payable:

(a) defend any suit against the Insured seeking damages on account of personal injury, property damage or advertising offense, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient;

(b) pay all expenses incurred by INA, all costs taxed against the Insured in any suit defended by INA and all interest on the entire amount of any judgment therein which accrues after entry of the judgment and before INA has paid or tendered or deposited in court that part of the judgment which does not exceed the limit of INA's liability thereon;

(c) pay premiums on appeal bonds required in any such suit, premiums on bonds to release attachments in any such suit for an amount not in excess of the applicable limit of liability of this policy, and the cost of bail bonds required of the Insured because of accident or traffic law violation arising out of the use of any vehicle to which this policy applies but INA shall have no obligation to apply for or furnish any such bonds;

(d) pay reasonable expenses incurred by the Insured at INA's request, including actual loss of wages or salary (but not loss of other income) not to exceed $50 per day because of his attendance at hearings or trials at such request.

In jurisdictions where INA may be prevented by law or otherwise from carrying out this agreement, INA shall pay any expense incurred with its written consent in accordance with this provision.

The Insured shall promptly reimburse INA for any amount of ultimate net loss paid on behalf of the Insured within the retained limit.

**When Underlying Insurance Does Apply to an Occurrence:**

This policy does not apply to defense, investigation, settlement or legal expenses covered by underlying insurance, but INA shall have the right and opportunity to associate with the Insured in the defense and control of any claim or proceeding reasonably likely to involve INA. In such event the Insured and INA shall cooperate fully.

In the event that the limits of liability of the underlying insurance listed in Schedule A are exhausted by an occurrence, INA shall be obligated to assume charge of the settlement or defense of any claim or proceeding against the Insured resulting from the same occurrence, but only where this policy applies and is immediately in excess of such listed underlying insurance without intervening excess insurance with another insurer.

## RETAINED LIMIT—INA's LIMIT OF LIABILITY

Regardless of the number of (1) Insureds under this policy, (2) persons or organizations who sustain injury or damage, or (3) claims made or suits brought on account of personal injury, property damage, or advertising offense, INA's liability is limited as follows:

With respect to personal injury, property damage or advertising offense, or any combination thereof, INA's liability shall be only for the ultimate net loss in excess of the Insured's retained limit defined as the greater of:

(a) an amount equal to the limits of liability indicated beside the underlying insurance listed in Schedule A hereof, plus the applicable limits of any other underlying insurance collectible by the Insured; or

(b) the amount specified in Item 1 of the Limits of Liability section of the Declarations as the result of any one occurrence not covered by the said insurance;

and then for an amount not exceeding the amount specified in Item 2 of the Limits of Liability section of the Declarations as the result of any one occurrence.

There is no limit to the number of occurrences during the policy period for which claims may be made, except that the liability of INA arising out of either the products hazard or the completed operations hazard, or both combined, on account of all occurrences during each policy year shall not exceed the amount specified in Item 3 of the Limits of Liability section of the Declarations.

In the event that the aggregate limits of liability of the underlying insurance listed in Schedule A are reduced or exhausted by reason of losses that arise out of occurrences which take place during the period of this policy, INA shall, subject to INA's limit of liability which is stated above, continue such coverage as is afforded by the listed underlying insurance in excess of the reduced or exhausted underlying limits.

For the purpose of determining the limit of INA's liability, all damages arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

## POLICY PERIOD, TERRITORY

This policy applies to personal injury, property damage or advertising offense which occurs anywhere during the policy period.

SPECIMEN FORM
From SSU

## PERSONS OR ENTITIES INSURED

(a) The Named Insured;

(b) Each of the following is an Insured under this policy to the extent set forth below:

(1) If the Named Insured is designated in the declarations as a partnership or joint venture, the partnership or joint venture so designated and any partner or member thereof but only with respect to his liability as such, however, this policy does not apply to personal injury, property damage or advertising offense arising out of the conduct of any partnership or joint venture of which the Insured is a partner or member and which is not designated in this policy as a Named Insured;

(2) any person, organization, trustee or estate to whom or to which the Named Insured is obligated by virtue of a written contract to provide insurance such as is afforded by this policy, but only with respect to operations by or in behalf of the Named Insured or to facilities of or used by the Named Insured;

(3) subject to the terms and conditions of this policy, any additional Insured included in the underlying insurance listed in Schedule A but only to the extent that insurance is provided to such additional Insured thereunder;

(4) except with respect to the ownership, maintenance or use, including loading or unloading, of automobiles, or aircraft, (i) any executive officer, other employee, director or stockholder of the Named Insured while acting within the scope of his duties as such; (ii) any person or organization while acting as real estate manager for the Named Insured;

(5) any person while using, with the permission of the Named Insured, any automobile or aircraft owned by, loaned to or hired for use by or on behalf of the Named Insured and any person or organization legally responsible for the use thereof, provided the actual operation or other actual use is within the scope of such permission, and any executive officer, director or stockholder of the Named Insured with respect to the use of an automobile or aircraft not owned by the Named Insured but only while such automobile or aircraft is being used in the business of the Named Insured. The insurance with respect to any person or organization other than the Named Insured does not apply under paragraph (5):

(i) to any person or organization, or to any agent or employee thereof, operating an automobile sales agency, repair shop, service station, storage garage or public parking place, with respect to any occurrence arising out of the operation thereof;

(ii) with respect to any automobile or aircraft hired by or loaned to the Named Insured, to the owner or a lessee (of whom the Named Insured is a sub-lessee) thereof other than the Named Insured, or to any agent or employee of such owner or lessee;

(iii) to any manufacturer of aircraft, aircraft engines or aviation accessories, or any aviation sales or service or repair organization or airport or hangar operator or their respective employee or agents, with respect to any occurrence arising out of the operation thereof.

## EXCLUSIONS

This policy does not apply:

(a) to any obligation for which the Insured or any carrier as his insurer may be held liable under any workmen's compensation, unemployment compensation or disability benefits law, or under any similar law;

(b) to property damage to (1) property owned by the Insured, or (2) the Insured's products arising out of such products or any part of such products, or (3) work performed by or on behalf of the Insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith, or (4) property rented to, occupied or used by or in the care, custody or control of the Insured to the extent the Insured is under contract to provide insurance therefor:

(c) to personal injury or property damage resulting from the failure of the Insured's products or work completed by or for the Insured to perform the function or serve the purpose intended by the Insured, if such failure is due to a mistake or deficiency in any design, formula, plan, specifications, advertising material or printed instructions prepared or developed by any Insured; but this exclusion does not apply to personal injury or property damage resulting from the active malfunctioning of such products or work;

(d) to damages claimed for the withdrawal, inspection, repair, replacement or loss of the use of the Insured's products or work completed by or for the Insured or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein;

(e) to damages arising out of advertising offense for (1) failure of performance of contract, (2) infringement of trade mark, service mark or trade name by use thereof as the trade mark, service mark or trade name of goods or services sold, offered for sale or advertised, but this shall not relate to titles or slogans, (3) incorrect description of any article or commodity, or (4) mistake in advertised price.

## NUCLEAR ENERGY LIABILITY EXCLUSION

SPECIMEN FORM
From SSU

This policy does not apply:

a. Under any Liability Coverage, to bodily injury or property damage:

(1) with respect to which an Insured under the policy is also an Insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, or Nuclear Insurance Association of Canada, or would be an Insured under any such policy but for its termination upon exhaustion of its liability; or

(2) resulting from the hazardous properties of nuclear material and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the Insured is, or had this policy not been issued would be entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization;

b. Under any Medical Payments Coverage, or under any Supplementary Payments provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization;

c. Under any Liability Coverage to bodily injury or property damage resulting from the hazardous properties of nuclear material, if:

(1) the nuclear material (a) is at any nuclear facility owned by, or operated by or on behalf of an Insured, or (b) has been discharged or dispersed therefrom;

(2) the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an Insured; or

(3) the bodily injury or property damage arises out of the furnishing by an Insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions, or Canada, this exclusion (3) applies only to property damage to such nuclear facility and any property thereat;

d. As used in this Exclusion:

(1) "Hazardous properties" include radioactive, toxic, or explosive properties;

(2) "Nuclear material" means source material, special nuclear material or byproduct material;

(3) "Source material," "special nuclear material," and "byproduct material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

(4) "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

(5) "Waste" means any waste material (a) containing byproduct material and (b) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (6), (a) or (b) thereof;

(6) "Nuclear facility" means: (a) any nuclear reactor; (b) any equipment or device designed or used for (i) separating the isotopes of uranium or plutonium, (ii) processing or utilizing spent fuel, or (iii) handling, processing, or packaging waste; (c) any equipment or device used for the processing, fabricating, or alloying of special nuclear material if at any time the total amount of such material in the custody of the Insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235; (d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste; and (e) includes the site on which any of the foregoing is located, all operations conducted on such site, and all premises used for such operations;

(7) "Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

(8) "Property damage" includes all forms of radioactive contamination of property.

## DEFINITIONS

When used in this policy (including endorsements forming a part hereof):

"advertising offense" means libel, slander, defamation, infringement of copyright, title or slogan, piracy, unfair competition, idea misappropriation or invasion of rights of privacy, arising out of the Insured's advertising activities;

"completed operations hazard" includes personal injury and property damage arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the personal injury or property damage occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the Insured. "Operations" include materials, parts or equipment furnished in connection therewith. Operations shall be deemed completed at the earliest of the following times:

(a) when all operations to be performed by or on behalf of the Insured under the contract have been completed,

(b) when all operations to be performed by or on behalf of the Insured at the site of the operations have been completed, or

(c) when the portion of the work out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

Operations which may require further service or maintenance work, or correction, repair or replacement because of any defect or deficiency, but which are otherwise complete shall be deemed completed.

