UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| EMHART INDUSTRIES, INC., Plaintiff, v. HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, LIBERTY MUTUAL INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICA INSURANCE COMPANY, and UNITED STATES FIRE INSURANCE COMPANY Defendants. | CIVIL ACTION NO. CA 02-053S<br><br>**DEFENDANT CENTURY INDEMNITY COMPANY'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

Pursuant to the Court's May 17, 2007 Order, defendant Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America ("Century") submits the following proposed findings of fact and conclusions of law:[1]

## FINDINGS OF FACT

### THE PARTIES

1. Plaintiff Emhart Industries, Inc. ("Emhart") is a Connecticut corporation with its principal place of business in Towson, Maryland. Emhart is a wholly owned subsidiary of Black & Decker, Inc. [Stipulation of Facts, Section I, ¶ 1.][2]

2. Century is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania [Stipulation of Facts, Section I, ¶ 2].

[1] Century requests permission to supplement these proposed findings of fact and conclusions of law following the evidentiary hearing to incorporate the actual testimony at the hearing and the exhibits admitted into evidence.
[2] The parties submitted the Stipulation of Facts to the Court on September 8, 2006.

**CENTURY'S POLICIES**

3. Century issued Policy No. GAL 36597 ("Century's 1969 primary policy") to Crown-Metro, Inc. ("Crown-Metro"), which was in effect during the period from February 15, 1969 to January 1, 1970. The limits under Century's 1969 primary policy are $100,000. [Stipulation of Facts, Section I, ¶ 3.]

4. Under the insuring agreement, Century agreed to defend any suit against Crown-Metro seeking damages on account of property damage caused by an "occurrence [PX-2 at CIC 0483]."

5. An "occurrence" is defined as "an accident, including injurious exposure to conditions, which results, **during the policy period**, in bodily injury or property damage neither expected nor intended from the standpoint of the insured [PX-2 at CIC 0478 (emphasis added)]."

6. The insuring agreement further provides that "[Century] shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of [Century's] liability has been exhausted by payment of judgments or settlements [PX-2 at CIC 0483]."

7. Century issued Policy No. XBC 46961 ("Century's 1969 excess policy") to Crown-Metro, which was in effect during the period from December 1, 1968 to January 1, 1970 [Stipulation of Facts, Section 1, ¶ 7, as modified at trial after the close of evidence].

8. Under the insuring agreement, Century agreed that if the limits of liability of the underlying insurance are exhausted because of property damage during the policy period, Century would defend any suit seeking damages against Crown-Metro on account of property damage caused by an "occurrence [PX-1 at CIC 0154]."

9. An "occurrence" is defined as "an injurious exposure to conditions which results, **during the policy period**, in personal injury, property damage or advertising injury neither expected nor intended from the standpoint of the insured [PX-1 at CIC 0155 (emphasis added)].

10. Emhart succeeded to the rights and benefits of Century's 1969 Primary Policy and Century's 1969 Excess Policy [Order, 5/1/07].[3]

**OTHER PRIMARY POLICIES**

11. The Aetna Casualty and Surety Company issued Policy No. 06AL124360 to USM Corporation ("USM") for the period from November 1, 1969 to November 1, 1970. The limits under the policy are $2 million. [DX-3.]

12. The Aetna Casualty and Surety Company issued Policy No. 06AL126945 to USM for the period from November 1, 1970 to November 1, 1971. The limits under the policy are $2 million. [DX-8.]

13. Liberty Mutual Insurance Company ("Liberty Mutual") issued Policy No. LGI-612-004059-211 to USM for the period from November 1, 1971 to November 1, 1972. The limits under that policy are $2 million. [Stipulation of Facts, Section II.B, ¶ 1.][4]

14. Liberty Mutual issued Policy No. LGI-612-004059-212 to USM for the period from November 1, 1972 to November 1, 1973. The limits under that policy are $2 million. [Stipulation of Facts, Section II.B, ¶ 3.]

15. Liberty Mutual issued Policy No. LGI-612-004059-213 to USM for the period from November 1, 1973 to November 1, 1974. The limits under that policy are $2 million. [Stipulation of Facts, Section II.B, ¶ 5.]

[3] Century disagrees with the Court's finding and reserves its right to challenge that finding on appeal or otherwise.
[4] Section II.B of the Stipulation of Facts were made subject to the ruling on Emhart's motion in limine regarding insurance policies issued by Liberty Mutual.

