UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

EMHART INDUSTRIES, INC.,

Plaintiff,

v.

HOME INSURANCE COMPANY,
INSURANCE COMPANY OF NORTH AMERICA,
LIBERTY MUTUAL INSURANCE COMPANY,
NORTH RIVER INSURANCE COMPANY,
ONEBEACON AMERICA INSURANCE COMPANY
and UNITED STATES FIRE INSURANCE COMPANY,

Defendants.

Civil Action No. 02-053-S

**EMHART INDUSTRIES, INC.'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiff Emhart Industries, Inc. ("Emhart") respectfully submits the following proposed findings of fact and conclusions of law in connection with the evidentiary hearing scheduled for June 25, 2007 (the "Hearing") in the above-captioned matter.[1] In its Order dated May 1, 2007, the Court found that: (1) Emhart succeeded to the rights and benefits of the Policy No. GAL 36597 (the "Primary Policy"), Policy No. XBC 64674 (the "Excess Policy"), and Policy No. S-16-07084 (the "Umbrella Policy"); and (2) Century Indemnity Company ("Century") owed a duty to defend Emhart under both the Primary Policy and Excess Policy, which duty ceased as of October 19, 2006. The Court scheduled the Hearing in order to determine: (1) Emhart's defense costs as of October 19, 2006; (2) whether Century breached its duty to defend Emhart in

[1] Attached hereto at Exhibits A and B are Emhart's Witness and Exhibit Lists, respectively.

connection with the Centredale Manor Superfund Site in North Providence, Rhode Island (the "Site"); and (3) Emhart's damages arising from Century's breach of its duty to defend.

As set forth in detail herein, because Century failed to fulfill its contractual obligation to provide Emhart with a defense in regard to the EPA and related proceedings concerning the Site, Century must reimburse Emhart's defense and indemnification costs that were incurred up to the time the jury verdict was entered in this case, October 19, 2006. Such costs total $5,590,011.25, representing the sum of (a) defense costs in the amount of $4,413,523.21 paid to Emhart's attorneys, (b) defense costs in the amount of $667,206.20 paid to Emhart's consultants, and (c) $509,281.84 in indemnification costs paid to Emhart's consultants for removal and remediation work at the Site.

## I. THE SITE

1. The Centredale Manor Restoration Superfund Site consists of two parcels located at 2072 and 2074 Smith Street in the Village of Centredale in North Providence, Rhode Island. The parcels, which total 9.7 acres, presently house two high-rise apartment buildings known as Brook Village and Centredale Manor. The Site also extends onto the 10-year floodplain of the Woonasquatucket River south to the Allendale Dam. On the eastern portion of the land comprising the Site there is a drainage swale or "tail race" that ultimately empties into a wooded wetland to the south. The Woonasquatucket River flows along the western portion of the Site.

2. The Site is a federal Superfund site contaminated with 2,3,7,8-tetrachlorodibenzi-*p*-dioxin (or "dioxin") and polychlorinated biphenyls ("PCBs"). These contaminants, which even at low levels pose significant human health and ecological risks, were distributed at elevated levels in soil and sediments on the Centredale Manor-Brook Village property as well as off-site properties and sediments in the Woonasquatucket River and Allendale and Lyman Mill Ponds and their vicinity.

3. For sites like Centredale Manor, CERCLA authorizes the EPA to compel certain classes of statutorily defined "responsible" parties to take action in response to the release of hazardous substances and/or to recover the costs of its response actions from "responsible" parties.

4. The EPA has taken actions to compel Emhart and a limited number of additional potentially responsible parties ("PRPs") to perform response actions at the Site, including the issuance of two Unilateral Administrative Orders under CERCLA, the negotiation of one Consent Order with respect to interim response actions and related investigations the EPA deemed necessary at the Site.

5. Under CERCLA, because Emhart is the current owner of the Site, it is a "responsible" party, despite Emhart not having contributed any of the contaminants to the Site. CERCLA liability includes both investigatory and cleanup costs and imposes strict, joint and several liability on liable parties.

6. Although CERCLA allows for equitable allocation of costs among the PRPs, in this case, there are a limited number of viable PRPs available to share the costs of the necessary response actions at the Site. Emhart is one of the only, if not the only, economically viable PRP, whereas the other PRPs have either limited resources or exposure in terms of their apparent equitable share of liability for Site conditions.

