UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| EMHART INDUSTRIES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, LIBERTY MUTUAL INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICA INSURANCE COMPANY, and UNITED STATES FIRE INSURANCE COMPANY<br><br>Defendants. | CIVIL ACTION<br>NO. CA 02-053S<br><br>**DEFENDANT CENTURY INDEMNITY COMPANY'S MOTION TO ADMIT DOCUMENTS** |

Defendant Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America ("Century"), by its attorneys, moves to admit the following documents: DX-241; DX-246; DX-295; DX-298; DX-300; DX-304; DX-378; DX-396; and the Response of Plaintiff Emhart Industries, Inc. to Defendant North River Insurance Company's First Set of Interrogatories. A copy of these documents is attached to the Affidavit of Lawrence A. Nathanson in Support of Defendant Century Indemnity Company's Motion to Admit Documents as Exhibit A through I.

In support of its motion, Century relies on the Affidavit of Lawrence A. Nathanson in Support of Defendant Century Indemnity Company's Motion to Admit Documents, and on the Memorandum of Law in Support of Defendant Century Indemnity Company's Motion to Admit Documents.

Dated: July 31, 2007

McKENNA & McCORMICK

By: /s/ James T. McCormick

James T. McCormick (#2614)
McKENNA & McCORMICK
128 Dorrance Street, Suite 330
Providence, RI 02903
(401) 831-2970

- and -

Lawrence A. Nathanson
Scott E. Levens
SIEGAL, NAPIERKOWSKI & PARK
533 Fellowship Road, Suite 120
Mt. Laurel, NJ 08054
(856) 380-8910

Attorneys for Defendant Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America

**CERTIFICATE OF SERVICE**

I hereby certify that on July 31, 2007, a copy of the foregoing Defendant Century Indemnity Company's Motion to Admit Documents was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

By: /s/ James T. McCormick
James T. McCormick (#2614)
McKENNA & McCORMICK
128 Dorrance Street, Suite 330
Providence, RI 02903
(401) 831-2970

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| EMHART INDUSTRIES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, LIBERTY MUTUAL INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICA INSURANCE COMPANY, and UNITED STATES FIRE INSURANCE COMPANY<br><br>Defendants. | CIVIL ACTION<br>NO. CA 02-053S<br><br>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT CENTURY INDEMNITY COMPANY'S MOTION TO ADMIT DOCUMENTS** |

Defendant Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America ("Century"), by its attorneys, submits this memorandum of law in support of its motion to admit the following documents: DX-241; DX-246; DX-295; DX-298; DX-300; DX-304; DX-378; DX-396; and the Response of Plaintiff Emhart Industries, Inc. to Defendant North River Insurance Company's First Set of Interrogatories.[1]

## STATEMENT OF THE ISSUE

Before the June 2007 evidentiary hearing, the parties stipulated that the following documents marked at trial as Defendants' Exhibits 241, 246, 295, 298, 300, 304, 378 and 396 are admissible in evidence, subject to the Court's ruling on relevance [Exhibit 37, ¶2.d.]. All of these documents are correspondence between Emhart and Liberty Mutual regarding the

[1] A copy of these documents is attached to the Affidavit of Lawrence A. Nathanson in support of Defendant Century Indemnity Company's Motion to Admit Documents ("Nathanson Aff.") as Exhibits A through I.

Centredale site [Nathanson Aff. Ex. A–Ex. H]. Century is offering these exhibits because they refute Emhart's allegations that Emhart tendered the defense of the Centredale claim to Century in July 1999, and that Century refused to defend Emhart before this lawsuit was filed. In stark contrast with the correspondence between Emhart and Century during the same period, the proposed exhibits show that Emhart tendered the defense of the Centredale site to Liberty Mutual in July 1999.

Century moved to admit these exhibits into evidence at the end of the evidentiary hearing. However, Magistrate Judge Almond deferred to this Court because this Court is more familiar with the issues.

At the end of the evidentiary hearing, Century also moved to admit the Response of Plaintiff Emhart Industries, Inc. to Defendant North River Insurance Company's First Set of Interrogatories [Nathanson Aff. Ex. I]. Century seeks to admit this document because Exhibit A to Emhart's response lists all of Emhart's liability insurance policies from 1964 through 1990, and all of USM's liability insurance policies from 1956 to 1979. This information is relevant to allocation.

Magistrate Judge Almond also did not rule on Century's motion regarding Emhart's discovery response. He deferred to this Court because he was not sure that Exhibit A to Emhart's discovery response was a part of the response. Following the evidentiary hearing, Century sent a copy of the full discovery response to Emhart's attorneys and asked them if Emhart had any objection to the admissibility of the document [Nathanson Aff. Ex. J]. Emhart's attorneys objected to the admissibility of Exhibit A to the discovery response based on relevance [Nathanson Aff. Ex. K].

## ARGUMENT

### I. THE STANDARD

Emhart objects to the admissibility of its correspondence with Liberty Mutual, and to the list of its other liability insurance policies on relevance grounds. Rule 401 of the Federal Rules of Evidence states that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The proposed exhibits meet this standard.

### II. THE CORRESPONDENCE BETWEEN EMHART AND LIBERTY MUTUAL IS RELEVANT BECAUSE IT REFUTES EMHART'S ALLEGATIONS THAT EMHART TENDERED THE CENTREDALE CLAIM TO CENTURY IN JULY 1999, AND THAT CENTURY REFUSED TO DEFEND EMHART AT THAT TIME.

Emhart first gave Century notice of the Centredale site in July 1999. Because Century did not defend Emhart at that time, Emhart contends that Century refused to defend and is responsible for all of Emhart's defense costs from that time forward, and for any indemnification costs Emhart has paid or will pay based on *Conanicut Marine Services, Inc. v. Insurance Co. of North America*, 511 A.2d 967 (R.I. 1986). The proposed exhibits refute Emhart's allegations. A comparison of the correspondence between Emhart and Liberty Mutual with the correspondence between Emhart and Century during the same period shows that Emhart was seeking a defense from Liberty Mutual during that period, and was not seeking a defense from Century.

#### A. Emhart's Correspondence with Liberty Mutual

From the time that Emhart first learned of the Centredale site, it aggressively pursued coverage from Liberty Mutual. On July 30, 1999, Emhart gave Liberty Mutual notice of the EPA claim regarding the Centredale site. Emhart demanded that Liberty Mutual provide a

defense and indemnify Emhart. [DX-241 (Nathanson Aff. Ex. A).] On August 23, 1999, Liberty Mutual acknowledged receipt of Emhart's claim and reserved its rights under its policies [DX-246 (Nathanson Aff. Ex. B)].

On May 4, 2000, Emhart advised Liberty Mutual that the EPA asserts its past costs claim now exceeds $4 million, the EPA advised that it has recently estimated that the cost to undertake additional emergency measures at portions of the site is $8 million to $16 million, and a final remedy could well exceed the cost of the initial work at the site. Emhart repeated its demand that Liberty Mutual provide a defense and indemnify Emhart. [DX 295 (Nathanson Aff. Ex. C).] On May 16, 2000, Emhart sent a copy of the Unilateral Administrative Order to Liberty Mutual, with Emhart's reply indicating its intention to comply [DX-298 (Nathanson Aff. Ex. D)].

On May 24, 2000, Liberty Mutual advised Emhart that Liberty Mutual would not be providing Emhart with a defense or indemnification because there is no potential obligation to defend or indemnify [DX-300 (Nathanson Aff. Ex. E)]. On June 19, 2000, Emhart advised Liberty Mutual that it disagreed with Liberty Mutual's conclusion on coverage [DX-304 (Nathanson Aff. Ex. F)].

On May 3, 2001, Emhart provided notice to Liberty Mutual of the Second Administrative Order for Removal Action. Emhart repeated its demand that Liberty Mutual provide a defense and indemnify Emhart. [DX-378 (Nathanson Aff. Ex. G).] On September 17, 2001, Emhart provided an update to Liberty Mutual. Emhart again repeated its demand that Liberty Mutual provide a defense and indemnify Emhart. [DX-396 (Nathanson Aff. Ex. H).]

**B. Emhart's Correspondence with Century**

In contrast with its correspondence with Liberty Mutual during the same period, Emhart was not seeking a defense from Century. For most of that time, Emhart was only providing notice to Century under upper level excess policies that Century had issued to USM and to Emhart.

On July 21, 1999, Emhart gave Century notice of the EPA claim regarding the Centredale site. The notice listed the following excess policies: INA – XCP4506, 1/5/70-1/1/71; XCP155977, 1/1/84-85; XCP157252, 1/1/85-86; XCC017060, 1/8/86-1/1/87. [PX-18A.] On August 10, 1999, Century acknowledged receipt of Emhart's notice under these same policies. Century advised Emhart that if Emhart intended to make a claim under any other policy number it should advise Century immediately. [PX-20.].

On February 9, 2000, Emhart's broker advised Century that the underlying coverage had not been eroded, and it had no reason to believe that any Century policy would be implicated:

> To date, there has no been no erosion of the underlying insurance. Indeed, no carrier has agreed to defend or indemnify Black & Decker in this matter. Furthermore, at the present time, there is no reason to believe that any INA or Pacific Employers layers of coverage will be implicated.

[DX-273.].

On March 14, 2000, Emhart provided notice of the February 28, 2000 PRP Letter to Century. The notice listed the same upper level excess policies. [PX-21A.] On April 21, 2000, Emhart provided notice of the Unilateral Administrative Order to Century under the same excess policies [PX-22A]. On October 17, 2000, Emhart advised Century of the lawsuits Crown-Metro filed against Emhart in South Carolina under the same excess policies issued to

USM and Emhart [DX-322]. On October 23, 2000, Century acknowledged receipt of Emhart's correspondence under these same excess policies. Century advised Emhart that if Emhart intended to make a claim under any other policy number it should advise Century immediately. [PX-23.]

On November 22, 2000, Emhart's attorneys wrote to Century seeking information for the first time regarding insurance coverage that Century issued to Crown-Metro. Attached to the letter was Century's 1969 Excess Policy. Emhart's attorneys requested that Century conduct a review of its records regarding Century's 1969 Excess Policy and any additional insurance coverage Century provided to Crown-Metro. Emhart's attorneys further demanded that Century provide a defense and indemnify Emhart for all damages, costs, and expenses in connection with the site under Century's 1969 Excess Policy and under any other policy Century issued to Crown-Metro. [PX-24A.]

On December 12, 2000, Century acknowledged receipt of Emhart's claim for coverage under Century's 1969 Excess Policy and denied coverage on the ground that Emhart is not a named insured. Century also reserved its rights to deny coverage on other grounds. [PX-26.] On January 3, 2001, Emhart's attorneys wrote back to Century. They repeated their request that Century review its records regarding Century's 1969 Excess Policy and any additional insurance coverage Century provided to Crown-Metro. They also provided further information on the relationship between Emhart and Crown-Metro, and asked Century to reconsider its position [PX-27.]

On January 11, 2001, Century wrote back to Emhart's attorneys and stated that Century had re-evaluated it previous denial under Century's 1969 Excess Policy and agreed that Emhart may be able to request insurance coverage to the extent it is a successor to Crown-Metro.

Century asked for proof of that successor relationship. Century also reserved its rights to deny coverage on other grounds. In addition, Century advised Emhart that Century would have no obligation under Century's 1969 Excess Policy until Emhart provided proof that all applicable primary and underlying limits have been exhausted:

> Policy XBC 46961 is an excess policy that provides coverage for liabilities in excess of primary and/or underlying limits of liability. If you wish to pursue coverage under this policy, you must provide proof that all applicable primary and/or underlying limits have been completely and properly exhausted. At this time, we have no information to indicate that underlying coverage has been exhausted or that this claim will reach our layer of insurance. Therefore, notwithstanding the pollution exclusion in the policy, we are not presently obligated either to provide a defense or to indemnify Emhart in this matter.

[PX-28.]

On April 9, 2001, Emhart's broker responded to Century's requests for information. The broker provided some information in response to Century's questions, including information on the relationship between Emhart and Crown-Metro. The broker did not provide any information on whether "all applicable primary and/or underlying limits have been completely and properly exhausted." [PX-29.] Emhart did not provide any such information to Century until after this lawsuit was filed.

The fact that Emhart did not provide any such information to Century before this lawsuit was filed is not surprising. Emhart had tendered the defense of the Centredale site to Liberty Mutual. The proposed exhibits should be admitted to prove these facts.

## II. THE LIST OF LIABILITY INSURANCE POLICIES ISSUED TO EMHART AND USM IS RELEVANT TO HOW EMHART'S DEFENSE COSTS SHOULD BE ALLOCATED.

Century's primary policy was in effect for 10 ½ months from February 15, 1969 to January 1, 1970. Century's excess policy was in effect for 13 months from December 1, 1968

to January 1, 1970. In contrast, Aetna Casualty & Surety Company and Liberty Mutual Insurance Company issued primary liability insurance policies to Emhart and its predecessors for 16 years from January 1, 1970 to January 1, 1986. Emhart's discovery response lists these insurance policies.

Despite the significant difference between the period of time that Century issued policies and the period of time that Aetna and Liberty Mutual issued policies, Emhart is seeking to recover all of its defense and indemnification costs from Century. That result would be contrary to Rhode Island law. In *Insurance Co. of North America v. Kayser-Roth Corp.*, 770 A.2d 403, 413 (R.I. 2001), the Supreme Court of Rhode Island said that a setoff based on the amount that should be allocated to other settling insurers may be applied in an appropriate case. *See Town of Cumberland v. Rhode Island Interlocal Risk Management Trust, Inc.*, 860 A.2d 1210, 1218 (R.I. 2004). In order for the Court to determine whether a setoff is appropriate it needs to know what other liability insurance policies were issued and when. Emhart's discovery responses provide that information and, thus, should be admitted.

## CONCLUSION

For the reasons stated, Century respectfully request that the Court admit the following documents: DX-241; DX-246; DX-295; DX-298; DX-300; DX-304; DX-378; DX-396; and the Response of Plaintiff Emhart Industries, Inc. to Defendant North River Insurance Company's First Set of Interrogatories.

Dated: July 31, 2007

McKENNA & McCORMICK

By: /s/ James T. McCormick
James T. McCormick (#2614)
McKENNA & McCORMICK
128 Dorrance Street, Suite 330
Providence, RI 02903
(401) 831-2970

- and -

Lawrence A. Nathanson
Scott E. Levens
SIEGAL, NAPIERKOWSKI & PARK
533 Fellowship Road, Suite 120
Mt. Laurel, NJ 08054
(856) 380-8910

Attorneys for Defendant Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America

**CERTIFICATE OF SERVICE**

I hereby certify that on July 31, 2007, a copy of the foregoing Defendant Century Indemnity Company's Memorandum of Law in Support of Defendant Century Indemnity Company's Motion to Admit Documents was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

By: /s/ James T. McCormick

James T. McCormick (#2614)
McKENNA & McCORMICK
128 Dorrance Street, Suite 330
Providence, RI 02903
(401) 831-2970

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| EMHART INDUSTRIES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, LIBERTY MUTUAL INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICA INSURANCE COMPANY, and UNITED STATES FIRE INSURANCE COMPANY<br><br>Defendants. | CIVIL ACTION<br>NO. CA 02-053S<br><br>**AFFIDAVIT OF LAWRENCE A. NATHANSON IN SUPPORT OF DEFENDANT CENTURY INDEMNITY COMPANY'S MOTION TO ADMIT DOCUMENTS** |

STATE OF NEW JERSEY :
:
COUNTY OF BURLINGTON:

Lawrence A. Nathanson, being first duly sworn, deposes and says as follows:

1. I am an attorney with Siegal, Napierkowski & Park, 533 Fellowship Road, Suite 120, Mt. Laurel, New Jersey 18054. My firm, along with McKenna & McCormick, 128 Dorrance Street, Suite 330, Providence, Rhode Island 02903, represents defendant Century Indemnity Company ("Century") in this matter. Century is a successor to CCI Insurance Company, which is a successor to Insurance Company of North America. I have personal knowledge of the matters contained in this affidavit, and if sworn as a witness could testify competently to them.

