UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| EMHART INDUSTRIES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, LIBERTY MUTUAL INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICA INSURANCE COMPANY, and UNITED STATES FIRE INSURANCE COMPANY<br><br>Defendants. | CIVIL ACTION<br>NO. CA 02-053S<br><br>**DEFENDANT CENTURY INDEMNITY COMPANY'S MEMORANDUM OF LAW ON THE ISSUES RAISED IN THE COURT'S JULY 5, 2007 ORDER** |

Defendant Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America ("Century"), by its attorneys, submits the following memorandum of law on the issues raised in the Court's July 5, 2007 Order. Section I of this memorandum addresses the issues that the Court raised regarding defense costs. Section II of this memorandum addresses the issues that the Court raised regarding breach of the duty to defend.

## I. DEFENSE COSTS

At the evidentiary hearing, the parties stipulated to the total amount of Emhart's defense costs through October 19, 2006. That amount is $4,740,617.92, which includes the following components: attorneys' fees ($4,104,962.36); law firm disbursements ($303,996.44); and technical consultant fees ($331,659.12). Of that total amount, Century is only responsible for its allocable share of Emhart's reasonable defense costs. This Section discusses how that

amount should be calculated. Section A addresses the appropriate standard for determining whether underlying defense costs are reasonable, and how that standard applies to Emhart's defense costs. Section B addresses when Century's obligation to pay Emhart's defense costs begins. Section C addresses when Century's obligation to pay Emhart's defense costs ends under the Primary Policy and Excess Policy. Section D addresses how Emhart's reasonable defense costs should be allocated to Century's Primary Policy and Excess Policy.[1]

**A. Reasonableness**

**1. The Standard**

In *Liberty Mut. Ins. Co. v. Continental Cas. Co.*, 771 F.2d 579 (1st Cir. 1985), the First Circuit, held that a party seeking reimbursement for underlying defense costs has the burden of proving those costs were in fact reasonable. In so holding, the First Circuit said that the underlying defense costs must be reasonable:

> To apply a lesser standard would be to invite excessive, duplicative, or outrageous charges-charges which were not originally contemplated by the parties to the policy and which, if allowed, might ultimately lead to increased premiums for many purchasers of insurance. We conclude therefore that the district court was correct in putting to the jury the question of whether all or part of the fees and expenses incurred by Robertson and Liberty were reasonable.

*Id.* at 582.

Next, the First Circuit rejected the argument that the party challenging the underlying defense costs has the burden to prove the costs were unreasonable. The court held that the party seeking to recover the underlying defense costs has the burden:

[1] The Court asked whether Century must reimburse Emhart for defense costs above and beyond the Excess Policy's limit of liability. The answer is yes. The limit of liability in both the Primary Policy and the Excess Policy only applies to indemnification costs.

> It is obvious that the party claiming such expenditures has the burden of proving them, including the burden of proving whether the fees were in fact reasonable.

*Id.*

Finally, the First Circuit rejected the argument that the insurer was equitably estopped from contesting the reasonableness of the fees because it had not defended the policyholder. The court held that the insurer had not acted in bad faith, and thus was entitled to challenge the reasonableness of the underlying defense costs:

> Liberty has conceded that Continental did not act in bad faith. Continental formally articulated its refusal to defend Robertson soon after each of the two liability suits was filed, commenced its declaratory judgment action to determine the parties' rights and obligations under the policies, and was, at least in ways that need not be explained here, partially successful in that action. To bar Continental from challenging the reasonableness of the fees incurred by Robertson and Liberty in conducting Robertson's defense would be to penalize Continental for having used legitimate means to determine the limits of its obligations. Equity does not call for such a harsh result.

*Id.*

Similarly, Emhart has not alleged that Century acted in bad faith. Like Continental, Century articulated its coverage positions, sought declaratory relief in this action, and was, in part, successful. By seeking to have the Court determine its contractual obligations, Century should not be barred from challenging the reasonableness of the underlying defense costs. *See also Michaud v. Merrimack Mut. Fire Ins. Co.*, 1994 WL 774683 at *7 (D.R.I. 1994) ("Merrimack is entitled to a hearing on the reasonableness of these defense costs and expenses if the parties fail to reach an agreement thereon.").

The Court asked whether the Rhode Island Supreme Court would, under the circumstances of this case, adopt the reasoning of the Seventh Circuit in *Taco Bell Corp. v.*

*Continental Cas. Co.*, 388 F.3d 1069 (7th Cir. 2004). In that case, Judge Posner held that the underlying defense costs were not subject to review because the policyholder has an incentive to minimize its legal expenses because it could not be sure it would be reimbursed for those expenses. *Id.* at 1076.

The Rhode Island Supreme Court is unlikely to follow *Taco Bell.* It is contrary to the law in this circuit as set forth above. *See Liberty Mutual,* 771 F.2d at 582. Moreover, Judge Posner's decision is based on a school of economic thought, which holds that efficient markets should be allowed to regulate themselves without any governmental interference. It ignores the fact that sometimes decision makers do not behave rationally and other parties should not be required to bear the consequences of those irrational decisions. Other courts have declined to follow *Taco Bell. See e.g., Steadfast Ins. Co. v. Purdue Federick Co.*, 2006 WL 1149207 at *2 (Conn.Super. 2006) ("Connecticut law does not conform with the holding of *Taco Bell,* and this court cannot, as a matter of law, hold that the legal expenditures of Purdue were reasonable."); *Santa's Best Craft, LLC v. St. Paul Fire and Marine Ins. Co.*, 353 F.Supp.2d 966, 974-975 (N.D.Ill. 2005) ("The court does not read *Taco Bell,* however, to hold that the amount of fees paid alone is always sufficient to find fees reasonable as a matter of law, particularly when as here, issues of material fact exist.").

