UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| EMHART INDUSTRIES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, LIBERTY MUTUAL INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICA INSURANCE COMPANY, and UNITED STATES FIRE INSURANCE COMPANY<br><br>Defendants. | CIVIL ACTION<br>NO. CA 02-053S<br><br>**DEFENDANT CENTURY INDEMNITY COMPANY'S REVISED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

Pursuant to the Court's July 5, 2007 Order, defendant Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America ("Century"), submits the following revised proposed findings of fact and conclusions of law:

## FINDINGS OF FACT

### THE PARTIES

1. Plaintiff Emhart Industries, Inc. ("Emhart") is a Connecticut corporation with its principal place of business in Towson, Maryland. Emhart is a wholly owned subsidiary of Black & Decker, Inc. [Stipulation of Facts, Section I, ¶ 1.][1]

2. Century is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania [Stipulation of Facts, Section I, ¶ 2].

[1] The parties submitted the Stipulation of Facts to the Court on September 8, 2006. The Stipulation of Facts was marked and admitted into evidence at the evidentiary hearing as Exhibit 38 [Tr. (6/26/07) at 8-10].

**CENTURY'S POLICIES**

3. Century issued Policy No. GAL 36597 ("Century's 1969 primary policy") to Crown-Metro, Inc. ("Crown-Metro"), which was in effect during the period from February 15, 1969 to January 1, 1970. The limits under Century's 1969 primary policy are $100,000. [Stipulation of Facts, Section I, ¶ 3.]

4. Under the insuring agreement, Century agreed to defend any suit against Crown-Metro seeking damages on account of property damage caused by an "occurrence [PX-2 at CIC 0483]."

5. An "occurrence" is defined as "an accident, including injurious exposure to conditions, which results, **during the policy period**, in bodily injury or property damage neither expected nor intended from the standpoint of the insured [PX-2 at CIC 0478 (emphasis added)]."

6. The insuring agreement further provides that "[Century] shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of [Century's] liability has been exhausted by payment of judgments or settlements [PX-2 at CIC 0483]."

7. Century issued Policy No. XBC 46961 ("Century's 1969 excess policy") to Crown-Metro, which was in effect during the period from December 1, 1968 to January 1, 1970 [Stipulation of Facts, Section 1, ¶ 7, as modified at trial after the close of evidence].

8. Under the insuring agreement, Century agreed that if the limits of liability of the underlying insurance are exhausted because of property damage during the policy period, Century would defend any suit seeking damages against Crown-Metro on account of property damage caused by an "occurrence [PX-1 at CIC 0154]."

9. An "occurrence" is defined as "an injurious exposure to conditions which results, **during the policy period**, in personal injury, property damage or advertising injury neither expected nor intended from the standpoint of the insured [PX-1 at CIC 0155 (emphasis added)].

10. Emhart succeeded to the rights and benefits of Century's 1969 Primary Policy and Century's 1969 Excess Policy [Order, 5/1/07].[2]

**OTHER PRIMARY POLICIES**

11. The relevant time period for which Emhart is seeking coverage is from 1940 up until the present [Biagioni D-X (Tr. 7/10/07) at 12-14].

12. The Hartford Insurance Company provided insurance to Metro-Atlantic Chemical Company [Biagioni D-X (Tr. 7/10/07) at 14-16]. A lawsuit is pending between Emhart and Hartford involving coverage for the Centredale site in Rhode Island. That lawsuit is dormant. [Biagioni D-X (Tr. 7/10/07) at 16.]

13. The Aetna Casualty and Surety Company issued Policy No. 06AL124360 to USM Corporation ("USM") for the period from November 1, 1969 to November 1, 1970. The limits under the policy are $2 million. [DX-3.]

14. The Aetna Casualty and Surety Company issued Policy No. 06AL126945 to USM for the period from November 1, 1970 to November 1, 1971. The limits under the policy are $2 million. [DX-8; Biagioni D-X (Tr. 7/10/07) at 18.]

[2] Century disagrees with the Court's finding and reserves its right to challenge that finding on appeal or otherwise.

15. Liberty Mutual Insurance Company ("Liberty Mutual") issued Policy No. LGI-612-004059-211 to USM for the period from November 1, 1971 to November 1, 1972. The limits under that policy are $2 million. [Stipulation of Facts, Section II.B, ¶ 1.][3]

16. Liberty Mutual issued Policy No. LGI-612-004059-212 to USM for the period from November 1, 1972 to November 1, 1973. The limits under that policy are $2 million. [Stipulation of Facts, Section II.B, ¶ 3.]

17. Liberty Mutual issued Policy No. LGI-612-004059-213 to USM for the period from November 1, 1973 to November 1, 1974. The limits under that policy are $2 million. [Stipulation of Facts, Section II.B, ¶ 5.]

18. Liberty Mutual issued Policy No. LGI-612-004059-214 to USM for the period from November 1, 1974 to November 1, 1975. The limits under that policy are $2 million. [Stipulation of Facts, Section II.B, ¶ 7.]

19. Liberty Mutual issued Policy No. LGI-612-004059-215 to USM for the period from November 1, 1975 to November 1, 1976. The limits under that policy are $2 million. [Stipulation of Facts, Section II.B, ¶ 9.]

20. Liberty Mutual issued Policy No. LGI-612-004059-216 to USM for the period from November 1, 1976 to November 1, 1977. The limits under that policy are $2 million. [Stipulation of Facts, Section II.B, ¶ 11.]

21. Liberty Mutual issued Policy No. LGI-612-004059-217 to USM for the period from November 1, 1977 to January 1, 1978. The limits under that policy are $2 million. [Stipulation of Facts, Section II.B, ¶ 13.]

[3] Section II.B of the Stipulation of Facts were made subject to the ruling on Emhart's motion in limine regarding insurance policies issued by Liberty Mutual. That motion was resolved based on Emhart's and Century's agreement to waive their right to a jury trial on the issues relating to the Liberty Mutual policies.

22. Liberty Mutual issued Policy No. LGI-612-004059-548 to USM for the period from January 1, 1978 to January 1, 1979. The limits under that policy are $2 million. [Stipulation of Facts, Section II.B, ¶ 15.]

23. The Aetna Casualty & Surety Company issued primary liability insurance policies to Emhart from January 1, 1979 to January 1, 1985 [Biagioni D-X (Tr. 7/10/07) at 21; Response of Plaintiff Emhart Industries, Inc. to Defendant North River Insurance Company's First Set of Interrogatories].

