UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| EMHART INDUSTRIES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>HOME INSURANCE COMPANY,<br>INSURANCE COMPANY OF NORTH AMERICA,<br>LIBERTY MUTUAL INSURANCE COMPANY,<br>NORTH RIVER INSURANCE COMPANY,<br>ONEBEACON AMERICA INSURANCE COMPANY<br>and UNITED STATES FIRE INSURANCE COMPANY,<br><br>Defendants. | Civil Action No. 02-053-S |

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**OF EMHART INDUSTRIES, INC.**

Plaintiff Emhart Industries, Inc. ("Emhart") respectfully submits the following proposed findings of fact and conclusions of law in connection with the evidentiary hearing that took place in the above-captioned matter on June 25-27, 2007 and July 2, 2007 ("the Hearing") and pursuant to the Court's order dated July 5, 2007.

Prior to the Hearing, in its Order dated May 1, 2007, the Court found that: (1) Emhart succeeded to the rights and benefits of the Policy No. GAL 36597 (the "Primary Policy"), Policy No. XBC 64674 (the "Excess Policy"), and Policy No. S-16-07084 (the "Umbrella Policy"); and (2) Century Indemnity Company ("Century") owed a duty to defend Emhart under both the Primary Policy and Excess Policy. The Court scheduled the Hearing in order to determine: (1) Emhart's defense costs as of October 19, 2006; (2) whether Century breached its duty to defend Emhart in connection with the Centredale Manor Superfund Site in North Providence, Rhode Island; and (3) Emhart's damages arising from Century's breach of its duty to defend.

## I. THE PARTIES

1. Emhart was a Connecticut corporation with its principal place of business in Towson, Maryland.

2. Century is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania.

## II. THE SITE

3. The Centredale Manor Restoration Superfund Site consists of two parcels located at 2072 and 2074 Smith Street in the Village of Centredale in North Providence, Rhode Island ("the Site"). The parcels, which total 9.7 acres, presently house two high-rise apartment buildings known as Brook Village and Centredale Manor. The Site also extends onto the 10-year floodplain of the Woonasquatucket River south to the Lyman Mill Dam. On the eastern portion of the land comprising the Site there is a drainage swale or "tail race." The Woonasquatucket River flows along the western portion of the Site.

4. The Site is a federal Superfund site contaminated with 2,3,7,8-tetrachlorodibenzi-*p*-dioxin (or "dioxin"), polychlorinated biphenyls ("PCBs"), and potentially other contaminants. These contaminants, which EPA has alleged pose significant human health and ecological risks even at low levels, have been found in soil and sediments on the Centredale Manor-Brook Village property as well as off-site properties and sediments in the Woonasquatucket River and Allendale and Lyman Mill Ponds and their vicinity.

5. For sites like Centredale Manor, CERCLA authorizes the EPA to compel certain classes of statutorily defined "responsible" parties to take action in response to the release of hazardous substances and/or to recover the costs of its response actions from "responsible" parties. Under CERCLA, parties deemed "responsible" may be held strictly, jointly, and severally liable for both investigatory and cleanup costs.

6. The EPA has taken actions to compel Emhart and a limited number of additional potentially responsible parties ("PRPs") to perform response actions at the Site and required the conduct of interim response actions, including the issuance of three administrative orders under CERCLA and related investigations the EPA deemed necessary at the Site.

7. Under CERCLA, because Emhart is alleged to be the successor of one of the Site operators, Emhart is claimed to be a "responsible" party, despite the lack of evidence that Emhart or its predecessor contributed contaminants to the Site.

8. Although CERCLA allows for equitable allocation of costs among the PRPs, in this case, there are a limited number of viable PRPs available to share the costs of the necessary response actions at the Site. Emhart is one of the only economically viable PRPs, whereas the other PRPs contend that they have either limited resources or exposure in terms of their apparent equitable share of liability for Site conditions.

## III. EMHART'S LEGAL FEES AND OTHER COSTS INCURRED WERE REASONABLE

### A. *Complexity Of The Site And Emhart's Potential Liability*

9. The complexity of the Site and Emhart's potential liability as one of the only solvent PRPs provide a background by which to assess the reasonableness of Emhart's defense. The Site itself is unusually large and complex in terms of geography and distribution of contaminants throughout residential and recreational properties as well as among various media, including sediment, ponds and water bodies, river banks, and surface water. [6/26/07 Tr., at 69:13-71:12.] Further, the primary contaminants at the Site, dioxin and PCBs, are viewed by EPA as high risk contaminants and have high remedial costs because of the difficulty and expense associated with their disposal. [6/26/07 Tr., at 69:13-71:12.]

10. Additionally, under CERCLA, EPA could compel one PRP to perform or pay for all of the Site response costs. Here, Emhart is currently viewed by the EPA as the only major viable PRP and could be held responsible for the majority, if not all, of the response costs, which likely exceed $100 million and may be as high as $200 million. [6/26/07 Tr., at 73:24-74:15; 74:16-75:12, 94:24-95:3; 6/25/07 Tr., at 132:20-133:6.] This amount represents unusually large potential exposure for one PRP. [6/26/07 Tr., at 73:24-74:15.]

11. Consequently, Emhart implemented a multi-prong defense where it sought to absolve itself of any liability, minimize the ultimate costs of the cleanup, and locate other solvent PRPs. [6/25/07 Tr., at 133:14-25; 6/26/07 Tr., at 91:19-93:14.] The largest portion of Emhart's legal expenses were incurred in connection with the EPA proceedings. [6/26/07 Tr., at 85:2-87:13.] The next largest category of legal expenses was related to Emhart's efforts to locate and pursue contribution from other PRPs, which Century's expert, Mr. Larry Silver, agreed is appropriate to do. [6/26/07 Tr., at 85:2-87:13; 7/26/07 Silver Dep. Tr., at 173:15-174:1.]

