UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| EMHART INDUSTRIES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>HOME INSURANCE COMPANY,<br>INSURANCE COMPANY OF NORTH AMERICA,<br>LIBERTY MUTUAL INSURANCE COMPANY,<br>NORTH RIVER INSURANCE COMPANY,<br>ONEBEACON AMERICA INSURANCE COMPANY<br>and UNITED STATES FIRE INSURANCE COMPANY,<br><br>Defendants. | Civil Action No. 02-053-S |

**MEMORANDUM OF LAW REGARDING ISSUES SET FORTH**
**<u>IN THIS COURT'S ORDER DATED JULY 5, 2007</u>**

Plaintiff Emhart Industries, Inc. ("Emhart") submits this memorandum of law pursuant to this Court's Order dated July 5, 2007 (the "July 5 Order"). As set forth in detail below, the Court should find as follows:

- Emhart is entitled to reimbursement for defense costs in the amount of $4,740,617.92 incurred in connection with the Centredale Manor Superfund Site in North Providence, Rhode Island (the "Site") as of October 19, 2006.

- Century Indemnity Company ("Century") is not entitled to set off the amount designated to the Site under Emhart's settlement agreement with Liberty Mutual; nor does Century have a legitimate claim for allocation of Emhart's defense costs to any other insurance policies. <u>Ins. Co. of N. Am. v. Kayser-Roth Corp.</u>, 770 A.2d 403 (R.I. 2001).

- Emhart's defense costs enjoy a presumption of reasonableness and need not be scrutinized. <u>Taco Bell Corp. v. Continental Cas. Co.</u>, 388 F.3d 1069 (7th Cir. 2004); <u>Ins. Co. of N. Am. v. Kayser-Roth Corp.</u>, 770 A.2d 403 (R.I. 2001). Century's second guessing of Emhart's defense costs and strategy is all the more egregious in light of the fact that Emhart is likely not responsible for the dioxin contamination at the Site and may have a complete defense to liability or at most only a divisible liability.

- Under Conanicut Marine Services, Inc. v. Insurance Co. of North America, 511 A.2d 967 (R.I. 1986), Emhart is entitled to reimbursement of its indemnification costs, because Century has breached its duty to defend and failed to avail itself of the exceptions to Conanicut liability. Further, the imposition of liability in excess of the face amount of an insurance policy upon Century is consistent with Conanicut.

- The Rhode Island Supreme Court would follow Conanicut under the circumstances of this case in view of its precedential value, Century's long and apparently willful delay in producing the relevant policy, and the strong public policy interest in requiring insurers to shoulder their burden in connection with the cleanup of Superfund sites.

In further support hereof, Emhart relies on its accompanying Proposed Findings of Fact and Conclusions of Law.

## DEFENSE COSTS

### A. Emhart Is Entitled To Reimbursement Of $4,740,617.92 In Defense Costs

Defense costs for which Emhart claims reimbursement total $4,740,617.92. Emhart incurred defense costs between the inception of its involvement in the Site in or around June 1999 and the jury verdict of October 19, 2006. These costs can be broken down into two broad categories: (1) defense costs for legal services and consultants in connection with the Site in the amount of $4,408,958.80 as reflected on invoices from Swidler Berlin Shereff Friedman, LLP and Bingham McCutchen LLP, PX-20[1]; and (2) additional professional and technical consultant costs related to Emhart's defense in the amount of $331,659.12. The latter amount represents the sum of the amounts set forth in two exhibits: (1) Trial PX-168A, and (2) PX-36B that was introduced into evidence on June 26, 2007. The professional and technical consultant costs were calculated by reviewing the relevant invoices and totaling the amounts set forth therein that were incurred prior to October 19, 2006. The parties have stipulated to the accuracy of the foregoing

[1] Emhart did not include in this calculation disbursements reflected on the Bingham McCutchen invoices for services provided during the month of October 2006, as it was not feasible to determine whether these disbursements occurred prior to or following October 19, 2006.

defense costs incurred by Emhart through October 19, 2006. See PX-37 (stipulation filed on June 22, 2007), and PX-38, (stipulation filed on September 8, 2006).

## B. Century Is Not Entitled To Setoff Or Allocation

### 1. Century Is Not Entitled To Setoff For The Liberty Mutual Settlement

Under Rhode Island law, Century may not look to other sources of contribution in an effort to reduce the amount of defense costs for which it is liable, including, without limitation, monies allocated for Emhart's defense costs related to the Site pursuant to Emhart's settlement agreement with Liberty Mutual (the "Settlement Agreement"). The facts of this case are analogous to Insurance Co. of North America v. Kayser-Roth Corp., 770 A.2d 403 (R.I. 2001), which held that a non-settling insurer is not entitled to either a setoff or other allocation credit on account of an insured's settlement agreements with other insurers. Insurance Co. of North America v. Kayser-Roth Corp., 770 A.2d 403, 412 (R.I. 2001). The Kayser-Roth court provided two rationales for its holding: the insurer's discovery misconduct and a public policy against allowing a non-settling insurer to benefit unjustly from its free rider status while other insurers settle. Both rationales are applicable to this case, and either should be sufficient to bar setoff or allocation. As the Kayser-Roth court explained:

> Although a setoff may be applied in an appropriate case, this is not such a case. First, as the trial justice correctly noted, [the insurer] had been precluded by its conduct from introducing any evidence at trial that other insurance existed to cover Kayser-Roth's losses as a result of the Stamina Mills spill. Therefore, [the insurer] could not carry its burden of proof in enforcing its rights concerning the existence of Kayser-Roth's other insurance. The settlement documents would not have been helpful to [the insurer] at trial; rather, a review of the applicable insurance policies was necessary. Id. at 414.

In Kayser-Roth, the insurer refused to comply with its discovery obligations and was found to have done so "'deliberately' to protect its legal position in another lawsuit." Id. at 411. As a result of its discovery misconduct, the insurer was precluded from presenting any evidence of the existence of other policies from which it might derive the benefit of setoff or other allocation credit. Id.

The facts of this case are substantially similar. The documentary evidence and the testimony of Ms. Alexandra Zajac, Century's claims agent, establish that Century engaged in a pattern of delay and evasion in searching its records for any Crown-Metro, Inc. ("Crown-Metro") policy that could provide coverage to Emhart, Crown-Metro's successor. Century could have conducted the search that eventually yielded the Primary Policy (as that term is defined in the Court's May 1, 2007 Order) when first provided notice of the EPA action. Century instead undertook a handful of narrower searches, the scope of at least one of which was not reasonably calculated to produce any policy. Only after years of resistance and after suit was filed did Century conduct an appropriate search and locate the Primary Policy. Then, inexplicably, Century delayed its production of the Primary Policy for an additional six months, until after the close of fact discovery in this case. The evidence gives rise to a strong inference of deliberate misconduct by Century.

The operative facts with respect to Century's misconduct are as follows:

By letter dated July 21, 1999, Emhart, through its agent, notified Century of the EPA action at the Site and demanded that Century provide Emhart with a defense and indemnify Emhart for its damages, costs, and expenses. See Trial PX-18A. The letter identified four excess policies with Century and named Emhart, USM Corporation, Black & Decker and Crown-Metro as the insureds. Id. Emhart included with this letter, along with the EPA's formal

information requests, a copy of a memorandum prepared by Emhart's attorney Jerome C. Muys, Jr. of the Swidler Berlin firm. Id. The memorandum detailed the various mergers and transactions that involved Emhart's predecessors, expressly naming, among other entities, Crown-Metro — an alleged operator at the Site identified in the EPA notice letter and the named insured on the Primary and Excess Policy (as the latter is defined in the Court's May 1, 2007 Order and, collectively, with the Primary Policy, the "Policies"). Id. Thus, from the outset, Century was aware that Crown-Metro was an insured.

