UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| EMHART INDUSTRIES, INC., Plaintiff, | ) | |
| v. | ) | C.A. No. 02-53 S |
| HOME INSURANCE COMPANY, INSURANCE COMPANY OF NORTH AMERICA, LIBERTY MUTUAL INSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, ONEBEACON AMERICA INSURANCE COMPANY, and UNITED STATES FIRE INSURANCE COMPANY, Defendants. | ) | |

**OPINION AND ORDER**

William E. Smith, United States District Judge.

In this diversity action, Emhart Industries, Inc. ("Emhart") seeks a defense and indemnity from several of its insurance carriers related to the remediation of environmental contamination at the Centredale Manor Superfund Site (the "Superfund Site" or "Site") in North Providence, Rhode Island. All six insurers named in this action have at some point refused to defend or indemnify Emhart under one or more applicable insurance policies. Three of them, Home Insurance Company, Liberty Mutual Insurance Company, and United States Fire Company, were dismissed before trial for one reason or another. The other three, Century Indemnity Company

("Century"),[1] OneBeacon America Insurance Company ("OneBeacon"), and North River Insurance Company ("North River"), proceeded to trial, ultimately obtaining a favorable jury verdict on their respective duties to indemnify. The principal players at this stage of the proceedings are Emhart and Century; OneBeacon and North River play only minor roles in this insurance drama. This opinion addresses various pre- and post-trial motions involving primarily the carriers' obligation to defend Emhart under three "occurrence" policies issued to Emhart's predecessor in the late 1960s. Together, these policies provide three layers of coverage for the period in question, ranging from general liability to excess umbrella, with a limit of $5.1 million.

For all the reasons that follow, Emhart's Renewed Motion for Judgment as a Matter of Law Regarding the Duty to Defend under the Century Primary Policy (the latest embodiment of an argument Emhart has been making for some time) is GRANTED; this ruling applies to the Century Excess Policy as well, but not the OneBeacon Umbrella Policy (or, because of Emhart's decision not to pursue the matter, the North River Policy). The Court also finds that Century breached its duty to defend Emhart under both of its policies, and fixes damages in the manner prescribed below. All of Emhart's remaining motions are DENIED.

---

[1] Century is the successor to the Insurance Company of North America ("INA"), a named defendant.

## I. BACKGROUND[2]

The Superfund Site, which totals approximately ten acres, occupies two parcels of land on Smith Street in North Providence. On the western boundary, the Woonasquatucket River flows and extends south to a ten-year floodplain and, ultimately, the Allendale Dam. On the eastern boundary, there is a drainage swale (or "tailrace") that empties into a wooded wetland to the south. From an altitude, these watery boundaries resemble a Mason's compass, giving the southern portion of the Site a wider base. Presently, the Site boasts two residential buildings; for many years, however, it was dedicated to the manufacture of industrial chemicals, particularly, hexachlorophene, an antiseptic agent used in soaps. As will be explained in greater detail below, Emhart is the corporate successor to the chemical companies that operated at the Site at the time in question.

In 1998, the United States Environmental Protection Agency ("EPA") detected elevated levels of 2,3,7,8-Tetracholordibenzo-*p*-Dioxin ("dioxin") in soil and sediments at the Site, as well as in the further reaches of the Woonasquatucket River.[3] Even at very

---

[2] These facts derive from stipulation, trial testimony, or the post-trial evidentiary hearing.

[3] Dioxin is the common name for a group of compounds classified as polychlorinated dibenzodioxins, of which 2,3,7,8-Tetracholordibenzo-*p*-Dioxin is the most toxic member (it has gained notoriety as a contaminant of Agent Orange, a herbicide used in the Vietnam War). While referring to 2,3,7,8-Tetracholordibenzo-*p*-Dioxin as "dioxin" is over-inclusive, it is an adequate label for

low levels, Dioxin poses significant risks to human and ecological health. On June 17, 1999, the EPA issued a request for information to Emhart's parent corporation, Black & Decker, pursuant to Section 104(e) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"). See 42 U.S.C. §§ 9601-9675. Emhart responded with information about its relationship to several chemical companies formerly operating at the Site, including Crown Metro, Inc. ("Crown Metro"). Based in part on this information, the EPA sent Emhart a Notice of Potential Liability (the "PRP Letter") on February 28, 2000. The PRP Letter informed Emhart that, under CERCLA § 107(a), it was a potentially responsible party ("PRP") based on its status as "a successor to the liability of a chemical company which operated at the Site." The PRP Letter also invited Emhart to participate in the clean-up activities at the Site.[4] Shortly thereafter, on April 12, 2000, the EPA issued a Unilateral Administrative Order for Removal Action (the "First Administrative Order"), which identified certain time-critical removal actions that Emhart was required to undertake.[5] Among

---

purposes of this case.

[4] Such an invitation is not easily declined. As the PRP Letter observes, the failure to accept responsibility may result in a fine of $27,500 per day, CERCLA § 106(b), or damages well in excess of the ultimate costs of remediation. See CERCLA § 107(c)(3) (authorizing the imposition of treble damages).

[5] Ideally, the costs of these removal actions would be divided among the various PRPs; they are, in the order introduced in the First Administrative Order: Brook Village Associates ("Brook

other things, the First Administrative Order made a finding of fact that "[h]azardous substances [i.e., dioxin] were disposed of at the Site as part of the former operations of several chemical companies," and observed that "Emhart is . . . a successor to liability of several chemical companies which operated at the Site from approximately 1943 to approximately 1971."

Almost immediately, Emhart began a dialog with the carriers that, as far as it could ascertain, had provided insurance coverage to one or more of its predecessor chemical companies. Although the full extent of that dialog is unclear, it appears that Emhart did not have a great deal of success convincing them to take up the defense. For example, Emhart's investigation into the extent of its insurance coverage revealed an Excess Blanket Catastrophe Liability Policy XBC 46961 (the "Excess Policy") that INA (now Century) issued to Crown Metro (now Emhart) at some point in the late 1960s. The Excess Policy provided coverage from December 1, 1968, to February 15, 1970, with a $1 million limit of liability and a deductible equal to the (unidentified) "Underlying

---

Village"), Centredale Manor Associates ("Centredale Manor") (the entities that purchased portions of the property to construct the residential apartment buildings referenced above), Crown Metro, Inc. (somewhat confusingly, a South Carolina corporation not otherwise involved in this case), Emhart, and New England Container Company ("NECC") (the now-defunct entity that operated a drum-reconditioning facility on the southern portion of the Site during the time in question). However, the reality of the situation is that Emhart, the only economically viable PRP, will have to shoulder the bulk of the remediation.

Insurance." Emhart forwarded Century the Excess Policy as an attachment to a November 22, 2000 letter, along with the PRP Letter and the First Administrative Order. In the letter, Emhart demanded that Century provide it with a defense in the administrative action and pay the EPA (or indemnify Emhart) for remediation activities. Also, Emhart asked Century to "immediately conduct a review of your records regarding this confirmed coverage and any additional insurance coverage INA provided to [Crown Metro]," with the understanding that its demand for a defense/coverage would extend to "any other policies your investigation identifies."

Century's claims representative, Alexandra Zajac, responded to Emhart's demand on December 12, 2000. In her letter, Zajac advised Emhart that the Excess Policy did not provide coverage for its claim because Emhart was neither a named insured nor a corporate successor to Crown Metro. Emhart replied on January 3, 2001, urging Century to reconsider its position on successorship and reminding Century that, in the November 22, 2000 letter, it had requested an investigation into the "'confirmed coverage and any additional insurance coverage' INA provided to Crown Metro." (Emphasis in original.) On January 11, 2001, Zajac told Emhart that, upon reevaluation, Century agreed that Emhart may have succeeded to Crown Metro's insurance policies, but that the Excess Policy

> provides coverage for liabilities in excess of primary and/or underlying limits of liability. If you wish to

> pursue coverage under this policy, you must provide proof that all applicable primary and/or underlying limits have been completely and properly exhausted. At this time, we have no information to indicate that underlying coverage has been exhausted or that this claim will reach our layer of insurance. Therefore, notwithstanding the pollution exclusion in the policy, we are not presently obligated either to provide a defense or to indemnify Emhart in this matter.

Although not referenced in the January 11, 2001 letter, the record reveals that Century had initiated a search for additional Crown Metro policies, but had failed to find any.

On January 25, 2002, Emhart brought the instant action against Century and the other named defendants. For reasons that are not entirely clear, on August 29, 2002, Zajac requested a second search for additional policies that INA had issued to Crown Metro. Four months later, the search generated a General Liability-Automobile Policy GAL 36597 (the "Primary Policy") with a coverage period from February 15, 1969, to February 15, 1970,[6] and a $100,000 limit of liability. Although there is no record of transmittal, it appears that the Primary Policy was forwarded (to Zajac, presumably) on January 7, 2003. However, Zajac did not see the Primary Policy until July 2, 2003, when she happened upon it while reviewing the case file. Zajac immediately faxed a copy of the Primary Policy to Century's outside counsel, who, eight days later, forwarded it to Emhart. Several months later, after Emhart reminded Century that

---

[6] The parties agree that the Primary Policy was cancelled ahead of time on January 1, 1970.

claims under "any other policies your investigation identifies" were still outstanding, Century denied coverage under the Primary Policy. The basis for the denial, as Zajac's January 29, 2004 letter makes clear, was a familiar one: Emhart was not a named insured and had not proven successorship.[7] On February 25, 2004, Century filed a counterclaim against Emhart, seeking a declaratory judgment that it did not have a duty to defend or indemnify Emhart under the Primary Policy. Thereafter, Emhart filed a response and a counterclaim-in-reply, which sought to establish those duties and to show that they had been breached.

On October 19, 2006, after a six-week jury trial on the issue of indemnity, the jury found in favor of Century and the remaining insurers. Specifically, the jury found, in response to a special interrogatory, that dioxin contamination was not reasonably discoverable during the applicable policy periods. On May 1, 2007, the Court, dealing with old business, issued an order finding, among other things, that Century had a duty to defend Emhart under

[7] Zajac supplemented this explanation in an April 20, 2005 letter, which denied coverage on the ground that Emhart could not prove that property damage was discovered or reasonably discoverable during the policy period (more on this later). See Textron, Inc. v. Aetna Cas. & Sur. Co., 754 A.2d 742, 745-46 (R.I. 2000) ("Textron-Wheatfield"); Textron, Inc. v. Aetna Cas. & Sur. Co., 723 A.2d 1138, 1144 (R.I. 1999) ("Textron-Gastonia"); CPC Int'l, Inc. v. Northbrook Excess & Surplus Ins. Co., 668 A.2d 647, 649 (R.I. 1995).

both the Primary Policy and the Excess Policy.[8] An evidentiary hearing was held in June and July 2007 to determine whether Century had breached that duty and, if so, to ascertain the extent of damages. This opinion provides the reasoning behind the May 1, 2007 order, rules on the issues presented in the evidentiary hearing, addresses Emhart's post-trial motions on indemnity, and enters judgment accordingly.[9]

## II. DISCUSSION

This discussion is divided into three parts, corresponding with distinct phases of this litigation. Concepts rather than chronology determine priority.

### A. The Duty to Defend

1. Corporate Successorship. For this threshold issue, Emhart contends that, through a long and complicated transactional history (the great majority of which need not be recounted here), it succeeded to Crown Metro's insurance policies. Century does not dispute Emhart's timeline, or the general proposition that a

---

[8] This odd chronology is in great part due to the complexities of this case, and in some small measure to this writer's reluctance to find a duty to defend at all. As the reader will see below, the Rhode Island Supreme Court has not had occasion to apply its relevant precedents to circumstances quite like these. Although hindsight makes this result more apparent now, it was not nearly as clear only several months ago.

[9] The reader's knowledge of the Court's previous rulings is presumed. (See, for example, Hr'g Tr. Aug. 3, 2006, 14-19 (ruling, inter alia, that the underlying administrative action constituted a "suit" within the meaning of the policies at issue).)

successor corporation inherits the rights and benefits of a predecessor corporation's "occurrence" policies. See, e.g., Imperial Enters., Inc. v. Fireman's Fund Ins. Co., 535 F.2d 287, 292-93 (5th Cir. 1976) (holding that a surviving corporation to a statutory merger succeeded to the benefits of the non-surviving corporation's occurrence policy, which contained a non-assignment clause and did not list the surviving corporation as a named insured); Brunswick Corp. v. St. Paul Fire & Marine Ins. Co., 509 F. Supp. 750, 752-53 (E.D. Pa. 1981) (similar); Paxton & Vierling Steel Co. v. Great Am. Ins. Co., 497 F. Supp. 573, 578-80 (D. Neb. 1980) (similar); cf. Textron, Inc. v. Aetna Cas. & Sur. Co., 638 A.2d 537, 540-43 (R.I. 1994) (holding that an acquiring corporation's occurrence policies did not cover the environmental damage that an acquired corporation caused prior to the acquisition).

However, Century, putting a new twist on an old argument, posits that Emhart did not inherit the insurance policies at issue in this case. Century observes that, in 1976, Crown Metro — at that point a subsidiary of USM Corporation ("USM"), which eventually merged into modern-day Emhart — changed its name to Bostik South, Inc. ("Bostik South"). A year later, Bostik South was liquidated and all of its assets and liabilities were distributed to its parent, USM. Then, in 1980, USM sold certain of Bostik South's former assets to Bengal Corporation ("Bengal"),

which, Century claims, succeeded to Crown Metro's insurance policies. To support its transactional rendition, Century points to § 3(2) of the Purchase and Sale Agreement (the "Agreement") between USM and Bengal. Section 3(2), which describes the assets being transferred, includes "executory contracts." Century argues that, because insurance policies are executory in nature, the term "executory contracts" in § 3(2) includes the insurance policies issued to Crown Metro, and, therefore, USM ceded those policies to Bengal in 1980. Subsequent language in the Agreement supports this interpretation, Century continues, particularly § 7(B)(3), which provides that USM (and thus Emhart) would retain liability associated with "[a]ny violation of laws, rules or regulations including, without limitation, EPA and OSHA regulations (and any other governmental agency) to the extent that such violations relate only to the time prior to [1980]," while Bengal would assume liability for "any violations occurring after [1980] or based on facts or condition which existed prior to [1980] but which continue thereafter."

Under Rhode Island law, which governs the Century and OneBeacon insurance policies, "the insured seeking to establish coverage bears the burden of proving a prima facie case, including but not limited to the existence and validity of a policy." Gen. Accident Ins. Co. of Am. v. Am. Nat'l Fireproofing, Inc., 716 A.2d 751, 757 (R.I. 1998). After the insured meets this burden, "[t]he

insurer then bears the burden of proving the applicability of policy exclusions and limitations in order to avoid an adverse judgment." Id.

Century's strained interpretation of the Agreement does not disturb Emhart's supportable account of the meanderings of Crown Metro's occurrence policies. As a preliminary matter, it is doubtful that an occurrence policy is "executory" in the sense advocated by Century simply because an insurer is subject to long-term "tail" exposure after the policy period has expired. See, e.g., Textron, Inc. v. Liberty Mut. Ins. Co., 639 A.2d 1358, 1361-62 nn.1 & 2 (R.I. 1994) (explaining that "tail" coverage is a distinguishing feature of occurrence policies, and one reason why premiums for occurrence policies are higher than, say, claims-made policies, which extinguish never-ending-tail liability); DiLuglio v. New England Ins. Co., 959 F.2d 355, 358 (1st Cir. 1992) (same). The surprisingly small amount of authority on the subject, limited primarily to the bankruptcy context, suggests that an occurrence policy is not an executory contract, at least, as in the present case, after premiums have been paid. See, e.g., Am. Safety Indemn. Co. v. Vanderveer Estates Holding, LLC (In re Vanderveer Estates Holding, LLC), 328 B.R. 18, 26 (Bankr. E.D.N.Y. 2005) ("It is well established that insurance policies for which the policy periods have expired and the premium has been paid are not executory contracts, despite continuing obligations on the part of the

insured" because "the failure of the insured to perform those continuing obligations would not excuse the insurer from being required to perform."); Vern Countryman, Executory Contracts in Bankruptcy, Part I, 57 Minn. L. Rev. 439, 460 (1973) (providing the working definition of an executory contract within the meaning of the Bankruptcy Code: "a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other"); see also Kunkel v. Sprague Nat'l Bank, 128 F.3d 636, 642 n.7 (8th Cir. 1997) (holding that a contract for the sale of cattle was not executory merely because one of the parties had not yet fulfilled its payment obligation, when all the acts necessary to give rise to that obligation had been performed).[10]

---

[10] Century's cases are helplessly conclusory; furthermore, none of them involves occurrence policies that are remotely similar to those in the present case. See, e.g., Burkett v. Maricopa County Pub. Fiduciary, 733 P.2d 673, 675 (Ariz. 1986) (life insurance); Marez v. Dairyland Ins. Co., 638 P.2d 286, 289 (Colo. 1981) (accident insurance), overruled by Friedland v. Travelers Indem. Co., 105 P.3d 639 (Colo. 2005); Mass. Bonding & Ins. Co. v. Chapman, 3 S.W.2d 18, 19 (Ark. 1928) (personal injury insurance); Lain v. Metro. Life Ins. Co., 54 N.E.2d 736, 738 (Ill. App. Ct. 1944) (life insurance), rev'd, 58 N.E.2d 587 (Ill. 1944); Spears v. Indep. Order of Foresters, 107 S.W2d 126, 130 (Mo. Ct. Ap. 1937) (same); Ind. Life Endowment Co. v. Reed, 103 N.E. 77, 80 (Ind. Ct. App. 1913) (same); Kansas City Life Ins. Co. v. Blackstone, 143 S.W. 702, 707 (Tex. Civ. App. 1912) (same), rev'd, 174 S.W. 821 (Tex. 1915); Knepp v. Nationwide Ins. Co., 471 A.2d 1257, 1261 (Pa. Super. Ct. 1984) (medical expense insurance); Graphic Arts Mut. Ins. Co. v. Monello, 246 N.Y.S.2d 645, 648 (N.Y. Civ. Ct. 1963) (workman's compensation insurance), rev'd, 254 N.Y.S.2d 351 (N.Y. Sup. App. Term 1964).