The completed operations hazard does not include personal injury or property damage arising out of

(1) operations in connection with the transportation of property, unless the personal injury or property damage arises out of a condition in or on a vehicle created by the loading or unloading thereof,

(2) the existence of tools, uninstalled equipment or abandoned or unused materials;

"damages" include damages for death and for care and loss of services resulting from personal injury and damages for loss of use of property resulting from property damage;

"Insured" means any person or organization qualifying as an Insured under the Persons or Entities Insured section of this policy. The insurance afforded applies separately to each Insured against whom claim is made or suit is brought, except with respect to the limits of INA's liability;

"Insured's products" means goods or products manufactured, sold, handled or distributed by the Insured or by others trading under his name, including any container thereof (other than a vehicle) but "Insured's products" shall not include a vending machine or any property other than such a container, rented to or located for use of others but not sold;

"Named Insured" means the organization named in the declarations of this policy and includes any subsidiary company (including subsidiaries thereof) of the Named Insured and any other company of which it assumes active management;

"occurrence", as respects property damage, means an accident, including injurious exposure to conditions, which results, during the policy period, in property damage neither expected nor intended from the standpoint of the Insured;

"personal injury" means, (a) bodily injury, sickness, disease, disability, shock, mental anguish and mental injury; (b) false arrest, detention or imprisonment, malicious prosecution or humiliation; (c) the publication or utterance of a libel or slander or of other defamatory material, including disparaging statements concerning the condition, value, quality or use of real or personal property, or a publication or utterance in violation of rights of privacy, except when any of the foregoing of this part (c) arises out of the Insured's advertising activities; (d) wrongful entry or eviction, or other invasion of the right of private occupancy; (e) racial or religious discrimination, unless insurance therefor is prohibited by law not committed by or at the direction of the Insured; and (f) assault and battery not committed by or at the direction of the Insured, unless committed for the purpose of protecting persons or property;

"products hazard" includes personal injury and property damage arising out of the Insured's products or reliance upon a representation or warranty made at any time with respect thereto, but only if the personal injury or property damage occurs away from premises owned by or rented to the Insured and after physical possession of such products has been relinquished to others;

"property damage" means injury to or destruction of tangible property;

"ultimate net loss" means the sum actually paid or payable in cash in the settlement or satisfaction of losses for which the Insured is liable either by adjudication or compromise with the written consent of INA, after making proper deduction for all recoveries and salvages collectible, but excludes all loss expenses and legal expenses (including attorneys' fees, court costs and interest on any judgment or award) and all salaries of employees and office expenses of the Insured, INA or any underlying Insurer so incurred.

## CONDITIONS

**1. Premium**

The premium for this policy shall be as stated in the Declarations.

**2. Inspection and Audit**

INA shall be permitted but not obligated to inspect the Insured's property and operations at any time. Neither INA's right to make inspections nor the making thereof nor any report thereon shall constitute an undertaking, on behalf of or for the benefit of the Insured or others, to determine or warrant that such property or operations are safe. INA may examine and audit the Insured's books and records at any time during the policy period and extensions thereof and within three years after the final termination of this policy, as far as they relate to the subject matter of this insurance.

**3. Insured's Duties in the Event of Occurrence, Claim or Suit**

(a) In the event of an occurrence, written notice containing particulars sufficient to identify the Insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the Insured to INA or any of its authorized agents as soon as practicable. The Insured shall promptly take at his expense all reasonable steps to prevent other personal injury or property damage or advertising offense from arising out of the same or similar conditions, but such expense shall not be recoverable under this policy.

(b) If claim is made or suit is brought against the Insured, the Insured shall immediately forward to INA every demand, notice, summons or other process received by him or his representative.

(c) The Insured shall cooperate with INA and upon INA's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the Insured because of personal injury or property damage or advertising offense with respect to which insurance is afforded under this policy; and the Insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The Insured shall not except at his own cost, voluntarily make any payment, assume any obligation or incur any expense; however, in the event that the amount of ultimate net loss becomes certain either through trial court judgment or agreement among the Insured, the claimant and INA, then, the Insured may pay the amount of ultimate net loss to the claimant to effect settlement and, upon submission of due proof thereof, INA shall indemnify the Insured for that part of such payment which is in excess of the retained limit, or, INA will, upon request of the Insured, make such payment to the claimant on behalf of the Insured.

**4. Appeals**

In the event the Insured or the Insured's underlying insurer elects not to appeal a judgment in excess of the retained limit, INA may elect to do so at its own expense, and shall be liable for the taxable costs, disbursements and interest incidental thereto, but in no event shall the liability of INA for ultimate net loss exceed the amount specified in the Limits of Liability section of the Declarations plus the taxable cost, disbursements and interest incidental to such appeal.

**5. Action Against INA**

No action shall lie against INA with respect to any one occurrence unless, as a condition precedent thereto, the Insured shall have fully complied with all the terms of this policy, nor until the amount of the Insured's obligation to pay an amount of ultimate net loss in excess of the retained limit shall have been finally determined either by judgment against the Insured after actual trial or by written agreement of the Insured, the claimant and INA. The Insured shall make a definite claim for any loss in which INA may be liable within a reasonable time after such final determination. If any subsequent payments are made by the Insured on account of the same occurrence, the Insured shall make additional claims from time to time and these claims shall be payable within thirty (30) days after proof in conformity with this policy. Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. Nothing contained in this policy shall give any person or organization any right to join INA as a co-defendant in any action against the Insured to determine the Insured's liability.

Bankruptcy or insolvency of the Insured shall not relieve INA of any of its obligations hereunder.

**6. Other Insurance with INA**

If collectible insurance under any other policy of INA is available to the Insured, covering a loss also covered hereunder, INA's total liability shall in no event exceed the greater or greatest limit of liability applicable to such loss under this or any other such policy provided, however, this does not apply to insurance with INA which is written as underlying insurance or which is written as excess insurance over the limit provided in this policy.

**7. Other Insurance Not with INA**

If collectible insurance with any other insurer is available to the Insured covering a loss also covered hereunder the insurance hereunder shall be in excess of, and not contribute with, such other insurance provided, however, this does not apply to insurance which is written as excess insurance over the limit provided in this policy.

**8. Subrogation**

INA shall be subrogated to the extent of any payment hereunder to all the Insured's rights of recovery therefor; and the Insured shall do nothing after loss to prejudice such rights and shall do everything necessary to secure such rights. Any amount so recovered shall be apportioned as follows:

Any interest (including the Insured's) having paid an amount in excess of the retained limit plus the limit of liability hereunder shall be reimbursed first to the extent of actual payment. INA shall be reimbursed next to the extent of its actual payment hereunder. If any balance then remains unpaid, it shall be applied to reimburse the Insured or any underlying insurer, as their interest may appear. The expenses of all such recovery proceedings shall be apportioned in the ratio of respective recoveries. If there is no recovery in proceedings conducted solely by INA, it shall bear the expenses thereof.

**9. Changes**

Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this policy or estop INA from asserting any right under the terms of this policy; nor shall the terms of this policy be waived or changed, except by endorsement issued to form a part of this policy.

**10. Assignment**

Assignment of interest under this policy shall not bind INA until its consent is endorsed hereon; if, however, the Named Insured shall die, such insurance as is afforded by this policy shall apply (a) to the Named Insured's legal representative, as the Named Insured, but only while acting within the scope of his duties as such, and (b) with respect to the property of the Named Insured, to the person having proper temporary custody thereof, as Insured, but only until the appointment and qualification of the legal representative.

**11. Three Year Policy**

If this policy is issued for a period of three years, the limits of INA's liability shall apply separately to each consecutive annual period thereof.

**12. Cancellation**

This policy may be cancelled by the Named Insured by surrender thereof to INA or any of its authorized agents or by mailing to INA written notice stating when thereafter the cancellation shall be effective. This policy may be cancelled by INA by mailing to the Named Insured at the address shown in this policy written notice stating when, not less than thirty days thereafter, such cancellation shall be effective. The mailing of notice as aforesaid shall be sufficient notice. The time of surrender or the effective date and hour of cancellation stated in the notice shall become the end of the policy period. Delivery of such written notice either by the Named Insured or by INA shall be equivalent to mailing.

If the Named Insured cancels, earned premium shall be computed in accordance with the customary short rate table and procedure. If INA cancels, earned premium shall be computed pro rata. Premium adjustment may be made either at the time cancellation is effected or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

IN WITNESS WHEREOF, the INSURANCE COMPANY OF NORTH AMERICA has caused this policy to be signed by its President and Secretary-Treasurer at Philadelphia, Pennsylvania, and countersigned on the Declarations page by a duly Authorized Agent of the Company.

SPECIMEN FORM
From SSU

Geoffrey Stengel — Secretary-Treasurer
GEOFFREY STENGEL

H. Richard Heilman — President
H. RICHARD HEILMAN

INA

INSURANCE COMPANY OF NORTH AMERICA

**NAMED INSURED ENDORSEMENT**

Crown Chemical Corporation

Regal Chemical Corporation

Crown Chemical Corporation Southern

The Cravanette Co., U.S.A.

Crown Polymer Corporation

Neva-Stain Corporation

I B C Chemical Co., Ltd.

Nothing herein contained shall vary, alter or extend any provision or condition of the policy other than as above stated.

| Effective Date | December 1, 1967 at the hour specified in the policy. | Part of Policy No. XBC 64674 |
|---|---|---|
| Issued to | Crown Chemical Corporation, etal | |

Authorized Agent

H Richard Heilman
President.

Not valid unless countersigned by a duly authorized agent of the INSURANCE COMPANY OF NORTH AMERICA.

C-1660

COMPANY REGISTRATION COPY

100M 7-10-67 Ptd. in U.S.A.

**Endorsement**

In consideration of an additional premium of $50.00, it is agreed the policy is amended as follows:

(1) The Policy Premium is amended to read: $24.00.

(2) Schedule of Underlying Insurance is amended to read:

Property Damage Liability
$50,000 each occurrence
$50,000 aggregate products

Nothing herein contained shall vary, alter or extend any provision or condition of the policy other than as above stated.

| | |
|---|---|
| Effective Date December 1, 1967 at the hour specified in the policy. | Part of Policy No. XBC 6 46 74 |
| Issued to Crown Chemical Corporation, Etal. | |

Authorized Agent

12 ca 1/8/68 Insurance Underwriters, Inc. 138024 Richard Heilman, President.

Not valid unless countersigned by a duly authorized agent of the INSURANCE COMPANY OF NORTH AMERICA

C-1660

COMPANY REGISTRATION COPY

100M 7-10-67 Ptd. in U.S.A.

INA

INSURANCE COMPANY OF NORTH AMERICA

correction

ENDORSEMENT

JAN 23 1968

Included below

In consideration of an additional premium of $50.00, it is agreed the policy is amended as follows:

(1) The Policy Premium is amended to read: $2400.00.

(2) Schedule of Underlying Insurance is amended to read:

Property Damage Liability
$50,000. each occurrance
$50,000. aggregate products

Nothing herein contained shall vary, alter or extend any provision or condition of the policy other than as above stated.

| | | |
|---|---|---|
| Effective Date | December 1, 1967 at the hour specified in the policy. | Part of Policy No. XBC 6 46 74 |
| Issued to | Crown Chemical Corporation, etal | |

Authorized Agent

H Richard Heilman
President.

Not valid unless countersigned by a duly authorized agent of the INSURANCE COMPANY OF NORTH AMERICA

C-1660 COMPANY REGISTRATION COPY

300M 7-10-67 Ptd. in U.S.A.

CASE NO. 02-053S

Emhart Industries, Inc.

VS. Home Insurance Co., et al.