16. Liberty Mutual issued Policy No. LGI-612-004059-214 to USM for the period from November 1, 1974 to November 1, 1975. The limits under that policy are $2 million. [Stipulation of Facts, Section II.B, ¶ 7.]

17. Liberty Mutual issued Policy No. LGI-612-004059-215 to USM for the period from November 1, 1975 to November 1, 1976. The limits under that policy are $2 million. [Stipulation of Facts, Section II.B, ¶ 9.]

18. Liberty Mutual issued Policy No. LGI-612-004059-216 to USM for the period from November 1, 1976 to November 1, 1977. The limits under that policy are $2 million. [Stipulation of Facts, Section II.B, ¶ 11.]

19. Liberty Mutual issued Policy No. LGI-612-004059-217 to USM for the period from November 1, 1977 to January 1, 1978. The limits under that policy are $2 million. [Stipulation of Facts, Section II.B, ¶ 13.]

20. Liberty Mutual issued Policy No. LGI-612-004059-548 to USM for the period from January 1, 1978 to January 1, 1979. The limits under that policy are $2 million. [Stipulation of Facts, Section II.B, ¶ 15.]

21. The Aetna Casualty & Surety Company issued primary liability insurance policies to Emhart from January 1, 1979 to January 1, 1985.

**THE UNDERLYING CLAIM**

22. The Centredale Manor Restoration Superfund Site ("Site") consists of two parcels located at 2072 and 2074 Smith Street in the Village of Centredale in North Providence, Rhode Island ("Smith Street Section of the Site"). The parcels, which total 9.7 acres, presently house two high-rise apartments known as Brook Village and Centredale Manor. The Site also extends on the ten-year floodplain of the Woonasquatucket River south to the Allendale Dam. On the eastern portion of the land comprising the Site there is a drainage swale or "tail race" that

ultimately empties into a wooded wetland to the south. The Woonasquatucket River flows along the western portion of the Site. [Stipulation of Facts, Section I, ¶ 10.]

23. On June 17, 1999, the EPA sent a Request for Information, pursuant to Section 104 of CERCLA and Section 3007 of RCRA, to Black and Decker Corporation regarding the Site [Stipulation of Facts, Section I, ¶ 59].

24. The Request for Information stated that the period being investigated is 1940 to 1986 [DX-221 at AON 00443].

25. On June 21, 1999, Emhart received the Request for Information from the EPA [Stipulation of Facts, Section I, ¶ 60].

26. On February 28, 2000, the EPA sent a letter advising Emhart that it is a potentially responsible party in connection with contamination at the Site ("PRP Letter") [Stipulation of Facts, Section I, ¶ 61].

27. Following receipt of the February 28, 2000 PRP Letter, Emhart and other entities who had received similar letters entered into negotiations with the EPA, but those negotiations did not result in an agreement with the EPA [Stipulation of Facts, Section I, ¶ 62].

28. On April 12, 2000, the EPA issued to Emhart, and others, a Unilateral Administrative Order for Removal Action, requiring the performance of certain work at the Site. Emhart and others performed the work in accordance with the Order and on August 14, 2000, the EPA issued a notice of completion of the work. [Stipulation of Facts, Section I, ¶ 63.] The Unilateral Administrative Order for Removal Action alleged that Emhart is "a successor to liability of several chemical companies which operated at the Site from approximately 1943 to approximately 1971," "chemicals manufactured by these companies included hexachlorophene," and the "chemical companies also buried drums and other containers at the Site [PX-13 at 3]."

29. On March 26, 2001, the EPA issued to Emhart, and others, a Second Administrative Order for Removal Action, requiring the performance of certain work at the Site. Emhart and others performed the work in accordance with the Order and on April 7, 2005, the EPA issued a notice of completion of the work. [Stipulation of Facts, Section I, ¶ 64.] The Second Administrative Order for Removal Action alleged that Emhart's predecessors operated at the Site from approximately 1940 to the early 1970s, and that the operations of the chemical companies resulted in releases and threats of releases of hazardous substances at the Site [PX-15 at AON 00021].

30. On September 11, 2003, the EPA issued to Emhart, and others, a Third Administrative Order on Consent for Removal Action, requiring the performance of certain work at the Site. Emhart and others performed the work in accordance with the Order and filed a completion of work report. [Stipulation of Facts, Section I, ¶ 65.] The Third Administrative Order on Consent for Removal Action also alleged that Emhart's predecessors operated at the Site from approximately 1940 to the early 1970s, and that the operations of the chemical companies resulted in releases and threats of releases of hazardous substances at the Site [PX-16 at 4].