## II. ACTIVITIES OF METRO-ATLANTIC AND NECC

7. In 1944, Atlantic Chemical Company ("Atlantic Chemical") began operations at a portion of the Smith Street Section of the Site. Stipulation of Facts, ¶ 12 (dated Sept. 8, 2006) ("SOF ¶ __"). Atlantic Chemical operated a manufacturing plant at a portion of the Smith Street Section of the Site for the production of, among other things, hexachlorophene. Id. In 1953, Atlantic Chemical changed its name to Metro-Atlantic, Inc. ("Metro-Atlantic"). Id., ¶ 14. Later,

through a series of transactions, Emhart Industries succeeded to the assets and liabilities of Metro-Atlantic.

8. Metro-Atlantic's hexachlorophene manufacturing process could not have caused the dioxin contamination at the Site. Metro-Atlantic's hexachlorophene manufacturing process used activated charcoal, which would have adsorbed any dioxin associated with the process. [Tr. 9/27/06 (Hass) at 63-64, 75-76.] Second, Metro-Atlantic did not dump waste on the Site or into the Woonasquatucket River. Rather, Metro-Atlantic's solid waste was removed by a waste hauler and disposed off-site and its liquid waste was disposed of through the municipal sewer system. [Tr. 9/13/06 (J. Buonanno); Tr. 9/15/06 (J. Nadeau) at 27-28, 48-49; Tr. 9/18/06 (Turcone) at 5-7.]

9. From approximately 1952 until 1969, NECC operated a drum reconditioning facility on a portion of the Smith Street Section of the Site. SOF, ¶ 13. (In 1969 or 1970, NECC relocated to Smithfield, Rhode Island. Id.) The evidence presented at trial was consistent with the conclusion that all or substantially all of the dioxin found on the Site was the result of NECC operations and fires on the Site in the vicinity of NECC's operations.

## III. NOTICE TO CENTURY

10. During the period between July 21, 1999 and April 27, 2001, Emhart provided Century with notice of the EPA's request for information pursuant to Section 104(e) of CERCLA, the PRP Letter, the First Order and the Second Order. Those notices referenced the Century Excess Policy and other insurance policies issued by Century. The November 22, 2000 Letter by which Emhart gave formal notice of the claim to Century under Century's Excess Policy specifically stated that information was being supplied to Century "as notice of this loss under your confirmed insurance policies and any other policies your investigation identifies." Century had the Primary Policy in its files but it was not produced until years later during

discovery in this litigation and after Emhart's multiple requests that Century search its files for any applicable policies.

11. The adequacy of the measures taken by Century to locate the Primary Policy is irrelevant, since once Century was given notice by Emhart under any policy, that notice was effective as to all other policies that Century issued to Emhart. See Sinclair Oil Corp. v. N.H. Ins. Co., 268 A.2d 281, 285 (R.I. 1970); see also Casualty Ins. Co. v. E.W. Corrigan Constr. Co., 617 N.E.2d 228, 233 (Ill. App. Ct. 1993).

12. Further, an insurer's actual knowledge satisfies a policy's notice requirement. Thus, even in the absence of Emhart's formal written notice, the communications between Emhart and Century regarding the EPA proceedings were sufficient to provide notice of EPA's claim to Century. See Samson v. Transamerica Ins. Co., 636 P.2d 32, 44 (Cal. 1981) ("Transamerica's claim of lack of notice is even less convincing in light of the company's admission, in its appellate briefs, that it had actual notice of the accident and the lawsuit, although not of the trial date"); Cincinnati Cos. v. West Am. Ins. Co., 701 N.E.2d 499, 505 (Ill. 1998 ) ("the insurer's duty to defend is triggered by actual notice of the underlying suit," meaning "notice sufficient to permit the insurer to locate and defend the lawsuit."); Aetna Cas. & Sur. Co. v. Souras, 552 A.2d 908, 911 (Md. Ct. Spec. App. 1989) ("In the instant case, although no formal notice was given, Aetna admitted in the request for admission that it was aware of appellee's suit against both Reich and its insured . . . ."); F.D.I.C. v. Oldenburg, 34 F.3d 1529, 1547 (10th Cir. 1994) ("the insurer may receive actual notice through other means" than formal notice from the insured); Aetna Cas. & Sur. Co. v. Dow Chem. Co., 10 F. Supp.2d 800, 819-20 (E.D. Mich. 1998) ("Aetna/Dow I") (where "Aetna was aware in 1985 of the 1983 EPA suit," there was no prejudice "regardless of the sources of its information"); Ohio Cas. Group v.