2. Attached hereto is a true and correct copy of the following documents, which Century is moving to admit into evidence:

A. Exhibit A is DX-241, which is a letter from Jack R. Pirozzolo (Emhart's attorney) to Ms. Kimberly Olson (Liberty Mutual Insurance Company), dated July 30, 1999.

B. Exhibit B is DX-246, which is a letter from Owen O'Neil, CPCU (Liberty Mutual Insurance Company) to Jack Pirozzolo, Esq., dated August 23, 1999.

C. Exhibit C is DX-295, which is a letter from Jack R. Pirozzolo to Ms. Kimberly Olson, dated May 4, 2000.

D. Exhibit D is DX-298, which is a letter from Jack R. Pirozzolo to Ms. Kimberly Olson, dated May 16, 2000.

E. Exhibit E is DX-300, which is a letter from Denise M. Szuniewicz (Liberty Mutual Insurance Company) to Mr. Joe Hovermill (Emhart's attorney), dated May 24, 2000.

F. Exhibit F is DX-304, which is a letter from Jack R. Pirozzolo to Ms. Denise M. Szuniewicz, dated June 19, 2000.

G. Exhibit G is DX-378, which is a letter from Jack R. Pirozzolo to Ms. Denise M. Szuniewicz, dated May 3, 2001.

H. Exhibit H is DX-396, which is a letter from Jack R. Pirozzolo to Ms. Denise M. Szuniewicz, dated September 17, 2001.

I. Exhibit I is the Response of Plaintiff Emhart Industries, Inc. to Defendant North River Insurance Company's First Set of Interrogatories.

3. On July 12, 2007, I sent Emhart's attorneys an electronic copy of Exhibit I, and asked them if Emhart had any objections to the admissibility of the document. Attached hereto as Exhibit J is a true and correct copy of my electronic message to Emhart's attorneys.

4. On July 18, 2007, David Cole (Emhart's attorney) informed me that Emhart objected to the admissibility of Exhibit I. Attached hereto as Exhibit K is a true and correct copy of Mr. Cole's electronic message.

[signature]
Lawrence A. Nathanson

Sworn to and subscribed before
me this 30th day of July 2007.

[signature]
Notary Public

JOSEPHINE A. DEL VACCHIO
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires May 30, 2008



EMHART\071907AF.LAN

# EXHIBIT

# A

WILLCOX, PIROZZOLO AND MCCARTHY
PROFESSIONAL CORPORATION
FIFTY FEDERAL STREET
BOSTON, MASSACHUSETTS 02110
TELEPHONE (617) 482-5470
TELECOPIER (617) 423-1572

HAROLD H. WILLCOX (1925-1975)
JACK R. PIROZZOLO
RICHARD F. MCCARTHY
RICHARD L. BINDER
RICHARD E. BENNETT
JUDITH S. ZIBS
CHRISTOPHER R. GODDU
KATHERINE L. YOUNG

OF COUNSEL
RICHARD P. CROWLEY
(REGISTERED PATENT ATTORNEY)

July 30, 1999

Ms. Kimberley Olson
Environmental Claims Specialist
Liberty Mutual Insurance Company
100 Main Street
Dover, New Hampshire 03822

Re: Insured: USM Corporation
Claimant: Environmental Protection Agency

Dear Ms. Olson:

We are writing to provide notice of the involvement of USM Corporation in a proceeding concerning the Centredale Manor Superfund site in North Providence, Rhode Island. Liberty Mutual insured USM from 1930 through January 1, 1969 and from November 1, 1971 through January 1, 1979. As Liberty Mutual is aware, USM was merged with and into Emhart Industries, Inc., a subsidiary of Emhart Corporation ("Emhart"), and Emhart is a wholly-owned subsidiary of The Black & Decker Corporation (these entities will collectively be referred to as "Black & Decker").

The proceeding concerning the Centredale Manor Superfund site is described in the enclosed memorandum prepared by Black & Decker's counsel in that matter.

Black & Decker hereby demands that Liberty Mutual provide Black & Decker a defense in this action and that Liberty Mutual pay and/or indemnify Black & Decker for all damages, costs and expenses incurred by Black & Decker arising out of this action.

A0208

Emhart Industries, Inc. v. Home Insurance Company, et al.
Case No. 02-053-S
DX-241

WILLCOX, PIROZZOLO & MCCARTHY

Ms. Kimberley Olson

July 30, 1999

-2-

You or your counsel should direct any future inquiries or correspondence concerning this matter to us.

Very truly yours,

Jack R. Pirozzolo

JRP:ps
Enclosure

cc: Ms. Linda R. Biagioni
Ms. Kimberly Alexander
Ralph T. Lepore, III, Esquire

CERTIFIED MAIL RETURN RECEIPT REQUESTED

Z 422 700 626

US Postal Service
Receipt for Certified Mail
No Insurance Coverage Provided.
Do not use for International Mail (See reverse)

| | |
|---|---|
| Sent to Ms. Kimberley Olson | |
| Street & Number 100 Main Street | |
| Post Office, State, & ZIP Code Dover, NH 03822 | |
| Postage | $ 1.43 |
| Certified Fee | 1.40 |
| Special Delivery Fee | |
| Restricted Delivery Fee | |
| Return Receipt Showing to Whom & Date Delivered | 1.25 |
| Return Receipt Showing to Whom, Date, & Addressee's Address | |
| TOTAL Postage & Fees | $ 4.08 |
| Postmark or Date | BOSTON, MA USPS |

SWIDLER [illegible] [illegible]LIN SHEREFF FRIEDMA[illegible], LLP

3000 K STREET, NW, SUITE 300
WASHINGTON, DC 20007-5116
TELEPHONE (202)424-7500
FACSIMILE (202) 424-7645

NEW YORK OFFICE
919 THIRD AVENUE
NEW YORK, NY 10022

MEMORANDUM

TO: Kimberly Alexander
Jack R. Pirozzolo

FROM: Jerome C. Muys, Jr.
Laura A. Ford

DATE: July 12, 1999

RE: Centredale Manor Superfund Site

---

EPA has issued Requests for Information pursuant to Section 104 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") and Section 3007 of the Resource Conservation and Recovery Act ("RCRA") to Black & Decker and USM Corporation. EPA is seeking information and documents related to contamination found at the Centredale Manor Superfund Site ("Site"), located in North Providence, Rhode Island. EPA has discovered dioxin, PCB, and pesticide contamination in the sediments on the Centredale Manor property as well as along the riverbank of the Woonasquatucket River. Specifically, EPA is seeking information concerning the operations of Crown-Metro, Inc. and its predecessors at the Site. Enclosed is EPA's CERCLA § 104(e) Information Request for your review.

a. Metro-Atlantic, the predecessor to Crown-Metro, Inc., a former subsidiary of USM Corporation, allegedly operated at the Site prior to 1971. The precise dates of operation are not yet known.

b. It appears that Metro-Atlantic occupied a portion of the Site prior to its consolidation with Crown Chemicals. Metro-Atlantic reportedly ceased operations on the property shortly thereafter but the precise dates of occupation are not yet known.

c. On December 2, 1968, Crown Chemical Corporation and Metro-Atlantic, Inc. filed an Agreement of Consolidation. By this Agreement of Consolidation, a new corporation was formed bearing the name "Crown-Metro, Inc." In 1969, USM Corporation acquired the stock of Crown-Metro, Inc. In 1976, Crown-Metro changed its name to Bostik South. Bostik South merged with and into USM Corporation in 1977. Thereafter. Bostik South was operated as a division of USM

Corporation. U. Corporation sold the business and ass of Bostik South to Bengal Corpporation in 1980, which has since changed its name to Crown-Metro, Inc.

In 1976, USM Corporation merged with a subsidiary of Emhart Corporation. The surviving entity kept the name USM Corporation. In May 1987, USM Corporation changed its name to Emhart Enterprises Corp. In September 1987, Emhart Enterprises Corp. merged with and into Emhart Industries, Inc.

d. At this point, EPA has not made any demand for reimbursement and there are no public estimates of the projected costs for investigation and/or remediation of the Site. The EPA attorney, Catherine Garypie, has informed us that EPA has spent $1.6 million on removal activities, in addition to an unspecified amount on investigation.

Enclosures

cc: Linda H. Biagioni
Peri Mahaley

2082714.1

# EXHIBIT

# B

LIBERTY MUTUAL.

LIBERTY MUTUAL GROUP

100 Main Street
Dover, NH 03820
Telephone: (603) 749-2600
Fax: (603) 749-3840

August 23, 1999

Willcox, Pirozzolo & McCarthy
Fifty Federal Street
Boston MA 02110
Jack Pirozzolo, Esq.

RE: USM Corporation
Black & Decker Corporation
Site: Centredal Manor Superfund Site

Dear Mr. Pirozzolo:

This letter will serve as acknowledgment of your notification to Liberty Mutual of your potential involvement with contamination discovered at the above-captioned site. In accordance with our company's procedure, we will initiate an investigation into the nature of this claim and the application of coverage. Your cooperation in this effort is important and, as such, preliminary information is requested from you.

INFORMATION REQUESTED:

You stated in your letter that you do not have any information with respect to General Mills involvement at this site. However, in order for us to begin our evaluation of this claim, we will need certain information. Upon receipt of any of the following items, please forward the information to my attention. If you have responded to an information request from a regulatory agency, please forward a copy of your response.

If the response does not contain the following information, please include it with a copy of the response that was sent to the regulator:

1. Shipping origin of the waste.

2. The exact waste product(s) generated from that facility.

3. The method of shipment: i.e., drum or bulk form? If in drum, how were they sealed?

4. Whether a transporter was involved. If so, was there a contract? Please submit a copy.

5. The exact quantity of waste shipped.

6. The dates of each shipment.

7. Why the site was chosen? Dates of site inspections by any personnel from your company.

8. How waste was disposed of before and after this site was used?

9. Any information you have regarding this site, including its background, regulatory history, results of any testing, and if any remediation has taken place.

10. Advise if there have been any state, federal, or other environmental violations issued to your company involving this site.

We presently lack sufficient information to comment specifically on how your policies may relate to the particular coverage issues present in environmental claims of this nature. Accordingly, we reserve all of our rights under the applicable law and under all policies of insurance issued to Black & Decker by Liberty Mutual and our continued investigation into this matter is not to be construed as a waiver of these rights.

Furthermore, should we determine that Liberty Mutual's policies afford coverage in the instant matter, we reserve our right to the selection of counsel to represent you in this matter. Additionally, we will pay only those rates for attorney services, and other defense costs, that are reasonable and necessary, incurred after the date of your notice to Liberty Mutual.

We will be in further contact with you once we have received and reviewed your responses to the information requested. We will review the information as well as our records of your policies and will advise you in more detail of our coverage position once this has been completed. In the interim, please keep us fully informed of any further developments.

If you have any questions regarding this matter please feel free to contact me at 1-800-344-0213 extension 32250.

Very truly yours,

Owen O'Neil, CPCU
Sr. Environmental Claims Specialist

# EXHIBIT

# C

WILLCOX, PIROZZOLO AND MCCARTHY
PROFESSIONAL CORPORATION
FIFTY FEDERAL STREET
BOSTON, MASSACHUSETTS 02110
TELEPHONE (617) 482-5470
TELECOPIER (617) 423-1572

HAROLD M. WILLCOX (1925-1978)
JACK R. PIROZZOLO
RICHARD F. McCARTHY
RICHARD L. BINDER
RICHARD E. BENNETT
JUDITH S. ZISS
CHRISTOPHER R. RODDU
KATHERINE L. YOUNG

OF COUNSEL
RICHARD P. CROWLEY
(REGISTERED PATENT ATTORNEY)

May 4, 2000

Ms. Kimberley Olson
Environmental Claims Specialist
Liberty Mutual Insurance Company
100 Main Street
Dover, New Hampshire 03822

Re: Insured: USM Corporation
Claimant: Environmental Protection Agency

Dear Ms. Olson:

In a letter dated July 30, 1999, we provided notice of the involvement of USM Corporation (USM Corporation and its successors under the applicable insurance policies issued by Liberty Mutual Insurance Company will collectively be referred to as "Black & Decker") in a proceeding concerning the Centredale Manor Superfund site in North Providence, Rhode Island ("Site"). Thereafter, in a letter dated March 28, 2000, we provided Liberty Mutual Insurance Company ("Liberty Mutual") further information regarding developments at the Site.

We are writing to advise Liberty Mutual of additional information that the Environmental Protection Agency ("EPA") has provided to Black & Decker. The EPA asserts that its past cost claim now exceeds $4,000,000. The EPA further advised that it has recently estimated that the cost to undertake additional emergency measures at portions of Site, including soil and river sediments, is $8,000,000-$16,000,000 and that, after the emergency measures are undertaken, the EPA intends to complete the final remedial investigation/feasibility study for the Site and to select a remedy which could well exceed the cost of the initial work at the Site.

A0214



Emhart Industries, Inc. v. Home Insurance Company, et al.
Case No. 02-053-S
DX-295

WILLCOX, PIROZZOLO & MCCARTHY

Ms. Kimberley Olson

-2- May 4, 2000

Black & Decker reiterates its demand that Liberty Mutual provide Black & Decker a defense in this action and that Liberty Mutual pay and/or indemnify Black & Decker for all damages, costs and expenses incurred by Black & Decker arising out of this action.

You or your counsel should direct any future inquiries or correspondence concerning this matter to us.

Very truly yours,

Jack R. Pirozzolo

JRP:ps

cc: Ms. Linda H. Biagioni
Mr. Steven H. Jones
Ralph T. Lepore, III, Esquire

CERTIFIED MAIL RETURN RECEIPT REQUESTED

# EXHIBIT

# D

Centredale insur

WILLCOX, PIROZZOLO AND McCARTHY
PROFESSIONAL CORPORATION
FIFTY FEDERAL STREET
BOSTON, MASSACHUSETTS 02110
TELEPHONE (617) 482-5470
TELECOPIER (617) 423-1572

HAROLD H. WILLCOX (1925-1975)
JACK R. PIROZZOLO
RICHARD F. McCARTHY
RICHARD L. BINDER
RICHARD E. BENNETT
JUDITH S. ZISS
CHRISTOPHER R. GODDU
KATHLEEN H. CROWLEY
KATHERINE L. YOUNG

OF COUNSEL
RICHARD P. CROWLEY
(REGISTERED PATENT ATTORNEY)

RECEIVED
MAY 18 2000
LINDA H. BIAGIONI

May 16, 2000

Ms. Kimberly Olson
Environmental Claims Specialist
Liberty Mutual Insurance Company
100 Liberty Way
Dover, New Hampshire 03822

Re: Insured: USM Corporation
Claimant: Environmental Protection Agency
Site: Centredale Manor Superfund

Dear Ms. Olson:

I enclose a copy of the the Unilateral Administrative Order ("UAO") issued by the Environmental Protection Agency on April 12, 2000 to Emhart Industries, Inc., together with Emhart's reply indicating its intention to comply with the UAO and to participate in the performance of the remedial activities described in the Scope of Work. You will note that the Emhart response states that its compliance with the UAO shall not constitute, be interpreted, construed, or used as evidence of any admission of liability, law or fact, or a waiver of any right or defense.