Emhart also cites the Rhode Island Supreme Court's opinion in *Insurance Co. of North America v. Kayser-Roth Corp.*, 770 A.2d 403 (R.I. 2001). That case did not address the reasonableness of underlying defense costs. Instead, it addressed, among other things, whether the insurer could challenge an award of $5.4 million in EPA oversight costs. *Id.* at 418. The court held that the award was not premature and erroneous. The award was based on the testimony of Kayser-Roth's damages expert and, thus, was not speculative. *Id.* at 419. Further,

the court held that the award was not grossly excessive given the magnitude of the EPA's cleanup efforts. *Id.* *Kayser-Roth* does not provide any guidance on whether the Rhode Island Supreme Court would follow *Taco Bell.*

### 2. Application of the Standard: A Portion of Emhart's Defense Costs Are Not Reasonable

In determining whether Emhart has met its burden of proving that its underlying defense costs are reasonable, the Court should consider the following factors: (1) whether the tasks performed were reasonable; (2) whether the rates charges were reasonable; and (3) whether the invoices support the amounts charged. *See Hebela v. Healthcare Ins. Co.,* 370 N.J. Super. 260, 282, 851 A.2d 75, 88 (2004) ("in quantifying the amount of fees and expenses which were reasonably associated with plaintiff's defense of the counterclaim, the trial judge should ascertain the propriety of those fees and expenses by considering whether the hourly rates charged and the time expended were reasonable."). Applying these factors to the facts of this case shows that Emhart cannot prove that a portion of its underlying defense costs was reasonable.

#### a. Some of the defenses Emhart's attorneys pursued had little or no chance of success and, thus, were not reasonable.

Century's expert Larry Silver identified four defenses that Emhart pursued that had little or no chance of success. Continuing to pursue those defenses, after an initial investigation should have revealed they would be a wasted effort, was unreasonable and wasted hundreds of thousands of dollars. Those defenses and the amounts Mr. Silver testified were unreasonable are as follows:

| DEFENSE | UNREASONABLE AMOUNT |
|---|---|
| Emhart claimed it was not a corporate successor to Crown-Metro. | $128,000 |
| Emhart challenged the consent decrees between the EPA and the Brook | $232,000 |



EMHART\071307.SUB

| | |
|---|---|
| Village Limited Partnership and Centredale Manor Limited Partnership. | |
| Emhart filed lawsuits against the Estate of Joseph Buonnano and Bernard Buonnano in federal and state court in Rhode Island. | $481,000 |
| Emhart sought to pierce the corporate veil in the Russell-Stanley bankruptcy proceeding in Delaware. | $256,000 |

These combined amounts ($1,097,000) should be subtracted from the total amount of attorneys' fees ($4,104,962.36), leaving a balance of $3,007,962.36. The percentage of attorney time that was spent on these defenses was 26.7%. That same percentage should be subtracted from the total amount of disbursements ($255,830.55[2]), leaving 73.3% or $187,523.79.

**b. The rates Emhart's attorneys charged were not reasonable.**

Mr. Silver testified that the rates Emhart's attorneys charged were too high. Emhart hired a large law firm in Washington, D.C. for this matter. Mr. Silver opined that Emhart could have hired a small to mid-sized firm in New England that specializes in environmental law. According to Mr. Silver, a firm of that type could have handled this matter equally well at rates that would have been 25% less than the rates Emhart's attorneys charged.[3] Reducing the total amount of attorneys' fees unrelated to defenses that should not have been pursued ($3,007,962.36) by 25% equals $2,255,971.77.

Also, if Emhart had hired a New England firm that specializes in environmental law, it could have significantly reduced its travel expenses. Emhart's attorneys charged $48,165.89 for traveling to and from Washington, D.C. That number should first be reduced to account for the defenses that should not have been pursued. Multiplying $48,165.89 by 73.3% equals $35,305.60. Mr. Silver then discounted that number an additional 75% to account for the

[2] This amount excludes travel costs, which are discussed below separately.
[3] Emhart's expert Christopher Davis agreed that environmental boutique firms in the Boston area charge approximately 25% less than the rates Emhart's attorneys charged.

savings that could have been achieved by hiring a more local firm. Multiplying $35,305.60 by 25% equals $8,826.40.

**c. The invoices do not support the full amount charged.**

Based on his review of the attorney invoices, Mr. Silver opined that approximately 10% of the entries do not support the amounts charged. Mr. Silver's criticisms included, among other things, vague entries, billing in 15 minute increments (which allowed Emhart's attorneys to overcharge for tasks that took less than fifteen minutes to complete), block billing (which made it impossible to check how long it took to complete individual tasks), over-staffing, legal assistants doing secretarial work, and attendance at seminars.[4] Discounting Emhart's attorneys' fees an additional 10% equals $2,030,374.60.

**d. Summary**

The following chart compares the total defense costs Emhart is seeking with the total amount Mr. Silver said is reasonable or Century is not challenging:

| CATEGORY OF FEES AND DISBURSEMENTS | TOTAL AMOUNT OF DEFENSE COSTS EMHART IS SEEKING | TOTAL AMOUNT OF DEFENSE COSTS MR. SILVER SAID WAS REASONABLE OR CENTURY IS NOT CHALLENGING |
|---|---|---|
| Attorneys' Fees | $4,104,962.36 | $2,030,374.60 |
| Disbursements (excluding travel) | $255,830.55 | $187,523.79 |
| Travel | $48,165.89 | $8,826.40 |
| Technical Consultants' Fees[5] | $331,659.12 | $331,659.12 |
| TOTAL | $4,740,609.92 | $2,558,383.91 |

**B. When Century's Obligation to Pay Emhart's Defense Costs Begins.**

In *Michaud v. Merrimack Mut. Fire Ins. Co.*, 1994 WL 774683 at *6 (D.R.I. 1994), Magistrate Judge Lovegreen held that the insurer was not responsible for pre-tender

[4] Mr. Davis also agreed that the invoices do not support the total amount charged. However, he said the percentage that could not be supported was between 3% to 4%.

[5] Century is not challenging the reasonableness of Emhart's technical consulting fees.

defense costs. The underlying action was brought in May 1993. The insurer, however, was not aware of the lawsuit until September 8, 1993. Under those circumstances, Judge Lovegreen held that the insurer was not responsible for the underlying defense costs before September 8, 1993. *Id.* Judge Lovegreen explained the relevant legal principle as follows:

> Coverage for the insured's defense is triggered by knowledge (of the insurer and/or its agents) that the insured has been sued and by knowledge that the insurer's assistance is desired. [Citations omitted.] Thus, an insurer will not be responsible for defense costs incurred prior to the date on which the insured tendered defense to its insurers, or notified it of an opportunity to participate in the defense.

*Id.*

Here, Century was not given any real opportunity to defend Emhart until November 22, 2000. That was when Emhart first gave Century notice under the Crown-Metro policies [PX-24A]. Before that time, Emhart had only given Century notice under four upper level excess liability insurance policies issued to USM and Emhart [PX-18A]. Emhart had advised Century that the underlying coverage had not been eroded, and Emhart had no reason to believe that any Century policy would be implicated [DX-273]. Emhart first demanded a defense from Century on November 22, 2000, after Emhart located the Crown-Metro policies. Century should not be responsible for Emhart's defense costs before that time.