**THE UNDERLYING CLAIM**

24. The Centredale Manor Restoration Superfund Site ("Site") consists of two parcels located at 2072 and 2074 Smith Street in the Village of Centredale in North Providence, Rhode Island ("Smith Street Section of the Site"). The parcels, which total 9.7 acres, presently house two high-rise apartments known as Brook Village and Centredale Manor. The Site also extends on the ten-year floodplain of the Woonasquatucket River south to the Allendale Dam. On the eastern portion of the land comprising the Site there is a drainage swale or "tail race" that ultimately empties into a wooded wetland to the south. The Woonasquatucket River flows along the western portion of the Site. [Stipulation of Facts, Section I, ¶ 10.]

25. On June 17, 1999, the EPA sent a Request for Information, pursuant to Section 104 of CERCLA and Section 3007 of RCRA, to Black and Decker Corporation regarding the Site [Stipulation of Facts, Section I, ¶ 59].

26. The Request for Information stated that the period being investigated is 1940 to 1986 [DX-221 at AON 00443].

27. On June 21, 1999, Emhart received the Request for Information from the EPA [Stipulation of Facts, Section I, ¶ 60].

28. On February 28, 2000, the EPA sent a letter advising Emhart that it is a potentially responsible party in connection with contamination at the Site ("PRP Letter") [Stipulation of Facts, Section I, ¶ 61].

29. Following receipt of the February 28, 2000 PRP Letter, Emhart and other entities who had received similar letters entered into negotiations with the EPA, but those negotiations did not result in an agreement with the EPA [Stipulation of Facts, Section I, ¶ 62].

30. On April 12, 2000, the EPA issued to Emhart, and others, a Unilateral Administrative Order for Removal Action, requiring the performance of certain work at the Site. Emhart and others performed the work in accordance with the Order and, on August 14, 2000, the EPA issued a notice of completion of the work. [Stipulation of Facts, Section I, ¶ 63.] The Unilateral Administrative Order for Removal Action alleged that Emhart is "a successor to liability of several chemical companies which operated at the Site from approximately 1943 to approximately 1971," "chemicals manufactured by these companies included hexachlorophene," and the "chemical companies also buried drums and other containers at the Site [PX-13 at 3]."

31. On March 26, 2001, the EPA issued to Emhart, and others, a Second Administrative Order for Removal Action, requiring the performance of certain work at the Site. Emhart and others performed the work in accordance with the Order and, on April 7, 2005, the EPA issued a notice of completion of the work. [Stipulation of Facts, Section I, ¶ 64.] The Second Administrative Order for Removal Action alleged that Emhart's predecessors operated at the Site from approximately 1940 to the early 1970s, and that the operations of the chemical companies resulted in releases and threats of releases of hazardous substances at the Site [PX-15 at AON 00021].

32. On September 11, 2003, the EPA issued to Emhart, and others, a Third Administrative Order on Consent for Removal Action, requiring the performance of certain work at the Site. Emhart and others performed the work in accordance with the Order and filed a completion of work report. [Stipulation of Facts, Section I, ¶ 65.] The Third Administrative Order on Consent for Removal Action also alleged that Emhart's predecessors operated at the Site from approximately 1940 to the early 1970s, and that the operations of the chemical companies resulted in releases and threats of releases of hazardous substances at the Site [PX-16 at 4].

33. The Court has ruled that the PRP Letter and the EPA orders constitute a suit within the meaning of the Century insurance policies [Stipulation of Facts, Section I, ¶ 66].[4]

**EMHART'S INSURANCE CLAIM**

34. On July 21, 1999, Emhart gave Century notice of the EPA claim regarding the Site [Stipulation of Facts, Section I, ¶ 67]. That was Century's first notice [Biagioni D-X (Tr. 7/10/07) at 33; Zajac D-X (Tr. 6/26/07) at 134; Zajac C-X (Tr. 6/27/07) at 14-15]. The notice listed the following excess policies issued to Emhart and USM: INA – XCP4506, 1/5/70-1/1/71; XCP155977, 1/1/84-85; XCP157252, 1/1/85-86; XCC017060, 1/8/86-1/1/87 [PX-18A at MISC 01390; Zajac D-X (Tr. 6/26/07) at 134-135; Zajac RD-X (Tr. 6/27/07) at 47-48]. None of these policies were issued to Crown-Metro [Biagioni D-X (Tr. 7/10/07) at 36; Zajac RD-X (Tr. 6/27/07) at 48].

35. On July 30, 1999, Emhart gave Liberty Mutual notice of the EPA claim regarding the Site. Emhart demanded that Liberty Mutual provide a defense and indemnify Emhart. [DX-241; Biagioni D-X (Tr. 7/10/07) at 26-27.]

---

[4] This paragraph states a ruling of the Court and is without waiver of the right of any party to appeal from the ruling of the Court.

36. On August 10, 1999, Century acknowledged receipt of Emhart's notice under the following policies: XCP 157252 (1/1/85-86; XCP 4506 (1/5/70-71); XCP 155977 (1/1/84-85); and XCC 017060 (1/1/86-87). Century further advised Emhart that if Emhart intended to make a claim under any other policy number it should advise Century immediately. [PX-20 at AON 00378; Zajac D-X (Tr. 6/26/07) at 135-137.]

37. On August 23, 1999, Liberty Mutual acknowledged receipt of Emhart's claim and reserved its rights under its policies [DX-246; Biagioni D-X (Tr. 7/10/07) at 27].

38. On February 9, 2000, Emhart's broker advised Century that the underlying coverage had not been eroded, and it had no reason to believe that any Century policy would be implicated:

> To date, there has no been no erosion of the underlying insurance. Indeed, no carrier has agreed to defend or indemnify Black & Decker in this matter. Furthermore, at the present time, there is no reason to believe that any INA or Pacific Employers layers of coverage will be implicated.

[DX-273; Biagioni D-X (Tr. 7/10/07) at 37; Zajac D-X (Tr. 6/26/07) at 137-138.]

39. On March 14, 2000, Emhart provided notice of the February 28, 2000 PRP Letter to Century [Stipulation of Facts, Section I, ¶ 69]. The notice listed the following excess policies: INA – XCP4506, 1/5/70-1/1/71; XCP155977, 1/1/84-85; XCP157252, 1/1/85-86; XCC017060, 1/8/86-1/1/87 [PX-21A at MISC 01420; Zajac D-X (Tr. 6/26/07) at 138-139].

40. On March 28, 2000, Emhart provided notice of the February 28, 2000 PRP Letter to Liberty Mutual. Emhart reiterated its demand that Liberty Mutual provide a defense and indemnify Emhart. [DX-284; Biagioni D-X (Tr. 7/10/07) at 27-28.]

41. On April 21, 2000, Emhart provided notice of the Unilateral Administrative Order to Century under the following excess policies: INA – XCP4506, 1/5/70-

1/1/71; XCP155977, 1/1/84-85; XCP157252, 1/1/85-86; XCC017060, 1/8/86-1/1/87 [PX-22A; Zajac D-X (Tr. 6/26/07) at 139].