12. Emhart's investigation revealed that the operations of Emhart's purported predecessor, Metro-Atlantic, on the Site could not have given rise to the dioxin contamination, which is currently driving the remediation at the Site. [6/25/07 Tr., at 125:6-126:25.] If Emhart is able to prove that Metro-Atlantic did not discharge dioxin, or that whatever discharge there was is divisible, Emhart stands to eliminate or substantially reduce its cleanup liability. [6/25/07 Tr., at 125:6-126:25, 128:5-11.]

13. Emhart's defense efforts yielded significant, cost-saving results. Among them are: (1) Emhart was able to maintain a per capita allocation among itself and three of the originally-named PRPs (NECC and the two limited partnerships) through three costly removal actions required by EPA, [6/26/07 Tr., at 83:7-84:17]; (2) Emhart identified and persuaded EPA

to send notice letters to fourteen additional PRPs, eleven of which participated and contributed to the work under some or all of EPA's administrative orders, id.; and (3) Emhart renegotiated the PRPs obligations under the second administrative order so that their obligations were reduced from approximately $12.6 million to $2.4 million, [6/25/07 Tr., at 79:9-80:7].

14. Defense costs for which Emhart claims reimbursement total $4,740,617.92. Emhart incurred these costs between the inception of its involvement in the Site in or around June 1999 and the jury verdict of October 19, 2006. These costs can be broken down into two broad categories: (1) defense costs for legal services and consultants in connection with the Site in the amount of $4,408,958.80 as reflected on invoices from Swidler Berlin and Bingham McCutchen, PX-20; and (2) additional professional and technical consultant costs related to Emhart's defense in the amount of $331,659.12, [Trial PX-168A, PX-36B]. The parties have stipulated to the accuracy of the foregoing defense costs incurred by Emhart through October 19, 2006. [PX-37; PX-38] Century is not contesting the fairness or reasonableness of the technical consultant fees paid by Emhart related to Emhart's defense.

15. Century, however, takes issue with several elements of Emhart's defense costs — costs which Century ultimately could have controlled if it lived up to its contractual obligations — and asks that its duty to reimburse Emhart be reduced for the following reasons: (1) Emhart's choice of counsel and computation of legal fees, (2) Emhart's decision not to accede to EPA's terms and conditions regarding the conduct of the Remedial Investigation/Feasibility Study, (3) Emhart's intervention in the Russell Stanley bankruptcy proceedings, (4) Emhart's pursuit of contribution from the Buonannos, who were former operators of businesses located at the Site, (5) Emhart's investigation of the "corporate successorship" issue, and (6) Emhart's challenge to the merits of EPA's settlement agreements with two of the PRPs originally identified by the

EPA. As addressed in more detail below, the purported issues raised by Century are without merit.

**B.** ***Emhart's Choice of Counsel And Defense Costs Were Reasonable***

16. Emhart's selection of the attorney Jerome C. Muys, Jr. and the Swidler Berlin law firm (which later merged with Bingham McCutchen LLP) as its counsel in this matter was reasonable. [6/26/07 Tr., at 75:13-18.]

17. Left without a defense by Century, Emhart turned to Mr. Muys and Swidler Berlin, Emhart's regular counsel on environmental matters. [6/25/07 Tr., at 26:24-27:15; 6/26/07 Tr., at 122:21-123:21, 124:13-125:4.] Mr. Muys was the billing attorney on this matter. [6/25/07 Tr., at 72:1-12.]

18. Having experience in the area of environmental enforcement from his previous work at EPA and the Department of Justice and over twenty years of private practice concentrating almost exclusively on Superfund counseling and enforcement matters, Mr. Muys had handled over 75 environmental matters for Emhart over the course of almost 2 decades. [6/25/07 Tr., at 25:9-26:11.] Mr. Muys is also viewed nationally as a leader in his practice area. [6/26/07 Tr., at 77:20-78:25.] Century's expert, Mr. Silver, agreed that Mr. Muys' experience is certainly a factor in choosing appropriate counsel [7/26/07 Silver Dep. Tr., at 140:5-141:9.] and, accordingly, agreed that choosing Mr. Muys was reasonable [7/26/07 Silver Dep. Tr., at 143:20-144:3].

19. Beginning in 2002, Anthony Fitch, also of Swidler Berlin, devoted time to issues concerning the Site. Mr. Fitch is a trial attorney approximately ten years senior to Mr. Muys and has a wide range of experience in, among other things, environmental and commercial litigation. [6/25/07 Tr., at 26:15-23.] Mr. Fitch is also considered a national leader in his practice area. [6/26/07 Tr., at 77:20-78:25.]

20. Messrs. Muys and Fitch were two of the six "core team" members that were assembled to handle the issues related to the Site. [PX-21; 6/25/07 Tr., at 68:23-70:6.] These "core team" members accounted for approximately 93% of the total legal bills related to the Site. [PX-21; 6/25/07 Tr., at 68:23-70:6.] The balance of the legal bills were generated over seven years by various attorneys, paralegals, summer associates, and others who addressed discrete or specialized matters. [PX-21; 6/25/07 Tr., at 70:7-71:13.] Accordingly, Mr. Muys appropriately staffed the matter. [6/26/07 Tr., at 89:6-91:18.] The assertion of Century's expert, Mr. Silver, that a total of approximately 47 timekeepers is unreasonable disregards the fact that the "core team" was responsible for the vast majority of the time billed to Emhart and should be given no weight. Century presented no credible evidence that Emhart or its counsel overstaffed this matter.