Century responded by letter dated August 10, 1999, denying coverage on the ground that the four policies identified in the July 21, 1999 letter were excess policies and no duty to defend or indemnify arose until any primary policy was exhausted. See Trial PX-20. Century made no independent effort to determine or confirm the corporate successor relationship between Crown-Metro and Emhart. See 6/27/07 Tr., at 21:6-10. Century has presented no evidence that in response to the July 21, 1999 letter it made any effort to locate any additional potentially applicable policies, including the Primary Policy.

By letter dated November 11, 2000, Emhart requested that Century undertake a broad search for any additional policies provided to Crown-Metro and sought a response within twenty days. See Trial PX-24A. Century did not do so. See 6/27/07 Tr., at 44:12-22. Instead, by letter dated December 12, 2000, Century stated that it would search for only one policy in addition to the four excess policies previously identified. See Trial PX-26.

Emhart, by letter dated January 3, 2001, responded by reiterating its request for a broad search and by asking to be informed if Century were refusing to do so. See Trial PX-27 ("In addition, you will notice that in our November 22, 2000 letter, we requested that you conduct 'a review of your records regarding this confirmed coverage *and* any additional insurance

coverage' INA provided to Crown Metro, Inc. Although you have agreed to conduct an internal search for policy 64674, you did not agree to conduct the broader search requested. If you are refusing to conduct such a search, please so state in writing.").

Astonishingly, in response to Emhart's repeated request for a broad search, Century did a search according to narrow criteria designed to yield general liability policies issued to Crown-Metro that had an *eight year term with an alleged inception date of December 2, 1968 and expiration date of December 31, 1976* — a term unheard of in general liability insurance. See DX-365. Ms. Zajac's testimony that this search would have yielded any general liability policy effective for any part of the eight-year period is not credible, see 6/27/07 Tr., at 49:7-50:20, in light of the fact that a later search without such restrictive temporal limitations located the Primary Policy. Century did not respond to Emhart's request that it be informed in writing if Century were refusing to conduct a broad search. Nor did Century inform Emhart of the search criteria it actually employed in response to Emhart's January 3, 2001 letter, nor even whether it conducted any search at all.

On January 25, 2002, Emhart initiated this action. Not until August 29, 2002, in response to Emhart's discovery requests, did Ms. Zajac request that a search be performed that was broad enough to locate the Primary Policy. See 6/26/07 Tr., at 155:6-156:1. On that date, Ms. Zajac sent a search request to searcher Cindy Crutcher for all general liability, workers compensation, and excess liability policies issued to Crown-Metro (as well as other potentially related entities) that was open-ended as to inception and expiration dates. See DX-431. Ms. Zajac provided a twelve-week deadline of November 21, 2002 for completion of the search. Id. This search, however, was not initiated until December 30, 2002, four months after Ms. Zajac's request and a month after the deadline for its completion. See DX-508; 6/26/07 Tr., at 156:2-20. The Primary

Policy was sent to Ms. Zajac on January 7, 2003. See 6/26/07 Tr., at 156:21-25; 6/27/07 Tr., at 27:19-29:7.

Finally, on July 2, 2003 — four years after Emhart's first search request, six months after the Primary Policy was finally located, and three months after the close of fact discovery, see February 4, 2003 Docket Entry — Ms. Zajac forward the Primary Policy to litigation counsel. See DX-446. Ms. Zajac's testimony that she did not receive the Primary Policy until early July 2003, six months after it was located and shortly before it was produced, is not credible. See 6/26/07 Tr., at 157:1-158:4 ("I came into work one morning, and I sat at my desk, and I started going through some material that was left for me on my desk. And as I was going through various documents, I came across this [P]rimary [P]olicy."); 6/27/07 Tr., at 25:1-26:10. Century finally denied coverage for boilerplate reasons on April 20, 2005, three years after the commencement of this lawsuit. Id. at 47:4.

In light of the foregoing, the evidence supports an inference that Century, like the insurer in Kayser Roth, deliberately withheld information in an effort to avoid its obligations to Emhart. Century should not be allowed to profit from the years-long shell game it played with respect to the Primary Policy. Accordingly, Century should be barred from setoff or allocation under Kayser-Roth.

The Kayser-Roth court articulated a second rationale for denying the setoff or allocation credit sought by the insurer:

> Furthermore, as the trial justice also correctly noted, "public policy [militates]*** strongly against [the insurer] receiving a windfall [as a result of its conduct]." To allow [the insurer] a setoff beyond the credit given for the Aetna policies would have the effect of discouraging insurers from settling in the future and would reward [the insurer] for its conduct in the instant case.

Kayser-Roth, 770 A.2d at 414.

In this case, allowing Century a setoff or other allocation credit would create an incentive for insurers to wait for other insurers to settle first and to take advantage of their "free rider" status. The Kayser-Roth court would not countenance such a result, nor should this Court, particularly in light of the taint on Century's conduct.

**2. Century Is Not Entitled To Allocation**

Even were Kayser-Roth somehow inapplicable to this case, a Rhode Island court would not allow Century to allocate its responsibility for defense costs to other policy periods. Beginning with the Policies themselves, under the Primary Policy, Century promised to pay "all sums" that "the insured shall become legally obligated to pay as damages because of . . . property damage to which this insurance applies . . .," and stated that Century would have the right and duty to defend any suit seeking such damages. Trial PX-2 at CIC0483. Under the Excess Policy, upon exhaustion of the Primary Policy, Century promised to indemnify Emhart for the "ultimate net loss . . . which the insured shall become legally obligated to pay as damages because of . . . property damage [to] which this insurance applies" and to defend any suit seeking damages on account of such property damage. Trial PX-1 at CIC0154.

By the terms of its policies, therefore, Century must pay for its insured's liability that arises out of covered property damage within the policy period, up to the policy limits, and must defend any suit seeking to impose such liability. Nothing in the policies makes Emhart's rights to a defense or to indemnification under the policies contingent on the extent of Emhart's coverage in other years. The existence or lack of coverage in prior or subsequent years neither depletes Emhart's rights nor exonerates Century of its obligations.

Century cannot allocate its obligations simply because Emhart cannot allocate the liability for which it sought a defense. Where property damage that takes place in one year is indivisible from property damage taking place in other periods, the insured is jointly and severally liable for the totality of the property damage in any given such year. See e.g., O'Neil v. Piccillo, 883 F.2d 176 (1st Cir. 1989). Because Emhart's liability for the indivisible property damage that took place, in part, during the policy period equals its entire liability for the Site, Century is bound by its policies to defend and indemnify Emhart for this entire liability. See Kayser-Roth, 770 A.2d at 412-414 (rejecting insurer's legal arguments that insured's liability should be allocated, pro rata, across each year property damage took place, and citing Koppers Co. v. Aetna Cas. & Sur. Co., 98 F.3d 1440 (3d Cir. 1996) for the proposition that each carrier on the risk during an injury spanning more than one policy period is liable for the full amount of the insured's resulting liability); see also, e.g., AcandS v. Aetna Cas. & Sur. Co., 764 F.2d 968, 973 (3d Cir. 1985)(stating that whether the insured's liability is partly attributable to injury taking place outside the policy period is "irrelevant" under the policy language). That property damage may have taken place in other periods is of no consequence because it is not the quantum of *damage* during the policy period that determines the extent of an insurer's defense and indemnity obligations, but the extent of the insured's *liability* arising from damage that takes place at least in part during the policy period. See Kayser-Roth, 770 A.2d at 414; and ACandS, 764 F.2d at 973. Because the insured's liability is indivisible, and cannot be allocated, neither can the insurer's defense or indemnity obligation.