In any event, Century's argument is beside the point. Viewing the Agreement in its entirety, Haydon v. Stamas, 900 A.2d 1104, 1110 (R.I. 2006) (observing that inquiring courts must "view a contract in its entirety, assigning to its terms their plain and ordinary meanings as the manifestation of the parties' intent"), the phrase "executory contracts" in § 3(2) cannot reasonably be interpreted so encyclopedically as Century proposes. For example, the Agreement does not contain representations about insurance coverage, a schedule of insurance policies, or a requirement that either USM or Bengal notify the insurers of the purported transfer. Their absence is conspicuous, if not determinative, in a document that is alleged to have conveyed occurrence policies with extensive long-term "tail" coverage.[11] Century's broad reading of the nondescript language in § 7(B)(3)'s division of liability is not a

[11] It should be noted that Century does not invoke the "continuity of the enterprise" theory or the "product line" doctrine (or anything similar) to support its successorship argument. See, e.g., B.F. Goodrich v. Betkoski, 99 F.3d 505, 519 (2d Cir. 1996); United States v. Mexico Feed & Seed Co., 980 F.2d 478, 487 (8th Cir. 1992); United States v. Carolina Transformer Co., 978 F.2d 832, 841 (4th Cir. 1992); Total Waste Mgmt. Corp. v. Commercial Union Ins. Co., 857 F. Supp. 140, 149-53 (D. N.H. 1994); 5 Blumberg on Corporate Groups § 179.09[C] (2d ed. 2005); Alfred R. Light, "Product Line" and "Continuity of Enterprise" Theories of Corporate Successor Liability Under CERCLA, 11 Miss. C.L. Rev. 63, 67-75 (1990); see also United States v. Davis, 261 F.3d 1, 52-55 (1st Cir. 2001) (discussing the appropriate standard for determining successor liability under CERCLA); cf. Dept. of Transp. v. PSC Resources, Inc., 419 A.2d 1151, 1156-57 (N.J. 1980) (New Jersey Spill Act). But see City Mgmt. Corp. v. U.S. Chem. Co., 43 F.3d 244, 252-53 (6th Cir. 1994) (rejecting the "continuity of the enterprise" doctrine for CERCLA purposes).

convincing substitute. Without any reasonable indication that USM and Bengal meant to include occurrence policies within the ambit of "executory contracts," Century has failed to satisfy its burden.

2. The Primary Policy. Turning to center stage, Emhart observes that, under Rhode Island law, an insurer has a duty to defend when the charging documents make allegations that would "potentially" require the insurer to provide for coverage. According to Emhart, because these documents "at least suggest[], through implication, that certain contamination at the Centredale Site was discoverable during the policy period," Century must defend under the Primary Policy. Century argues that the complaining documents do not allege affirmatively that dioxin was discoverable during the policy period, only that "contamination" – not necessarily dioxin – occurred at some point between 1943 and 1971. The implication that dioxin was discoverable in the approximately eleven-month policy period, Century claims, is not a "reasonable possibility."

As a preliminary matter, Century misconstrues the appropriate standard. Rhode Island, like the great majority of jurisdictions, applies the "pleadings test," Progressive Cas. Ins. Co. v. Narragansett Auto Sales, 764 A.2d 722, 724 (R.I. 2001), also known as the "four corners of the complaint" rule, see, e.g., Hartford Cas. Ins. Co. v. Litchfield Mut. Fire Ins. Co., 876 A.2d 1139, 1146 (Conn. 2005); Everson v. Lorenz, 695 N.W.2d 298, 314 (Wis.

2005); W. Va. Fire & Cas. Co. v. Stanley, 602 S.E.2d 483, 498-99 (W. Va. 2004); Cyprus Amax Minerals Co. v. Lexington Ins. Co., 74 P.3d 294, 299 (Colo. 2003), or the "comparison test." See, e.g., Elliott v. Hanover Ins. Co., 711 A.2d 1310, 1312 (Me. 1998); Smith v. Nationwide Mut. Fire Ins. Co., 446 S.E.2d 877, 878 (N.C. 1994). Under the pleadings test, the insurer's duty to defend is ascertained by laying the complaint "alongside the policy; if the allegations in the complaint fall within the risk insured against in the policy, the insurer is said to be duty-bound to provide a defense for the insured." Employers' Fire Ins. Co. v. Beals, 240 A.2d 397, 402 (R.I. 1968). Elaborating upon this test, the Beals court said, "in other words, when a complaint contains a statement of facts which bring the case within or potentially within the risk coverage of the policy, the insurer has an unequivocal duty to defend." Id. at 403 (emphasis supplied). Since Beals, the Rhode Island Supreme Court has consistently applied the potential-for-coverage standard in duty-to-defend cases. See, e.g., Howard v. Guidant Mut. Ins. Group, 785 A.2d 561, 562 (R.I. 2001) (indicating that the "potential" for coverage is the standard); Allstate Ins. Co. v. Russo, 641 A.2d 1304, 1306 (R.I. 1994) (same); Mellow v. Med. Malpractice Joint Underwriting Assoc. of R.I., 567 A.2d 367, 368 (R.I. 1989) (same); Hingham Mut. Fire. Ins. Co. v. Heroux, 549

A.2d 265, 266 (R.I. 1988) (same); Flori v. Allstate Ins. Co., 388 A.2d 25, 26 (R.I. 1978) (same).[12]

The "reasonable possibility" standard that Century trumpets likely comes from confounding language in Nortek, Inc. v. Liberty Mut. Ins. Co., 858 F. Supp. 1231 (D.R.I. 1994). In Nortek, a magistrate judge remarked (in an adopted and appended Report and Recommendation) that, under Rhode Island law, the pleadings test requires that "the factual allegations in the complaint raise[] the reasonable possibility of coverage under the policy." Nortek, 858 F. Supp. at 1236 (emphasis in original). A footnote purporting to provide authority for this new development cites four Rhode Island cases (all referenced above) that do not support it. See id. at 1236 n.17 (citing Mellow, Hingham, Flori, and Beals). The only authority cited in footnote seventeen that can explain the presence of the word "reasonable" is Liberty Life Ins. Co v. Commercial Union Ins. Co., 857 F.2d 945 (4th Cir. 1988). However, in Liberty, the Fourth Circuit construed the law of South Carolina, 857 F.2d at 950 n.8, which, unlike Rhode Island, requires a "reasonable possibility of recovery" in duty-to-defend cases. See Gordon-Gallup Realtors, Inc. v. Cincinnati Ins. Co., 265 S.E.2d 38, 40 (S.C. 1980). Despite this controvertible lineage, judges in this

---

[12] In Shelby Ins. Co. v. Northeast Structures, Inc., 767 A.2d 75, 77 (R.I. 2001), the court used the word "possibility," but with no mention of the word "reasonable." Standing alone, the distinction between "possible" and "potential" is inappreciable.

district have recited Nortek's inaccurate language on occasion, inadvertently giving it the imprimatur of the court. See, e.g., Employers Mut. Cas. Co. v. PIC Contractors, Inc., 24 F. Supp. 2d 212, 215 (D.R.I. 1998); Aetna Cas. & Sur. Co. v. Kelly, 889 F. Supp. 535, 541 (D.R.I. 1995). But see O'Donnell v. Twin City Fire Ins. Co., 40 F. Supp. 2d 68, 71 (D.R.I. 1999) (using "could possibly be covered" as the standard without using the word "reasonable"). To the extent this difference alters the duty-to-defend analysis in the first place,[13] the Court takes this opportunity to recalibrate the case law of this District accordingly.

The relevant question then is whether the allegations in the charging documents are potentially within the Primary Policy's risk of coverage.

The charging documents are four separate instruments delivered to Emhart (and then promptly forwarded to Century and company) over a span of months. Two of them have been identified already. The PRP letter claims that Emhart is "a successor to the liability of a chemical company which operated at the Site," and thus a party potentially responsible for the remedial costs associated with the

[13] One court has commented that the difference is semantical only. See Avondale Indus., Inc. v. Travelers Indem. Co., 894 F.2d 498, 500 (2d Cir. 1990) (per curiam) (denying a petition for rehearing in spite of a recent New York Court of Appeals' case applying a "reasonable possibility" standard when the panel had earlier applied a potential-for-coverage standard).

"release or threat of release" of a cornucopia of hazardous substances, including dioxin. The First Administrative Order makes a finding of fact that "[h]azardous substances [i.e., dioxin] were disposed of at the Site as part of the former operations of several chemical companies," observes that "Emhart is . . . a successor to liability of several chemical companies which operated at the Site from approximately 1943 to approximately 1971," and directs Emhart to perform certain remedial tasks. The two remaining instruments supplemented the First Administrative Order, but do not disclose much if any novel information. The Second Administrative Order for Removal Action (the "Second Administrative Order"), issued on March 26, 2001, focuses mainly on downstream remedial activities. In pertinent part, it states that "[e]vidence suggests that the operations of the chemical companies and the drum reconditioning facility at the Site resulted in releases or threats of releases of hazardous substances at the Site," and concludes that Emhart "is a liable party" under CERCLA. The Third Administrative Order for Removal Action (the "Third Administrative Order"), issued over two years later, addresses remediation at the tailrace. Its relevant sections simply reiterate the findings and conclusions of the Second Administrative Order.

The Primary Policy provides coverage for an "occurrence," which is defined as "an accident, including injurious exposure to conditions, which results, <u>during the policy period</u>, in property

damage neither expected nor intended from the standpoint of the insured." (Emphasis supplied.) The latter underscored phrase precludes coverage for property damage that Emhart intended to cause or expected to be caused; in other words, environmental contamination that Emhart knew about and that was not accidental.[14] The former underscored phrase, by operation of Rhode Island law, precludes coverage for property damage, even if accidental, that was not discovered, did not manifest itself, or was not discoverable in the exercise of reasonable diligence during the policy period; here, between February 15, 1969 and January 1, 1970. See Textron-Wheatfield, 754 A.2d at 745-46; Textron-Gastonia, 723 A.2d at 1144; CPC, 668 A.2d at 649. It is undisputed that property damage was not discovered and did not manifest itself until long after the Primary Policy had expired; therefore, coverage would trigger, if at all, only under the discoverability prong. As applied here, discoverability has three elements: (1) that environmental contamination took place between February 1969 and January 1970; (2) that it was capable of being detected at the Site at that time; and (3) that Crown Metro had a reason to test for it at the Site at that time. See Textron-Wheatfield, 754 A.2d at 745.

Of course, as Century points out, the charging documents are silent with respect to whether dioxin was discoverable at the Site

---

[14] For whatever reason, the parties have chosen not to contest whether this element provides a potential for coverage.

in 1969; it is, therefore, unclear from the face of the documents whether the alleged contamination was caused by an "occurrence." But under Rhode Island law, neutral or ambiguous allegations do not foreclose an insurer's duty to defend. In Flori, the Rhode Island Supreme Court considered whether an insurer had a duty to defend its insured even though the complaint failed to allege facts necessary to determine whether a policy exclusion applied. Flori, 388 A.2d at 27. There, a homeowner hired a general contractor to renovate a downstairs area for occupancy. The general contractor, in turn, subcontracted with the insured to perform foundation and concrete work. When the basement flooded, the homeowner sued the general contractor and the insured for negligently performing their work. The insured requested a defense, but the insurer refused based on an exclusion for "completed operations" and the fact that the complaint did not specify whether the alleged negligence occurred before or after the work was "deemed completed" under the policy. Acknowledging that "[t]he pleadings . . . leave in doubt whether a state of facts exists that will render inapplicable the completed operations exclusion," the court nevertheless required the insurer to defend: "Under our rule that doubt must be resolved against [the insurer]." Id.; see also Shelby, 767 A.2d at 76-77 (holding that the possibility that a force majeure caused the collapse of a structure did not insulate the insurer from its duty to defend an insured under a policy that limited coverage to the

insured's negligent performance); PIC Contractors, 24 F. Supp. 2d at 216-17 (refusing to consider when plaintiffs were diagnosed with illness because the complaint did not allege the date of the diagnosis, which was disputed in any event); Providence Journal Co. v. Travelers Indemn. Co., 938 F. Supp. 1066, 1074, 1072 (D.R.I. 1996) ("The court must resolve any uncertainty as to the adequacy of the pleadings in this respect in favor of the insured.").

That Emhart has shown a potential for coverage in this case is most convincingly demonstrated by Century's failure to establish the absence of any such potential. See Montrose Chem. Corp. v. Superior Court, 861 P.2d 1153, 1161 (Cal. 1993) (en banc) (rejected a similar plea for a "reasonable possibility" standard, and holding that "the insured must prove the existence of a potential for coverage, while the insurer must establish the absence of any such potential. In other words, the insured need only show that the underlying claim may fall within policy coverage; the insurer must prove it cannot.") (emphasis in original); see also PIC Contractors, 24 F. Supp. 2d at 216-17 (holding that a duty to defend lies where pleadings did not "exclude the possibility" that the policies triggered). First off, Century's argument about the specificity of the alleged "contamination" is mistaken; the charging documents clearly allege that dioxin, among several other noxious compounds, was responsible for the contamination at the Site. That aside, assuming arguendo that the allegations in the

charging documents do not provide a "reasonable possibility" of coverage, it is something else entirely to say that they do not provide the potential for coverage. To be sure, the policy period is a relatively small speck on the continuum of contamination alleged by the EPA. Whether coverage triggered under the Primary Policy, therefore, is unclear (and perhaps remote) from the perspective that the charging documents provide. But there's the rub, for Rhode Island precedents demand that, to avoid its duty to defend, Century must confute any potential for coverage, however remote. See Flori, 388 A.2d at 26; Beals, 240 A.2d at 403; see also Montrose, 861 P.2d at 1156 (requiring an insurer to defend a CERCLA action when the insurer could not show that the underlying claim fell outside of the policy coverage, even though the allegations of the charging documents were "neutral"). Viewed in this manner, Century's statement that the charging documents are defective because they indirectly rather than affirmatively allege coverage is more of a concession than a criticism.

Century responds, and Emhart vehemently denies, that the Court should consult "extrinsic facts" before it decides Century's defense obligations. Century notes that other jurisdictions have allowed for such consultation when it is not entirely clear from the charging documents whether a particular policy would provide coverage, and when the underlying litigation would not resolve the coverage dispute. These requirements are satisfied in the present

case, Century explains, because, under CERCLA, Emhart (as the successor to a chemical company that operated on the Site) is strictly liable for the contamination on the Site and the costs associated with cleaning it up. See 42 U.S.C. § 9607(a)(2). As a consequence of CERCLA's strict liability regime, the EPA need not allege in the charging documents or prove in an underlying administrative action that dioxin was discoverable at the Site during the policy period. Thus, Century concludes that extrinsic evidence must be considered in order to have a full and accurate picture of whether it must defend Emhart.