PLAINTIFF'S EXHIBIT 4

DATE ______ IDEN.

DATE ______ EVID.

BY ______
Deputy Clerk

AO 386

# EXHIBIT 19

AON

Aon Risk Services

July 21, 1999

To The Interested Underwriters

RE: Insured: USM/Emhart/Black & Decker
Site: Centredale Manor Superfund Site
North Providence, Rhode Island

Dear Ladies/Gentlemen:

Enclosed is documentation received from the insured on the above matter. The insured has requested that we supply this information to you as notice of this loss under your respective policies. Please acknowledge receipt of this material in writing to our office.

USM/Emhart/Black & Decker hereby demands that you provide USM/Emhart/Black & Decker a defense in this action and that you pay and/or indemnify USM/Emhart/Black & Decker for all damages, costs and expense incurred USM/Emhart/Black & Decker arising out of this matter.

For prompt and proper response to this loss, defense counsel has been assigned by the insured.

By copy of this letter to the insured, I ask that this office be advised of all significant developments.

If specific questions arise on this loss, please direct your inquiries to the undersigned.

Thank you for your attention to this matter.

Respectfully,

K Alexander

Kimberly Alexander
Assistant Vice President

Enclosure

A0226

CIC 0380

*Aon Risk Services, Inc. of Washington, D.C. • Formerly Rollins Hudig Hall of Washington, D.C., Inc.*
1120 20th Street, N.W. • Washington, D.C. 20036-3406 • tel: (202) 223-0673 • fax: (202) 331-8409 • (800) 424-8830

cc: Ms. Linda Biagioni
Vice President, Environmental Affairs
Black & Decker, Inc.

Peri N. Mahaley, Esq.
Swidler & Berlin

**Centredale Manor Superfund Site**
**North Providence, Rhode Island**
**Exposure 1940-1986**

Fireman's Fund Insurance
777 San Marin Drive
Novato, CA 94998
Excess Policies: XLX1219333, 7/1/76-77; XLX1269496, 7/1/77-78; XLX1620600, 1/1/84-85
American Insurance Co- XLX1366139, 7/1/80-81; XLX1734107, 12/31/84-1/1/86

Risk Enterprise Management
59 Maiden Lane
New York, NY 10038
(Primary& Excess)
Re: Home Insurance: HEC9305389, 7/15/69-1/1/70; HEC9791288, 1/1/70-71; HEC9919551, 1/1/71-72; HEC4165802, 1/1/72-73 ; HXL1574305, 1/1/84-85

Chubb Group
Fountain Place
Suite 2500
1445 Ross Avenue
Dallas, TX 75202-2763
Attn: Elaine Haug
Excess Policies: Federal Insurance- 79287725, 1/1/84-85

ITT Hartford
Hartford Plaza
Hartford, CT 06115
Attn: Tracy DiFrancesco
First State Ins. Co.-Excess Policies: 923240 (1977-78), 925745 (1978-80) EU936398 (1/1/84-85), Twin City-TXS103566, 1/1/84-85

Highlands Insurance Company
10370 Richmond Avenue
Houston, TX 7042-4123
Excess Policy: SR50537 (7/1/79-80) SR21955 (1/1/84-12/31/84) SR22461 (12/31/84-1/1/86) SR22461, 12/31/84-1/1/86

Envision Claims Service
250 Commercial Drive, Suite 5000
Manchester, NH 03101
Attn: Paul Amirita
Excess Policy: US Fire Ins. Co.-JU0007, 1/1/73-11/1/75; 522000262 (1978-80)

AIG
Excess Casualty Claims
80 Pine Street
New York, NY 10005
Excess Policy: American Home-9608518, 1/1/84-85; Birmingham-2486, 1/1/84-85
Granite –64857108, 1/1/85-86
National Union-9609033, 1/1/85-86

CIGNA Companies
Environmental Claims Department
1601 Chestnut Street
Philadelphia, PA 19192-2181
Policies: INA- XCP4506, 1/5/70-1/1/71; XCP155977, 1/1/84-85, XCP157252, 1/1/85-86, XCC017060, 1/8/86-1/1/87

Crum & Forster
305 Madison Avenue
PO Box 1973
Morristown, NJ 07960
Policy: North River –JU0123, 11/1/75-1/1/79; 5233131099, 1/1/84-12/31/84 (Insured-Emhart)

Agricultural Excess
Dixie Terminal Building, Suite 923
49 East Fourth Street
Cincinnati, OH 45202-3803
Attn: Ted Mueller, Litigation Consultant
Policies: XS0005310, 1/1/84-85; XS0005313, 1/1/84-85; XS0005318, 12/31/84-1/1/86

Westchester Specialty Group
6 Concourse Parkway
Atlanta, GA 30328
Policies: International Insurance Company- 5220468207, 1/1/84-85; 5220495117, 12/31/84-1/1/86; 5220539604, 1/1/85-86, 5220529119, 1/1/86-87

AIU Ins. Co.
Environmental Claims Department
70 Pine Street-14/72
New York, NY 10270
Policies: 75103181, 1/1/84-85; 75103182, 1/1/84-85, 75104332, 1/1/85-86

Integrity Insurance Company in Liquidation
49 E. Midland Avenue
Paramus, NJ 07652
Attn: Kathryn Kherlopian, Senior Claims Examiner
Policies: ISX117524, 12/31/84-1/1/86

Allstate
Specialty Lines Division-Direct
3 Allstate South Barrington Plaza
51 West Higgins Road
South Barrington, IL 60010
Attn: Theresa A. Dickey
Policies: Northbrook Insurance Company-63009351, 1/1/84-85

CNA Insurance
Environmental Claims Department
333 S. Wabash, 19th Floor
Chicago, IL 60685
Attn: Stephanie Stevens
Policies: Harbor Insurance Company- Excess Policy: H1207841 (1984-85) HI178585, 1/1/85-86, HI179770, 1/1/85-86

Hudson Insurance Company
One Liberty Plaza
New York, NY 10006
Policies: HNO1339, 1/1/84-85

Royal Specialty Underwriting
945 E. Paces Ferry Road
Suite 1890
Atlanta, GA 30326
Policies: ED102351, 1/1/84-85

SWIDLER BERLIN SHEREFF FRIEDMAN, LLP

3000 K STREET, NW, SUITE 300
WASHINGTON, DC 20007-5116
TELEPHONE (202)424-7500
FACSIMILE (202) 424-7645

NEW YORK OFFICE
919 THIRD AVENUE
NEW YORK, NY 10022

**MEMORANDUM**

**TO:** Kimberly Alexander
Jack R. Pirozzolo

**FROM:** Jerome C. Muys, Jr.
Laura A. Ford

**DATE:** July 12, 1999

**RE:** Centredale Manor Superfund Site

---

EPA has issued Requests for Information pursuant to Section 104 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") and Section 3007 of the Resource Conservation and Recovery Act ("RCRA") to Black & Decker and USM Corporation. EPA is seeking information and documents related to contamination found at the Centredale Manor Superfund Site ("Site"), located in North Providence, Rhode Island. EPA has discovered dioxin, PCB, and pesticide contamination in the sediments on the Centredale Manor property as well as along the riverbank of the Woonasquatucket River. Specifically, EPA is seeking information concerning the operations of Crown-Metro, Inc. and its predecessors at the Site. Enclosed is EPA's CERCLA § 104(e) Information Request for your review.

a. Metro-Atlantic, the predecessor to Crown-Metro, Inc., a former subsidiary of USM Corporation, allegedly operated at the Site prior to 1971. The precise dates of operation are not yet known.

b. It appears that Metro-Atlantic occupied a portion of the Site prior to its consolidation with Crown Chemicals. Metro-Atlantic reportedly ceased operations on the property shortly thereafter but the precise dates of occupation are not yet known.

c. On December 2, 1968, Crown Chemical Corporation and Metro-Atlantic, Inc. filed an Agreement of Consolidation. By this Agreement of Consolidation, a new corporation was formed bearing the name "Crown-Metro, Inc." In 1969, USM Corporation acquired the stock of Crown-Metro, Inc. In 1976, Crown-Metro changed its name to Bostik South. Bostik South merged with and into USM Corporation in 1977. Thereafter, Bostik South was operated as a division of USM

RECEIVED
JUL 19 1999

Corporation. USM Corporation sold the business and assets of Bostik South to Bengal Corporation in 1980, which has since changed its name to Crown-Metro, Inc.

In 1976, USM Corporation merged with a subsidiary of Emhart Corporation. The surviving entity kept the name USM Corporation. In May 1987, USM Corporation changed its name to Emhart Enterprises Corp. In September 1987, Emhart Enterprises Corp. merged with and into Emhart Industries, Inc.

d. At this point, EPA has not made any demand for reimbursement and there are no public estimates of the projected costs for investigation and/or remediation of the Site. The EPA attorney, Catherine Garypie, has informed us that EPA has spent $1.6 million on removal activities, in addition to an unspecified amount on investigation.

Enclosures

cc: Linda H. Biagioni
Peri Mahaley

RECEIVED JUL 19 1999

2082714.1

# EXHIBIT 20

ace usa

ACE USA
Claims Division
Six Concourse Parkway
Suite 2500
Atlanta GA 30328

Box 740277
Atlanta GA 30374

678 441-5000 main
678 441-5030 fax
www.acelimited.com

August 6, 1999

Received Claim Department
AUG 09 1999

Kimberly Alexander
Assistant Vice President
Aon Risk Services, Inc.
of Washington, D.C.
1120 20th Street, NW
Washington, D.C. 20036-3406

RE: Insured: Black & Decker
Site: Centredale Manor Superfund Site
North Providence, Rhode Island

Dear Ms. Alexander:

This will acknowledge receipt without prejudice, of your letter providing ACE USA initial notification of the aforementioned matter.

In general, there is no duty for an umbrella or excess insurer to defend an insured. Also, in general, there is no duty for an umbrella or excess insurer to indemnify an insured unless all primary insurance has been exhausted by proper payment of insured claims.

The notice did not provide a great deal of information and at this time we are not in a position to determine whether there is coverage for this claim. We will, therefore, investigate this matter under a complete reservation of rights. The insured is hereby advised to take such action as is necessary to protect its interest in this matter until we can make a coverage determination.

Accordingly, we would appreciate your responses to the following:

1) Names, addresses and phone numbers for all underlying carriers;
2) Specify any erosion of the underlying insurance;
3) A list of all carriers put on notice of this event and their years of coverage and limits.

If this incident involves Bodily Injury claims, please provide the following information:

1) Names of all plaintiffs, addresses, age, marital status, dependents;
2) Work and earning history;
3) Medical history;
4) Dates exposed to conditions alleged to have caused illness;
5) Names of places where exposure is alleged to have occurred.