31. The Court has ruled that the PRP Letter and the EPA orders constitute a suit within the meaning of the Century insurance policies [Stipulation of Facts, Section I, ¶ 66].[5]

**EMHART'S INSURANCE CLAIM**

32. On July 21, 1999, Emhart gave Century notice of the EPA claim regarding the Site [Stipulation of Facts, Section I, ¶ 67]. The notice listed the following excess policies:

[5] This paragraph states a ruling of the Court and is without waiver of the right of any party to appeal from the ruling of the Court.

INA – XCP4506, 1/5/70-1/1/71; XCP155977, 1/1/84-85; XCP157252, 1/1/85-86; XCC017060, 1/8/86-1/1/87 [PX-18A at MISC 01390].

33. On July 30, 1999, Emhart gave Liberty Mutual notice of the EPA claim regarding the Site. Emhart demanded that Liberty Mutual provide a defense and indemnify Emhart. [DX-241.]

34. On August 10, 1999, Century acknowledged receipt of Emhart's notice under the following policies: XCP 157252 (1/1/85-86; XCP 4506 (1/5/70-71); XCP 155977 (1/1/84-85); and XCC 017060 (1/1/86-87). Century further advised Emhart that if Emhart intended to make a claim under any other policy number it should advise Century immediately. [PX-20 at AON 00378.]

35. On August 23, 1999, Liberty Mutual acknowledged receipt of Emhart's claim and reserved its rights under its policies [DX-246].

36. On February 9, 2000, Emhart's broker advised Century that the underlying coverage had not been eroded, and it had no reason to believe that any Century policy would be implicated:

> To date, there has no been no erosion of the underlying insurance. Indeed, no carrier has agreed to defend or indemnify Black & Decker in this matter. Furthermore, at the present time, there is no reason to believe that any INA or Pacific Employers layers of coverage will be implicated.

[DX-273.]

37. On March 14, 2000, Emhart provided notice of the February 28, 2000 PRP Letter to Century [Stipulation of Facts, Section I, ¶ 69]. The notice listed the following excess policies: INA – XCP4506, 1/5/70-1/1/71; XCP155977, 1/1/84-85; XCP157252, 1/1/85-86; XCC017060, 1/8/86-1/1/87 [PX-21A at MISC 01420].

38. On March 28, 2000, Emhart provided notice of the February 28, 2000 PRP Letter to Liberty Mutual. Emhart reiterated its demand that Liberty Mutual provide a defense and indemnify Emhart. [DX-284.]

39. On April 21, 2000, Emhart provided notice of the Unilateral Administrative Order to Century under the following excess policies: INA – XCP4506, 1/5/70-1/1/71; XCP155977, 1/1/84-85; XCP157252, 1/1/85-86; XCC017060, 1/8/86-1/1/87 [PX-22A].

40. On May 4, 2000, Emhart advised Liberty Mutual that the EPA asserts its past costs claim now exceeds $4 million, the EPA advised that it has recently estimated that the cost to undertake additional emergency measures at portions of the Site is $8 million to $16 million, and a final remedy could well exceed the cost of the initial work at the Site. Emhart reiterated its demand that Liberty Mutual provide a defense and indemnify Emhart. [DX 295.]

41. On May 16, 2000, Emhart sent a copy of the Unilateral Administrative Order to Liberty Mutual, with Emhart's reply indicating its intention to comply [DX-298]. On May 24, 2000, Liberty Mutual advised Emhart that Liberty Mutual would not be providing Emhart with a defense or indemnification because there is no potential obligation to defend or indemnify [DX-300]. On June 19, 2000, Emhart advised Liberty Mutual that it disagreed with Liberty Mutual's conclusion on coverage [DX-304].

42. On October 17, 2000, Emhart advised Century of the lawsuits Crown-Metro filed against Emhart in South Carolina under the following policies issued to USM (INA-XCP4506, 1/5/70-1/1/71) and Emhart (XCP 155977, 1/1/84-85; XCP157252, 1/1/85-86; and XCC017060, 1/8/86-1/1/87) [DX-322].

43. On October 23, 2000, Century acknowledged receipt of Emhart's correspondence under the following policies: XCP 157252 (1/1/85-86; XCP 4506 (1/5/70-71);

XCP 155977 (1/1/84-85); and XCC 017060 (1/1/86-87). Century further advised Emhart that if Emhart intended to make a claim under any other policy number it should advise Century immediately. [PX-23.]