Risinger, 960 S.W.2d 708, 711 (Tex. App. 1997) (insured may defeat notice defense "by proving that the insurer had actual knowledge of the suit (which would show that the insurer was not prejudiced by its insured's failure)").

## IV. REMEDIAL EFFORTS TO DATE

13. EPA placed the Site on the NPL in February 2000. EPA sent information requests and "notice of potential liability" letters to five PRPs, including Emhart, Crown-Metro, Inc., Centredale Manor Associates Limited Partnership, Brook Village Associates Limited Partnership, and New England Container Company, Inc.

14. In April 2000, after the noticed parties did not agree to EPA's request to sign an Administrative Order on Consent ("AOC") for completion of "time critical removal actions" at the Site, EPA issued an order requiring noticed PRPs to complete a removal action consisting of completing a soil cap and flood control measures at the Site. The five PRPs agreed to perform the work and to allocate the costs thereof on a per capita basis. This first removal action cost approximately $120,000.

15. In March 2001, again after the noticed parties did not agree to sign an AOC for completion of "no-time critical removal actions" at the Site, and unsuccessful negotiations, EPA issued a second order to the five PRPs, ordering them to restore the downstream Allendale dam, sample residential soils and shoreline sediments within the River flood plain, and to excavate and remove such soils and sediments containing greater than 1 ppb of dioxin. Four of the five complied (Crown-Metro, Inc. did not) and allocated the costs on a per capita basis. The total cost of this work was approximately $2.3 million.

16. In September 2003, following EPA's issuance of notice letters to 11 additional PRPs, EPA and a group of PRPs, including Emhart, entered into an AOC for the performance of

a third removal action, involving the removal of contaminated soils and sediments from a former "tailrace" area adjacent to the Site. This work was completed for approximately $500,000.

17. In June 2005, EPA issued its Remedial Investigation report, documenting the distribution of contaminants at and in the vicinity of the Site. EPA also issued a related Human Health Assessment report and Ecological Risk Assessment report, describing the human health and ecological risks in the vicinity of the Site. EPA has not yet determined the final remedy for the Site and is in the process of completing the Feasibility Study, and reviewing potential remedial alternatives. EPA is expected to issue its Record of Decision, setting forth its final remedy, in late 2008. The final costs associated with any cleanup could well exceed $100 million.

## V. DEFENSE COSTS

18. In response to EPA's information requests, notice letters, three orders, actual Site conditions and related matters, Emhart undertook various actions to comply with the EPA orders and requests, protect Emhart's interests, and reduce Emhart's exposure. These actions included: (1) investigating and responding to EPA claims and information requests; (2) negotiating with EPA regarding response actions and orders; (3) identifying other PRPs and seeking contributions from them; (4) negotiating with other PRPs regarding compliance with EPA orders and cost allocation; (5) engaging in litigation with other PRPs in federal and state courts; and (6) challenging EPA's settlements with PRPs who are Section 8 housing owners. Through these efforts, Emhart incurred approximately $4,413,523.21 million in legal fees and $667,206.20 in defense costs associated with work preformed by technical consultants as of October 19, 2006.

19. The strategies pursued by Emhart through its counsel and technical consultants were appropriate given: (1) the size and complexity of the Site, the nature of the contaminants, the extensive distribution thereof in the soil and sediments, and the potential costs associated

with the EPA's final remedy for the Site, which are anticipated to be on the order of $100 million; (2) EPA's notification of relatively few PRPs and the limited resources of those initially notified other than Emhart, which created a strong incentive for Emhart to pursue other PRPs, in light of the potentially high costs of the cleanup of the Site; and (3) the possibility that Emhart's pursuit of a factual defense to liability -- namely that its predecessor's manufacturing process could not have produced the contaminants present at the Site -- would, if successful, significantly reduce its liability.