Very truly yours,

Jack R. Pirozzolo

JRP:pw
Enclosures
cc: Ms. Linda H. Biagioni
Mr. Steven H. Jones
Ralph T. Lepore, III, Esquire

Certified Mail Return Receipt Requested

Emhart Industries, Inc. v.
Home Insurance Company, et al.
Case No. 02-053-S
DX-298

SBSF 10934

Centredale

SWIDLER BERLIN SHEREFF FRIEDMAN, LLP

3000 K STREET, NW, SUITE 300
WASHINGTON, DC 20007-5116
TELEPHONE (202) 424-7500
FACSIMILE (202) 424-7643

JEROME C. MUYS, JR.
DIRECT DIAL (202) 424-7547

NEW YORK OFFICE
405 LEXINGTON AVENUE
NEW YORK, NY 10174

April 24, 2000

VIA FACSIMILE AND CERTIFIED MAIL – RETURN RECEIPT REQUESTED

Catherine Garypie
Senior Enforcement Counsel
U.S. Environmental Protection Agency, Region 1
1 Congress Street, Suite 1100
Boston, MA 02114-2023

Re: Centredale Manor Restoration Project Superfund Site, North Providence, Rhode Island

Dear Ms. Garypie:

I am writing on behalf of Emhart Industries, Inc. ("Emhart") in response to the Unilateral Administrative Order ("UAO") issued by the Environmental Protection Agency on April 12, 2000, regarding the Centredale Manor Restoration Project Superfund Site in North Providence, Rhode Island ("Site"). Emhart will comply with the UAO and participate in the performance of the remedial activities described in the Scope of Work. Emhart's compliance with the UAO shall not constitute, be interpreted, construed or used as evidence of any admission of liability, law or fact, or a waiver of any right or defense. Please feel free to contact me if you have any questions concerning this matter.

Sincerely,

Jerome C. Muys, Jr.

Jerome C. Muys, Jr.

cc: Linda H. Biagioni
Colburn T. Cherney
Howard Castleman
Leonard H. Freiman
Richard J. Welch
Knox L. Haynsworth, III
Deming E. Sherman

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
REGION 1
1 CONGRESS ST., SUITE 1100
BOSTON, MA 02114-2023

April 12, 2000

VIA FACSIMILE AND REGULAR MAIL

[SEE ATTACHED LIST OF ADDRESSEES]

Re: Centredale Manor Restoration Project Superfund Site, North Providence, Rhode Island

Counselors:

Please find enclosed a copy of a Unilateral Administrative Order ("UAO"), issued today by the United States Environmental Protection Agency - New England ("EPA"). Please note that you may request a conference with EPA within the next two calendar days. If a conference is requested, it must be held within the next eight calendar days. The UAO becomes effective on April 24, 2000.

If you have any questions regarding this matter, please contact me at 617/918-1540.

Sincerely yours,

Catherine Garypie
Senior Enforcement Counsel

Enclosure

LIST OF ADDRESSEES

For Brook Village Associates Limited Partnership:
Colburn T. Cherney
Ropes & Gray
One Franklin Square
1301 K Street, NW, Suite 800 East
Washington, D.C. 20005-3333
PH 202-626-3900
FAX 202-626-3961

Howard Castleman
Roche, Carens & DeGiacomo, P.C.
99 High Street
Boston, MA 02110
PH 617-457-4000
FAX 617-482-3868

For Centerdale Manor Associates Limited Partnership (C/S Housing Associates):
Leonard H. Freiman
Goulston & Storrs, A Professional Corporation
400 Atlantic Avenue
Boston, MA 02110-3333
PH 617-482-1776
FAX 617-574-4112

For Centerdale Manor Associates Limited Partnership (Centerdale Associates):
Richard J. Welch
Moses & Alfonso, Ltd.
170 Westminster Street, Suite 201
Providence, RI 02903
PH 401-453-3600
FAX 401-453-3604

For Emhart Industries, Inc.
Jerome C. Muys, Jr.
Swidler Berlin Shereff Friedman LLP
3000 K Street, NW, Suite 300
Washington DC 20007-5116
PH 202-424-7547
FAX 202-424-7643

For Crown-Metro, Inc.
Knox L. Haynsworth, III
Brown, Massey, Evans, McLeod & Haynsworth, P.A.
P.O. Box 2464
Greenville, SC 29602
PH 864-271-7424
FAX 864-242-6469

For New England Container Company, Inc.:
Deming E. Sherman, Esq.
Edwards & Angell, LLP
2800 BankBoston Plaza
Providence, RI 02903-2499
PH 401-274-9200
FAX 401-276-6611

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**EPA NEW ENGLAND**

| | |
|---|---|
| In the Matter of:<br><br>Centredale Manor Restoration Project<br>Superfund Site<br><br>Brook Village Associates Limited Partnership;<br>Centerdale Manor Associates Limited Partnership;<br>Crown Metro, Inc.; Emhart Industries, Inc.,<br>and; New England Container Company, Inc.<br><br>Respondents,<br><br>Proceeding under Section 106(a) of the<br>Comprehensive Environmental Response,<br>Compensation and Liability Act, as<br>as amended, 42 U.S.C. § 9606(a) | U.S. EPA Region I<br>CERCLA Docket No.<br>CERCLA1-2000-0026<br><br>UNILATERAL<br>ADMINISTRATIVE<br>ORDER FOR REMOVAL<br>ACTION |

**JURISDICTION**

1. This Administrative Order ("Order") is issued pursuant to the authority vested in the President of the United States by Section 106(a) of the Comprehensive Environmental Response, Compensation, and Liability Act, as amended ("CERCLA"), 42 U.S.C. § 9606(a). This authority was delegated to the Administrator of the United States Environmental Protection Agency ("EPA") on January 23, 1987, by Executive Order 12580, 52 Fed. Reg. 2926 (January 29, 1987), and further delegated to the Regional Administrators by EPA Delegation Nos. 14-14-A (April 15, 1994) and 14-14-B (May 11, 1994)) and further delegated to the Director, Office of Site Remediation and Restoration by Region I Delegations 14-14-A (September 29, 1995) and 14-14-B (September 3, 1996).

**STATE COORDINATION**

2. Pursuant to Section 106(a) of CERCLA, 42 U.S.C. § 9606(a), the State of Rhode Island has been notified in writing of the issuance of this Order.

## PURPOSE

3. The purpose of this Order is to compel the Respondents to perform certain removal activities at the Centredale Manor Restoration Project Superfund Site in North Providence, Rhode Island, as set forth in the Action Memoranda signed by Director of the Office of Site Remediation and Restoration on May 4, 1999, and September 13, 1999, and the Scope of Work appended to this Order as Appendix A.

## FINDINGS OF FACT

4. Numerous hazardous substances have been found at the Centredale Manor Restoration Project Superfund Site ("Site"), including 2,3,7,8 -Tetrachlorodibenzo-*p*-Dioxin, PCBs, volatile organic compounds, semi-volatile organic compounds, and metals.

5. These hazardous substances have been found in surface and subsurface soil, sediment and at the groundwater/surface water interface in the Woonasquatucket River at the Site. Surface soil locations include areas within 50 feet of the senior highrise housing complexes located on the main portion of the Site, and areas on residential parcels along the River.

6. Hazardous substances were disposed of at the Site as part of former operations of several chemical companies (the Atlantic Chemical Company, Metro-Atlantic Inc., and Crown Metro, Inc.) and a drum recycler (New England Container Co., Inc.).

7. The current owners at the Site include Brook Village Associates Limited Partnership and Centerdale Manor Associates Limited Partnership, both of which conducted extensive construction activities at the Site.

## SITE DESCRIPTION

8. The Centredale Manor Restoration Project Superfund Site ("Site") is located in North Providence, Rhode Island. The main portion of the Site is known as 2072 and 2074 Smith Street (or, plat 14, lots 200 and 250). The Site extends on the flood plain of the Woonasquatucket River from the main portion of the Site south to the Allendale Dam.

9. Currently, two high rise buildings (Centredale Manor and Brook Village) are located on the Site. In addition to the buildings, the Site is covered by roadway and parking lots. On the eastern portion of the Site is a drainage swale that begins near the northern portion of the Site and extends south, then curves to the west and discharges into a wooded wetland south of the Site and eventually into the Woonasquatucket River. The Site consists of all contaminated areas within this area as well as any other location to which contamination from that area has come to be located, or from which that contamination originated.

10. Pursuant to Section 105(8)(B) of CERCLA, 42 U.S.C. § 9605(8)(B), the Site is listed on the National Priorities List, 40 C.F.R. Part 300, Appendix B (1990).

**RESPONDENTS**

11. Respondent Brook Village Associates Limited Partnership ("BVALP") is a Massachusetts limited partnership with its principal place of business in Boston, Massachusetts.

12. Respondent Centerdale Manor Associates Limited Partnership ("CMALP") is a Rhode Island limited partnership with its principal place of business in East Providence, Rhode Island.

13. Respondent Crown Metro, Inc. ("Crown Metro") is a South Carolina corporation with its principal place of business in Greenville, South Carolina.

14. Respondent Emhart Industries, Inc. ("Emhart") is a Connecticut corporation with its principal place of business in Towson, Maryland.

15. Respondent New England Container Co., Inc. ("NECC") is a Rhode Island corporation with its principal place of business in Smithfield, Rhode Island.

16. By letters dated September 15, 1999 and February 28, 2000, EPA notified the Respondents of their status as potentially responsible parties at the Site and afforded them the opportunity to perform or finance necessary removal activities. Attempts by EPA to reach settlement with the Respondents have been unsuccessful.

**SITE HISTORY**

17. Respondent Crown Metro is a successor to liability of several chemical companies which operated at the Site from approximately 1943 to approximately 1971. The chemicals manufactured by these companies included hexachlorophene. The chemical companies also buried drums and other containers at the Site.

18. Respondent Emhart is also a successor to liability of several chemical companies which operated at the Site from approximately 1943 to approximately 1971. The chemicals manufactured by these companies included hexachlorophene. The chemical companies also buried drums and other containers at the Site.

19. Respondent NECC operated at the Site from approximately 1952 to approximately 1969. NECC's operations included obtaining 55-gallon drums containing residual chemicals,

disposing of certain drum residuals in the soil at the Site and incinerating other drum residuals at the Site.

20. Respondent BVALP acquired a portion of the Site by two deeds dated October 19, 1976 and October 20, 1976. BVALP constructed a high-rise on the main portion of the Site (2072 Smith Street) in approximately 1976-77.

21. Respondent CMALP acquired a portion of the Site by a deed dated March 18, 1982. CMALP constructed a high-rise on the main portion of the Site (2074 Smith Street) in approximately 1982-83.

## ENDANGERMENT

22. With regard to actual or potential exposure to nearby human populations, EPA has documented elevated levels of contaminants including dioxin and PCBs in numerous areas at the Site which could result in human exposure. First, elevated levels of dioxin have been found in surface soils at primarily residential parcels along the floodplain of the Woonasquatucket River. Elevated levels of dioxin in surface soil include levels above the Agency-recommended 1 ppb (TEQs, or toxicity equivalent) to be used as a starting point for residential soil cleanup level for CERCLA non-time critical removal sites and as a preliminary remediation goal for remedial sites (Approach for Addressing Dioxin on Soil at CERCLA and RCRA Sites, OSWER Directive 9200.4-26, April 13, 1998). Levels as high as 140 ppb have been found in soil located near the highrises at the Site. Second, elevated levels of numerous hazardous substances have been found in surface soils at 2072 and 2074 Smith Street--including areas as close as 50 feet from the apartment complexes located on these parcels. Because the contaminants are found at the surface of the soil, they are readily accessible to residents of and visitors to the apartment complexes at 2072 and 2074 Smith Street, as well as neighborhood children who have been known to play in the southern portion of this area Third, contamination was found in Woonasquatucket River sediments between Route 44 and a point just below the Allendale Dam. The Woonasquatucket River becomes relatively shallow approximately 2,000 feet south of Route 44, in an area known as the Allendale Pond. Due to a 1991 breach of the Allendale Dam, the sediments in this portion of the river are readily accessible to neighborhood children who have been known to play in the area. Finally, there are elevated levels of contaminants entering the Woonasquatucket River itself. The river is occasionally used by fishermen and recreational boaters. It is possible that these people could come in contact with sediment/surface water contamination while in the Site area.

23. With regard to actual or potential exposure to animals or the food chain, in the fall of 1999 the Rhode Island Department of Health (DOH) documented elevated levels of dioxin in fish tissue from fish collected in the portion of the Woonasquatucket River which flows through the Site. Although other animal/food chain studies have not been conducted, the potential for

exposure of animals or the food chain to hazardous substances or pollutants or contaminants is great. As explained above, elevated levels of hazardous substances have been found in surface soils, sediment, surface water and wetland areas. All of these areas are natural habitat for numerous species of plants and animals (ecological receptors).

24. The Woonasquatucket River and its associated wetlands and floodplain represent a sensitive ecosystem at the Site. Numerous media in this ecosystem have been affected by contamination: sediment, surface water, soil, and wetland areas. Although an ecological risk assessment has not yet been conducted at the Site, numerous birds, fish and animals have been observed at the Site by EPA employees and EPA contractors, including but not limited to: great blue herons; black crown night herons; black ducks; mallard ducks; Canada geese; spotted sandpipers; muskrat; mink; squirrels; snapping turtles; small mouth bass; large mouth bass; sucker fish; and sunfish. These ecological receptors would likely be damaged by exposure to the types of hazardous substances found at the Site.

25. There is evidence that drums and other waste material may be buried at the property. Drum carcasses were found by EPA in certain areas of the Site. Buried drums and waste material may be leaching contaminants into the Woonasquatucket River.

26. High levels of hazardous substances have been found in soils largely at or near the surface of the Site. These soils are in areas subject to erosion by the Woonasquatucket River as well as periodic flooding. Erosion and flooding appear to have caused the contaminated soil to migrate, since elevated levels of hazardous substances have been found in Woonasquatucket River sediments located in the downstream portion of the Site, including below the Allendale Dam. In addition, high levels of chlorinated solvents (TCE and PCE) found at the groundwater/surface water interface in the river indicate migration of contaminants from suspected buried waste near the riverbanks and likelihood of a non-aqueous phase liquid source of contamination that may continue to impact surface water and sediment.

27. The land portions of the Site are located in the floodplain and have been frequently flooded during high river stage. These weather conditions have caused and will continue to cause the migration of contaminated soil at the Site (particularly from those areas which are not covered by an interim cap) into the Woonasquatucket River and the migration of contaminated sediments further downstream. Allendale Dam, the first flood control structure downstream from 2072 and 2074 Smith Street, was breached in 1991 and its condition is continuing to deteriorate. This is causing the release of contaminated sediment into downstream reaches of the river, particularly during flood events.

28. The time critical removal activities already completed by EPA include sampling and analysis as well as placing fences and interim caps (one of which is completed, a second which is partially completed and a third which was determined to be beyond the scope of a time-critical

removal action) in the areas of surface soil contamination. EPA is also conducting two Engineering Evaulation/Cost Analysis studies and a Remedial Investigation at the Site.