Emhart's total defense costs from June 9, 1999 through November 21, 2000 are $151,713.91. Adjusting that number based on the reasonableness discounts set forth above equals $75,064.25.[6] That amount should be subtracted from the total amount of reasonable costs set forth above ($2,558,383.91), leaving a balance of $2,483,319.66.

[6] To get $75,064.25, Century multiplied $151,713.91 (the total amount of attorneys' fees and disbursements from June 9, 1999 through November 21, 1999) by 73.3% (the discount based on the defenses that should not have been pursued), by 75% (the rate discount), and by 90% (the billing irregularities discount).

**C. When Century's Obligation to Pay Emhart's Defense Costs Ends under the Primary Policy and Excess Policy.**

Under both the Primary Policy and Excess Policy, Century's obligation to pay defense costs terminates when each policy is exhausted. Century's obligation to begin paying defense costs under the Excess Policy begins when the Primary Policy is exhausted. Century and Emhart disagree over whether the Primary Policy has been exhausted.

On the one hand, Century contends that the Primary Policy has never been exhausted because Century has not paid any of Emhart's indemnification costs under that policy. Rhode Island courts have not addressed this issue. However, under the majority rule, an underlying policy does not exhaust until the limits are actually paid. *See e.g., U.S. Fidelity and Guar. Co. v. Federated Rural Elec. Ins. Corp.*, 37 P.3d 828, 832-33 (Okla. 2001) ("Most jurisdictions that have addressed the question have concluded that where an insured has both primary and excess liability insurance, the excess insurer is not responsible to participate in the costs of defense until after the limits of the primary policy are exhausted."); *Weyerhaeuser Co. v. Commercial Union Ins. Co.*, 15 P.3d 115, 135 (Wash. 2001) ("The majority of jurisdictions adhere to the following rule: once the underlying insurer has paid its limits in *settlement or judgments,* the supplemental insurer's obligation to defend arises.").

Furthermore, Century contends that Emhart's indemnification costs should be allocated equally over all of the years that the alleged dioxin contamination occurred from 1940 to 1998. Century would then have no duty to defend Emhart under the Excess Policy until more than $100,000 of indemnification costs is allocated to each year that the alleged property damage allegedly occurred. Century, thus, would have no obligations under the Excess Policy until Emhart first incurred costs in excess of $5.6 million. That has not yet happened.

Also, because Emhart settled with Liberty Mutual, Emhart should first have to exhaust all of Liberty Mutual's coverage, as well as the limits of the Primary Policy, before Century would have any duty to defend under the Excess Policy. *See GenCorp., Inc. v. AIU Ins. Co.*, 138 Fed.Appx. 732, 734 (6th Cir. 2005).

Based on its position, Century would have a duty to defend Emhart under the Primary Policy beginning on November 22, 2000 (the date of tender) and continuing through October 19, 2006 (the date of the jury verdict). The total amount of Emhart's defense costs during that period is $4,588,896.01. The discounted amount, based on Century's arguments set forth above, is $2,483,319.66. Century would have no duty to defend Emhart under the Excess Policy.

On the other hand, Emhart contends that Century had a duty to defend Emhart under the Excess Policy as soon as Emhart incurred indemnification costs in excess of $100,000. Emhart also argues that Century had a duty to defend Emhart under the Excess Policy as soon as Century failed to defend Emhart under the Primary Policy.

The Court appears to have resolved this dispute. On May 1, 2007, the Court entered an Order stating that Century's duty to defend Emhart triggered under the Excess Policy because the "Primary Policy's $100,000 limit of liability was exhausted by October 19, 2006." The Court further stated that OneBeacon's duty to defend Emhart did not trigger because Emhart has not shown that OneBeacon was required to "drop down" and defend Emhart after Century refused to do so. On July 5, 2007, the Court further clarified its May 1, 2007 Order, by stating that the obvious implication of the parties' stipulation that the Emhart had incurred costs in the amount of $711,732.00 is that the Primary Policy had been exhausted before that time.

Based on the Court's orders, it appears that the Court has rejected Century's arguments that coverage under the Primary Policy is not exhausted until Century actually pays out the limits under the Primary Policy. The Court appears to be saying that the Primary Policy became exhausted once Emhart incurred costs in excess of $100,000. It also appears that the Court has rejected Century's other arguments that the indemnification costs should be allocated equally over all of the years that the alleged dioxin contamination took place, and that Emhart should first have to exhaust all of the applicable Liberty Mutual coverage, as well as the limits under the Primary Policy, before Century would have a duty to defend Emhart under the Excess Policy. It also appears that the Court has rejected Emhart's argument that Century had a duty to defend under the Excess Policy as soon as Century failed to defend under the Primary Policy.

If Century's understanding of the Court's Orders is correct, then the date the Primary Policy became exhausted would be October 17, 2001. That is when Emhart incurred indemnification costs in excess of $100,000 [PX-170]. Century would then have a duty to defend Emhart under the Primary Policy from November 22, 2000 (the date of tender) to October 17, 2001 (the date of exhaustion). Emhart's total defense costs during that period are $458,437.03. The discounted value of those defense costs is $226,823.18.

Century would then have a duty to defend Emhart under the Excess Policy from October 18, 2001 (the date after the Primary Policy became exhausted) to October 19, 2006 (the date of the jury verdict). Emhart's total defense costs during that period are $4,130.458.98. The discounted value of those defense costs is $2,256,496.48.

The following chart summarizes Emhart's actual defense costs and discounted defense costs during the applicable periods:

| PERIOD | 6/9/99 to 11/21/90 | 11/22/90 to 10/17/01 | 10/18/01 to 10/19/06 |
|---|---|---|---|
| ACTUAL DEFENSE COSTS | $151,713.91 | $458,437.03 | $4,130,458.98 |
| DISCOUNTED DEFENSE COSTS | $75,064.25 | $226,823.18 | $2,256,496.48 |

## D. Allocation

Century's Primary Policy was in effect for 10 ½ months from February 15, 1969 to January 1, 1970. Century's excess policy was in effect for 13 months from December 1, 1968 to January 1, 1970. In contrast, the alleged property damage at the site allegedly took place from 1940 until it was first discovered in 1998. In further contrast, Emhart and its predecessors have other available primary liability insurance policy at least from January 1, 1970 through January 1, 1986. Despite the period of time over which the alleged property damage took place and the availability of other primary liability insurance policy during that period, Emhart is seeking to recover all of its defense and indemnification costs from Century. That result would be contrary to the plain language of the policies, which limits coverage to property damage that occurs during the policy period. It would also be unfair to Century because it would assign all of the defense and indemnification costs to Century and none to the other insurers who may not have paid their full share of the costs. It would also force Century to file new lawsuits seeking contribution against the other insurers and Emhart, insofar as Emhart has agreed to indemnify those other insurers.