42. On May 4, 2000, Emhart advised Liberty Mutual that the EPA asserts its past costs claim now exceeds $4 million, the EPA advised that it has recently estimated that the cost to undertake additional emergency measures at portions of the Site is $8 million to $16 million, and a final remedy could well exceed the cost of the initial work at the Site. Emhart reiterated its demand that Liberty Mutual provide a defense and indemnify Emhart. [DX 295; Biagioni D-X (Tr. 7/10/07) at 28.]

43. On May 16, 2000, Emhart sent a copy of the Unilateral Administrative Order to Liberty Mutual, with Emhart's reply indicating its intention to comply [DX-298; Biagioni D-X (Tr. 7/10/07) at 28]. On May 24, 2000, Liberty Mutual advised Emhart that Liberty Mutual would not be providing Emhart with a defense or indemnification because there is no potential obligation to defend or indemnify [DX-300; Biagioni D-X (Tr. 7/10/07) at 28-29]. On June 19, 2000, Emhart advised Liberty Mutual that it disagreed with Liberty Mutual's conclusion on coverage [DX-304; Biagioni D-X (Tr. 7/10/07) at 29].

44. On October 17, 2000, Emhart advised Century of the lawsuits Crown-Metro filed against Emhart in South Carolina under the following policies issued to USM (INA-XCP4506, 1/5/70-1/1/71) and Emhart (XCP 155977, 1/1/84-85; XCP157252, 1/1/85-86; and XCC017060, 1/8/86-1/1/87) [DX-322; Zajac D-X (Tr. (6/26/07) at 140].

45. On October 23, 2000, Century acknowledged receipt of Emhart's correspondence under the following policies: XCP 157252 (1/1/85-86; XCP 4506 (1/5/70-71); XCP 155977 (1/1/84-85); and XCC 017060 (1/1/86-87). Century further advised Emhart that if

Emhart intended to make a claim under any other policy number it should advise Century immediately. [PX-23; Zajac D-X (Tr. 6/26/07) at 141-142.]

46. On October 30, 2000, CGU sent Emhart's attorneys a copy of Century's 1969 Excess Policy [PX-128A]. Before that time, Emhart was not aware of Century's 1969 Excess Policy or any other insurance policy that Century issued to Crown-Metro [Biagioni D-X (Tr. 7/10/07) at 38-39].

47. On October 31, 2000, Emhart sent Century, among other things, a copy of the following policies:

| **Policy Number** | **Insurer** | **Named Insured** | **Policy Period** |
|---|---|---|---|
| XCP157252 | INA | Emhart | 12/31/84-1/1/86 |
| XCC017060 | Pacific Employers | Emhart | 1/1/86-87 |
| XCP4506 | INA | USM | 1/5/70-71 |
| XCP155977 | INA | Emhart | 1/1/83-84 |

Emhart did not send Century a copy of Century's 1969 Excess Policy or any other insurance policy that Century issued to Crown-Metro. [DX-329; Zajac D-X (Tr. 6/26/07) at 142-143.]

48. On November 6, 2000, Century sent a letter to Emhart's broker listing the policies under which Emhart was seeking coverage. The letter did not include Century's 1969 Excess Policy or any other insurance policy that Century issued to Crown-Metro. Century asked Emhart to advise Century if Emhart intended to make a claim under any other policy number. Century reserved its rights under the policies for which Emhart was seeking coverage. [DX-331; Zajac D-X (Tr. 6/26/07) at 143-144.]

49. On November 7, 2000, Emhart's attorneys sent Emhart a copy of Century's 1969 Excess Policy. Emhart's attorneys advised that Emhart could submit a claim to Century with respect to the Site, but an inquiry letter may be a better first step because "carriers tend to be of more assistance when they are unaware of a potential claim." [DX-332.] Before

receiving Century's 1969 Excess Policy, Emhart was not aware that Century had issued liability insurance policies to Crown-Metro [Biagioni D-X (Tr. 7/10/07) at 41].

50. On November 22, 2000, Emhart's attorneys wrote to Century seeking information for the first time regarding insurance coverage that Century issued to Crown-Metro. Attached to the letter was Century's 1969 Excess Policy. Emhart's attorneys requested that Century conduct a review of its records regarding Century's 1969 Excess Policy and any additional insurance coverage Century provided to Crown-Metro. Emhart's attorneys further demanded that Century provide a defense and indemnify Emhart for all damages, costs, and expenses in connection with the Site under Century's 1969 Excess Policy and under any other policy Century issued to Crown-Metro. [PX-24A; Biagioni D-X (Tr. 7/10/07) at 42; Zajac D-X (Tr. 6/26/07) at 144-145.] The November 22, 2000 letter was the first letter Century received in connection with the Site that referenced policies issued to Crown-Metro [Biagioni D-X (Tr. 7/10/07) at 42-43; Zajac D-X (Tr. 6/26/07) at 146].

51. On December 8, 2000, Century initiated a search for the following alleged policy issued to Crown-Metro: XBC64674 (expires 1968) [DX-340; Zajac D-X (Tr. 6/26/07) at 146-147].

52. On December 12, 2000, Century acknowledged receipt of Emhart's claim for coverage under Century's 1969 Excess Policy and denied coverage on the ground that Emhart is not a named insured. Century also reserved its rights to deny coverage on other grounds. [PX-26; Zajac D-X (6/26/07) at 147-148.] At the time of the letter, Century was not aware of a primary policy issued to Crown-Metro around the same time that Century's 1969 Excess Policy was issued [Zajac D-X (6/26/07) at 148].

53. On January 3, 2001, Emhart's attorneys wrote back to Century. They repeated their request that Century review its records regarding Century's 1969 Excess Policy and any additional insurance coverage Century provided to Crown-Metro. They also provided further information on the relationship between Emhart and Crown-Metro, and asked Century to reconsider its position [PX-27; Zajac D-X (Tr. (6/26/07) at 148-149.]

54. On January 10, 2001, Century initiated a search for any and all general liability insurance policies that may have been issued to Crown-Metro for the period from December 2, 1968 through December 31, 1976. The results of that search were negative. [DX-365; Zajac D-X (Tr. 6/26/07) at 149-151; Zajac C-X (Tr. 6/27/07) at 37, 39; Zajac RD-X (Tr. 6/27/07) at 49-50.] Century also initiated a search on that date for any and all general liability insurance policies that may have been issued to Crown-Metro from the beginning of time through July 7, 1963 [DX-364].