21. The practice of the Swidler Berlin firm was to bill in 15-minute increments, which was standard with all of the firm's clients at the time, in a block billing format with sufficient description to provide the client with an understanding of the services provided. [6/25/07 Tr., at 66:13-25, 134:9-12.] These billing practices met Emhart's needs, afforded sufficient description to provide Emhart with an understanding of the services, and were found acceptable by Emhart. [6/25/07 Tr., at 66:13-25, 134:13-16, 134:17-18.] Further, the Swidler Berlin firm's use of 15-minute billing increments is certainly not unheard of in the legal profession and was for a while not uncommon. [6/26/07 Tr., at 52:1-10.] Apart from unsubstantiated insinuations, Century presented no credible evidence that the Swidler Berlin firm in any way overcharged Emhart for its services.

22. After the Swidler Berlin firm became part of Bingham McCutchen, the billing increments changed to 6-minute increments, but otherwise the billing format and procedures

remained the same. [6/25/07 Tr., at 67:1-5.] Emhart was supplied with descriptions sufficient to meet its needs. [6/25/07 Tr., at 67:6-8.] Again, Century presented no credible evidence that the Bingham McCutchen firm in any way overcharged Emhart for its services.

23. Emhart also received significant discounts on its legal bills. When, in early 2002, Mr. Fitch started billing on the matter, an agreement was reached between Emhart and its counsel by which Mr. Fitch would be billed at a reduced rate and that rate would remain frozen. [6/25/07 Tr., at 67:9-24.] In early 2006, the agreement between Emhart and its counsel was changed by unfreezing Mr. Fitch's rate and, instead, applying a 10% discount to all timekeepers' rates. [6/25/07 Tr., at 67:25-68:8.] In any event, the billing rates of the Swidler Berlin and Bingham McCutchen firms were below the market rates for large firms in the Northeast that could handle a Superfund matter of this magnitude. [6/26/07 Tr., at 75:16-76:25, 67:12-69:6; PX-23] Indeed, the rates of Century's own expert, Mr. Silver, at the time Swidler Berlin took on the matter for Emhart were comparable to those of Mr. Muys. In 2002, the rates of Mr. Muys and Mr. Silver, then an attorney at Duane Morris LLP, were identical. [PX-23; 7/26/07 Silver Dep. Tr., at 114:3-14.]

24. Mr. Muys, as the billing attorney for this matter, reported primarily to Linda Biagioni, the client's Vice President for Environmental Affairs. [6/25/07 Tr., at 72:1-12; 7/10/07 Biagioni Dep. Tr., at 11:17-12:2, 51:13-23.] Mr. Muys frequently updated Ms. Biagioni on the status of the efforts that his law firm had undertaken on Emhart's behalf via telephone calls, periodic status reports, email, and meetings. [6/25/07 Tr., at 134:19-136:8; 6/26/07 Tr., at 87:20-88:8, 88:22-89:5.] Mr. Muys regularly sent Ms. Biagioni copies of documents for her review, comment, and approval. [6/25/07 Tr., at 134:19-136:8] Ms. Biagioni would also review the legal invoices submitted by Mr. Muys and would, on occasion, question or challenge entries if

the explanation did not make immediate sense to her or if the billing rates indicated on the invoices were incorrect. [6/25/07 Tr., at 72:1-12; 7/10/07 Biagioni Dep. Tr., at 51:24-52:8.] Emhart was a sophisticated consumer of legal services and had extensive experience working with outside counsel in defending EPA Superfund actions. Emhart exercised a reasonable degree of oversight of case strategy and decision-making. In light of the foregoing, the invoices approved and paid by Emhart were reasonable. [6/26/07 Tr., at 87:14-19.]

25. Emhart acted reasonably in selecting Mr. Muys and the Swidler Berlin firm (later Bingham McCutchen) as its counsel for this Superfund matter because (1) Swidler Berlin was Emhart's usual outside environmental counsel, (2) Emhart enjoyed a relationship of trust with its counsel established over decades, (3) Swidler Berlin had a strong favorable national reputation in the fields of environmental law and litigation with depth at the partner and associate levels, as well as lawyers experienced in defending complex high-exposure Superfund matters, and (4) the firm's rates were below hourly market rates for large firms in the Northeast capable of handling a Superfund matter as large and complex as the Site. [6/26/07 Tr., at 75:16-76:25, 77:20-78:25.]

26. Depth at the associate and partner levels was particularly important, considering the amount of work that was required in connection with the Site. [6/26/07 Tr., at 75:16-76:25] Additionally, Emhart acted reasonably in retaining a firm with a wide array of available expertise in areas other than environmental law, given that the work required litigation in state, federal courts and federal bankruptcy court. [6/26/07 Tr., at 80:10-81:2.]

27. Century has suggested that Emhart's choice of the Swidler Berlin firm was unreasonable because the firm is based in Washington, D.C. — outside of the EPA region in which the Site is located. However, it is not uncommon for large corporations to use law firms in Superfund matters based in Washington, D.C. for matters around the country. [6/26/07 Tr.,

79:1-11.] Moreover, Swidler Berlin's office is located relatively close to Ms. Biagioni's office in Towson, Maryland, which facilitated communication between Emhart and its counsel and saved costs. Century's expert, Mr. Silver, admitted that in his own practice he customarily took on Superfund engagements located outside his EPA region and, of course, those cases involved travel for which the clients were charged. [7/26/07 Silver Dep. Tr., at 120:16-123:11.] Mr. Silver further stated that experience in the specific EPA Region was a factor in selecting appropriate counsel for Superfund matters, but admitted that he had no knowledge of Mr. Muys' or Swidler Berlin's experience with Superfund sites in Region 1, where the Site is located, and that he did not bother to find out this publicly available information before rendering his opinion. [7/26/07 Silver Dep. Tr., at 34:8-13, 129:6-131:24.] If he had performed any investigation, Mr. Silver should have become aware of Mr. Muys' extensive experience in Region 1 including, for example, Mr. Muys' recent representation of Emhart in relation to the Sutton Brook Superfund site in Massachusetts. [6/26/07 Tr., at 122:21-123:21.]