To the extent the Court finds Rhode Island law unsettled on this issue, the rulings of Massachusetts courts provide further guidance. See Providence & Worcester R&R Co. v. Sargent & Greenleaf, Inc., 802 F. Supp. 680, 685 (D.R.I. 1992) ("[i]n undertaking this forecast,

the court must look to relevant, i.e. analogous, state court decisions . . . and may assay sister state adjudications of the issue")(applying Massachusetts law)(quoting Hart Engineering Co. v. FMC Corp., 593 F. Supp. 1471, 1482 (D.R.I. 1984)).

As the Massachusetts Supreme Judicial Court recently recognized, Massachusetts courts have consistently rejected insurer arguments that defense and indemnity costs must be allocated "pro rata" to each year, or to each policy in effect, during a multi-year injury. A.W. Chesterton Co. v. Massachusetts Ins. Insolvency Fund, 838 N.E.2d 1237, 1242, n.3 (Mass. 2005). Under Massachusetts law, an insurer on the risk during an injury spanning multiple years is responsible for the insured's entire defense of a claim alleging such injury, until exhaustion of its indemnity obligation. See Rubenstein v. Royal Ins. Co. of Am., 694 N.E.2d 381, 386 (Mass. App. Ct. 1998)(holding insured "entitled to a full and complete defense from every insurer having a duty to defend"); High Voltage Engineering Corp. v. American Employer's Ins. Co., 1995 WL 809577 No. 941033 at *5 (Mass. Super. July 7, 1995)(holding that "on the basis of the 'all sums' language of the Policy, [the insurer] is obligated to provide full coverage to [the insured], and is therefore jointly and severally liable for the costs incurred in defending against [the underlying lawsuit]"); see also Chicago Bridge & Iron Co. v. Certain Underwriters at Lloyd's, London, 797 N.E.2d 434 (Mass App. Ct. 2003)(refusing to allocate defense obligation and observing that because "defense costs were not expended in direct relation to the timing, duration, or degree of the contamination," they were not allocable to other years)(applying Illinois law).[2] The Court should reject Century's allocation argument on the same grounds.

---

[2] The courts of numerous jurisdictions have reached the same result. See, e.g, Ray Industries, Inc. v. Liberty Mut. Ins. Co., 974 F.2d 754, 770 (6th Cir. 1992)(Michigan law)(rejecting insurer's allocation argument and holding insurer liable for all defense costs); ACandS, Inc. v. Aetna Cas. & Sur. Co., 764 F.2d 968, 974 (3rd Cir. 1985)(Pennsylvania law)(affirming district court decision denying pro rata allocation); Keene Corp. v. Ins. Co. of North America, 667 F.2d 1034, 1050 (D.C. Cir. 1981), *vacated on other grounds*, at 631 F. Supp. 34 (D.D.C. 1985)("Because we hold that each insurer is fully liable to Keene for indemnification, it follows that each is fully liable for defense costs."); Lincoln Elec. Co. v. St. Paul Fire and Marine Ins. Co., 10 F. Supp. 2d 856, 870 (N.D.

Additionally, Century may not seek to set off or allocate defense costs to other insurers because it has not met its evidentiary burden of showing that a duty to defend exists under any other insurance policy. See Dash v. Chicago Ins. Co., No. Civ.A. 00-11911-DPW, 2004 WL 1932760 at *9 n.20 (D. Mass. Aug. 23, 2004)("Courts which allow defense cost allocation generally place the burden of proof of allocation with the insurer."); Liberty Mut. Ins. Co. v. Metropolitan Life Ins. Co., 260 F.3d 54, 63 (1st Cir. 2001)("[W]hen allocation of defense costs is possible, the burden of allocation generally falls on the insurer.").[3] Indeed, Century cannot meet this burden because essentially all other potentially applicable policies contained some form of pollution exclusion precluding coverage. In his affidavit, Rodney J. Taylor, managing director of Aon Environmental Services Group of Jericho, New York, noted:

> In the summer of 1970, U.S. insurers writing general and excess liability coverage adopted the so-called 1970 Insurance Services Office (ISO) Pollution Exclusion, which contained an exception

---

Ohio 1998), *aff'd in part, rev'd in part on other grounds*, 210 F.3d 672 (6th Cir. 2000)("With regard to allocating a particular fumes claim to specific 'triggered' occurrence policies, Lincoln Electric is entitled to select that triggered policy which will pay all of Lincoln Electric's defense costs in a particular case."); Monsanto Co. v. C.E. Heath Comp. & Liab. Ins. Co., 652 A.2d 30, 35 (Del. 1994)(applying Missouri law)(under an "all sums" policy, the insurance companies could not limit their payments to a pro rata share of the policyholder's liabilities); Zurich Ins. Co. v. Raymark Ind., Inc., 514 N.E.2d 150, 165 (Ill. 1987)("Having rejected the premise underlying the *pro rata* allocation approach adopted in Forty-Eight Insulations, we conclude that the appellate court did not err insofar as it declined to order the *pro rata* allocation of defense and indemnity obligations among the triggered policies."); but cf. Outboard Marine Corp. v. Liberty Mut. Corp., 670 N.E.2d 740 (1996), and Missouri Pac. R.R. Co. v. Int'l Ins. Co., 679 N.E.2d 801 (1997)(both cases holding that a pro rata, time-on-the-risk allocation approach is appropriate); Kuhn v. Grant County, 201 Kan. 163, 170 (1968)(denying allocation); Continental Cas. Co. v Rapid-American Corp., 80 N.Y.2d 640, 655-56 (N.Y. 1993)("When more than one policy is triggered by a claim, pro rata sharing of defense costs may be ordered, but we perceive no error or unfairness in declining to order such sharing, with the understanding that the insurer may later obtain contribution from other applicable policies.")(internal citations omitted); Owens-Corning Fiberglas Corp. v. Am. Centennial Ins. Co., 660 N.E.2d 770, 793- 95 (Ohio Misc. 1995)("[O]nce an insurer is chosen, that insurer is required to pay in full."); J.H. France Refractories Co. v. Allstate Ins. Co., 626 A.2d 502, 507 (Pa. 1993)("Under any given policy, the insurer contracted to pay *all sums* which the insured becomes legally obligated to pay, not merely some pro rata portion thereof."); American Nat'l Fire Ins. Co. v. B & L Trucking & Constr. Co., 951 P.2d. 250 (Wash. 1998)(allowing insured to collect from any of the insurers whose policies had been triggered).

[3] As previously stated, where, as here, Rhode Island is silent on a question of law, it is appropriate for a Rhode Island court to look to Massachusetts law. See supra Providence & Worcester R&R Co., 802 F. Supp. at 685 (D. R.I. 1992)("[i]n undertaking this forecast, the court must look to relevant, i.e. analogous, state court decisions . . . and may assay sister state adjudications of the issue")(applying Massachusetts law)(quoting Hart Engineering Co. v. FMC Corp., 593 F. Supp. 1471, 1482 (D.R.I. 1984)).