Without having addressed this precise issue, Rhode Island courts generally (with one narrow exception) condemn the use of extrinsic facts in determining the scope of an insurer's duty to defend.[15] See, e.g., Beals, 240 A.2d at 399; see also O'Donnell, 40 F. Supp. 2d at 71 ("The insurer cannot rely on facts not asserted in the complaint to avoid its duty to defend."). The

---

[15] The exception is Peerless Ins. Co. v. Viegas, 667 A.2d 785 (R.I. 1995). In the limited context of civil actions for damages resulting from acts of child molestation, the Peerless court held that it would infer intent and thus relieve insurers from their duty otherwise to defend or indemnify under policies that contain an intentional-act exclusion. Peerless, 667 A.2d at 788-89. Thus, even though the allegations in the Peerless complaint were described in terms of "negligence," the court reasoned that "[a] plaintiff, by describing his or her cat to be a dog, cannot simply by that descriptive designation cause the cat to bark." Id. at 789. Of course, this logic has broader implications, but the Rhode Island Supreme Court has refused to extend Peerless beyond cases involving sexual assault. See Town of Cumberland v. R.I. Interlocal Risk Mgmt. Trust, Inc., 860 A.2d 1210, 1217 (R.I. 2004).

seminal case in this regard is Beals, which involved a romp of two third-grade students, one of whom, for some unknown reason, struck the other in the eye with a lead pencil. Beals, 240 A.2d at 399. The insurer fired the first salvo by seeking a declaratory judgment that it was not required to defend or indemnify its insured (the pencil-wielding pupil) because the act was intentional. A couple months later, the injured student and his parents brought a civil action against the insured alleging negligence. Applying the pleadings test, the Rhode Island Supreme Court held that the insurer was obligated to defend, even though it was unclear whether the act was intentional (and thus excluded from coverage) or unintentional (and thus within the risk of coverage).

In so holding, the court propounded three principles to govern an insurer's duty to defend in Rhode Island. First, "the duty to defend is broader in its scope than the duty of an insurer to indemnify." Id. at 403; see also Mellow, 567 A.2d at 368. Second, and flowing from the first principle, an insurer's duty to defend exists, if at all, "regardless of the actual details of the injury or the ultimate grounds on which the insured's liability to the injured party may be predicated." Beals, 240 A.2d at 402 (citing 7A Appleman, Insurance Law and Practice § 4683, p. 436); see also Flori, 388 A.2d at 26 ("irrespective of whether the plaintiffs in the tort action can or will ultimately prevail"). This is related to the widely-recognized rule, observed in Rhode Island, see Sanzi

v. Shetty, 864 A.2d 614, 618 (R.I. 2005), that "claims stated in the complaint must be taken 'as pleaded,' even if they are demonstrably groundless, false or fraudulent." See 1 Barry R. Ostrager and Thomas R. Newman, Handbook on Insurance Coverage Disputes § 5.02[a] at 221 (13th ed. 2006). Third, "any doubts as to the adequacy of the pleadings to encompass an occurrence within the coverage of the policy are resolved against the insurer and in favor of its insured." Beals, 240 A.2d at 403; see also Flori, 388 A.2d at 27.

The authority Century offers as evidence to support the abrogation of these principles is unpersuasive. Not one of Century's cases involve an insurer's duty to defend an administrative action under CERCLA, or even a claim in a more traditional proceeding with comparable attributes (i.e., strict liability). See Delta Airlines v. State Farm Fire & Cas. Co., 96 F.3d 1451 (9th Cir. 1996) (unpublished) (unfair competition and commercial disparagement); W. Heritage Ins. Co. v. River Entm't, 998 F.2d 311 (5th Cir. 1993) (negligent operation of a motor vehicle); Millers Mut. Ins. Assoc. of Ill. V. Ainsworth Seed Co., 552 N.E.2d 254 (Ill. App. Ct. 1989) (negligent installation of machinery and equipment); Burd v. Sussex Mut. Ins. Co., 267 A.2d 7 (N.J. 1970) (negligent infliction of shotgun wounds). These cases fade in the light of clearly-established Rhode Island precedent. For instance, Delta's nonbinding prediction that "the Alaska

Supreme Court would follow sound authority allowing an insurer to rely on extrinsic facts to prove that coverage is unavailable when the complaint is silent as to the existence of those facts," 96 F.3d 1451, *1 (emphasis in original), directly conflicts with Flori, 388 A.2d at 27. So too does the Fifth Circuit's interpretation of Texas law in W. Heritage: "when the petition does not contain sufficient facts to enable the court to determine if coverage exists, it is proper to look to extrinsic evidence in order to adequately address the issue." 998 F.2d at 313. The Millers Mut. opinion, perhaps the least helpful of all, considered extrinsic facts without explaining why it had departed from the rule the opinion itself recognized as one of general application; it simply found a previous opinion "persuasive" on that point.[16] 552 N.E.2d at 256.

Century's reliance on Burd is similarly misplaced. The insurance dispute in Burd had its genesis in a shooting incident that led to the conviction of the insured for assault and battery.

[16] Strangely (but par for the course in this case it seems), the authority that the Millers Mut. court relied upon, Fidelity & Cas. Co. of N.Y. v. Envirodyne Eng'rs, Inc., 461 N.E.2d 471 (Ill. App. Ct. 1983), in turn relied upon the Rhode Island Supreme Court's opinion in Beals for the proposition that "if an insurer opts to file a declaratory proceeding, we believe that it may properly challenge the existence of such a duty by offering evidence to prove that the insured's actions fell within the limitation of one of the policy's exclusions." Envirodyne, 461 N.E.2d at 473. However, Beals stands for no such proposition; in fact, the opinion explicitly repudiated an insurer's ability to challenge its duty to defend with extrinsic evidence.

Burd, 267 A.2d at 8-9. The victim then sued the insured for damages, alleging both intentional and unintentional torts. The insured in turn sued the insurer when it refused to defend the civil suit on the ground that the policy excluded coverage of intentional bodily injury. The New Jersey Supreme Court held that a conflict of interest obviated the insurer's duty to defend because it was unclear whether the ultimate grounds for recovery (if any) would be based on negligence (and not on an intentional tort, which the policy excluded). The solution: "translate [the insurer's defense] obligation into one to reimburse the insured if it is later adjudged that the claim was one within the policy covenant to pay." Id. at 10. This made sense, the New Jersey court explained, because the purpose of the "covenant is to defend suits involving claims which the carrier would have to pay if the claimant prevailed in the action." Id.

Although otherwise sound, Burd strikes a discordant tone with Beals. Both cases addressed similar situations, but competing ideas about an insurer's duty to defend led to significantly different results. Burd understood the duty to defend to be coextensive with the duty to indemnify (at least in the critical respect discussed). See Burd, 267 A.2d at 10. When a conflict of interest prevented an insurer from controlling its insured's defense, the court made the duty to defend contingent upon an insurer's ultimate duty to indemnify. Id. This was not an option

in Beals because, under Rhode Island law, the duty to defend is far more expansive than the duty to indemnify – an observation that necessarily implies that an insurer may have to defend a suit that it may not have a coverage obligation in the end. See Beals, 240 A.2d at 403; see also Flori, 388 A.2d at 26; see also 1 Allan D. Windt, Insurance Claims & Disputes: Representation of Insurance Companies & Insureds, § 4:4 (5th ed. 2007) (recognizing that many courts have refused to align themselves with the New Jersey Supreme Court's holding in Burd).

From a policy perspective, Century's call for the use of extrinsic facts appears to be a sensible response to laconic CERCLA complaints and inordinately high costs of defending CERCLA actions. See Hecla Mining Co. v. N.H. Ins. Co., 811 P.2d 1083, 1095-98 (Colo. 1991) (Mullarkey, J., dissenting) (arguing that the majority's rigid adherence to the pleadings test unfairly prejudices insurers in CERCLA actions). But closer examination reveals a cunning attempt at an end run around the duty to defend. The weakness in this play, however, is that Century has not offered a single undisputed extrinsic fact that would eliminate the potential for coverage in this case. See Montrose, 861 P.2d at 1156 ("[W]here extrinsic evidence establishes that the ultimate question of coverage can be determined as a matter of law on undisputed facts, we see no reason to prevent an insurer from seeking summary adjudication that no potential for liability exists

and thus that it has no duty to defend."); see also Providence Journal, 938 F. Supp. at 1074, 1079 (holding that the insurer did not have a duty to defend or indemnify because the insured admitted that the discharge of liquid waste at the Site was expected or intended from the standpoint of the insured, even though that fact was not alleged in the charging documents).[17] As catalogued in the Court's pre-trial rulings, several issues of material fact surrounded the discoverability of dioxin at the Site in 1969. The parties dedicated a sizable portion of the ensuing six-week trial to those issues, which the jury ultimately, but not inevitably, resolved in Century's favor.[18] It is no great surprise then that

---

[17] Tellingly, even the cases upon which Century relies (with the exception of Burd) appear to require such a showing. See Delta, 96 F.3d at *1 (reviewing "uncontroverted" facts pertaining to the initial publication date); W. Heritage, 998 F.2d at 313 (reviewing "undisputed facts extraneous to this petition"); Millers Mut., 552 N.E.2d at 255, 257 (reviewing an "undisputed affidavit").

[18] For good reason, Century has retracted its argument, advanced in previous memoranda, that it does not have to defend Emhart because the jury found no indemnity obligation. An indemnity finding favorable to an insurer does not erase that insurer's defense obligations, as long as the pleadings test has been satisfied. See Travelers Indem. Co. v. Ins. Co. of N. Am., 886 F. Supp. 1520, 1526 (S.D. Cal. 1995) ("If, despite a potential for coverage as alleged in the complaint, the insurer successfully proves that no potential for coverage existed, the duty to defend ceases at the time such proof is made. Such proof does not, however, retroactively delete the duty to defend as it had existed up to the point of proof."). Rather, once triggered, the duty to defend continues until a finding that the claims do not fall within the risk of coverage; here, the date of the jury's verdict. See Shelby, 767 A.2d at 77 ("The plaintiff has a duty to defend the underlying action at trial until there has been a finding of fact that the cause of the collapse was excluded from coverage under the policy or until a settlement has been reached."). Otherwise, in

Century has not identified any extrinsic evidence establishing that "the ultimate question of coverage can be determined as a matter of law on undisputed facts." Montrose, 861 P.2d at 1159; see also City of Johnstown v. Bankers Standard Ins. Co., 877 F.2d 1146, 1149 (2d Cir. 1989) (holding that insurers had not met their burden to show that they had no duty to defend a CERCLA action, "whether that duty is measured against the underlying CERCLA complaint alone, or against the record as a whole") (citations omitted). Allowing Century to obviate its duty to defend based on what were at all relevant times disputed extrinsic facts would effectively erode the distinction, under Rhode Island law, between the duties to defend and indemnify. See Beals, 240 A.2d at 403. This Court is neither willing nor able to permit that.

3. The Excess Policy. The inquiry turns to the Excess Policy, which, although similar to the Primary Policy in scope of coverage, calls for separate analysis because of certain provisions that Century claims anticipate its duty to defend. Century observes that the indemnity obligations of the Excess Policy trigger when Emhart becomes legally obligated to pay damages because of property damage caused by an occurrence and when either

---

cases where coverage is possible but unlikely, a cunning insurer would deny an estimable defense request based on the probability that it will not have to cover the claim in the end. See United Nat'l Ins. Co. v. Frontier Ins. Co., 99 P.3d 1153, (Nev. 2004) (observing that the duty to defend is broadly construed so as to prevent the insurer from evading its duty to provide a prompt defense).

(1) a claim falls within the terms of coverage of the Excess Policy but not the Primary Policy or (2) the Primary Policy's limit of liability is exhausted because of property damage during the policy period. Pointing to the latter requirement, Century argues that Emhart has not proven exhaustion and that a defense under the Excess Policy does not lie until Emhart does so. See, e.g., United States Fidelity & Guar. Co. v. Federated Rural Elec. Ins. Corp., 37 P.3d 828, 833 (Okla. 2001) ("Most courts reject the argument . . . that if a claim against the insured is for a sum greater than the primary coverage the excess insurer should be required to participate in the defense even though the primary policy is not exhausted."); 14 Couch on Insurance § 200:45 (Lee R. Russ, et al. eds., 3d ed. 1995) ("On the other hand, it had been held that where a claim which exceeds policy limits has merely been asserted, and the policy limits have not been paid over, an excess insurer is not obligated to defend.").

Emhart, who has the burden to establish exhaustion, see Ins. Co. of N. Am. v. Kayser-Roth, Corp., 770 A.2d 403, 416-17 (R.I. 2001), responds that Century must defend under the Excess Policy because the charging documents made it abundantly clear that the costs of complying with the EPA's remediation requirements would well exceed the Primary Policy's $100,000 limit of liability. See, e.g., Am. Family Life Assurance Co. v. U.S. Fire Co., 885 F.2d 826, 832 (11th Cir. 1989) (holding that excess insurer was obligated to

defend once it became clear that the primary policy would not cover the insured's liability); 14 Couch on Insurance § 200:45 ("Some courts have held that an excess carrier must participate in the defense and share in the cost of defense when it is clear that the potential judgment against the insured many be substantially greater than the amount of the primary policy limits.").

In the absence of specific instructions in the insurance contract, the requirements for exhaustion are, as the authority above suggests, unsettled. Here, the question is almost entirely academic. Any doubt that the possible extent of Emhart's liability would exceed $100,000 has long since vanished. Prior to trial the parties stipulated that "[t]hrough June 2006, Emhart has incurred costs in the amount of $711,732.00 for performing the work required by the three orders issued by the EPA." How Century could agree to this stipulation and yet contest exhaustion is beyond comprehension. The obvious implication of the stipulation is that the Primary Policy's limit of liability was exhausted long ago. In fact, a review of the record reveals that Emhart's indemnification expenses exceeded $100,000 in October 2001, three months before this lawsuit was filed. See supra Part II.C.2 (discussing the rather unique time line in this case). Accordingly, Century was obliged to defend Emhart under the Excess Policy unless it can show that a limitation or exclusion applied.

Century's argument that Emhart cannot prove exhaustion because Century "has not paid anything to Emhart under the Primary Policy for the underlying claim" is likewise unavailing. In critical respect, the Excess Policy conditions coverage on the event that the "limits of liability of the underlying insurance are exhausted because of . . . property damage." Like the Primary Policy, Century's duty to defend triggers under the Excess Policy in the event of "any suit against [Emhart] seeking damages on account of . . . property damage." As this language makes plain, the only qualification for exhaustion is "property damage," which the Excess Policy defines as "injury to or destruction of tangible property." No reasonable construction of the Excess Policy would require payment from Century's coffers as a prerequisite for exhaustion. See Am. Commerce Ins. Co. v. Porto, 811 A.2d 1185, 1192 (R.I. 2002) (observing that the proper test is "not [] what the insurer may have intended the policy to cover or exclude, but rather what an ordinary reader of the policy would have understood the policy's terms to mean if he or she had read them"). Courts presented with this precise question have concluded similarly. See, e.g., Pac. Employers Ins. Co. v. Servco Pac. Inc., 273 F. Supp. 2d 1149, 1154 (D. Haw. 2003) (distinguishing between policy language that requires exhaustion because of property damages and exhaustion by payment of judgments and settlements). To hold otherwise would allow Century to avoid liability under the Excess Policy by

wrongfully holding out under the Primary Policy. This would be a perversion of the exhaustion requirement.

In a final attempt to avoid its duty to defend under the Excess Policy, Century points to the Exclusion of Waste Products Endorsement, which excludes "[i]njury to or destruction of property caused by intentional or willful introduction of waste products, fluids or materials . . . irrespective of whether the insured [possessed] knowledge of the harmful effects of such acts." According to Century, the charging documents allege that Metro-Atlantic caused the contamination at the Site by intentionally introducing waste products. Because the waste-product exclusion explicitly states that the Excess Policy does not apply to such activity, Century contends that it need not provide Emhart with a defense under the Excess Policy.

Century has the burden to prove that the waste-product exclusion applies. <u>See</u> <u>Children's Friend & Serv. v. St. Paul Fire & Marine Ins. Co.</u>, 893 A.2d 222, 229 (R.I. 2006) (requiring an insurer to prove that a professional services endorsement that was not attached to the policy was properly part of it). As previously discussed, that burden requires Century to show that the charging documents do not provide any <u>potential</u> for coverage in light of the Excess Policy's exclusionary language. <u>See</u> <u>Flori</u>, 388 A.2d at 26; <u>Beals</u>, 240 A.2d at 403; <u>see also</u> <u>Montrose</u>, 861 P.2d at 1156. If Century cannot do so, it must defend Emhart under the Excess

Policy. See Porto, 811 A.2d at 1196 ("If the type of injuries suffered are excluded from coverage under the language of the policy, no right to coverage or duty to defend the insured exists."); see also Providence Journal, 938 F. Supp. at 1074, 1079 (holding that a pollution exclusion barred insurer's duty to defend and indemnify).