One of the ACE Group of Insurance & Reinsurance Companies

ace usa

Received Claim Department

AUG 09 1999

Ms. Kimberly Alexander
August 6, 1999
RE: Black & Decker

If the incident involves Property Damage claims, please provide the following information:

1) History of the site from date operation began to closure;
2) Copies of any site assessment;
3) Copies of any Remediation plans and costs;
4) Names of any chemicals alleged to have caused the problem.

Neither this letter, or any future communication regarding this claim should be regarded as a waiver of rights or defenses against coverage, which may be available under the policies issued to Black & Decker. We are conducting our investigation under a full reservation of rights.

Please do not hesitate to contact me if you should have any questions concerning this matter.

Sincerely,

Bernard B. Smith, AIC

BBS/db.217

# EXHIBIT 21

ace usa

ACE USA
Routing TL16A
1601 Chestnut Street
Philadelphia, PA 19101-1484
(215) 761-2928 tel
(215) 761-5543 fax
Mitchell.Nathanson@ACE-INA.com
www.ace-ina.com

**Mitchell J. Nathanson**
*Environmental Claims Specialist*

August 10, 1999

***VIA CERTIFIED MAIL – RETURN RECEIPT REQUESTED***

Kimberly Alexander
Assistant Vice President
AON Risk Services, Inc.
1120 20th Street, NW
Washington, DC 20036-3406

**Re: Black and Decker, Inc.**
**Site: Centredale Manor Superfund Site**
**North Providence, RI**
**File No.: 717 L 048738-8**

Dear Ms. Alexander:

This letter acknowledges receipt of recent correspondence regarding the above-captioned claim.

It is our understanding that coverage is being sought under the following policies allegedly issued by Century Indemnity Company, as successor to CCI Insurance Company, as successor to INA (Century Indemnity):

| | | | |
|---|---|---|---|
| INA | XCP 157252 | (1/1/85-86) | Emhart XS $52 m |
| INA | XCP 4506 | (1/5/70-71) | USM XS $17m |
| INA | XCP 155977 | (1/1/84-85) | Emhart XS $212 m |
| PE | XCC 017060 | (1/1/86-87) | Emhart XS $12m |

If you intend to make a claim under any other policy number, kindly advise us immediately. Otherwise, we will assume our understanding of the policies and policy periods, as outlined herein, under which this claim is made is correct. We have initiated an internal search for the alleged policies and ask that you provide us with copies of the any of the above alleged policies currently in your possession.

A claim number has been assigned to this matter for processing purposes only. In order to establish this file, we have arbitrarily selected a date of event within the first policy period. Our establishment of a claim file does not reflect any conclusion on behalf of Century Indemnity Company, as successor to CCI Insurance Company, as successor to INA (Century Indemnity) as to the existence of coverage under any of the policies or as to an actual date of event, if any.

RECEIVED
AUG 13 1999

As you may know, these alleged policies provide excess insurance. Please note, with respect to any policies underlying the above-cited excess policies, we reserve the right to make our own interpretation of the terms, conditions, exclusions, and endorsements of such policies and will not be bound by the coverage positions taken by the underlying carriers. In addition, we are not obligated to afford coverage for defense or indemnification until such time as the limits of primary insurance, as specified in the policies, has been exhausted. Please notify us if, at any time, you receive information indicating that our level of coverage may be reached.

Please understand that we are unable to accept or deny coverage or respond to your request for a defense at this time. Until the existence of the alleged policies is established, and we have had the opportunity to review the terms and conditions of these policies and to complete a factual investigation of this claim, we reserve all of our rights under the above alleged policies and any other policies under which you may make a claim.

We take this opportunity to advise you that, based upon the information presently available to us, the alleged policies may not provide coverage for this claim. Environmental pollution claims often raise significant coverage issues which warrant extensive investigation. Such issues may include:

1. Whether the asserted claim is for "damages";
2. Whether the claim is for "property damage" or "bodily injury" as defined by the policies;
3. Whether any alleged "property damage" or "bodily injury" was caused by an "occurrence" as defined by the policies;
4. Whether "property damage" or "bodily injury" took place during the periods of the policies;
5. Whether a "pollution exclusion" applies;
6. Whether an "absolute pollution exclusion" applies;
7. Whether notice of the claim was given in accordance with the terms of the policies;
8. Whether the claim presented is being made against a "named insured" under the policies;
9. Whether any previous or future payments made by the policyholder violate the voluntary payment provision contained in the policies;
10. Whether the "owned property" exclusion bars coverage for this claim;
11. Whether there is any duty to defend.

Other questions may be presented as further information of the alleged policies and the asserted claim becomes available.

We reserve the right to amend or modify the Reservation of Rights set forth in this letter until such time as coverage is either accepted or denied. We also reserve the right to deny the existence of any liability policies as alleged. This notice should not be understood as either accepting or disclaiming coverage but, rather, as notice to you that coverage may be in jeopardy under the alleged policies.

RECEIVED AUG 13 1999

Please be advised that you may be contacted by one of our regional environmental specialists during the course of our investigation of this claim. If contacted, we ask that you provide your full cooperation with that investigation. Additionally, we ask that you provide the following information at your earliest convenience:

1. Please provide me with all information received from and sent to the United States EPA or any other governmental agency with regard to the site at issue.

2. Please provide me with all documents in your possession which indicate Black and Decker's alleged involvement at the site at issue.

3. Please provide information concerning when Black and Decker Inc. first received notice of the above claim.

If you have any questions concerning this matter, please do not hesitate to contact the undersigned. Thank you for your cooperation.

Very truly yours,

Mitchell J. Nathanson
MCM-Environmental Coverage Group
Century Indemnity Company, as successor to CCI Insurance Company, as successor to INA (Century Indemnity)

RECEIVED
AUG 13 1999

# EXHIBIT 22

AON

*Aon Risk Services*
111 Market Place
Baltimore, Maryland 21202
Telephone 410 547-2800
FAX 410 547-2914

March 14, 2000

Writer's Direct Dial:
(410) 547-2890

To The Interested Underwriters

RE: Insured: USM/Emhart/Black & Decker
Site: Centredale Manor Superfund Site
North Providence, Rhode Island

Dear Ladies & Gentlemen:

On July 21,1999, a notice of loss letter and enclosure was forwarded to you regarding the Centredale Manor Superfund Site. That initial letter contained a demand that you provide USM/Emhart/Black & Decker a defense to this action and that you pay and/or indemnify USM/Emhart/Black & Decker for all damages, costs and expenses it incurs arising from this matter.

In order to keep you apprised of significant developments, enclosed is a Demand Letter from the U.S. EPA that the insured has requested we send to you as interested underwriters handling the matter.

Please note that I have taken over the USM/Emhart/Black & Decker claim files from my colleague, Kimberly Alexander. If you have not already done so, please acknowledge receipt of this claim in writing to our office and direct all future correspondence to my attention.

If specific questions arise on this loss, please let me know. Thank you for your attention to this matter.

Respectfully,

Steven H. Jones, CPCU, ARM
Senior Claims Consultant

Enclosure

CC: Ms. Linda H. Biagioni
Vice President, Environmental Affairs
The Black & Decker Corp.

Peri N. Mahaley Esq.
Swidler Berlin Shereff Friedman, LLP

**Centredale Manor Superfund Site**
**North Providence, Rhode Island**
**Exposure 1940-1986**

| INTERESTED UNDERWRITERS |
|---|
| ACE USA<br>Claims Division<br>Attn: Mr. Bernard B. Smith, AIC<br>Six Concourse Parkway<br>Suite 2500<br>Atlanta, GA 30328<br>File: 717L 048738-8 |
| ACE USA<br>Environmental Claims Department<br>Attn: Mitchell Nathanson<br>1601 Chestnut Street<br>Philadelphia, PA 19192-2181<br>Policies: INA - XCP4506, 1/5/70-1/1/71; XCP155977, 1/1/84-85; XCP157252, 1/1/85-86; XCC017060, 1/8/86-1/1/87 |
| Agricultural Excess<br>Attn: Penny Ogden, Claims Specialist<br>Dixie Terminal Building, Suite 923<br>49 East Fourth Street<br>Cincinnati, OH 45202-3803<br>File: 560-10021<br>Policies: XS0005310, 1/1/84-85; XS0005313, 1/1/84-85; XS0005318, 12/31/84-1/1/86 |
| AIGTS<br>Excess Casualty Claims<br>80 Pine Street<br>New York, NY 10005<br>Excess Policy: American Home - 9608518, 1/1/84-85; Birmingham-2486, 1/1/84-85; Granite – 64857108, 1/1/85-86<br>National Union - 9609033, 1/1/85-86 |
| AIU Ins. Co.<br>Environmental Claims Department<br>70 Pine Street-14/72<br>New York, NY 10270<br>Policies: 75103181, 1/1/84-85; 75103182, 1/1/84-85; 75104332, 1/1/85-86 |
| Allstate<br>Specialty Operations Division-Direct<br>Attn: Ms. Theresa A. Dickey<br>South Barrington Plaza<br>51 West Higgins Road – T2B<br>South Barrington, IL 60010-9300<br>File: 009 351-1384<br>Policies: Northbrook Insurance Company - 63 009 351, 1/1/84-85 |

| *INTERESTED UNDERWRITERS* |
|---|
| Chubb Group<br>Attn: Ms. Elaine Haug<br>Environmental Supervisor<br>Fountain Place<br>Suite 2500<br>1445 Ross Avenue<br>Dallas, TX 75202-2763<br>File: 79664823/427<br>Excess Policies: Federal Insurance- 79287725, 1/1/84-85 |
| CNA Insurance<br>Attn: Stephanie Stevens<br>Environmental Claims Department<br>333 S. Wabash, 19th Floor<br>Chicago, IL 60685<br>Policies: Harbor Insurance Company - Excess Policy: H1207841 (1984-85); HI178585, 1/1/85-86; HI179770, 1/1/85-86 |
| Crum & Forster<br>305 Madison Avenue<br>PO Box 1973<br>Morristown, NJ 07960<br>Policy: North River – JU0123, 11/1/75-1/1/79; 5233131099, 1/1/84-12/31/84 (Insured-Emhart) |
| Fireman's Fund Insurance<br>777 San Marin Drive<br>Novato, CA 94998<br>Excess Policies: XLX1219333, 7/1/76-77; XLX1269496, 7/1/77-78; XLX1620600, 1/1/84-85<br>American Insurance Co- XLX1366139, 7/1/80-81; XLX1734107, 12/31/84-1/1/86 |
| Highlands Insurance Company<br>10370 Richmond Avenue<br>Houston, TX 7042-4123<br>Excess Policy: SR50537 (7/1/79-80); SR21955 (1/1/84-12/31/84); SR22461 (12/31/84-1/1/86);<br>SR22461, 12/31/84-1/1/86 |
| Hudson Insurance Company<br>One Liberty Plaza<br>New York, NY 10006<br>Policies: HNO1339, 1/1/84-85 |
| Integrity Insurance Company in Liquidation<br>Attn: Maureen Stomberg,<br>Senior Claims Examiner<br>49 E. Midland Avenue<br>Paramus, NJ 07652<br>File: 00399514080<br>Policies: ISX117524, 12/31/84-1/1/86 |