44. On October 30, 2000, CGU sent Emhart's attorneys a copy of Century's 1969 Excess Policy [PX-128A]. Before that time, Emhart was not aware of Century's 1969 Excess Policy or any other insurance policy that Century issued to Crown-Metro.

45. On October 31, 2000, Emhart sent Century, among other things, a copy of the following policies:

| **Policy Number** | **Insurer** | **Named Insured** | **Policy Period** |
|---|---|---|---|
| XCP157252 | INA | Emhart | 12/31/84-1/1/86 |
| XCC017060 | Pacific Employers | Emhart | 1/1/86-87 |
| XCP4506 | INA | USM | 1/5/70-71 |
| XCP155977 | INA | Emhart | 1/1/83-84 |

Emhart did not send Century a copy of Century's 1969 Excess Policy or any other insurance policy that Century issued to Crown-Metro. [DX-329.]

46. On November 6, 2000, Century sent a letter to Emhart's broker listing the policies under which Emhart was seeking coverage. The letter did not include Century's 1969 Excess Policy or any other insurance policy that Century issued to Crown-Metro. Century asked Emhart to advise Century if Emhart intended to make a claim under any other policy number. Century reserved its rights under the policies for which Emhart was seeking coverage. [DX-331.]

47. On November 22, 2000, Emhart's attorneys wrote to Century seeking information for the first time regarding insurance coverage that Century issued to Crown-Metro. Attached to the letter was Century's 1969 Excess Policy. Emhart's attorneys requested that Century conduct a review of its records regarding Century's 1969 Excess Policy and any

additional insurance coverage Century provided to Crown-Metro. Emhart's attorneys further demanded that Century provide a defense and indemnify Emhart for all damages, costs, and expenses in connection with the Site under Century's 1969 Excess Policy and under any other policy Century issued to Crown-Metro. [PX-24A.]

48. On December 8, 2000, Century initiated a search for the following alleged policy issued to Crown-Metro: XBC64674 (expires 1968) [DX-340].

49. On December 12, 2000, Century acknowledged receipt of Emhart's claim for coverage under Century's 1969 Excess Policy and denied coverage on the ground that Emhart is not a named insured. Century also reserved its rights to deny coverage on other grounds. [PX-26.]

50. On January 3, 2001, Emhart's attorneys wrote back to Century. They repeated their request that Century review its records regarding Century's 1969 Excess Policy and any additional insurance coverage Century provided to Crown-Metro. They also provided further information on the relationship between Emhart and Crown-Metro, and asked Century to reconsider its position [PX-27.]

51. On January 10, 2001, Century initiated a search for all general liability insurance policies issued to Crown-Metro for the period from December 2, 1968 to December 31, 1976. The results of that search were negative. [DX-365.]

52. On January 11, 2001, Century wrote back to Emhart's attorneys and stated that Century had re-evaluated it previous denial under Century's 1969 Excess Policy and agreed that Emhart may be able to request insurance coverage to the extent it is a successor to Crown-Metro. Century asked for proof of that successor relationship. Century also reserved its rights to deny coverage on other grounds. In addition, Century advised Emhart that Century would have

no obligation under Century's 1969 Excess Policy until Emhart provided proof that all applicable primary and underlying limits have been exhausted:

> Policy XBC 46961 is an excess policy that provides coverage for liabilities in excess of primary and/or underlying limits of liability. If you wish to pursue coverage under this policy, you must provide proof that all applicable primary and/or underlying limits have been completely and properly exhausted. At this time, we have no information to indicate that underlying coverage has been exhausted or that this claim will reach our layer of insurance. Therefore, notwithstanding the pollution exclusion in the policy, we are not presently obligated either to provide a defense or to indemnify Emhart in this matter.

[PX-28.]

53. As of January 11, 2001, Emhart had paid $55,000 in indemnification expense [PX-170]. Emhart did not inform Century it had paid that amount until after this lawsuit was filed.

54. On February 27, 2001, Emhart's attorneys submitted a list of insurance policies to the attorneys for Crown-Metro in South Carolina. The list referred to a Century policy issued to Crown-Metro with a $100,000 per occurrence limit and $0 attachment point [DX-361].

55. On April 9, 2001, Emhart's broker responded to Century's requests for information. The broker provided some information in response to Century's questions, including information on the relationship between Emhart and Crown-Metro. The broker did not provide any information on whether "all applicable primary and/or underlying limits have been completely and properly exhausted." [PX-29.]