20. Century owed a duty to defend Emhart under both the Primary Policy and Excess Policy. It did not do so. Indeed, while Emhart incurred defense costs, Century vigorously denied that it had any duty to defend or to reimburse Emhart for its defense costs. Emhart's uncertainty concerning reimbursement created an economic incentive on the part of Emhart to minimize its expenses associated with the Site. See Taco Bell Corp., v. Cont'l Cas. Co., 388 F.3d 1069, 1075-76 (7th Cir. 2004) (noting, "Because of the resulting uncertainty about reimbursement [from insurer's denial of any existing duty to defend], Taco Bell [the insured] had an incentive to minimize its legal expenses (for it might not be able to shift them); and where there are market incentives to economize, there is no occasion for a painstaking judicial review."). Under the circumstances, Century is estopped from challenging Emhart's expenses or arguing that Century would have proceeded differently if it had actually given Emhart the defense that it was contractually obligated to provide. See id.; Ins. Co. of North America v. Kayser-Roth Corp., 770 A. 2d 403 (R.I. 2001).

21. Emhart's associated attorneys' fees can be calculated under the "lodestar" method, which is simply "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." In re Schiff, 684 A.2d 1126, 1131 (R.I. 1996). Were this

calculation employed in this case, it would support a finding that the sum of $4,413,523.21 representing Emhart's attorneys' fees is reasonable.

22. The rates charged by Emhart's counsel were reasonable. The size of the Site, the complexity and expense of any remedial action, the dangerous nature of the contamination and Emhart's potential exposure justified Emhart in retaining law firms with a national reputation in the practice of environmental law and with extensive experience in Superfund matters. The direct involvement and regular oversight of Emhart and its parent company, Black & Decker, as legal expenses were incurred further indicate that the expenses were reasonable, because Emhart's parent company, Black & Decker, is a sophisticated consumer of legal services with experience in Superfund matters.

23. Moreover, the large potential exposure for Emhart and the projected costs of the cleanup, as well as the highly complex and specialized nature of CERCLA litigation, further support the conclusion that Emhart's attorneys' fees were reasonable. Cady v. IMC Mortgage Co., 2006 WL 2796662, at * 5 (R.I. Super. 2006).

24. Emhart's technical consultant defense costs in the amount of $667,206.20 were also reasonable. The firms employed are highly-qualified, experienced firms with significant experience in the investigation, assessment, and remediation of Superfund sites, and their rates are consistent with or below market rates charged by similarly qualified consultants for work performed on Superfund sites.

## VI. INDEMNIFICATION COSTS

25. As of October 19, 2006, Emhart incurred approximately $509,000 in "indemnity" costs, representing its share of response costs incurred in implementing the work required by the EPA. The work by Emhart's consultants in connection with the Site was required by the EPA

orders. These consultants' rates were competitive and in some instances below market rates for firms performing similar Superfund remediation work.

26. Because Century breached its duty to defend Emhart under both the Primary Policy and the Excess Policy, Century cannot contest its indemnification obligations under the policies. Conanicut Marine Servs., Inc. v. Ins. Co. of N. America, 511 A.2d 967 (R.I. 1986).

27. Century did not enter into a non-waiver agreement with Emhart nor did it bring an action for a declaratory judgment concerning the question of coverage under either policy. Accordingly, Century forfeited the opportunity to contest its duty to indemnify. See Michaud v. Merrimack Mut. Fire Ins. Co., 1994 WL 774683, at *9 (D.R.I. Nov. 16, 1994); Conanicut Marine Servs., Inc. v. Ins. Co. of N. America, 511 A.2d 967 (R.I. 1986).

28. As is true of Emhart's defense costs, Century is estopped from contesting the reasonableness of certain expenses that Emhart incurred in complying with the EPA orders. See Taco Bell, 388 F.3d at 1075-76; Kayser-Roth, 770 A. 2d at 412-14.

## VII. THE EFFECT OF THE LIBERTY MUTUAL SETTLEMENT AGREEMENT

29. Under the Primary Policy, Century promised to pay "all sums" that "the insured shall become legally obligated to pay as damages because of . . . property damage to which this insurance applies . . . ," and that Century would have the right and duty to defend any suit seeking such damages.

30. Under the Excess Policy, upon exhaustion of the Primary Policy, Century promised to indemnify Emhart for the "ultimate net loss . . . which the insured shall become legally obligated to pay as damages because of . . . property damage [to] which this insurance applies" and to defend any suit seeking damages on account of such property damage.