29. The following table identifies the highest concentrations of some of the chemical compounds detected by EPA in soil samples collected at the Site:

| CHEMICAL COMPOUND | HIGHEST CONCENTRATION (in parts per billion - ppb) |
|---|---|
| 2,3,7,8 -Tetrachlorodibenzo-*p*-Dioxin | 140 |
| PCBs | 1,300,000 |
| 1,2-dichlorobenzene | 2,800,000 |
| benzene | 480,000 |
| chlorobenzene | 1,000,000 |
| tetrachloroethene | 1,7000,000 |
| trichloroethene | 2,400,000 |
| cadmuim | 180,000 |
| lead | 3,160,000 |
| manganese | 6,420,000 |
| alumimum | 16,100,000 |
| antimony | 27,800 |
| arsenic | 49,300 |
| cadmium | 180,000 |
| chromium | 472,000 |
| copper | 934,000 |
| mercury | 7,400 |
| silver | 35,500 |
| vanadium | 72,500 |

30. The following table represents some of the dangers to human health associated with each of the hazardous substances found on-site, as well as the potential routes of human exposure to these wastes:

| HAZARDOUS SUBSTANCE | ROUTE(S) OF EXPOSURE | POTENTIAL HUMAN HEALTH EFFECTS |
|---|---|---|
| 2,3,7,8 - Tetrachlorodibenzo-*p*-Dioxin | inhalation; skin absorption; ingestion; skin and/or eye contact | irritated eyes, skin, and mucous membranes; chloracne; porphyria; gastrointestinal disturbances; possible reproductive problems; teratogenic effects<br><br>The World Health Organization has classified dioxin as a human carcinogen |
| PCBs | inhalation; skin absorption | irritated eyes; chloracne; liver damage; reproductive problems |
| 1,2-dichloro-benzene | inhalation; skin absorption; ingestion; skin and/or eye contact | irritated eyes and nose; liver and kidney damage; skin blisters |
| benzene | inhalation; skin absorption; ingestion; skin and/or eye contact | irritated eyes, skin, nose and respiratory system; giddiness; headache, nausea, staggered gait; fatigue, anorexia, lassitude; dermatitis; bone marrow depression<br><br>The U.S. Department of Health and Human Services has designated benzene as a known human carcinogen |
| chloro-benzene | inhalation; ingestion; skin and/or eye contact | irritated eyes, skin, nose; drowsiness, incoordination; central nervous system depression |
| tetrachloro-ethene | inhalation; skin absorption; ingestion; skin and/or eye contact | irritated eyes, nose, throat; nausea; flushed face and neck; vertigo, dizziness, incoordination; headache, somnolence; skin erythema; liver damage |
| trichloro-ethene | inhalation ;skin absorption; ingestion; skin and/or eye contact | irritates eyes and skin, headache, vertigo; visual disturbance; fatigue, giddiness, tremors, somnolence, nausea, vomiting; dermatitis; cardiac arrhythmia, paresthesia, liver injury |
| cadmuim | inhalation; ingestion | pulmonary edema, dyspnea, cough, chest tightness, substernal pain; headache, chills, muscle aches; nausea, vomiting, diarrhea; anosmia, emphysema, proteinuria, mild anemia |

| | | |
|---|---|---|
| lead | inhalation; ingestion; skin and/or eye contact | [NOTE: THESE SYMPTOMS ARE MORE PRONOUNCED IN CHILDREN] weakness, lassitude, insomnia; facial pallor, anorexia, weight loss; constipation, abdominal pain, colic, anemia; gingival lead line; tremors, paralysis of the wrist and ankles; encephalopathy; kidney disease, irritated eyes; hypotension. |
| manganese | inhalation, ingestion | Parkinson's; asthenia, insomnia, mental confusion, metal fume fever: dry throat, cough, chest tightness, dyspnea, rales, flu-like fever; lower back pain; vomiting; malaise; fatigue; kidney damage |
| aluminum | inhalation; skin and/or eye contact | irritated eyes, skin and respiratory system |
| antimony | inhalation; ingestion; skin and/or eye contact | irritated eyes, skin, nose, throat, mouth; cough; dizziness; headache; nausea, vomiting, diarrhea; stomach cramps; insomnia; anorexia; unable to smell properly |
| arsenic | inhalation; skin absorption; ingestion; skin and/or eye contact | ulceration of nasal septum, dermatitis, gastrointestinal disturbances, peripheral neuropathy, respiratory irritation, hyperpigmentation of skin<br><br>The U.S. Department of Health and Human Services has designated arsenic as a known carcinogen |
| cadmium | inhalation; ingestion | pulmonary edema, dyspnea, cough, chest tightness, substernal pain; headache; chills, muscle aches; nausea, vomiting, diarrhea; anosmia, emphysema, proteinuria, mild anemia |
| chromium | inhalation; ingestion; skin and/or eye contact | irritated eyes and skin; lung fibrosis |
| copper | inhalation; ingestion; skin and/or eye contact | irritated eyes, nose, pharynx; nasal perforation; metallic taste; dermatitis |
| mercury | inhalation; skin absorption; ingestion; skin and/or eye contact | irritated eyes and skin; cough, chest pain, dyspnea, bronchial pneuitis; tremors, insomnia, irritability, indecision, headache, fatigue, weakness; stomatitis, salivation, gastrointestinal disturbance, anorexia, weight loss, proteinuria |
| silver | inhalation; ingestion; skin and/or eye contact | blue-gray eyes, nasal septum, throat and skin irritation, ulceration skin; gastrointestinal disturbance |

| | | |
|---|---|---|
| vanadium | inhalation; ingestion; skin and/or eye contact | irritated eyes, skin and throat; green tongue, metallic taste, eczema, cough; fine rales, wheezing, bronchitis, dyspnea |

31. Approximately 200 residents live in the two high-rise housing complexes for the elderly located at the Site. Some of the highest levels of dioxin at the Site were found near these high-rises. Additionally, elevated levels of volatile organic compounds and semi-volatile organic compounds were found very close to the high-rises. The remainder of the Site (the drainage swale and the Woonasquatucket River and its floodplain extending south from Route 44 to the Allendale dam) is adjacent to or includes a number of residential yards as well as church grounds used for picnics and other events.

32. The Agency for Toxic Substances and Disease Registry (ATSDR) issued a Health Consultation on June 7, 1999. In that Health Consultation, ATSDR concluded that although current exposures are probably low, significant risks could exist for children or adults who have frequent contact with contaminated soils or sediment at the Site. ATSDR made several recommendations, including that public access be restricted to surface soils which exceed 1 part per billion (ppb) of dioxin.

33. By completing the second interim cap at the Site and implementing certain flood control measures at the Site, the removal action will minimize direct contact threat to humans. This removal action will also address the threat to the environment by minimizing contamination resulting from surface water run-off into the Woonasquatucket River and the drainage swale at the Site.

## CONCLUSIONS OF LAW AND DETERMINATIONS

On the basis of the findings of fact, EPA makes the following Conclusions of Law and Determinations:

34. The Centredale Manor Restoration Project Superfund Site is a "facility" as that term is defined in Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

35. Each Respondent is a "person" as that term is defined in Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

36. Each Respondent is a liable party within the meaning of Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

37. Each substance listed in paragraph 29 above is a "hazardous substance" as that term is defined in Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

38. The conditions described above in paragraphs 22 through 33 constitute an actual or threatened "release" into the "environment" within the meaning of Section 101(8), (22) of CERCLA, 42 U.S.C. § 9601(8), (22).

39. The actual or threatened releases of hazardous substances at or from the Site may pose "an imminent and substantial endangerment to the public health or welfare or the environment" within the meaning of Section 106(a) of CERCLA, 42 U.S.C. § 9606(a).

40. In order to protect public health and welfare and the environment, and prevent further release or threat of release of hazardous substances at or from the Site, a Removal Action is necessary and appropriate. The Removal Action will consist of implementation of the Scope of Work appended to this Order. The Removal Action is designed to prevent, minimize, and/or mitigate damage to the public health or welfare or the environment which may otherwise result from the release or threat of release of hazardous substances, and was developed in accordance with the criteria set forth at Section 300.415 of the National Contingency Plan ("NCP"), 40 C.F.R. § 300.415.

41. The removal actions specified in this Order will be done promptly and properly by the Respondents, and will be consistent with the NCP, if performed in accordance with the terms of this Order and Scope of Work.

## ORDER

42. Based upon EPA's jurisdiction, and the findings of fact and determinations set forth above, the Respondents are **ORDERED** to perform all work required under this Order. The Respondents shall comply with the following provisions and perform all actions required by the terms and conditions of this Order.

## PARTIES BOUND

43. This Order shall apply to and be binding upon the Respondents and upon their receivers, trustees, successors, and assigns. No change in ownership or corporate status shall in any way alter the Respondents' responsibilities under this Order. Respondents are jointly and severally responsible for carrying out all activities required of them by this Order. The failure of one or more Respondent to comply with all or any part of this Order shall not in any way excuse or justify noncompliance by any other Respondent, including but not limited to the failure to perform all obligations of any defaulting Respondent.

DESIGNATION OF SUPERVISING CONTRACTOR AND PROJECT COORDINATOR

44. Within seven (7) days after the effective date of this Order, the Respondents shall retain the services of a qualified and experienced Supervising Contractor for the purpose of performing the work required by this Order in accordance with the terms and conditions of the Scope of Work. Within the same seven (7) day period, the Respondents shall notify EPA in writing of the name, address, and qualifications of the proposed supervising contractor and the name and telephone number of the supervising contractor's primary contact person. The Respondents shall also notify EPA of the identity and qualifications of any other contractor(s) or subcontractor(s) to be used at the Site at least seven (7) days in advance of their performing any work under this Order.

45. The supervising contractor shall be a qualified and certified professional engineer with substantial expertise and experience in the cleanup of hazardous waste sites. EPA reserves the right to disapprove, based on professional qualifications, conflicts of interest, and/or deficiencies in previous similar work, any contractor or subcontractor or other person engaged directly or indirectly by the Respondents to conduct work activities under this Order. If EPA disapproves the selection of any proposed contractor, the Respondents shall notify EPA in writing of the name, address, and qualifications of another contractor within seven (7) days after receipt of the notice of disapproval.

46. The Respondents shall provide a copy of this Order to all contractors, subcontractors, laboratories, and consultants retained in connection with this Order within seven (7) days after the Order's effective date or of such retention, whichever is later. The Respondents shall ensure that all such contractors, subcontractors, laboratories and consultants will perform all work in conformity with CERCLA, the NCP, and the terms and conditions of this Order and Scope of Work.

47. Within seven (7) days after the effective date of this Order, the Respondents shall designate a single Project Coordinator who shall be responsible for administration of all of the Respondents' actions called for by this Order, and shall submit the designated coordinator's name, address, and telephone number to EPA. EPA will deem the project coordinator's receipt of any notice or communication from EPA relating to this Order as receipt by the Respondents.

COMMUNICATION AND COOPERATION AMONG THE RESPONDENTS

48. Within three (3) days after the effective date of this Order, the Respondents shall submit to EPA for approval a Communication and Coordination Plan (CCP) that specifies the requirements and procedures by which the Respondents will communicate and coordinate

with one another in carrying out the requirements of this Order. The CCP shall include at a minimum the following:

A. Communication Strategy. The Respondents shall specify how the designated coordinator and the individual Respondents will communicate and disseminate information relative to this Order. The name, title, address and telephone number of the primary contact person for each Respondent shall be included in the communication strategy.

B. Coordination of Efforts. The Respondents shall describe with specificity how the technical, financial, and administrative requirements of this Order are to be coordinated and distributed among and performed by the Respondents. The CCP shall describe the obligations of each and every Respondent in full.

Each Respondent shall sign the CCP (by a duly authorized representative if the Respondent is other than a natural person) prior to its submission to EPA. Failure of any Respondent to sign the CCP will constitute a violation of this Order by that individual Respondent. The Respondents shall submit all proposed changes or amendments to the CCP to EPA for approval. The CCP as approved by EPA shall be incorporated into and enforceable under this Order.

## EPA ON-SCENE COORDINATOR

49. The EPA On-Scene Coordinator ("OSC") will administer EPA's responsibilities and receive all written notices, reports, plans and other documents required by this Order. All submissions required by this Order shall be sent to EPA's OSC at the following address:

Ted Bazenas
Office of Site Remediation and Restoration
U.S. Environmental Protection Agency - New England
1 Congress Street, Suite 1100 (HBR)
Boston, MA 02114-2023
(617) 918-1230
FAX (617) 918-1291

50. EPA's OSC shall have the authority vested in her/him by the NCP, including but not limited to the authority to stop work being performed pursuant to this Order and the authority to modify the Scope of Work. Absence of the OSC from the Site shall not be cause for stoppage of work by the Respondents unless specifically directed by the OSC.

## REMOVAL WORK TO BE PERFORMED; COMPLETION OF WORK

51. Within fourteen (14) days after retention of the supervising contractor, the Respondents shall commence the work detailed in the Scope of Work (completing the second interim soil cap and implementing flood control measures). All work performed by the Respondents shall be conducted in accordance with CERCLA, the NCP, applicable guidance documents provided by EPA, and the provisions of this Order including any standards, specifications, and time schedules contained in the Scope of Work or specified by the OSC.

52. Within thirty (30) days after completing all work required under this Order, the Respondents shall submit for EPA approval a Completion of Work Report summarizing the activities conducted pursuant to the Scope of Work. The Completion of Work Report shall include the categories of information and conform to the requirements specified in the Scope of Work. The Completion of Work Report shall be certified by the supervising contractor, to the effect that all removal activities have been completed in full satisfaction of the requirements of this Order.

53. When EPA determines that all work has been fully performed in accordance with this Order (with the exception of all continuing obligations required by this Order, including record preservation), and that all goals and objectives of this Order and the Scope of Work have been satisfied, EPA will provide written notice to the Respondents. If EPA determines that all removal activities have not been completed in accordance with the provisions of this Order, it will so notify the Respondents and provide a list of the tasks remaining and a schedule for their completion. The Respondents shall perform all remaining tasks and shall submit an amended Completion of Work Report in accordance with the EPA notice. If EPA determines that the remaining tasks have not been completed in accordance with the provisions of the EPA notice and this Order, the Respondents shall be in violation of this Order.

54. EPA's issuance of the notice referred to in paragraph 53 shall not preclude it from later determining, based upon new information or otherwise, that the Respondents have not completed all removal activities in accordance with the provisions of this Order.

## SUBMISSIONS REQUIRING AGENCY APPROVAL; RESPONDENTS' OBLIGATION TO PROCEED

55. After review of any deliverable, plan, report or other item ("submission") which the Respondents are required to submit for review and approval pursuant to this Order and Scope of Work, EPA may: (i) approve the submission; (ii) conditionally approve the submission with required modifications; (iii) disapprove the submission and notify the Respondents of deficiencies; or (iv) disapprove the submission and modify the deliverable, plan, report, or other

item itself to cure any deficiencies. In the event EPA approves or conditionally approves the submission, or disapproves and modifies the submission itself, the Respondents shall perform all actions required by the submission, as approved, conditionally approved, or modified by EPA.

56. Upon receipt of a notice of disapproval with deficiencies ((iii) above), the Respondents shall correct the deficiencies and resubmit the submission within seven (7) days or such other time period specified in the notice of disapproval. Notwithstanding a notice of disapproval, the Respondents shall proceed to take any action required by any non-deficient portion of the submission. If EPA does not approve the submission as resubmitted, Respondents shall be in violation of the Order.

57. For each submission provided to EPA, the Respondents shall submit such copies as specified by the OSC. Any deliverable, plan, or report submitted to EPA pursuant to this Order shall be dated and shall include, in a prominent location in the document, the following disclaimer: "Disclaimer: This document has been prepared pursuant to a government administrative order (U.S. EPA Region I CERCLA Docket No. CERCLA1-2000-0026) and is subject to approval by the U.S. Environmental Protection Agency. The opinions, findings, and conclusions expressed are those of the authors and not those of the U.S. Environmental Protection Agency." In addition, any such deliverable, plan, or report which has not received final approval from EPA shall be marked "Draft" on each page.

## INCORPORATION AND ENFORCEABILITY OF DOCUMENTS

58. The Scope of Work and all other appendices or attachments to this Order shall be deemed incorporated into, and made an enforceable part of, this Order. Upon approval by EPA pursuant to the procedures of paragraphs 55-57, all contracts, deliverables, plans, reports, specifications, schedules, or other items required by or developed under this Order shall be deemed incorporated into, and made an enforceable part of, this Order. In the event of conflict between this Order and any document attached to, incorporated into, or enforceable hereunder, the provisions of this Order shall control.