The parties have proposed different methods for allocating Emhart's reasonable defense costs. Each method is discussed below. Section 1 discusses a pro rata allocation of Emhart's defense costs over the period of time the alleged property damage allegedly happened. Section 2 discusses a pro rata allocation of Emhart's defense costs over the period of time that

other primary coverage was available. Section 3 discusses crediting Century for the amount Liberty Mutual actually paid Emhart for the settlement of the Centredale site.

**1. Pro Rata Allocation over the Period the Alleged <u>Property Damage Allegedly Took Place.</u>**

Rhode Island courts have not addressed how defense costs should be allocated when indivisible property damage or bodily injury allegedly takes place over multiple policy periods. Other courts, however, in similar situations have allocated such defense costs on a pro rata basis over the period of time the alleged property damage or bodily injury allegedly happened. *See e.g., Security Ins. Co. of Hartford v. Lumbermens Mut. Cas. Co.*, 264 Conn. 688, 699, 826 A.2d 107, 115 (2003); *Owens-Illinois, Inc. v. United Ins. Co.*, 138 N.J. 437, 473, 650 A.2d 974, 993 (1994); *Gulf Chemical & Metallurgical Corp. v. Associated Metals & Minerals Corp.*, 1 F.3d 365, 372 (5th Cir. 1993); *Commercial Union Ins. Co. v. Sepco Corp.*, 918 F.2d 920, 924 (11th Cir. 1990); *E.E.O.C. v. Southern Pub. Co., Inc.*, 894 F.2d 785, 791-792 (5th Cir. 1990); *Budd Co. v. Travelers Indem. Co.*, 820 F.2d 787, 791 (6th Cir. 1987); *Insurance Co. of North America v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212, 1224-1225 (6th Cir. 1980); *Fireman's Fund Ins. Co. v. Ex-Cell-O Corp.*, 685 F.Supp. 621, 626 (E.D. Mich. 1987).

In this action, the EPA alleges that the alleged property damage at the site began in 1940 – when operations began – and continued until 1998 – when the alleged property damage was first discovered. The Court appears to have held that the alleged occurrence of property damage raises the potential that the alleged property damage was discoverable in the exercise of reasonable diligence during Century's policy periods. Emhart's defense costs should be spread over that entire period.

Spreading Emhart's reasonable defense costs in this fashion, Century would only be responsible for a pro rata share of Emhart's reasonable defense costs based on the months of

coverage divided by the months over which the alleged property damage was allegedly discoverable in the exercise of reasonable diligence. That formula could be applied to the facts of this case as follows:

To determine Century's share under the Primary Policy, the Court should multiply Emhart's reasonable defense costs from November 22, 2000 through October 17, 2001 ($226,823.18) by the months of coverage (10 ½ months), and then divide by the number of months over which the alleged property damage was allegedly discoverable in the exercise of reasonable diligence (696 months). That result would be $3,421.90.

To determine Century's share under the Excess Policy, the Court should multiply Emhart's reasonable defense costs from October 18, 2001 through October 19, 2006 ($2,256,496.48) by the months of coverage (13 months), and then divide by the number of months over which the alleged property damage was allegedly discoverable in the exercise of reasonable diligence (696 months). That result would be $42,147.20.

Under this approach, Century would be liable for $45,569.10.

**2. <u>Pro Rata Allocation over the Period of Time of Available Primary Coverage</u>.**

The only Rhode Island case to address allocation is *Insurance Co. of North America v. Kayser-Roth Corp.*, 770 A.2d 403 (R.I. 2001). In that case, the Rhode Island Supreme Court held that the insurer (First State) was not entitled to a credit for amounts that should be allocated to other policy periods because First State had been barred from offering evidence of policies issued during other policy periods as a discovery sanction. *Id.* at 413. The Rhode Island Supreme Court, however, stated that "a setoff may be applied in an appropriate case." *Id.* at 414.

In discussing what type of setoff might be applied in an appropriate case, the Rhode Island Supreme Court cited with approval the Third Circuit's opinion in *Koppers Co. Inc. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440 (3d Cir. 1996). The Rhode Island Supreme Court said that *Koppers* stands for the proposition that a non-settling insurer is entitled to a credit for a settling insurer's apportioned share of liability:

> In reaching its conclusion, the Third Circuit looked to a case in which the Pennsylvania Supreme Court had held that when multiple primary insurance policies cover an indivisible loss, those insurers would be jointly and severally liable for the loss; the Third Circuit, therefore, predicted that the Pennsylvania Supreme Court would hold that a non-settling insurer would be entitled to reduce the judgment to account for a settling insurer's apportioned shares of liability.

*Kayser-Roth*, 770 A.2d at 414. *See also Town of Cumberland v. Rhode Island Interlocal Risk Management Trust, Inc.*, 860 A.2d 1210, 1218 (R.I. 2004) ("in *Kayser-Roth*, we cited *Koppers* for the principle that 'non-settling insurers are entitled to a setoff of settlement amounts received by the insured or to a proportional credit for those shares that would have been allocated to the settling insurer.'").[7]

Based on *Koppers*, Century would be entitled to a credit for the settling insurers' apportioned shares of liability. That result makes sense because Emhart should be responsible for any settlements it made. If Emhart settled with other insurers for less than those other insurers' full shares, Emhart should bear the consequences of its decision to settle with those

[7] Rhode Island applies a similar rule to cases involving liability among joint tortfeasors, when one tortfeasor settles. Under that circumstance, the release of one joint tortfeasor "reduces the claim against the other tortfeasors in the amount of the consideration paid for the release, or in any amount or proportion by which the release provides that the total claim shall be reduced, if greater than the consideration paid." RI ST § 10-6-7. This rule is based "upon the fundamental doctrine that an injured person is entitled to only one satisfaction of the tort, even though two or more parties contributed to the loss." *Augustine v. Langlais*, 121 R.I. 802, 805, 402 A.2d 1187, 1189 (1979). Consistent with that principle, Emhart's claim against Century should be reduced by the amounts other settling insurers paid or by their allocable shares, whichever is greater.

other insurers. Emhart accepted the risk that the apportioned shares of those other insurers would be less than the amounts of the settlements.