55. On January 11, 2001, Century wrote back to Emhart's attorneys and stated that Century had re-evaluated it previous denial under Century's 1969 Excess Policy and agreed that Emhart may be able to request insurance coverage to the extent it is a successor to Crown-Metro. Century asked for proof of that successor relationship. Century also reserved its rights to deny coverage on other grounds. In addition, Century advised Emhart that Century would have no obligation under Century's 1969 Excess Policy until Emhart provided proof that all applicable primary and underlying limits have been exhausted:

> Policy XBC 46961 is an excess policy that provides coverage for liabilities in excess of primary and/or underlying limits of liability. If you wish to pursue coverage under this policy, you must provide proof that all applicable primary and/or underlying limits have been completely and properly exhausted. At this time, we have no information to indicate that underlying coverage has been exhausted or that this claim will reach our layer of insurance. Therefore, notwithstanding the pollution exclusion in the policy,

> we are not presently obligated either to provide a defense or to indemnify Emhart in this matter.

[PX-28; Zajac D-X (Tr. 6/26/07) at 151-153.] At the time of the letter, Century was not aware of a primary policy Century had issued to Crown-Metro around the same time that Century's 1969 Excess Policy was issued [Zajac D-X (6/26/07) at 153].

56. As of January 11, 2001, Emhart had paid $55,000 in indemnification expense [PX-170]. Emhart did not inform Century it had paid that amount until after this lawsuit was filed [Biagioni D-X (Tr. 7/10/07) at 46].

57. On February 27, 2001, Emhart's attorneys submitted a list of insurance policies to the attorneys for Crown-Metro in South Carolina. The list referred to a Century policy issued to Crown-Metro with a $100,000 per occurrence limit and $0 attachment point [DX-361]. That policy was never referenced in any correspondence from Emhart to Century before Century located Century's 1969 Primary Policy [Biagioni D-X (Tr. 7/10/07) at 49-50].

58. On April 9, 2001, Emhart's broker responded to Century's requests for information. The broker provided some information in response to Century's questions, including information on the relationship between Emhart and Crown-Metro. The broker did not provide any information on whether "all applicable primary and/or underlying limits have been completely and properly exhausted." The broker also did not provide any information on Century's 1969 Primary Policy. [PX-29; Zajac D-X (Tr. 6/26/07) at 153-154.]

59. On May 3, 2001, Emhart provided notice to Liberty Mutual of the Second Administrative Order for Removal Action. Emhart reiterated its demand that Liberty Mutual provide a defense and indemnify Emhart. [DX-378; Biagioni D-X (Tr. 7/10/07) at 29-30.]

60. On September 17, 2001, Emhart provided an update to Liberty Mutual. Emhart reiterated its demand that Liberty Mutual provide a defense and indemnify Emhart. [DX-396; Biagioni D-X (Tr. 7/10/07) at 30.]

61 On October 17, 2001, Emhart paid $125,000 in indemnification expense [PX-170]. Emhart did not advise Century it had paid that amount until after this lawsuit was filed [Biagioni D-X (Tr. 7/10/07) at 46; Zajac D-X (Tr. 6/26/07) at 154].

**INSURANCE COVERAGE LAWSUIT**

62. On or about January 25, 2002, Emhart filed this lawsuit against Century and five other insurance companies, including Liberty Mutual. Emhart sought, among other things, declaratory relief against Century and damages for breach of contract in connection with Century's 1969 Excess Policy, and an excess policy Century issued to USM. Emhart did not seek declaratory relief or damages for breach of contract with respect to Century's 1969 Primary Policy. As of the date the lawsuit was filed, Emhart had not advised Century that the underlying limit under Century's 1969 excess policy had been exhausted. Century was also not aware it had issued a primary policy to Crown-Metro during the same period that Century's 1969 excess policy was issued. [Zajac D-X (Tr. 6/26/07) at 154.] As of the date the lawsuit was filed, Century had not denied coverage under either Century's 1969 Primary Policy or Century's 1969 Excess Policy [Zajac D-X (6/26//07) at 155]. On March 25, 2002, Century filed its answer and affirmative defenses denying coverage for Emhart's claim.

63. On August 29, 2002, Century initiated a second search for any and all insurance policies issued to Crown-Metro in response to discovery requests in this lawsuit [DX-431; Zajac D-X (Tr. 6/26/07) at 155-156].

64. Century's policy search unit in Richmond, Indiana located Century's 1969 Primary Policy on about January 7, 2003 [DX-508; Zajac D-X (Tr. 6/26/07) at 156; Zajac C-X (Tr. 6/27/07) at 29]. Century's claim department in Philadelphia, Pennsylvania did not receive Century's 1969 Primary Policy until on or about July 2, 2003 [DX-446; Zajac D-X (Tr. 6/26/07) at 157-158; Zajac C-X (Tr. 6/27/07) at 25; Zajac RD-X (Tr. 6/27/07) at 49]. Before receiving Century's 1969 Primary Policy in July 2003, Century's claim department was unaware of the policy [Zajac D-X (Tr. 6/26/07) at 158].

65. On July 10, 2003, Century's attorneys sent Emhart's attorneys a copy of Century's 1969 Primary Policy [PX-35; Zajac D-X (Tr. 6/26/07) at 158-159].

66. On September 11, 2003, Emhart's attorneys advised Century that "Emhart seeks to amend its complaint in this action to include claims for defense and indemnification costs that it contends are within the scope of [Century's 1969 Primary Policy] and declaratory relief concerning future defense and indemnification costs that it contends are within the scope of said policy." On September 30, 2003, Century's attorneys advised Emhart's attorneys that Century did not anticipate objecting to an appropriate motion by plaintiff to amend its complaint in this action. [DX-460; Zajac D-X (Tr. 6/26/07) at 159-160.]

67. On December 12, 2003, Emhart filed a motion for partial summary judgment against Century and Liberty Mutual seeking, among other things, a declaration that Century had a duty to defend and indemnify Emhart for costs relating to the Site under Century's 1969 Excess Policy.

68. On January 16, 2004, Century filed its opposition to Emhart's motion for partial summary judgment and a cross-motion for summary judgment. One of the arguments

Century raised in its opposition and cross-motion was that Emhart is not a corporate successor to Crown-Metro. [Zajac D-X (Tr. 6/16/07) at 162.]

69. On January 27, 2004, Century filed a motion for leave to file counterclaim and cross-claim in order to assert a claim under Century's 1969 Primary Policy [Zajac D-X (Tr. 6/26/07) at 160]. Century had not denied coverage under the 1969 Primary Policy before it moved to amend [Zajac D-X (Tr. 6/26/07) at 160-161].

70. On January 29, 2004, Century sent a letter to Emhart's broker denying coverage under Century's 1969 Primary Policy on the ground that Emhart is not a named insured or additional insured under that policy. In support of its denial, Century stated that Emhart never established it is a successor-in-interest to Crown-Metro, and that Emhart continues to deny it is a successor to Crown-Metro. In addition, Century reserved its rights to deny coverage on other grounds. [DX-475; Zajac D-X (Tr. 6/26/07) at 161-162.]