28. At the time the Swidler Berlin firm undertook the representation in 1999, there were few if any small "boutique" firms in Providence or Boston that could have possibly handled the matter for Emhart. [6/26/07 Tr., at 79:12-80:9.] The testimony of Century's expert, Mr. Silver, that Emhart should have retained a smaller firm overlooks this fact and neglects Emhart's long history with the Swidler Berlin firm as its usual environmental counsel, which he admits is an important factor in retaining counsel. [7/26/07 Silver Dep. Tr., at 123:16-126:2.] Further, Mr. Silver admitted that, when he was at Duane Morris, a large international law firm, he could not recall a single specific instance when he referred a Superfund matter to a less expensive firm because he believed it to be a more reasonable alternative for the client or that representation by Duane Morris was inherently unreasonable. [7/26/07 Silver Dep. Tr., at 105:3-106:15, 120:3-

12.] Moreover, Mr. Silver did not have any understanding of the size of the Swidler Berlin firm at the time it was retained in connection with the Site. [7/26/07 Silver Dep. Tr., at 107:22-112:10.]

29. After thorough, painstaking review of all legal bills rendered by the Swidler Berlin and Bingham McCutchen firms in connection with the Site, Emhart's expert, Christopher Davis, an attorney with a wealth of experience in Superfund matters, concluded that the fees paid by Emhart were reasonable, with the exception of three percent of the total charges, for which he lacked sufficient information to form an opinion. [PX-28; 6/26/07 Tr., at 63:7-25, 64:8-66:15, 88:9-21, 99:12-100:4.] The bills have been paid as rendered. [PX-37, ¶ 3.]

30. Given the uncertainty as to whether its defense costs would ever be reimbursed by Century, who was vigorously denying that it had any duty to provide Emhart with a defense or to reimburse Emhart, Emhart had an incentive to act rationally in incurring legal expenses [6/26/07 Tr., at 88:4-8]. See Taco Bell Corp. v. Cont'l Cas. Co., 388 F.3d 1069, 1075-77 (7th Cir. 2004); Ins. Co. of N. Am. v. Kayser-Roth Corp., 770 A.2d 403, 419 (R.I. 2001).

31. Century's expert, Mr. Silver, opined that the overall legal expenses were excessive. However, his opinion on this subject is inherently unreliable because he never actually reviewed all the Swidler Berlin or Bingham McCutchen legal invoices, but rather he had other unidentified persons do it for him. [7/26/07 Silver Dep. Tr., at 177:12-179:18 ("I did not look at every bill.").] For this reason alone, Mr. Silver's testimony concerning work descriptions and time devoted to certain projects and opinions flowing therefrom should be given no weight.

32. Moreover, Century did not present any credible evidence that Emhart's choice of its usual environmental counsel in 1999 to defend the EPA action was unreasonable or that at any point thereafter changing counsel would have been appropriate, required, or reasonable.

**C. *Emhart's Decision Not To Assume Control Of RI/FS Was Reasonable***

33. Emhart's decision not to accede to EPA's terms and conditions regarding the conduct of the Remedial Investigation/Feasibility Study ("RI/FS") was reasonable. [6/26/07 Tr., at 72:5-74:23.]

34. The RI/FS is a study that typically occurs early in a Superfund cleanup and is the procedural vehicle by which EPA investigates a Superfund site and makes a determination regarding the extent to which cleanup is necessary and appropriate. [6/25/07 Tr., at 72:16-23.]

35. Within three or four months of the original EPA notice letters, EPA made a request that the originally named PRPs take control over and pay directly for the RI/FS, which had already been commenced by EPA. [6/25/07 Tr., at 73:2-9.] EPA had already acted unusually aggressively with respect to enforcement actions and removal work and had already devoted significant resources to EPA's own activities and consultants at the Site. [6/26/07 Tr., at 71:13-72:2.]

36. If the PRPs had taken control of the RI/FS, they would have been required to reimburse EPA for its oversight costs, which can rival the costs of the actual investigative efforts. [6/26/07 Tr., at 20:18-21:18.]

37. At that time none of the other PRPs wanted to take control of the RI/FS because it was expected to be very expensive and the parameters of that obligation had not been defined. [6/25/07 Tr., at 73:12-20.] After the other PRPs made it clear that they were not willing to take on the RI/FS, Emhart considered assuming responsibility for the RI/FS by itself, but, because EPA was unwilling to put in place either financial or geographic boundaries, Emhart ultimately decided not to do so. [6/25/07 Tr., at 73:21-74:7; 6/26/07 Tr., at 21:19-22:10.]

38. From the beginning of Emhart's and the other PRPs' discussions with EPA regarding the RI/FS, even prior to EPA's offer to let the PRPs take control, EPA had stressed

that it had limited resources to dedicate to the Site. [6/26/07 Tr., at 26:18-27:22, 36:21-37:5.] Thus, if Emhart or the other PRPs had assumed control and paid directly for the RI/FS, EPA would likely have required a more extensive investigation than if EPA had devoted its own resources and then sought reimbursement. [6/26/07 Tr., at 23:17-24:1, 25:5-11, 29:23-10.] This outcome was especially likely where EPA refused to set financial or geographic boundaries on the RI/FS or on the Site. Moreover, by not taking over the RI/FS, EPA's high oversight costs would be avoided.

39. Nonetheless Emhart did propose to EPA to take sole control of the RI/FS with appropriate limitations and to assume the concomitant financial burden. [6/26/07 Tr., at 72:24-73:23.] EPA, however, quickly and uncharacteristically terminated discussions after a 5-week negotiation period — a period that more typically lasts for a period of months, not weeks, and can take as long as six months. [7/2/07 Tr., at 23:3-11; 6/26/07 Tr. at 72:3-73:12.]

40. Subsequently, Emhart participated in the RI/FS process on an informal basis, which involved EPA providing access to key documents, sampling data and personnel who were conducting the RI/FS. [6/25/07 Tr., at 74:11-24; 6/26/07 Tr., at 30:11-17.]