> for claims arising out of sudden and accidental releases of pollutants (hereinafter referred to as "1970 ISO Pollution Exclusion"). In 1986 these same insurers adopted a more comprehensive form of pollution exclusion known as the ISO "Absolute Pollution Exclusion", which did not include the exception for sudden and accidental releases that appeared in the 1970 ISO Pollution Exclusion. From the adoption of the 1970 ISO Pollution Exclusion through the present, the generally available primary and excess liability insurance for commercial industrial and institutional risks in the United States contained either the 1970 ISO Pollution Exclusion or the Absolute Pollution Exclusion.

Affidavit of Rodney J. Taylor at 5, Docket No. 372.

Assuming *arguendo* that Century's obligations should be reduced to account for settlement payments Emhart received from Liberty Mutual, any such setoff must not exceed the amount allocated by the Settlement Agreement for the Site. See Ins. Co. of North America v. Kayser-Roth Corp., 770 A.2d 403, 414 (R.I. 2001). Offsetting Century's obligations by any amount greater than those allocated under the Settlement Agreement for defense and indemnity in connection with the Site would fail to make Emhart whole, and would deprive Emhart of the protection for which it paid. Id.

Finally, there is absolutely no basis to Century's contention that the Settlement Agreement, in whole or in part, resulted from collusion. The deposition testimony of the Liberty Mutual and Emhart representatives taken pursuant to the Court's June 26, 2007 Order provides not a scintilla of evidence in support of this misbegotten notion. On the contrary, their testimony reveals that the Settlement Agreement was the product of arduous, arms-length negotiations between adversaries. The evidence shows that negotiations involved multiple rounds of proposals and counter-proposals through which the parties gradually resolved their conflicting interests. The amounts specifically allocated to defense and indemnity for the Site need to be understood in the context of the parties' efforts to achieve a global resolution of numerous

outstanding claims under numerous policies involving numerous entities. There is no evidence that the specific amounts for the Site reflect collusion between Emhart and Liberty Mutual. Thus, the testimony lends no credence or support to Century's contention that the Settlement Agreement was collusive.

**C. Century Must Reimburse Emhart For Defense Costs Above The Excess Policy's Limit of Liability**

Under the plain language of the Policies, Century is liable for defense costs above its limits of liability. The Policies impose on Century two separate and distinct duties to its insured — a duty to defend and a duty to indemnify — and the Policies' plain language provides that the Policies' limits of liability apply only to the duty to indemnify. Because the policy language makes clear that payment of defense costs does not erode the limits of liability of the Policies, Century must reimburse Emhart for defense costs even if such costs exceed the Policies' limits of liability.

Under the Primary Policy, Century promised to "pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of . . . property damage to which this insurance applies, caused by an occurrence." Trial PX-2 at CIC 0483. Separate and distinct from this duty to indemnify Emhart, Century promised to "defend any suit against the Insured seeking damages on account of such . . . property damage." Id. Century becomes absolved of this duty to defend only "after the applicable limit of the Company's liability has been exhausted *by payments of judgments or settlements*." Id. (emphasis added). Because payment of defense costs does not constitute payment of judgments or settlements, defense cost payments do not exhaust, or reduce, the policy limits. In other words, the Primary Policy's limits do not cap Century's defense obligation.

Despite employing slightly different wording, the same is true under the Excess Policy. Under the Excess Policy, Century promised to "indemnify the Insured for ultimate net loss in excess of the retained limit hereinafter stated [i.e. the limits of underlying insurance] which the insured shall become legally obligated to pay as damages because of . . . property damage . . . to which this insurance applies, caused by an occurrence." Trial PX-1 at CIC 0154. In addition, upon exhaustion of underlying insurance, Century promised to "defend any suit against the insured seeking damages on account of such . . . property damage." Id. As with the Primary Policy, Century's duty to defend ceases only "after [Century's] limit of liability has been exhausted *by payment of judgments or settlements.*" Id. Again, like the Primary Policy, because defense costs constitute neither judgments nor settlements, defense costs payments neither erode, nor are capped by the policy limits.

This conclusion is bolstered by the express exclusion of defense costs from the definition of the "ultimate net loss" for which Century is bound to indemnify Emhart. The Excess Policy defines "ultimate net loss" as "the sum actually paid or payable in cash in the settlement or satisfaction of losses for which the insured is liable either by adjudication or compromise with the written consent of INA, after making proper deduction for all recoveries and salvages collectible, *but excludes all loss expenses and legal expenses including attorneys' fees [and] court costs.*" Id. at CIC 0155 (emphasis added). Having described its defense obligation as a duty separate and distinct from its indemnity obligation, and having expressly excluded defense costs from its duty to indemnify, Century made clear that defense costs are not capped by the policy limits, and that payment of such costs do not reduce those limits. Id. at CIC 0154-55. Had Century intended otherwise, it could easily have written the policy to provide as much. Having failed to do so, Century must not be permitted to rewrite the policies after the fact to

minimize its obligations. See 56 Assocs. v. Firebrand, 89 F.Supp.2d 189, 193 (D.R.I. 2000) (policy terms must be "applied as written" and "a court is not free to rewrite a policy or read provisions into it"). Accordingly, Century is responsible for all of Emhart's defense costs, regardless of the limits of the Excess Policy.

**D. The Rhode Island Supreme Court Would Apply The *Taco Bell* Standard Under The Circumstances Of This Case**

The reasoning of the Seventh Circuit court in Taco Bell Corp. v. Continental Cas. Co., 388 F.3d 1069 (7th Cir. 2004), has clear application in this case. Like the insurer in Taco Bell, Century had every opportunity to provide a defense for Emhart and take control of the litigation. Century could have chosen the lawyers, overseen their work, reviewed their bills, and decided case strategy. Instead, Century chose neither to live up to its contractual duty nor to avail itself of the policy provisions allowing it to control the defense. Indeed, Century denied it had any duty to defend up until the jury verdict. Emhart was left to fend for itself in the EPA administrative action as one of the only solvent PRPs facing potential liability for an environmental cleanup that eventually could total hundreds of millions of dollars.

Century now has the audacity to engage in unabashed and unseemly second guessing of the conduct of Emhart's defense, caviling over large strategic decisions, such as identifying and pursuing other PRPs, and carping about the most minute billing practices of Emhart's attorneys, including the quarter-hour billing units and the individual narrative entries in their invoices.[4] In this regard, the opinion of Century's expert, Mr. Larry Silver, that Emhart's bills were excessive is inherently unreliable. Mr. Silver admitted that he never actually reviewed all the Swidler

[4] This situation is conceptually different from situations where a prevailing party asks for attorneys' fees and costs under a cost shifting statute. Where, as here, the insurer had the contractual right to assume the insured's defense, the insurer should be *estopped* from challenging the reasonableness of the insured's defense costs. See Taco Bell Corp. v. Cont'l Cas. Co., 388 F.3d 1069, 1075-77 (7th Cir. 2004); Ins. Co. of N. Am. v. Kayser-Roth Corp., 770 A.2d 403 (R.I. 2001).

Berlin or Bingham McCutchen legal invoices, but rather he had unidentified persons do it for him. [7/26/07 Silver Dep. Tr., at 177:12-179:8.] For this reason alone, Mr. Silver's testimony concerning work descriptions and time devoted to certain projects and opinions flowing therefrom should be given no weight.