Laying the charging documents alongside the circumscribed language of the waste-product exclusion as the pleadings test requires, it becomes apparent that Century has failed to satisfy its burden. The closest language in the charging documents helpful to Century's position is as follows. The PRP Letter states that the EPA "has documented the release or threatened release of hazardous substances or pollutant or contaminants at the Site." The First Administrative Order alleges that "[t]he chemical companies [] buried drums and other containers at the Site," and that "[t]he chemicals manufactured by these companies included hexachlorophene." The Second and Third Administrative Orders state, in identical language, that "[e]vidence suggests that the operations of the chemical companies and the drum reconditioning facility at the Site resulted in releases and threats of releases of hazardous substances at the Site." None of these documents allege the intentional or willful introduction of waste products at the Site, see Porto, 811 A.2d at 1196, and Emhart has not conceded that Metro-Atlantic engaged in such conduct, see Providence

Journal, 938 F. Supp. at 1079. Neither do these documents allege the unintentional or involuntary introduction of waste products such that would clearly remove Emhart's claim from the specter of exclusion, but under long-settled Rhode Island law, "doubt must be resolved against [the insurer]," Flori, 388 A.2d at 27, as explained in greater detail above. See also Montrose, 861 P.2d at 1156.

The Interim Final Remedial Investigation (the "Remedial Investigation"), which Century touts in a supplemental memorandum, contains the same neutral allegations that saturate the charging documents.[19] For example, § 7.1.1, entitled "Primary Sources of Contamination," is entirely equivocal:

> Trichlorophenols were shipped to the site, where it is believed that hexachlorophene was manufactured in approximately 1965. [Hexachloroxanthene] and dioxin were byproducts of this process. The building where this process is believed to have taken place was located on the east bank of the Woonasquatucket River . . . . Other chemical processes also occurred and could be the source of other contaminants at the site.

---

[19] The Remedial Investigation was issued by an environmental consulting firm on behalf of the EPA in June 2005. Century claims that "[t]he EPA's allegations include the [Remedial Investigation]," implying, it would seem, that, if the Remedial Investigation did in fact allege the intentional or willful introduction of waste products (it does not), Century's decision in 2000 not to defend Emhart under the Excess Policy was proper. This contention borders on frivolous. If anything, the Remedial Investigation merely would have discontinued Century's duty to defend as of June 2005, not five years earlier. See supra note 18. In any event, the Remedial Investigation fails to show that there is no potential for coverage.

The following section, entitled "Primary Release and Transport Mechanisms," is equally speculative:

> Chemicals were apparently released directly to the ground, buried, and possibly discharged directly to the Woonasquatucket River. . . . Discharge of chemicals directly into the river, overland flow of chemicals, and erosion and transport of contaminated source area soils by surface runoff resulted in contamination of surface water and sediment in the adjacent river and ponds and tailrace on the east side of the site.
>
> The spatial distributions and concentrations of dioxin (primarily 2,3,7,8-TCDD) and [Hexachloroxanthene] in soil and sediment suggest that these contaminants may have been released to the Woonasquatucket River via the direct discharge of dioxin-bearing waste. Dioxins/furans, PCBs, pesticides and other chemicals also probably migrated to the river and Allendale Pond via surface runoff and erosion of contaminated soils from the source area.

An earlier section, purporting to analyze the results of a "forensic review," conveys the following "conceptual model":

> Dioxins (primarily 2,3,7,8-TCDD), furans, and [Hexachloroxanthene] were generated as hexachlorophene byproducts that were discharged directly into the Woonasquatucket River. 2,3,7,8-TCDD and [Hexachloroxanthene] ratios are not constant because of variations in the hexochlorophene production process; however, the co-occurrence of [Hexachloroxanthene] and 2,3,7,8-TCDD above background levels in sediments from Allendale Pond to downstream of Manton Dam indicates that the contaminants came from the manufacture of hexachlorophene on the [] site.

These conjectural statements fail even to identify Emhart's predecessor, let alone accuse it of the <u>intentional</u> or <u>willful</u> introduction of waste products.

The application of the pleadings test here may seem unduly burdensome on Century, but Rhode Island precedents are clear. Of

course, INA could have chosen to exclude the introduction of waste products generally without qualification. It did not. (In fact, the record shows that INA modified the Excess Policy to incorporate the more narrow waste-product exclusion (Endorsement 6) in place of an absolute pollution exclusion (Endorsement 5) that, all parties agree, would have barred Emhart's claims in this case.) As written, the waste-product exclusion does not negate the potential for coverage in this case; Century therefore cannot rely on it to avoid its duty to defend.

4. <u>The Umbrella Policy</u>. Notwithstanding Century's defense obligations under the Excess Policy, OneBeacon argues that an absolute pollution exclusion obviates its duty to defend Emhart under the Excess Umbrella Policy No. S-16-07084 (the "Umbrella Policy"). First, OneBeacon calls for the reformation of the Umbrella Policy based on a so-called scrivener's error. The Umbrella Policy provides that it is "subject to all the terms and conditions of Policy No. XBC64674." As it turns out, Policy XBC 64674 is an expired excess insurance policy that Century issued to Crown Chemical Co. ("Crown Chemical"), Crown Metro's immediate predecessor. OneBeacon maintains that its underwriter mistakenly identified the expired XBC 64674 policy, and that the parties really intended that the Umbrella Policy would "follow form" to the superceding Excess Policy (XBC 46961, discussed at length above) then in effect. This distinction is important because the expired

XBC 64674 policy has no pollution exclusion of any kind; the Excess Policy does. Second, OneBeacon argues that, properly reformed, the Umbrella Policy incorporates an absolute pollution exclusion that unequivocally precludes coverage in this case. OneBeacon observes that, at the time the Umbrella Policy was issued, the Excess Policy contained an absolute pollution exclusion (Endorsement 5);[20] later, the Excess Policy was amended by Endorsement 6, which superceded Endorsement 5 and added a narrower pollution exclusion: the now-familiar waste-product exclusion. However, according to OneBeacon, after the Umbrella Policy issued, it could be modified only by an endorsement to the Umbrella Policy itself, not simply by an endorsement to the Excess Policy. Thus, because Endorsement 6 did not purport to modify the Umbrella Policy, OneBeacon contends that the absolute pollution exclusion of Endorsement 5 applies to bar Emhart's claims.

Generally, to reform a contract, "it must appear by reason of mutual mistake that the parties' agreement fails in some material respect to reflect correctly their prior understanding." Yate v. Hill, 761 A.2d 677, 680 (R.I. 2000). By definition, "[a] mutual mistake is one common to both parties wherein each labors under a misconception respecting the same terms of the written agreement

---

[20] In pertinent part, Endorsement 5 reads: "(Except with respect to the products hazard), such insurance as is afforded by this policy or any other endorsement thereto shall not apply to any claim for damages arising out of contamination or pollution of land, air, water or other real or personal property."

sought to be [reformed]." Dubreuil v. Allstate Ins. Co., 511 A.2d 300, 302-03 (R.I. 1986). Because contract law attaches great weight to the written expression of an agreement, mutuality of mistake must be proved by clear and convincing evidence. Kornstein v. Almac's, Inc., 201 A.2d 645, 648-49 (R.I. 1964); Vanderford v. Kettelle, 64 A.2d 483, 487 (R.I. 1949); Restatement (Second) of Contracts § 155 cmt. c. (1981). These requirements apply with equal force to insurance policies. Hopkins v. Equitable Life Assurance Soc'y of the U.S., 270 A.2d 915, 918 (R.I. 1970); Ferla v. Commercial Cas. Ins. Co., 59 A.2d 714, 716 (R.I. 1948).

In recent years, reformation based on a scrivener's error has not received a great deal of attention in Rhode Island courts, and this writer's research has revealed no case in this jurisdiction, however outmoded, that has addressed the issue head-on. See Patterson v. Atkinson, 37 A. 532, 532-33 (R.I. 1897) (holding that a mortgage was valid even though, on account of a scrivener's error, it purported to convey the entire property when, in fact, the mortgagor maintained only a half interest in the property and the parties had intended to convey only that half interest); Cannon v. Beaty, 34 A. 1111, 1111-12 (R.I. 1896) (refusing to reform a deed that contained a scrivener's error because a statute precluded the execution of the deed in the first place); Almy v. Daniels, 4 A. 753, 755 (R.I. 1886) (declining to consider reformation argument based on a scrivener's error because the matter was not properly

before the court); Diman v. Providence, Warren, & Bristol R.R. Co., 5 R.I. 130, 1858 WL 2576 at *1-*2 (R.I. 1858) (holding that an agreement contained in a subscription book could not be reformed when the plaintiff had mistakenly subscribed for double the amount of stock).

Emhart uses this dearth of authority as a basis for its argument that there can be no reformation, regardless of OneBeacon's intentions, without clear and convincing evidence that the insured (as well as the insurer by way of its underwriter's error) intended for the Umbrella Policy to follow form to the Excess Policy. OneBeacon responds that mutuality of mistake is not necessary where, as here, the mistake is due to the clerical error of the scrivener. The rationale for this departure essentially is that the mistake is mutual in the sense that the scrivener did not properly memorialize or transcribe what either party actually intended. 2 Couch on Insurance § 27:28 (Lee R. Russ, et al. eds., 3d ed. 1995); see Nash Finch Co. v. Rubloff Hastings, L.L.C., 341 F.3d 846, 849-50 (8th Cir. 2003) (construing Nebraska law); Int'l Union of Elec., Elec., Salaried, Mach. and Furniture Workers, AFL-CIO v. Murata Erie N. Am., Inc., 980 F.2d 889, 907-08 (3d Cir. 1992) (construing Pennsylvania law within the context of ERISA); Cincinnati Ins. Co. v. Fred S. Post, Jr., Co., 747 S.W.2d 777, 781-82 (Tenn. 1988); Geoghegan v. Dever, 194 P.2d 397, 403 (Wash. 1948); see also OneBeacon Am. Ins. Co. v. Travelers Indem. Co. of

Ill., 465 F.3d 38, 41 (1st Cir. 2006) (observing that "'[t]he classic case for reformation' is when the mutual mistake can be traced to a typo or transcription error") (quoting E. Allen Farnsworth, Farnsworth on Contracts § 7.5 (2001)). For evidence of the parties' unitary intention that the Umbrella Policy would follow form to the Excess Policy (as opposed to the expired XBC 64674 policy), OneBeacon observes that the Umbrella Policy identifies Crown Metro (not Crown Chemical) as the named insured. Also, OneBeacon's underwriter, Vincent Puccio, testified that it was not his practice to underwrite excess umbrella coverage subject to the terms and conditions of an expired underlying excess policy. Moreover, OneBeacon posits that, without some specific reason in mind, it would be nonsensical for an insured to procure an additional layer of excess coverage that would not follow form to the existing layer beneath it; here, the Excess Policy.

At first blush, OneBeacon's call for reformation is compelling. But, in the end, reformation would be a pointless remedy under the circumstances of this case. Were the Umbrella Policy to be reformed as requested, OneBeacon could succeed only if the Court agreed that it should have its cake and eat it too. OneBeacon argues that Endorsement 6 did not modify the (properly reformed) Umbrella Policy because OneBeacon did not explicitly consent to it. Here, Onebeacon cannot succeed. If OneBeacon intended for the Umbrella Policy to follow form to the Excess

Policy, it must have been aware that the terms of that policy were subject to change. The applicable provision in the Excess Policy provides that "the terms of this policy [shall not] be waived or changed, except by endorsement issued to form a part of this policy." The Umbrella Policy could have provided a separate means of modification. For example, a section entitled "Exceptions" states that "[t]his insurance differs from the Policy which it follows in the following particulars," and goes on to set a different limit of liability and premium. A subcategory entitled "Other" provides an ideal space where OneBeacon could have addressed its modification concerns. The category is conspicuously left blank.[21] The conclusion to draw from this omission is that OneBeacon set a premium that reflected the risk that an endorsement to the Excess Policy might amplify its scope of coverage (as Endorsement 6 certainly did). The upshot is that, by claiming that the Umbrella Policy followed form to the Excess Policy, OneBeacon effectively consented to the incorporation of Endorsement 6. See GenCorp, Inc. v. Am. Int'l Underwriters, 178 F.3d 804, 812-13 (6th Cir. 1999) (allowing the incorporation into a follow form excess policy of an absolute pollution exclusion that was added to the primary policy after the policy period had ended and that was made retroactive to the issuance of the primary policy); Great Atl. Ins.

[21] Also conspicuous is the fact that when OneBeacon received a courtesy copy of Endorsement 6 in the mail, it did nothing to dispute the modification.

Co. v. Liberty Mut. Ins. Co., 773 F.2d 976, 978 (8th Cir. 1985) (holding that an excess insurer had to follow form to a primary policy that the primary insurer and the insured reformed to include a territorial endorsement to correct a clerical error); Pub. Util. Dist. No. 1 v. Int'l Ins. Co., 881 P.2d 1020, 1027 (Wash. 1994) (holding that an excess insurer was bound by a retroactive errors-and-omissions endorsement added to the primary policy afterwards).

In the last act, however, OneBeacon is saved from Century's fate by a deus ex machina of sorts: the Umbrella Policy's exhaustion requirement and the timing of the jury verdict. OneBeacon's duty to defend Emhart under the Umbrella Policy is subject to the exhaustion of the Excess Policy's $1 million limit of liability (the threshold is $1.1 million with the addition of the Primary Policy's limit). Cf. Liberty Mut. Ins. Co. v. Harbor Ins. Co., 603 A.2d 300, 302 (R.I. 1992) (holding that the duty of a true excess insurer to indemnify the insured does not attach until the primary policy has been exhausted). Any duty to defend Emhart in the present case, however, ceased as of the date the jury found in favor of the insurers on the issue of indemnity.[22] See

---

[22] Emhart disputes this on the grounds that it is an "innocent" party to the CERCLA action and is therefore entitled to an unending defense by its insurers. Emhart cites no authority to support this position. This writer has found several that, in addition to Shelby, supra, definitively reject it. See, e.g., Conway Chevrolet-Buick, Inc. v. Travelers Indem. Co., 136 F.3d 210, 213-15 (1st Cir. 1998) (holding that the district court's partial grant of summary judgment relieved the insurer of its duty to defend because the claims that remained were clearly excluded from coverage);

Shelby, 767 A.2d at 77 ("The plaintiff has a duty to defend the underlying action at trial until there has been a finding of fact that the cause of the collapse was excluded from coverage under the policy or until a settlement has been reached."). As a practical matter, the only relevant inquiry now is whether the Excess Policy's limit of liability has been, by the date of the jury verdict (October 19, 2006), "exhausted because of . . . property damage." All parties agree that is has not. Indeed, Emhart, who bears the burden of proof on this issue, see Kayser-Roth, 770 A.2d at 416-17, stipulated that "[t]hrough October 19, 2006, the indemnification costs incurred by Emhart did not exceed $1.0 million."

Attempting to avoid this result, Emhart argues that OneBeacon was required to "drop down" and defend Emhart under the Umbrella Policy after Century wrongfully refused to provide a defense. See 14 Couch on Insurance § 200:46 ("If a primary insurer denies coverage, the excess insurer would be obligated to defend."). However, this argument ignores OneBeacon's status as a true excess

---

Liberty Mut. Ins. Co. v. FAG Bearings Corp., 153 F.3d 919, 922-24 (8th Cir. 1998) (holding that the insurer must continue to defend the insured "so long as there remained any question as to whether the underlying claims were covered by the policies"); Snug Harbor, Ltd. v. Zurich Ins., 968 F.2d 538, 545 (5th Cir. 1992) (holding that "[a]lthough the outer boundary of a policy's potential coverage may be expansive, an insurer's duty to defend ceases there"); 14 Couch on Insurance § 200:29 ("An insurer's duty to defend is a continuing one and continues until the underlying action is resolved, or it is shown that there is no potential for coverage.") (footnotes omitted).

insurer, see Liberty Mut. Ins. Co., 603 A.2d at 302; 1 Insurance Claims & Disputes § 4:11 (obligation to "drop down" does not apply to excess policies that require exhaustion of underlying policies as a precondition to coverage), and incorrectly assumes that the charging documents clearly assert that remediation costs would exceed $1.1 million. See 1 Insurance Claims & Disputes § 4:11 (observing that a non-true excess insurer may have an obligation to "drop down" if "the claim against the insured exceeds the policy limits of the underlying insurance"); see also Hocker v. N.H. Ins. Co., 922 F.2d 1476, 1484-85 (10th Cir. 1991); Am. Family Life Assurance Co. v. U.S. Fire Co., 885 F.2d 826, 832 (11th Cir. 1989); N.H. Indem. Co. v. Budget Rent-A-Car Systems, Inc., 64 P.3d 1239, 1243 (Wash. 2003). As Emhart itself concedes, "none of these documents expressly listed remediation costs in excess of $1,000,000" such that might have triggered OneBeacon's duty to defend under this theory.