| *INTERESTED UNDERWRITERS* |
| --- |
| International Insurance Company<br>Attn: Paul Amirata, Esq.<br>Claims Technical Case Manager<br>Waumbec Commercial Center<br>250 Commercial Street, Suite 5000<br>Manchester, NH 03101<br>Excess Policy: US Fire Ins. Co.-JU0007, 1/1/73-11/1/75; 522000262 (1978-80) |
| Risk Enterprise Management<br>59 Maiden Lane<br>New York, NY 10038<br>(Primary& Excess)<br>Re: Home Insurance: HEC9305389, 7/15/69-1/1/70; HEC9791288, 1/1/70-71; HEC9919551, 1/1/71-72; HEC4165802, 1/1/72-73 ; HXL1574305, 1/1/84-85 |
| Royal Specialty Underwriting<br>945 E. Paces Ferry Road<br>Suite 1890<br>Atlanta, GA 30326<br>Policies: ED102351, 1/1/84-85 |
| Travelers Property Casualty<br>Attn: Gail Petersen, Associate Account Executive<br>3 Farm Glen Boulevard<br>Farmington, CT 06032 |
| Westchester Specialty Group<br>6 Concourse Parkway<br>Atlanta, GA 30328<br>Policies: International Insurance Company- 5220468207, 1/1/84-85; 5220495117, 12/31/84-1/1/86; 5220539604, 1/1/85-86, 5220529119, 1/1/86-87 |

# EXHIBIT 23

ace usa

Environmental Coverage Group
Routing TL 16A
Two Liberty Place
1601 Chestnut Street
Philadelphia, PA 19101-1484

215.640.2928 *tel*
215.640.5543 *fax*

Mitchell.Nathanson@ace-ina.com
www.ace-ina.com

**Mitchell J. Nathanson**
*Environmental Claims Specialist*

October 23, 2000

Steven H. Jones
Senior Claims Consultant
AON Risk Services, Inc.
111 Market Place
Baltimore, MD 21202

**Certified Mail**
**Return Receipt Requested**

Re: Black and Decker, Inc.
Site: Centredale Manor Superfund Site, North Providence, RI
File No.: 717 L 048738-8

Dear Mr. Jones:

This letter acknowledges receipt of recent correspondence regarding the above-captioned claim.

It is our understanding that coverage is being sought under the following policies allegedly issued by Century Indemnity Company, as successor to CCI Insurance Company, as successor to INA (Century Indemnity) and International Insurance Company:

| | |
|---|---|
| XCP 157252 | (1/1/85-86) |
| XCP 4506 | (1/5/70-71) |
| XCP 155977 | (1/1/84-85) |
| XCC 017060 | (1/1/86-87) |
| 5220468207 | (1/1/84-85) |
| 5220495117 | (12/31/84-1/1/86) |
| 5220539604 | (1/1/85-86) |
| 5220529119 | (1/1/86-87) |

If you intend to make a claim under any other policy number, kindly advise us immediately. Otherwise, we will assume our understanding of the policies and policy periods, as outlined herein, under which this claim is made is correct. We have initiated an internal search for the alleged policies and ask that you provide us with copies of the any of the above alleged policies currently in your possession.

A claim number has been assigned to this matter for processing purposes only. In order to establish this file, we have arbitrarily selected a date of event within the first policy period. Our establishment of a claim file does not reflect any conclusion on behalf of Century Indemnity Company as successor to CCI

RECEIVED
OCT 27 2000
AON RISK SERVICES
CLAIMS DEPARTMENT

Insurance Company, as successor to INA (Century Indemnity), or International Insurance Company as to the existence of coverage under any of the policies or as to an actual date of event, if any.

As you may know, these alleged policies provide excess insurance. Please note, with respect to any policies underlying the above-cited excess policies, we reserve the right to make our own interpretation of the terms, conditions, exclusions, and endorsements of such policies and will not be bound by the coverage positions taken by the underlying carriers. In addition, we are not obligated to afford coverage for defense or indemnification until such time as the limits of primary insurance, as specified in the policies, has been exhausted. Please notify us if, at any time, you receive information indicating that our level of coverage may be reached.

Please understand that we are unable to accept or deny coverage or respond to your request for a defense at this time. Until the existence of the alleged policies is established, and we have had the opportunity to review the terms and conditions of these policies and to complete a factual investigation of this claim, we reserve all of our rights under the above alleged policies and any other policies under which you may make a claim.

We take this opportunity to advise you that, based upon the information presently available to us, the alleged policies may not provide coverage for this claim. Environmental pollution claims often raise significant coverage issues which warrant extensive investigation. Such issues may include:

1. Whether the asserted claim is for "damages";
2. Whether the claim is for "property damage" or "bodily injury" as defined by the policies;
3. Whether any alleged "property damage" or "bodily injury" was caused by an "occurrence" as defined by the policies;
4. Whether "property damage" or "bodily injury" took place during the periods of the policies;
5. Whether a "pollution exclusion" applies;
6. Whether an "absolute pollution exclusion" applies;
7. Whether notice of the claim was given in accordance with the terms of the policies;
8. Whether the claim presented is being made against a "named insured" under the policies;
9. Whether any previous or future payments made by the policyholder violate the voluntary payment provision contained in the policies;
10. Whether the "owned property" exclusion bars coverage for this claim;
11. Whether there is any duty to defend.

RECEIVED
OCT 27 2000
AON RISK SERVICES
CLAIMS DEPARTMENT

Other questions may be presented as further information of the alleged policies and the asserted claim becomes available.

We reserve the right to amend or modify the Reservation of Rights set forth in this letter until such time as coverage is either accepted or denied. We also reserve the right to deny the existence of any liability policies as alleged. This notice should not be understood as either accepting or disclaiming coverage but, rather, as notice to you that coverage may be in jeopardy under the alleged policies.

Please be advised that you may be contacted by one of our regional environmental specialists during the course of our investigation of this claim. If contacted, we ask that you provide your full cooperation with that investigation. Additionally, we ask that you provide the following information at your earliest convenience:

1. Please provide me with all information received from and sent to the United States EPA or any other governmental agency with regard to the site at issue.

2. Please provide me with all documents in your possession which indicate Black and Decker's alleged involvement at the site at issue.

3. Please provide information concerning when Black and Decker Inc. first received notice of the above claim.

If you have any questions concerning this matter, please do not hesitate to contact the undersigned. Thank you for your cooperation.

Very truly yours,

Mitchell J. Nathanson
MCM-Environmental Coverage Group
Century Indemnity Company, as successor to CCI Insurance Company, as successor to INA (Century Indemnity); International Insurance Company

RECEIVED
OCT 27 2000
AON RISK SERVICES
CLAIMS DEPARTMENT

# EXHIBIT 24

RECEIVED
NOV 29 2000
MAJOR CLAIMS

LAW OFFICES
MILES & STOCKBRIDGE P.C.
10 LIGHT STREET
BALTIMORE, MARYLAND 21202-1487

TELEPHONE 410-727-6464
FAX 410-385-3700

CAMBRIDGE, MD
COLUMBIA, MD
EASTON, MD
FREDERICK, MD

ROCKVILLE, MD
TOWSON, MD
WASHINGTON, D.C.

WRITER'S DIRECT
(410) 385-3442
jhovermill@milesstockbridge.com

November 22, 2000

**VIA CERTIFIED MAIL**
Insurance Company of North America
1601 Chestnut Street
P.O. Box 41484
Philadelphia, PA 19192

Re: **Crown Metro, Inc. Insurance Coverage/ Centredale Manor Superfund Site**

Dear Madam/ Sir:

This office represents ~~Emhart Industries, Inc.~~ (formerly USM Corporation) in connection with investigations relating to insurance coverage for a former subsidiary, a United States Environmental Protection Agency investigation, and two lawsuits filed in South Carolina federal court.

Specifically, we are seeking information regarding insurance coverage issued by Insurance Company of North America ("INA") to a former Emhart/ USM subsidiary, Crown Metro, Inc. Crown Metro, Inc. was formed in 1968 by the merger of two Rhode Island-based companies, Metro-Atlantic, Inc. and Crown Chemical Corporation. Our investigation, thus far, has recently found substantial documentation evidence demonstrating that INA provided insurance coverage to Crown Metro, Inc. from, at least, December 1, 1968 through February 15, 1970. For example, we have obtained a first layer excess blanket catastrophe liability policy (XBC46961) issued by INA to Crown Metro, Inc. (Exhibit A). Based on our review of this policy (in particular, the declarations page), it appears that Crown Metro, Inc. was also insured by INA for a period immediately prior to 1968. "Old policy number" listed at the top of the policy confirms that policy XBC46961 was a renewal of policy XBC64674 (Exhibit A). There is also secondary evidence in the form of correspondence relating to this earlier policy (Exhibit B).

On behalf of Emhart, we request that you immediately conduct a review of your records regarding this confirmed coverage and any additional insurance coverage INA provided to this entity. We look forward to receiving this information within twenty days.

We also enclose information concerning the Centredale Manor Superfund site, which triggers the above-referenced coverage. The insured has received a Request for Information from the United States Environmental Protection Agency ("USEPA"); a Demand Letter from the USEPA; and a Unilateral Administrative Order ("UAO") issued to Emhart by the USEPA (Exhibit C). The UAO requires Emhart, and other parties, to complete the second interim soil cap and implement flood control measures at the site. We also include for you information notices of this action that have been sent to other confirmed carriers of the insured (Exhibit D).

In addition, we enclose two complaints filed in the United States District Court for the District of South Carolina, Greenville Division: Crown Metro, Inc. v. Emhart Enterprises, Inc. (Case Number 6:00-2720-13) and Crown Metro, Inc. v. Emhart Corporation and USM Corporation (Case Number 6:00-1534-24) (Exhibit E). We likewise include for you information two memorandums from Swidler Berlin Shereff Friedman, LLP, both dated October 6, 2000, that have been sent to other confirmed carriers of the insured (Exhibit F).