56. On May 3, 2001, Emhart provided notice to Liberty Mutual of the Second Administrative Order for Removal Action. Emhart reiterated its demand that Liberty Mutual provide a defense and indemnify Emhart. [DX-378.]

57. On September 17, 2001, Emhart provided an update to Liberty Mutual. Emhart reiterated its demand that Liberty Mutual provide a defense and indemnify Emhart. [DX-396.]

58 On October 17, 2001, Emhart paid $125,000 in indemnification expense [PX-170]. Emhart did not advise Century it had paid that amount until after this lawsuit was filed.

**INSURANCE COVERAGE LAWSUIT**

59. On or about January 25, 2002, Emhart filed this lawsuit against Century and five other insurance companies, including Liberty Mutual. Emhart sought, among other things, declaratory relief against Century and damages for breach of contract in connection with Century's 1969 Excess Policy, and an excess policy Century issued to USM. Emhart did not seek declaratory relief or damages for breach of contract with respect to Century's 1969 Primary Policy. On March 25, 2002, Century filed its answer and affirmative defenses denying coverage for Emhart's claim.

60. On August 29, 2002, Century initiated a second search for any and all insurance policies issued to Crown-Metro in response to discovery requests in this lawsuit [DX-431].

61. Century's policy search unit in Richmond, Indiana located Century's 1969 Primary Policy on about January 7, 2003 [DX-508]. Century's claim department in Philadelphia, Pennsylvania did not receive Century's 1969 Primary Policy until on or about July 2, 2003 [DX-446].

62. On July 10, 2003, Century's attorneys sent Emhart's attorneys a copy of Century's 1969 Primary Policy [PX-35].

63. On September 11, 2003, Emhart's attorneys advised Century that "Emhart seeks to amend its complaint in this action to include claims for defense and indemnification costs that it contends are within the scope of said policy and declaratory relief concerning future defense and indemnification costs that it contends are within the scope of said policy." On September 30, 2003, Century's attorneys advised Emhart's attorneys that Century did not anticipate objecting to an appropriate motion by plaintiff to amend its complaint in this action. [DX-460.]

64. On December 12, 2003, Emhart filed a motion for partial summary judgment against Century and Liberty Mutual seeking, among other things, a declaration that Century had a duty to defend and indemnify Emhart for costs relating to the Site under Century's 1969 Excess Policy.

65. On January 16, 2004, Century filed its opposition to Emhart's motion for partial summary judgment and a cross-motion for summary judgment. One of the arguments Century raised in its opposition and cross-motion was that Emhart is not a corporate successor to Crown-Metro.

66. On January 27, 2004, Century filed a motion for leave to file counterclaim and cross-claim in order to assert a claim under Century's 1969 Primary Policy.

67. On January 29, 2004, Century sent a letter to Emhart's broker denying coverage under Century's 1969 Primary Policy on the ground that Emhart is not a named insured or additional insured under that policy. In support of its denial, Century stated that Emhart never established it is a successor-in-interest to Crown-Metro, and that Emhart continues to deny it is a successor to Crown-Metro. In addition, Century reserved its rights to deny coverage on other grounds. [DX-475.]

68. On February 20, 2004, the Court granted Century's motion for leave to file counterclaim and cross-claim. On February 25, 2004, Century filed its counterclaim and cross-claim seeking, among other things, a declaratory judgment it had no duty to defend or indemnify Emhart in connection with the Site under Century's 1969 Primary Policy. On March 23, 2004, Emhart filed its answer to Century's counterclaim and a counterclaim in reply concerning Century's 1969 Primary Policy. On April 15, 2004, Century filed its answer and affirmative defenses to Emhart's counterclaim in reply, denying coverage under Century's 1969 Primary Policy.

69. On February 15, 2005, United States Magistrate Judge Robert Lovegreen issued a Report and Recommendation recommending that all of the pending motions for summary judgment be denied. In his Report and Recommendation, United States Magistrate Judge Lovegreen found that Emhart had provided sufficient evidence it was a corporate successor to Crown-Metro.

70. In light of Judge Lovegreen's decision, Century re-evaluated its position on whether Emhart was a corporate successor to Crown-Metro. On April 20, 2005, Century sent a letter to Emhart's broker denying coverage under Century's 1969 Primary Policy on the additional ground that the alleged property damage at the site was neither discovered nor reasonably discoverable during Century's policy period. In addition, Century reserved its rights to deny coverage on other grounds. [DX-501.]