31. By the terms of its policies, Century must pay for its insured's liability that arises out of covered property damage within the policy period, up to the policy limits, and to defend

any suit seeking to impose such liability. Nothing in the policies makes Emhart's rights under the policies contingent on the extent of Emhart's coverage in other years. The existence or lack of coverage in prior or subsequent years neither depletes Emhart's rights nor relieves Century of its obligations.

32. Because Emhart's liability for the indivisible property damage that took place, in part, during the policy period equals its entire liability for the Centredale site, Century is bound by its policies to defend and indemnify Emhart for this entire liability. See Kayser-Roth, 770 A.2d at 412-14; see also, e.g., ACandS v. Aetna Cas. & Sur. Co., 764 F.2d 968, 973 (3d Cir. 1985).

33. That property damage may have taken place in other periods is irrelevant because it is not the quantum of *damage* during the policy period that determines the extent of coverage, but the extent of the insured's *liability* arising from damage that takes place at least in part during the policy period. See Kayser-Roth, 770 A.2d at 414; ACandS, 764 F.2d at 973.

34. Giving Century credit for payments made by Liberty Mutual would reward Century for refusing to honor its obligations, and would have the effect of discouraging insurers from reaching settlements with their insureds. See Kayser Roth, 770 A.2d at 414.

35. Even if this case is an "appropriate case" for applying a setoff, offsetting Century's obligations by any amount greater than Emhart received from Liberty Mutual on account of property damage at the Site would fail to make Emhart whole, and deprive Emhart of the protection for which it paid. See id. Any such setoff must not exceed the amount allocated by the Liberty Mutual settlement agreement for the Site, specifically $250,000 in defense costs and $750,000 in indemnity costs.

Respectfully submitted,

/s/ Gerald J. Petros

Gerald J. Petros (#2931)
HINCKLEY, ALLEN & SNYDER LLP
50 Kennedy Plaza, Suite 1500
Providence, Rhode Island 02903
(401) 274-2000

Jack R. Pirozzolo (*pro hac vice*)
Adam M. Weisberger (*pro hac vice*)
Elisa K. Nethercott (*pro hac vice*)
FOLEY HOAG LLP
Seaport World Trade Center West
155 Seaport Boulevard
Boston, Massachusetts 02210
(617) 832-1000

Counsel for EMHART INDUSTRIES, INC.

**CERTIFICATE OF SERVICE**

To:

James T. Murphy, Esquire
Kelly N. Michels, Esquire
Hanson Curran LLP
146 Westminster Street
Providence, Rhode Island 02903

Peter C. Netburn, Esquire
Kevin J. O'Connor, Esquire
Michael S. Batson, Esquire
Hermes, Netburn, O'Connor & Spearing, P.C.
265 Franklin Street, 7th Floor
Boston, Massachusetts 02110

Mark T. Nugent, Esquire
Michael Marcello, Esquire
Morrison Mahoney LLP
121 South Main Street, Suite 600
Providence, Rhode Island 02903-7141

Michael F. Aylward, Esquire
John T. Harding, Esquire
Morrison Mahoney LLP
250 Summer Street
Boston, Massachusetts 02210

James T. McCormick, Esquire
McKenna & McCormick
128 Dorrance Street, Suite 330
Providence, Rhode Island 02903

Kimball Ann Lane, Esquire
Duane Morris LLP
380 Lexington Avenue
New York, New York 10168-0002

Martin F. Siegal, Esquire
Scott E. Levens, Esquire
Lawrence A. Nathanson, Esquire
Siegal Napierkowski & Park
533 Fellowship Road, Suite 120
Mt. Laurel, New Jersey 08054

I hereby certify that I caused a copy of the foregoing to be filed with the Court's CM/ECF system and sent electronically to the parties identified as registered participants on the Notice of Electronic Filing (NEF) and paper copies will be sent to those parties not registered as participants.

/s/ Gerald J. Petros_________________

811520v1

# EXHIBIT A
# EMHART'S WITNESS LIST

Paul B. Aldinger

Mr. Aldinger is the President of Paul B. Aldinger & Associates, Inc. ("Aldinger") of East Providence, Rhode Island, an engineering firm that rendered consulting services regarding remedial work at the Site to comply with orders issued by the EPA. He is expected to testify that Aldinger was paid for its work.