## SITE ACCESS

59. All Respondents that own, occupy, or control property at the Site, or property other than the Site to which access is required in order to properly carry out the terms of this Order, shall grant access to the other Respondents, the other Respondents' authorized representatives, the State of Rhode Island, and EPA and its officers, employees, agents, contractors, consultants, and other authorized representatives for purposes of implementing and monitoring work to be performed under this Order.

60. To the extent access to, use or ownership of, or easements over property not owned, occupied, or controlled by the Respondents, or property other than the Site is required for the proper and complete implementation of this Order, the Respondents shall use their best efforts to obtain site access agreements or other interests in the property, in writing, sufficient to allow implementation of this Order within fourteen (14) days after the Order's effective date. For purposes of this paragraph, "best efforts" include but are not limited to the payment of money in consideration of access to property.

61. Such written access agreements or other interests obtained pursuant to the preceding paragraph shall provide the Respondents, the Respondents' authorized representatives, the State of Rhode Island, and EPA and their officers, employees, agents, contractors, consultants, and other authorized representatives access to the Site at all times for purposes of implementing and monitoring work under this Order. Such written access agreements or other interests shall specify that the Respondents are not EPA's representatives or agents with respect to liability associated with the Site.

62. In the event that site access agreements or other interests sufficient for implementation and monitoring of work under this Order are not obtained within the time period specified above, the Respondents shall notify EPA in writing within three (3) days thereafter regarding the lack of such agreements and the efforts made by the Respondents to obtain them. Lack of access shall not excuse or justify failure to perform any activity or to meet any deadline not requiring or directly dependent upon such access.

## QUALITY ASSURANCE/SAMPLING

63. The Respondents shall submit to EPA, upon request, the results of all sampling or tests and all other data generated by the Respondents, their contractor(s), or on the Respondents' behalf in the course of implementing this Order. The Respondents shall also provide the quality assurance/quality control procedures followed by all sampling teams and laboratories performing data collection and/or analysis.

64. Upon request, the Respondents shall allow EPA or its authorized representatives to take split and/or duplicate samples of any samples collected by the Respondents while performing work under this Order. The Respondents shall notify EPA not less than fourteen (14) days in advance of any sample collection activity. In addition, EPA shall have the right to take any additional samples that it deems necessary.

65. The Respondents shall assure that EPA and its authorized representatives are allowed access to any laboratory utilized by the Respondents in implementing this Order. Upon request, the Respondents shall have a designated laboratory analyze samples submitted by EPA for quality assurance monitoring.

## ACCESS TO INFORMATION; RECORD PRESERVATION; CONFIDENTIALITY CLAIMS

66. Upon request, the Respondents shall provide EPA with copies of all records, documents, and other information generated by the Respondents and their contractor(s) which relates in any way to the Site or to the implementation of this Order, including but not limited to, sampling and analysis records, field sheets and field notes, engineering logs, chain of custody records, contracts, bills of lading, trucking logs, manifests, receipts, reports, and correspondence. In addition, the Respondents' employees, agents, or representatives with knowledge of facts concerning the conditions at the Site or performance of work under this Order shall be made available to EPA to provide such information.

67. For a period of at least nine (9) years following completion of all work conducted by the Respondents pursuant to this Order, the Respondents shall preserve all documents, records, and information of whatever kind, nature or description in their possession and/or control or that of their officers, employees, agents, accountants, contractors, attorneys, successors and assigns, that relate in any way to the performance of work under this Order, or relate in any way to releases or threatened releases of hazardous substances which are the subject of the removal action addressed by this Order. After this nine (9) year period has expired, the Respondents shall provide EPA with thirty (30) days advance written notice prior to the destruction of any such records, documents, or information. The Respondents shall send such notice, accompanied by a copy of this Order, to:

Office of Environmental Stewardship
U.S. Environmental Protection Agency
1 Congress Street, Suite 1100 (SES)
Boston, MA 02114-2023
Re: Removal Action at Centredale Manor Restoration Project Superfund Site,
CERCLA Docket No. CERCL1-2000-0026

Upon request, the Respondents shall provide to EPA copies of all such records, documents, or information.

68. The Respondents may assert a confidentiality claim, if appropriate, covering part or all of the information required by or requested under this Order, pursuant to Section 104(e)(7) of CERCLA, 42 U.S.C § 9604(e)(7), and 40 C.F.R. § 2.203(b) (1989). The Respondents shall adequately substantiate all such assertions. Analytical and other data specified in Section 104(e)(7)(F) of CERCLA shall not be claimed as confidential by the Respondents. Information determined to be confidential by EPA will be afforded the protection required by Section 104(e)(7) of CERCLA and by 40 C.F.R. Part 2, Subpart B. If no confidentiality claim

accompanies the information when submitted to EPA, EPA may make it available to the public without further notice to the Respondents.

CREATION OF DANGER; EMERGENCY RESPONSE

69. Upon the occurrence of any incident or change of conditions during the activities conducted pursuant to this Order that causes or threatens a release of hazardous substances from the Site or an endangerment to the public health or welfare or the environment, the Respondents shall immediately take all appropriate action to prevent, abate or minimize such release or endangerment. The Respondents shall also immediately notify the OSC or, in the event of his/her unavailability, shall notify the Regional Duty Officer of the Emergency Planning and Response Branch, EPA Region I, telephone (617) 223-7265. In taking any actions under this paragraph, the Respondents shall act in accordance with all applicable provisions of the Health and Safety Plan prepared pursuant to the Scope of Work.

70. The Respondents shall submit a written report to EPA within seven (7) days after each incident specified above, setting forth the events that occurred and the measures taken and to be taken to mitigate any release or endangerment caused or threatened by the incident and to prevent the reoccurrence of such an incident.

71. Nothing herein shall limit the power and authority of EPA or the United States to take, direct, or order all actions necessary to protect public health, welfare, or the environment or to prevent, abate, or minimize an actual or threatened release of hazardous substances, pollutants or contaminants, or hazardous or solid waste on, at, or from the Site.

OFF-SITE RULE

72. All hazardous substances, pollutants, or contaminants removed off-site for treatment, storage, or disposal pursuant to this Order shall be treated, stored, or disposed of at a facility in compliance with the EPA Off-Site Rule pursuant to the National Contingency Plan, 40 C.F.R. § 300.440 (Procedures for Planning and Implementing Off-Site Response Actions). This Rule was published in the Federal Register, Volume 58, Number 182, Page 49200, on Wednesday, September 22, 1993.

AMENDMENTS

73. This Order, other than the Scope of Work, may only be amended in writing by signature of the EPA New England Director of the Office of Site Remediation and Restoration. Amendments to the Scope of Work may be made in writing by the OSC or at the OSC's oral direction. Where the OSC makes an oral modification, he will memorialize the modification in

writing to the Respondents within three (3) days; provided, however, that the effective date of the modification shall be the date of the OSC's oral direction.

74. No informal advice, guidance, suggestion, or comment by EPA regarding reports, plans, specifications, schedules, and any other writing submitted by the Respondents shall be construed as relieving the Respondents of their obligation to obtain such formal approval as may be required by this Order.

## OTHER APPLICABLE LAWS

75. Except as otherwise provided pursuant to paragraph 76 herein and Section 121(c) of CERCLA, all on-site and off-site actions required pursuant to this Order shall be performed in accordance with all applicable local, state, and federal laws and regulations. Such laws shall include, but not be limited to, the laws relating to occupational health and safety and worker's compensation.

76. In accordance with 40 C.F.R. § 300.415(i), all on-site actions required pursuant to this Order shall, to the extent practicable, as determined by EPA, considering the exigencies of the situation, attain applicable or relevant and appropriate requirements under federal environmental, state environmental, or facility siting laws.

## INSURANCE

77. At least seven (7) days prior to commencing any on-site work under this Order, the Respondents shall secure, and shall maintain for the duration of this Order, comprehensive general liability and automobile insurance with limits of three hundred thousand dollars ($200,000), combined single limit. The United States shall be named as an additional insured for all such insurance policies. Within the same time period, the Respondents shall provide EPA with certificates of such insurance and a copy of each insurance policy. If the Respondents demonstrate to EPA that any contractor or subcontractor maintains insurance equivalent to that described above or insurance covering the same risks but in a lesser amount, then the Respondents need provide only that portion of the insurance described above which is not maintained by such contractor or subcontractor.

## ENFORCEMENT; PENALTIES FOR NONCOMPLIANCE

78. Violation of this Order may subject the Respondents to civil penalties of up to twenty-seven thousand five hundred dollars ($27,500) for each day the violation occurs, as provided in Section 106(b)(1) of CERCLA, 42 U.S.C. § 9606(b)(1). The Respondents may also be subject to punitive damages in an amount up to three (3) times the amount of any costs

incurred by the United States as a result of such violation, as provided in Section 107(c)(3) of CERCLA, 42 U.S.C. § 9607(c)(3).

## DISCLAIMER OF LIABILITY BY EPA

79. By issuance of this Order, the United States and EPA assume no liability for injuries or damages to persons or property resulting from acts or omissions by the Respondents, their officers, employees, agents, representatives, successors, assigns, contractors, or consultants in carrying out activities pursuant to this Order. Neither the United States nor EPA shall be held as a party to any contract entered into by the Respondents or their directors, officers, employees, agents, representatives, successors, assigns, contractors, or consultants in carrying out activities pursuant to this Order.

## NO RELEASE FROM LIABILITY

80. Nothing in this Order shall constitute or be construed as a satisfaction or release from any claim, cause of action, or demand in law or equity against the Respondents or any other person, whether or not a party to this Order, for any liability such person may have for any conditions or claims arising out of or relating in any way to the generation, storage, treatment, handling, transportation, release, or disposal of any hazardous substances, hazardous wastes, pollutants, or contaminants found at, taken to, or taken from the Site, including but not limited to any and all claims of the United States for money damages and interest under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), or under any other applicable statute or the common law.

81. Nothing in this Order shall be deemed to constitute any decision on preauthorization of a claim within the meaning of Section 111 of CERCLA, 42 U.S.C. § 9611.

## RESERVATION OF RIGHTS BY THE UNITED STATES GOVERNMENT

82. The United States reserves all rights against the Respondents and all other persons to take any further civil, criminal, or administrative enforcement action pursuant to CERCLA and/or any other available legal authority, including natural resource damages, the right to seek injunctive relief, the recovery of money expended or to be expended (plus interest); monetary penalties; criminal sanctions; and/or punitive damages regarding: (i) any violation of this Order; or (ii) any actual or potential threat to human health or welfare or the environment, or any release or threat of release of hazardous substances on, at, in, or near the Site.

83. EPA further expressly reserves the right both to disapprove work performed by the Respondents and to request or order the Respondents to perform tasks in addition to those detailed in the Order. In addition, EPA reserves the right to undertake response actions at any

time and to perform any and all portions of the work activities which the Respondents have failed or refused to perform properly or promptly.

84. Notwithstanding any other provision of this Order, EPA shall retain all of its information gathering, entry, inspection, and enforcement authorities and rights under CERCLA and under any other applicable law, regulation, or permit.

## OPPORTUNITY TO CONFER

85. Within two (2) days after receipt of this Order, the Respondents may request a conference with EPA to be held no later than two (2) days before the effective date. Requests for a conference should be submitted to:

Catherine Garypie, Senior Enforcement Counsel
Office of Environmental Stewardship
U.S. Environmental Protection Agency - New England
1 Congress Street, Suite 1100 (SES)
Boston, Massachusetts 022114-2023
(617) 918-1540
FAX (617) 918-1809

86. The purpose and scope of the conference shall be limited to issues involving the implementation of the response actions required by this Order and the extent to which the Respondents intend to comply with this Order. The conference is not an evidentiary or adversarial hearing and is not part of any proceeding to enforce or challenge the Order. The conference does not give the Respondents a right to seek review of this Order, or to seek resolution of potential liability, and no official stenographic record of the conference will be made. At any conference held pursuant to this section, the Respondents may appear in person or by attorney or other representative.

## EFFECTIVE DATE; COMPUTATION OF TIME

87. This Order shall be effective ten (10) days after the Order is signed by the EPA New England Director of the Office of Site Remediation and Restoration. All times for performance of obligations under this Order shall be calculated from the effective date. For purposes of this Order, the term "day" shall mean a calendar day unless otherwise noted herein. When computing any period of time under this Order, if the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the next working day.

**IT IS SO ORDERED.** Issued at Boston, Massachusetts this 12th day of April, 2000.

Patricia L. Meaney, Director
Office of Site Remediation and Restoration

## SCOPE OF WORK

**This Scope of Work is provided for the Centredale Manor Restoration Project in North Providence, Rhode Island as an attachment to the Unilateral Administrative Order.**

---

### Preface

EPA has determined that Potentially Responsible Parties (PRPs) have the ability to promptly and properly prevent, mitigate, or eliminate the threats posed by hazardous substances at the Site. Therefore, EPA has issued a Unilateral Administrative Order (Order) to such parties (the Respondents) with this attached Scope of Work (SOW).

As described previously in the Order, EPA has undertaken Removal Action at the Site to prevent exposure and control migration of contaminants at the Site including, but not limited to, dioxins, PCBs and others. This scope of work addresses the completion of Removal Activities which were proposed in the Action Memorandum (May, 1999) and the Action Memorandum Addendum (September, 1999). It should be noted that several actions proposed in these Action Memoranda were subsequently determined to be beyond the scope of Removal Action and have been incorporated into the Engineering Evaluation/Cost Analysis (EE/CA) process that EPA has undertaken to address the larger scale threats at the Site.

All actions taken by the Respondents shall be consistent with the National Contingency Plan (NCP), found in Title 40, Part 300 of the Code of Federal Regulations (40 CFR 300).

The Respondents shall communicate freely with the On-Scene Coordinator (OSC) prior to and during development of plans and deliverables, and throughout the implementation of approved plans.

The Order and SOW compel the Respondent to commence the work detailed in the Scope of Work. Therefore, within seven (7) days of retaining the services of a qualified and experienced Supervising Contractor for the purpose of performing the work required by this Order, the respondent shall submit a general plan (the Plan) to EPA for approval. The Plan shall address the components listed below:

### GENERAL COMPONENTS

1. **Site Security** - The plan shall provide for on-site security during construction and thereafter by, at a minimum, maintaining the current fences and signs which are in place



SBSF 10960

to limit access to contaminated areas of the site. The effectiveness of signs, fences, and barriers will be evaluated during the construction phase to determine if they adequately restrict access. If not deemed to be sufficient by the OSC, additional fencing, the placement of security guards or other measures may be warranted. Site security shall be maintained until EPA determines that the threats posed by conditions at the Site are eliminated or substantially mitigated.

2. **Work Plan** - The Work Plan will provide a detailed description of expected activities and the **project schedule**, including completion dates for interim activities. Out of respect for the nearest residents, noisy equipment (such as dumptrucks or bulldozers) will not be operated before 0800AM. A **daily work schedule** will also be provided to the OSC. At a minimum, **weekly progress meetings** will be scheduled with the OSC throughout the implementation of the Order.

3. **Site-Specific Health and Safety Plan (HASP)** - The Respondents shall develop and implement a HASP for all activities to be conducted at the Site in accordance with the NCP §300.150, and OSHA. The HASP shall be developed to protect all on-site personnel and the general public. Private employers are responsible for the health and safety of their own employees. Nothing contained in this SOW or the Order shall relieve the Respondents of their liability in this regard.