Century issued a policy to Crown-Metro beginning on December 1, 1968. Liberty Mutual Insurance Company and Aetna Casualty & Surety Company issued primary liability insurance policies to USM and Emhart from 1970 to 1986. Century's share, thus, should be based on its month of coverage divided by the total months of coverage (205 months). That formula can be applied to the facts of this case as follows:

To determine Century's share under the Primary Policy, the Court should multiply Emhart's reasonable defense costs from November 22, 2000 through October 17, 2001 ($226,823.18) by the months of coverage (10 ½ months), and then divide by the total number of months of coverage (205 months). That result would be $11,617.77.

To determine Century's share under the Excess Policy, the Court should multiply Emhart's reasonable defense costs from October 18, 2001 through October 19, 2006 ($2,256,496.48) by the months of coverage (13 months), and then divide by the total number of months of coverage (205 months). That result would be $143,094.90.

Under this second approach, Century's total exposure would be $154,712.67.

**3. <u>Liberty Mutual</u>**

**[See Section One of Defendant Century Indemnity Company's Supplemental Memorandum of Law on the Issues Raised in the Court's July 5, 2007 Order, filed under seal.]**

## II. <u>BREACH OF THE DUTY TO DEFEND</u>

This Section addresses the issues the Court raised concerning *Conanicut Marine Services, Inc. v. Insurance Co. of North America,* 511 A.2d 967 (1986). Section A discusses the

facts and holding of *Conanicut,* the cases it relied upon, the cases that have followed, and why the Rhode Island Supreme Court would not apply that rule in the context of this case. Section B shows that *Conanicut* does not apply to the facts of this case because Century did not refuse to defend Emhart under either the Primary Policy or the Excess Policy before seeking declaratory relief. Section C discusses damages.

**A. *Conanicut***

In *Conanicut,* the policyholder sought coverage under a "Boat Dealers/Repairs And Marina Operators Policy" for a personal injury lawsuit filed against the policyholder based on negligence. The insurer refused to defend on the ground that the policy was a contract of indemnity and not a general liability policy. As a result, the policyholder filed a petition for a declaratory judgment. Two years later, the policyholder settled the underlying claim for $18,000, plus attorneys' fees and costs. The policyholder then filed a separate lawsuit against the insurer to recover its costs and expenses.

On appeal of the coverage action, the Rhode Island Supreme Court addressed two issues. The first was whether the contract of insurance is a general liability policy or a policy of indemnity. The second was whether the insurer was required to pay the $18,000 settlement.

On the first issue, the Rhode Island Supreme Court held that the insurance contract was a general liability policy and that the insurer had a duty to defend. On the second issue, the insurer argued that it should not be required to pay the $18,000 because it had not had an opportunity to contest the issue of coverage. The issue upon which coverage turned – whether the insured's employee involved with the claim was properly licensed – was material to the underlying negligence claim against the insured. The court rejected the insurer's argument holding that:

> where an insurer refuses to defend an insured pursuant to a general-liability policy, the insurer will be obligated to pay, in addition to the costs of defense and attorneys' fees, the award of damages or settlement assessed against the insured.

*Id.* at 971.

The Rhode Island Supreme Court held that the insurer could have taken one of two actions to avoid becoming liable for any damages or settlement assessed against the policyholder. First, the insurer could have defended the underlying claim pursuant to a non-waiver agreement. Second, the insurer could have sought declaratory relief:

> We note that defendant could have exercised one of two options instead of completely refusing to defend plaintiff. It could have entered into a nonwaiver agreement with plaintiff whereby it agreed to defend plaintiff and plaintiff recognized the right of defendant to question coverage, or defendant could have brought an action against plaintiff for a declaratory judgment on the question of coverage.

*Id.* at 971 n.10.

In reaching its decision, the Rhode Island Supreme Court relied upon only two cases, a 1958 decision from the Supreme Court of California, *Comunale v. Traders & General Ins. Co.,* 50 Cal.2d 654, 328 P.2d 198 (1958), and the decision of the Supreme Judicial Court of Massachusetts in *Saragan v. Bousquet,* 322 Mass. 14, 75 N.E.2d 649 (1947). Neither of these decisions supports application of *Conanicut* to the present case. *Comunale* allowed the policyholder to recover indemnity costs in excess of policy limits. However, that case dealt with a far different situation than is presented between Century and Emhart. In *Comunale,* the insurer not only refused to defend. It also refused to settle the underlying claim within policy limits. Based on that second refusal, the California Superior Court said the insurer was responsible for damages in excess of the policy's limits:

> It follows from what we have said that an insurer, who wrongfully declines to defend **and who refuses to accept a reasonable settlement within the policy limits** in violation of its duty to consider in good faith the interest of the insured in the settlement, is liable for the entire judgment against the insured even if it exceeds the policy limits.

*Id.* at 661, 328 P.2d at 202 (emphasis added).

Clearly, *Comunale* does not support application of the *Conanicut* holding to the dispute between Century and Emhart. Nor do other California decisions. In a case in which the insurer only refused to defend and did not refuse to settle the underlying claim within the policy limits, the California Supreme Court made clear that the insurer would not be responsible for any settlements or judgments in excess of policy limits:

> The decisive factor in fixing the extent of Traders' liability is not the refusal to defend; it is the refusal to accept an offer of settlement within the policy limits. **Where there is no opportunity to compromise the claim and the only wrongful act of the insurer is the refusal to defend, the liability of the insurer is ordinarily limited to the amount of the policy plus attorneys' fees and costs.** [Citation omitted.] In such a case it is reasoned that, if the insured has employed competent counsel to represent him, there is no ground for concluding that the judgment would have been for a lesser sum had the defense been conducted by the insurer's counsel, and therefore it cannot be said that the detriment suffered by the insured as the result of a judgment in excess of the policy limits was proximately caused by the insurer's refusal to defend. [Citation omitted.] This reasoning, however, does not apply where the insurer wrongfully refuses to accept a reasonable settlement within the policy limits.

*Id.* at 659-660, 328 P.2d at 201 (emphasis added).