71. On February 20, 2004, the Court granted Century's motion for leave to file counterclaim and cross-claim. On February 25, 2004, Century filed its counterclaim and cross-claim seeking, among other things, a declaratory judgment it had no duty to defend or indemnify Emhart in connection with the Site under Century's 1969 Primary Policy. On March 23, 2004, Emhart filed its answer to Century's counterclaim and a counterclaim in reply concerning Century's 1969 Primary Policy. On April 15, 2004, Century filed its answer and affirmative defenses to Emhart's counterclaim in reply, denying coverage under Century's 1969 Primary Policy.

72. On February 15, 2005, United States Magistrate Judge Robert Lovegreen issued a Report and Recommendation recommending that all of the pending motions for summary judgment be denied. In his Report and Recommendation, United States Magistrate

Judge Lovegreen found that Emhart had provided sufficient evidence it was a corporate successor to Crown-Metro. [Zajac D-X (Tr. 6/26/07) at 162.]

73. In light of Judge Lovegreen's decision, Century re-evaluated its position on whether Emhart was a corporate successor to Crown-Metro. On April 20, 2005, Century sent a letter to Emhart's broker denying coverage under Century's 1969 Primary Policy on the additional ground that the alleged property damage at the Site was neither discovered nor reasonably discoverable during Century's policy period. In addition, Century reserved its rights to deny coverage on other grounds. [DX-501; Zajac D-X (Tr. 6/26/07) at 162-163.]

74. On May 17, 2005, this Court entered an Order accepting and adopting the findings in the February 15, 2005 Report and Recommendation in total.

**COSTS INCURRED BY EMHART**

75. In response to the EPA's February 28, 2000 letter, Emhart retained the law firm Swidler Berlin Shereff Freedman LLP ("SBSF"), now Bingham McCutchen LLP, to represent it in connection with the EPA claim [Stipulation of Facts, Section I, ¶ 72].

76. Through June 2006, Emhart has incurred costs in the amount of $711,732.00 for performing the work required by the three orders issued by the EPA [Stipulation of Facts, Section I, ¶ 73].

77. Through October 19, 2006, Emhart also has incurred costs for legal services and consultants in connection with the Site in the amount of $4,408,958.80 that are reflected in invoices from SBSF.

78. Through June 2006, Emhart incurred additional costs in connection with the Site that are reflected in invoices from other contractors in the amount of $241,073.65 [Stipulation of Facts, Section I, ¶ 75].

79. From July 1, 2006 through October 19, 2006, Emhart incurred additional costs in connection with the Site that are reflected in invoices from other contractors in the amount of $90,585.47.

80. Emhart has never submitted its defense costs in connection with the Site to Century for payment [Biagioni D-X (Tr. 7/10/07) at 51].

**REASONABLENESS OF EMHART'S DEFENSE COSTS**

81. Ms. Biagioni is the person at Black & Decker who is responsible for reviewing the invoices for defense costs in connection with the Site. Her background is in engineering and science. She is not an attorney. [Biagioni D-X (Tr. 7/10/07) at 51.] The only times she has ever challenged an invoice is if an entry did not make sense or if an entry had the wrong billing rate [Biagioni D-X (Tr. 7/10/07) at 51-52].

82. Emhart failed to take control of the RI/FS, which exacerbated Emhart's defense costs and ultimate liability. The reasons for a PRP to take control of the RI/FS include:

(1) A PRP can perform the RI/FS at a much lower cost than the EPA typically does. PRPs are more efficient in controlling costs in overseeing performance of the contractors and consultants who perform the RI/FS. In contrast, when the EPA performs the RI/FS it seeks to charge back to the PRPs the cost, plus a multiplier rate between 25% and 70%, and

(2) Performance of the RI/FS by the PRPs and their selected consultants and contractors gives the PRPs the greatest opportunity to have as much input into the ultimate remedy chosen by EPA.

[Silver D-X (Tr. 7/26/07) at 43-46.]

83. Emhart's environmental consultant, Mr. Loureiro, agreed that when a PRP takes control of the RI/FS that significant cost savings can occur and that in his experience, when a PRP takes over the RI/FS, the PRP has experienced cost savings. [Loureiro C-X (Tr. 6/26/07) at 38].

84. Mr. Loureiro further testified that his company has been involved in roughly a half dozen RI/FSs and, in all of those matters, the PRPs have taken control of the RI/FS, with the exception of the Centredale site. [Loureiro C-X (Tr. 6/26/07) at 36].

85. The following discrete areas of defense costs were not reasonable to Emhart's defense of the underlying claim:

A. Investigating Emhart's defense of non-successorship and asserting that defense against EPA (approximately $131,000 in attorney time). Century's expert, Larry Silver, Esq., testified that $2,850.00 in attorney time should have been billed for this component of Emhart's defense [Silver D-X (Tr. 7/26/07) at 58-61; *see* DX-605]. Mr. Silver testified that Emhart was already in possession of the corporate history information that was needed to determine that Emhart was a successor to Metro-Atlantic, Inc. and Crown Metro, Inc. This is supported by a 1999 memo of Swidler Berlin, which traces the corporate history, and a 1998 affidavit of a Black & Decker in-house lawyer on the same subject. Also, Robert Cattaneo, Esq., who submitted an expert report in this matter on behalf of Emhart on successorship, has been familiar with Black & Decker's corporate history for 20 years. Mr. Cattaneo was a resource available to Emhart as to successorship, further negating the need for attorney time to be spent on the issue. [Silver D-X (Tr. 7/26/07) at 51-52.]

B. Challenging the Centredale Manor and Brook Village Consent Decrees (approximately $232,000 in attorney time). Century's expert, Larry Silver, Esq.,

testified that $14,918 in attorney time should have been billed for this component of Emhart's defense [Silver D-X (Tr. 7/26/07) at 66-67; *see* DX-605]. In support of his opinion, Mr. Silver testified that it is always difficult to challenge Consent Decrees in Superfund cases and research conducted by Mr. Silver revealed no successful challenges to Consent Decrees back to 1994 [Silver D-X (Tr. 7/26/07) at 64-65]. The Consent Decree challenges were rejected by Judge Lisi. During the appeal process, a settlement was negotiated where a slight adjustment was made to the Consent Decrees, which in Mr. Silver's opinion, was not consequential. [Silver D-X (Tr. 7/26/07) at 68-69.]