41. Through its informal participation, Emhart was able to broaden the range of remedial alternatives under consideration by EPA. Indeed, Emhart's consultants developed remedial alternatives that had not previously been considered by EPA or evaluated as part of the RI/FS. [6/25/07 Tr., at 132:9-19; 6/26/07 Tr., at 25:12-26:12.] If one of these alternatives is chosen by EPA, there will likely be a significant reduction in the cost of the cleanup of the Site. [6/25/07 Tr., at 132:9-19; 6/26/07 Tr., at 25:12-26:12.]

42. In addition, through Emhart's informal participation, Emhart and EPA agreed that Emhart would actually perform a portion of the RI/FS. [6/26/07 Tr., at 24:14-20.]

43. Generally, a PRP may save costs by controlling and paying directly for a RI/FS. In this instance, however, EPA's financial constraints regarding the Site likely limited the amount of upfront investigative costs EPA could incur on its own and seek reimbursement for later. If, instead, Emhart were to take on and directly fund the RI/FS under the EPA's terms and conditions, Emhart faced a potentially boundless study and investigation that EPA could, and likely would, require. Accordingly, it was reasonable for Emhart to decide not to accede to EPA's terms and conditions regarding the conduct of the RI/FS.

44. The opinion of Century's expert, Mr. Silver, that Emhart should have taken control of the RI/FS because it would have led to cost savings is belied by his complete inability to quantify or even estimate how much Emhart could have saved. [7/26/07 Silver Dep. Tr., at 158:22-163:10.]

**D. *Emhart's Participation In The Russell Stanley Bankruptcy Proceedings Was Reasonable***

45. Emhart's participation in the Russell Stanley bankruptcy proceedings was reasonable. [6/26/07 Tr., at 93:15-95:3.]

46. Emhart became aware that assets of New England Container Company ("NECC"), a drum reconditioning operation and former operator on the Site, had been sold to a third party. [6/25/07 Tr., at 35:12-36:6.] All that remained of NECC was limited cash and non-cash assets, which were primarily insurance policies. [6/25/07 Tr., at 35:12-36:6.] In the summer of 2005, Emhart received notice that Russell Stanley Holdings, Inc. ("Russell Stanley"), the parent of NECC, had initiated Chapter 11 bankruptcy proceedings. [6/25/07 Tr., at 35:12-36:6.]

47. In response, Emhart filed on behalf of itself and EPA two proofs of claim, which led to an adversary proceeding and hearings in the Russell Stanley bankruptcy. [6/25/07 Tr., at 35:12-36:6.]

48. Emhart had developed substantial evidence that NECC was a source of the dioxin contamination at the Site. Further, Emhart retained two experts, one an expert in corporate law and the other an economist, to analyze whether there was a reasonable factual and legal basis for piercing the corporate veil in order for NECC's potential liability for the Site to flow through to its parent, Russell Stanley. [6/25/07 Tr., at 36:10-37:2; 6/26/07 Tr., at 93:15-95:3.] As a result of this consultation, Emhart had a reasonable basis to conclude that Russell Stanley could in fact be held liable and decided to contest its Chapter 11 reorganization plan on the grounds that the plan did not make adequate provision for the Site. [6/25/07 Tr., at 36:10-37:2.] In view of NECC's apparent liability for the contamination and the strength of Emhart's legal theory, Emhart's efforts to pierce the corporate veil between NECC and its parent, Russell Stanley, constituted a rational course of action. [6/25/07 Tr., at 36:10-37:2; 6/26/07 Tr., at 93:15-95:3.]

49. During the bankruptcy proceedings, Russell Stanley initiated settlement discussions with Emhart by which the parties sought to reach an agreement concerning the allocation of the remaining assets of NECC to provide for the maximum amount for the Site cleanup. [6/25/07 Tr., at 43:19-44:14.] These discussions also addressed whether NECC's insurance policies, which were very substantial in amount, could be made available to fund the cleanup at the Site. [6/25/07 Tr., at 43:19-44:14.] When discussions met an impasse, Emhart initiated a lawsuit against NECC and NECC's insurance companies, seeking to have the insurance policies applied to the Site. [6/25/07 Tr., at 43:19-44:14.]

**E. *Emhart's Pursuit Of The Buonannos Was Reasonable***

50. Emhart's pursuit of contribution claims against the Buonannos was reasonable. [6/26/07 Tr., at 95:4-97:2.]

51. The Buonanno family were the owners and operators of businesses that operated at the Site from approximately 1940 through the 1960s. [6/25/07 Tr., at 37:14-38:13.] When the Buonannos sold their businesses, the consideration paid to the Buonannos was as much as $20 million. [6/25/07 Tr., at 37:14-38:13.] Accordingly, it was reasonable to assume that they had substantial assets potentially available to fund the cleanup. [6/26/07 Tr., at 95:4-97:2.]

52. Emhart pursued contribution claims against the Buonannos as individual operators, believing that a portion of the $20 million remained and could be used to fund the cleanup of the Site that the Buonannos had operated. [6/25/07 Tr., at 37:14-38:13.] The Buonannos mounted a vigorous defense in the litigation and resisted producing financial documents and any information concerning their assets. [6/26/07 Tr., at 95:4-97:2.]

53. Discovery in the Buonanno litigation ultimately revealed: (1) additional evidence regarding approximately thirty additional PRPs who were believed to be solvent, and (2) the Buonannos' remaining assets were not worthy of pursuit. [6/25/07 Tr., at 38:20-39:3, 39:4-40:25.]

54. Because of an adverse procedural ruling by the Rhode Island Supreme Court and because the Buonannos were apparently judgment proof (despite the millions of dollars they had received from their sale of their businesses), Emhart agreed to dismiss the litigation without prejudice. [6/25/07 Tr., at 38:20-39:3, 98:19-99:14.]