The exercise of such hindsight is particularly egregious in light of the evidence that Emhart probably is not responsible for the dioxin contamination of the Site and may have a complete or divisibility defense to liability. See 6/25/07 Tr., at 87:15- 88:10; In re Bell Petroleum Servs., 3 F.3d 889, 903 (5th Cir. 1993)("If the expert testimony and other evidence establishes a factual basis for making a reasonable estimate that will fairly apportion liability, joint and several liability should not be imposed in the absence of exceptional circumstances."); United States v. Alcan Aluminum Corp., 990 F.2d 711, 722 (2d Cir. 1993)("Alcan may escape any liability for response costs if it either succeeds in proving that its oil emulsion, when mixed with other hazardous wastes, did not contribute to the release and the clean-up costs that followed, or contributed at most to only a divisible portion of the harm."). Emhart's potential absolute and divisibility defenses to liability ought to have motivated Century to defend Emhart vigorously. Century, however, has never seen fit to take Emhart's defenses to liability seriously.

The economic, contractual and public policy considerations informing the Taco Bell court's analysis of the reasonableness of the insured's defense costs are on all fours with this case. The Taco Bell court reasoned:

> ... Zurich [the insurer] complains about the amount of defense costs incurred by Taco Bell [the insured]. Zurich submitted an affidavit by a firm that hires itself out to review lawyers' bills and that opined that Taco Bell had overpaid the lawyers who represented it in the Wrench litigation. We are unimpressed, as was the district court. When Taco Bell hired its lawyers, and indeed at all times since, Zurich was vigorously denying that it had any duty to defend — any duty, therefore, to reimburse Taco Bell. Because of the resulting uncertainty about reimbursement, Taco Bell had an incentive to minimize its legal expenses (for it

> might not be able to shift them); and where there are market incentives to economize, there is no occasion for a painstaking judicial review. The affidavit of the firm that picked through Taco Bell's legal bills is excruciatingly detailed. The amount of time and money that went into its preparation and would be incurred in adjudicating its accuracy probably exceeds the potential excesses that it identifies.
>
> ....
>
> Furthermore, although Zurich's policy entitled it to assume Taco Bell's defense, in which event Zurich would have selected, supervised, and paid the lawyers for Taco Bell in the Wrench litigation, it declined to do so — gambling that it would be exonerated from a duty to defend — with the result that Taco Bell selected the lawyers. Had Zurich mistrusted Taco Bell's incentive or ability to economize on its legal costs, it could, while reserving its defense that it had no duty to defend, have assumed the defense and selected and supervised and paid for the lawyers defending Taco Bell in the Wrench litigation, and could later have sought reimbursement if it proved that it had indeed had no duty to defend Taco Bell. So presumably it had some confidence in Taco Bell's incentive and ability to minimize legal expenses. We add that the duty to defend would be significantly undermined if an insurance company could, by the facile expedient of hiring an audit firm to pick apart a law firm's billing, obtain an evidentiary hearing on how much of the insured's defense costs it had to reimburse.

Taco Bell Corp. v. Cont'l Cas. Co., 388 F.3d 1069, 1075-77 (7th Cir. 2004)(citations omitted).

The Rhode Island Supreme Court has indicated that it would apply the same contract and public policy principles underpinning the Taco Bell decision in the closely analogous situation of an insurer's duty to indemnify. In Insurance Company of North America v. Kayser-Roth Corporation, 770 A.2d 403 (R.I. 2001), an insurance company breached two of its insurance policies by failing to defend and indemnify its insured against claims by the EPA relating to a Superfund cleanup site. Id. at 405. When the insurer challenged the indemnification costs based on its retrospective critique of the results obtained by the insured, the Rhode Island Supreme Court, affirming the lower court, stated:

> So, while First State [the insurer] may contend that the EPA charges are too high, are redundant, or that Kayser-Roth [the insured] should attempt to mitigate its damages by contesting or negotiating the charges, First State has missed its opportunity to defend Kayser-Roth against the EPA and cannot now stand back and quibble with the job Kayser-Roth has done in defending itself.

Id. at 419.

Like Taco Bell, Kayser-Roth in effect establishes a presumption in favor of the reasonableness of all proven costs in order to temper reliance on hindsight, conserve judicial resources, and discourage reactionary denials of coverage. This is especially true where, as the Kayser-Roth court observes, an insured is left to provide its own defense in a Superfund action because of "the magnitude of the EPA cleanup efforts." Id. at 419. The Rhode Island Supreme Court would presume the reasonableness of Emhart's defense costs, in light of the reasoning of the Taco Bell and Kayser-Roth decisions.

## BREACH OF THE DUTY TO DEFEND

### A. Century Breached Its Duty To Defend Emhart Under *Conanicut*

The law in Rhode Island regarding damages arising from an insurer's breach of the duty to defend is settled. In Conanicut Marine Serv. Inc. v. Ins. Co. of North America, 511 A.2d 967 (R.I. 1986), the Rhode Island Supreme Court held that "where an insurer refuses to defend an insured pursuant to a general-liability policy, the insurer will be obligated to pay, in addition to the costs of defense and attorneys' fees, the award of damages or settlement assessed against the insured." Id. at 971. There is no dispute that Emhart provided Century notice of its claims under all applicable policies. Century's counsel acknowledged this fact in closing argument, stating, "Now, we're not contesting notice here. Century did, in fact, get notice of the Centredale site back in 1999. It wasn't under these policies, but it wasn't under any other. Century has never said it would not honor any coverage obligation to Emhart because it didn't get adequate notice." 7/02/07 Tr., at 69:4-9. The Court, moreover, has determined that Century had a duty to defend Emhart pursuant to its May 1, 2007 Order. To date Century has paid not one penny of Emhart's

defense costs. When Century failed to provide Emhart with a defense despite adequate notice of the EPA proceedings, it breached its duty to defend Emhart.

Century cannot avail itself of either of the exceptions to Conanicut liability. The Conanicut court noted two means by which an insurer could shield itself from liability for breach of the duty to defend: an insurer could (1) enter into a non-waiver agreement and provide a defense under a reservation of rights or (2) bring a declaratory judgment action as to the question of coverage. Conanicut at 971. Century did neither. Because it failed to enter into a non-waiver agreement or commence a declaratory judgment action, Century cannot escape the full weight of Conanicut liability.

Century argues, citing no supporting authority, that its counterclaim for declaratory judgment satisfies the declaratory judgment exception to Conanicut. In closing argument Century's counsel asserted, "Emhart filed this lawsuit against several insurers, including Century. In response to that, Century filed an answer and affirmative defenses denying coverage. At that point, Century was asking the Court to decide the very issue as to whether there's coverage or not, therefore, Conanicut didn't apply because Century denied coverage after first having the policy involved in this lawsuit." 7/02/07 Tr., at 70:11-15.

This argument lacks any legal basis. As an initial matter, there is no evidence that the ultimate result of Century's denial of coverage would have been any different had Century found the Primary Policy earlier. Thus, Century's argument that it is exempted from liability for Emhart's indemnification because it did not deny coverage until after its counterclaim was filed is irrelevant and, in any event, was due only to its dilatory conduct in searching for and producing the Primary Policy. The fact that the jury ultimately denied coverage under the Policies for one of the reasons cited by Century in its summary judgment motion is equally

irrelevant. Conanicut provides for an insurer's payment of an insured's indemnification costs where, as here, an insurer has breached its duty to defend, regardless of whether coverage is required under the policy at issue and notwithstanding the jury verdict. See also Michaud v. Merrimack Mut. Fire Ins. Co., 1994 U.S. Dist. LEXIS 19930 C.A. No. 94-0175B at *23 (D.R.I. Nov. 16, 1994).