The difficulty for Emhart at this juncture is that the jury verdict created a clear end-date for any defense obligation that may have existed (and for Century, did in fact exist) up to that point. Before then, the exhaustion of the Umbrella Policy was simply a condition that presumably would have been satisfied at some time in the future, and did not then affect Emhart's call for declaratory relief. But when the jury found no coverage, exhaustion became a present and yet-unrealized requirement without

which OneBeacon's duty to defend could not trigger. Hindsight reveals that Emhart bears some measure of responsibility: had it waited to file suit until exhaustion had run its course, today's outcome may very well have been different. As circumstances unraveled, however, OneBeacon's gamble in refusing to defend Emhart paid off; for Century, it did not.

B. Breach of the Duty to Defend

Because Century had a duty to defend Emhart, but failed to do so, the inquiry turns to damages, the proper measure of which is the subject of some dispute.

1. Defense Costs as a Measure of Damages. Century's primary argument here is that the defense costs that Emhart had incurred as of October 19, 2006 ($4,740,617.92) were unreasonable, and that it is entitled to a discount for all unreasonable expenditures. Century takes particular issue with Emhart's attorneys' fees ($4,408,958.80 or 93% of the total defense costs). First, Century argues that it is not responsible for costs generated before Emhart's tender of defense under the Excess Policy (November 22, 2000).[23] Second, Century challenges four discrete

---

[23] Uncharacteristically, Emhart does not appear to contest this argument. (See Dkt. Entry #517, Pl.'s Proposed Findings of Fact and Conclusions of Law 4-6.) Although Century is likely correct, see, e.g., Elan Pharm. Research Corp. v. Employers Ins. of Wausau, 144 F.3d 1372, 1381-82 (11th Cir. 1998) (applying Georgia law); Lafarge Corp. v. Hartford Cas. Ins. Co., 61 F.3d 389, 399 & n.19 (5th Cir. 1995) (applying Texas law); Hartford Accident & Indem. Co. v. Gulf Ins. Co., 776 F.2d 1380, 1382-84 (7th Cir. 1985) (applying Illinois law), the issue is far from settled. See, e.g.,

pursuits that it claims were not reasonably related to Emhart's defense because they had little to no chance of success: (1) asserting a non-successorship defense; (2) challenging the proposed consent decrees of two other PRPs, United States v. Brook Village Assocs., No. 05-195, 2006 WL 3227769 (D.R.I. Nov. 6, 2006); (3) suing the Buonanno estate, In re Estate of Buonanno, 909 A.2d 494 (R.I. 2006); and (4) filing a claim in the Chapter 11 bankruptcy proceedings against the parent corporation of a now defunct PRP. Third, Century contends that the entire fee award should be reduced by 35% for improper time-keeping and inflated hourly rates.

Emhart responds essentially with an estoppel argument. It argues that Century should not be allowed to contest the reasonableness of the fees it was forced to shoulder as a result of Century's breach. To support this hypothesis, Emhart touts Taco Bell Corp. v. Cont'l Cas. Co., 388 F.3d 1069 (7th Cir. 2004). There, much like here, an insurer (Zurich) that breached its duty to defend argued that the insured (Taco Bell) had overpaid its lawyers in the underlying litigation. The Seventh Circuit refused to give Zurich a forum to voice its objection. Writing for the panel, Judge Posner observed that Taco Bell had a powerful

---

Sherwood Brands, Inc. v. Hartford Accident & Indem. Co., 698 A.2d 1078, 1083-87 (Md. 1997) (reviewing an insurer's obligation to reimburse its insured for pre-tender defense costs in a variety of contexts). But in the welcomed absence of controversy, the Court will credit Century's reimbursement obligation the amount of defense costs Emhart incurred before November 22, 2000 ($151,713.91).

incentive to minimize its legal expenses because of the uncertainty surrounding reimbursement, and "where there are market incentives to economize, there is no occasion for a painstaking judicial review." Taco Bell, 399 F.3d at 1076. He continued,

> although Zurich's policy entitled it to assume Taco Bell's defense, in which event Zurich would have selected, supervised, and paid the lawyers for Taco Bell in the Wrench litigation, it declined to do so – gambling that it would be exonerated from a duty to defend – with the result that Taco Bell selected the lawyers. Had Zurich mistrusted Taco Bell's incentive or ability to economize on its legal costs, it could, while reserving its defense that it had no duty to defend, have assumed the defense and selected and supervised and paid for the lawyers defending Taco Bell in the Wrench litigation, and could later have sought reimbursement if it proved that it had indeed had no duty to defend Taco Bell. So presumably it had some confidence in Taco Bell's incentive and ability to minimize legal expenses.

Id. at 1076-77 (citation omitted). Based on this theory of economization, the court rejected Zurich's challenge as a matter of law.

There is little data to suggest that the Rhode Island Supreme Court would adopt such an approach. Emhart points to language in Kayser-Roth where the court remarks: "First State has missed its opportunity to defend Kayser-Roth against the EPA and cannot now stand back and quibble with the job Kayser-Roth has done in defending itself." Kayser-Roth, 770 A.2d at 419 (quoting Ins. Co. of N. Am. v. Kayser-Roth, Corp., No. 92-5248, 1999 WL 813661 at *46 (R.I. Super. July 29, 1999)). But judges expect their pronouncements to be read in context, In re Olympic Mills, 477 F.3d

1, 11 (1st Cir. 2007), and the broader context of Kayser-Roth does not support Emhart's position. Closer examination reveals that the court was referring to EPA oversight costs (i.e., indemnity costs), not attorneys' fees (i.e., defense costs) that, under the logic of Taco Bell, could be minimized by a cautious insured. See Kayser-Roth, 770 A.2d at 419. Moreover, Taco Bell itself is hardly the watershed that Emhart's argument implies. Few courts outside of the Seventh Circuit have even cited it; of those, none have adopted its reasoning in the manner advocated by Emhart.[24]

Rather, the general rule in these situations is that the initial burden is on the insured to prove that its fees were reasonable (not on the insurer to prove the negative). E.g. Liberty Mut. Ins. Co. v. Cont'l Cas. Co., 771 F.2d 579, 582 (1st Cir. 1985) (applying Massachusetts law); 14 Couch on Insurance § 205:76 ("Insureds and the lawyer seeking attorney's fees for the insurer's breach of its duty to defend have the burden of proving the reasonableness of hourly rates, given the character and complexity of the litigation, the attorney's experience and other qualifications, and the locale of the legal services."); see also Colonial Plumbing & Heating Supply Co. v. Contemporary Constr. Co.,

---

[24] To this writer's knowledge, only one court in the country has considered the question. See Steadfast Ins. Co. v. Purdue Federick Co., No. X08CV020191697S, 2006 WL 1149207 at *2 (Conn. Super. Apr. 10, 2006) (rejecting Taco Bell because Connecticut law did not permit courts to presume that an insured's attorneys' fees were reasonable unless there was no evidence of unreasonableness, thus defeating the insured's basis for summary judgment).

Ins., 464 A.2d 741, 744 (R.I. 1983) (requiring the presentation of "affidavits or testimony establishing the criteria on which a fee award is to be based" to "assist a trial justice in determining what a reasonable fee would be in a given case"). An insurer's ability to contest this proffer, however, is somewhat diminished (although not entirely eradicated). For example, second guessing an insured's tactical decisions within the defensive sphere is generally precluded, and uncertainties in the nature and extent of an insured's legal representation are to be resolved against the breaching insurer. See Arenson v. Nat'l Auto. & Cas. Ins. Co., 310 P.2d 961, 968 (Cal. 1957). These nuances recognize that, by breaching its duty to defend, the insurer effectively ceded its "right and duty" to control the manner and scope of the defense.

Under Rhode Island law, which governs this question, see Blanchette v. Cataldo, 734 F.2d 869, 878 (1st Cir. 1984), an award of attorneys' fees must be fair and reasonable. Fallon v. Skin Med. & Surgery Centers of R.I., Inc., 713 A.2d 777, 780 (R.I. 1998); see Kayser-Roth, 770 A.2d at 419 (cataloging authority in the insurance context). A leading case on the subject teaches that,

> [w]hat is fair and reasonable depends, of course, on the facts and circumstances of each case. We consider the amount in issue, the questions of law involved and whether they are unique or novel, the hours worked and the diligence displayed, the result obtained, and the experience, standing and ability of the attorney who rendered the services. Each of these factors is important, but no one is controlling.

Palumbo v. U.S. Rubber Co., 229 A.2d 620, 622-23 (R.I. 1967) (citations omitted); Colonial Plumbing, 464 A.2d at 743 (adding factors that take into account the "fee customarily charged in the locality for similar legal services" and "the nature and length of the professional relationship with the client"); see also OCG Microelectronic Materials, Inc. v. White Consolidated Indus., Inc., 40 F. Supp. 2d 83, 86 (D.R.I. 1999) (noting that an inquiring court can, based on the Palumbo factors, "make concrete findings and reduce the claim by corresponding, precise amounts" or "by an across-the-board discount").[25]

---

[25] As an interesting aside, these factors mirror (and predate) those developed by the Fifth Circuit in Johnson v. Ga. Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974), an influential case that established one of the two methods for calculating attorneys' fee at the federal level. The other method is the so-called "lodestar" method developed by the Third Circuit in Lindy Bros. Builders, Inc. v. Am. Radiator & Standard Sanitary Corp., 487 F.2d 161 (3d Cir. 1973). In this context, a lodestar is "the base amount of the fee to which the prevailing party is entitled [calculated] by multiplying the number of hours productively expended by counsel times a reasonable hourly rate." Lipsett v. Blanco, 975 F.2d 934, 937 (1st Cir. 1992). Although the lodestar method is generally preferred in fee-shifting cases, see Coutin v. Young & Rubicam P.R., Inc., 124 F.3d 331, 337 (1st Cir. 1997) (noting a strong preference for the lodestar method in civil rights cases), no Rhode Island court has applied it under state law. In fact, a state trial court has rejected it to the extent that it conflicted with the Palumbo factors. See Gooding Realty Corp. v. Bristol Bay CVS, Inc., No. 99-4987, 2001 WL 1643802 at *3 n.1 (R.I. Super. Dec. 17, 2001). However, because Emhart has already calculated a lodestar in the present case, the Court will use that number as a starting point from which to apply the factors identified in Palumbo and its progeny.

After reviewing these factors, the Court finds that, based on the circumstances of this case, Emhart has satisfied its burden to prove that its attorneys' fees were reasonable. Although the amount of fees is quite high (about $4.3 million without pre-tender fees), Emhart's potential liability is exponentially higher. When all is said and done, EPA oversight costs and natural resource damages are likely to exceed $100 million. This alone justified, if it did not demand, a vigorous and multifarious defense. At the same time, the issues involved in defending the underlying action were extremely complex, making it more difficult to predict the likelihood of success on a particular issue. The successorship issue, for example, required a deep understanding of a corporate paper trail that spanned decades; in addition, many of the necessary documents were hard to find or lost. Emhart ultimately abandoned the defense, but the initial pursuit was hardly unreasonable, especially considering that success would have shielded Emhart from liability altogether.[26] The Buonanno litigation and the bankruptcy claim fall into similar categories. The fact that Emhart did not have a great deal of success in these areas says very little. Superfund practice is generally about minimizing damages; eliminating them entirely, as Century's own expert witness testified, is rare if not unheard of. Viewed in

[26] Century's criticism here is particularly bold considering it too (unsuccessfully) challenged Emhart's status as a corporate successor to Crown Metro. <u>See</u> <u>supra</u> Part II.A.1.

this light, Emhart obtained some measure of success in at least one area identified by Century: by intervening to challenge two proposed consent decrees, Emhart ensured that the settlement funds were placed in escrow for future remediation efforts (the fear was that the EPA would use these funds to satisfy past obligations instead of letting them accumulate interest that Emhart could use to offset future costs).

Turning to its global challenges, Century requests that the overall award be reduced by 25% because Emhart chose a large Washington, D.C. firm instead of a boutique or medium-size environmental law firm in Providence or Hartford. That request is denied. The going rate for a particular legal service in Rhode Island is a factor, but it is only one factor among many. See Palumbo, 229 A.2d at 623. There are several reasons why a large corporation like Emhart may wish to retain out-of-district counsel that may happen to have higher hourly rates. See Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany, 493 F.3d 110, 119 (2d Cir. 2007) (holding that "a district court may use an out-of-district hourly rate . . . in calculating the presumptively reasonable fee if it is clear that a reasonable, paying client would have paid those higher rates"); cf. In re Cabletron Sys., Inc. Sec. Litig., 239 F.R.D. 30, 38 (D.N.H. 2006) (adopting an approach that seeks to determine the reasonableness of a fee award based on what a lawyer would receive if he were selling his

services in the open market). Many of those reasons are present in this case. For example, Emhart had a long professional relationship with Swindler Berlin (now part of Bingham McCutchen's Washington office), to whom it would naturally turn for representation in a high-exposure Superfund case, as it has been doing for years. See Colonial Plumbing, 464 A.2d at 743. Also, a corporation (like Emhart) with multiple pending Superfund actions may reasonably want advice from a core team of attorneys familiar with its liabilities and larger strategic interests. Moreover, a full-service law firm like Bingham McCutchen would be better positioned to tackle the range of diverse issues that typically arise in a more complicated Superfund case, as they did here (bankruptcy and trusts and estates come to mind). Retaining a firm with a national reputation may be another important consideration, especially when the client's own reputation is on the line. See Palumbo, 229 A.2d at 623. As noted earlier, Emhart is essentially the only economically viable PRP, and may be saddled with much or all of the costs associated with remediation. A corporation in this unenviable position might reasonably desire premier representation; equally reasonable would be its desire that its representation be perceived as such.

Century also requests a 10% reduction for what it thinks was an excessive number of timekeepers, a general lack of billing oversight, the use of quarter-hour billing increments, and vague

entries. There is something off-putting about this request. After all, it was Century who wrongfully refused to defend Emhart in the first place. If it had defended Emhart (under a reservation of rights, for example), Century would have been in a position to monitor and perhaps prevent the time-management and billing practices it now decries (and when defense costs approached $1.1 million, it could have paid the policy limits and saved millions). Busy judges should not be expected to assume that function ex post on account of an insurer's ill-considered refusal to defend (made in good faith or bad). See, e.g., Etchell v. Royal Ins. Co., 165 F.R.D. 523, 564 (N.D. Cal. 1996) (resolving ambiguities in an attorney's time sheets against the breaching insurer). That said, this Court is unwilling to ignore Emhart's own expert, who testified that approximately 3% of the aggregate fee (or about $130,000) was unreasonable. His basis for calculating this figure is not exactly clear, but it appears to quantify excessive or otherwise unnecessary billing. Given the Herculean task of sorting through Emhart's voluminous fee application, the Court accepts this figure and reduces the fee award accordingly. See OCG Microelectronic, 40 F. Supp. 2d at 86 (applying an overall reduction in the fee award to resolve issues that could not accurately be defined in terms of hours of service).