The insured has requested that we supply this information to you as notice of this loss under your confirmed insurance policies and any other policies your investigation identifies. Please acknowledge receipt of this material in writing to our office. USM/ Emhart hereby demands that you provide USM/ Emhart a defense in these actions and that you pay and/or indemnify USM/Emhart for all damages, costs, and expenses incurred by USM/ Emhart arising out of these matters.

Should you have any questions, please do not hesitate to contact me. I look forward to hearing from you soon.

Very truly yours,

Joseph W. Hovermill

/anw
enclosures
cc: Ms. Linda H. Biagioni (w/ encl.)
Mr. Steven H, Jones (w/ encl.)

# EXHIBIT 25

ace usa

ACE USA
Environmental C ge Group
Routing TL-16A
1601 Chestnut Street
Philadelphia, PA 19103

215.640.1227 *tel*
215.640.5534 *fax*

alex.zajac@ace-ina.com
www.ace-ina.com

**Alexandra S. Zajac**
*Claims Representative*

December 12, 2000

Joseph W. Hovermill, Esq.
Miles & Stockbridge P.C.
10 Light Street
Baltimore, Maryland 21202-1487

Re: Insured: Emhart Industries
Suits: Crown Metro Inc. v. Emhart Industries
Crown Metro Inc. v. Emhart Industries and USM Corp.
Site: Centredale Manor Superfund Site, North Providence, RI
File: 717 L 055406-X

Dear Mr. Hovermill:

We are in receipt of your November 22, 2000 letter tendering notice of the above-captioned environmental claim on behalf of Emhart Industries ("Emhart"). It is our understanding that Emhart Industries has been identified as a Potentially Responsible Party ("PRP") by the United States Environmental Protection Agency ("USEPA") at the Centredale Manor Superfund Site ("the Site") located in North Providence, Rhode Island. Emhart is a PRP based on its former subsidiary Crown Metro Inc.'s involvement at the Site.

Emhart Industries has also been named as a defendant in the complaints captioned Crown Metro Inc. v. Emhart Industries and Crown Metro Inc. v. Emhart Industries and USM Corp. The plaintiff in these actions allege contractual indemnity, equitable indemnity and fraud resulting from the USEPA action referenced above.

It is our understanding that Emhart is requesting insurance coverage for this matter under policy XBC 46961 (12/1/68 - 2/15/70), issued to Crown-Metro, policy XCP 4506 (1/5/70 - 1/1/71) issued to USM Corp., policy 522000262 (7/1/78 - 7/1/79) issued to Black & Decker and alleged policy XBC 64674 (expiring 12/1/68). Please be advised that previous environmental claims submitted to this company by Emhart have involved additional policies and we assume that your request for coverage for this matter includes the following:

| Policy | Terms |
|---|---|
| XCP 155977 | 1/1/84 - 1/1/85 |
| XCP 157252 | 1/1/85 - 1/1/86 |
| XCC 017060 | 1/8/86 - 1/1/87 |
| XCC 027192 | 1/1/87 - 1/1/88 |
| XCC 027281 | 1/1/88 - 1/1/89 |

EXHIBIT
28)DC-2
MM 4/24/03

If Emhart intends to pursue this matter under any other policies, please advise us at this time. Otherwise, our coverage determination will be made with regard to the above-listed policies only.

*Alleged Policy XBC 64674 (expiring 12/1/68)*

At the present time, we do not have a copy of the above-listed alleged policy. Therefore, we are not in a position to either accept or deny coverage for this matter. In the meantime, we will perform a search for alleged policy XBC 64674. However, it is the burden of the party seeking the benefit of an insurance policy to prove both its existence and its terms and conditions. This company reserves the right to deny coverage if the policies cannot be found.

In undertaking an internal policy search and investigation, we reserve all of our rights under any insurance policy that may have been issued. In particular, we reserve the right to assert any and all defenses of non-coverage that may develop during the course of our investigation, including but not limited to, the absence of sufficient proof as to the existence, terms, and other relevant provisions of any policy.

*Policy XBC 46961 (12/1/68 - 2/15/70), and Policy XCP 4506 (1/5/70 - 1/1/71)*

Please be advised that there is no coverage for this claim under the above-listed policies. As you know policy XBC 46961 is issued to Crown Metro, Inc. and policy XCP 4506 is issued to USM Corp. Emhart is not a named insured under either policy. You maintain that Emhart is entitled to policies issued to Crown Metro, Inc. and/or USM Corp. based on the corporate relationship amongst these entities. According to the corporate history you provided with this claim Crown Metro, Inc., formerly known as Bostick South[1], and USM Corp. merged into what is now Emhart Industries in 1976, which post-dates the expiration date of both policy XBC 46961 and policy XCP 4506. Therefore, Emhart is not entitled to coverage under these policies.

*Policy 522 000262 8 (7/1/78 - 7/1/79)*

Please be advised that there is no coverage for this claim under the above-listed policy. As you know policy 522 000262 8 is issued to Black & Decker. Emhart is not a named insured under this policy. Black & Decker did not acquire Emhart until, at the earliest, 1989, which post-dates the expiration date of policy 522 000262 8. Therefore, Emhart is not entitled to coverage under this policy.

*Policies XCP 155977 (1/1/84 - 1/1/85), XCP 157252 (1/1/85 - 1/1/86), XCC 017060 (1/8/86 - 1/1/87), XCC 027192 (1/1/87 - 1/1/88) and XCC 027281 (1/1/88 - 1/1/89)*

The above listed policies are excess policies that provide coverage for liabilities in excess of primary and/or underlying limits of liability. If you wish to pursue coverage under these policies, you must provide proof that all applicable primary and/or underlying limits have been completely and properly exhausted. At this time, we have no information to indicate that underlying coverage has been exhausted or that this claim will reach our layer of insurance. Therefore, we are not presently obligated either to provide a defense or to indemnify Emhart in this matter.

Additionally, policies XCP 157252, XCC 017060, XCC 027192 and XCC 027281 contain the following absolute pollution exclusions:

[1] Bostick South was sold to Bengal Corp. in 1980 and on an unknown date changed its name to Crown Metro.

*Policy XCP 157252*

In consideration of the premium charged it is understood and agreed that this policy does not apply to personal injury or property damages arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; . . .

*Policy XCC 017060*

It is agreed that any exclusion in the policy relating to the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants is replaced by the following:

(This policy does not apply:)

to bodily injury or property damage arising our of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water.

This insurance also does not apply to any cost or expense arising out of any government demand or request that an Insured test for, assess, monitor, clean-up, remove, contain, detoxify, or neutralize any such irritants, contaminants, or pollutants.

This Company shall not have the duty to defend any claim or suit seeking to impose such costs, expenses, liability for such damages, or any other relief.

*Policy XCC 027192 and policy XCC 027281*

1. The coverage afforded by this policy does not apply to:

   A. The contamination of any environment by pollutants that are introduced at any time, anywhere, in any way;

   B. Any bodily injury, personal injury, property damage, costs or other loss or damage arising out of such contamination, including but not limited to, cleaning up, remedying, or detoxifying such contamination; or

   C. Payment of sums related to (1) the investigation or defense of any loss, injury or damage or (2) payment of any cost, fine, or penalty or (3) payment of any expense involving a claim or suit related to A or B above.

2. As used in the endorsement, the following terms will have the following meanings:

   A. "Contamination" means any unclean or unsafe or damaging or injurious or unhealthful condition arising out of the presence of pollutants, whether permanent or transient in any environment.

   B. "Environment" includes any person, any man made object or feature, animals, crops and vegetation, land, bodies of water, underground water or water table supplies, air and any other feature of the earth or its atmosphere, whether or not altered, developed or

cultivated; including, but not limited to any of the above, owned, controlled, occupied by the Insured

C. "Pollutants" means smoke, vapors, soot, fumes, acids, sound, alkalies, chemicals, liquids, solids, gases, thermal pollutants, and all other irritants or contaminants.

Therefore, even if this claim reached our layers, there would be no coverage for this matter under policies XCP 157252, XCC 017060, XCC 027192, XCC 027281 based on the absolute pollution exclusions contained therein.

Additionally, these policies "follows form" or in other words, follows, in whole or in part, the terms, conditions, definitions, exclusions, and limitations of coverage provided by the underlying policy in effect at the time of our coverage. We reserve all of our rights under the underlying policies and rely on the terms, conditions, definitions, exclusions and limitations of coverage both as to the policy as well as the underlying policy or policies.

Notwithstanding the above, there are other issues which may also preclude coverage of this claim under all the policies cited above. Based on the circumstances giving rise to this claim, questions arise as to whether there was "property damage" as this term is defined by the policies. Further, it is questionable whether the alleged "property damage" was caused by an "occurrence" as defined by the policies. If there was "property damage" caused by an "occurrence," questions arise as to whether the "property damage" took place during the policy period. Further there is no coverage for the insured's actions and conduct which were in violation of state and federal law. Also, fines and penalties are not covered under our policies. Finally, there is a question as to whether this company has an obligation to defend the above-cited declaratory action alleging contractual indemnity, equitable indemnity and fraud.

Specification of the above shall not and may not be deemed a waiver of any other provision, term or condition of the policies. The positions expressed herein are not meant to be exhaustive or exclusive. This company expressly reserves all rights under the policies that are available pursuant to pertinent law, and based on the facts surrounding this matter. This company additionally expressly reserves the right to supplement this letter and assert any applicable provision, term or condition of the policies in the event additional facts are provided which may impact coverage issues herein.

Should you have any questions regarding the foregoing, please contact me.

Very truly yours,

Alexandra S. Zajac

Alexandra S. Zajac
MCM – Environmental Coverage Group

/ASZ

Emhartdis

# EXHIBIT 26

AON

*Aon Risk Services*
Writer's Direct Dial:
(410) 547-2890
800-638-6421, ext. 2890

Claire_May@ars.aon.com

April 27, 2001

A. Zayac
RECEIVED
MAY 09 2001
MAJOR CLAIMS

To The Interested Underwriters

RE: Insured: Emhart/Black & Decker
Site: Centredale Manor Superfund Site
North Providênce, Rhode Island

Dear Ladies & Gentlemen:

Please find an update regarding the above captioned matter.

In order to keep you apprised of significant developments, enclosed is a copy of the Second Administrative Order for Removal Action with regards to the Centredale Manor Superfund Site. Emhart Industries, Inc. ("Emhart") is one of the four recipients of the Order that intend to comply through the design phase.

If you have any questions concerning this matter, please contact me.