71. On May 17, 2005, this Court entered an Order accepting and adopting the findings in the February 15, 2005 Report and Recommendation in total.

**COSTS INCURRED BY EMHART**

72 In response to the EPA's February 28, 2000 letter, Emhart retained the law firm Swidler Berlin Shereff Freedman LLP ("SBSF"), now Bingham McCutchen LLP, to represent it in connection with the EPA claim [Stipulation of Facts, Section I, ¶ 72].

73. Through June 2006, Emhart has incurred costs in the amount of $711,732.00 for performing the work required by the three orders issued by the EPA [Stipulation of Facts, Section I, ¶ 73].

74. Through October 19, 2006, Emhart also has incurred costs for legal services and consultants in connection with the Site in the amount of $4,408,958.80 that are reflected in invoices from SBSF [DX-600].

75. Through June 2006, Emhart incurred additional costs in connection with the Site that are reflected in invoices from other contractors in the amount of $241,073.65 [Stipulation of Facts, Section I, ¶ 75].

76. From July 1, 2006 through October 19, 2006, Emhart incurred additional costs in connection with the Site that are reflected in invoices from other contractors in the amount of $88,013.35 [DX-601].

**REASONABLENESS OF EMHART'S DEFENSE COSTS**

77. The following discrete areas of defense costs were not reasonable to Emhart's defense of the underlying claim:

A. Investigating Emhart's defense of non-successorship and asserting that defense against EPA (approximately $128,000 in attorney time).

B. Challenging the Centredale Manor and Brook Village Consent Decrees (approximately $247,000 in attorney time).

C. Filing suit in federal court and state court against the Estate of Joseph Buonnano (approximately $496,000 in attorney time).

D. Pursuing Emhart's purported claim against NECC in Bankruptcy Court in Delaware against Russell-Stanley Holdings, Inc. (approximately $267,000 in attorney time).

78. The amount of disbursements that relate to these discrete areas listed in the paragraph above are approximately $84,261.

79. The fees for attorney time should be discounted another 10% in the aggregate due to (i) the excessive number of timekeepers used by SBSF, (ii) the lack of billing oversight, (iii) the use of ¼-hour rather than 1/10th-hour minimum billing increments, (iv) the failure either to itemize or code entries, and (v) the use of vague entries and billing for insurance-related and clerical work.

80. A 25% discount should also be applied to the legal fees to account for the fact that Emhart used a large firm in Washington, D.C. with high billing rates rather than a quality mid-sized firm closer to Region 1 in Boston and the Site.

**BLACK & DECKER/LIBERTY MUTUAL SETTLEMENT AGREEMENT**

81. On March 24, 2005, Black & Decker and Liberty Mutual executed a Settlement Agreement and Release.[6]

[6] On November 2, 2005, United States Magistrate Judge Lovegreen entered an Order granting in part and denying in part Emhart's motion for a protective order regarding this settlement agreement. United States Magistrate Judge Lovegreen ruled that the settlement agreement is for attorneys' eyes only until a court rules otherwise. Century respectfully requests permission to use the settlement agreement at the evidentiary hearing, and an opportunity to supplement these proposed findings if allowed to do so.

## CONCLUSIONS OF LAW

### DUTY TO DEFEND

1. Century's duty to defend Emhart triggered under Century's 1969 Primary Policy because the complaining documents provided a potential for coverage [Order, 5/1/07].[7] Century's duty terminated as of the date Emhart incurred costs in excess of $100,000. That occurred on October 17, 2001.

2. Century's duty to defend Emhart triggered under Century's 1969 Excess Policy because the complaining documents provided a potential for coverage, Century's 1969 Primary Policy's $100,000 limit of liability was exhausted by October 19, 2006, and the waste-product exclusion did not preclude a potential for coverage [Order, 5/1/07].[8]

3. Any existing duty to defend Emhart in this matter ceased as of October 19, 2006, the date of the jury verdict finding no coverage [Order, 5/1/07].