Kimberly Alexander

Ms. Alexander is a former employee of AON Risk Services of Baltimore, Maryland. She is expected to testify regarding that AON provided notice of the EPA claim against Emhart to various insurers, including CIC, and that she had written communications with those insurers concerning the Emhart claim.

Linda H. Biagioni

Ms. Biagioni is the Vice President of Emhart. She is expected to testify that Emhart retained counsel to defend it and paid the defense costs, and that Emhart joined a group of potentially responsible parties that performed the work required by the three EPA Orders and paid a portion of the group's expenses.

Richard A. Cleary

Mr. Cleary is the head of R.A.C. Investigative Services, Inc. ("R.A.C.") in Providence, Rhode Island, an investigative services firm that rendered services regarding defense of the EPA proceedings regarding the Site. He is expected to testify that R.A.C. was paid for its work.

Christopher P. Davis, Esq. (expert witness)

Mr. Davis is an attorney with the Boston office of Goodwin Procter. His anticipated testimony concerns the legal services and technical services rendered in defense of the EPA proceedings regarding the Site. He is expected to testify that the legal services rendered were reasonably necessary to defend Emhart and that the fees and disbursements were fair and reasonable. He will also testify concerning the nature of the services performed by technical contractors and the appropriateness of those services in the investigation and remediation of contamination at the Site.

Dr. J. Ronald Hass

Dr. Hass is the Chief Scientist at Chatham Research, Ltd. ("Chatham") in Durham, North Carolina, the trace and ultra trace chemical analysis firm that rendered consulting services regarding defense of the EPA proceedings regarding the Site. He is expected to testify that Chatham was paid for its work.

Joseph W. Hovermill, Esq.

Mr. Hovermill, an attorney with the Baltimore office of Miles & Stockbridge, is expected to testify concerning notice of the EPA proceeding against Emhart that he provided to CIC after receiving a copy of INA Policy No. XBC 46961. He is also expected to testify concerning written communications that he had with CIC after the notice that he provided to CIC.

Robert L. Jenson

Mr. Jenson is the Chief Financial Officer at Hart Crowser in Seattle, Washington, an engineering firm that rendered consulting services regarding defense of the EPA proceedings regarding the Site. He is expected to testify that Hart Crowser was paid for its work.

Steve Jones

Mr. Jones is a former employee of AON Risk Services of Baltimore, Maryland. He is expected to testify regarding that AON provided notice of the EPA claim against Emhart to various insurers, including CIC, and that he had written communications with those insurers concerning the Emhart claim.

Russell E. Keenan

Mr. Keenan is a consultant at AMEC Earth & Environmental ("AMEC") of Portland, Maine, an engineering firm that rendered consulting services regarding defense of the EPA proceedings regarding the Site. He is expected to testify that AMEC was paid for its work.

Jeffrey J. Loureiro

Mr. Loureiro is the president of Loureiro Engineering Associates, Inc. ("LEA") of Plainville, Connecticut, the engineering firm that performed remedial work at the Site to comply with orders issued by the EPA and consulting services in connection with the defense of the EPA proceeding. He is expected to testify concerning the work that LEA and its contractors performed to comply with the EPA orders. He is also expected to testify that LEA was paid for its work.

Claire D. May

Ms. May, an employee of AON Risk Services of Baltimore, Maryland, is expected to testify regarding that AON provided notice of the EPA claim against Emhart to various insurers, including CIC, and that she had written communications with those insurers concerning the Emhart claim.

Joseph E. McCain, Jr.

Mr. McCain was the head of The Jemis Group ("Jemis") in Boston, Massachusetts, an investigative services firm that rendered services regarding defense of the EPA proceedings regarding the Site. He is expected to testify that Jemis was paid for its work.

Thomas P. McShane

Mr. McShane is a principal of The Dewey Square Group ("Dewey") in Boston, Massachusetts, a consulting firm that rendered services regarding defense of the EPA proceedings regarding the Site. He is expected to testify that Dewey was paid for its work.

Robert D. Mutch

Mr. Mutch is the principal ground water hydrologist for HydroQual, Inc. ("HydroQual") in Mahwah, New Jersey, an engineering firm that rendered consulting services regarding defense of the EPA proceedings regarding the Site. He is expected to testify that Hydroqual was paid for its work.