4. **Quality Assurance Plan (QAP)** - If sample collection and analysis is necessary, the Respondents shall develop a QAP to be used in conducting all field and laboratory analysis. The QAP shall ensure that analytical results generated are of known quality. The QAP will be consistent with the Region 1, EPA- New England *Compendium of Quality Assurance Project Plan Guidance.*

5. **Completion of Work Report (CWR)** - Upon completion of the tasks in this Order and SOW, the Respondent shall submit a CWR summarizing the work performed. At a minimum, the CWR will provide an estimate of the Respondents' costs incurred; identify all required activities and certify that each has been completed in accordance with the approved plans; include original photographs with written descriptions; include analytical results of any environmental samples collected during the period of performance, in both tables and on site maps; include 'as-built' drawings of any structures or features constructed ; contain a chronology of onsite activities; identify subcontractors and their roles.

**Centredale Manor Restoration Project**
**Unilateral Administrative Order**
**Scope of Work**

SPECIFIC ACTIONS

6. **Complete construction of Interim Cap #2** - The Army Corps of Engineers (ACOE) has provided a Preliminary Plan for completion of an interim protective cap with flood management berms over the area of contaminated soil adjacent to the Woonasquatucket River and between the Centredale Manor and Brook Village parking lots. (Refer to the attached plans.) The Respondents will complete construction of the interim cap with berms to the specifications provided by the ACOE through the OSC.

7. **Other specific actions requested by EPA** - At any time prior to or after the completion of the work specified in this SOW, EPA may determine that additional tasks are necessary in order to achieve the objectives of the Order, the SOW and CERCLA. Therefore, this SOW may be modified by the OSC at anytime.

# EXHIBIT

# E

05/JUN 12 '00 11:36AM ENV. AFFAIRS P.2/18

LIBERTY MUTUAL.

RECEIVED
MAY 26

ENVIRONMENTAL DEPARTMENT

100 Liberty Way
PO Box 1525
Dover NH 03821-1525
Telephone: (603) 749-2600

Jan 1 69 · NOV 1 71

May 24, 2000

Mr. Joe Hovermill
Miles & Stockbridge
10 Light Street
Baltimore, Maryland 21202

Re: USEPA(Centredale Manor)-Black & Decker
File #: P 096-311205-01

Dear Mr. Hovermill:

This is in response to Black & Decker Corporation's ("Black & Decker") request that Liberty Mutual Insurance Company ("Liberty Mutual") defend and indemnify Black & Decker under policies of insurance issued to USM Corporation ("USM") in connection with USM's alleged environmental liabilities at the Centredale Manor property located at 2072 and 2074 Smith Street, North Providence, Rhode Island (the "Site").

Liberty Mutual will not be providing Black & Decker with a defense or indemnification for any liability or costs incurred. It is Liberty Mutual's position that there is no potential obligation to defend and/or indemnify Black & Decker as outlined further below.

Site History

Based on the information provided by Black & Decker, the Centredale Manor Superfund Site consists of approximately 9.04 acres and is located in North Providence, Rhode Island. The Site extends on the floodplain of the Woonasquatucket River south to the Allendale Dam. On the eastern portion of the Site there is a drainage swale that begins in the northern section, extends south and then curves west discharging into a wooded wetland south of the Site.



Emhart Industries, Inc. v. Home Insurance Company, et al.
Case No. 02-053-S
DX-300

The United States Environmental Protection Agency ("USEPA") believes the property was used for the disposal or treatment of wastes by several owners from approximately 1940-1986. The earliest identified site operator was Crown Chemical Corporation who was at the Site from an unknown date until 1968 when they merged with Metro-Atlantic, Inc. The new corporation was known as Crown-Metro, Inc. until 1976 when the operation changed its name to Bostik South. It is reported that Bostik South then merged with and into USM Corporation in 1977.

The USEPA reports that contamination was confirmed at the Site on April 10, 1986.

Policies of Insurance

Liberty Mutual Insurance Company has confirmed that it issued Comprehensive General Liability ("CGL") policies to USM effective from November 1, 1952 to January 1, 1959; January 1, 1961 to January 1, 1969; and November 1, 1971 to January 1, 1979.

Application of Coverage

There is no coverage under the Liberty Mutual policies for property damage which was not caused by an insured and which did not occur during Liberty Mutual's policy period. It is Liberty Mutual's position that the only policy even potentially applicable to this claim is that which was in effect on the date there was actionable contamination at the Site. The subject contamination at this site was confirmed on April 10, 1986, more than seven years after the expiration of the last policy issued by Liberty Mutual to USM.

Notwithstanding our position that the only policy potentially applicable to this claim is that which was in effect on the date actionable contamination was confirmed, the pollution exclusion present on the CGL policies effective November 1, 1971 to January 1, 1979 also precludes coverage.

The PRP Notification from the USEPA does not constitute a "suit" giving rise to a defense obligation under the Liberty Mutual policies. Accordingly, we will not retain defense counsel for Black & Decker, nor will we reimburse Black & Decker for defense costs incurred at this time.

In addition to the foregoing basis for denial, we also take this opportunity to alert you to additional policy terms, conditions and exclusions which may

operate to limit and/or bar coverage and as to which Liberty Mutual reserves all rights:

To the extent that the alleged injuries do not fall within the scope of the Insuring Agreement and/or to the extent that the alleged injuries do not constitute property damage as that term is defined in the policies, there is no coverage thereunder.

There is no coverage under the Liberty Mutual policies for costs incurred by Black & Decker and/or USM to comply with statutes and regulations governing its business operations.

There is no coverage under the Liberty Mutual policies for otherwise covered property damage which was expected and intended or which was not caused by an occurrence and/or accident, within the meaning of the policies.

To the extent that the property damaged is owned, occupied or rented to the insured, used by the insured, within the care, custody or control of the insured or alienated or sold by the insured, there is no coverage hereunder.

There is no coverage under the Liberty Mutual policies for losses which were known to or should have been known to the insured prior to the inception of any Liberty Mutual policy period.

There is no coverage under the Liberty Mutual policies for costs and expenses or other obligations assumed by Black & Decker and/or USM without notice to and consent of Liberty Mutual.

To the extent that coverage might otherwise exist, Liberty Mutual's obligations under its policies are limited by the "other insurance" clause contained therein, as well as any per occurrence, per person, and aggregate limits of liabilities, and other policy provisions precluding the stacking or accumulation of multiple policy limits of liability, including, particularly, the "Non-Cumulation of Liability" provision in the policies.

While we have tried to identify and address above, all of the coverage considerations that we feel are related to this claim, the foregoing specificity is not intended, nor should it be construed as a waiver of any right or basis which Liberty Mutual may have to further disclaim coverage. Liberty Mutual expressly reserves all rights in this regard concerning this claim and any other matter, including without limitation those claims at issue in the pending Massachusetts coverage action.

If there is any additional information Black & Decker wishes Liberty Mutual to consider regarding this claim, please forward it to my attention as soon as possible.

Sincerely,

Denise M. Szuniewicz
Environmental Claims Specialist

cc: Jack Pirozzolo, Esq.
Rob Whitney, Esq.
Al Rommal
Russel Cregg, Esq.

# EXHIBIT

# F

Insur

WILLCOX, PIROZZOLO AND MCCARTHY
PROFESSIONAL CORPORATION
FIFTY FEDERAL STREET
BOSTON, MASSACHUSETTS 02110

TELEPHONE (617) 482-5470
TELECOPIER (617) 423-1572

HAROLD M. WILLCOX (1925-1978)
JACK R. PIROZZOLO
RICHARD F. McCARTHY
RICHARD L. BINDER
RICHARD C. BENNETT
JUDITH S. ZISS
CHRISTOPHER R. GOODU

OF COUNSEL
RICHARD P. CROWLEY
(REGISTERED PATENT ATTORNEY)

RECEIVED
JUN 21 2000
LINDA H. BIAGIONI

June 19, 2000

Ms. Denise M. Szuniewicz
Environmental Claims Specialist
Liberty Mutual Insurance Company
100 Main Street
Dover, New Hampshire 03822

Re: Insured: USM Corporation
Claimant: Environmental Protection Agency
Site: Centredale, Sunrise Landfill and A-1

Dear Ms. Szuniewicz:

This will acknowledge receipt of your letters of May 24, 2000 regarding the Centredale Superfund Site and the Sunrise Landfill and your letter of June 1, 2000 regarding the A-1 Disposal Site.

You assert that Liberty Mutual will not indemnify or defend its insureds ("Black & Decker") with respect to those sites for the reasons stated in your letters. Black & Decker does not acquiesce in any representation you have made regarding the terms of insurance policies issued by Liberty Mutual Insurance Company or in any conclusions you have drawn regarding the nature and scope of coverage provided in those policies. At this time, Black & Decker expressly reserves any and all of its rights under such policies. No prior action or future action taken and no information provided now or in the future by Black & Decker shall prejudice or effect Black & Decker's rights or Liberty Mutual Insurance Company's obligations under the policies.

Your letters were addressed to Joseph W. Hovermill of Miles & Stockbridge. We have previously advised Liberty Mutual and its counsel that all communications regarding environmental

SBSF 10915

Emhart Industries, Inc. v. Home Insurance Company, et al.
Case No. 02-053-S
DX-304

WILLCOX, PIROZZOLO & MCCARTHY

Ms. Denise M. Szuniewicz

-2- June 19, 2000

claims should be addressed to us, not to Mr. Hovermill or to any other counsel or any employee of Black & Decker. Only communications regarding long-term exposure claims should be addressed to Mr. Hovermill (with copies provided to us).

You or your counsel should direct any future inquiries or correspondence concerning this matter to us.

Very truly yours,

Jack R. Pirozzolo

JRP:ps

cc: Ms. Linda H. Biagioni
Mr. Steven H. Jones
Joseph W. Hovermill, Esquire
Ralph T. Lepore, III, Esquire

CERTIFIED MAIL RETURN RECEIPT REQUESTED

# EXHIBIT

# G

WILLCOX, PIROZZOLO AND MCCARTHY
PROFESSIONAL CORPORATION
FIFTY FEDERAL STREET
BOSTON, MASSACHUSETTS 02110

TELEPHONE (617) 482-5470
TELECOPIER (617) 423-1572

HAROLD M. WILLCOX (1925-1976)
JACK R. PIROZZOLO
RICHARD F. McCARTHY
RICHARD L. BINDER
RICHARD E. BENNETT
JUDITH S. ZISS
CHRISTOPHER R. GODDU

OF COUNSEL
RICHARD P. CROWLEY
(REGISTERED PATENT ATTORNEY)

May 3, 2001

2216-31305.01

CERTIFIED MAIL RETURN RECEIPT REQUESTED

Ms. Denise M. Szuniewicz
Environmental Claims Specialist
Liberty Mutual Insurance Company
100 Main Street
Dover, New Hampshire 03822

Re: Insured: USM Corporation
Claimant: Environmental Protection Agency
Site: Centredale Manor Superfund

Dear Ms. Szuniewicz:

We previously provided Liberty Mutual Insurance Company ("Liberty Mutual") notice of the involvement of its insured USM Corporation (USM Corporation and its successors under the applicable insurance policies issued by Liberty Mutual Insurance Company will collectively be referred to as "Black & Decker") in a proceeding concerning the Centredale Manor Superfund site in North Providence, Rhode Island ("Site"). We subsequently provided Liberty Mutual further information regarding developments at the Site.

We are writing to advise Liberty Mutual that the enclosed Second Administrative Order for Removal Action at the Site ("Order") was issued to Black & Decker and four other entities. Black & Decker and at least three of the parties to whom the Order was issued intend to comply with the Order through the design phase, at an estimated cost of $190,000. Those parties have agreed to share said costs on a pro rata basis, reserving all rights as to the ultimate allocation of costs.

5/4/01 52586-4

A0221

Emhart Industries, Inc. v. Home Insurance Company, et al.
Case No. 02-053-S
DX-378

0000097

WILLCOX, PIROZZOLO & MCCARTHY

Ms. Denise M. Szuniewicz

-2-

May 3, 2001

Black & Decker reiterates its demand that Liberty Mutual provide Black & Decker a defense in this action and that Liberty Mutual pay and/or indemnify Black & Decker for all damages, costs and expenses incurred by Black & Decker arising out of this action, including the costs incurred as a result of the Order.

You or your counsel should direct any future inquiries or correspondence concerning this matter to us.

Very truly yours,

Jack R. Pirozzolo

JRP:rlb
Enclosure
cc: Ms. Linda H. Biagioni w/enclosure
Mr. Steven H. Jones w/enclosure
Ralph T. Lepore, III, Esquire w/enclosure

# EXHIBIT

# H

WILLCOX, PIROZZOLO AND McCARTHY
PROFESSIONAL CORPORATION
FIFTY FEDERAL STREET
BOSTON, MASSACHUSETTS 02110
TELEPHONE (617) 482-5470
TELECOPIER (617) 423-1572

HAROLD M. WILLCOX (1925-1975)
JACK R. PIROZZOLO
RICHARD F. McCARTHY
RICHARD L. BINDER
RICHARD E. BENNETT
JUDITH S. ZISS
CHRISTOPHER R. GODDU

OF COUNSEL
RICHARD P. CROWLEY
(REGISTERED PATENT ATTORNEY)

September 17, 2001

**CERTIFIED MAIL RETURN RECEIPT REQUESTED**

Ms. Denise M. Szuniewicz
Environmental Claims Specialist
Liberty Mutual Insurance Company
100 Liberty Way
Dover, New Hampshire 03822

Re: Insured: USM Corporation
Claimant: Environmental Protection Agency
Site: Centredale Manor Superfund

Dear Ms. Szuniewicz:

We previously provided Liberty Mutual Insurance Company ("Liberty Mutual") notice of the alleged responsibility of its insured, USM Corporation (USM Corporation and its successors under the applicable insurance policies issued by Liberty Mutual Insurance Company will collectively be referred to as "Black & Decker"), in a proceeding concerning the Centredale Manor Superfund site in North Providence, Rhode Island ("Site"). We subsequently provided Liberty Mutual further information regarding developments at the Site.

In our letter of May 3, 2001, we advised Liberty Mutual of a Second Administrative Order for Removal Action at the Site that the Environmental Protection Agency ("EPA") issued to Black & Decker and four other entities ("Order"). We enclosed a copy of the Order. The Order required the respondents to perform certain non-time-critical removal activities at the Site. This includes restoration of the Allendale Dam and excavation of residential soil and sediments containing more than 1 ppb of dioxin. At that time, four of the five recipients of the Order, including Black & Decker, agreed to comply with Order through the design phase at an estimated



Emhart Industries, Inc. v.
Home Insurance Company, et al.
Case No. 02-053-S
DX-396

cost of $190,000 and to share said costs on a pro rata basis, reserving all rights as to the ultimate allocation of costs. The respondents submitted draft design documents to EPA on July 9, 2001. The design documents were approved on July 25.

On July 27, 2001, representatives of the four respondents met with EPA to discuss the schedule for completing the remaining activities required by the Order. EPA agreed to amend the schedule provided under the Order by allowing excavation of the residential soil and sediments to occur in the spring of 2002. This year, respondents will complete the site preparation, site investigation, dam restoration and dam-related soil and sediment activities required by the Order at an estimated cost of $1,400,000. The four respondents have agreed to share these costs on an interim basis, reserving all rights as to the ultimate allocation of costs.

Black & Decker reiterates its demand that Liberty Mutual provide Black & Decker a defense in this action and that Liberty Mutual pay and/or indemnify Black & Decker for all damages, costs and expenses incurred by Black & Decker arising out of this action, including the costs incurred as a result of the Order.

You or your counsel should direct any future inquiries

WILLCOX, PIROZZOLO & MCCARTHY

Ms. Denise M. Szuniewicz

-3- September 17, 2001

or correspondence concerning this matter to us.

Very truly yours,

Jack R. Pirozzolo

JRP:ps
cc: Ms. Linda H. Biagioni
Ms. Claire May
Ralph T. Lepore, III, Esquire

# EXHIBIT

# I

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

EMHART INDUSTRIES, INC.,

Plaintiff,

v.

HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, LIBERTY MUTUAL INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICA INSURANCE COMPANY, and UNITED STATES FIRE INSURANCE COMPANY,

Defendants.

Civil Action No. 02-053-S

LIBERTY MUTUAL INSURANCE COMPANY,

Third-Party Plaintiff,

v.

NORTH RIVER INSURANCE COMPANY, AS TO POLICY NO. JU0123, and UNITED STATES FIRE INSURANCE COMPANY,

Third-Party Defendants.

RESPONSE OF PLAINTIFF EMHART INDUSTRIES, INC. TO DEFENDANT NORTH RIVER INSURANCE COMPANY'S FIRST SET OF INTERROGATORIES

Plaintiff, Emhart Industries, Inc. ("Emhart"), responds to the First Set of Interrogatories propounded by defendant, North River Insurance Company ("North River"), as follows:

OBJECTIONS APPLICABLE TO ALL INTERROGATORIES

1. Emhart objects to the definitions of "plaintiff", "you", "your" and "Emhart" to the extent that they include subsidiaries or divisions of Emhart unrelated to the Site. Emhart includes, and has included, numerous subsidiaries or divisions that are and were unrelated to the

Site. In responding to these interrogatories, Emhart will provide information related to the Site, the Claim, Crown Metro, Inc. and predecessors of Crown Metro, Inc., but not information concerning other subsidiaries or divisions of Emhart.

2. Emhart objects to each and every interrogatory to the extent that it seeks information outside the proper scope of discovery and protected by the attorney-client privilege or the work product doctrine or as trial preparation material.

3. Emhart objects to each and every interrogatory to the extent that it seeks confidential matter. Following entry of a protective order applicable to confidential matter, Emhart will produce such matter subject to the provisions of said protective order.

RESPONSES TO PARTICULAR INTERROGATORIES

Without waiving, and subject to, the objections set forth above, Emhart responds to the numbered interrogatories as follows:

Interrogatory No. 1:

Identify all insurance policies issued to Plaintiff from 1940 to the present, including, but not limited to, the insurance policies identified on the schedule attached as "Exhibit A" that was produced in this action and bears bates numbers SBSF 14652 - 14662.

Response to Interrogatory No. 1:

Emhart objects to this interrogatory on the grounds that it is overly broad, unduly burdensome, and seeks information not relevant to the claims and defenses in this action to the extent that it requests that Emhart provide "the identity of all persons involved in the creation" of each policy, "the identity of each person to whom" each policy "was addressed or sent", and "the present location of the original and all copies of" each policy, as such information is not (and never has been) within Emhart's knowledge. Subject to, and without waiving, this objection, Emhart responds as follows:

With respect to policies issued to Crown Metro, Inc., Emhart refers North River in accordance with Fed. R. Civ. P. 33(d) to the document Bates numbered SBSF 14653, except that policy XBC64674 was issued to Crown Chemical Corporation. With respect to policies issued to USM Corporation and Emhart, Emhart refers North River to the list attached hereto as Exhibit A. After 1990, Emhart was a named insured on insurance policies issued to The Black & Decker Corporation.

Emhart believes that insurance policies were issued to Metro-Atlantic, Inc., but it does not currently have specific information concerning policy numbers or the terms of such policies. Emhart is continuing its investigation of insurance policies issued to Metro-Atlantic, Inc., and will supplement its response to this interrogatory when and if it receives information responsive to this interrogatory.

Interrogatory No. 2:

For each insurance policy identified in your response to Interrogatory No. 1, identify:

A. The insurance policy's attachment point, limits, and policy periods;

B. Whether Emhart, USM, Crown Metro, Inc., Metro-Atlantic, Inc., or any other party entered into any settlement or release agreements concerning the insurance policy.

Response to Interrogatory No. 2:

With respect to the information requested in part A of this interrogatory, Emhart refers North River in accordance with Fed. R. Civ. P. 33(d) to the documents Bates numbered MISC 00044 through MISC 01101 and to the documents being produced by Emhart in response to Request No. 2 of North River Insurance Company's First Request for Production of Documents. Emhart does not have the requested information with respect to the policies which it believes were issued to Metro-Atlantic, Inc.

With respect to the information requested in part B of this interrogatory, Emhart is not

aware of any settlements or release agreements entered into by Crown Metro, Inc. or Metro-Atlantic, Inc. regarding the insurance policies issued to those entities. Emhart cannot otherwise answer this interrogatory due to obligations to other parties.

Interrogatory No. 3:

Do you contend that the deductibles, self-insured retentions, self-insurance, or underlying limits of coverage for the North River Policy are exhausted in connection with the claims at issue in this litigation? If so, describe in detail all facts which support your contention that you have exhausted or will exhaust the deductibles, self-insured retentions, self-insurance, or underlying limits of coverage for the North River Policy in connection with the claims at issue in this litigation.

Response to Interrogatory No. 3:

Yes. Emhart cannot provide a more detailed answer to this interrogatory due to obligations to another party.

Interrogatory No. 4:

Do you contend that the deductibles, self-insured retentions, self-insurance, or underlying limits of coverage for any insurance policy identified in response to Interrogatory No. 1 are exhausted in connection with the claims at issue in this litigation? If so, describe in detail all facts which support your contention that you have exhausted or will exhaust the deductibles, self-insured retentions, self-insurance, or underlying limits of coverage for any insurance policy identified in response to Interrogatory No. 1 in connection with the claims at issue in this litigation.

Response to Interrogatory No. 4:

Emhart has exhausted the deductibles and/or self-insured retentions of the primary policies alleged in the Complaint and of Policy XBC46961. Emhart believes it has exhausted deductibles and/or self-insured retentions of the primary policies issued to Metro-Atlantic, Inc. Emhart objects to answering this interrogatory with respect to the vast number of policies identified in its Response to Interrogatory No. 1 on the grounds that the interrogatory is overly broad and unduly burdensome with respect to those policies. North River may obtain the information it seeks by comparing the expenses that Emhart has incurred to date (information which Emhart has provided in discovery and which will be supplemented) with the terms and

conditions on the insurance policies identified in Emhart's Response to Interrogatory No. 1, and Emhart refers North River in accordance with Fed. R. Civ. P. 33(d) to the documents Bates numbered MISC 00044 through MISC 01101 and to the documents being produced by Emhart in response to Request No. 2 of North River Insurance Company's First Request for Production of Documents. Emhart cannot provide a further answer to this interrogatory due to obligations to other parties.

Interrogatory No. 5:

Identify the date of notice to North River.

Response to Interrogatory No. 5:

Emhart objects to this interrogatory on the grounds that it seeks a legal conclusion as to the "date of notice." Without waiving, and subject to, this objection, Emhart states that July 21, 1999 is the date of notice to North River.

Interrogatory No. 6:

If you identified a date of notice to North River in the preceding interrogatory, identify the person who provided notice on your behalf, the person who received notice on North River's behalf, the date of notice, and the form of notice.

Response to Interrogatory No. 6:

Emhart refers North River in accordance with Fed. R. Civ. P. 33(d) to the documents Bates numbered MISC 01387 through MISC 01418.

Interrogatory No. 7:

If you entered into any settlement agreements or releases concerning any insurance policy that – absent such settlement agreement or release – might otherwise provide coverage for damages from environmental contamination at the Site, provide the following:

A. The parties to the settlement agreement or release;

B. The amounts paid (if any) under the settlement agreement or release;

C. The terms of the settlement agreement or release.

Response to Interrogatory No. 7:

Emhart cannot answer this interrogatory due to obligations to other parties.

Interrogatory No. 8:

Paragraph 14 of the Complaint alleges "[i]n or about 1976, USM merged with a subsidiary of Emhart Corporation and the surviving entity kept the name USM." Identify the efforts that the subsidiary of Emhart, identified in Paragraph 14 of the Complaint, undertook in or about 1976 and prior to its merger with USM, to determine the potential liabilities of USM associated with environmental contamination.

Response to Interrogatory No. 8:

Emhart objects to this interrogatory on the grounds that it is overly broad, unduly burdensome and seeks information not relevant to the claims and defenses in this action to the extent that it seeks information about "potential liabilities ... associated with environmental contamination" that are unrelated to the Site and/or the alleged contamination at the Site. Subject to, and without waiving, this objection, Emhart states that no such effort was undertaken by the subsidiary of Emhart in or about 1976 with respect to the Site.

Interrogatory No. 9:

Paragraph 14 of the Complaint further alleges "[i]n or about 1987, USM was merged with and became Emhart." Identify the efforts that Emhart undertook in or about 1987 prior to its merger with USM to determine the potential liabilities of USM associated with environmental contamination.

Response to Interrogatory No. 9:

Emhart objects to this interrogatory on the grounds that it is overly broad, unduly burdensome and seeks information not relevant to the claims and defenses in this action to the extent that it seeks information about "potential liabilities ... associated with environmental contamination" that are unrelated to the Site and/or the alleged contamination at the Site. Subject to, and without waiving, this objection, Emhart states that no such effort was undertaken by Emhart in or about 1987 with respect to the Site.

Interrogatory No. 10:

Identify all individuals with whom you contacted or consulted in preparing the responses to these Interrogatories.

Response to Interrogatory No. 10:

Emhart objects to this interrogatory on the grounds that it seeks information outside the scope of discovery and protected by the attorney-client privilege and the work product doctrine.

Signed as to objections,

Gerald J. Petros (#2391)
Christopher R. Bush (#5411)
Hinckley, Allen & Snyder LLP
1500 Fleet Center
Providence, Rhode Island 02903
(401) 274-2000
(401) 277-9600 (facsimile)

Jack R. Pirozzolo
Willcox, Pirozzolo & McCarthy
Professional Corporation
50 Federal Street
Boston, Massachusetts 02110
(617) 482-5470

Counsel for Plaintiff Emhart Industries, Inc.

# VERIFICATION

I, Linda H. Biagioni, depose and say that I am Vice President of Emhart Industries, Inc.; that I am duly authorized to execute the foregoing response to interrogatories; that although the foregoing response includes information not necessarily within my personal knowledge, the factual information in the foregoing response is true to the best of my knowledge, information, and belief.

Linda H. Biagioni
Linda H. Biagioni
Vice President
Emhart Industries, Inc.

March 7, 2003

**CERTIFICATION**

To:

Robin L. Main, Esq.
Holland & Knight LLP
One Financial Plaza, Suite 1800
Providence, RI 02903

James T. Murphy, Esq.
Kelly N. Michels, Esq.
Hanson Curran LLP
146 Westminster Street
Providence, RI 02903

Mark T. Nugent, Esq.
Michael T. Farley, Esq.
Morrison, Mahoney & Miller, LLP
One Providence Washington Plaza, 6th Floor
Providence, RI 02903

James T. McCormick, Esq.
McKenna & McCormick
128 Dorrance Street, Suite 330
Providence, RI 02903

Richard W. MacAdams, Esq.
MacAdams & Wieck, Inc.
101 Dyer Street, Suite 400
Providence, RI 02903

Ralph T. Lepore, Esq.
Holland & Knight LLP
Ten St. James Avenue
Boston, MA 02116

Ian Wallach, Esq.
Kimball Ann Lane, Esq.
Luce, Forward, Hamilton & Scripps LLP
153 East 53rd Street, 26th Floor
New York, NY 10022

Michael F. Aylward, Esq.
Morrison, Mahoney & Miller, LLP
250 Summer Street
Boston, MA 02201

John F. Glowacki, Jr. Esq.
Siegal & Napierkowski
220 Lake Drive East
Suite 304
Cherry Hills, NJ 08002

Kurt Hirsh, Esq.
Baach, Robinson & Lewis, PLLC
One Thomas Circle, Suite 200
Washington, DC 20005

Kevin J. O'Connor, Esq.
Hermes, Netburn, O'Connor & Spearing, P.C.
111 Devonshire Street
Boston, MA 02109

I hereby certify that a copy of the within document was mailed, by first class mail, postage prepaid, upon the counsel of record listed above, on March 7, 2003.

Donna M. Falcon

533156.v1

# EXHIBIT A

Emhart Corp.

| Insurer | Policy Number | Start | End |
|---|---|---|---|
| Home Ins. Co. | HEC9543570 | 1/1/64 | 1/1/67 |
| Aetna Casualty & Surety Co. | 52AL10038 | 1/1/65 | 1/1/66 |
| Aetna Casualty & Surety Co. | 52AL011307SR(Y) | 1/1/66 | 1/1/67 |
| Aetna Casualty & Surety Co. | 52XS56SC | 7/1/66 | 1/1/69 |
| Aetna Casualty & Surety Co. | 52AL122228SR(Y) | 1/1/67 | 1/1/68 |
| Aetna Casualty & Surety Co. | 52AL123773SR(Y) | 1/1/68 | 1/1/69 |
| Aetna Casualty & Surety Co. | 52AL125459SR(Y) | 1/1/69 | 1/1/70 |
| Aetna Casualty & Surety Co. | 52AL127112SR(Y) | 1/1/70 | 1/1/71 |
| Aetna Casualty & Surety Co. | 52XS531SC | 1/1/70 | 1/1/71 |
| Aetna Casualty & Surety Co. | 52AL128862SR(Y) | 1/1/71 | 1/1/72 |
| Aetna Casualty & Surety Co. | 52XS531SC | 1/1/71 | 1/1/73 |
| Aetna Casualty & Surety Co. | 52AL130882SRA(Y) | 1/1/72 | 1/1/73 |
| Aetna Casualty & Surety Co. | 52XS756SCA | 1/1/73 | 1/1/74 |
| Aetna Casualty & Surety Co. | 52AL132675SRA(Y) | 1/1/73 | 1/1/74 |
| Aetna Casualty & Surety Co. | 52AL257449SRA(Y) | 1/1/74 | 1/1/75 |
| Aetna Casualty & Surety Co. | 52XS1089SCA | 1/1/74 | 1/1/75 |

Emhart Corp.

| Insurer | Policy Number | Start | End |
|---|---|---|---|
| Aetna Casualty & Surety Co. | 52AL258413SRA | 1/1/75 | 1/1/76 |
| Aetna Casualty & Surety Co. | 52XS1089SCA | 1/1/75 | 1/1/77 |
| Aetna Casualty & Surety Co. | 52AL258418SRA | 1/1/76 | 1/1/77 |
| Aetna Casualty & Surety Co. | 52XS1627SCA | 1/1/77 | 1/1/78 |
| Aetna Casualty & Surety Co. | 52AL258432SRA | 1/1/77 | 1/1/78 |
| Aetna Casualty & Surety Co. | 52XS1628SCA | 1/1/78 | 1/1/79 |
| Aetna Casualty & Surety Co. | 52AL258442SRA | 1/1/78 | 1/1/79 |
| Aetna Casualty & Surety Co. | 52GL5SRA | 1/1/79 | 1/1/80 |
| Aetna Casualty & Surety Co. | 52AL258447SRA (MI/TX) | 1/1/79 | 1/1/80 |
| Aetna Casualty & Surety Co. | 52XS1629SCA | 1/1/79 | 1/1/80 |
| Aetna Casualty & Surety Co. | 52GL11SRA | 1/1/80 | 1/1/81 |
| Aetna Casualty & Surety Co. | 52XS1632SCA | 1/1/80 | 1/1/81 |
| Aetna Casualty & Surety Co. | 52GL19SRA | 1/1/81 | 1/1/82 |
| Aetna Casualty & Surety Co. | 52XS1634SCA | 1/1/81 | 1/1/82 |
| Aetna Casualty & Surety Co. | 52GL1229SRA | 1/1/82 | 1/1/83 |
| Aetna Casualty & Surety Co. | 52XS1636SCA | 1/1/82 | 1/1/83 |

Emhart Corp.