In *Saragan,* the second decision relied upon by *Conanicut,* both liability in the underlying matter and coverage turned upon the same issue, whether the claimant was acting as an employee at the time of her injury. Under the jury instructions provided, the jury verdict in favor of the underlying claimant required a jury finding that the claimant was acting as an

employee. If binding on the insurer, that finding also established coverage. The Massachusetts Supreme Judicial Court held that both the policyholder and the insurer, whether the insurer defends or not, were bound by that finding:

> It is settled, where the original action is ostensibly within the terms of the policy, that whether the insurer assumes the defense or refuses so to do without legal justification, the insurer and the plaintiff are bound by the result of that action as to all matters decided therein material to recovery by the plaintiff.

*Id.* at 19, 75 N.E.2d at 652.

*Saragan*, thus, helps explain the rationale behind *Conanicut.* An insurer that refuses to defend without seeking declaratory relief or entering into a non-waiver agreement should not be allowed to relitigate issues of fact that were either decided or could have been decided in the underlying action. That rationale has no application in the context of insurance coverage for Superfund liability because coverage issues are irrelevant to such liability. Under Superfund, Emhart, as a former operator at the site, is strictly liable for the contamination at the site. In contrast, Century denied coverage on the ground that the dioxin contamination at the site was not discoverable in the exercise of reasonable diligence during Century's policy period. That issue and other coverage issues are not relevant to the underlying Superfund action and never would have been addressed in it. As such, Century should not be precluded from litigating those other issues in a separate coverage action.[8]

*Conanicut* was decided in 1986. Since that time, only one recorded Rhode Island court has followed that opinion. That was Magistrate Judge Lovegreen's Report and Recommendation in *Michaud v. Merrimack Mut. Fire Ins. Co.*, 1994 WL 774683 (D.R.I. 1994). In *Michaud,* the insurer refused to defend, without entering into a non-waiver agreement or

[8] The Court asked whether any of the current EPA orders qualifies as a "judgment" or "settlement" as required by *Conanicut.* Century contends that the EPA's administrative action is not a "suit." In that context, the EPA orders are not "judgments" or "settlements."

seeking a declaration. Although critical of *Conanicut,* Judge Lovegreen said he was bound to follow it. He entered a judgment against the insurer for the amount of the underlying settlement. *Id.* at *9. To Century's knowledge, no Rhode Island court has ever entered a judgment against an insurer based on *Conanicut* in excess of policy limits or for future judgments or settlements entered after the court had found that the underlying claim was not covered.

Furthermore, neither *Conanicut* nor *Michaud* hold that an insurer must indemnify claims that do not involve occurrences during the policy period. Nor do they hold that an insurer may be liable for benefits or limits beyond those expressly stated in the written insurance contract. The Rhode Island Supreme Court has subsequently made very clear that the doctrine of equitable estoppel is not to be employed so as to expand the general scope of the insurance or to expand the benefits afforded by the coverage. *Zarrella v. Minnesota Mutual Life Ins. Co.,* 824 A.2d 1249, 1260 (R.I. 2003).

In *Conanicut*, the accident occurred on a boat and during the period of the insurance policy, so there was no question that the claim came within the general insurance grant. The insurer refused to defend on two grounds: first, the policy did not provide a duty to defend but was instead an indemnity policy; second, the claim was excluded from coverage due to the policyholder's breach of a warranty condition. Before applying the doctrine of estoppel, the court first determined that the claim came within the general scope of the insurance contract. In the second and third paragraphs of the decision, the court observed that "[t]he facts are not in dispute. The plaintiff purchased an insurance policy … in effect during the period April 18, 1980 to April 18, 1981. The incident … occurred **at the Marina on August 31, 1980** …." *Id.* at 968-969 (emphasis added). The court did not generally extend the policy's coverage, but instead refused to consider a policy exclusion contained in a warranty.

The court in *Conanicut* did not hold that the insurer must pay for a settlement of a claim involving an occurrence outside of the policy period. Indeed, were a court to apply estoppel in such a manner, an insurer that provided coverage to a marina for occurrences during 1980 would be required to defend claims (or pursue declaratory relief) arising from a boat accident occurring during 2000 if the underlying complaint was silent as to the date of the accident. Rather than creating coverage where the claim is not within the general grant of coverage, the court in *Conanicut* applied the general rule and precluded the insurer from relying upon the policy exclusion, but only after first determining that the underlying claim was *in fact* (not merely potentially) within the general insurance grant.

Similarly, in *Michaud*, the court first observed that **"[t]here is no dispute that the alleged activity occurred during the policy period and in the covered territory."** 1994 WL 774683 at *4 (emphasis added). The court then proceeded to find that the underlying complaint included two claims that could potentially be covered because the damages were potentially not expected or intended or because the claim involved an alleged invasion of the right of private occupancy.

These cases are consistent with the general principle that the doctrine of equitable estoppel may not be used to create coverage beyond the scope of the Insuring Agreement of a liability policy. Instead, where applicable, the doctrine precludes an insurer from relying upon policy exclusions or conditions where, due to the insurer's wrongful conduct, enforcement of the coverage exclusion would be prejudicial to the policyholder. The general rule in applying equitable estoppel to insurance contracts is that "estoppel may be used defensively to prevent a forfeiture of insurance coverage, but not affirmatively to create or extend coverage." *Crown Life Ins. Co. v. McBride*, 517 So.2d 660, 661 (Fla. 1987). The general rule does not "aid a litigant in

gaining something, but only in preventing a loss. In other words, it will not avail in offense, but only in defense." *Id.* (quoting *Kerivan v. Fogal,* 156 Fla. 92, 96, 22 So.2d 584, 586 (1945)). Thus, the doctrine of equitable estoppel cannot be used to create coverage for a claim based on property damage or bodily injury outside of the relevant policy period. *See Interstate Idem. Co. v. Continental Ins. Co.*, 1998 WL 118165 at *5 (S.D.N.Y. 1998) (insurer not estopped from asserting that policy did not provide coverage during the relevant policy period); *Wausau Ins. Companies. v. Feldman,* 213 A.D.2d 179, 180 (N.Y.A.D. 1 Dept. 1995) (because insurer did not insure doctor at the time of the purported malpractice, it could not be forced to defend him).