C. Filing suit in federal court and state court against the Estate of Joseph Buonnano (approximately $481,000 in attorney time). Century's expert, Larry Silver, Esq., testified that $14,253 in attorney time should have been billed for this component of Emhart's defense [Silver D-X (Tr. 7/26/07) at 75-76; *see* DX-605]. Joseph Buonanno died in 1991. Emhart's petition to file a claim out of time was not filed until 2002. Additionally, there had already been a claim for over $1 million against the estate with an inventory of approximately $2 million. Also, the estate had been fully distributed by 1992, a fact relied on by the Rhode Island Supreme Court in finding that Emhart's petition was too late. [Silver D-X (Tr. 7/26/07) at 70-71.]

D. Pursuing Emhart's purported claim against NECC in Bankruptcy Court in Delaware against Russell-Stanley Holdings, Inc. (approximately $256,000 in attorney time). Century's expert, Larry Silver, Esq., testified that $10,536 in attorney time should have been billed for this component of Emhart's defense [Silver D-X (Tr. 7/26/07) at 80-81; *see* DX-605]. Russell-Stanley bought all of the NECC stock in 1998, long after the events which resulted in the contamination at the site [Silver D-X (Tr. 7/26/07) at 77]. Mr. Silver testified that his

research demonstrates that pursuing an alter ego theory in Delaware is very difficult and further testified that of 30 cases identified that addressed alter ego theory, none found an alter ego relationship existed [Silver D-X (Tr. 7/26/07) at 78].

86. Accordingly, $1,097,000 should be subtracted from the total amount of attorney time billed of $4,104,962.36, resulting in $3,007,962.36, as the amount of attorney time that should have been billed [*see* DX-606].[5]

87. The percentage of attorney time spent on these defenses that should not have been pursued was 26.7%. That same percentage should be subtracted from the total amount of disbursements excluding travel costs ($255,830.55), leaving 73.3% or $187,523.79. Emhart's travel costs ($48,165.89) should be reduced by the same percentage, leaving $35,305.60. In addition, Emhart's travel costs should be reduced by an additional 75% to account for the savings that could have been achieved by hiring a more local firm. The total amount of reasonable travel costs is $8,826.40.

88. The fees for attorney time should be discounted another 10% in the aggregate due to (i) the excessive number of timekeepers used by SBSF, (ii) the lack of billing oversight, (iii) the use of ¼-hour rather than 1/10th-hour minimum billing increments, (iv) the failure either to itemize or code entries, and (v) the use of vague billing entries [Silver D-X (Tr. 7/26/07) at 97-98, 99-100; *see* DX-606].

89. Emhart's own expert, Mr. Davis, testified that there were billing invoices which "...did not supply sufficient information that would allow me to conclude that the time charges were fair and reasonable [Davis D-X (Tr. 6/26/07) at 63]." Mr. Davis prepared a chart indicating that these vague entries amounted to $160,000 in attorney time [*See* Exhibit 28]. At

[5] In these revised proposed findings of fact, Century has adjusted Mr. Silver's numbers to reflect the actual payments based on the testimony at the evidentiary hearing and the documents admitted into evidence.

the evidentiary hearing, Mr. Davis changed his opinion, indicating that after speaking with Mr. Muys, he concluded that under 4% of the entries were questionable [Davis D-X (Tr. 6/26/07) at 66].

90. A 25% discount should also be applied to the legal fees to account for the fact that Emhart used a large firm in Washington, D.C. with high billing rates rather than a quality mid-sized firm closer to Region 1 in Boston and the Site [Silver D-X (Tr. 7/26/07) at 100-101, *see* DX-606]. Defendant Exhibit 602, which was admitted into evidence, is a chart prepared by Mr. Silver which demonstrates the high billing rates charged by Emhart's counsel as compared to litigation partners in other firms around the nation. The information on this chart comes from a national billing rate survey by Altman Weil, Inc. The Altman Weil Survey was admitted into evidence as Defendant Exhibit 602A.

91. Emhart's expert, Mr. Davis, testified that the only formal rate survey that he relied upon was a peer-review survey consisting of larger firms, which did not include the rates of smaller or medium-size firms [Davis C-X (Tr. 6/26/07) at 103].

92. Emhart's expert, Mr. Davis, testified that his rates were consistently higher than those of Emhart's defense counsel, Mr. Muys. [Davis C-X (Tr. 6/26/07) at 105].

93. Mr. Davis further testified that, during his deposition, he had agreed that Mr. Muys' rates were reasonable, in part, because they were consistently lower than his own rates [Davis C-X (Tr. 6/26/07) at 105].

94. Accordingly, a total discount of 35% should be applied to the $3,007,962.36 amount of attorney time that should have been billed, which results in $1,955,175.53 for the estimated total of attorney time that should have been incurred by Emhart. [*See* DX-606.]

**SETTLEMENT AGREEMENTS WITH OTHER INSURERS**

**[For paragraphs 95 through 102, see Section One of Defendant Century Indemnity Company's Supplemental Revised Findings of Fact and Conclusions of Law, filed under seal.]**

**CONCLUSIONS OF LAW**

**DUTY TO DEFEND**

1. Century's duty to defend Emhart triggered under Century's 1969 Primary Policy because the complaining documents provided a potential for coverage [Order, 5/1/07].[6] Century's duty terminated as of the date Emhart incurred costs in excess of $100,000. That occurred on October 17, 2001.[7]

2. Century's duty to defend Emhart triggered under Century's 1969 Excess Policy because the complaining documents provided a potential for coverage, Century's 1969 Primary Policy's $100,000 limit of liability was exhausted by October 19, 2006, and the waste-product exclusion did not preclude a potential for coverage [Order, 5/1/07].[8]

3. Any existing duty to defend Emhart in this matter ceased as of October 19, 2006, the date of the jury verdict finding no coverage [Order, 5/1/07].

**WRONGFUL REFUSAL TO DEFEND**

4. If an insurer refuses to defend a policyholder pursuant to a general liability policy, the insurer will be obligated to pay, in addition to the costs of defense and attorneys' fees, the award of damages or settlement assessed against the policyholder. *Conanicut Marine*

[6] Century disagrees with the Court's conclusion and reserves its right to challenge it on appeal or otherwise.
[7] This conclusion is based on Century's understanding of the Court's May 1, 2007 Order. Century disagrees with the Court's Order. Its position is that it had a duty to defend under Century's 1969 Primary Policy from November 22, 2000 (the date of tender) to October 19 2006 (the date of the jury verdict). Century also contends its duty to defend under Century's 1969 Excess Policy was never triggered.
[8] Century disagrees with the Court's conclusion and reserves its right to challenge it on appeal or otherwise.