### F. *Emhart's Investigation Of The "Corporate Successorship" Issue Was Reasonable*

55. Emhart's investigation of the "corporate successorship" issue was reasonable. [6/26/07 Tr., at 91:19-93:14.] If it could be proven that Emhart had no legal connection to the Site and thereby avoid liability completely, then investing a reasonable amount of time and money trying to do so was appropriate. [6/26/07 Tr., at 91:19-93:14.]

56. Emhart, through its counsel, spent approximately $10,000 in investigating the "corporate successorship" issue. The investigation focused on whether Emhart was in fact a successor to the Metro-Atlantic entity that operated on the Site in the 1960s. [7/2/07 Tr., at 15:25-16:9.] In this instance, the research was particularly difficult because of the need to trace decades of corporate history, the absence of primary documents such as closing bibles, necessitating recourse to secondary references, and the complex nature and large number of individual transactions that comprised the chain of transfer of the Metro-Atlantic business. [6/25/07 Tr., at 124:7-125:5.]

57. After reviewing the corporate history, Emhart initially concluded that there was insufficient direct evidence to conclude that Emhart was successor to Metro-Atlantic. [6/25/07 Tr., at 123:24-124:6.]

58. The calculation performed by Century's expert, Mr. Silver, was inaccurate and dramatically inflated the time and money expended by Emhart on this issue. Mr. Silver erroneously included all of the time identified by Emhart as "Investigation of EPA Claims" in performing this calculation. [7/26/07 Silver Dep. Tr., at 181:18-182:21, 195:4-21.] Mr. Silver discredited himself by maintaining this opinion in spite of his admission that he himself had not reviewed all the legal invoices and had relied on others to do so. The evidence indicated,

however, that the category "Investigation of EPA Claims" included a wide array of activities unrelated to the "corporate successorship" issue. [PX-17A; 7/2/07 Tr., at 16:10-22.]

59. The criticism of Century's expert, Mr. Silver, that Emhart should have consulted with Messrs. Cattaneo and Lutkus, counsel to Emhart in corporate matters, in order to resolve the issue earlier, is unreliable and should be given no weight. Mr. Silver ignored the fact that Mr. Muys had frequent contact with Messrs. Cattaneo and Lutkus and other sources who may have had information relevant to the issue (a fact that, had Mr. Silver actually reviewed the invoices, he would have known). [7/26/07 Silver Dep. Tr., at 182:22-187:22.] Further, Mr. Silver's opinion is based on the information in Mr. Cattaneo's 2006 expert report and Mr. Silver's inference that this information must have been known by Mr. Cattaneo and available to Emhart at an earlier point in time is pure speculation and unreliable expert testimony. [7/26/07 Silver Dep. Tr., at 182:22-187:22.] It should be given no weight.

**G. *Emhart's Challenge To The Consent Decrees Was Reasonable***

60. Emhart's challenge to the consent decrees was reasonable. [6/26/07 Tr., at 97:3-99:11.]

61. Two of the five original PRPs that received notice letters from the EPA were limited partnerships that had constructed and operated Section 8 housing on the Site. [6/25/07 Tr., at 41:13-42:22.]

62. In or around May 2005, EPA announced that it intended to enter into settlement agreements in the form of consent decrees with the partnerships. EPA published a notice in the Federal Register and invited comment from interested parties. [6/25/07 Tr., at 41:13-42:22.] Both Emhart and NECC filed objections. [6/25/07 Tr., at 40:13-42:22.]

63. The general partners of each of the limited partnerships were entities with substantial assets. If the general partners could be brought into the EPA proceeding, then the

partnerships' ability to pay far exceeded the $4 million settlement proposed by the EPA. [6/26/07 Tr., at 97:3-99:11.] Thus Emhart's expenditures of resources in attempting to persuade EPA to increase the settlement payments by the partnerships were reasonable. [6/26/07 Tr., at 97:3-99:11.] Century's expert, Mr. Silver, admittedly did not consider the assets of the general partners in his analysis of the reasonableness of this undertaking. [7/26/07 Silver Dep. Tr., at 199:6-18.]

64. EPA, however, rebuffed Emhart and subsequently moved the Rhode Island federal district court to enter the two decrees. [6/25/07 Tr., at 41:13-42:22.] Emhart, after consulting with various experts, successfully intervened to contest the two consent decrees on the grounds that: (1) EPA had not followed its own guidance in determining the two partnerships' contributions, and (2) EPA underestimated the cash flow associated with the ongoing operations of the two housing complexes. [6/25/07 Tr., at 41:13-42:22.]

65. In view of the assets owned by the general partners and the size of Emhart's potential exposure, the challenge to the consent decrees was appropriate. [6/26/07 Tr., at 97:3-99:11.]

66. Ultimately, the district court entered judgment for EPA and approved the consent decrees. [6/25/07 Tr., at 43:7-18.] Emhart appealed the district court's decision, and, while the appeal was pending, EPA and Emhart engaged in settlement negotiations. [6/25/07 Tr., at 43:7-18.]

67. The result of those settlement negotiations was that the parties agreed to place the partnerships' contributions in an EPA-administered escrow account that restricted the EPA's use of the funds for cleanup to the time after EPA issues its Record of Decision [PX-39, PX-40, PX-

41; 6/25/07 Tr., at 43:7-18; 7/2/07 Tr., at 18:8-19:7, 34:7-9]. The Record of Decision is the EPA document that sets forth the scope of the final cleanup of the Site. [7/2/07 Tr., at 33:23-34:6.]

68. As a result, EPA cannot use the settlement funds for its past expenses or immediate additional testing, monitoring, or bureaucratic costs, but is restricted in its use of the funds for the future cleanup efforts specifically outlined in the Record of Decision. [PX-39; PX-40; PX-41; 6/25/07 Tr., at 43:7-18; 7/2/07 Tr., at 19:8-15; 6/26/07 Tr., at 97:3-99:11.] In light of the foregoing, Emhart's challenge produced a tangible benefit to Emhart and thus was rational.