Century's argument that it should be excepted from Conanicut liability is also groundless because a counterclaim is not the same as a claim. Emhart commenced this lawsuit, seeking a declaratory judgment as to *all* applicable policies issued by Century. Century has no one but itself to blame for what *at best* can be characterized as its negligence in locating the Primary Policy and producing it *after* the close of fact discovery. Now Century has the temerity to seek to benefit from what could only in the most charitable terms be described as its "mistakes." Even if a counterclaim could somehow be deemed the equivalent of commencing a declaratory judgment action, which it should not, Century, by its own conduct, should be estopped from availing itself of the declaratory judgment exception to Conanicut. If an insurer were permitted to avoid Conanicut liability by *counterclaiming* for a declaratory judgment, the exception would swallow the rule.

Additionally, Century misstates the Conanicut standard for breach of the duty to defend. Century contends that Conanicut requires a "wrongful refusal" on the part of the insurer to provide a defense to support a finding of breach of the duty to defend. In fact, the Conanicut court explicitly rejected any bad faith requirement. See Conanicut at 970-971 ("The defendant urges this court to hold that where an insurer in good faith refuses to defend an insured the insurer will not be required to pay settlement or damages awarded against the insured until the issue of coverage has been determined. However, we are not persuaded by defendant's argument

and refuse to adopt such a ruling.") The precise language of the Conanicut holding is as follows: "We hold that where an insurer refuses to defend an insured pursuant to a general-liability policy, the insurer will be obligated to pay, in addition to the costs of defense and attorneys' fees, the award of damages or settlement assessed against the insured." Id. at 971. Nowhere does the holding of the Conanicut court include the word "wrongful." If a duty to defend exists and the insured provides the insurer with adequate notice of a claim, the insurer is obligated to provide a defense or face Conanicut liability. Id.; see also Employers Mut. Cas. Co. v. PIC Contractors, Inc., 24 F. Supp.2d 212, 215 (D.R.I. 1998)(an insurer must provide a defense when the facts and circumstances alleged in the underlying complaint raise a "reasonable possibility of coverage" of the claim).

Even if Conanicut establishes a "wrongful refusal" standard, which it does not, Century's failure to provide a defense was indeed wrongful. As discussed above, Century's inaction and delays in searching for and producing the Primary Policy, followed by its denial of coverage for boilerplate reasons, rises to the level of wrongful refusal. See infra at pp. 4-7. Accordingly, were the Court to adopt a "wrongful refusal" standard, which it should not, Century should still be found to have breached its duty to defend.

### B. The Rhode Island Supreme Court Would Apply *Conanicut* Under The Circumstances Of This Case

The most compelling reason for the Court to apply Conanicut is Conanicut itself. Conanicut, a decision rendered by the highest court in Rhode Island, is settled law and precedent that should not lightly be disturbed. See Norton v. McOsker, 407 F.3d 501, 506 (1st Cir. 2005) (noting that "[a]s a federal court sitting in diversity, our task is to interpret and apply as best we can the state rules of decision. Relying on pronouncements of the [Rhode Island] supreme court . . . ultimately our task is to ascertain the rule the state court would most likely follow under the

circumstances, *even if our independent judgment on the question might differ*.")(emphasis added)(internal citations omitted). Additionally, in Michaud v. Merrimack Mut. Fire Ins. Co., 1994 U.S. Dist. LEXIS 19930 C.A. No. 94-0175B (D.R.I. Nov. 16, 1994), the Rhode Island federal district court, applying Conanicut, stated:

> The Conanicut holding may seem harsh in view of the fact that Merrimack does appear to have a meritorious argument that no coverage exists for the Keene action. This issue has been addressed by courts in other jurisdictions which have reached different results than the Rhode Island Supreme Court. For example, in Polaroid Corp. v. Travelers Indem. Co., 414 Mass. 747, 610 N.E.2d 912 (Mass. 1993), the court rejected the result adopted in Conanicut. . . . It matters little whether I favor the rule established in Massachusetts or that in Rhode Island. Here, Rhode Island law applies.

Michaud v. Merrimack Mut. Fire Ins. Co., 1994 U.S. Dist. LEXIS 19930 C.A. No. 94-0175B at *23-25 (D.R.I. Nov. 16, 1994). Because Conanicut establishes the precedent for the proper measure of damages for breach of an insurer's duty to defend, it should be applied in this case.

Similarly, certification of the question of the applicability of Conanicut in this case to the Rhode Island Supreme Court would be inappropriate. Pursuant to Rule 6(a) of the Rhode Island Supreme Court Rules of Appellate Procedure, "[t]his Court may answer questions of law certified to it by . . . a United States District Court when requested by the certifying court if there are involved in any proceeding before it questions of law of this state which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court *there is no controlling precedent in the decisions of this Court*." (emphasis added). The requirement of "no controlling precedent" is clearly not met in this instance, as Conanicut has been neither subsequently limited nor criticized by any court in Rhode Island.

The First Circuit has squarely addressed the issue of when certification is appropriate and has concluded that it is improper to seek certification to persuade a state court to extend or

overrule the current state of the law. See Cantwell v. Univ. of Mass., 551 F.2d 879, 880 (1st Cir. 1977)(the purpose of certification is not "to permit a party to seek to persuade the state court to change what appears to be present law"). Accordingly, because Conanicut is the settled law of Rhode Island, the Court should not certify the question of whether Conanicut applies to the present circumstances to the Rhode Island Supreme Court.

A Conanicut measure of damages, moreover, is within the mainstream of American insurance law. The courts of numerous other jurisdictions have concluded that reimbursement of the insured's reasonable settlement costs, together with its actual defense costs, is the proper measure of damages for breach of the insurer's duty to defend.[5] Missionaries of the Co. of Mary, Inc. v. Aetna Cas. & Sur. Co., 230 A.2d 21 (Conn. 1967), is particularly apposite. The Missionaries court held that an insurer found to have breached the duty to defend would be responsible for the full amount of "the obligation reasonably incurred by [the insured]." Id. at 26. In response to the insurer's argument that recovery was barred because the insured's claim