One seemingly complicated issue remains before moving on to the more interesting discussion of punitive damages. Century

argues that, where a claim raises the potential for coverage in multiple periods, an insurer is only responsible for a "pro rata share" of the underlying defense costs. See, e.g., Sec. Ins. Co. of Hartford v. Lumbermens Mut. Cas. Co., 826 A.2d 107, 121-22 (Conn. 2003); Owens-Illinois, Inc. v. United Ins. Co., 650 A.2d 974, 989-93 (N.J. 1994); Ins. Co. of N. Am. v. Forty-Eight Insulations, Inc., 633 F.2d 1212, 1225 (6th Cir. 1980). According to Century, that share is a portion of the reasonable defense costs (allocated to each policy) based on the ratio between the periods of Century's coverage (10.5 months for the Primary Policy, thirteen months for the Excess Policy) and the period of dioxin exposure alleged by the EPA (fifty-eight years). This means, figuring in the Court's 3% discount above, that Century would owe Emhart approximately $71,000 under both policies, or about 1.5% of the reasonable defense costs (for another telling statistic, consider that this figure represents about 6% of the policies' aggregate limit).[27]

---

[27] This figure assumes that defense costs accrued at a constant rate. In all likelihood, they did not. With that caveat, the calculation would look something like this:

This argument is without merit for many, but primarily two, reasons. The first is that proration (often called the "time-on-the-risk" method of allocation) is inconsistent with the plain language of the policies. The Primary Policy says that Century "will pay on behalf of the Insured all sums which the Insured . . . shall become legally obligated to pay as damages because of . . . property damage" and "shall have the right and duty to defend any suit against the Insured seeking damages on account of such . . . property damage." (Emphasis supplied.) Similarly, the Excess Policy states that, upon the exhaustion of underlying insurance, Century "will indemnify the Insured for ultimate net loss in excess of the retained limit . . . which the Insured shall become legally obligated to pay as damages because of . . . property damage," and

| | Tail Exposure (Days) | Allocated Defense Costs (Hypothetical) | Coverage Ratio (Months) | **Pro Rata Share** |
|---|---|---|---|---|
| Primary Policy | 329/2157 (11/22/00 through 10/17/01) | $691,252.37 (15% of reasonable defense costs) | 10.5/696 | $10,368.79 (1.5% of allocated defense costs) |
| Excess Policy | 1828/2157 (10/18/01 through 10/19/06) | $3,197,096.79 (85% of reasonable defense costs) | 13/696 | $60,744.84 (1.9% of allocated defense costs) |
| **Total** | | $4,608,349.16 ($4,740,617.92 - $132,268.76 ($4,408,958.80 * .03)) | | **$71,113.63** |

"will have the right and duty to defend any suit against the Insured seeking damages on account of such . . . property damage." (Emphasis supplied.) Nothing in this language limits Century's defense obligation to a portion of the amount that Emhart has reasonably incurred in the defense of a "suit . . . seeking damages on account of such . . . property damage." Under long-settled Rhode Island law, "when the terms of an insurance policy are found to be clear and unambiguous, judicial construction is at an end. The contract terms must be applied as written and the parties are bound by them." Amica Mut. Ins. Co. v. Streicker, 583 A.2d 550, 551 (R.I. 1990). Even when an ambiguity exists, "it will be strictly construed against the insurer." Sentry Ins. Co. v. Grenga, 556 A.2d 998, 999 (R.I. 1989). This framework itself is enough to defeat Century's complex (and, based on its ultimate result here, ridiculous) allocation scheme. See Porto, 811 A.2d at 1193 (remarking that "we will not engage in mental or verbal gymnastics to hurdle over the plain meaning of the policy's language").

Although not in direct terms, the Rhode Island Supreme Court endorsed the so-called "all sums" method (sometimes sardonically referred to as the "pick-and-choose" method) in Kayser-Roth. There, Chief Justice Williams, writing for a unanimous court, looked to the "contract principles" applied in Koppers Co. v. Aetna Cas. & Sur. Co., 98 F.3d 1440 (3d Cir. 1996), for guidance in the

case before it. Particularly, the writer observed that, "[i]n Koppers and the case upon which its determination relies, each insurer specifically 'obligated itself to pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of bodily injury [or property damage].'" Kayser-Roth, 770 A.2d at 414 (quoting Koppers, 98 F.3d at 1450) (emphasis in original) (internal quotation marks omitted). Based in part on this authority, the court saddled much of the indemnity costs on the breaching insurer in spite of "the existence of Kayser-Roth's other insurance." See id. This appears to be in line with the majority of other jurisdictions that have considered the question, although the issue is far from settled. See, e.g., Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co., 769 N.E.2d 835, 841 (Ohio 2002); Allstate Ins. Co. v. Dana Corp., 759 N.E.2d 1049, 1058-59 (Ind. 2001); Hercules, Inc. v. AIU Ins. Co., 784 A.2d 481, 491-92 (Del. 2001); J.H. France Refractories Co. v. Allstate Ins. Co., 626 A.2d 502, 505 (Pa. 1993); Keene Corp. v. Ins. Co. of N. Am., 667 F.2d 1034, 1047-50 (D.C. Cir. 1981); see also A.W. Chesterton Co. v. Mass. Ins. Insolvency Fund, 838 N.E.2d 1237, 1242 n.3 (Mass. 2005) (declining to address the question, but noting that the Massachusetts appellate courts have rejected proration in favor of the "all sums" approach). But see Wooddale Builders, Inc. v. Md. Cas. Co., 722 N.W.2d 283, 296 (Minn. 2006); Pub. Serv. Co.

of Colo. v. Wallis & Cos., 986 P.2d 924, 941 (Colo. 1999), and the cases identified by Century.

The other fly in the ointment is that time-on-the-risk allocation is most commonly associated with the continuous-trigger theory. This theory, which had its genesis in the asbestos context, charges a loss to policies in effect from the time of exposure to manifestation. Because the period between exposure and manifestation is typically quite long, these cases generally involve numerous policies. Courts charged with allocating damages among these policies have, as a matter of efficiency more than anything else, opted for an equally dispersive allocation method. This correlation is evident in the very cases Century cites. See, e.g., Security Ins. Co., 826 A.2d at 113-14, 121-22 (adopting pro rata allocation in an asbestos case with a "continuous trigger situation"); Owens-Illinois, 650 A.2d at 990-96 (similar, and criticizing attempts to couple the continuous-trigger theory with other forms of allocation); Forty-Eight Insulations, 633 F.2d at 1224-25 (observing that the court's adoption of the "exposure theory," a precursor to the continuous-trigger theory, provided the basis for pro rata allocation). But see Pub. Serv., 986 P.2d at 941 (concluding that, "in our view, the use of a continuous trigger theory neither requires nor precludes the use of time-on-the-risk allocation"). The problem for Century is that the Rhode Island Supreme Court has adopted a separate, more circumscribed trigger

theory, see CPC, 668 A.2d at 649, described in more detail supra Part II.A.2., and the court has refused to replace it, despite having at least two opportunities to do so. See Textron-Wheatfield, 754 A.2d at 745-46; Textron-Gastonia, 723 A.2d at 1144. In fact, in Textron-Gastonia, the court expressly declined to consider a continuous-trigger argument in light of the test established in CPC. Textron-Gastonia, 723 A.2d at 1141; see also Truk-Away of R.I., Inc. v. Aetna Cas. & Sur. Co., 723 A.2d 309, 313-14 (R.I. 1999) (similar). This undermines the significance of the authority identified by Century, and thus its pitch for time-on-the-risk allocation.

However, Century is entitled to a setoff equal to the amount of settlement funds allocated to the defense of the underlying action ($250,000)[28] that Emhart received from another carrier.[29] See Kayser-Roth, 770 A.2d at 414 (observing that, in the "appropriate

---

[28] Century accuses the settling parties of colluding to keep this figure artificially low, and argues that it should receive a setoff for the full amount allocated to the Site ($1 million). Despite an opportunity for limited discovery in the twilight of this case, Century's only basis for this argument is the fact that the settling parties allocated more to indemnity costs ($750,000). However, under Massachusetts law, which governs this issue, that basis alone is insufficient to modify or otherwise challenge the allocation of settlement funds. See, e.g., United States v. Dynamics Research Corp., 441 F. Supp. 2d 259, 268-69 (D. Mass. 2006); Chapman v. Bernard's Inc., 198 F.R.D. 575, 577-78 (D. Mass. 2001); Slocum v. Donahue, 693 N.E.2d 179, 182 (Mass. App. Ct. 1998); Noyes v. Raymond, 548 N.E.2d 196, 199 (Mass. App. Ct. 1990).

[29] The identity of this settling insurer is irrelevant; also, other information contained in the settlement agreement is subject to a protective order.

case," a non-settling insurer may be entitled to a setoff for a settling insurer's apportioned share of liability) (citing Koppers, 98 F.3d at 1451-55); see also Interlocal Risk Mgmt. Trust, 860 A.2d at 1217-18. Emhart argues that allowing a setoff would reward Century for refusing to honor its obligations, and would discourage insurers from reaching settlements with their insured. These arguments parrot part of the court's holding in Kayser-Roth, but Emhart (again) fails to recognize the distinct backdrop in that case. In Kayser-Roth, the court refused to apply a setoff because First State "hung back" during multi-party negotiations with the insured in the hopes of reducing its liability at the expense of the insurers who had bargained in good faith and reached a settlement. See Kayser-Roth, 770 A.2d at 412-15. That is not what happened here. Nor is there any evidence of bad faith (although carelessness abounded, see below) that might compel a similar result. To ignore the settlement under these circumstances would result in an unjustifiable double recovery, a practice condemned in numerous Rhode Island decisions. See, e.g., Pa. Gen. Ins. Co. v. Cantley, 615 A.2d 477, 480-81 (R.I. 1992) (allowing a setoff to prevent double recovery); Poulos v. Aetna Cas. & Sur. Co., 379 A.2d 362, 365 (R.I. 1977) (recognizing the public policy against double recovery).

All told, Century must pay defense costs as follows:

| | |
|---|---|
| Incurred Defense Costs | $4,740,617.92 |
| Pre-Tender Credit | - $151,713.91 |
| 3% Atty Fee Discount | - $127,717.35 ($4,257,244.89 * .03) |
| Settlement Offset | - $250,000.00 |
| Amount Century Must Pay | = $4,211,186.66[30] |

2. Indemnity Costs as a Measure of Damages. As an addendum to its earlier estoppel argument, Emhart argues that Century, having breached its duty to defend, cannot contest its duty to indemnify. Emhart relies on Conanicut Marine Servs., Inc. v. Ins. Co. of N. Am., 511 A.2d 967 (R.I. 1986). The injury that gave rise to the action in Conanicut was a run-of-the-mill slip-and-fall: one of the marina's customers had injured herself as she disembarked from a motor launch operated by the insured. The customer subsequently sued the insured, who unsuccessfully sought a defense from its insurance carrier. The insured retained its own counsel and proceeded to trial, ultimately settling for $18,000. The insured then sued its insurer to recover the settlement amount.

[30] In another uncharacteristic move, Century concedes that the policies' aggregate limit of liability applies only to indemnification costs, and that it must therefore reimburse Emhart for all reasonable defenses costs even if they exceed that limit. Century provides no authority to support this rather expensive concession (not that it needed to); however, a glace at the case law suggests that Century is correct. See, e.g., Aetna Cas & Sur. Co. v. Commonwealth., 179 S.W.3d 830, 841-42 (Ky. 2005); Cont'l Ins. Co. v. Burr, 706 A.2d 499, 500-02 (Del. 1998); Sproles v. Greene, 407 S.E.2d 497, 501-02 (N.C. 1991).

A trial justice entered judgment in favor of the insured. The Rhode Island Supreme Court affirmed:

> We hold that where an insurer refuses to defend an insured pursuant to a general-liability policy, the insurer will be obligated to pay, in addition to the costs of defense and attorneys' fees, the award of damages or settlement assessed against the insured. Therefore, as a result of the defendant's breach of its duty to defend the plaintiff, it is obligated to pay the $18,000 settlement award plus any interest thereon, in addition to the costs of defense.

Id. at 971. According to Emhart, this rule requires Century to pay indemnity costs in spite of the jury's finding that Century's policies did not provide coverage.

However, Century observes that, in Conanicut, the court identified two mechanisms by which a skeptical insurer might insulate itself from the application of this penalty: (1) defend the insured under a reservation of rights; or (2) seek a declaratory judgment against the insured on the issue of coverage. Id. at 971 n.10; see also Rumford Prop. & Liab. Ins. Co. v. Carbone, 590 A.2d 398, 401 (R.I. 1991), abrogated on other grounds by Skaling v. Aetna Ins. Co., 799 A.2d 997, 1005 (R.I. 2002). Century argues that it took similar (and, for one policy, identical) precautions. For instance, Century claims that it did not "breach" its duty to defend Emhart under the Excess Policy because it never technically refused to tender a defense; instead, Century simply denied coverage under certain (and mutable) grounds.

Next, Century blames Emhart for not telling it when the Primary Policy's limit of liability became exhausted, a prerequisite to Century's duty to defend under the Excess Policy. This lack of knowledge, Century continues, prevented it from exercising its right and duty to defend. Finally, Century argues that it could not have breached its obligations under the Primary Policy because it was not aware that the policy existed until after Emhart filed this lawsuit. And when Century discovered the Primary Policy, it immediately filed a counterclaim seeking a declaratory judgment against Emhart on the issue of coverage, as Conanicut requires.

These arguments have varying degrees of plausibility, but all must be rejected in the end. Century's claim that an insurer cannot breach its duty to defend without expressly refusing to do so is a variation of an argument rejected earlier. See supra Part II.A.3 (payment from insurer as prerequisite for exhaustion). As a preliminary matter, Century overlooks Zajac's January 11, 2002 letter, where she concluded that Century was "not presently obligated either to provide a defense or to indemnify Emhart in this matter." (Emphasis supplied.) But Century's argument would be meritless even if Zajac had not been so forthright. Yes, there is some authority that conditions breach on an express denial, but only in situations where an insurer has not yet been presented with a complaint or equivalent. See, e.g., Manny v. Anderson's Estate, 574 P.2d 36, 38-39 (Ariz. App. Ct. 1977) (holding that anticipatory

repudiation must be express); see also 14 Couch on Insurance § 205:16 ("Denial of Coverage Not Accompanied by Refusal to Defend"). Here, Emhart provided Century with the PRP Letter and the First Administrative Order along with its November 22, 2000 letter requesting coverage under the Excess Policy; later, Emhart forwarded the remaining charging documents to Century when they became available.

Century's next argument is hollow and a little hypocritical. It is true that, in October 2001, Emhart did not disclose the fact that indemnification costs had exceeded $100,000. But such a disclosure would have been odd; more importantly, Century would have greeted it with perplexity. At that time, neither Emhart nor Century knew that the Primary Policy existed. They therefore could not have known, as they do now, that the Excess Policy's exhaustion requirement had been fulfilled in October 2001. Nevertheless, in a typical case, Emhart would be charged with the delay, for it is the insured and not the insurer who must prove the existence of a particular policy. See Gen. Accident Ins., 716 A.2d at 757. This is not a typical case, however. Recall that in November 2000 Emhart asked Century to "immediately conduct a review of your records regarding . . . any additional insurance coverage INA provided to [Crown Metro]." Zajac overlooked the request at first, then, when she was reminded about it in January 2001, initiated an unsuccessful search (the results of which she did not convey to

Emhart). For some unknown reason,[31] she initiated a second search in August 2002 that, half a year later, located the Primary Policy,[32] which sat for another seven months in her file until she happened upon it one morning in July 2003 – nearly three years after Emhart's original request. There is no room for Century's argument in these facts. When an insurer's conduct frustrates the insured's ability to satisfy its burden, the insurer should bear the costs of its own carelessness.

Century's third and final argument, although perhaps the most appealing, is without merit for many of the same reasons discussed above. Giving an insurer the option to seek a declaratory judgment

---

[31] Why Zajac would have initiated a second search in August 2002 if she believed that her 2001 search was comprehensive is another mystery in this case. The only change in circumstances was the filing of the lawsuit; however, the record reveals that Emhart did not submit document requests or interrogatories to Century in connection with this litigation until October 2002, when Zajac's second search was already underway.