Sincerely,

Claire D. May

Claire D. May, JD
Senior Claims Consultant

CC: Ms. Linda H. Biagioni
Vice President, Environmental Affairs
The Black & Decker Corporation

Peri N. Mahaley, Esq.
Swidler Berlin Shereff Friedman, LLP

CIC 0020

**Centredale Manor Superfund Site**
**North Providence, Rhode Island**
**Exposure 1940-1986**

| *INTERESTED UNDERWRITERS* |
| --- |
| ACE USA<br>Claims Division<br>Attn: Mr. Bernard B. Smith, AIC<br>Six Concourse Parkway<br>Suite 2500<br>Atlanta, GA 30328<br>File: 717L 048738-8 |
| ACE USA<br>Environmental Claims Department<br>Attn: Mitchell Nathanson<br>1601 Chestnut Street<br>Philadelphia, PA 19192-2181<br>Policies: INA - XCP4506, 1/5/70-1/1/71; XCP155977, 1/1/84-85; XCP157252, 1/1/85-86; XCC017060, 1/8/86-1/1/87 |
| Agricultural Excess<br>Attn: Penny Ogden, Claims Specialist<br>Dixie Terminal Building, Suite 923<br>49 East Fourth Street<br>Cincinnati, OH 45202-3803<br>File: 560-10021<br>Policies: XS0005310, 1/1/84-85; XS0005313, 1/1/84-85; XS0005318, 12/31/84-1/1/86 |
| AIGTS<br>Environmental Claim Department<br>Attn: Ms. Cordelia Smith<br>80 Pine Street, Sixth Floor<br>New York, NY 10005<br>Excess Policy: American Home - 9608518, 1/1/84-85; Birmingham-2486, 1/1/84-85; Granite – 64857108, 1/1/85-86<br>National Union - 9609033, 1/1/85-86 |
| AIU<br>Claim Management Department<br>Attn: Ms. Dianne Proimos<br>Excess Casualty Claim Examiner<br>70 Pine Street – 14/72<br>New York, NY 10270<br>Policies: 75103181, 1/1/84-85; 75103182, 1/1/84-85; 75104332, 1/1/85-86<br>Claim No.: 87-56568 |

| *INTERESTED UNDERWRITERS* |
| --- |
| **Allstate**<br>**Specialty Operations Division-Direct**<br>**Attn: Ms. Theresa A. Dickey**<br>**South Barrington Plaza**<br>**51 West Higgins Road – T2B**<br>**South Barrington, IL 60010-9300**<br>**File: 009 351-1384**<br>**Policies: Northbrook Insurance Company - 63 009 351, 1/1/84-85** |
| **CGU Insurance**<br>**Attn: Ms. Judith A. Wilder, CCLA**<br>**Environmental Claims Specialist**<br>**CGU Corporate Offices**<br>**100 Summer Street – 17th Floor**<br>**Boston, MA 02110-2103**<br>**Policy: Crown Metro –**<br>**Employers' Surplus Lines Insurance Company - S-16-07084 (4/24/69-2/15/72)** |
| **Chubb Group**<br>**Attn: Ms. Elaine Haug**<br>**Environmental Supervisor**<br>**Fountain Place**<br>**Suite 2500**<br>**1445 Ross Avenue**<br>**Dallas, TX 75202-2763**<br>**File: 79664823/427**<br>**Excess Policies: Federal Insurance- 79287725, 1/1/84-85** |
| CNA Insurance<br>Specialty Claims – Environmental Claims<br>Attn: Ms. Denise L. Pincus<br>Three Embarcadero Center – Suite 1200<br>San Francisco, CA 94111<br>Excess policies: HI177523 (1/1/84-85); HI178585 (1/1/85-86); HI179770 (1/1/85-86)<br>Claim No.: 05-118634 |
| Crum & Forster<br>Attn: Mr. Michael Jacapraro<br>Claim Specialist<br>305 Madison Avenue<br>PO Box 1973<br>Morristown, NJ 07960<br>Policy: North River – 5233131099, 1/1/84-12/31/84 (Insured-Emhart) |
| Fireman's Fund Insurance<br>777 San Marin Drive<br>Novato, CA 94998<br>Excess Policies: XLX1219333, 7/1/76-77; XLX1269496, 7/1/77-78; XLX1620600, 1/1/84-85<br>American Insurance Co- XLX1366139, 7/1/80-81; XLX1734107, 12/31/84-1/1/86 |

| *INTERESTED UNDERWRITERS* |
|---|
| Highlands Insurance Company<br>10370 Richmond Avenue<br>Houston, TX 77042-4123<br>Excess Policy: SR50537 (7/1/79-80); SR21955 (1/1/84-12/31/84); SR22461 (12/31/84-1/1/86) |
| Hudson Insurance Company<br>One Liberty Plaza<br>New York, NY 10006<br>Policies: HNO1339, 1/1/84-85 |
| Integrity Insurance Company in Liquidation<br>Attn: Maureen Stomberg,<br>Senior Claims Examiner<br>49 E. Midland Avenue<br>Paramus, NJ 07652<br>File: 00399514080<br>Policies: ISX117524, 12/31/84-1/1/86 |
| International Insurance Company<br>Attn: Paul Amirata, Esq.<br>Claims Technical Case Manager<br>Waumbec Commercial Center<br>250 Commercial Street, Suite 5000<br>Manchester, NH 03101<br>Excess Policy: US Fire Ins. Co.-JU0007, 1/1/73-11/1/75; JU0123, 11/1/75-1/1/79;<br>522000262 (1978-80) |
| Risk Enterprise Management<br>Environmental & Mass Tort Claims<br>Attn: Mr. Martin D. Berger, CPCU<br>Claim Manager<br>4940 Viking Drive, Suite 530<br>Edina, MN 55435-5308<br>(Primary& Excess)<br>Re: Home Insurance: HEC9305389, 7/15/69-1/1/70; HEC9791288, 1/1/70-71; HEC9919551, 1/1/71-72; HEC4165802, 1/1/72-73 ; HXL1574305, 1/1/84-85 |
| Royal Specialty Underwriting<br>945 E. Paces Ferry Road<br>Suite 1890<br>Atlanta, GA 30326<br>Policies: ED102351, 1/1/84-85 |
| Travelers Property Casualty<br>Attn: Gail Petersen, Associate Account Executive<br>3 Farm Glen Boulevard<br>Farmington, CT 06032 |

| *INTERESTED UNDERWRITERS* |
| --- |
| **Westchester Specialty Group**<br>**6 Concourse Parkway**<br>**Atlanta, GA 30328**<br>**Policies: International Insurance Company- 5220468207, 1/1/84-85; 5220495117, 12/31/84-1/1/86; 5220539604, 1/1/85-86, 5220529119, 1/1/86-87** |

# EXHIBIT 27

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

EMHART INDUSTRIES, INC.,
Plaintiff,

V CIVIL ACTION NO.
02-053 S

HOME INSURANCE COMPANY,
INSURANCE COMPANY OF
NORTH AMERICA, LIBERTY
MUTUAL INSURANCE COMPANY,
NORTH RIVER INSURANCE COMPANY,
ONEBEACON AMERICA INSURANCE
COMPANY and UNITED STATES
FIRE INSURANCE COMPANY
Defendants.

Oral deposition of JANET ANN LOCKHART, taken at the law offices of WHITE & WILLIAMS, LLP, 1800 One Liberty Place, 1650 Market Street, Philadelphia, Pennsylvania, on Tuesday, November 1, 2005, commencing at 10:49 a.m., before Dianna R. Pugliese, a Registered Merit Reporter, Certified Realtime Reporter, Certified Shorthand Reporter (NJ), and Notary Public, pursuant to notice.

APPEARANCES:
WILLCOX PIROZZOLO & McCARTHY, PC
JACK R. PIROZZOLO, ESQUIRE
RICHARD L. BINDER, ESQUIRE
50 Federal Street
Boston, Massachusetts 02110
617-482-5470
Counsel for Plaintiff Emhart Industries, Inc.

SIEGAL, NAPIERKOWSKI & PARK
LAWRENCE A. NATHANSON, ESQUIRE
lawrence.nathanson@mclolaw.com
533 Fellowship Road, Suite 120
Mt. Laurel, New Jersey 08054
856-380-8910
Counsel for Defendant Century Indemnity Company

DUANE MORRIS, LLP
MICHAEL A. TURSCHMANN, ESQUIRE
maturschmann@duanemorris.com
380 Lexington Avenue
New York, New York 10168
212-692-1043
Counsel for Defendant North River Insurance Company

HERMES, NETBURN, O'CONNOR & SPEARING, P.C.
KEVIN J. O'CONNOR, ESQUIRE
koconnor@hnso.org
265 Franklin Street
Seventh Floor
Boston, Massachusetts 02110-3113
617-210-7730
Counsel for Defendant OneBeacon America Insurance Company

EXAMINATION INDEX

JANET A. LOCKHART
BY MR. PIROZZOLO . . . 4



EXHIBIT INDEX



| Lockhart | | MARKED |
|---|---|---|
| 1 | Notice of Deposition | 26 |
| 2 | Policy | 34 |
| 3 | Policy Search Request, Request Date 8/29/2002 | 35 |
| 4 | 1/18/01 letter to Ms. Zajac from Ms. Phenis with attached two-page Policy/Underwriting Search Checklist #1 | 35 |
| 5 | Policy/Underwriting Search Checklist #2, two pages | 36 |
| 6 | Policy/Underwriting Search Checklists #4 and #3, four pages | 36 |
| 7 | 2/27/01 letter to Ms. Zajac from Ms. Phenis | 36 |
| 8 | Policy/Underwriting Search Checklists #5 and #6, four pages | 36 |
| 9 | Policy/Underwriting Search Checklist #19, one page | 37 |
| 10 | 7/10/03 letter to Mr. Binder from Mr. Brock | 37 |
| 11 | 7/2/03 Fax Transmission document to Mr. Brock from Ms. Zajac | 38 |





COURT REPORTER: Are there any stipulations?
MR. NATHANSON: No. The witness will read and sign.
JANET ANNE LOCKHART, having been duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. PIROZZOLO:
Q. May I ask you to give your name and address?
A. My name is Janet Anne Lockhart. My home address is in Connersville, Indiana. Business address is Richmond, Indiana.
Q. Do you have a more specific business address than Richmond?
A. 120 North 9th Street, Richmond, Indiana.
Q. And what is the business that's located at that address?
A. The Richmond operations center of ACE INA.
Q. And is that your daily



workplace? Is that the place where you report to work on a daily basis?
A. Yes.
Q. For how long have you reported to work on a daily basis at that place in Richmond, Indiana?
A. I was hired in there in 1981.
Q. Did you say you retired in 1981?
A. I was hired.
Q. Was hired in 1981.
A. In 1981.
Q. And have you worked there continuously since then?
A. Yes.
Q. What is your present job title?
A. Policy search specialist.
Q. How long have you held that position?
A. Approximately two years.
Q. What was your job title before then?