### WRONGFUL REFUSAL TO DEFEND

4. If an insurer refuses to defend a policyholder pursuant to a general liability policy, the insurer will be obligated to pay, in addition to the costs of defense and attorneys' fees, the award of damages or settlement assessed against the policyholder. *Conanicut Marine Services, Inc. v. Insurance Co. of North America,* 511 A.2d 967, 971 (R.I. 1986). An insurer, however, will not be responsible for the award of damages or settlement assessed against the policyholder if the insurer either (1) enters into a non-waiver agreement with the policyholder whereby it agrees to defend the policyholder and the policyholder recognizes the right of the insurer to question coverage, or (2) the insurer brings an action against the policyholder for a declaratory judgment on the question of coverage. *Rumford Property and Liability Ins. Co. v.*

[7] Century disagrees with the Court's conclusion and reserves its right to challenge it on appeal or otherwise.
[8] Century disagrees with the Court's conclusion and reserves its right to challenge it on appeal or otherwise.

*Carbone*, 590 A.2d 398, 401 (R.I. 1991), abrogated on other grounds by, *Skaling v. Aetna Cas. Co.*, 799 A.2d 997 (R.I. 2002); *Conanicut*, 511 A.2d at 971 n.10; *Michaud v. Merrimack Mut. Fire Ins. Co.*, 1994 WL 774683 at *9 (D.R.I. 1994).[9]

5. Based on these principles, Century is not responsible for Emhart's indemnification costs because Century did not wrongfully refuse to defend Emhart under either Century's 1969 Excess Policy or Century's 1969 Primary Policy. Instead, Century sought declaratory relief in this lawsuit before denying coverage as follows:

A. With respect to Century's 1969 Excess Policy, Century did not refuse to defend Emhart. Century advised Emhart that Century would have no obligations under the policy until Emhart first demonstrated that the underlying coverage had been exhausted. Emhart incurred indemnification costs in excess of $100,000 as of October 17, 2001. However, Emhart did not inform Century of that fact until after this lawsuit was filed. Once the lawsuit was filed, Century had the right to have the coverage issues resolved without incurring a penalty.

B. With respect to Century's 1969 Primary Policy, Century was not aware of that policy when this lawsuit was filed. After Century discovered the policy, it sent a copy to Emhart and filed a motion for leave to assert a counterclaim with respect to that policy. Century did not deny coverage under that policy until after it first sought leave to file a counterclaim. Century was entitled to seek declaratory relief under the policy without incurring a penalty.

**PRE-TENDER DEFENSE COSTS**

6. An insurer will not be responsible for defense costs incurred before the date on which the policyholder tendered defense to its insurer, or notified its insurer of an

---

[9] Other courts have rejected *Conanicut*. *See e.g.*, *Flannery v. Allstate Ins. Co.*, 49 F.Supp.2d 1223, 1229 (D. Colo. 1999); *Sentinel Ins. Co., Ltd. v. First Ins. Co. of Hawai'i, Ltd.*, 76 Hawai'i 277, 294-295, 875 P.2d 894, 911-912 (1994); *Poloroid Corp. v. Travelers Indem. Co.*, 414 Mass. 747, 763, 610 N.E.2d 912. 921 (1993).

opportunity to participate in the defense. *Michaud,* 1994 WL 774683 at *6; *Fireman's Fund Ins. Companies v. Ex-Cell-O Corp.*, 790 F.Supp. 1318, 1329 (E.D. Mich. 1992).

7. Emhart did not tender the underlying claim to Century under the Crown-Metro policies until November 22, 2000. Thus, Century is not responsible for any defense costs Emhart incurred before that time.

**REASONABLENESS OF DEFENSE COSTS**

8. The party seeking to recover its underlying defense costs has the burden of proving those costs are reasonable. *Liberty Mut. Ins. Co. v. Continental Cas. Co.*, 771 F.2d 579, 582 (1st Cir. 1985); *Michaud,* 1994 WL 774683 at *7.

9. Emhart has failed to meet its burden. Of the $4,165,000 billed in attorney time, the amount that should have been billed is $1,967,500. Instead of the $308,561 billed in disbursements, the amount that should have been billed is $185,800.

**ALLOCATION**

10. Where a claim raises the potential for coverage in multiple periods, an insurer is only responsible for a pro rata share of the underlying defense costs based on the period of time of the insurer's coverage over the entire period of time that the claim could be triggered. *See e.g., Security Ins. Co. of Hartford v. Lumbermens Mut. Cas. Co.*, 264 Conn. 688, 699, 826 A.2d 107, 115 (2003); *Owens-Illinois, Inc. v. United Ins. Co.*, 138 N.J. 437, 473, 650 A.2d 974, 993 (1994); *Gulf Chemical & Metallurgical Corp. v. Associated Metals & Minerals Corp.*, 1 F.3d 365, 372 (5th Cir. 1993); *Commercial Union Ins. Co. v. Sepco Corp.*, 918 F.2d 920, 924 (11th Cir. 1990); *E.E.O.C. v. Southern Pub. Co., Inc.*, 894 F.2d 785, 791-792 (5th Cir. 1990); *Budd Co. v. Travelers Indem. Co.*, 820 F.2d 787, 791 (6th Cir. 1987); *Insurance Co. of North*

*America v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212, 1224-1225 (6th Cir. 1980); *Fireman's Fund Ins. Co. v. Ex-Cell-O Corp.*, 685 F.Supp. 621, 626 (E.D. Mich. 1987).