Jerome C. Muys Jr., Esq.

Mr. Muys, an attorney with the Washington, D.C. office of Sullivan and Worcester, has represented Emhart in connection with the EPA proceeding concerning the Site. His anticipated testimony will describe the legal services his law firm rendered in the defense of that matter. Those services include consultations with the EPA concerning the scope of remediation at the Site, work with other Potentially Responsible Parties to defend the EPA claim and coordinating the activities that contractors performed to comply with the requirements of the EPA orders. His law firm also conducted investigations to locate other parties responsible for contamination at the Site and prosecuted litigation with respect to other Potentially Responsible Parties. He will also

testify concerning the nature of the services performed by contractors and the appropriateness of those services in the investigation and remediation of contamination at the Site.

M'Liss Rinaldi

Ms. Rinaldi is an assistant Vice President and Rhode Island state counsel for Commonwealth Title Insurance Company ("Commonwealth") in Smithfield, Rhode Island. Commonwealth rendered consulting services regarding remedial work at the Site to comply with orders issued by the EPA. She is expected to testify that Commonwealth was paid for its work.

Craig M. Scott, Esq.

Mr. Scott is an attorney with Duffy, Sweeney & Scott ("Duffy") in Providence, Rhode Island. Duffy rendered legal services regarding defense of the EPA proceedings regarding the Site. He is expected to testify that Duffy was paid for its work.

Stephen Siano

Mr. Siano is Vice President and Assistant Controller of Arcadis of New York, Inc., ("Arcadis") in Syracuse, New York, an engineering firm that rendered consulting services regarding defense of the EPA proceedings regarding the Site. He is expected to testify that Arcadis was paid for its work.

Wesley M. Stallings

Mr. Stallings is a partner at Bernard Robinson & Company ("Bernard") in Greensboro, North Carolina, a certified public accounting firm that rendered consulting services regarding defense of the EPA proceedings regarding the Site. He is expected to testify that Bernard was paid for its work.

# EXHIBIT B

## Plaintiff's Exhibit List[1]

**Emhart Industries, Inc. v. The Home Insurance Co., et al., No. 02-53-S**

| Ex. | Description | Date | Dep. Ex. | Bates Range | Purpose |
|---|---|---|---|---|---|
| 1 | Unilateral Administrative Order for Removal Action, In the Matter of Centredale Manor Restoration Project Superfund Site, U.S. EPA Region I CERCLA Docket No. CERCLA1-2000-0026 | 04/12/2000 | | AON 00850-00873 | Nature of underlying claim against Emhart |
| 2 | Second Administrative Order for Removal Action, In the Matter of Centredale Manor Restoration Project Superfund Site, U.S. EPA New England CERCLA Docket No. CERCLA-1-2001-0032 | 03/26/2001 | | SBSF 13954-13957 | Nature of underlying claim against Emhart |
| 3 | Third Administrative Order On Consent for Removal Action, In the Matter of Centredale Manor Restoration Project Superfund Site, U.S. EPA Region I CERCLA Docket No. 01-2004-0001 (Ciba Specialty Chemicals Corp. and Organic Dyestuffs Corp., Respondents) | 10/08/2003 | | SBSF 19636-19685 | Nature of underlying claim against Emhart |
| 4 | Loureiro Engineering Associates Power Point presentation to EPA | 07/27/2001 | | | Damages |
| 5 | AMEC Power Point evidentiary summary presentation to EPA | 05/13/2002 | | | Damages |
| 6 | Loureiro Engineering Associates Power Point presentation to EPA | 06/2002 | | | Damages |
| 7 | Loureiro Engineering Associates Power Point presentation to EPA | 11/07/2005 | | | Damages |
| 8 | EPA Power Point presentation | 04/23/2007 | | | Damages |
| 9 | Kastrinos Slide: Area Map | | | | Damages |
| 10 | Kastrinos Slide: Topographic detail showing surface runoff direction with red arrows | | | | Damages |

[1] Plaintiff Emhart reserves its right to supplement this list as necessary.