| Insurer | Policy Number | Start | End |
|---|---|---|---|
| Aetna Casualty & Surety Co. | 52GL1235SRA | 1/1/83 | 1/1/84 |
| Aetna Casualty & Surety Co. | 52XS1638SCA | 1/1/83 | 1/1/84 |
| Aetna Casualty & Surety Co. | 52GL1236SRA | 1/1/84 | 1/1/85 |
| North River Ins. Co. | 5233131099 | 1/1/84 | 1/1/85 |
| Agricultural Excess | XS0005310 | 1/1/84 | 1/1/85 |
| International Ins. Co. | 5220468207 | 1/1/84 | 1/1/85 |
| AIU | 75103181 | 1/1/84 | 1/1/85 |
| First State Ins. Co. | EU936398 | 1/1/84 | 1/1/85 |
| Hudson | HN01339 | 1/1/84 | 1/1/85 |
| Highlands Ins. Co. | SR21955 | 1/1/84 | 12/31/84 |
| AIU | 75103182 | 1/1/84 | 1/1/85 |
| Ins. Co. of North America | XCP155977 | 1/1/84 | 1/1/85 |
| Twin City Fire Ins. Co. | TXS103566 | 1/1/84 | 1/1/85 |
| Harbor Ins. Co. | HI177523 | 1/1/84 | 1/1/85 |
| Royal Ins. Co. of America | ED102351 | 1/1/84 | 1/1/85 |
| Birmingham Fire Ins. Co. of PA | Confirm. No. 2486 | 1/1/84 | 1/1/85 |

**Emhart Corp.**

| Insurer | Policy Number | Start | End |
|---|---|---|---|
| Federal Ins. Co. | 79287725 | 1/1/84 | 1/1/85 |
| Northbrook Ins. Co. | 63009351 | 1/1/84 | 1/1/85 |
| Agricultural Excess | XS0005313 | 1/1/84 | 1/1/85 |
| National Union Fire Ins. Co. of PA | 9608518 | 1/1/84 | 1/1/85 |
| Fireman's Fund Ins. Co. | XLX1620600 | 1/1/84 | 1/1/85 |
| Ins. Co. of North America | XCP155977 | 1/1/84 | 1/1/85 |
| Home Ins. Co. | HXL1574305 | 1/1/84 | 1/1/85 |
| Integrity Ins. Co. | ISX117524 | 12/31/84 | 1/1/86 |
| International Ins. Co. | 5220495117 | 12/31/84 | 1/1/86 |
| Agricultural Excess | XS0005318 | 12/31/84 | 1/1/86 |
| Highlands Ins. Co. | SR22461 | 12/31/84 | 1/1/86 |
| American Insurance Co (The) | XLX1734107 | 12/31/84 | 1/1/86 |
| Aetna Casualty & Surety Co. | 07GL2783725RA | 1/1/85 | 1/1/86 |
| National Union Fire Ins. Co. of PA | 9609033 | 1/1/85 | 1/1/86 |
| Granite State Ins. Co. | 64837108 | 1/1/85 | 1/1/86 |
| AIU | 75104332 | 1/1/85 | 1/1/86 |

Emhart Corp.

| Insurer | Policy Number | Start | End |
| --- | --- | --- | --- |
| Ins. Co. of North America | XCP157252 | 1/1/85 | 1/1/86 |
| Transit Casualty | SCU957062 | 1/1/85 | 1/1/86 |
| Harbor Ins. Co. | HI179770 | 1/1/85 | 1/1/86 |
| Harbor Ins. Co. | HI178585 | 1/1/85 | 1/1/86 |
| National Union Fire Ins. Co. of PA | 9609033 | 1/1/85 | 1/1/86 |
| Aetna Casualty & Surety Co. | 01XN4790WCA | 1/1/85 | 1/1/86 |
| Western Employers | EXJ0018520319 | 1/1/85 | 1/1/86 |
| GAP | | 1/1/85 | 1/1/86 |
| International Ins. Co. | 5220539604 | 1/1/85 | 1/1/86 |
| Aetna Casualty & Surety Co. | 01XN4791WCA | 1/1/85 | 1/1/86 |
| Midland Ins. Co. | XL770880 | 1/1/85 | 1/1/86 |
| Aetna Casualty & Surety Co. | 07GL27E389SCA | 1/1/86 | 1/1/87 |
| Aetna Casualty & Surety Co. | 07XS134304SCA | 1/1/86 | 1/1/87 |
| International Ins. Co. | 5220529119 | 1/1/86 | 1/1/87 |
| GAP | | 1/1/86 | 1/1/87 |
| Great American Surplus Lines | 6CX02743 | 1/1/86 | 1/1/87 |

Emhart Corp.

| Insurer | Policy Number | Start | End |
|---|---|---|---|
| Aetna Casualty & Surety Co. | 01XN5961SCA | 1/1/86 | 1/1/87 |
| GAP | | 1/1/86 | 1/1/87 |
| Pacific Employers Ins. Co. | XCCO17060 | 1/8/86 | 1/1/87 |
| Lexington Ins. Co. | 5528152 | 3/7/86 | 1/1/87 |
| Zurich Ins. Co. | 7321386C | 3/7/86 | 1/1/87 |
| A.C.E. Ins | EMH493 | 4/15/86 | |
| X.L. Ins. Co. | G109HXA | 9/29/86 | |
| Aetna Casualty & Surety Co. | 07GL655354SCA | 1/1/87 | 1/1/88 |
| Aetna Casualty & Surety Co. | 07XS134307SCA | 1/1/87 | 1/1/88 |
| Pacific Employers Ins. Co. | XCC027192 | 1/1/87 | 1/1/88 |
| American Empire Surplus | 7CX03882 | 1/1/87 | 1/1/88 |
| International Ins. Co. | 5220696717 | 1/1/87 | 1/1/88 |
| Pacific Employers Ins. Co. | XCC027192 | 1/1/87 | 1/1/88 |
| International Ins. Co. | 5220409401 | 1/1/87 | 1/1/88 |
| Aetna Casualty & Surety Co. | 01XN6562SCA | 1/1/87 | 1/1/88 |
| Aetna Casualty & Surety Co. | 07GL5000069SCA | 1/1/88 | 1/1/89 |

Embhart Corp.

| Insurer | Policy Number | Start | End |
|---|---|---|---|
| Aetna Casualty & Surety Co. | 07XS134316SCA | 1/1/88 | 1/1/89 |
| American Empire Surplus | 8CX05931 | 1/1/88 | 1/1/89 |
| International Ins. Co. | 5312000376 | 1/1/88 | 1/1/89 |
| Pacific Employers Ins. Co. | XCC027281 | 1/1/88 | 1/1/89 |
| Pacific Employers Ins. Co. | XCC027281 | 1/1/88 | 1/1/89 |
| North River Ins. Co. | 5314000248 | 1/1/88 | 1/1/89 |
| Aetna Casualty & Surety Co. | 01XN6855SCA | 1/1/88 | 1/1/89 |
| National Union Fire Ins. Co. of PA | BE1944888 | 1/1/89 | 1/1/90 |
| Aetna Casualty & Surety Co. | 07GL5000847SCA | 1/1/89 | 1/1/90 |
| Associated International Ins. Co. | 75104848 | 1/1/89 | 1/1/90 |
| Aetna Casualty & Surety Co. | 01XN7212SCA | 1/1/89 | 1/1/90 |
| Aetna Casualty & Surety Co. | 07GL5001775SCA | 1/1/90 | 10/1/90 |
| National Union Fire Ins. Co. of PA | BE1945023 | 1/1/90 | 10/1/90 |

USM Corp.

| Insurer | Policy Number | Start | End |
|---|---|---|---|
| Liberty Mutual Ins. Co. | RG169048555 | 5/18/56 | 11/1/56 |
| Liberty Mutual Ins. Co. | RG169048556 | 11/1/56 | 11/1/57 |
| Liberty Mutual Ins. Co. | RG601290311537 | 11/1/57 | 1/1/59 |
| Liberty Mutual Ins. Co. | RG601290311539 | 1/1/59 | 1/1/60 |
| Liberty Mutual Ins. Co. | RG1612004059010 | 1/1/60 | 1/1/61 |
| Liberty Mutual Ins. Co. | RG1612004059011 | 1/1/61 | 1/1/62 |
| Liberty Mutual Ins. Co. | RG1612004059012 | 1/1/62 | 1/1/63 |
| Liberty Mutual Ins. Co. | RG1612004059013 | 1/1/63 | 1/1/64 |
| Liberty Mutual Ins. Co. | RG1612004059014 | 1/1/64 | 1/1/65 |
| Liberty Mutual Ins. Co. | RG1612004059015 | 1/1/65 | 1/1/66 |
| Liberty Mutual Ins. Co. | RG1612004059016 | 1/1/66 | 1/1/67 |
| Liberty Mutual Ins. Co. | LE1612004059156 | 1/21/66 | 1/1/67 |
| Liberty Mutual Ins. Co. | RG1612004059017 | 1/1/67 | 1/1/68 |
| Liberty Mutual Ins. Co. | LE1612004059157 | 1/1/67 | 1/1/68 |
| Liberty Mutual Ins. Co. | RG1612004059018 | 1/1/68 | 1/1/69 |
| Liberty Mutual Ins. Co. | LE1612004059158 | 1/1/68 | 1/1/69 |

USM Corp.

| Insurer | Policy Number | Start | End |
|---|---|---|---|
| Aetna Casualty & Surety Co. | 06AL121648SR(Y) | 1/1/69 | 11/1/69 |
| Aetna Casualty & Surety Co. | 06XS511SC | 1/1/69 | 1/1/70 |
| Home Ins. Co. | HEC9305389 | 7/15/69 | 1/1/70 |
| Aetna Casualty & Surety Co. | 06AL124360SR(Y) | 11/1/69 | 11/1/70 |
| Aetna Casualty & Surety Co. | 06XS560SC | 1/1/70 | 1/1/71 |
| Home Ins. Co. | HEC9791288 | 1/1/70 | 1/1/71 |
| Ins. Co. of North America | XCP4506 | 1/5/70 | 1/1/71 |
| Aetna Casualty & Surety Co. | 06AL126945SR(Y) | 11/1/70 | 11/1/71 |
| Aetna Casualty & Surety Co. | 06XS596SGA | 1/1/71 | 1/1/72 |
| Home Ins. Co. | HEC9919551 | 1/1/71 | 1/1/72 |
| Liberty Mutual Ins. Co. | LG1612004059211 | 11/1/71 | 11/1/72 |
| Liberty Mutual Ins. Co. | LE1612004059242 | 1/1/72 | 1/1/73 |
| Home Ins. Co. | HEC4165802 | 1/1/72 | 1/1/73 |
| Liberty Mutual Ins. Co. | LG1612004059212 | 11/1/72 | 11/1/73 |
| Liberty Mutual Ins. Co. | LE1612004059243 | 1/1/73 | 1/1/74 |
| United States Fire Ins. Co. | JU0007 | 1/1/73 | 11/1/75 |

USM Corp.

| Insurer | Policy Number | Start | End |
|---|---|---|---|
| Liberty Mutual Ins. Co. | LG1612004059213 | 11/1/73 | 11/1/74 |
| Liberty Mutual Ins. Co. | LE1612004059244 | 1/1/74 | 1/1/75 |
| Liberty Mutual Ins. Co. | LG1612004059214 | 11/1/74 | 11/1/75 |
| Liberty Mutual Ins. Co. | LE1612004059245 | 1/1/75 | 11/1/75 |
| Liberty Mutual Ins. Co. | LG1612004059215 | 11/1/75 | 11/1/76 |
| Liberty Mutual Ins. Co. | LE1612004059435 | 11/1/75 | 11/1/76 |
| North River Ins. Co. | JU0123 | 11/1/75 | 1/1/79 |
| Liberty Mutual Ins. Co. | LG1612004059216 | 11/1/76 | 11/1/77 |
| Liberty Mutual Ins. Co. | LE1612004059436 | 11/1/76 | 11/1/77 |
| Liberty Mutual Ins. Co. | LG1612004059217 | 11/1/77 | 1/1/78 |
| Liberty Mutual Ins. Co. | LE1612004059437 | 11/1/77 | 1/1/78 |
| Aetna Casualty & Surety Co. | 52XN15WCA | 12/20/77 | 1/1/79 |
| Liberty Mutual Ins. Co. | LG1612004059548 | 1/1/78 | 1/1/79 |
| Liberty Mutual Ins. Co. | LE1612004059578 | 1/1/78 | 1/1/79 |

# EXHIBIT

# J

## Nathanson, Lawrence

**From:** Nathanson, Lawrence
**Sent:** Thursday, July 12, 2007 9:28 AM
**To:** Pirozzolo, Jack; 'Weisberger, Adam'; koconnor@hnso.org; 'Harding, John'
**Cc:** Levens, Scott; McKenna & McCormick
**Subject:** FW: Attached image data.

**Attachments:** 63791.pdf

63791.pdf (1 MB)

Dear Counsel:

Attached is a complete copy of the Response of Plaintiff Emhart Industries, Inc. to Defendant North River Insurance Company's First Set of Interrogatories. Please let me know if you have any objection to the admission of this document. If you have an objection, please let me know the basis so I can address it in Century's motion to admit certain exhibits. Thank you for your anticipated cooperation.

Larry Nathanson
-----Original Message-----
From: konicanj2@resmgmt.resolute-midatlantic.com [mailto:konicanj2@resmgmt.resolute-midatlantic.com]
Sent: Thursday, July 12, 2007 5:15 AM
To: Nathanson, Lawrence
Subject: Attached image data.

This is image data from the scanner.

# EXHIBIT

# K

**Nathanson, Lawrence**

---

**From:** Cole, David [DCole@foleyhoag.com]
**Sent:** Wednesday, July 18, 2007 3:19 PM
**To:** koconnor@hnso.org; jharding@morrisonmahoney.com; Nathanson, Lawrence; Levens, Scott
**Cc:** Pirozzolo, Jack; Weisberger, Adam; Nethercott, Elisa
**Subject:** Emhart Indus., Inc. v. Home Ins. Co. et al.
**Attachments:** Biagioni_Designations.pdf; Gregg_Designations.pdf

Counsel:

Attached please find Emhart's objections and counter-designations to Century's designations for the Biagioni and Gregg deposition transcripts.

<<Biagioni_Designations.pdf>> <<Gregg_Designations.pdf>>

In addition, Emhart objects to the admissibility the Response of Plaintiff Emhart Industries, Inc. to Defendant North River Insurance Company's First Set

of Interrogatories to the extent Century seeks to associate it in any way with Ms. Biagioni's testimony. The version of this document that was used at her deposition was, as the record indicates, incomplete. Further, Emhart objects to the admissibility of Interrogatory Nos. 3-10 and Responses 3-10 because they have no relation to the issues before the Court and are irrelevant. Emhart also objects to Interrogatory Nos. 1-2 and Ex. A and Responses 1-2 on relevance grounds because they concern other insurance policies and insurance companies and have no bearing on the issues before the Court.

Regards,
David

**David E. Cole**
FOLEY HOAG LLP | Seaport World Trade Center West | 155 Seaport Boulevard, Boston, Massachusetts 02210 | T 617.832.3055 | F 617.832.7000 | dcole@foleyhoag.com

United States Treasury Regulations require us to disclose the following: Any tax advice included in this document and its attachments was not intended or written to be used, and it cannot be used, for the purpose of avoiding penalties under the Internal Revenue Code.

This email message and any attachments are confidential and may be privileged. If you are not the intended recipient, please notify Foley Hoag LLP immediately -- by replying to this message or by sending an email to postmaster@foleyhoag.com -- and destroy all copies of this message and any attachments without reading or disclosing their contents. Thank you.

For more information about Foley Hoag LLP, please visit us at www.foleyhoag.com.