Rhode Island follows the general rule and does not permit the use of estoppel to create insurance coverage where it actually does not exist. *Zarrella.*, 824 A.2d at 1260 (equitable estoppel may not be used "to expand the scope of coverage of an insurance policy"); *Anderson v. Polleys,* 54 R.I. 296, 173 A. 114 (1934). In *Zarella,* the Rhode Island Supreme Court held that the following elements must be established for a policyholder to be entitled to estoppel: (1) that he was misled by the acts or statements of the insurer or its agent; (2) reliance by the insured on those representations; (3) that such reliance was reasonable; and (4) detriment or prejudice suffered by the insured based on the reliance." 824 A.2d at 1260. Even if these elements are established, "[t]he court, however, may not invoke the doctrine of equitable estoppel to expand the scope of coverage of an insurance policy." *Id.* Finally, the doctrine may not be applied "when the parties are bound by an express contract." *Id.* The Supreme Court held that the policyholder could not prevail on the estoppel theory:

> In this case, the trial justice held that the doctrine of equitable estoppel did not apply because the plaintiff and defendant had an express, unambiguous insurance contract. **Because the doctrine of equitable estoppel shall not apply to unambiguous contracts or to enlarge the scope of insurance benefits**, there are no set of facts under which plaintiff could prevail on this theory.

*Id.* (emphasis added).

*Zarrella* prohibits using equitable estoppel to enlarge the scope of insurance benefits. The policyholder in *Zarrella* attempted to use estoppel to obtain greater policy benefits than were set forth in the written contract. The Rhode Island Supreme Court made clear that there are "**no set of facts**" that would permit a policyholder to employ estoppel to increase the policy benefits beyond those set forth, unambiguously, in the written insurance policy. 824 A.2d at 1260-1261. This ruling by the Rhode Island Supreme Court is directly contrary to Emhart's creation of coverage, with no limits, through estoppel. *Conanicut* does not go so far and, if it had, would be inconsistent with the holding of *Zarrella.* Century has found no case that allows the doctrine of equitable estoppel to trump a jury's determination that the policyholder cannot establish an elementary requirement contained in the general insuring agreement of the written insurance contract. The Rhode Island Supreme Court has instructed that the equitable estoppel doctrine has very limited application and cannot be employed to expand coverage in the fashion proposed by Emhart.

The Supreme Judicial Court of Rhode Island would not apply *Conanicut* to the facts presented in this case because, as set forth above, the underlying rationale of *Conanicut* does not apply to those facts and because to apply *Conanicut* would be contrary to established Rhode Island law requiring a causal link between a breach of contract and recoverable damages. *Wells v. Uvex Winter Optical, Inc.*, 635 A.2d 1188, 1193 (R.I. 1994); *Rhode Island Turnpike and Bridge Authority v. Bethlehem Steel Corp,* 119 R.I. 141, 165, 379 A.2d 344, 357 (R.I. 1977). Courts from other jurisdictions have criticized *Conanicut* and have refused to follow it for just this reason. *See Flannery v. Allstate Ins. Co.*, 49 F.Supp.2d 1223, 1229 (D. Colo. 1999); *Sentinel Ins. Co., Ltd. v. First Ins. Co. of Hawai'i, Ltd.*, 76 Hawai'i 277, 294-295, 875 P.2d 894, 911-912

(1994); *Poloroid Corp. v. Travelers Indem. Co.*, 414 Mass. 747, 763, 610 N.E.2d 912. 921 (1993). These courts require some proof that the refusal to defend resulted in the settlement or judgment. The Court in this case should apply this same rule. The damages recoverable for breach of the duty to defend are those proximately caused by that breach.

Adoption of this rule will not leave policyholders without a remedy for an insurer's refusal to defend. Where that refusal was incorrect, a policyholder can recover all resulting damages. Where that refusal was unfair or unreasonable in some respect, other statutory remedies may be available to the insured.

### B. ***Conanicut* Does Not Apply to the Facts of this Case Because Century Sought Declaratory Relief before Refusing to Defend Emhart under the Primary Policy and Excess Policy.**

Even if it were appropriate to apply *Conanicut* in this case, for it to apply, an insurer must first refuse to defend without seeking declaratory relief. That did not happen here. The undisputed facts show that Century sought declaratory relief before refusing to defend Emhart under the Primary Policy and Excess Policy.

Emhart first provided notice of the Centredale site to Century in July 1999. That notice listed four upper level excess policies issued to USM and Emhart. It did not list any policies issued to Crown-Metro. In February 2000, Emhart advised Century that the underlying coverage had not been eroded, and Emhart had no reason to believe that any Century policy would be implicated.

In November 2000, Emhart sent Century the Excess Policy and demanded a defense under that policy, and under any other policy issued to Crown-Metro. Century initially denied coverage under the Excess Policy because Emhart was not a named insured under that policy, but then retracted that denial a few weeks later when Emhart provided additional

information. At that time, the underlying coverage had not been eroded. Century then advised Emhart that Century would have no obligation under the Excess Policy until the underlying limits were exhausted and demanded proof of exhaustion. Emhart paid over $100,000 in indemnity by October 17, 2001, but did not advise Century it had paid that amount until after this lawsuit was filed. Century denied coverage under the Excess Policy in the context of this lawsuit. *See L.A. Connection v. Penn-America Ins. Co.*, 363 Ill.App.3d 259, 263, 843 N.E.2d 427, 431 (Ill. App. 3 Dist.), *appeal denied by*, 219 Ill.2d 567, 852 N. E.2d 240 (2006) (insurer "fulfilled its obligations by filing its answer and cross-claim to plaintiff's declaratory action."). Century had not been advised that the underlying coverage had been exhausted before that time.

In January 2001, Century conducted a search for any and all general liability insurance policies issued to Crown-Metro. No policies were found. After this lawsuit was filed, Century conducted a second search. As a result of that second search, Century located the Primary Policy. Century was not aware of the Primary Policy before that time. After finding the Primary Policy, Century sent a copy to Emhart and filed a motion in this action to assert a claim for declaratory relief under the Primary Policy. After filing its motion, Century denied coverage.

Emhart contends that notice under one policy constitutes notice under any and all policies. Thus, Century had a duty to defend Emhart under the Primary Policy when Century first received notice of the Centredale site in July 1999. Century, however, is not claiming it did not receive notice of the site. Instead, Century contends it did not refuse to defend under the Primary Policy at that time. A refusal to defend is different than a failure to defend. To refuse to defend, Century would have to know about the Primary Policy and that Century had an obligation to defend under that policy. That way, Century could have entered into a non-waiver agreement or sought declaratory relief as required by *Conanicut.* Century could not have refused

to defend under a policy it did not know about. Once Century learned about the Primary Policy, it did seek declaratory relief. Thus, *Conanicut* does not apply.