*Services, Inc. v. Insurance Co. of North America,* 511 A.2d 967, 971 (R.I. 1986). An insurer, however, will not be responsible for the award of damages or settlement assessed against the policyholder if the insurer either (1) enters into a non-waiver agreement with the policyholder, whereby it agrees to defend the policyholder and the policyholder recognizes the right of the insurer to question coverage, or (2) the insurer brings an action against the policyholder for a declaratory judgment on the question of coverage. *Rumford Property and Liability Ins. Co. v. Carbone,* 590 A.2d 398, 401 (R.I. 1991), *abrogated on other grounds by, Skaling v. Aetna Cas. Co.*, 799 A.2d 997 (R.I. 2002); *Conanicut,* 511 A.2d at 971 n.10; *Michaud v. Merrimack Mut. Fire Ins. Co.,* 1994 WL 774683 at *9 (D.R.I. 1994).[9]

5. Based on these principles, Century is not responsible for Emhart's indemnification costs because Century did not wrongfully refuse to defend Emhart under either Century's 1969 Excess Policy or Century's 1969 Primary Policy. Instead, Century sought declaratory relief in this lawsuit before denying coverage as follows:

A. With respect to Century's 1969 Excess Policy, Century did not refuse to defend Emhart. Century advised Emhart that Century would have no obligations under the policy until Emhart first demonstrated that the underlying coverage had been exhausted. Emhart incurred indemnification costs in excess of $100,000 as of October 17, 2001. However, Emhart did not inform Century of that fact until after this lawsuit was filed. Once the lawsuit was filed, Century had the right to have the coverage issues resolved without incurring a penalty. *See L.A. Connection v. Penn America Ins. Co.*, 363 Ill.App.3d 259, 263, 843 N.E.2d 427, 431 (Ill. App. 3 Dist.), *appeal denied by,* 219 Ill.2d 567, 852 N.E.2d 240 (2006) (insurer "fulfilled its obligations by filing its answer and cross-claim to plaintiff's declaratory actions.).

---

[9] Other courts have rejected *Conanicut. See e.g., Flannery v. Allstate Ins. Co.,* 49 F.Supp.2d 1223, 1229 (D. Colo. 1999); *Sentinel Ins. Co., Ltd. v. First Ins. Co. of Hawai'i, Ltd.,* 76 Hawai'i 277, 294-295, 875 P.2d 894, 911-912 (1994); *Poloroid Corp. v. Travelers Indem. Co.,* 414 Mass. 747, 763, 610 N.E.2d 912. 921 (1993).

B. With respect to Century's 1969 Primary Policy, Century was not aware of that policy when this lawsuit was filed. After Century discovered the policy, it sent a copy to Emhart and filed a motion for leave to assert a counterclaim with respect to that policy. Century did not deny coverage under that policy until after it first sought leave to file a counterclaim. Century was entitled to seek declaratory relief under the policy without incurring a penalty. *See id.* at 265, 843 N.E.2d at 432 (insurer must seek declaratory relief within a reasonable period of time).

6. Emhart contends that notice under one policy constitutes notice under any and all policies. Thus, Century had a duty to defend Emhart under Century's 1969 Primary Policy when Century first received notice of the Centredale site in July 1999. Century, however, is not claiming it did not receive notice of the site. Instead, Century contends it did not refuse to defend under Century's 1969 Primary Policy at that time. A refusal to defend is different than a failure to defend. To refuse to defend, Century would have to know about Century's 1969 Primary Policy and that Century had an obligation to defend under that policy. That way, Century could have entered into a non-waiver agreement or sought declaratory relief as required by *Conanicut*. Century could not have refused to defend under a policy it did not know about. Once Century learned about Century's Primary Policy, it did seek declaratory relief. Thus, *Conanicut* does not apply.

7. Emhart also suggest that Century was negligent in not locating Century's 1969 Primary Policy earlier. But, again, a refusal to defend is not the same as a failure to defend. A refusal requires a knowing and deliberate act. Century could not have refused to defend under Century 1969 Primary Policy before it first became aware of the policy. For *Conanicut* to apply,

the insurer must refuse to defend. Because Century did not do so until after it sought declaratory relief, *Conanicut* does not apply.

8. The rationale behind *Conanicut* is that an insurer that refuses to defend without seeking declaratory relief or entering into a non-waiver agreement should not be allowed to relitigate issues of fact that were either decided or could have been decided in the underlying action. That rationale makes no sense in the context of a Superfund case. Under Superfund, Emhart, as a former operator at the Site, is strictly liable for the contamination at the Site. In contrast, Century denied coverage on the ground that the dioxin contamination at the Site was not discoverable in the exercise of reasonable diligence during Century's policy period. That issue and other coverage issues are not relevant to the underlying Superfund action. As such, Century should not be precluded from litigating those other issues in a separate coverage action.

9. Furthermore, *Conanicut* did not hold that an insurer must indemnify claims that do not involve occurrences during the policy period. Nor did it hold that an insurer may be liable for benefits or limits beyond those expressly stated in the written insurance contract. The Rhode Island Supreme Court has subsequently made clear that the doctrine of equitable estoppel is not to be employed so as to expand the general scope of the insurance or to expand the benefits afforded by the coverage. *Zarrella v. Minnesota Mutual Life Ins. Co.*, 824 A.2d 1249, 1260 (R.I. 2003).

**PRE-TENDER DEFENSE COSTS**

10. An insurer will not be responsible for defense costs incurred before the date on which the policyholder tendered defense to its insurer, or notified its insurer of an opportunity to participate in the defense. *Michaud*, 1994 WL 774683 at *6; *Fireman's Fund Ins. Companies v. Ex-Cell-O Corp.*, 790 F.Supp. 1318, 1329 (E.D. Mich. 1992).

11. Emhart did not tender the underlying claim to Century under the Crown-Metro policies until November 22, 2000. Thus, Century is not responsible for any defense costs Emhart incurred before that time.

**REASONABLENESS OF DEFENSE COSTS**

12. The party seeking to recover its underlying defense costs has the burden of proving those costs are reasonable. *Liberty Mut. Ins. Co. v. Continental Cas. Co.*, 771 F.2d 579, 582 (1st Cir. 1985); *Michaud*, 1994 WL 774683 at *7.

13. Emhart has failed to meet its burden. Of the $4,104,962.36 billed in attorney time, the amount that should have been billed is $2,030,374.60. Instead of the $303,996.44 billed in disbursements, the amount that should have been billed is $196,350.19.