## IV. CENTURY IS NOT ENTITLED TO ANY ALLOCATION OR OFFSET

69. The documentary evidence and the testimony of Ms. Alexandra Zajac, Century's claims agent, establish that Century engaged in a pattern of delay and evasion in searching its records for any Crown-Metro policy that could provide coverage to Emhart, Crown-Metro's successor.

70. By letter dated July 21, 1999, Emhart, through its agent, notified Century of the EPA action at the Site and demanded that Century provide Emhart with a defense and indemnify Emhart for its damages, costs, and expenses. [PX-18A.] The letter identified four excess policies with Century and named Emhart, USM Corporation, Black & Decker and Crown-Metro as the insureds. Id. Emhart included with this letter, along with the EPA's formal information requests, a copy of a memorandum prepared by Mr. Muys that detailed the various mergers and transactions that involved Emhart's predecessors, expressly naming, among other entities, Crown-Metro — an alleged operator at the Site identified by the EPA and the named insured on the Primary and Excess Policy. Id. Thus from the outset Century was aware that Crown-Metro was an insured. Moreover, Century has stated that it is not contesting the adequacy of notice under the Primary or Excess Policies. [7/2/07 Tr., at 69.]

71. Century responded by letter dated August 10, 1999, denying coverage on the ground that the four policies identified in the July 21, 1999 letter were excess policies and no duty to defend or indemnify arose until any primary policy was exhausted. [Trial PX-20] Century made no independent effort to determine or confirm the corporate successor relationship between Crown-Metro, one of the operators at the Site named in the EPA notice letter, and Emhart. [6/27/07 Tr., at 21:6-10.] Century presented no evidence that in response to the July 21, 1999 letter it made any effort to locate any additional potentially applicable policies, including the Primary Policy.

72. By letter dated November 11, 2000, Emhart specifically requested that Century undertake a broad search for any additional policies provided to Crown-Metro and sought a response within twenty days. [Trial PX-24A] Century did not do so. [6/27/07 Tr., at 44:12-22.] Instead, by letter dated December 12, 2000, Century stated that it would search for only one policy in addition to the four excess policies previously identified. [Trial PX-26.]

73. Emhart, by letter dated January 3, 2001, responded by reiterating its request for a broad search and by asking to be informed in writing if Century were refusing to do so. [Trial PX-27]

74. In response to Emhart's repeated request for a broad search, Century did a search according to narrow criteria designed to yield general liability policies issued to Crown-Metro that had an eight year term with an alleged inception date of December 2, 1968 and expiration date of December 31, 1976 — a term unheard of in general liability insurance. [DX-365] Ms. Zajac's testimony that this search would have yielded any general liability policy effective for any part of the eight-year period is not credible [6/27/07 Tr., at 49:7-50:20], in light of the fact that a later search without such restrictive temporal limitations located the Primary Policy.

Century presented no evidence that it responded to Emhart's request that it be informed in writing if Century were refusing to conduct a broad search. Nor did Century adduce evidence that it informed Emhart of the search criteria it actually employed in response to Emhart's January 3, 2001 letter, nor even whether it conducted any search at all.

75. On January 25, 2002, Emhart initiated this action. Not until August 29, 2002, in response to Emhart's discovery requests, did Ms. Zajac request that a search be performed that was broad enough to locate the Primary Policy. [6/26/07 Tr., at 155:6-156:1.] On that date, Ms. Zajac sent a search request to "searcher" Cindy Crutcher for all general liability, workers compensation, and excess liability policies issued to Crown-Metro (as well as other potentially related entities) that was open-ended as to inception and expiration dates. [DX-431] Ms. Zajac provided a twelve-week deadline of November 21, 2002 for completion of the search. Id. This search, however, was not initiated until December 30, 2002, four months after Ms. Zajac's request and a month after the deadline for its completion. [DX-508; 6/26/07 Tr., at 156:2-20.]

76. The Primary Policy was finally sent to Ms. Zajac on January 7, 2003. [6/26/07 Tr., at 156:21-25; 6/27/07 Tr., at 27:19-29:7.]

77. Not until July 2, 2003 — four years after Emhart's first search request, six months after the Primary Policy was finally located, and three months after the close of fact discovery (2/4/03 Docket Entry) — did Ms. Zajac forward the Primary Policy to litigation counsel. [DX-446]

78. Ms. Zajac's testimony that she did not receive the Primary Policy until early July 2003, six months after it was located and shortly before it was produced, is not credible. [6/26/07 Tr., at 157:1- 158:4 ("I came into work one morning, and I sat at my desk, and I started

going through some material that was left for me on my desk. And as I was going through various documents, I came across this primary policy."); 6/27/07 Tr., at 25:1-26:10.]

79. On April 20, 2005, Century finally denied coverage for boilerplate reasons in letters drafted by litigation counsel, three years after the commencement of this lawsuit. [6/27/07 Tr., at 47:4.]

80. Century's discovery abuses and negligent or willful withholding of the Primary Policy bar application of any setoff or allocation among other policies or policy periods. Ins. Co. of N. Am. v. Kayser-Roth Corp., 770 A.2d 403, 412 (R.I. 2001). Century's discovery misconduct and the public policy against allowing a non-settling insurer to benefit unjustly from its free rider status while other insurers settle provide ample justification for this result. Id.

81. Further, costs arising out of the duty to defend under an "all sums" policy, such as the Primary Policy, are not allocable across insurance policies. See, e.g., High Voltage Eng'g Corp. v. Am. Employer's Ins. Co., 1995 WL 809577 No. 941033 at *5 (Mass. Super. July 7, 1995).