[5] See, e.g., Capitol Reprod., Inc. v. Hartford Ins. Co., 800 F.2d 617, 624 (6th Cir. 1986)(applying Michigan law and affirming the district court's award of the cost of the settlement for defendant's breach of its duty to defend); Rhodes v. Chicago Ins. Co., 719 F.2d 116, 120-21 & n.5 (5th Cir. 1983)(applying Texas law); Blakely v. Am. Employers' Ins. Col., 424 F.2d 728, 734 (5th Cir. 1970)(applying Texas law); State Farm Fire & Cas. Co. v. Ruiz, 36 F. Supp.2d 1308, 1318 (D.N.M. 1999)(holding insurer liable for the amount of the settlement entered into by insured because of insurer's breach of the duty to defend); Race City Fasteners, Inc. v. Selective Ins. Co. of South Carolina, 2007 WL 1340404, *7-8 (W.D.N.C. 2007)(noting that "[b]oth Rhode Island and North Carolina law hold that when an insurer breaches its duty to defend, it waives its right to rely on any coverage defense and is then liable for the full amount of any judgment or settlement against its insured in the action it refused to defend"); Menasha Corp. v. Lumbermens Mut. Cas. Co., 361 F. Supp.2d 887, 892 (E.D. Wis. 2005); Galen Health Care, Inc. v. Am. Cas. Co. of Reading, Pa., 913 F.Supp. 1525, 1533 (M.D. Fla. 1996); Grindheim v. Safeco Ins. Co. of Am., 908 F. Supp. 794, 808 (D. Mont. 1995); St. Paul Fire & Marine Ins. Co. v. Vigilant Ins. Co., 724 F. Supp. 1173 (M.D.N.C. 1989), *aff'd in relevant part and rev'd in part*, 919 F.2d 235, 240 (4th Cir. 1990); Beckwith Mach. Co. v. Travelers Indem. Co., 638 F.Supp. 1179, 1188-1189 (W.D. Pa. 1986)(insurer's breach of duty to defend estopped insurer from claiming insured's settlement was not within policy coverage); Sauer v. Home Indem. Co., 841 P.2d 176, 184 (Alaska 1992); Employers Ins. of Wausau v. Ehlco Liquidating Trust, 708 N.E.2d 1122, 1130 (Ill. 1999); Ames v. Cont'l Casualty Co., 340 S.E.2d 479, 485 (N.C. 1986), *review denied*, 345 S.E.2d 385 (N.C. 1986); Nixon v. Liberty Mut. Ins. Co., 120 S.E.2d 430, 436 (N.C. 1961); Truck Ins. Exch. v. VanPort Homes, Inc., 58 P.3d 276, 284 (Wash. 2002)(finding insurer liable for settlement entered into by insured and stating that "hold[ing] otherwise would provide an incentive to an insurer to breach its policy"); and Prof'l Office Bldgs., Inc. v. Royal Indem. Co., 427 N.W.2d 427, 431 (Wis. Ct. App.), *review denied*, 436 N.W.2d 30 (Wis. 1980).

was not covered under the policy, the court stated, "The defendant, after breaking the contract by its unqualified refusal to defend, should not thereafter be permitted to seek the protection of that contract in avoidance of its indemnity provisions." Id. Once an insurer has breached its duty to defend, it should not then be allowed to pick and choose which provisions of the policy it wants to enforce. Similarly here, jury verdict notwithstanding, see Docket No. 454, Century should not be released from its indemnification obligations stemming from its breach of the duty to defend Emhart.

Century could have easily avoided this result by defending under a reservation of rights or by affirmatively seeking a declaratory judgment on its coverage obligation. In light of these easily available alternatives, Century should not be heard to complain now about the imposition of Conanicut damages, where its own inaction, if not mendacity, has rendered it liable for Emhart's settlement costs under the settled law of Rhode Island.

### C. Liability In Excess Of The Policy Limits Is Consistent With *Conanicut*

Under Conanicut, Century may be held liable for Emhart's ultimate settlement or remediation costs in excess of the limits of the Policies. The Conanicut court did not enunciate a principle limiting the *amount* of damages flowing from the insurer's breach of the duty to defend.[6] In fact, the Conanicut court noted favorably that the court in Comunale v. Traders & Gen. Ins. Co., 328 P.2d 198, 202 (Cal. 1958), "allowed recovery in excess of the policy limit stating that 'the policy limits restrict only the amount the insurer may have to pay in the performance of the contract as compensation to a third person for personal injuries caused by the insured; they do not restrict the damages recoverable by the insured for a breach of contract by the insurer.'" Conanicut at 971. See also Walters v. Am. Ins. Co., 8 Cal. Rptr. 665, 672 (Cal.

[6] Emhart's indemnification costs through June 2006 were $711,732.00. See Stipulation No. 73, PX-38 (stipulation filed on September 8, 2006), which was entered into evidence on June 26, 2007.

App. 1960)(awarding settlement costs as damages for breach of duty to defend and stating that insured's "rights against [the insurer] are based upon [insurer's] breach of the insurance contract and not upon provisions of such contract requiring [insurer] to pay any amounts for which plaintiff has become legally obligated"). Nor does Conanicut contemplate any limiting principle regarding the time period during which the insurer's liability for settlement or judgment in the underlying action may accrue. In light of the foregoing, the Court should hold Century liable for the full cost of Emhart's settlement with the EPA, regardless of the ultimate settlement amount or date when the final settlement amount is determined.

In addition to *stare decisis* considerations, public policy strongly supports the application of Conanicut to this case. This dispute does not arise from a garden variety personal injury suit. If anything, the interests in need of vindication are broader, and potentially implicate the health and safety of the citizens of Rhode Island. The unusual complexity and scope of the contamination at the Site and the potential for its remediation to cost tens of millions of dollars, if not more, are uncontested. An insurer should not be allowed to abandon the defense of an insured facing potential liability in excess of $100 million without risking the result of the Conanicut decision. The incentive for insurers to honor the terms of their policies should be even greater, where, as here, the health and safety of the public are potentially at stake.

The imposition of Conanicut damages should not be deemed a penalty. Nowhere does the Conanicut court state that obligating an insurer that has breached its duty to defend to pay the settlement or judgment assessed against the insured is punitive. The underlying logic of Conanicut is that an insurer that refuses to provide a defense assumes the risk of being found responsible for the entire quantum of detriment incurred by the insured, including the payment of both defense and settlement costs. Indeed the holding of Conanicut accords with standard

principles of contract damages, because it provides for an assessment representing the foreseeable result of an insurer's breach. See Mellow v. Med. Malpractice Joint Underwriting Ass'n of Rhode Island, 1991 R.I. Super. LEXIS 129 at *6 (R.I. Super. April 5, 1991)(applying to insurer's breach of the duty to defend the "long recognized principle that damages recoverable for breach of contract include the foreseeable consequential damages").

From the very beginning, Century received repeated, specific notice of the ongoing EPA proceedings and was provided core EPA documents in connection with the Site. Yet Century sat idly by, leaving Emhart essentially alone to defend itself in the face of potentially huge liability for the cleanup of the Site. Settlement or judgment for Emhart's share of the cleanup costs are the foreseeable result of Century's inaction. Because Emhart's ultimate remediation costs were a reasonably foreseeable consequence of Century's breach, it is appropriate to impose them on Century and consistent with Conanicut.

Even if, however, the Court does find that Conanicut liability effectively operates as a penalty, the Court should not hesitate to impose such liability on Century on the facts of this case. As previously noted, the evidence supports a finding that Century engaged in negligence or malfeasance in its policy searches and discovery misconduct in an effort to avoid its obligations under the Policies. See infra pp. 4-7. Conanicut liability is an appropriate sanction against an insurer that ignores or intentionally flouts its contractual and discovery obligations.

**D. The EPA Orders Qualify As "Judgments" Or "Settlements" Pursuant To *Conanicut***

Past and future EPA orders in connection with the Site constitute "settlements" or "judgments" as required by Conanicut. This Court has previously held that the PRP notification letter and administrative orders issued by the EPA qualify as a "suit." See Report and Recommendation dated February 15, 2005 at 42 ("[T]he defense of no suit should not be

available to Liberty Mutual"), Docket No. 220; accepted and adopted by the Court in total on May 17, 2005, Docket No. 238. Accordingly, costs that Emhart has incurred or will incur in the performance of agreements with EPA regarding the Site should be deemed settlements or judgments.