[32] Century offers no explanation for why Zajac's 2002 search located the Primary Policy when her 2001 search did not. The only material distinction between the two searches was the parameters for the policy's alleged inception/expiration dates: in the 2001 search, she used specific dates (December 2, 1968 and December 31, 1976); in the 2002 search, however, she simply put "UNKNOWN." The source of these dates is unclear; also unclear is whether these parameters limited the search to policies (1) with corresponding inception/expiration dates or (2) with inception/expiration dates somewhere in that range. Zajac testified to the latter, but the fact that her 2002 search discovered the Primary Policy – indeed, that is was found in a facility ("Pierce Leahy/Iron Mountain") where, in 2001, it was specifically disclaimed – strongly suggests the former. If this is correct (and Century has presented no evidence to suggest otherwise), Zajac's first search was doomed from the start, and carelessly delayed the production of the Primary Policy.

in this type of situation provides the parties with a determination of their obligations ex ante. Cf. Fireman's Fund Ins. Co. v. E. W. Burman, Inc., 391 A.2d 99, 101 (R.I. 1978) (describing actions for declaratory judgment "the most expeditious and fairest method by which an insurer can secure an advance determination as to its contractual duty to defend or indemnify one of its policyholders"). Declaratory judgment is thus a valuable mechanism for a melancholy insurer faced with a difficult choice (to defend or not to defend a borderline claim) because it eliminates "the risk of being found in breach of its duty to defend at a subsequent time."[33] Conanicut, 511 A.2d at 971 n.10. This scheme is wholly at odds with what Century did here. For over two years, Century disavowed any obligation under the Excess Policy, compelling Emhart to invoke judicial process. During the course of the suit (well over a year after it had commenced), Century finally located the Primary Policy. Seven months later (February 2004), Century filed a counterclaim seeking a declaratory judgment that it did not have a duty to defend or indemnify Emhart under the Primary Policy. Even

---

[33] The plain language of Conanicut does not require an insurer who seeks a declaratory judgment to defend its insured simultaneously under a reservation of rights, see Conanicut, 511 A.2d at 971 n.10, but a subsequent case seems to imply otherwise. See Shelby, 767 A.2d at 76 (noting that an insurer, who filed a declaratory judgment action to establish that it did not have a duty to defend or indemnify its insured, "continued to defend the underlying action under a reservation[] of rights, in accordance with our decisions" in Rumford and Conanicut) (internal quotation marks omitted).

ignoring the length of time it took Century to file the counterclaim, the fact remains that Century could have (and, based on the facts above, should have) found the Primary Policy before Emhart filed suit. Its late discovery was a clarion call for Century to take up the defense (under a reservation of rights, of course), not an invitation for further demurral.

This leaves Century standing on a precipice. The mechanical application of Conanicut to these facts would impose an astronomical penalty on Century. In addition to defense costs, Century would be obligated to pay the full extent of indemnity costs assessed against Emhart,[34] see Conanicut, 511 A.2d at 971 (breaching insurer must pay "the award of damages or settlement assessed against the insured"), regardless of the policies' aggregate limit of liability ($1.1 million). See id. at 971 n.9 (noting, in what was probably dictum,[35] that recovery against a

---

[34] A final consent decree (like the one Emhart is expected to enter into with the EPA) is considered to be a "settlement," at least for purposes of seeking contribution under CERCLA. See 42 U.S.C. § 9613(f)(2); see also Responsible Envt'l Solutions Alliance v. Waste Mgmt., Inc., 493 F. Supp. 2d 1017, 2007 WL 1933064 at *4-*5 (S.D. Ohio 2007).

[35] It is unclear whether the policy in Conanicut had a limit less than $18,000. Because this figure is so low, and because the court's observation is in a footnote, the likely answer is that it did not. Although this statement (or observation) in Conanicut is probably dictum, the Rhode Island Supreme Court has, in at least one analogous context, made insurers liable for judgments in excess of their policy limits. Asermely v. Allstate Ins. Co., 728 A.2d 461, 464 (R.I. 1999) (creating a rule that would force an insurer to pay a judgment in excess of a policy's limit when that insurer refuses to settle a claim within that limit, unless it can show

breaching insurer may be had in excess of the policy limit). As previously mentioned, this figure, while it was only about $711,000 as of October 2006, is likely to exceed $100 million in the end.[36] Considering the fact that the jury has already absolved Century of any indemnity obligation, this penalty would be more than unreasonable - it would be completely irrational.[37]

If this Court were merely a reflexive appendage of the State, it might well be inclined to follow Emhart's advice and push Century from the ledge. But a federal judge is not a ventriloquist dummy;[38] his or her "prediction cannot be the product of a mere recitation of previously decided cases." McKenna v. Ortho Pharm.

---

that the insured was unwilling to do so). This gives Conanicut's dictum, even though its potential impact may not have been carefully considered at the time, a certain air of authority.

[36] It should be noted that, because the amount of indemnity costs is just a measure of punitive damages (as opposed to an award for the breach of the duty to indemnify), Century would have to pay the full amount even if the Court had agreed (it did not) that proration was the appropriate allocative tool for this case.

[37] Because the Court ultimately does not apply Conanicut to these facts, Century's argument under the Due Process Clause need not be addressed. See State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 418-29 (2003) (holding that an award of $145 million in punitive damages on a $1 million compensatory judgment violated due process).

[38] Apologies here to Judge Jerome Frank, the esteemed jurist to whom this colorful metaphor is attributed. See Richardson v. Comm'r, 126 F.2d 562, 567 (2d Cir. 1942) (criticizing what was then the prevailing view of Erie's mandate); see also 19 Charles Alan Wright et al., Federal Practice and Procedure § 4507 at 123 (2d ed. 1996) (describing the evolution of the Erie doctrine).

Corp., 622 F.2d 657, 662 (3d Cir. 1980). As Professors Wright and Miller and their colleagues have explained,

> Unless a federal court is allowed this much freedom and flexibility, the Erie doctrine simply would have substituted one kind of forum-shopping for another. The lawyer whose case was dependent on an ancient or shaky state court decision that might no longer be followed within the state would have a strong incentive to bring the suit in or remove it to federal court, hoping that the state decision could not be impeached under the mechanical application of existing precedents that the Erie doctrine once was thought to require. Moreover, to give state court decisions more binding effect than they would have in the state court system would undermine the ability of the federal courts to ensure that the outcome of the litigation be substantially the same as it would be if tried in a state court and subjected to that system's appellate process.

19 Federal Practice and Procedure § 4507 at 140-41. For this reason, a federal court may, in a sense, "overrule" an outmoded decision by predicting that the state's highest court would, if presented with the opportunity, do the same. See, e.g., Quint v. A.E. Staley Mfg. Co., 172 F.3d 1, 17 (1st Cir. 1999); Carlton v. Worcester Inc. Co., 923 F.2d 1, 3 & n.5 (1st Cir. 1991); In re Ryan, 851 F.2d 502, 509 (1st Cir. 1988).[39]

---

[39] Such predictions have been rare. See, e.g., Provencher v. Berman, 699 F.2d 568, 570 (1st Cir. 1983) (predicting that Massachusetts would follow what had become a "virtually universal" rule of property law, notwithstanding an 1878 Supreme Judicial Court case to the contrary); Mason v. Am. Emery Wheel Works, 241 F.2d 906, 909 (1st Cir. 1957) (predicting that the Supreme Court of Mississippi would agree with the "overwhelming weight of authority" and overrule a decision that, in the thirty years since its issuance, had become a minority rule).

There are several compelling grounds for doing so here. Conanicut's estoppel rationale has been rejected by numerous jurisdictions. See, e.g., Elliott, 711 A.2d at 1313; Sentinel Ins. Co. v. First Ins. Co. of Haw., Ltd., 875 P.2d 894, 911 (Haw. 1994); Polaroid Corp. v. Travelers Indem. Co., 610 N.E.2d 912, 921 (Mass. 1993). They recognize that, in cases (such as this one) where there is no duty to indemnify, estoppel forces the insurer to cover claims it never agreed to cover. By expanding the scope of coverage in this way, Conanicut blurs the much-touted distinction between the duty to defend and the duty to indemnify; in fact, it makes them indistinguishable. For this and other reasons, it has come to represent the minority view. See 14 Couch on Insurance § 205:73; 1 Insurance Claims & Disputes § 4:37; 1 Handbook on Insurance Coverage Disputes § 5.06[a] at 315; Susan Randall, Redefining the Insurer's Duty to Defend, 2 Conn. Ins. L.J. 221, 230 n.24 (1997); Todd J. Weiss, A Natural Law Approach to Remedies For the Liability Insurer's Breach of the Duty to Defend: Is Estoppel of Coverage Defenses Just?, 57 Alb. L. Rev. 145, 147 (1993).

Moreover, Conanicut has been undermined by several recent pronouncements of Rhode Island's highest court. On at least five occasions since Conanicut (and without referencing it), the court has held that estoppel could not be invoked to expand the scope of coverage of an insurance policy. Zarrella v. Minn. Mut. Life Ins. Co., 824 A.2d 1249, 1260-61 (R.I. 2003); Leiter v. Allstate Ins.

Co., 725 A.2d 882, 883 (R.I. 1999) (per curiam); D'Antuono v. Narragansett Bay Ins. Co., 721 A.2d 834, 836-37 (R.I. 1998) (per curiam); Gen. Accident Ins., 716 A.2d at 755; Martinelli v. Travelers Ins. Cos., 687 A.2d 443, 447 (R.I. 1996). Yet that is precisely what Emhart seeks here.

It is also difficult to ignore the fact that no Rhode Island court has applied Conanicut in its twenty-year tenure. Emhart observes that Magistrate Judge Lovegreen applied Conanicut in Michaud v. Merrimack Mut. Fire Ins. Co., 1994 WL 774683 at *7-*9 (D.R.I. Nov. 16, 1994), an unpublished opinion that appears to have been settled before it could be either accepted or rejected by the district court. What Emhart overlooks is that Michaud presented facts closely analogous to Conanicut; and even then, its application invoked stinging criticism from a federal magistrate who felt constrained by the bounds of Erie. See Michaud, 1994 WL 774683 at *9.

These data strongly suggest that Conanicut has lost its persuasive force. But as tempting as it may be to predict Conanicut's fate, the issue in this case can be resolved without taking that step. In Robertson Stephens, Inc. v. Chubb Corp., 473 F. Supp. 2d 265 (D.R.I. 2007), an insured asked this Court to apply a state holding that would have allowed it to proceed against its insurer's independent administrator in negligence. Id. at 276-78 (discussing Forte Bros. Inc. v. Nat'l Amusements, Inc., 525 A.2d

1301 (R.I. 1987) (holding that a supervising architect owed a duty of care to its general contractor's independent excavator)). The holding had superficial appeal to the facts in Robertson, and, if this Court had a broader mandate, might have extended it to the insurance context. See id. at 277-78. But without any indication that Rhode Island's highest court would have done so, this writer refused to "pioneer[] new frontiers in the law of negligence on its own." Id. at 278-81.

Like the insured in Robertson, Emhart points to no persuasive authority that would suggest a future extension of Conanicut's holding beyond the ubiquitous facts of that case. Only a single trial justice has even mentioned Conanicut (without applying it) in the Superfund context. Kayser-Roth, 1999 WL 813661 at *48. On appeal, however, the Rhode Island Supreme Court (tellingly) did not, choosing, instead, to remand many of the issues that the trial justice had prematurely considered. See Kayser-Roth, 770 A.2d at 419. In any event, trial court decisions are of limited (if any) value to this inquiry. See Diesel Serv. Co. v. AMBAC Int'l Corp., 961 F.2d 635, 639 (7th Cir. 1992), overruled in part by Generac Corp. V. Caterpillar Inc., 172 F3d 971, 974-75 (7th Cir. 1999) ("While we will always follow a state supreme court's interpretation of its law, an unclear opinion from a single state trial court is not binding."). Moreover, appellate courts that have addressed Conanicut within the context of an underlying CERCLA

action (all outside of this jurisdiction) have rejected it wholesale, as discussed above. See, e.g., Polaroid, 610 N.E.2d at 921.

Superfund cases typically involve millions of dollars (here, perhaps over $100 million) of liability, which is joint and several and strict. If the Rhode Island Supreme Court wishes to impose such a drastic penalty on breaching insurers as a mechanism to police the limits of the duty to defend, it could, of course, do so in this or any other context. But federal courts are not sounding boards for avant-garde theories of insurance law. See Robertson, 473 F. Supp. 2d at 280-81; see also Bucci v. Essex Ins. Co., 393 F.3d 285, 293-95 (1st Cir. 2005) (refusing to expand a similar Maine law beyond its present limits). And it is not for this Court, sitting in diversity, to make outlandish predictions for an insured who deliberately chose this forum instead of the state court. Robertson, 473 F. Supp. 2d at 280-81; see also Ryan v. Royal Ins. Co. of Am., 916 F.2d 731, 744 (1st Cir. 1990) ("[L]itigants who reject a state forum in order to bring suit in federal court under diversity jurisdiction cannot expect that new trails will be blazed.").

This conclusion would seem to leave a vacuum, and, as a result, the need for further prophesy. However, the framework for decision is already constructed. In Rhode Island, as in other jurisdictions, the proper measure of damages for breach of contract

is that which the injured party can tie to the breach itself.[40] George v. George F. Berkander, Inc., 169 A.2d 370, 372 (R.I. 1961) (limiting recovery to the amount that "may fairly and reasonably be considered . . . arising naturally, i.e., according to the usual course of things, from such breach of contract itself"); accord Polaroid, 610 N.E.2d at 921 (Massachusetts law). Here, Emhart has not proven any contract damages beyond the costs of defense. Emhart's recovery, therefore, is limited to the amount set forth supra Part II.C.1.

C. The Duty to Indemnify

Emhart's motions for renewed judgment as a matter of law, new trial, and certification remain. They raise a total of ten issues among them. One issue (breach of the duty to defend) has been addressed above, see supra Part II.B.2, and requires no further discussion. The rest (some of which have been discussed at least in part on previous occasions) will be addressed below, following the applicable standards of review.

In prototypical circumstances, "[a] motion for judgment as a matter of law only may be granted when, after examining the evidence of record and drawing all reasonable inferences in favor of the nonmoving party, the record reveals no sufficient

---

[40] This familiar rule traces its roots to Hadley v. Baxendale, 156 Eng. Rep. 145, 151 (Ex. 1854), as adopted by the Rhode Island Supreme Court in Greene v. Creighton, 7 R.I. 1, 9 (1861). See Quill Co. v. A.T. Cross Co., 477 A.2d 939, 942-43 (R.I. 1984).

evidentiary basis for the verdict." Zimmerman v. Direct Fed. Credit Union, 262 F.3d 70, 75 (1st Cir. 2001). A reviewing court must "recount the facts in the light most favorable to plaintiffs, drawing all reasonable inferences in their favor," Lama v. Borras, 16 F.3d 473, 475 (1st Cir. 1994), and cannot "evaluate the credibility of witnesses or the weight of the evidence." Id. "In the end, the jury's verdict must stand unless the evidence, taken in the light most favorable to the prevailing party, points unerringly to an opposite conclusion." Zimmerman, 262 F.3d at 75.

The standard is more exacting, however, when the moving party bears the burden of proof of the issue in question. Marrero v. Goya of P.R., Inc., 304 F.3d 7, 22 (1st Cir. 2002). As the Third Circuit has explained,

> it requires the judge to test the body of evidence not for its insufficiency to support a finding, but rather for its overwhelming effect. He must be able to say not only that there is sufficient evidence to support the finding, even though other evidence could support as well a contrary finding, but additionally that there is insufficient evidence for permitting any different finding. The ultimate conclusion that there is no genuine issue of fact depends not on a failure to prove at least enough so that the controverted fact can be inferred, but rather depends on making impossible any other equally strong inferences once the fact in issue is at least inferable.

Mihalchak v. Am. Dredging Co., 266 F.2d 875, 877 (3d Cir. 1959) (footnote omitted). To succeed under these circumstances, the moving party must establish its case by "testimony that the jury is not at liberty to disbelieve," Jordan v. U.S. Lines, Inc., 738 F.2d

48, 49 (1st Cir. 1984), and evidence that is "'uncontradicted and unimpeached.'" Serv. Auto Supply Co. of P.R. v. Harte & Co., 533 F.2d 23, 25 (1st Cir. 1976) (quoting Fed. Ins. Co. v. Summers, 403 F.2d 971, 975-76 (1st Cir. 1968)). For obvious reasons, these obstacles are rarely overcome. Summers, 403 F.2d at 975-76.

The standard for a new trial is similarly burdensome. "A verdict may be set aside and new trial ordered when the verdict is against the clear weight of the evidence, or is based upon evidence which is false, or will result in a clear miscarriage of justice." Fonten Corp. v. Ocean Spray Cranberries, Inc., 469 F.3d 18, 23 (1st Cir. 2006) (quoting Ahern v. Scholz, 85 F.3d 774, 780 (1st Cir. 1996)); see also Coffran v. Hitchcock Clinic, Inc., 683 F.2d 5, 6 (1st Cir. 1982) (observing that a trial judge "should not interfere with the verdict 'unless it is quite clear that the jury has reached a seriously erroneous result.'") (quoting Borras v. Sea-Land Serv., Inc., 586 F.2d 881, 887 (1st Cir. 1978)) (internal quotations omitted).