Page 30

you asked her why it took so long to produce the policy after we first located the policy; is that right?
A. Correct.
Q. Okay. Focusing on the phrase when we first located the policy, when did we first locate the policy?
MR. NATHANSON: We -- okay. Just answer.
MR. PIROZZOLO: Whoever we may be.
MR. NATHANSON: She's testifying on behalf of the company.
MR. PIROZZOLO: Yes. I will ask her.
THE WITNESS: And we being the policy search unit, I believe. The policy I was questioning was located in January, I want to say 2003, but I'm not certain of the year.
BY MR. PIROZZOLO:
Q. And to your understanding,

Page 31

when was it produced?
A. July of the same year.
Q. How did you know it was located in January 2003?
A. One of the checklists that I reviewed indicated that that's when it was sent.
Q. And did you know one way or another whether it was sent to Alexandra Zajac at the time it was located?
A. That would depend on the parameters of the search request.
Q. Whatever it depends on, do you recall whether it was sent to her at that time?
A. I can't say because I would have to see the specific search request on that.
Q. And have you reviewed that in preparation for this deposition?
A. I'm not sure that we had the actual request. I don't recall.
Q. Maybe I misunderstand your

Page 32

testimony, but if I understand correctly, you called Alexandra Zajac to ask why a policy that was located in January of 2003 was not produced until July of 2003; is that the substance of your testimony?
A. That's correct.
Q. Okay. What made you think Alexandra Zajac would ever answer that question?
A. I just thought perhaps she might know why it took so long.
Q. Hypothetically, if she never saw the policy until July of 2003, how would she know why it would take so long?
A. She might know of some reason within her office what -- you know, why it took so long.
Q. I'm beating around the bush here.
Did you have reason to believe that she saw it in January of 2003?

Page 33

A. No.
Q. Or did you believe she had seen it in January of 2003?
A. No.
Q. You didn't.
A. No.
Q. What did she tell you in answer to your question?
A. She didn't have an answer.
Q. And I guess you're not able to tell us who was given a copy of the policy in January of 2003 when it was located?
A. Again, that would depend on the parameters of the search request.
Q. As you sit here now, you don't know those parameters and, therefore, you can't tell us?
A. That's correct.
MR. NATHANSON: Off the record.
(Discussion off the record.)
MR. PIROZZOLO: Can I ask

MR. NATHANSON: Should be. She just compared the two.

(Exhibit Lockhart-11 was marked for identification.)

MR. PIROZZOLO: Can we just take a brief recess, see if somebody can make us a set of copies.

(A recess was taken from 11:32 a.m. to 11:41 a.m.)

BY MR. PIROZZOLO:

Q. Using the set of Exhibits Lockhart-3 through Lockhart-10 that have been placed before you, there was a question that you were unable to answer before about the parameters of the search.

Does this give you information regarding the parameters of the search with respect to the search that led to the production of the policy that's been marked Exhibit 2?

A. Yes.

Q. And which one or more of



those documents give you that information?

A. Exhibit 3 along with Exhibit Number 9.

Q. Would you explain to us in what way Exhibit 3 and Exhibit 9 inform you concerning the parameters of the search?

A. Exhibit 3 is the policy search request that was received which ultimately resulted in the location -- the identification and location of Exhibit Number 2.

MR. NATHANSON: 5.

MR. PIROZZOLO: It would be Exhibit Number 2.

MR. NATHANSON: I apologize.

BY MR. PIROZZOLO:

Q. How do you know that from looking at Exhibit 3?

A. Because of the searcher name.

Q. And in what way does the



searcher name help you to answer that question?

A. The searcher name is the same on the request as it is the Exhibit Number 9, and the alleged insured names are the same. So that tells me that these two go together.

Q. So if I understand correctly, Exhibit 3 is the request for the search, Exhibit 9 is a checklist done by the searcher in carrying out the search.

A. That's correct.

Q. And Exhibit 11 is the document by which the searched for policy was transmitted from one person to another.

A. Exhibit 11 is when Alexandra sent it to Stephen Brock. Yes.

Q. Is there any document that shows when Alexandra received it?

A. None that I'm aware of.

Q. Well, I guess I'm not



understanding you maybe.

MR. NATHANSON: Can we go off the record for a second.

MR. PIROZZOLO: I didn't ask the right question. No, let me pursue it.

MR. NATHANSON: I could tell you.

MR. PIROZZOLO: Okay.

MR. NATHANSON: Off the record.

(Discussion off the record.)

BY MR. PIROZZOLO:

Q. Let me just, for the record, get this in sequence. Exhibit 3 is the document that generates the search, correct?

A. That's correct.

Q. The search was assigned to Cindy Crutcher; is that correct?

A. Yes.

Q. Cindy Crutcher apparently conducted a search; is that right?

# EXHIBIT 28

# Policy Search Request

*Monday, October 21, 2002*

Request Date: 08/29/2002 **ACE/INA & ACE/Westchester** Target Date: 11/21/2002

Type: Major Claims
Imaging Checked: ☑ Rush: ☑

*Alleged Insured Name(s):* CROWN METRO,

Additional Alleged Insured name(s): METRO ATLANTIC, METRO ATLANTIC RESEARCH CORP.,METRO ASSOCIATES, ATLANTIC CHEMICAL COMPANY, CENTREDALE ENTERPRISES INC., PURITAN PLASTICS INC., PHARMATEK INC., BRYANT CHEMICAL CORPORATION, RANEDALE CORPORATION & BON COLOR CORPORATION.

**Alleged Policy Information** (Any/All Unknown)

Inception Date: UNKNOWN Expiration Date: UNKNOWN

*Lines of Business:* GL, WC, XS

Company Name: Unknown

**Complete this section for additional information**

Referenced Policies Needed: ☐ All Prior/Subsequent Policies Needed: ☐

U/W Material Needed: ☑ U/W Material Only: ☐

**Please forward all necessary documents**

Requested By: LORENA DAVENPORT Phone#: 5-4289

Requested For: ALEX ZAJAC Routing: 16TLA

Comments: (PLEASE RUSH) PLEASE SEARCH FOR ALL THE ADDITIONAL ALLEGED SEARCH REQUESTED.

Searcher: Cindy Crutcher
Completed Date:

Lockhart
EXHIBIT NO. 3
dnp 11/1/05

# EXHIBIT 29

# Policy/Underwriting Search Checklist #19

*Friday, September 02, 2005*

**Searcher:** Cindy Crutcher    Date Checklist Initiated: 12/30/2002

**Alleged Insured:** CROWN METRO,

Alleged Policy Number: GAL036597    Inc. Date: 02-15-1969    Exp. Date: 02-15-1970

Lines of Business Searched: GL, WC, XS

**Named Insured:** CROWN-METRO, INC., ETAL

Policy Number: GAL036597    Inc. Date: 02-15-1969    Exp. Date: 02-15-1970

| Resources | Contact | Request Date | Response/Results |
|---|---|---|---|
| Policy Library | | 12/30/2002 | Negative |
| Iron Mountain | | 12/30/2002 | Located Policy |
| Roswell | | | Inapplicable or Insufficient Information |
| Richmond Operations Center | | | Inapplicable or Insufficient Information |
| Electronic Inquiries | | | Inapplicable or Insufficient Information |
| Resource Library | | 12/30/2002 | Negative |
| Claim File(s) Identified | | | Inapplicable or Insufficient Information |
| Claim Files Reviewed | | | Inapplicable or Insufficient Information |
| ARM(ACE Risk Management-Processing) | | | Inapplicable or Insufficient Information |
| ARS(ACE Reinsurance Solutions) | | 12/30/2002 | Negative |
| Marketing Center | | | Inapplicable or Insufficient Information |
| ARM(ACE Risk Management-Facility) | | | Inapplicable or Insufficient Information |

**Results**

Purported Policy Located? Yes ☑ No ☐    If so, source: Pierce Leahy/Iron Mountain

Underwriting Material Requested? ☑
Underwriting Material Searched? ☑
Underwriting Material Located? ☑    If so, source: Pierce Leahy/Iron Mountain

Date Sent: 01/07/2003

Additional Areas Contacted:

Additional Comments: Identified policy number from insured inquiry in Iron Mountain

Lockhart
EXIBIT NO. 9
dif 11/1/05

# EXHIBIT 30

ace usa

Major Claims
Routing TL-16A
1601 Chestnut Street
Philadelphia, PA 19103
www.ace-ina.com

# Fax Transmission

To:
Stephen Brook

cc:

Company/Department:

Fax:
856.667.2210

Tel:

Re:
Embart Ind.

From:
Alexandra S. Zajac

Fax:
215.640.5534

Tel:
215.640.1227

Date:
July 02, 2003

E-mail:
alex.zajac@ace-ina.com

Pages including cover:

*This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law.*



Lockhart
EXHIBIT NO. 11
dre 11/1/05

# EXHIBIT 31

SIEGAL & NAPIERKOWSKI
SUITE 304
220 LAKE DRIVE EAST
CHERRY HILL, NEW JERSEY 08002

(856) 667-2080
FAX: (856) 667-2210

STEPHEN F. BROCK*
BRIAN G. FOX*
JERRALD J. HOCHMAN
SCOTT E. LEVENS
EDWARD M. NAPIERKOWSKI*
LAWRENCE A. NATHANSON*
LAWRENCE A. SERLIN*
MARTIN F. SIEGAL

*ALSO ADMITTED IN PENNSYLVANIA
*ALSO ADMITTED IN DISTRICT OF COLUMBIA
*ALSO ADMITTED IN ILLINOIS
*NOT ADMITTED IN NEW JERSEY
ALSO ADMITTED IN MASSACHUSETTS
ALSO ADMITTED IN NEW YORK

WRITER'S DIRECT DIAL: (856) 414-6106
FACSIMILE: (856) 414-0285

July 10, 2003

Via Overnight Mail

Richard L. Binder, Esq.
Willcox, Pirozzolo & McCarthy
50 Federal Street
Boston, MA 02110

**RE: Emhart Industries, Inc. v. Liberty Mutual Ins. Co., et. al.**
**Civil Action No. CA 02-053 ML**

Dear Mr. Binder:

Enclosed herewith in connection with this matter are documents Bates-stamped CIC 412-471. This letter and enclosure supplement Century Indemnity Company 's ("CIC's") responses to the document requests and interrogatories of Emhart Industries, Inc. ("Emhart") in this matter, including but not necessarily limited to CIC's October 18, 2002 responses to document request no. 4, and interrogatories 3 and 5. This letter, and enclosures, are not a waiver of any of CIC's objections to Emhart's discovery in this matter, and likewise are not a waiver of any other rights.

Very truly yours,

Stephen F. Brock

cc: All Counsel (via first class mail) (w/encl.)

RECEIVED
JUL 11 2003
Willcox Pirozzolo & McCarthy