11. Based on the principles set forth in these cases, Century would only be responsible for a pro rata share of Emhart's reasonable underlying defense costs as follows:

A. Under Century's 1969 Primary Policy, Century would only be responsible for a pro rata share of Emhart's reasonable defense costs from November 22, 2000 (the date of tender) to October 17, 2001 (the date of exhaustion) based on the period of coverage (10 ½ months) over the period of time the claim could potentially have been triggered, which runs from 1940 (the first date under the underlying complaining documents that the alleged property damage was potentially discoverable in the exercise of reasonable diligence) to 1998 (the date under the underlying complaining documents that the alleged property damage was actually discovered).

B. Under Century's 1969 Excess Policy, Century would only be responsible for a pro rata share of Emhart's reasonable defense costs from October 17, 2001 (the date the underlying coverage was exhausted) to October 19, 2006 (the date the jury found the claim was not covered) based on the period of coverage (13 months) over the period of time the claim could potentially be covered, which runs from 1940 (the first date under the underlying complaining documents that the alleged property damage was potentially discoverable in the exercise of reasonable diligence) to 1998 (the date under the underlying complaining documents that the alleged property damage was actually discovered).

12. Rhode Island courts have not addressed how defense costs should be allocated where a claim raises the potential for coverage in multiple periods. However, in *Insurance Co. of North America v. Kayser-Roth Corp.*, 770 A.2d 403, 413 (R.I. 2001), the

Supreme Court of Rhode Island said, with respect to indemnification costs, that a setoff based on the amount that should be allocated to other settling insurers may be applied in an appropriate case. *See Town of Cumberland v. Rhode Island Interlocal Risk Management Trust, Inc.*, 860 A.2d 1210, 1218 (R.I. 2004).

13. If the Court applied that method of allocation to the facts of this case, then Century would only be responsible for a pro rata share of Emhart's reasonable underlying defense costs as follows

A. Under Century's 1969 Primary Policy, Century would only be responsible for a pro rata share of Emhart's reasonable defense costs from November 22, 2000 (the date of tender) to October 17, 2001 (the date of exhaustion) based on the period of coverage (10 ½ months) over the period of coverage of other available primary insurance (15 years).

B. Under Century's 1969 Excess Policy, Century would only be responsible for a pro rata share of Emhart's reasonable defense costs from October 17, 2001 (the date the underlying coverage was exhausted) to October 19, 2006 (the date the jury found the claim was not covered) based on the period of coverage (13 months) over the period of coverage of other available primary insurance (15 years).[10]

Dated: June 20, 2007

McKENNA & McCORMICK

By: /s/ James T. McCormick
James T. McCormick (#2614)
McKENNA & McCORMICK
128 Dorrance Street, Suite 330
Providence, RI 02903
(401) 831-2970

- and -

[10] Emhart contends that the Court should enter judgment against Century in the amount of Emhart's reasonable defense costs less the amount of defense costs Liberty Mutual actually paid. If the Court accepts Emhart's argument, then Century would seek to offer evidence regarding the Black & Decker /Liberty Mutual settlement to show that the parties to that settlement colluded on setting the amount of the settlement allocated to the Site and to defense costs.

Lawrence A. Nathanson
Scott E. Levens
SIEGAL, NAPIERKOWSKI & PARK
533 Fellowship Road, Suite 120
Mt. Laurel, NJ 08054
(856) 380-8910

Attorneys for Defendant Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America

**CERTIFICATE OF SERVICE**

I hereby certify that on June 20, 2007, a copy of the foregoing Defendant Century Indemnity Company's Proposed Findings of Fact and Conclusions of Law was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

By: /s/ James T. McCormick
James T. McCormick (#2614)
McKENNA & McCORMICK
128 Dorrance Street, Suite 330
Providence, RI 02903
(401) 831-2970