| **Ex.** | **Description** | **Date** | **Dep. Ex.** | **Bates Range** | **Purpose** |
|---|---|---|---|---|---|
| 11 | Kastrinos Slide: Site profile showing runoff direction with red arrows | | | | Damages |
| 12 | Kastrinos slide: Dioxins in soil | | | | Damages |
| 13A | Map of Centredale Site showing concentrations of 2,3,7,8 - TCDD and PCB's | | | SBSF 09505 | Damages |
| 13B | Map of Centredale Site showing concentrations of 2,3,7,8 - TCDD and PCB's | | | SBSF09511 | Damages |
| 13C | Map of Centredale Site showing concentrations of 2,3,7,8 - TCDD and PCB's | | | SBSF 09512 | Damages |
| 13D | Map of Centredale Site showing concentrations of 2,3,7,8 - TCDD and PCB's | | | SBSF 09513 | Damages |
| 13E | Map of Centredale Site showing concentrations of 2,3,7,8 - TCDD and PCB's | | | SBSF 09514 | Damages |
| 13F | Map of Centredale Site showing concentrations of 2,3,7,8 - TCDD and PCB's | | | SBSF 09515 | Damages |
| 13G | Map of Centredale Site showing concentrations of 2,3,7,8 - TCDD and PCB's | | | SBSF 09516 | Damages |
| 13H | Map of Centredale Site showing concentrations of 2,3,7,8 - TCDD and PCB's | | | SBSF 09517 | Damages |
| 13I | Map of Centredale Site showing concentrations of 2,3,7,8 - TCDD and PCB's | | | SBSF 09518 | Damages |
| 13J | Map of Centredale Site showing concentrations of 2,3,7,8 - TCDD and PCB's | | | SBSF 09519 | Damages |
| 13K | Map of Centredale Site showing concentrations of 2,3,7,8 - TCDD and PCB's | | | SBSF 09520 | Damages |
| 13L | Map of Centredale Site showing concentrations of 2,3,7,8 - TCDD and PCB's | | | SBSF 09521 | Damages |
| 13M | Blow-Up of Exhibit 13G | | | SBSF 09516 | Damages |
| 14 | Collection of invoices showing Emhart's defense expenses | | | various | Damages |

| Ex. | Description | Date | Dep. Ex. | Bates Range | Purpose |
|---|---|---|---|---|---|
| 15 | Bingham McCutchen bills from 07/05/2006 through 10/30/2006 | | | PTL-EMH 0001 - 0112; PTL-EMH 0154 - 0157; PTL-EMH 0184 - 0193; PTL-EMH 0254 - 0266; PTL-EMH 0333 - 0358; PTL-EMH 1081 - 1173; PTL-EMH 1476 - 1561; PTL-EMH 1588 - 1610 | Damages |
| 16 | Loureiro Engineering Associates, Inc. invoices from 05/10/2000 through 11/03/2006 | | | various | Damages |
| 17A | A summary chart for the legal invoices | | | PTL-EMH 2224 - 2231 | Damages |
| 17B | Supporting documents for Exhibit 17A | | | | |
| 18A | A summary chart for the non-legal consultant invoices | | | PTT-EMH 0195 | |
| 18B | Supporting documents for Exhibit 18A | | | | |
| 19 | An updated summary chart of legal disbursements | | | PTL-EMH 2246 | Damages |
| 20 | An updated summary of invoices comprising Emhart's defense expenses | | | PTL-EMH 2239-2245 | Damages |
| 21 | A summary chart of legal hours worked by time keeper | | | PTL-EMH 2247-2248 | Damages |
| 22 | A chronology of Centredale Manor Site events | | | PTC-EMH 0001 - PTC-EMH 0018 | Damages |
| 23 | A summary chart indicating a comparison of legal rates | | | | Damages |
| 24 | Summary of invoices comprising Emhart's defense expenses | | | none | Damages |

| **Ex.** | **Description** | **Date** | **Dep. Ex.** | **Bates Range** | **Purpose** |
|---|---|---|---|---|---|
| 25 | Summary of invoices comprising Emhart's defense expenses other than invoices from Swidler Berlin/Bingham McCutchen | | | none | Damages |
| 26 | Summary of invoices/checks comprising Emhart's payments to PRP group excrow accounts and other remediation expenses | | | none | Damages |
| 27 | Expert Report of Christopher P. Davis | 06/08/2007 | | | Damages |
| 28 | A summary chart of Emhart legal fees adjustments | | | | |