Emhart also suggests that Century was negligent in not locating the Primary Policy earlier. But, again, a refusal to defend is not the same as a failure to defend. A refusal requires a knowing and deliberate act. Century could not have refused to defend under the Primary Policy before it first became aware of the policy. For *Conanicut* to apply, the insurer must refuse to defend. Because Century did not do so until after it sought declaratory relief, *Conanicut* does not apply.

In *L.A. Connection*, the court held that an insurer must seek declaratory relief within a reasonable period of time. 363 Ill.App.3d at 265, 843 N.E.2d at 432. Century did so. When Century discovered the Primary Policy, this lawsuit was already pending and the relevant coverage issues had already been raised. Emhart advised Century it would move to amend its pleadings to include the Primary Policy. When Emhart did not, Century did so. When Century moved to assert a counterclaim based on the Primary Policy, the underlying claim was not close to being resolved. That is still true today.

**C. <u>Damages</u>**

As discussed above, Century did not refuse to defend Emhart before seeking declaratory relief under the Primary Policy and Excess Policy. Thus, Emhart is not entitled to any damages based on *Conanicut*. However, even if the Court was to find that Century did refuse to defend Emhart before seeking declaratory relief under either the Primary Policy or Excess Policy, Emhart would still not be entitled to any damages based on *Conanicut* because Emhart has not established any link between Century's refusal to defend and any amounts Emhart has been required to pay or will pay.

The *Conanicut* rule is not intended to be punitive. Rhode Island has a separate statute that governs punitive damages for insurer bad faith. RI ST § 9-1-33; *see Skaling v. Aetna Ins. Co.*, 799 A.2d 997 (R.I. 2002). As discussed above, the purpose of *Conanicut* is to bar an insurer from relitigating an issue that arose or could have arisen in the underlying action. That purpose is not applicable here because the issues on which Century ultimately denied coverage, and upon which the jury ultimately agreed that the underlying claim was not covered, are not relevant in the underlying action. Thus, for Century to be liable for Emhart's indemnification costs, Emhart must first establish some link between Century's refusal to defend and the amounts Emhart paid.

Here, Emhart cannot establish any such link. Emhart hired defense counsel on its own and pursued an extremely vigorous defense. Emhart has not paid any amounts it would not otherwise have been required to pay. Hence, none of the amounts Emhart paid are related in any way to Century's alleged refusal to defend. Thus, Century should not be liable for these costs.

If the Court holds that Emhart does not have to prove any such link, then Emhart's damages should be limited to the amount it paid before the jury verdict. The jury found that the dioxin contamination at the Site was not discoverable during the exercise of reasonable diligence during Century's policy period. Based on that finding, the Court held that Century has no continuing duty to defend Emhart. Thus, any amounts that Emhart may be required to pay in the future cannot be related to Century's wrongful refusal to defend Emhart. Century has no such duty going forward. Thus, Century should not be liable for these costs.[9]

[9] The Court asked whether *Conanicut* damages may reflect indemnity costs beyond October 19, 2006, and, if so, describe the affect that would have on the calculation of damages for present purposes. Century contends it should not be responsible for any costs beyond October 19, 2006. If the Court disagrees, it could enter a declaratory judgment stating that Century would be responsible for any future damages.

In no event should Century be obligated to pay any amounts in excess of the Primary Policy's and the Excess Policy's limits. As discussed above, no Rhode Island court in a recorded decision has ever awarded *Conanicut* damages in excess of policy limits. The case that *Conanicut* cites with respect to awarding costs in excess of policy limits was a case in which the insurer refused an offer to settle within policy limits. That did not happen here. The EPA has not offered to settle within the limits of the Century policies. If the EPA had offered to settle for $1.1 million, Emhart certainly would have accepted. Thus, Century should not be responsible for any amounts Emhart may be required to pay in excess of policy limits.

Finally, Emhart's proposed reading of *Conanicut* would violate the Due Process Clause of the United States Constitution. Under Emhart's proposed reading, Century – which issued a primary policy limited to $100,000 per occurrence and an excess policy limited to $1 million per occurrence – would be stripped of all coverage defenses, and required to provide limitless coverage under that policy, at a site where Emhart's witnesses have estimated the company's ultimate liabilities may amount to hundreds of millions of dollars. The gross disproportionality of such an award is obvious. *See Cooper Industries. v. Leatherman Tool Group, Inc.*, 532 U.S. 424 (2001); *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996). It is particularly egregious on the facts of this case, where a jury has found that Century has a valid and legitimate defense to coverage, and where – absent the punitive provisions that Emhart reads *Conanicut* to embody – Century would have no indemnity exposure whatsoever under its policy.

To permit such grossly excessive and arbitrary damages, untethered to any underlying contractual liability, would raise significant due process concerns. *See State Farm Mut. Ins. Co. v. Campbell*, 538 U.S. 408 (2003) (striking down $145 million punitive damage award against insurance carrier, where jury held that plaintiff was entitled to only $1 million in

compensatory damages). Because Emhart's position would impose limitless liability on insurers – up to the full amount of a policyholder's settlement – in a wholly arbitrary and open-ended fashion – it is repugnant to the constitutional interests identified in *State Farm*, and cannot survive.

**[See Section Two of Defendant Century Indemnity Company's Supplemental Memorandum of Law on the Issues Raised in the Court's July 5, 2007 Order.]**

Dated: July 31, 2007

McKENNA & McCORMICK

By: /s/ James T. McCormick
James T. McCormick (#2614)
McKENNA & McCORMICK
128 Dorrance Street, Suite 330
Providence, RI 02903
(401) 831-2970

- and -

Lawrence A. Nathanson
Scott E. Levens
SIEGAL, NAPIERKOWSKI & PARK
533 Fellowship Road, Suite 120
Mt. Laurel, NJ 08054
(856) 380-8910

Attorneys for Defendant Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America

**CERTIFICATE OF SERVICE**

I hereby certify that on July 31, 2007, a copy of the foregoing Defendant Century Indemnity Company's Memorandum of Law on the Issues Raised in the Court's July 5, 2007 Order was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

By: /s/ James T. McCormick

James T. McCormick (#2614)
McKENNA & McCORMICK
128 Dorrance Street, Suite 330
Providence, RI 02903
(401) 831-2970