**ALLOCATION**

14. Where a claim raises the potential for coverage in multiple periods, an insurer is only responsible for a pro rata share of the underlying defense costs based on the period of time of the insurer's coverage over the entire period of time that the claim could be triggered. *See e.g., Security Ins. Co. of Hartford v. Lumbermens Mut. Cas. Co.*, 264 Conn. 688, 699, 826 A.2d 107, 115 (2003); *Owens-Illinois, Inc. v. United Ins. Co.*, 138 N.J. 437, 473, 650 A.2d 974, 993 (1994); *Gulf Chemical & Metallurgical Corp. v. Associated Metals & Minerals Corp.*, 1 F.3d 365, 372 (5th Cir. 1993); *Commercial Union Ins. Co. v. Sepco Corp.*, 918 F.2d 920, 924 (11th Cir. 1990); *E.E.O.C. v. Southern Pub. Co., Inc.*, 894 F.2d 785, 791-792 (5th Cir. 1990); *Budd Co. v. Travelers Indem. Co.*, 820 F.2d 787, 791 (6th Cir. 1987); *Insurance Co. of North America v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212, 1224-1225 (6th Cir. 1980); *Fireman's Fund Ins. Co. v. Ex-Cell-O Corp.*, 685 F.Supp. 621, 626 (E.D. Mich. 1987).

15. Based on the principles set forth in these cases, Century would only be responsible for a pro rata share of Emhart's reasonable underlying defense costs as follows:

A. Under Century's 1969 Primary Policy, Century would only be responsible for a pro rata share of Emhart's reasonable defense costs from November 22, 2000 (the date of tender) to October 17, 2001 (the date of exhaustion) based on the period of coverage (10 ½ months) over the period of time the claim could potentially have been triggered, which runs from 1940 (the first date under the underlying complaining documents that the alleged property damage was potentially discoverable in the exercise of reasonable diligence) to 1998 (the date under the underlying complaining documents that the alleged property damage was actually discovered). That result would be $3,421.90.

B. Under Century's 1969 Excess Policy, Century would only be responsible for a pro rata share of Emhart's reasonable defense costs from October 1, 2001 (the date after the underlying coverage was exhausted) to October 19, 2006 (the date the jury found the claim was not covered) based on the period of coverage (13 months) over the period of time the claim could potentially be covered, which runs from 1940 (the first date under the underlying complaining documents that the alleged property damage was potentially discoverable in the exercise of reasonable diligence) to 1998 (the date under the underlying complaining documents that the alleged property damage was actually discovered). That result would be $42,147.20.

16. Rhode Island courts have not addressed how defense costs should be allocated where a claim raises the potential for coverage in multiple periods. However, in *Insurance Co. of North America v. Kayser-Roth Corp.*, 770 A.2d 403, 413 (R.I. 2001), the Supreme Court of Rhode Island said, with respect to indemnification costs, that a setoff based on the amount that should be allocated to other settling insurers may be applied in an appropriate

case. *See Town of Cumberland v. Rhode Island Interlocal Risk Management Trust, Inc.*, 860 A.2d 1210, 1218 (R.I. 2004).

17. If the Court applied that method of allocation to the facts of this case, then Century would only be responsible for a pro rata share of Emhart's reasonable underlying defense costs as follows

A. Under Century's 1969 Primary Policy, Century would only be responsible for a pro rata share of Emhart's reasonable defense costs from November 22, 2000 (the date of tender) to October 17, 2001 (the date of exhaustion) based on the period of coverage (10 ½ months) over the period of coverage of other available primary insurance (16 years). That result would be $11,617.77.

B. Under Century's 1969 Excess Policy, Century would only be responsible for a pro rata share of Emhart's reasonable defense costs from October 17, 2001 (the date the underlying coverage was exhausted) to October 19, 2006 (the date the jury found the claim was not covered) based on the period of coverage (13 months) over the period of coverage of other available primary insurance (16 years). That result would be $143,090.90.

**LIBERTY MUTUAL**

**[For paragraphs 18 through 19, see Section Two of Defendant Century Indemnity Company's Supplemental Revised Proposed Findings of Fact and Conclusions of Law, filed under seal.]**

**DAMAGES FOR BREACH OF THE DUTY TO DEFEND**

20. Century did not refuse to defend Emhart before seeking declaratory relief under Century's 1969 Primary Policy and Century's1969 Excess Policy. Thus, Emhart is not entitled to any damages based on *Conanicut.*

21. Even if Century had refused to defend Emhart before seeking declaratory relief under either Century's 1969 Primary Policy or the Century's 1969 Excess Policy, Emhart would still not be entitled to any damages based on *Conanicut* because Emhart has not established any link between Century's refusal to defend and any amounts Emhart has been required to pay or will pay.

22. Emhart cannot establish any such link. Emhart hired defense counsel on its own and pursued an extremely vigorous defense. Emhart has not paid any amounts it would not otherwise have been required to pay. Hence, none of the amounts Emhart paid are related in any way to Century's alleged refusal to defend.

23. The *Conanicut* rule is not intended to be punitive. Rhode Island has a separate statute that governs punitive damage for insurer bad faith. RI ST § 9-1-33; *see Skaling v. Aetna Ins. Co.*, 799 A.2d 997 (R.I. 2002).

24. Emhart's damages, at most, should be limited to the amount it paid before the jury verdict in the coverage action. The jury found that the dioxin contamination at the Site was not discoverable during Century's policy periods. Based on that finding, the Court held that Century has no continuing duty to defend Emhart. Thus, any amounts that Emhart may be required to pay in the future cannot be related to Century's wrongful refusal to defend Emhart. Century has no such duty going forward.

25. In no event should Century be obligated to pay any amounts in excess of Century's 1969 Primary Policy's and Century's 1969 Excess Policy's limits. No Rhode Island court in a recorded decision has ever awarded *Conanicut* damages in excess of policy limits. The case that *Conanicut* cites with respect to awarding costs in excess of policy limits was a case in which the insurer refused to settle within policy limits.

26. Emhart's proposed reading of *Conanicut* would violate the Due Process Clause of the United States Constitution. *See Cooper Industries v. Leatherman Tool Group, Inc.*, 532 U.S. 424 (2001); *BMW or North America, Inc. v. Gore*, 517 U.S. 559 (1996).

**[For paragraph 27, see Section Three of Defendant Century Indemnity Company's Supplemental Revised Proposed Findings of Fact and Conclusions of Law, filed under seal.]**

Dated: July 31, 2007

McKENNA & McCORMICK

By: /s/ James T. McCormick
James T. McCormick (#2614)
McKENNA & McCORMICK
128 Dorrance Street, Suite 330
Providence, RI 02903
(401) 831-2970

- and -

Lawrence A. Nathanson
Scott E. Levens
SIEGAL, NAPIERKOWSKI & PARK
533 Fellowship Road, Suite 120
Mt. Laurel, NJ 08054
(856) 380-8910

Attorneys for Defendant Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America

**CERTIFICATE OF SERVICE**

I hereby certify that on July 31, 2007, a copy of the foregoing Defendant Century Indemnity Company's Revised Proposed Findings of Fact and Conclusions of Law was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

By: /s/ James T. McCormick

James T. McCormick (#2614)
McKENNA & McCORMICK
128 Dorrance Street, Suite 330
Providence, RI 02903
(401) 831-2970