82. In any event, Century is not entitled to set off or allocate defense costs to other insurers because it has not met its evidentiary burden of showing that a duty to defend exists under any other insurance policy. See Liberty Mut. Ins. Co. v. Metropolitan Life Ins. Co., 260 F.3d 54, 63 (1st Cir. 2001); Dash v. Chicago Ins. Co., No. Civ.A. 00-11911-DPW, 2004 WL 1932760 at *9 n.20 (D. Mass. Aug. 23, 2004).

83. Indeed, Century cannot meet this burden because essentially all other potentially applicable policies contained some form of pollution exclusion precluding coverage. See Affidavit of Rodney J. Taylor at 5 (Docket No. 372).

84. Even assuming that Century's obligations should be reduced to account for settlement payments Emhart received from Liberty Mutual, which it should not, any such setoff cannot exceed the amount allocated by the Settlement Agreement for the Site. See Ins. Co. of North America v. Kayser-Roth Corp., 770 A.2d 403, 414 (R.I. 2001). Offsetting Century's obligations by an amount greater than those allocated under the Settlement Agreement for defense and indemnity in connection with the Site would fail to make Emhart whole, and would deprive Emhart of the protection for which it paid.[1] Id.

## V. BECAUSE OF ITS BREACH OF ITS DUTY TO DEFEND, CENTURY MUST REIMBURSE EMHART FOR ITS INDEMNIFICATION COSTS

85. Because Century refused to defend Emhart pursuant to the Primary Policy, a general liability policy, Century is obligated to pay, in addition to the costs of defense and attorneys' fees, the award of damages or settlement assessed against Emhart. Conanicut Marine Serv. Inc. v. Ins. Co. of N. Am., 511 A.2d 967 (R.I. 1986).

86. There is no dispute that Emhart provided Century notice of its claims under all applicable policies. [7/2/07 Tr., at 69:4-9.]

87. The Court, moreover, has determined that Century had a duty to defend Emhart pursuant to its May 1, 2007 Order.

[1] There is absolutely no basis to Century's contention that the Liberty Mutual Settlement Agreement, in whole or in part, resulted from collusion. The deposition testimony of the Liberty Mutual and Emhart representatives taken pursuant to the Court's June 26, 2007 Order provides not a scintilla of evidence in support of this misbegotten notion. On the contrary, their testimony reveals that the Settlement Agreement was the product of arduous, arms-length negotiations between adversaries. The evidence shows that negotiations involved multiple rounds of proposals and counter-proposals through which the parties gradually resolved their conflicting interests. The amounts specifically allocated to defense and indemnity for the Site need to be understood in the context of the parties' efforts to achieve a global resolution of numerous outstanding claims under numerous policies involving numerous entities. There is no evidence that the specific amounts for the Site reflect collusion between Emhart and Liberty Mutual. Thus, the testimony lends no credence or support to Century's contention that the Settlement Agreement was collusive.

88. To date Century has paid not one penny of Emhart's defense costs. When Century failed to provide Emhart with a defense despite adequate notice of the EPA proceedings, it breached its duty to defend Emhart.

89. Century did not enter into a non-waiver agreement with Emhart to provide a defense under a reservation of rights. Conanicut at 971; see also Emhart's Memorandum of Law, at 18-21, filed herewith. Century did not commence a declaratory judgment action to determine its coverage obligations. Id.

90. Under Conanicut, Century is also required to pay $711,732.00 in indemnification costs previously incurred by Emhart [Ex. 38 ¶ 73], the reasonableness of which Century has never contested, plus either Emhart's future reasonable settlement costs or the amount of any judgment entered against Emhart in connection with the Site.

Respectfully submitted,

/s/ Gerald J Petros
Gerald J. Petros (#2931)
HINCKLEY, ALLEN & SNYDER LLP
50 Kennedy Plaza, Suite 1500
Providence, Rhode Island 02903
(401) 274-2000
(401) 277-9600 (fax)
gpetros@haslaw.com

Jack R. Pirozzolo (*pro hac vice*)
Adam M. Weisberger (*pro hac vice*)
Elisa K. Nethercott (*pro hac vice*)
FOLEY HOAG LLP
Seaport World Trade Center West
155 Seaport Boulevard
Boston, Massachusetts 02210
(617) 832-1000

Counsel for EMHART INDUSTRIES, INC.

**CERTIFICATE OF SERVICE**

To:

James T. Murphy, Esquire
Kelly N. Michels, Esquire
Hanson Curran LLP
146 Westminster Street
Providence, Rhode Island 02903

Peter C. Netburn, Esquire
Kevin J. O'Connor, Esquire
Michael S. Batson, Esquire
Hermes, Netburn, O'Connor & Spearing, P.C.
265 Franklin Street, 7th Floor
Boston, Massachusetts 02110

Mark T. Nugent, Esquire
Michael Marcello, Esquire
Morrison Mahoney LLP
121 South Main Street, Suite 600
Providence, Rhode Island 02903-7141

Michael F. Aylward, Esquire
John T. Harding, Esquire
Morrison Mahoney LLP
250 Summer Street
Boston, Massachusetts 02210

James T. McCormick, Esquire
McKenna & McCormick
128 Dorrance Street, Suite 330
Providence, Rhode Island 02903

Kimball Ann Lane, Esquire
Duane Morris LLP
380 Lexington Avenue
New York, New York 10168-0002

Martin F. Siegal, Esquire
Scott E. Levens, Esquire
Lawrence A. Nathanson, Esquire
Siegal Napierkowski & Park
533 Fellowship Road, Suite 120
Mt. Laurel, New Jersey 08054

I hereby certify that I caused a copy of the Proposed Findings of Fact and Conclusions of law of Emhart Industries, Inc. to be filed with the Court's CM/ECF system and sent electronically to the parties identified as registered participants on the Notice of Electronic Filing (NEF) and paper copies will be sent to those parties not registered as participants on July 31, 2007.

/s/ Gerald J. Petros

819837v1