The Unilateral Administrative Orders ("UAOs") issued by EPA require Emhart to perform specified removal activities at the Centredale Manor Site. See Trial PX-13, UAO 1, at ¶¶ 3, 42; Trial PX-15, UAO 2, at ¶¶ 3, 49.[7] Moreover, the UAOs make findings of fact and conclusions of law that Emhart is a responsible party pursuant to CERCLA § 107. See Trial PX-13, UAO1, at ¶¶ 6, 18, 36; Trial PX-15, UAO 2, at ¶¶ 14, 43. The UAOs impose significant penalties for noncompliance, including fines of up to $27,500 a day and punitive damages up to three times the amount of any costs EPA incurs as a result of noncompliance. See Trial PX-13, UAO 1, at ¶ 78; Trial PX-15, UAO 2, at ¶ 97.

"In terms of the burden it places on a party, a UAO is similar to a judgment issued pursuant to a court proceeding." Carrier Corp. v. Piper, 460 F. Supp. 2d 827, 841 (W.D. Tenn. 2006). The Carrier court reasoned that, like a judgment, a party who received a UAO "has little choice but to comply." Id. (quoting Akzo Coatings, Inc. v. Aigner Corp., 30 F.3d 761, 769 (7th Cir. 1994)). The court also found that a UAO is equivalent to a judgment due to the substantial penalty for noncompliance, coupled with the possibility of punitive damages. Id. Therefore, while a UAO issued pursuant to CERCLA § 106 may not be a "civil action" for purposes of bringing a contribution action under CERCLA § 113(f)(1), see Emhart Indus., Inc. v. New England Container Co., 478 F. Supp. 2d 199, 203 (D.R.I. 2007), it is a judgment as required by Conanicut.

---

[7] Both Trial PX-13 and Trial PX-15 were admitted into evidence. See PX-38 (stipulation filed on September 8, 2006), which was entered into evidence on June 26, 2007.

Emhart has also entered into an Administrative Order on Consent ("AOC") with EPA in which Emhart agreed to perform a third removal action at the Site in exchange for a covenant not to sue from EPA. Trial PX-16, AOC, at ¶ 98.[8] Upon completion of the work required by the AOC, EPA agreed not to sue or take any administrative action against Emhart for performance of this work. Id. In other words, Emhart has resolved its CERCLA liability to the United States for the removal action embodied in the AOC and, therefore, the AOC is a settlement as required by Conanicut.

An AOC for a removal action in which a party resolves its CERCLA liability to the United States for that removal action is a settlement. Responsible Envt'l Solutions Alliance v. Waste Management, Inc., No. 3:04cv013, __ F.Supp.2d __, 2007 WL 1933064, at*3-6 (Mar. 27, 2007 S.D. Ohio). The court's decision in Pharmacia Corp. v. Clayton Chemical Acquisition, 382 F. Supp. 2d 1079 (S.D. Ill. 2005), which held that an order to perform a removal action that was issued pursuant to CERCLA § 106 and did not use the word "settlement" was not a settlement, is distinguishable. Here, as in Responsible Envt'l Solutions Alliance, the AOC was issued pursuant to, *inter alia*, CERCLA § 122 and specifically acknowledged that the AOC embodies a "settlement." See Trial PX-16, AOC, ¶ 119. Accordingly, the past and future EPA orders entered in connection with the Site satisfies the Conanicut requirement of a "settlement" or "judgment" for which the breaching insurer is responsible.

**E. Even If This Court Applies *Polaroid*, Century Should Be Responsible For Emhart's Indemnification Costs**

Even if this Court were to apply the measure of damages adopted by the Massachusetts court in Polaroid Corp. v. Travelers Indem. Co., 610 N.E.2d 912 (Mass. 1993), which it should

[8] Trial PX-16 was admitted into evidence. See PX-38 (stipulation filed on September 8, 2006), which was entered into evidence on June 26, 2007.

not, Century would still be liable for damages likely to be in excess of the Policies' limits. The Polaroid court held that an insurer that had breached its duty to defend would be liable for indemnification amounts caused by the breach. See Polaroid Corp. v. Travelers Indem. Co., 610 N.E.2d 912, 921 (Mass. 1993). The Polaroid court's inquiry focused on whether an insurer that had breached the duty to defend could be liable for the amounts paid in settlement by the insured, which turned on whether the "settlement arose naturally from the breach so as to be recoverable as contract damages." Id.

Here, there is a direct causal link between Century's refusal to provide a defense and the amount of remediation for which Emhart may ultimately be held responsible. Century's own expert, Mr. Larry Silver, has opined that Emhart could have reduced the ultimate cost of cleanup by assuming responsibility for the remedial investigation and feasibility study ("RI/FS") of the Site, focusing attention on more cost-effective remedial alternatives. [7/26/07 Silver Dep. Tr., at 158:22-159:5.] Assuming *arguendo* Mr. Silver's assertion is correct, it follows that had Century provided a defense, it would have elected to conduct the RI/FS and, in the opinion of Century's own expert, thereby substantially reduced the ultimate costs of remediation.

If the Court were to find that Emhart acted reasonably in not undertaking the RI/FS under the circumstances, which it should, then the measure of damages under Polaroid would be the difference between (a) the actual ultimate amount of Emhart's remediation obligation for the Site and (b) the remediation amount had Century, in defending Emhart, decided to conduct the RI/FS. Id. at 922 (noting "the benefit of controlling the defense" for the insurer, and that, in not providing a defense, the insurer assumes "the risk of a settlement at an amount that is reasonable but higher than that for which the insurer could have settled the case").

WHEREFORE, this Court should find that Century breached its duty to defend Emhart and award Emhart both its defense and indemnification costs.

Respectfully submitted,

EMHART INDUSTRIES, INC.

By its attorneys,

/s/ Gerald J. Petros
HINCKLEY, ALLEN & SNYDER LLP
50 Kennedy Plaza, Suite 1500
Providence, Rhode Island 02903
(401) 274-2000

Jack R. Pirozzolo (*pro hac vice*)
Adam M. Weisberger (*pro hac vice*)
Elisa K. Nethercott (*pro hac vice*)
FOLEY HOAG LLP
Seaport World Trade Center West
155 Seaport Boulevard
Boston, Massachusetts 20010
(617) 832-1000

Dated: July 31, 2007

**CERTIFICATE OF SERVICE**

To:

James T. Murphy, Esq.
Kelly N. Michels, Esq.
Hanson Curran LLP
146 Westminster Street
Providence, RI 02903

Peter C. Netburn, Esq.
Kevin J. O'Connor, Esq.
Hermes, Netburn, O'Connor & Spearing, P.C.
265 Franklin Street, 7th Floor
Boston, MA 02110

Mark T. Nugent, Esq.
Michael Marcello, Esq.
Morrison Mahoney LLP
121 South Main Street, Suite 600
Providence, RI

Michael F. Aylward, Esq.
John T. Harding, Esq.
Morrison Mahoney LLP
250 Summer Street
Boston, MA 02210

James T. McCormack, Esq.
McKenna & McCormick
128 Dorrance Street, Suite 330
Providence, RI 02903

Kimball Ann Lane, Esq.
Duane Morris LLP
380 Lexington Avenue
New York, NY 10168

Lawrence A. Nathanson, Esq.
Scott E. Levins, Esq.
Siegal Napierkowski & Park
533 Fellowship Road, Suite 120
Mt. Laurel, NJ 08054

I hereby certify that I caused a copy of the foregoing to be filed with the Court's CM/ECF system and sent electronically to the parties identified as registered participants on the Notice of Electronic Filing (NEF) and paper copies will be sent to those parties not registered as participants.

/s/ Gerald J. Petros

#819807-P-v1