Finally, a district court may, in its discretion, and if authorized by local procedure, certify important but difficult and unclear issues of applicable state law to a state's highest court.[41] 19 Federal Practice and Procedure § 4507 at 169-79; see Horn v. S. Union Co., 907 A.2d 691, 691 (R.I. 2006) (accepting a certified

[41] The interested reader might consider Bruce M. Selya, Certified Madness: Ask a Silly Question. . ., 29 Suffolk U. L. Rev. 677 (1995), for a thoughtful exegesis of certification practice.

question, pursuant to Rule 6 of Article I of the Supreme Court Rules of Appellate Procedure, from the district court).

This Court must address one threshold matter before moving on to the merits. Emhart casts eight of its ten issues as grounds for renewed judgment as a matter of law under Fed. R. Civ. P. 50(b) ("RJML") against either Century and OneBeacon or North River. Of those issues, Emhart re-designates only two as grounds for new trial under Fed. R. Civ. P. 59 (continuous-trigger and initial-release instructions). To these two issues, Emhart adds the two not designated as grounds for RJML (exclusion of Calabrese testimony and newspaper articles). The problem with this rather odd approach is that all but one of the issues that Emhart has designated for RJML exclusively are more appropriately heard as grounds for new trial, attacking, as they do, aspects of the jury instructions. <u>See</u> <u>Goodman v. Bowdoin Coll.</u>, 380 F.3d 33, 47 (1st Cir. 2004). And the one issue that is appropriate for RJML (overwhelming effect of the discoverability evidence) is waived because Emhart did not raise it as a specific ground for judgment as a matter of law under Fed. R. Civ. P. 50(a).[42] <u>See</u> <u>Correa v. Hosp. San Francisco</u>, 69 F.3d 1184, 1195-96 (1st Cir. 1995);

---

[42] The fact that Emhart raised a related issue (overwhelming effect of the expect-or-intend evidence) does not preclude waiver because the two issues are not "inextricably intertwined." <u>See</u> <u>Chrabaszcz</u>, 474 F. Supp. 2d at 307-08 (quoting and discussing <u>Rockport Pharmacy, Inc. v. Digital Simplistics, Inc.</u>, 53 F.3d 195, 198 (8th Cir. 1995)).

Chrabaszcz v. Johnston Sch. Comm., 474 F. Supp. 2d 298, 306-08 (D.R.I. 2007).

That said, the Court will construe these orphan arguments, with the exception of the discoverability issue,[43] as arguments for new trial.

1. Continuous-Trigger Instruction. This issue has already been discussed (and essentially rejected) in the context of allocation. See supra Part II.B.1. For over a decade, Rhode Island courts have used the discovery/manifestation/discoverability trigger announced in CPC, 668 A.2d at 649. See Textron-Wheatfield, 754 A.2d at 745-46; Textron-Gastonia, 723 A.2d at 1144. Attempts to change it have failed. See Textron-Gastonia, 723 A.2d at 1141; see also Truk-Away, 723 A.2d at 313-14. By refusing to instruct the jury on a continuous trigger, this Court was simply following clearly-established Rhode Island law. If Emhart thought that this case would usher the continuous-trigger theory into the hearts and minds of Rhode Island jurists, it chose poorly in filing here. See, e.g., Ryan, 916 F.2d at 744; Robertson Stephens, 473 F. Supp. 2d at 281.

---

[43] However, were the Court to consider this argument under the rubric of Rule 59, it would find that the jury correctly determined that dioxin was not reasonably discoverable at the Site in 1969 because (1) a duly diligent Crown Metro had no reason to test for dioxin or other toxins that could have led to it, and (2) reasonably available technologies could not have detected it.

For the same reason, Emhart's alternate request to certify this issue to the Rhode Island Supreme Court is denied. See Croteau v. Olin Corp., 884 F.2d 45, 46 (1st Cir. 1989) ("[O]ne who chooses to litigate his state action in the federal forum (as plaintiff did here) must ordinarily accept the federal court's reasonable interpretation of extant state law rather than seeking extensions via the certification process."). Even if Emhart had no choice but to file in federal court (it did not), it should have sought certification within a reasonable time after initiating these proceedings, not almost five years later (and certainly not after the jury verdict). See Santiago v. Sherwin Williams Co., 3 F.3d 546, 548 (1st Cir. 1993) (denying a request for certification in part because five years had passed since the suit commenced).

2. Objective-Standard Instruction. Emhart claims that the Court's discoverability instruction should have incorporated an objective rather than a subjective standard. Emhart misconstrues the instruction given. The Court said, at least twice, that discoverability depended on the exercise of reasonable diligence, not the diligence that Crown Metro would have exercised in some subjective sense. The use of Crown Metro's name within the elements of discoverability (e.g., "did Crown Metro have a reason to test for dioxin contamination at the site") was a tool to help the jury understand its task. It did not trick the jury into applying a more burdensome standard, as Emhart suggests. See Brown

v. Trs. of Boston Univ., 891 F.2d 337, 353 (1st Cir. 1989) ("Our principle focus in reviewing jury instructions is to determine whether they tended to confuse or mislead the jury on the controlling issues.") (citation omitted). Indeed, the Rhode Island Supreme Court has framed the discoverability inquiry in the same way. Textron-Wheatfield, 754 A.2d at 745 ("the insured had reason to test for the property damage") (emphasis supplied); Textron-Gastonia, 723 A.2d at 1144 ("Textron must have had some reason to test for the contamination") (emphasis supplied). For reasons previously discussed, Emhart's alternate request to certify this issue to the Rhode Island Supreme Court is denied as well. See supra Part II.C.1.

3. Leaks-and-Spills Instruction. Emhart also claims that the Court should have instructed the jury that "leaks and spills of chemicals suffice to create a reason to test." To support this instruction, Emhart relies on Textron-Gastonia. There, Emhart observes, the court found that testimony of leaks and spills could have given the insured a reason to test for contamination. Textron-Gastonia, 723 A.2d at 1144. But Emhart ignores the fact that Textron-Gastonia (and Textron-Wheatfield too) was an appeal from a summary judgment decision in favor of the insurer. Reversing, the court found that the reason-to-test prong was in dispute based in part on that testimony, viewed, under the appropriate standard of review, in the light most favorable to the

insured. Textron-Gastonia, 723 A.2d at 1144. Whether that testimony alone satisfied the insured's burden of proof was a question left for determination on remand. Transmuting some form of this circumscribed language into an affirmative instruction, as Emhart requested, would have been inappropriate if not erroneous.

4. Exclusion of Calabrese Testimony. Dr. Edward Calabrese is a toxicologist that North River designated as an expert prior to trial. When North River decided during the course of trial not to call him as a witness, Emhart served Dr. Calabrese with a subpoena to testify on its behalf. North River, in response, successfully moved to quash the subpoena. Emhart argues that it should have been allowed to call Dr. Calabrese, and that, because it was not, a new trial is required. This argument is without merit. During voir dire, North River identified Dr. Calabrese as a witness that it would call at trial – a fact the jury was likely to remember. If Emhart had called and questioned Dr. Calabrese instead, the jury might have inferred that North River was trying to silence his opinion by not seeking it. As a consequence of this inference, the jury might have afforded unique and undue weight to Dr. Calabrese's opinion simply because he was called by North River's adversary. See 8 Federal Practice and Procedure § 2032 at 447. Sometimes that risk of prejudice cannot be avoided, of course. See, e.g., House v. Combined Ins. Co. of Am., 168 F.R.D. 236, 247-48 (N.D. Iowa 1996) (allowing a treating

psychiatrist to testify on behalf of the opposing party based on a showing of "exceptional circumstances"). But that was not the case here: Emhart's own experts had already opined on the precise issues that Dr. Calabrese would have discussed. See id.; see also Durflinger v. Artiles, 727 F.2d 888, 891 (10th Cir. 1984). His testimony, therefore, was cumulative, unnecessary, and certainly not worth prejudicing North River to get it. (See the Court's oral ruling, Trial Tr. 86-88, Sept. 27, 2006, for further discussion of this issue.)

5. Choice of Law for the North River Policy. In the mid-1980s, North River issued a Commercial Comprehensive Catastrophe Liability Policy No. 5233131099 (the "North River Policy") to Emhart Corporation (a latter-day predecessor of Emhart Industries, Inc.). The North River Policy provides coverage between January 1, 1984, and January 1, 1985, with a $15 million limit of liability, and, like the Century and OneBeacon policies, contains no choice-of-law provision. In early 2004, Magistrate Judge Lovegreen issued a thorough report (which this Court accepted, see Dkt. Entry #238) recommending, among other things, the application of New York law to the North River Policy. (Dkt. Entry #220, Report and Recommendation, Emhart v. Home Ins. Co., No. 02-53 at *33-*39 (D.R.I. Feb. 15, 2004) (discussing and applying DeCesare v. Lincoln Benefit Life Co., 853 A.2d 474, 483-84 (R.I. 2004).) Emhart (who unsuccessfully objected to that aspect of the

report) argues that Rhode Island choice-of-law rules compel the application of Rhode Island law instead. The Court disagrees, and sees little value in reiterating why, other than to state that DeCesare is still good law.

6. Initial-Release Instruction. An exclusion in the North River Policy (the so-called and litigious sudden-and-accidental exclusion) provides no coverage

> to liability arising out of the discharge, dispersal, release, or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water, but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

Emhart argues that the Court's discoverability instruction overlooked the word "dispersal" above by focusing exclusively on the initial release of contaminants, and not their subsequent dissemination. The argument draws from a command of the English language, and an infirm decision of New York's appellate division. See Farm Family Mut. Ins. Co. v. Bagley, 409 N.Y.S.2d 294, 296 (N.Y. App. Div. 1978) (observing that "the word 'dispersal' may refer to the original release or it may refer to a secondary dissemination after the original release").

However compelling in the abstract, Emhart's argument is squarely at odds with more recent pronouncements of New York law. See, e.g., Northville Indus. Corp. v. Nat'l Union Fire Ins. Co., 679 N.E.2d 1044, 1048 (N.Y. 1997) ("The focus in determining

whether the temporally sudden discharge requirement is met, for the purpose of nullifying the pollution coverage exclusion, is on the initial release of the pollutant, not on . . . the timespan of the eventual dispersal of the discharged pollutant in the environment.") (emphasis altered); Redding-Hunter Inc. v. Aetna Cas. & Sur. Co., 615 N.Y.S.2d 133, 135 (N.Y. App. Div. 1994) (observing that "the focus of the exclusion and its exception is the initial placement of wastes into the land and not the subsequent migration") (emphasis supplied); Technicon Elec. Corp. v. Am. Home Assurance Co., 533 N.Y.S.2d 91, 100-01 (N.Y. App. Div. 1988) (rejecting a nearly identical argument, and, in the process, expressly declining to follow Farm Family).

Emhart says that Northville's reference to "dispersal" is dictum, and that the appellate division is divided on the issue. Both contentions are probably not correct, but there is little need to quibble: even as dictum, this Court would apply Northville and reject Emhart's argument. See 19 Federal Practice and Procedure § 4507 at 166-67 ("[A] carefully considered statement by the state court, even though technically dictum, certainly is persuasive evidence of how the state court might decide the point, and, in the absence of any conflicting indication of the law of the state, even may be regarded as conclusive."); cf. United States v. Santana, 6 F.3d 1, 9 (1st Cir. 1993) ("Carefully considered statements of the Supreme Court, even if technically dictum, must be accorded great

weight and should be treated as authoritative when, as in this instance, badges of reliability abound.").

7. Response to the Jury's Question. During its deliberations, the jury asked the following question: "[C]ould a series of small, sudden and accidental events, which may have caused a small percentage of the overall property damage be enough to satisfy the 'sudden and accidental' provision[?]" (Trial Tr. 6, Oct. 19, 2006.) In response, the Court explained that more than one release could satisfy the exclusion's exception, but that each release must be significant enough to have some potentially damaging environmental effect. (Trial Tr. 8, Oct. 19, 2006.) Emhart argues that the Court should have simply answered the jury's question in the affirmative. By not doing so, the argument goes, the Court failed to respond to the jury's source of confusion and, moreover, signaled a disbelief that the releases were sudden and accidental. Emhart has it backwards. A simple affirmative response from the Court might have signaled a belief in Emhart's position on the issue, inappropriately influencing the jury's fact finding. Arizona v. Johnson, 351 F.3d 988, 994 (9th Cir. 2003) (holding that district courts must exercise caution when a "simple affirmative or negative response might favor one party's position, place undue weight on certain evidence, or indicate that the trial judge believes certain facts to be true when such matters should properly be determined by the jury"); United States v. Lakich, 23

F.3d 1203, 1209 (7th Cir. 1994) (noting that a district court "would have risked intruding on the jury's fact-finding" if it had given "a simple affirmative answer" to the jury's question); see also United States v. Roberson, 459 F.3d 39, 46 (1st Cir. 2006) (observing that a jury cannot shift its fact-finding responsibility to a district court in the form of a question). The much safer course here was to redirect the jury's attention to the original instructions (as clarified by the Court's response).

8. Exclusion of Newspaper Articles. Emhart's final argument centers upon the exclusion of seven newspaper articles that it claims were admissible as "ancient documents" under Fed. R. Evid. 803(16).[44] Although these articles are over twenty years old, and thus "ancient" under Rule 803(16)'s definition of it, they are littered with admissibility issues. The articles describe fires, floods, or like biblical events that consumed or otherwise affected parts of the Site. But none of them talks about or insinuates the release of dioxin, the only contaminant capable of causing a sufficient amount of environmental damage to qualify for coverage under the North River Policy. One article reports flooding without even mentioning the Woonasquatucket River. See Many Forced to Evacuate Homes By Rain-Caused Floods in State, The Providence Journal, March 19, 1968, at 1. Four of them have sensationalistic

---

[44] Rule 803(16) provides that "[s]tatements in a document in existence twenty years or more the authenticity of which is established" are not excluded by the hearsay rule.

headlines. See Tank Explosion Hurls Chemicals, The Providence Journal, Jan. 10, 1968, at 1; Explosions Punctuate Blaze, The Providence Journal, Aug. 29, 1972, at 23; Explosion and Fire Light Up Centredale, The Evening Bulletin, Aug. 29, 1972, at 1; Emergency declared in R.I. After Once-In-Century Deluge, The Providence Journal, June 8, 1982, at B1. And all of them (the two that remain are: Broken Valve Frees Steam At Centredale Chemical Co., The Providence Journal, Oct. 11, 1961, at 25; Vacant Plant Ruined by Fire in Centredale, The Evening Bulletin, July 10, 1972, at 21) contain an additional layer of hearsay (witness accounts) that Emhart does not address. See United States v. Hajda, 135 F.3d 439, 444 (7th Cir. 1998) (holding that "if the [ancient] document contains more than one level of hearsay, an appropriate exception must be found for each level"); Hicks v. Charles Pfizer & Co. Inc., 466 F. Supp. 2d 799, 807 (E.D. Tex. 2005) (adopting the Seventh Circuit's approach in Hajda to harmonize Rule 803(16) and Fed. R. Civ. P. 805). In any event, the insurers did not dispute that these events took place, and Emhart was able to solicit first-hand descriptions of them at trial from several venerable witnesses. The admission of these articles, then, would have been cumulative as well as prejudicial (and with little probative value) in addition to their relevance and hearsay problems.

III. CONCLUSION

For all of these reasons:

(1) Emhart's Renewed Motion for Judgment as a Matter of Law Regarding the Duty to Defend under the Primary Policy is GRANTED; this ruling applies to the Excess Policy as well, but not to the Umbrella Policy or the North River Policy;

(2) Emhart's Renewed Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial Regarding its Claims against Century and OneBeacon is DENIED;

(3) Emhart's Renewed Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial Regarding its Claims against North River is DENIED;

(4) Emhart's Motion for Certification of Questions of Law to the Rhode Island Supreme Court is DENIED;

(5) Century's Motion to Admit Documents is GRANTED as to defense exhibits 241, 246, 295, 298, 300, 304, 378, and 396, but DENIED as to Exhibit I (Resp. of Pl. to Def.'s First Set of Interrogs. and App.) because it is irrelevant;

(6) Century's Motion to Admit defense exhibit 498 (the settlement agreement) is GRANTED; the document shall be placed under seal.

Accordingly, judgment shall enter for Emhart against Century in the amount of $4,211,186.66 plus prejudgment interest pursuant

to R.I. Gen. Laws § 9-21-10. See Buckley v. Brown Plastics Mach., LLC, 368 F. Supp. 2d 167, 169-73 (D.R.I. 2005). Judgment shall enter for the defendants on all remaining counts. Emhart shall file a proposed judgment, along with a supporting memorandum, within ten (10) days. Century shall respond within seven (7) days, unless the parties can agree to the appropriate calculations.

It is so ordered.

William E. Smith
United States District Judge

Date: 9/25/07